UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

MAY 0 8 2002

JUDGE JOHN W DARRAH

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

PETER ROGAN,
BRADDOCK MANAGEMENT L.P. (of California),
BAINBRIDGE MANAGEMENT L.P.,
    f/k/a Braddock Management L.P. (of Illinois),
BAINBRIDGE MANAGEMENT, INC.,
    f/k/a Braddock Management, Inc.,
    f/k/a Waldo Point Management,
        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**02C 33 10**

MAGISTRATE JUDGE LEVIN

## COMPLAINT

The United States of America, by Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, for its complaint states:

### Jurisdiction And Venue

1.    This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact, unjust enrichment, and fraud. This court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

2.    Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

### Parties

3.    Plaintiff, the United States of America, acting through the Department of Health and Human Services (HHS), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (Act), 42 U.S.C. §§ 1395 *et seq.* (Medicare),



and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C.

§§ 1396 *et seq.* (Medicaid).

4.     Defendant Peter Rogan resides at 476 Wexford Road, Valparaiso, Indiana, 46385.

From approximately 1995 through October 22, 1998, Peter Rogan was president of Waldo Point

Management, the general partner of Braddock Management L.P., which operated Edgewater Hospital

and Medical Center, located at 5700 North Ashland Avenue, Chicago, Illinois 60660.  From October

22, 1998 to the present, Peter Rogan was president, secretary, and director of Bainbridge

Management, Inc., f/k/a Braddock Management, Inc., and f/k/a Waldo Point Management, the

general partner of Braddock Management L.P., which operated Edgewater Hospital and Medical

Center, located at 5700 North Ashland Avenue, Chicago, Illinois 60660.  From October 22, 1998

to the present, Peter Rogan has been trustee for the Peter Rogan Revocable Trust, which is the sole

shareholder of Bainbridge Management, Inc., f/k/a Braddock Management, Inc., and f/k/a Waldo

Point Management, the general partner of Braddock Management L.P., which operated Edgewater

Hospital and Medical Center, located at 5700 North Ashland Avenue, Chicago, Illinois 60660.  All

of these entities are located within and/or have done business within the jurisdiction of the court.

5.     Defendant Braddock Management L.P. was a California limited partnership, which

was operated by its general partner, Bainbridge Management, Inc., f/k/a Braddock Management, Inc.,

and f/k/a Waldo Point Management.  From approximately 1995 through March 2000, defendant

Braddock Management L.P. had management contracts with Edgewater. These contracts provided

that defendant Braddock Management L.P. would act as the exclusive manager of the day-to-day

operations of Edgewater, and that defendant Braddock Management L.P. would supervise and

manage all billings, collections, cost reporting, and other financial matters related to the day-to-day

2

operations of the hospital. Beginning in April 1995, Braddock Management L.P.'s limited partner,, was Boulevard Management Ltd. Braddock Management L.P. with its general partner Bainbridge Management, Inc., f/k/a Waldo Point Management and its limited partner Boulevard Investors, Ltd., will be referred to hereinafter as Braddock Management L.P. All of these entities are located within and/or have done business within the jurisdiction of the court.

6.     Defendant Bainbridge Management L.P., f/k/a/ Braddock Management L.P., was an Illinois limited partnership operated by its general partner, Bainbridge Management, Inc., f/k/a Braddock Management, Inc., and f/k/a Waldo Point Management.     Defendant Bainbridge Management L.P. bought out defendant Braddock Management L.P.'s contract with Edgewater effective March 2000, which provided that defendant Bainbridge Management L.P. would act as the exclusive manager of the day-to-day operations of Edgewater, and that defendant Bainbridge Management L.P. would supervise and manage all billings, collections, cost reporting, and other financial matters related to the day-to-day operations of the hospital. Bainbridge Management L.P.'s limited partner was Boulevard Investors Limited.  Bainbridge Management L.P. f/k/a Braddock Management L.P. with its general partner being Bainbridge Management, Inc., f/k/a Waldo Point Management and its limited partner Boulevard Investors, Ltd., will be referred to hereinafter as Bainbridge Management L.P.  All of these entities are located within and/or have done business within the jurisdiction of the court.

7.     Defendant Bainbridge Management Inc., f/k/a Braddock Management, Inc., and f/k/a Waldo Point Management, was the general partner of Braddock Management L.P. and Bainbridge Management L.P., during all times that these respective limited partnerships maintained contracts

with Edgewater.  All of these entities are located within and/or have done business within the

jurisdiction of the court.

### The Law

8.    The False Claims Act (FCA) provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be
> presented, to an officer or employee of the United States Government
> or a member of the Armed Forces of the United States a false or
> fraudulent claim for payment or approval; (2) knowingly makes, uses,
> or causes to be made or used, a false record or statement to get a false
> or fraudulent claim paid or approved by the Government; (3)
> conspires to defraud the Government by getting a false or fraudulent
> claim paid or approved by the Government; . . . or (7) knowingly
> makes, uses, or causes to be made or used, a false record or statement
> to conceal, avoid, or decrease an obligation to pay or transmit money
> or property to the Government,
>
> * * *
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, plus 3 times the amount
> of damages which the Government sustains because of the act of that
> person . . . .
> (b) For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person, with respect to information (1) has
> actual knowledge of the information; (2) acts in deliberate ignorance
> of the truth or falsity of the information; or (3) acts in reckless
> disregard of the truth or falsity of the information, and no proof of
> specific intent to defraud is required.

31 U.S.C. § 3729.

9.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional

concern that payoffs to those who can influence healthcare decisions would result in goods and

services being provided that are medically unnecessary, of poor quality, or even harmful to a

vulnerable patient population.  To protect the integrity of the program from these difficult-to-detect

harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form,

regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

      10.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.

      (b) Illegal remuneration

* * *

    (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

        (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

    shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).  Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties

5

of $50,000 per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

11.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital.  The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

12.     The Stark Statute establishes the clear rule that the United States will not pay for items or services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

13.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider.  *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

14.     In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

15.     As of January 1, 1995, Stark II applied to patient referrals by physicians with a
prohibited financial relationship for the "designated health services" which included inpatient and
outpatient hospital services. *See* 42 U.S.C. § 1395nn(h)(6).

16.     In pertinent part,  the Stark Statute provides:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or
an immediate family member of such physician) has a financial
relationship with an entity specified in paragraph (2), then --

(A) the physician may not make a referral to the entity for the
furnishing of designated health services for which payment
otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim
under this subchapter or bill to any individual, third party
payor, or other entity for designated health services furnished
pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn.

17.     The Stark Statute broadly defines prohibited financial relationships to include any
"compensation" paid directly or indirectly to a referring physician.  The statute's exceptions then
identify specific transactions that will not trigger its referral and billing prohibitions.

18.     For example, compensation paid to a referring physician serving as a consultant to
a hospital will fall within an exception to the statute if the contract (1) is in writing and signed by
the parties; (2) is for a term of at least a year; (3) specifies the services covered, covers all the
services to be provided by the physician, and the aggregate of such services is reasonable and
necessary for the legitimate business purposes of the hospital; and (4) sets the payment for contract
services in advance, consistent with fair market value for services actually rendered, not taking into

7

account the volume or value of the referrals or other business generated between the parties.  42 U.S.C. § 1395nn(e)(3).  Thus, compensation paid to a physician (directly or indirectly) under a medical directorship that exceeds fair market value, for which no actual services are required, or which takes into account the volume or value of the referrals or other business generated between the parties, triggers the referral and payment prohibitions of Stark II with respect to designated health services referred by that physician.

19.     Violation of the statute may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of $15,000 for each service included in a claim for which the entity knew or should have known that payment should not be made under Section 1395nn(g)(1); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knew or should have known was prohibited.  *See* 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

### The Medicare and Medicaid Programs

20.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A.  Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4.

21.     HHS is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.

22.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

23.     As detailed below, defendants submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

24.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

25.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92.

26.     As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

27.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for

the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

28.    Edgewater Hospital was, at all times relevant to this complaint, required to submit annually a hospital cost report to the fiscal intermediary.

29.    During the relevant time period, Medicare payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

30.    Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the hospital cost reports and financial representations made by Edgewater to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

31.    Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

32.    At all times relevant to this complaint, the hospital cost report certification page included the following notice:

> Misrepresentation or falsification of any information contained in this cost
> report may be punishable by criminal, civil and administrative action, fine
> and/or imprisonment under federal law.  Furthermore, if services identified
> in this report were provided or procured through the payment directly or
> indirectly of a kickback or where otherwise illegal, criminal, civil and
> administrative action, fines and/or imprisonment may result.

33.    At all times relevant to this complaint, the responsible provider official was required

to certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is
> a true, correct and complete statement prepared from the books and
> records of the provider in accordance with applicable instructions,
> except as noted.

> I further certify that I am familiar with the laws and regulations
> regarding the provision of health care services, and that the services
> identified in this cost report were provided in compliance with such
> laws and regulations.

34.    Thus, the provider was required to certify that the filed hospital cost report is

(1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*,

that the provider is entitled to reimbursement for the reported costs in accordance with applicable

instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to

the provider; and (4) that the services provided in the cost report were not infected by kickbacks and

were billed in compliance with the Stark Statute.

35.    A hospital is required to disclose all known errors and omissions in its claims for

Medicare reimbursement (including its cost reports) to its fiscal intermediary.  42 U.S.C. § 1320a-

7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A)
> his initial or continued right to any such benefit or payment . . . conceals or
> fails to disclose such event with an intent fraudulently to secure such benefit
> or payment either in a greater amount or quantity than is due or when no such

benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

36.     Edgewater Hospital submitted cost reports at all times material to this complaint. defendants Rogan and Bainbridge caused the cost reports to be submitted and signed by Kenneth W. Huff, vice president of finance, who attested, among other things, to the certification quoted above.

37.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

38.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 *et seq*.

39.     Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

40.     In Illinois, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the Illinois Department of Public Aid for payment.

### The Fraud Scheme

41.     No later than 1995, Bainbridge Management L.P. or its predecessor, Braddock Management L.P. had management contracts with Edgewater Hospital which provided that Bainbridge Management L.P. or Braddock Management L.P. would act as the exclusive manager of the day-to-day operations of the hospital, which included the submission of claims to Medicare and Medicaid for services rendered to patients.

42.    The contracts also provided that Bainbridge Management L.P. or Braddock Management L.P. would create a quality control system at Edgewater, which in fact was the means by which the defendants encouraged and concealed medically unnecessary admissions, tests — including cardiac catheterizations — and a variety of other procedures.

43.    Pursuant to the contracts, Edgewater paid Bainbridge Management L.P. or Braddock Management L.P. a percentage of the hospital's revenues — essentially a commission-based payment.

44.    Beginning in 1995 and continuing at least until December 2000, defendants devised a scheme by which they:

       a.    gave, and caused others to give, kickbacks and bribes in the form of money and other remuneration and incentives to certain doctors, patient recruiters, and other individuals, in exchange for patient referrals (hereinafter referred to as kickbacks);

       b.    disguised the payment of kickbacks as legitimate payments for services, to avoid discovery of the scheme;

       c.    hospitalized patients and caused others to hospitalize patients knowing that these patients did not need to be treated in a hospital and did not meet the Medicare or Medicaid criteria for hospitalization;

       d.    performed and caused others to perform medically unnecessary procedures and testing on certain patients, including but not limited to heart catheterizations, angioplasties, other angiographic and cardiac-related tests and procedures, ultrasounds, CAT scans, blood tests, and x-rays;

e.      generated hospital admissions, and caused others to generate hospital admissions, by giving patients cash or other benefits, by coaching patients to lie about their physical condition, by promising that hospital services would cost the patients nothing, and by falsely representing to certain patients that they needed to be hospitalized, knowing that those patients did not need hospitalization;

f.      created, and caused others to create, false records to justify and support claims submitted to insurers, including false medical records and false business records;

g.      concealed, and caused others to conceal from certain patients material information concerning the payment of kickbacks in exchange for admissions, including the fact that those kickbacks were intended to and did influence the decisions of certain doctors; and

h.      submitted and caused others to submit false and fraudulent claims for payment to Medicare and Medicaid, which included claims relating to medically unnecessary admissions, services, procedures, and testing; and for services rendered to patients who were referred to the hospital in exchange for kickbacks.

45.      Roger Ehmen, an employee of Bainbridge Management L.P. and Braddock Management L.P., served as senior vice president (or with a similar title and responsibilities) for Edgewater at least between 1996 and 2000. His duties included recruiting physicians for the medical staff, entering into contracts with physicians, handling certain complaints from staff, and executing other documents on behalf of the hospital. Ehmen was also charged with maintaining and ultimately increasing the number of patients admitted to the hospital.

46.   Ravi Barnabas, M.D. (Barnabas) was a licensed internist who admitted patients to Edgewater and acted as attending physician for additional patients at Edgewater. Barnabas had contracts with Edgewater for a medical directorship as well as physician recruitment, both of which were signed by Ehmen.

47.   Sheshiqiri Rao Vavilikolanu, M.D. (Rao) was a licensed internist and anesthesiologist who operated a clinic on the south side of Chicago and who referred patients to Edgewater. From approximately April 1, 1997, through May 1999, another owned by Rao, Rao M.D., S.C., had a service contract with Edgewater, under which Rao's company was the exclusive provider of anesthesia services at Edgewater. From approximately November 1997 to February 1998, Rao's company, Florascribe, Inc., had a management services agreement with Edgewater, under which Rao's company was to provide services for Edgewater's detoxification program, which included marketing and coordinating aftercare treatment, signed by Ehmen.

48.   Kumar Kaliana, M.D. (Kumar) was a licensed internist who referred patients to Edgewater. Kumar was barred from participating in the Medicaid program, and was prohibited from submitting claims for payment for services and treatment rendered to Medicaid beneficiaries.

49.   Andrew Cubria (Cubria) at all times relevant to this complaint was a licensed cardiologist who had a who had a medical clinic which was located at Edgewater.

**Payments to Rao and Kumar**

50.   In October 1996, defendants agreed to give Rao a contract to provide anesthesia services at Edgewater. In return, Rao agreed that he would refer a substantial number of patients to Edgewater for admission for medical treatment or for detoxification treatment.

51.     In April 1997, defendants gave or caused others to give Rao's company, Rao, M.D., S.C., a contract that enabled him to bill for all anesthesia services provided at the hospital, in return for patient admissions by Rao to Edgewater.

52.     Between May 1997 and May 1998, defendants paid or caused others to pay Rao, M.D., S.C. approximately $15,000 a month, totaling more than $200,000, in exchange for referring patients for admission to Edgewater.  Rao used $156,000 of those funds to pay Kumar for patients Kumar sent to Edgewater.  Between May 1997 and June 1998, Kumar referred approximately 20 to 30 patients a month to Edgewater.  Rao also paid patient recruiters to refer patients to Edgewater and sent patients from his clinic to Edgewater.

53.     On November 14, 1997, defendants working with Barnabas gave or caused others to give a sham contract to Rao's company, Florascribe, to conceal Edgewater's payments to Rao for patient referrals and admissions.  The contract stated that Florascribe would provide services for Edgewater's detoxification program, including marketing and coordinating aftercare treatment.  In fact, no legitimate marketing or aftercare services were provided.  Between May 1997 and April 1998, defendants paid or caused others to pay Florascribe in excess of $200,000 in exchange for patient admissions.  Rao used some of those funds to pay individuals to recruit patients to be admitted for detoxification treatment at Edgewater.  Rao also referred such patients from his own clinic to Edgewater.

**Recruiting Patients**

54.     Defendants, along with Barnabas, Cubria, Ehmen, Kumar, Rao, and others, generated admissions and caused others to generate admissions to Edgewater by:

16

a.     recruiting homeless persons, substance abusers, and others who were willing to be hospitalized in order to get a meal and a place to stay;

b.     admitting and causing others to admit individuals who did not meet the Medicare or Medicaid criteria for hospital admission;

c.     giving and causing others to give certain individuals cash, cigarettes, and food in order to induce them to seek admission to Edgewater;

d.     coaching and causing others to coach patients to complain of chest pain, dizziness, abdominal pain, and other symptoms, even though the patients did not have these symptoms, in order to create the appearance that a hospital admission was reasonable and medically necessary;

e.     lying and causing others to lie to patients and falsely representing to those patients that they needed to be hospitalized or that they needed certain tests or procedures because of medical problems when, in fact, the patients did not need hospitalization or the specified tests or procedures; and

f.     waiving and causing others to waive Medicare co-payments for patients without making any legitimate effort to collect the co-payments or deductibles.

### Payments to Cubria

55.     For a period of years through at least December 2000, defendants paid or caused to be paid monies exceeding $1,000,000 for television advertising that generated patients for Cubria's medical practice. Defendants paid or caused to be paid these amounts so that Cubria would maintain and/or increase the number of patients he admitted to Edgewater Hospital and to encourage Cubria to help Edgewater increase its revenues.

56.     From approximately 1998 and through at least December 2000, defendants gave a contract or caused a contract to be given to Cubria to act as a medical director for the Cardiac Rehabilitation Program, with payments to Cubria of approximately $48,000 per year. Cubria performed little or no work under the contract. Defendants paid or caused to be paid these amounts to Cubria so that he would maintain and/or increase the number of patients he admitted to Edgewater Hospital and to encourage Cubria to help Edgewater increase its revenues.

### False and Fraudulent Claims and Statements

57.     The physicians to whom defendants provided illegal remuneration and kickbacks and with whom defendants entered into illegal financial relationships referred large volumes of patients, including Medicare and Medicaid patients, to Edgewater Hospital in violation of federal law. Defendants, in turn, submitted claims to Medicare and Medicaid and obtained millions of dollars worth of payments from the United States. Under the False Claims Act, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent because defendants had no entitlement to payment for services provided on referrals from such physicians, or for medically unnecessary services, or for services rendered to patients whose condition did not warrant inpatient care.

58.     Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(2), by making or causing to be made false statements when submitting these claims for payment to Medicare and other government programs. Defendants falsely certified the claims and statements were "true" and/or "correct" and as such were entitled to payment.

59.     To conceal their unlawful conduct and avoid refunding payments made on the false claims, defendants also falsely certified, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7), that the services identified in their annual cost reports were provided in compliance with federal law,

including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report submitted to the government, were part of defendants' unlawful scheme to defraud Medicare and other government healthcare programs.

60.     Defendants, along with Barnabas, Cubria, Ehmen, Kumar, Rao and others, submitted and caused to be submitted false claims to Medicare and Medicaid for payment including:

a.     submitting claims for Medicare payment in violation of Stark II, 42 U.S.C. § 1395nn(a)(2);

b.     falsely representing and causing others to falsely represent that the various medical services provided to patients were medically necessary;

c.     concealing and causing others to conceal the fact that certain admissions were medically unnecessary, that kickbacks had been paid to induce the admissions, and that co-payments had been waived, knowing that such disclosures would result in the denial of those claims; and

d.     creating and causing others to create medical records that contained false entries, false diagnoses, and other false information; creating business records that contained false information to create the appearance that Edgewater had made efforts to collect the co-payments or deductibles when, in fact, the intention all along was to waive those payments in order to get patient admissions.

61.     Defendants, along with Ehmen and others, submitted, and caused to be submitted false cost reports to Medicare for the years 1995, 1996, 1997, 1998, and 1999 with supporting

documents and certifications in order to obtain payments from Medicare knowing that those documents included false representations including:

    a.      The cost reports for 1995, 1996, 1997, 1998, and 1999 each included a certification falsely representing that services provided by the hospital were provided in compliance with pertinent laws and regulations when in fact, defendants knew that they had violated various laws and regulations, including those pertaining to kickbacks, providing medically necessary services, and the waiver of co-payments and deductibles; and

    b.      The cost reports for 1997 and 1998 each included a provider cost report reimbursement questionnaire which contained the false representation that there had been no waivers of Medicare co-payments or deductibles during calendar years 1997 and 1998 when in fact defendants and others had waived and caused to be waived co-payments in order to induce patients to be admitted to Edgewater.

## Amount of Medicare and Medicaid Payments

62.     As a result of Rogan's, Bainbridge Management L.P.'s, and Braddock Management L.P.'s false and fraudulent claims for reimbursement, Medicare reimbursed Edgewater Hospital at least $13, 644,598 in Medicare monies during the period 1995 through 2000; and $4,469,202 in Medicaid monies during the period 1995 through 2000.

63.     In so doing, defendants presented, or caused to be presented, these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

**Criminal Indictment**

64.   On May 17, 2001, a federal grand jury indicted Bainbridge Management, L.P., Ehmen, and Drs. Barnabas, Kumar, and Rao for, among other things, "devising and participating in a scheme to defraud health care providers and to obtain money and property by means of false and fraudulent pretenses and to deprive certain individuals of the intangible right of the defendant's honest services in violation of 18 U.S.C. §§ 1341 and 1347." *United States v. Bainbridge Management, et al.,* No. 01 CR 469, (N.D. Ill.).

65.   On May 24, 2001, Kumar pled guilty to Counts One and Nine of the indictment concerning the acceptance of kickback payments for the admission of patients, and the submission of false claims to Medicare and Medicaid.

66.   On May 24, 2001, Rao pled guilty to Count 57 of the indictment concerning racketeering pursuant to 18 U.S.C. § 1962.

67.   On October 10, 2001, Rao was sentenced to 35 months of incarceration and ordered to pay restitution of $6 million to Medicare and Medicaid.  On the same day, Kumar was sentenced to 16 months of incarceration and ordered to pay restitution of $1,156,000 to Medicare and Medicaid.

68.   On October 1, 2001, Ehmen and Barnabas pled guilty to Count 57 of the indictment concerning racketeering pursuant to 18 U.S.C. § 1962.

69.   On November 28, 2001, Ehmen was sentenced to 78 months of incarceration and ordered to pay restitution of $5 million to Medicare and Medicaid.  On the same day, Barnabas was sentenced to 52 months of incarceration and ordered to pay restitution of $100,000 to Medicare and Medicaid.

70.     On October 4, 2001, the United States filed a superseding indictment against Bainbridge, L.P., and also added defendants Bainbridge, Inc., and Cubria.  The complaint charged Cubria with having performed medically unnecessary invasive procedures, including cardiac catheterizations and angioplasties.

71.     On February 8, 2002, Cubria pled guilty to Count 57 of the indictment concerning racketeering pursuant to 18 U.S.C. § 1962.  Cubria is set to be sentenced on June 28, 2002.

**Count I**
**False Claims Act, 31 U.S.C. § 3729(a)(1)**
**Presenting Claims to Medicare and Medicaid**
**for Services Rendered as a Result of Kickbacks**
**and Presenting Claims for Medically Unnecessary Services**

72.     Plaintiff incorporates by reference paragraphs 1-71 of this complaint as if fully set forth.

73.     Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including medically unnecessary claims and claims for reimbursement for services rendered to patients unlawfully referred to Edgewater facilities by physicians and others to whom defendants provided kickbacks and/or illegal remuneration and/or with whom defendants entered into prohibited financial relationships in violation of the Anti-Kickback Statute and the Stark Statute.

74.     By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

22

## Count II
### False Claims Act, 31 U.S.C. § 3729(a)(2)
### Use of False Statements

75.     Plaintiff incorporates by reference paragraphs 1-71 of this complaint as if fully set forth.

76.     Defendants knowingly made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made and caused to be made by defendants when initially submitting the false claims for interim payments and the false certifications made and caused to be made by defendants in submitting the cost reports as well as false entries in medical records — to get false or fraudulent claims paid and approved by the United States.

77.     By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## Count III
### False Claims Act, 31 U.S.C. § 3729(a)(3)
### Conspiracy to Submit False Claims

78.     Plaintiff incorporates by reference paragraphs 1-71 of this complaint as if fully set forth.

79.     Defendants entered into agreements with certain physicians and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3). As part of the schemes and agreements to obtain reimbursement from the United States in violation of federal laws, defendants conspired to provide kickbacks and illegal remuneration to physicians and others, to engage in prohibited financial relationships with physicians and others in violation of the Anti-

Kickback Statute and the Stark Statute, and to provide health care services to beneficiaries that were not medically necessary or for which inpatient care was not warranted, and to cause the United States to pay claims for health care services based on false claims and false statements that the services were provided in compliance with all laws regarding the provision of health care services whereas they were not so provided.

80.     By virtue of defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty of $5,000 to $10,000 for each violation.

### Count IV
### False Claims Act, 31 U.S.C. § 3729(a)(7)
### False Record to Avoid an Obligation to Refund

81.     Plaintiff incorporates by reference paragraphs 1-71 of this complaint as if fully set forth.

82.     Defendants knowingly made and used or caused to be made or used false records or false statements — *i.e.*, the false certifications made or caused to be made by defendants in submitting the cost reports as well as false entries in medical records — to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

83.     By virtue of the false records or false statements made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

### Count V
### Payment Under Mistake of Fact

84.     Plaintiff incorporates by reference paragraphs 1-71 of this complaint as if fully set forth.

24

85.     This is a claim for the recovery of monies paid by the United States and the State of Illinois to the defendants as a result of mistaken understandings of fact.

86.     The false claims which defendants submitted to the United States' and the State of Illinois' agents were paid by the United States and the State of Illinois based upon mistaken or erroneous understandings of material fact.

87.     The United States and the State of Illinois, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of defendants' certifications and representations, paid defendants certain sums of money to which they were not entitled, and defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States and the State of Illinois.

**Count VI**
**Common Law Fraud**

88.     Plaintiff incorporates by reference paragraphs 1-71 of this complaint as if fully set forth.

89.     Defendants made material and false representations in their cost reports with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentations to its detriment. The United States acted in justifiable reliance upon defendants' misrepresentations by making interim payments on the false claims and then by settling the cost reports at inflated amounts.

90.     Had the true facts been known to the United States, defendants would not have received the interim payments or the inflated amounts on the cost reports.

91.     By reason of these interim payments and the inflated amounts on the cost reports, the United States has been damaged in an amount to be determined at trial.

**Count VII**
**Unjust Enrichment**

92.    Plaintiff incorporates by reference paragraphs 1-71 of this complaint as if fully set forth.

93.    This is a claim for the recovery of monies by which all defendants have been unjustly enriched.

94.    By directly or indirectly obtaining government funds to which they were not entitled, defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States and the State of Illinois.

**Count VIII**
**Disgorgement, Constructive Trust, and Accounting**

95.    Plaintiff incorporates by reference paragraphs 1-71 of this complaint as if fully set forth.

96     This is a claim for disgorgement of profits earned by Edgewater and the defendants because of illegal kickbacks the defendants paid to physicians.

97.    Defendants concealed their illegal activity through false statements, claims, and records, and failed to abide by their duty to disclose such information to the United States and the State of Illinois.

98.    The United States and the State of Illinois did not detect defendants' illegal conduct.

99.    This court has the equitable power to, among other things, order the defendants to disgorge the entire profit the defendants earned from business generated as a result of their violations of the Anti-Kickback Statute, the Stark Statute, state laws and the False Claims Act.

100.    By this claim, the United States and the State of Illinois request a full accounting of all revenues (and interest thereon) and costs incurred by Edgewater and the defendants on referrals from physicians to whom they paid kickbacks, disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States and the State of Illinois on those profits.

### Prayer For Relief

WHEREFORE, plaintiff, United States requests that judgment be entered in its favor and against defendants jointly and severally as follows:

1.    On the First, Second, Third, and Fourth Counts under the False Claims Act for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.    On the Fifth, and Seventh Counts, for payment by mistake and unjust enrichment, for the damages sustained and/or amounts by which the defendants were unjustly enriched or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.    On the Sixth Count, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

4.     On the Eighth Count, for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by defendants and such further equitable relief as may be just and proper.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: *Linda A. Wawzenski*

LINDA A. WAWZENSKI
Assistant United States Attorney
219 South Dearborn Street
Chicago, IL 60604
(312) 353-1994

JS 44
(Rev. 07/89)

**CIVIL COVER SHEET**

DOCKETED

MAY 0 8 200?

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

UNITED STATES OF AMERICA,

JUDGE JOHN W DARRAH

MAGISTRATE JUDGE LEVIN

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

PETER ROGAN, BRADDOCK MANAGEMENT L.P. (of California), BRADDOCK MANAGEMENT L.P. (f/k/a Braddock Management L.P. of Illinois), BRADDOCK MANAGEMENT , INC., f/k/a Braddock Management, Inc., f/k/a Waldo Point Management,

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ Cook
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Linda A. Wawzenski, Assistant U.S. Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312_ 353-1994

ATTORNEYS (IF KNOWN)

02C 3310

**II. BASIS OF JURISDICTION** (PLACE AN × IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN × IN ONE BOX FOR PLAINTIFF)
(For Diversity Cases Only) (AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

31 U.S.C. §§ 3729-33

**V. NATURE OF SUIT** (PLACE AN × IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury— Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R.& Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability |  | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / Habeas Corpus: | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights / ☐ 540 Mandamus & Other |  |  | ☒ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property |  ☐ 550 Other |  |  |  |

**VI. ORIGIN** (PLACE AN × IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint:
**JURY DEMAND:** ☐ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions):

JUDGE _____  DOCKET NUMBER _____

DATE  5/8/02

SIGNATURE OF ATTORNEY OF RECORD  Linda A Wawzenski

UNITED STATES DISTRICT COURT