# Exhibit

# A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 02 C 3310 |
| ) | |
| PETER ROGAN, ) | Judge John W. Darrah |
| ) | |
| Defendant. ) | Magistrate Judge Levin |
| ) | |

**DEFENDANT PETER ROGAN'S FIRST SET OF REQUESTS
FOR ADMISSIONS AND SECOND SET OF INTERROGATORIES TO PLAINTIFF**

Defendant Peter Rogan ("Rogan"), by his attorneys and pursuant to Rule 33 and 36 of the Federal Rules of Civil Procedure, hereby requests that Plaintiff United States of America ("United States" or "Government") admit the truth to the matters contained in Rogan's First Set of Requests for Admissions and respond to Rogan's Second Set of Interrogatories within thirty (30) days of service.

**DEFINITIONS AND INSTRUCTIONS**

1. In accordance with Rule 36 of the Federal Rules of Civil Procedure, the following matters shall be deemed admitted unless a signed answer or objection addressed to the matter(s) is received within thirty (30) days of service.

2. In accordance with Rule 36 of the Federal Rules of Civil Procedure, any denial to the following requests shall fairly meet the substance of the requested admission, and when good faith requires that you qualify your answer or deny only a part of the matter in which the admission is requested, you shall specify so much of it as true and qualify the remainder.

3. "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive. The use of the word "including" shall be construed without limitation.

4. The term "each" shall include the word "every" and "every" shall include the word "each." "Any" shall include the word "all" and "all" shall include the word "any."

5. "You" means Plaintiff United States of America including any of its employees, agents, attorneys, affiliates and anyone acting or purporting to act on its behalf.

6. "Rogan" means Defendant Peter G. Rogan in his individual capacity.

7. "Edgewater" means Edgewater Medical Center, an Illinois not-for-profit corporation, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

8. "Waldo Point Management" means Waldo Point Management, Inc., its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

9. "Braddock Management, Inc." means Braddock Management, Inc., its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

10. "Bainbridge Management, Inc." means Bainbridge Management, Inc., its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys,

subsidiaries, affiliates and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

11. "Bainbridge Management, LP" means Bainbridge Management, LP, an Illinois limited partnership, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

12. "Braddock Management, LP" means Braddock Management, LP, a California limited partnership, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

13. "Cubria" means Andrew Cubria and any agents, attorneys, or anyone acting or purporting to act on his behalf.

14. "Rao" means Sheshiqiri Rao Vavilikolanu and any of his employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on his behalf.

15. "Barnabas" means Ravi Barnabas and any of his employees, agents, attorneys, subsidiaries and anyone acting or purporting to act on his behalf.

16. "Kumar" means Kumar Kaliana and any of his employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on his behalf.

17. "Northside" means Northside Operating Company (d/b/a Edgewater Medical Center), its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

18. "Permian" means Permian Healthcare, Inc., a Colorado not-for-profit corporation, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

19. "Vital" means Vital Community Health Services, Inc., an Illinois not-for-profit corporation, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

20. "Access" means Access Community Health Services, Inc., an Illinois not-for-profit corporation, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf, excluding Peter Rogan.

21. Rogan hereby incorporates all of his instructions and definitions as set forth in Rogan's First Set of Interrogatories.

## ADMISSIONS

1. Rogan did not have any contractual relationship with Edgewater after 1990.

2. Waldo Point Management, Braddock Management, Inc. and Bainbridge Management, Inc. did not have any contractual relationship with Edgewater.

3. Northside had management contracts only with Bainbridge Management, LP and Braddock Management, LP.

4. Rogan did not have a contractual relationship with Northside.

5. Bainbridge Management, Inc. did not have a contractual relationship with Northside.

6. Waldo Point Management did not have a contractual relationship with Northside.

7. Pursuant to their management agreements with Northside, Bainbridge Management, LP and Braddock Management, LP had no authority over the Edgewater medical staff.

8. Bainbridge Management, LP and Braddock Management, LP had no authority, ability or privilege to allow, deny or reject admissions of any patient to Edgewater or Northside.

9. Only members of the medical staff as authorized by the Board of Directors of Northside had authority to admit patients to Northside.

10. Pursuant to the Northside by-laws as well as the management contracts between Braddock Management, LP, Bainbridge Management, LP and Northside, the medical staff was under the control of Northside's Board of Directors.

11. Pursuant to the Northside by-laws and the management contracts between Braddock Management, LP, Bainbridge Management, LP and Northside, Edgewater's medical staff was not under the control of Bainbridge Management, LP or Braddock Management, LP.

12. Northside is a separate and independent corporation from Braddock Management, LP and Bainbridge Management, LP.

13. Rogan did not personally submit any claims to Medicare or Medicaid or any private insurer for reimbursement.

14. Rogan did not personally submit any claims to Medicare or Medicaid or any private insurer for reimbursement on behalf of Edgewater or Northside.

15. Rogan did not create any medical records in connection with the submission of claims to Medicare or Medicaid or any private insurer for reimbursement.

16. Rogan did not submit any CMS 2552 forms, more commonly known as cost reports.

17. Rogan did not sign any CMS 2552 forms, more commonly known as cost reports.

18. Cubria, Rao and Barnabas had contractual relationships with Northside.

19. Rogan did not have any contractual relationship (a) Cubria; (b) Rao; (c) Barnabas; or (d) Kumar.

20. Rogan did not receive any money, compensation or benefit from (a) Kumar; (b) Rao; (c) Barnabas; or (d) Cubria.

21. Rogan did not provide any remuneration, compensation, or pay any money or benefit, to any physician on the medical staff of Northside.

22. Rogan was not on the Board of Directors of Northside.

23. Rogan was not an officer of Northside.

24. Rogan did not incorporate Northside.

25. Rogan did not have an employment agreement with Northside.

26. Rogan was not employed by Northside.

27. Rogan was not on the Board of Directors of Permian.

28. Rogan was not an officer of Permian.

29. Prior to October 1998, Permian appointed the Board of Directors of Northside.

30. Between October 1998 and 2000, Northside elected the Board of Directors of Northside.

31. Beginning in 2000, Vital or Access elected the Board of Directors of Northside.

32. Rogan was not on the Board of Directors of Access or Vital.

33. Rogan was not an officer of Access or Vital

34. Northside's Board of Directors and medical staff were responsible for medical staff quality assurance pursuant to medical staff by-laws and Northside's Quality Assurance plans.

35. Pursuant to the by-laws of Northside's medical staff, Rogan was not responsible for medical care quality assurance.

36. Pursuant to Northside's Articles of Incorporation and by-laws between 1994 and 1998, a majority of the board of directors of Northside had to be a majority of the board of directors of Permian.

37. Between 1994 and 1998, Permian could at any time change the composition, structure and personnel of the Northside Board of Directors.

38. The Government has a policy or procedure that requires the preparation of a 302 report within five days after an interview is conducted.

39. At the time Rao agreed to record conversations of others, he had a specific agreement with the Government that the U.S. Attorney's Office would recommend to the Court a 50% downward departure to his sentence.

7

40. The Government did not investigate the group that provided anesthesia services at Edgewater after Rao was terminated.

41. Rao's termination letter stated that the reason for Rao's termination was the inadequate anesthesia services provided regarding the completion of quality assurance activities as called for by the contract between Northside and Rao.

42. The government recommended that Rao attempt to record conversations between himself and Rogan.

43. On August 24, 1996, Rogan denied that Edgewater paid to doctors to admit patients in Rao's only recorded conversation involving himself and Rogan.

44. After hearing the content of the recorded conversation between Rao and Rogan, the Government never instructed Rao or anyone else to record another conversation involving Rogan.

45. Dr. Saudye, Dr. Maynulet, Dr. Zanetti, Dr. Garlovski, Dr. Rao, Dr. J.K. Kim, Del Patulo, Judy Lunde and Naomi Lopez-Delvecchio did not tell Rogan about any problems concerning cardiac catheterizations performed by Cubria.

46. Roger Ehmen did not tell Rogan about any problems concerning cardiac catheterizations performed by Cubria.

47. Cubria never told Rogan that he was performing unnecessary medical procedures.

48. Attorneys from the U.S. Attorney's Office prepared the statement that was read to the grand jury by Ehmen.

49. Rogan was not aware that Cubria was not fulfilling the duties required under the contracts he had with Edgewater.

50. There was nothing in the terms of the contracts between Edgewater and Edgewater staff members that indicated illegal activity.

51. Rogan's only connection to an alleged scheme to provide kickbacks to doctors and other patient recruiters in exchange for patient referrals is that Rogan approved some physician contracts for services.

52. The Government did not investigate whether or not Edgewater had in place a procedure for the consideration and approval of physician contracts for services.

53. Rogan's only connection to the allegation of disguising the payment of kickbacks as legitimate payments for services is that Rogan approved some physician contracts.

54. Rogan's only connection to the allegation of hospitalizing patients with the knowledge that those patients did not need hospitalization and did not meet Medicare and Medicaid criteria for hospitalization is that Rogan approved some physician contracts.

55. Rogan did not instruct physicians or others to hospitalize or assist in hospitalizing patients that he knew did not need to be treated in a hospital.

56. Rogan did not instruct Cubria to perform or have others perform medically unnecessary procedures.

57. Rogan did not instruct physicians to falsify records.

58. Rogan did not personally falsify patient records.

59. Rogan did not tell Roger Ehmen to conceal payments of kickbacks.

60. Rogan did not tell others to conceal the payment of kickbacks.

61. As of February 11, 2004, the government had not concluded that Rogan paid money to Anthony Todd or Universal Geriatrics to refer patients to Edgewater.

9

## INTERROGATORIES

1. For each and every Request to Admit denied by Plaintiff, identify the basis for Plaintiff's denial, including, but not limited to, identifying each fact and document that supports your denial and identifying each person who, to your knowledge, information, or belief, has or claims to have knowledge that supports your denial.

Dated: August 10, 2004

Howard M. Pearl
Neil E. Holmen
Joseph A. Spiegler
Monika M. Blacha
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

Respectfully submitted,

PETER G. ROGAN

By: *Monika Blacha*
One of his attorneys

11

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that I caused a copy of the foregoing DEFENDANT PETER ROGAN'S FIRST SET OF REQUESTS FOR ADMISSIONS and SECOND SET OF INTERROGATORIES on the following individuals as indicated on this _12_ th day of August, 2004:

Linda A. Wawzenski
Assistant United States Attorney
U.S. Attorney's Office
  for the Northern District of Illinois
Federal Dirksen Building
219 S. Dearborn St.
Chicago, IL 60604
(via messenger and facsimile)

Laurie A. Oberembt
United States Department of Justice
601 D Street, Northwest
Room 6532
Washington DC 20530
(202) 305-7868 (fax)
(via overnight delivery and facsimile)

*Monika Blake*