UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No. |
| | ) | 02 C 3310 |
| Plaintiff, | ) | |
| | ) | Judge Darrah |
| | ) | |
| v. | ) | |
| | ) | |
| PETER ROGAN, | ) | |
| | ) | |
| Defendant. | ) | |

**TRIAL BRIEF OF THE UNITED STATES**

Peter Rogan, a former owner and CEO of Edgewater Medical Center (Edgewater or
the hospital), devised and orchestrated a kickback scheme that offered several physicians
illegal remuneration in exchange for their promises to refer patients to Edgewater. The
kickback schemes and assorted criminal activities at the hospital resulted in the indictment of
five individuals, as well as the management company Rogan helped create to run the hospital,
all of whom eventually pled guilty to criminal charges. The criminal conspiracy led to the
financial collapse and eventual bankruptcy of the hospital, but not before Rogan caused
Edgewater to submit approximately $18 million in false claims to the Medicare and Medicaid
programs between 1995 and 2000. The United States is entitled to recover against Rogan
under the False Claims Act (FCA) and the common law for the damages it has suffered
through its payments to Edgewater for services provided to patients referred to the hospital by
physicians involved in this illegal kickback scheme.

## I. FACTUAL BACKGROUND

**A.**    **Background**

Peter Rogan served as the Chief Executive Officer of Edgewater between 1991 and approximately October of 1997. Even after relinquishing the title of CEO in late 1997, Rogan continued to supervise the individual who assumed that title, and remained effectively in charge of Edgewater until May 2001.

Rogan's financial relationship with Edgewater was far more intricate than simply serving as its salaried CEO for a period of time. In January 1989, Rogan formed an entity called Edgewater Operating Company (EOC) in order to purchase Edgewater, which was then undergoing serious financial difficulties. EOC purchased the hospital for approximately $1 million in cash (along with assumption of certain hospital liabilities); Rogan was EOC's only shareholder at the time of the purchase and he had a majority stake in Edgewater until he sold the facility for approximately $35 million in August, 1994. The terms of EOC's sale of the hospital ensured that a Rogan-controlled entity, Braddock Management, L.P. (Braddock), would operate Edgewater, with Rogan formally serving as CEO of the hospital.

Braddock entered into a series of management contracts with Edgewater, providing that Braddock would act as the exclusive manager of the day-to-day operations of the hospital, which included the submission of claims to Medicare and Medicaid for services rendered to patients, and would supervise and manage all billings, collections, cost reporting, and other financial matters related to hospital operations. As part of a corporate reorganization in 2000 that Rogan approved, Bainbridge Management L.P. (Bainbridge), another Rogan-controlled

entity, bought out Braddock's contract with Edgewater effective March 2000. As before, the management contract provided that Bainbridge would act as the exclusive manager of the day-to-day operations of Edgewater, and that Bainbridge would supervise and manage all billings, collections, cost reporting, and other financial matters related to the day-to-day operations of the hospital.

Pursuant to these management contracts, Edgewater paid Braddock and later Bainbridge a monthly fee <u>and</u> a monthly percentage of the hospital's revenues — essentially a commission-based payment. Rogan received a personal salary from Braddock as CEO of Edgewater, as well as bonuses from the hospital's Board of Directors that depended on the hospital's financial performance.

## B.     <u>The Scheme</u>

In order to ensure that the hospital maximized its revenue, Rogan arranged to pay several physicians substantial kickbacks in exchange for their referral of patients to Edgewater. Rogan directly negotiated several of these kickback arrangements with physicians; in other instances, he worked through a subordinate, Roger Ehmen, to enter into these deals. The kickback arrangements often took the form of contracts in which the hospital agreed to pay particular physicians for some facially legitimate set of services, be it teaching the hospital's medical residents, serving as a medical director for a hospital department or program, or, in one instance, administering the hospital's anesthesia department. These contracts enabled Rogan to disguise the kickbacks as legitimate payments for services to be rendered. In fact, many of the hospital's physician contracts were utter shams, with little or no

expectation on the part of Rogan that the physician's contractual obligations would be fulfilled. In all instances, the contracts at issue in this case were awarded with the understanding that the physician would be providing a steady volume of patient referrals to Edgewater.

Ravi Barnabas, M.D. (Barnabas) was an internist who admitted patients to Edgewater and acted as the attending physician for additional patients at Edgewater. As a successful primary care physician, Barnabas had a significant patient base. In 1993, in order to secure patient referrals from Barnabas, Rogan and Ehmen agreed to pay him $60,000 annually, ostensibly for physician recruitment services. In fact, the contract provided to (and signed by) Barnabas in 1993 was a _teaching_ contract, despite Barnabas's express insistence that he did not want to teach medical residents and would not do so. Barnabas's contract was presented to the hospital's Board of Directors in 1994 as a _teaching_ contract; only in 1995 did Rogan and Ehmen create a contract that referenced his ostensible physician recruiting duties. This recruiting contract was renewed every year through the 1997-1998 term. Barnabas was not expected to perform all of the obligations spelled out in the recruiting contracts, and was never expected to (nor did he) perform _any_ of the duties in the teaching contracts. Barnabas was substantially overpaid for the little recruiting work that he actually did perform. Rogan simply used these contracts as an inducement to Barnabas to refer his substantial base of patients to Edgewater for their hospital needs.

Seshiqiri Rao Vavilikolanu, M.D. (Rao) was an anesthesiologist. Rogan arranged for Rao's company, Rao M.D., S.C., to obtain a service contract with Edgewater, under which

Rao's company was the exclusive provider of anesthesia services at Edgewater. The contract was effective from approximately April 1997, through May 1998.

In return for this contract, Rao agreed with Rogan that he would refer a substantial number of patients to Edgewater for admission for medical treatment. As an anesthesiologist, Rao had no patients of his own. However, Rao had a relationship with Kumar Kaliana, M.D. (Kumar), a primary care physician who operated a clinic on Chicago's South Side. Rao agreed to pay kickbacks to Kumar in exchange for Kumar's agreement to send his patients to Edgewater for treatment. Both Kumar and Rao lacked admitting privileges at Edgewater; therefore, Rao agreed with Barnabas (with whom he had a professional relationship) that Barnabas would serve as the admitting (and attending) physician for these patients, ensuring that Edgewater received the benefit of Rao's patient referrals.

Between May 1997 and June 1998, Rao referred approximately 20 to 30 patients a month to Edgewater through Barnabas. Edgewater tracked Barnabas's admissions that came through Rao and Kumar, to distinguish Rao's and Kumar's patients from those that came from Barnabas's own practice. Barnabas in turn referred these same Rao and Kumar patients, including Medicare and Medicaid patients, to other physicians at Edgewater for additional services and procedures. Edgewater ultimately paid Rao's companies more than $200,000 for the anesthesia contract and a later, short-lived contract to ostensibly run the hospital's detoxification program. Rogan approved payments to Rao's companies before either contract was even signed. These contracts and payments would not have been awarded but for Rao's promises to generate admissions for Edgewater in exchange for the contracts.

Andrew Cubria, M.D. (Cubria) was a cardiologist who referred patients to Edgewater and performed numerous procedures at the hospital. Cubria had a substantial practice and controlled a heavy volume of cardiology patients. Cubria continually threatened to move his patient base to other hospitals; Rogan offered various inducements to Cubria to keep his patients at Edgewater.

Between 1995 and 2000, Rogan approved various sham contracts between Edgewater or Braddock and Cubria, and also provided Cubria with loans and other benefits through a variety of vehicles. Contractually, Cubria served as a medical director for the cardiac rehabilitation program at Edgewater, had a teaching contract and various consulting agreements with the hospital, and read electrocardiograms (EKGs). Cubria performed little or no work as required under his contracts, and the contracts were understood by both sides as a method of funneling money to Cubria in exchange for his agreement to funnel patients to Edgewater. Rogan also arranged for the hospital to pay a substantial sum for television advertising featuring Cubria and designed to benefit Cubria's practice. Additionally, Rogan arranged for the hospital to loan Cubria in excess of $250,000, in part to alleviate Cubria's personal financial difficulties. In February 2001, Rogan also indirectly provided money to Cubria by giving approximately $9,800 in cash to another physician at Edgewater, who was told to and did give the cash to Cubria.

On May 17, 2001, a federal grand jury indicted Bainbridge, Roger Ehmen, and Drs. Barnabas, Kumar, Rao and Cubria, for, among other things, "devising and participating in a scheme to defraud health care providers and to obtain money and property by means of false

and fraudulent pretenses and to deprive certain individuals of the intangible right of the defendant's honest services in violation of 18 U.S.C. §§ 1341 and 1347." United States v. Bainbridge Management, et al., No. 01 CR 469 (N.D. Ill.). All of the individuals and the corporate entity eventually pleaded guilty to various criminal charges.

By the end of April 2001, with the indictments imminent, the hospital's board of directors terminated Bainbridge's management contract with the hospital, severing Rogan's ties to the institution. The hospital closed its doors to the public in December 2001 and filed for bankruptcy protection in early 2002.

## II. APPLICABLE LAW

The United States' principal legal argument in this case is that Rogan violated the False Claims Act (FCA) by causing Edgewater to submit false claims for payment to the Medicare and Medicaid programs. The falsity of the claims derives from Rogan having caused Edgewater to certify (both explicitly and implicitly) compliance with the Anti-kickback and Stark Statutes when billing Medicare and Medicaid for services rendered by the hospital. In fact, Rogan knew that the hospital was in violation of these laws, as he caused Edgewater to enter into arrangements with physicians that violated the plain terms of one or both statutes. The United States is entitled to recover the amount it paid Edgewater in claims submitted in connection with the payment of unlawful remuneration.

A. **The FCA**

The FCA provides for liability on the part of any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the

United States Government . . . a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or statement
to get a false or fraudulent claim paid or approved by the Government;

31 U.S.C. § 3729. For the United States to recover from a defendant under the FCA, it must

prove by a preponderance of the evidence each of the following three elements:

> 1.  That the defendant made, used, or caused another to make or use, a
>     false statement or document, or that the defendant caused to be
>     presented to the United States a false or fraudulent claim for payment;
>     and
>
> 2.  That the defendant did so for the purpose of obtaining payment from the
>     government or approval of a claim against the government; and
>
> 3.  That the defendant knew that the claim was false or fraudulent.

31 U.S.C. § 3729; United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943).

A "claim" is a demand for the payment of government money or the transfer of

government property. United States v. Neifert-White Co., 390 U.S. 228 (1968); United States

v. Ekelman & Associates, 532 F.2d 545 (6th Cir. 1976); United States v. Veneziale, 268 F.2d

504 (3d Cir. 1959). The Supreme Court has held that the FCA is intended "to reach all types

of fraud" and that the statute "reaches beyond 'claims' which might be legally enforced, to all

fraudulent attempts to cause the Government to pay out sums of money." Neifert-White, 390

U.S. at 232. The FCA is not limited to cases where a person makes an actual

misrepresentation to the government. Rather, if appropriate knowledge on the part of the

defendant can be established, the FCA applies whenever someone wrongfully obtains money,

either directly or indirectly, from the government. Hess, 317 U.S. at 543-545.

-8-

A defendant "causes" the submission of a false claim when he instructs others to submit false claims or delegates that responsibility to others.  United States v. Mackby, 261 F.3d 821, 827–29 (9th Cir. 2001); United States v. Krizek, 111 F.3d 934, 942 (D.C. Cir. 1997).  Establishing procedures that cause others to present false claims can also give rise to FCA liability.  United States v. Teeven, 862 F.Supp 1200, 1223 (D. Del. 1992).  The causation element of the FCA can be satisfied by "anyone who knowingly assists in causing the government to pay claims grounded in fraud." United States ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 378 (5th Cir. 2004).

For purposes of the FCA, "knowledge" that the statement or document was false or fraudulent means that the defendant:

1. had actual knowledge that the claim was false;

2. acted in deliberate ignorance of the truth or falsity of the claim; or

3. acted in reckless disregard of the truth or falsity of the claim.

No specific intent to defraud is required.  31 U.S.C. § 3729(b).

The United States' complaint also includes allegations under 31 U.S.C. § 3729(a)(3), which prohibits "conspir[ing] to defraud the government by getting a false or fraudulent claim allowed or paid."  General civil conspiracy principles apply to FCA claims under 31 U.S.C § 3729(a)(3), meaning that to prevail on this count, the government need only show a single illegal plan, a shared general conspiratorial objective, and an overt act committed in furtherance of the conspiracy that damaged the United States.  See generally United States v. Murphy, 937 F.2d 1032, 1039 (6th Cir. 1991).

The United States also asserts FCA claims under the terms of 31 U.S.C § 3729(a)(7), which imposes liability for knowingly making or using "a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." In order to prevail against a defendant under § 3729(a)(7), the United States must demonstrate, by a preponderance of the evidence, that the defendant had "an existing, legal obligation to pay or transmit money or property to the Government,'" and that the defendant submitted false records or statements to conceal, avoid, or decrease that obligation. See United States v. Pemco Aeroplex, Inc., 195 F.3d 1234, 1236-37 (11th Cir. 1999).

The government's core allegations in this case rest on the relationship between the FCA and two statutory regimes – the Anti-kickback Statute and the Stark Statute. As is detailed below, the conduct prohibited by these statutes is the precise conduct Peter Rogan engaged in repeatedly and regularly during his ill-fated stewardship of Edgewater.

**B.    The Anti-Kickback Statute**

The Anti-Kickback Statute, codified at 42 U.S.C. § 1320a-7b(b) (as amended), prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. In pertinent part, the Anti-kickback Statute reads:

> (b) Illegal remuneration
>
>                      *  *  *
>
>      (2) whoever knowingly and willfully offers or pays any
> remuneration (including any kickback, bribe, or rebate) directly

-10-

or indirectly, overtly or covertly, in cash or in kind to any person
to induce such person --

> (A) to refer an individual to a person for the furnishing
> or arranging for the furnishing of any item or service for
> which payment may be made in whole or in part under a
> Federal health care program, or

> (B) to purchase, lease, order or arrange for or
> recommend purchasing, leasing or ordering any good,
> facility, service, or item for which payment may be made
> in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined
not more than $25,000 or imprisoned for not more than five years, or
both.

42 U.S.C. § 1320a-7b(b).

## C.    <u>The Stark Statute</u>

Enacted as amendments to the Social Security Act, the Stark Statute, codified at 42

U.S.C. § 1395nn, prohibits a hospital (or other entity providing healthcare items or services)

from submitting Medicare claims for payment based on patient referrals from physicians

having a prohibited "financial relationship" (as defined in the statute) with the hospital.

The Stark Statute establishes the bright-line rule that the United States will not pay for

claims submitted by a hospital for items or services referred by a physician with whom the

hospital has a prohibited financial relationship.  The statute provides, in pertinent part:

> (a) Prohibition of certain referrals

> (1) In general

> Except as provided in subsection (b) of this section, if a
> physician (or an immediate family member of such physician)

-11-

has a financial relationship with an entity specified in paragraph (2), then --

> (A) <u>the physician may not make a referral</u> to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
>
> (B) <u>the entity may not present or cause to be presented a claim</u> under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

In the Stark Statute, "referral" is defined as "the request or establishment of a plan of care by a physician which includes the provision of designated health services."  42 U.S.C. § 1395nn(h)(5)(A).   The accompanying regulations interpreting the statute broadly define "referral" as, among other things,  "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351.   A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." <u>Id</u>.

On the standard electronic claims form hospitals submit to Medicare in order to receive payment for both inpatient and outpatient hospital services (CMS Form UB-92),

-12-

hospitals are required to designate the patient's attending physician and the physician that performed the principal procedure (the "operating" physician). See Medicare Hospital Manual, 460, FL 82-83. A UB-92 is the hospital's claim for Medicare reimbursement for a service it provided that was requested by a given patient's attending or operating physician, was included in the plan of care established by the patient's attending or operating physician, or certified as necessary by the patient's attending or operating physician. Hence, a physician designated as an attending or operating physician on a hospital's UB-92 form qualifies as a "referring" physician under the Stark Statute.

The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly by a hospital to a referring physician. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. In order to avoid the referral and billing prohibitions in the statute, a hospital's financial relationship with a physician must meet the requirements of one of these enumerated exceptions.

For example, in order for compensation paid to a referring physician serving as a hospital consultant or director to fall within an exception to the statute, the contract must (1) be in writing and signed by the parties; (2) be for a term of at least a year; (3) specify the services covered, cover all the services to be provided by the physician, with the aggregate of such services reasonable and necessary for the legitimate business purposes of the hospital; and (4) set the payment for contract services in advance, consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other

business generated between the parties. 42 U.S.C. § 1395nn(e)(3).

Compensation paid to a physician (directly or indirectly) under a medical directorship or other contractual arrangement that exceeds fair market value, for which no actual services are required, or which takes into account the volume or value of the referrals or other business generated between the parties, triggers the referral and payment prohibitions of Stark II with respect to designated health services referred by that physician.

If a relationship between a physician and a hospital does not meet one of the exceptions in the statute, the hospital is <u>prohibited</u> from billing for "designated health services" (which includes inpatient and outpatient hospital services) referred by that physician. If a hospital submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn expressly require that the hospital <u>refund</u> all collected amounts on a timely basis. 42 C.F.R. § 411.353 (emphasis added).

### III. ROGAN CAUSED THE SUBMISSION OF FALSE CLAIMS

A.   **Rogan Caused Edgewater to Certify Compliance with the Anti-kickback and Stark Statutes, and to Submit False Cost Reports and Patient Claims**

Between 1995 and 2000, Rogan caused Edgewater to submit numerous claims for payment to the federal Medicare and the state Medicaid programs. These claims took three forms: (1) CMS form 2252s, or "cost reports,"  (2) interim claims for reimbursement submitted to the Medicare program on UB-92s for specific patients; and (3) "Hospital Statements of Cost" submitted to the Illinois Medicaid program (Medicaid Cost Reports). Rogan caused Edgewater to expressly certify compliance with the Anti-kickback and Stark

-14-

Statutes on the Medicare cost reports, and impliedly did so on the hospital's UB-92s and Medicaid cost reports. Because the hospital was not in compliance with these statutes at the time these claims were submitted, the claims were false, and are actionable under the FCA.

The express false certifications at issue in this case can be found on the face of the cost reports that Edgewater submitted to Medicare annually for the years 1995-2000. Hospitals are paid by Medicare on an interim basis (through the filing of electronic UB-92 claims forms, among other submissions) for services and items rendered; however, in order to retain eligibility for those payments, CMS requires hospitals to submit annually a cost report. Cost reports are the final "claim" that a provider submits to the Medicare program for items and services rendered to Medicare beneficiaries. After the end of each hospital's fiscal year, the hospital files its cost report with its designated Medicare fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the hospital's cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

Medicare cost reports contain the following language:

Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

Furthermore, providers certify on the face of the cost report that:

-15-

to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

It is well established in the case law that express false certifications of compliance with the Anti-Kickback and Stark Statutes on a Medicare cost report is actionable under the FCA. See United States ex rel. Bidani v. Lewis, 264 F. Supp. 2d 612 (N.D. Ill. 2003); United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,125 F.3d 899, 902 (5th Cir. 1997), on remand, 20 F. Supp. 2d 1017 (S.D. Tex. 1998); United States ex rel. Pogue v. American Healthcorp. Inc., 914 F. Supp. 1507 (M.D. Tenn. 1996).

It is equally well established that the knowing submission of claims by a person who has violated a statute or regulation that contains, on its face, a direct nexus to the government's payment decision can also establish FCA liability. In such cases, liability attaches notwithstanding the absence of an express certification. See, e.g., United States ex rel. Augustine v. Century Health Svcs., Inc., 289 F.3d 409, 415 (6th Cir. 2002). Presentment of the claim falsely represents an entitlement to payment that the claimant forfeited by violating the other statute or regulation. See United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F.Supp.2d 28, 33 (D.D.C. 2003) ("[w]here the government pays funds to a party, and would not have paid those funds had it known of the violation of a law or regulation, the claim submitted for those funds contained an implied certification of

-16-

compliance with the law or regulation and was fraudulent.").

Here, Rogan also caused Edgewater to submit interim UB-92 claim forms for reimbursement to the Medicare program, as well as annual Medicaid cost reports to the Illinois Department of Public Aid, for services provided to patients of Doctors Barnabas and Cubria. While these claims do not contain the same express certification of compliance with applicable statutes found on the Medicare cost reports, the statutes at issue make plain on their face that compliance with their terms is a condition of payment. Several courts have affirmed that the Stark and Anti-kickback statutes are in fact conditions of payment, and that providers thus impliedly certify compliance with these statutes when submitting claims to federal health care programs for reimbursement. See United States ex rel. McNutt v. Haleyville Medical Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005) ("compliance with [The Anti-kickback Statute] is necessary for reimbursement under the Medicare program . . . ."); United States ex rel. Pogue v. Diabetes Treatment Centers of America, 238 F.Supp 258, 266 (D.D.C. 2002) ("The Stark laws . . . specifically state that compliance is required in order to receive Medicare reimbursement."); Thompson, 20 F.Supp 2d 1017, 1047-48 (defendants impliedly certified compliance with the Anti-kickback and Stark Statutes when submitting claims to Medicare). By submitting claims to federal health care programs, the provider implicitly certifies that it has complied with the Stark and Anti-kickback statutes with respect to those claims.

In sum, Rogan caused Edgewater to submit claims to Medicare (and the state Medicaid program) during the period in question. In submitting such claims, Rogan caused Edgewater

to explicitly and implicitly certify compliance with the Anti-kickback and Stark Statutes.  As will be described below, Rogan knew that such claims were false, because Rogan knowingly caused the hospital to enter into arrangements with certain physicians that plainly violated these statutes.  Hence, Rogan knowingly caused the hospital to submit false claims, rendering him liable to the government under the FCA.

B.      **Rogan Knew Edgewater's Claims were False**

In order to increase the volume of patients at Edgewater, thereby increasing the hospital's gross revenue, Rogan caused the hospital to enter into a series of relationships with physicians in exchange for their promises to refer patients to Edgewater.  These arrangements violated the provisions of the Anti-kickback and Stark statutes in several ways.

Beginning in 1993 and continuing through 1998, Rogan arranged for Edgewater to enter into a series of teaching and physician recruiting contracts with Barnabas.  Rogan's purpose in causing the hospital to enter these contracts was to induce Barnabas to refer his substantial body of patients to Edgewater.  Barnabas was paid $60,000 per year through these contracts, and was not expected to (nor did he) perform all the obligations spelled out in the contracts.  The contracts thus exceeded fair market value and required few (if any) services, thereby violating the Stark Statute.  The purpose of all of the contracts was to induce Barnabas's referral of patients to Edgewater, and hence it constituted a violation of the Anti-kickback Statute as well.

In 1997, Rogan caused Edgewater to make a series of payments to and ultimately to enter into a contract with Dr. Rao, ostensibly to manage the hospital's anesthesia services.

-18-

Rogan's purpose in causing the hospital to make these payments and execute this contract, which was mutually understood by the parties, was to induce Rao to refer a substantial number of patients to Edgewater. Rao's referrals, most of which were obtained through kickbacks paid to Kumar, were admitted to Edgewater through Barnabas, who could then bill for services provided to these patients. The purpose of this contract was to induce referrals to Edgewater from Rao (through Barnabas), and hence the arrangement violated the Anti-kickback Statute. The agreement also violated the Stark Statute because the compensation was determined by taking into account the volume or value of the expected referrals.

As with Drs. Rao and Barnabas, Rogan entered into various kickback arrangements with Cubria, beginning prior to 1995 and continuing on forward into 2000. In the early 1990's, Cubria maintained an office in Edgewater's medical office building, but referred his patients primarily to a competing hospital. In order to persuade Cubria to shift patients to Edgewater, Rogan directed Edgewater to provide Cubria with extensive remuneration in the form of payments and contractual arrangements, each of which provided Cubria with compensation far in excess of the value of any services Cubria provided to the hospital. Rogan also arranged for Edgewater to pay a significant sum for television advertising that was designed to benefit Cubria's practice. In sum, Rogan ensured a steady flow of money to Dr. Cubria in order to ensure a correspondingly steady flow of patient referrals. The final transaction between the two men occurred in February 2001 after news of the investigation had broken. After urging Cubria to destroy his computer to avoid incriminating himself or Rogan, Rogan gave $9,800 in cash to Cubria. Rather than giving the money directly to

Cubria, Rogan arranged for another physician, Dr. Lopez, to physically hand the money to Cubria.

Rogan was fully aware that the hospital's contracts and financial relationships with Cubria, Barnabas, and Rao were devised to induce these physicians' referrals. As the CEO and later head of the management company that operated Edgewater, Rogan was also fully aware of the fact that the hospital was routinely submitting claims to the Medicare and Medicaid programs for services on behalf of patients referred by Cubria and Barnabas. Rogan directly supervised the individuals responsible for signing the hospital's Medicare and Medicaid cost reports and overseeing the submission of UB-92 forms. He never once informed these individuals that some of the services contained in the reports were procured through the payment of illegal kickbacks or in violation of the Stark Statute. Rogan caused Edgewater to submit approximately $18,000,000 in false claims, and is liable under the FCA for these actions.

### IV. DAMAGES AND PENALTIES

Under the FCA, the United States is entitled to recover all damages incurred "because of" the false claims at issue in this case. The term "because of" simply means those damages that were caused by or would not have occurred but for the false claims and false statements. United States v. First Nat'l Bank of Cicero, 957 F.2d 1362, 1374 (7th Cir. 1992). The measure of damages the United States is entitled to recover under the FCA is the amount of money the government paid out by reason of the false claims over and above what it would have paid out if the claims had not been false or fraudulent. Marcus, 317 U.S. at 543-545;

Neifert-White, 390 U.S. at 232.

In the instant case, the United States would have paid Edgewater nothing for hospital claims related to patients referred to Edgewater by physicians with a prohibited financial relationship with the hospital. See 42 U.S.C. § 1395nn. Barnabas and Cubria both had prohibited financial relationships with Edgewater. Hence, the United States' damages are the value of claims Edgewater submitted on behalf of patients referred to the hospital by Barnabas and Cubria – i.e. the claims for which either Barnabas or Cubria served as either the attending or operating physician.

The FCA provides for treble damages and a civil penalty of $5,000 to $10,000 for each false claim submitted.[1] See 31 U.S.C. § 3729(a). The court assesses the penalties and applies the treble damages multiplier. See United States ex rel. Chandler v. Cook County, 538 U.S. 119, 123 S. Ct. 1239, 1247 (2003) ("[U]nder the FCA, if [the jury] finds liability, its instruction is to return a verdict for actual damages, for which the court alone then determines any multiplier, just as the court alone sets any separate penalty."). The imposition of penalties is mandatory. See United States v. Hughes, 585 F.2d 284, 286 (7th Cir. 1978).

In the instant case, Rogan caused Edgewater to submit approximately $18 million in false claims. Rogan caused Edgewater to submit five fraudulent cost reports to the Medicare program and another five fraudulent cost reports to the Medicaid program; he also caused the hospital to submit almost 2,000 UB-92 claims to Medicare for services provided to patients

---

[1] False claims submitted after September 29, 1999 incur a penalty of between $5,500 and $11,000 per claim. See 28 C.F.R. § 85.

referred by Barnabas and Cubria.  The United States is entitled to the trebling of its actual

damages and a civil penalty for each of the false claims Rogan caused Edgewater to submit to

the United States government.

## V. COMMON LAW CLAIMS

The United States also asserts claims for common law fraud, unjust enrichment, and

payment under mistake of fact in its complaint.  Each of these alternative theories of recovery

involve the rights of the federal government under a nationwide program, and hence are

governed by federal common law.  United States v. Kimbell Foods, Inc., 440 U.S. 715, 726

(1976).

The elements of common law fraud are: "(1) a false statement of material fact,

(2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other

party to act, (4) action by the other party in reliance of the truth of the statements, and (5)

damage to the other party resulting from such reliance."  Indemnified Capital Investments, SA.

v. R.J. O'Brien & Associates, Inc., 12 F.3d 1406, 1412 (7th Cir. 1993) (citation omitted).   In

the instant case, Rogan knowingly caused Edgewater to falsely certify compliance with

applicable statutes and regulations, in order to induce the United States to pay false claims.

The United States paid claims it would not have paid had it been informed of the true facts

underlying Edgewater's relationships with certain physicians, and hence was damaged by

Rogan's misconduct.  Rogan is liable to the United States under traditional principles of

common-law fraud.

Under the equitable theory of unjust enrichment, "a person is unjustly enriched if the

-22-

retention of [a] benefit would be unjust." Restatement of Restitution, § 1 (1937); see also Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co., 534 F. Supp. 340, 347 (D. Mass. 1982) (noting that, under the federal common law, "[t]he doctrine of unjust enrichment is equitable in nature and correspondingly broad"). The elements of a federal common law claim of unjust enrichment have been summarized as follows: "the plaintiff must show that: (1) he had a reasonable expectation of payment, (2) the defendant should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by nonpayment." Provident Life & Accident Ins. Co. v. Waller, 906 F.2d 985, 993-94 (4th Cir. 1990) (citation omitted) (emphasis added). In this case, Rogan received substantial pecuniary benefits from his affiliation with Edgewater, from his salary and bonuses as CEO to the profits his entities made through their management contracts with the hospital. Given the egregious abuses that took place at Edgewater under Rogan's watch, at a minimum, the United States (a victim of the misconduct) is entitled to recover from Rogan the substantial benefits that accrued to him from his stewardship of the institution.

Under the common law, the United States has a right to recover funds lost through the erroneous acts of its agents – i.e. payments made under a mistake of fact. Thus, if agents of the federal government, acting on behalf of the United States, paid claims submitted by Edgewater as a result of Rogan's actions "under an erroneous belief which was material to the decision to pay, [the Government] is entitled to recover the payments." United States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970) (citations omitted). Here, the express and implied certifications of compliance with the Anti-kickback and Stark Statutes contained in

Edgewater's cost reports and UB-92 forms were material to the United States' decision to pay

Edgewater, and as these certifications were false, the United States erroneously paid

Edgewater and is entitled to recover the amounts improperly provided to the hospital.

## VI. CONCLUSION

For the foregoing reasons, the United States is entitled to recover against Rogan under

the FCA and the common law for the payments it made to Edgewater on behalf of patients

referred to the hospital as a result of illegal kickbacks, or by physicians who had a prohibited

financial relationship with the hospital.

<div style="margin-left:50%">

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

PATRICK J. FITZGERALD
UNITED STATES ATTORNEY

<u>s/Linda A. Wawzenski</u>
by:   Linda A. Wawzenski
Assistant United States Attorney
(312) 353-1994

Laurie A. Oberembt
John K. Neal
Michael J. Friedman
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Washington, D.C.  20044

</div>

Dated: March 30, 2006            Counsel for the United States

**CERTIFICATE OF SERVICE**

The undersigned Assistant United States Attorney hereby certifies that the following

documents:

**TRIAL BRIEF FOR THE UNITED STATES**

were served on March 30, 2006, in accordance with FED. R. CIV. P. 5, LR5.5, and the General

Order on Electronic Case Filing pursuant to the district court's Electronic Case Filing (ECF)

system as to ECF filers.

/s/ Linda A.Wawzenski
LINDA A. WAWZENSKI
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
(312) 353-1994

-25-