UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 92 C 3310 |
| | ) | |
| PETER ROGAN, | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFIED COPY**

VIDEOTAPED DEPOSITION OF SCOTT GROSS

San Francisco, California

Friday, November 19, 2004

Reported by:

JOANNE BALBONI

CSR No. 10206

JOB No. 58030

1                 UNITED STATES OF AMERICA

2             NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4

UNITED STATES OF AMERICA,        )

5                Plaintiff,        )

6                          )

7          vs.                    ) No. 02 C 3310

8                          )

PETER ROGAN,                  )

9                Defendant.        )

_____)

10

11

12             Videotaped Deposition of SCOTT GROSS,

13       taken on behalf of Defendant Peter Rogan, at 5

14       Embarcadero Center, Pacific A, San Francisco,

15       California, beginning at 8:58 a.m. and ending at

16       3:28 p.m., on Friday, November 19, 2004, before

17       JOANNE BALBONI, Certified Shorthand Reporter

18       No. 10206.

19

20

21

22

23

24

25

                                                2

```
 1    APPEARANCES:

 2

 3    For Plaintiff:

 4            UNITED STATES OF AMERICA
              BY:  JOHN NEAL (via telephone)
 5            Attorney at Law
              601 D Street, Northwest
 6            Room 9219
              Washington, D.C., 20044
 7            Fax:  (202) 305-7797

 8    For Defendant Peter Rogan:

 9            WINSTON & STRAWN
              BY:  NEIL HOLMEN
10            Attorney at Law
              35 West Wacker Drive
11            Chicago, Illinois 60601-9703
              (312) 558-7935
12
      Videographers:
13
              JOSH TILSON
14            JONATHAN BAUER
              ESQUIRE DEPOSITION SERVICES
15            505 Sansome Street, 5th Floor
              San Francisco, California 94111
16            (415) 288-4280

17

18

19

20

21

22

23

24

25
```

1     Peter Rogan.

2        THE WITNESS: Scott Gross, deponent.

3        MR. NEAL: John Neal representing Plaintiff

4     United States.

5        THE VIDEOGRAPHER: Will the reporter please

6

7

8

9     BY MR. HOLMEN:

10       Q. Good morning, Mr. Gross. Thanks for joining us

11     this morning.

12       Would you first tell us where you currently

13     reside?

14       A. I reside in San Francisco.

15       Q. And you've been out here for a number of years?

16       A. 16 years.

17       Q. Okay. And let's start with your educational

18     background.

19       A. I have a bachelor's degree in biology and a

20     master's degree in public administration with a

21     specialty in health services.

22       Q. When did you obtain that degree?

23       A. The latter?

24       Q. Yes.

25       A. 1974.

8

1    Q.    And from what university?

2    A.    University of Southern California.

3    Q.    And could you then tell us about your work

4    experience in the healthcare industry?

5    A.    Prior to going to graduate school, I worked in

6    patient care for eight years, primarily in a

7    cardiopulmonary laboratory.  Immediately after graduate

8    school, I became an assistant hospital administrator at

9    a university teaching hospital in Los Angeles.  Four

10   years later, I joined a company called National Medical

11   Enterprises as a hospital administrator.

12        A year and a half after that, within the same

13   firm, I was promoted to supervise about seven hospitals.

14   Two years later, I was promoted to a senior vice

15   president and put in charge of the south central part of

16   the United States where I lead the growth and

17   development of the company there and its operations.

18   In --

19   Q.    Let me just stop you there for a minute.

20   A.    Sure.

21   Q.    How many hospitals were in that system,

22   National Medical Enterprises?

23   A.    At one point -- when I left, about 120 owned

24   and managed.

25   Q.    And what did you do?

9

1    A.    I was the senior operating person.  And then in

2    1983, I became president of the hospital group and I was

3    in charge of all those hospitals and numerous related

4    ancillary businesses.

5    Q.    So did that include all of the administrative

6    and managing functions related to those hospitals?

7    A.    Yes.

8    Q.    All right.  Then continue.

9    A.    So in 19 -- I think it was 1983, I became

10   president of the hospital group.  In 1987, I left

11   National Medical Enterprises and I took three and a half

12   years off to raise my children, who I became a single

13   parent of.  Then in 1990, along with a financial

14   partner, started my own management company.

15   Q.    What was the name of that organization?

16   A.    That was one was named at the time Alpha

17   Hospital Management, and then we changed the name in

18   1992, I think it was, to Primus Hospital Management --

19   Primus Management, Inc.

20   Q.    Okay.  What was the business of Alpha Hospital

21   Management?

22   A.    To provide various services to hospital boards,

23   primarily in the area of facility management, but

24   included strategy, managing their acquisitions, and

25   assisting them in obtaining financing.

1    Q.   What was your position within Alpha?

2    A.   I was the CEO.

3    Q.   How many hospitals did you work with while it

4  was called Alpha?

5    A.   At various times, seven to eight hospitals in

6  that area.

7    Q.   Would you have contracts, consulting type of

8  contracts?

9    A.   Some of them, we had total hospital management

10  contracts.  And others, we did some consulting work.

11  And we also worked with a large medical group integrated

12  with the hospital.

13    Q.   When you say "total hospital management," can

14  you describe what you mean by that?

15    A.   Yes.  Under the supervision of the board of

16  directors, we would be responsible for hiring and

17  retaining the senior management team at the hospital,

18  and we would be responsible for managing and overseeing

19  all of the operational and financial affairs of the

20  hospital.

21    Q.   And you were not employed by the hospital in

22  that capacity, right?

23    A.   No.

24    Q.   It was a separate management company?

25    A.   Yes.  It was a separate management company.  We

1    employed on behalf of the hospital the senior management

2    team.   They were employees of our company, and we would

3    pass through their direct costs.

4        Q.   And they, in effect, reported to you?

5        A.   They reported operationally and functionally to

6    me, but they also had an accountability to the board of

7    directors.

8        Q.   And by that, you mean the board of directors of

9    the hospital?

10       A.   Of the hospital, yes.

11       Q.   And who managed their medical affairs of the

12   hospitals that you had management contracts with?

13       A.   The independent organized medical staff.

14       Q.   All right.   Now, you say the name changed from

15   Alpha Hospital Management to Primus Management in about

16   1992?

17       A.   Yes.

18       Q.   Why did that take place?

19       A.   I bought my partner out.   And he flipped the

20   coin and named the company when we started it.   So when

21   I bought it out, I chose my own.   And I reincorporated

22   in California.

23       Q.   Was the business of -- Primus, that was the

24   name of the new company?

25       A.   Yes.

1    Q.    Was the business of Primus the same as the

2  business of Alpha Management Hospital?

3    A.    Yes.

4    Q.    You continued on with the same contracts that

5  you had?

6    A.    Yes.

7    Q.    How many -- when you were operating under

8  Primus, before you got involved with Edgewater, how many

9  hospitals were you working with?

10    A.    Three.

11    Q.    What were the names of those hospitals?

12    A.    Corona Regional Medical Center, Corona Rehab

13  Hospital, and Arroyo Grande Community Hospital.

14    Q.    And were there separate management contracts

15  with those organizations --

16    A.    Yes.

17    Q.    -- as you described?

18    A.    Yes.

19    Q.    And did you assist those organizations with

20  strategic planning?

21    A.    Yes.

22    Q.    And management?

23    A.    Yes.

24    Q.    And were any of those hospitals in what we

25  might call a turn-around mode?

1     A.   Each was, yes.  Each of them were turn-arounds.

2     Q.   And for the purposes of educating the jury or

3 the court, what do you mean by turn-around mode?

4     A.   A hospital that is struggling in any number of

5 ways.  The most frequent is struggling financially where

6 they are either in a financial decline or operating at a

7 loss.  Other ways that hospitals struggle and need

8 turn-around is where their volume is dropping off, where

9 they have not been successful in working with the

10 medical staff to develop that medical staff,

11 competition.  They may be out competed by other

12 facilities.  They may have a physical plant problem that

13 they didn't attend to that affected the utilization of

14 the hospital.  A variety of different ways, but almost

15 invariably included financial turn-around.

16     Q.   You said the volume was dropping off.

17     A.   Yes.

18     Q.   What did you mean by that?

19     A.   Admissions and utilization of the surgeries and

20 the outpatient facilities and the like.

21     Q.   And you took steps to turn those things around?

22     A.   Yes.

23     Q.   What kind of things would you do?

24     A.   Depending on the problem, financial, they had

25 some very specific remedies, whether it was in the area

14

1    of accounts receivable and billing, whether it was in

2    the area of cost management.  A lot of these hospitals

3    were not only overstaffed, but did not know how to staff

4    variably with changes in volume.

5         There were sometimes reputation problems having

6    to do with service, and so we would find out what those

7    services difficulties were and work with the employees

8    and the medical staff to improve the services.

9         Sometimes it was that they lacked or fell

10   behind in technology, of having sufficient equipment or

11   type of equipment, and we would assist them in making

12   those kind of changes, et cetera.  And in almost every

13   case, to help the facility develop a marketing plan to

14   increase the utilization of their hospital by community

15   physicians.

16        Q.   Were you successful in turning around the

17   hospitals that you worked with?

18        A.   Yes.

19        Q.   Now, prior to the time that you got involved

20   with Edgewater Hospital, which was '93, '94 --

21        A.   Right.

22        Q.   -- how many years had you worked in hospital

23   management and administration?

24        A.   Let me see.  That would be 20 years.

25        Q.   In that 20 years, that included the financial

```
1   aspects of a hospital?

2        A.    Yes.

3        Q.    Facilities?

4        A.    Yes.

5        Q.    Physician relations?

6        A.    Yes.

7        Q.    Improving revenues?

8        A.    Yes.

9        Q.    Improving admissions?

10       A.    Yes.

11       Q.    Essentially, were most of those years involved

12  with turning around troubled institutions --

13       A.    Yes.

14       Q.    -- in some ways?

15       A.    Yes.

16       Q.    Now, you are familiar with an organization

17  called Permian Healthcare, correct?

18       A.    Yes.

19       Q.    Would you pick up what's been marked as

20  Defendant's Exhibit Number 25?

21       A.    Yes.

22       Q.    Tell us first, what is Permian Healthcare?

23       A.    Permian Healthcare was a 501(c)3 organization.

24       Q.    Let me -- not to interrupt, but can you explain

25  to us what you mean by a 501(c)3 organization?
```

16

1    A.    Yeah.    501(c)3 is the provision of the Internal

2    Revenue Service code that permits a tax exempt status

3    for a nonprofit or a charity and their specific section

4    in there that relates to hospitals.

5        Q.    What do you mean by "tax exempt status"?

6        A.    Tax exempt status means that they are not

7    required to pay federal taxes on the excess of their

8    revenues over expense.

9        Q.    Now, getting back to Permian.    Again, what was

10   Permian?

11       A.    Permian was a not for profit 501(c)3 with what

12   was called a group exemption.    Group exemption defined

13   as the ability of Permian to create a number of

14   subordinates, which is the nonprofit parlance for

15   subsidiary, that are also tax exempt.

16       Q.    And how did you get involved with Permian?

17       A.    I was contacted by an investment banker who was

18   working with Permian who was trying to acquire

19   hospitals.

20       Q.    The exhibit that I just handed you, take a look

21   at that, and tell me if that's an accurate description

22   of Permian and how you got involved with the Permian

23   organization.

24       A.    Give me a moment to read it, please.

25       Q.    Very good.

17

1    A.    Yeah.   This is accurate.

2    Q.    Okay.   And in this description, it says that

3  Permian's investment banker solicited your services?

4    A.    Yes.

5    Q.    Were you ever told why you were requested to

6  assist them?

7    A.    Yes.

8    Q.    What were you told about that?

9    A.    Well, Permian was attempting to acquire small,

10 what I would call orphan hospitals, that were being

11 divested by the large hospital chains.   And as such,

12 lacked access to capital and sophisticated management

13 expertise.   And in order for the financiers, which were

14 tax exempt bond funds, to provide financing for the

15 acquisition of these hospitals, the bond fund managers

16 required a nationally-recognized hospital manager to

17 provide the management services to the company under the

18 direction of the board of directors.

19   Q.    And you were the expert that they had looked

20 to?

21   A.    Yes.

22   Q.    And you had developed that reputation --

23   A.    Yes.

24   Q.    -- over the past 20 years?

25   A.    Yes.   I was president of the hospital group of

18

1    the second largest hospital chain in the world.

2        Q.    Okay.  When you mentioned tax exempt bond

3    funds, can you explain how that fits into this whole

4    picture?

5        A.    Yeah.  The sources of capital for a

6    not-for-profit hospital is typically borrowings from --

7    by issuing tax exempt bonds.  And there are certain

8    mutual funds -- in fact, most of the major mutual funds

9    have entities or have investment pools that will acquire

10   bonds issued by hospitals.

11             Those bonds are attractive to investors because

12   the interest that is received on those bonds is tax

13   exempt.  And in some states, like California for

14   example, it's triple tax exempt.  It's exempt from

15   state, federal, and local taxes.  For the hospital the

16   benefits of tax exempt bonds is a lower interest rate

17   than they could get from taxable bonds.

18       Q.    And these bond funds, those are things that you

19   and I could buy into if we wanted to?

20       A.    Absolutely.  They are the major marquee names,

21   big, huge, multi billion dollar bond funds.  You can

22   only issue these bonds to these bond funds in units of

23   $100,000.  These type of bonds that were nonrated are

24   not the type that are retailed to private individuals.

25       Q.    Okay.  And the advantage to the bond holder is

19

1    the requirement that you don't have to pay federal

2    income tax?

3         A.    Right.

4         Q.    All right.  Now, what was the relationship that

5    you developed with Permian?  By "you," I mean Primus.

6         A.    Primus?

7         Q.    Yes.

8         A.    We contracted with Permian to assist them with

9    the acquisition -- after they had -- they had a failure

10   of acquiring a hospital in Colorado.  At this particular

11   point in time, in the early '80s and early '90s, there

12   were a number of divestitures by the large hospital

13   chains.

14           And we assisted them in acquiring a couple of

15   hospitals during that period of time.  The hospitals

16   were identified by their investment banker.  We helped

17   them go through those hospitals and evaluate them.  We

18   recommended the ones that we thought fit their profile,

19   the ones that we thought could be made to be financially

20   viable and be financed, and assist them with the

21   acquisition and financing of two hospitals.

22

23

24

25

1

2

3

4     Q.   Was Edgewater the first hospital that you had

5  helped Permian acquire?

6     A.   No.

7

8

9     Q.   What other hospitals did you work with Permian

10  on before you got involved with Edgewater?

11     A.   Arroyo Grande Community Hospital, Circle City

12  Medical Center, and Corona Community Hospital.

13     Q.   Okay.  So you had a track record with Permian

14  before the Edgewater deal came on?

15     A.   Yes.

16     Q.   Now, before we get into Edgewater specifically,

17  what I'd like to ask you about, Mr. Gross, is some

18  general questions about the business of hospitals.

19       Now, you alluded to not-for-profit hospitals,

20  and there is also for-profit hospitals, correct?

21     A.   Right.

22     Q.   Now, to you and I as potential pay patients of

23  hospitals and hopefully not soon --

24     A.   M-hm.

25     Q.   -- what is the difference to you and I as a

ESQUIRE DEPOSITION SERVICES
(415) 288-4280

1    user of those services?

2        A.    You would see no real difference.

3        Q.    All right.   What is the difference in the

4    management of a not-for-profit versus a for-profit

5    hospital?

6        A.    The real difference between them -- in fact,

7    I've always believed that not for profit versus for

8    profit is a misnomer -- is actually tax paying and

9    nontax paying, the for profit having an obligation to

10   pay taxes, various taxes, on its profits, its surplus of

11   revenue over expense, whereas in the tax exempt arena,

12   they are not required to pay tax.   They are exempt from

13   taxes on the excess of their revenues over expense.

14            There are some requirements that are imposed

15   upon not-for-profit hospitals, very strict requirements

16   by the Internal Revenue Service, to make sure that no

17   individual or individuals have any private benefit from

18   the proceeds or the assets of the not for profit.

19       Q.    So is it fair to say that the not-for-profit

20   hospitals, at least on the financial and administrative

21   side, are more regulated than a for-profit hospital?

22

23

24            THE WITNESS:   Yeah.   I would say in a general

25   sense, because of the IRS -- because of the Internal

22

1  Revenue Service's rules and the state charitable trust

2  rules in the state in which they occupy, that's another

3  layer of regulation above and beyond what a for profit

4  would have.

5  BY MR. HOLMEN:

6      Q.   In terms of regulation related to medical

7  services, are they similar or the same?

8      A.   The same.

9      Q.   All right.  And --

10

11

12  BY MR. HOLMEN:

13      Q.   Do both for-profit and not-for-profit hospitals

14  have to be accredited?

15      A.   Well, they don't have to be accredited, but if

16  they are not accredited they can't participate in most

17  of the reimbursement programs.

18      Q.   As a practical matter, all hospitals that want

19  to stay in business find how to be accredited by the

20  JCAH, correct?

21      A.   Yeah.  The JCHO and the licensing -- health

22  facilities licensing body in their respective state.

23      Q.   And what is the source of revenue for-profit

24  and not-for-profit hospitals?

25      A.   It's the same.  Delivering patient care.

23

1     Q.   And the management of the medical staff, is

2    there any real difference between a for-profit or a

3    not-for-profit hospital?

4     A.   No.

5     Q.   And is there any difference between a

6    not-for-profit and for-profit hospital in terms of

7    reimbursement from insurance companies, MediCare,

8    Medicaid?

9     A.   No.

10    Q.   That all operates the same, correct?

11    A.   Yes.

12    Q.   And you've worked with both for-profit and

13    not-for-profit hospitals, correct?

14    A.   Correct.

15    Q.  And there is nothing wrong with a hospital

16    being a for-profit institution, is there?

17

18

19       THE WITNESS:  That's a value of judgment and in

20    my mind, no.  They both are there to do the same thing.

21    BY MR. HOLMEN:

22    Q.   I mean, a hospital, even though its services

23    are to render health care to people, it's still a

24    business, correct?

25     A.   It's still a business.  And whether or not it's

1    not for profit or for profit, it must generate a profit.

2        Q.   And in both cases, is it important for the

3    revenues to meet or exceed the costs?

4        A.   The revenues must exceed the costs.

5        Q.   And why is that?

6        A.   Well, because a hospital -- first of all, it

7    must do so to stay afloat.  Secondly, a hospital relies

8    very heavily on equipment and staying current with

9    technology.  It's a very sophisticated physical plant

10   that not only needs to be maintained on a current basis,

11   but eventually needs to be replaced.  So the hospital

12   must be able to generate cash flow and income in excess

13   of its current expense requirements so that it can

14   accumulate funds to stay current with technology and

15   eventually modify or replace the physical plant.

16       Q.   How do hospitals go about attracting business?

17

18            THE WITNESS:  Basically, by providing good

19   service.  It's kind of a simple description.  A hospital

20   is nothing more than a workshop for doctors.  No one in

21   a hospital besides a doctor can write an order or

22   initiate care.  So it is really where doctors aggregate

23   their patients or congregate their patients for

24   efficiency.

25            So what a hospital has to do is provide quality

25

1    service and care to the patients, quality service and

2    access to the physicians, the most modern technology it

3    can, the best nursing care it can.  And since a large

4    number of patients stay multiple days in a hospital, it

5    also has what I call a hotel function.  So it has to be

6    clean, comfortable, well ventilated.  The food has to be

7    acceptable, et cetera.

8    BY MR. HOLMEN:

9        Q.    And are those obligations fall to the

10   management side --

11       A.    Hospital management, yes.

12       Q.    -- of the hospital?  Have you seen hospitals do

13   advertising?

14       A.    Yes.

15       Q.    Is that important?

16       A.    Yes.

17       Q.    Why is that important to hospitals?

18       A.    Well, there is some -- you know, the basic just

19   name recognition, but in these days of managed care

20   where employees have a choice in open enrollment periods

21   in health plans, health plans will give employees

22   various options.  And some health plans include certain

23   hospitals and exclude others.

24            And so there is a desire on the part of the

25   hospital in its particular community to maintain an

26

1    awareness in the minds of the consuming public that they

2    are available for their care.  And also, hospitals have

3    emergency rooms.  There are a lot of elective procedures

4    that are done at hospitals.  A lot of hospitals that

5    have obstetrics, for example, will advertise that

6    they've got modern, you know, OB programs, package

7    programs for OB, and things of that nature.

8        Q.    And all of that is done to hopefully increase

9    admissions and therefore revenues, correct?

10       A.    Absolutely.

11       Q.    Now, do hospitals also, in your experience,

12   recruit physicians?

13       A.    Yes.

14       Q.    And why is that important?

15       A.    Well, since the medical staff -- going back to

16   my metaphor that a hospital is a workshop for doctors,

17   you know, you have to deal with several factors.  One is

18   the population.  If your population is growing in your

19   area, you have to make sure that there are enough

20   doctors in the community to handle the increasing

21   population.

22            Also, physicians come and go.  Some physicians

23   leave the area, and you have to have new physicians come

24   in the area.  And also, medical staff age.  And so when

25   physicians retire and leave practice and the like, there

27

1  has to be a pipeline of physicians to come in and take

2  their place.  In fact, physician recruitment is actually

3  a responsibility that the hospital has to the community

4  to make sure there are adequate physicians in the

5  community to provide for their care.

6       Q.   How do you attract and recruit physicians as a

7  general matter?

8       A.   As a general matter, by being -- by providing

9  service both to the physician and his patients and doing

10  a good job and having a reputation for doing a good job

11  and having the kind of internal efficiency of operations

12  that work for the physician to make good use of his or

13  her time.

14       Q.   Now, are you aware of legal concerns in

15  connection with recruiting physicians?

16       A.   Yes.

17       Q.   What is it that you are aware of in that

18  regard?

19       A.   There are numerous laws and regulations,

20  federal government, state government, Internal Revenue

21  Service, and insurance plans that in a broad sense

22  prohibit any direct or indirect inducement for a

23  physician to direct patients to the hospital.  And there

24  are some very precise rules about what you can and

25  cannot do.

1    Q.   So how do you address those concerns when you

2    recruit physicians?

3    A.   First of all, when you are recruiting a

4    physician, let the physician know what you are not able

5    to offer the physician.  A lot of physicians when you go

6    to recruit them, you know, they'd say, "Hey, what's in

7    it for me?  How can I make more money," or this, that,

8    and the other thing.

9         Basically, you have to tell them by, you know,

10   "Building your practice," you know, "We can help because

11   we have patient referral services where people who don't

12   have physicians call us and, you know, want to know

13   doctors are available.  People who don't have physicians

14   come to the emergency room, and we have a panel of

15   physicians who will back up the emergency room and take

16   patients."

17        And basically, demonstrate to the physician

18   that we provide good service.  We have modern

19   technology.  We have good through-put.  We really pay

20   attention to the hotel function to make sure that the

21   patients are satisfied.  We try to give timely reports

22   and accurate reports to the physicians.

23        Physicians, the way they make their living is,

24   their time is very important to them.  And if you can

25   operate your hospital efficiently and help the physician

1   make good use of his time, give him access to operating

2   rooms in a timely fashion, quick turn-around of reports,

3   and then make his patients happy, generally you don't

4   have much trouble recruiting physicians.

5       Q.   So you try to make the hospital an attractive

6   place for the physician to work in --

7       A.   Yes.

8       Q.   -- going back to your earlier metaphor?

9       A.   Yes.

10      Q.   All right.  Now, a few more questions,

11  Mr. Gross, about the management and the administration

12  of a hospital, and I'm not referring to the medical

13  aspects of it now.

14          We touched on this, but what are the various

15  functions that go on within a hospital to keep it

16  operating that are not medically related?

17      A.   Well, it relates to everything from maintaining

18  the physical plant, lights, electricity, water, power,

19  et cetera, health and safety issues, recruiting,

20  training, and providing adequate technical and

21  nontechnical staff to take care of the patients, food

22  service, janitorial service, acquisition and operation

23  of sophisticated diagnostic equipment, maintaining a

24  pharmacy, a purchasing function, et cetera.

25      Q.   And then there is the financial side of it,

30

1    too?

2        A.    Absolutely.

3        Q.    What goes into that?

4        A.    It ranges from the billing and collecting --

5    billing third-party payers and private individuals for

6    the services rendered and collecting those, maintaining

7    the hospital's books to required accounting standards,

8    maintaining the inventory, managing the cash, investing

9    the cash, et cetera.

10       Q.    And these are the various functions that in

11   your organization the management companies have been

12   responsible for; is that correct?

13       A.    Correct.

14       Q.    And the various management companies that

15   you've worked with, have they had any responsibility for

16   medical aspects of the business of hospitals?

17       A.    No.

18

19

20

21

22   BY MR. HOLMEN:

23       Q.    Okay.  Who has responsibility for the medical

24   aspects of the hospital?

25       A.    The medical staff is an independent

1    organization and it's self-governing.  They have their

2    own bylaws, rules, and regulations.  They conduct peer

3    review.  They review applications and determine the

4    delineation of clinical privileges, and they recommend

5    to the board of directors the -- directly to the board

6    of directors through the president of the medical staff

7    the admission to the medical staff of a physician and

8    what privileges that physician will have at the

9    hospital.

10       Q.   On the management side, the administrative and

11    management side of the business of hospitals, is there

12    any responsibility there for the admission of patients?

13       A.   No.

14       Q.   Is there any responsibility in the management

15    and administration of a hospital for the treatment of

16    patients?

17       A.   We only implement that which a physician has

18    ordered.

19       Q.   And that's through medical staffs and --

20       A.   Medical staff, yeah.  The medical staff writes

21    an order on the chart, and we have to follow the order.

22       Q.   But you don't make any decisions in terms of

23    what's going on the chart, what's administered --

24       A.   No.

25       Q.   -- how it's administered --

1    A.    No.

2    Q.    -- that type of thing?

3          Now, when did you first hear about Edgewater

4  Medical Center?

5    A.    I can't remember specifically, but either very

6  late in 1992 or very early in 1993.

7    Q.    How did it come to your attention?

8    A.    I received in the mail an offering document

9  that indicated that the hospital was for sale.

10   Q.    And you received that in your position with

11  Primus --

12   A.    Primus.

13   Q.    -- correct?  What is it that you got?  I mean,

14  was it an offering circular?

15   A.    It was an offering circular describing the

16  hospital, its financials, you know, et cetera.

17   Q.    And what did you do with it?

18   A.    Well, we reviewed it amongst our staff to see

19  if it met the profile of a hospital that Permian would

20  be interested in pursuing.

21   Q.    And at that time you had a contract with

22  Permian?

23   A.    Yes.

24   Q.    Okay.

25   A.    And that was one of our responsibilities.

1    Q.    To look for new opportunities?

2    A.    Right.  And to evaluate those that were brought

3    to the company.

4    Q.    What was the -- strike that.

5          Were you familiar with what Permian viewed as

6    its goal or its strategy at that point in time?

7    A.    Yes.

8    Q.    What was that?

9    A.    The strategy was basically to acquire these

10   orphan hospitals or free-standing hospitals and create

11   in various marketplaces around the country a small

12   system of hospitals to where you could get some scale

13   and put you in a better position for contracting with

14   health plans and physician recruitment and equipment

15   acquisition and things of that nature.  And Chicago was

16   a market that Permian had identified as one that it may

17   be interested in.

18   Q.    And one of the obligations that Primus had to

19   Permian was to give them advice in that regard?

20   A.    Yes.

21   Q.    And at that time you were also managing these

22   two other institutions in California?

23   A.    Yes.

24   Q.    Okay.

25   A.    Three other facilities.

1    Q.    Three other facilities.

2          Had you heard or knew of Peter Rogan at that

3    time?

4    A.    No.

5    Q.    All right.  What was the first thing that you

6    did to investigate whether or not Edgewater would fit

7    within the strategy of Permian such that you would

8    recommend them to move forward with that?

9    A.    Well, once Permian authorized us to take a

10   look, I personally went to Chicago.  I met with

11   Mr. Rogan along with his investment banker, took a tour

12   of the facility, called some of my industry contacts in

13   the Chicago area to learn more about the hospital, drove

14   around the area, kind of what I would call kind of an

15   initial kicking of the tires.

16   Q.    What were you told by Mr. Rogan about the

17   hospital?

18   A.    That the hospital had been for the longest time

19   a prominent hospital in Chicago.  It catered to the

20   carriage trade in that area, had fallen on hard times

21   due to the death of the physician who was the driving

22   force behind his hospital, and had been severely

23   mismanaged at a time that there were also some

24   unfavorable demographic changes in the area.  He was

25   called in to take a look at the hospital and ended up

1    acquiring the hospital and turning it around.

2        Q.    And after your initial visit there, what was

3    your impression of Edgewater Medical Center as a

4    candidate for Permian?

5        A.    I thought it was a prime candidate for Permian

6    if what we saw on paper could be verified upon due

7    diligence.

8        Q.    And what was your impression of Mr. Rogan at

9    that time?

10       A.    I thought Mr. Rogan was very bright.  He was

11   very well educated.  It was very clear he had a keen

12   understanding of the hospital business, and he had a

13   really good combination of somebody who understood the

14   business and financial part of the hospital, the

15   operating side of the hospital, and also the medical

16   staff development side of hospital management.

17       Q.    How did you compare what you saw in the

18   condition of Edgewater at the time that Mr. Rogan had

19   put together compared to what you had done yourself with

20   hospitals you had previously worked with?

21       A.    Well, again, my stock and trade being

22   turn-arounds, I felt that I was in a pretty good

23   position to judge or make an assessment of it.  I

24   thought that they had done an incredible job.  I thought

25   they kind of snatched this hospital from falling into a

36

1    demise.

2         Q.   What did you learn about how that had happened,

3    how the turn-around came about?

4         A.   When I explored it with Peter and then

5    subsequently with others and looking at the data, there

6    was a major and very aggressive cost-cutting effort.

7    The hospital had been very overstaffed and very

8    inefficiently staffed.  It had very poor vendor

9    contracts, paying much too much for supplies.  There had

10   been no effort to take advantage of negotiating

11   principles to reduce those costs.

12        Also, what was apparent was that because of the

13   demographic changes in that area, that had some very

14   large pockets of various ethnic groups that were

15   employed while insured, that there had been no effort on

16   the part of that hospital to encourage physicians from

17   that local community and those ethnic groups to utilize

18   that facility, and that they had been successful in

19   attracting those physicians to utilize the facility and

20   move their patients there.

21        Q.   And is that the kind of approach that you would

22   take into the hospitals that you had turned around?

23        A.   Yes.  A similar approach.

24        Q.   Okay.

25        A.   Each hospital is a little different but, you

37

1    know, that's kind of the formula.  That's what you've

2    got to do to turn a hospital around.

3        Q.    Now, when you look at a hospital like Edgewater

4    or any other hospital for the possibility of

5    recommending it as an acquisition candidate, is the

6    MediCare, Medicaid an issue that you are concerned with?

7        A.    Absolutely.

8        Q.    Now, talking about the initial inspection, is

9    there anything you can do to investigate whether or not

10   that was an issue with Edgewater?

11       A.    We do several things.  We look at -- we try to

12   get at quality of care in various ways.  So we see what

13   their malpractice history is, and there are various

14   search engines that are available to ferret that out.

15            Also, there are certain indicators where there

16   have been fraudulent activities in hospitals.  Our

17   industry was very good at making people aware of when

18   that had occurred.  Medicare is also very good at

19   sending out bulletins of permitted and nonpermitted

20   practices.

21            So when we went through and we looked at things

22   like length of stay, admission rate through the

23   emergency room, number of invasive procedures done,

24   number of laboratory procedures done, there are certain

25   ways that you can almost vector in to determine to get

38

1    an initial indication if there are any practices that

2    would raise concerns.

3        Q.    From your initial inspection and conversations

4    with Mr. Rogan, did you have any hint that there was any

5    fraud or abuse going on there?

6        A.    No.

7        Q.    All right.  After your initial trip out to

8    Chicago to look at Edgewater, what was the next step in

9    evaluating whether or not Edgewater would be a candidate

10   for Permian's acquisition?

11       A.    I brought a couple of other members of my team

12   as well as a physician to -- well, we signed a

13   confidentiality agreement.

14       Q.    Okay.

15       A.    Yeah.  And then I brought a number of members

16   of my team and a physician from the board of directors

17   to take a look at the operations of the hospital at the

18   next level of detail, and also the physician to

19   interview members of the medical staff, to look at their

20   incident reports, to take a look at their peer review

21   process and the like.  Particularly, since they had a

22   cardiac program there, we made sure that the physician

23   who went there was a cardiologist.

24       Q.    And who was that?

25       A.    That was Bertram Rosenthal, M.D.

39

1      Q.   And was he affiliated with Permian in any way?

2      A.   Yes.

3      Q.   What was --

4      A.   Actually, I'm not sure at that time -- I just

5 can't remember whether or not he was on the Permian

6 board. I knew he was on the Vista Hospital System's

7 board.

8      Q.   Okay.

9      A.   I just can't remember.

10      Q.   And Vista was one of the hospitals you were

11 managing?

12      A.   Vista, yeah, is a subsidiary of Permian.

13

14      Did you go back out to Chicago?

15      A.   Oh, yes, many times.

16      Q.   Who else did you take, you know, on the second

17 level of --

18      A.   I took Dan Finnane, who was my operating

19 officer. Karen Heinman, who was my chief financial

20 officer. And a gentleman named Dick Woolslayer, who was

21 probably my best nuts and bolts operating manager in the

22 company.

23      Q.   What do you mean by "nuts and bolts"?

24      A.   Nuts and bolts -- you know, how the inventories

25 are controlled, how the patient flow goes, the staffing

40

1    efficiencies, how the physical plant is maintained,

2    cleanliness, internal mechanical systems, and things of

3    that nature.

4        Q.    And then you took that team out to Chicago to

5    take another look at Edgewater?

6        A.    Yes.

7        Q.    How long did that process take?

8        A.    Two days.

9        Q.    After that was done, what was your view of

10   Edgewater then?

11       A.    I thought that at the appropriate pricing, that

12   it would be a viable candidate for Permian.

13       Q.    And in that process, did anybody come up with

14   any hint that there was any fraud or abuse going on at

15   Edgewater?

16       A.    No.

17       Q.    After that step, what happened next?

18       A.    I don't remember the specific order of it, but

19   typically there is some verbal negotiation between the

20   parties.  In that case, we did it with the investment

21   banker, Edgewater's investment banker, and then

22   submitted an offer letter, a letter of intent, if you

23   would.

24       Q.    Okay.

25       A.    And then -- after some negotiation where the

41

1  parties decided that they wanted to go ahead, then the

2  actual acquisition and financing process begins.

3      Q.   All right.  And when you made the decision to

4  go forward with that process, had you made a decision on

5  how you wanted Edgewater to be structured?  That is, not

6  for profit or for profit?

7      A.   Yes.  It was definitely not for profit.

8      Q.   And why did it have to be structured as not for

9  profit?

10      A.   Well, a couple of reasons.  First of all, it

11  was -- Permian's mission was primarily to be a not for

12  profit, but also, too, the reality in the marketplace is

13  that tax exempt financing is less expensive than taxable

14  financing.  In a hospital at that particular time, you

15  could get -- tax exempt rates for a hospital with this

16  financial profile, the rates could be anywhere from 7 to

17  8 and a half percent tax exempt.  They could up to 14 to

18  16 percent taxable.

19      Q.   Okay.  By that, you mean the interest rate?

20      A.   Interest rate.

21      Q.   That's what would have to be paid on the bonds,

22  right?

23      A.   On the bonds.

24      Q.   Okay.

25      A.   And so the difference on 30 or 40 million

1    dollars worth of bonds is a very significant amount of

2    money.

3         Q.   Did you have in mind at that stage how the

4    hospital would be managed?

5         A.   Yes.

6         Q.   And what did you have in mind for that?

7         A.   Well, that we would -- that my company would be

8    given the management contract.

9         Q.   Your company being?

10        A.   My company being Primus Management or an

11   affiliate of my company and that -- by then, I had

12   convinced the senior management team at Edgewater that

13   we wanted them to stay and work with us to continue

14   develop the hospital, which was one of the philosophies

15   of Permian and also of my company.

16        Q.   All right.  Now, I want to talk a little bit

17   about the process that you actually went through to

18   acquire the hospital.  And if you would look at Exhibit

19   Number 26, which is there in front of you --

20        A.   Okay.

21        Q.   -- that's a memorandum with some attachments,

22   on the letterhead of CS First Boston.

23             Who was and what was CS First Boston in this --

24        A.   CS First Boston was Permian's investment bank.

25        Q.   And the memorandum is addressed to the members

43

1    of the Edgewater working group.

2          What was the Edgewater working group?

3          A.    Well, once a letter of intent is signed and --

4    the letter of intent is signed and a definitive

5    agreement is being negotiated, a team is put together to

6    work on the actual business acquisition of the facility

7    by Permian lawyers, appraisers, accountants, and the

8    like.  And because at the same time Permian had to

9    obtain a financing to acquire the hospital, there was a

10   team put together to work on the tax exempt financing.

11   Again, lawyers, accountants, appraisers, feasibility

12   consultants, et cetera.

13         Q.    Now, in Exhibit Number 26, if you would look at

14   what's marked as page FL 000202, there is a list of the

15   working group.

16         Now, is that a list of all of the various

17   parties that were involved in the transaction to acquire

18   Edgewater Medical Center?

19         A.    Yes.

20         Q.    And your organization is listed under "Hospital

21   Management," correct?

22         A.    Yes.

23         Q.    The issuer is Illinois Health Facilities

24   Authority.  What does that mean?

25         A.    Issuer, they are the ones that actually issue

44

1    the bonds.

2        Q.   And that are ultimately purchased by one of

3    these --

4        A.   Purchased -- that are ultimately purchased by

5    the bond holders, and they are required to be repaid by

6    Edgewater North Side Operating Company.

7        Q.   And the "authority financial advisor," what is

8    that?

9        A.   Those are the -- that is an independent

10   financial advisor who advises the authority on the

11   various aspects of the transaction, its financial

12   feasibility, you know, is it complying with all of the

13   rules.

14       Q.   And by the authority, we mean the Illinois

15   Health Facilities?

16       A.   Yes.

17

18

19

20

21

22       Q.   On the next page, there is a category "Bond

23   Counsel."  What is that?

24       A.   Bond counsel, that's a specialty in law that

25   prepares the bond documents, the actual loan documents.

45

1    And their expertise is to make sure that they are not

2    only properly done, but that they comply with all the

3    applicable Internal Revenue regulations --

4        Q.    And you --

5        A.    -- and Securities Exchange regulations.

6        Q.    And you had been through this process yourself

7    how many times before this?

8        A.    Dozens.

9        Q.    Okay.  And the next category is "Hospital

10   Counsel."  Who would they be representing?

11       A.    They would be representing the Permian board.

12       Q.    And then below that, the next category is

13   "Underwriter."  What was their role?

14       A.    Their role was to underwrite the bonds to

15   actually be the ones that bought and sold the bonds and

16   underwrite the transaction.

17       Q.    On the next page the underwriter had its own

18   lawyers involved?

19       A.    Yes.

20       Q.    That was the law firm of Foley & Lardner?

21       A.    Yes.

22       Q.    Below that is the category of "Trustee."  Now,

23   what was their role in this?

24       A.    The trustee -- the funds -- all of the funds

25   that are raised by the bond sale are put in the custody

46

1   of the trustee.  The trustee then pays everybody that

2   needs to be paid out of the proceeds, and then the

3   trustee also maintains control over various reserve

4   funds and capital improvement funds that were also

5   obtained through the bond financing.

6       Q.    All right.  The next category on the working

7   group list is the hospital.  That's Edgewater, showing

8   Mr. Rogan as president.

9       A.    Right.

10      Q.    The next listing is for the accountant.

11            That would have been the hospital's

12  accountants?

13      A.    No.  Actually, the accountant here works for

14  Permian and is responsible for doing the financial

15  feasibility analysis that is used by Permian and all of

16  the professionals, the authority, the investment bank,

17  and the bond holders, as a true representation of the

18  hospital's financial status.

19      Q.    So Coopers & Lybrand was brought into this

20  transaction by you?

21      A.    Well, by Permian.

22      Q.    By Permian.

23      A.    But that -- even though we brought them in and

24  had to pay for them -- we, I'm using the collective

25  we -- that had to be agreed to by the other

47

1  professionals.

2     Q.   Okay.  On the next page, there is a listing for

3  a hospital counsel.  That was McDermott, Will & Emery?

4     A.   Right.

5     Q.   They represented Mr. Rogan --

6     A.   Yes.

7     Q.   -- right?

8     A.   Yes.

9     Q.   The next group, "Financial Advisor to Primus

10  Management, Epic Financial Group"?

11     A.   Yes.

12     Q.   What was their role?

13     A.   Their role was to help us -- help Primus

14  find -- how can I put this?

15           First Boston has a certain set of bond funds

16  that it services, and we wanted to widen the universe of

17  bond funds to see if we can attract them to acquire

18  these bonds.  And the Epic Financial Group had an

19  expertise with a group of funds out of Pittsburgh,

20  Pennsylvania, that had just entered into the tax exempt

21  hospital bond market.

22     Q.   Okay.  And you brought them into this?

23     A.   Yes.

24     Q.   The next category in this list is "Purchasers."

25           What does that relate to?

48

1      A.    Those are the bond funds that actually

2    purchased the bonds when they were issued.  These firms

3    are the advisory firms or the managers of those mutual

4    funds.

5      Q.    And that group had their own lawyers?

6      A.    Yes.

7      Q.    And they are listed at the bottom there --

8      A.    Yes.

9      Q.    -- correct?

10           Mr. Gross, why are there so many different

11    entities involved in doing a transaction like this?

12      A.    Well, again, we are doing both an

13    acquisition -- a business acquisition and a financing at

14    the same time.  The very nature of a tax exempt hospital

15    acquisition and a tax exempt bond financing is a very

16    laborious, very technical and highly regulated process

17    and requires independent advice from the various parties

18    participating in the transaction; the issuer -- the

19    health authority had to have separate counsel, the

20    purchaser, the seller, the purchaser of the bonds and

21    the underwriter of the bonds.

22      Q.    Why is that all so important?

23      A.    Because, first of all, it's a very large sum of

24    money.  Secondly, failure to properly do this

25    transaction could have catastrophic consequences for the

49

1   hospital and for the holders of the bonds.

2       Q.    Can you explain what you mean by that?

3       A.    Yes.  If there is a violation of either the

4   MediCare fraud and abuse statutes or the IRS tax exempt

5   regulations, there can be severe consequences to the

6   hospital.  Maybe losing its ability to participate in

7   the MediCare program on one hand.  On the other hand, if

8   it violates the IRS rules, it would lose its tax exempt

9   status.  The net income of the hospital would have to be

10  taxed and the bonds issued by the bond holder --

11  purchased by the bond holders, now the interest would be

12  taxable and not tax exempt.

13      Q.    The whole structure would fall apart?

14      A.    It would fall apart.  It would be a

15  catastrophe.

16      Q.    Now, in connection with all of this review, do

17  you also look at physician contracts?

18      A.    Oh, absolutely.  We look at all contracts.

19      Q.    Why do you look at the contracts?

20      A.    First of all, we want to -- you know, as any

21  good business discipline, you would want to know what

22  contractual obligations the hospital had and contractual

23  relationships.  Secondly, you want to make sure that

24  they were legal, that they complied with all applicable

25  rules and regulations with a particular sensitivity to

50

1    the MediCare fraud and abuse and the IRS private benefit

2    and private enrollment rules.

3         Q.   Now, if you would pick up what's there and

4    marked Exhibits 27 and 28 --

5         A.   Yes.

6         Q.   -- which actually should be stapled together --

7         A.   M-hm.

8         Q.   -- do you recognize this document, Mr. Gross?

9         A.   Yes.

10        Q.   What is this?

11        A.   This is a due diligence document prepared by

12   the legal team that basically listed the contract and

13   who the contractor was with the hospital and what the

14   services were.

15        Q.   And on the third page of what's marked as

16   Exhibit 27 is a list of vendor contracts?

17        A.   Yes.

18        Q.   Can you describe that?

19        A.   Harris Hospital Supply, Gallagher Inspec., IBEK

20   Corporation.  You know, these are --

21        Q.   Various vendors?

22        A.   Those are various vendors, yes.

23        Q.   What about the next page?  Those are physician

24   contracts, correct?

25        A.   Yes.

51

1      Q.   All right.  And the last page of that document

2  shows more vendor contracts?

3      A.   Yes.

4      Q.   Now, going to what's marked as Exhibit 28 --

5      A.   Right.

6      Q.   -- what is this?

7      A.   This is a worksheet that expands upon the

8  description of these contracts.  It talks about -- you

9  know, the contract or what it does.  Some specifics

10  about, you know, how long the contract has been in

11  place, when the contract ends, you know, what the

12  compensation arrangement is, is the contract assignable

13  to another or not.

14      Q.   Okay.  And on the second page of that exhibit,

15  down towards the bottom, begins a list of physician

16  contracts, correct?

17      A.   Right.

18      Q.   And were every one of these contracts reviewed

19  in the process of acquiring Edgewater Medical Center?

20      A.   Yes.

21      Q.   For the reasons that you explained earlier,

22  correct?

23      A.   Yes.

24      Q.   And would you on occasion find contracts that

25  were not in compliance with the statutes and regulations

52

1    that needed to be complied with?

2        A.    Yes.

3        Q.    What would you do then?

4        A.    We would require that they be changed to comply

5    with the regs.  And if they weren't to be changed, they

6    were to be cancelled.

7        Q.    Now, in this due diligence process with all

8    these lawyers and consultants going over this

9    transaction, was there an eye towards seeing if any

10   fraud and abuse or anything of that nature was going on?

11       A.    Yes, there was, and particularly at Edgewater

12   Medical Center.

13       Q.    Why particularly as to Edgewater?

14       A.    Because they had an extraordinary large number

15   of contracts with physicians, and that is probably the

16   most obvious place where the rules and regulations could

17   be vulnerable to being violated.

18       Q.    You mean contracts?

19       A.    Contracts.  I'm sorry.

20       Q.    Okay.

21       A.    And we wanted to make extra certain that those

22   relationships were proper.

23       Q.    And you didn't find anything in those

24   contracts?

25       A.    No.  They were -- you know, there were some

1    minor things -- wording, cancellation provisions and

2    things like that -- that had to be changed to comply

3    with mainly IRS regs, but they were minor.

4        Q.    Eventually, all of the due diligence was done.

5    Permian went ahead and purchased Edgewater Hospital,

6    correct?

7        A.    Yes.

8        Q.    And do you remember what the purchase price

9    was?

10       A.    Offhand, I don't.

11       Q.    If you take Exhibit Number 29, do you recognize

12    that document?

13       A.    Yes.

14       Q.    What is that?

15       A.    That's the offering -- you know, the OS or the

16    offering memorandum for the bonds.

17       Q.    And what is the purpose of this document?

18       A.    This document basically describes the bond

19    transaction and the covenants of the bond transaction

20    for both the issuers and the purchasers of the bonds.

21       Q.    And in the first line on the first page, it

22    says, "The Illinois Health Facilities Authority is

23    offering 41 million dollars of revenue bonds."

24         Was that related to the purchase price --

25       A.    That's more than the purchase price.

1      Q.   But is most of that related to the purchase

2  price?

3      A.   Yes.

4      Q.   All right.  And was one of the jobs that you

5  had in this transaction to evaluate the fairness of the

6  purchase price?

7      A.   Yes.

8      Q.   Did you determine that the purchase price in

9  this case was fair?

10     A.   Yes.

11     Q.   And would it be accurate to say that all of the

12 other lawyers in due diligence, part of their job was to

13 evaluate the fairness of the purchase price?

14     A.   Yeah.

15

16

17     Q.   Who evaluated the fairness of the purchase

18 price in this transaction?

19     A.   Well, initially there was an appraiser that

20 came in and actually did an independent appraisal using

21 various methods.  Then the investment bank itself did

22 comparability analysis with other hospitals that had

23 been sold, and the bond holders and their

24 representatives similarly evaluated the pricing to make

25 sure it was fair.

55

1      Q.   And so all of those various entities would have

2 to be satisfied that the purchase price was fair?

3      A.   Yes.

4      Q.   And who was the purchase price paid to?

5      A.   I'm not sure of the exact entities, but I know

6 it was to Peter Rogan and his investors.

7      Q.   It would be the shareholders?

8      A.   The shareholders, yeah. And I don't know who

9 they all were, or if there were any besides just

10 Mr. Rogan.

11      Q.   And who actually paid the money?

12      A.   The money was paid by the trustee upon receipt

13 of the proceeds of the bond sale.

14      Q.   Who was obligated on the bonds, then?

15      A.   The hospital.

16      Q.   The North Side Operating Company?

17      A.   The North Side Operating Company.

18      Q.   I jumped ahead. What was North Side Operating

19 Company?

20      A.   The North Side Operating Company was the

21 subordinate/subsidiary of Permian healthcare that was

22 established in Illinois for the purpose of owning and

23 operating Edgewater Medical Center and obtaining

24 financing through the Illinois Health Facilities

25 Authority.

1    Q.   And North Side Operating Company was an
2  Illinois not-for-profit corporation?
3    A.   Yes.
4    Q.   And it was the party that was obligated to pay
5  off the bonds, correct?
6    A.   Yes.
7    Q.   It wasn't Permian?
8    A.   Correct.  Permian had no obligation.
9    Q.   I just want to ask you a few questions about
10 Exhibit Number 29.  The first -- if you would go to page
11 three or -- it's got a Bates number of CB 2014 --
12   A.   Okay.
13   Q.   -- and it's -- what's described on that page is
14 the plan of merger and finance.  Now, without going into
15 it, what's included in this section?
16   A.   Well, let me take a quick look at it to
17 refresh.
18   Q.   Okay.
19   A.   It basically describes the transaction --
20   Q.   Okay.
21   A.   -- yeah.
22   Q.   All right.  Then if you would go to page 19,
23 there is a -- about the middle of the page --
24   A.   I didn't know it was printed on the back.
25   Q.   Yeah.

1          -- it says, "MediCare."  Underneath that, it

2    says, "Approximately 56 percent of the patients service

3    revenues of EOC."  Now, that's the prior organization,

4    correct?

5        A.   I'm not sure I'm looking at the correct page.

6        Q.   I'm sorry.  It's CB 2030.

7        A.   You said 19.

8        Q.   Well, it's numbered both ways.

9        A.   Okay.  2030.

10       Q.   I'll go with those numbers then.

11       A.   Okay.  Okay.  I got it.

12       Q.   That relates to the payer mix, correct?

13       A.   Yes.

14       Q.   And that's something that you looked at?

15       A.   Yes.

16       Q.   And on the next page, there is a similar entry

17   for Medicaid, correct?

18       A.   Yes.

19       Q.   So you knew going in that Medicare and Medicaid

20   combined, at least at that point in time, accounted for

21   almost 74 percent of patient revenues, correct?

22       A.   Correct.

23       Q.   And that's something you just needed to know in

24   the transaction, right?

25       A.   Correct.

58

1    Q.    Now, if you would go to CB 2046 --

2    A.    Okay.

3    Q.    -- and at the bottom of that page, it describes

4  the organization.  Do you see that?

5    A.    Yes.

6    Q.    And it names that, "the corporation."  Now they

7  were talking about the new corporation North Side

8  Operating Company?

9    A.    Yes.  I had to read it for a second.

10   Q.    Okay.  In that description there, it states,

11  "The majority of the members of the board of directors

12  shall also comprise the majority of the members of the

13  board of directors of Permian."

14         Do you see that?

15   A.    Yes.

16   Q.    Why was it done that way?

17   A.    Well, it's control and it's a requirement of

18  Permian's charter and also in the corporate laws of the

19  states.  If you are going to have a subordinate or a

20  subsidiary, the parent has to maintain control.

21   Q.    By that, you mean Permian's control over --

22   A.    North Side Operating Company.

23   Q.    Okay.  And on the next page, it lists the

24  initial board of directors.  Do you see that?

25   A.    Yes.

59

1    Q.   Now, Bertram Rosenthal, is that the same

2  physician you mentioned earlier?

3    A.   Yes.

4    Q.   So he was one of the members of the board of

5  North Side?

6    A.   Yes.

7    Q.   And he came from Permian, correct?  It

8  states he was a member of the board of directors of

9  Permian.

10   A.   Yes.

11   Q.   Stina Hans, do you know who that was?

12   A.   Yes.

13   Q.   Who was that?

14   A.   She was the president of Vista Hospital

15  Systems, and she is also a member of the board of

16  Permian.

17   Q.   Okay.  And the next board member listed was

18  Macon Brewer.  Do you know who he was?

19   A.   Yes.  He was a member of the North Side

20  Operating Company board.

21   Q.   Did you meet Mr. Brewer?

22   A.   I met him at the first board meeting after the

23  acquisition was done.

24   Q.   It says here he was retired, but formerly the

25  president of Dean Witter Capital Markets?

60

1     A.    Yes.

2     Q.    Were you familiar with that?

3     A.    Yes.

4     Q.    Were you involved in the selection of these

5  board members?

6     A.    No.

7     Q.    And the next member of the board was the George

8  Chapas.  Did you know him?

9     A.    Similarly, I met him at the first board

10  meetings of North Side Operating Company.

11     Q.    How about Jane Hurd?  Did you know who she was?

12     A.    Yes.

13     Q.    Who was she?

14     A.    She was a member of the board of directors of

15  Permian and a prominent person in healthcare, mainly

16  California.

17     Q.    And then from there, it goes on to describe --

18  let me back up.

19          So three of the five members of the board of

20  North Side were also members of the board of Permian?

21     A.    Yes.

22     Q.    And that's -- the board of North Side

23  controlled the operation of Edgewater Medical Center

24  after this, correct?

25     A.    Correct.

61

1      Q.    Then the document goes on to describe the

2  hospital facility management.  Do you see that?

3      A.    Yes.

4      Q.    Peter Rogan, you met and we've talked about

5  earlier?

6      A.    Yes.

7      Q.    Did you know -- do you remember Jim Cole?

8      A.    Yes.

9      Q.    Who was he?

10     A.    He was a financial officer at that time.

11     Q.    And did you evaluate him at all in your review

12 of Edgewater?

13     A.    I didn't.  But my financial staff did, and we

14 also had him evaluated by the accounting firm.

15     Q.    And what did you learn about Mr. Cole, if you

16 remember?

17     A.    He seemed to be competent.

18     Q.    Now, how about Mr. Ehman?  Did you ever meet

19 Mr. Ehman?

20     A.    Yes.  I met Mr. Ehman.

21     Q.    And did you evaluate whether he should be

22 retained or not?

23     A.    Yes.

24     Q.    What did you decide about Mr. Ehman?

25     A.    We decided that he should be retained.  He had

ESQUIRE DEPOSITION SERVICES
(415) 288-4280

1    really an excellent rapport with the physicians.  And

2    it's a familiar position in most hospitals of that size,

3    and it's important that that person be well thought of

4    and respected by the physicians.

5         Q.   Okay.  Judy Lundy, do you remember who she was?

6         A.   Yeah.  She was the chief nursing officer.

7         Q.   And was she evaluated by your group --

8         A.   Yes.

9         Q.   -- in terms of whether she should be kept?

10        A.   Yes.

11        Q.   And I take it she was acceptable?

12        A.   Yes.

13        Q.   Michael Naman, do you recall him?

14        A.   No.

15        Q.   How about Joann Skavarek?

16        A.   Yes.

17        Q.   Do you recall Joann?

18        A.   Yes.

19        Q.   And what was your evaluation of Joann Skavarek?

20        A.   She was a hard-nosed, tough, very effective

21   day-to day hospital operator.

22        Q.   So you were on board with keeping her employed

23   by the hospital, correct?

24        A.   Yes.

25        Q.   All right.  The next page I want you to look at

1    is -- it would be CB 2057 and 2058.

2

3        Q.    And those two pages, as well as 2059, have some

4    statistics related to the admissions for the hospital?

5        A.    Yes.

6        Q.    And is that something that you looked at in

7    your evaluation of Edgewater?

8        A.    Yes.

9        Q.    Why is that important?

10        A.    Well, again, going back to my metaphor that

11    hospitals are a workshop for doctors, you want to know

12    how many doctors are using your workshop and with what

13    frequency and what kind of things they do there.

14        Q.    And why was it important to know how many

15    admissions were related to these doctors?

16        A.    It was a way of determining which programs and

17    services the hospital emphasized and what its profile

18    was.

19        Q.    Which ones were successful, that type of thing?

20        A.    Yes.

21        Q.    All right.  Next page would be -- it's getting

22    towards the end of the document -- CB 2171, and there is

23    a discussion there about --

24

25

64

1

2     Q.   There is a discussion on page 2171 about

3  recruitment.  Do you see that?

4     A.   Yes.

5     Q.   Related to the medical staff?

6     A.   Yes.

7     Q.   Why was that important to include a discussion

8  about?

9     A.   Well, it tells you -- particularly in a

10  hospital that has been turned around or in the

11  turn-around mode, you want to know is there a critical

12  mass of physicians that utilize the hospital.

13       Secondly, you want to know that you are

14  reaching out and trying to offer the opportunity for

15  physicians in the community to come and utilize the

16  hospital and also to, you know, physicians -- some

17  physicians leave, some age and retire, and you want to

18  make sure that you have a pipeline of physicians that

19  are replacing those that leave for those various

20  reasons.

21     Q.   And that's important to include in this

22  document because of why?

23     A.   Well --

24     Q.   The description of that I mean.

25     A.   Well, the description of that is important for

65

1    several reasons.  One, the purchasers of the bonds want

2    to know that the hospital has a plan in place to make

3    sure that there will be adequate volume and volume

4    growth into the future to make sure that it stays

5    financially viable and can repay the debt.  The Illinois

6    Health Facility Authority has the same intent.  Permian

7    also wants to know that the hospital will be

8    appropriately staffed with physicians.

9       Q.   And the fact that it's described in here, is it

10   fair to state that the recruitment practices and the

11   recruitment strategy had been reviewed by all of the

12   different parties that we had earlier talked about and

13   passed the muster by them?

14

15

16

17

18       A.   That is correct.

19       Q.   Now, on the next page, 2172, there is a

20   description of the senior program.  Do you see that?

21       A.   Yes.

22       Q.   And in the first sentence, it states, "The

23   senior program was established in concert with the

24   Chicago Housing Authority in July 1992."  You got that?

25       A.   Yes.

1    Q.  Now, the fact that it's described here, is it

2    accurate to say that the senior program established with

3    the Chicago Housing Authority was another program that

4    was reviewed by the parties that were involved in

5    reviewing the transaction as a whole?

6    A.  Correct.

7    Q.  And the fact that it's listed and described in

8    here, what does that say about the program in terms of

9    its legality or appropriateness?

10   A.  It doesn't necessarily -- I think it infers

11   that it's legal and appropriate because otherwise we

12   would not have done the transaction, and it would not

13   have been permissible.

14       It also said that a very significant program of

15   this type had been vetted by the various parties.  And

16   also important to us operationally was that the

17   feasibility of consultants who did the demand study, we

18   wanted them to determine the sustainability of this.

19   You know, was this a short-term program that wouldn't

20   last very long, or was it a program that could be

21   sustained.

22   Q.  And the fact that it's in here, is it fair to

23   say that the inference is that this is a program that

24   the hospital is at least contemplating to stay with to

25   bring patients into the hospital?

67

1     A.   Yes.  That's correct.

2     Q.   And as we've discussed, bringing patients in is

3  important because of --

4     A.   Because, again, that's what the hospital is

5  there for.

6     Q.   Now, one thing I missed and I want to go back

7  to -- it will be on page CB 2032.

8     A.   Okay.

9     Q.   The last section on 2032 is captioned "Federal

10  Fraud and Abuse Regulations."  Do you see that?

11     A.   Yes.

12     Q.   And why is -- just take a look at that for a

13  second.

14     A.   Okay.

15     Q.   Why is this discussed in the offering circular?

16     A.   Well, it's -- I think it's under the risk

17  section of the offering circular, and it defines various

18  things that could affect in one way or another the

19  future of the hospital and in particular -- I mean, I

20  see this in every deal --

21     Q.   Okay.

22     A.   -- but in particular with a deal that has a

23  high Medicare utilization.

24     Q.   Now, looking at the next page, 2033 --

25     A.   Uh-huh.

68

1      Q.   In the last paragraph of the sections dealing

2  with the federal fraud and abuse regulations --

3      A.   Yes.

4      Q.   -- there is a statement there that says,

5  "Nonetheless, management of the corporation believes

6  that the contracts it will assume, referring to

7  relationships with physicians and other referral

8  sources, are presently in material compliance with the

9  NI kickback law."

10        Now, is that in reference to what you earlier

11  described as to the review of the physician contracts by

12  the various parties?

13      A.   Yes.

14      Q.   So at this point in time, you were comfortable

15  that everything was above board and legal.  Is that fair

16  to say?

17      A.   Yes.

18

19

20

21      Q.   Okay.  You said the management of the hospital

22  was going to be placed in the hands of a management

23  company?

24      A.   Yes.

25      Q.   Did you specifically form a company for that

69

1     purpose?

2        A.    Yes.

3        Q.    What was the name of that company?

4        A.    It was Braddock Management, LP.

5        Q.    And when you say "LP," what do you mean by

6     that?

7        A.    That there are -- there is a general partner

8     who manages the partnership and limited partners who own

9     percentages of the partnership.

10       Q.    Okay.  LP stands for limited partnership?

11       A.    Limited partner, yeah.

12       Q.    And limited partners are investors, if you

13     will?

14       A.    Yes.

15       Q.    And the general partner runs it, correct?

16       A.    Right.

17       Q.    Why did you choose that form of organization to

18     be the management company?

19       A.    For personal estate planning purposes.

20       Q.    Without going into your personal --

21       A.    Yes.  You know, I'm a high net worth

22     individual, and I have tax advice.  And one of the

23     strategies of my estate planning is to minimize estate

24     taxes upon the death of my wife and I.  And we were

25     advised that certain assets could be placed in trusts

70

1    for our children when they are at a low cost basis and

2    the value of them -- they can increase in value in the

3    children's trust, and therefore bypass our estate.

4         Q.   Okay.  And in this case, they got the benefit

5    of the company without having either the responsibility

6    or the ability to run the business, correct?

7         A.   Correct.

8         Q.   And the business of the limited partnership was

9    run by the general partner?

10        A.   Yes.

11        Q.   And who was the general partner?

12        A.   The general partner was Waldo Management, and I

13   was the sole shareholder of Waldo Management.

14        Q.   Okay.  So in effect, you ran the business of

15   the limited partnership?

16        A.   Yes.

17        Q.   And the name of that partnership was what?

18        A.   Waldo.

19        Q.   The limited partner?

20        A.   Braddock Management.

21        Q.   Okay.  And where did the name Braddock come

22   from?

23        A.   That's where I was born.  That's my hometown.

24        Q.   Where is that located?

25        A.   Braddock, Pennsylvania, right outside of

71

1    Pittsburgh.

2        Q.   Now, if you look at Exhibit 30, do you

3    recognize that document?

4        A.   Yes.

5        Q.   And what is that?

6        A.   That's the -- it's basically the partnership

7    agreement for the limited partnership.

8        Q.   And if you look over, you see the little

9    numbers down in the lower right-hand corner?

10       A.   Right.

11       Q.   If you go all the way to the back actually,

12   1365 --

13       A.   Okay.

14       Q.   -- it shows there that the general partner is

15   Waldo Point Management Corporation --

16       A.   Right.

17       Q.   -- signed by -- was that Mr. Finnane's

18   signature?

19       A.   Yes.

20       Q.   And the limited partner was Vista Ancillary

21   Properties, LP.  What was that?

22       A.   Vista Ancillary Property is the family

23   partnership that we have that is owned by my family --

24   my wife and my family trust and my children's trust.

25       Q.   Okay.  Now, in terms of the relationship, then,

72