1    of Braddock to the operations of Edgewater Medical

2    Center, was there another contract that was entered into

3    that covered those services?  Was there a management

4    contract?

5         A.   Yes, there was.

6         Q.   Would you look at Exhibit Number 31?  Do you

7    recognize that document?

8         A.   Yes.

9         Q.   What is that?

10        A.   That's the hospital management agreement.

11        Q.   And that was the first hospital management

12   agreement that was entered into between Braddock and

13   North Side Operating Company?

14        A.   Yes.

15        Q.   And under this document, if you look at

16   paragraph 2.02 on page two --

17        A.   Okay.

18        Q.   -- who had the ultimate control over the assets

19   and operations of the hospital?

20        A.   Its board of directors.

21        Q.   And this particular contract was approved by

22   the board of Permian?

23        A.   No.  It was approved by the board of North Side

24   Operating Company and ratified by the board of Permian.

25        Q.   Okay.  Who prepared the form of this contract?

1  A. My lawyers.

2  Q. So this form was brought to the transaction by

3 you?

4  A. Yes.

5  Q. I mean, this wasn't given to you by Mr. Rogan

6 as how he wanted to run the hospital, correct?

7  A. No.

8  Q. And was this contract reviewed by your

9 attorneys?

10  A. It was reviewed by all the attorneys on the

11 working group.

12  Q. Okay. Are there certain requirements that this

13 document had to fulfill?

14  A. Yes.

15  Q. And what did those relate to, generally

16 speaking?

17  A. Well, it had to delineate -- it obviously had

18 to delineate the duties and responsibilities. Term and

19 termination and the like, and limits on the duties and

20 responsibilities, plus compensation.

21  Q. Did Mr. Rogan have anything to do with

22 negotiating the terms of this agreement?

23  A. No.

24  Q. Who decided the amounts that were to be paid to

25 Braddock as its fee for managing the hospital?

74

1      A.    It was a negotiation between myself and the

2   board of Permian because they were really running it

3   before the deal was done, yeah.

4      Q.    Did Mr. Rogan have anything to do with deciding

5   the amounts that were to be paid --

6      A.    No.

7      Q.    -- under this agreement?

8      A.    No.

9      Q.    If you would turn page FL 301 or page 13 of the

10  document, Section 6 of the agreement --

11     A.    Okay.

12     Q.    -- that is the section related to the

13  compensation of the manager, meaning Braddock, correct?

14     A.    Yes.

15     Q.    And how was the compensation structured?

16     A.    Well, it was a combination of a fixed and a

17  variable fee paid by the month.

18     Q.    And what was the fixed amount of the fee?

19     A.    It's about $62,000.

20     Q.    And what was the variable part?

21     A.    The variable part was 2 percent of net

22  revenues, but it could not exceed $62,000 a month.

23     Q.    So the variable amount could never --

24     A.    It was capped.

25     Q.    It was capped?

75

1    A.   Yes.

2    Q.   It could never exceed the fixed amount?

3    A.   Right.

4    Q.   Why was there a cap on it?

5    A.   Well, it was actually a safeguard.  It was a

6    safeguard to prevent the management company from

7    pursuing various short-term strategies that might in the

8    short term increase hospital revenues by a substantial

9    amount but not being the long-term interest of the

10   hospital.

11   Q.   Why were there caps on the amount?

12   A.   Because -- well, there were couple of reasons.

13   First of all --

14   Q.   I'm sorry.  You just answered that, why --

15   A.   Yes.

16   Q.   Why was there a percentage amount included at

17   all?

18   A.   Well, because if you had a total fixed fee

19   contract, you know, all you had to do was just do the

20   minimum.  Just keep the hospital well enough to pay the

21   fixed fee.  So there was -- the incentive fee was really

22   a carrot on a stick.  It was a carrot to encourage the

23   efficient operation of the hospital, the growth and

24   development of the hospital and the like, so that it

25   would maintain its viability, but not so much of an

1    incentive that it would encourage people to engage in

2    any short-term, ill-advised business practices, or in

3    the worst case, any wrongdoing.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Q.    Mr. Gross, if you would pull out once again

19    Exhibit Number 31, the management agreement. In the

20    section related to compensation, the percentage --

21    A.    Which section is that?

22    Q.    Page 13.

23    A.    13. Okay.

24    Q.    -- the percentage amount is based on something

25    defined as "net patient service revenues." That would

1    be in 6.01 (B).  Do you see that?

2        A.    Yes.

3        Q.    Do you recall what "net patient revenues"

4    meant?  And if you don't, it's on page 24.

5        A.    I do recall, yes.

6        Q.    Okay.  Tell us what that was.

7        A.    Yeah.  One of the simplest ways of saying it

8    is, like when you look at a car, it's the difference

9    between sticker price and what you actually pay for it.

10        Q.    Okay.

11        A.    Under the accounting rules, particularly for

12    MediCare, even though you are paid on a schedule of

13    fixed rate reimbursement per diagnosis, the healthcare

14    financing administration still requires that you produce

15    a bill with all of the retail charges.  Those become

16    gross revenues.  What the net revenues are is what you

17    actually paid for those services.  The difference

18    between the two is called a contractual allowance.

19        Q.    But the net patient revenues includes revenues

20    from MediCare, correct?

21        A.    Yes.

22        Q.    Medi --

23        A.    From all payers.

24        Q.    Including private insurance?

25        A.    Private insurance, cash.

78

1    Q.    It's not just MediCare, Medicaid, correct?

2    A.    And it excludes any money that was donated that

3    is revenue to the hospital, and it also excludes any

4    investment income on cash reserves.

5    Q.    And it also includes the revenue generated, if

6    you will, by all doctors who admit patients to the

7    hospital, correct?

8    A.    Correct.

9    Q.    All right.  So the amount of revenue that was

10    applicable to the percentage portion of the fee is

11    really a small amount because of the cap, correct?

12    A.    Correct.

13    Q.    And then any amount that is directly related to

14    any one particular physician is even much smaller than

15    that, correct?

16    A.    Generally speaking, yes, particularly a

17    facility the size of Edgewater.

18    Q.    Okay.  Now, would you turn to Section 3 of the

19    management agreement, which is on page three?

20    A.    Okay.

21    Q.    And that's a section that's entitled "Duties of

22    the Manager."  Do you see that?

23    A.    Yes.

24    Q.    Can you just briefly run down what the

25    contractual duties were that Braddock assumed under this

79

1    contract?

2         A.    I can read them off from the --

3         Q.    Yeah.  Why don't you just read off the titles

4    for us.

5         A.    Okay.  On personnel, there is a key distinction

6    and that is, other than the chief executive officer and

7    certain members of the administrative team, financial

8    officer, nursing, marketing officer, all of those

9    employees are actually employees of the hospital.

10        The excepted ones, chief executive officer,

11   chief financial officer, chief nursing officer,

12   marketing person, are employees of the management

13   company.  And we have -- with that team, we have the

14   responsibility for supervising all nonphysician

15   personnel at the hospital.  And we can do the hiring and

16   firing and everything subject to the hospital's policies

17   and procedures.

18        It's our job to look at wages and benefits, et

19   cetera, which usually is determined by market forces.

20   Any kind of labor negotiations, we have to do.  There

21   are certain situations where we have to get the consent

22   of the board.  Thresholds on layoffs, thresholds on

23   certain salary levels, et cetera, hospital rates.

24        Q.    Okay.

25        A.    We can hire consultants on behalf of the

80

1    hospital, including lawyers, et cetera.

2        Q.    That's paragraph 3.02?

3        A.    M-hm.

4        Q.    Under 3.03, you have responsibility for

5    financial management?

6        A.    Yes.

7        Q.    And I think you talked about that a little bit

8    earlier today, correct?

9        A.    Right.

10       Q.    On the next page, you have responsibility for

11   financial services, books, and records?

12       A.    Correct.

13       Q.    What does that include, just generally

14   speaking?

15       A.    Well, that means that we must maintain the

16   books and recs of the hospital, not only in an honest

17   way, but according to generally accepted accounting

18   principles and the rules of the health financing

19   administration of MediCare.

20       Q.    Okay.  Under paragraph 3.05, what are your

21   duties?

22       A.    We have the responsibility of negotiating and

23   entering into and discharging certain contracts for

24   services, the hospital, and we can enlist the assistance

25   of outside professionals, if we need to, but it's

1    primarily our job.

2        Q.    Okay.   And 3.06?

3        A.    Is litigation.   We can -- subject to the

4    approval of the board, we can file lawsuits on behalf of

5    the hospital.   We can settle lawsuits on behalf of the

6    hospital in a variety of different situations subject to

7    any rules of our insurance coverage.

8        Q.   All right.   3.07?

9        A.    3.07, in marketing, we have to -- both in terms

10   of marketing the hospital and the public relations

11   aspect of the hospital, that's our responsibility.

12       Q.   Okay.   3.08, risk management?

13       A.    Risk management is to -- in addition to

14   insurance -- most insurance policies give you much more

15   favorable rates or sometimes as a condition of

16   participation, that you have an internal risk management

17   program.   And we also support the medical staff by

18   providing them data and information that they may

19   request from time to time to do peer review so that they

20   can do their part under risk management.

21       Q.   All right.   3.08, repairs and maintenance?

22       A.    We've got to keep the physical plant and its

23   grounds maintained to the standards, at the very

24   minimum, of health and safety codes.

25       Q.   All right.   3.10, government regulations?

1    A.   It's our job to have knowledge of, either

2    directly or through our advisors, which are usually

3    lawyers and the accounting firms, to stay up to date on

4    applicable government regulations that apply in whatever

5    respect -- financial, physical plant, patient care --

6    with respect to the hospital.

7        Q.   Okay.  3.11, confidentiality of records?

8        A.   Right.  It's our job, as overseeing the

9    custodian of records for the hospital, that the

10   confidentiality of those records, particularly as they

11   relate to patient identity and patient information, be

12   maintained.

13       Q.   Okay.  Under 3.12, you have certain

14   responsibilities regarding quality control?

15       A.   Yes.  Quality control -- this is primarily

16   focused on nonphysicians.  We have licensed personnel in

17   nursing and laboratory and other allied health

18   professions.  It's our job to make sure that they do

19   their job and they do it correctly and that we have a

20   system to make sure that patient care is adequately

21   given, and then we work in conjunction with the medical

22   staff jointly on projects on quality issues.

23       Q.   And the physician quality control, who has

24   responsibility for that?

25       A.   The medical staff and the executive committee.

1    The medical staff and usually the quality assurance

2    committee of the medical staff.

3        Q.   Okay.  3.13, legal and risk management

4    services?

5        A.   You know, it's in a similar vein, yeah.

6        Q.   What you talked about earlier?

7        A.   Yes.

8        Q.   Okay.  And then there's some miscellaneous

9    services that are listed in the next few paragraphs.

10       A.   M-hm.

11       Q.   Then 3.17 is general corporate services.  Do

12   you see that?

13       A.   Yes.

14       Q.   What is that?

15       A.   Let me look at that.  3.17, corporate service.

16   Let me refresh myself on that.

17       Q.   Sure.

18       A.   Yeah.  There are certain things that the

19   hospital, just as a business, as a corporation, has to

20   do.  It has to do planning, strategic planning.  It has

21   to communicate, have liaison with its financing sources,

22   with the community, with businesses and the like in the

23   community, governmental agencies and the like.  We are

24   contracted to perform those corporate functions.

25       Q.   3.18 is exclusive corporate services.  What is

1    that?

2        A.    We can basically manage the competition, number

3    one.  Number two, if there is a business opportunity

4    that is available for the hospital, either an adjunctive

5    service or a merger or whatever with another hospital

6    and the like, we have a duty to the hospital as a client

7    to work exclusively on their behalf.

8        Q.    And under 3.19, you are entitled to additional

9    compensation for exclusive corporate services, correct?

10       A.    Correct.

11       Q.    And then that would have been in addition to

12   the fees outlined in paragraph six of the agreement?

13       A.    Correct.

14       Q.    All right.  Now, in terms of the services to be

15   provided by the hospital, were there any activities that

16   Braddock did not have that were specifically reserved

17   for the hospital or to the medical staff?

18       A.    Not that I can recall.  You know, the medical

19   staff has its own responsibilities for continuing

20   education and things of that nature.  So that wouldn't

21   be a responsibility for us.  I can't think of any major

22   function that would fall within the purview of the

23   nonphysician components of the hospital that we

24   ultimately didn't have to provide on behalf of the

25   board.

1      Q.    And when you say that, you mean -- you are

2   referring to administrative and managerial?

3      A.    Administrative and managerial.

4      Q.    Okay.  Turn to the next page, page 11, Article

5   4.  So there were some limitations on the

6   responsibilities of the manager, correct?

7      A.    Yes.

8      Q.    And what were those?

9      A.    Well, the medical staff oversight -- we have --

10  you know, let me -- I want to just refresh myself on the

11  language here.

12        The only entity that had any oversight or

13  control over the medical staff was the corporation

14  through its board of directors.  Ultimately, when the

15  medical staff conducts its business, either admitting

16  new members, delineating privileges, committee reports,

17  quality assurance reports, or any other type of

18  activity, it has a responsibility to report that to the

19  board and to receive approval from the board.

20        Management's job is to provide whatever

21  assistance to the medical staff in doing that, and

22  that's usually clerical in nature and administrative in

23  nature.  And we communicate changes.  It's our job if

24  there are changes in regulations and changes in the

25  environment, the board looks to us to inform them and

86

1      the medical staff of those changes.

2          Q.    All right.   In paragraph 4.01, it states,

3      "Hospital corp. shall have exclusive control and

4      authority for overseeing medical staff affairs,

5      including monitoring the performance of professional

6      services by the medical staff and other licensed

7      personnel, to ensure that the hospital maintains high

8      standards of patient care treatment and related

9      functions."   You see that, right?

10         A.    Yes.

11         Q.    Hospital corp. in that context means North

12     Side --

13         A.    North Side Operating Company.

14         Q.    And its board of directors?

15         A.    And its board of directors.

16         Q.    It does not mean Braddock and its employees --

17         A.    No.

18         Q.    -- correct?

19         A.    No.

20         Q.    These responsibilities --

21         A.    In fact, it implicitly limits the role of the

22     manager not to do those things.

23         Q.    Okay.   That was my point.

24         A.    Yes.

25         Q.    All right.   Why were those matters reserved to

87

1    the hospital and its board of directors as opposed to

2    Braddock?

3

4

5         THE WITNESS:  Law.

6    BY MR. HOLMEN:

7         Q.    What do you mean by that?

8         A.    Well, the laws and the rules and regulations of

9    medical practice say that, first of all, the hospital

10   cannot employ physicians.  That's number one.  And

11   number two, the hospital is a collegial organization,

12   not unlike a university where you have a faculty and you

13   have students, where the administration is responsible

14   for the buildings and all the administration, but the

15   faculty governs itself.  Okay.  It's very much like that

16   in a hospital.  So the management lacks the medical

17   expertise, the training, and the skills to even have the

18   capacity to oversee the medical staff.

19        Q.    Very good.  All right.

20             Now, with regard to the management fees that

21   were set forth in the contract, was anything done to

22   evaluate the reasonableness of the fees set forth in the

23   agreement?

24        A.    Yes.

25        Q.    What was that?

1    A.    The board -- the IRS regulations require that

2  management contracts in a not-for-profit hospital

3  setting be market-based.  Medicare requires that the

4  management fees for not just the hospital management,

5  but any management contract, or any contract be

6  market-based.

7    Q.    What does that mean?

8    A.    That means that it be fair market value.  It

9  will fall within the range of what other companies would

10  charge for similar services under similar circumstances.

11  So it's a part of the board's process.

12         It, either on its own or through its law firm,

13  retains a third party.  In this case, it's been either

14  Coopers & Lybrand or evaluation counselors that go out

15  and use their database to independently determine a

16  range of fees that can be charged by a management

17  company, and then the hospital board is required to

18  contract within that range.

19    Q.    And was that done with regard to the first

20  contract you entered into?

21    A.    Yes.  That was also a requirement of the

22  financing.

23    Q.    All right.  Skip 32 and 33 and go to Exhibit

24  Number 34.

25    A.    Okay.

89

1    Q.    It's a document prepared by Coopers &

2    Lybrand --

3    A.    Yes.

4    Q.    -- entitled "North Side Operating Company

5    Management Fee Study?

6    A.    Yes.

7    Q.    Do you recall this document?

8    A.    Yes.

9    Q.    And is this the evaluation that you were

10   referring to that was done in this case?

11   A.    Yes.

12   Q.    Do you recall what their conclusion was?

13   A.    Their conclusion was that our fees were felt

14   within the market ranges and were fair and reasonable.

15   Q.    Okay.  And if you look at page four of that

16   document --

17   A.    Yes.

18   Q.    -- under the section entitled "Findings" --

19   A.    Yes.

20   Q.    -- what does it say specifically?

21   A.    "Given the responses to our interviews,

22   findings from contract reviews and results of our

23   procedures, the fees charged by Braddock appear under

24   the term agreement to fall within the reasonable range

25   of commercial management fees paid by U.S. hospitals."

90

1     Q.   And with that, you felt comfortable that the

2 fees that were being charged and paid fell in compliance

3 with all the regs you had mentioned, correct?

4     A.   Yes.

5     Q.   And it was the -- strike that.

6          Who retained Coopers & Lybrand?

7     A.   The board.

8     Q.   The board of North Side?

9     A.   Yes.

10     Q.   Did Mr. Rogan have anything to do with

11 selecting and hiring Coopers & Lybrand?

12     A.   No.

13

14

15

16

17

18

19     Q.   So you were satisfied with this review that you

20 were in compliance with all of the pertinent regs with

21 regard to the fees that were being charged, correct?

22     A.   Correct.

23     Q.   Now, over the years, the management contract

24 was amended from time to time?

25     A.   Correct.

91

1    Q.    Did the basic structure in terms of duties and

2    responsibilities remain the same?

3    A.    Yes.

4    Q.    Those were the responsibilities that we just

5    went over?

6    A.    Yes.

7    Q.    And did the fee structure -- that, meaning the

8    flat fee, percentage fee, and a fee for exclusive

9    services, did that remain the same notwithstanding any

10   other changes?

11   A.    It had remained the same, although I'd have to

12   look at this one.  I can't remember.  There were --

13   right around that time, the IRS changed the safe harbor

14   rules.  And you could go anywhere from 50 percent to a

15   fixed fee, depending on the length of the term, and I

16   can't recall if the variable fee changed.

17   Q.    We'll get to that in a minute.

18   A.    Okay.

19   Q.    Now, once the North Side board was put in

20   place, who was responsible for hiring the personnel at

21   Braddock to perform the duties and responsibilities that

22   we just discussed?

23   A.    Me.

24   Q.    You as being the president?

25   A.    As being -- no, no.  As being -- as president

1    of Braddock, CEO of Braddock Management, I hired the

2    personnel that worked in Braddock Management.

3         Q.   Okay.  Was that subject of the board approval?

4         A.   Yes.

5         Q.   And did you have a practice when you acquired a

6    hospital in terms of evaluating the existing personnel?

7         A.   Yes.

8         Q.   Did you do that in this case?

9         A.   Yes.

10        Q.   And we touched on this a little bit before, and

11   you did evaluate Mr. Rogan in terms of retaining him,

12   correct?

13        A.   Yes.

14        Q.   And you talked a little bit about your opinion

15   of his capabilities.

16             Did you get any input from any other sources as

17   to whether he should be retained?

18        A.   Yes.

19        Q.   What was that about?

20        A.   When I personally spoke to various members of

21   the medical staff, I would, sometimes subtly and

22   sometimes directly, try to assess how they felt about

23   Mr. Rogan and his work.  And also when I was speaking to

24   the Coopers & Lybrand people, when their consulting team

25   did the demand study where they went out and

1    confidentially interviewed physicians and others, I

2    asked that they try to get at that question for

3    Mr. Rogan and other members of the management team.

4        Q.   Did you get any reports from any of the people

5    that you talked to when you were marketing the bonds?

6        A.   Yes.

7        Q.   Who did you talk to when --

8        A.   Well, when -- the bond marketing process

9    requires what we call a road show, where members of the

10   management team and the investment bankers and the

11   accountants go out and meet with the analyst of the

12   various bond funds.  And then after that, some of them

13   decide that they want to invest in the bond.  Some of

14   them decide they don't.

15            Two of the funds stated very strongly that one

16   of the things that put them over the top to put the

17   investment is our decision to keep on Peter Rogan.

18   Because when we brought him with us on the road show, I

19   required that he answer a lot of the hospital-specific

20   questions and questions about the marketplace.

21       Q.   And did you get feedback from the people you

22   were talking to?

23       A.   Yes.

24       Q.   And what did you hear about Mr. Rogan?

25       A.   That he was very, very sharp.  He was

1    tough-minded about cost, that he knew the marketplace

2    really well, and things of that nature.

3        Q.   And was keeping Mr. Rogan involved in the

4    hospital then, in your opinion, important for the

5    marketplace, if you will?

6        A.   Yes.

7        Q.   Okay.  So you did decide to hire Mr. Rogan for

8    Braddock, correct?

9        A.   Yes.

10       Q.   And what was he hired as?

11       A.   He was hired at that time as chief executive

12   officer of the hospital.

13       Q.   And if you would look at Exhibit Number 35, and

14   that's a document entitled "Executive Employment

15   Agreement," dated August 17, 1994?

16       A.   Yes.

17       Q.   That is the employment contract you entered

18   into with Mr. Rogan, correct?

19       A.   Yes.

20       Q.   And what were his duties and responsibilities?

21   And if you would look at the page that is -- well, in

22   type, it's number seven.  The Bates number is 36336.

23       A.   M-hm.  I see it.

24       Q.   And that contains his job description, correct?

25       A.   Yes.

95

1    Q.   Now, without going through each and every one,

2   can you generally describe what Mr. Rogan's duties and

3   responsibilities were?

4    A.   Mr. Rogan's duties and responsibilities were

5   delegated by me to oversee the day-to-day on-site

6   activities of the hospital, to basically make sure that

7   the contractual duties and responsibilities of the

8   management company on site were fulfilled, and delegated

9   him the responsibility to supervise his direct reports

10  on the management team and, again, to fulfill the duties

11  and responsibilities listed in the management agreement,

12  and then any other duties and responsibilities that I

13  delegated to him.  And I also had certain restrictions

14  of things that he had to come back to my approval.

15   Q.   Okay.  The details of what he was responsible

16  for, then, is contained in paragraphs A through P on

17  pages seven, eight, and nine of the employment

18  agreement?

19   A.   Yes.

20   Q.   Okay.  Now, there were some limitations placed

21  on his duties, correct?

22   A.   Yes.

23   Q.   And what were those?

24   A.   Well, you know, off the top of my head, I can't

25  remember specific ones.  But categorically, he had

1   certain amounts that he could make discretionary

2   decisions about expenditures.  Above that threshold, he

3   required my approval.  Above a threshold, I required the

4   approval of the board.

5       Q.   Are the limitations outlined on pages 9 and 10

6   of the employment agreement?

7       A.   Let me take a look.  Yes.

8       Q.   Why did you put those limits on Mr. Rogan?

9       A.   Well, first of all, it's a basic discipline of

10  multi-site management control.  You know, you don't want

11  to give somebody a free rein without having checks and

12  balances.  And also, they are a derivative of some of

13  the limitations that the management company had in its

14  contract with the hospital.

15      Q.   All right.  And who did Mr. Rogan report to?

16      A.   To me personally.

17      Q.   All right.  And how was he compensated?

18      A.   He was compensated -- you mean amount?  He

19  received a salary, he received employee benefits, and he

20  was eligible for a bonus.

21      Q.   And under this agreement that is dated August

22  17th, 1994, what was his salary?  It's on page two.

23      A.   Okay.  I will have to read it because I don't

24  remember.  175,000 a year.

25      Q.   And he was entitled to earn a bonus, correct?

97

1      A.    Correct.

2      Q.    Who determined what the bonus amount would be?

3      A.    It was determined in collaboration between

4 myself and the board.

5      Q.    What was the basis for bonuses that Mr. Rogan

6 would earn?

7      A.    They were based on some financial and some

8 nonfinancial criteria.  I can tell you what they can't

9 be based on.  They can't be based on profits.  Okay.

10 You can't use profits -- that's a prohibition under the

11 IRS rules -- but you can set goals for increased

12 revenues, for program development, for cash-flow issues,

13 days outstanding on accounts receivable, physician

14 recruitment, certain community-oriented functions based

15 on the mission statement of the hospital, personnel

16 development, making sure they got a high score on the

17 JCHL accreditation, and the state licensing survey.

18 Those kind of measurements.

19          And then there is always a discretionary piece,

20 that you can either -- I've seen myself -- I've done

21 myself and I've seen boards use that discretion to

22 reduce a bonus or to increase a bonus based on

23 observations that could not be made by just a specific

24 criteria.

25      Q.    And whose job was to it determine the amount of

98

1    bonus that Mr. Rogan was to be paid, if any?

2        A.    Mine.

3        Q.    And was that subject to the board approval?

4        A.    Yes.

5        Q.    And talking about the North Side, that's the

6    North Side Operating Board --

7        A.    Yes.

8        Q.    -- right?

9              How was the board of the North Side Operating

10   Committee selected?  And earlier we mentioned the names,

11   but I don't think I asked you; how did they wind up on

12   the board?

13       A.    You know, I can't speak about the specific

14   individuals.  I can tell you about the process that was

15   literally always used by Permian.

16              It was a five-person board.  Three of the

17   members had to be members of the Permian board for

18   corporate control.

19       Q.    Right.

20       A.    Then what we did is, we looked either to the

21   local medical staff or the local management team to

22   recommend individuals to serve on the board based on,

23   you know, either skills, experience, contacts,

24   connections.  Sometimes we were lucky enough to get the

25   mayor of a city on the board or a very prominent citizen

99

1 or someone who may have financial expertise or

2 programmatic expertise and the like.  And there was

3 some -- the way the process goes is, there are various

4 nominations put forth.  Their credentials are looked at,

5 and then there is a selection of them.

6  Q. And that process was followed with staffing the

7 North Side board?

8  A. Yes.

9  Q. Was Mr. Rogan on the board of North Side

10 Operating Committee?

11  A. North Side Operating Company?

12  Q. Yes.

13  A. No.

14  Q. Did he in any way control the board or any of

15 it members?

16  A. No.

17  Q. How do you know that?

18

19  THE WITNESS:  Well, first of all, the board is

20 controlled by Permian and the Permian board members.

21 Secondly, we required disclosures on the part of all

22 board members.  There was a conflict of interest

23 statement and the like.  So, you know, any -- you know,

24 unless somebody was just being dishonest, we saw no

25 evidence that he controlled any individual, and he

1  certainly didn't control the board.  The board was

2  controlled by Permian.

3  BY MR. HOLMEN:

4      Q.   Did you attend board meetings for North Side?

5      A.   Most of them, yes.

6      Q.   And so you saw the board in operation?

7      A.   Yes.

8      Q.   And did you know the members of the board at

9  the time?

10      A.   I knew the Permian ones, and then I got to know

11  the ones that were appointed after the acquisition.

12      Q.   And the Permian members in particular, were

13  they the type of people that Mr. Rogan was able to

14  control?

15      A.   No, no.

16

17

18      Q.   And that would have been Mr. Rosenthal,

19  correct?

20      A.   Dr. Rosenthal.

21      Q.   I'm sorry.  Dr. Rosenthal --

22      A.   Ms. Hans --

23      Q.   Ms. Hans.

24      A.   -- and Ms. Hurd.  Yeah, very independent

25  individuals.

101

1     Q.   All right.  And you saw no evidence at any time

2   that Mr. Rogan could exert any undue control over any of

3   the board members?

4     A.   No.

5     Q.   Did you expect Mr. Rogan to have interaction

6   with the board?

7     A.   Yes.  That's part of his job.

8     Q.   Okay.  And what did you expect in that regard?

9     A.   I expected for him to -- the board of Permian

10  and at North Side Operating Company was operated at a

11  strategic level.  They did not get involved in the

12  management of the hospital.  That was viewed not to be a

13  board function.

14        But from time to time, in between board

15  meetings, if there was anything major that happened, his

16  instructions were to talk to me, and then I would deal

17  with the board.  I would usually talk just to the board

18  chairman or the board president.

19        Our process for developing the agenda for the

20  board meeting was that management -- that's one of our

21  jobs in management, was to develop the agenda.  And

22  there were certain items that always had to be in the

23  agenda, and then there were certain items that came up

24  during the course of the interval between each board

25  meeting.  We also require that the hospital CEO take the

1    lead in presenting at the board meeting.

2        Q.    Now, I've looked at a number of board meeting

3    minutes, and Mr. Rogan's name is all over those minutes.

4        A.    Yes.

5        Q.    Now, is that what you expected him to do?

6        A.    Absolutely.  And I think if you looked at the

7    board of meetings of almost any hospital, you'll be able

8    to tell who the hospital CEO is because their name is

9    all over the place.

10       Q.    And that was consistent with what you expected

11   him to be as the CEO of Braddock --

12       A.    Correct.

13       Q.    -- correct?

14       A.    No.  CEO of Edgewater.

15       Q.    Of Edgewater.  I'm sorry.

16             Now, the law firm of Foley and Lardner, do you

17   remember them?

18       A.    Yes.

19       Q.    They were involved in the process, correct?

20       A.    Yes.

21       Q.    And after the deal was closed -- strike that.

22             Who brought Foley and Lardner into the whole

23   process?

24       A.    First Boston, CS First Boston.

25       Q.    It wasn't Mr. Rogan who brought Foley and

                                                          103

1    Lardner in?

2        A.   No.

3        Q.   After the deal was closed, did you continue to

4    use Foley and Lardner as attorneys for North Side?

5        A.   Yes.

6        Q.   Now, if you will look at Exhibit Number 36,

7    it's a letter dated August 19th, 1994, from Robert

8    Zimmerman to you as president of Primus.

9        A.   Yes.

10       Q.   And do you recall this letter?

11       A.   Yes.

12       Q.   And in this letter, Mr. Zimmerman offers you

13   the opportunity to utilize Foley and Lardner at a

14   reduced rate for the next year.  Do you see that?

15       A.   Yes.

16       Q.   And did, in fact you used Foley and Lardner as

17   counsel for North Side over the next year?

18       A.   Yes.

19       Q.   And again, Foley and Lardner was not a firm

20   that Mr. Rogan had brought into the mix, correct?

21       A.   No.   That's correct.   It was brought in by

22   First Boston and then us.

23       Q.   Now I want you to look at Exhibit Number 37.

24            During the course of your involvement with

25   Edgewater, you monitored the performance of the

                                                          104

1  hospital, correct?

2      A.   Yes.

3      Q.   And Exhibit Number 37 is a letter with

4  attachments dated August 5th of 1996, from Ken Huff,

5  vice president of finance, to Sal Banks with the

6  Illinois Health Authority, with a copy to you.  Do you

7  see that?

8      A.   Yes.

9      Q.   And what are the attachments to this letter?

10     A.   Let me just make sure that this is a typical

11 one.

12     Q.   There is nothing special about this, but

13 just --

14     A.   Let me take a look.  Under the bond documents,

15 the hospital is required to submit a report quarterly to

16 the bond holders.  The trust -- the trustee accepts that

17 report on behalf of the bond holders.  Although in this

18 particular case, the bond holders waived having the

19 trustee do it, we send it directly to the bond analyst.

20 And Ms. McInerney of the Health Facility Authority, also

21 in the bond documents, is required to get a copy.

22          And we are supposed to provide them with an

23 interim financial report with financial information,

24 balance sheet information, statement of cash flow, and

25 in addition to that, kind of a written overview of

1    operations.

2         Q.    And you received a copy of this --

3         A.    Yes.

4         Q.    -- every quarter?

5         A.    Every quarter.

6         Q.    Did you review it when you got it?

7         A.    Actually, we usually reviewed it before it was

8    sent.

9         Q.    Okay.  And why was it of interest to you?

10        A.    Well, because as the management company, we are

11   ultimately responsible for the performance of the

12   hospital.  So this report was actually kind of a

13   bottoms-up report.  And there is a certain format and a

14   template that's prepared by the hospital.  I had my

15   staff check it to make sure it was accurate, and then we

16   added certain information, usually about the balance

17   sheet.  And we also, from time to time, would add

18   written comments to the operating report.  And the board

19   required us to review this and vet it and sign off on it

20   essentially before it went out.

21        Q.    So while Permian owned Edgewater Medical

22   Center, you were very interested in knowing how it

23   performed?

24        A.    Absolutely.

25        Q.    And that was one of the obligations that you

106

1    assumed, correct?

2        A.    Absolutely.

3        Q.    Now, I'd like you to take a look at what's been

4    marked as Exhibit Number 38, which is a memorandum from

5    Daniel Finnane to Ken Huff.

6             Earlier, we established that Dan was your

7    right-hand man?

8        A.    Chief operating officer.

9        Q.    And did you see reports of this type?

10       A.    Every day.

11       Q.    And what is this type of report?

12       A.    We just call these flash reports.  It's kind of

13   like putting your fingers on the pulse to watch certain

14   trends there.  There are certain things in a hospital

15   that can give you an indication of activity level, and

16   we look at this just, again, so we can stay on top of

17   how the hospital is performing.

18            We can see, for example, if there is a decline

19   in census or outpatient activity.  We try to find out

20   why.  We try to make sure that the hospital is adjusting

21   its staffing and its cost accordingly.  Similarly, if

22   the census is extraordinarily high, we try to determine

23   why that is and are we staffing promptly and the like

24   and to get a picture of what our cash position is.

25       Q.    And so you were interested in seeing this

107

1   information monthly?

2       A.    Well, every day.

3       Q.    Every day you would?

4       A.    We would get these daily.

5       Q.    Okay.  Now, the report that's attached, for

6   example, the month of September of 1995 --

7       A.    Right.

8       Q.    -- but you'd also get them daily?

9       A.    Daily.

10      Q.    Faxed to you in California?

11      A.    Faxed, yes.

12      Q.    So it was important to you to monitor how the

13  hospital was operating on a daily basis?

14      A.    Yes.

15      Q.    Including admissions, how many people were

16  coming in, that sort of thing?

17      A.    Yes.

18      Q.    And why is all that important to you?

19      A.    Well, again, that's how -- you know, when you

20  have a multi-site organization and you've delegated

21  responsibility to an on-site management team and you

22  were not there every day, there are certain things as a

23  matter of discipline that I require so that we can have

24  our fingers on the pulse of the place.  And it allowed

25  us to anticipate trends.  It allowed us to anticipate

1    how the month was going.  Any problems, it gave us an

2    opportunity to intervene early if there were any issues.

3    And basically, to make sure that the hospital people

4    knew we were watching them.

5

6

7

8

9

10

11

12

13

14

15        Q.    Mr. Gross, earlier you testified that you

16   attended most of the board meetings of North Side

17   Operating Committee?

18        A.    Yes.

19        Q.    Would you look at Exhibit Number 39, which are

20   the minutes of a board meeting held June 16th?  You can

21   put all those out of the way.

22        A.    This one?

23        Q.    Yeah.

24        A.    Yes.

25        Q.    And was it the -- were minutes created for

1    board minutes in the ordinary course of the business of

2    North Side Operating committee?

3        A.   Yes.

4        Q.   And was it the ordinary course of business for

5    North Side to create such minutes?

6        A.   Correct.

7        Q.   And was that true for any and all board

8    meetings?

9        A.   Correct.

10       Q.   And these particular minutes, would you say

11   they are typical in their format and what's reported in

12   here?

13       A.   Yes.

14       Q.   And as you look through this, there are items

15   that were reported on by Mr. Rogan, items reported on by

16   yourself, items reported on by Mr. Finnane, but usually

17   within their particular area of expertise and

18   responsibility, correct?

19       A.   Yes.

20       Q.   And that's how the board minutes were run?

21       A.   Yes.

22       Q.   I'm sorry.  The board meetings?

23       A.   The board meetings, yes.

24       Q.   All right.  Now, would you review the minutes

25   after you got them?

110

1    A.    Yes.

2    Q.    And would you review them every time?  Strike

3  that.

4          Would you receive all of the minutes of every

5  board meeting?

6    A.    Either myself or Mr. Finnane.  One or the two

7  of us had to review them.

8    Q.    All right.  Now, look at Exhibit Number 40, if

9  you would.

10         Those are the board minutes from the October

11  10th, 1995, meeting?

12   A.    Correct.

13   Q.    And you were in attendance at this meeting?

14   A.    Correct.

15   Q.    And what I would like you to do is look at page

16  ten, and the page number is in the upper left-hand

17  corner.

18   A.    Yes.

19   Q.    And in subparagraph (k), there is a reference

20  to a report that you gave concerning Braddock's

21  performance bonus for 1995.  Do you see that?

22   A.    Yes.

23   Q.    Take a minute and look at that, if you would.

24   A.    Okay.

25   Q.    In the first sentence of that section, it

1  states that you discussed the outstanding performance of

2  the Braddock management team and the suitability as such

3  of awarding performance bonuses.  Do you see that?

4      A.   Yes.

5      Q.   What were you referring to in connection with

6  the outstanding performance of the Braddock management

7  team?

8      A.   They significantly beat their numbers.

9      Q.   By that you mean what?

10     A.   They had positive variances to the budget for

11 net revenue and expenses for unitive service, margin,

12 cash collections, et cetera.

13     Q.   And the Braddock management team included who?

14     A.   That would include Rogan, Joann Skavarek, I

15 think her name was, Judy, the nursing director, and

16 Roger --

17     Q.   Ehman?

18     A.   -- Ehman, who was the marketing person.

19     Q.   And as of this time, a little more than a year

20 after Permian had bought it, were you satisfied with the

21 way Mr. Rogan and his team were operating?

22     A.   Yes.

23     Q.   Obviously you were because of this report?

24     A.   Yes.

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Q.   Now, I have another document here that's marked

19    Exhibit Number 46.   And it comes at this time only in

20    sequence of dates, but it's a memo that Mr. Olsen --

21    Mike Olsen, who is Mike Olsen?

22    A.   Mike Olsen was the in-house counsel for Primus

23    and Braddock.

24    Q.   Okay.  And he sent this document to

25    Mr. Ficcaro --

122

1      A.   M-hm.

2      Q.   -- and it's a description of Permian

3 Healthcare, Inc., and its management entities.

4           Do you remember this document?

5      A.   Yes.

6      Q.   Take a minute and look at it.  And all I want

7 to ask you, Mr. Gross, is whether this is an accurate

8 description of the entities that it talks about?

9      A.   Yes.

10     Q.   And you'll note on page FL 5374 --

11     A.   M-hm.

12     Q.   -- there is a footnote, which states, "F. Scott

13 Gross directly or indirectly owns, operates, and

14 controls the above entities" -- referring to Primus,

15 Braddock, and Primus -- "through various trusts

16 established for estate planning purposes."  Do you see

17 that?

18     A.   Yes.

19     Q.   Is that what you were referring to earlier when

20 you talked about how and why you set up these companies?

21     A.   Yes.

22     Q.   Now, if you turn to the next page, it's an

23 organizational chart for Permian Healthcare, right?

24     A.   Yes.

25     Q.   This was put together by you or somebody on

1    your staff?

2       A.   I don't know, but it looks like something that

3    we frequently used.

4       Q.   And is this an accurate depiction of the lines

5    of authority and control that existed at this time?

6       A.   Yes.

7       Q.   And you show North Side Operating Board of

8    Directors reporting up to the Permian Healthcare Board

9    of Directors.  Do you see that?

10      A.   Yes.

11      Q.   That was the correct line of authority there,

12   right?

13      A.   Correct.

14      Q.   And then you show Braddock in a shaded area off

15   to the right.  Why is it indicated that way?

16      A.   Well, because it is accountable to the board of

17   directors of North Side Operating company.  And other

18   than just format, I think that's the only reason it's

19   off to the side.

20      Q.   Okay.  Now, if you were going to put the

21   medical staff as a separate unit -- which it was,

22   correct?

23      A.   Yes.

24      Q.   If you were to include that on here, where

25   would you put that?

124

1    A.    I would put it under the North Side Operating

2  Company Board of Directors.

3    Q.    Okay.   Reporting with a line to North Side?

4    A.    Yes.

5    Q.    And you wouldn't put a line to Braddock at all,

6  would you?

7    A.    No.

8    Q.    Okay.   Would you put it on an equal level with

9  Braddock and then a line towards that -- the line coming

10  down from North Side?

11    A.    Yes.

12    Q.    Okay.   But it wouldn't line up with Braddock at

13  all, right?

14    A.    No.

15    Q.    Now, there is also a little box that says,

16  "Edgewater Medical Center Local Governing Board."   Do

17  you see that?

18    A.    Yes.

19    Q.    What was the local governing board?

20    A.    The local governing board is, again, part of

21  the governance process of the Permian Healthcare system.

22  They were on the local governing boards.   You can see

23  there is one for each of these hospitals.

24        It's made up of the majority of members of the

25  local community and a number of physicians on the

125

1    medical staff to get the most local input.  It's

2    really -- they call them local governing boards, but

3    they really function as advisory committees.

4        Q.    And what do they do?  Who do they report to?

5        A.    They report to the North Side Operating Company

6    Board of Directors, and they kind of screen and look at

7    the budgets before they are put in.  You know, what the

8    North Side Operating Company Board of Directors is

9    concerned about and Permian is concerned about is

10   that -- since some of these individual board members

11   live remotely, several states away, it wanted to make

12   sure that somebody at a local level was taking a look at

13   whether the hospital was being run correctly, but also

14   its programs and services were meeting the needs of the

15   local medical staff and the local community.

16       Q.    Did it carry the pulse of the hospital, if you

17   will, and report that up to the primary board?

18       A.    Essentially, yes.

19       Q.    Okay.  Did it have any authority to make

20   decisions without reporting to the North Side board?

21       A.    No.

22       Q.    It reported directly to the North Side board,

23   correct?

24       A.    Yes.  And the North Side board, there were

25   some -- they would make recommendations.  For example,

126

1    let's say the operating budget and the capital budget,

2    they would -- the North Side Operating Company Board

3    would not entertain the operating budget or the capital

4    budget unless it had been recommended for approval by

5    that local board.

6        Q.   But that was -- at the local board level, it

7    was simply a recommendation?

8        A.   Yes.

9        Q.   Still subject to being approved by the main

10   North Side board, correct?

11       A.   Correct.

12       Q.   All right.   Now, if you look at Exhibit Number

13   47, it's a letter dated June 4th, 1996, from Mr. Rogan

14   to yourself.

15       A.   M-hm.

16       Q.   Do you recall this particular letter?

17       A.   Yes.

18       Q.   And what was Mr. Rogan reporting to you here?

19       A.   Let me just read it because I want to be

20   absolutely certain.

21       Q.   That will be fine.

22       A.   This is where -- basically, where we are

23   getting -- if I remember correctly, the way the process

24   worked is, we were getting ready to have the bonuses

25   recommended and approved to the parent board and we had

1   gone over the -- we had gone over the bonuses for

2   Mr. Rogan's subordinates but had not yet addressed his.

3       Q.   And was this a letter that was sent to you --

4   strike that.

5           When you received this letter, was the line

6   blank for Mr. Rogan's bonus?

7       A.   Yes.

8       Q.   And who determined the amount to put in there?

9       A.   I did.

10      Q.   And that's your signature at the bottom, right?

11      A.   Yes.

12      Q.   And you wrote in $75,000?

13      A.   Yes.

14      Q.   And what was the basis for awarding him $75,000

15  in 1996?

16      A.   You know, again, I don't remember the

17  specifics, but it was a combination of our -- "our," I

18  mean my management team at Braddock -- the evaluation of

19  Mr. Rogan's performance and contribution against his

20  goals, against the goals that were set out.  And I can't

21  remember specifically if there was a discretionary piece

22  to this.  And I also talked to the chairman of the board

23  of Edgewater Medical Center.

24      Q.   And who was that?

25      A.   It was Dr. Rosenthal.

128

1    Q.   And did Mr. Rogan have anything to do with

2  setting the amount of his bonus?

3    A.   No.

4    Q.   Now, if you would look at Exhibit Number 48,

5  which is a letter dated June 24th, 1996, to Mr. Rogan

6  from you, this, once again, concerns the bonuses for

7  1996.  Do you see that?

8    A.   Yes.

9    Q.   And in this letter, it indicates that there was

10 $500,000 available for bonuses?

11   A.   Yes.

12   Q.   Did I read that correctly?

13   A.   Yes.

14   Q.   And how much was actually paid out?

15   A.   342,979.

16   Q.   So that left something that wasn't paid in

17 bonuses, correct?

18   A.   Correct.

19   Q.   And what happened to that money?

20   A.   That money stayed with the North Side Operating

21 Company.  It was returned to them.

22   Q.   So it wasn't automatic that Mr. Rogan would get

23 all of the money that was allocated for bonuses?

24   A.   That's correct.

25   Q.   And so what was left over, went right back into

1    North Side, correct?

2         A.    The general fund of North Side.

3         Q.    It didn't stay with Braddock?

4         A.    No.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

130

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17     Q.    Now, if I can turn your attention to Exhibit

18     Number 50, which is a letter dated September 10th, 1996,

19     addressed to you from Mr. Rogan?

20     A.    Yes.

21     Q.    And in this letter, he references his

22     employment agreement of August 17th, 1997.  Do you see

23     that?

24     A.    Yes.

25     Q.    I'm sorry.  That it would expire on August

1    17th, 1997.

2        A.    Yes.

3        Q.    What was Mr. Rogan -- what was he asking you to

4    do?

5        A.    Well, I think what he was asking me to do is to

6    start discussing with him whether we were going to

7    retain him or not retain him.

8        Q.    And did you feel it was appropriate for him to

9    start the discussion almost a year ahead of time?

10       A.    Yes.

11       Q.    Why?

12       A.    Well, you know, planning to replace -- it's not

13   a good idea to renew a contract of somebody at the last

14   minute.  It's too difficult.  There are too many

15   emotional issues.

16

17

18

19

20

21

22

23            I had the bond analyst from the major bond

24   funds saying to me, "Hey, what are you doing to make

25   sure that we can retain Peter Rogan," because, you know,

1    they were very pleased with the performance and also

2    knew that Mr. Rogan was instrumental in that.

3            When we would have periodic conference calls

4    with the bond holders to go over these quarterly

5    reports, we would oftentimes have Mr. Rogan on the call,

6    and they were comforted by his answers and the fact that

7    he knew the business and were concerned that if we would

8    replace him, we would not replace him with somebody as

9    capable.

10   Q.   Now, in the second paragraph of this letter,

11   Mr. Rogan states, "Further, I believe we have a

12   accomplished a great deal and are poised to accomplish a

13   great deal more."  Do you see that?

14   A.   Yes.

15   Q.   Did you agree with his statement that he had

16   accomplished a great deal?

17   A.   Definitely.

18   Q.   And what did you think that they had

19   accomplished?

20   A.   Well, the obvious is the continued improved

21   financial performance of the hospital, the continued

22   growth and deportment of the medical staff, the

23   continued establishment of new programs and widening the

24   amount of service that it was providing to the

25   community.

134

1    Q.   So overall, I take it, you were very pleased

2    with Mr. Rogan's job?

3    A.   Yes.

4    Q.   Were you similarly pleased with the work that

5    had been done by Ms. Skavarek at that time?

6    A.   Yes.

7    Q.   And anything specific come to mind about that?

8    A.   She was a very, very thorough operating person.

9    She was very cost conscious.

10        In the hospital business, one of the things you

11   have to be concerned about is a lot of the departmental

12   managers are not really trained managerially.  Like in

13   the X-ray department, it may be the super X-ray tech.

14   Or in the lab department, it may be the super lab tech.

15   And they often don't have the management skills.  They

16   have to be watched carefully.

17        Then there is a tendency when a hospital is

18   doing extremely well, it's growing, it's making a lot of

19   money, et cetera, for people to kind of drop their

20   shoulders and not watch costs as much as they need to.

21   And Joanne was just really, really good at that.  She

22   was very, very good and was not an easy sale.

23   Q.   Okay.  The next exhibit I'd like you to look at

24   is the minutes for the October 5th, 1996, board meeting,

25   Exhibit Number 51.  It shows that you were in

135

1    attendance, correct?

2        A.    Yes.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

136

1      Q.    Okay.   Now, if you'd go to page seven of those

2   minutes, in about the middle, there is a section

3   entitled "Braddock Management fees."   Do you see that?

4      A.    Yes.

5      Q.    And what did you propose with regard to the

6   Braddock management fees?

7      A.    Well, it was time to renew the agreement in the

8   near future.   And we wanted to get the process started,

9   and so we asked the board to start kind of the market

10  analysis and the market review of rates and fees.

11     Q.    Okay.   On the next page, there is a discussion

12  about executive compensation.   Do you see that?

13     A.    Yes.

14     Q.    And that would relate to Mr. Rogan and his

15  staff; is that right?

16     A.    Yes.

17     Q.    And who reviewed compensation for the staff?

18     A.    You mean who in the organization?

19     Q.    Right.

20     A.    Mr. Finnane and myself.

21     Q.    Okay.   Now, did Mr. Rogan have any role in

22  reviewing compensation for other members of Braddock?

23     A.    Yes.   I mean, the people who reported to

24  directly to him.   The three people on Braddock's

25  payroll, we solicit his input.   He supervised all the

137

1  time.

2    Q.  And he made recommendations for that?

3    A.  Yes.

4    Q.  In the third paragraph of Section 2 on page

5  eight here, it says that you'll review Mr. Rogan.  Do

6  you see that?

7    A.  Yes.

8    Q.  And would you read the next sentence right

9  after that?

10   A.  "He explained that he reviews performance and

11 compensation of Braddock's managers, and Mr. Gross

12 reviews Mr. Rogan.  The board members were concerned

13 that given the high level of performance of Braddock and

14 the concurrent development of its managers, other

15 organizations will recruit the senior executives away

16 from Braddock and North Side."

17   Q.  What exact senior executives were you

18 particularly concerned about losing?

19   A.  Any one of the four of them.

20   Q.  Meaning?

21   A.  Rogan.  The nursing director's last name, I

22 can't remember.

23   Q.  Lundy?

24   A.  Lundy.  Judy Lundy, Joann Skavarek, I think her

25 name was, and Roger Ehman.

138

1      Q.   And Roger Ehman.

2      And then did you do a review of Mr. Rogan?

3      A.   Yes.

4      Q.   Now, if you look at Exhibit Number 52, which is

5 a letter dated January 31st, 1997, to you from

6 Mr. Rogan --

7      A.   M-hm.

8      Q.   You got that?

9      A.   Yes.

10     Q.   And attached to that is a schedule of proposed

11 compensation and bonuses for Braddock employees --

12     A.   Yes.

13     Q.   -- right?

14     And according to the letter, this schedule was

15 put together and given to you by Mr. Rogan, correct?

16     A.   Right.

17     Q.   And he intentionally left his own bonus blank?

18     A.   Correct.

19     Q.   Now, the salary amount for Peter Rogan, 225,

20 that was proposed by Mr. Rogan, correct?

21     A.   Yes.

22     Q.   But he didn't set that amount?

23     A.   No.

24     Q.   And what was your -- how did you respond to

25 Mr. Rogan's request regarding these levels of

1    compensation and bonus?

2        A.    They were approved, and I determined, again

3    through a collaboration with my staff and with

4    Dr. Rosenthal, $100,000 bonus for Mr. Rogan.

5        Q.    Okay.  And the increase in Mr. Rogan's

6    compensation from the 1994 base was what?

7        A.    It was about $50,000.

8        Q.    Okay.  And $100,000 bonus was set by who?

9        A.    It was set in collaboration between myself and

10   my staff and the chairman of the board, the president of

11   the board.

12       Q.    And did you need to get board approval to

13   approve these?

14       A.    Oh, yes, yes.

15       Q.    And I take it they were, correct?

16       A.    Yes.

17       Q.    And if you would look at Exhibit Number 53,

18   which are the minutes from the February 14th board

19   meeting, particularly on page six, subparagraph G, what

20   does it report regarding the compensation for the

21   Braddock people?

22       A.    Let me read it to refresh my memory, please.

23   Okay.

24       Q.    What was done with regard to the proposal?

25       A.    They approved in total compensation paid to

1   Braddock Management, LP, employees, including the

2   bonuses.

3       Q.   Including the bonuses.  All right.

4            Now, if you would turn to Exhibit Number 54,

5   where the board minutes from the June 5, 1997, meeting,

6   you were in attendance, right?

7       A.   Yes.

8       Q.   And if you turn over to page three, there is a

9   section -- Paragraph D titled "Status of the Braddock

10  Management agreement."  Take a moment to read that over.

11      A.   Can I hear your question again?

12      Q.   What was discussed concerning the new Braddock

13  or the renewal of the Braddock agreement?

14      A.   That a committee would be appointed to

15  negotiate the contract with Braddock Management, LP.

16      Q.   And was it a desire of the board to renew the

17  contract?

18      A.   It was.

19      Q.   Along the lines -- and for the reasons you

20  earlier stated?

21      A.   Yes.

22      Q.   Was there a discussion about changing roles of

23  Mr. Rogan and Mr. Skavarek at this time?

24      A.   Yes.

25      Q.   What was discussed in that regard?

141

1      A.    Well, the hospital -- it was felt that the

2    hospital had more than stabilized in terms of its

3    performance and that there were opportunities to begin

4    the development of an integrated delivery network in

5    that marketplace, that section of Chicago -- I can't

6    remember the campus points at the moment -- and that

7    Mr. Rogan was to take the lead in doing that.  And he

8    needed to be freed up from the day to day overall

9    management of the hospital.

10         It was felt that Joanne Skavarek was

11   sufficiently familiar with the hospital and had the

12   respect of the medical staff and the department managers

13   that she could do that, and that Mr. Rogan could step

14   outside the day-to-day activities of the hospital.

15   Basically, she would be Ms. Inside, and he would be

16   Mr. Outside.

17      Q.    And what that meant in terms of the day-to-day

18   responsibilities for North Side would be that Joann

19   Skavarek would assume those responsibilities?

20      A.    She would become the CEO.

21      Q.    And Mr. Rogan would have less responsibilities

22   for the day-to-day operations of the hospital?

23      A.    Correct.

24      Q.    And is it fair to say that then his focus

25   became more of the strategic planning and growth, if you

1    will?

2

3         THE WITNESS:   Correct.

4    BY MR. HOLMEN:

5         Q.   What did you contemplate Mr. Rogan's role to be

6    once Ms. Skavarek assumed the day-to-day

7    responsibilities?

8         A.   I expected Mr. Rogan to investigate

9    opportunities for strategic alliances with other

10   hospitals, with other physician groups, independent

11   practice associations.   There was a -- being that many

12   of us that were involved in the organization, both on

13   the board and in management, were from California, which

14   was a very big management state and with very

15   significant HMO penetration, there was some feeling that

16   in Chicago where there had been the ability to resist

17   the penetration of the HMOs and the managed care plans

18   in that city, that that may change, and so we wanted to

19   get out ahead of the change.   Given our California

20   experience, and develop some of these alliances and to

21   begin to develop a delivery network.

22        Q.   So that took Mr. Rogan out of kind of the

23   day-to-day management of the hospital's affairs?

24        A.   Correct.

25        Q.   Okay.   If you look at Exhibit 55 now, which are

143

1 the minutes from the board of directors meeting of

2 October 4, 1997 --

3   A. Yes.

4   Q. And again, you were present at that meeting?

5   A. Yes.

6   Q. On page two, there is a discussion of the

7 status of the Braddock agreement.  Do you see that?

8   A. Yes.

9   Q. Again, take a minute to review that.

10   A. Okay.  It's off the page a little bit here --

11   Q. Right.

12   A. -- but I'll try.

13   Q. It's the best I could do.

14   A. Okay.  It was basically, you know, discussing

15 the status of the agreement and the change in roles and

16 responsibilities for Mr. Rogan and the need to have an

17 independent verification of the magnitude of the fees,

18 the fee structure, et cetera.

19   Q. Up towards the top of that Section D, it says

20 that legal counsel Foley and Lardner have reviewed a

21 draft copy of the new agreement.  Do you see that?

22   A. Yes.

23   Q. Why was it necessary to have Foley and Lardner

24 review that document?

25

144

1      THE WITNESS:  They are the legal counsel for

2   the board.  The board has to conduct an independent

3   inquiry.  The board is required to have a contract that

4   meets all the legal requirements of MediCare and the

5   Internal Revenue Service, and it relied on Foley and

6   Lardner to conduct that review and advise them if the

7   contract met those requirements.

8   BY MR. HOLMEN:

9      Q.   Okay.  Now, a little farther down in the

10  paragraph, it states, "The committee was concerned about

11  Mr. Rogan's future role with NOC."  Do you see that?

12     A.   Where is that?

13     Q.   About the middle.

14     A.   I'm not finding it.  Oh, yeah.  I see it.  I

15  see it.

16     Q.   And then it goes on to say, "It was recognized

17  that he will no longer be responsible for the day-to-day

18  activities as the CEO of NOC, but was to be actively and

19  intimately involved in providing strategic direction to

20  NOC."

21     A.   Yes.

22     Q.   What was the concern that the committee had?

23     A.   Well, you know, Peter is a very good leader.

24  He was very successful in leading the hospital.  And

25  there was a concern that -- you know, how would the

145

1    hospital do without Peter not there offering stewardship

2    every day.

3         Q.   And what was discussed about how that concern

4    would be alleviated?

5         A.   First of all, he wasn't going very far away.

6    Secondly, he was intimately familiar with the hospital

7    and had relationships with key personnel, that he and

8    Joann Skavarek had really good communication, and he had

9    really trained her.  So it was felt that Mr. Rogan could

10   assure that the operating performance of the hospital

11   would not fall off under this arrangement.

12        Q.   Were you confident that Ms. Skavarek was

13   capable of handling the day-to-day operations of the

14   hospital?

15        A.   Yes.

16        Q.   Okay.  Now, if you look at Exhibit 56, it's an

17   amended and restated hospital management agreement.

18             Is this the agreement that was ultimately

19   entered into with Braddock?

20        A.   Let me look at the back here.  Yes.

21        Q.   And if you turn to page 12 of the agreement,

22   what was the compensation package that was agreed to in

23   this amended agreement?

24        A.   Okay.  Let me review it just to be sure.

25        Q.   It's under 6.01 --

1    A.    A and B.

2    Q.    -- A and B.

3    A.    Okay.  Yeah.  It discusses the amount of the

4    fixed fee and the amount of the variable fee.

5    Q.    Now, the fixed fee amount was increased

6    significantly, correct?

7    A.    Yes.

8    Q.    In your opinion, was that justified?

9    A.    Yes.

10   Q.    Why?

11   A.    The hospital was performing exceptionally well.

12   It had higher revenues, and also the fact that the

13   annual percentage fee was -- the cap was being lowered

14   from 2 to 1.75 percent.

15   Q.    Okay.  The structure was the same in the sense

16   that the annual percentage amount still couldn't exceed

17   the fixed fee, correct?

18   A.    Correct.

19   Q.    So, again, there was only a portion that was

20   directly tied to revenues of the hospital --

21   A.    Correct.

22   Q.    -- right?

23         Now, was this subject or did you have this

24   contract in a particular compensation package reviewed

25   by anybody on the outside?

147

1    A.    Yes.

2    Q.    And do you know who did that?

3    A.    You know, I can't recall because we have used

4    both -- "we," meaning the hospital operating company,

5    had used both Coopers & Lybrand and Valuation

6    Counselors.

7    Q.    If you look at Exhibit 57, now what is that,

8    Mr. Gross?

9    A.    That is a management fee study by Coopers &

10   Lybrand.

11   Q.    Of the most recent Braddock agreement, right?

12   A.    Correct.

13   Q.    And what were the findings?

14   A.    The findings?

15   Q.    That's on CB 1303.

16   A.    Let me read through it, please.

17         That although the fees were above average, they

18   were in the range.  And I do recall that we added an

19   additional measure during this particular one, and that

20   was to look at -- in addition to revenue, look at EBIT

21   DA, which is a statement of cash flow.  Earnings before

22   interest, taxes, depreciation, and amortization.

23   Q.    And once you factored in EBIT DA, what did that

24   do to the evaluation?

25   A.    It showed that it was a very fair and

148

1    reasonable management fee.

2         Q.   In the last paragraph on the findings, can you

3    just read for the record -- it starts at about the

4    middle, "Based on the limited procedures."  Do you see

5    that?

6         A.   Yes.

7         Q.   Would you read that for us?

8         A.   "Based on the limited procedures, nothing came

9    to our attention except for those observations noted in

10   the three preceding paragraphs that cause us to believe

11   that the management fees contracted to Braddock under

12   this agreement do not fall within the range paid by

13   other hospitals, including within our procedures."

14        Q.   Do you know why this document is marked

15   "Draft"?

16        A.   I can't recall.

17        Q.   Do you know whether you ever got a final

18   version of this?

19        A.   I can't recall.

20        Q.   All right.  Take a look at Exhibit Number 58.

21   What is that?

22        A.   This is a management fee study by Valuation

23   Counselors.

24        Q.   And it was also of the amended and restated

25   agreement?

149

1    A.    Yes.

2    Q.    Why did you have two outside firms look at the

3    management contract?

4    A.    You know, I'm having difficulty recalling

5    what's from accuracy.   That's my problem here.   I

6    just --

7    Q.    But both of these studies were done to review

8    the 1997 agreement, correct?

9    A.    Yes.

10   Q.    Okay.  So you had additional information to

11   base your conclusion that the agreement --

12   A.    Yeah.

13   Q.    -- was or was not reasonable?

14   A.    Yes.

15   Q.    What was the conclusion of the Valuation

16   Counselors regarding the 1997 agreement?

17   A.    That these were reasonable fees.

18   Q.    Okay.  And would you read from page two of the

19   second to the last paragraph?

20   A.    "Excluding the flat fee portion, we computed

21   the percentage of management fees estimated to be

22   charged by Braddock as a percentage of annualized 1997

23   earnings before EBIT DA.  We used information provided

24   both by the OSHPD," which stands for State Hospital

25   Planning and Development, "financial disclosure reports

1   and phone interviews to develop a range of management

2   fees as a percentage of EBIT DA.

3        "We did not perform a review of the management

4   contracts or actual months paid. Therefore, the level

5   of service provided by each management program is

6   unknown and could vary. The average of the fees as a

7   percent of EBIT DA was calculated to be approximately

8   17.5 percent. The management fees proposed by Braddock

9   were well below this average at approximately 9

10   percent."

11      Q. And what other statement, next paragraph?

12      A. "Based on our review of the above market data

13   and interviews, we believe a management fee between 2 to

14   4 percent of net patient revenues for the specific

15   services rendered by Braddock Management to Edgewater

16   Medical Center would be reasonable."

17      Q. And what did that tell you about the management

18   agreement itself?

19      A. It told me that it was market-based and fee --

20   a reasonable management agreement that complied with the

21   rates.

22      Q. Very good.

23

24

25

1    A.   You know, I don't specifically remember this

2    letter.

3    Q.   Well, it attaches a confidentiality agreement.

4    Do you remember that?

5    A.   No.

6    Q.   Do you remember beginning the process of

7    talking with Credit Local de France concerning

8    refinancing?

9    A.   Yes.

10   Q.   And that you were then involved in that process

11   to some degree, correct?

12   A.   Yes.

13   Q.   If you look at Exhibit Number 61, which are the

14   board minutes from March the 6th of 1998, in particular

15   on page two, there is a section labeled "D.   Status of

16   refinancing."  Do you see that?

17   A.   Yes.

18   Q.   And in the minutes, it states that you provided

19   an update concerning the status of the refinancing?

20   A.   Yes.

21   Q.   Does that refresh you that you were  involved

22   in that process at least in and through March of 1998?

23   A.   Yeah.  Myself and my team, yes.

24   Q.   Okay.  And what was the reason that you were

25   looking into refinancing?

155

1      A.    To lower the interest cost to the hospital.

2      Q.    And that's significant because?

3      A.    Because the interest costs were determined in

4   1994 at the time of the transaction and because of the

5   exceptional performance of the hospital in the interim

6   and also some favorable changes in the financial

7   markets, it was felt that and advised by the investment

8   bankers that a very significant savings could be made to

9   the hospital interest expense, which would provide

10  savings, very significant cash savings.

11     Q.    Now, if you would look at Exhibit 62, it's a

12  document which states, "55 million dollars, Illinois

13  Health Facilities Authority, Edgewater Medical Center

14  Distribution List."  Do you recognize this document?

15     A.    Yes.

16     Q.    And what is it, Mr. Gross?

17     A.    This is the working group of professionals and

18  all parties involved in the team to seek the financing.

19     Q.    Is this similar to the document that we looked

20  at earlier entitled "Working Group List"?

21     A.    Yes.

22     Q.    And were the processes that were going on in

23  terms of the refinancing the same that you had done in

24  1994 in connection with the purchase?

25     A.    Essentially, yes.

156