1    Q.    And why did you have to go through that whole

2 process again?

3    A.    Well, you know, what we tried to do is just get

4 some of these professionals to kind of update what they

5 had done previously to save money.  These financings are

6 very, very expensive, but the discipline of the various

7 lawyers and finance advisors and the Illinois Health

8 Facility Authority require everything to be done again

9 from scratch.

10    Q.    And that included reviewing physician

11 contracts --

12    A.    Everything.

13    Q.    -- and reviewing all the financing?

14    A.    Everything.

15    Q.    The same thing that you had gone through in

16 1994?

17    A.    Correct.

18    Q.    Was it --

19    A.    In fact, it was as if we did not go through it

20 in 1994.

21    Q.    So again, starting from scratch?

22    A.    Starting from scratch.

23    Q.    Looking at all of the indicia of fraud or abuse

24 to see if there was anything along those lines?

25    A.    Correct.

1      Q.   And as far as you know, was that process in

2   1998 once again successful in terms of allowing you to

3   go forward with a refinancing?

4      A.   Yes.

5      Q.   And were you able to refinance the bonds?

6      A.   The bonds were refinanced.

7      Q.   At a more favorable interest rate?

8      A.   Yes.

9      Q.   And would you look at Exhibit Number 63?  Do

10  you recognize that document?

11     A.   Yes.

12     Q.   And what is that?

13     A.   This is essentially what we call the OS or the

14  official statement basically documenting the

15  refinancing.

16     Q.   Similar to the offering circular that we had

17  looked at earlier, correct?

18     A.   Correct.

19     Q.   I mean, it contains a lot of the same

20  description of the hospital, its board of directors, and

21  so forth, correct?

22     A.   Correct.

23     Q.   Now, if you would turn to page 41, on page 41

24  towards the bottom, there is a section entitled "Federal

25  Fraud and Abuse Laws and Regulations."  Do you see that?

158

1     A.   Yes.

2     Q.   Then if you would turn to the next page, what

3 is reported in this documented concerning the

4 investigation into that aspect of the hospital?  Right

5 at the top.

6     A.   "The management of the corporation believes

7 that the contracts of the corporation with physicians

8 and other referral sources are in material compliance

9 with the anti-kickback law only because of the

10 narrowness of the safe harbor regulations and scarcity

11 of case law interpreting the anti-kickback law.  There

12 can be no assurances that the corporation will not be

13 found to have violated the anti-kickback law."

14     Q.   Okay.  And how was it determined that the

15 review revealed that you were in compliance with the

16 anti-kickback laws?

17     A.   After review by independent legal counsel of

18 the contracts against the law and the regulations.

19     Q.   Okay.  Now, if you would turn to page 50, there

20 is a section entitled "Legal Matters"?

21     A.   Yes.

22     Q.   And you see there is a reference to the law

23 firm of Jones, Day, Reavis & Pogue --

24     A.   Yes.

25     Q.   -- as bond counsel?

1    A.   Yes.

2    Q.   And a reference to the law firm of Sidley and

3  Austin?

4    A.   Yes.

5    Q.   A reference to the law firm of Foley and

6  Lardner?

7    A.   Yes.

8    Q.   A reference to the law firm of Ballard, Spahr,

9  Andrews & Ingersoll?

10    A.   Yes.

11    Q.   A reference to the law firm of Arent, Fox,

12  Kintner, Plotkin & Kahn?

13    A.   Yes.

14    Q.   And also a reference to a French law firm named

15  Gide, G-i-d-e, Loyrette, L-o-y-r-e-t-t-e, Nouel,

16  N-o-u-e-l.  Do you see that?

17    A.   Yes.

18    Q.   Now, does that report that all of those lawyers

19  were involved in reviewing some or all of the aspects of

20  this transaction?

21    A.   Correct.

22    Q.   And the fact that the transaction went forward,

23  what does that suggest concerning their conclusions?

24    A.   Their conclusions -- it basically says that

25  their conclusions are that the hospital meets all legal

160

1  and regulatory requirements. And I think in many of

2  these cases, the firm had to opine to that effect.

3      Q.   I mean, the deal couldn't have been closed

4  without that, right?

5

6          THE WITNESS:  Impossible.

7  BY MR. HOLMEN:

8      Q.   In fact, the refinancing did close, right?

9      A.   Correct.

10     Q.   Now, if you would turn to page A-2, letter A,

11 dash 2, which is -- there's numbers at the bottom,

12 19956.

13     A.   Let me get there.  Yes.

14     Q.   Up at the top, there is at a listing of the

15 board of directors of the current board for North Side.

16 Do you see that?

17     A.   Correct.

18     Q.   Again, Dr. Rosenthal is still on the board?

19     A.   Correct.

20     Q.   Mr. Fruland is now on the board?

21     A.   Yes.

22     Q.   Stina Hans?

23     A.   Yes.

24     Q.   Macon Brewer?

25     A.   Yes.

161

1     Q.   And George Chapas?

2     A.   Yes.

3     Q.   Now, how many of those were also members of the

4 Permian board?

5     A.   Well, there had to be three of them.

6     Q.   And those were?

7     A.   Let me see.  There is an asterisk.  George

8 Chapas, Stina Hans, and Bertram Rosenthal.

9     Q.   Okay.  So once again, the 1998 the North Side

10 board was controlled by members of the Permian Board --

11    A.   Correct.

12    Q.   -- is that fair to say?

13       Then below that, there is a description of the

14 management of the hospital, including a description of

15 yourself?

16    A.   Yes.

17    Q.   And Mr. Finnane?

18    A.   Yes.

19    Q.   And then a Ms. Karen Heinman.  Do you see that?

20    A.   Yes.

21    Q.   Who was she?

22    A.   She was the chief financial officer.

23    Q.   Of?

24    A.   Of -- she was an employee of the managing

25 company.

162

1    Q.   Of Braddock?

2    A.   Of Braddock.  And provided the financial

3  officer services for the parent boards.

4    Q.   So was she in effect the chief financial

5  officer of North Side Operating dba Edgewater Medical

6  Center?

7    A.   Yes.

8    Q.   Now, the last thing I would like you to take a

9  look at in this document is on A-13 or numbered 19967.

10    A.   Yes.

11    Q.   And up at the top of that page, there is a

12  description of something called "The Senior Program."

13  Do you see that?

14    A.   Yes.

15    Q.   And it states, "The senior program was

16  established in concert with the Chicago Housing

17  Authority in July 1992," right?

18    A.   Right.

19    Q.   Now, is that the same program that was

20  described in the offering circular that was put out in

21  1994 when Permian bought Edgewater?

22    A.   Yes.

23

24

25  .

163

1

2     Q.   And so in 1998, it was once again investigated

3   by all of the law firms and accountants that were

4   involved in this transaction, correct?

5     A.   Correct.

6     Q.   And by the fact it's included in here, what

7   does that say about whether the CHA program complied

8   with all pertinent rules and regulations?

9     A.   It was assumed that it did because it's in

10  here.

11    Q.   The fact that's in here says --

12    A.   Yes.

13    Q.   -- the professionals believed it to be in

14  compliance?

15    A.   Yes.

16    Q.   All right.

17    A.   We could not go forth if it wasn't.

18    Q.   All right.   Good.   We are almost there.

19        Now, if you turn to Exhibit 64, which are the

20  board minutes for the meeting of June 1st, 1998, it

21  shows you in attendance, correct?

22    A.   Yes.

23    Q.   Now, on the first page under Roman II,

24  subparagraph B --

25    A.   M-hm.

164

1          Q.   -- it shows that Ms. Skavarek was making a

2     report on some information, correct?

3          A.   Correct.

4          Q.   And then on page five under "New Business," it

5     also indicates that Ms. Skavarek was reporting on

6     various aspects of new business?

7          A.   Correct.

8          Q.   And, again, on page nine, there is also an

9     indication that Ms. Skavarek was making a presentation

10    to the board?

11         A.   Correct.

12         Q.   Now, was that an indication of the change in

13    her status assuming the day-to-day operations and the

14    reports to the board?

15

16         THE WITNESS:  Yes.

17    BY MR. HOLMEN:

18         Q.   What does -- strike that.

19         The fact that Ms. Skavarek's name is mentioned

20    several times in these minutes, what does that indicate

21    in connection with her new status with North Side?

22         A.   It indicates that she was functioning as the

23    chief executive officer of the hospital, and that's her

24    job.

25         Q.   And does it also -- strike that.

165

1    What does it indicate with regard to the

2 responsibilities that Mr. Rogan used to have?

3   A. She assumed those responsibilities.

4   Q. Okay. Now, Mr. Rogan's name is mentioned in

5 here. Why is that?

6   A. Because he's assumed the broader

7 responsibilities, working with the management company on

8 the strategic development and project-specific things

9 for the North Side Operating Company.

10   Q. So it was still appropriate for Mr. Rogan to be

11 making reports to the board, correct?

12   A. Yes.

13   Q. Now, I'd like to direct your attention to page

14 seven of these minutes. In the second paragraph, it

15 starts, "The board then entered into a discussion about

16 NOC's corporation organization and positioning." Do you

17 see that?

18   A. Yes.

19   Q. Take a minute and refresh yourself about that

20 discussion. I want to ask you some questions about

21 that.

22   A. Okay.

23   Q. It indicates there was a discussion that it

24 might be in NOC -- that means North Side Operating

25 Company, correct?

166

1      A.    Yes.

2      Q.    It might be in its best interest if it were a

3  free-standing institution?

4      A.    Yes.

5      Q.    What was that all about?

6      A.    Well, this kind of -- it's not necessarily

7  complex, but not an easy one to answer in just a few

8  words.

9           There was a very significant change in the

10  environment in healthcare during that period of time

11  after the passage of the Balanced Budget Act.  At that

12  time because there was a paradigm shift in the

13  reimbursement environment, that the Permian board of

14  Directors asked each of its subordinates, Vista Hospital

15  Systems, French Hospital Medical Center, and North Side

16  Operating Company Boards, to actually do some strategic

17  analysis of their marketplaces and their environments

18  and what they wanted emphasized.

19           It was determined at that time that the

20  original concept of having Permian kind of be the parent

21  of a multi-state health system no longer was as feasible

22  because the reimbursement environment had changed, and

23  that there was a very significant difference in the

24  reimbursement and business environment amongst regions

25  of the country, and that the Hospital Systems and

1  Permian would concentrate on developing west of the

2  Rocky Mountains.

3  And east of the Rocky Mountains, it was not

4  going to develop anymore, and that the North Side

5  operating company was of sufficient financial strength

6  that it could operate independently and could expand on

7  its own in the greater Chicago marketplace.

8  Q.  What was meant where it states in the middle of

9  that paragraph, "The board realized that over the past

10  years, NOC has succeeded beyond the original plan"?

11  What was that all about?  Do you know?

12  A.  Well, no one at the time the acquisition was

13  made ever anticipated that Edgewater Medical Center

14  would be as successful as it was.  It just far exceeded

15  everyone's expectations in terms of its volume, its

16  program development, its cash flow, its profitability,

17  et cetera, et cetera.  Just far beyond.

18  It actually now began to develop the profile of

19  a hospital that didn't need to be a part of a multi-site

20  organization, that it could either stand on its own or

21  be the flagship of a regional system of its own.

22  Q.  Is that what it's meant here where it says,

23  "It" -- meaning North Side or Edgewater -- "is

24  financially strong and in a position to stand on its own

25  without the support of Permian"?

168

1    A.    Yes.

2    Q.    Is that what you are talking about?

3    A.    Yes.

4    Q.    Okay.  Down in the next paragraph, it states,

5    "The board also recognized that at some point in time,

6    it may be beneficial to North Side to separate from

7    Permian and the board directed management to pursue this

8    action."  Why would it be beneficial to North Side --

9    A.    Where are you reading that from?

10   Q.    The very last paragraph right above the MSC

11   reference.

12   A.    "The board is also" -- okay.

13   Q.    Why would it be beneficial to North Side to

14   separate from Permian?

15   A.    There were a couple of reasons.  One was

16   political.  That it was becoming more and more

17   difficult -- it was felt -- for the Illinois Health

18   Facility Authority to continue to provide a financing

19   vehicle for a company that was essentially based outside

20   of Illinois.  That was a big one.  And it was also

21   thought that as time went on, that Permian was no longer

22   providing a great deal of value to North Side Operating

23   Company to justify its continued ownership of North Side

24   Operating Company.

25   Q.    Okay.  So as a result of that -- if you turn

1   over to the next page. As a result of the discussion I

2   should say, what did the board decide to do?

3      A.   Let me --

4      Q.   If you look at the top of page eight.

5      A.   Yeah. I've got the read it again. I'm --

6      Q.   At the top, MSC means motion second --

7      A.   Second to carry, right.

8      Q.   -- to carry, right?

9           I mean, is it a fact that the board also

10  authorized a finance committee to pursue an analysis to

11  determine the appropriate corporate structure for North

12  Side?

13     A.   Yes.

14     Q.   Wasn't that a reference to whether or not it

15  should separate from Permian?

16     A.   Yes.

17     Q.   Okay. So as a result of the discussion at the

18  June 1st board meeting, there was going to be an

19  investigation into whether or how North Side and Permian

20  should separate, correct?

21     A.   Correct.

22     Q.   Now, if you look at Exhibit 65, which are the

23  minutes from the board meeting of September 18th, 1998,

24  you were present at that meeting, correct?

25     A.   Yes.

1    Q.    And I'll direct you to page six and seven under

2    "Strategic Positioning."  Do you see that?

3    A.    Let me get there.  Okay.

4    Q.    Just take a minute and review that, and I'll

5    ask you some questions about it, what's discussed there.

6    A.    It basically said, I think, to what I alluded

7    to a little bit earlier.  That a culmination of

8    strategic planning meetings separately, Vista Hospital

9    Systems Board on its own and North Side Operating

10   Company Board on its own and other such meetings, it was

11   felt that Vista and Permian were going to concentrate

12   west of the Rockies.  And North Side Operating Company

13   could not only stand on its own, but possibly affiliate

14   or position itself with other providers.

15   Q.    So did the board make a decision to pursue the

16   separation of North Side and Permian?

17   A.    Yes.

18   Q.    And eventually that took place, didn't it?

19   A.    Yes.

20   Q.    And once that separation took place, did you

21   have any further involvement with North Side Operating

22   Committee or Edgewater Medical Center?

23   A.    No.

24

25

171

1

2

3

4

5

6

7

8

9     Q.    Scott, you said that the CEO of the hospital

10    was empowered to enter into physician contracts a minute

11    ago?

12    A.    Yes.

13    Q.    Was it also true that Mr. Ehman was empowered

14    to enter into physician contracts so long as he followed

15    the protocol?

16    A.    Yes.

17        MR. HOLMEN:  That's all I have.

18        THE WITNESS:  And I would add that those

19    contracts eventually had to be ratified and approved by

20    the board.

21

22

23

24

25

1

2

3

4

5

6

7

8

9          I, SCOTT GROSS, do hereby declare under penalty of

10    perjury that I have read the foregoing transcript; that

11    I have made any corrections as appear noted, in ink,

12    initialed by me; that my testimony as contained herein,

13    as corrected, is true and correct.

14          EXECUTED this ___ day of _____,

15    2004, at _____, _____.

16                    (City)                    (State)

17

18

19                    _____

20                    SCOTT GROSS

21

22

23

24

25

188

1

2

3

4       I, the undersigned, a Certified Shorthand

5    Reporter of the State of California, do hereby

6    certify:

7       That the foregoing proceedings were taken

8    before me at the time and place herein set forth; that

9    any witnesses in the foregoing proceedings, prior to

10    testifying, were placed under oath; that a verbatim

11    record of the proceedings was made by me using machine

12    shorthand which was thereafter transcribed under my

13    direction; further, that the foregoing is an accurate

14    transcription thereof.

15       I further certify that I am neither

16    financially interested in the action nor a relative or

17    employee of any attorney of any of the parties.

18       IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

Dated: November 24, 2004
21

22

23

24    JOANNE BALBONI
      CSR No. 10206

25

189

# Exhibit

# 25

Permian Health Care, Inc. ("Permian") was established in 1989 by five (5) individuals who wished to acquire a hospital from American Medical International ("AMI") and convert the hospital to non-profit status. Their intent was to acquire the AMI facility, other hospitals "orphaned" by the larger for profit and non-profit chains, and smaller community hospitals overlooked by the larger hospital entities. The five community members formed the Board of Directors and incorporated as a Colorado 501(c)(3) organization because the initial acquisition target was a Colorado hospital. Permian was unsuccessful in its bid to acquire the Colorado hospital from AMI because it could not satisfy financing requirements. In evaluating its capital formation problems, Permian learned from the institutional investor community that it was viewed as lacking strong hospital management experience. Permian's investment banker recommended that Permian retain the services of a professional hospital manager. In 1990, Permian's investment banker solicited the services of Mr. F. Scott Gross, former President of the Hospital Group of National Medical Enterprises ("NME"). Mr. Gross had recently left NME to form his own, independent hospital management company.

Permian acquired its first two hospitals in California in 1991, and the Permian Board recruited California representation for the Board. When Edgewater Medical Center was acquired by a Permian subsidiary in 1994, Permian added a Midwest representative to the Board. The Permian Board currently consists of four (4) West Coast representatives and one (1) Midwest representative. The Permian Board has had no reason to change its State of incorporation from Colorado.

DEXIA 006574

EX 25

# Exhibit

# 26

 **CS First Boston**

## *Memorandum*

*To:*       Members of the Edgewater Working Group

*From:*     Susan McMillan
            Rob Kay

*Date:*     May 11, 1994

*Subject:*  Updated Timetable and Working Group List

Attached please find an updated financing timetable and working group list for the Edgewater financing.  Please note that we have tentatively scheduled a conference call at 4:00 p.m. Eastern time on Monday, May 16.  The purpose of the call is to review the attached schedule and disclosure documents.

Please call Rob Kay at 212-909-2934 if you have any questions or comments prior to the call.

DEFENDANT'S
EXHIBIT
26
PENGAD-Bayonne, N. J.

41310024.CTB

FL 000199

**Illinois Health Facilities Authority**
**Revenue Bonds, Series 1994**
**(Edgewater Medical Center)**

Financing Timetable
May 1994

| MAY 1994 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| JUNE 1994 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| DATE | EVENT | RESPONSIBILITY |
|---|---|---|
| May 9 | Amend merger agreement | O, M |
| May 13 | Distribute updated draft of term sheet to members of the working group and purchasers | M |
| May 16 | • Conference call to review initial draft of term sheet (time TBA) | W |
| | • Authority meeting | A, FA |
| | • Finalize outstanding feasibility study issues | M, FC |
| May 17 | • Circulate first draft of POS supplement | UC |
| | • Circulate draft of comfort letter | UC, Au |
| May 18 | Circulate second draft of term sheet | M |
| May 20 | Conference call to finalize term sheet and review initial draft of POS supplement | W |
| May 23 | • Circulate final draft of term sheet | M |
| | • Circulate first draft of bonds documents and second draft of POS supplement | BC, UC |

41250022   05/11/94

FL 000200

**MAY 1994**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**JUNE 1994**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| | | |
|---|---|---|
| May 24 | Price the Bonds | U |
| May 25 | Sign BPA | A, FA, M, U |
| May | Conference Call to review bond documents and POS supplement | W |
| May 31 | Circulate second draft of legal documents | BC, UC |
| June | Conference Call to discuss documents | W |
| June | Receive final comments on bond and offering documents | W |
| June 20 | Authority meeting | A, FA |
| | Pre-closing | W |
| June 21 | Closing | W |

A = Illinois Health Facilities Authority
FA = Financial Advisor to the Illinois Health Facilities Authority (Ponder & Company)
O = Current Owner of Edgewater Medical Center (Peter Rogan)
BC = Bond Counsel (Chapman & Cutler)
M = Management Company (Primus Management)
MC = Primus Management Counsel
U = Underwriter (CS First Boston)
UC = Underwriter's Counsel
FC = Feasibility Consultant (Cooper's & Lybrand)
T = Trustee (LaSalle Bank)
Au = Auditor (Ernst & Young)
W = Working Group (all the above)

41250022   05/11/94

FL 000201

**Illinois Health Facilities Authority**
**Edgewater Hospital and Medical Center**
**Working Group List**

## HOSPITAL MANAGEMENT

Primus Management, Inc.
One Eleven Sutter Street, Suite 2150
San Francisco, CA 94104

F. Scott Gross                          Tel:    (415) 627-0755
President                               FAX:  (415) 627-0766

Dan Finnane
Vice President

Karen Schultz
Chief Financial Officer

## ISSUER

Illinois Health Facilities Authority
35 East Wacker Drive, Suite 2188
Chicago, IL 60601

Mary M. McInerney                       Tel:    (312) 782-9447
Executive Director                      FAX:  (312) 263-0142

## AUTHORITY FINANCIAL ADVISORY

Ponder & Co.
35 East Wacker Drive, Suite 2160
Chicago, IL 60601

Benson T. Caswell                       Tel:    (312) 263-2247
Vice President                          FAX:  (312) 263-0142

33350012.CTB

FL 000202

## BOND COUNSEL

Chapman and Cutler
111 West Monroe Street
Chicago, IL 60603

| | | |
|---|---|---|
| Jeff Barry | Tel: | (312) 845-3713 |
| Lynn L. Coe | Tel: | (312) 845-3850 |
| John Bibby, Jr. | Tel: | (312) 845-2964 |
| | FAX: | (312) 701-2361 |

## HOSPITAL COUNSEL

Latham & Watkins
505 Montgomery Street, 18th Floor
San Francisco, CA 94111

| | | |
|---|---|---|
| Robert Waterman Partner | Tel: | (415) 395-8138 |
| John Kenney Partner | Tel: | (415) 395-8007 |
| | FAX: | (415) 395-8095 |

Latham & Watkins
233 South Wacker Drive
Suite 5800
Chicago, IL 60606

| | | |
|---|---|---|
| David Gregg | Tel: | (312) 876-7660 |
| | FAX: | (312) 993-9767 |

## UNDERWRITER

CS First Boston
55 East 52nd Street
New York, NY 10055

| | | |
|---|---|---|
| Thomas M. Barry Managing Director | Tel: | (212) 909-2120 |
| | FAX: | (212) 318-1418 |
| Susan McMillan Associate | Tel: | (212) 909-2828 |
| | FAX: | (212) 318-1221/1222 |

33350012.CTB

FL 000203

05-11-94 04:56 PM  FROM CS FIRST BOSTON NY                    P007/008/F42

CS First Boston
227 West Monroe Street, 42nd Floor
Chicago, IL 60606

Eric Jordahl                              Tel:    (312) 750-3050
Vice President                            FAX:    (312) 750-9007

## UNDERWRITER'S COUNSEL

Foley & Lardner
One IBM Plaza, Suite 3300
330 North Wabash Avenue
Chicago, IL 60611

Robert Zimmerman                          Tel:    (312) 755-2521
Michael E. Olson                          Tel:    (312) 755-2522
Chris J. Mollet                           Tel:    (312) 755-2549
Marcie Handler Mauro                      Tel:    (312) 755-2545
                                          FAX:    (312) 755-1925

## TRUSTEE

LaSalle National Bank, N.A.
135 South LaSalle St., Suite 200
Chicago, IL 60603

Sarah Webb                                Tel:    (312) 443-2444
                                          FAX:    (312) 443-2236

Pat Laughlin                              Tel:    (312) 781-8102
Loan Officer

## HOSPITAL

Edgewater Hospital and Medical Center
5700 North Ashland Ave
Chicago, IL 60660

Peter G. Rogan                            Tel:    (312) 878-8080
President                                 FAX:    (312) 878-6151

## ACCOUNTANT

Coopers & Lybrand
350 South Grand Avenue
Los Angeles, CA 90071

Mary Ann Harrison                         Tel:    (213) 356-6000
                                          FAX:    (213) 356-6363

33350012.CTB

FL 000204

## HOSPITAL COUNSEL

McDermott, Will & Emery
227 West Monroe Street
Chicago, IL  60606

Robert G. Hoban                         Tel:    (312) 984-7519
                                        FAX:   (312) 984-7700

## FINANCIAL ADVISOR TO PRIMUS MANAGEMENT

Epic Financial Group
2 Gateway Center, Suite 1690
Pittsburgh, PA  15222

Glen Flickenger                         Tel:    (412) 471-4523
                                        FAX:   (412) 391-9249

## PURCHASERS

Colonial Management Associates
One Financial Center, 12th Floor
Boston, MA  02111

Beth Ware                               Tel:    (617) 772-3757
                                        FAX:   (617) 737-0358

Federated Investors, Inc.
1001 Liberty Ave., 26th Floor
Federated Investors Tower
Pittsburgh, PA 15222-3779

Jim Roberge                             Tel:    (412) 288-7799
                                        FAX:   (412) 288-8230

Jonathan Connelly

## COUNSEL TO THE PURCHASER

Mintz, Levin, Cohen, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA  02111

Fred Pittaro                            Tel:    617-348-1714
                                        FAX:   ((617) 542-2241

33350012.CTB                                        **FL 000205**

# Exhibit

# 27

**Primus Management, Inc.**
**111 Sutter St., Suite 2150**
**San Francisco, CA 94104**
**415-627-0755 phone**
**415-627-0766 fax**

# M E M O R A N D U M

**TO:**        Mike Olson

**FROM:**    Kate Scanlan

**DATE:**     July 20, 1994

**SUBJECT:** Edgewater Merger Agreement Exhibit 2(u) Updates

Enclosed please find the latest group of contracts that will be inserted in Exhibit 2(u). Note also that a few of them have also been removed. Feel free to contact me if you need to clarify any of these.

DEFENDANT'S
EXHIBIT
27

PENGAD-Bayonne, N. J.

FL 015691

**EXHIBIT 2 (u)**

**CONTRACTS**

**(SEE ATTACHED)**

FL 015692

NEW

## EDGEWATER MEDICAL CENTER
## ADDITIONALS

| CONTRACT NAME | DESCRIPTION |
|---|---|
| 1 Harris Hospital Supply, Inc. | Primary/Secondary Medical & Surgical Distribution Program |
| 2 Gallagher & Speck | Elevator Maintenance Agreement |
| 3 IVAC Corporation | Thermometer Service Agreement |
| 4 Metropolitan Chicago Healthcare Council | Group Purchasing Agreement |
| 5 OSF Healthcare System | Affiliate Healthcare Group Purchasing Program |
| 6 Plants, Inc. | Plant Rental & Maintenance Agreement |
| 7 Renal Systems | Concentrate Products Purchase Contract |
| 8 Telephone Dictation Services, Inc. | Transcription of Radiology Reports Agreement |
| 9 WESCO Lab, Inc. | Billing Agreement |
| 10 UNIVERSAL GERIATRIC SERVICES | CONTRACT FORTHCOMING |
| 11 WALLACE COMPUTER SERVICES | |

DADIVAS, J. RENE

FL 015693

AMENDED

# EDGEWATER MEDICAL CENTER
## PHYSICIAN CONTRACTS

| PHYSICIAN | STATUS |
|---|---|
| ~~Neerja Ahlowalia, M.D.~~ | ~~Expired 06/30/94~~ ~~Not Renewed~~ |
| Emo Robert Bonaminio, D.P.M. (Residency) | Expired 06/30/94 New Agreement Forthcoming |
| Mark Camilleri, D.P.M. (Residency) | Expired 06/30/94 New Agreement Forthcoming |
| J. Rene Dadivas, M.D. | New (See Attached Agreement) |
| Michael Fox, D.P.M. | Expired 12/31/93 Renewed (See Attached Addendum) |
| John Fultz, M.D. | Expires 07/31/94 New Addendum Forthcoming |
| Hamid Humayun, M.D. | Expired 03/31/94 New Agreement Forthcoming |
| Jong Jin, M.D. | Expired 06/30/94 New Addendum Forthcoming |
| Steve Kalish, M.D. | Expired 06/30/94 Renewed (See Attached Addendum) |
| J.K. Kim, M.D. | Expired 06/30/94 Renewed (See Attached Addendum) |
| Rogelio Maynulet, M.D. | Expired 06/30/94 Renewed (See Attached Addendum) |
| Robert Ramoska, D.P.M. | Expired 06/30/94 Renewed (See Attached Addendum) |
| Michael Schwartzman, D.P.M. | Expired 06/30/94 New Addendum Forthcoming |
| ~~Peter Seifert, M.D.~~ | ~~Expired 06/30/94~~ ~~Not Renewed~~ |
| Claude Zanetti, M.D. | Expired 06/30/94 Renewed (See Attached Addendum) |

FL 015694

### EDGEWATER MEDICAL CENTER
### CONTRACTORS CONTRACTS

| CONTRACTOR | STATUS |
|---|---|
| Auto Suture Company | Cancelled |
| Chiron IntraOptics | Consignment Note Only Cancellable at Any Time See Attached |
| DuPont Company (2) | Consumables Agreement Begin Term: 10/18/93 End Term : 10/18/95 See Attached |
| | Fee Per Test Agreement Begin Term: 10/05/93 End Term : 10/05/96 See Attached |
| Instrumention Lab | Begin Term: 05/04/93 End Term 05/04/96 See Attached |
| Kelly & Associates | Not Renewed |
| Marriott Health Care Services | Under Negotiation |
| Philips Medical Systems | Contract No Longer In Existence Since Work Has Been Completed |
| Stericycle, Inc. | Renewal (See Attached) |
| Universal Geriatric Services | New Contract Forthcoming |
| Universal Medical Equipment Corporation | Expired 01/31/94 Not Renewed |
| Wallace Computer Services | Renewal (See Attached) |

FL 015695

# Exhibit

# 28

FL 015696

PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT
28

| CONTRACTOR | FUNCTION | BEGIN TERM | END TERM | COMPENSATION | ASSIGNMENT |
|---|---|---|---|---|---|
| Action Computer Service, Inc. | Technical assistance | 10/05/93 (renewal) | 10/04/94 | $6,371.12 semi-annual. | none |
| Baxter Healthcare Corp | Equipment leasing | 12/1/93 | 12/1/98 | $8,010 monthly | WC |
| Brink's Incorporated | Secured shipments for pickup & delivery | 5/1/94 | 4/30/95 | | none |
| Business, Credit Leasing | Lease of postage meter & scale | 9/28/93 | 9/28/98 | $294.22 monthly | WC |
| Carrier Building Systems & Services | Centrifugal chillers services | 8/26/93 | 8/26/2000 | $327.50 monthly | none |
| | Refrigerator, water & packaged equipments | 1/1/86 | | $6,676 monthly | none |
| ~~Chicago Inter Office~~ | ~~Medical Equipment~~ | ~~6/10/93~~ | ~~6/10/94~~ | ~~$1,000 flat rate~~ | |
| Clinipad Corporation | Custom Kit | 6/16/93 | 6/16/95 | $44,160 flat rate | none |
| COM/DISCO Medical Leasing Group | Medical equipment leasing | 11/4/91 | 11/4/96 | $9,910.89 monthly | 60 day prior WC |
| Coulter Leasing Corp | Medical Equipments | 8/15/89 | 8/15/94 | $3,540.72 monthly | WC |
| DuPont | Customer Financing | 5/16/90 | 5/16/92 | $1,639 monthly | none |
| Dupont | consumables | 10/18/93 | 10/18/95 | | none |
| Gallagher & Speck | Elevator Maintenance | 1962 | monthly | $170.00 | none |
| GE Medical Systems | Maintenance Service | 1/1/94 | 1/1/95 | $600 monthly | WC |
| Granada Hospital Group, Inc. | Patient Television Rental | 1/26/89 | 1/26/97 | Misc | none |
| Harris Hospital Supply | Primary/Secondary Medical & surgical dist. Program | 12/1/93 | 12/1/96 | sales driven cost-plus stru cture | none |
| HRM Consultants, Inc. | Software support for Series 4000 | 9/26/90 | 4/30/96 | $250 per account monthly total software support fees-$65,060 yearly, invoiced monthly | none |
| IBAX Healthcare Systems | | 4/30/89 | month-to-month | | none |
| IBM | Equipment Leasing | 6/30/93 | 6/30/97 | $698,238.50 monthly | none |
| Imperial/Royal Laundry Systems of WI | Linen pick-up & delivery | 8/12/93 | 7/31/95; initial contract to 8/31/93 | 0.2550/lb 8/12/93-7/31/94; 0.2660/lb 8/1/94-7/31/95;yearly | none |
| Instrumentation Lab | Blood Gas Analyzer/reagents | 5/4/93 | 5/4/96 | $1,506/mo | none |
| IVAC Corporation | Thermometer Svcs. | 12/13/93 | 12/13/94 | per thermometer replacement fee | WC |
| Marriot Health Care Services | Manage & operate nutrition services | 1/1/92 | 12/31/93 *then year to year thereafter | mgmt fee $25,680;gen spl all $32,000; operating-exp (as invoiced);yearly | none |
| Metro Chicago Healthcare Council [George W. Brady & Co.] | Group Purchase of Radiology Film | 12/1/91 | 11/30/94 | discounted manufacturer's price according to volume | none |

07/19/94

| Entity | Service | Start | End | Amount | Terms |
|---|---|---|---|---|---|
| OSF Healthcare System | Affiliate Healthcare purchase Agreement | 6/1/94 | 6/1/95 | yearly m-ship $800.00 minimum monthly billing $200.00 pre-agreed cost (Sec.11) monthly | none |
| Owen Healthcare Inc. | Manage the inventory & operate a pharmacy service on the hospital premises | 7/1/89 | 12/31/96 | monthly | 10 day prior WC |
| Plants, Inc. | Plant Rental & maintenance | 6/24/91 | monthly | $225.25 | none |
| Press, Ganey Associates, Inc. | Consulting services patient satisfaction | 7/23/90 | 7/23/91- month to month thereafter | $3,150/quarterly | none |
| Renal Systems | Concentrate Products | 6/15/93 | 6/15/95 | SB-100 & BC-1-L at $7.20 per case SB-100 By drum $79.00 | none |
| Service Master Co. | Management services for housekeeping & maintenance | 3/25/91 | 5/25/94 | biweekly $27,956 effective 3/25/93 | WC |
| Stericycle | Lawful transport, treatment & final disposal of medical waste | 2/1/94 | 2/1/96 | $2,500 monthly & fees for associated services | none |
| Sunbelt PT Services, Inc. IN EXHIBIT 2D | PT Professional Services | 1/3/94 | 12/95 | $40.00/HR | none |
| Telephone Dictation Services, Inc. | Transcription of Radiology reports | 6/7/94 | 6/7/95 | $.125 per typewritten line | none |
| Terminix International Co. | Pest control | 5/7/92 | 5/7/95 | $550 monthly *renew itself annually for 1 year period | none |
| United Technologies Otis Elevator | Elevators | 6/1/80 | 6/1/2000 | $7,482.71 monthly | none |
| Universal Geriatric Services, Inc Waste Management Metro | Special Waste Services | 8/12/93 | | $744.60 monthly | none |
| Wallace Computer Services, Inc. | Computer Printing forms | 4/1/94 | 3/31/97 | minimum order $25 prices subject to market costs | none |
| WESCO Lab, Inc. | Physician billing Service | 7/8/94 | 12/31/94 | | binds successor of contract |
| WillTel | Telephone services | 12/19/93 | 12/19/94 | $30,264/yr | WC |
| Ali, Mir Akif M.D. | Residency | 1/1/93 | 12/31/94 | $1,000 monthly | WC |
| Allen, Neil M.D. | Division Director of Neurology Serices | 7/1/94 | 6/30/95 | $12,000/120 hours annually | WC |
| Alzona, Emanuel M.D. | Residency | 10/1/93 | 9/30/94 | $5,000 monthly | none |
| Atcha, Ismail M.D. | Residency | 1/1/92 | 12/31/94 | $2,750 monthly | none |

revised 07/19/94

2

FL 015697

| Name | Specialty | Start | End | Amount | |
|---|---|---|---|---|---|
| Barnabas, Ravi T. | Specialist Internal Medicine | 11/1/93 | 10/31/94 | $60,000/600 hours annually | WC |
| Berk, Mark A. M.D. | Residency | 10/1/93 | 9/30/94 | $833 monthly | none |
| Bonamino, Erno Robert D.P.M. | Residency | 6/14/93 | 6/20/94 | $16,000/annually | none |
| Camilleri, Mark D.P.M. | Residency | 6/14/93 | 6/30/94 | $16,000/annually | none |
| Castro, Ramon M.D. | Internal medicine | 4/1/94 | 3/31/95 | $12,000/120 hours annually | WC |
| Cheregi, Ioan M.D. | Internal Medicine | 11/1/93 | 10/31/94 | $40,000/annually | none |
| Cherry, Yuri M.D. | Family Medicine | 5/1/95 | 5/31/95 | $1,416 monthly | none |
| Chou, Peter M.D. | Specialist Internal medicine | 6/1/89 | 9/30/94 | $24,000/annually | WC |
| Cubria, Andrew M.D. | Specialist Internal medicine | 1/1/94 | 12/31/94 | $6,000 monthly | WC |
| Dadivas, J. Rene | Residency | 3/1/94 | 2/28/95 | $24,000 annually | WC |
| Fox, Michael D.P.M. | Residency | 1/1/93 | 3/31/95 | $28,000 annually | none |
| Fultz, John M.D. | Residency | 8/1/93 | 7/31/94 | $65,000 annually | none |
| Gavin, Kevin Sean D.P.M. | Residency | 6/14/93 | 6/30/94 | $16,000/annually | none |
| Giokaris, Demetrios M.D. | Residency | 6/1/93 | 5/31/95 | $18,000 annually | none |
| Goldenberg, Bruce M.D. | Residency | 1/1/94 | 12/31/94 | $3,333 monthly | none |
| Hadrych, Jerry Ignatius D.P.M. | Residency | 6/14/93 | 6/30/94 | $16,000/annually | none |
| Haery, Koorosh M.D. | Cardiology | 1/1/94 | 6/30/94 | $6,000/mo | WC |
| Hilizik, David D.P.M. | Residency | 1/1/94 | 12/31/94 | $2,000 monthly | none |
| Hirsen, Daniel M.D. | Specialist in Rheumatology | 2/1/93 | 12/31/94 | $12,000/100 hours annually | WC |
| Humayun, Hamid M. M.D. | Residency | 4/1/92 | 3/31/94 | $600 monthly | none |
| Hussain, Mohammed M.D. | Residency | 1/1/93 | 10/31/94 | $3,333 monthly | WC |
| Hymanson, Bruce M.D. | Residency | 1/1/91 | 12/31/95 | $2,500 monthly | WC |
| Jani, Pareshkumar M.D. | Residency | 5/15/94 | 5/14/95 | $4,000 monthly | WC |
| Jin, Jong M.D. | Residency | 7/1/91 | 6/20/94 | $3,000 monthly | none |
| Kalish, Steve M.D. | Residency | 7/1/85 | 6/30/95 | $2,000 monthly | none |
| Kane, John F. M.D. | Residency | 5/1/93 | 4/30/95 | $2,000 monthly | none |
| Kim, Jong Koo M.D. | Residency | 8/1/89 | 6/30/95 | $4,833 monthly | none |
| Luvison, James M.D. | Specialist Podiatric Medicine | 4/1/94 | 3/31/95 | $12,000/120 hours annually | WC |
| Martin, Gladstone M.D. | Residency | 8/23/93 | 8/31/95 | $8,333 monthly + benfits + bonus | none |
| Martinez, Salud M.D. | Residency | 10/9/88 | 9/30/94 | $5,000 monthly | none |
| Marvahi, Birinder S. M.D. | Residency | 9/1/93 | 8/31/94 | $4,000 monthly | none |
| Maynulet, Rogelio M.D. | Residency | 7/1/88 | 6/30/95 | $3,333 monthly | WC |
| Mendes, Guillermo M.D. | Specialist Family Practice | 2/1/94 | 1/31/95 | $12,000/120 annually | WC |
| Miff, Stephen M.D. | Specialist Internal Medicine | 9/5/94 | 9/4/97 | $40,000/400 hours annually | WC |
| Mineof, Barry D.P.M. | Specialist Podiatric medicine | 11/1/93 | 10/31/94 | $5,000/100 hours annually | WC |

revised 07/19/94

3

FL 016598

| Name | Service/Specialty | Start | End | Compensation | |
|---|---|---|---|---|---|
| Morganstern, Michael M.D. | Residency | 2/1/92 | 1/31/95 | $8,333 monthly/minimum 1000 hours annually | none |
| Oliveros, Mario M.D. | Residency | 7/1/85 | 2/28/95 | $20,000 annually-paid on a biweekly basis | none |
| Patodia, Nirmal M.D. | Specialist Cardiology | 4/11/94 | 4/10/95 | $30,000/300 hours annually | WC |
| Pepelea, Dr. Mark R. Ph.D. | Residency | 11/1/93 | 10/31/96 | $52,000 annually-paid on a biweekly basis | WC |
| Potach, Paul M.D. | Residency | 11/1/93 | 10/31/94 | $1,500 monthly | WC |
| Ramos, Antonio M.D. | Residency | 12/1/93 | 11/30/94 | $6,250 monthly | none |
| Ramoska, Roberta D.P.M. | Residency | 7/1/93 | 6/30/95 | $2,000 monthly | none |
| Riazi, Ali M.D. | Residency | 9/1/93 | 8/31/94 | $4,000 monthly | none |
| Ritling, Anton M.D. | Residency | 6/1/93 | 5/31/95 | $2,000 monthly | none |
| Rubio, Nunilo M.D. | Specialist Internal Medicine | 4/1/94 | 3/31/95 | $24,000/240 hours annually | WC |
| Sandler Steven, M.D. | Residency | 10/1/93 | 9/30/94 | $2,500 monthly | none |
| Santangelo, Louis D.P.M. | Residency | 9/1/92 | 9/30/94 | $1,500 monthly | WC |
| Sattar Abdul, M.D. | Residency | 3/1/93 | 2/28/95 | $5,416 monthly | none |
| Saudye, Muhammad M.D. | Residency | 10/1/87 | 3/31/95 | $1,666 monthly | none |
| Schwartzman, Michael D.P.M. | Residency | 7/1/92 | 6/30/94 | $2,000 monthly | none |
| Shah, Bharat Keshavlal M.D. | Residency | 2/1/89 | 1/31/95 | $2,000 monthly | none |
| Song, Chung M.D. | Residency | 3/13/91 | 9/30/94 | $4,166 monthly | none |
| Stankovic, Dusan M.D. | Specialist Family Practice | 12/1/93 | 11/30/94 | $60,000/650 hours annually | WC |
| Weiser, Sidney D.P.M. | Residency | 12/1/93 | 11/30/94 | $12,000 annually | none |
| Weiss, Richard D.P.M. | Residency | 2/1/93 | 1/31/95 | $2,000 monthly | none |
| Wise, William J. M.D. | Director of Nephrology | 7/13/87 | 3/31/95 | $30,000 annually-paid biweekly installments | none |
| Yunez, Salvador M.D. | Residency | 10/1/93 | 9/30/94 | $2,500 monthly | none |
| Zahtz, Merrill M.D. | Residency | 1/1/94 | 12/31/95 | $2,600 monthly | WC |
| Zanetti, Claude M.D. | Residency | 7/12/85 | 6/30/95 | $4,333 monthly | none |
| Zivkovic, Dusan M.D. | Residency | 5/1/91 | 4/30/95 | $44,000 annually | none |
| Chicago Neurological Surgeons | Neurosurgery Services | 2/1/94 | 1/31/95 | $2,000 monthly | none |
| Edgewater Anesthesia Associates | Anesthesiology Services | 3/1/94 | 2/28/97 | Compensated solely on their own billing of patients & insurance cos. | none |
| Edgewater Emergency Physicians, Ltd. | Medical emergency department | 2/15/92 | 2/14/97 | According to guaranteed annual collections | |
| IMMC Pathologist | Residency | 5/1/94 | 4/30/95 | Bill patients directly at market rate Corporation will bill patients w/ | prohibited |
| UNIMED, Ltd. | Medical Imaging Reading Services | 7/1/93 | 6/30/95 | EMC approval of charges | prohibited |

FL 015699

4

# Exhibit

# 29

NEW ISSUE                       LIMITED OFFERING MEMORANDUM

$41,000,000
Illinois Health Facilities Authority
Revenue Bonds, Series 1994
(Edgewater Hospital and Medical Center)

Dated: July 1, 1994                                    Due: July 1, as described below

The Illinois Health Facilities Authority (the "Authority") is offering its $41,000,000 Revenue Bonds, Series 1994 (Edgewater Hospital and Medical Center) (the "Series 1994 Bonds") pursuant to a Bond Trust Indenture dated as of July 1, 1994 (the "Bond Indenture") between the Authority and LaSalle National Bank, Chicago, Illinois, as trustee (the "Bond Trustee"). Except to the extent payable from Series 1994 Bond proceeds or moneys derived from the investment thereof and certain insurance and condemnation proceeds, the Series 1994 Bonds are payable solely from the payments to be received by the Authority pursuant to a Loan Agreement dated as of July 1, 1994 between the Authority and Northside Operating Co., d/b/a Edgewater Hospital and Medical Center, Inc. (the "Corporation") and a Direct Note Obligation and any Additional Obligations pledged under the Bond Indenture and issued pursuant to a Master Trust Indenture dated as of July 1, 1994 between the Corporation and LaSalle National Bank, as the Master Trustee. On the date of delivery of the Series 1994 Bonds, the Corporation will be the sole Member of the Obligated Group. There are no plans to add any additional Members in the immediate future.

The Series 1994 Bonds will initially be issuable only as fully registered bonds without coupons, in book-entry form, in denominations of $100,000 and integral multiples of $5,000 in excess thereof. Series 1994 Bonds issued in exchange for Series 1994 Bonds initially issued will be issued only in Authorized Denominations. Purchasers of the Series 1994 Bonds may register their Series 1994 Bonds in book-entry form.

Principal of and premium, if any, and interest on the Series 1994 Bonds will be paid by the Bond Trustee. Interest will be payable on January 1 and July 1 of each year, commencing January 1, 1995, to the Bondholders of record as of the applicable Record Dates, as herein described.

THE SERIES 1994 BONDS ARE LIMITED OBLIGATIONS OF THE AUTHORITY AND ARE NOT A DEBT OF THE STATE OF ILLINOIS OR ANY POLITICAL SUBDIVISION OR AGENCY THEREOF OTHER THAN THE AUTHORITY. THE AUTHORITY HAS NO TAXING POWER. THE SOURCE OF PAYMENTS OF, AND SECURITY FOR, THE SERIES 1994 BONDS ARE MORE FULLY DESCRIBED HEREIN.

THE SERIES 1994 BONDS ARE SUBJECT TO REDEMPTION PRIOR TO MATURITY AS DESCRIBED HEREIN.

$41,000,000 9.25% Series 1994 Term Bonds due July 1, 2024
(Plus accrued interest from July 1, 1994)

*Subject to compliance by the Authority and the Corporation with certain covenants, in the opinion of Chapman and Cutler, Bond Counsel, under present law, interest on the Series 1994 Bonds will not be includible in gross income of the owners thereof for federal income tax purposes and, therefore, will be exempt from present federal income taxation, except to the extent that such interest will be taken into account in computing the corporate alternative minimum tax, the environmental tax and the branch profits tax. See the information under the captions "TAX MATTERS" herein for a more detailed discussion of some of the federal tax consequences of owning the Series 1994 Bonds. The interest on the Series 1994 Bonds is not exempt from present Illinois income taxes.*

The Series 1994 Bonds are offered when, as and if issued and received by the Underwriter, subject to prior sale, to withdrawal or modification of the offer without any notice, and to the approval of legality of the Series 1994 Bonds by Chapman and Cutler, Chicago, Illinois, Bond Counsel. Certain legal matters will be passed upon for the Authority by Sidley & Austin, Chicago, Illinois. Certain legal matters will be passed upon for the Corporation by Latham & Watkins, Chicago, Illinois and by Foley & Lardner, Chicago, Illinois. Certain legal matters will be passed upon for the Underwriter by Foley & Lardner, Chicago, Illinois. Subject to prevailing market conditions, the Underwriter intends, but is not obligated, to make a market in the Series 1994 Bonds. It is expected that the Series 1994 Bonds, in book-entry form, will be available through the facilities of DTC, on or about August 17, 1994.

CS FIRST BOSTON

The date of this Limited Offering Memorandum is August 17, 1994

DEFENDANT'S
EXHIBIT
29
PENGAD-Bayonne, N. J.

CB          02011

## LIMITED OFFERING MEMORANDUM
### relating to
### $41,000,000
### ILLINOIS HEALTH FACILITIES AUTHORITY
### REVENUE BONDS, SERIES 1994
### (EDGEWATER HOSPITAL AND MEDICAL CENTER)

The descriptions and summaries of various documents hereinafter set forth do not purport to be comprehensive or definitive, and reference is made to each document for the complete details of all terms and conditions. All statements herein are qualified in their entirety by reference to each document. Executed copies of the Master Indenture, the First Supplemental Master Indenture, the Bond Indenture, the Loan Agreement and the Mortgage (as such terms are hereinafter defined) are included herein as APPENDIX D.

### Availability of Financial Information

Northside Operating Co., d/b/a Edgewater Hospital and Medical Center, Inc. (the "Corporation") has covenanted to provide to LaSalle National Bank, Chicago, Illinois, as bond trustee (the "Bond Trustee") a copy of the Obligated Group's audited consolidated annual financial statements and copies of the Obligated Group's unaudited consolidated quarterly financial information. The Corporation has covenanted in the Loan Agreement dated as of July 1, 1994 (the "Loan Agreement"), between the Illinois Health Facilities Authority (the "Authority") and the Corporation to furnish to any requesting owner of the Series 1994 Bonds such financial statements and information.

### INTRODUCTION

**Purpose of this Limited Offering Memorandum.** The purpose of this Limited Offering Memorandum, including the cover page, the back cover page and the Appendices hereto, is to set forth information in connection with the offering by the Authority of its $41,000,000 Revenue Bonds, Series 1994 (Edgewater Hospital and Medical Center) (the "Series 1994 Bonds"). The Series 1994 Bonds are to be issued and secured under and pursuant to a Bond Trust Indenture dated as of July 1, 1994 (the "Bond Indenture"), between the Authority and the Bond Trustee.

**The Obligated Group and the Corporation.** As of the date of the issuance of the Series 1994 Bonds, Northside Operating Co., d/b/a Edgewater Hospital and Medical Center, Inc., an Illinois not for profit corporation (the "Corporation"), will be the only Member of the Obligated Group (as such term is defined in the Master Indenture). Other persons may become Members of the Obligated Group in accordance with the procedures set forth in the Master Indenture; however, there is no intention of adding Members to the Obligated Group in the foreseeable future.

Following completion of a plan of merger described herein, the Corporation will own and operate a general acute-care hospital licensed for 335 beds and the real estate upon which it is located (the "Hospital Facility") in Chicago, Illinois.

The Corporation is exempt from federal income taxation pursuant to Section 501(a) of the Internal Revenue Code of 1986, as amended (the "Code"), as an organization described in Section 501(c)(3) of the Code by virtue of its inclusion in a group exemption extended to Permian Health Care, Inc. ("Permian"), a Colorado nonprofit corporation and its subordinates, including the Corporation. The Corporation is not a private foundation as defined in Section 509(a) of the Code.

For further information concerning the Corporation (including certain financial information), the Hospital Facility and the plan of merger, see the information herein under the caption, "PLAN OF MERGER AND FINANCE" and in APPENDIX A hereto.

CB          02012

**Purposes of the Series 1994 Bonds.** The proceeds to be received by the Authority from the sale of the Series 1994 Bonds will be loaned to the Corporation pursuant to the Loan Agreement. Such proceeds will be used (i) to provide the funds necessary to pay $31,100,000 to the shareholders of the outstanding stock of Edgewater Operating Company, the current operator of the Hospital Facility, and to acquire the Hospital Facility, (ii) to fund the Debt Service Reserve Fund held under the Bond Indenture, (iii) to provide working capital, (iv) to finance the costs of renovating certain portions of the Hospital Facility and to acquire certain equipment and (v) to pay certain expenses incurred in connection with the issuance of the Series 1994 Bonds and the Merger (as that term is hereinafter defined). In addition to the payment to the shareholders of Edgewater Operating Company of the funds described above from the proceeds of the sale and the Series 1994 Bonds, the Corporation will issue and deliver to such shareholders, on the date of delivery of the Series 1994 Bonds, the Corporation's Unsecured, Subordinated Promissory Note in the aggregate principal amount of $4,000,000 (the "Subordinated Note"), all as described below under the caption, "PLAN OF MERGER AND FINANCE--The Subordinated Note". The Subordinated Note will bear interest at the rate of 10% per annum and will mature on August 17, 2004. A more detailed description of the uses of the proceeds of the loan, including the purposes and approximate amounts thereof, is included herein under the captions, "PLAN OF MERGER AND FINANCE" and "ESTIMATED SOURCES AND USES OF FUNDS."

**Security.** The Series 1994 Bonds will be issued under the Bond Indenture. As security for the Series 1994 Bonds, pursuant to a Master Trust Indenture dated as of July 1, 1994 (the "Master Trust Indenture"), between the Corporation and LaSalle National, Chicago, Illinois, as master trustee (the "Master Trustee"), as amended and supplemented by a First Supplemental Master Trust Indenture dated as of July 1, 1994 (the "First Master Indenture Supplement" and, together with the Master Trust Indenture, the "Master Indenture") between the Corporation and the Master Trustee, the Corporation will issue and deliver to the Authority its $41,000,000 Direct Note Obligation, Series 1994 (Illinois Health Facilities Authority) (the "Series 1994 Obligation"). The Series 1994 Obligation, together with any other Additional Obligations issued under the Master Indenture (whether or not pledged under the Bond Indenture) are referred to herein as the Obligations.

The terms of the Series 1994 Obligation will require payments by the Corporation and any future Members of the Obligated Group (and the terms of the Loan Agreement will require payments by the Corporation) which, together with other moneys available therefor (and interest thereon), will be sufficient, in the aggregate, to provide for the payment of the principal of and interest and premium, if any, on the Series 1994 Bonds. The Series 1994 Obligation will entitle the Bond Trustee, as the holder thereof, to the protection of the covenants, restrictions and other obligations imposed upon the Obligated Group by the Master Indenture. The obligations of each of the Members of the Obligated Group to make payments on the Obligations are secured by a mortgage of the Hospital Facility granted pursuant to a Mortgage and Security Agreement dated as of July 1, 1994 (the "Mortgage") between the Corporation and the Master Trustee and by a pledge of the Members' Unrestricted Receivables pursuant to the Master Indenture. On the date the Series 1994 Bonds are issued, the Corporation will be the sole Member of the Obligated Group. See the information herein under the captions, "SECURITY FOR THE SERIES 1994 BONDS" and "BONDHOLDERS' RISKS--Factors Concerning the Enforceability of the Master Indenture" and "--Matters Relating to Security for the Series 1994 Bonds". For a description of the Hospital Facility, see APPENDIX A hereto.

Principal of and premium, if any, and interest on the Series 1994 Bonds are payable solely from (i) payments or prepayments to be made on the Series 1994 Obligation, and Additional Obligations, if any, pledged under the Bond Indenture, (ii) payments or prepayments made under the Loan Agreement (other than payments constituting Unassigned Rights), (iii) moneys and investments held by the Bond Trustee in the funds created under, and to the extent provided in, the Bond Indenture, including amounts on deposit in the Debt Service Reserve Fund and (iv) in certain circumstances, proceeds from insurance and condemnation awards and sales consummated under threat of condemnation. See the information herein under the caption, "SECURITY FOR THE SERIES 1994 BONDS".

2

CB          02013

Additional Bonds and Additional Indebtedness. Additional Bonds, on a parity with the Series 1994 Bonds, may be issued by the Authority for the purposes, upon the terms and subject to the conditions provided in the Bond Indenture. The Series 1994 Bonds and any Additional Bonds are collectively referred to herein as the "Bonds."

Under certain circumstances, the Members of the Obligated Group may issue Additional Obligations under the Master Indenture to entities other than the Authority, which will not be pledged under the Bond Indenture (unless they secure Additional Bonds), but will be equally and ratably secured with the Series 1994 Obligation (except as described herein) pledged under the Bond Indenture for the benefit of the Series 1994 Bonds. See the Master Trust Indenture and the First Master Indenture Supplement in APPENDIX D hereto. Under the terms of the Master Indenture, Additional Indebtedness may also be entitled to the benefit of security in addition to that securing all any other Obligation or Indebtedness (including letters and lines of credit or insurance), which additional security need not be extended to any other Obligation or Indebtedness, including the Series 1994 Obligation. See the Master Trust Indenture and the First Master Indenture Supplement in APPENDIX D hereto.

Bondholders' Risks. There are risks associated with the purchase and ownership of the Series 1994 Bonds. For a discussion of certain of these risks, see the information under the caption, "BONDHOLDERS' RISKS" herein.

## PLAN OF MERGER AND FINANCE

The Hospital Facility is currently owned by Edgewater Property Company ("EPC") and is leased to and operated by Edgewater Operating Company ("EOC"), each an Illinois business corporation. Pursuant to an Agreement of Merger dated November 19, 1993, as amended and supplemented (as amended and supplemented, the "Agreement of Merger") among the Corporation, EOC and EPC, the Hospital Facility and all equipment and furnishings therein will be transferred to EOC. Thereafter, EOC will merge into the Corporation and the Corporation will pay $31,100,000 to the shareholders of EOC and will deliver to such shareholders the Subordinated Note. (The transactions described in the Agreement of Merger are described herein collectively as the "Merger.") The Corporation will enter into a Management Agreement (the "Management Agreement") with Braddock Management, L.P., a California limited partnership ("Braddock"), pursuant to which Braddock will agree to operate the Hospital Facility. See the information in APPENDIX A to this Limited Offering Memorandum under the caption, "MANAGER" for a discussion of Braddock and the services provided under the Management Agreement.

Upon completion of the Merger, the Corporation does not intend immediately to alter the number of staffed beds or to alter the services provided at the Hospital Facility. Any such alteration may require a certificate of need from the Illinois Health Facilities Planning Board.

Edgewater Property Company ("EPC") will own certain facilities contiguous or in proximity to the Hospital Facility, including two medical office buildings and two residential apartment buildings (collectively, the "Retained Assets"). The Corporation does not anticipate that the continued ownership of the medical office buildings by EPC will adversely affect the Corporation or its operation of the Hospital Facility. However, the Corporation has negotiated an option to purchase the Retained Assets from EPC.

A portion of the proceeds of the sale of the Series 1994 Bonds will be used to provide working capital to the Corporation. The Corporation anticipates that such working capital will be expended within 18 months, after which time the Corporation anticipates that sufficient revenues will be generated from operations to pay all expenses of operation. In addition, a portion of the proceeds of the sale of the Series 1994 Bonds will be used to finance certain renovations to the Hospital Facility and the acquisition of certain equipment, all as described in APPENDIX A to this Limited Offering Memorandum under the caption, "HOSPITAL FACILITY."

3

CB        02014

**The Subordinated Note**

Contemporaneously with the delivery of the Series 1994 Bonds, the Corporation will issue the Subordinated Note to EOC's shareholders. Neither the principal of nor the interest on the Subordinated Note will be paid (i) during any period of time that either the principal of or interest on the Series 1994 Bonds has not been paid when due or there is a deficiency in the amounts on deposit in the Debt Service Reserve Fund, (ii) if the Obligated Group's Historical Debt Service Coverage Ratio (a) for the six month period (ended June 30) immediately preceding each July 1 (with respect to payments of interest due and owing) or (b) the 12 month period (ended December 31) immediately preceding each January 1 (with respect to payments of principal and accrued interest due and owing) is less than 1.5:1.0 or (iii) Days Cash on Hand (calculated as of each June 30 or December 31) is, (a) from August 17, 1994, through and including December 31, 1996, less than 20 days and (b) from January 1, 1997, throughout the remaining term of the Subordinated Note Agreement, less than 30 days. Failure to pay the principal of and interest due on the Subordinated Note will not constitute an event of default under the Master Indenture, the Bond Indenture, the Loan Agreement or the Mortgage. The holders of the Subordinated Note will have no right to enforce any remedies available under such documents as a consequence of the failure by the Corporation to make any such payment, when due, while any of the Series 1994 Bonds are outstanding. However, amounts not so paid shall continue to accrue, shall bear interest on the principal and interest so unpaid at the rate of interest borne by the Subordinated Note on the date when such non-payment occurs and shall be due August 17, 2004, the date of maturity of the Subordinated Note. See the First Master Indenture Supplement included in APPENDIX D hereto for the definition of "Historical Debt Service Coverage Ratio" and "Days Cash on Hand".

**The Manager**

The Hospital Facility will be managed by Braddock. Braddock was organized in 1993 and does not have material assets or liabilities. See APPENDIX A for additional information with respect to Braddock and the experience of its principal officers in managing health care facilities.

### THE SERIES 1994 BONDS

**Description of the Series 1994 Bonds**

The Series 1994 Bonds are issuable in fully registered form, and as initially issued, in the denomination of $100,000 and integral multiples of $5,000 in excess thereof and, will be dated as of July 1, 1994 and will bear interest from such date, payable on January 1 and July 1 of each year (each, an "Interest Payment Date"), commencing January 1, 1995, at the rates and will mature in the amounts and on the dates set forth on the cover page of this Limited Offering Memorandum. Series 1994 Bonds issued in exchange for Series 1994 Bonds initially issued will be issued only in Authorized Denominations (as defined in the Bond Indenture which is included in APPENDIX D hereto). Except as described in the next sentence, subsequently issued Series 1994 Bonds will be dated as of the later of July 1, 1994, or the most recent preceding Interest Payment Date to which interest has been paid thereon. Series 1994 Bonds issued on an Interest Payment Date to which interest had been paid will be dated as of such date.

The principal of and premium, if any, on the Series 1994 Bonds will be payable upon presentment at the principal corporate trust office of the Bond Trustee in Chicago, Illinois. Except as otherwise provided in the Bond Indenture with respect to Defaulted Interest, interest payments on the Series 1994 Bonds will be made to the registered owners thereof as of the close of business of the Bond Trustee on December 15 or June 15 (whether or not a Business Day) immediately preceding each Interest Payment Date (each, a "Record Date") for such payments (i) by check or draft of the Bond Trustee mailed on the Interest Payment Date to such owners at their addresses as they appear on the Bond Register or at such other addresses as are furnished to the Bond Trustee in writing by such owners prior to the applicable Record Date or (ii) as to any owner of $1,000,000 or more in aggregate principal

4

CB        02015

amount of the Series 1994 Bonds as of the close of business of the Bond Trustee on the Record Date who so elects, by wire transfer of funds to such wire transfer address within the continental United States on such Interest Payment Date, upon written notice from such owner containing the wire transfer address to which such owner wishes to have such wire directed, which written notice is received not later than the Business Day next preceding such Record Date. The principal on and the premium, if any, payable upon redemption of the Series 1994 Bonds are payable (i) upon presentment at the principal corporate trust office of the Bond Trustee or (ii) as to the owner of $1,000,000 or more in aggregate principal amount of Series 1994 Bonds who so elects and who has presented its Series 1994 Bond on or prior to the payment date, by wire transfer of funds on such payment date to such wire transfer address within the continental United States upon written notice from such owner containing the wire transfer address to which such owner wishes to have such wire directed which written notice is received not later than Business Day next preceding the Record Date for such payment.

## Redemption of the Series 1994 Bonds

The Series 1994 Bonds are subject to mandatory redemption, optional redemption and mandatory redemption upon a Determination of Taxability and extraordinary redemption, all as described below. The Series 1994 Bonds subject to redemption in part shall be redeemed on a pro rata basis from each registered holder of Series 1994 Bonds of the maturity to be redeemed. Anything in the Bond Indenture to the contrary notwithstanding, including the requirements regarding pro-rata redemption of the Series 1994 Bonds, the Series 1994 Bonds of each registered holder to be redeemed shall be selected by the Bond Trustee in such a manner so as to assure that, subsequent to such redemption, all Series 1994 Bonds remaining outstanding are in denominations of not less than $100,000 in principal amount or integral multiples of $5,000 in excess thereof. In addition, no redemption (other than mandatory sinking fund redemptions) of less than all of the Series 1994 Bonds at the time outstanding shall be made unless the aggregate principal amount of Series 1994 Bonds to be redeemed is equal to or exceeds $100,000 and the principal amount of the Series 1994 Bond outstanding after such redemption is not less than $100,000 and all Series 1994 Bonds outstanding will be in Authorized Denominations. In the case of any optional or extraordinary redemption or any purchase and cancellation of Series 1994 Bonds, the Authority shall receive credit against the required Bond Sinking Fund deposits with respect to such Series 1994 Bonds in the inverse order of such bond sinking fund requirements thereof.

**Bond Sinking Fund Payments.** The Series 1994 Bonds maturing on July 1, 2024 are subject to mandatory redemption, on a pro rata basis from each of the registered holders, on July 1, in each of the years set forth below and are payable at maturity, under the Bond Sinking Fund provisions of the Bond Indenture, at 100% of the principal amount so redeemed or paid, plus accrued interest as set forth below:

5

CB    02016

### Series 1994 Bonds Maturing July 1, 2024

| Redemption Date July 1, | Principal Amount |
|---|---|
| 1996 | $ 300,000 |
| 1997 | 300,000 |
| 1998 | 400,000 |
| 1999 | 400,000 |
| 2000 | 500,000 |
| 2001 | 500,000 |
| 2002 | 500,000 |
| 2003 | 600,000 |
| 2004 | 600,000 |
| 2005 | 700,000 |
| 2006 | 800,000 |
| 2007 | 800,000 |
| 2008 | 900,000 |
| 2009 | 1,000,000 |
| 2010 | 1,100,000 |
| 2011 | 1,200,000 |
| 2012 | 1,300,000 |
| 2013 | 1,400,000 |
| 2014 | 1,600,000 |
| 2015 | 1,700,000 |
| 2016 | 1,900,000 |
| 2017 | 2,000,000 |
| 2018 | 2,200,000 |
| 2019 | 2,400,000 |
| 2020 | 2,600,000 |
| 2021 | 2,900,000 |
| 2022 | 3,200,000 |
| 2023 | 3,400,000 |
| 2024* | 3,800,000 |

*Maturity

In lieu of mandatory Bond Sinking Fund redemption, the Bond Trustee may, at the request of the Corporation, purchase in the open market for cancellation, an equal principal amount of Series 1994 Bonds of the maturity to be redeemed at prices not exceeding the principal amount of the Series 1994 Bonds being purchased plus accrued interest thereon, with the interest portion of the purchase price to be paid from the Interest Fund and the principal portion of such purchase price to be paid from the Bond Sinking Fund. In addition, the aggregate principal amount of Series 1994 Bonds to be redeemed on any date pursuant to the mandatory Bond Sinking Fund redemption schedule shall be reduced by the aggregate principal amount of Series 1994 Bonds of the maturity required to be redeemed which are acquired by the Corporation or any other Member of the Obligated Group and delivered to the Bond Trustee for cancellation; provided, further, that the Series 1994 Bonds to be purchased as a result of any such related tender offer, shall be purchased pro rata from each registered holder of Series 1994 Bonds accepting such tender offer.

Mandatory Redemption Upon a Determination of Taxability. Upon the occurrence of a Determination of Taxability (as defined in the Bond Indenture which is included in APPENDIX D hereto), the Series 1994 Bonds are subject to mandatory redemption, in whole, on any date, at a redemption price equal to (i) 100% of the outstanding principal amount thereof, plus interest accrued to the redemption date, if such Determination of Taxability is generally applicable to all bonds issued in respect of hospitals of the general character of the Series

6

CB 02017

1994 Bonds or (ii) 105% of the outstanding principal amount, plus accrued interest to the redemption date, if such Determination of Taxability is a result of any other occurrence, at the earliest practicable date selected by the Bond Trustee, after consultation with the Borrower, but in no event later than 60 days following receipt by the Bond Trustee of notice of the Determination of Taxability. Within five Business Days after receipt by the Bond Trustee of written notice of a Determination of Taxability, the Bond Trustee shall give provide notice thereof to the Holders of all Series 1994 Bonds then outstanding, as shown by the Bond Register, and shall also provide written notice to the Corporation and the Authority.

Optional Redemption. The Series 1994 Bonds maturing on or after July 1, 2005 are subject to redemption, prior to maturity, on or after July 1, 2004 at the option of the Authority, upon the direction of the Corporation, in whole or in part on any date, and if in part, pro rata from each registered owner of the Series 1994 Bonds from amounts prepaid on the Series 1994 Obligation, at the redemption prices (expressed as percentages of the principal amounts to be redeemed) set forth below, plus accrued interest to the redemption date:

| Redemption Periods (both dates inclusive) | Price |
|---|---|
| On or after July 1, 2004, but prior to June 30, 2005 | 102% |
| On or after July 1, 2005, but prior to June 30, 2006 | 101 |
| On or after July 1, 2006 | 100 |

Extraordinary Redemption. The Series 1994 Bonds are also subject to redemption by the Authority prior to maturity, in whole or in part on any date, and if in part in inverse order of the maturities thereof, and pro rata within a maturity, at the principal amount thereof plus accrued interest to the redemption date, without premium, in the event of the damage to, or destruction or condemnation (or sale consummated under threat of condemnation) of the Facilities or any part thereof, in the event of prepayment of the Series 1994 Obligation and provided the conditions to such prepayment included in the Master Indenture are satisfied. See the First Master Indenture Supplement included in APPENDIX D hereto.

Notice of Redemption. The Bond Trustee shall give notice of the redemption of the Series 1994 Bonds selected for redemption by registered or certified mail not less than 30 days or more than 60 days prior to the date fixed for the redemption of such Series 1994 Bonds to all registered owners of Series 1994 Bonds or portions thereof to be redeemed, at their addresses as they then appear on the registration books of the Bond Registrar. Failure to give any such notice by mailing or a defect in the notice or the mailing as to any Series 1994 Bond will not affect the validity of the proceedings for redemption as to any other Series 1994 Bond with respect to which notice was properly given to the holder thereof. Interest will not accrue after the redemption date on the Series 1994 Bonds called for redemption if timely notice of redemption has been given and if sufficient moneys have been timely deposited with the Bond Trustee as required by the Bond Indenture to pay, on the redemption date, the principal of the Series 1994 Bonds so called for redemption and the premium, if any, and interest accrued on such Series 1994 Bonds to the redemption date and such Series 1994 Bonds will no longer be considered outstanding under the Bond Indenture.

Effect of Redemption and Call for Redemption. On the date fixed for the redemption of the Series 1994 Bonds, proper notice having been given and moneys for the payment of the redemption price thereof being held in trust for the registered owners of the Series 1994 Bonds or portions thereof to be redeemed, the Series 1994 Bonds so called for redemption shall become due and payable at the redemption price provided for such Series 1994 Bonds on that date, the interest on such Series 1994 Bonds shall cease to accrue, the Series 1994 Bonds so called for redemption shall cease to be entitled to any benefit or security under the Bond Indenture and the registered owners of such Series 1994 Bonds shall have no rights in respect thereto except to receive payment of the redemption price thereof and to receive Series 1994 Bonds for any unredeemed portions of Series 1994 Bonds.

7

CB          02018

### Bond Registration

The Bond Trustee shall keep the registration books for the Series 1994 Bonds at its principal corporate trust offices. Subject to the further conditions contained in the Bond Indenture, the Series 1994 Bonds of a particular maturity may be transferred or exchanged for one or more Series 1994 Bonds of the same maturity in different authorized denominations upon surrender thereof at the principal corporate trust office of the Bond Trustee by the registered owners or their duly authorized attorneys. Upon surrender of any Series 1994 Bonds to be transferred or exchanged, the Bond Trustee shall record the transfer or exchange in its registration books and shall authenticate and deliver new Series 1994 Bonds of the same maturity appropriately registered and in appropriate authorized denominations. The Bond Trustee shall not be required to effect or register any transfer of or exchange any Series 1994 Bond after notice calling such Series 1994 Bond or portion thereof for redemption has been mailed or during the 15-day period next preceding the mailing of such notice of redemption of the Series 1994 Bonds of the same maturity. The Authority and the Bond Trustee may require payment by the person requesting an exchange or transfer of Series 1994 Bonds of a sum sufficient to cover any tax, fee or other governmental charge that may be imposed in relation thereto, except in the case of the issuance of Series 1994 Bonds for the unredeemed portion of a Series 1994 Bond surrendered for redemption. The Authority and the Bond Trustee shall be entitled to treat the registered owners of the Series 1994 Bonds, as their names appear in the registration books as of the appropriate dates, as the owners of such Series 1994 Bonds for all purposes under the Bond Indenture. No transfer or exchange made other than as described above and in the Bond Indenture shall be valid or effective for any purposes under the Bond Indenture.

## SECURITY FOR THE SERIES 1994 BONDS

The Series 1994 Bonds are limited obligations of the Authority and are payable solely from (i) payments or prepayments to be made on the Series 1994 Obligation and Additional Obligations, if any, pledged under the Bond Indenture, (ii) payments or prepayments made under the Loan Agreement (other than payments constituting Unassigned Rights), (iii) moneys and investments held by the Bond Trustee in the funds maintained under, and to the extent provided in, the Bond Indenture, including amounts on deposit in the Debt Service Reserve Fund and (iv) in certain circumstances, proceeds from insurance and condemnation awards and sales consummated under threat of condemnation. Certain investment earnings on moneys held by the Bond Trustee in connection with the Series 1994 Bonds will be transferred to the Rebate Fund established pursuant to the Tax Exemption Agreement dated the date of delivery of the Series 1994 Bonds among the Authority, the Bond Trustee and the Corporation. Amounts held in the Rebate Fund are not part of the "trust estate" pledged under the Bond Indenture to secure the Series 1994 Bonds and, consequently, will not be available to make payments on the Series 1994 Bonds.

The Authority will pledge and assign the Series 1994 Obligation and its rights under the Loan Agreement (other than Unassigned Rights) to the Bond Trustee as security for the Series 1994 Bonds. The Loan Agreement and the Series 1994 Obligation will require payments by the Corporation, which, together with other moneys available therefor (and interest thereon), will be sufficient, in the aggregate, to provide for the payment of the principal of and interest and premium, if any, on the Series 1994 Bonds.

### Mortgage Lien and Pledge of Unrestricted Receivables

The obligations of the Members of the Obligated Group to make payments on the Obligations are secured by a mortgage on the Hospital Facility granted pursuant to the Mortgage and by a security interest in the Unrestricted Receivables of each of the Members of the Obligated Group granted pursuant to the Master Indenture, subject to liens on the property subject to the Mortgage and the Unrestricted Receivables that are Permitted Liens. On the date the Series 1994 Bonds are issued, the Corporation will be the sole Member of the Obligated Group. As described herein under the caption, "BONDHOLDERS' RISKS—Matters Relating to Security for the Series 1994 Bonds," such security interests may be limited by a variety of factors described therein.

8

CB          02019

**Master Indenture**

The Master Indenture permits the Obligated Group, among other things; to (i) incur Additional Indebtedness, including without limitation Additional Indebtedness secured by Additional Obligations, which may be secured by security in addition to that provided under the Master Indenture or may be unsecured, (ii) enter into Guaranties, (iii) sell, lease or otherwise dispose of Property and (iv) encumber its Property with Liens, all upon the terms and conditions specified therein. See the Master Trust Indenture and the First Master Indenture Supplement included in APPENDIX D for a description of the terms of the Master Indenture, including certain restrictions imposed on the Obligated Group's actions for the benefit of all holders of Obligations issued thereunder.

The Series 1994 Obligation is a general obligation of the Members of the Obligated Group. The Master Indenture provides that payments on the Series 1994 Obligation and Additional Obligations, if any, pledged under the Bond Indenture will be the joint and several obligations of the Members of the Obligated Group. Notwithstanding uncertainties as to the enforceability of the covenant of the Members of the Obligated Group in the Master Indenture to be jointly and severally liable for each Obligation (as described under the caption, "BONDHOLDERS' RISKS—Factors Concerning the Enforceability of the Master Indenture" herein), the accounts of the Members of the Obligated Group will be combined for financial reporting purposes and will be used in determining whether various covenants and tests contained in the Master Indenture (including tests relating to the incurrence of Additional Indebtedness) are satisfied.

**Loan Agreement**

The Loan Agreement also imposes certain restrictions on the actions of the Corporation for the benefit of the Authority and the owners of the Series 1994 Bonds. See "SUMMARY OF CERTAIN PROVISIONS OF THE LOAN AGREEMENT" in APPENDIX D hereto. The Loan Agreement provides that the Corporation shall make designated loan payments to the Bond Trustee for deposit into the Revenue Fund in amounts sufficient to pay the interest on and principal of the Series 1994 Bonds when due and, in certain circumstances, into the Debt Service Reserve Fund to maintain the same at the Debt Service Reserve Fund Requirement. The obligations of the Corporation to make payments on the Series 1994 Obligation will be satisfied to the extent that payments are made under the Loan Agreement by the Corporation and the Corporation will receive similar credit under the Loan Agreement for payments made by any Member of the Obligated Group on the Series 1994 Obligation.

**Debt Service Reserve Fund**

An amount not less than the Debt Service Reserve Fund Requirement is required to be on deposit in the Debt Service Reserve Fund maintained under the Bond Indenture at the time the Series 1994 Bonds are issued. The Debt Service Reserve Fund Requirement is $4,100,000. On the date of issuance of the Series 1994 Bonds, $4,100,000 of proceeds of the Series 1994 Bonds will be deposited into the Debt Service Reserve Fund. If on any valuation date, the amount on deposit in the Debt Service Reserve Fund is less than 100% of the Debt Service Reserve Fund Requirement as a result of a decline in the market value of investments in such Debt Service Reserve Fund, the Corporation is required under the Loan Agreement to restore the amount on deposit in the Debt Service Reserve Fund to the Debt Service Reserve Fund Requirement within not more than 120 days following the date of receipt of notice of such deficiency. If at any time the amount on deposit in the Debt Service Reserve Fund is less than 100% of the Debt Service Reserve Fund Requirement as a result of the Debt Service Reserve Fund having been drawn upon to pay principal of or interest on the Bonds, the Loan Agreement requires the Corporation to restore the amount on deposit in the Debt Service Reserve Fund to an amount equal to the Debt Service Reserve Fund Requirement by the deposit therein of an amount equal to such deficiency in not more than three substantially equal monthly payments commencing with the first day of the first month after the month in which such draw occurred. Moneys on deposit in the Debt Service Reserve Fund are required to be used by the Bond Trustee whenever, and to the extent that, moneys on deposit in the Interest Fund or the Bond Sinking Fund are insufficient for the purpose of paying, respectively, interest on or principal of the Series 1994 Bonds as the same become due, to the extent such

9

CB        02020

Series 1994 Bonds are then outstanding and are entitled to the benefits and security of the Debt Service Reserve Fund. A withdrawal from Debt Service Reserve Fund to make any payment on the Series 1994 Bonds other than in connection with the payment in full of all outstanding Series 1994 Bonds is an Event of Default under the Bond Indenture. See the Bond Indenture included in APPENDIX D hereto.

Additional Bonds will not be entitled to the benefits and security of the Debt Service Reserve Fund.

The Corporation is authorized to deposit moneys in the Debt Service Reserve Fund to replace moneys deposited therein at the time of issuance of the Series 1994 Bonds. With the consent of the holders of 66-2/3 % in aggregate principal amount of the Series 1994 Bonds, the Bond Indenture permits the Corporation to substitute a letter of credit, a surety bond or non-cancelable insurance policy in lieu of maintaining the required amount in the Debt Service Reserve Fund. See the Bond Indenture included in APPENDIX D hereto.

## State of Illinois Not Liable on the Series 1994 Bonds

The Series 1994 Bonds and the interest and premium, if any, payable thereon do not constitute a debt or liability of the State of Illinois (the "State") or of any political subdivision thereof other than the Authority, or a pledge of the faith and credit of the State or any political subdivision thereof other than the Authority, but shall be payable solely from the funds pledged therefor in accordance with the Bond Indenture. The issuance of the Series 1994 Bonds does not, directly, indirectly or contingently, obligate the State or any political subdivision thereof to levy any form of taxation for the payment thereof or to make any appropriation for their payment. The Series 1994 Bonds and the interest and premium, if any, payable thereon, do not now and shall never constitute a debt of the State within the meaning of the Constitution or the statutes of the State and do not now and shall never constitute a charge against the credit or taxing power of the State or any political subdivision thereof. The State shall not, in any event, be liable for the payment of the principal or, redemption premium, if any, or interest on the Series 1994 Bonds or for the performance of any pledge, mortgage, obligation or agreement of any kind whatsoever which may be undertaken by the Authority. No breach by the Authority of any such pledge, mortgage, obligation or agreement may impose any liability, pecuniary or otherwise, upon the State or any charge upon its general credit or against its taxing power. The Authority has no taxing power.

As described herein under the caption, "THE ILLINOIS HEALTH FACILITIES AUTHORITY", the Illinois Health Facilities Authority Act (the "Act") provides that the State pledges to, and agrees with, the holders of any obligations issued under the Act, that it will not limit or alter the rights vested in the Authority by the Act until such obligations, together with the interest thereon, are fully met and discharged, provided nothing in the Act precludes such limitation or alteration if and when adequate provision shall be made by law for the protection of the holders of such obligations.

## Additional Bonds, Additional Indebtedness and Additional Obligations

With the consent of the holders of 66-2/3 % of the aggregate principal amount of Series 1994 Bonds and Additional Bonds outstanding, the Authority may issue Additional Bonds on a parity with the Series 1994 Bonds, for the purposes, upon the terms and subject to the conditions provided in the Bond Indenture. Each such series of Additional Bonds will rank on a parity with the Series 1994 Bonds under the Bond Indenture, except that Additional Bonds will not be entitled to the benefits and security of the Debt Service Reserve Fund maintained under the Bond Indenture. In addition, all or any portion of any series of such Additional Bonds may be advance refunded through the deposit in escrow, for the benefit of such refunded Additional Bonds, of cash or United States Government Obligations or both. See the Bond Indenture included in APPENDIX D hereto.

10

In certain circumstances, the Members of the Obligated Group may also incur Additional Indebtedness and issue Additional Obligations to the Authority or to entities other than the Authority, which Additional Obligations will not be pledged under the Bond Indenture (unless they secure Additional Bonds issued thereunder), but will be equally and ratably secured with the Series 1994 Obligation pledged under the Bond Indenture for the benefit of the Series 1994 Bonds. Under the terms of the Master Indenture, such Additional Obligations or other Additional Indebtedness may also be entitled to the benefit of security in addition to that securing all Obligations (including letters and lines of credit, insurance, Liens on Property, including health care Facilities of the Obligated Group, or security interests in depreciation reserve, debt service or interest reserve or debt service or similar funds), which additional security need not be extended to any other Obligations or Indebtedness, including the Series 1994 Obligation. See the Master Trust Indenture included in APPENDIX D hereto.

## SOURCES AND USES OF FUNDS

The sources and uses of funds, exclusive of accrued interest to the date of issuance of the Series 1994 Bonds and exclusive of investment earnings, are as follows:

Sources of Funds

| | |
|---|---|
| Principal amount of Series 1994 Bonds | $41,000,000 |
| Total Sources of Funds | $41,000,000 |

Uses of Funds

| | |
|---|---|
| Pay shareholders for all of the outstanding stock of EOC | $31,100,000 |
| Deposit to the Debt Service Reserve Fund | $ 4,100,000 |
| Deposit to the Project Fund | $ 2,930,000 |
| Deposit to the Working Capital Fund | $ 2,050,000 |
| Issuance Costs [1] | $    820,000 |
| Total Uses of Funds | $41,000,000 |

[1] Includes Underwriter's discount, legal, printing, auditing, Master Trustee, Bond Trustee and Authority fees and other miscellaneous costs of issuance.

11

## ANNUAL DEBT SERVICE REQUIREMENTS

The following table sets forth, for each Bond Year ending June 30, the amounts required in each Bond Year for the payment of principal at maturity or by mandatory redemption of the Series 1994 Bonds, through the Bond Sinking Fund, and the payment of interest on the Series 1994 Bonds. Payment of the Series 1994 Bonds at maturity or by mandatory redemption becomes due on July 1 following the close of the respective Bond Years listed below:

| Bond Year Ending June 30, | Principal | Interest | Total Debt Service |
|---|---|---|---|
| July 1, 1995 | $        0 | $ 3,792,500 | $    3,792,500 |
| July 1, 1996 | 300,000 | 3,792,500 | 4,092,500 |
| July 1, 1997 | 300,000 | 3,764,750 | 4,064,750 |
| July 1, 1998 | 400,000 | 3,737,000 | 4,137,000 |
| July 1, 1999 | 400,000 | 3,700,000 | 4,100,000 |
| July 1, 2000 | 500,000 | 3,663,000 | 4,163,000 |
| July 1, 2001 | 500,000 | 3,616,750 | 4,116,750 |
| July 1, 2002 | 500,000 | 3,570,500 | 4,070,500 |
| July 1, 2003 | 600,000 | 3,524,250 | 4,124,250 |
| July 1, 2004 | 600,000 | 3,468,750 | 4,068,750 |
| July 1, 2005 | 700,000 | 3,413,250 | 4,113,250 |
| July 1, 2006 | 800,000 | 3,348,500 | 4,148,500 |
| July 1, 2007 | 800,000 | 3,274,500 | 4,074,500 |
| July 1, 2008 | 900,000 | 3,200,500 | 4,100,500 |
| July 1, 2009 | 1,000,000 | 3,117,250 | 4,117,250 |
| July 1, 2010 | 1,100,000 | 3,024,750 | 4,124,750 |
| July 1, 2011 | 1,200,000 | 2,923,000 | 4,123,000 |
| July 1, 2012 | 1,300,000 | 2,812,000 | 4,112,000 |
| July 1, 2013 | 1,400,000 | 2,691,750 | 4,091,750 |
| July 1, 2014 | 1,600,000 | 2,562,250 | 4,162,250 |
| July 1, 2015 | 1,700,000 | 2,414,250 | 4,114,250 |
| July 1, 2016 | 1,900,000 | 2,257,000 | 4,157,000 |
| July 1, 2017 | 2,000,000 | 2,081,250 | 4,081,250 |
| July 1, 2018 | 2,200,000 | 1,896,250 | 4,096,250 |
| July 1, 2019 | 2,400,000 | 1,692,750 | 4,092,750 |
| July 1, 2020 | 2,600,000 | 1,470,750 | 4,070,750 |
| July 1, 2021 | 2,900,000 | 1,230,250 | 4,130,250 |
| July 1, 2022 | 3,200,000 | 962,000 | 4,162,000 |
| July 1, 2023 | 3,400,000 | 666,000 | 4,066,000 |
| July 1, 2024 | 3,800,000 | 351,500 | 4,151,500 |
| Totals | $41,000,000 | $82,019,750 | $123,019,750 |

CB      02023

## FORECASTED DEBT SERVICE COVERAGE

The forecasted financial statements for the five months ending December 31, 1994 and for the fiscal years ending December 31, 1995 through 1998 (the "Forecast"), included in APPENDIX C hereto are based on historical data furnished by management of EOC and the Corporation and assumptions as to future events furnished by the Corporation. The Forecast should be read in its entirety for an understanding of the assumptions and rationale underlying the financial forecasts. The forecasted debt service coverage of the Series 1994 Bonds is as follows:

| | Fiscal Period August 1, 1994 to December 31, 1994 | Fiscal Year Ending December 31, | | | |
|---|---|---|---|---|---|
| | | 1995 | 1996 | 1997 | 1998 |
| Excess of revenues over expenses | $1,439 | $2,984 | $2,120 | $1,681 | $1,498 |
| Plus - Depreciation and amortization | 764 | 2,088 | 2,208 | 2,328 | 2,448 |
| Plus - Interest | 1,719 | 4,081 | 4,226 | 4,198 | 4,167 |
| Income Available for Debt Service | 3,922 | 9,153 | 8,554 | 8,207 | 8,114 |
| Debt Service Requirements - Excluding Subordinated Note | 1,759 | 4,274 | 4,417 | 4,308 | 4,179 |
| Debt Service Coverage Ratio for the Series 1994 Bonds | 2.23 | 2.14 | 1.94 | 1.91 | 1.94 |
| Debt Service Requirements on the Subordinated Note | 167 | 400 | 400 | 400 | 400 |
| Overall Debt Service Coverage Ratio | 2.04 | 1.96 | 1.78 | 1.74 | 1.77 |
| Days Cash on Hand | 22 | 37 | 39 | 50 | 66 |

## SUBORDINATION OF MANAGEMENT FEES

The Corporation has employed Braddock for a monthly fixed fee of $62,500, adjusted annually to reflect increases in the consumer price index, plus an amount equal to 2% of the Corporation's adjusted patient service revenues (provided that such amount paid annually cannot exceed the fixed fee payable annually), plus reimbursement of the salary and fringe benefits and reimbursable expenses of the Chief Executive Officer of the Hospital Facility. Peter G. Rogan, the principal shareholder of EOC, will be the Chief Executive Officer of the Hospital Facility and will enter into an employment agreement with Braddock. See APPENDIX A hereto under the caption, "MANAGER" for a discussion of Braddock and the Management Agreement. Payment of all amounts due Braddock will be subordinated to payments required under the Loan Agreement and on the Series 1994 Obligation. To the extent not paid as a consequence thereof, such amounts will continue to be due and will bear interest at a rate equal to the Bond Trustee's prime rate of interest.

## THE ILLINOIS HEALTH FACILITIES AUTHORITY

### Powers

The Authority is a body politic and corporate and a public instrumentality of the State. The Authority was created under the Illinois Health Facilities Authority Act (the "Act"). The Authority has, among other powers, the statutory power to (i) make mortgage loans or other secured or unsecured loans to or for the benefit of any participating health institution (as defined in the Act) located in Illinois for the cost of a project in accordance with an agreement between the Authority and the participating health institution; (ii) refund outstanding obligations, loans, indebtedness or advances issued, made or given by such participating health institution for the cost of a project; (iii) refinance indebtedness incurred by such participating health institution for projects undertaken and completed or for

13

CB          02024

other facilities acquired prior to or after the enactment of the Act, when the Authority finds that such refinancing is in the public interest, and either alleviates a financial hardship of such participating health institution, or is in connection with other financing by the Authority for such participating health institution, or may be expected to result in a lessened cost of patient care and a savings to third parties, including the government, and to others who must pay for patient care, or any combination thereof; (iv) mortgage all or any portion of a project or other health facilities and the property on which any such project or other health facilities are located whether owned or thereafter acquired, and to assign and pledge mortgages, notes and other securities of participating health institutions to or for the benefit of which the Authority has made loans, and the revenues therefrom, for the benefit of the owners of bonds issued to finance such project or health facilities or issued to refund or refinance outstanding obligations, loans, indebtedness or advances of participating health institutions as permitted by the Act; and (v) do all things necessary or convenient to carry out the purposes of the Act.

## Members of the Authority

Pursuant to the Act, the Authority is to consist of seven members, all of whom must be Illinois residents, appointed by the Governor by and with the consent of the State Senate. Currently, there is one vacancy on the Authority. The members receive no compensation for the performance of their duties but are paid their necessary expenses incurred while engaged in the performance of such duties. The Act provides that no member, officer, agent or employee of the Authority may, directly or indirectly, have any financial interest in any bond issue or in any loan or any property to be included in, or with, any project of the Authority, under penalty of law, unless such member, officer, agent or employee of the Authority abstains from discussion, deliberation, action and vote by the Authority regarding such matters. Members of the Authority, however, may serve as directors or officers of participating health institutions for which the Authority is providing financing, but they may not vote on or take part in the Authority's deliberations concerning such financing. No member serves as a director or officer of EOC, EPC II, the Corporation or the Underwriter.

Louis G. Alexander, Vice-Chairman. Term expires June 30, 1996. Residence: Chicago, Illinois. Background: Retired Vice President of Amalgamated Trust & Savings Bank, Chicago, Illinois. Mr. Alexander performs consulting services for industry on government contracts administration and serves as a member of the Boards of the Better Boys Foundation, the Absalom Jones Theological Institute and the Illinois Humane Society, and as Treasurer of each of the Chicago Convention & Visitors Bureau and of the Midwest, U.S. Department of Commerce Executive Reserve.

Cameron S. Avery. Term expires June 30, 1999. Residence: Winnetka, Illinois. Background: Partner and co-chairman of the executive committee of the law firm of Bell, Boyd & Lloyd, Chicago, Illinois; admitted to Illinois Bar, 1963; B.S., Princeton University, 1960; J.D., Harvard Law School, 1963. Memberships: American Bar Association, Illinois State Bar Association and Chicago Bar Association.

Jeffrey M. Holden. Term expires June 30, 2000. Residence: Glen Ellyn, Illinois. Background: Assistant Executive Vice President and Chief Operating Officer, Illinois State Medical Society, Chicago, Illinois; B.S., The American University, 1974.

Katherine S. Janega. Term expires June 30, 1997. Residence: Glencoe, Illinois. Background: Partner in the law firm of Rosenthal, Murphy, Coblentz & Janega, Chicago, Illinois; admitted to Illinois Bar, 1977; B.A., College of Saint Teresa, 1969; J.D., Loyola University School of Law, 1977. Memberships: American Bar Association, Illinois State Bar Association and Chicago Bar Association.

CB      02025

Irene M. Mills. Term expires June 30, 1994. Residence: Decatur, Illinois. Background: B.S., DePaul University, 1941; served on the Board of Directors of the Illinois Association for Mental Health, Inc., and as Vice President and as Chairman of its Public Affairs Committee; has been a delegate to the National Association for Mental Health, a member of the Illinois Committee for the White House Conference on Children, a member of the Advisory Committee on Volunteer Action Force, a member of the Council on Government Affairs of the Illinois Hospital Association and a member of the Friends of St. Mary's Hospital Foundation, Decatur.

Joseph S. Wright, Jr. Term expired June 30, 1991. Under the Act, Mr. Wright will continue to serve as a member of the Authority until he is reappointed or until a successor is appointed and qualified. Residence: Chicago, Illinois. Background: Partner in the law firm of McBride Baker & Coles, Chicago, Illinois; admitted to Illinois Bar, 1963; B.A., Washington & Lee University and Beloit College, 1960; LL.B., George Washington University, 1963. Memberships: Illinois State Bar Association, American Bar Association, Legal Club of Chicago and Law Club of Chicago.

Executive Director

Mary M. McInerney. Executive Director since August 1989; Associate Executive Director from August 1988 to August 1989. Residence: Chicago, Illinois. Background: B.A., Loyola University of Chicago, 1975; J.D., Loyola University of Chicago School of Law, 1979. Prior to becoming Associate Executive Director, Ms. McInerney was Assistant General Counsel of the Illinois Housing Development Authority. Memberships: Illinois State Bar Association and Chicago Bar Association.

Authority Advisors

Sidley & Austin, Chicago, Illinois, serves as general counsel to the Authority.

Ponder & Co., Chicago, Illinois, serves as financial advisor to the Authority.

Bonds of the Authority

The Authority may from time to time issue bonds for any of its corporate purposes and, pursuant to the Act, such bonds are negotiable for all purposes notwithstanding their payment from a limited source. Since its organization in 1975, through the end of its fiscal year ended June 30, 1993, the Authority has issued an aggregate of approximately $8.9 billion of bonds in approximately 360 issues. The bonds of each issue are payable solely out of revenues of the Authority specified in the resolution under which they are issued or in a related trust indenture or indenture of mortgage and deed of trust. The bond resolution or other instrument of the Authority providing for the issuance of bonds for a project may pledge the revenues to be received by the Authority on account of the financing described in such resolution or other instrument and may contain such provisions for protecting and enforcing the rights and remedies of the bondholders as the Authority deems reasonable and proper and which are not in violation of law.

Certain State Securities Law Disclosure

Section 517.051 Florida Statutes, 1987, as amended, provides for the exemption from registration of certain governmental securities, provided that, if an issuer of governmental securities has been in default at any time after December 31, 1975 as to principal and interest on any obligation, its securities may not be offered or sold in Florida pursuant to the exemption except by means of an offering circular containing full and fair disclosure, as prescribed by rules of the Florida Department of Banking and Finance (the "Department"). Under the rules of the Department, the prescribed disclosure is not required if the information is not an appropriate disclosure because the information would not be considered material by a reasonable investor.

15

CB        02026

As described above, the Authority has the power to and has issued bonds for the purpose of financing projects for other facilities which are payable from the revenues of the particular project. Revenue bonds issued by the Authority for other projects may have been, or may be, in default as to principal and interest. The source of payment, however, for any such defaulted bonds is separate and distinct from the source of payment for the Series 1994 Bonds and, therefore, the default on such bonds is not considered a material fact with respect to the payment of the Series 1994 Bonds.

### Interest Not Exempt from Illinois Income Taxes

Interest on bonds issued by the Authority is not exempt from present State taxes.

## BONDHOLDERS' RISKS

### General

As described herein under the caption, "SECURITY FOR THE SERIES 1994 BONDS," the principal of and premium, if any, and interest on the Series 1994 Bonds are payable solely from amounts payable by the Corporation under the Loan Agreement and on the Series 1994 Obligation. On the date the Series 1994 Bonds are issued, the Corporation will be the sole Member of the Obligated Group; however, other Persons may become Members of the Obligated Group in the future and, in such event, will be liable for amounts due on the Series 1994 Obligation and any Additional Obligations which may be issued under the Master Indenture. No representation or assurance is given or can be made that revenues will be realized by the Corporation in amounts sufficient to pay debt service on the Series 1994 Bonds when due and other payments necessary to meet the obligations of the Corporation. The risk factors discussed below should be considered in evaluating the ability of the Corporation, and any future Members of the Obligated Group, to make payments in amounts sufficient to provide for the payment of the principal of, premium, if any, and interest on the Series 1994 Bonds.

The receipt of future revenues by the Corporation and any future Members of the Obligated Group will be subject to, among other factors, federal and state policies affecting the health care industry (including changes in reimbursement and payment policies and procedures), increased competition from other health care providers, the capability of the management of the Corporation and any future Members of the Obligated Group and future economic and other conditions that are impossible to predict. The extent of the Obligated Group's ability to generate future revenues has a direct effect upon the payment of, principal of, premium, if any, and interest on the Series 1994 Bonds. Neither the Underwriter nor the Authority have made any independent investigation of the extent to which any such factors may have an adverse affect on the revenues of the Corporation.

This discussion of risk factors is not, and is not intended to be, exhaustive.

### Factors Concerning the Enforceability of the Master Indenture

The obligations of the Members of the Obligated Group under the Master Indenture will be limited to the same extent as the obligations of debtors are affected by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights generally and the application of general principles of creditors' rights ("Debtor Relief Laws") and as additionally described below.

The accounts of the Members of the Obligated Group will be combined for financial reporting purposes and will be used in determining whether various covenants and tests contained in the Master Indenture (including tests relating to the incurrence of Additional Indebtedness) are met, notwithstanding uncertainties as to the enforceability of the pledge of the Unrestricted Receivables by the Obligated Group and certain obligations of the Members of the Obligated Group contained in the Master Indenture which bear on the availability of the assets and

16

CB 02027

revenues of the Members of the Obligated Group for payment of debt service on Obligations, including the Series 1994 Obligation pledged under the Bond Indenture. The joint and several obligations described herein of the Members of the Obligated Group to make payments of debt service on Obligations, including the Series 1994 Obligation (including transfers in connection with voluntary dissolution or liquidation) are, in the opinion of Latham & Watkins, Chicago, Illinois, enforceable under the laws of the State of Illinois, except to the extent that such payments (i) are requested to be made with respect to any Obligation issued by a Member other than the Member from which such payment is requested and which is issued for a purpose that is not consistent with the charitable purposes of the Member of the Obligated Group from which such payment is requested or which is issued for the benefit of any entity other than a Tax-Exempt Organization; (ii) are requested to be made from any moneys or Property which are donor restricted or which are subject to a direct or express trust which does not permit the use of such Property for such payment; (iii) would result in the cessation or discontinuation of any material portion of the health care or related services previously provided by the Member of the Obligated Group from which such payment is requested; or (iv) are made pursuant to any loan violating applicable usury law. Due to the absence of clear legal precedent in this area, the extent to which the assets of any future Member of the Obligated Group fall within the category referred to in clause (ii) above cannot now be determined. The amount of such assets which fall within such category could be substantial.

A Member of the Obligated Group may not be required to make any payment, loan or other transfer of moneys or assets to provide for the payment on any Obligation, or portion thereof, the proceeds of which were not loaned or otherwise disbursed to such Member of the Obligated Group to the extent that such transfer would render such Member of the Obligated Group insolvent or which would conflict with, not be permitted by or which is subject to recovery for the benefit of other creditors of such Member of the Obligated Group under applicable laws. There is no clear precedent in the law as to whether such transfers from a Member of the Obligated Group in order to pay debt service on the Obligations may be voided by a trustee in bankruptcy in the event of bankruptcy of such Member of the Obligated Group, or by third party creditors in an action brought pursuant to state fraudulent conveyances statutes. Under the United States Bankruptcy Code, a trustee in bankruptcy and, under state fraudulent conveyance statutes and common law, a creditor of a related guarantor, may avoid any obligation incurred by a related guarantor if, among other bases therefor, (1) the guarantor has not received fair consideration or reasonably equivalent value in exchange for the guaranty and (2) the guaranty renders the guarantor insolvent, as defined in the United States Bankruptcy Code or state fraudulent conveyance statutes, or the guarantor is undercapitalized.

Application by courts of the tests of "insolvency," "reasonably equivalent value" and "fair consideration" has resulted in a conflicting body of case law. It is possible that, in an action to force a Member of the Obligated Group to transfer moneys or assets to pay debt service on an Obligation for which it was not the direct beneficiary, a court might not enforce such a transfer in the event it is determined that such Member of the Obligated Group is analogous to a guarantor of the debt of the Member of the Obligated Group who directly benefitted from the borrowing and that sufficient consideration for the guaranty of the Member of the Obligated Group was not received or that the incurrence of such obligation has rendered or will render the Member of the Obligated Group insolvent or such Member is or will thereby become undercapitalized.

There exist, in addition to the foregoing, common law authority and authority under state statutes (including the State of Illinois) pursuant to which courts may terminate the existence of a not for profit corporation or undertake supervision of its affairs on various grounds, including a finding that such corporation has insufficient assets to carry out its stated charitable purposes or has taken some action which renders it unable to carry out such purposes. Such court action may arise on the court's own motion or pursuant to a petition of a government agency with jurisdiction over the affairs of charities or persons who have interests different from those of the general public, pursuant to the common law and statutory power to enforce charitable trusts and to see to the application of their funds to their intended charitable uses.

17

CB        02028