**Matters Relating to Security for the Series 1994 Bonds**

The effectiveness of the security interest in the Corporation's Unrestricted Receivables granted in the Master Indenture may be limited by a number of factors, including: (i) provisions prohibiting the direct payment of amounts due to health care providers from Medicaid and Medicare programs to persons other than such providers; (ii) the absence of an express provision permitting assignment of receivables due the Corporation under the contracts between the Corporation and Blue Cross, and present or future prohibitions against assignment contained in any applicable statutes or regulations; (iii) certain judicial decisions which cast doubt upon the right of the Master Trustee, in the event of the bankruptcy of the Corporation, to collect and retain accounts receivable from Medicare, Medicaid and other governmental programs; (iv) commingling of proceeds of Unrestricted Receivables with other moneys of the Corporation not subject to the security interest in Unrestricted Receivables; (v) statutory liens; (vi) rights arising in favor of the United States of America or any agency thereof; (vii) constructive trusts, equitable or other rights impressed or conferred by a federal or state court in the exercise of its equitable jurisdiction; (viii) federal bankruptcy laws which may affect the enforceability of the Master Indenture or the security interest in the Unrestricted Receivables of the Corporation which are earned by the Corporation within 90 days preceding or, in certain circumstances with respect to related corporations, within one year preceding and after any effectual institution of bankruptcy proceedings by or against the Corporation; (ix) rights of third parties in Unrestricted Receivables converted to cash and not in the possession of the Master Trustee; and (x) claims that might arise if appropriate financing or continuation statements are not filed in accordance with the Uniform Commercial Code, as from time to time in effect.

The Hospital Facility is a single purpose facility. There has been no attempt to determine if the liquidation value of the Hospital Facility is currently, or will, in the future, be sufficient to pay the Series 1994 Bonds and therefore no assurance or representation can be made that the proceeds realized by enforcement of the lien against the Mortgaged Property granted under the Mortgage would be sufficient to pay principal of and interest on the Series 1994 Bonds when due. Furthermore, as described herein, the ability of the Master Trustee to enforce the terms and agreements set forth in the Mortgage and the Loan Agreement may be limited by laws relating to bankruptcy, insolvency, reorganization or moratorium and by other similar laws affecting creditors' rights, including claims regarding the appropriate or timely filing of financial or continuation statements in accordance with the Uniform Commercial Code, as from time to time in effect. In addition, the Master Trustee's ability to enforce such terms will depend upon the exercise of various remedies specified by such documents which may, in many instances, require judicial actions that are often subject to discretion and delay or that otherwise may not be readily available or be limited.

Certain amendments to the Bond Indenture and the Loan Agreement may be made with the consent of the holders of not less than 51% of the aggregate principal amount of the Bonds then outstanding and certain amendments to the Master Indenture may be made with the consent of the owners of at least 51% of the aggregate principal amount of Obligations then outstanding. Such amendments may adversely affect the security of the Series 1994 Bondholders and such percentage may be composed wholly or partially of the holders of Additional Bonds or Additional Obligations other than the Series 1994 Bonds or the Series 1994 Obligation.

The remedies available to either the Bond Trustee, the Master Trustee, the Authority or the holders of the Series 1994 Bonds upon an event of default under the Bond Indenture, the Master Indenture, the Loan Agreement or the Series 1994 Obligation are in many respects dependent upon judicial actions which are often subject to discretion and delay. Under existing constitutional and statutory law and judicial decisions, including, specifically, Title 11 of the United States Code (the Federal Bankruptcy Code), the remedies provided in the Bond Indenture, the Master Indenture, the Loan Agreement, the Series 1994 Obligation or the Mortgage may not be readily available or may be limited. The various legal opinions to be delivered concurrently with the delivery of the Series 1994 Bonds will be qualified as to the enforceability of the various legal instruments by limitations imposed by general principles of equity and by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors generally and laws relating to fraudulent conveyances.

18

CB          02029

### Health Care Industry Factors Affecting the Corporation

The health care industry is highly dependent on a number of factors which may limit the ability of the Corporation to meet its obligations under the Loan Agreement and the Series 1994 Obligation. Among other things, participants in the health care industry (such as the Corporation) are subject to stringent regulatory requirements of federal, state and local governmental agencies and independent professional organizations and accrediting bodies, technological advances and changes in treatment modes, various competitive factors and changes in third party reimbursement programs. Discussed below are certain of these factors which could have a significant effect on the future operations and financial condition of the Corporation and future Members of the Obligated Group.

### Medicare and Medicaid and Other Third-Party Payment Programs

Medicare and Medicaid are the commonly used names for reimbursement or payment programs governed by certain provisions of the federal Social Security Act. Medicare is an exclusively federal program and Medicaid is a combined federal and state program. Medicare provides certain health care benefits to beneficiaries who are 65 years of age or older, disabled or qualify for the End Stage Renal Disease Program. Medicare Part A covers inpatient hospital costs and Medicare Part B covers payment to physicians and suppliers. Medicaid is designed to pay providers for care given to the medically indigent and others who receive federal aid. Medicaid is funded by federal and state appropriations and in the State is administered by the Illinois Department of Public Aid.

### Medicare

Approximately 56% of the patient service revenues of EOC were derived from the Medicare program for the fiscal year ended December 31, 1993.

Medicare pays acute care hospitals for most services provided to inpatients under a payment system known as the "Prospective Payment System" or "PPS." Separate payments are made for inpatient operating costs and inpatient capital costs.

**Inpatient Operating Costs.** Payments for operating costs are based upon a Diagnosis Related Group ("DRG") to which each Medicare patient is assigned, which is determined by the diagnosis and procedure and other factors for each particular Medicare patient. The amount to be paid for each DRG is established prospectively by the Health Care Financing Administration ("HCFA"), an agency of the United States Department of Health and Human Services ("HHS"), and is not related to a hospital's actual costs. Annual increases in the DRG payments are based upon the hospital "market basket" index, or the cost of providing health care services. For every year since 1983, Congress has modified the increases and given substantially less than the increase in the "market basket" index. Pursuant to the Omnibus Budget Reconciliation Act of 1993 ("OBRA 1993"), the annual increase for federal fiscal years 1994 through 1997 will be less than the increase in the market basket index. There is no assurance that future increases in the DRG payments will keep pace with the increases in the cost of providing hospital services.

**Capital and Certain Other Costs.** Medicare payments for capital costs are based upon a PPS system similar to the inpatient operating cost PPS. A separate per-case standardized amount is paid for capital costs, adjusted to take into account certain hospital characteristics and weighted by DRG. The capital cost PPS payment system, which commenced on October 1, 1991, is subject to a ten-year transition period. Two alternative payment methods apply during the transition period, one being a prospective method and the other a "hold harmless" method for high capital cost hospitals. The prospective method is a blend of a "standard federal rate" based on Medicare fiscal year 1988 national average capital costs per discharge updated to Medicare fiscal year 1993 and the subject hospital's hospital-specific rate. The hospital-specific rate is based on a hospital's latest cost reporting period ending on or before December 31, 1990, adjusted for case mix and updated to fiscal year 1993 based on the increase in national average capital cost per discharge. Each year during the transition period, the

19

percentage of the blended rate paid by the federal rate increases until payment is based entirely on the federal rate. Under the hold harmless system, hospitals with a hospital specific rate above the federal rate will receive payment for old capital at 85% of the reasonable costs of such old capital during the transition period. "Old capital" is that which appears on the hospital's cost report for its last cost reporting period ending on or before December 31, 1990. At any point during the ten-year transition period, a hospital may be paid fully at the federal rate if that rate is more favorable to the hospital. Under current law, for fiscal years 1992 through 1995, HHS is required to update the federal rate based on actual increases in Medicare capital-related costs per case for the period three and four years prior to the fiscal year in question. For each fiscal year during the transition period, a payment "floor" will be in effect, which generally provides that at least 70% of allowable capital-related costs for most hospitals will be paid. Minimum payment amounts will be determined annually.

           **Costs of Medical Education.** Payments for costs associated with direct medical education, and certain indirect medical education activities, are reimbursed using formulas. Pursuant to OBRA 1993, payments for medical education will not be increased for federal fiscal years 1994 and 1995.

           **Costs of Outpatient Services.** Medicare payment for outpatient radiology procedures is capped at an amount equal to a blended rate based upon a facility's reasonable costs and a fee schedule. In addition, hospitals are reimbursed for outpatient surgery on the basis of the lesser of their costs or a blended rate based upon actual costs and a prospective rate applied to ambulatory surgery centers. Outpatient diagnostic services are paid based upon a blended rate based upon a facility's reasonable costs and a fee schedule.

           **Physician Payment.** While Medicare payments for physicians do not directly affect hospitals, they may affect the relationship between the Corporation and its medical staff. Physicians are paid on the basis of a resource based-relative value scale ("RB-RVS"). These fee schedules establish payment amounts for all physician services, including services of provider-based physicians. The RB-RVS fee schedule, which commenced on July 1, 1992, will be phased in over four years. OBRA 1993 reduces the annual increases in physician payment (other than for primary care physicians) for federal fiscal years 1994 and 1995.

### Medicaid

           Approximately 18% of the patient service revenues of EOC were derived from the Medicaid program for the fiscal year ended December 31, 1993.

           Hospitals are reimbursed for inpatient services under a DRG system. Commencing April 1, 1994, the Illinois Medicaid program will use the Federal Medicare DRG payment rates that were in effect 90 days prior to the date of admission. The DRG group methodology and weighting factors must also be updated 90 days after they are updated under the Federal Medicare program.

           As of October 1, 1993, the Illinois Medicaid program pays disproportionate share hospitals a per day adjustment based on each hospital's Medicaid utilization rate and a supplemental adjustment. OBRA 93 provides that, effective for Medicaid payments made to private hospitals after the end of the State's fiscal year that ends during or after 1995, Medicaid disproportionate share hospital payment adjustments may not exceed the costs incurred for furnishing hospital services to Medicaid recipients.

           Outpatient services are reimbursed based upon a separate payment rate. As of October 1, 1993, payment for outpatient services were increased by an adjustment payment equal to the outpatient payment rate multiplied by a hospital's "indigent volume factor" (calculated on the basis of a hospital's Medicaid inpatient utilization rate and its uncompensated care rate).

CB      02031

As part of the 1994 State budget, funding for the Medicaid program has been provided in part by a new hospital provider tax. The hospital provider tax equals 1.88% of gross patient revenues less Medicare contractual allowances and is calculated on the basis of revenues for the previous calendar year. Hospital "swing beds" are not subject to the licensing fee. Revenues generated from the State Medicaid provider taxes are subject to matching funds from the federal government.

### Blue Cross

Blue Cross offers private insurance programs that provide subscribers with hospital and medical benefits. Pursuant to contracts with the Blue Cross affiliated plan for the particular area, Blue Cross reimburses the Corporation on a variety of methods including discount from customary changes, prospective payment per discharge and fixed payment per inpatient day.

### Managed Care

The Corporation has entered into contractual arrangements with preferred provider, health maintenance and other similar managed care organizations pursuant to which the Corporation agrees to perform certain health care services for eligible participants at discounted rates. Revenues received under such contracts are expected to be sufficient to cover the variable cost of the services provided.

### Commercial Insurance and Other Third-Party Plans

Many commercial insurance plans, including group plans, reimburse their customers or make direct payments to the Corporation for charges at established rates. Generally, these plans pay semi-private room rates plus ancillary service charges, which are subject to various limitations and deductibles depending on the plan. Patients carrying such coverage are responsible to the hospital for any deficiency between the commercial insurance proceeds and total billed charges.

### Health Care Reform

President Clinton has submitted to Congress for its consideration The Health Security Act of 1993 (the "Health Reform Act"). Alternative legislation has been introduced by various members of Congress. The objective of the Health Reform Act and such other proposed legislation is to alter substantially the health care delivery system. If the Health Reform Act or other national reform legislation is enacted, the Corporation may benefit from certain provisions thereof, and, conversely, may be adversely affected by other provisions. Management of the Corporation cannot now anticipate the aggregate affect of the various provisions of the Health Reform Act or any other legislative reform proposals upon the Corporation. However, the Hospital may be materially adversely affected.

### Federal "Fraud and Abuse" Regulations

The Federal Medicare/Medicaid Anti-Fraud and Abuse Amendments to the Social Security Act (the "Anti-Kickback Law") make it a criminal felony offense to knowingly and willfully offer, pay, solicit or receive remuneration in order to induce business for which reimbursement is provided under the Medicare or Medicaid programs. In addition to criminal penalties, including fines of up to $25,000 and five years imprisonment, violations of the Anti-Kickback Law can lead to civil monetary penalties and exclusion from the Medicare and Medicaid programs. The scope of prohibited payments in the Anti-Kickback Law is broad and includes economic arrangements involving hospitals, physicians and other health care providers, including joint ventures, space and equipment rentals, purchases of physician practices and management and personal services contracts. HHS recently published regulations which describe certain arrangements that will not be deemed to constitute violations of the Anti-Kickback Law. The safe harbors described in the regulations are narrow and do not cover a wide range of economic relationships which many hospitals, physicians and other health care providers consider to be legitimate business arrangements not prohibited by the statute. Because the recently published regulations describe safe harbors

21

CB        02032

and do not purport to describe comprehensively all lawful or unlawful economic arrangements or other relationships between health care providers and referral sources, hospitals and other health care providers having these arrangements or relationships may not be required to alter them in order to ensure compliance with the Anti-Kickback Law.

As a consequence of the Merger, the Corporation will have certain relationships with physicians and other referral sources which may not qualify for safe harbor protection under the regulations. Nonetheless, management of the Corporation believes that the contracts it will assume are presently in material compliance with the Anti-Kickback Law. However, in light of the narrowness of the safe harbor regulations and the scarcity of case law interpreting the Anti-Kickback Law, there can be no assurances that the Corporation will not be found to have violated the Anti-Kickback Law, and if so, whether any sanction imposed would have a material adverse effect on the operations of the Corporation.

### Restrictions on Referrals

Current law (known as the "Stark" provisions) prohibits a physician who has a financial relationship with a clinical laboratory from referring Medicare patients to that laboratory for clinical laboratory services, with limited exceptions. OBRA 93 expands the scope of the Stark restrictions as of July 1, 1993, to patient referrals under the Medicaid program. OBRA 93 also provides that, as of July 1, 1995, the limitations on referrals will also be expanded to include ten new designated health services including physical therapy services, occupational therapy services, radiology or other diagnostic services, durable medical equipment, radiation therapy services, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices, home health services, outpatient prescription drugs, and inpatient and outpatient hospital services. OBRA 93 also modifies the current exceptions to the Stark provisions which permit referrals within physician group practices and to hospitals "under arrangement," and introduces new provisions relating to physician profit productivity bonuses and faculty practice plans.

### JCAHO Accreditation

The Corporation and its operations will be subject to regulation and certification by various Federal, state and local government agencies and by certain nongovernmental agencies such as the Joint Commission on Accreditation of Healthcare Organizations. No assurance can be given as to the effect on future operations of the Corporation of existing laws, regulations and standards for certification or accreditation or any future changes in such laws, regulations and standards.

### Tax Exemption for Nonprofit Corporations

Loss of tax-exempt status by the Corporation could result in loss of tax exemption of the Series 1994 Bonds and of other tax-exempt debt that may hereafter be issued for the benefit of the Corporation, and defaults in covenants regarding the Series 1994 Bonds and such other tax-exempt debt would likely be triggered. Such an event would have material adverse consequences on the financial condition of the Corporation, and could make it impossible for the Corporation to continue as a going concern.

The maintenance by the Corporation of its tax-exempt status depends, in part, upon its maintenance of its status as an organization described in section 501(c)(3) of the Code. The maintenance of such status is contingent upon compliance with general rules promulgated in the Code and related regulations regarding the organization and operation of tax-exempt entities, including their operation for charitable and educational purposes and their avoidance of transactions which may cause their assets to inure to the benefit of private individuals. The Internal Revenue Service has announced that it intends to closely scrutinize transactions between nonprofit corporations and for-profit entities, and in particular has issued revised audit guidelines for tax-exempt hospitals. Although specific activities of hospitals, such as medical office building leases, have been the subject of interpretations by the Internal Revenue Service in the form of Private Letter Rulings, many activities have not been addressed in any official

22

opinion, interpretation or policy of the Internal Revenue Service. Because the Corporation conducts large-scale and diverse operations involving private parties, there can be no assurance that certain of the Corporation's transactions would not be challenged by the Internal Revenue Service.

Uncertainty about the Internal Revenue Service's position on a wide range of common activities by health care organizations has been increased with the release of General Counsel Memorandum No. 39862 ("GCM") in December of 1991. The GCM proposed the revocation of three previous Private Letter Rulings of the Internal Revenue Service regarding the sale by hospitals of net revenue streams to joint ventures involving physician investors. This change of direction by the Internal Revenue Service with respect to previously issued Private Letter Rulings may indicate more stringent enforcement and interpretation of rules regarding tax-exempt health care organizations generally, and may signal an abandonment of other positions previously announced by the Internal Revenue Service and relied upon by tax-exempt hospitals. In addition, the GCM undertakes an in-depth analysis of compliance with Medicare and Medicaid regulations regarding direct or indirect payments for referrals, and the GCM, together with subsequent letters written by the Office of Inspector General to the Internal Revenue Service, suggests that tax-exempt hospitals which are in violation of these broadly-stated payment for referral prohibitions may also be subject to revocation of their tax-exempt status. See the information herein under the caption, "BONDHOLDERS' RISKS--Health Care Industry Factors Affecting the Corporation--Federal 'Fraud and Abuse' Regulations". As a wide variety of commonplace hospital-physician transactions potentially violate the Medicare and Medicaid prohibitions on inducements for referrals, the GCM and subsequent correspondence by the Office of Inspector General appear to have broadened the range of activities which may directly affect tax exemption, without defining specifically how such rules will be applied. As a result, tax-exempt hospitals, particularly those such as the Hospital Facility to be owned by the Corporation which have, and will continue to have, extensive transactions with physicians are subject to an increased degree of scrutiny and perhaps enforcement by the Internal Revenue Service. The GCM is merely a statement of policy and interpretation of the Internal Revenue Service, and is not necessarily indicative of the result of a judicial adjudication of the applicable issues.

Additional uncertainty about the ability of health care organizations to maintain their tax-exempt status has resulted from the introduction of the Health Reform Act. The Health Reform Act or related regulations could limit or condition the ability of hospitals to claim tax-exemption. For example, the current version of the Health Reform Act provides that hospitals would not be considered charitable and tax-exempt unless they participated in assessment of and planning for community health care needs. Currently, it is not possible to predict what such a planning process would entail. Currently, it is not possible to predict what changes may be made to the Health Reform Act or whether health care reform in any form will be enacted, and it is not possible to assess the impact of any such reform on the tax-exempt status of the Corporation or future Members of the Obligated Group.

Bills were introduced in prior Congressional terms which would require a tax-exempt hospital to provide a certain amount of charity care and care to Medicare and Medicaid patients in order to maintain its tax exempt status and avoid the imposition of an excise tax. Other legislation would have conditioned a hospital's tax-exempt status on the delivery of adequate levels of charity care. Most hospitals, in order to maintain tax-exempt status, would have been compelled to demonstrate that at least 5% of gross revenues was devoted to "charity care" (defined to exclude bad debt and contractual allowances). Such bills were not enacted. However, there can be no assurance that similar legislative proposals or judicial actions will not be adopted in the future.

The Subcommittee on Oversight of the United States House of Representatives Ways and Means Committee has considered options and recommendations in the area of taxation of unrelated business income of nonprofit corporations. Hearings have been held on these options and recommendations and legislation may be drafted to clarify and strengthen existing law with respect to unrelated business income tax. The scope and effect of legislation, if any, which may be adopted at the federal and state levels with respect to unrelated business income cannot be predicted. Any such legislation could have the effect of subjecting a portion of the Corporation's income to federal or state income taxes.

23

CB          02034

In addition to the foregoing proposals with respect to income by nonprofit corporations, various state and local governmental bodies have challenged the tax exempt status of such institutions and have sought to remove the exemption of property from real estate taxes of part or all of the property of various nonprofit institutions on the grounds that a portion of such property was not being used to further the charitable purposes of the institutions or that the institution did not provide sufficient care to indigent persons so as to warrant exemption from taxation as a charitable institution. Several of these disputes have been determined in favor of the taxing authorities or have resulted in settlements.

Existing uncertainty regarding the ability of tax-exempt entities to maintain their tax-exempt status is compounded by the fact that revocation is the only applicable penalty for violations of the general rules and regulations regarding tax-exempt entities set out in the Code. The United States Department of Treasury has, in the past, suggested to Congress that it adopt sanctions which are less onerous than full revocation of tax-exempt status. Legislation has been introduced to provide for imposition of excise taxes in lieu of revocation of tax-exempt status as the penalty for certain activities. While the Internal Revenue Service has not frequently revoked the section 501(c)(3) tax-exempt status of nonprofit health care corporations, there can be no assurance that it will not do so in the future or that it will not direct enforcement activities at the Corporation.

It is not possible to predict the scope or effect of future legislative or regulatory actions with respect to taxation of nonprofit corporations. There can be, however, no assurance that future changes in the laws and regulations of the federal, state or local governments will not materially and adversely affect the operations and revenues of the Corporation, or future Members of the Obligated Group, by requiring them to pay income or real estate taxes.

## Possible Increased Competition

The Corporation could face increased competition in the future from other hospitals, from skilled nursing facilities and from other forms of health care delivery that offer health care services to the populations which the Corporation currently serves. This could include the construction of new or the renovation of existing hospitals and skilled nursing facilities, health maintenance organization facilities, ambulatory surgery centers, free standing emergency facilities, and private laboratory and radiological services.

In addition, competition could result from forms of health care delivery services that are able to offer lower priced services to the populations served by the Corporation. These services could be substituted for some of the revenue generating services currently offered by the Corporation. The services that could serve as substitutes for hospital treatment include skilled and specialized nursing facilities, home care, intermediate nursing home care, preventive care and drug and alcohol abuse programs.

## Changes in Health Care Technology and Services

Scientific and technological advances, new procedures, drugs and appliances, preventative medicine, occupational health and safety and outpatient health care delivery may reduce utilization and revenues of the Corporation's facilities in the future. Technological advances in recent years have accelerated the trend toward the use by hospitals of sophisticated and costly equipment and services for diagnosis and treatment. The acquisition and operation of certain equipment or services may continue to be a significant factor in hospital utilization, but the ability of the Corporation to offer such equipment or services may be subject to the availability of equipment or specialists, governmental approval or the ability to finance such acquisitions or operations.

24

CB        02035

**Environmental Laws and Regulations**

Health care providers are subject to a wide variety of federal, state and local environmental and occupational health and safety laws and regulations which address, among other things, hospital operations, facilities and properties owned or operated by hospitals. Among the type of regulatory requirements faced by hospitals are (a) air and water quality control requirements, (b) waste management requirements, (c) specific regulatory requirements applicable to asbestos, polychlorinated biphenyls and radioactive substances, (d) requirements for providing notice to employees and members of the public about hazardous materials handled by or located at the hospital, (e) requirements for training employees in the proper handling and management of hazardous materials and wastes, and (f) other requirements.

In its role as the owner and operator of properties or facilities, the Corporation may be subject to liability for investigating and remedying any hazardous substances that may have migrated off of its property. Typical hospital operations include, but are not limited to, in various combinations, the handling, use, storage, transportation, disposal and discharge of hazardous, infectious, toxic, radioactive, flammable and other hazardous materials, wastes, pollutants or contaminants. As such, hospital operations are particularly susceptible to the practical, financial and legal risks associated with compliance with such laws and regulations. Such risks may (a) result in damage to individuals, property or the environment, (b) interrupt operations and increase their cost, (c) result in legal liability, damages, injunctions or fines and (d) result in investigations, administrative proceedings, penalties or other governmental agency actions. There is no assurance that the Corporation will not encounter such risks in the future, and such risks may result in material adverse consequences to the operations or financial condition of the Corporation.

At the present time, management of the Corporation is not aware of any pending or threatened claim, investigation or enforcement action regarding such environmental issues which, if determined adversely to the Corporation, would have a material adverse effect on its operations or financial condition.

**Other Risk Factors Affecting the Health Care Industry**

In the future, the following factors, among others, may adversely affect the operations of the Corporation to an extent that cannot be determined at this time:

(1) Adoption of federal and state legislation which would establish and implement a national health care program.

(2) Employee strikes and other adverse labor actions that could result in a substantial reduction in revenues without corresponding decreases in costs.

(3) Reduced need for hospitalization or other services arising from increased utilization management by third party payors or from future medical and scientific advances.

(4) Reduced demand for the services of the Corporation that might result from decreases in population in their respective service areas.

(5) Increased unemployment or other adverse economic conditions in the service areas of the Corporation which would increase the proportion of patients who are unable to pay fully for the cost of their care.

(6) Any increase in the quantity of indigent care provided which is mandated by law or required due to increase needs of the community in order to maintain the charitable status of the Corporation.

25

CB     02036

(7) Efforts by insurers and governmental agencies to limit the cost of hospital services, to reduce the number of beds and to reduce the utilization of hospital facilities by such means as preventive medicine, improved occupational health and safety measures, and increased outpatient care.

(8) Regulatory actions which might limit the ability of the Corporation to undertake capital improvements to their respective facilities or to develop new institutional health services.

(9) Cost of medical malpractice insurance.

(10) Decrease in availability or receipt of grants, or in receipt of contributions or bequests.

(11) Inflation or other adverse economic conditions.

## Tax-Exempt Status of the Series 1994 Bonds

The tax-exempt status of the Series 1994 Bonds is based on the continued compliance by the Authority and the Corporation with certain covenants relating generally to restrictions on use of the facilities of the Corporation, arbitrage limitations, rebate of certain excess investment earnings to the federal government and restrictions on the amount of issuance costs financed with the proceeds of the Series 1994 Bonds. Failure to comply with such covenants could cause interest on the Series 1994 Bonds to become subject to federal income taxation retroactive to the date of issue of the Series 1994 Bonds. In such event, the Series 1994 Bonds are not subject to redemption solely as a consequence thereof.

## LITIGATION

### The Authority

There is not now pending or, to the knowledge of the Authority, threatened, any litigation restraining or enjoining the issuance or delivery of the Series 1994 Bonds or questioning or affecting the validity of the Series 1994 Bonds or the proceedings or authority under which they are to be issued. Neither the creation, organization or existence of the Authority nor the title of any of the present members or other officials of the Authority to their respective offices is being contested. There is no litigation pending or, to its knowledge, threatened, which in any manner questions the right of the Authority to enter into the Bond Indenture or the Loan Agreement or to secure the Series 1994 Bonds in the manner provided in the Bond Indenture and the Act.

### The Corporation

The Corporation has advised that no litigation, proceedings or investigations are pending or, to its knowledge, threatened against the Corporation or EOC, except litigation, proceedings or investigations involving claims for hospital professional or general patient liability in which the probable recoveries and the estimated costs and expenses of defense, in the opinion of litigation counsel to the Corporation, will be entirely within applicable insurance policy limits (subject to applicable deductibles) or not in excess of the total reserves held under applicable self-insurance, pooled-risk insurance and shared insurance programs, or litigation, proceedings or investigations involving other types of claims which if adversely determined will not, in the opinion of litigation counsel to the Corporation, have a material adverse effect on the operations or condition, financial or otherwise, of the Corporation.

26

CB      02037

## LEGAL MATTERS

All legal matters incident to the authorization and issuance of the Series 1994 Bonds by the Authority are subject to the approval of Chapman and Cutler, Bond Counsel, Chicago, Illinois, whose approving opinion will be delivered with the Series 1994 Bonds. Certain legal matters will be passed upon for the Authority by Sidley & Austin, Chicago, Illinois. Certain legal matters will be passed upon for the Corporation by Latham & Watkins, Chicago, Illinois and by Foley & Lardner, Chicago, Illinois. Certain legal matters will be passed upon for the Underwriter by Foley & Lardner, Chicago, Illinois.

## TAX EXEMPTION

The Internal Revenue Code of 1986, as amended (the "Code") contains a number of requirements and restrictions which apply to the Series 1994 Bonds, including investment restrictions, a requirement of periodic payments of arbitrage profits to the United States of America, requirements regarding the timely and proper use of bond proceeds and the facilities financed or refinanced therewith, and certain other matters. The Authority and the Corporation have each covenanted to comply with all requirements of the Code that must be satisfied in order for the interest on the Series 1994 Bonds to be excludible from gross income. Failure to comply with such requirements could cause interest on the Series 1994 Bonds to become includible in gross income retroactive to the date of issuance of the Series 1994 Bonds.

Subject to the condition that the Authority and the Corporation comply with the above-referenced covenants, under present law, in the opinion of Bond Counsel, interest on the Series 1994 Bonds will not be includible in the gross income of the owners thereof for federal income tax purposes, and therefore is exempt from present federal income taxation, except to the extent that such interest will be taken into account in computing an adjustment used in determining the alternative minimum tax for certain corporations, in computing the environmental tax imposed on certain corporations and in computing the "branch profits tax" imposed on certain foreign corporations. Interest on the Series 1994 Bonds will not be treated as an item of tax preference in computing the alternative minimum tax for individuals and corporations.

In rendering their opinion, Bond Counsel will rely upon certificates of the Corporation with respect to certain material facts solely within the knowledge of the Corporation relating to the property financed or refinanced with the proceeds of the Series 1994 Bonds and the application of the proceeds of the Series 1994 Bonds.

The Code includes provisions for an alternative minimum tax ("AMT") for corporations. The AMT is levied for taxable years beginning after December 31, 1986, in addition to the corporate regular tax in certain cases. The AMT, if any, depends upon the corporation's alternative minimum taxable income ("AMTI"), which is the corporation's taxable income with certain adjustments. One of the adjustment items used in computing AMTI of a corporation (excluding S Corporations, Regulated Investment Companies, Real Estate Investment Trusts and REMICs) is an amount equal to 75% of the excess of such corporation's "adjusted current earnings" over an amount equal to its AMTI (before such adjustment item and the alternative tax net operating loss deduction). "Adjusted current earnings" would include all tax-exempt interest, including interest on the Series 1994 Bonds.

The "Superfund Revenue Act of 1986" imposes an additional tax (the "environmental tax") on a corporation at a rate of .12 percent on the excess over $2,000,000 of such corporation's "modified alternative minimum taxable income," which would include a portion of the interest on the Series 1994 Bonds.

Under the provisions of Section 884 of the Code, a branch profits tax may be levied (for taxable years beginning after December 31, 1986) on the "effectively connected earnings and profits" of certain foreign corporations, which include tax-exempt interest such as interest on the Series 1994 Bonds.

27

CB        02038

Ownership of the Series 1994 Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, certain insurance companies, certain S corporations, individual recipients of Social Security or Railroad Retirement benefits and taxpayers who may be deemed to have incurred (or continued) indebtedness to purchase or carry the Series 1994 Bonds. Prospective purchasers of the Series 1994 Bonds should consult their tax advisors as to applicability of such collateral consequences.

Interest on the Series 1994 Bonds is not exempt from present State income taxes.

INVESTORS SHOULD CONSULT THEIR TAX ADVISORS AS TO THE TAX CONSEQUENCES TO THEM OF ACQUIRING, HOLDING OR DISPOSING OF THE SERIES 1994 BONDS.

## UNDERWRITING

The Series 1994 Bonds are being purchased by the Underwriter at an aggregate purchase price of $41,274,597.23, which reflects an underwriting discount of $210,000 plus accrued interest from July 1, 1994, pursuant to a purchase contract (the "Purchase Contract") among the Authority, the Corporation and the Underwriter. In addition, the Corporation will pay to the Underwriter a placement fee of $302,500, from amounts which are not proceeds of the Series 1994 Bonds. The Underwriter may offer and sell the Series 1994 Bonds to certain dealers (including dealers depositing Series 1994 Bonds into investment trusts) and others at prices lower (or yields higher) than the public offering prices (or yields) stated on the cover page hereof, which may be changed after the initial offering by the Underwriter. The Purchase Contract provides, with respect to each of the Series 1994 Bonds, that the Underwriter will purchase all the Series 1994 Bonds, if any are purchased, and requires the Corporation, as the case may be, to indemnify the Underwriter and the Authority against losses, claims, damages and liabilities arising out of any statement or information contained in this Limited Offering Memorandum pertaining to the Corporation, that is incorrect in any material respect.

## INDEPENDENT ACCOUNTANTS

The financial forecast of Northside Operating Company as of December 31, 1994 through 1998 and for the five months ending December 31, 1994 and for each of the fiscal years ending December 31, 1995 through 1998, appended hereto as part of the Limited Offering Memorandum, APPENDIX C, have been examined by Coopers & Lybrand, Independent Accountants, as set forth in their report which includes an explanatory paragraph relating to the proposed legislation to reform the national health care delivery system, dated August 12, 1994, which report is also appended hereto.

## FINANCIAL STATEMENTS

The financial statements of EOC are included in APPENDIX B to this Limited Offering Memorandum as of and for the fiscal years ended December 31, 1991, 1992 and 1993.

## MISCELLANEOUS

The references to the Act, the Bond Indenture, the Master Indenture, the Loan Agreement, the Mortgage and the Series 1994 Obligation are brief outlines of certain provisions thereof. Such outlines do not purport to be complete and for full and complete statements of the provisions thereof reference is made to the Act, the Bond Indenture, the Master Indenture, the Loan Agreement, the Mortgage and the Series 1994 Obligation. Copies of such documents are included in APPENDIX D hereto.

CB        02039

The agreement of the Authority with the owners of the Series 1994 Bonds is fully set forth in the Bond Indenture, and neither any advertisement of the Series 1994 Bonds nor this Limited Offering Memorandum is to be construed as constituting an agreement with the purchasers of the Series 1994 Bonds. So far as any statements are made in this Limited Offering Memorandum involving estimates, projections or matters of opinion, whether or not expressly so stated, they are intended merely as such and not as representations of fact.

CUSIP identification numbers will be printed on the Series 1994 Bonds, but no error in the printing of such numbers shall constitute cause for a failure or refusal by the purchaser thereof to accept delivery of and pay for any Series 1994 Bonds.

The attached Appendices are integral parts of this Limited Offering Memorandum and must be read together with all of the foregoing statements.

The execution and delivery of this Limited Offering Memorandum has been duly authorized by the Authority.

NORTHSIDE OPERATING CO., D/B/A EDGEWATER
HOSPITAL AND MEDICAL CENTER, INC.

By:  /s/ Bertram P. Rosenthal, M.D.
     President

29

CB     02040

[This page intentionally left blank]

CB        02041

**APPENDIX A**


**NORTHSIDE OPERATING CO., D/B/A**
**EDGEWATER HOSPITAL AND MEDICAL CENTER, INC.**


The information contained
herein as an Appendix to this
Limited Offering Memorandum has been obtained from
Northside Operating Co., d/b/a
Edgewater Hospital and Medical Center, Inc.

CB          02042

[This page intentionally left blank]

CB     02043

## TABLE OF CONTENTS

| | Page |
|---|---|
| GENERAL INFORMATION | A-1 |
| PLAN OF MERGER | A-1 |
| HOSPITAL FACILITY | A-1 |
| ORGANIZATION | A-2 |
| Board of Directors | A-2 |
| Conflicts of Interest | A-3 |
| Hospital Facility Management | A-3 |
| Related Organizations | A-4 |
| MANAGER | A-5 |
| SERVICES AND UTILIZATION | A-7 |
| Bed Complement | A-7 |
| Services | A-7 |
| Historical Utilization | A-8 |
| SERVICE AREA INFORMATION | A-8 |
| General | A-8 |
| Household Size and Income | A-10 |
| Population Statistics | A-10 |
| Age Distribution and Growth | A-11 |
| Competing Providers | A-11 |
| MEDICAL STAFF | A-12 |
| Age Distribution Analysis | A-14 |
| Physician Admissions | A-14 |
| Physician Speciality Admissions | A-15 |
| FINANCIAL INFORMATION | A-16 |
| Summary of Revenues and Expenses | A-16 |
| Sources of Revenue | A-17 |
| MANAGEMENT'S DISCUSSION | A-18 |
| EMPLOYEES | A-19 |
| LICENSES, ACCREDITATION, MEMBERSHIPS AND AFFILIATIONS | A-19 |
| PROFESSIONAL LIABILITY AND OTHER INSURANCE | A-20 |

CB      02044

## GENERAL INFORMATION

Northside Operating Co., d/b/a Edgewater Hospital and Medical Center, Inc. (the "Corporation"), an Illinois not for profit corporation, was incorporated on August 18, 1993, to own and operate acute care general hospitals. The Corporation is licensed by the Department of Public Health of the State of Illinois to operate an acute care hospital with 335 licensed acute care beds, of which approximately 188 are currently staffed, located in Chicago, Illinois (the "Hospital Facility").

The Corporation is exempt from federal income tax under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code, by virtue of its inclusion in a group exemption extended to Permian Health Care, Inc. ("Permian"), a Colorado nonprofit corporation, as a subordinate of Permian, on October 25, 1989. The Corporation is not a private foundation within the meaning of Section 509(a) of the Code.

## PLAN OF MERGER

The Hospital Facility is currently owned by Edgewater Property Company ("EPC") and is leased to and operated by Edgewater Operating Company ("EOC"), each an Illinois business corporation. Pursuant to an Agreement of Merger, dated November 19, 1993, as amended and supplemented (as so amended and supplemented, the "Agreement of Merger"), among the Corporation, EOC and EPC, the Hospital Facility and all equipment and furnishings situated therein will be transferred to EOC. Thereafter, EOC will merge into the Corporation and the Corporation will pay to the shareholders of EOC the amounts described in the forepart of this Limited Offering Memorandum under the caption, "PLAN OF MERGER AND FINANCE." (The transactions described in the Agreement of Merger are described herein collectively as the "Merger.") Upon completion of the Merger, the Corporation does not intend immediately to alter the number of staffed beds or to alter the services provided at the Hospital Facility.

EPC will continue to own certain facilities contiguous or in proximity to the Hospital Facility, including two medical office buildings and two residential apartment buildings (collectively, the "Retained Assets"). The Corporation does not anticipate that the continued ownership of the medical office buildings by EPC will adversely affect the Corporation or its operation of the Hospital Facility. However, the Corporation has negotiated an option to purchase the Retained Assets from EPC.

## HOSPITAL FACILITY

The Hospital Facility is located at 5700 North Ashland in a predominantly residential area of the North side of Chicago. The Hospital Facility's main campus consists of eight structures, all connected by tunnel or bridge. A total of 250 parking spaces are available on the campus, including a parking structure to be owned by the Corporation. The Hospital Facility and the equipment, furnishings and fixtures therein, will be subject to the lien of the Mortgage.

The original Hospital Facility was completed in 1929. There have been many significant renovations and facility improvements to the Hospital Facility in the past several years. Since January 1, 1989, over $10 million has been invested in new plant and equipment.

A-1

Completed projects include the following:

- The Emergency Room was relocated and renovated in 1988.

- The lobby was redecorated in 1989.

- Patient rooms and hallways on the second through fifth floors were renovated during the period 1988 to 1991, including changes made to provide for a new nursing unit on the fourth floor and a more modernized unit on the fifth floor.

- A diabetic inpatient unit and support space was constructed in 1989.

- In 1991, the same day surgery service was relocated to the sixth floor, adjacent to the surgery area, in a completely remodeled area. This move improved accessibility and the aesthetics of the floor.

- Radiology Department equipment was replaced with modern radiology and fluoroscopy rooms in 1989.

- A new emergency generator was installed in 1990.

- A state-of-the-art mammography machine was installed in 1991.

- The seventh floor was renovated to provide for an inpatient oncology and medical/surgical unit of 26 beds.

- A new linear accelerator was installed.

- A new cardiac catheterization laboratory was completed.

The Corporation will utilize a portion of the proceeds of the Series 1994 Bonds to renovate patient rooms on the fifth floor, acquire and install new diagnostic and patient monitors for the nuclear medicine and intensive care areas and acquire additional equipment. Additional future renovation will include the remodeling of the operating room suites to provide an additional operating room, physicians' lounge, new support space and a new HVAC system.

## ORGANIZATION

### Board of Directors

The Corporation is governed by a Board of Directors, consisting of not less than three nor more than eight persons, as determined from time to time by a majority of the directors then in office. A majority of the members of the Board of Directors shall also comprise a majority of the members of the Board of Directors of Permian, which is the sole corporate member of the Corporation. There are currently five members of the Board of Directors of the Corporation, three of whom also serve as directors of Permian. The Board of Directors of the Corporation is responsible for managing the business and affairs of the Corporation and its affiliates. The Board of Directors of the Corporation is comprised of the individuals identified below, each of whom is elected to a one-year term. Board members are eligible for reappointment.

A-2

The current Board members, and their respective offices, are as follows:

| Name/Office | Affiliation |
| --- | --- |
| Bertram P. Rosenthal, M.D., President | Surgeon; member of the Board of Directors of Permian |
| Stina Hans, Secretary/Treasurer | President, Vista Hospital Systems, Inc.; member of the Board of Directors of Permian |
| B. Macon Brewer | Retired (formerly, President, Dean Witter Capital Markets) |
| George Chappas | President, Instructional Design Associates |
| Jane Hurd | Vice President/Partner, Korn/Ferry International; member of the Board of Directors of Permian |

### Conflicts of Interest

Any duality of interest or possible conflict of interest on the part of any Director is required to be disclosed to the Board and made a matter of record. Any Director having a duality of interest or possible conflict of interest on any matter is not permitted to vote on the matter. There currently exist no conflicts of interest among the members of the Board of Directors and the Corporation, and no conflicts are anticipated following the Merger.

### Hospital Facility Management

The day-to-day management of the Hospital Facility is delegated by the Board of Directors to the Chief Executive Officer, who will be assisted by various department directors, all of whom currently serve in the same capacity with EOC and who will be responsible for administrative, nursing and ancillary services. The key members of the Hospital Facility management staff include:

Peter G. Rogan, Ph.D., Chief Executive Officer. Mr. Rogan is the principal shareholder of EOC and is responsible for its successful turnaround since he purchased it in 1989. He is also owner and President/CEO of InterHealth Associates, Inc., a Chicago healthcare consulting firm he founded in 1986. From 1983 to 1986, Mr. Rogan was President/CEO of St. Anthony Medical Center, a 400-bed tertiary medical center located in Crown Point, Indiana. Prior to this, Mr. Rogan was a Principal of Ernst & Whinney in Chicago. Mr. Rogan is a graduate of Niagara University and has a M.H.A. from St. Louis University and a Ph.D. in Hospital and Health Administration from the University of Iowa. Mr. Rogan will be an employee of Braddock assigned to the Corporation pursuant to the Management Agreement.

James H. Cole, Vice President, Finance. Mr. Cole has been in his current capacity with EOC since 1991. Previously, he served as Controller for EOC. Mr. Cole has more than 17 years of experience as a financial officer for hospitals and health care providers. Mr. Cole is a graduate of DePaul University and has a Graduate Certificate in Healthcare Administration from the University of Illinois - Chicago.

A-3

**Roger H. Ehmen, Vice President, Marketing, Staff Development and Planning.** Mr. Ehmen has 19 years experience in the health care field, 16 of them at the Hospital Facility. Previously, he served as Director of Medical Records and the Medical Staff Office at the Hospital Facility. Mr. Ehmen is a graduate of Western Illinois University, has a Master of Business Administration from Northern Illinois University and is an Accredited Record Technician.

**Judy Lunde, Director of Nursing.** Ms. Lunde has been in her present position since 1991. She is a graduate of the University of Wisconsin and has a Master of Science in Nursing Administration from the University of Illinois. She has been involved in nursing management since 1986.

**Michael L. Naiman, Director of Human Resources.** Mr. Naiman commenced his career in health care management in 1986 as an Administrative Assistant at the Hospital Facility. He worked in a variety of administrative departments including Planning & Development and Human Resources, through 1990. Mr. Naiman rejoined EOC in 1991 as Director of Human Resources. Mr. Naiman is a graduate of Loyola University and has a Master of Health Administration degree from Governors State University.

**JoAnne A. Skvarek, Vice President of Ancillary Services, Information Services and Quality Assurance/Utilization Review.** Ms. Skvarek has nearly 20 years of experience in managing and operating health care facilities. She was most recently a Consultant with InterHealth Associates, Inc. before joining EOC. Ms. Skvarek is a graduate of Purdue University.

*Related Organizations*

As described above, the Corporation is a controlled subordinate and affiliate of Permian. Permian also controls Vista Hospital Systems, Inc. ("Vista"), a California nonprofit public benefit corporation that owns and operates two acute care hospitals licensed for an aggregate of 227 beds and a rehabilitation hospital licensed for 77 beds that opened in December 1993. These facilities are located in California.

The members of the Board of Directors of Permian are as follows:

| Name/Office | Affiliation |
|---|---|
| Bertram P. Rosenthal, M.D., President | Physician/Surgeon |
| Bill Miller, Secretary/Treasurer | Chief Executive Officer/President, Odyssey Group |
| Jane Hurd | Vice President/Partner, Korn/Ferry International |
| Michael K. Payne, M.D. | Physician |
| Stina Hans | President, Vista Hospital Systems, Inc. |

A-4

## MANAGER

The Hospital Facility will be managed by Braddock Management, L.P., a California limited partnership ("Braddock"), pursuant to a Management Agreement (the "Management Agreement"), between the Corporation and Braddock, to be executed on or before the date of delivery of the Series 1994 Bonds. Braddock was formed in late 1993 as part of the strategic corporate restructuring of Primus Management, Inc., a California corporation ("Primus"). Braddock is operated by Primus, which was founded by its Chief Executive Officer, F. Scott Gross.

The mission of Braddock and Primus is to manage freestanding, primarily not for profit, community hospitals, providing them with sophisticated financial and operational management expertise typically available only in multi-hospital systems. Primus and Braddock remain small in order to maintain the quality of their services, to develop relationships with the community and to allow the senior executives to take an active, direct role in each managed hospital. Pursuant to the Management Agreement, Braddock will provide to the Corporation management services including operations, financial management, marketing, physician relations, recruitment, and program development. Primus and Braddock maintain affiliations with experienced consulting firms and financial institutions. These resources are used to provide timely and cost effective supplemental expertise not directly provided by Primus or Braddock.

A brief outline of the Primus and Braddock professionals follows:

F. Scott Gross, President and Chief Executive Officer of Primus since its inception, Mr. Gross has also been the President and CEO of Alpha Hospital Management. Mr. Gross has over 20 years experience in private not for profit hospitals and for profit multi-hospital systems, including responsibility for management, acquisition and new facility development. Mr. Gross is the former president of the Hospital Group of National Medical Enterprises (NME), the nation's second largest publicly traded health services management company. His educational background includes the Harvard Business School, Advanced Management Program, Senior Management Fellow, Harvard University; Masters Degree in Public Administration (health care management option) from the University of Southern California; and a Bachelor's of Science Degree in Biology from California State University, Northridge.

Daniel F. Finnane, Vice President of Primus, Mr. Finnane also served as the Vice President at Alpha Hospital Management. He oversees financial analysis and consultation as well as performing site reviews and project management for hospitals under contract. Mr. Finnane is a graduate of the Dartmouth College Amos Tuck School of Business Administration with a Masters of Business Administration. He received a Bachelor of Business Administration Degree in Finance from the University of Iowa. He has worked previously as an Information Systems Specialist to the health care industry, expertise he continues to use in his current position.

In addition, Peter G. Rogan, whose background is described above, will be an employee of Braddock and will serve as the Chief Executive Officer of the Hospital Facility.

Employees of Primus who will provide consultative and support services to Braddock include:

Marlene Woodworth, who has been the Chief Executive Officer at Circle City Medical Center/Corona Regional Medical Center, located in Corona, California and owned by Vista, for a total of seven years. Ms. Woodworth holds a Masters Degree in Business Administration from Pepperdine University and an undergraduate degree in Nursing from Holy Name College. Before assuming her present position, Ms. Woodworth was the Chief Financial Officer at Circle City Medical Center and the Chief Operating Officer, Pacific Southwest region, for AMI.

A-5

CB        02049

Richard N. Woolslayer, who has been the Chief Executive Officer at Arroyo Grande Community Hospital, located in Arroyo Grande, California and owned by Vista, for the past seven years. He holds a Masters Degree in Business Administration with a specialization in hospital administration and concentrations in finance and accounting from the University of Chicago Graduate School of Business. He also received a Bachelor of Arts Degree in Economics from Whitman College. Before assuming his present position, Mr. Woolslayer was the Chief Operating Officer of AMI Tarzana Regional Medical Center in Tarzana, California.

Karen Schulz, who has been the Chief Financial Officer of Vista and Arroyo Grande Community Hospital since 1991. She received her Bachelor's Degree in Business Administration from Cal State Fullerton and is also a Certified Public Accountant. Prior to assuming her present position, Ms. Schulz was the Director of Finance with Golden Health System which owned and operated an acute care hospital and skilled nursing facilities in five states.

David G. Yeager, who is the Chief Financial Officer at Corona Regional Medical Center is a new addition to the Primus team. He is responsible for all financial services required to manage Corona Regional Medical Center. He received a Bachelor of Science Degree in Accounting from San Diego State University and a Masters Degree in Business Administration from the University of Phoenix. Prior to assuming his current role, Mr. Yeager held financial management positions with Sharp HealthCare, located in San Diego, California, and served most recently as Vice President of Finance and Business Services at its Murrieta facility.

Jane E. Frein, who has been the Director of Nursing Services at Arroyo Grande Community Hospital for four years. She received a Masters Degree in Nursing from the University of California, Los Angeles, and a Bachelor of Science Degree in Nursing from the University of California, San Francisco. She has worked previously as the Education Department Manager at Marian Medical Center in Santa Maria, California, and as the Cardiac Rehabilitation Coordinator at French Hospital Medical Center in San Luis Obispo, California.

Patricia B. Sanders, who has been the Chief of Nursing at Circle City Medical Center/Corona Regional Medical Center since 1987. She received a Bachelor of Science Degree in Nursing from the University of Phoenix, Costa Mesa, California and a Bachelor of Science Degree in Hospital Administration through the New York Region Program. Prior to becoming Director of Nursing at Circle City Medical Center, Ms. Sanders was the Clinical Instructor at Kaiser Permanente.

Odette Lamb-Osantowski, who is the Rehabilitation Care Administrator for Corona Regional Medical Center. Previously, Ms. Osantowski served as Vice President of Nursing Services at Corona Community Hospital for six years. She has been employed by Corona Regional Medical Center, including her tenure as Vice President, for a total of 20 years.

A-6

CB          02050

## SERVICES AND UTILIZATION

### Bed Complement

The Corporation will offer the full range of inpatient and outpatient diagnostic and therapeutic services and related ancillary services that are currently offered by EOC. The Corporation is licensed to operate 335 beds, of which 188 are currently staffed. The distribution of the staffed acute care beds as of December 1993, is set forth below:

| BED COMPLEMENT | |
|---|---|
| **Bed Category** | **Staffed Bed Complement** |
| Medical/Surgical | 146 |
| Critical Care and Step-Down | 42 |
| Total | 188 |

Source: EOC Records

### Services

The specialty and subspecialty services offered at the Hospital Facility include:

Angioplasty
Cardiac Non-Invasive Lab
Cardiac Catheterization Lab
Chronic Obstructive Pulmonary Disease
Electroencephalography
Emergency Services
Geriatric Clinics
Health Promotion/Education
Hemodialysis
Home Health Care Program
Intensive Care Services:
   Medical/Surgical
Laboratory Services:
   Blood Bank
   General Lab
   Histopathology Lab
Mammography Screening
Oncology Services
Ophthalmology Services
Organized Outpatient Department
Pharmacy Services:
   Outpatient Pharmacy

Primary Care Unit
Radiation Therapy:
   Megavolt Radiation
   X-Ray Radiation
Radiology Diagnostic:
   Nuclear Medicine
   Scanner, Body
   Ultrasound
Rehabilitation Services:
   Cardiac Rehabilitation
Surgical Services:
   General Surgical Services
   Open Heart Surgery
   Orthopedic Surgery
   Outpatient Surgery
Therapy Services:
   Occupational Therapy
   Physical Therapy
   Respiratory Therapy
   Speech Pathology
Volunteer Services

Source: EOC Records

A-7

CB    02051

*Historical Utilization*

The following table presents selected historical utilization data for the Hospital Facility for the four calendar years ended December 31, 1993 and the five-month period ended May 31, 1994:

| HISTORICAL UTILIZATION | | | | | |
|---|---|---|---|---|---|
| | Calendar Year Ended December 31, | | | | Five-Month Period Ended May 31, |
| | **1990** | **1991** | **1992** | **1993** | **1994** |
| Average Staffed Beds | 137 | 137 | 162 | 175 | 188 |
| Occupancy [a] | 74.9% | 84.2% | 75.7% | 83.5% | 80.1% |
| Average Length of Stay [b] | 7.28 | 7.84 | 8.46 | 8.04 | 8.0 |
| Admissions | 5,139 | 5,371 | 5,289 | 6,637 | 2,886 |
| Patient Days | 37,249 | 42,083 | 44,761 | 53,352 | 22,988 |
| Total Surgeries | | | | | |
|   Inpatient | 2,369 | 2,173 | 1,949 | 2,199 | 1,039 |
|   Outpatient | 1,929 | 2,078 | 2,170 | 2,141 | 1,090 |
| Emergency Room Visits | 14,763 | 13,940 | 12,521 | 13,352 | 5,431 |

Source: EOC Records
[a] As a percent of staffed beds.
[b] Based upon discharge data.

## SERVICE AREA INFORMATION

*General*

The Hospital Facility is located near Lake Michigan in the north Chicago area, approximately six miles from the "Loop." The Hospital Facility's service area encompasses portions of Chicago, Illinois, as shown on the map on page A-9 hereof. The service area includes the Chicago communities of Roger's Park, West Ridge, Uptown, Lincoln Square, North Park, Albany Park and Edgewater. The service area was identified based upon an analysis of discharges from the Hospital Facility during the fiscal year ended December 31, 1991, as set forth in the following table.

| 1991 Patient Origin Distribution Analysis by Zip Code | | |
|---|---|---|
| **Zip Code** | **Discharges** | **Percent** |
| 60625 | 242 | 4.5% |
| 60626 | 800 | 14.9 |
| 60640 | 719 | 13.4 |
| 60645 | 349 | 6.5 |
| 60659 | 216 | 4.0 |
| 60660 | 1,046 | 19.5 |
| **Total** Service Area | 3,372 | 62.8% |
| Other Zip Codes | 1,998 | 37.2% |
| **Total** | 5,370 | 100.0% |

Source: Illinois Health Care Cost Containment Council, Patient Origin Data Set and EOC Records

A-8



MARKET AREA ZIP CODE MAP

Edgewater Medical Center
Service Area

A-9

CB          02053

*Household Size and Income*

Set forth in the table below are the median household size and income levels for the service area compared to the City of Chicago for 1992.

| Service Area Household Size Income | | |
|---|---|---|
| | Service Area | City of Chicago |
| Household Size | 2.43 | 2.73 |
| **Household Income** | | |
| 0 - $14,999 | 28.8% | 29.7% |
| $15,000 - $24,999 | 20.1 | 18.0 |
| $25,000 - $34,999 | 16.5 | 15.4 |
| $35,000 - $49,999 | 16.0 | 16.6 |
| $50,000 - $74,999 | 12.2 | 12.8 |
| $75,000 or more | 6.3 | 7.5 |
| **Total** | **100.0%** | **100.0%** |
| Mean Income | **$31,947** | **$26,301** |

Source: Chicago Department of Planning and Development (December 1992)

*Population Statistics*

The following population data and projected population growth during the period 1993 through 1998 are based upon information published by the U.S. Bureau of the Census, Claritas/National Planning Data Corporation and the City of Chicago Department of Planning and Development.

| Service Area Population and Growth | | | |
|---|---|---|---|
| | 1993 | 1998 | % Change |
| Service Area | 349,274 | 365,338 | 4.6% |
| State of Illinois | 11,647,420 | 11,994,172 | 3.0 |
| Cook County | 5,155,790 | 5,233,935 | 1.5 |

Source: Claritas/National Planning Data Corporation

A-10

CB      02054

*Age Distribution and Growth*

The average age of the population of the Hospital Facility's service area is slightly older than Cook County. The percentage of persons 65 and over is greater at 13.7 percent vs. 12.6 percent for Cook County, and the percentage under 15 years is smaller at 19.0 percent vs. 21.3 percent for Cook County. The fastest growing age group in the service area is the 45-64 age group, which is projected to grow 15.2 percent, compared to the overall service area growth of 4.6 percent. Projected growth of the 65+ age group in the service area is also more than twice as great as the growth for this age group in Cook County (10.2 percent vs. 4.6 percent for Cook County). The 15-44 age group is projected to decrease by -0.2 percent by 1998, reflecting the aging of the "baby boomers". Similarly, the childbearing female age group (15-44) is also projected to decline by -0.2 percent in size.

*Competing Providers*

There are five other acute care facilities located in the Corporation's service area. These facilities are Louis A. Weiss Memorial Hospital, Methodist Hospital of Chicago, Ravenswood Hospital Medical Center, Swedish Covenant Hospital and Thorek Hospital and Medical Center. In addition, Evanston Hospital and St. Francis Hospital, both located in north suburban Evanston, Illinois and Illinois Masonic Medical Center and St. Joseph Hospital, located to the south of the Corporation's service area in Chicago, draw patients from the service area. Numerous outpatient providers are operating in the Corporation's service area, including physician private practices and ambulatory care centers, as well as other competing outpatient service providers. Information regarding staffed beds, admissions, average census and percent occupancy for the Hospital Facility and such competing hospitals are summarized in the table below. The locations of the competing facilities are shown on the map on page A-9.

Competing Hospital Beds and Utilization, 1991

|  | Staffed Hospital Beds | Admissions | Average Census | Percent Occupancy |
|---|---|---|---|---|
| Service Area Hospitals: |  |  |  |  |
| Edgewater Medical Center | 165 | 5,405 | 116 | 70.3% |
| Louis A. Weiss Memorial Hospital | 232 | 8,406 | 175 | 75.4 |
| Methodist Hospital of Chicago | 146 | 3,187 | 71 | 48.6 |
| Ravenswood Hospital Medical Center | 295 | 10,504 | 225 | 76.3 |
| Swedish Covenant Hospital | 252 | 9,248 | 190 | 75.4 |
| Thorek Hospital and Medical Center | 170 | 4,596 | 86 | 50.6 |
| Area Hospital Total | 1,260 | 41,346 | 863 | 68.5% |
| Other Chicago Hospitals: |  |  |  |  |
| Illinois Masonic Medical Center | 365 | 16,111 | 273 | 74.8% |
| St. Joseph Hospital | 425 | 11,976 | 245 | 57.6 |
| Evanston Hospitals: |  |  |  |  |
| Evanston Hospital | 549 | 23,597 | 447 | 81.4% |
| St. Francis Hospital | 436 | 16,109 | 323 | 74.1 |

Source: American Hospital Association, 1992 Guide, "Issues to the Health Care Field"
(May differ from EOC's records due to data gathering techniques)

A-11

No single acute care hospital dominates the service area. Eight hospitals had more than five percent market share in 1991, and the highest market share is 14.5 percent, maintained by St. Francis Hospital. The other two acute care hospitals with the strongest market shares are Swedish Covenant Hospital and Ravenswood Hospital Medical Center, with 10.2 percent each. The six competitor hospitals in the service area (including the Hospital Facility), the two other Chicago hospitals to the south, and the two Evanston Hospitals, account for 72.4 percent of the area market share. The Hospital Facility's market share declined between 1987 and 1989, reflecting the Hospital's prior management and financial difficulties. Since the new ownership and management in 1989, market share for the Corporation improved slightly in 1991, notwithstanding that the obstetrics service was discontinued in 1990. During fiscal year 1993, the Hospital Facility experienced a substantial increase of 24.5 percent in admissions, compared to fiscal year 1992. Through the period ended May 31, 1994, admissions have increased 4 percent compared to the comparable period for fiscal year 1993.

Because the Hospital Facility competes only for inpatient medical/surgical and critical care patients, a more accurate reflection of its market position is its share of that portion of the area's hospital inpatient market. It is estimated that the Hospital Facility's market share of the medical/surgical and critical care market in 1991 was approximately 11.1 percent. This estimate was derived by subtracting patient admissions for obstetrics/gynecology, pediatrics, psychiatric, and other (such as alcohol/drug abuse) from total admissions, based on data on the ten competitor hospitals with 72.4 percent of the area market share.

## MEDICAL STAFF

As of June 1993, the Medical Staff consisted of 348 members. Excluding Courtesy Staff members, there are 324 members of the Medical Staff; 205 of whom are the most active admitters, of whom 68 percent are board certified in their respective specialties. The Attending, Associate and Consulting Medical Staff members' average age is approximately 47 years. Admissions by the Courtesy Staff grew by 40 percent from the comparable period in 1992, reflecting the ongoing recruitment of new physicians. Because the Courtesy Staff at the Hospital Facility includes all the newer members of the Medical Staff who will eventually become eligible for Associate and Attending status, this category plays and important role in the Hospital Facility's future operations. The following table provides the distribution of active physicians by specialty practice:

CB        02056

**Active Medical Staff by Specialty**
**(As of June 1993)**

| Category | Number of Physicians | Board Certified Physicians | Average Age | January to June 1993 Admissions | Percentage of Admissions |
|---|---|---|---|---|---|
| Anesthesiology | 3 | 1 | 48 | 0 | 0.0% |
| Cardiology | 7 | 6 | 45 | 201 | 5.8 |
| Chiropractic Medicine | 1 | 0 | 42 | 0 | 0.0 |
| Cardio-Vascular Thoracic Surgery | 5 | 5 | 55 | 28 | 0.8 |
| Dentists | 1 | 0 | 41 | 0 | 0.0 |
| Dermatology | 1 | 1 | 46 | 0 | 0.0 |
| Endocrinology | 2 | 2 | 49 | 14 | 0.4 |
| Family Practice | 21 | 6 | 52 | 471 | 13.7 |
| Gastroenterology | 6 | 5 | 50 | 14 | 0.4 |
| Hematology/Oncology | 3 | 3 | 47 | 7 | 0.2 |
| Infectious Disease | 3 | 3 | 36 | 0 | 0.0 |
| Internal Medicine | 44 | 24 | 47 | 2,441 | 71.0 |
| Nephrology | 2 | 2 | 44 | 4 | 0.1 |
| Neurosurgery | 2 | 2 | 58 | 0 | 0.0 |
| Neurology | 9 | 8 | 48 | 3 | 0.1 |
| Obstetrics/Gynecology | 7 | 7 | 55 | 32 | 0.9 |
| Oral/Maxillofacial Surgery | 1 | 1 | 47 | 0 | 0.0 |
| Ophthalmology | 6 | 6 | 44 | 11 | 0.3 |
| Orthopedic Surgery | 10 | 7 | 43 | 59 | 1.7 |
| Otolaryngology | 1 | 1 | 47 | 2 | 0.1 |
| Pathology | 1 | 1 | 37 | 0 | 0.0 |
| Pediatrics | 1 | 1 | 66 | 1 | 0.0 |
| Plastic Surgery | 1 | 1 | 52 | 1 | 0.0 |
| Podistry | 34 | 19 | 37 | 39 | 1.1 |
| Psychiatry | 4 | 3 | 64 | 1 | 0.0 |
| Pulmonary Medicine | 1 | 1 | 44 | 5 | 0.1 |
| Radiology | 3 | 2 | 48 | 0 | 0.0 |
| Radiological Oncology | 2 | 2 | 49 | 0 | 0.0 |
| Rheumatology | 1 | 1 | 42 | 0 | 0.0 |
| Surgery | 14 | 10 | 50 | 73 | 2.1 |
| Urology | 4 | 4 | 58 | 6 | 0.2 |
| Vascular Surgery | 2 | 2 | 43 | 0 | 0.0 |
| Vascular Thoracic Surgery | 2 | 2 | 52 | 4 | 0.1 |
| Other | | | | 19 | 0.6 |
| **Total** | **205** | **139** | **47** | **3,437** | **100.0%** |

Source: EOC Records

A-13

CB      02057

## Age Distribution Analysis

The average age of the top admitters is 48 years. The following table shows that the age distribution of the admitting Medical Staff members is well distributed among age groups, and approximately 75 percent of the Hospital Facility admissions in 1993 were attributable to physicians under 55 years of age. In addition, approximately 41 percent of the admissions are attributable to physicians under 44 years of age.

| Profile of 1993 Admitting Physicians and Admissions by Age Group | | | |
|---|---|---|---|
| | Admitting Physicians | Percent of Admissions | Cumulative Percent |
| Less Than 35 Years | 10 | 0.2% | 0.2% |
| 35-44 Years | 69 | 40.8 | 41.0 |
| 45-54 Years | 67 | 34.3 | 75.3 |
| 55-64 Years | 22 | 11.7 | 87.0 |
| 65+ Years | 15 | 13.0 [a] | 100.0 |
| Total | 183 | 100.0% | 100.0% |

Source: EOC Records

[a] Three physicians are responsible for over 95% of the admissions in the 65+ years category. Each of these physicians practices with a younger physician.

## Physician Admissions

For the fiscal year ended December 31, 1993, the most active physicians, by patient discharges and on a percentage basis, is set forth in the following chart:

| Top 20 Active Physicians | | |
|---|---|---|
| | Cumulative Percentage of Physician Discharges for the Fiscal Year Ended December 31, 1993 | Average Age |
| Top 5 Physicians | 37.2% | 52 |
| Top 10 Physicians | 50.6 | 43 |
| Top 15 Physicians | 59.6 | 53 |
| Top 20 Physicians | 66.8 | 48 |

Source: EOC Records

A-14

CB        02058

Physician Specialty Admissions

For the period January to December 1993, the most active 15 physicians, by specialty practice, admissions, percentage and age include:

| | Admissions[1] | Percentage of Total Admissions | Percentage of Total Admissions to the Hospital Facility | Age |
|---|---|---|---|---|
| **Top 15 Admitters** | | | | |
| Internal Medicine | | 1,103 | 15.8% | 100% | 50 |
| Residency[*] | 996 | | 14.2% | | |
| Private | 107 | | 1.5 | | |
| Internal Medicine[2] | | 416 | 5.9 | 100 | 38 |
| Geriatric Program[*] | 315 | | 4.5% | | |
| Private[*] | 101 | | 1.4 | | |
| Internal Medicine[2] | | 410 | 5.9 | 100 | 67 |
| Geriatric Program[*] | 282 | | 4.0% | | |
| Private[*] | 128 | | 1.8 | | |
| Family Practice[3] | | 351 | 5.0 | 100 | 67 |
| Internal Medicine | | 323 | 4.6 | 90 | 37 |
| Internal Medicine[4] | | 219 | 3.1 | 100 | 40 |
| Internal Medicine[4] | | 196 | 2.8 | 80 | 43 |
| Internal Medicine | | 183 | 2.6 | 95 | 41 |
| Internal Medicine | | 182 | 2.6 | 50 | 42 |
| Internal Medicine | | 161 | 2.3 | 100 | 48 |
| Internal Medicine | | 143 | 2.0 | 95 | 56 |
| Internal Medicine | | 130 | 1.9 | 100 | 42 |
| Internal Medicine[3] | | 129 | 1.8 | 40 | 40 |
| Family Practice | | 121 | 1.7 | 90 | 59 |
| Internal Medicine | | 106 | 1.5 | 75 | 66 |
| | | | | | 49 |
| Sub-Total | | 4,173 | 59.6% | | |
| **TOTAL** | | **7,003** | **100.0%** | | |

[*] Programs in which multiple physicians admit under the name of the physician directing the program. Percentage of admissions attributable to individual physician is also noted.

[1] 23-Hour Observations are included in Admissions.

[2] Practice together.

[3] Family Practice Physician Associated with Internal Medicine Physician.

[4] Practice together.

Source: EOC Records

A-15

CB          02059

# FINANCIAL INFORMATION

Summary of Revenues and Expenses

The audited financial statements of EOC included in this Limited Offering Memorandum as Appendix B do not reflect the ownership and operation of the Hospital Facility by a not for profit corporation exempt from federal, state and local taxation. However, EOC is an "S Corporation" for federal income tax purposes and, accordingly, does not pay federal or state income taxes, and such items are not reflected in the audited financial statements. The following Summary of Revenues and Expenses has been prepared by management of the Corporation and shows the effects of eliminating state sales and local real estate taxes from such financial statements on the assumption that the Corporation had owned and operated the Hospital Facility during such periods. No further adjustments have been made to the financial information to reflect changes in operations that the Corporation anticipates implementing. In addition, the following table includes a summary of revenues and expenses for the five-month periods ended May 31, 1993 and 1994, and have been prepared on the same assumptions described above.

The following Summary of Revenue and Expenses for the fiscal years ended December 31, 1992 and 1993 and the five-month periods ended May 31, 1993 and 1994 includes all adjustments, consisting of normal recurring accruals, which management of the Corporation considers necessary to present such information in conformity with generally accepted accounting principles. The results of operations for the five months ended May 31, 1994 are not necessarily indicative of the operating results to be expected for the entire fiscal year ending December 31, 1994. This Summary of Revenues and Expenses should be read in conjunction with the audited financial statements and related notes appearing as APPENDIX B to this Limited Offering Memorandum. The Forecast, appearing as APPENDIX D to this Limited Offering Memorandum, includes forecasted revenues and expenses for the fiscal years ending December 31, 1998, and should be reviewed in its entirety.

A-16

CB        02060

| SUMMARY OF REVENUES AND EXPENSES | | | |
|---|---|---|---|
| | Fiscal Years Ended December 31, (000's omitted) | | Five Months Ended May 31, (000's omitted) |
| | 1992 | 1993 | 1993 | 1994 |
| **OPERATING REVENUES:** | | | | |
| Net patient service revenue | $53,761,209 | $58,067,632 | $23,713,572 | $26,269,289 |
| Other operating revenues | 855,394 | 752,382 | 366,912 | 415,771 |
| Interest income | 111,685 | 53,565 | 22,723 | 27,333 |
| Total operating revenues | $54,728,288 | $58,853,579 | $24,103,207 | $26,712,393 |
| **OPERATING EXPENSES:** | | | | |
| Salaries, wages and employee benefits | $21,764,071 | $22,272,493 | $9,739,051 | $9,984,765 |
| Purchased services and physician fees | 6,359,075 | 8,261,759 | 3,193,864 | 3,614,715 |
| Supplies | 5,054,238 | 5,646,965 | 2,396,551 | 2,583,647 |
| General overhead and maintenance | 6,541,541 | 7,363,966 | 3,086,562 | 3,179,589 |
| Depreciation | 1,254,600 | 1,384,513 | 654,670 | 734,125 |
| Real estate and sales taxes | 607,025 | 702,721 | 306,564 | 446,886 |
| Interest | 1,341,557 | 765,150 | 357,558 | 270,648 |
| Illinois Medicaid Provider Tax | 585,950 | 1,311,692 | 488,294 | 604,786 |
| Bad debts | 7,766,699 | 6,395,167 | 2,249,785 | 3,676,858 |
| Other | 1,097,387 | 1,262,785 | 442,871 | 474,479 |
| Total operating expenses | $52,372,143 | $55,865,211 | $22,915,570 | $25,770,494 |
| Net Operating Income | 2,356,145 | 2,988,368 | 1,187,637 | 941,895 |
| Excess of revenues over expenses | $2,356,145 | $2,988,368 | $1,187,637 | $941,895 |
| Add: Real estate and sales taxes | $607,025 | $702,721 | $306,564 | $646,886 |
| Adjusted Excess of revenue over expenses | $2,963,170 | $3,690,389 | $1,494,201 | $1,588,781 |

Sources of Revenue

EOC derives a substantial portion of its operating revenue from federal and state programs and insurance plans which pay for all or a portion of the health care services provided to a patient. As a consequence, the operating revenue of EOC depends to a great extent upon the availability and level of reimbursement or payment under such programs and plans. See the information under the caption, "BONDHOLDERS RISKS" in the front portion of this Limited Offering Memorandum. The following table sets forth the percentages of discharges of patients by revenue source for EOC applicable to the different programs and plans for the four fiscal years ended December 31, 1994 and for the five-month period ended May 31, 1994.

A-17

CB      02061

| Discharges of Patients by Revenue Source | | | | | |
|---|---|---|---|---|---|
| | Fiscal Years Ended December 31, | | | | Five Months Ended May 31, 1994 |
| | 1990 | 1991 | 1992 | 1993 | |
| Medicare | 48.5% | 52.7% | 52.2% | 51.3% | 51.2% |
| Medicaid | 18.8 | 18.7 | 22.4 | 20.4 | 20.8 |
| Commercial Insurance | 16.5 | 12.9 | 10.8 | 11.9 | 11.0 |
| HMO | 3.5 | 3.2 | 3.3 | 4.0 | 4.5 |
| Other | 12.7 | 12.5 | 11.3 | 12.4 | 12.5 |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Source: EOC Records

## MANAGEMENT'S DISCUSSION

For the fiscal year ended December 31, 1993, EOC continued its trend of improved financial and operating performance, which commenced during the 1991 fiscal year. For the fiscal year ended December 31, 1993, EOC's income from operations increased approximately 27 percent over the 1992 fiscal year results. In addition, EOC experienced a 25 percent increase in admissions during fiscal year 1993 as compared to fiscal year 1992. For the five months ended May 31, 1994, compared to the similar period in 1993, inpatient admissions increased approximately 7 percent, outpatient revenue increased approximately 39 percent and net revenue increased approximately 8 percent.

Management of EOC believes that it has implemented and continues to implement programs resulting in significant improvements in operating and financial performance. Further, the average age of the Medical Staff has decreased from 55 years in 1988 to the current average age of 47 years. More than 21 percent of EOC's admissions during fiscal year 1992 were attributable to 54 physicians who have become members of the Medical Staff since the 1990 fiscal year. This trend continued to improve during the 1993 fiscal year. EOC has targeted the Medicare population as an area of growth. In connection with this focus, EOC established various senior programs, which in the 1993 fiscal year resulted in approximately $3,596,000 of gross revenues, with $1,885,000 of this revenue coming from patients who had not previously used EOC's services.

Management of the Corporation believes that, in the future, managed care will become a larger component of revenues, which is evidenced by EOC's recent execution of a number of new managed care contracts. Furthermore, as noted earlier, the percentage of managed care patients is increasing. This trend is also identified in the "Deduction From Patient Revenue" assumptions in the Forecast, as evidenced by declining trends in income and debt service coverage during the forecast periods. However, by utilizing the extensive managed care experience and resources of Braddock, management of the Corporation believes that additional opportunities exist to manage expenses and to enhance revenue growth.

A-18

CB        02062

Current management of EOC has developed a utilization review and quality improvement program to better manage the Hospital Facility's operation. These programs have decreased the length of stay by approximately one-half a day for fiscal year 1993 compared to fiscal year 1992. In addition, during the 1993 fiscal year, the programs reduced the length of stay for Medicare patients by approximately seven-tenths of a day. For the five-month period ended May 31, 1994, compared to the similar period during 1993, the average length of stay for Medicare patients decreased approximately eight-tenths of a day and the average length of stay for all patients decreased approximately one-half of a day.

While overall operating expenses increased during the 1993 and 1992 fiscal years, expenses on an adjusted patient day have decreased. The increase was due primarily to increased patient volume. During the 1993 fiscal year, expenses on an adjusted patient day were approximately $773. During the 1992 fiscal year, expenses were approximately $841 per adjusted patient day. This approximate 8 percent decrease in expenses per adjusted patient day is primarily attributable to increased efficiencies in delivering services and maintaining increased volumes in inpatient and outpatient services. For the five-month period ended May 31, 1994, expenses per adjusted patient day were approximately $816. However, fiscal year 1994 expenses included a one time tax expense of approximately $450,000.

Medicare and Blue Cross have completed their audits of all Cost Reports through the 1992 fiscal year. All the financial results referenced above reflect EOC's recognition of all audit adjustments associated with such Cost Reports.

## EMPLOYEES

As of December 1993, EOC employed 655 full-time equivalent employees. The Corporation anticipates that it will continue to employ this full-time equivalent number of employees. The Corporation will provide compensation and a full range of employee benefit programs which management of the Corporation believes are competitive with other hospitals in the service area.

None of the employees of EOC is represented by bargaining representatives.

## LICENSES, ACCREDITATION, MEMBERSHIPS AND AFFILIATIONS

On the date of delivery of the Series 1994 Bonds, the Corporation will be provisionally licensed by the State of Illinois Department of Public Health. The Hospital Facility is accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") for a three-year period expiring October 1995. The Corporation will notify the JCAHO upon the change in ownership of the Hospital Facility to continue such accreditation. The Corporation will continue as a provider under the Medicare and the Medicaid Programs. Affiliations of the Corporation include the American Hospital Association and the Metropolitan Chicago Healthcare Council.

A-19

CB          02063

## PROFESSIONAL LIABILITY AND OTHER INSURANCE

General and Professional liability insurance coverage for the Corporation will be provided by various insurers on a claims-made basis. The Corporation has secured a three year policy for continuing claims-made coverage until September 30, 1996.

It is the opinion of management of the Corporation that the reserves, as stated in the audited financial statements for self-insurance claims and other professional liability reserves, are adequate to provide for losses resulting from professional and general liability claims.

In addition to the coverage described above concerning professional and comprehensive general liability, the Corporation will maintain insurance with respect to its property and operations against risks and in amounts not less than is customary for entities engaged in the same or similar activities and similarly situated.

A-20

CB      02064

[This page intentionally left blank]

CB     02065

**APPENDIX B**

**FINANCIAL STATEMENTS**
**OF**
**EDGEWATER MEDICAL CENTER**

CB          02066

[This page intentionally left blank]

CB    02067

Financial Statements

Edgewater Medical Center

*Year ended December 31, 1993*
*with Report of Independent Auditors*

CB        02068

Edgewater Medical Center

Financial Statements

Year ended December 31, 1993

## Contents

Report of Independent Auditors ................................................................... 1

Financial Statements

Balance Sheets ................................................................................ 2
Statements of Income ........................................................................ 3
Statements of Shareholders' Equity ..................................................... 4
Statements of Cash Flows .................................................................. 6
Notes to Financial Statements ........................................................... 7

CB       02069

**≡ᴉⵏ ERNST & YOUNG**

■ Sears Tower
233 South Wacker Drive
Chicago, Illinois 60606-6301

■ Phone: 312 879 2000

## Report of Independent Auditors

Shareholders and the Board of Directors
Edgewater Medical Center

We have audited the accompanying balance sheet of Edgewater Medical Center (Medical Center) as of December 31, 1993, and the related statements of income, shareholders' equity and cash flows for the year then ended. These financial statements are the responsibility of the Medical Center's management. Our responsibility is to express an opinion on these financial statements based on our audits. The financial statements of the Medical Center for the year ended December 31, 1992 were audited by other auditors, whose report, dated March 3, 1993, expressed an unqualified opinion thereon.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Edgewater Medical Center as of December 31, 1993, and the results of its operations and its cash flows for the year then ended in conformity with generally accepted accounting principles.

*Ernst + Young*

March 30, 1994

1

CB          02070

## Edgewater Medical Center

### Balance Sheet

|  | December 31 | |
|---|---|---|
|  | 1993 | 1992 |
| **Assets** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 1,607,510 | $ 1,532,059 |
| Patient accounts receivable, less allowances for uncollectible accounts of $3,544,000 in 1993 and $3,249,000 in 1992 | 10,148,614 | 10,821,164 |
| Other receivables | 89,885 | 255,238 |
| Inventories, at cost | 1,034,833 | 725,167 |
| Prepaid expenses | 2,187,118 | 951,739 |
| Estimated amounts due from third-party payors | 84,519 | 1,168,196 |
|  | 15,152,479 | 15,453,563 |
| **Assets limited as to use:** | | |
| Self-insurance trust | 170,378 | 167,212 |
| Investments | 297,889 | 350,743 |
| Deferred compensation trust, at market | 991,433 | 965,189 |
|  | 1,459,700 | 1,483,144 |
| **Property, plant, and equipment:** | | |
| Building and leasehold improvements | 3,380,525 | 2,432,938 |
| Equipment and equipment under capital lease | 9,137,765 | 8,243,435 |
| Construction in progress | | 630,017 |
|  | 12,518,290 | 11,306,390 |
| Accumulated depreciation | (4,032,934) | (3,609,946) |
|  | 8,485,356 | 7,696,444 |
|  | $25,097,535 | $24,633,151 |

2

| | December 31 | |
|---|---|---|
| | 1993 | 1992 |
| **Liabilities and shareholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,547,798 | $ 2,625,337 |
| Accrued payroll and taxes | 1,422,148 | 1,387,084 |
| Other accrued expenses | 857,444 | 1,056,778 |
| Current portion of insurance premium financing payable | 682,551 | 431,184 |
| Current maturities of other long-term debt | 2,026,146 | 1,047,601 |
| Amounts due to third-party payors | 4,051,755 | 4,491,311 |
| | 12,587,842 | 11,039,295 |
| | | |
| Noncurrent liabilities: | | |
| Long-term debt | 9,498,960 | 5,890,153 |
| Due to third-party payors | — | 3,932,229 |
| Self insurance reserve | 1,784,609 | 1,499,762 |
| Deferred compensation obligation | 991,433 | 965,189 |
| Due to related party | — | 4,060,000 |
| | 12,275,002 | 16,347,333 |
| | | |
| Shareholders' equity: | | |
| Common stock, $.01 par value: | | |
| Authorized shares — 1,000; 100 shares issued and outstanding | 1 | 1 |
| Retained earnings (deficit) | 234,690 | (2,753,478) |
| Total shareholders' equity | 234,691 | (2,753,477) |
| Total liabilities and shareholders' equity | $25,097,535 | $24,633,151 |

*See notes to financial statements.*

3

CB        02072

# Edgewater Medical Center

## Statements of Income

|  | December 31 | |
|  | **1993** | **1992** |
|---|---|---|
| **Revenue** | | |
| Net patient service revenue | $58,067,632 | $53,456,408 |
| Other operating revenue | 732,382 | 855,394 |
| Interest income | 53,365 | 111,685 |
| Total revenue | 58,853,379 | 54,423,487 |
| | | |
| **Expenses** | | |
| Salaries, wages and employee benefits | 22,772,493 | 21,764,071 |
| Purchased services and physician fees | 8,261,759 | 6,359,075 |
| Supplies | 5,646,965 | 5,054,238 |
| General overhead and maintenance | 7,363,966 | 6,541,541 |
| Depreciation | 1,384,513 | 1,254,600 |
| Interest | 765,150 | 1,341,557 |
| Real estate and sales taxes | 702,721 | 607,025 |
| Bad debt expense | 6,393,167 | 7,461,898 |
| Other | 1,262,785 | 1,097,387 |
| Total expense | 54,553,519 | 51,481,392 |
| Income before Illinois Medicaid Provider Tax | 4,299,860 | 2,942,095 |
| Illinois Medicaid Provider Tax | 1,311,692 | 585,950 |
| Net income | $ 2,988,168 | $ 2,356,145 |

*See notes to financial statements.*

4

## Edgewater Medical Center

### Statements of Shareholders' Equity

| | Common Stock | Retained Earnings |
|---|---|---|
| Balance at January 1, 1992 | $1 | $(5,109,623) |
| Net income | — | 2,356,145 |
| Balance at December 31, 1992 | 1 | (2,753,478) |
| Net income | — | 2,988,168 |
| Balance at December 31, 1993 | $1 | $ 234,690 |

*See notes to financial statements.*

5

CB      02074

# Edgewater Medical Center

## Statements of Cash Flows

| | Year ended December 31 | |
| --- | ---: | ---: |
| | 1993 | 1992 |
| **Operating activities** | | |
| Net income | $2,988,168 | $2,356,145 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation | 1,384,513 | 1,254,600 |
| Decrease (increase) in accounts receivable | 672,550 | (2,508,380) |
| Net change in estimated amounts due from/to third-party payors | (3,288,108) | 2,596,318 |
| Increase (decrease) in accounts payable, accrued payroll and taxes, and other accrued expenses | 758,191 | (80,783) |
| (Decrease) increase in reserve for self-insurance claims | 284,847 | (617,712) |
| Net change in other assets and liabilities | (1,379,692) | 345,936 |
| Net cash provided by operating activities | 1,420,469 | 3,346,124 |
| **Investing activities** | | |
| Decrease in assets limited as to use | 49,688 | 1,478,578 |
| Purchase of property and equipment additions, net | (974,547) | (1,905,542) |
| Net cash used in investing activities | (924,859) | (426,964) |
| **Financing activities** | | |
| Proceeds from issuance of debt | 6,510,000 | 6,500,000 |
| Payments of debt | (6,930,159) | (8,364,537) |
| Net cash used in financing activities | (420,159) | (1,864,537) |
| Increase in cash and cash equivalents | 75,451 | 1,054,623 |
| Cash and cash equivalents at beginning of year | 1,532,059 | 477,436 |
| Cash and cash equivalents at end of year | $1,607,510 | $1,532,059 |

*See notes to financial statements.*

6

CB     02075

Edgewater Medical Center

Notes to Financial Statements

December 31, 1993

**1. Corporate Structure**

Edgewater Operating Company, d/b/a Edgewater Medical Center (the Medical Center), is an Illinois business corporation established for the purpose of providing health care services. The Medical Center is owned 70% by a primary shareholder and 30% owned by each of the primary shareholder's three children in equal shares which are held in trust. The Medical Center began operations January 21, 1989, when the primary shareholder purchased all the assets and liabilities of The Edgewater Hospital, Inc. The primary shareholder of the Medical Center is also the sole shareholder of the Edgewater Property Company, a related party. Edgewater Property Company's sole business is leasing property to the Medical Center.

**2. Summary of Significant Accounting Policies**

**Depreciation**

Depreciation of property and equipment is provided over the estimated useful lives of the assets using the straight-line method. Useful lives range from two to forty years for building and leasehold improvements and two to twenty years for equipment. One-half year of depreciation is taken in the year of acquisition and in the year of disposal.

**Cash and Cash Equivalents and Assets Limited As To Use**

The Medical Center considers all marketable short-term securities, not otherwise restricted, having an original maturity of 90 days or less to be cash equivalents.

Assets limited as to use, which principally consist of certificates of deposit, are carried at cost, which approximates their fair value.

**Illinois Medicaid Provider Tax**

The Illinois General Assembly enacted a tax for all Illinois hospitals licensed under the Illinois Hospital Licensing Act. The purpose of the tax is to fund the Illinois Medicaid Program. The tax is equal to 1.88% of the Hospital's net patient service revenue, as defined.

7

CB        02076

Edgewater Medical Center

Notes to Financial Statements (continued)

## 2. Summary of Significant Accounting Policies (continued)

Reclassifications

Certain amounts in the 1992 financial statements have been reclassified to conform to the 1993 presentation.

## 3. Revenue

The components of patient service revenue are as follows:

|  | 1993 | 1992 |
|---|---|---|
| Patient service revenue: |  |  |
| Routine revenue | $ 41,018,291 | $ 32,115,695 |
| Ancillary – Inpatient | 97,279,899 | 76,465,083 |
| Ancillary – Outpatient | 28,730,297 | 24,855,529 |
| Gross patient service revenue | 167,028,487 | 133,436,307 |
| Contractual allowances under third-party payor programs | 108,960,855 | 79,979,899 |
| Net patient service revenue | $ 58,067,632 | $ 53,456,408 |

Contractual allowances represent the difference between the Medical Center's standard charges for services and the estimated ultimate payment from the various third-party payors.

The Medicare and Medicaid programs pay the Medical Center for inpatient services at predetermined rates based on treatment diagnosis. Medicare reimbursement for outpatient services is based on allowable costs which are subject to retroactive audit and adjustment. Payment for services provided to Blue Cross program inpatients is based on allowable reimbursable costs which are subject to retroactive audit and adjustment.

Provision has been made in the financial statements for estimated contractual allowances, representing the difference between the Medical Center's standard charges for services and the estimated ultimate payment from the various third-party payors.

8

CB          02077

Edgewater Medical Center

Notes to Financial Statements (continued)

### 3. Revenue (continued)

Gross revenue received related to primary third-party payor programs are as follows:

|  | 1993 | 1992 |
|---|---|---|
| Medicare | $ 93,744,000 | $ 77,526,000 |
| Medicaid | 29,252,000 | 19,714,000 |
| Blue Cross | 6,039,000 | 5,677,000 |
|  | $129,035,000 | $102,917,000 |

Medicare cost reports have been audited by the administering agency and final settlements agreed upon through 1991. Blue Cross cost reports have been reviewed for propriety through 1992 by the administering agency.

### 4. Professional Liability Insurance

Effective October 1, 1989, the Medical Center became self-insured for all future medical malpractice and general liability claims for the first $2,000,000 per claim and $4,000,000 aggregate per year. Professional liability claims above the self-insurance layer, up to a limit of $7,500,000, are covered with purchased insurance.

The reserve for self-insured risks is based on a report of consulting actuaries that is updated annually to reflect the Medical Center's actual experience. The Medical Center is funding its self-insurance liability with Boulevard Bank. The self-insurance trust is currently underfunded by $1,617,000. The Medical Center plans to fund this amount within a period recommended by its consulting actuary.

The Medical Center's accruals for self-insurance expense represent the present value of the estimated liability for asserted and unasserted professional malpractice and patient general liability claims. The undiscounted amount of these claims was $2,207,000 and $1,921,000 at December 31, 1993 and 1992, respectively. The interest rate used to discount these claims was 6% at December 31, 1993 and 1992.

9

CB          02078

Edgewater Medical Center

Notes to Financial Statements (continued)

#### 4. Professional Liability Insurance (continued)

The Medical Center has partial self-insurance and deductible liabilities relating to the liabilities associated with quota-share participation in certain layers of insurance between December 15, 1986, and September 30, 1989, and a deductible of $20,000 per claim for the period October 1, 1988, to September 30, 1989, and "tail" liabilities from December 15, 1986, through September 30, 1989. According to the Medical Center's actuary, the liability for estimated losses for these coverage periods range from $54,000 to $162,000 at December 31, 1993. A reserve of approximately $127,000 has been accrued in the financial statements relating to the tail liability.

It is the opinion of management that the reserve for self-insurance claims and other professional liability reserves at December 31, 1993, is adequate to provide for possible losses resulting from malpractice claims.

#### 5. Deferred Compensation Trust Fund and Obligation

Prior to the change in ownership on January 21, 1989, a nonqualified, deferred compensation program was offered to employees. Due to the Medical Center's tax status as a taxable corporation, the program is no longer offered to employees. Under the purchase agreement, the Medical Center has retained ownership and control of the funds and is liable for payments to participants.

10

CB          02079

Edgewater Medical Center

Notes to Financial Statements (continued)

**6. Long-Term Debt**

The Medical Center's long-term debt consists of the following at December 31:

|  | 1993 | 1992 |
|---|---|---|
| Loan payable to Boulevard Bank, due October 31, 1996, with principal and interest payable in equal monthly installments, interest at .25% above the prime rate (6% at December 31, 1993) | $ 469,345 | $ — |
| Loan payable to Boulevard Bank, due August 31, 1999, with principal and interest payable in equal monthly installments, interest at the prime rate (6% at December 31 1993) | 3,567,241 | — |
| Loan payable to Boulevard Bank, due August 31, 1999, with principal and interest payable in equal monthly installments, interest at .25% above the prime rate (6% at December 31, 1993) | 5,380,813 | 6,229,517 |
| Capital lease obligations | 1,200,124 | 708,237 |
| Insurance premium financing payable | 1,590,134 | 431,184 |
|  | 12,207,657 | 7,368,938 |
| Less – Current portion of insurance premium financing payable | 682,551 | 431,184 |
| Less – Current portion of other long-term debt | 2,026,146 | 1,047,601 |
| Total long-term debt | $9,498,960 | $5,890,153 |

The Medical Center is required to comply with certain restrictive covenants under the existing loan agreements with Boulevard Bank. These covenants require that the Medical Center have a debt service ratio of not less than 1.5 to 1; a current ratio of not less than 1.2 to 1; and that the Medical Center combined with the Edgewater Property Company have retained earnings of not less than $2,000,000 at December 31, 1993, and for each December 31 thereafter that combined retained earning must increase by not less than $2,000,000 over the prior year.

Principal payments will vary with the change in the prime rate. However, future maturities of bank loans will not be less than approximately $1,698,000 in 1994; $1,842,000 in 1995; $1,924,000 in 1996; $1,864,000 in 1997; $1,704,000 in 1998, and $385,000 thereafter. Interest paid during 1993 and 1992 totaled $571,000 and $896,000, respectively.

11

CB          02080

Edgewater Medical Center

Notes to Financial Statements (continued)

### 6. Long-Term Debt (continued)

The Medical Center leases certain equipment under capital leases. Future minimum lease payments under these leases as of December 31, 1993, are as follows:

Year ending December 31:

| | |
|---|---:|
| 1994 | $ 428,650 |
| 1995 | 337,847 |
| 1996 | 337,847 |
| 1997 | 228,389 |
| 1998 | 99,109 |
| Total minimum lease payments | 1,431,842 |
| Less – Amount representing interest | 231,718 |
| Capital lease obligation | $1,200,124 |

The Medical Center has an operating lease agreement to lease the Medical Center premises from the Edgewater Property Company through December 31, 2004. According to the agreement, the annual amount of rent increases shall be 5%. The total amount of rent expense incurred and paid in 1993 and 1992 was $3,183,469 and $3,031,875, respectively.

The Medical Center has a line of credit with Boulevard Bank which provides available credit of up to $1,000,000 as of December 31, 1993 and 1992. At December 31, 1993 and 1992, no amounts were outstanding under these agreements.

The Medical Center has guaranteed the Edgewater Property Company's $2,000,000 term loan in 1993 and 1992. Amounts outstanding under these agreements as of December 31, 1993 and 1992, were $1,678,000 and $1,917,000, respectively.

The Medical Center has obtained irrevocable bank letters of credit guarantees with various companies and various expiration dates. At December 31, 1993 and 1992, outstanding letters of credit were $292,500.

As part of the letters of credit agreements, the Medical Center has an agreement with the bank to keep approximately $297,000 at December 31, 1993 and 1992 in investments on hand as a compensating balance. These investments are reflected under Assets Limited as to Use on the accompanying balance sheet.

12

CB    02081

Edgewater Medical Center

Notes to Financial Statements (continued)

### 6. Long-Term Debt (continued)

The Medical Center entered into a three-year financing agreement with Premium Financing Specialists, Inc., in 1993 in order to finance professional and general liability insurance premiums. The financing is paid in monthly installments through March 30, 1996. The interest rate on this financing is at 5.50%.

### 7. Transactions With Related Parties

Amounts owed by the Medical Center to related parties at December 31 are summarized as follows:

|  | 1993 | 1992 |
|---|---|---|
| Edgewater Property Company loan — 13.5% interest payable monthly, no specific due date for principal (see discussion below related to refinancing) | $— | $4,060,000 |
| Amounts due to related parties | $— | $4,060,000 |

In February 1993, the Medical Center paid the $4,060,000 loan to Edgewater Property Company by refinancing the same loan amount with Boulevard Bank.

The total amount paid in 1993 and 1992 to the primary shareholder's company and other related parties (excluding rent expense, pass-through real estate taxes and payroll-related costs) is as follows:

|  | 1993 | 1992 |
|---|---|---|
| Professional service fees | $560,000 | $520,000 |
| Other | 140,000 | 90,952 |
|  | $700,000 | $610,952 |

13

CB          02082

Edgewater Medical Center

Notes to Financial Statements (continued)

## 8. Pension Plan

The Medical Center sponsors a defined contribution plan covering all full-time employees of Edgewater Medical Center who have 12 consecutive months of service. Employees may elect to defer up to 15% of their base salary. At the discretion of the Medical Center, the Medical Center may elect to match employee contributions for each plan year. No matching contributions were made during 1993 and 1992.

All expenses relating to the operation of the Plan are paid by the Plan. However, various administrative, legal, and accounting services are performed by various Medical Center personnel on behalf of the Plan for which no charges are made to the Plan.

## 9. Subchapter S Election and Income Taxes

The stockholders of the Medical Center have elected under Subchapter S of the Internal Revenue Code to include the Medical Center's income in their own income for federal income tax purposes. Accordingly, the Medical Center is not subject to federal income taxes. The Medical Center continues to be subject to certain state income taxes.

14

CB    02083



ARTHUR
ANDERSEN

ARTHUR ANDERSEN & CO. SC

# EDGEWATER MEDICAL CENTER

**FINANCIAL STATEMENTS**
AS OF DECEMBER 31, 1992 AND 1991
TOGETHER WITH AUDITORS' REPORT

CB          02084

[This page intentionally left blank]

CB          02085

ARTHUR ANDERSEN & CO.

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Shareholders and the Board of Directors of
Edgewater Medical Center:

We have audited the accompanying balance sheets of EDGEWATER MEDICAL CENTER (an
Illinois corporation) as of December 31, 1992 and 1991, and the related
statements of income, shareholders' equity and cash flows for the years then
ended. These financial statements are the responsibility of the Medical Center's
management. Our responsibility is to express an opinion on these financial
statements based on our audits.

We conducted our audits in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements. An audit also includes
assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.
We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all
material respects, the financial position of Edgewater Medical Center as of
December 31, 1992 and 1991, and the results of its operations and its cash flows
for the years then ended, in conformity with generally accepted accounting
principles.

*Arthur Andersen & Co.*

Chicago, Illinois,
March 3, 1993

CB        02086