**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

## Market Share Profile and Trends

No one hospital dominates the Medical Center's market area. Eight hospitals had more than 5 percent market share in 1991, and the highest market share is 14.5 percent, held by St. Francis Hospital. The other two hospitals with the strongest market shares are Swedish Covenant Hospital and Ravenswood Hospital Medical Center, with 10.2 percent each.

The five competitor hospitals in the market area and the Medical Center, the two other Chicago hospitals to the South, and the two Evanston Hospitals, account for 72.4 percent of the area market share.

| Percent Market Area Market Share by Hospital | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1987 | 1988 | 1989 | 1990 | 1991 | Cum. Share | % Chg. 1987-91 |
| **Market Area Hospitals:** | | | | | | | |
| Edgewater Medical Center | 9.7 | 8.1 | 7.8 | 7.5 | 7.7 | 7.7 | -2.0 |
| Louis A. Weiss Hospital | 9.4 | 10.8 | 10.3 | 8.7 | 8.4 | 16.1 | -1.0 |
| Methodist Hosp. of Chicago | 3.2 | 3.9 | 3.2 | 2.5 | 2.4 | 18.4 | -0.8 |
| Ravenswood Hosp. Med. Ctr. | 10.3 | 10.6 | 9.7 | 9.6 | 10.2 | 28.7 | -0.1 |
| Swedish Covenant Hospital | 7.9 | 8.9 | 9.3 | 9.2 | 10.2 | 38.9 | 2.3 |
| Thorek Hosp. & Med. Ctr. | 1.9 | 1.0 | 2.3 | 2.2 | 1.9 | 40.8 | 0.0 |
| Area Hospital Total | 42.4 | 43.3 | 42.6 | 39.7 | 40.8 | — | -1.6 |
| **Other Chicago Hospitals:** | | | | | | | |
| Illinois Masonic Med. Ctr. | 5.1 | 5.6 | 6.0 | 6.8 | 6.9 | 47.7 | 1.8 |
| St. Joseph Hospital | 3.2 | 3.8 | 4.3 | 4.6 | 5.0 | 52.7 | 1.8 |
| **Evanston Hospitals** | | | | | | | |
| Evanston Hospital | 5.0 | 4.5 | 4.7 | 5.1 | 5.2 | 57.9 | 0.2 |
| St. Francis Hospital | 11.4 | 11.5 | 12.9 | 13.8 | 14.5 | 72.4 | 3.1 |
| All Other Hospitals | 32.9 | 31.3 | 29.5 | 30.0 | 27.6 | 100.0 | -5.3 |
| Total Area Patients | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | — | — |
| Source: Illinois Health Care Cost Containment Council, Patient Origin Data Set. | | | | | | | |

48

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

The Medical Center's market share declined between 1987 and 1989, reflecting the Medical Center's prior management and financial difficulties. Since the new ownership and management in 1989, market share gained slightly in 1991. This occurred even though the Medical Center discontinued its obstetrics service in 1990.

During 1993, the Medical Center has experienced a substantial increase in admissions. This increase appears to reflect an increase in market share.

Since the Medical Center competes only for inpatient medical/surgical and critical care patients, a more accurate reflection of its market position is its share of that portion of the hospital inpatient market. It is estimated that the Medical Center's market share of the medical/surgical and critical care market in 1991 is about 11.1 percent. The estimate was derived by subtracting patient admissions for obstetrics/gynecology, pediatrics, psychiatric, and other (such as alcohol/drug abuse) from total admissions based on data on the 10 competitor hospitals (including the Medical Center) with 72.4 percent of the area market share.

### Admissions by Payor

The Medical Center has the highest percentage of Medicare patients (52.8 percent) compared to the area average and to its principal five competitors, as demonstrated in the following table. It has a lower than average percentage (3.2 percent) for HMO contracts, reflecting a decision by the new Medical Center management to discontinue contracts with unfavorable financial terms.

In contrast, Illinois Masonic Hospital has the lowest percentage of Medicare (22.2 percent) and the highest HMO percentage (17.2 percent).

CB      02154

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

| 1991 Payor Source by Hospital | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Market Area | Edgewater | Swedish Covnt. | Louis A. Weiss | Illinois Masonic | Ravens-wood | St. Francis |
| Medicare | 34.0% | 52.8% | 41.5% | 40.7% | 22.2% | 27.0% | 43.3% |
| Medicaid | 13.8% | 18.7% | 12.0% | 13.3% | 24.7% | 25.6% | 18.0% |
| Insurance[a] | 35.1% | 18.5% | 26.4% | 33.8% | 32.1% | 32.6% | 34.7% |
| HMO | 9.6% | 3.2% | 7.5% | 2.9% | 17.2% | 7.7% | 0.0% |
| Self Pay | 3.0% | [b]6.6% | 9.3% | 5.0% | 0.0% | 5.9% | 4.0% |
| Other | 4.5% | 0.2% | 3.3% | 4.3% | 3.8% | 1.2% | 0.0% |
| Total Admissions | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

[a] Includes Blue Cross.
[b] In 1993, Edgewater Medical Center's Self Pay percentage decreased to 3.5 percent.
Source: Illinois Health Care Cost Containment Council, Quarterly Reports, and Hospital Records.

CB    02155

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

## MEDICAL STAFF

The composition of the medical staff is a significant factor in evaluating the future utilization of the Medical Center. The major characteristics of medical staff composition are examined below.

### Residency Programs

The Medical Center's Internal Medicine Residency Program has 21 residents, and is affiliated with the University of Illinois. The Medical Center has also entered into an arrangement with the University of Illinois for residencies in Pathology, Neurology, Emergency Medicine, and Vascular Surgery. These additional residencies strengthen the Hospital's Internal Medicine Residency Program, and are an attractive feature for recruiting medical staff.

The Medical Center also established a Podiatric Surgical Residency Program in January, 1991. This program is in affiliation with the Council of Podiatric Medicine, and currently has six residents. This residency program recently received full accreditation.

### Staff Status Definitions

The Medical Center medical staff privilege categories are as follows:

- **Courtesy Physician,** includes all physicians who have been members of the medical staff for less than two years.

- **Associate Physician,** includes those physicians who have been on staff for more than two years and are being considered for advancement to membership on the Attending Staff. Except for medical staff Executive Committee and the Credentials Committee, Associate Staff may serve on department or staff committees and vote on matters before their committees and on medical staff matters.

51

CB     02156

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

- Attending Physician, includes those physicians who have been on staff for more than five years and are those who reside in the area, are eligible to vote, hold office, and serve on medical committees. They may attend patients in the Medical Center and act on all committees.

- Consulting Physician, includes those physicians who are recognized for their professional ability, but are not members of any other category. They may provide consultation to patients at the request of any practitioner who has privileges at the Medical Center. They are not required to attend meetings of particular departments of the medical staff, but may attend if they choose to do so.

The significant and highly successful recruitment of physicians to the Medical Center accounts for the preponderance of physicians in this category.

## Staff Status Profile

| Medical Staff Status Profile | | | |
|---|---|---|---|
| Category | Number of Physicians | Percent of 1992 Admissions | Percent of 1993 Admissions[a] |
| | | | |
| Attending[b] | 60 | 41.8 | 34.5 |
| Associate | 40 | 10.9 | 8.6 |
| Courtesy | 224 | 46.9 | 56.5 |
| Other[c] | 24 | 0.4 | 0.4 |
| Total | 348 | 100.0 | 100.0 |

[a] Based upon six months: January to June, 1993.
[b] Includes Senior Attending.
[c] "Other" includes Consulting, Emeritus, and Affiliate.
Source: Hospital Records.

52

CB    02157

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

Courtesy Staff admissions account for more than half the admissions in the first six months of 1993, and grew by 40 percent from the comparable period in 1992, reflecting the ongoing recruitment of new physicians. Since Courtesy Staff at the Medical Center includes all the newer members of the staff who will eventually become eligible for associate and attending status, this category plays an important role in the Medical Center's future utilization.

## Active Staff Profile

Medical staff considered to be active are those physicians who admit patients to the Medical Center, perform procedures, or act as a consultant in a case. Active staff, such as surgical subspecialists and consulting staff, play an important role in medical care at the Medical Center, even though they are often not the admitting physician of record. About 59 percent of the total medical staff at the Medical Center are categorized as Active. Two-thirds of the active staff are Board Certified, and their average age is 46.8 years.

| Active Staff Profile by Specialty (continued) | | | |
|---|---|---|---|
| Category | Number of Physicians | Board Certified Physicians | Average Age |
| Anesthesiology | 3 | 1 | 48.3 |
| Cardiology | 7 | 6 | 44.9 |
| Cardiovascular Thoracic Surgery | 5 | 5 | 55.0 |
| Chiropractic Medicine | 1 | 0 | 42.0 |
| Dentistry | 1 | 0 | 41.0 |
| Dermatology | 1 | 1 | 46.0 |
| Endocrinology | 2 | 2 | 49.0 |
| Family Practice | 21 | 6 | 51.8 |
| Gastroenterology | 6 | 5 | 50.3 |
| Hematology/Oncology | 3 | 3 | 47.0 |

CB       02158

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

| Active Staff Profile by Specialty (continued) | | | |
|---|---|---|---|
| Category | Number of Physicians | Board Certified Physicians | Average Age |
| Infectious Disease | 3 | 3 | 36.3 |
| Internal Medicine | 44 | 24 | 46.8 |
| Nephrology | 2 | 2 | 44.5 |
| Neurology | 9 | 8 | 47.8 |
| Neurosurgery | 2 | 2 | 58.0 |
| Obstetrics/Gynecology | 7 | 7 | 54.6 |
| Opthahlmology | 6 | 6 | 44.5 |
| Oral/Maxillofacial Surgery | 1 | 1 | 47.0 |
| Orthopedic Surgery | 10 | 7 | 43.5 |
| Otorhinolaryngology | 1 | 1 | 47.0 |
| Pathology | 1 | 1 | 37.0 |
| Pediatrics | 1 | 1 | 66.0 |
| Plastic Surgery | 1 | 1 | 52.0 |
| Podiatry | 34 | 19 | 37.3 |
| Psychiatry | 4 | 3 | 64.0 |
| Pulmonary Disease | 1 | 1 | 44.0 |
| Radiation Oncology | 2 | 2 | 48.5 |
| Radiology | 3 | 2 | 47.7 |
| Rheumatology | 1 | 1 | 42.0 |
| Surgery | 14 | 10 | 50.1 |
| Urology | 4 | 4 | 57.8 |
| Vascular Surgery | 2 | 2 | 42.5 |
| Vascular Thoracic Surgery | 2 | 2 | 52.5 |
| **Total** | **205** | **139** | **46.8** |

Source: Hospital Records.

54

CB        02159

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

<u>**Admitting Staff Profile**</u>

| Admitting Staff Profile by Specialty | | | |
|---|---|---|---|
| Category | Number of Physicians | Board Certified Physicians | Average Age | Percent of 1992 Admissions |
| Cardiology | 11 | 10 | 45.8 | 7.6 |
| Cardiovascular Thoracic Surgery | 1 | 1 | 60.0 | 1.0 |
| Endocrinology | 2 | 2 | 49.0 | 1.3 |
| Family Practice | 24 | 6 | 51.0 | 11.5 |
| Gastroenterology | 4 | 3 | 46.8 | 0.5 |
| Hematology/Oncology | 3 | 3 | 51.7 | 0.6 |
| Internal Medicine | 47 | 24 | 47.4 | 67.4 |
| Nephrology | 4 | 4 | 45.5 | 0.5 |
| Neurology | 1 | 1 | 52.0 | 0.1 |
| Neurosurgery | 1 | 1 | 62.0 | 0.0 |
| Obstetrics/Gynecology | 7 | 6 | 54.0 | 1.4 |
| Ophthalmology | 4 | 4 | 44.0 | 0.6 |
| Orthopedic Surgery | 11 | 7 | 43.1 | 2.4 |
| Otolaryngology (ENT) | 1 | 1 | 47.0 | 0.0 |
| Physical Medicine/Rehabilitation | 1 | 0 | 69.0 | 0.0 |
| Plastic Surgery | 1 | 1 | 52.0 | 0.0 |
| Podiatry | 18 | 13 | 39.8 | 1.0 |
| Psychiatry | 1 | 0 | 46.0 | 0.2 |
| Pulmonary Disease | 1 | 1 | 44.0 | 0.2 |
| Radiation Oncology | 1 | 1 | 47.0 | 0.0 |
| Surgery | 12 | 9 | 52.7 | 3.2 |
| Urology | 3 | 3 | 55.0 | 0.2 |
| Vascular Thoracic Surgery | 2 | 2 | 52.5 | 0.1 |
| **Total** | **161** | **103** | **47.8** | **100.0** |
| Source: Hospital Records. | | | | |

The profile of admitting physicians by specialty shows both the importance of general medicine in total admissions and the wide range of specialties active on the medical staff.

55

CB      02160

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

Board Certification is also an indicator of the qualifications of the medical staff. As shown on the previous page, about 64 percent of the Hospital's admitting staff are Board Certified, which is comparable to the national average of 66 percent, as published by the American Board of Medical Specialties in Chicago, Illinois.

## Age Distribution Analysis

The average age of the top admitters is 47.8 years. The table on the age distribution of the admitting medical staff is well distributed among age groups, and about 80 percent of Hospital admissions in 1992 were attributable to physicians under 55 years of age. Also, almost half of the admissions are attributable to physicians under 44 years of age. Physicians in this age group are still in the practice building stage of their professional life, and are likely to increase their admissions as their practices grow.

| Profile of 1992 Admitting Physicians and Admissions by Age Group | | | |
|---|---|---|---|
| | Admitting Physicians | Percent of Admissions | Cumulative Percent |
| Less Than 35 Years | 6 | 0.3% | 0.3% |
| 35-44 Years | 60 | 49.0% | 49.3% |
| 45-54 Years | 63 | 30.3% | 79.6% |
| 55-64 Years | 19 | 12.4% | 92.0% |
| 65+ Years | 13 | 8.0% | 100.0% |
| Total | 161 | 100.0% | |
| Source: Hospital Records. | | | |

56

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

Profile of Highest Admitting Physicians

The profile of highest admitting physicians shows that about 24 percent (39 out of 161) of the admitting physicians account for 80 percent of total admissions. This ratio is comparable to many institutions, and indicates that there is not an over-reliance on one or a few physicians for admissions.

| | Profile of Highest Admitting Physicians (continued) | | | |
|---|---|---|---|---|
| Rank | Specialty | 1992 Admissions | Percent of Total | Cumulative Percent |
| 1 | Internal Medicine | 311 | 6.7 | 6.7 |
| 2 | Internal Medicine | 211 | 4.6 | 11.3 |
| 3 | Internal Medicine | 198 | 4.3 | 15.6 |
| 4 | Internal Medicine | 153 | 3.3 | 18.9 |
| 5 | Internal Medicine | 152 | 3.3 | 22.2 |
| 6 | Internal Medicine | 148 | 3.2 | 25.4 |
| 7 | Internal Medicine | 147 | 3.2 | 28.6 |
| 8 | Internal Medicine | 133 | 2.9 | 31.5 |
| 9 | Internal Medicine | 128 | 2.8 | 34.3 |
| 10 | Internal Medicine | 121 | 2.6 | 36.9 |
| 11 | Internal Medicine | 117 | 2.5 | 39.5 |
| 12 | Internal Medicine | 107 | 2.3 | 41.8 |
| 13 | Internal Medicine | 96 | 2.1 | 43.9 |
| 14 | Internal Medicine | 93 | 2.0 | 45.9 |
| 15 | Internal Medicine | 92 | 2.0 | 47.9 |
| 16 | Internal Medicine | 91 | 2.0 | 49.8 |
| 17 | Internal Medicine | 88 | 1.9 | 51.8 |
| 18 | Family Practice | 87 | 1.9 | 53.6 |

CB          02162

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

**Profile of Highest Admitting Physicians**
**(continued)**

| Rank | Specialty | 1992 Admissions | Percent of Total | Cumulative Percent |
|------|-----------|-----------------|------------------|--------------------|
| 19 | Family Practice | 86 | 1.9 | 55.5 |
| 20 | Cardiology | 84 | 1.8 | 57.3 |
| 21 | Family Practice | 83 | 1.8 | 59.1 |
| 22 | Cardiology | 83 | 1.8 | 60.9 |
| 23 | Cardiology | 79 | 1.7 | 62.6 |
| 24 | Internal Medicine | 72 | 1.6 | 64.2 |
| 25 | Family Practice | 71 | 1.5 | 65.7 |
| 26 | Family Practice | 65 | 1.4 | 67.2 |
| 27 | Cardiology | 65 | 1.4 | 68.6 |
| 28 | Internal Medicine | 64 | 1.4 | 70.0 |
| 29 | Internal Medicine | 58 | 1.3 | 71.2 |
| 30 | Internal Medicine | 49 | 1.1 | 72.3 |
| 31 | Cardiovascular Thoracic Surgery | 44 | 1.0 | 73.2 |
| 32 | Orthopedic Surgery | 43 | 0.9 | 74.2 |
| 33 | Internal Medicine | 41 | 0.9 | 75.1 |
| 34 | Internal Medicine | 40 | 0.9 | 75.9 |
| 35 | Surgery | 39 | 0.8 | 76.8 |
| 36 | Endocrinology | 38 | 0.8 | 77.6 |
| 37 | Internal Medicine | 38 | 0.8 | 78.4 |
| 38 | Internal Medicine | 38 | 0.8 | 79.2 |
| 39 | Obstetrics/Gynecology | 36 | 0.8 | 80.0 |

Source: Hospital Records.

58

CB        02163

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

## Sources of Growth in Admissions

The growth in admissions during the first six months of 1993 grew substantially from the comparable period of 1992. The table comparing 1992 and 1993 for these months shows that the increase is attributable to increases from Courtesy Physicians, the Senior Program, and the Residency Program. These are three areas of Program Initiative emphasis being pursued by the Hospital.

| Comparison of 1992 and 1993 Admissions | | | | | |
|---|---|---|---|---|---|
| | Number of Physicians | | Number of Admissions | | 1992-1993 Change |
| | 1992 | 1993 | 1992 | 1993 | |
| Attending[a] | 43 | 39 | 1,038 | 911 | -127 |
| Associate | 23 | 24 | 272 | 228 | -44 |
| Courtesy | 66 | 65 | 1,072 | 1,493 | 421 |
| Other[b] | 3 | 4 | 36 | 22 | -14 |
| Total | 135 | 132 | 2,418 | 2,654 | 236 |
| Senior Program | -- | -- | N/A | 255 | 255 |
| Residency Program | -- | -- | 447 | 528 | 81 |
| Total[c] | | | 2,865 | 3,437 | 572 |

[a] Includes Senior Attending.
[b] Includes Affiliate, Consulting, and Emeritus.
[c] First six months of each year.
Source: Hospital Records.

59

CB          02164

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

## HISTORICAL AND FORECASTED UTILIZATION

The projections of inpatient utilization at the Medical Center integrates market area population projections with principal factors affecting future utilization, including:

- Projected admissions per 1,000 population.

- Projected total market area admissions.

- Projected Medical Center market share.

- Projected Medical Center average length of stay.

Projections of Medical Center's market share are based on a combination of historical trends, recent changes, and program initiatives. Recent changes and program initiatives are particularly important for the Medical Center because of the recent change in ownership and management in 1989.

Projected ancillary service workloads are also included in the analysis.

### Historical Trends

Historical trends for the Medical Center reflect its recent experience of "turnaround" after new management and ownership in 1989. Overall patient days and admissions declined after a financially troubled 1988. This was reported by current management to reflect actions taken to improve the payor mix of patients and return the Hospital to a profitable position, including the discontinuation of the obstetric service in May, 1990.

The sharp increase in admissions in 1993 is believed to be the result of specific ongoing program initiatives started by management to improve the Medical Center's competitive position and profitability.

60

CB      02165

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

| Summary of Hospital Beds and Utilization: 1988-1993 | | | | | |
|---|---|---|---|---|---|
| Year | Beds[a] | Admissions | Patient Days | Average Census | Pct. Occupancy |
| 1988 | 178 | 6,528 | 41,219 | 112.9 | 64.3% |
| 1989 | 152 | 6,361 | 42,277 | 115.8 | 76.2% |
| 1990 | 137 | 5,139 | 37,249 | 102.1 | 74.9% |
| 1991 | 137 | 5,371 | 42,083 | 115.3 | 84.2% |
| 1992 | 162 | 5,289 | 44,761 | 122.6 | 75.7% |
| 1993 | 175 | 6,637 | 53,352 | 146.1 | 83.5% |

[a] Staffed and available. The Hospital has 335 licensed beds, and can increase the number of beds available to 200 without additional construction cost.

Source:  Hospital records.

A summary of utilization trends, with detail and medical/surgical shown separately, is presented in the following table.

61

CB      02166

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

| Edgewater Medical Center Admission Trends | | | |
|---|---|---|---|
| Year | Medical/Surgical | Obstetrics | Total |
| 1988 | 5,741 | 787 | 6,528 |
| 1989 | 5,537 | 824 | 6,361 |
| 1990[a] | 4,808 | 331 | 5,139 |
| 1991 | 5,371 | — | 5,371 |
| 1992 | 5,289 | — | 5,289 |
| Percent Change: 1988-1992 | -7.9% | — | -19.0% |
| 1993 | 6,637 | — | 6,637 |
| Percent Change: 1992-1993 1988-1993 | 24.5% 14.7% | — — | 24.5% 0.9% |

[a]  Obstetrics was discontinued in May, 1990.

Source:  Hospital records.

## Average Length of Stay

Average length of stay (ALOS) increased substantially in the 1989 to 1992 period, but has remained relatively constant in the first part of 1993. One cause of the increased length of stay is increased acuity. The Medicare case mix index for the Hospital increased from 1.31 to 1.45 in the period.

| Average Length of Stay: 1988-1993 | | | | | | |
|---|---|---|---|---|---|---|
| | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 |
| Medical/Surgical[a] | 6.79 | 7.24 | 7.57 | 7.84 | 8.46 | 8.02 |
| Obstetrics | 2.81 | 2.67 | 3.11 | n.a. | n.a. | n.a. |
| All Services | 6.31 | 6.65 | 7.28 | 7.84 | 8.46 | 8.04 |

[a]  Includes Critical Care.

Source:  Hospital Records.

62

CB      02167

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

As a result of the increasing average length of stay over the 1988 to 1992 period, the number of patient days increased, even though admissions declined.

| Historical Patient Days | |
|---|---|
| Year | Patient Days |
| 1988 | 41,219 |
| 1989 | 42,277 |
| 1990 | 37,429 |
| 1991 | 42,083 |
| 1992 | 44,761 |
| 1993 | 53,352 |
| Percent Change | 27.6% |

Source:   Hospital Records.

The payor mix distribution trend shows increases in Medicare and Medicaid, with decreases in Self-Pay, Blue Cross, and Commercial Insurance.

| Distribution of Patients by Payor Source | | | | | | |
|---|---|---|---|---|---|---|
| | 1988 | 1989 | 1990 | 1991 | 1992 | Pct. Change 1988-1992 |
| Medicare | 41.3% | 42.8% | 48.5% | 52.7% | 52.2% | (a)10.9% |
| Blue Cross | 7.5% | 7.0% | 6.0% | 5.6% | 4.4% | -3.1% |
| Medicaid | 19.7% | 19.5% | 18.8% | 18.7% | 22.4% | 2.7% |
| Commercial Insurance | 17.4% | 16.8% | 16.5% | 12.9% | 10.8% | -6.6% |
| Self Pay | 10.2% | 8.8% | 3.5% | 4.2% | 4.9% | -5.3% |
| Worker Compensation | 0.4% | 0.6% | 0.5% | 0.4% | 0.8% | 0.4% |
| HMO | 3.5% | 4.5% | 3.5% | 3.2% | 3.3% | -0.2% |
| Other | 0.0% | 0.0% | 2.4% | 2.3% | 1.2% | 1.2% |
| **Total** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 0.0% |

(a)   Large percentage change reflects the discontinuation of obstetrics within a non-Medicare service.
Source:   Hospital Records.

CB      02168

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

Four services at the Medical Center account for more than 95 percent of all patients: General Medicine, General Surgery, Cardiology, and Orthopedics. In the 1990 to 1992 period, growth has occurred in Surgery, Cardiology, and Orthopedic services,

| Service | 1990 | 1991 | 1992 | Pct. Dist. | Cum. Pct. | Pct. Chg. 1990-1992 |
|---|---|---|---|---|---|---|
| Medicine | 3,870 | 3,907 | 3,820 | 72.2% | 72.2% | -1.3% |
| Surgery | 367 | 679 | 768 | 14.5% | 86.7% | 109.3% |
| Cardiology | 286 | 398 | 340 | 6.5% | 93.2% | 18.9% |
| Orthopedics | 91 | 132 | 154 | 2.9% | 96.1% | 69.2% |
| Other[b] | 525 | 255 | 207 | 3.9% | 100.0% | -60.5% |
| **Total** | **5,139** | **5,371** | **5,289** | **100.0%** | — | **2.9%** |

Patients by Service[a]

[a] Comparable data not available for 1988 and 1989 due to change in information system.
[b] Includes Gynecology, Obstetrics, Cardiovascular Surgery, Urology, and "Other".
Source: Hospital records.

## Outpatient Utilization

In the 1990 to 1992 period, for which there is comparable data available on ancillary services, emergency room visits declined -15.2 percent and ambulatory surgery cases increased by 12.5 percent. Outpatient utilization of other ancillary services increased 7.2 percent overall in this period, with the largest increases occurring in Cardiology, Laboratory, and Cardiac Catheterization.

CB       02169

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

| Ancillary Service Outpatient Utilization[a] | | | | |
|---|---|---|---|---|
| Service | 1990 | 1991 | 1992 | Pct. Chg. 1990-1992 |
| Emergency Room Visits | 14,763 | 13,940 | 12,521 | -15.2% |
| Ambulatory Surgery Cases | 1,929 | 2,078 | 2,170 | 12.5% |
| **Outpatient Ancillary Services:** | | | | |
| Laboratory Tests | 58,011 | 66,025 | 66,025 | 13.8% |
| Diagnostic Radiology Exams[b] | 15,140 | 16,768 | 16,122 | 6.5% |
| Cardiac Cath Procedures | 772 | 972 | 862 | 11.7% |
| Cardiology Procedures | 3,157 | 3,736 | 4,078 | 29.2% |
| Neurodiagnostic Procedures | 155 | 96 | 132 | -14.8% |
| Respiratory Therapy Procedures | 4,875 | 4,849 | 2,139 | -56.1% |
| Pulmonary Function Procedures | 2,253 | 2,406 | 1,794 | -20.4% |
| Rehab Service Treatments | 6,701 | 4,800 | 6,488 | -3.2% |
| **Total Outpatient Ancillary Services** | **91,064** | **99,652** | **97,640** | **7.2%** |

[a] Comparable data not available for 1988 and 1989 due to change in information system.
[b] Includes General Radiology and Fluoroscopy, Ultrasound, CT Scans, and Angiography.
Source: Department statistics.

65

CB    02170

Northside Operating Company
Methodology for Forecasting Demand for Services

## PROGRAM INITIATIVES

Specific program initiatives started by the new Medical Center management, as part of its actions to improve the Medical Center's competitive position and profitability, are summarized below.

### Medical Staff Recruitment and Retention

The medical staff is the bridge between the Medical Center and the communities it serves. To strengthen its medical staff, the Medical Center is pursuing actions to both recruit quality physicians and to retain physicians on its medical staff.

#### Recruitment

The Medical Center's recruitment strategy has been to emphasize recruitment of primary care physicians who have established practices in the area, who are providing quality care, and who maintain a practice base with an attractive payor mix. The Medical Center also identifies promising residents from the Internal Medicine Residency Program, and assists them in building their practices. Nurturing new residents produces long-term benefits and provides for a balanced medical staff age distribution. Specialists are recruited based upon needs identified in each clinical area and to enhance the comprehensive range of services offered at the Medical Center. Recruitment efforts have already produced measurable results. The average age of the medical staff has dropped from 55 years old in 1988 to its present average of 46 years. More than 21 percent of the Medical Center's 1992 admissions were attributed to the 54 physicians who have been recruited since 1990.

#### Retention

Retention activities include the availability of a Physician Benefit Package developed by the Medical Center, which includes group purchasing advantages and discounts on equipment. The Vice President of Marketing and Medical

66

CB        02171

Northside Operating Company
Methodology for Forecasting Demand for Services

Staff Development acts as liaison to the medical staff and works personally with individual physicians to resolve any medical staff concerns or dissatisfactions. Workshops for medical staff office personnel on various practice management topics are also offered by the Hospital as part of its retention program.

## Senior Citizen Programs

### Senior Program

The Senior Program was established in concert with the Chicago Housing Authority in July, 1992. It provides a community service for a segment of the population which has not received adequate medical care in the past. Seniors are provided screening programs at various senior housing facilities throughout Chicago. Screenings include cholesterol, blood pressure, and diabetes. Senior residents are referred to the Medical Center's outpatient center for further care and physician consultation, as needed. This program has resulted in 134 admissions in 1992, and 170 admissions in the four months of January through April, 1993. The program was expanded in June, 1993, by offering physician services on-site in the various housing facilities.

### Premier Years

The Premier Years program is a Medical Center-sponsored membership program for persons over 55 years of age. This program was established in October, 1988, with 980 enrollees in its initial year. The Premier Years program enrollment has expanded to 2,786 in February, 1993. This program focuses on attracting the membership of persons who have not previously utilized the Medical Center to make them aware of the various services offered by the Hospital. Premier Years members generated $3,973,879 of gross revenue in 1992, with $2,315,572 of this revenue coming from members without prior use of the Medical Center's services.

67

CB     02172

Northside Operating Company
Methodology for Forecasting Demand for Services

## Managed Care Contracting

The Medical Center is placing increased emphasis on managed care contracting, and it now has a full-time employee to coordinate contracting services. The Medical Center's goal is not solely to increase the volume of contracts, but rather to develop contracts with quality organizations which lead to long-term mutually beneficial relationships. With the recent merger of Share Health Plan of Illinois and Chicago HMO, the Medical Center, which already contracts with Chicago HMO, will gain access to Share Health Plan's membership. A contract with a major managed care organization was recently finalized in mid-1993. The Medical Center is also involved in establishing a network with various community hospitals and a major teaching hospital, which will act as the anchor, to conduct direct contracting.

## Hispanic Community Marketing

The Medical Center has identified the Hispanic community as a target market segment. This segment of the population has grown from 12 percent to more than 19 percent of market area population in recent years. As part of its marketing effort, the Medical Center has recruited Hispanic physicians to increase penetration into this market segment. Recently, an Hispanic physician on staff has established office hours at the Itasca Industrial Medicine Center to attract Spanish-speaking patients in the northwest suburbs. An Hispanic physician, recently recruited, has already admitted 125 patients to the Medical Center in the first four months of 1993.

## Industrial Medicine and Practice Development

The Medical Center has recruited an orthopedic surgeon who operates an Industrial Medicine Center. The industrial medicine center has more than 1,200 companies under contract for industrial and occupational medicine services. An internal medicine specialist from the Medical Center's medical staff has also recently been located on this site, creating a multi-specialty group practice. The Medical Center has benefitted from this relationship with increased admissions and surgeries. The industrial medicine center also offers an opportunity to further expand services through direct contracting.

68

CB     02173

Northside Operating Company
Methodology for Forecasting Demand for Services

## Physician Group Networks

### Chicago IPA

The Medical Center has close ties with Chicago IPA, the largest IPA in Chicago. Chicago IPA has been in existence for over ten years and has its headquarters located in the Medical Center's professional building. The close relationship between the Medical Center and Chicago IPA provides an attractive avenue for further entry into managed care contracting.

### Group Practice Development

The Medical Center is developing "group without walls" multi-specialty groups by networking primary care physicians located in office sites throughout the market area with specialist physicians concentrated in the Medical Center's professional building. This strategy enables the patients easy access to primary care physicians in their neighborhoods with referrals to specialists with convenient access to high-tech inpatient and outpatient services located at the Medical Center.

## Newcomer's Program and Physician Referral

The community served by the Medical Center has become very attractive to young home buyers due to excellent transportation, the diverse stock of housing available, the lake-front location, and quality parks and beaches. The average selling price for a home in the Edgewater community rose by 33 percent from 1990 to 1991, the fourth largest increase among 20 communities in Chicago. There is a significant housing diversity in the Edgewater community, with the eastern section containing large courtyard buildings and high-rises, and the western section containing bungalows, Victorian homes, and two and three-flat buildings. "Rehabbers" have returned many of the vintage apartment buildings to their former glory.

69

CB      02174

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

To take advantage of these demographic trends, the Medical Center distributes a newcomers's packet of information, introducing new residents in the area to the Medical Center. Approximately 300 to 400 information packets are mailed out each month. The Newcomer's Program provides the Medical Center with exposure to new residents moving into the community, and encourages the newcomer's to call the Medical Center's Physician Referral Service to learn more about physicians on staff and the Medical Center's services.

<u>Transportation Services</u>

The Medical Center provides a full range of transportation services to patients. A Van Service provides transportation to those patients within the Medical Center's service area. Limousine Service is offered to those who are outside the service area, and the Hospital has made arrangements with an ambulance service to accept patient's insurance coverage for payment. These comprehensive transportation services provide patients with better access to the Medical Center. These services are especially beneficial to same-day surgery patients scheduled for outpatient tests.

<u>Housing</u>

Furnished apartments are available to patients who wish to stay at the Medical Center before outpatient testing or same-day surgery. These extra services have contributed to the 22 percent increase in same day surgery experienced from 1990 to 1991. These apartments are also available for family members of patients who are inpatients. This amenity is especially useful for family members who are from out of town.

70

CB      02175

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

## PROJECTED UTILIZATION

Projected area utilization and projected Medical Center utilization focuses only on Medical/Surgical utilization, including Critical Care, since this is the principal inpatient service offered by the Medical Center.

### Area Admissions Per 1,000 Population

In the 1993 to 1998 period, overall Hospital admissions per 1,000 population are projected to decrease by 4.0 percent, going from 125.0 in 1993 to 121.0 in 1998. The rate per 1,000 for Medical/Surgical patients is projected to decline in proportion to the overall rate per 1,000.

| Area Admissions Per 1,000 Population: 1993-1998 | | | | | | |
|---|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
| Overall Rate | 125.0 | 124.2 | 123.4 | 122.6 | 121.8 | 121.0 |
| Medical/Surgical Rate[a] | 108.9 | 108.2 | 107.5 | 106.7 | 106.0 | 105.3 |
| [a] Based on population 15+ years of age, includes Critical Care. | | | | | | |

This projected decline is comparable to what occurred in the 1987 to 1991 period, and is based on a trend line to fit the data for those years. Downward pressure on the admission rate is expected to continue; however, the potential effects of improved access from possible health care reforms is a major unknown at this time.

### Area Admissions

Projected area Medical/Surgical admissions per 1,000 (-3.6 percent) combined with the projected population for the 15+ age group, gives a projected increase in area admissions of 1.3 percent for the 1993 to 1998 period, compared to the projected growth for the 15+ area population of 4.8 percent.

71

CB          02176

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Pct. Change 1993-98 |
|---|---|---|---|---|---|---|---|
| **Area Medical/Surgical Admission Projections** | | | | | | | |
| Area Population (15+ Years of Age) | 282,929 | 285,620 | 288,311 | 291,002 | 293,693 | 296,384 | 4.8% |
| Area Admissions/ 1,000 Population[a] | 108.9 | 108.2 | 107.5 | 106.7 | 106.0 | 105.3 | -3.6% |
| Area Admissions[a] | 30,813 | 30,899 | 30,982 | 31,061 | 31,137 | 31,209 | 1.3% |

[a] Medical/Surgical, including Critical Care.

## Hospital Admissions

Projected admissions for the Medical Center are based on its projected market share of area Medical/Surgical admissions, plus the estimated percent of total admissions coming from out of the area. With the increase in 1993 admissions, it is estimated that the Medical Center's area market share will increase by more than 2 percent from 1992 to 1993. Based on the Medical Center's program initiatives described in this report, a further increase in projected market share is indicated. For the purposes of the forecasts, it is assumed that future market share increases from 1993 to 1998 will be less than one-half percent per year (0.3 percent). This produces a cumulative market share increase of 1.5 percent for the entire 1993 to 1998 period, and 1.6 percent for the 1994 to 1998 forecast period.

For forecasting purposes, the percentage of Medical Center patients from outside its market area is held constant at the 1991 value of 37.2 percent. It is, however, likely that this percentage will grow in the future due to the Medical Center's program initiatives that will draw more patients from out of the area, including:

- The Senior Citizen Programs providing referrals from housing facilities throughout the city and county.

- Increased managed care contracting.

72

CB    02177

Northside Operating Company
Methodology for Forecasting Demand for Services

- Hispanic community marketing in the northwest suburbs.

- Physician group networks.

- Transportation services.

| Projected Hospital Admissions: 1994-1998 | | | | | |
|---|---|---|---|---|---|
| | 1994[b] | 1995 | 1996 | 1997 | 1998 |
| Medical/Surgical | 6,730 | 6,874 | 7,018 | 7,162 | 7,305 |
| In Area | 4,227 | 4,317 | 4,407 | 4,498 | 4,588 |
| Out of Area[a] | 2,503 | 2,557 | 2,611 | 2,664 | 2,717 |

[a] Based on a projected 32.7 percent of admissions.
[b] 1994 Annualized forecasted data.

**Length of Stay and Patient Days**

Average length of stay is projected to decline from 8.04 days in 1993, based on the first nine months, to 7.30 days by 1995. There are two principal anticipated sources of this decline in average length of stay. First, there are plans to more aggressively manage "outliers" through transfers to sub-acute settings. Second, increased admissions from managed care and commercial insurance will serve to reduce the proportion of Medicare patients and reduce the acuity level. The projected average length of stay and the corresponding projected patient days and average daily census are shown below.

73

CB     02178

**Northside Operating Company**
**Methodology for Forecasting Demand for Services**

| Projected Length of Stay and Patient Days | | | | | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 | 1998 |
| Average Length of Stay | 7.80 | 7.30 | 7.20 | 7.10 | 7.00 |
| Patient Days | 52,494 | 50,180 | 50,530 | 50,850 | 51,135 |
| Average Daily Census | 143.8 | 137.5 | 138.4 | 139.3 | 140.1 |

### Outpatient Utilization

A summary of projected outpatient utilization of ancillary services is presented below. The forecasts are based on recent trends at the Hospital and expected impacts of program initiatives. For this same period, the corresponding increase in projected admissions is 17.6 percent.

| Projected Ancillary Service Outpatient Utilization (continued) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1993[a] | 1994 | 1995 | 1996 | 1997 | 1998 | Pct. Chg. 1993-98 |
| Emergency Room Visits | 13,010 | 12,578 | 12,162 | 11,762 | 11,376 | 11,000 | -15.5% |
| Ambulatory Surgery Cases | 2,397 | 2,465 | 2,536 | 2,611 | 2,690 | 2,772 | 15.6% |
| **Outpatient Ancillary Services:** | | | | | | | |
| Laboratory Tests | 73,247 | 75,640 | 78,153 | 80,803 | 83,592 | 86,501 | 18.1% |
| Diagnostic Radiology Exams[b] | 17,468 | 17,617 | 17,778 | 17,951 | 18,137 | 18,330 | 4.9% |
| Cardiac Cath Procedures | 950 | 974 | 999 | 1,026 | 1,054 | 1,084 | 14.1% |
| Cardiology Procedures | 4,682 | 4,975 | 5,263 | 5,546 | 5,826 | 6,100 | 30.3% |
| Neurodiagnostic Procedures | 143 | 144 | 146 | 147 | 149 | 150 | 4.8% |

74

Northside Operating Company
Methodology for Forecasting Demand for Services

| Projected Ancillary Service Outpatient Utilization (continued) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1993[a] | 1994 | 1995 | 1996 | 1997 | 1998 | Pct. Chg. 1993-98 |
| Respiratory Therapy Procedures | 2,279 | 2,261 | 2,244 | 2,228 | 2,214 | 2,200 | -3.5% |
| Pulmonary Function Procedures | 1,793 | 1,663 | 1,536 | 1,413 | 1,293 | 1,176 | -34.4% |
| Rehab Service Treatments | 6,809 | 6,651 | 6,500 | 6,536 | 6,217 | 6,083 | -10.7% |
| Total Outpatient Ancillary Services | 107,372 | 109,926 | 112,618 | 115,469 | 118,481 | 121,623 | 13.3% |

[a]  Based on the first nine months of 1993.
[b]  Includes General Radiology and Fluoroscopy, Ultrasound, CT Scans, and Angiography.
Source:  Hospital records on department statistics.

75

CB     02180

Northside Operating Company
Methodology for Forecasting Demand for Services

## IMPACT OF NATIONAL HEALTH CARE REFORM

During October, 1993, President Clinton submitted to Congress for its consideration the Health Security Act of 1993 (the "Act"). Additionally, alternative legislation has been introduced by various members of Congress. The objective of the Act and such other proposed legislation is to significantly alter the health care delivery system nationally. As of the date of this report, Congress is actively reviewing and drafting health care reform legislation. This legislation is intended to directly impact the core elements of the nation's health care delivery system including access, benefits, financing, plan management and implementation.

The various legislative proposals vary widely in how changes in the above key elements will be mandated. The issues which represent the area of significant differences in the proposals include:

- Definition of universal coverage
- Employer and Individual mandates
- Standard benefit packages to be defined by the Federal Government
- Establishment of national spending targets
- Voluntary vs. mandatory cost controls
- Federal and state roles in establishing guidelines for mandates and spending
- Impact on current Medicare and Medicaid plans

Because it is not known what the eventual health reform legislation will be, the effect of the Act or any other legislation on demand and utilization has not been reflected in the demand statistics.

76

CB          02181

# Exhibit

# 30

# LIMITED PARTNERSHIP AGREEMENT

## OF

## BRADDOCK MANAGEMENT, L.P.

## A CALIFORNIA LIMITED PARTNERSHIP



DEFENDANT'S
EXHIBIT

30

TR 001339

# TABLE OF CONTENTS

Page

1. Formation; Name; Principal Place of Business . . . . . . . 1

2. Term . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3. Purpose . . . . . . . . . . . . . . . . . . . . . . . . 2

4. Partners . . . . . . . . . . . . . . . . . . . . . . . . 2

    4.1 General Partner . . . . . . . . . . . . . . . . 2
    4.2 Limited Partners . . . . . . . . . . . . . . . . 2

5. Capital Contributions . . . . . . . . . . . . . . . . . 3

    5.1 General Partner's Capital Contribution . . . . 3
    5.2 Limited Partners' Capital Contribution . . . . 3
    5.3 Additional Capital Contributions . . . . . . . 3
    5.4 No Withdrawals or Interest . . . . . . . . . . 4

6. Partners' Capital Accounts . . . . . . . . . . . . . . . 4

7. Net Income, Net Losses and Distributions . . . . . . . . 5

    7.1 Allocation of Net Income or Net Losses and
        Income Tax Credits . . . . . . . . . . . . . . 5
    7.2 Section 704(c)--Special Rule for Contributed
        Property . . . . . . . . . . . . . . . . . . . 6
    7.3 Distributions . . . . . . . . . . . . . . . . . 7
    7.4 Target Capital Accounts . . . . . . . . . . . . 7

8. Liabilities . . . . . . . . . . . . . . . . . . . . . . 7

    8.1 Limited Liability of Limited Partner . . . . . 7
    8.2 Indemnification . . . . . . . . . . . . . . . . 7

9. Management . . . . . . . . . . . . . . . . . . . . . . . 8

    9.1 Control Vested in General Partner . . . . . . . 8

i.

TR 001340

Page

9.2  Obligation of the General Partner to Provide
     Skill and Time to Partnership . . . . . . . .  9
9.3  Limited Partners Have No Management
     Rights . . . . . . . . . . . . . . . . . . . .  10
9.4  General Partner Loans . . . . . . . . . . . .  10

10.  Transfer of Limited Partnership Interests . . . . . . .  10

     10.1 Assignment . . . . . . . . . . . . . . . . .  10
     10.2 Substituted Limited Partners . . . . . . . .  11
     10.3 Right of First Refusal . . . . . . . . . . .  11

11.  Termination . . . . . . . . . . . . . . . . . . . .  13

     11.1 Terminating Events . . . . . . . . . . . . .  13
     11.2 Election to Continue . . . . . . . . . . . .  14
     11.3 Dissolution . . . . . . . . . . . . . . . . .  14
     11.4 Negative Capital Accounts . . . . . . . . .  16

12.  Power of Attorney . . . . . . . . . . . . . . . . . .  16

     12.1 General Partner Appointed as Attorney-In-
          Fact . . . . . . . . . . . . . . . . . . . .  16
     12.2 Substituted Limited Partner . . . . . . . .  17

13.  Death or Incompetency or Dissolution of a Limited
     Partner . . . . . . . . . . . . . . . . . . . . . .  17

14.  Miscellaneous . . . . . . . . . . . . . . . . . . . .  17

     14.1 Notices . . . . . . . . . . . . . . . . . . .  17
     14.2 Pronouns . . . . . . . . . . . . . . . . . .  18
     14.3 Capacity . . . . . . . . . . . . . . . . . .  18
     14.4 Binding Effect . . . . . . . . . . . . . . .  18
     14.5 Agreement in Counterparts . . . . . . . . .  18
     14.6 Amendment of Agreement . . . . . . . . . . .  18
     14.7 Governing Law; Consent to Jurisdiction,
          Venue, Service of Process . . . . . . . . .  18

EXHIBIT A

TR 001341

<u>LIMITED PARTNERSHIP AGREEMENT</u>

<u>OF</u>

<u>BRADDOCK MANAGEMENT, L.P.,</u>

<u>A CALIFORNIA LIMITED PARTNERSHIP</u>

THIS LIMITED PARTNERSHIP AGREEMENT is made this 15th day of June, 1993, by and between Waldo Point Management Corporation, as general partner ("General Partner"), and Vista Ancillary Properties, L.P., as limited partner ("Limited Partner"). The General Partner and the Limited Partner are collectively called the "Partners."

In consideration of the mutual covenants herein contained, the Partners agree as follows:

1. <u>Formation; Name; Principal Place of Business</u>. The Partners hereby form with each other a limited partnership (the "Partnership"), pursuant to the provisions of the California Revised Limited Partnership Act (California Corporations Code Sections 15611-15723). The name of the Partnership shall be BRADDOCK MANAGEMENT, L.P., A CALIFORNIA LIMITED PARTNERSHIP and its principal place of business shall be at 111 Sutter Street, Suite 2150, San Francisco, California 94104 or at such other place as the General Partner may from time to time hereafter designate.

2. <u>Term</u>. The Partnership shall commence upon the filing of a Certificate of Limited Partnership (the "Certificate") by the General Partner pursuant to Section 15621 of the California Corporations Code. The Partnership shall

1.

continue until December 31, 2050, unless sooner terminated pursuant to the provisions of this Agreement.

    3.   <u>Purpose</u>. The purpose of the Partnership shall be to provide hospital management services to hospitals. The Partnership shall have and may exercise whatever powers are necessary in fulfillment of the foregoing specific purpose, including, without limitation, the investment of Partnership funds in such business ventures which the General Partner deems appropriate. The Partnership shall have and may exercise whatever powers are necessary in fulfillment of the foregoing purposes.

    4.   <u>Partners</u>. The Partnership shall have the following Partners:

    4.1   <u>General Partner</u>. Waldo Point Management Corporation shall be the initial General Partner.

    4.2   <u>Limited Partners</u>. Vista Ancillary Properties, L.P. shall be the initial Limited Partner. No person or entity may be substituted as a Limited Partner except as specifically provided in this Agreement. Any purported transfer of an interest in the Partnership which does not comply with this Agreement shall be void and of no effect. All references herein to "Limited Partners" or "Limited Partner" shall refer collectively to the initial Limited Partners named above and to all other persons or entities receiving transfers of Limited Partnership interests which are made in accordance with this Agreement.

2.

TR 001343

5.   Capital Contributions.  The Partners shall make
the following capital contributions.

5.1   General Partner's Capital Contribution.  Upon
execution hereof, the General Partner shall contribute to the
Partnership $20.

5.2   Limited Partners' Capital Contribution.  Upon
execution hereof, Vista Ancillary Properties, L.P. shall
contribute to the Partnership $1,980.

5.3   Additional Capital Contributions.  The
Partners shall make additional capital contributions to the
Partnership at such time and in such amounts as determined by the
General Partner in proportion to their respective Percentages as
set forth in Section 7.2, upon 30 days' written notice to the
Partners.  If any Partner fails to make such additional capital
contributions, then the capital accounts of the Partners who do
make such additional capital contributions shall be increased by
the amount of such capital contributions and each Partner's
Percentage shall be adjusted upward or downward, as the case may
be, to reflect the Partners' respective aggregate capital
contributions in proportion to the total capital contributions of
all Partners to the Partnership.  There shall be no other remedy
for the failure of a Partner to make an additional contribution.
No Partner shall have the right to make voluntary capital
contributions without the consent of the General Partner.  If any
Partner makes a loan to the Partnership, such loan shall not
increase the lending Partner's capital account nor entitle the

3.

TR 001344

lending Partner to any greater share of Partnership profits, credits or distributions, nor subject the lending Partner to any greater proportion of Partnership losses. The amount of the loan shall be a debt owed by the Partnership to the lending Partner, and repayable on the terms and conditions agreed on by the lending Partner and the Partnership.

5.4 <u>No Withdrawals or Interest</u>. Except as expressly provided in this Agreement, no Partner shall have the right to demand or receive property other than cash in return for such Partner's capital contribution. A Partner shall have the right to a return of all or any part of his capital contribution only upon the termination and dissolution of the Partnership as provided in this Agreement. No Partner shall receive interest on such Partner's capital contribution to the Partnership.

6. <u>Partners' Capital Accounts</u>.

(a) The Partnership shall maintain a separate capital account for each Partner in accordance with Section 704 of the Internal Revenue Code of 1986, as amended (the "Code"), and the Treasury Regulations promulgated thereunder.

(b) The initial capital accounts of the Partners shall be equal to their respective cash contributions to the Partnership.

(c) Subject to the preceding paragraphs, the capital accounts shall be adjusted as follows. The capital account of each Partner shall be increased by the amount of money and the fair market value of any property contributed by the

4.

TR 001345

Partner to the Partnership. All net income allocated to a Partner and additional capital contributions by a Partner, if any, shall increase the capital account of such Partner. All net losses allocated to a Partner and all distributions from the Partnership (other than distributions in repayment of any principal and interest on loans and reimbursement of expenses) to a Partner, and the amount of any tax credits allocated to a Partner, to the extent that the allowance of such tax credit results in the reduction in basis of the related property, shall decrease such Partner's capital account. Loans by any Partner shall not be considered contributions to the capital of the Partnership.

7. <u>Net Income, Net Losses and Distributions</u>. The net income or net losses of the Partnership for financial accounting and federal income tax purposes shall be determined in accordance with federal income tax principles, including the deductions for cost recovery and/or amortization of all Partnership assets and expenditures.

7.1 <u>Allocation of Net Income or Net Losses and Income Tax Credits</u>.

(a) For Partnership accounting and tax purposes, except as provided in Sections 7.2(b) and 7.2(c) all net income or net losses of the Partnership and all income tax

5.

credits shall be apportioned and shared in accordance with the following percentages ("Percentage"):

|     General Partner     | Percentage |
| Waldo Point Management Corporation | 1% |

|     Limited Partners     | *See Attached* ✗ |
| Vista Ancillary Properties, L.P. | 99% |

(b)   Notwithstanding the foregoing, no net losses shall be allocated to a Limited Partner to the extent it would result in such Limited Partner having a negative capital account after increasing the capital account by such Limited Partner's share of partnership minimum gain and partner nonrecourse debt minimum gain as defined in Treasury Regulations Section 1.704-2.  Any net losses not allocated to a Limited Partner as a result of the foregoing, shall instead be allocated to the General Partner.

(c)  If any net loss is allocated to the General Partner under Section 7.2(b), then all subsequent net income shall be allocated in a manner that results in the allocations made under this subparagraph 7.1(c) offsetting the effect of the prior allocations under subparagraph 7.1(b) such that the Partners' capital accounts are returned to the balances that would have existed absent subparagraph 7.1(b).

7.2   <u>Section 704(c)--Special Rule for Contributed Property</u>.  If property is contributed by a Partner to the Partnership, then allocations of income, loss and income tax

6.

*Attachment*

7. <u>Net Income, Net Losses and Distributions</u>. The net income or net losses of the Partnership for financial accounting and federal income tax purposes shall be determined in accordance with federal income tax principles, including the deductions for cost recovery and/or amortization of all Partnership assets and expenditures, by using a cash receipts and disbursements method consistently applied from year to year as determined by the Partnership's accountants.

7.1 <u>Allocation of Net Income or Net Losses and Income Tax Credits</u>.

(a) For Partnership accounting and tax purposes, except as provided in Sections 7.2(b) and 7.2(c) all net income or net losses of the Partnership and all income tax credits shall be apportioned and shared in accordance with the following percentages ("Percentage"):

| General Partner | Percentage |
|---|---|
| ~~Siena~~ *Braddock* Services, Inc. | 1% |

| Limited Partners *-Vista Ancillary properties* | |
|---|---|
| Siena Investment Group Trust | 79% |
| The Julie Marie Gross Trust dated _Jan. 4,_ , 1993 | 10% |
| The Lisa Irene Gross Trust dated _Jan. 4,_ , 1993 | 10% |

(b) Notwithstanding the foregoing, no net losses shall be allocated to a Limited Partner to the extent it

credits attributable to the contributed property shall be made in accordance with Code Section 704(c).

7.3  <u>Distributions</u>.  Distributions of cash or other property shall be distributed to the Partners in accordance with their relative Percentages.  The amount and timing of Partnership distributions shall be determined by the General Partner.

7.4  <u>Target Capital Accounts</u>.  The tax allocation provisions of this Agreement are intended to produce final capital account balances ("Target Capital Accounts") which reflect the Distribution priorities described in subparagraph 7.3.  To the extent that the tax allocation provisions of this Agreement would not produce such Target Capital Accounts, then gross income and deductions shall be allocated in a manner which produces such Target Capital Accounts, and, if necessary, prior tax returns shall be amended to reallocate gross income and deductions to produce such Target Capital Accounts.

8.  <u>Liabilities</u>.

8.1  <u>Limited Liability of Limited Partner</u>.  The Limited Partners shall not be bound by, liable for or subject to any loss, liability, obligation or expense whatsoever of the Partnership, except that a Limited Partner shall be obligated to return to the Partnership a part or all of any distribution if so required by applicable law.

8.2  <u>Indemnification</u>.  The General Partner shall not be liable, responsible or accountable in damages or otherwise

7.

TR 001349

to the Partnership or to the Limited Partners for any acts or omissions performed by or omitted by it in good faith and reasonably believed to be within the scope of the authority conferred by this Agreement, or for its performance or omission to perform any acts on advice of the accountants or legal counsel of the Partnership. In no event shall the General Partner be liable for any indirect or consequential damages arising from a breach of this Agreement. The Partnership shall indemnify and hold harmless the General Partner from any expenses, loss or damage incurred by the General Partner by reasons of any act or failure to act by the General Partner under this Agreement, except for the negligent or willful misconduct of the General Partner. Any indemnity under this section shall be provided out of and to the extent of Partnership assets only, and the Limited Partners shall not be personally liable on account thereof.

9. <u>Management</u>.

9.1 <u>Control Vested in General Partner</u>. Except as provided in Section 9.3, the General Partner shall have exclusive control over the business and management of the Partnership and shall have all the rights, powers, and duties usually vested in the general partner of a partnership organized for the purpose set forth in Section 3 hereof, including the day-to-day administration of the Partnership's business and the determination of its business policies. The General Partner's powers shall include, without limitation, the following:

8.

TR 001350

(a)   To execute and deliver in the name of the Partnership agreements, documents, deeds of trust, mortgages, promissory notes, security agreements, leases, and any and all instruments relating to the Partnership.

(b)   To expend the capital and net income of the Partnership in the exercise of any right or power possessed by the General Partner hereunder.

(c)   To purchase, hold, lease, manage, operate, sell, exchange and improve Partnership property.

(d)   To act as the Tax Matters Partner pursuant to Section 6231(a)(7) of the Code for all purposes under the Code and to otherwise make all federal and state tax elections applicable to the Partnership in the best interests of a majority in interest of the Partners.

(e)   To control and perform all other activities incident to managing the operations and affairs of the Partnership, including, without limitation, the employment of any professional management firm or other professionals at the Partnership's sole expense, and to make all decisions regarding the business of the Partnership unless otherwise specifically limited in Section 9.2 below.

9.2   Obligation of the General Partner to Provide Skill and Time to Partnership.  The General Partner shall apply itself diligently to the business of the Partnership and devote to the Partnership as much of its time as is reasonably necessary for the business of the Partnership, but the General Partner

9.

TR 001351

shall not be required to devote all of its business time to the affairs of the Partnership, it being understood that it may be engaged in other activities which may be similar or in competition with this Partnership. No Partner shall have any duty to offer or present to the Partnership any investment or future projects which it may locate.

9.3  <u>Limited Partner Duties</u>.  The Limited Partner shall use its best efforts to negotiate a hospital management contract for the Partnership.

9.4  <u>General Partner Loans</u>.  The General Partner may in its sole discretion, but shall not be obligated to, advance monies to the Partnership for use by the Partnership in its operations.  Such obligations shall be repaid with interest at an annual rate equal to one-half of one percent (1/2%) above the prime rate as it shall be from time to time charged by Wells Fargo Bank (but in no event higher than the rate allowed by law) or at such other rate as may be agreed to by the Partners.  Such loans shall not be deemed a capital contribution.

10.  <u>Transfer of Limited Partnership Interests</u>.

10.1 <u>Assignment</u>.  No Limited Partner, including any successors or assigns of the Limited Partner, or its personal representative, may sell, exchange, transfer, pledge or otherwise hypothecate, or assign its Partnership interest, its interest in Partnership profits and losses, its interest in capital or any other interest in the Partnership, unless such Limited Partner, or its personal representative or other successor-in-interest,

10.

obtains the prior written consent of the General Partner. Any
such sale, exchange, transfer, pledge, hypothecation or
assignment in violation of the foregoing shall be void.

10.2 <u>Substituted Limited Partners</u>. No transferee
of a Limited Partner's interest in Partnership profits and losses
or in Partnership capital who is not then a Partner shall become
a substituted Limited Partner unless the transferee agrees in
writing to all terms and conditions of this Agreement and a
majority of the other Partners consent to such transfer;
provided, however, that if a Limited Partner's interest in
Partnership profits and losses or in Partnership capital is
transferred to an individual whose spouse will have community
property rights in the transferred interest, the transferee's
spouse shall also agree in writing to all terms and conditions of
this Agreement before said transfer is effective.

10.3 <u>Right of First Refusal</u>.

(a) In the event that any Limited Partner
wishes to transfer all or any part of his interest in the
Partnership to a proposed transferee and receives a bona fide
arm's-length written offer to purchase such Partnership interest
on terms acceptable to such Limited Partner (the "Offering
Partner") from such proposed transferee, the Offering Partner
shall give written notice thereof to the Partnership and to all
other Partners (the "Offeree Partners"), setting forth the
identity of the proposed transferee and the price, terms and
conditions of the proposed transfer with a photostatic copy of

11.

TR 001353

such offer attached to such notice. At any time within thirty (30) days after such notice is given by the Offering Partner, the Offeree Partners shall have the right to purchase their proportionate share (based on their relative Percentages provided in Section 7.2 above) of the interest which the Offering Partner proposes to transfer at the same price and on the same terms and conditions as are set forth in the written offer attached to the Offering Partner's notice; provided, however, if the consideration to be paid by the transferee identified in the notice is unique in nature, then the Offeree Partner need only pay equivalent value (as determined in accordance with Section 10.4(d) below) in cash. In the event that any Offeree Partner elects not to exercise its right to acquire its share of the interest being offered, then the remaining Offeree Partners may purchase their proportionate amount of such share and such remaining Offeree Partners' rights hereunder shall be extended for an additional five (5) days beyond their expiration period.

The Offeree Partners' rights hereunder may be exercised only by giving written notice of such exercise to the Offering Partner within thirty (30) days after notice of the proposed transfer is given by the Offering Partner. Closing of the purchase of the interest being offered by the Offering Partner shall occur on the ninetieth (90th) day following the Offeree Partners' exercise of their right in accordance herewith, or on such later date as may be specified in the Offering Partner's notice of proposed transfer.

12.

TR 001354

(b)  If the Offeree Partners do not elect to purchase the entire interest being offered by the Offering Partner, and if the General Partner consents to the sale pursuant to Section 10.1, then the Offering Partner shall sell all of such interest to the transferee identified in the Offering Partner's notice at the price and on the terms and conditions therein set forth within one hundred eighty (180) days following the date on which such notice is first given or on such later date as may be specified in such notice to the Offeree Partners.  In the event that such sale does not occur within such time limits, such sale shall be void unless the procedures under this Section 10.4 are again applied to this transaction.  Once the interest being offered is sold in accordance with this Section 10.4, all of the provisions contained in this Agreement, including the restrictions contained in this Section 10, shall continue to apply to all Partnership interests.

(c)  In the event that the parties are unable to otherwise agree as to the amount that is "equivalent value," such amount shall be determined by binding arbitration in San Francisco, California, in accordance with the rules of the American Arbitration Association.

11.  Termination.

11.1 Terminating Events.  Notwithstanding any provision to the contrary contained in this Agreement, the Partnership shall terminate and dissolve (except as described in

13.

TR 001355

Section 11.2 below) upon the happening of any of the following events:

(a) the voluntary or involuntary withdrawal from the Partnership of the General Partner;

(b) the involuntary dissolution of the General Partner;

(c) the vote of 2/3 in interest of the Partners to terminate and dissolve the Partnership;

(d) the Bankruptcy of the General Partner or a general assignment by the General Partner for the benefit of creditors, or the appointment of a receiver for the General Partner's property or affairs;

(e) the sale or other disposition (except an exchange for other real property) of all or substantially all the Partnership assets;

(f) on the date set forth in Section 2;

(g) the dissolution of the Partnership by operation of law or judicial decree.

11.2 <u>Election to Continue</u>. Notwithstanding the provisions of Section 11.1 hereof, within sixty (60) days following the occurrence of any of the events described in subparagraphs (a), (b) and (d) of Section 11.1, the remaining Partners, by unanimous vote may elect to continue the Partnership and elect a new General Partner.

11.3 <u>Dissolution</u>. If the Partners do not elect to continue the Partnership within the sixty (60) day period

14.

TR 001356

specified in Section 11.2, the Partnership shall be dissolved at the expiration of said period. If the election to continue the Partnership under Section 11.2 is not applicable, then the Partnership shall be dissolved forthwith. Upon dissolution of the Partnership, the Partners shall, in the following order of priority:

(a) sell all of the property of the Partnership as quickly as is reasonably possible without undue sacrifice by the Partnership;

(b) pay or provide for all debts, liabilities and other obligations of the Partnership (including, after payment or provision is made for the debts, liabilities and obligations to other creditors, any debts, liabilities and obligations owing to any Partner);

(c) pay all expenses incurred in connection with the liquidation and dissolution of the Partnership and the distribution of its property; and

(d) distribute to the Partners within sixty (60) days in accordance with the Partners' capital accounts, all remaining assets (including all unapplied assets held in reserve) of the Partnership (subject to such liens, encumbrances, restrictions, contracts, operating agreements, obligations, commitments or undertakings as may from time to time exist with respect to any such assets), including any asset which could not be sold in a reasonably prompt manner without undue sacrifice by the Partnership. Any Partnership assets to be distributed to

15.

TR 001357

Partners in kind shall be valued at their fair market value on the date of distribution and may be distributed in undivided interests among all Partners. The Partnership shall engage in no further business other than to wind up its business affairs and to distribute its assets.

11.4 <u>Negative Capital Accounts</u>. In the event that after all allocations of gain and loss and after all distributions there exists a deficit balance in a Partner's capital account; (i) no Limited Partner shall be required to contribute any amount to the Partnership or otherwise have any liability with respect to such deficit balance; and (ii) any General Partner shall pay to the Partnership the amount of such deficit balance in accordance with Treasury Regulation Section 1.704.

12. <u>Power of Attorney</u>.

12.1 <u>General Partner Appointed as Attorney-In-Fact</u>. The Limited Partner irrevocably constitutes and appoints the General Partner its true and lawful attorney-in-fact, in its name, place and stead, to make, execute, acknowledge, record and file: (i) any certificate or other instrument which may be required by law to be recorded or filed by the Partnership, or which the General Partner shall deem advisable to record or file; (ii) any amendment to this Agreement actually approved by the Limited Partners in accordance with Section 15.6 hereof, or any amendment made for the purpose of reflecting a transfer of Partnership interests; (iii) any certificates, documents or

16.

TR 001358

instruments and any and all amendments, modifications or cancellations as may from time to time be required or appropriate under the laws of the State of California; and (iv) all other documents which may be required to effectuate the dissolution and termination of the Partnership.

12.2 <u>Substituted Limited Partner</u>. By the execution of this Agreement by a substituted Limited Partner or an agreement to be bound thereby, said substituted Limited Partner shall be deemed to have given the General Partner a power-of-attorney identical to that which his assignor had given.

13. <u>Death or Incompetency or Dissolution of a Limited Partner</u>. The death or incompetency or dissolution of a Limited Partner shall not dissolve or terminate the Partnership. In such event, the legal representative or successor of such Limited Partner shall have all the rights of a Limited Partner in the Partnership to the extent of the deceased or incompetent or dissolved entity's interest therein, subject to the terms and conditions of this Agreement.

14. <u>Miscellaneous</u>.

14.1 <u>Notices</u>. All notices under this Agreement shall be in writing, and shall be given to a party at the address set forth next to the party's signature below or at such other address as it may submit to the General Partner and to the Partnership at its principal office.

17.

14.2 <u>Pronouns</u>.  In this Agreement personal pronouns shall be construed as though of the gender and number required by the context.

14.3 <u>Capacity</u>.  Each of the Partners expressly desires and intends that corporations, trusts, partnerships and any other form of legal entity, as well as natural persons, may pursuant hereto, become a partner of the Partnership, hold Partnership interests and act through the individuals who from time to time are representatives thereof (as officers, trustees, partners or otherwise).

14.4 <u>Binding Effect</u>.  This Agreement shall inure to the benefit of and bind the parties hereto and their respective successors, assigns, representatives, estates, heirs or legatees.

14.5 <u>Agreement in Counterparts</u>.  This Agreement may be executed in several counterparts and all so executed shall constitute one agreement, binding on all the parties hereto, notwithstanding that all the parties may not be signatory to the same counterpart.

14.6 <u>Amendment of Agreement</u>.  This Agreement may be amended only by a written instrument signed by the General Partner and by a majority in interest of the Limited Partners.

14.7 <u>Governing Law; Consent to Jurisdiction, Venue, Service of Process</u>.  Regardless of where or in what sequence this Agreement is executed, it shall be deemed to be

18.

made and entered into in California and shall be governed by, and construed in accordance with, California law.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

General Partner:

**WALDO POINT MANAGEMENT CORPORATION**

Dated: _11/2/93_          By: _____

Limited Partner:

**VISTA ANCILLARY PROPERTIES, L.P.**

Dated: _11/3/93_          By: _____

TR 001361

## FIRST AMENDMENT TO THE LIMITED PARTNERSHIP
## AGREEMENT OF BRADDOCK MANAGEMENT, L.P.

This First Amendment to the Limited Partnership Agreement of Braddock Management, L.P., is entered into as of the 1st day of August, 1994 by Waldo Point Management Corporation and Vista Ancillary Properties, L.P.

NOW, THEREFORE, the parties agree to amend the Partnership Agreement by adding new Section 15 as follows:

      15.   Permitted Transfers.  Notwithstanding anything to the contrary, the Partnership and the Partners may enter into an Exclusive Put Option Agreement with Peter Rogan and sell all or part of the Partnership assets or all or part of their Partnership interests pursuant to such Exclusive Put Option Agreement.

Except as specifically amended above, the Limited Partnership Agreement of Braddock Management, L.P. shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment on the date(s) set forth below, to be effective as of 8/1, 1994.

Dated: 8/1/94

**GENERAL PARTNER**

Waldo Point Management
Corporation

By: _____
Daniel F. Finnane
CFO

Dated: 8/1/94

**LIMITED PARTNER**

Vista Ancillary Properties,
L.P.

By: _____
Elsa Payumo
Secretary
Braddock Services, Inc.
General Partner

TR 001362

## SECOND AMENDMENT TO THE LIMITED PARTNERSHIP

## AGREEMENT OF BRADDOCK MANAGEMENT, L.P.

This Second Amendment to the Limited Partnership Agreement of Braddock Management, L.P., is entered into as of the 1st day of April, 1995 by Waldo Point Management Corporation ("Waldo"), a California corporation, and Vista Ancillary Properties, L.P., ("Vista"), a California limited partnership.

### RECITALS

WHEREAS, Waldo, as sole general partner ("General Partner"), and Vista, as sole limited partner ("Limited Partner"), formed Braddock Management, L.P. ("Braddock") on June 15, 1993 by filing with the California Secretary of State a Certificate of Limited Partnership; and

WHEREAS, Waldo and Vista entered into that certain Limited Partnership Agreement dated June 15, 1993 ("Partnership Agreement") for purposes of defining the manner of ownership and management of the business and affairs of the partnership; and

WHEREAS, Vista owns a ninety-nine percent (99%) interest in the profits and capital of the partnership and Waldo owns a one percent (1%) interest in the partnership; and

WHEREAS, Section 14.6 of the Partnership Agreement provides that the Partnership Agreement may only be amended by a written instrument signed by the General Partner and by a majority in interest of the Limited Partners; and

-1-

TR 001363

WHEREAS, Waldo and Vista previously amended the Partnership Agreement on August 1, 1994; and

WHEREAS, the partners of Vista desire to enter into that certain purchase and sale agreement (the "Agreement for Purchase and Sale of 99% Limited Partnership Interest") with Boulevard Management, Ltd. ("Boulevard"), a Florida limited partnership, for purposes of transferring Vista's entire limited partnership interest in Braddock to Boulevard; and

WHEREAS, Waldo and Vista each desire to further amend the Partnership Agreement to, among other things: (i) facilitate the transfer of Vista's limited partnership interest to Boulevard; and (ii) to provide for the special basis adjustment provisions as contained under Sections 734, 743 and 754 of the Internal Revenue Code of 1986, as amended ("Code").

NOW, THEREFORE, the parties hereby agree to amend the Partnership Agreement as follows:

1.      Section 15 shall be deleted in its entirety, the following new Section 15 shall be in inserted in its place:

"15.    Elections.      Upon a majority vote of the Partners based upon percentage interests, the Partnership may take any action necessary to permit the Partnership or certain of its Partners to avail themselves (or apply for revocation) of the special basis adjustment elections provided in Sections 734, 743 and 754 of the Internal Revenue Code of 1986, as amended ("Code"), or any other income tax return elections, during the earliest fiscal year in which such election (or revocation) is effective. Any adjustments made pursuant to Section 754 of the Code shall affect only the

-2-

TR 001364

Partnership and the transferee of or the successor in interest to the transferor or deceased Partner. A transferee Partner or successor in interest to a deceased Partner shall furnish the Partnership with all information necessary to give effect to any such election."

2.    All references in the Partnership Agreement to Vista shall be deleted as of the Closing Date (as defined in the Agreement for Purchase and Sale of 99% Limited Partnership Interest) and Boulevard shall be substituted in its place.

Except as specifically amended above, the Limited Partnership of Braddock Management, L.P. shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Second Amendment on the date set forth below, to be effective as of April 1, 1995.

Dated: <u>April 1, 1995</u>

GENERAL PARTNER

Waldo Point Management
Corporation

By: _____
It's _____

LIMITED PARTNER

Vista Ancillary Properties,
L.P.

By: _____
It's <u>Secretary</u> Braddock Sevices, Inc
General Partner for Vista

npc04.braddock.amd

−3−

# Exhibit

# 31

## HOSPITAL MANAGEMENT AGREEMENT

This Management Agreement ("Agreement") is effective as of August 17, 1994, by and between Northside Operating Co. dba Edgewater Hospital and Medical Center, an Illinois not-for-profit corporation ("Hospital Corp.") and Braddock Management, L.P., a California Limited Partnership ("Manager").

### W I T N E S S E T H:

WHEREAS, Hospital Corp. and Manager desire that Hospital Corp. engage Manager to manage the day-to-day operations of the hospital located at 5700 North Ashland Avenue in Chicago, Illinois, ("Hospital").

NOW, THEREFORE, the parties agree as follows:

### I.

### TERM AND TERMINATION

1.01 **Term**. This Agreement shall, subject to Section 9.12, be effective from 12:01 a.m. on August 17, 1994 (the "Operating Date") until 12:00 p.m. on August 16, 1999. The term of this Agreement shall hereinafter be referred to as the "Operating Period."

1.02 **Termination**. Notwithstanding the provisions of paragraph 1.01, this Agreement may be terminated: (i) by Hospital Corp. at any time, without cause or penalty, upon 90 days written notice to Manager or (ii) by Manager at any time, without cause or penalty, upon 180 days written notice to Hospital Corp. To terminate this Agreement, the terminating party must give written notice to the other party.

### II.

### GENERAL RESPONSIBILITIES OF PARTIES

2.01 **Appointment; Fiduciary Duty**. Hospital Corp. hereby appoints Manager as the sole and exclusive manager of the day-to-day operations of the Hospital during the Operating Period. Manager hereby accepts such appointment and shall have authority for the day-to-day operations of the Hospital, subject to this Agreement and to the ultimate control of Hospital Corp. as licensee of the Hospital as provided by this Agreement and as required by Illinois law. Manager acknowledges that it shall have a fiduciary responsibility to Hospital Corp. with regard to the performance of Manager's responsibilities under this Agreement.

DEFENDANT'S EXHIBIT 31

FL 000289

2.02  <u>General Control of Hospital</u>.  Hospital Corp., as licensee, acting through its Board of Directors (the "Board"), shall at all times during the Operating Period have ultimate control over the assets and operations of the Hospital.  Manager shall perform its duties as described in this Agreement pursuant to policies, procedures, rules and other directives adopted and amended from time to time by Hospital Corp. and communicated to Manager, and in accordance with all applicable laws, rules, and regulations issued or adopted by any state, federal, or local agency having jurisdiction over the Hospital or any of its operations or properties.  Manager shall not be responsible for complying with or carrying out any policies, procedures, rules or directives of the Board of which it has not been advised.  The Board shall communicate all of its policies, procedures, rules and directives to Manager either directly or through its designated representative (the "Board Designee"), and Manager shall be entitled to rely on and assume the validity of communications from the Board or the Board Designee.  Unless otherwise communicated in writing to Manager, the Board Designee shall be Hospital Corp.'s President.  The Board Designee may, in his sole and absolute discretion, consent to matters requiring Board approval under terms of this Agreement in the place and stead of, and with the same force and effect, as the entire Board.

Manager shall, subject to the availability of funds, ensure that the Hospital retain all current licenses, accreditations and other approvals issued by any federal, state or local agency having jurisdiction over the Hospital, its operations, and properties.  Hospital Corp. and Manager acknowledge and agree that nothing in this Agreement is intended to alter, weaken, displace or modify in any manner whatsoever the duties, obligations, responsibilities, rights and privileges of Hospital Corp. as licensee, and of the Board as the governing body of Hospital Corp. to direct and control the Hospital and Manager's management thereof as required by law pursuant to Hospital Corp.'s status as the holder of the operating license for the Hospital.

2.03  <u>Medical and Professional Matters</u>.  All matters relating to the care and treatment of patients requiring professional medical judgment shall remain the responsibility of the Board and of the Hospital's Medical Staff, and Manager shall have no responsibility for nor any right to make such judgments.  However, the Board and the Medical Staff shall consult with Manager and Manager shall have the opportunity to make recommendations concerning such matters where such consultation is feasible and in the best interests of patients of the Hospital.

FL 000290

## III.

### DUTIES OF MANAGER

3.01 <u>Personnel</u>.

(a) All employees of the Hospital shall be employees of Hospital Corp., with the exception of the Chief Executive Officer and selected senior managers (the "Administrative Managers"), each of whom shall be approved by the Board. The Administrative Managers shall be employees of and compensated by Manager, but Manager shall be reimbursed monthly by Hospital Corp. for all compensation to the Administrative Managers, inclusive of salary, fringe benefits, bonuses and approved reimbursable business expenses (not to exceed $50,000 per fiscal year) paid to such Administrative Managers, all of which shall be a Cost of Operation. Fringe benefits shall include the employer's contribution to F.I.C.A., unemployment compensation and other employment taxes, workmen's compensation, group life, accident and health insurance premiums, disability coverage, retirement matching, car allowance and any other benefits.

(b) Manager shall have sole responsibility for supervising all non-physician personnel at the Hospital, and, except as otherwise provided by this Agreement, shall be entitled to take such actions with respect to such personnel as Manager, in its sole discretion, believes are necessary to manage the Hospital in accordance with this Agreement. Manager shall after consulting, and with the approval of the Board Designee, act as agent for Hospital Corp. with regard to Hospital Corp.'s employees, including but not limited to the following:

(i) Determining such personnel's wages, benefits and other terms and conditions of employment;

(ii) Supervising all such personnel, including responsibility for all hiring, counseling, disciplinary and termination decisions; and

(iii) All actions relating to labor organizations, including but not limited to recognition of such organizations and the negotiation, settlement, execution and administration of any labor agreements, to the extent permitted by the terms of such agreements and by Hospital Corp.

(c) Notwithstanding anything in the foregoing to the contrary, Manager shall obtain the prior approval of the Board prior to implementing employee layoffs as part of a single, permanent reduction in force involving at least twenty percent (20%) of the employees of Hospital or which include layoff of employees subject to labor agreements. The prior written approval require-

FL 000291