accreditation by the Joint Commission on Accreditation of Hospitals.

(k) The Executive shall designate in writing other individuals, by name or position, who are, in order of succession, authorized to act for him during any period of his absence from the Client.

(1) The Executive shall assist the auxiliary organizations of the Client with policies, management and services when called upon, if such organizations exist.

(m) The Executive shall negotiate, enter into, perform, modify, and terminate all Client contracts with physicians. The Executive shall have the power to bind the Client pursuant to the Executive's signature on the physician contract, subject to Client approval.

(n) The Executive shall develop, implement and administer, and have the authority and responsibility as the Executive for, the following:

- management performance evaluation, compensation and benefit review, including increases or decreases in same, within the salary and compensation structure approved by the Client;

  with respect to any management and other employees of Client ("Employees"), recruitment, selection (or dismissal) and advancement of such personnel and provision for their development;

  management and organizational structures, titles, position descriptions and reporting relationships for all Employees designed to carry out the policies and directives of the Client; and

  with respect to officers, following review by the Client, create, eliminate or modify their positions and job descriptions as appropriate and appoint individuals to assume those responsibilities.

- Subject to restrictions specifically established by the General Partner and/or the Client:

  - establish (or terminate) and maintain relationships with independent contractors, professional and consulting organizations to further the purposes of the Client;

RDX 036337

- enter into, modify or terminate any contracts or leases of the Client;

- initiate, defend or settle any claim or lawsuit on behalf of the Client;

- represent the Client to the public and the press; and

- make contacts with and serve as spokesman for the Client in relationships with public and governmental officials.

- Serve as the primary liaison in providing direction to and managing the Client relationships with their related and controlled corporations; take whatever steps are necessary to ensure that policies and individuals are in place to facilitate the furtherance of those organizations' corporate objectives consistent with the interests and policies of the Client.

- Serve as the sole Employee reporting directly to the General Partner.

(o) With respect to all related and controlled organizations of Client, the Executive shall be the chief executive officer in such organizations.

(p) In general, the Executive shall manage and direct Client and its related and controlled corporations in what the Executive believes in his discretion to be its best interests, consistent with law and the policies of the General Partner and the Client.

Notwithstanding the foregoing lists of obligations and responsibilities of the Executive, the Executive shall not take any of the following actions without the approval of the General Partner and/or the Client.

1. **Contracts, Leases.** Enter into any contracts or leases where the term is in excess of three years, or the total payments to be made by the Partnership or Client during the entire term of the contract or lease exceeds $100,000.

2. **Loans, Guaranties.** Enter into any loans, as a borrower or lender, where the principal amount exceeds $20,000, or enter into any guaranties in excess of $20,000.

3. **Joint Ventures.** Enter into any joint ventures or partnerships with physicians or any other persons.

WPHSF6\RCL\0048563.02
11/16/93

9

RDX 036338

4. __Management Arrangements__. Enter into any management arrangements for a term in excess of one year.

5. __Officers__. Appoint or remove any officers of the Client.

6. __Distributions__. Make any dividends or other distributions to Partners and individuals, including the timing, amount and allocations of such distributions.

7. __Sale of Assets__. Sell or agree to sell any asset of the Client (or any lease of greater than three years of such an asset) where the value of such asset exceeds $5,000.

8. __Conflict of Interest Transactions__. Enter into any contract on behalf of the Client where Executive, any director, officer or partner has any direct or indirect interest in the party contracting with the Client.

9. __Adoption of Budgets__. Adopt the annual capital and operating budgets of the Client.

10. __Expenditures__. Expend, or agree to expend, amounts which in the aggregate exceed $500,000 over the Client's operating budget for any fiscal year.

11. __Capital Budget__. Exceed the Client's capital budget by any amounts.

12. __Lawsuits__. Bring or defend any lawsuit not covered by insurance, where the amount in controversy exceeds $50,000.

13. __Auditors__. Change or appoint the Client's independent auditors.

RDX 036339

# Exhibit

# 36

FOLEY & LARDNER
ATTORNEYS AT LAW

ONE IBM PLAZA
SUITE 3300
330 NORTH WABASH AVENUE
CHICAGO, ILLINOIS 60611
TELEPHONE (312) 755-1900
FACSIMILE (312) 755-1925
WRITER'S DIRECT LINE

MILWAUKEE
MADISON
WASHINGTON, D.C.
JACKSONVILLE
ORLANDO
TALLAHASSEE
TAMPA
WEST PALM BEACH

A MEMBER OF GLOBALEX
WITH MEMBER OFFICES IN

BERLIN
BRUSSELS
DRESDEN
FRANKFURT
LONDON
PARIS
SINGAPORE
STUTTGART
TAIPEI

August 19, 1994

Mr. F. Scott Gross
President
Primus Management, Inc.
One Eleven Sutter Street
Suite 2150
San Francisco, CA 94104

Re: Legal Services for Edgewater Hospital and Medical Center

Dear Scott:

We enjoyed working with you, Dan and Peter in successfully closing the Edgewater acquisition and financing. As with any transaction that is both complicated and lengthy, the fees accumulated on a seemingly geometric basis.

In response to Dan's request, we have agreed to accept payment of our fee submitted at closing in installments, with the initial one-third payable at closing and subsequent installments payable one-third by the end of September 1994 and the balance by the end of October 1994. Enclosed is an invoice reflecting such, showing payment of the first installment. Prior to September 30, 1994, we will provide you with a detailed billing statement and an adjusted invoice to reflect late posting of disbursements.

In recognition that Edgewater has paid a substantial amount of fees in order to commence operations, we would like to offer to you the opportunity to utilize our firm's services at a substantially reduced charge through June 30, 1995. In order to provide for immediate assistance, we offer the first 100 hours of legal services (commencing August 18, 1994) at $50 per hour and all services in excess of 100 hours through June 30, 1995 payable at $150 per hour. The billing rate will apply regardless of the billing attorney. We would also expect to bill our out-of-pocket disbursements. Excluded from this offer will be any litigation related matter, which would have a separate billing rate, and any "extraordinary item" related to the financing, the financing structure or any restructuring thereof. Our intention is to provide a reduced rate during the start-up period in order to reduce any hesitancy that may exist to use legal services when needed during this crucial phase.

DEFENDANT'S
EXHIBIT
36
PENGAD-Bayonne, N.J.

ESTABLISHED 1842

FL 000239

Mr. F. Scott Gross
August 19, 1994
Page 2

     We appreciate your confidence in our abilities to service your needs in Chicago and hope to develop a strong and continuous working relationship. If there is anything we can do for you in Chicago, whether in the nature of legal services or not, please give us a call.

          Respectfully,

          Robert J. Zimmerman

RJZ:nel
Enclosure
cc:   Dan Finnane
      Chris J. Mollet
      Michael E. Olsen

FL 000240

# Exhibit

# 37



# EDGEWATER MEDICAL CENTER

August 5, 1996

Mr. Erik Benson                    Ms. Mary McInerney
Trust Officer                      Executive Director
Corporate Trust Department         Illinois Health Facilities Authority
LaSalle National Bank              Suite 1100
135 South LaSalle Street           180 North Stetson Avenue
Chicago, Illinois 60603            Chicago, Illinois 60601

                                   Re: IHFA Revenue Bonds, Series 1994
                                       Edgewater Hospital and Medical
                                       Center

Dear Mr. Benson and Ms. McInerney:

The Quarterly Report for the period ending June 30, 1996
is hereby submitted in accordance with Section 9.4 of the Loan
Agreement, Section 414 of the Master Indenture, and Sections 110
and 115 of the First Supplemental Master Trust Indenture which
comprises:

Exhibit A       Statement of Revenues and Expenses
        B       Statement of Changes in Fund Balance
        C       Balance Sheet
        D       Certification Statement
        E-1     Management Report – Finance
        E-2     Management Report – Operations
        E-3     Other Reporting Requirements
        F       Bond Covenant Ratios

Please contact me if there are any comments or questions.

Sincerely,

Kenneth W. Huff

Kenneth W. Huff
Vice President of Finance

DEFENDANT'S
EXHIBIT
37

cc: Ms. M. Elizabeth Ware, Colonial Management Associates
    Mr. Jonathan Connolly, Federated Investors, Inc.
    Mr. David Belton, Federated Investors, Inc.
    Board of Directors, Northside Operating Company
    Board of Directors, Permian Health Care, Inc.        RCI 006765
    Mr. F. Scott Gross, Primus Management, Inc.

EDGEWATER MEDICAL CENTER
EXHIBIT A
STATEMENT OF REVENUES & EXPENSES

| | QTR ENDING 06/30/96 ACTUAL | QTR ENDING 06/30/96 BUDGET | QTR ENDING 06/30/96 VARIANCE | QTR ENDING 06/30/96 O/O | YTD 06/30/96 ACTUAL | YTD 06/30/96 BUDGET | YTD 06/30/96 VARIANCE | YTD 06/30/96 O/O |
|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | |
| ROOM & BOARD | 11,498,019 | 11,908,819 | (410,800) | (3.4) | 24,052,151 | 24,172,041 | (119,890) | (0.5) |
| ANCILLARY-INPATIENT | 26,328,144 | 26,692,931 | (364,787) | (1.4) | 54,990,181 | 54,118,661 | 871,520 | 1.6 |
| ANCILLARY-OUTPATIENT | 8,788,017 | 9,260,342 | (472,325) | (5.1) | 17,469,949 | 18,575,285 | (1,105,336) | (6.0) |
| OTHER OPERATING | 763,994 | 547,990 | 216,004 | 39.4 | 1,755,314 | 1,095,980 | 659,334 | 60.2 |
| **TOTAL REVENUE** | 47,378,174 | 48,410,082 | (1,031,908) | (2.1) | 98,267,595 | 97,961,967 | 305,628 | 0.3 |
| **ALLOWANCES** | | | | | | | | |
| CONTRACTUAL | 28,647,541 | 30,110,989 | (1,463,448) | (4.9) | 59,436,151 | 60,984,785 | (1,548,634) | (2.5) |
| CHARITY CARE | 373,940 | 390,250 | (16,310) | (4.2) | 770,122 | 780,500 | (10,378) | (1.3) |
| OTHER ALLOWANCE | 599,325 | 567,276 | 32,049 | 5.8 | 1,390,237 | 1,134,552 | 255,685 | 22.5 |
| **CONTRACTUAL** | 29,620,806 | 31,068,515 | (1,447,709) | (4.7) | 61,596,510 | 62,899,837 | (1,303,327) | (2.1) |
| **NET REVENUE** | 17,757,368 | 17,341,567 | 415,801 | 2.4 | 36,671,085 | 35,062,130 | 1,608,955 | 4.6 |
| **EXPENSES** | | | | | | | | |
| SALARIES | 5,452,839 | 5,764,157 | 311,318 | 5.4 | 11,006,178 | 11,476,585 | 470,407 | 4.1 |
| EMPLOYEE BENEFITS | 706,344 | 806,569 | 100,225 | 12.4 | 1,440,318 | 1,613,137 | 172,819 | 10.7 |
| PHYSICIAN FEES | 586,529 | 622,999 | 36,470 | 5.9 | 1,192,705 | 1,226,667 | 33,962 | 2.8 |
| PURCHASED SERVICES | 2,059,862 | 2,044,768 | (15,094) | (0.7) | 4,492,358 | 4,362,687 | 269,749 | 2.9 |
| SUPPLIES | 1,677,792 | 1,845,191 | 167,399 | 9.1 | 3,492,358 | 3,752,107 | 259,749 | 6.9 |
| INSURANCE | 281,632 | 261,973 | 11,599 | 1.2 | 556,527 | 593,946 | 37,419 | 6.3 |
| INTEREST | 295,914 | 387,821 | 106,372 | 26.4 | 1,912,444 | 1,935,641 | 23,197 | 1.2 |
| REPAIRS/MAINTENANCE | 308,122 | 402,286 | (8,122) | 12.7 | 622,286 | 803,925 | (81,134) | 22.6 |
| UTILITIES | 360,156 | 300,000 | 11,599 | 11.5 | 950,356 | 841,540 | (181,533) | (8.5) |
| IPA PROVIDER TAX | 1,659,390 | 1,421,270 | (198,640) | (11.9) | 3,052,162 | 2,959,500 | (92,962) | 14.4 |
| BAD DEBT EXPENSE | 663,390 | 662,499 | (1) | (0.0) | 1,325,001 | 1,324,998 | (3) | (3.1) |
| DEPRECIATION | 82,521 | 82,521 | (1) | (0.0) | 165,045 | 1,165,043 | (2) | (0.0) |
| AMORTIZATION | 82,805 | — | — | (0.0) | 848,876 | 1,028,088 | 181,192 | (0.0) |
| OTHER EXPENSE | 372,805 | 545,471 | 172,666 | 31.7 | 848,876 | 1,028,088 | 181,192 | 17.8 |
| **TOTAL EXPENSES** | 15,459,829 | 16,242,245 | 782,416 | 4.8 | 31,069,082 | 32,529,504 | 1,460,422 | 4.5 |
| **NET OPER.INCOME(LOSS)** | 2,297,539 | 1,099,322 | 1,198,217 | 109.0 | 6,602,003 | 2,532,626 | 3,069,377 | 121.2 |
| NON OPER. REVENUE | 291,032 | 300,000 | (8,968) | (3.0) | 381,181 | 600,000 | (218,819) | (36.5) |
| **NET INCOME (LOSS)** | 2,588,571 | 1,399,322 | 1,189,249 | 85.0 | 5,983,184 | 3,132,626 | 2,850,558 | 91.0 |

RCI 006766

RDX 007600

EDGEWATER MEDICAL CENTER
EXHIBIT B
STATEMENT OF CHANGES IN FUNDS BALANCE

| | QTR ENDING 06/30/96 | QTR ENDING 03/31/96 | CHANGE |
|---|---|---|---|
| GENERAL FUND BALANCE-BEGINNING | 14,050,197 | 10,655,584 | 3,394,613 |
| RESULTS FROM OPERATIONS | 2,297,539 | 3,304,464 | (1,006,925) |
| NON OPERATING REVENUE | 291,032 | 90,149 | 200,883 |
| GENERAL FUND BALANCE-ENDING | 16,638,768 | 14,050,197 | 2,588,571 |

| | QTR ENDING 06/30/96 | QTR ENDING 03/31/96 | CHANGE |
|---|---|---|---|
| RESTRICTED FUND BALANCE-BEGINNING | 2,937,636 | 0 | 2,937,636 |
| ADDITIONS | 0 | 2,937,636 | (2,937,636) |
| DELETIONS | (2,937,636) | 0 | (2,937,636) |
| RESTRICTED FUND BALANCE-ENDING | 0 | 2,937,636 | (2,937,636) |

RCI 006767

RDX 007601

EDGEWATER MEDICAL CENTER
EXHIBIT C
BALANCE SHEET

## ASSETS

| | QTR ENDING 06/30/96 | QTR ENDING 12/31/95 | CHANGE |
|---|---:|---:|---:|
| **CURRENT ASSETS** | | | |
| CASH & CASH EQUIVALENTS | 12,285,789 | 9,960,652 | 2,325,137 |
| INVESTMENT | 12,138,906 | 8,209,270 | 3,929,636 |
| PATIENT ACCOUNTS RECEIVABLE LESS ALLOW FOR UNCOLLECTIBLE ACCTS OF $3,185,217 @ 06/30/96 | 10,363,216 | 10,909,247 | (546,031) |
| OTHER RECEIVABLES | 1,016,979 | 967,919 | 68,371 |
| PREPAID EXPENSE | 1,377,772 | 709,801 | 108,060 |
| ASSETS LTD AS TO USE-CURRENT | 3,232,514 | 3,063,507 | 189,007 |
| **TOTAL CURRENT ASSETS** | 39,888,551 | 34,166,400 | 5,722,151 |
| **ASSETS LIMITED AS TO USE** | | | |
| PROJECT FUND | 1,696,415 | 1,746,658 | (50,243) |
| DEBT SERVICE FUND | 4,321,155 | 4,440,375 | 124,774 |
| INSURANCE FUND | 4,560,633 | 4,488,573 | 3,605 |
| INVESTMENT-TDA | 1,081,214 | 1,081,214 | 0 |
| **TOTAL ASSETS LTD AS TO USE** | 7,545,364 | 7,467,228 | 78,138 |
| **PROPERTY PLANT & EQUIP** | | | |
| LAND | 2,000,000 | 2,000,000 | 0 |
| BUILDINGS & IMPROVEMENTS | 28,394,122 | 28,393,437 | 685 |
| EQUIPMENT | 4,560,633 | 4,488,573 | 72,060 |
| CONSTRUCTION IN PROGRESS | 279,008 | 70,028 | 208,980 |
| SUB-TOTAL | 35,233,763 | 34,952,038 | 281,725 |
| LESS ACCUM DEPR | 4,730,381 | 3,405,381 | 1,325,000 |
| NET PROP PLANT & EQPT | 30,503,382 | 31,546,657 | (1,043,275) |
| **INTANGIBLES** | | | |
| GOODWILL | 1,297,314 | 1,297,314 | 0 |
| ISSUANCE COST | 2,118,736 | 2,118,736 | 0 |
| SUB-TOTAL | 3,416,050 | 3,416,050 | 0 |
| LESS: ACCUM AMORTIZATION | 618,095 | 453,051 | 165,044 |
| NET INTANGIBLES | 2,797,955 | 2,962,999 | (165,044) |
| **TOTAL ASSETS** | 80,735,252 | 76,143,284 | 4,591,968 |

## LIABILITIES & FUND BALANCE

| | QTR ENDING 06/30/96 | QTR ENDING 12/31/95 | CHANGE |
|---|---:|---:|---:|
| **CURRENT LIABILITIES** | | | |
| ACCOUNTS PAYABLE | 3,298,800 | 4,090,257 | (791,457) |
| INTEREST PAYABLE (SERIES A NOTES) | 1,908,219 | 1,913,415 | (205,184) |
| INTEREST PAYABLE (SUB NOTES) | 1,024,773 | 980,834 | 43,939 |
| CREDIT BALANCE PAYABLE | 927,910 | 428,003 | 499,937 |
| TAXES OTHER PAYABLE | 354,242 | 347,143 | 7,099 |
| ACCRUED EXPENSES | 1,782,736 | 1,494,637 | 288,099 |
| PAYROLL & TAXES | 1,495,266 | 1,495,266 | 0 |
| LEASES PAYABLE | 300,000 | 300,000 | 0 |
| DUE TO 3RD PARTY PAYOR | 10,321,666 | 7,566,786 | 2,754,880 |
| **TOTAL CURRENT LIABILITIES** | 20,193,441 | 17,597,404 | 2,596,037 |
| **NON-CURRENT LIABILITIES** | | | |
| RESERVE FOR SELF INSURANCE | 1,960,919 | 1,797,395 | 163,524 |
| TAX DEFERRED ANNUITY | 1,081,214 | 1,081,213 | 1 |
| **TOTAL NON-CURRENT LIAB.** | 3,042,133 | 2,878,608 | 163,525 |
| **LONG TERM DEBT** | | | |
| LEASES PAYABLE (LESS CURRENT) | 160,910 | 311,688 | (150,778) |
| BONDS PAYABLE (LESS CURRENT) | 40,700,000 | 300,000 | 0 |
| NOTES PAYABLE (SUBORDINATED) | 0 | 4,000,000 | (4,000,000) |
| **TOTAL LONG TERM DEBT** | 40,860,910 | 45,011,688 | (4,150,778) |
| **FUND BALANCE** | 16,638,768 | 10,655,584 | 5,983,184 |
| **TOTAL LIAB & FUND EQUITY** | 80,735,252 | 76,143,284 | 4,591,968 |

RDX 007602

RCI 006768

EDGEWATER MEDICAL CENTER
EXHIBIT C
BALANCE SHEET

| | QTR ENDING 06/30/96 | QTR ENDING 09/31/96 | CHANGE |
|---|---|---|---|

**RESTRICTED FUND**

**ASSETS**

| | QTR ENDING 06/30/96 | QTR ENDING 09/31/96 | CHANGE |
|---|---|---|---|
| CASH & CASH EQUIVALENTS | 0 | 2,937,636 | (2,937,636) |
| TOTAL ASSETS | 0 | 2,937,636 | (2,937,636) |

**LIABILITIES**

| | QTR ENDING 06/30/96 | QTR ENDING 09/31/96 | CHANGE |
|---|---|---|---|
| OTHER | 0 | 2,937,636 | (2,937,636) |
| TOTAL LIABILITIES | 0 | 2,937,636 | (2,937,636) |

RDX 007603

RCI 006769

**EDGEWATER MEDICAL CENTER**
**EXHIBIT D**
**CERTIFICATION STATEMENT**


I hereby certify that the financial statements, information
contained in this Quarterly Report, and Bond Covenant Ratios have
been prepared in accordance with generally accepted principles of
accounting consistently applied, subject to year-end adjustment.


August 5, 1996
_____
Date

Kenneth W. Huff
_____
By:  Kenneth W. Huff
Its Vice President
of Finance

RDX 007604          RCI 006770

EDGEWATER MEDICAL CENTER
EXHIBIT E-1
MANAGEMENT REPORT-FINANCE
FISCAL QUARTER ENDING 6/30/96

## STATISTICAL SUMMARY

|  | Actual | Budget | Variance |
|---|---|---|---|
| Admissions | 2,160 | 2,068 | 92 |
| Patient Days | 13,507 | 14,235 | (728) |
| Average Length of Stay | 6.25 | 6.88 | (.63) |
| Case Mix Index | 1.40 | 1.40 | -0- |
| Ambulatory Surgery | 379 | 290 | 89 |
| Emergency Visits | 3,343 | 3,276 | 67 |
| Outpatient Registrations | 2,805 | 3,381 | (576) |

## GROSS REVENUES

Inpatient revenues fell short of the budget (by $776,000 or 2.0%), which is attributed to a greater than anticipated seasonal volume decline. Outpatient revenues are approximately $472,000 or 5.1% below budget for the quarter. Several services, such as the Emergency Room are meeting expected volumes but have a greater percentage of inpatients than budgeted and a lesser percentage of outpatients. Overall, gross revenues are within 2.1% for the quarter and 0.3% for the year to date.

## DEDUCTIONS FROM REVENUE

Revenue deductions were approximately $1,448,000 or 4.7% less than budgeted overall, as an improved collection percentage (62.5% of gross revenues were not collected versus 64.1% budgeted) accounts for $758,000 of the variance and the balance is attributed to the volume shortfall. The provision for bad debts, however, was greater than budgeted (3.4% of gross revenue versus 3.0% budgeted). On a combined basis for the year to date, the deductions from revenue (contractual allowances and bad debts) vary favorably from the budget by 1.8%.

Charity care provided in this quarter equalled $374,000.

RDX 007605          RCI 006771

EDGEWATER MEDICAL CENTER
EXHIBIT E-1
FQE 6/30/96
PAGE TWO

The quarterly review of revenue deduction calculations was completed by an outside reimbursement consultant with no adjustments proposed.

EXPENSES

Total expenses were $15,460,000 for the quarter and were less than budgeted by $782,000 or 4.8%. The only significant unfavorable variance is in Bad Debt expense, which relates to the aging of accounts receivable from the higher volume of the first quarter. Favorable variances for the most part are attributed to the volume shortfall.

NET INCOME

Net Operating Income totalled approximately $2,298,000 or 12.9% of Net Revenues. In comparison to the budget, Net Revenue was greater than budgeted by $416,000 and Expenses were less than budgeted by $782,000, accounting for the $1,198,000 favorable variance in Net Operating Income.

Non Operating Income totalled approximately $291,000 for the quarter, $9,000 less than budgeted. In accordance with FASB 124, the change in market value on investments has been recognized.

Debt Service Coverage is 4.42.

BALANCE SHEET

The Days Cash on Hand ratio is at 141.6 with eligible prepaids and at 137.9 days without. Cash and Cash Equivalents totalled $12,286,000 and Investments totalled $12,139,000, approximately $7,665,000 greater than the March 31, 1996 balances.

The Medicare program paid $2,917,000 as two cost report settlements were made, and paid $1,510,000 as a lump sum adjustment to the Periodic Interim Payment pertaining to high Medicare utilization in the first quarter.

Net Days in Accounts Receivables are at 52.5.

The Restricted Fund was extinguished as its purpose was met.

The Project Fund balance at June 30, 1996 totalled $2,596,000, as disbursements of $159,000 were processed. There are encumbrances of $205,000 for the Laboratory Information System on order.

EDGEWATER MEDICAL CENTER
EXHIBIT E-2
MANAGEMENT REPORT - OPERATIONS
FISCAL QUARTER ENDING 6/30/96

The Average Daily Census was 148.4 for the quarter, 8.0 patients or 5.1% less than budgeted. Admissions for medical/surgical services were approximately 4.0% less than budgeted and had an Average Length of Stay of 7.4 days (versus 7.8 budgeted), which represents a 13 patients per day unfavorable variance. The substance abuse detoxification program had an Average Daily Census of 16.5 days (versus 11.5 budgeted), a 5 patients per day favorable variance.

The articles published in Modern Healthcare that were noted in the March 31, 1996 Quarterly Report have impacted Edgewater, as Officers and Management have had to divert their efforts to first verify that there is no substantiation to the articles' allegations, and then develop and conduct a "damage control" communications campaign.

Admissions dropped from 790 in April to 667 in May, a decrease of 123. Given in the previous year there was an increase of 38 admissions in May over April, it seems reasonable that the articles are a partial explanation for the change.

The audit of the hospital's books and records has also been impacted, as the outside certified public accountants have delayed issuing the report awaiting a final report on internal investigations of the allegations. Management has thoroughly investigated all allegations, with the assistance of outside legal counsel, and has not discovered any evidence to substantiate the claims made by Modern Healthcare. The audit is expected to be released by August 31, 1996.

The three year Internal Medicine Residency program graduated 7 physicians; three have opted to remain in our primary service area and join the Medical Staff.

Full accreditation for three years was granted to Continuing Medical Education by the Illinois State Medical Society.

EDGEWATER MEDICAL CENTER
EXHIBIT E-2
FQE 6/30/96
PAGE TWO

The Northside Operating Co Board of Directors has also engaged an independent firm to conduct a similar review.  This firm will report directly to the Board of Directors.

The second article repeated many of the allegations of the first, and reported that the Executive Director of the Chicago Housing Authority (CHA) has indicated that the day to day operations "should be monitored more closely."  We have been in contact with Mr. Joseph Shuldiner, Executive Director of CHA, who has informed us that our Centers' operations do not conflict with current CHA policies.  He further informed EMC that, as a result of its analysis, CHA would not be forwarding any formal communication to EMC.

Edgewater's position has been and will continue to be full cooperation with all agencies.

Edgewater is one of eight hospitals that operate Healthcare Centers in Chicago Housing Authority projects, and from the inception of the operation in 1992 we are proud of our service to these low income, medically underserved residents.

RDX 007608        RCI 006774

EDGEWATER MEDICAL CENTER
EXHIBIT E-3
OTHER REPORTING REQUIREMENTS

The descriptions of the events requiring prompt notice have been reviewed and, in management's opinion, there is no event requiring Prompt Notice.

RDX 007609          RCI 006775

EDGEWATER MEDICAL CENTER
EXHIBIT F
BOND COVENANT RATIOS
FOR THE QUARTER ENDED
JUNE 30, 1996

## DAYS CASH ON HAND

AVERAGE DAILY CASH AVAILABLE FOR THE QUARTER    20,643,756
(INCLUDING PREPAID EXPENSES)

AVERAGE DAILY CASH AVAILABLE FOR THE QUARTER    20,103,089

AVERAGE DAILY OPERATING EXPENSES
  TOTAL OPERATING EXPENSES (YTD)   31,069,082
  LESS: DEPRECIATION   (1,325,000)
  AMORTIZATION   (165,044)
  BAD DEBT   (3,052,162)

  TOTAL   26,526,876

AVERAGE DAILY OPERATING EXP    145,752
(TOTAL/DAYS IN PERIOD [182])

DAYS CASH ON HAND (INCL PPDS)    141.64
DAYS CASH ON HAND    137.93
REQUIRED DAYS CASH ON HAND    20.00

## DEBT COVERAGE RATIO

OPERATING REVENUE
  NET PT SERVICE REVENUE   36,671,085
  OTHER REVENUE   381,181
  LESS: INT REV ON RSTR FUND   (258,598)
    TOTAL    36,793,668

OPERATING EXPENSE
  TOTAL EXPENSES   31,069,082
  LESS: INTEREST   (1,912,445)
  AMORTIZATION   (165,044)
  DEPRECIATION   (1,325,000)
    TOTAL    27,666,593

INCOME AVAILABLE FOR DEBT SERVICE    9,127,075
DEBT SERVICE REQUIREMENT    2,063,223
HISTORICAL DEBT SERVICE COVERAGE RATIO    4.42
REQUIRED DEBT SERVICE COVERAGE RATIO (BOND DOCUMENTS)    1.20

DEBT SERVICE REQUIREMENT
  INTEREST   1,912,445
  PRIN PMTS ON CAP LEASES   150,778
  TOTAL   2,063,223

RDX 007610      RCI 006776

# Exhibit

# 38

TO:    Daniel F. Finnane

FROM:  Ken Huff

DATE:  Sept. 27, 1995

VIA FAX:  (415)627-0766

The statistics report is enclosed for your review.

Please advise of any comments or questions.

cc:  Peter Rogan
     Henry Zeisel



DEFENDANT'S
EXHIBIT
38

RDX 007462

RCI 006619

EDGEWATER MEDICAL CENTER
MONTHLY STATISTICS

MONTH:    Sep-95

| DATE | CENSUS | TOTAL ADMITS | DETOX ADMITS | O/P SURGERIES | ER VISITS | O/P VISITS | OBSERVATN VISITS | DAILY REVENUE | GROSS A/R | A/R DAYS | DEPOSITS | CASH BALANCE | DAYS CASH ON HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/95 | 122 | 14 | 2 | 7 | 43 | 39 | 2 | 445,937 | 24,118,911 | 45 | 217,554 | 17,221,451 | 119 |
| 09/02/95 | 110 | 9 | 2 | 0 | 44 | 5 | 0 | 301,050 | 24,419,961 | 45 | 0 | 17,221,451 | 119 |
| 09/03/95 | 109 | 12 | 1 | 0 | 50 | 1 | 3 | 276,970 | 24,696,931 | 46 | 0 | 17,221,451 | 119 |
| 09/04/95 | 114 | 9 | 0 | 0 | 55 | 3 | 4 | 312,735 | 23,917,626 | 44 | 0 | 17,221,451 | 119 |
| 09/05/95 | 124 | 28 | 2 | 16 | 30 | 83 | 4 | 558,889 | 24,868,772 | 46 | 92,389 | 16,497,140 | 114 |
| 09/06/95 | 148 | 39 | 6 | 9 | 43 | 73 | 4 | 551,730 | 24,052,775 | 45 | 75,608 | 16,572,720 | 114 |
| 09/07/95 | 162 | 27 | 4 | 6 | 31 | 37 | 7 | 588,090 | 24,227,187 | 45 | 54,523 | 16,626,765 | 115 |
| 09/08/95 | 152 | 24 | 2 | 6 | 35 | 62 | 9 | 583,703 | 24,325,120 | 45 | 40,008 | 16,666,184 | 115 |
| 09/09/95 | 148 | 14 | 6 | 0 | 30 | 8 | 0 | 383,314 | 24,708,433 | 46 | 0 | 16,666,184 | 115 |
| 09/10/95 | 147 | 8 | 0 | 0 | 29 | 0 | 2 | 293,433 | 25,801,867 | 47 | 0 | 16,666,184 | 115 |
| 09/11/95 | 155 | 30 | 6 | 6 | 41 | 56 | 5 | 612,987 | 24,762,500 | 46 | 1,054,756 | 16,868,411 | 116 |
| 09/12/95 | 164 | 35 | 4 | 13 | 31 | 84 | 3 | 626,121 | 23,855,735 | 44 | 51,202 | 17,771,811 | 123 |
| 09/13/95 | 160 | 21 | 4 | 8 | 30 | 80 | 6 | 518,613 | 24,024,990 | 45 | 77,366 | 17,160,229 | 118 |
| 09/14/95 | 160 | 27 | 1 | 9 | 33 | 77 | 6 | 657,786 | 24,324,125 | 45 | 326,401 | 16,967,638 | 117 |
| 09/15/95 | 159 | 18 | 4 | 9 | 38 | 59 | 5 | 640,237 | 24,290,650 | 45 | 379,169 | 17,360,340 | 120 |
| 09/16/95 | 145 | 14 | 1 | 0 | 31 | 2 | 0 | 318,378 | 24,609,028 | 45 | 0 | 17,360,340 | 120 |
| 09/17/95 | 151 | 10 | 0 | 0 | 30 | 2 | 0 | 309,262 | 24,918,290 | 46 | 0 | 17,360,340 | 120 |
| 09/18/95 | 150 | 32 | 4 | 15 | 32 | 44 | 8 | 560,951 | 24,990,439 | 47 | 133,528 | 17,493,751 | 121 |
| 09/19/95 | 146 | 17 | 5 | 9 | 37 | 80 | 5 | 737,254 | 24,918,347 | 46 | 300,307 | 17,794,059 | 123 |
| 09/20/95 | 152 | 24 | 3 | 5 | 29 | 78 | 3 | 615,011 | 24,466,676 | 45 | 121,747 | 17,915,719 | 124 |
| 09/21/95 | 147 | 20 | 3 | 12 | 42 | 75 | 1 | 606,988 | 24,314,889 | 45 | 91,480 | 17,472,006 | 121 |
| 09/22/95 | 131 | 19 | 5 | 5 | 27 | 51 | 6 | 513,300 | 24,023,771 | 45 | 268,906 | 17,740,912 | 122 |
| 09/23/95 | 127 | 14 | 3 | 0 | 39 | 8 | 1 | 320,208 | 24,349,899 | 45 | 0 | 17,740,912 | 122 |
| 09/24/95 | | | | | | | | | | | | | |
| 09/25/95 | | | | | | | | | | | | | |
| 09/26/95 | | | | | | | | | | | | | |
| 09/27/95 | | | | | | | | | | | | | |
| 09/28/95 | | | | | | | | | | | | | |
| 09/29/95 | | | | | | | | | | | | | |
| 09/30/95 | | | | | | | | | | | | | |
| TOTAL | 3,283 | 465 | 68 | 135 | 830 | 1,007 | 84 | 11,332,946 | | | 3,284,944 | | |
| AVG | 143 | 20 | 3 | 6 | 36 | 44 | 4 | 492,737 | 24,443,170 | 45 | 142,824 | 17,199,454 | 119 |
| AVG BUDGET | 155 | 20 | 0 | 9 | 36 | | | 571,150 | | | 189,730 | 6,524,775 | 45 |
| BUDGET | 4,645 | 601 | 0 | 276 | 1,088 | | | 17,134,499 | | | 5,691,900 | | |
| PRIOR MTH | 4,638 | 718 | 129 | 230 | 1,303 | 1,603 | 104 | 16,228,712 | | | 10,618,365 | | |
| PR MTH AVG | 150 | 23 | 4 | 7 | 42 | 52 | 3 | 523,507 | 29,039,583 | 53 | 342,528 | 14,164,912 | 97 |

RDX 007463

RCI 006620

EDGEWATER MEDICAL CENTER
MONTHLY STATISTICS

MONTH: Sep-95

| DATE | CENSUS | TOTAL ADMITS | DETOX ADMITS | O/P SURGERIES | ER VISITS | O/P VISITS | OBSERVATN VISITS | DAILY REVENUE | GROSS A/R | A/R DAYS | DEPOSITS | CASH BALANCE | DAYS CASH ON HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/95 | 122 | 14 | 2 | 7 | 43 | 39 | 2 | 445,937 | 24,118,911 | 45 | 217,554 | 17,221,451 | 119 |
| 09/02/95 | 110 | 9 | 2 | 0 | 44 | 5 | 0 | 301,050 | 24,419,961 | 45 | 0 | 17,221,451 | 119 |
| 09/03/95 | 109 | 12 | 1 | 0 | 50 | 1 | 3 | 276,970 | 24,696,931 | 46 | 0 | 17,221,451 | 119 |
| 09/04/95 | 111 | 9 | 0 | 0 | 55 | 3 | 4 | 312,735 | 23,917,626 | 44 | 0 | 17,221,451 | 119 |
| 09/05/95 | 124 | 28 | 2 | 16 | 30 | 83 | 4 | 558,889 | 24,868,772 | 46 | 92,389 | 16,497,140 | 114 |
| 09/06/95 | 148 | 39 | 6 | 9 | 43 | 73 | 4 | 551,730 | 24,052,775 | 45 | 75,608 | 16,572,720 | 114 |
| 09/07/95 | 162 | 27 | 4 | 6 | 31 | 37 | 7 | 588,090 | 24,227,187 | 45 | 54,523 | 16,626,765 | 115 |
| 09/08/95 | 152 | 24 | 2 | 6 | 35 | 62 | 9 | 583,703 | 24,325,120 | 45 | 40,008 | 16,666,184 | 115 |
| 09/09/95 | 148 | 14 | 6 | 0 | 30 | 8 | 0 | 383,314 | 24,708,433 | 46 | 0 | 16,666,184 | 115 |
| 09/10/95 | 147 | 8 | 0 | 0 | 29 | 0 | 2 | 293,433 | 25,001,867 | 47 | 0 | 16,666,184 | 115 |
| 09/11/95 | 155 | 30 | 6 | 6 | 41 | 56 | 5 | 612,987 | 24,762,500 | 46 | 1,054,756 | 16,868,411 | 116 |
| 09/12/95 | 164 | 35 | 4 | 13 | 31 | 84 | 3 | 626,121 | 23,855,735 | 44 | 51,202 | 17,771,811 | 123 |
| 09/13/95 | 160 | 21 | 4 | 8 | 30 | 80 | 6 | 518,613 | 24,024,990 | 45 | 77,366 | 17,160,229 | 118 |
| 09/14/95 | 160 | 27 | 1 | 9 | 33 | 77 | 6 | 657,786 | 24,324,125 | 45 | 326,401 | 16,967,638 | 117 |
| 09/15/95 | 159 | 18 | 4 | 9 | 38 | 59 | 5 | 640,237 | 24,290,650 | 45 | 379,169 | 17,360,340 | 120 |
| 09/16/95 | 145 | 14 | 1 | 0 | 31 | 2 | 0 | 318,378 | 24,609,028 | 46 | 0 | 17,360,340 | 120 |
| 09/17/95 | 151 | 10 | 0 | 0 | 30 | 2 | 0 | 309,262 | 24,918,290 | 46 | 0 | 17,360,340 | 120 |
| 09/18/95 | 150 | 32 | 4 | 15 | 32 | 44 | 8 | 560,951 | 24,990,439 | 47 | 133,528 | 17,493,751 | 121 |
| 09/19/95 | 146 | 17 | 5 | 9 | 37 | 80 | 5 | 737,254 | 24,918,347 | 46 | 300,307 | 17,794,059 | 123 |
| 09/20/95 | 152 | 24 | 3 | 5 | 29 | 78 | 3 | 615,011 | 24,466,676 | 45 | 121,747 | 17,915,719 | 124 |
| 09/21/95 | 147 | 20 | 3 | 12 | 42 | 75 | 1 | 606,988 | 24,314,889 | 45 | 91,480 | 17,472,006 | 121 |
| 09/22/95 | 131 | 19 | 5 | 5 | 27 | 51 | 6 | 513,300 | 24,029,771 | 45 | 268,906 | 17,740,912 | 122 |
| 09/23/95 | 127 | 14 | 3 | 0 | 39 | 8 | 1 | 320,208 | 24,349,899 | 45 | 0 | 17,740,912 | 122 |
| 09/24/95 | 134 | 10 | 2 | 0 | 30 | 0 | 4 | 327,925 | 24,706,495 | 46 | 0 | 17,740,912 | 122 |
| 09/25/95 | 142 | 28 | 7 | 7 | 39 | 58 | 4 | 638,967 | 24,808,993 | 46 | 1,271,087 | 18,191,763 | 125 |
| 09/26/95 | 150 | 28 | 3 | 8 | 31 | 76 | 7 | 673,959 | 24,222,118 | 45 | 53,167 | 19,065,080 | 131 |
| 09/27/95 | 146 | 20 | 3 | 12 | 39 | 50 | 0 | 539,909 | 24,306,662 | 45 | 48,243 | 19,115,902 | 132 |
| 09/28/95 | 154 | 27 | 3 | 11 | 35 | 68 | 4 | 650,675 | 23,949,900 | 45 | 17,799 | 17,877,207 | 123 |
| 09/29/95 | 147 | 19 | 3 | 13 | 30 | 57 | 2 | 643,538 | 23,780,583 | 44 | 440,319 | 18,490,774 | 128 |
| 09/30/95 | 152 | 22 | 2 | 0 | 42 | 3 | 3 | 348,623 | 24,129,206 | 45 | 0 | 18,490,774 | 128 |
| | | | | | | | | | | | | | |
| TOTAL | 4,308 | 619 | 91 | 186 | 1,076 | 1,319 | 108 | 15,156,543 | | | 5,115,560 | | |
| AVG | 144 | 21 | 3 | 6 | 36 | 44 | 4 | 505,218 | 24,403,229 | 45 | 170,519 | 17,485,329 | 121 |
| AVG BUDGET | 155 | 20 | 0 | 9 | 36 | | | 571,150 | | | 189,730 | 6,524,775 | 45 |
| BUDGET | 4,645 | 601 | 0 | 276 | 1,088 | | | 17,134,499 | | | 5,691,900 | | |
| PRIOR MTH | 4,636 | 718 | 129 | 230 | 1,303 | 1,603 | 104 | 16,228,712 | | | 10,618,365 | | |
| PR MTH AVG | 150 | 23 | 4 | 7 | 42 | 52 | 3 | 523,507 | 29,039,583 | 53 | 342,528 | 14,164,912 | 97 |

RDX 007465

RCI 006622

# Exhibit

# 39

NORTHSIDE OPERATING COMPANY
BOARD OF DIRECTORS MEETING
PARK HYATT SAN FRANCISCO
SAN FRANCISCO, CALIFORNIA
JUNE 16, 1995
2:00 PM (PST)


MINUTES


In Attendance:       Macon Brewer
                     George Chapas
                     William Fruland

Others In Attendance:   Dan Finnane    –   Primus Management, Inc.
                        Scott Gross    –   Primus Management, Inc.
                        David Miller   –   Braddock Management, LP
                        Peter Rogan    –   Braddock Management, LP

In Attendance Via     Karen Hyneman   –   Primus Management, Inc.
Telephone:            Michael Olsen   –   Primus Management, Inc.


I.   CALL TO ORDER

   Chairman Dr. Bert Rosenthal was unable to attend the meeting due
   to weather related airport delays in Los Angeles.  On Dr.
   Rosenthal's behalf, William Fruland, Secretary, acted as Chairman
   and called the meeting to order at 2:05 p.m. (PST).

II.  OLD BUSINESS

   A.   Approval of Prior Board Meeting Minutes of February 13, 1995

      All attendees noted that they had reviewed the Minutes and no
      exceptions were found.  Mr. Fruland called for a motion to
      accept and approve the minutes as presented.

MSC

   "that the minutes of the Board of Directors Meeting of February 13,
   1995, be accepted and approved."

   B.   Discuss and Approve Actions and Expenditures Required to
        Resolve Issues Noted in IDPH Report

      Mr. Rogan summarized developments since the last Board meeting
      regarding correction of deficiencies cited under Physical
      Environment in the Report issued by the Illinois Department of
      Public Health (IDPH).  At the prior meeting, Mr. Rogan had
      indicated one option had been developed that had an estimated
      cost of $1.2 Million to $1.5 Million and a 2.5 year completion

DEFENDANT'S
EXHIBIT
39

PENGAD-Bayonne, N.J.

EMC 002059

Northside Operating Company
June 16, 1995
Page 2

period, and a second approach that would be less costly and completed in 1.5 years. He noted that an architect has been retained to assist in the development of a construction plan, and it is now estimated that the total capital cost to correct the deficiencies will be $.65 Million. Mr. Rogan asked the Board to authorize him to approve these expenditures and move forward with the construction plan. After a lengthy discussion, Mr. Fruland called for a motion to approve these expenditures. (Note: Further discussion of the 1995-96 Capital Expenditure Plan is included under Section V. New Business, Subsection A).

MSC

"that Mr. Rogan is authorized to approve the capital expenditures necessary to implement a plan to correct the deficiencies cited in the Illinois Department of Public Health Inspection Report."

III. FACILITY REPORTS

A.   Advisory Board Minutes

Mr. Rogan briefly summarized the major topics of these meetings. Each Board member confirmed that they had received as part of the Board packets the Advisory Board Minutes for the meetings that had taken place on January 25, 1995; April 5, 1995; and May 24, 1995. Each member noted that they had reviewed these Minutes and that there were no questions for Mr. Rogan. Mr. Fruland then called for a motion to accept and approve the Minutes as presented.

MSC

"that the January 25, 1995; April 5, 1995; and May 24, 1995 Advisory Board Minutes be accepted and approved as presented."

B.   Medical Staff Meeting Minutes

Mr. Rogan again provided a brief summary of the Minutes from January, February, March and April, 1995, including all credentialing actions. There were no questions from the Board regarding these minutes. Mr. Fruland called for a motion to accept the Minutes as presented.

MSC

"that the January, February, March and April, 1995, Medical Staff Meeting Minutes be accepted and approved as presented."

Northside Operating Company
June 16, 1995
Page 3

C.   **Financial Reports**

Mr. Rogan gave a brief presentation of the April, 1995, and Year-To-Date April, 1995, Financial Reports. There were no questions from the Board regarding these reports. Mr. Fruland called for a motion to accept the report as presented.

**MSC**

"that the April, 1995, and Year-To-Date April, 1995, Financial Reports be accepted and approved as presented."

IV.  BRADDOCK MANAGEMENT, L.P. REPORT

A.   **Update of New Chiropractic Program and Affiliation with National College of Chiropractic**

Mr. Rogan reported that the first students of the College have rotated through Edgewater under the affiliation program approved at the last Board Meeting. Mr. Rogan mentioned that the affiliation reflects the points requested by Dr. Rosenthal at the February meeting. The program has had no significant impact on business as yet, but the outlook for the success of the affiliation remains positive. Mr. Finnane asked if an actual affiliation agreement had been executed and Mr. Rogan responded that this has not yet occurred. Mr. Rogan said that he would provide each member of the Board with a copy of the proposed agreement for their review prior to the next Board Meeting in September, 1995, at which time the agreement would be discussed and acted upon.

B.   **Update on Negotiations with Blue Cross**

Mr. Rogan reported that Blue Cross withdrew its demand that the contract with Edgewater be renegotiated. Blue Cross offered the same type of contract to Edgewater as is currently held with other hospitals. The term of the new contract is one year.

**MSC**

"that the Blue Cross contract be accepted and approved."

C.   **Update on Line of Credit Financing**

Mr. Rogan reported that discussions are continuing with LaSalle National Bank with respect to establishing a Line of Credit. He also summarized a series of meetings he attended in conjunction with Permian Health Care, Inc. These meetings were held with several potential lenders to educate them on

EMC 002061

**Northside Operating Company**
**June 16, 1995**
**Page 4**

the history of Permian and its member healthcare facilities and establish a discourse that is intended to develop a master financing package. Mr. Rogan told the Board that he would continue to keep them informed of progress in this area.

D. **Update on Status of 26th Street Satellite Clinic**

Mr. Rogan reported that this project had not achieved the volume anticipated and that it was being closed down. The total start-up cost and operational loss will amount to less than $15,000 once the operation is completely shut down.

E. **Update on Inpatient Detox Program**

Mr. Rogan summarized the progress to date of this program, approved at the last meeting. Admissions have grown from 50 in February to 75 in March, 112 in April and 128 in May. June to date appears to be running below May levels, but is still well above the monthly break-even level.

F. **Impact of Medicaid Program – State of Illinois Budget**

Mr. Rogan reported that the Illinois State Legislature has devised a settlement to the Medicaid budget difficulties. The impact to Edgewater will be $100,000 favorable as the reduction in public aid payments will be more than offset by the decrease in tax payments.

G. **The Fiscal Year 1994 Financial Audit by Ernst & Young, LLP, and Management Letter**

Each member of the Board had been provided with a copy of the 1994 audited Financial Statements and accompanying opinion of Ernst & Young, as well as the Management Letter. There being no questions regarding either of these items, Mr. Fruland called for a motion to accept Ernst & Young's reports.

**MSC**

"that the 1994 Financial Statements and Report of the Independent Auditor, Ernst & Young, and the accompanying Management Letter, be accepted and approved as issued."

H. **Master Trustee Report – 1st Quarter 1995**

Each member of the Board had been provided with a copy of the Master Trustee Report for the 1st Quarter of 1995 in their Board packet. There being no questions regarding this report, Mr. Fruland called for a motion to accept this Report as issued.

EMC 002062

Northside Operating Company
June 16, 1995
Page 5

<u>MSC</u>

"that the 1st Quarter 1995 Master Trustee Report be approved and accepted as issued."

I.   <u>Risk Management - Reorganization</u>

Mr. Rogan reported that the resignation of an employee had offered the opportunity to divide Risk Management responsibilities in a more effective manner. Henceforth, Nancy Bryson will be responsible for this area as it relates to patient activity and Mike Naiman will oversee risk management as it relates to liabilities to third parties.

J.   <u>Update of IDPH/Managed Care Organization</u>

Mr. Rogan reported that efforts by the State of Illinois to develop a managed care approach have been stalled as the State has not received the waivers that would be required from the federal Government. He believes the soonest any impact might be felt from this would be mid-1996. Edgewater is continuing conversations with existing HMO's who have current managed care arrangements with Illinois for public aid patients. Ms. Hyneman has provided Edgewater with a copy of a California full capitation contract as an example of the appropriate structure.

K.   <u>Joint Radiation Therapy Venture with Ravenswood</u>

Mr. Rogan reported that there has been no substantive progress on this effort as Ravenswood's attentions have been diverted by other activities.

L.   <u>Trading of Northside Operating Company Bonds on the Secondary Market</u>

Mr. Finnane reported that it has been confirmed that $.5 Million of Northside bonds were sold to outsiders in denominations less than the required $100,000. While it is not yet clear exactly how this happened, Mr. Olsen explained that it appears that the dissolution of the Muni Group by First Boston, Underwriter of the Northside issue, may have resulted in the inadvertent sale of a retained block of bonds. Mr. Olsen is in contact with counsel at First Boston and assured the Board that he will keep all members informed of developments in this area as it appears that such a sale would be a violation of securities regulations. Mr. Olsen expects cooperation from First Boston. In the meantime, he counseled all Board members and attendees that there is no requirement

EMC 002063

Northside Operating Company
June 16, 1995
Page 6

to provide any information to anyone who is holding bonds, as a result of this error.

There being no further discussion regarding any of the Braddock Management, L.P., reports, Mr. Fruland called for a motion to accept these reports.

MSC

"that the Braddock Management, L.P., report be approved."

V.    NEW BUSINESS

A.    Review and Approval of 1995 Capital Budget

Mr. Rogan reviewed the proposed FY 1995 Capital Expenditures Budget, a copy of which was included in the packet given to Board members. The original proposal called for $.9 Million to be spent and the revised budget added $1.34 Million for a total of $2.24 Million. Of this total, $1.7 Million will be spent in 1995 with the balance to be spent in 1996. The $1.34 Million of additional proposed expenditures includes the $.65 Million to correct IDPH Report deficiencies discussed earlier, and an additional $.34 Million to reconstruct the main entrance to the Medical Center. Mr. Rogan said that the latter will be undertaken now that the cost of correcting the IDPH deficiencies is known. Also included is $.15 Million for Surgical Services (see further discussion below in Subsection F.) and $.2 Million to add 17 beds on the 7th Floor as part of the expansion of the detoxification program. There being no further discussion, Mr. Fruland called for a motion to approve the FY 1995 Capital Expenditures Budget.

MSC

"that the FY 1995 Capital Expenditures Budget be approved as submitted."

B.    Review and Approve New Physician and Vendor Contracts

Physician Teaching Contracts

Wilbur Britt, M.D.                    Ramon Castro, M.D.
Michael Fox, D.P.M.                   David Hiltzik, M.D.
Satyendra K. Humad, M.D.             John Kane, D.P.M.
Yako Lebar, M.D.                      James Luvison, D.P.M.
Rogelio Maynulet, M.D.               Fernando Ojea, M.D.
Mario Oliveros, M.D.                  Nirmal Patodia, M.D.
Antonio Ramos, M.D.                   Gonzalo Ruiz, M.D.
Muhammed Saudye, M.D.                 Richard Weiss, M.D.
Dusan Zivkovic
Chicago Neurological Surgeons, Ltd.

EMC 002064

Northside Operating Company
June 16, 1995
Page 7

### Vendor Contracts

Baxter Healthcare Corporation
Mitsubishi International Corporation
Philips Medical Systems

The Board reviewed all of the contracts presented. There were no objections to any of those contracts noted above. Mr. Fruland called for a motion to accept and approve the contracts as presented.

MSC

"that the contracts presented be accepted and approved."

C. ### Review and Approve - Financing Program

Mr. Olsen reviewed a program of the Illinois Health Facilities Authority wherein it is possible for Northside to borrow funds for capital expenditures at an attractive interest rate of 4. to 4.5% per annum. He pointed out that this rate was significantly lower than alternate forms of financing, and proposed that the Board approve borrowing up to $6 Million for capital expenditures 1996 - 1998. There being no further discussion, Mr. Fruland called for a motion to approve the resolution offered by Mr. Olsen.

MSC

"that the Corporation be authorized to borrow up to $6 Million from the IHFA to fund capital expenditures for the years 1996, 1997 and 1998, and that the President and the Secretary of the Corporation shall be authorized to execute such documents as are necessary to complete these borrowings."

D. ### Review and Approve Change of Braddock Management, L.P. Management Agreement

This First Amendment to the Hospital Management Contract redefines the limitations to the annual increase of the Management Fees paid to Braddock Management. This amendment is a result of the request by Chapman and Cutler, Bond Counsel, to change the Management Agreement between Northside Operating Company and Braddock Management, L.P. As a result, Braddock Management, L.P., and Bond Holders agreed to implement a First Amendment to the Braddock Management, L.P., management contract that met the business terms and the technical terms requested by Chapman and Cutler.

This First Amendment to the management contract must be approved by the Bond Holders.

EMC 002065

Northside Operating Company
June 16, 1995
Page 8

MSC

"that the First Amendment To Hospital Management Agreement be accepted and approved as submitted, effective January 1, 1995."

    E.    Approve Re-opening of 7 West - 17 Medical/Surgical Beds

        This item, having been previously discussed with the FY 1995 Capital Expenditures Budget, had no further discussion and Mr. Fruland called for a motion authorizing this action.

MSC

"that the plan to re-open the Seventh Floor - West and provide for 17 new medical/surgical beds be accepted and approved as submitted."

    F.    Consultant Report Surgical Services - Phase II

        Mr. Rogan reported that this phase of the project was complete and he requested authorization to retain Higman Associates for 16-18 weeks, at a total cost of $80,000, to assist in the implementation of the recommendations. Mr. Rogan further requested authorization to proceed with the overall implementation of these recommendations. There being no further discussion, Mr. Fruland called for a motion to approve the authorization requested by Mr. Rogan.

MSC

"that the findings of the surgical services report be accepted and authorization provided to take the actions necessary to implement recommendations contained in that report, including the expenditure of $80,000 to retain Higman Associates to assist in the implementation effort."

    G.    Review and Approve Unum as New Manager for Employees Self-Directed 403B and Long Term Disability Insurance

        Mr. Rogan reported that this change would result in an 18% reduction in cost to administer the program. Mr. Fruland requested a motion that this change be approved.

MSC

"that Unum be named as the Manager of the Edgewater Medical Center Employee's 403B and Long Term Disability Plan."

EMC 002066

Northside Operating Company
June 16, 1995
Page 9

H.    **Approve Establishment of Additional Chicago Housing Authority Clinic – Larrabee**

Mr. Rogan reported that CHA is very interested in establishing this clinic and is willing to contribute, at no cost to Edgewater, the space and equipment necessary to operate the clinic. He went on to explain that this arrangement would facilitate servicing the needs of patients in CHA facilities. There being no further discussion, Mr. Fruland called for a motion to approve the establishment of such a clinic.

MSC

"that the establishment of the Larrabee clinic within Chicago Housing Authority property be approved."

I.    **Approval of General Counsel and Assistant Secretary**

It was proposed that Michael Olsen be named General Counsel of Northside Operating Company. Mr. Finnane added that he should also be named Assistant Secretary so as to be covered under the Corporation's Directors and Officers Insurance Policy. After a general discussion ended, Mr. Fruland called for a motion approving the appointment of Mr. Olsen to the positions indicated.

MSC

"that Michael Olsen be named General Counsel and Assistant Secretary of Northside Operating Company."

J.    **Approve Mission Statement of Edgewater Medical Center**

Each Board member had been supplied with a copy of the proposed Mission in their Board packet. There being no objection to the Mission as stated, Mr. Fruland requested a motion that it be accepted as presented.

MSC

"that the Mission Statement of Edgewater Medical Center be accepted and approved as submitted."

K.    **Review and Approve Resolution Regarding the Community Service Plan and Report for EMC**

Mr. Olsen explained the requirement and purpose of "community service plans" in the State of California, and how it appears these requirements will be adopted by the Federal or State of

EMC 002067

Northside Operating Company
June 16, 1995
Page 10

Illinois governments. It was noted that this plan is instrumental in securing an exemption from real estate and/or sales taxes. As such, it would be prudent to commence with the preparation of such a plan for Edgewater. Following a general discussion, Mr. Fruland called for a motion to adopt a resolution to approve the development of a plan.

MSC

"that Permian Health Care, Inc. and, to the extent necessary, Braddock Management, L.P., coordinate the preparation, development and submission of a Community Service Plan to this Board for its review and approval."

L.  **Northside Operating Company Creation of a Hospital Based Home Health Care Agency**

Mr. Rogan explained that the creation of such an Agency is being investigated. Medicare cost reimbursement procedures allow an allocation of hospital overhead to such an agency, effectively increasing total cost recovery. Edgewater Medical Center currently refers its patients to two different private agencies. Mr. Rogan asked the Board to be allowed to pursue this opportunity. The discussion having been completed, Mr. Fruland asked for a motion granting Mr. Rogan such authority.

MSC

"that Braddock Management, L.P., is hereby authorized and directed for, and on behalf of, the Northside Operating Company to do and perform all acts, cause any contracts to be entered into and to cause such payments to be made as may be necessary and proper to implement the establishment of a home healthcare program."

M.  **Educational Program**

**Continuous Quality Improvement and Performance Improvement Activities**

Mr. Gross lead a discussion on the various approaches being used in the health care industry on continuous quality and performance improvement. A good deal of discussion ensued concerning which approaches would be most suited to Edgewater Medical Center.

The Board asked that Braddock Management, L.P., in its future reports, keep the Board current on these developments.

Northside Operating Company
June 16, 1995
Page 11

VI.  NEXT MEETING/ADJOURNMENT

It was noted that the next meeting would take place in September,
1995, at a place, date and time to be specified.  With nothing
further to discuss, Mr. Fruland adjourned the meeting at 3:20 p.m.
(PST).

Approved:                              Attested:


_____              _____
Bert Rosenthal, M.D.                   William D. Fruland
Chairman                               Secretary


Date:

_Oct 10 1995_

EMC 002069

# Exhibit

# 40

**NORTHSIDE OPERATING CO.**
**BOARD OF DIRECTORS MEETING**
**TELEPHONIC CONFERENCE**
**October 10, 1995**
**3:00 PM  (PST)**


## MINUTES

In Attendance:              Bert Rosenthal, M.D.
                            Stina Hans
                            Macon Brewer
                            George Chapas
                            William Fruland

Others In Attendance:       Dan Finnane  -      Primus Management, Inc.
                            Scott Gross  -      Primus Management, Inc.
                            Karen Hyneman  -    Primus Management, Inc.
                            Mike Olsen  -       Northside Operating Co.
                            Peter Rogan  -      Braddock Management, L.P.


### I.    CALL TO ORDER

The meeting was called to order by Dr. Rosenthal at 3:02 PM (PST).

### II.   OLD BUSINESS

A.    Approval of Prior Board Meeting Minutes of June 16, 1995

With the exception of Mr. Rogan, all attendees noted that they had
reviewed the Minutes and no exceptions were found.  Mr. Rogan asked
that a change be made under IV. Braddock Management, L.P. Report,
F. Impact of Medicaid Program - State of Illinois Budget.  Mr. Rogan
indicated that his report at the meeting had indicated an expected
favorable impact to Edgewater of $ 100,000.  As it now appears the
new program will result in the loss of Medical Education funding of
about $ 200,000, resulting in an unfavorable impact of $ 100,000.  Dr.
Rosenthal called for  a motion to accept and approve the minutes as
presented, and amended to reflect Mr. Rogan's update.

<u>MSC</u>

"that the prior Board of Directors Meeting minutes as amended be accepted and
approved."

DEFENDANT'S
EXHIBIT
40

PENGAD-Bayonne, N.J.

EMC 002282

**Northside Operating Company**
**October 10, 1995**
**Page 2**

    B.    <u>Illinois Department of Public Health Compliance Status</u>

Mr. Rogan reported that the Facility Plan is in compliance with the requirements to correct deficiencies cited under Physical Environment in the Report issued by the Illinois Department of Public Health (IDPH). The plan to implement these corrections is progressing on schedule.

## III.    FACILITY REPORTS

    A.    <u>Advisory Board Minutes</u>

Mr. Rogan briefly summarized the major topics of these meetings. Each Board member confirmed that they had received as part of their Board packets the Advisory Board packet containing the Minutes for the meeting that had taken place on August 2, 1995. Each member noted that they had reviewed these Minutes and that there were no questions for Mr. Rogan. Dr. Rosenthal then called for a motion to accept and approve the Minutes as presented.

<u>MSC</u>

"that the August 2, 1995 Advisory Board Minutes be accepted and approved as presented."

    B.    <u>Medical Staff Meeting Minutes</u>

Mr. Rogan again provided a brief summary of the Minutes from May, June, July, August and September, 1995, including all credentialing actions. After questions from the Board regarding these minutes. Dr. Rosenthal called for a motion to accept the Minutes as presented.

<u>MSC</u>

"that the May, June, July, August and September, 1995, Medical Staff Meeting Minutes be accepted and approved as presented."

    C.    <u>Financial Reports</u>

Mr. Rogan gave a brief summary of the August, 1995, and Year-To-Date August, 1995, Financial Reports. In addition, Mr. Rogan estimated September's operating income about $ 575,000, bringing the year-to-date total to approximately $ 7.2 million. After no questions from the Board, Dr. Rosenthal called for a motion to accept the reports as presented.

EMC 002283

**Northside Operating Company**
**October 10, 1995**
**Page 3**

MSC

"that the August, 1995, and Year-To-Date August, 1995, Financial Reports be accepted and approved as presented."

IV.     **BRADDOCK MANAGEMENT, L.P. REPORT**

    A.     Update on Negotiations with Blue Cross

        Mr. Rogan reported that Blue Cross is continuing its process of renegotiating contracts with Chicago area hospitals. Edgewater is currently number 11 on the Blue Cross list.

    B.     Impact of Medicaid Program - State of Illinois Budget

        Mr. Rogan reported that the State of Illinois is still waiting for the waiver required to implement a Managed Care Program. The expectation is that no substantive action will be taken until changes have been finalized at the Federal level and a Block Grant Program is implemented.

    C.     Draft of Affiliation Agreement with National College of Chiropractic

        Mr. Rogan reported that both Mike Olsen and the National College of Chiropractic have reviewed and commented on a first draft agreement. Mike Olsen is continuing to work with the College to produce a final version.

    D.     Update on Line of Credit Financing

        Mr. Rogan reported that discussions are continuing with Vista Hospital Systems, Inc. to develop a total package line of credit. A number of issues will be clarified over the next month, after which additional progress is expected.

Northside Operating Company
October 10, 1995
Page 4

E. Master Trustee Report - 2nd Quarter 1995

Each member of the Board had been provided with a copy of the Master Trustee Report for the 2nd Quarter of 1995 in their Board packet. After questions regarding this report, Dr. Rosenthal called for a motion to accept this Report as issued.

MSC

"that the 2nd Quarter 1995 Master Trustee Report be approved and accepted as issued."

F. Trading of Northside Operating Company Bonds on the Secondary Market

Mr. Olsen reported that the law firm of Foley and Lardner, as well as the Illinois Health Finance Authority have been contacted and that Northside is working with them to determine the appropriate course of action.

G. Update on Reopening of 7 West

Mr. Rogan reported that demolition has been completed and remodeling is underway.

H. Update on Chicago Housing Authority Clinic - Larrabee

Mr. Rogan reported that the physician in charge of the Clinic resigned, and a replacement began yesterday.

I. Update on Hospital Based Home Health Care Agency

Mr. Rogan reported that negotiations are underway with a target agency. The objective is to have the hospital based agency in operation on January 1, 1996.

J. Update on Property Tax Exemption

Mr. Rogan reported that application has been made to Cook County and no determination has been made yet. 1993 applications are still being worked on, so it is expected it will be at least 1996 before Northside's application will be reviewed.

EMC 002285

**Northside Operating Company**
**October 10, 1995**
**Page 5**

K.   Update on JCAHO Survey

Mr. Rogan reported that the survey was completed in September and the results were favorable. A copy of the Exit Conference Report was included in the Board Meeting packets. Final comments regarding Infection Control are being held awaiting the receipt of a written report from JCAHO.

L.   Response to Ernst & Young's Management Letter

Mr. Rogan reported that a response has been submitted and a copy will be forwarded to each Board Member.

M.   IDPA Medicaid Tax Correction

Mr. Rogan reported that it had been discovered that IDPA had made a mistake in calculating the assessment to Edgewater Medical Center. The additional amount due has been sent to IDPA along with explanatory material.

N.   1996 Preliminary Operating Budget

Mr. Rogan reported that on a preliminary basis, operating income of $6.5 million is expected for 1996. This projection assumes no new programs, and reflects an increase of 3% for compensation and related expenses, and 2% for all other costs. The full budget for 1996 will be presented to the Board for approval at its next meeting.

There being no further discussion regarding any of the Braddock Management, L.P. reports, Dr. Rosenthal called for a motion to accept these reports.

MSC

"that the Braddock Management, L.P., report be approved."

EMC 002286

Northside Operating Company
October 10, 1995
Page 6

## V.    NEW BUSINESS

A.    <u>Authorization for Braddock Management, LP to pay, on Northside</u>
<u>Operating Co.'s behalf, Primus Management, Inc. for the services of</u>
<u>Michael E. Olsen in his capacity as General Counsel for Northside</u>

The proposed amount is $ 37,500 per annum, to be paid by Braddock
and passed through to Northside.  After discussion with respect to the
proposal, Dr. Rosenthal requested a motion to approve the proposal.

<u>MSC</u>

"that Braddock Management, LP is authorized to pay to Primus Management, Inc. on
behalf of Northside Operating Co., $ 37,500 for the services of Michael E. Olsen as
Corporate Counsel for Northside Operating Co.."

B.    <u>Review and Approve New Physician and Vendor Contracts</u>

<u>Physician Contracts</u>

| | |
|---|---|
| Mir Akif Ali, M.D. | Teaching |
| Emo Bonaminio, D.P.M. | Teaching |
| Jesus Rene Dadivas, M.D. | Teaching |
| Kevin Gavin, D.P.M. | Teaching |
| Will Gee, M.D. | Physician Services |
| Peter Seifert, M.D.. | Teaching |

<u>Vendor Contracts</u>

ServiceMaster                                    Contract Services

<u>Other</u>

Neighborhood Health Care                Managed Care
Foundation

<u>Other</u>

University of Illinois                           Medical Education Affiliation
- Emergency Medicine
- Surgery
- Pathology

EMC 002287

**Northside Operating Company**
**October 10, 1995**
**Page 7**

The Board reviewed all of the contracts presented. There were no objections to any of those contracts noted above. Dr. Rosenthal called for a motion to accept and approve the contracts as presented.

<u>MSC</u>

"that the contracts presented be accepted and approved."

C.   <u>Review and Approve Payment of Subordinated Debt on January 1, 1996</u>

Mr. Gross reviewed the status of the subordinated debt, including the fact that it carries interest at 10%, costing Northside $ 400,000 per year. Mr. Gross proposed that this debt be paid off, assuming the required covenants and conditions are met as of December 31, 1995. Mr. Gross indicated that an opinion of counsel would be obtained to assure these requirements had been met. A number of comments were made that given the Hospital's cash balances and debt coverage, this would be a prudent business action. There being no further discussion, Dr. Rosenthal called for a motion to accept Mr. Gross's proposal.

<u>MSC</u>

"that the Corporation be authorized to repay the subordinated debt upon appropriate opinion of counsel that all the required covenants had been met"

D.   <u>Authorization to Obtain Fair Market Valuation of Leased Property</u>

Given the space constraints, Mr. Gross proposed such a valuation be obtained to determine if it made economical sense to attempt to lease and/or purchase all of the available space in adjacent buildings on campus, or seek alternate locations off campus. There being no objections, Dr. Rosenthal called for a motion to authorize Mr. Gross's request.

<u>MSC</u>

"that Northside Operating Co. obtain a fair market value appraisal for determination of the rental and fair market value of the property located in adjacent campus buildings in anticipation of entering into a long term lease for those properties."

EMC 002288

**Northside Operating Company**
**October 10, 1995**
**Page 8**

E.   Review and Approve Northside Operating Co. to Join Vista Hospital System, Inc. Workers Compensation Captive

Ms. Hyneman discussed the cost savings available from this alliance. There being no objections, Dr. Rosenthal called for a motion authorizing this action.

MSC

"that the Northside Operating Co. be authorized to join the Vista Hospital System, Inc. captive Workers Compensation Insurance Program."

F.   Authorize Midwestern University Teaching Affiliation

Mr. Rogan reported that such an affiliation would present an alternative to the current arrangement with the University of Illinois, and would provide options not available with a single affiliation. There being no objections, Dr. Rosenthal called for a motion to approve the authorization requested by Mr. Rogan.

MSC

"that Braddock Management, LP be authorized to enter into a teaching affiliation agreement with Midwestern University on behalf of Northside Operating Company."

G.   Donated Property - Designated Donation

Mr. Gross reported that Mr. Rogan has indicated a potential desire to donate to Northside Operating Company some property. Mr. Gross further explained that it is necessary that such a donation be "designated" to avoid Northside having to provide these additional assets as collateral under the bond indenture. There being no objections, Dr. Rosenthal called for a motion approving the designation.

MSC

"that Northside Operating Company designate any land and/or buildings currently owned by Mr. Rogan and donated to Northside Operating Co. as a designated donation."

**Northside Operating Company**
**October 10, 1995**
**Page 9**

H.     <u>Review and Approve Edgewater Medical Center Strategic Plan</u>

Mr. Rogan briefly discussed the Plan, a copy of which was included in the packets distributed to the Board members. The Board asked that Mr. Rogan compliment the preparers on the comprehensive job they had done. There being no further discussion, Dr. Rosenthal called for a motion to accept the Plan.

<u>MSC</u>

"that the Strategic Plan of Edgewater Medical Center be accepted as submitted."

I.     <u>Review and Approve Contracted Services Report</u>

Mr. Rogan reviewed the Report, a copy of which had been furnished in the Board members' packets. There being no further discussion, Dr. Rosenthal called for a motion accepting the Report.

<u>MSC</u>

"that the Contracted Services Report be accepted as submitted."

J.     <u>Authorize the development of the Advisory Board Role and Responsibility</u>

Mr. Rogan discussed the possibility of being able to more fully utilize the available expertise by developing a document outlining the specific objectives of the Group. The Board agreed that this would be a worthy effort, and it was suggested that the Leadership Document of Arroyo Hospital be provided to Mr. Rogan as an example of such a document. There being no further discussion, Dr. Rosenthal called for a motion authorizing the development of a roles and responsibility document.

<u>MSC</u>

"that Braddock Management, LP be authorized to develop a Roles and Responsibilities document for the Advisory Board of Northside Operating Company."

EMC 002290

Northside Operating Company
October 10, 1995
Page 10

K.   Braddock Management, LP. - Performance Bonus for 1995

Mr. Gross discussed the outstanding performance of the Braddock
management team and the suitability, as such, of rewarding
performance bonuses. Mr. Gross explained that the Board would be
presented with a recommendation of the amount of the proposed bonus.
The Board would then review and approve these recommendations , as
appropriate. There being no objections, Dr. Rosenthal called for a
motion that such a list be developed.

MSC

"that Mr. Gross, in conjunction with Mr. Rogan, develop a list of recommendations
of 1995 performance bonuses for Braddock Management, LP."

L.   Review and Approve Community Awareness and Education
Programs

Mr. Rogan gave an overview of the Programs and requested approval
of same. There being no objections, Dr. Rosenthal called for a motion
approving the programs.

MSC

"that the Community Awareness and Education Programs of Edgewater Medical
Center be approved as submitted."

M.   Review and Approve Investment Advisor

Mr. Rogan explained that the financial success of Northside Operating
Company provides the opportunity to consider placing a substantial
amount with an investment advisor for the purpose of providing returns
beyond those obtained from the historical practice of turning over
Treasury obligations. Due to the requirements of the Bond documents,
Mr. Rogan discussed the fact that careful consideration must be given
to the nature of such investments. As such, Mr. Rogan requested
authorization to solicit proposals from qualified investment advisors for
the purpose of making a recommendation to the Board. There being no
further discussion, Dr. Rosenthal called for a motion authorizing
Braddock Management, LP, to develop a recommendation for an
investment advisor and implement in a timely fashion an investment
plan.

EMC 002291

**Northside Operating Company**
**October 10, 1995**
**Page 11**

## MSC

"that Braddock Management, LP, be authorized to develop a recommendation for an investment advisor for Northside Operating Company and in a timely fashion, implement the investment plan upon approval of Braddock Management, LP."

### VI.    NEXT MEETING/ADJOURNMENT

It was noted that the next meeting would take place in February, 1996, at a place, date and time to be specified. With nothing further to discuss, Dr. Rosenthal adjourned the meeting at 4:10 PM Pacific Standard Time.

Approved:                                   Attested:

_____                   _____
Bert P. Rosenthal, M.D.                     William D. Fruland
President                                   Secretary

Date:

_March 2, 1996_

EMC 002292

# Exhibit

# 46

## *PRIMUS MANAGEMENT, INC.*
### *708-573-1726 Office / 708-472-5115 FAX*


### F A C S I M I L E


ATTENTION:        Mike Ficcaro

COMPANY NAME: _____

FAX NUMBER:       312/558-6538


FROM:             *Mike Olsen*

DATE:             May 7, 1996

# PAGES TO FOLLOW:        4

COMMENTS:

Mike:  Pursuant to your request, I am forwarding the following for your review and understanding.  Please contact me if you have any questions or concerns.



DEFENDANT'S EXHIBIT 46

PENGAD-Bayonne, N. J.

FL 005371

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE

## PERMIAN HEALTH CARE, INC.

Permian Health Care, Inc. ("Permian") is a Colorado nonprofit corporation exempt from federal income tax by virtue of a group exemption. Permian is governed by a five (5) member Board of Directors. Permian is considered a "Supporting Organization" under Section 509(a) of the Code (as defined below), which establishes certain requirements regarding the makeup of the Board of Directors of Permian and its subordinates.

### SUBORDINATES

Permian's subordinates are exempt from federal income tax under Section 501(a) of the Internal Revenue Code of 1986 (the "Code"), as amended, as organizations described in Section 501(c)(3) of the Code, by virtue of their inclusion in Permian's group exemption.

Each of Permian's subordinates are governed by a five (5) member Board of Directors, of which a majority (3) must also be members of Permian's Board of Directors. A majority of Permian's Directors must also be members of each subordinate Board of Directors. In addition, each hospital of each subordinate has a local Advisory Board that reviews hospital policy and procedures and makes recommendations to the subordinate Boards of Directors.

### Vista Hospital Systems, Inc. ("Vista")

Vista is a California nonprofit, public benefit corporation, incorporated on July 6, 1990. Vista was incorporated by Permian to own and operate acute care general hospitals, and in anticipation of the acquisition of Arroyo Grande Community Hospital ("AGCH") and Circle City Medical Center ("CCMC"). AGCH is an acute care hospital licensed for 79 beds located in Arroyo Grande, California. At the time, CCMC was an acute care hospital licensed for 99 beds located in Corona, California.

In October, 1992, Vista acquired Corona Community Hospital ("CCH"), an acute care hospital licensed for 148 beds, also located in Corona, California. Vista merged the operations of CCMC and CCH to form Corona Regional Medical Center ("CRMC"), which now consists of an acute care hospital campus licensed for 148 beds with a comprehensive outpatient center, and a rehabilitation hospital campus licensed for 77 beds.

Also in October, 1992, Vista became the sole corporate member of a private foundation, now known as Corona Regional Medical Center Foundation ("CRMCF"), which corporate membership has since been transferred to Permian. Permian oversees all fund raising activity for its subordinates. CRMCF has its own IRS determination letter and is not technically a subordinate of Permian.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE

**Northside Operating Co. ("Northside")**

Northside, an Illinois not for profit corporation, was incorporated on August 18, 1993, to own and operate acute care general hospitals. On August 17, 1994, Northside acquired Edgewater Medical Center ("EMC"), an acute care hospital licensed to operate 335 beds located in Chicago, Illinois.

**Vista Medical Foundation, Inc. ("Foundation")**

The Foundation, a California nonprofit, public benefit corporation, was incorporated on November 15, 1995, for the purposes of, among other things, establishing, operating, maintaining and contracting with third party payors, health care providers and primary and multi-specialty clinics and promoting charitable health care, educational and medical research activities. The Foundation acquired Circle City Management Services, Inc.("CCMS"), located in Corona, California, on March 5, 1996. CCMS is operated by the Foundation under the name Circle City Medical Group ("CCMG"). CCMG is a medical foundation which contracts with third party payors for the provision of health care services to defined populations, provides a full range of administrative services for the provision of such services, and contracts with physician provider groups and individual providers for the provision of medical and related services to the Foundation's patients.

FL 005373

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE

## PERMIAN HEALTH CARE, INC.
## MANAGEMENT ENTITIES

Each subordinate of Permian Health Care, Inc. ("Permian") is required by its respective bondholders to be managed by a professional hospital management company. Each of Vista Hospital Systems, Inc., Northside Operating Co. and Vista Medical Foundation, Inc. is managed, under contract, by the following entities. If at any time, as long as each subordinate's bonds are outstanding, the respective entity below is no longer under contract to manage the facility, each set of bond documents requires that another nationally recognized hospital management company be hired. Under certain circumstances, the bondholders have veto rights regarding the selection of the hospital manager.

**Primus Management, Inc. ("Primus") - Vista Hospital Systems, Inc.**
Primus, a California corporation, was formed in 1993 as the successor organization to Alpha Hospital Management, Inc., which was formed in 1989 by F. Scott Gross. Primus has direct responsibility to the Permian Board of Directors for certain functions. Primus also manages Corona Regional Medical Center and Arroyo Grande Community Hospital pursuant to a management agreement with Vista Hospital Systems, Inc.

**Braddock Management, LP ("Braddock") - Northside Operating Co.**
Braddock, a California limited partnership, was formed in late 1993 as part of a strategic corporate restructuring of Primus. Braddock manages Edgewater Medical Center pursuant to a management agreement with Northside Operating Co. The General Partner of Braddock is Waldo Point Management, the stock of which is owned and controlled solely by F. Scott Gross.

**Primus Medical Management, LLC ("PMM") - Vista Medical Foundation, Inc.**
PMM, a California limited liability company, was formed in early 1996 to manage physician practice groups and medical service organizations. PMM manages Vista Medical Foundation, Inc. pursuant to a management agreement. PMM's managing member is Braddock Services, Inc., which was formed and is controlled by F. Scott Gross.

NOTE: F. Scott Gross, directly or indirectly, owns, operates and controls the above entities through various trusts established for estate planning purposes.



PERMIAN HEALTH CARE, INC.

CONFIDENTIAL
ATTORNEY-CLIENT
PRIVILEGE

# Exhibit

# 47

## BRADDOCK MANAGEMENT, L.P.

**Midwest Region Office**

1619 Edgewater Avenue
Chicago, Illinois 60660-4001
312/878-8080 • Fax: 312/878-6151

June 4, 1996

F. Scott Gross
c/o Primus Management, Inc.
111 Sutter Street, Ste 2150
San Francisco, California 94104

Re:  1995 Braddock Management, L.P. Bonus Allocation

Dear Scott:

As you are aware, Northside Operating Company allocated Braddock
Management, L.P. up to a $500,000.00 bonus for employees assigned
to Northside Operating Company with respect to this calendar year
1995 activities.  You have previously approved 1995 employee
bonuses in the total amount of $266,891, which were paid to all
other Braddock employees, but have not yet finalized my 1995 bonus.

As we discussed, please provide me with direction with respect to
the amount (if any) of my 1995 bonus.  Please indicate below, on
the enclosed copy of this letter, the amount of my 1995 bonus (if
any), so that I may cause the year ended December 31, 1995 to be
closed.

Of course, please call if you have any additional questions.

Cordially yours,

Peter G. Rogan

The bonus payment allocable to Peter G. Rogan attributable to his
1995 services shall be the sum of $ 75,000 .

F. Scott Gross

DEFENDANT'S
EXHIBIT
47

PENGAD-Bayonne, N.J.

TR 001324

**Corporate Office**
One Eleven Sutter Street, Suite 2150, San Francisco, CA 94104
415/627-0755 • Fax: 415/627-0766

# Exhibit

# 48

*CC : John Takoles*

**WALDO POINT MANAGEMENT, INC.**
One Eleven Sutter Street
Suite 2150
San Francisco, California 94104

June 24, 1996

Peter G. Rogan
President – Braddock Management, LP
5700 North Ashland Avenue
Chicago, IL 60660

Dear Peter:

As you are aware, Northside Operating Co. allocated Braddock Management, LP up to $500,000.00 for bonuses for employees assigned to Northside Operating Co. with respect to calendar year 1995 activities. We have previously reviewed, and approved, individual 1995 bonuses in the amount of $342,979.00, which have been paid to the respective Braddock employees.

As we have concluded that all appropriate 1995 bonuses have been paid, the preliminary amount paid by Northside Operating Co. to Braddock Management, LP for 1995 bonuses was greater than the actual amount of the bonuses awarded. Therefore, it is appropriate that Braddock Management, LP refund to Northside Operating Co. $157,021.00, the balance of the 1995 allocation.

This letter serves as your authorization to proceed with this refund. This transaction will complete 1995 activities. Please advise me if you require any additional information.

Sincerely,

F. Scott Gross

PHIGLD-Bayonne, N.J.
**DEFENDANT'S EXHIBIT**
48

TR 001282

# Exhibit

# 50