# BRADDOCK MANAGEMENT, L.P.

## Midwest Region Office

1619 Edgewater Avenue
Chicago, Illinois 60660-4001
312/878-8080 • Fax: 312/878-6151

September 10, 1996

Mr. Scott Gross
Waldo Point Management
One Eleven Sutter Street - Suite 2150
San Francisco, CA  94104

Dear Scott:

This is a follow-up to our discussions concerning my employment agreement with Braddock Management, LP. As we discussed, the agreement expires August 17, 1997. To allow both you and Northside Operating Company ample time to plan accordingly, I think it would be useful to begin a dialogue at this time so as to determine my future involvement with Braddock Management, LP and Northside Operating Company. As we agreed, an early resolution to any future employment agreement would be in everybody's best interest.

As I stated, I have enjoyed most of my two year relationship with Northside and Braddock Management. Further, I believe we have accomplished a great deal and are poised to accomplish a great deal more. I also believe a long-term effort and commitment from all parties will be necessary if we are to accomplish our goals.

I look forward to reaching an early and successful completion of our discussion.

Very truly yours,


Peter G. Rogan


bxc:   John Tatooles

DEFENDANT'S
EXHIBIT
50
PENGAD-Bayonne, N. J.

**RDX 009664**

# Exhibit

# 51

## NORTHSIDE OPERATING CO.
## BOARD OF DIRECTORS

**Meeting Date:**     October 5, 1996

I.     **CALL TO ORDER:**     The meeting was called to order by Bertram P. Rosenthal, MD, President on Saturday, October 5, 1996.

    **Present:**     B. Macon Brewer
    George Chapas
    William D. Fruland
    Stina Hans
    Bertram P. Rosenthal, MD

    **Also Present:**     Dan Finnane, Primus Management, Inc.
    F. Scott Gross, Primus Management, Inc.
    Karen Hyneman, CFO - Northside Operating Co.
    David Miller, Braddock Management, LP
    Michael Olsen, General Counsel - Northside Operating Co.
    Peter G. Rogan, CEO - Northside Operating Co.
    Dean Spizzirri, Associate General Counsel

II.     **MINUTES:**

    **Approval of Board Meeting Minutes:**

    **MSC**
    Minutes of the June 25, 1996 and August 29, 1996 meetings of the Northside Operating Co. (NOC) were received, reviewed and approved upon motion which was duly seconded and carried.

III.     **OLD BUSINESS:**

    Mr. Rogan reported as follows:

1.     Illinois Department of Public Health (IDPH) Facilities Compliance Status: NOC is on schedule with the compliance parameters of the IDPH. The facility has had no deficiencies in the interim inspection period.

DEFENDANT'S
EXHIBIT
51
PENGAD-Bayonne, N.J.

EMC 002703

Northside Operating Co.
October 5, 1996
Page 2

2.    **Analysis of Adjacent Properties Purchase Option:** As directed by the Board of Directors, an analysis was undertaken and the properties are being leased.

3.    **Attorney General (AG) Review and Chicago Housing Authority (CHA) Audit:** The Inspector General's report on Edgewater Medical Center's CHA Program has been completed. All allegations have been investigated and there was no substantiation found for those allegations. A redacted copy of the report has been received under a court order and we are allowed to release to the public only certain sections of the report.

Our attorneys indicated that the Attorney General's investigation is dormant. NOC is negotiating with the AG's office to secure a letter for its files stating that the investigation is closed and there are no negative findings against NOC

Mike Olsen is also working to secure a letter from Drinker, Biddle & Reath, who had been engaged by the Board to review the NOC's CHA Program, that can be used as a document for disclosure and public relations purposes.

4.    **Joint Commission on Accreditation of Healthcare Organizations (JCAHO):** The JCAHO survey indicated that NOC was in compliance with all requirements with the exception that NOC received a non-compliance status in the area of Infection Control. This was appealed to the JCAHO. JCAHO reversed itself on this area of non-compliance. NOC now has a score of 1 (which is the best score) in this area of Infection Control.

5.    **Med Psych Program:** The program has not yet been implemented. NOC is working on development of the program.

6.    **Nursing Home Respiratory Therapy Program:** NOC will provide respiratory therapists to go into nursing homes to provide services to patients in need of respiratory treatment. Revenue is estimated at $50,000/annum. NOC is working with vendors to secure contracts. This program is still in the development stage.

Northside Operating Co.
October 5, 1996
Page 3

7   **Physician Practice Acquisitions:**

    A.   **Industrial Medicine Practice:** The valuation analysis is being conducted by Valuation Counselors. After the valuation is completed, NOC will proceed with due diligence and the acquisition. The Board will be kept informed as to management's progress.

    B.   **Illinois Department of Public Health (IDPH) Satellite Program:** The first satellite office has been identified. The valuation process has been completed by an independent valuation firm. NOC has negotiated a practice acquisition at a cost of approximately $90,000 and is proceeding with the closing process for the Granville Practice. The tentative closing date is October 14, 1996. A graduate physician from the residency program has been hired into the practice. This practice is located on the Northwestside of our service area.

       NOC's goal is to seed and/or acquire practices in public aid areas so as to identify and serve market. We will work with legal counsel to comply with all applicable rules and regulations on physician practice acquisition.

       The IDPH has developed a program to move Public Aid recipients into a managed care environment. NOC is now looking at areas around the hospital in which to locate other family practice offices to serve the Public Aid recipients.

    C.   **Physician Network IPA:** The practice association consists of about 700 doctors of which 200 are primary care physicians. The program was put on hold pending the outcome of the AG and CHA investigations. This program will be revisited during the second quarter of 1997.

    D.   **Medical Group:** NOC has begun to investigate the strategy necessary to link together a number of primary care physician practices that are independent of one another. The structure will tie the independent primary care physicians, the specialists and the hospital together into a network. The goal is to achieve the benefits of a multi-specialty group.

EMC 002705

Northside Operating Co.
October 5, 1996
Page 4

Dr. Rosenthal was asked if NOC intended to put an MSO in place. Mr. Rogan indicated that the IPA and the medical group were not necessarily tied together but management is considering recommending the establishment of an MSO. Dr. Rosenthal cautioned that steps should be taken to prevent conflict between the IPA and the Medical Group.

Scott Gross commented that the acquisition of physician practices will be legally structured to comply with all appropriate regulations. Suggestions being considered are to 1) ask Permian to create another subsidiary company to affiliate with the doctors; or 2) create another subsidiary under NOC. It is anticipated that a recommendation will be forthcoming at the next board meeting.

MSC

That NOC proceed with all the physician practice acquisition strategies and that the Board reconfirm its approval of the Granville Practice acquisition and the development/acquisition of additional practice sites for the IDPH Satellite Program.

III. FACILITY REPORTS

Advisory Board:
A.     Minutes of July 31, 1996
B.     Minutes of May 30, 1996
The minutes were reviewed. Discussed was

Residency Program. In an effort to have all residency programs university based, AAMC is embarking upon a strategy to eliminate all independent (community hospital based) residency programs. NOC's accreditation will be withdrawn in a two to three year process. As a back-up, NOC is affiliating with Midwestern University, the osteopathic college in Chicago. Students from Midwestern University are now rotating throughout the institution and NOC is receiving good reports on this experience. This program is paving the road to have interns and residents from Midwestern University rotate to the hospital next year. An internship program with the university is anticipated next year with a residency program in internal medicine to follow. The CEO will continue to pursue the internship/residency affiliation.

MSC

The minutes of the Advisory Board meetings were accepted as presented.

EMC 002706

Northside Operating Co.
October 5, 1996
Page 5

2.    **Medical Staff Meetings:**
      A.    Minutes of June 25, 1996
      B.    Minutes of July 30, 1996
      C.    Minutes of August 27, 1996

**MSC**
The minutes of the Medical Staff Meetings were accepted as presented.

3.    **Financial Reports:**
      A.    June 30, 1996
      B.    July 31, 1996
      C.    August 31, 1996

**MSC**
The financial reporting was accepted as presented.

IV.    **BRADDOCK MANAGEMENT, LP REPORT**

1.    **1995 Financial Audit - Coopers & Lybrand:** A meeting was held with the local partner of Coopers & Lybrand and a time frame established for the audit. The anticipated completion date is the end of October. The final due date is November 15, 1996. Coopers & Lybrand will review the Ernst & Young (E&Y) findings and perform an independent analysis of reserves, bad debts and contractual allowances and other items as necessary to complete this independent audit. The E&Y relationship has been ended.

2.    **Review of Master Trustee Report, 2nd Quarter 1996:** Feedback from Federated is they are very happy with the financial performance to date.

3.    **Home Health Care Agency Development:** The end stages for completing the merger of the existing not-for-profit home health care agency (as approved by the Board on 6/25/96) are in progress and should be completed by October 31, 1996. Due diligence has been performed. It is anticipated that the first year's income would cover any exposure for the previous years. Deloitte & Touche is conducting a review of the Home Health Care Agency and management believes it can address all of the management issues raised by Deloitte & Touche.

EMC 002707

Northside Operating Co.
October 5, 1996
Page 6

Dr. Rosenthal stated he would appoint a Committee of the Board to take any actions that may need Board attention.

## MSC

That all actions previously taken are approved and that the Chairman of the Board is authorized to appoint a Committee of the Board to take any and all additional action required to implement NOC's home health care program and authorize the approval of any related contracts and/or documents.

**Radiation Therapy Joint Venture:** A proposed joint venture between NOC, Ravenswood Hospital, radiation oncologists and medical oncologists is being pursued. A backup plan is being developed for NOC to enter into an agreement with the radiation and medical oncologists alone.

**Affiliation with Midwestern University:** Meetings have been held with the President and Provost of the University. Student rotation is in progress. The goal is to have student rotation in Respiratory Therapy, Internal Medicine, Nephrology and one other area. Time frames for the intern and resident rotation is June 1996 and 1997 respectively.

## MSC

That CEO take all necessary actions to establish a teaching affiliation with Midwestern University. This should include not only post graduate students but all medical students and students from the other schools as appropriate.

**Market Research Chicago Housing Authority (CHA):** The Board reviewed an independent market research study that was conducted to determine the perception of CHA residents receiving care through the Edgewater NOC system. The results indicated that the Seniors were satisfied with the program and request additional sites.

**Banking Relationship(s):** It is anticipated that NOC will switch banking relationships from First Bank which, under new ownership, has not been providing the necessary services. Currently, NOC is considering Bank of America, LaSalle National Bank and Bank One. The inclination now is to choose Bank of America or LaSalle. Mr. Olsen will investigate some options with his contact at LaSalle. The goal is to enter into a new banking relationship by December 31, 1996.

Northside Operating Co.
October 5, 1996
Page 7

**MSC**
The Board authorized and approved the CEO and/or the Vice President
Finance to execute all necessary documents regarding the banking relationship.

8.    **Other Hospitals:** As directed by the Board of Directors, management had
preliminary discussions with other hospitals regarding opportunities to work
together in mutually beneficial ventures. Hospitals contacted are: Ravenswood,
Bethany Methodist, St. Joseph's Columbus and the University of Chicago.

**MSC**
The Board moved to have the CEO explore various programatic joint venture options
with other providers and report to the Board.

**Braddock Management Fees:** It was requested by Scott Gross that permission
from the Board of Directors be granted to study and review the Braddock
Management agreement and alternatives with respect to its renewal. The review
would include management fee surveys, review of regulations and long term
planning goals to make sure that the arrangement is up-to-date and in compliance
with appropriate laws and regulations.

**MSC**
That Braddock Management, LP prepare and present proposals for the renewal of the
management agreement so that an extension of the agreement term and fee arrangement
can be determined.

**MSC**
The Braddock Management Report was accepted by the Board of Directors.

V.    **NEW BUSINESS**

**Contract Approval:**
A.    Chicago Disposal -
B.    STEPP Equipment Company

Mr. Rogan reviewed the following contracts. After discussion.

**MSC**
The Board moved to approve the contracts presented.

EMC 002709

Northside Operating Co.
October 5, 1996
Page 8

2.  **Executive Compensation Review:** To review the executive compensation
    practices of NOC, a compensation firm, Qwest, was engaged to perform a review
    of the top nine positions in the organization. These are the positions that are
    provided by Braddock Management, LP and are directly reimbursed by NOC. The
    first phase cost $8-10,000 and consisted of an overview to test the
    reasonableness of the compensation paid. The second phase, if necessary, would
    develop a formal, on-going program that would be in conformance with NOC's
    compensation philosophy. Findings from the first phase of the study determined
    that the base pay of the nine positions is at the median percentile or below. Total
    compensation, including bonus compensation, is at or below the 75th percentile.

    A lengthy discussion ensued  The Board members were concerned that at the
    current level of compensation, Edgewater Medical Center may lose some of the
    senior managers  Further, the Board's expressed executive compensation
    philosophy is to provide base pay at the levels necessary to retain our skilled
    executives and bonus compensation at the highest level(s) to reflect performance.
    Questions were raised whether the amounts paid to the senior executives were
    sufficient. The Board also expressed concern that for Braddock to retain senior
    managers, some mechanism(s) needed to be initiated for long-term rewards and/or
    incentives for senior managers

    Mr. Rogan reviewed the compensation of each senior level manager with the
    Board. He explained that he reviews performance and compensation of these
    Braddock managers and Mr. Gross reviews Mr. Rogan  The Board members were
    concerned that, given the high level of performance of Braddock and the
    concurrent development of its managers, other organizations will recruit the senior
    executives away from Braddock and NOC.

    The Board directed that Braddock Management, LP work with Qwest or a similar
    firm to finalize an executive compensation strategy which will allow the Board to
    pay for performance and incent long-term loyalty. The strategy should address the
    Board's philosophy of base pay at appropriate levels to reflect the recruitment and
    retention of senior executives, discretionary bonus pay based on performance,
    long-term incentives, employment contracts with requisite severence terms and
    appropriate executive fringe benefits.

EMC 002710

Northside Operating Co.
October 5, 1996
Page 9

**MSC**
The Board approved Qwest's review of compensation for the top Braddock positions assigned to NOC, and its compensation review findings. The Board authorized management to develop a compensation plan, which will be presented to the Board for approval. The Board also adopted a policy for hiring, appointing and retaining senior level personnel and compensating such personnel at levels commensurate with their performance and the organization's need to retain those personnel.

3    **Pharmacy Contract Renewal:** The current pharmacy contract is with Owen Pharmaceutical and is fee-for-service based  The annual fee includes the staffing and inventory  A contract review determined that a new agreement would be based on a cost per discharge. In this structure, some of the risk is shifted from the hospital to the drug company  It will be Owen's responsibility to manage their costs.  Owen is interested in putting a drug dispensing machine on each service with a tracking system that enters the patient ID# and the nurse ID#  The cost of the machines to NOC is $700,000 which will be reflected in a credit to the monthly Owen invoice in order for NOC to recover its principal cost over a five year period and a one-time credit of $100,000 to cover the cost of money

The new agreement will be for a three year term  Owen will then have a little bit of negotiating edge at the end of this period since the principal recovery period is five years.  It is also recognized that at the end of the three years, if a new agreement cannot be negotiated. NOC will be in the position to a) hire another company, or b) take over the operation of the pharmacy internally at lower staffing costs because of the existence of the drug dispensing equipment which lowers staffing costs.

**MSC**
The Board authorized management to enter into a three-year contract with Owen Pharmaceutical for pharmacy services on a cost per discharge basis. It is understood that said contract will include the authorization to purchase drug dispensing equipment at a cost of approximately $700,000 and financial arrangements inherent in recovering principal and money costs.

EMC 002711

Northside Operating Co.
October 5, 1996
Page 10

4.    **Cardiac Cath Lab Replacement:** Bids were reviewed from General Electric (GE) and Phillips for the replacement of the Cardiac Cath Lab.   Phillips has quoted the replacement of the Cardiac Cath Lab at approximately $900,000, including installation.

**MSC**

The Board authorized the replacement of the Cardiac Cath Lab for a total cost of approximately $900,000

5.    **R&F Room Replacement:** Phillips has bid a Radiology & Fluoroscopy room and other equipment for a total cost of $400,000   This was less than the GE bid.

**MSC**
Board authorized the purchase from Phillips of the Radiology & Fluoroscopy Room and additional radiologist equipment for $400,000

6.    **Conflict of Interest Statement:** Michael Olsen explained that the IRS recently adopted policies giving Boards of Directors more flexibility in their composition and permitting physicians to serve on a Board in an amount of greater than 20% and still not challenge the tax-exempt status.   This may favorably impact the structuring of physician practice acquisitions.  However, in expanding the flexibility, they are requiring a stronger Conflict of Interest policy for the Boards of Directors.

Directors were requested to sign the existing Conflict of Interest Statements.  Mr. Olsen will present a revised Conflict of Interest policy and member certification that will be in compliance with the new regulations at a future meeting.

7.    **IRS Intermediate Sanctions Regulations:** Mr. Olsen reported that the Taxpayer Bill of Rights includes regulations designed to prohibit and penalize self-dealing of board members and organizational managers for individuals.   The IRS is now able to impose fines of 25% of the excess benefit with a 200% penalty for non-correction for the individuals and a 10% penalty of the excess benefit to the company managers.  These are individual fines.  Mr. Olsen is attempting to confirm that NOC's Directors and Officers insurance coverage will adequately cover this issue.  Only one insurance carrier was able to respond to inquiries about coverage for the Board members.  It was agreeable to covering the 10% fine against company managers and was considering the 25% for the individual.

EMC 002712

Northside Operating Co.
October 5, 1996
Page 11

They would not cover the 200% because this implied a willful non-compliance.
Mr. Olsen will continue to investigate the insurance coverage.

The Bylaws require that the NOC indemnify all the Board members to the fullest
extent permitted by law. The NOC should have insurance coverage and company
indemnification. The NOC complies within the Safe Harbor Rules which Mr.
Olsen explained.

FY 1997 Operating & Capital Budgets: Mr Rogan presented a preliminary
FY 1997 Operating & Capital Budget and the related assumptions. Inpatient
volumes are anticipated to remain at current levels. Outpatient volumes will
increase slightly. No price increase is anticipated. Contractuals are predicted at a
flat level. Inflation is predicted at 3% increase and selected expenses are
predicted at 5–9% This would result in a $8.5 Million income not including any
proposed new programs. The 1997 Capital Budget requirements are anticipated at
approximately $7 Million. The anticipated cash position at the end of 1996 and
1997 respectively will be $28 Million and $32 Million. A formal FY 1997
Operating & Capital Budget will be presented to the Board for approval at a later
date.

MSC
The Board moved to accept the preliminary operating and capital
budget for FY 1997.

Insurance Coverage: A schedule of insurance coverage for NOC (d/b/a
Edgewater Medical Center) was presented and reviewed. Directors & Officers
liability insurance was consolidated under Permian HealthCare coverage.

1993 IRS AUDIT The IRS has completed its initial review of Edgewater
Operating Company for FY1993. There is a disagreement with regards to bad
debts. Medicare bad debt regulations differ from IRS bad debt regulations. This
appears to be a Northside Operating Company liability.

EMC 002713

Northside Operating Co.
October 5, 1996
Page 12

## VI.    ADJOURNMENT

### MSC

There being no further business, a motion for adjournment was moved, duly seconded and carried.

Approve:

Bertram P. Rosenthal, MD
President

Attest:

William D. Fruland
Secretary

EMC 002714

# Exhibit

# 52

# BRADDOCK MANAGEMENT, L.P.

## Midwest Region Office

1619 Edgewater Avenue
Chicago, Illinois 60660-4001
312/878-8080 • Fax: 312/878-6151

January 31, 1997

F. Scott Gross
c/o Primus Management, Inc.
111 Sutter Street - Suite 2150
San Francisco, California 94104

Dear Scott:

RE:     **1996 Braddock Employee Bonuses and 1997 Base Compensation**

Based on our discussions, attached is a schedule outlining proposed base compensation for all of the full-time Braddock employees for calendar year 1997. Additionally, proposed 1996 performance bonuses for all full-time Braddock employees are also outlined. Please confirm your acceptance of the outlined 1997 base compensation and 1996 performance bonuses by executing a duplicate copy of this letter where indicated below and returning the same to me for Braddock's files. As you may recall, all proposed compensation and bonus amounts are within the reasonableness parameters described by "Quest" in its recent comparative compensation study.

As you can see, I have not proposed a bonus for myself. If appropriate, please propose a 1996 bonus for me in the space provided below.

After your approval, the proposed compensation and bonus structure will be made a part of the Braddock report for approval at the February, 1997 Northside Operating Co. board meeting. Of course, please call if you have any questions or require additional information.

Cordially yours,

Peter G. Rogan

I, F. Scott Gross, concur with the 1996 bonus payments and base compensation as proposed. Additionally, the bonus payment allocable to Peter Rogan for 1996 performance shall be the sum of $ _100,000.00_

Signed: _F. Scott Gross_
F. Scott Gross, this _11_ day of February, 1997

> **DEFENDANT'S EXHIBIT**
> **52**
> PRIGG&D-Bayonne, N.J.

**RDX 009662**

# BRADDOCK MANAGEMENT, LP
## PROPOSED 1997 BASE COMPENSATION
## PROPOSED 1996 PERFORMANCE BONUS
## PROPOSED 1996 MONEY PURCHASE PENSION PLAN CONTRIBUTION

| Name | Proposed 1997 Base Compensation | Proposed 1996 Performance Bonus | Proposed 1996 MPP Contribution |
|------|--------------------------------:|--------------------------------:|-------------------------------:|
| JoAnn Banvich | 160,000 | 50,000 | 20,500 |
| Nancy Bryson | 79,000 | 15,000 | 11,014 |
| Roger Ehmen | 160,000 | 25,000 | 20,500 |
| Kenneth Huff | 79,600 | 4,000 | 11,174 |
| Judith Lunde | 78,200 | 10,000 | 10,833 |
| Peter Rogan | 225,000 | - | 20,500 |
| Henry Zeisel | 65,000 | 9,000 | 8,356 |
| Daniel Schuman | 64,000 | 6,200 | 9,310 |
| Salomon Babani | 72,100 | 5,250 | - |
| **TOTAL** | 982,900 | 124,450 | 112,187 |

RDX 009663

# Exhibit

# 53

**NORTHSIDE OPERATING CO.**

**BOARD OF DIRECTORS**

**Meeting Date:** **February 14, 1997**

I.  **CALL TO ORDER:** The meeting was called to order by Bertram P. Rosenthal, MD, President on Friday, February 14, 1997.

**Present:** B. Macon Brewer
George Chapas
William D. Fruland
Stina Hans
Bertram P. Rosenthal, MD

**Also Present:** Dan Finnane, Primus Management, Inc.
F. Scott Gross, Primus Management, Inc.
Karen Hyneman, CFO, Northside Operating Co.
Michael Olsen, General Counsel, Northside Operating Co.
Peter G. Rogan, CEO, Northside Operating Co.
Dean Spizzirri, Associate General Counsel, Northside Operating Co.

II.  **OLD BUSINESS**

A.  **Review and Approval of Prior Board Meeting Minutes**

**MSC**

Minutes of the October, 5, 1996, Meeting of the Northside Operating Co. NOC were received, reviewed and approved upon motion which was duly seconded and carried.

B.  **Review and Approval of the Illinois Department of Public Health Compliance Project**

**Mr. Rogan reported as follows:**

NOC is on schedule with its compliance parameters of the IDPH. The facility had no deficiencies in the interim inspection period.

Mr. Rogan went on to report that two areas will be specifically addressed in the next months. The first area will be the Same Day Surgery Project with an estimated cost of $150,000. The second area pertains to the Lobby and the First Floor area with an estimated cost of $900,000.

**MSC**

That the Board approve the IDPH compliance report with specific projects for the Same Day Surgery area with an estimated cost of $150,000 and the Lobby & First Floor area with an estimated cost of $900,000.

**DEFENDANT'S EXHIBIT**
53
PENGAD-Bayonne, N. J.

EMC 002888

thside Operating Co.
ard of Directors
February 14, 1997
Page Two

C. **Review and Approval of Home Health Care**

The minutes of the Home Health Care Committee Meeting of the Board of Directors of NOC dated January 25, 1997, were received, reviewed and approved.

**MSC**

That the minutes of the January 25, 1997, Home Health Care Committee Meeting of the Board of Directors of NOC be accepted and approved upon a motion which was duly seconded and carried.

In addition to accepting the minutes of the Home Health Care Committee, the Board also received a status report of the Marketing Plan from Mr. Rogan. Mr. Rogan also reviewed the status report of the Home Health Care Department of NOC and its future plans.

**MSC**

That the Board reconfirmed its prior selection of the Manager of NOC home health care program and upon receipt of reports from legal counsel and Deloitte & Touche, directed the Management of NOC to enter into a contract with Healthcare Management, Inc. for the management of NOC's Home Health Care Program.

D. **Ratify Acceptance of Executive Compensation Report**

The Board received, reviewed and approved the Executive Compensation Report as provided by outside experts from the firm of Qwest. Upon reviewing the report, the Board reiterated its philosophy regarding executive compensation that base pay for Senior Executives be on an appropriate level to reflect the recruitment and retention of said Executives and that compensation should include discretionary bonus compensation based upon performance, include long term incentives, employment contracts with appropriate severance terms and appropriate fringe benefits.

The Board directed Management to further work with Qwest if necessary to develop a Compensation Program which will reflect the Board's philosophies.

**MSC**

That the Board approve Qwest's review of compensation for the Senior Executives assigned to NOC as supplied by Braddock Management, L.P. The Board authorized Management to develop a Compensation Plan which will be presented to the Board of Directors for approval.

EMC 002889

thside Operating Co.
ard of Directors
February 14, 1997
Page Three

E. **Review and Approval of Physician Practice Acquisition/Management**

Mr. Rogan reported upon the need to develop a computer system and management structure which would allow NOC to enter into practice management and work with members of NOC's Medical Staff and other physicians in this regard. Mr. Rogan informed the Board that he anticipates a capital expenditure in the area of approximately $500,000 to secure the appropriate software which will allow Management to enter into practice management services. Mr. Rogan went on to explain that an appropriate fee would be charged to physicians when they enter into a Practice Management Agreement for their practices with NOC. Management's strategy is in concert with an already approved strategy addressing physician practice acquisitions in the areas of Industrial Medicine and Primary Care. He also pointed out that this would facilitate the development of a physician network and also in developing a strategy for Physicians Without Affiliations.

A lengthy discussion ensued to discuss the various strategies. The Board expressed the opinion that all of these strategies as discussed in previous minutes still appear to be appropriate at this time.

**MSC**

The Board approved expenditures of approximately $500,000 to purchase and install hardware and software which are required for practice management. Further, that the Board direct and authorize the CEO to take all necessary actions and authorize the Management of NOC to enter into any and all contracts to establish the capabilities for NOC to enter into the practice management field.

F. **IRS Intermediate Sanctions**

**Insurance Coverage**

Mr. Olsen reported to the Board with regard to discussions he has had with various insurance underwriters concerning Directors & Officers coverage for intermediate sanctions. He also discussed how he has entered into discussions concerning Errors & Omissions coverage which would be beneficial to NOC should it enter into insurance risk contracting. The Board directed Mr. Olsen to keep them informed as to any further discussions he might have.

G. **Review and Approve Conflict of Interest Policy**

Mr. Olsen discussed the Conflict of Interest Policy for hospital employees and members of the Board of Directors. The Board reviewed the policy and procedure regarding the Conflict of Interest.

EMC 002890

...thside Operating Co.
...ard of Directors
February 14, 1997
Page Four

**MSC**

The Board approved the establishment of the Conflict of Interest Policy for hospital employees and the Board of Directors and directed Management to implement the policy as soon as it is deemed appropriate.

H. **Drinker, Biddle & Reath (DBR) Report**

Mr. Olsen reported to the Board of Directors on his ongoing discussions with DBR and their report of the CHA Program. Mr. Olsen reminded the Board that DBR had been engaged by the Board to review NCC's CHA Program and to provide a report document. Mr. Olsen reported that he had the final draft of the report from DBR and would be finalizing the report in the near future.

III. **FACILITY REPORTS**

A. **Review and Approval of Advisory Board Meeting Minutes**

The Advisory Board Meeting minutes of October 2, 1996 and December 3, 1996, were received, reviewed and approved by the Board of Directors.

**MSC**

That the Advisory Board Meeting minutes be accepted as presented by the Board.

B. **Review and Approval of Medical Staff Meeting Minutes**

The Medical Staff Meeting minutes of September, October and November, 1996 and January, 1997 were received, reviewed and approved by the Board of Directors.

**MSC**

That the Medical Staff Meeting minutes be accepted as presented by the Board.

C. **Review and Approval of Financial Reports**

The Financial Reports of September, October and November, 1996 were received, reviewed and approved by the Board of Directors.

**MSC**

That the Financial Reports be accepted as presented by the Board.

EMC 002891

rthside Operating Co.
oard of Directors
February 14, 1997
Page Five

IV.  BRADDOCK MANAGEMENT, L.P. REPORT

A.  Master Trustee Report - Annual Report for the Fiscal Year Ended December 31, 1995

The Annual Report for the Fiscal Year Ended December 31, 1995, was received and reviewed by the Board of Directors.

MSC

That the Board of Directors approve the Master Trustee Report for the Fiscal Year Ended December 31, 1995.

B.  Master Trustee Report - 3rd Quarter, 1996

The Master Trustee Report for the 3rd Quarter of 1996 was received and reviewed by the Board of Directors.

MSC

That the Board of Directors approve the Master Trustee Report for the 3rd Quarter of 1996.

C.  Coopers & Lybrand FY 1996 External Audit

Mr. Rogan reported upon the status of the Coopers & Lybrand Audit for fiscal year 1996. Mr. Rogan informed the Board that the audit was almost complete and provided the Board with a preliminary draft report of the 1996 External Audit. The Board reviewed and discussed the External Audit and directed Mr. Rogan to provide them with a final copy as soon as it becomes available.

D.  Residency Programs

Mr. Rogan reported upon the ACGME Appeal Process for the Allopathic Internal Medicine Programs. Mr. Rogan informed the Board that the Appeal had been drafted and a hearing date is being scheduled for some time in March, 1997. Mr. Rogan stated that although NOC was confident entering the Appeal Hearing, he reminded the Board, the expected outcome will most likely be unfavorable. The Board discussed the reasons for this likely outcome and appreciated the efforts of the Institution in the appeal process.

Mr. Rogan also discussed the status of the Midwestern University affiliation and the status of the students, interns and residents expected in the future years. Mr. Rogan reviewed the report contained in the Board of Directors Meeting package and responded to questions from the Board.

rthside Operating Co.
oard of Directors
february 14, 1997
Page Six

E.    Banking Relationship

In follow-up to the previous Board Meeting, Mr. Rogan informed the
Board that the selected bank that NOC will have its operating account
with is the LaSalle National Bank. Mr. Rogan also informed the Board
that NOC will continue to have a relationship with Bank of America but
primarily from a short term investment standpoint.

F.    Radiation Therapy - Joint Venture

Mr. Rogan reported to the Board that this joint venture was put on
hold subject to the other institution's budget timetable. Mr. Rogan
stated he will keep the Board apprised of the status of this joint
venture at future Board Meetings.

G.    Braddock Management, L.P. - 1996 Performance Bonus & 1997 Base Salaries

The Board entered into Executive Session and excused all management
personnel from the meeting to discuss the performance bonus and base
salaries for the Braddock Management, L.P. employees assigned to NOC.
During its Executive Session, the Board reviewed each person's salary
for 1996 and performance bonus for 1996. In addition, the Board
reviewed each person's 1997 base salary. A lengthy discussion ensued
and the Board discussed the goals and objectives accomplished in 1996
and directed Braddock Management, L.P. to establish appropriate goals
for 1997.

MSC

That the Board approve the 1996 total compensation paid to the Braddock
Management, L.P. employees assigned to NOC including performance
bonuses and money purchase of pension plan contribution. The Board
also approved the 1997 base salaries for Braddock Management, L.P.
employees assigned to NOC.

H.    CAP Survey

Mr. Rogan reviewed the College of American Pathology Survey for the
Laboratory and informed the Board that NOC passed this inspection.

I.    CLIA Certification

The Board reviewed the CLIA Certification included in the Board
package.

J.    Medical Director

Mr. Rogan asked that this agenda item be tabled for a future meeting.

EMC 002893

Northside Operating Co.
Board of Directors
February 14, 1997
Page Seven

### K. Laboratory Reporting System

Mr. Rogan informed the Board that the Laboratory Reporting System has been successfully installed and is operational.

### L. Risk Management Issues

Mr. Rogan reviewed specific malpractice cases and discussed potential risk areas with the Board.

MSC

That the Braddock Management, L.P. Report be accepted and approved by the Board of Directors.

## V. NEW BUSINESS

### A. Review and Approval of New Physician, Vendor and Other Contracts

Mr. Rogan presented and reviewed the physician contracts which primarily pertain to administrative and/or teaching responsibilities for the included physicians. After discussion:

| | |
|---|---|
| Emo Bonaminio, DPM | Luis Mendoza, DPM |
| Robert Cohen, DPM | Robert Ramoska, DPM |
| Andrew Cubria, MD | Anton Rittling, DPM |
| Kevin Gavin, DPM | Bella Rozentsvagy, MD |
| Betty Graham, DC | Yuri Shapiro, MD |
| David Hiltzik, DPM | Neal Spero, MD |
| John Kane, DPM | Sidney Weiser, DPM |
| J.R. Kim, MD | Richard Weiss, DPM |
| Yako Lebar, MD | Maria Wojnarska, MD |
| Issam Matar, MD | Marvin Wolf, MD |
| Rogelio Maynulet, MD | Claude Zanetti, MD |

MSC

That the Board approve the physician contracts as presented.

Mr. Rogan presented and reviewed the vendor contracts with the Board. After discussion:

Excellcare, Inc.
Nebo Systems, Inc.

EMC 002894

MSC

That the Board approve the vendor contracts as presented.

Mr. Rogan presented and reviewed the other contracts which primarily pertain to the Respiratory Therapy Program and the Home Health Care Program of NOC. After discussion:

Respiratory Therapy Program Management Agreement with Respiratory Care

Northside Operating Co.
Board of Directors
February 14, 1997
Page Eight

Respiratory Care Services Agreement (Template)

Mary Ann Slama

Working Smart, Inc.

<u>MSC</u>

That the Board approve the contracts as presented.

B.  <u>Approval of Budgets for Fiscal Year 1997</u>

Mr. Rogan reviewed the material presented for the Operating and Capital
Budgets for 1997. A lengthy discussion ensued and Mr. Rogan responded
to the Board's questions regarding the budgets. Mr. Rogan pointed out
that NOC will be making room for additional parking by tearing down
the Kane Building which is currently not in use. He noted that this
space could be better used for parking. After discussion:

<u>MSC</u>

That the Board approve the Capital and Operating Budgets for Fiscal
Year 1997 as presented.

C.  <u>Approval of Trustee for the Self-Insured Retention Trust</u>

The Board reviewed the material presented in the board package
concerning the appointment of the Trustee for the Self-Insured
Retention Trust.

<u>MSC</u>

That the Board approve the appointment of LaSalle National Bank to be
the Trustee for the Self-Insured Retention Trust.

D.  <u>Approval of Physician Practice Acquisition Model</u>

The Board reviewed the material as presented by Mr. Olsen and contained
in the board package concerning various physician practice acquisition
models. A lengthy discussion ensued and Mr. Olsen responded to the
various questions raised by Board members.

<u>MSC</u>

That the Board direct the CEO to proceed with the model selected by the
Board for physician practice acquisitions and authorize the CEO to
enter into any and all contracts or execute appropriate documents to
establish the selected model.

EMC 002895

Northside Operating Co.
Board of Directors
bruary 14, 1997
ge Nine

E.  **Approval of the CHA Clinics - Westside and Southside**

Mr. Rogan discussed the status of the CHA clinics with the Board.
After lengthy discussion directed at the establishment of a Westside
and Southside clinic:

**MSC**

That the Board authorize the establishment of a Westside and a
Southside Clinic and authorize Management to enter into any and all
contracts to establish such clinics.

F.  **Approval of the Medicaid Managed Care Strategy**

Mr. Rogan lead the Board through discussions of the materials contained
in the board package regarding NOC's Medicaid Managed Care Strategy.
A lengthy discussion ensued in which Mr. Rogan responded to the
Board's questions concerning the appropriateness of the strategy and
the approximate $1 Million of capital and operational funds which will
be required to implement the strategy. After review of all the
documents and having all their questions responded to:

**MSC**

That the Board approve the implementation of NOC's Medicaid Managed
Care Strategy as outlined in the materials and discussions at the
Board Meeting.

G.  **Review and Approval of Braddock Management, L.P. Agreement**

Mr. Gross reported to the Board on the 1997 Contract Adjustment. Mr.
Gross lead the Board through a discussion of the Contract Adjustment
as contained in the Management Agreement.

**MSC**

That the Board approve a 5% increase in the Braddock Management, L.P.
Agreement.

Mr. Gross reported on his progress as directed by the Board at previous
meetings regarding future renewal of the Braddock Management, L.P.
contract.

H.  **Permian Health Care - French Hospital**                    EMC 002896

Due to the complexity of this discussion, the members of the Board of
Directors of NOC had been invited to participate in part of the
Permian Health Care Board of Directors Meeting prior to their own
meeting of February 14, 1997. During the Permian Health Care Board of
Directors Meeting, there was a lengthy and full discussion concerning
Permian's desire to have its subordinate, Vista Hospital Systems,
purchase French Hospital. Further, it was discussed that depending
upon the final purchase price it may be necessary for Permian to enter
into a loan agreement with NOC for an amount of up to $10 Million

Northside Operating Co.
Board of Directors
February 14, 1997
Page Ten

which would then subsequently be loaned to Vista Hospital Systems and
could be used towards the purchase of French Hospital. The discussion
associated with this which occurred during the Permian Health Care
Board of Directors Meeting is added to and incorporated as part of the
minutes of this meeting.

MSC

The Board recognizes that it may be requested to loan up to $10
Million to Permian Health Care to assist Permian or one of its
affiliates to purchase French Hospital. Presently, the necessity of
the loan, if any, and the total amount of such loan, if any, is
currently unknown. Therefore, the Board authorize the CEO to maintain
up to $10 Million in readily available funds.

The Board also authorizes and directs the CEO of NOC to enter into any
negotiations and prepare any and all documents necessary to complete
this transaction subject to the Board's final approval. The Board
also authorizes the CEO of NOC to hire any consultants, attorneys or
other advisors to advise him on the terms and conditions of the loan,
if any, to Permian Health Care.

I.    The Establishment of a Committee on Investments for NOC

Given the size of the cash reserves being generated by NOC, the Board
discussed the need to establish a Committee on Investments. After a
lengthy discussion:

MSC

That the Board move to establish a Committee on Investments consisting
of William D. Fruland and B. Macon Brewer. This Committee is to meet
and develop an investment philosophy and strategy for NOC. The CEO
was authorized and directed to provide appropriate resources required
by this Committee to develop the investment philosophy and strategy
for NOC. These resources would include but not be limited to the
hiring of appropriate advisors to advise and counsel the Committee.

VI.   ADJOURNMENT

MSC

There being no further business, a motion for adjournment was moved, duly
seconded and carried.

APPROVE:                              ATTEST:

                                      EMC 002897

Bertram P. Rosenthal, M.D.            William D. Fruland
President                             Secretary

# Exhibit

# 54

NORTHSIDE OPERATING CO.

BOARD OF DIRECTORS

Meeting Date: **June 5, 1997**

I.  **CALL TO ORDER:**  The meeting was called to order by Bertram P. Rosenthal, MD, President on Thursday, June 5, 1997.


Present:  B. Macon Brewer
George Chapas
William D. Fruland
Stina Hans
Bertram P. Rosenthal, MD

Also Present:  Dan Finnane, Primus Management, Inc.
F. Scott Gross, Primus Management, Inc.
Karen Hyneman, CFO, Northside Operating Co.
Michael Olsen, General Counsel, Northside Operating Co.
Peter G. Rogan, CEO, Northside Operating Co.
Dean Spizzirri, Associate General Counsel, Northside Operating Co.


OLD BUSINESS

A.  Review and Approval of Prior Board Meeting Minutes

MSC

Minutes of the February 14, 1997, Meeting of the Northside Operating Co. (NOC) were received, reviewed and approved upon a motion which was duly seconded and carried.

B.  Review and Approval of the Illinois Department of Public Health Compliance Project

Mr. Rogan reported as follows:

The Department of Health & Human Services has extended the deadline for the Plan of Corrections for Edgewater Medical Center. The new deadline is now February 28, 1998. The institution believes that it will be in full compliance with the Plan of Corrections at this date.

DEFENDANT'S
EXHIBIT
54
PENGAD-Bayonne, N. J.

EMC 003070

Northside Operating Co.
Board of Directors
June 5, 1997
Page Two

In addition, Mr. Rogan also informed the Board that in conjunction with the Plan of Corrections, management took advantage of the timing of the work to be done and developed a separate, unrelated, detailed first floor master plan for use throughout the areas of Administration, Admitting, Cashiers, Emergency Room Waiting and Radiology. Also EMC will install bathrooms in compliance with ADA and renovate the elevators on the first floor. Mr. Rogan reminded the Board that approximately $900,000 was estimated for the IDPH compliance work. The additional related work will add approximately $600,000 to $800,000. The separate and unrelated remodeling projects will cost approximately $500,000 to $800,000.

MSC

That the Board approve the additional cost of approximately $600,000 to $800,000 for the additional compliance related construction throughout the first floor of the institution. This would result in a total cost of approximately $1.5 to $1.7 Million.

MSC

That the Board approve the separate and unrelated remodeling for Administration, Emergency Department, related areas and the building exterior for the approximate cost of $500,000 to $800,000.

MSC

The Board authorized the CEO to enter into all necessary contracts and arrangements to complete the above projects.

MSC

That the Board approved the examination of all sources of financing including but not limited to the utilization of tax exempt bond financing for these capital projects.

C.   **Status of the Home Health Care Management, LLC.**

Mr. Rogan reported that according to NCC's attorneys, there may be a slight chance that the home health care management company selected by the Board might be considered a related party for Medicare purposes due to Mr. Rogan's potential ownership of the company. As a result of this analysis, Mr. Rogan informed the Board that he and his family would not have an interest in the home health care management company. As such, the outside counsel for NCC informed Mike Olsen, General Counsel, that there is no related party issue.

MSC

That NCC proceed with the contract with Health Care Management, LLC. for the management of NCC's Home Health Care Program.

EMC 003071

Northside Operating Co.
Board of Directors
June 5, 1997
Page Three

D. **Status of the Braddock Management, L.P. (BMLP) Agreement**

As a result of a discussion at the previous Board meeting and at the Board's request, Mr. Rogan reported to the Board that BMLP had drafted a proposed new contract to be entered into between NOC and BMLP. As discussed at the prior Board Meeting, this contract was drawn up in concert with renewal of Mr. Rogan's Employment Agreement with BMLP as well as the strong desire of the Board to secure BMLP and its managers' services. It is anticipated that Mr. Rogan will remain as President of BMLP and supervise BMLP activities including its duties to NOC, and the day to day responsibilities of NOC will now be assumed by Joann Skvarek, Executive Vice President.

To facilitate the negotiation of this contract, Dr. Rosenthal appointed a committee of Messrs. Brewer, Chapas and Fruland to act with the assistance of Foley & Lardner as the negotiation team.

The Board was informed that Mr. Rogan as President of Waldo Point Management, the general partner in BMLP, will serve as the negotiator for BMLP.

MSC

That the Board approve a Committee consisting of Mr. Brewer, Mr. Chapas and Mr. Fruland to negotiate the contract with BMLP. This Committee was authorized to utilize the services of outside legal counsel, Foley & Lardner, to assist in their negotiations.

It is anticipated that the contract will be effective September 1, 1997.

E. **Status Report of the Conflict of Interest Policy**

Mr. Olsen reported to the Board that he had received each board members signed Conflict of Interest Statement as required by the Hospital's policy.

Mr. Rogan informed the Board that he had received the senior managers Conflict of Interest Statements and had forwarded his own Conflict of Interest Statement to Mr. Olsen. Mr. Rogan went on to state that the Purchasing Department personnel of Edgewater Medical Center will also be required to sign a Conflict of Interest Statement.

F. **Drinker Biddle & Reath Report**

The Board reviewed the Drinker Biddle & Reath Report included in the Board package.

EMC 003072

rthside Operating Co.
ɔard of Directors
June 5, 1997
Page Four

### MSC

The Board accepted Drinker Biddle & Reath's report concerning the allegations made by Mrs. Meade as reported in Modern Healthcare.

G.  **Report from the Committee on Investments**

The Committee on Investments reported that it has not held any meetings pending the acquisition of French Hospital by Vista Healthcare Systems. It is anticipated that the Committee will meet some time over the next few months and report back to the Board accordingly.

H.  **Status of French Hospital Acquisition**

Dr. Rosenthal brought the Board of Directors up to date regarding Vista Hospital Systems, Inc.'s purchase of French Hospital. As the Board recalled, the total amount being committed by NOC to Vista Hospital Systems, Inc. is in an amount up to $10 Million. On a preliminary basis it was anticipated that this would be a ten year term at a 7% interest rate and subordinated to all other Vista obligations. Interest and principal would be payable only after Vista achieves an investment grade bond rating.

After a great deal of discussion, the Board concluded that any note it may enter into with Vista Hospital Systems, Inc. was in the best interest of Permian system. Further, a report provided by Mr. Olsen reported upon the Cain Brothers' opinion there is a reasonable expectation of repayment of this note. The Board was also told by Mr. Olsen that the Board would be receiving directly from Cain Brothers a letter documenting the reasonableness of the Note repayment.

### MSC

That the Board authorize Dr. Bertram Rosenthal to negotiate the final terms of the loan and contribution to be made from NOC to Vista Hospital Systems, Inc. If final terms are within the above parameters, Dr. Rosenthal is authorized to execute the loan on NOC's behalf.

ırthside Operating Co.
ɔoard of Directors
June 5, 1997
Page Five


III. <u>FACILITY REPORTS</u>

    A.    <u>Review and Approval of Advisory Board Meeting Minutes</u>

        The Advisory Board Meeting minutes of January 28, 1997 and April 2, 1997, were received, reviewed and approved by the Board of Directors.

        <u>MSC</u>

        That the Advisory Board Meeting minutes be accepted as presented by the Board.

    B.    <u>Review and Approval of Medical Staff Meeting Minutes</u>

        The Medical Staff Meeting minutes of February and March, 1997 were received, reviewed and approved by the Board of Directors.

        <u>MSC</u>

        That the Medical Staff Meeting minutes be accepted as presented by the Board.

    C.    <u>Review and Approval of Financial Reports</u>

        The Financial Reports of December, 1996 and January, February and March, 1997 were received, reviewed and approved by the Board of Directors.

        Mr. Rogan discussed the 1st Quarter results with the Board of Directors. It was pointed out that NOC has a negative variance to budget and Mr. Rogan went into a thorough and complete discussion as to the reasons for the variance to budget. Mr. Rogan went on to explain that in April and anticipated in May, we will have made a significant recovery and will be very close to achieving budget. A lengthy discussion concerning the financial operations occurred.

        <u>MSC</u>

        That the Financial Reports be accepted as presented.

EMC 003074

rthside Operating Co.
ɔard of Directors
June 5, 1997
Page Six

IV.   BRADDOCK MANAGEMENT, L.P. REPORT

   A.   **Master Trustee Report - Annual Report for the Fiscal Year Ended
        December 31, 1996**

        The Annual Report for the Fiscal Year Ended December 31, 1996, was
        received and reviewed by the Board of Directors.

        **MSC**

        That the Board of Directors approve the Master Trustee Report for the
        Fiscal Year Ended December 31, 1996.

   B.   **Master Trustee Report - 4th Quarter, 1996 & 1st Quarter, 1997**

        The Master Trustee Reports for the 4th Quarter of 1996 and the 1st
        Quarter of 1997 were received and reviewed by the Board of Directors.

        **MSC**

        That the Board of Directors approve the Master Trustee Reports for the
        4th Quarter of 1996 and the 1st Quarter of 1997.

   C.   **Coopers & Lybrand FY 1996 External Audit**

        The Coopers & Lybrand FY 1996 External Audit was received and reviewed
        by the Board of Directors.  The Board asked a number of questions of
        Ms. Hyneman to which she responded accordingly.

        **MSC**

        That the Coopers & Lybrand FY 1996 External Audit be accepted as
        presented.

   D.   **Coopers & Lybrand FY 1996 Management Comments & BMLP Response**

        The Coopers & Lybrand FY 1996 Management Comments and BMLP Response
        were presented and discussed by Karen Hyneman. Ms. Hyneman stated
        Coopers' comments were not substantive in nature and appropriate
        actions were taken to address the comments.

        **MSC**

        That the Coopers & Lybrand FY 1996 Management Comments and BMLP
        Response be accepted as presented.

EMC 003075

rthside Operating Co.
oard of Directors
June 5, 1997
Page Seven

E.  **Status of the Residency Programs**

**ACGME Appeal**

Mr. Rogan reported that on a preliminary basis a response should be forthcoming from ACGME concerning the appeal status of the Internal Medicine Residency Program.

**Midwestern University Affiliation**

Mr. Rogan elaborated on the report presented in the Board package with regard to the Midwestern University Affiliation

Mr. Rogan also projected the number of Interns and Residents in the Internal Medicine and Surgery Programs for the 1998/99 Academic Year. It was discussed that additional ambulatory teaching sites need to be developed to accomodate additional students, interns and residents in the areas of family practice.

F.  **Status of the Friendly Physician Model**

Mr. Rogan and Mr. Olsen made a report to the Board of Directors concerning the selected model for physician acquisition and management. After thorough discussion:

**MSC**

That the Board authorize Mr. Rogan and Mr. Olsen to proceed with the establishment of a Friendly Physician Professional Corporation and develop other documents necessary to assist in the management and/or acquisition of physician practices. The Board authorized expenditures of $50,000 in this regard.

G.  **Status of the Med/Psych Program**

Mr. Rogan reported to the Board that this program was once again viable and he was proceeding as previously directed with the implementation.

EMC-003076

orthside Operating Co.
Board of Directors
June 5, 1997
Page Eight

H.   **Fund Raising Process/Organization**

Mr. Rogan reported on the need of Edgewater Medical Center to develop a fund raising arm in order to access and interact with the Community. After a good deal of discussion as to the relative alternatives available to Edgewater Medical Center:

**MSC**

That Mr. Rogan be authorized to establish a foundation and to work with outside counsel and consultants as needed to initiate this organization.

**MSC**

That the Braddock Management, L.P. Report be accepted and approved by the Board of Directors.

**NEW BUSINESS**

A.   **Review and Approval of New Physician, Vendor and Other Contracts**

-   Mr. Rogan presented and reviewed the physician contracts which primarily pertain to administrative and/or teaching responsibilities for the included physicians. After discussion:

Nalini Ahluwalia, MD
Jean C. Alexandre, MD
Mir Akif Ali, MD
Emanuel Alzona, MD
Ismail Atcha, MD
Ravi Barnabas, MD
Wilbur Britt, MD
Ramon Castro, MD
Luis Castro, MD
Michael Fox, DPM
Galilee Medical Center
Irving Garlovsky, MD
Bruce Goldenberg, MD
Greenview Healthcare
Satyendra Humad, MD
Illinois Regional Oncology Network, S.C.

Steve Kalish, MD
Satwant Kingra, MD
Howard Kotler, MD
Michael Morgenstern, MD
Michael Olden, MD
Paul Potach, MD
Rogers Park Family Health Facilities, Ltd.
Nunilo Rubio, MD
Gonzalo Ruiz, MD
Louis Santangelo, DPM
Michael Schwartzman, DPM
B.K. Shah, MD
Thomas Stilp, MD
William Wise, MD
Merrill Zahtz, MD

EMC 003077

ɔrthside Operating Co.
.ɔard of Directors
June 5, 1997
Page Nine

**MSC**

That the Board approve the physician contracts as presented.

— Mr. Rogan presented and reviewed the vendor contracts with the Board:

Design Organization, Inc.

**MSC**

That the Board approve the vendor contracts as presented.

— Mr. Rogan presented and reviewed the other contracts with the Board.

Angela Borosh
Sandra Hudak
Stuart Leon
Midwestern University/Chicago College of Osteopathic Medicine
Rao, M.D., S.C.

Feasibility Study for the Establishment of the Hispanic Cardiac Institute

Feasibility Study to Investigate a Wellness Center/Health Club

**MSC**

That the Board approve the contracts as presented.

B.  **Risk Management Issue**

Mr. Rogan presented a letter for discussion concerning the establishment of an Offshore Capitative Insurance Co. to assist the institution in its malpractice and general liability insurance risks. Mr. Rogan discussed the advantages and disadvantages of establishing such an organization.

EMC 003078

orthside Operating Co.
board of Directors
June 5, 1997
Page Ten

### MSC

That the Board direct the CEO to proceed with the feasibility study to establish an Offshore Capitative Insurance Co. and authorize the CEO to hire the appropriate consultants and legal counsel to assist in this study.

C. ### Lease - Adjacent Property

Mr. Rogan pointed out that there was an oversight in the adjacent property lease whereby two parcels were omitted from the lease. Mr. Rogan stated he had a conflict of interest because of his ownership of these adjacent properties. As such, he would recuse himself from this discussion. Mr. Finnane went on to say that two outside firms had been engaged to provide a fair market value appraisal for these properties. He also stated that these properties were being used by the institution and had been used by the institution since August, 1994 for parking. Further, a similar lease which has already been entered into for the other adjacent properties would be utilized for these two parcels.

### MSC

That the Board authorize Dr. Rosenthal to enter into a lease with regard to these two additional properties similar to the lease which had previously been approved and executed.

D. ### IRS Audit

As previously reported in the October, 1996, minutes, the IRS is conducting an audit of the institution's bad debt for the years 1993/94. As was reported at the October 6, 1996, Board of Directors Meeting, the financial responsibilities of the audit may be of NOC. Upon further review by outside counsel, it was determined that this is not the responsibility of NOC but of the previous shareholders of Edgewater Operating Co. However, it remains in the best interest of NOC to manage the audit.

EMC 003079

Northside Operating Co.
Board of Directors
June 5, 1997
Page Eleven

   E.   **Refinancing Existing Debt**

Mr. Rogan reported upon his conversation with Elizabeth Ware of Colonial Management concerning the current debt. He reported to the Board that Ms. Ware is very satisfied with the operations of the organization and is pleased with its plans and progress. Mr. Rogan went on to inform the Board that as discussed with Ms. Ware, we are beginning our preliminary analysis of the advisability of refinancing our existing debt.

The Board thoroughly discussed the advantages of refinancing the existing debt.

**MSC**

That the Board approve the engagement of Cain Brothers as investment bankers and BMLP to manage the process. BMLP is authorized on behalf of NOC to engage all necessary parties and negotiate requisite fees. BMLP is engaged to direct the functions associated with the refinancing of outstanding debt.

**ADJOURNMENT**

**MSC**

There being no further business, a motion for adjournment was moved, duly seconded and carried.

APPROVE:                ATTEST:

Bertram P. Rosenthal, M.D.      William D. Fruland
President                  Secretary

EMC 003080

NOC0605.MIN

# Exhibit

# 55