NORTHSIDE OPERATING CO.

BOARD OF DIRECTORS

**Meeting Date:** October 4, 1997

I. **CALL TO ORDER:** The meeting was called to order by Bertram P. Rosenthal, MD, President on Saturday, October 4, 1997, at 9:00 a.m.

**Present:** B. Macon Brewer
George Chapas
William D. Fruland
Stina Hans
Bertram P. Rosenthal, MD

**Also Present:** Dan Finnane, Primus Management, Inc.
F. Scott Gross, Primus Management, Inc.
Karen Hyneman, CFO, Northside Operating Co.
Michael Olsen, General Counsel, Northside Operating Co.
Peter G. Rogan, Braddock Management, L.P.
Dean Spizzirri, Associate General Counsel, Northside Operating Co.

DEFENDANT'S EXHIBIT 55

II. **OLD BUSINESS**

A. **Review and Approval of Prior Board Meeting Minutes**

**MSC**

Minutes of the June 5, 1997, Meeting of the Northside Operating Co (NOC) were received, reviewed and approved as amended upon a motion which was duly seconded and carried.

B. **Review and Approval of the Illinois Department of Public Health Compliance Project**

Mr. Rogan gave an update to the Board concerning the status of the compliance project relative to the Lobby. He informed the Board that this project was proceeding on time and the construction was to begin within the next 7 to 10 days.

EMC 003238

C. **Status of Exterior and 1st Floor Project Contracts**

Mr. Rogan informed the Board that the estimates for these projects were to be received the following week. He further informed the Board that it was decided to move Security to the first floor which would necessitate approximately $125,000 to $150,000 additional expenditure in the contracts. Mr. Rogan noted that these separate and additional projects will be done after the completion of the Lobby for the Department of Public Health Compliance Project.

rthside Operating Co.
Board of Directors
tober 4, 1997
rage Two

**MSC**

That the Board approve the additional expenditure of $125,000 to $150,000 for the 1st Floor project to include the Security department.

EMC 003239

**MSC**

That the Board approve the examination of all sources of financing including but not limited to the utilization of tax exempt bond financing for these capital projects and reimbursement for such expenditures therefrom.

D. **Status of the Braddock Management, L.P. (BMLP) Agreement**

Mr. Chapas reported on behalf of the Committee which consisted of Messrs. Brewer, Chapas and Fruland. He informed the Board that the Committee met and reviewed a draft copy of the contract between BMLP and NOC. He further reported that the Committee met with outside legal counsel from Foley, Lardner, Weissburg & Aronson and were informed the contract met the legal requirements and appropriate rules and regulations. Mr. Chapas informed the Board that an independent firm (C+L) was engaged to review the financial aspects associated with the contract. The Committee expressed concern that the reorganization of the personnel responsibilities to NOC, needed to be finalized bef concerned about Mr. Rogan's future role with NOC. It was recognized that he will no longer be responsible for the day to day activities as the CEO of NOC but was to be actively and intimately involved in providing strategic direction to NOC. The Committee desires that significant portion of Mr. Rogan's time needed to be devoted to NOC and agreed an appropriate compensation level for Mr. Rogan should be passe through to NOC. The Committee went on to report that although there wa a significant increase in fees between this contract and the origina contract, they believe, based upon performance and upon the desire of NOC to retain the key personnel, that the fee was justified. Th Committee further reported that it was the intention of the Board t continue to properly motivate and reward BMLP. Nonetheless, th Committee did report it is awaiting a report from the independent fir as to the comparison of the management fees to other hospitals and wa prepared to make a counter offer to BMLP relative to the fee propose by BMLP to NOC. Before final approval by the Committee an recommendation to the Board, the Committee will need to recei additional information and most likely hold a Conference Meetin Furthermore, as required by the Master Trust Indenture, approval by N bond holders will need to be obtained.

Mr. Rogan reported that C+L informed him they should have this repo on the fee structure of the proposed revised contract complet shortly. On a preliminary basis, C+L informed Mr. Rogan of t approximate 20 other hospitals in their data that at a fee capp 3.5% of net patient revenues, NOC was second or third highest a a fee as a percentage of EBDITA, NOC was below the mean.

Responding to questions, Mr. Rogan informed the Board he believed m the data was from California hospitals. After discussion, the Bo to engage another firm to broaden the scope

Northside Operating Co.
Board of Directors
October 4, 1997
Page Three

Because these organizational arrangements and the management fee information needed to be finalized before the BMLP contract can be finalized, all of this is being concurrently considered by the Committee.

The Committee believed it would be in a position to report back to the Board prior to the end of this calendar year.

E.  Report from Committee on Investments

The Committee on Investments of Messrs. Brewer, Chapas and Fruland met. The Committee reported to the Board that it believed significant attention needs to be devoted to the investments since cash and investments have grown at such an exceptional rate over the past three years. Along these lines, the Committee directed Mr. Rogan to secure the services of a consultant to assist the Committee to sort through various investment advisors so the Committee could recommend one to the Board. In addition, the Committee felt that because of the efforts of management in developing such a large amount of investment in a short period of time, an investment advisor should be selected in the near future.

The Committee felt it would have this project completed prior to the year end depending upon the availability of the consultant to complete his work.

MSC

That the Board accept the Committee's report and authorize the engagement of a consultant to assist management in the selection of an investment advisor. Further, Management is directed to take all necessary steps to implement this action.

F.  Status of Refinancing of Outstanding Debt

Mr. Gross reported upon meetings with the selected investment banking firm of Cain Brothers. He also reported upon the activitie that BMLP has undertaken to direct and organize the refinancing efforts. Mr. Gross reported that the negotiated Cain Brothers fee is 65 basis points including expenses and that BMLP fees, associate with this refinancing, will also be an all inclusive 65 basis points. Mr. Gross went on to say that he has had discussions with Foley & Lardner, outside counsel, with respect to the redrafting o the Master Trust Indenture. It was also reported that the Illinoi Health Facilities Authority has been contacted and the existing bor holders will also be contacted. Although, initial thoughts were t have the refinancing completed by the end of this calendar year, this does not appear to be achievable. Delays have occurred in dealing with the various banks and receiving proposals with regard to the Letter of Credit. As such, it is anticipated that the refinancing will now be completed some time during the first quart of 1998.

EMC 003240

Northside Operating Co.
Board of Directors Meeting
October 4, 1997
Page Four

Mr. Gross reviewed with the Board the forecasted financial
statements provided to the banks for information purposes in their
determining their proposals to NOC. Specifically, to be very
conservative, NOC informed the banks that in the forecasted
financial statements prepared by Management, they were to ignore the
loan to Vista Hospital Systems, Inc. as the loan is not to be
included as part of the security provided under the new financing.
In this manner, it is believed we are adopting the most conservative
posture with the banks.

MSC

That the Board approve the financing fees to be paid to Cain
Brothers and BMLP.

G. Lease of Adjacent Property

Mr. Rogan reported to the Board that the lease has not been
finalized and once this is completed, it will be brought to the
Board for its attention.

H. Vista Hospitals Loan and Gift

Mr. Gross reported on the final details of the loan of $9,085,627
and the gift of $914,373 to Vista Hospital Systems, Inc. It was also
discussed with the Board that this transaction has been completed
and French Hospital has been acquired by Vista Hospital Systems,
Inc.

MSC

That the Board affirmed and approved Dr. Rosenthal's actions
regarding the loan of $9,085,627 and the gift of $914,373 to Vista
Hospital Systems, Inc.

I. Status of Capitive Insurance Co.

Mr. Rogan reported that the feasibility for the Offshore Capitive
Insurance Company has been put on hold.

J. Status of 1993/94 IRS Audit

Mr. Rogan reported this has been completed and the final calculation
of the amount due to the IRS for bad debts is currently being
determined. At the current time, no other issues have been raised
by the IRS.

EMC 003241

III. FACILITY REPORTS

A. Review and Approval of Advisory Board Meeting Minutes

The Advisory Board Meeting minutes of May 23, 1997 and July 30,
1997, were received, reviewed and approved by the Board of

Northside Operating Co.
Board of Directors
October 4, 1997
Page Five

MSC
That the Advisory Board Meeting minutes be accepted as presented by the Board.

B. **Review and Approval of Medical Staff Meeting Minutes**

The Medical Staff Meeting minutes of April, May, June and August, 1997 were received, reviewed and approved by the Board of Directors.

MSC

That the Medical Staff Meeting minutes be accepted as presented by the Board.

C. **Review and Approval of Financial Reports**

The Financial Reports of April, May, June, July, and August, 1997, were received, reviewed and approved by the Board of Directors.

MSC

That the Financial Reports be accepted as presented.

7. **BRADDOCK MANAGEMENT, L.P. REPORT**

A. **Master Trustee Report - 2nd Quarter, 1997**

The Master Trustee Report for the 2nd Quarter of 1997 was received and reviewed by the Board of Directors.

MSC

That the Board of Directors approve the Master Trustee Report for the 2nd Quarter of 1997.

B. **Hispanic Physician Network**

Mr. Rogan reported upon the discussions he has had with a group of hispanic physicians who are setting up a network throughout the Chicagoland area. This organization is also attempting to set up networks in other cities. Mr. Rogan reported he believes this would be a significant benefit to NOC in it becoming a key hospital in this network. At the present time, NOC's future capital contribution to the network is unknown, but it could be up to $500,000.00. Currently, most of the time will be spent in management participating with the leaders of the network in their efforts to establish the network.

EMC 003242

Northside Operating Co.
Board of Directors
October 4, 1997
Page Six

### MSC

That the Board approve NOC's participation in the Hispanic Physician Network and direct management to take whatever steps are necessary to ensure NOC's participation in the network.

C. **Ambulatory Surgery Center**

Mr. Gross reported upon the investigation of NOC either establishing or purchasing or entering into a joint venture for an ambulatory surgery center. Mr. Rogan discussed the advantages and disadvantages of an ambulatory surgery center and how it would compliment NOC. At the present time, the final cost has not been determined and prior to NOC entering into any contracts for an ambulatory surgery center, Mr. Rogan will seek approval from the Board.

D. **Home Visit Program**

Mr. Rogan discussed the establishment of a Home Visit Program to compliment the work being done with Edgewater's Senior Program. Specifically, this Home Visit Program would be similar to the historic physician house call. At the present time, it is anticipated that NOC will contract with a number of services to implement this program. In the future, it is anticipated that NOC will establish its own program.

### MSC

That the Board approve the establish of a Home Visit Program and direct NOC to take all necessary steps to implement the program.

E. **Ambulatory Physician Network**

This was delayed until discussion of item V.B. (Edgewater Foundation Relationship).

F. **Status of Residency Programs**

Mr. Rogan reported that the results of the appeal to ACGME were received and the appeal has been denied. As such, the Allopathic Residency Program will be terminated in June, 1998.

Mr. Rogan went on to report that the affiliation with Midwestern University is proceeding very well. It is anticipated that a number of residents and interns will start in June of 1998.

In addition, Edgewater has also been approached by the University establish a Family Practice Residency Program and this is current been taken under consideration.

EMC 003243

rthside Operating Co.
oard of Directors
ctober 4, 1997
ige Seven

G. **Status of Friendly Physical Model - Acquisition**

Mr. Rogan reported upon the status of the purchase of the Industrial Medicine practice which is currently still being negotiated.

Mr. Rogan discussed the acquisition of the Hispanic Cardiology Practice. He stated that a report was received from Valuation Counselors valuing the practice between $1 and $1.5 Million depending upon the physician compensation.

Mr. Rogan went on to report that he is currently in final negotiations with the owner of the Hispanic Cardiology practice and he anticipates the final purchase price will be approximately between $1.3 and $1.4 Million and that the acquisition will probably be completed before the end of this year.

With regard to other primary care, Mr. Rogan reported:

- The opening of the Westside Clinic in concert with the Chicago Housing Authority Program. The physician has been hired and the clinic is open and operational;

- The Far Southside Clinic is currently on hold in that an appropriate site is currently being sought; and

- With regard to Dr. Ilagrin's clinic, a preliminary appraisal has been received for the real estate associated with this practice which is worth approximately $120,000. Mr. Rogan reminded the Board that the entire purchase price for this clinic to include the building and the clinic is $135,000.

Mr. Rogan brought the Board up to date concerning the acquisition of various other clinics which are in different phases of development in their acquisitions.

**MSC**

That the Board approve the purchase of the Hispanic Cardiology practice for an amount not to exceed $1.5 Million and the compensation package to commensurate with the purchase price and authorized NOC to take all actions necessary to complete the transaction.

**MSC**

That the Board approve the purchase of Dr. Ilagrin's clinic for an amount not to exceed $150,000 given the appraised value of the clinic and authorized NOC to take all actions necessary to complete this transaction.

EMC 003244

Northside Operating Co.
Board of Directors
October 4, 1997
Page Eight

MSC

NOC's Management was authorized to proceed with the development and
purchase of the other clinics and to perform all the necessary steps
to bring those acquisitions to completion. As specific information
is developed on each acquisition, the Board is to be kept informed.

H.   Status of the Med/Psych Program

Mr. Rogan reported that a consulting group had been retained to
assist in developing this program. He believed that the program
would be operational during the first quarter of 1998.

I.   Assisted Living Program

Mr. Gross discussed the development of a program to be located in
the Kadin Building. He went on to state that Management believed
this program would be a good compliment to the services being
provided by the institution. Because of the lack of expertise in
the current management, it is anticipated that NOC would contract
for the management of this program.

J.   Status of Med/Detox Program

Mr. Gross reported that the contract with Special Care Hospital
Management will be terminated at the end of its term. In order to
continue to provide this valuable service to the community, it is
anticipated that a marketing contract will be entered into with an
organization called Florascribe and additional duties will be added
to the Universal Geriatric Services contract.

MSC

That the Board authorize NOC to enter into a contract with
Florascribe and Universal Geriatric Services for relevant activitie
related to the Med/Detox Program and to take all necessary actions
and enter into all necessary agreements.

V.   NEW BUSINESS

A.   Review and Approval of New Physician, Vendor and Other Contracts

• Mr. Rogan presented and reviewed the physician contracts which
primarily pertain to administrative and/or teaching
responsibilities for the included physicians.

Emanuel Alzona, MD                    Ismail Atcha, MD
Samina Chaudry, MD                    Ioan Cheregi, MD
Yuri Cherny, MD                       Demetrios Giokaris, MD

EMC 003245

Northside Operating Co.
Board of Directors
October 4, 1997
Page Nine

| | |
|---|---|
| Bruce Goldenberg, MD | Bruce Hymanson, MD |
| Satyendra Humad, MD | Steve Kalish, MD |
| J.K. Kim, MD | Michael Maitar, MD |
| Rogelio Maynulet, MD | Michael Morgenstern, MD |
| Mario Oliveros, MD | Nunilo Rubio, MD |
| Gonzalo Ruiz, MD | B.K. Shah, MD |
| Yuri Shapiro, MD | Neal Spero, MD |
| Thomas Stilp, MD | William Wise, MD |
| Maria Wojnarska, MD | Merrill Zahtz, MD |
| Claude Zanetti, MD | |

| | |
|---|---|
| Emo Bonaminio, DPM | Robert Cohen, DPM |
| Michael Fox, DPM | Kevin Gavin, DPM |
| David Hiltzik, DPM | John Kane, DPM |
| Luis Mendoza, DPM | Paul Potach, DPM |
| Robert Ramoska, DPM | Louis Santangelo, DPM |
| Sidney Weiser, DPM | Richard Weiss, DPM |

**MSC**

That the Board approve the physician contracts as presented.

- Mr. Rogan presented and reviewed the vendor contracts with the Board:

Actamed Master Products
Dade International, Inc.
Emergency Medical Associates of Illinois/Indiana
Mark Therapeutic Services, P.C.

**MSC**

That the Board approve the vendor contracts as presented.

- Mr. Rogan presented and reviewed the other contracts with the Board.

Day Surgicenters, Inc.

**MSC**

That the Board approve the contract as presented.

EMC 003246

thside Operating Co.
rd of Directors
ctober 4, 1997
age Ten

B.   Edgewater Foundation Relationship

Messrs. Gross and Rogan discussed the establishment of an Ambulatory
Physician Network in a relationship with Edgewater Foundation. They
explained NOC had looked at both the current laws in the State of
Illinois and the Medicare Rules & Regulations relative to our
physician contracts for administrative and teaching duties and also
with our desire to establish a physician network.

They went on to describe in detail the results of all of the work
that management, legal counsel and consultants had performed in
organizing and implementing such a network and relationships.
Specifically, it was felt by the parties that it would be best if a
separate organization such as Edgewater Foundation provide all of
the teaching services and administrative physician services to NOC.
Furthermore, it is felt that Edgewater Foundation should undertake
the development and direction of the Ambulatory Physician Network
under the umbrella of the teaching program requirements of both
Midwestern University and NOC. The relationship between Edgewater
Foundation and Midwestern University and NOC was discussed in depth.
The relative advantages and disadvantages of such an organization
endeavor were also discussed in depth.

MSC

That the Board authorize NOC management to enter into negotiations
with Edgewater Foundation for the establishment of an Ambulatory
Physician Network and the establishment of a Faculty Physician
Teaching Program which would provide the teaching responsibilities
for NOC's residency program and to have Edgewater Foundation provide
the necessary medical professional administrative services to NOC.

The Board authorized that an amount up to $250,000 be paid to
Edgewater Foundation for the establishment of these programs and
relationships.  In addition, the Board recognized that Edgewater
Foundation would be charging Edgewater Medical Center an amount for
providing teaching physicians for Edgewater's Internship and
Residency Program as associated with Midwestern University

MSC

That the Board authorize NOC management to enter into any and all
agreements necessary to implement these programs and to negotiate
the appropriate fees that NOC would pay Edgewater Foundation for the
services it would provide NOC.

EMC 003247

Northside Operating Co.
Board of Directors
October 4, 1997
Page Eleven

C.  **Corporate Compliance Program**

Mr. Gross informed the Board that NOC is in the process of developing a Corporate Compliance Program which will be able to address compliance requirements for NOC.

**MSC**

That the Board authorize NOC's management to implement a Corporate Compliance Program and to incur the necessary expenses and enter into appropriate agreements to implement the program.

D.  **Banking Resolutions**

Appropriate banking resolutions will be proposed for signatory purposes and be presented to the Board for approval. It was recommended that finance personnel be granted only limited funds transfer and check signing privileges.

E.  **Appointments to NOC**

Roger Ehmen was appointed Senior Vice President, Joann Skvarek was appointed Executive Vice President and Henry Zeisel was appointed Vice President of Finance of NOC as recommended by Management.

**MSC**

That the Board approve the above appointments as recommended by Management.

**MSC**

That the Board empower the above to sign authorized employment/independent contractor contracts and third party supplier contracts for amounts less than $100,000 and bind the institution.

F.  **Insurance Program**

Mr. Olsen reported on the professional and general liability insurance programs and the three year renewal option. Mr. Olsen also discussed that NOC may have an opportunity to decrease its property and plant insurance premium by consolidating with Vista. NOC will explore this and report back to the Board at a future date.

**MSC**

That the Board approve the three year renewal option for the professional and general liability insurance.

rthside Operating Co.
ard of Directors
:tober 4, 1997
age Twelve

That the Board approve the review consolidation of the property
insurance and the consolidation of the Directors and Officers and
errors and omissions into Permian Health Care, Inc.

VI.   ADJOURNMENT

MSC

There being no further business, a motion for adjournment was moved, duly
seconded and carried.

APPROVE:                                        ATTEST:

Bertram P. Rosenthal, M.D.                      William D. Fruland
President                                       Secretary

EMC 003249

# Exhibit

# 56

# AMENDED AND RESTATED
# HOSPITAL MANAGEMENT AGREEMENT

This Amended and Restated Hospital Management Agreement ("Agreement or Restated Management Agreement") is entered into as of ~~August 1~~, 1997, by and between Northside Operating Co., doing business as Edgewater Medical Center, an Illinois not-for-profit corporation ("Edgewater") and Braddock Management, L.P. ("Manager"), a California limited partnership.

## WITNESSETH:

**WHEREAS,** Edgewater currently owns an acute care general hospital located at 5700 N. Ashland Avenue, Chicago, Illinois 60660.

**WHEREAS,** effective August 17, 1994, Edgewater and Manager entered into that certain Management Contract with respect to the management of the day-to-day operations of Edgewater ("1994 Agreement").

**WHEREAS,** Edgewater desires to amend and restate the 1994 Agreement and reengage Manager to manage the day-to-day operations of Edgewater.

**WHEREAS,** the Board of Directors of Edgewater is concerned that, given the current rapidly evolving health care industry, ensuring competent and stable management is an essential ingredient of Edgewater's continued success over the long term.

**WHEREAS,** Manager has assigned certain Administrative Managers to Edgewater, each of whom has performed exemplary services for Edgewater pursuant to the 1994 Agreement and have been integral to the success of Edgewater.

**WHEREAS,** The Manager and its Administrative Managers have indicated that, due to the uncertainties in the health care industry, they may not be able to remain in their respective positions for an extended period of time unless they receive certain assurances regarding continued engagement.

**WHEREAS,** the Board of Directors of Edgewater believes that its continued success is, in large part, contingent on the continued services of the Manager and its Administrative Managers.

- 1 -



DEFENDANT'S
EXHIBIT
56

RDX 009618

**WHEREAS,** in order to induce the Manager and its Administrative Managers, and any Administrative Managers engaged in the future, to remain as employees of Manager, Edgewater desires to enter into this Restated Management Agreement.

**NOW THEREFORE,** in consideration of the mutual benefits accruing to the parties hereto, the mutual covenants and agreements herein and other valuable consideration, the adequacy of which the parties hereto acknowledge, the parties hereto agree to amend and restate the Agreement as follows:

## I. TERM AND TERMINATION

Section 1.1 <u>Term.</u> This Agreement shall, subject to Section 9.13 hereof, be effective from 12:01 a.m. on August 1, 1997 ("Effective Date") until 11:59 p.m. on July 31, 2002; provided, however, that either party shall have the right to terminate this Agreement upon sixty (60) days written notice to the other party, after July 31, 2000 (the "Operating Period").

## II. GENERAL RESPONSIBILITIES OF PARTIES

**2.01** <u>Appointment and Fiduciary Duty.</u> Edgewater hereby appoints Manager as the sole and exclusive manager of the day-to-day operations of Edgewater during the Operating Period. Manager hereby accepts such appointment and shall have authority for the day-to-day operations of Hospital, subject to this Agreement and to the ultimate control of Edgewater as licensee of Hospital, as provided by this Agreement and as required by Illinois law and federal laws and regulations. Manager acknowledges that it shall have a fiduciary responsibility to Edgewater with regard to the performance of Manager's responsibilities under this Agreement.

**2.02** <u>General Control of Edgewater.</u> Edgewater, as licensee, acting through its Board of Directors (the "Board"), shall at all times during the Operating Period have ultimate control over the assets and operations of Edgewater. Manager shall perform its duties as described in this Agreement pursuant to policies, procedures, rules and directives, adopted and amended from time to time, by the Edgewater Board of Directors and communicated, in writing, to Manager, and in accordance with all applicable laws, rules, and regulations issued or adopted by any State, Federal, or local agency having jurisdiction over Edgewater or any of their operations or properties. Manager shall not be responsible for complying with or carrying out any policies, procedures, rules or directives of the Board of which it has not been advised, in writing. The Board shall communicate all of its policies, procedures, rules and directives to Manager, in writing, either directly or through its designated representative (the "Board Designee"), and Manager shall be entitled to rely on and assume the validity of communications from the Board or the Board Designee, as required herein and as reasonably requested by the Board or the Board Designee. Unless otherwise communicated in writing to Manager, the Board Designee shall be Edgewater's President.

- 2 -

RDX 009619

Manager shall, consistent with Edgewater's financial condition, assist and advise Edgewater in retaining all current licenses, accreditations and other approvals issued by any Federal, State or local agency having jurisdiction over the Hospital, its operations, and properties. Edgewater and Manager acknowledge and agree that nothing in this Agreement is intended to alter, weaken, displace or modify in any manner whatsoever the duties, obligations, responsibilities, rights and privileges of Edgewater as licensee, and of the Board as the governing body of Edgewater to direct and control the Hospital and Manager's management thereof as required by law pursuant to Edgewater's status as the holder of the operating license for the Hospital.

    2.03   <u>Medical and Professional Matters</u>. All matters relating to the care and treatment of patients requiring professional medical judgment shall remain the responsibility of the Hospital's Medical Staff, and neither the Board nor the Manager shall be responsible for nor have any right to make medical judgments regarding the delivery of medical care by physicians or allied health professionals. However, the Board and the Medical Staff shall consult with Manager regarding such matters where consultation is feasible and in the best interest of the patients of the Hospital.

## III. DUTIES OF MANAGER

### 3.01   <u>Personnel</u>.

    (a)   All employees of Edgewater shall be employees of Edgewater, with the exception of those certain administrators designated by the Manager (the person identified in such written documents are referred to herein as the "Administrative Managers"). The Administrative Managers as of the Effective Date of this Agreement are listed in Schedule A attached hereto. The Administrative Managers shall be employees of and be compensated by Manager. Manager shall be reimbursed monthly by Edgewater for all compensation and related expenses incurred or paid by Manager to or on behalf of the Administrative Managers (the "Administrative Manager Reimbursement"), but only to the extent that such compensation has been approved by the Board. For purposes of this Section 3.01, Administrative Manager Reimbursement shall be inclusive of salary, fringe benefits, bonuses, severance benefits (including those paid as a result of the termination of this Agreement), and approved reimbursable business expenses paid to the Administrative Managers. Administrative Manager Reimbursement shall be a "Cost of Operation." "Fringe benefits" shall include the employer's contribution to F.I.C.A., unemployment compensation and other employment taxes, workmen's compensation, group life, accident and health insurance premiums, disability coverage insurance premiums, retirement matching, car allowance and any other benefits. Notwithstanding the foregoing, Edgewater shall not be required to reimburse Manager for any portion of said compensation, fringe benefits and related expenses that are determined by a final, non-appealable decision by a court or administrative tribunal to be unreasonable compensation and that such reimbursement would have a material adverse effect on Edgewater's tax-exempt status ("Non-reimbursable Compensation and Benefits"). If Edgewater has already reimbursed Manager for some or all of said Non-Reimbursable Compensation and Benefits,

RDX 009620

then Manager will reimburse Edgewater under such terms and conditions as the parties shall mutually agree upon.

(b)     Manager shall have sole responsibility for supervising all non-physician personnel at the Hospital, and, except as otherwise provided by this Agreement, shall be entitled to take such actions with respect to such personnel as Manager, in its sole discretion, believes are necessary to manage the Hospital in accordance with this Agreement.  Manager shall have complete authority as to Edgewater's employees and the Administrative Managers, including but not limited to the following:

(i)     determining such personnel's wages, benefits and other terms and conditions of employment, including reasonable severance agreements;

(ii)     supervising all such personnel, including responsibility for all hiring, counseling, disciplinary and termination decisions; and

(iii)     after consulting with and obtaining the approval of the Board Designee, acting as agent for Edgewater with regard to all actions relating to labor organizations, including but not limited to recognition of such organizations and the negotiation, settlement, execution and administration of any labor agreements, to the extent permitted by the terms of such agreements and by Edgewater.

(c)     Notwithstanding anything contained in the foregoing to the contrary, Manager shall obtain the prior written approval of the Board prior to implementing employee layoffs: (i) as part of a single, permanent reduction in work force involving at least twenty percent (20%) of the employees of Edgewater or (ii) which include layoff of employees subject to collective bargaining labor agreements.  The prior written approval requirement of this subparagraph © shall not apply to a non-permanent reduction in work force necessitated by volume fluctuations or negative cash flow at the Hospital.

3.02     **Consultants.**  Manager may hire or retain any consultants, accountants, attorneys or other professional personnel (the "Consultants") necessary and appropriate to assist Manager in carrying out its duties and responsibilities in accordance with this Agreement.  All costs for such Consultants are to be included in Costs of Operation.

3.03     **Financial Management.**

(a)     Manager shall supervise and manage all purchasing, billings, collections, payables, data processing, accounting, cost reporting and other financial matters related to the day-to-day operation of the Hospital.  Manager shall supervise and manage the business affairs of the Hospital to ensure that funds are collected and expended for and on behalf of the Hospital and in accordance with the terms of this Agreement.

- 4 -

RDX 009621

(b)     Manager, acting in Edgewater's name and as agent for Edgewater, shall make or direct to be made timely deposits in Edgewater' existing bank accounts of all receipts and moneys arising from the operation of the Hospital, and shall make disbursements from such accounts on behalf of Edgewater in such amounts and at such times as the same are required.  Signatories and approvals as to the amounts on all checks shall be in accordance with the duly adopted policies and procedures of Edgewater.

(c)     Manager shall establish and implement, with the Board's approval, all prices, price schedules, rates and rate schedules for the Hospital.

(d)     Manager shall be responsible for the negotiation and preparation of service and such other contracts reasonably necessary or desirable in connection with the operation of the Hospital in the usual course of business, including the execution of all provider agreements necessary and appropriate to obtain and maintain facility status as a reimbursable provider of services under the Medicare Program and, if so desired, the Medicaid Program.  It is understood and agreed, however, that the cost of professional assistance (including personnel of Manager) in any labor negotiations or administrative or legal appeals of reimbursement rulings, E.E.O.C. claims and the like, shall be included in Costs of Operation.

(e)     Manager shall be responsible for the performance of all acts reasonably necessary or required in connection with the operation of the Hospital in accordance with Edgewater's approved annual budgets and standards and policies established or to be established by Manager.

3.04     **Financial Services, Books and Records.**  Manager shall:

(a)     Retain, on behalf of Edgewater, a nationally recognized firm of independent certified public accountants (the "CPAs") approved by Edgewater and not objected to by the Trustee (as defined in the Financing Documents).

(b)     Prepare or cause to be prepared for Edgewater the following financial statements:

(i)     audited annual financial statements of Edgewater for each fiscal year prepared by the CPAs (the costs of which shall be a "Cost of Operation"); and

(ii)     unaudited monthly financial statements.

(c)     Compile, on a monthly basis, a report which highlights the different cost and revenue centers of the Hospital.

(d)     Pursuant to and in compliance with Section 952 of the Omnibus Reconciliation Act of 1980 (PL96-499), Manager covenants to maintain, or cause the maintenance of, for a period of at least four (4) years after the rendering of any management services, all books, documents and records of Manager as the same pertain to Manager's actual cost of providing the services

- 5 -

RDX 009622

contemplated herein and, additionally, to make said documents available to the Secretary of the United States Department of Health and Human Services, the Comptroller General of the United States Government, or any of their duly authorized representatives upon written request from said officials of their designees.

(e)     Keep all books, accounts and records maintained for the operation of the Hospital open at all reasonable hours and upon appropriate notice for inspection and audit by Edgewater or any accountants selected by Edgewater for that purpose.

(f)     Cause the preparation and filing of all State and Federal cost reports necessary for reimbursement (the costs of which shall be a "Cost of Operation").

(g)     Create, implement and review annual budgets (capital and operating) for the Hospital, which shall be approved annually by Edgewater.

(h)     Process, or arrange for the processing of, all payroll checks, including associated reports (the costs of which shall be a "Cost of Operation").

**3.05    Contracts.** Manager may enter into, modify, discharge, make any settlements with respect to or terminate contracts, leases or other documents in the name of Edgewater with vendors, physicians, or any other persons or entities as may be necessary and appropriate to manage and operate Edgewater pursuant to this Agreement.  It is understood and agreed that the cost of professional assistance (including personnel of the Manager other than the Administrative Managers) in any such activities shall be a "Cost of Operation."

**3.06    Litigation.**  Subject to any rights of indemnity which the parties may have under this Agreement, Manager may, in its sole discretion, defend, assert, settle, or otherwise dispose of any claims, litigation, judgments, or liabilities in connection with The Hospital during the Operating Period.

**3.07    Marketing.**  Manager shall manage, supervise and ensure the performance of marketing and public relations efforts for the Hospital.

**3.08    Manager Liability.**  Except as otherwise provided pursuant to Section 3.14 herein, the Manager shall cause to be maintained policies of insurance or self-insurance as are, in its opinion, appropriate to insure it, its employees and agents against any liability resulting from its acts or omissions during the Operating Period.

**3.09    Repairs and Maintenance.**  Manager shall, in the name of and for the account of Edgewater, as appropriate, negotiate, contract for and supervise the repair and maintenance of the physical property and equipment of the Hospital as shall be necessary to keep and maintain the Hospital in good working order and condition.

- 6 -

RDX 009623

**3.10**  **Government Regulations.**  On behalf of Edgewater, Manager shall use its best efforts and all due diligence to ensure that (a) the Hospital continuously complies with all applicable laws. rules, regulations or orders of any governmental or regulatory body having jurisdiction over the Hospital, its operations and assets, and (b) the Hospital retains and maintains in good standing all necessary accreditations, licenses, permits and authorizations required for its ongoing operations.

**3.11**  **Confidentiality of Records.**  Manager shall protect the confidentiality of all records of the Hospital and assist Edgewater in complying with all applicable Federal, State, and local laws and regulations relating to the records of the Hospital.  Manager shall notify the Board Designee of any violation of such laws or regulations upon becoming aware of them.  During and following the term of this Agreement, all records of the Hospital shall remain the property of Edgewater.

**3.12**  **Quality Control.**  Manager shall  cause to be maintained a quality control system at the Hospital designed to provide for quality of patient care at Edgewater.

**3.13**  **Marketing.**  Manager shall:

**(a)**  Cause to be maintained a marketing program designed to inform and educate health care professionals and the general public in the geographical area served by the Hospital of the existence of all services offered by the Hospital.

**(b)**  Cause to be prepared and distributed such descriptive booklets, brochures or pamphlets as may be necessary to inform health care professionals and members of the public of the nature and requirements of State and Federal reimbursement programs for patients and how the same relate to the services offered at the Hospital.  The production cost of such material shall be a "Cost of Operation."

- 7 -

RDX 009624

**3.14    Legal and Risk Management Services.** Manager shall:

**(a)**    Cause to be prepared a facility Patient's Rights Policy and a Patient Care Policy for the Hospital which complies with all applicable Federal and State standards.

**(b)**    Cause to be maintained a risk management program at the Hospital, including periodic safety checks, the installation of and review of the performance of functions of safety committees designed to monitor all incidents involving patients, staff or visitors at the Hospital and the implementation of corrective procedures designed to remedy such incidents.

**(c)**    Caused to be reviewed insurance and other liability claims.

**(d)**    Review all insurance requirements of the Hospital and attempt to obtain necessary and required coverages at commercially reasonable premiums.

**(e)**    Maintain a workmen's compensation insurance or self insurance program regarding claims by employees of the Hospital under any worker's compensation or similar laws, and also from any other claims for personal injury, including death or property damage, which may be made by or on behalf of agents or employees of Manager and Edgewater and the general public, in amounts which are customarily carried, subject to customary deductibles, and against such risks as are customarily insured against by other corporations in connection with the ownership and operation of facilities of similar character and size. Manager agrees to employ an insurance consultant at least annually to review the insurance requirements of the Hospital. The cost of such insurance and insurance consultant shall be a "Cost of Operation." All such policies of insurance shall name Manager as an additional insured.

**3.15    Other Actions.** Except as otherwise limited by this Agreement, Manager may take any other actions necessary and appropriate, in its sole opinion and discretion, to manage the Hospital, as long as such action is under the authority of the Manager and does not in any material manner obligate Edgewater beyond the end of the Operating Period.

**3.16    Visits to Edgewater.** Manager shall cause the Administrative Managers of the Hospital (other than as agreed to between the Board Designee and the Manager) to be full-time, on-site managers of the Hospital and shall cause executive personnel of Manager to visit the Hospital as needed to coordinate, review and supervise the operations of the Hospital.

**3.17    Additional Reports.** Manager agrees to prepare, cause to be prepared or otherwise make available reports regarding the operation of Edgewater as follows:

**(a)**    Within forty-five (45) days after the end of each fiscal quarter, Manager shall make available to Edgewater the following information:

**(i)**    relevant statistics for the Hospital for the prior quarter;

- 8 -

RDX 009625

(ii)     financial statements and budget analysis for the Hospital for the prior quarter; and

(iii)     a report on the progress of any special projects which have been agreed to between Edgewater and Manager.

(b)     Manager shall provide to Edgewater, on at least thirty (30) days' notice, or sooner if necessary to implement such required action, a description of any needed or discontinued services, refinancing proposals, expansion plans or material changes in operating procedures. The proposal shall explain the reasons for the proposed activity.

(c)     Manager agrees to respond, in writing, to any and all recommendations made by Edgewater's CPAs, which response shall either acknowledge that an audit proposal or recommendation has been implemented or, if not, the reasons why not.

3.18     **General Corporate Services.** In addition to the services provided to Edgewater as set forth above in Sections 3.01 through 3.17, Manager shall provide the following corporate services to Edgewater:

(a)     Coordinate comprehensive cash management services for the Hospital.

(b)     Provide overall financial management advice to Edgewater other than that specifically provided in Section 3.17.

(c)     Assist and advise with strategic corporate development.

(d)     Act as liaison with the Trustee and Bondholders of Edgewater, as defined in the Financing Documents.

(e)     Provide planning and assistance with regard to obtaining and maximizing reimbursement.

(f)     Act as liaison with the IRS in the event of audit or routine review of returns.

(g)     Act as liaison with counsel to the Hospital and Edgewater.

(h)     Provide assistance and advice with regard to compliance with tax-exempt status.

(i)     Provide assistance with legislative and regulatory affairs.

(j)     Act as representative and spokesman of Edgewater with regard to community relations including acting as liaison with any charitable foundations associated with Edgewater.

RDX 009626

(k)     The Manager shall assist Edgewater in connection with the development, implementation and management of an integrated health care delivery system, including but not limited to (i) governance, financial, legal and operational matters, (ii) assisting the Board regarding strategic and long-range plans and discharging Edgewater's charitable mission and purpose, (iii) improving patient access, (iv) improving the quality of Edgewater's health care services and (v) improving Edgewater's ability to offer competitively priced managed care services and its ability to effectively and efficiently manage risk.

3.19    <u>Exclusive Corporate Services.</u>  Edgewater hereby agrees to retain Manager, exclusively, to provide the following services to Edgewater on an as-needed basis:

(a)     Planning and advice with regard to mergers and acquisitions;

(b)     Merger and acquisition development, including identifying acquisition candidates and securing rights to purchase;

(c)     Acting as agent to negotiate and close any acquisition or merger;

(d)     Performing due diligence with regard to mergers and acquisitions;

(e)     Providing advice and coordination with regard to the financing of mergers and acquisitions, including coordinating activities and communication among corporate counsel, underwriters, underwriter's counsel, tax counsel, special counsel, city officials and their counsel, and any other entities whose input is required regarding proposed transactions;

(f)     Identifying potential bond holders;

(g)     Acting as manager on an interim basis of any facilities which Edgewater proposes to acquire; and

(h)     Providing assistance and advice with regard to planning, coordination and development of special projects outside the scope of routine operations of the Hospital.

3.20    <u>Compensation for Exclusive Corporate Services.</u>  Notwithstanding the provisions of Article VI, compensation to Manager for the services described above in 3.19 shall be in addition to that provided for the services described in Sections 3.01 through 3.18 pursuant to Article VI of this Agreement.  Edgewater and Manager shall determine the appropriate compensation and reimbursement due to Manager following requests by Edgewater for such services.

## IV. LIMITATIONS ON RESPONSIBILITIES OF MANAGER

4.01    <u>Medical Staff Oversight.</u>  Edgewater shall have exclusive control and authority for overseeing medical staff affairs, including monitoring the performance of professional services by the Medical Staff and other licensed personnel to ensure that the Hospital maintains high standards

- 10 -

RDX 009627

of patient care, treatment and related functions. Edgewater shall also have exclusive control and authority regarding all appointments to the Hospital's Medical Staffs, the granting of clinical privileges at the Hospital, and any actions taken with respect to Medical Staff members. Manager shall, from time to time, provide assistance in matters relating to the Medical Staffs as directed by Edgewater and shall, in carrying out its duties and responsibilities hereunder, maintain good working relations with the Medical Staffs of the Hospital.

      **4.02**   **Risk of Loss.** At all times during and following the term of this Agreement, the risk of loss with respect to Edgewater's operations and assets shall be borne by Edgewater.

      **4.03**   **Liabilities.** Manager shall not be responsible for liabilities incurred by Manager, either in the name of or on behalf of Edgewater, in connection with or as a result of the performance by Manager of Manager's duties under this Agreement.

      **4.04**   **Expenses.** Manager shall not be responsible for the payment of any expenses incurred by Manager and/or the Administrative Managers on behalf of Edgewater in the performance of the duties of the Manager and/or the Administrative Managers under this Agreement.

      **4.05**   **Contracts.** Manager shall not be responsible for the performance of any act or the payment of any amount, or the forbearance from taking any act or paying any amount, under any contracts, leases, notes, guaranties or other agreement or document entered into by, for or on behalf of Edgewater or any of its affiliates.

      **4.06**   **Licensure.** Manager shall not, without the prior consent of Edgewater act, or fail to act, in a manner which could adversely affect the licensure of the Hospital by the state of Illinois as an acute care hospital or the accreditation of the Hospital by the Joint Commission on the Accreditation of Health Care Organizations.

## V. FINANCIAL MATTERS

      **5.01**   **Handling and Disposition of Funds.** Funds originating from the operation of Edgewater and received by Manager shall be received, handled, managed and disposed of as follows:

      **(a)**   Manager shall deposit all funds actually received by it from the operation of the Hospital, and all working capital loans advanced for and on behalf of Edgewater, in a bank account or accounts bearing the name of Edgewater (hereinafter the "Edgewater Accounts") in a bank or trust company approved by Edgewater and Manager. Such funds shall in no event be commingled with the funds of Manager. Manager shall have no liability or responsibility for any loss resulting from the insolvency, malfeasance or nonfeasance of the bank or banks in which such funds are deposited.

**RDX 009628**

**(b)** Edgewater and Manager shall control Edgewater Accounts and have the right to make withdrawals from and use Edgewater Accounts for the purposes of operating the Hospital and performing their obligations hereunder and paying Manager's fees herein until the expiration or termination of the Agreement, at which time Manager shall resign as co-signatory for the account.

**(c)** Out of such Edgewater Accounts, Manager is authorized to pay all Costs of Operation, including all payments due to Manager hereunder.

**5.02 Manager Not to Pledge Edgewater Credit.** Manager shall not, under any circumstance, pledge the credit of Edgewater, nor shall Manager in the name of, or on behalf of, Edgewater borrow any money or execute any promissory note, bill of exchange, or other obligation, or dispose of any asset of Edgewater not in the ordinary course of business, without the consent of Edgewater.

**5.03 Reimbursement for Costs of Operations.** Everything done by Manager in the performance of and pursuant to its obligations and duties hereunder, and all its costs and expenses incurred under and pursuant to this Agreement, shall be for Edgewater's account. In the event that Manager shall have advanced any funds to third parties in payment of Costs of Operation, then Edgewater agrees to reimburse Manager within fifteen (15) days after receipt of written notice of the advance or advances. Manager shall notify Edgewater of such advances and shall furnish Edgewater with receipts evidencing such advancements.

## VI. COMPENSATION OF MANAGER

**6.01 Compensation to Manager.** For each calendar year of this Agreement, Edgewater shall pay Manager for all services rendered to Edgewater, as set forth below:

**(a) Monthly Fixed Fee.** Subject to the adjustments set forth in Section 6.01(d) herein, for each month of this Agreement, Edgewater shall pay Manager, in advance on the first day of each such month, a monthly fixed fee (the "Monthly Fixed Fee") equal to One Hundred Forty Five Thousand Eight Hundred Thirty Three and 33/100 Dollars ($145,833.33). The sum of the Monthly Fixed Fees for each calendar year during the term of this Agreement shall be referred to herein as the "Annual Fixed Fee."

**(b) Annual Percentage Fee.** Subject to the provisions of this Agreement, Edgewater shall pay to Manager an annual percentage fee (the "Annual Percentage Fee") equal to one and three quarters percent (1.75%) of Edgewater's Net Patient Service Revenues for the calendar year for which the calculation is being made. Such fee shall be paid in monthly installments due and payable on the fifteenth day of each month during the term hereof, commencing September 15, 1997, with each such monthly amount to be in an amount equal to one and three quarters percent (1.75%) of Edgewater's Net Patient Service Revenues for the immediately preceding calendar month.

- 12 -

RDX 009629

(c) **Limits and Adjustments on Annual Fixed Fee and Annual Percentage Fee.** Limits on and adjustments of the amount of the Annual Fixed Fee and the Annual Percentage Fee, and the terms and conditions under which it shall be paid are set forth below.

(i) **Annual Percentage Fee not to Exceed Annual Fixed Fee.** In no event shall the amount of the Annual Percentage Fee for any year exceed the amount of the Annual Fixed Fee for such year (as adjusted pursuant to Section 6.01(d)). If at any time during a calendar year the sum of: (A) all monthly payments previously made for such calendar year pursuant to Section 6.01(b) above; plus (B) the amount otherwise due as the next scheduled monthly payment, shall exceed the amount of the Annual Fixed Fee for such year, then such next scheduled monthly payment shall be reduced to the amount which, when added to the sum of the monthly payments previously made for such year pursuant to Section 6.01(b) above, will equal the amount of the Annual Fixed Fee for such year.

(ii) **Fee Cap.** Notwithstanding anything contained herein to the contrary, in no event shall the sum of the Annual Fixed Fee and the Annual Percentage Fee for any calendar year of this Agreement exceed three and one-half percent (3.5%) of Edgewater's Net Patient Service Revenues for such year.

(iii) **Audit Adjustment.** In the event the sum of monthly payments toward the Annual Percentage Fee which were made pursuant to Section 6.01(b) above for any calendar year exceed the finally adjusted Annual Percentage Fee for such calendar year based on Edgewater's Net Patient Service Revenue as established by and set forth in Edgewater's audited financial statements for such calendar year, then the excess amount shall be repaid by Manager to Edgewater within ninety (90) days after issuance of such audited annual financial statements. In the event the sum of monthly payments which were made pursuant to Section 6.01(b) above for any calendar year are less than the finally adjusted Annual Percentage Fee for such calendar year based on Edgewater's Net Patient Service Revenues as established by and set forth in Edgewater's audited financial statements for such calendar year, then, in the event and to the extent such payment would otherwise be permitted under Section 6.01(c), the amount of the shortfall shall be paid to Manager within ninety (90) days after the issuance of such audited annual financial statements.

(d) **CPI Adjustment.** The amount of the Monthly Fixed Fee shall be increased each January 1 during the term of the Agreement as follows (the "CPI Adjustment"):

(i) Such increase shall be equal to the greater of (1) five percent (5%) or (2) the percentage increase in the Consumer Price Index during the immediately preceding calendar year; and

(ii) Such increase shall in no event exceed ten percent (10%) annually.

- 13 -

RDX 009630

**6.02    Deferred Management Fees.** Anything to the contrary herein notwithstanding, if the funds available to Edgewater in any month (the "Available Funds") is less than the sum of (i) the amount of principal, interest, premium, if any, and other charges due under the Financing Documents, (ii) essential Edgewater operating expenses (e.g. payroll and all expenses due to Manager), (iii) a reasonable operating cash balance for Edgewater's businesses and operations and (iv) the compensation due to Manager, then the payment of the portion of the Manager's compensation that would cause such sum to exceed the Available Funds shall be deferred to the extent of the excess amount (the "Deferred Management Fees"). Deferred Management Fees shall bear interest at ten percent (10%) per annum until paid in full. Such interest shall be deferred on the same basis as the Deferred Management Fees. Deferred Management Fees shall be due and payable each month to the extent that the payment thereof shall not violate the terms of this Section 6.02. All payments of Deferred Management Fees by Manager shall be applied first to interest and thereafter to principal. In any event, accrued Deferred Management Fees and interest thereon shall be immediately due and payable on the expiration or, to the extent permitted by applicable law, the termination of this Agreement.

## VII. DEFAULT

**7.01    Non-Financial Default.** In the event either party to this Agreement deems the other party to be in default of its obligations hereunder, then said party shall be required to provide notice of the alleged default to the other party, which notice shall contain detailed specifications (which shall be deemed to have occurred on the date the specifications were mailed to the party by certified mail, return receipt requested), the party being charged with the default shall have thirty (30) days in which to:

    **(a)**    correct the alleged default or provide appropriate assurances to the charging party that the default will be timely corrected; or

    **(b)**    file notice with the charging party that the party against whom the default has been charged denies that the factual matters alleged constitute a default under this Agreement. In the event this latter course is chosen, the parties do hereby covenant and agree to submit such matter to binding arbitration under the American Arbitration Association rules then in effect in Chicago, Illinois, with the arbitration to be conducted in that city. The decision of the arbitrator or arbitrators shall be binding upon the parties and may be entered as a judgment in a court of competent jurisdiction. The cost of arbitration shall be paid by the party deemed to have been at fault.

    **7.02    Financial Default.** In the event Edgewater fails to make the payments or reimbursements due to Manager pursuant to Articles 5 and 6 of this Agreement, then (but only after thirty (30) days' written notice of said default, which Edgewater may cure during that time), Manager shall be authorized, at its option, to terminate this Agreement.

- 14 -

RDX 009631

## VIII. NO ASSUMPTION OF LIABILITIES AND INDEMNITY

**8.01** <u>Assumption of Liabilities</u>. Prior to, during or after the Operating Period, Manager shall not be deemed to have assumed or be liable for any claim, liability, or obligation of Edgewater (for purposes of this Section 8.01, the term Edgewater shall be deemed to include Edgewater, and its corporate member and any affiliate of any of them), whether known or unknown, fixed or contingent, accrued or unaccrued, related to or arising from, under or in connection with, but not limited to, the following:

(a)     Any contracts, notes, leases obligations or liabilities (collectively, the "obligations"), whether or not such obligations have been disclosed to Manager or are otherwise known to Manager.

(b)     Any claims, liabilities or obligations with respect to the employment by Edgewater of any employee or group of employees, or the termination thereof; whether union or nonunion employees, and whether arising from a collective bargaining agreement, contract, past practice, custom or otherwise.

(c)     Any claims, liabilities or obligations arising out of any pension, profit sharing, 403(b) or 401(k) plan, health insurance, workers' compensation, or other employee plan or benefit in any way relating to or arising in connection with the employees of Edgewater, or their employment by Edgewater.

(d)     Any claims, liabilities or obligations arising out of any violation or claimed violation by Edgewater prior to, during or after the Operating Period of any laws or regulations, including but not limited to any environmental laws.

(e)     Any claims, liabilities, or obligations arising out of any personal injury or other injury or wrong to any employee of Edgewater or any other person where the injury or wrong resulted in any way from the condition of Edgewater prior to, during or after the Operating Period, an event or occurrence prior to, during or after the Operating Period, an event or occurrence prior to, during or after the Operating Period or the acts or omissions of the Hospital prior to, during or after the Operating Period.

(f)     Any Medicare, Medicaid, private payor or patient adjustments, disallowances, or claims.

(g)     Any claims, liabilities or obligations arising prior to, during or after the Operating Period with respect to medical staff affairs, including the  status of physicians and other licensed health care professionals on the medical staff.

- 15 -

RDX 009632

    **(h)**    Any claims or actions arising from any release or threatened release of a hazardous substance, pollutant, or contaminant, or any condition of pollution, contamination or nuisance, which may occur or exist prior to, during or after the Operating Period at any site at which Edgewater or Manager's employees, contractors, or agents, have arranged for, or used for, the treatment, disposal, recycling or other disposition of any substance, whether or not a hazardous substance, generated, produced, or otherwise handled in the operation of the Hospital's facilities prior to, during or after the Operating Period.

    **(i)**    Any claims or actions arising from any release or threatened release prior to, during or after the Operating Period of any substance (whether or not a hazardous substance and whether or not arising out of the operation of Edgewater's facilities) or any condition of pollution, contamination or nuisance (a) at, in, on, under, from, over, or related to the Hospital's facilities or (b) into, upon, or over soil, surface water or groundwater at, in, on, under or related to Edgewater's facilities.

    **8.02**   **Indemnification by Edgewater.**  Edgewater agrees to protect, indemnify, defend by counsel reasonably acceptable to Manager, and hold Manager, its affiliates and their respective successors and assigns, and the shareholders, directors, officers, employees, agents, and independent contractors of each of them (collectively "Indemnitees") free and wholly harmless from and against any and all losses, claims, liens, encumbrances, charges, obligations, damages, remediation, liabilities, demands, suits, causes of action, proceedings, costs, and expenses whatsoever (including without limitation consequential damages, interest, fines, claims for the recovery of response costs, and reasonable attorneys', engineering consultants', accounting, and other necessary professional fees and expenses), in each case whether known or unknown to Edgewater or Manager, absolute or contingent, accrued or unaccrued, and including without limitation unasserted claims incurred or suffered by Indemnitees, or any of them, directly or indirectly by reason of, or caused in whole or in part by, or pertaining to or in any manner connected with:

    **(a)**    Any material breach of any representation or warranty made by any of Edgewater in this Agreement.

    **(b)**    Any liabilities for which Manager is not liable under this Agreement.

    **(c)**    Any claim or cause of action against Edgewater or liability or obligation of Edgewater, arising prior to, during or after the Operating Period.

    **(d)**    Any injury or damage occurring in connection with the Hospital's facilities or operations prior to, during or after the Operating Period.

    **(e)**    Any amounts payable to any employee of Edgewater on account of employment prior to, during or after the Operating Period, including without limitation any obligation with respect to any past or present employee benefit plan.

- 16 -

(f)     Any taxes on, or measured by, the earnings or income of Edgewater accruing prior to, during or after the Operating Period, including any taxes arising from or under or in connection with this Agreement.

(g)     Any use, operation, condition, maintenance or ownership of Edgewater's assets.

(h)     Any claims by Edgewater.

(i)     Any release or threatened release of a hazardous substance or solid waste or any condition of pollution, contamination, or nuisance existing (i) at, in, on, under, from, over, or related to Edgewater's facilities or operations prior to, during or after the Operating Period, or (ii) into, upon, or over soil, surface water or groundwater at, in, on, under or related to Edgewater's facilities or operations prior to, during or after the Operating Period.

(j)     Any act or omission of Edgewater (or predecessor in interest of Edgewater), or any of their respective directors, officers, employees, agents, independent contractors or insurers relating to any release or threatened release of a hazardous substance or solid waste prior to, during or after the Operating Period.

(k)     Any violation of any applicable law or environmental law relating to Edgewater's facilities or operations or property adjacent or near thereto, including without limitation any failure to obtain and comply with any permit, license, authorization, or other approval required by any environmental law or other applicable law prior to, during or after the Operating Period.

(l)     Any liability or obligation of, or claim against, Edgewater or Manager relating to Edgewater's facilities or operations as conducted prior to, during or after the Operating Period.

All legal fees and other costs and expenses of the prosecution, defense, compromise, settlement, or payment of any claim subject to indemnification hereunder, and the liability or settlement amount itself, shall be paid or immediately reimbursed by Edgewater. Manager shall give Edgewater notice within thirty (30) days of any claim or demand asserted by third parties against any Indemnitee for which indemnity may be sought under this Article. Edgewater shall have the right to prosecute, defend, compromise, settle, or pay any claim not entailing any commitment of or limitation of any kind on any Indemnitee and which is satisfactory in form and substance to any Indemnitee and its/his/her counsel.

8.03    **Indemnification by Manager.**  Manager agrees to protect, indemnify, defend by counsel reasonably acceptable to Edgewater and hold Edgewater, their affiliates and their respective successors and assigns, and the directors, officers, employees, agents, and independent contractors of each of them (collectively "Indemnitees") free and wholly harmless from and against any and all losses, claims, liens, encumbrances, charges, obligations, damages, remediation, liabilities, demands, suits, causes of action, proceedings, costs, and expenses whatsoever (including without limitation consequential damages, interest, fines, claims for the recovery of response costs, and reasonable

- 17 -

RDX 009634

attorneys', engineering consultants', accounting, and other necessary professional fees and expenses), in each case whether known or unknown (to Edgewater) absolute or contingent, accrued or unaccrued, and including without limitation unasserted claims incurred or suffered by Indemnitees, or any of them, directly or indirectly by reason of, or caused in whole or in part by, or pertaining to or in any manner connected with any inaccuracy in or breach of any representation, warranty, covenant, term or agreement of Manager contained in this Agreement.

## IX. MISCELLANEOUS

**9.01** <u>Medical Services to Administrative Managers</u>. Edgewater agrees to accept, as payment in full, reimbursement for medical services provided to the Administrative Managers from payors as arranged by Manager.

**9.02** <u>Access to Records</u>. In order to assure that payments made to Manager by or on behalf of Edgewater pursuant to this Agreement are included to the extent appropriate in determining the reasonable costs incurred by Edgewater as a provider of service under the Medicare Program, Manager agrees that, if this Agreement is determined to be a contract between a provider and any of its subcontractors which is entered into after December 5, 1980, and the value or cost of which is $10,000 or more over a twelve-month period, Manager will perform the obligations as may be from time to time specified for subcontractors in Social Security Act Section 1861(v)(1)(I) and the regulations promulgated in implementation thereof (initially codified at 42 C.F.R. Section 420.300 et seq.)

**9.03** <u>Binding Agreement</u>. This Agreement and the rights and obligations of the parties hereunder may not be assigned by either party and shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and permitted assigns. Any assignment in violation of this Section shall be null and void.

**9.04** <u>Governing Law</u>. This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed and governed by and in accordance with, the laws of the State of Illinois.

**9.05** <u>Heading</u>. The section and subsection headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Agreement.

**9.06** <u>Notices</u>. All communication provided for hereunder shall be in writing and shall be deemed to be given when delivered in person or deposited in the United States mail, first-class, registered or certified, return receipt requested, with proper postage prepaid, and delivered to the parties at the following addressed:

### If to Manager:

- 18 -

Braddock Management, L.P.
c/o Edgewater Medical Center
5700 N. Ashland Avenue
Chicago, Illinois 60660
Attn: Peter G. Rogan

**If to Edgewater:**

Edgewater Medical Center
5700 N. Ashland Avenue
Chicago, Illinois 60660
Attn: General Counsel and President of the Board of Directors

**With a copy to:**

Foley Lardner Weissburg & Aronson
One IBM Plaza
330 North Wabash Avenue
Suite 3300
Chicago, Illinois 60611
Attention: Robert J. Zimmerman, Esq.

    **9.07**   **Survival of Representations.** All of the representations, warranties, covenants and agreements contained in this Agreement shall survive the expiration or the termination, for any reason, of this Agreement. No performance or execution of this Agreement, in whole or in part, by any party hereto, no course of dealing between or among the parties hereto or any delay or failure on the part of any party in exercising any rights hereunder or at law or in equity, and no investigation by any party hereto, shall operate as a waiver of any rights of such party, except to the extent expressly waived in writing by such party.

    **9.08**   **Expenses.** Each of the parties hereto shall bear its own expenses in connection with the preparation and execution of this Agreement.

    **9.09**   **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

    **9.10**   **Laws.** Any act or statute referred to herein by name shall be deemed to include any regulations thereunder, as well as any amendments thereto.

RDX 009636

9.11    **Severability**.  Each and every provision of this Agreement is severable, and the invalidity of one or more of such provisions shall not, in any way, affect the validity of this Agreement or any other provisions hereunder.

9.12    **Cumulative Rights and Remedies**.  Any right, power or remedy provided under this Agreement to any party hereto shall be cumulative and in addition to any other right, power or remedy provided under this Agreement or existing in law or in equity, including, without limitation, the remedies of injunctive relief and specific performance.

9.13    **Termination**.  This Agreement may be terminated only in writing by both parties, except as set forth in Article VIII.

9.14    **Entire Agreement**.  This Agreement is intended by the parties hereto to be the complete and final expression of their agreement and is the complete and exclusive statement of the terms thereof notwithstanding any representation or statement to the contrary heretofore made.  This Agreement may be modified only by a written instrument signed by the authorized representatives of each of the parties hereto.

9.15    **Not Recordable**.  Each of the parties to this Agreement hereby covenants and agrees not to record this Agreement, or any memorandum or description of this Agreement or any of the transactions contemplated hereby, in the real estate records of any jurisdiction.

9.16    **Modification**. This Agreement may only be amended by a writing signed by all parties.

9.17    **Attorneys' Fees**.  Should any action be brought to enforce this Agreement, the prevailing party shall be entitled to its attorneys' fees and costs.

9.18    **Binding Effect**.  This Agreement has been duly executed by the parties hereto and constitutes a valid and binding obligation enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors generally, and except as enforceability may be subject to general principles of equity.  This Agreement shall be binding on the successor and assigns of the parties.

## X. DEFINITIONS

10.01    **Definitions**.  As used in this Agreement, the following terms shall have the meanings assigned below:

(a)    "Administrative Managers" shall have the meaning set forth in Section 3.01(a).

- 20 -

RDX 009637

(b)    **"Administrative Manager Reimbursement"** shall have the meaning set forth in Section 3.01(a) hereof.

(c)    **"Annual Fixed Fee"** shall have the meaning set forth in Section 6.01(b).

(d)    **"Annual Percentage Fee"** shall have the meaning set forth in Section 6.01(b).

(e)    **"Board Designee"** shall have the meaning set forth in Section 2.02.

(f)    **"Consultants"** shall have the meaning set forth in Section 3.02.

(g)    **"Consumer Price Index"** shall mean the Consumer Price Index-All Urban Consumers for Chicago as published from time to time by the U.S. Bureau of Labor Statistics.

(h)    **"CPAs"** shall have the meaning set forth in Section 3.04(a).

(i)    **"Cost of Operation"** means all costs attributable to the operation of Edgewater's facilities and operations, whether direct or indirect, including, without limitation, (I) Debt Service Payments, (ii) the expenses of Manager and the management fees payable to Manager pursuant to Section 6.01 or 6.02 hereof, and (iii) all expenses specifically designated in this Agreement as being a "Cost of Operation."

(j)    **"Deferred Management Fees"** shall have the meaning set forth in Section 6.02.

(k)    **"Edgewater Accounts"** shall have the meaning set forth in Section 5.01(a).

(l)    **"Financing Documents"** means those instruments evidencing the issuance by Edgewater of its 1994 tax-exempt obligations or any similar obligation issued during the term of this Agreement.

(m)    **"Hospital"** means the acute care general hospital located at 5700 North Ashland Avenue, Chicago, Illinois 60660 and any of its affiliated, controlled or otherwise related health care activities, entities or services maintained by Edgewater.

(n)    **"Monthly Fixed Fee"** shall have the meaning set forth in Section 6.01(a).

(o)    **"Net Patient Service Revenues"** means all revenues and income derived from patient services from the operation of Edgewater, and any of its affiliates, controlled or otherwise related entities, as calculated on an accrual basis using generally accepted accounting principles, after adjustments for contractual allowances, bad debt, and free care.

(o)    **"Obligations"** shall have the meaning set forth in Section 8.01(a).

- 21 -

**RDX 009638**

(j)    **"Deferred Management Fees"** shall have the meaning set forth in Section 6.02.

(k)    **"Edgewater Accounts"** shall have the meaning set forth in Section 5.01(a).

(l)    **"Financing Documents"** means those instruments evidencing the issuance by Edgewater of its 1994 tax-exempt obligations or any similar obligation issued during the term of this Agreement.

(m)    **"Hospital"** means the acute care general hospital located at 5700 North Ashland Avenue, Chicago, Illinois 60660 and any of its affiliated, controlled or otherwise related health care activities, entities or services maintained by Edgewater.

(n)    **"Monthly Fixed Fee"** shall have the meaning set forth in Section 6.01(a).

(o)    **"Net Patient Service Revenues"** means all revenues and income derived from patient services from the operation of Edgewater, and any of its affiliates, controlled or otherwise related entities, as calculated on an accrual basis using generally accepted accounting principles, after adjustments for contractual allowances, bad debt, and free care.

(o)    **"Obligations"** shall have the meaning set forth in Section 8.01(a).

(q)    **"Operating Period"** shall have the meaning set forth in Section 1.01.

(r)    **"Tax-Exempt Obligation"** shall mean and include any bond, certificate of participation or other obligation the interest on which is excludable from federal income taxation under Section 103 of the Internal Revenue Service Code.

**IN WITNESS WHEREOF**, the undersigned parties have entered into this Amended and Restated Agreement effective as of the date first written above.

NORTHSIDE OPERATING CO.

By:

Title: President

BRADDOCK/MANAGEMENT, L.P.

By:

Title: General Partner

MANAGE6.AGR august14, 1997

- 22 -

RDX 009639

## EXHIBIT A

### ADMINSTRATIVE MANAGERS

A-1

RDX 009640

Exhibit A

011.160677.1

RDX 009641

# Exhibit

# 57

# NORTHSIDE OPERATING COMPANY
## AGREED UPON PROCEDURES
## RELATING TO THE REASONABLENESS
## OF MANAGEMENT FEES

## DRAFT

PENGAD-Bayonne, N.J.

**DEFENDANT'S
EXHIBIT**

57

CONFIDENTIAL

CB      01295

**DRAFT**

November 7, 1997

Northside Operating Company
Board of Directors
Post Office Box 268440
Chicago, IL 60626

Attention:    Bert Rosenthal, M.D., President

Dear Gentlemen:

We have performed certain agreed-upon procedures requested by you relating to the reasonableness of management fees charged by Braddock Management, L.P. ("Braddock") under both a written management agreement, currently in effect and a proposed agreement with Northside Operating Company d/b/a Edgewater Medical Center, ("Medical Center"), to provide management services. Our procedures were performed solely to assist you in your assessment of the reasonableness of such fees and our procedures are only part of the due diligence required of you. It is understood that this report is solely for use by the parties to these management agreements, including their legal counsel and consultants, and is not to be used for any other purpose. It is our understanding that legal counsel will consider this report with respect to their opinion relative to the Medical Center's Section 501 (c)(3) tax exemption in connection with a proposed tax-exempt financing.

Attachment A sets forth the procedures performed in connection with this work and the findings reached as a result of that work.

Because the above procedures do not constitute an audit made in accordance with generally accepted auditing standards, we do not express an opinion on any of the accounts or items referred to above, nor do we express an opinion on the reasonableness of payments made under either the current or proposed contracts. This report relates only to the procedures specified above and does to extend to any financial statements.

Very truly yours,

**CONFIDENTIAL**

CB        01296

ATTACHMENT A

*MANAGEMENT AGREEMENT REVIEW*

# DRAFT

We have read the management agreement ("Term Agreement") between Braddock and the Medical Center, effective as of August 17, 1994 and extending through August 16, 1999 which describes specific management responsibilities of Braddock to manage the Medical Center. We have also read the proposed management contract ("Proposed Term Agreement") between Braddock and the Medical Center that would supersede the Term Agreement and be effective as of September 1, 1997, expiring August 31, 2002. The Term Agreement and the Proposed Term Agreements are referred to collectively as the "agreements."

We understand that the management responsibilities contracted to Braddock include, but are not limited to, the full management responsibility for the operation of the Medical Center in an amount and manner customary to other similar licensed acute care hospitals. Management responsibilities specifically identified in the Term Agreement are summarized in Exhibit I. The responsibilities are generally the same under both agreements.

We obtained the management fee information from the agreements and the Net Patient Service Revenue ("NPR") and the earnings before interest, taxes, depreciation and amortization before extraordinary items and management fees ("EBITDA") information from the following sources:

- 1994 audited financial statements, dated and issued March 20, 1995

- 1995 and 1996 audited financial statements, dated and issued February 13, 1997

- 1997 estimated, and 1998, 1999 and 2000 forecasted income statements provided by Medical Center management, without any verification by Coopers & Lybrand. *[Forecasted net patient revenue and management fees could decline if the effects of Medicare Reform have not been included. Effects must be included for this report to be finalized.]*

*MANAGEMENT FEE ANALYSIS*

We obtained research data from two primary sources:

□ **Coopers & Lybrand Telephone Interviews and Contract Review**
We conducted telephone interviews with representatives from two hospital management companies. We also read management contracts executed by hospitals and hospital management company clients of Coopers & Lybrand.

# CONFIDENTIAL

CB      01297

DRAFT                                                                          **ATTACHMENT A**

☐   **The Office of Statewide Health Planning and Development (OSHPD)**
We extracted data from the 1995-1996 OSHPD financial disclosure reports
(fiscal years ending 6/30/95 through 6/29/96) which present individual
facility financial and operating information from yearly reports filed by
non-federal California hospitals.

Although we attempted to include hospitals outside of California in our
procedures, California hospitals are used due to the availability and
accessibility of management fee information through OSHPD financial
disclosure reports. Due to the decline in the number of independent
hospitals with management agreements in California, the number of
hospitals used in the procedures continues to decline from previously
available OSHPD data. In addition, based upon this and our prior reports,
management fees appear to be on a downward trend.

*FEES/NPR*

We computed the management fees per the agreements and the percentage of
management fees charged by Braddock under the agreements as a percentage of net
patient service revenues computed from previously issued audited financial statements,
estimates and forecasts provided by Medical Center management. The results are as
follows:

| | Actual 1994 (8/1-12/31) | Actual 1995 | Actual 1996 | Estimated 1997 | Forecast 1998 | Forecast 1999 | Forecast 2000 |
|---|---|---|---|---|---|---|---|
| Net Patient Revenue | 22,926,855 | 70,341,776 | 73,377,830 | 66,226,340 | 70,342,558 | 71,483,150 | 71,601,333 |
| Management Fees | 829,560 | 1,635,812 | 1,620,475 | 2,317,922 | 2,461,990 | 2,501,910 | 2,506,047 |
| Fees/NPR | 3.62% | 2.33% | 2.21% | 3.50%[1] | 3.50% | 3.50% | 3.50% |

[1]   It is anticipated that the Proposed Term Agreement will become effective during 1997, thus the
maximum Fees/NPR percentage of 3.5% was used for purposes of calculating the management fee.

The table above shows the actual 1994, 1995 and 1996 management fees, estimated 1997,
and forecasted 1998, 1999 and 2000 management fees as a percentage of net patient
revenue.

The Term Agreement provides a fixed fee of $62,500, indexed for inflation, annually,
should be paid each month, as well as an annual percentage of 2% of Edgewater's Net
Patient Service Revenues for the calendar year, not to exceed the aggregate Annual Fixed
Fee.

2

**CONFIDENTIAL**

CB        01298