**DRAFT**

ATTACHMENT A

The Proposed Term Agreement provides a fixed fee of $166,666, indexed for inflation, annually, shall be paid each month, as well as an annual percentage fee of 2% of Edgewater's Net Patient Service Revenues for the calendar year, not to exceed the aggregate Annual Fixed Fee. The sum of the Annual Fixed Fee and the Annual Percentage Fee for any calendar year cannot exceed 3.5% of Edgewater's Net Patient Service Revenue.

Using information provided by the OSHPD financial disclosure reports (see Exhibit II), we compared management fees charged by Braddock to a list of 20 hospitals. The data indicated that hospitals reporting an "amount paid" to a management firm from 0.22% to 6.42% of net patient revenues for a variety of management services. We eliminated the highest and lowest outliers. Of the remaining 18 hospitals, one is in litigation with its management company and two hospitals are currently closed. The amount paid for management services by the 18 hospitals ranges from 0.36% to 3.79% of NPR.

Although the Fees/NPR percentages charged by Braddock, under the Term and Proposed Term Agreements, ranging from 2.21% to 3.5%, are within the ranges indicated by the OSHPD reports, they are above the average (excluding outliers) of 1.34%. Of the hospitals used in our procedures, including outliers, used to compute the average Fees/NPR, two have a Fees/NPR percentage greater than 3.5%.

Below is a graph of the 18 hospitals showing a normal or "bump-shaped" distribution. The mean, or average, was calculated to be 1.34% with a standard deviation of 0.94%. Plus or minus one standard deviation corresponds to a fees per NPR range of 0.40% to 2.28%, of which 78% (14 out of 18) of the hospitals in our list lay. Two standard deviations from the mean reveals 95% (17 out of 18) of our data falling within the range of -0.54% to 3.22%.



In the course of our telephone interviews with representatives of most of the hospitals on which we extracted data from the OSHPD reports, we noted that the management firms

3

CONFIDENTIAL

CB      01299

**ATTACHMENT A**

**DRAFT**

charged fees based upon a variety of rate structures and for an assortment of managerial services. Accordingly, we standardized the OSHPD data by including in our analysis of the range of management fees only those cases where: (a) the hospital and management firm were not related parties and (b), the relationship appeared comparable in terms of services provided; and (c), the reported "Amount Paid on the OSHPD Report could be componentized between management fees and compensation reimbursements, if any, so that the management fee amount only, would be considered in the calculation of the Fees/NPR percentage and the Fees/EBITDA percentage." Based on these criteria and the exclusion of Vista Hospital Systems, Inc. (a related organization) managed hospitals from the procedures; 20 OSHPD reporting entities were identified as entities subjected to agreed-upon procedures which was reduced to 18 by excluding the outliers.

The data compiled and analysis relating to these procedures appears at Exhibit II. These results are based on the information available from the OSHPD reports and through our phone interviews, and not on a review of management contracts or actual amounts paid. Therefore, the level and type of services provided by each management company could vary from hospital to hospital.

*FEES/EBITDA*

We also computed the percentage of management fees charged by Braddock as a percentage of actual (1994, 1995 and 1996), estimated (1997), and forecasted (1998, 1999 and 2000) earnings before interest, taxes, depreciation, and amortization, and before extraordinary items and management fees ("EBITDA"). Again, we obtained the management fee information from the agreements, and the EBITDA information from actual 1994, 1995 and 1996 EBITDA from the audited financial statements and forecasted information provided by Medical Center management, without review.

| | Actual 1994 (9/1-12/31) | Actual 1995 | Actual 1996 | Estimated 1997 | Forecast 1998 | Forecast 1999 | Forecast 2000 |
|---|---|---|---|---|---|---|---|
| Fees | 829,560 | 1,635,812 | 1,620,475 | 2,317,922 | 2,461,990 | 2,501,910 | 2,506,047 |
| EBITDA | 5,083,082 | 22,065,049 | 20,145,426 | 25,428,820 | 21,504,716 | 20,663,511 | 19,931,738 |
| Fees/EBITDA | 16.32% | 7.41% | 8.04% | 9.12%[1] | 11.45% | 12.11% | 12.57% |

[1] It is anticipated that the Proposed Term Agreement will become effective during 1997, thus the maximum Fees/NPR percentage of 3.5% was used for purposes of calculating the management fee.

We used information provided by the OSHPD financial disclosure reports for the same 20 reporting entities that are identified in Exhibit II to develop a range of management fees as a percent of EBITDA.

4

CONFIDENTIAL

CB        01300

**DRAFT**                                                      ATTACHMENT A

The data compiled and the analysis relating to these procedures appears at Exhibit III. Again, these results are based on the information available from the OSHPD reports and through our phone interviews, and not on a review of management contracts or actual amounts paid. Therefore, the level of services provided by each management company could vary.

As per Exhibit III, the estimated management fee only, for the 20 OSHPD reporting entities ranges from -5.13% to 121.52%

The Fees/EBITDA percentages listed in the table, above, pertaining to the fees charged by Braddock, is within the range of the computed average. The average of the fees as a percent of EBITDA was calculated to be 17.52%. The management fees charged by Braddock fall below the 17.52% average throughout the actual, estimated, and forecasted periods.

Based upon the identified population, excluding outliers, the standard deviation was calculated to be 18.35% with a mean of 17.52%. Plus and minus one standard deviation produces a range of -0.83% to 35.87%, which 83% of our list (15 out of 18) and Braddock's fees fall. If we were to move two standard deviations from the mean, the range incorporates 89% of the list.



Note: The management fee in both the agreements are not based on EBITDA. EBITDA is merely used as a means of comparison with other hospitals.

### INTERVIEWS & CONTRACT READING

In addition to confirming the amounts in our list of hospitals, we conducted interviews of personnel at two national hospital management companies. Both companies disclosed or represented that their fees are based upon the estimated cost to provide management services to hospitals with an additional incremental profit factor. Further, each stated that neither company bases its fees on a percentage of net patient revenue. One company

CONFIDENTIAL

CB      01301

**DRAFT**

indicated that the large hospitals managed by it tend to pay fees that are lower as a percentage of NPR due to the fact that all hospitals require minimum levels of service.

Not included in the OSHPD data, but considered in the agreed-upon procedures, is a recently executed management contract under which the management agreement provides for a fixed fee of $2,000,000 (indexed for inflation) and an incentive fee of up to an additional $2,000,000 annually. Assuming a $4,000,000 annual fee and the hospital's F.Y.E. 1996, $48,600,000 NPR, this particular Fees/NPR percentage is 8.23%.

CONFIDENTIAL

CB       01302

**DRAFT**

ATTACHMENT A

## *FINDINGS*

Given the responses to our interviews, findings from the contract reading, and results of our procedures, the actual and proposed fees to be charged under the agreements by Braddock are above the average fees as a percentage of net patient revenue charged in our list of hospitals. Of the 20 hospitals in our list, including outliers, only two reported management fees higher than 3.5% of net patient revenue. Five hospitals paid management fees of 2.21% of net patient revenue or more. The average Fees/NPR percentage, excluding the outliers, in our list is 1.34%, however, the Fees/NPR percentages under the agreements range from 2.21% to 3.5%. The graph of the data shows a standard distribution of 0.94%, and 95% of the hospitals in our list falling within two standard deviations of the mean at 3.22% Fees/NPR.

With regard to EBITDA, the Braddock fee (actual and proposed) ranges from 7.41% of EBITDA to 16.32% of EBITDA. Including outliers, eleven of the hospitals in our list have a fees to EBITDA of over 10% and six hospitals have a percentage of 18% of EBITDA or more. The average management fee, excluding outliers, as a percentage of EBITDA was computed to be 17.52% with a standard deviation of 18.35%. Braddock's fees/EBITDA fell within the plus and minus one standard deviation range of -0.83% to 35.87%. Over 83% of our list of 18 hospitals fell within one standard deviation range as well.

Note: EBITDA is used as a comparative measure of fees among hospitals it is not used to compute the fees.

Because the above procedures do not constitute an audit made in accordance with generally accepted auditing standards, we do not express an opinion on the agreed-upon procedures mentioned. Based on the limited procedures, nothing came to our attention, except for those observations noted in the three preceding paragraphs, that caused us to believe that the management fees contracted to Braddock under the agreements do not fall within the range paid by other hospitals included within our procedures. Had we performed additional procedures or an audit in accordance with generally accepted auditing standards, other matters might have come to our attention that would have been reported to you.

CONFIDENTIAL

CB        01303

**EXHIBIT I**      **DRAFT**                    **ATTACHMENT A**

## SUMMARY OF MEDICAL CENTER MANAGEMENT, INC. RESPONSIBILITIES

### General responsibilities of Parties

☐    Cause the appointed Administrative Managers to be full-time, on-site managers and perform duties pursuant to policies, procedures, rules and other directives adopted and amended by the Medical Center. All matters relating to the care and treatment of patients requiring professional medical judgment shall remain the responsibility of the Board and of the Hospitals' Medical Staff

☐    Ensure that all current licenses, accreditations and other approvals issued by any Federal, State or local agency are retained

### Duties of Manager

#### Personnel

☐    Determine the selection, terms of compensation, supervision, direction, training and assignment of duties for the non-physician personnel of the Medical Center

#### Consultants

☐  ·  May hire or retain any consultants, accountants, attorneys or other professional personnel necessary and appropriate

#### Financial Management

☐    Supervise and manage all purchasing, billings, collections, payables, data processing, accounting, cost reporting, cash management, and other financial matters related to daily operations

☐    Manage the Medical Center's bank accounts

☐    Establish all prices, price schedules, rates, and rate schedules

CONFIDENTIAL

CB        01304

**DRAFT**                                                          **ATTACHMENT A**

Financial Management (continued)

☐     Maintain provider agreements necessary to maintain facility status as reimbursable provider of Medicaid and Medicare general acute care hospital facility programs

Financial Services, Books, and Records

☐     Employment of an independent certified public accounting firm for preparation of all financial statements

☐     Arrangement for audited financial statements each fiscal year by the selected independent CPA firm

☐     Furnish monthly unaudited financial statements

☐     Provide a monthly report to each administrator highlighting the different revenue and cost centers

☐     Maintain all books, documents, and records for at least 4 years and making said documents available to official government agencies and other authorized representatives upon written request

☐     Cause all books, accounts, and records to be open at all reasonable hours and upon appropriate notice for inspection and audit by owner or any accountants selected for that purpose

☐     Preparation and filing of all state and federal cost reports necessary for reimbursement

☐     Creation, implementation, and review of an annual budget

☐     Process all payroll checks, including associated reports

Contracts

☐     Enter into, modify, discharge, make any settlements with respect to or terminate contracts, leases, or other documents with vendors, physicians, or any other appropriate persons

9

**CONFIDENTIAL**

CB      01305

**DRAFT**

**ATTACHMENT A**

Litigation

❑     Defend assert, settle or otherwise dispose of any claims, litigation, judgments, or liabilities in connection with the Hospitals during the operating period

Marketing

❑     Manage, supervise and ensure the performance of marketing and public relations efforts

Risk Management

❑     Maintain policies of insurance or self-insurance appropriate to insure it, its employees and agents against any liability

Repairs and Maintenance

❑     Negotiate, contract for, and supervise the repair and maintenance of the physical property and equipment of the Medical Center

Government Regulations

❑     Use its best efforts and all due diligence to ensure that the Medical Center continuously comply with all applicable laws, rules, regulations or orders of any governmental or regulatory body and retain and maintain in good standing all existing accreditations, licenses, permits and authorizations required for their ongoing operations

Confidentiality of Records

❑     Protect the confidentiality of all records and notify the Board designee of any violation of laws or regulations. All records of the Medical Center shall remain the property of the Medical Center.

CONFIDENTIAL

CB     01306

**DRAFT**

Quality Control

☐     Cause to be initiated, reviewed and disseminated a quality control system

☐     Cause to be initiated and maintained a continuing education program designed to inform and educate health care professionals and the general public

☐     Distribute information to health care professionals relating to state and federal reimbursement programs and how they relate to services offered

Legal Services

☐     Preparation, in accordance with federal and state standards, of a "Patient's Rights Policy" and a "Patient Care Policy"

☐     Review of all insurance claims

☐     Review of all insurance requirements and obtain best known rated available on a group basis

☐     Maintain of standard insurance policies with customary coverage and deductibles. Employ an insurance consultant annually to review insurance requirements

Other Actions

☐     Take any other actions necessary and appropriate, in its sole opinion and discretion, to manage the Medical Center, as long as such action is under the authority of the Manager and does not in any way obligate the Medical Center beyond the operating period

Visits to Medical Center

☐     Cause executive personnel to visit the Medical Center not less than quarterly to coordinate, review and supervise the operations

CONFIDENTIAL

CB      01307

**DRAFT**

ATTACHMENT A

Additional Reports

- ☐ Provide monthly reports regarding the operation of the Medical Center to include: labor analysis, census mix, budget analysis, progress of special projects, and revenues, expenses and funds

- ☐ Monthly description of any need for discontinued services, refinancing proposals, expansion plans, or material changes in operating procedures,

- ☐ Respond in writing to recommendations made by the Medical Center's annual independent auditors

General Corporate Services

- ☐ Coordinate comprehensive cash management services for the Medical Center

- ☐ Provide overall financial management advice

- ☐ Assist and advise with strategic corporate development

- ☐ Act as liaison with the Trustee and Bondholders

- ☐ Provide planning and assistance with regard to obtaining and maximizing reimbursement

- ☐ Act as liaison with the IRS in the event of audit or routine review of consolidated returns

- ☐ Act as liaison with counsel

- ☐ Provide assistance and advice with regard to compliance with tax-exempt status

- ☐ Provide assistance with legislative and regulatory affairs

- ☐ Act as representative and spokesman of the Medical Center with regard to community relations

12

CONFIDENTIAL

CB     01308



ATTACHMENT A

Exclusive Corporate Services

❑   Provide merger and acquisition services to the Medical Center on an as-needed basis

Note that compensation for merger and acquisition services shall be in addition to that provided for the services described above

CONFIDENTIAL

CB      01309

EXHIBIT II:  Management Fee Analysis - Fees/NPR                                                          ATTACHMENT A
OSHPD Data for Define Reporting Entities

**DRAFT**

| | Hospital | Management Firm | FYE | Beds Available | Total Mgmt Fees paid to to Mgmt Firm per OSHPD | Mgmt Fees only, paid to Mgmt Firm per phone interview * A | Net Patient Revenue B | Fees as % of NPR A/B |
|---|---|---|---|---|---|---|---|---|
| 1 | Western Med Ctr Hosp - Anaheim | Alpha Partners | 06/30/95 | 193 | 134,108 | 134,108 | 60,829,727 | 0.22% |
| 2 | Charter Community Hospital | FHP, Inc. | 09/30/95 | 125 | 120,709 | 120,709 | 33,330,266 | 0.36% |
| 3 | Alhambra Community Hospital | ACH Management | 09/30/95 | 144 | 350,473 | 116,824 | 29,347,142 | 0.40% |
| 4 | Kern Valley Hospital | Delta One Management | 06/30/95 | 101 | 66,743 | 66,743 | 12,834,335 | 0.52% |
| 5 | Marian Medical Center | Management Perform. Assoc. | 11/30/95 | 225 | 355,619 | 355,619 | 52,513,893 | 0.68% |
| 6 | Western Medical Center - Santa Ana | Alpha Partners | 03/31/96 | 301 | 868,758 | 868,758 | 106,441,168 | 0.82% |
| 7 | Washington Medical Center | Health Care Industries C/O | 04/30/96 | 82 | 63,420 | 156,710 | 18,679,009 | 0.84% |
| 8 | The General Hospital | Brim Healthcare, Inc. | 12/31/95 | 83 | 697,876 | 264,996 | 28,506,497 | 0.93% |
| 9 | Merced Community Medical Center | Valley Health, Inc. | 06/30/95 | 142 | 483,188 | 483,188 | 51,209,303 | 0.94% |
| 10 | Hazel Hawkins Memorial Hospital | Brim Healthcare, Inc. | 06/30/95 | 87 | 420,485 | 175,529 | 17,552,884 | 1.00% |
| 11 | Pioneers Memorial Hospital | Brim Healthcare, Inc. | 06/30/95 | 80 | 457,862 | 282,862 | 27,485,842 | 1.03% |
| 12 | San Gorgonio Memorial Hospital | Brim Healthcare, Inc. | 06/30/95 | 68 | 171,254 | 155,470 | 14,133,633 | 1.10% |
| 13 | Pacifica Hospital of the Valley | Pacific Optima Hospital | 12/31/95 | 233 | 891,000 | 491,000 | 39,758,958 | 1.23% |
| 14 | Desert Valley Hospital | Quorum Health Resources | 12/31/95 | 77 | 715,340 | 515,340 | 38,059,487 | 1.35% |
| 15 | Lassen Community Hospital | Lutheran Health Management | 12/31/95 | 87 | 284,943 | 150,113 | 9,931,752 | 1.51% |
| 16 | Colusa Community Hospital | Community Health Mgmt. | 03/30/96 | 56 | 421,225 | 210,613 | 9,536,685 | 2.21% |
| 17 | Bear Valley Community Hospital | Brim Healthcare, Inc. | 06/30/95 | 30 | 325,140 | 125,000 | 5,149,221 | 2.43% |
| 18 | Good Samaritan Hosp of California | Tri Star Healthcare | 12/31/95 | 64 | 360,000 | 360,000 | 11,774,994 | 3.06% |
| 19 | Mission Community Hospital | Intercare Resources, Inc. | 06/30/95 | 165 | 1,200,000 | 1,200,000 | 31,703,539 | 3.79% |
| 20 | East Bay Hospital | Masters Business Advisors | 01/31/96 | 87 | 776,880 | 776,880 | 12,100,484 | 6.42% |

| Group Average : the 18 entities only, excluding outliers #1 and #20 | | | | 119 | 458,558 | 338,860 | 29,886,034 | 1.34% ** |

| Standard Deviation | | | | | | | | 0.94% |

Edgewater Hospital:  Comparison Table of Actual and Forecasted Fees/ NPR

| | Actual 1994 | Actual 1995 | Actual 1996 | Estimated 1997 | Forecast 1998 | Forecast 1999 | Forecast 2000 |
|---|---|---|---|---|---|---|---|
| Net Patient Revenue | 22,928,855 | 70,341,775 | 73,377,830 | 66,226,340 | 70,342,558 | 71,483,150 | 71,601,333 |
| Management Fees | 829,560 | 1,635,812 | 1,620,475 | 2,317,922 | 2,461,990 | 2,501,910 | 2,506,047 |
| Fees/NPR | 3.62% | 2.33% | 2.21% | 3.50% *** | 3.50% | 3.50% | 3.50% |

*  Exhibit II and III show different averages due to different outliers
** Average Management Fee per NPR percentage of 1.34% is an average of each hospital's percent of fees.  The calculation does not give greater weight
   to hospitals with larger than average revenue and management fees.
*** It is anticipated that the Proposed Term Agreement will become effective during 1997, thus the maximum Fees/NPR percentage of 3.5% was used for
    purposes of calculating the management fee

CONFIDENTIAL

CB          01310

**EXHIBIT III** — Management Fee Analysis - Fees/ EBITDA — **ATTACHMENT A**
OSHPD Data for Defined Reporting Entities

**DRAFT**

| | Hospital | FYE | Net Income Before Taxes & Extraordinary Items Per OSHPD p.8. ln 215 A | Depreciation Per OSHPD p.8. ln 170 B | Interest Expense Per OSHPD p.8. ln 180 C | Mgmt. Fees Only * D | EBITDA Before Extraordinary Items & Mgmt Fees E | Fees as % of EBITDA F |
|---|---|---|---|---|---|---|---|---|
| 1 | Charter Community Hospital | 09/30/95 | (2,778,386) | 304,154 | 0 | 120,709 | (2,353,523) | -5.13% |
| 2 | Western Medical Ctr Hosp - Anaheim | 06/30/95 | 3,029,047 | 2,329,047 | 2,373,277 | 134,108 | 7,865,479 | 1.71% |
| 3 | Kern Valley Hospital | 06/30/95 | (519,010) | 1,378,605 | 1,520,918 | 66,743 | 2,447,256 | 2.73% |
| 4 | Marian Medical Center | 11/30/95 | 4,422,635 | 3,476,536 | 1,500,473 | 355,619 | 9,755,263 | 3.65% |
| 5 | Washington Hospital | 04/30/96 | 1,499,696 | 795,758 | 81,435 | 156,710 | 2,533,599 | 6.19% |
| 6 | Alhambra Community Hospital | 09/30/95 | 1,044,262 | 190,652 | 339,545 | 116,824 | 1,691,283 | 6.91% |
| 7 | Hazel Hawkins Memorial Hospital | 06/30/95 | 354,764 | 1,097,370 | 719,384 | 175,529 | 2,347,047 | 7.48% |
| 8 | Western Medical Center - Santa Ana | 03/31/96 | 1,783,096 | 5,284,080 | 2,840,832 | 868,758 | 10,776,766 | 8.06% |
| 9 | Pioneers Memorial Hospital | 06/30/95 | 1,463,707 | 1,390,291 | 235,490 | 282,862 | 3,372,350 | 8.39% |
| 10 | Pacifica Hospital of the Valley | 12/31/95 | 2,347,522 | 843,801 | 941,240 | 491,000 | 4,623,563 | 10.62% |
| 11 | The General Hospital | 12/31/95 | 1,633,554 | 555,764 | 3,743 | 264,996 | 2,458,057 | 10.78% |
| 12 | Merced Community Medical Center | 06/30/95 | 381,336 | 2,028,557 | 1,036,412 | 483,188 | 3,929,493 | 12.30% |
| 13 | Lassen Community Hospital | 12/31/95 | 693,708 | 134,037 | 4,973 | 150,113 | 982,831 | 15.27% |
| 14 | Good Samaritan Hosp of California | 12/31/95 | 1,117,417 | 85,561 | 688,687 | 360,000 | 2,251,665 | 15.99% |
| 15 | San Gorgonio Memorial Hospital | 06/30/95 | 132,766 | 448,591 | 126,891 | 155,470 | 863,718 | 18.00% |
| 16 | Desert Valley Hospital | 12/31/95 | 246,600 | 750,704 | 867,543 | 515,340 | 2,380,187 | 21.65% |
| 17 | Colusa Community Hospital | 03/30/96 | 35,525 | 285,714 | 30,313 | 210,613 | 562,165 | 37.46% |
| 18 | Bear Valley Community Hospital | 06/30/95 | (356,705) | 234,629 | 194,476 | 125,000 | 197,400 | 63.32% |
| 19 | Mission Community Hospital | 09/30/95 | (2,345,154) | 665,743 | 2,329,097 | 1,200,000 | 1,849,686 | 64.88% |
| 20 | East Bay Hospital | 01/31/96 | (661,170) | 231,970 | 291,635 | 776,880 | 639,315 | 121.52% |

| Group Average: excluding outliers #1 & #20 | | | 942,487 | 1,220,858 | 879,707 | 339,604 | 3,382,656 | 17.52% ** |

| Standard Deviation | | | | | | | | 18.36% |

**Edgewater Hospital : Comparison Table of Actual and Forecasted Fees/ EBITDA**

| | Actual 1994 | Actual 1995 | Actual 1996 | Estimated 1997 | Forecast 1998 | Forecast 1999 | Forecast 2000 |
|---|---|---|---|---|---|---|---|
| Management Fees | 829,560 | 1,635,812 | 1,620,475 | 2,317,922 | 2,461,990 | 2,501,910 | 2,506,047 |
| EBITDA | 5,083,082 | 22,065,049 | 20,145,426 | 25,428,820 | 21,504,716 | 20,663,511 | 19,931,738 |
| Fees/EBITDA | 16.32% | 7.41% | 8.04% | 9.12% *** | 11.45% | 12.11% | 12.57% |

\* Exhibits II and III show different averages due to different outliers
\** Average Management Fee Percentage per EBITDA of 17.52% is an average of each hospital's percent of fees. The calculation does not give greater weight to hospitals with larger than average EBITDA and management fees.
\*** It is anticipated that the Proposed Term Agreement will become effective during 1997, thus the ... imum Fees/NPR percentage of 3.5% was used for purposes of calculating the management fee.

CONFIDENTIAL

CB      01311

# Exhibit

# 58

*A Member of Valuation Counselors Group*

January 23, 1998

Edgewater Medical Center
5700 North Ashland
Chicago IL 60602

Attn: Dr. Bert Rosenthal

Ladies and Gentlemen:

In accordance with your request we have completed certain limited procedures to assist you in assessing the reasonableness of the proposed management fees charged by Braddock Management, L.P. to Northside Operating Company d/b/a Edgewater Medical Center (EMC) and if these fees fall within the range of fees charged by other management companies to other hospitals. These procedures were performed to assist the hospital's board of directors in their business planning efforts and solely for this expressed purpose. To arrive at our conclusion we:

- Reviewed the proposed 1997 management agreement between Braddock Management, L.P. and Northside Operating Co. D/B/A Edgewater Medical Center;

- Reviewed the Northside Operating Co. management fee study conducted by Coopers & Lybrand, dated September 16, 1994;

- Reviewed the draft Northside Operating Co. agreed upon procedures relating to the reasonableness of management fees by Coopers & Lybrand (prepared November, 1997);

- Reviewed published market data concerning hospital management fees charged by management companies;

- Reviewed our internal research files; and

- Conducted confidential interviews with certain of our client personnel relating to hospital management fees charged and/or received.

Since we were provided with the referenced Coopers & Lybrand reports, we did not duplicate the work performed in those reports.

In addition to the Coopers & Lybrand reports, we reviewed information obtained from the California's Office of Statewide Health Planning and Development (OSHPD) reports which contains individual facility data filed by non-federal California hospitals. This information reported an "amount paid" by 43 hospitals to a management firm. The "amount paid" in these reports range

RCI 12746

RDX 044229

300 South Wacker Drive • Chicago, Illinois 60606 • Phone (312) 360-0200 • Fax (312) 360-1113
Atlanta • Boston • Chicago • Dallas • Los Angeles • Princeton • St Louis

DEFENDANT'S EXHIBIT 58
PENGAD-Bayonne, N. J.

Edgewater Medical Center
January 23, 1998
Page 2

from .55% to 26.89% of net patient revenue. Eliminating the five highest and five lowest outliers as not representative of the overall group, the "amount paid" ranges from .91% to 4.01% of net patient revenue (NPR). Although, the proposed fees charged by Braddock under the term agreement are a percentage of NPR and are within the range indicated by the OSHPD reports, they are above the average, which is approximately 1.40%.

Our research indicated that a contract based upon a percent of net patient revenue was becoming less popular. In its place was a formula arrangement which included a flat fee and a percentage of earnings before interest, taxes, depreciation, and amortization (EBITDA), for an assortment of managerial services. However, the appropriateness of such a contract structure is an area in which your legal counsel should advise you. Since this new contract formula is becoming increasingly popular, we thought that providing EMC with such a calculation would be a useful reference.

Excluding the flat fee portion, we computed the percentage of management fees estimated to be charged by Braddock as a percentage of annualized 1997 earnings before EBITDA. We used information provided by both the OSHPD financial disclosure reports and phone interviews to develop a range of management fees as a percent of EBITDA. We did not perform a review of management contracts or actual amounts paid. Therefore, the level of services provided by each management company is unknown and could vary. The average of the fees as a percent of EBITDA was calculated to be approximately 17.50%. The management fees proposed by Braddock were well below this average at approximately 9.00%

Based upon our review of the above market data and interviews, we believe a management fee between 2% to 4% of net patient service revenue for the specific services rendered by Braddock Management to Edgewater Medical Center would be reasonable.

The letter is subject to the attached Assumptions and Limiting Conditions.

Sincerely,

VALUATION COUNSELORS

David S. Felsenthal
Managing Director                    RCI 12747

DSF:nma
Enclosure/87-5766

RDX 044230

Valuation Counselors

## ASSUMPTIONS AND LIMITING CONDITIONS

Valuation Counselors (VC) strives to clearly and accurately disclose the assumptions and limiting conditions that directly affect an appraisal analysis, opinion, or conclusion. In order to assist the reader in interpreting this report, such assumptions and limiting conditions are set forth as follows:

Because our procedures do not constitute an audit made in accordance with generally accepted auditng standards, we do not express an opinion on any of the accounts or items referred in our letter report. This report relates only to the procedures specified in our letter and does not extend to any financial statements.

No opinion is intended in matters that require legal, engineering, or other professional advice which has been or will be obtained from other professional sources.

The property will not operate in violation of any applicable government regulations, codes, ordinances, or statutes. All required licenses, certificates of occupancy, consents, or other legislative or administrative authorization from all local, state, or national governmental or private entities or organizations have been or can be obtained or renewed.

Information furnished by others is presumed to be reliable and, where so specified in the report, has been verified; however, we assume no responsibility, legal or otherwise, for its accuracy and cannot be guaranteed as being certain. All facts and data set forth in the report are true and accurate to the best of VC's knowledge and belief. No single item of information was completely relied upon to the exclusion of other information.

Valuation working papers may contain prospective financial information, estimates, or opinions that represent the appraiser's view of reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. All opinions as to value are presented as VC's considered opinion based on the facts and data obtained during the investigation and set forth in the report. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

The value estimate is based on the purchasing power of the United States dollar as of the date of value. Any allocation of total price between land and improvements as shown is invalidated if used separately or in conjunction with any other report.

Competent management is assumed. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.



RCI 12748

RDX 044231

Valuation Counselors

## ASSUMPTIONS AND LIMITING CONDITIONS
### (continued)

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of the original assignment. If the need for subsequent services related to an appraisal assignment (e.g., testimony, updates, conferences, reprint or copy services) is contemplated, special arrangements acceptable to VC must be made in advance. VC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem necessary by consideration of additional or more reliable data that may become available.

Neither the report nor any portions thereof, especially any conclusions as to value, or the identity of the appraiser or of VC, shall be disseminated to the public through public relations media, news media, sales media, or any other public means of communications without the prior written consent and approval of VC.

RCI 12749

RDX 044232



**Valuation Counselors**

# Exhibit

# 60

FEB-18-1998  08:54  FROM  Credit Local de France NY  TO        ARENT FOX-FINE    P.02



PRIMUS MANAGEMENT, INC.

February 17, 1998

Mr. John Flaherty
Vice President
Credit Locale De France
450 Park Avenue, 3rd Floor
New York, NY 10022

Re:    Northside Operating Co Transaction

Dear John:

In connection with the provision to Credit Local De France of certain confidential financial
information for Braddock Management, LP and Primus Management, Inc., I have prepared the
following Confidentiality Agreement. Please review the Agreement and provide me with any
questions or concerns. I expect you will find it to be quite standard and reasonable. I will ask
that the Agreement be executed prior to providing you with the subject confidential information,
which I intend to have available for you no later than this Thursday, February 19, 1998.

Please feel free to call me at (415) 627-0755 or fax any comments to me at (415) 627-0766.

Sincerely,

Daniel F. Finnane
Vice President

Enclosure

cc:    F. Scott Gross
       Matthew Goldreich

DEFENDANT'S
EXHIBIT
60
PENGAD-Bayonne, N. J.

One Eleven Sutter Street, Suite 2150 • San Francisco, CA 94104

415.627.0755 • FAX 415.627.0766
02/18 '98 08:43          **Arent Fox 000077**

# AGREEMENT FOR USE AND NON-DISCLOSURE
## OF CONFIDENTIAL INFORMATION

**THIS AGREEMENT FOR USE AND NON-DISCLOSURE OF CONFIDENTIAL INFORMATION**, dated as of the 17th day of February, 1998, is by and between Credit Local De France ("Recipient"), and Braddock Management, LP and Primus Management, Inc. (together, the "Provider") to assure the protection and preservation of the confidential and/or proprietary nature of information to be disclosed or made available by or on behalf of Provider to Recipient in connection with Recipient's proposed transaction with Northside Operating Co. d/b/a Edgewater Medical Center ("Hospital").

**WHEREAS**, Recipient has expressed an interest in a potential transaction with Hospital.

**WHEREAS**, any such transaction requires advance analysis by Recipient of certain confidential and proprietary information of Provider.

**WHEREAS**, the parties desire to assure the confidential status of the information which may be disclosed to Recipient.

**NOW, THEREFORE**, in reliance upon and in consideration of the following undertakings, the parties hereto agree as follows:

1.     Subject to the provisions of Section 6 below, all information disclosed to Recipient by or on behalf of Provider shall be deemed to be "Proprietary Information."

2.     Recipient may use the Proprietary Information only to the extent required to accomplish the purposes for which it was disclosed.  No other rights are implied or granted under this Agreement.

3.     Proprietary Information supplied shall not be reproduced in any form except for internal use or with the prior written authorization of Provider.  Each such reproduction shall include any ownership and confidentiality legends of Provider included in the original.

4.     Recipient shall use all reasonable efforts to protect the Proprietary Information received with the same degree of care used to protect its own Proprietary Information from unauthorized use of disclosure by its agents and employees.  Such Proprietary Information may be used by or disclosed to its agents and employees as may be reasonably required to accomplish the intent of this Agreement during the term of this Agreement.

**Arent Fox 000078**

5.     All Proprietary Information, unless otherwise specified in writing, shall remain the property of Provider, shall be used by Recipient only for the purposes intended, and shall be returned to Provider (including all whole or partial copies thereof) promptly upon completion of Recipient's analysis of the proposed transaction with Hospital, or upon termination of this Agreement according to Section 12 of this Agreement.

6.     It is understood that the term "Proprietary Information" does not include Information which:

> (i)     is now or thereafter in the public domain through no fault of Recipient;

> (ii)    prior to disclosure hereunder, is properly within the rightful possession of Recipient;

> (iii)   prior to or subsequent to disclosure hereunder, is lawfully received from a third party with no restriction on further disclosure; or

> (iv)    is obligated to be produced under order of a court of competent jurisdiction, unless made the subject of a confidentiality agreement or order in connection with such proceeding.

7.     Recipient acknowledges that in the event of any breach this Agreement, monetary damages would be inadequate compensation for Provider, and therefore Provider shall be entitled to an injunction or injunctions to prevent breaches of this Agreement, and that in such an event Provider shall be entitled to reasonable attorney's fees in addition to any other amounts which may be awarded as damages.

8.     This Agreement shall be governed by the laws of the State of California. This Agreement is deemed entered into in San Francisco County, California, and in the event of litigation, the parties agree that venue shall lie in San Francisco County, California. The provisions of this Agreement are separable, and the enforceability of one covenant or provision hereof shall not render invalid any other covenant or provision hereof.

9.     In the event any attorney is employed by any party to this Agreement with regard to any legal action, arbitration or other proceeding brought by any party for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, then the party prevailing in such proceeding, whether at trial or upon appeal, shall be entitled to recover reasonable attorney's fees and other costs and expenses incurred, in addition to any other relief to which it may be entitled.

2

**Arent Fox 000079**

FEB-18-1998 08:55 FROM  Credit Local de France NY  TO      ARENT FOX-FINE    P.05

10.    For the purpose of all communications under this Agreement, addresses of the parties, subject to change upon written notice, are:

### Provider:
Daniel F. Finnane
Vice President
Primus Management, Inc.
111 Sutter Street, Suite 2150
San Francisco, CA  94104

### Recipient:
John Flaherty
Vice President
Credit Locale De France
450 Park Avenue, 3rd Floor
New York, NY  10022

11.    There are no understandings, agreements, or representations, express or implied, not specified herein.  This Agreement may not be amended except in writing executed by all parties hereto.

12.    This Agreement shall continue in full force and effect until terminated.  This Agreement may be terminated at any time by any of the parties upon ten days written notice to the other parties.  Termination of this Agreement shall not relieve Recipient of its obligations imposed by Section 4 and 5 above, with respect to Proprietary Information exchanged prior to the effective date of termination.

**EXECUTED** as of the date set forth above.


### PROVIDER

### RECIPIENT


By:   _____ __        By:   _____
     Daniel F. Finnane                        Name: _____
     Vice President                            Title: _____


3


Arent Fox 000080

02/18 '98 08:43

# Exhibit

# 61

NORTHSIDE OPERATING CO.

BOARD OF DIRECTORS

eting Date: **March 6, 1998**

I. **CALL TO ORDER:** The meeting was called to order by Bertram P. Rosenthal, MD, President on Friday, March 6, 1997, at 3:00 p.m. (PST)

**Present:** B. Macon Brewer
George Chapas
Stina Hans
William D. Fruland
Bertram P. Rosenthal, MD

DEFENDANT'S
EXHIBIT
61

**Also Present:** Dan Finnane, Primus Management, Inc.
F. Scott Gross, Primus Management, Inc.
Karen Hyneman, CFO, Northside Operating Co.
Michael Olsen, General Counsel, Northside Operating Co.
Peter G. Rogan, Braddock Management, L.P.
Dean Spizziri, Assistant Counsel, Northside Operating Co.

II. **OLD BUSINESS**

A. **Review and Approval of Prior Board Meeting Minutes**

It was pointed out that two ommissions needed to be added to the section titled "Old Business" under the minutes of the December 1, 1997, meeting.

**MSC**

EMC 003554

Minutes of the December 1, 1997, Meeting of Northside Operating Co. (NOC) were received, reviewed and approved as amended upon a motion which was duly seconded and carried.

B. **Report on the Illinois Department of Public Health Compliance Project**

Mr. Rogan reported that NOC was proceeding with its plan to comply with the Illinois Department of Public Health Project. He reported that there had been some confusion with regard to the fire stopping materials which were used and United States Gipson (USG) was asked to conduct some independent lab tests on the materials they had supplied. USG confirmed that the materials used meet the fire code for the Underwriters Laboratories. At the present time, NOC is in discussions with the IDPH to determine how to best resolve any concerns they might have or any differences in the reports received from USG.

C. **Braddock Management, L.P. Agreement (BMLP) Committee Report**

The meeting of the Special Committee of the Board concerning the BMLP agreement reported upon their meeting of February 14, 1998, and the minutes of that meeting are attached to this Board report. In addition, the Committee also discussed with the Board the additional

Northside Operating Co.
Board of Directors
March 6, 1998
Page Two

materials they had requested from BMLP concerning the new contract. The Committee discussed its meeting of March 3, 1998. The minutes of the March 3, 1998, meeting were provided to the full Board.

The Board entered into a thorough discussion concerning the Committee reports and the Committee's two meetings. Dr. Rosenthal complimented the Committee on its efforts and its thorough review and analysis of the new management contract and Mr. Rogan's compensation for his years of service as NOC's CEO from August, 1994 through November, 1997 and the future assistance he will provide NOC. Further, he stated that he appreciated all the extra time the Committee members had spent in this regard on behalf of the Board.

MSC

That the Board of Directors accept the Committee meetings and recommendations of both February 14 and March 3, 1998, subject to an outside consultant's review.

MSC

That Dr. Rosenthal, given the consent of the bondholders, is authorized to execute, on behalf of NOC, any and all documents relating to the new BMLP Management Agreement between NOC and BMLP. That this Agreement would be effective as previously agreed, August 1, 1997.

D.   Status of Refinancing

Mr. Gross provided the Board with an update concerning the status of the refinancing of the existing debt for NOC. He informed the Board that the refinancing had experienced some delays but nothing unusual had occurred. The results of all of these delays is that it appears the financing will close some time in late April or early May, 1998.

Mr. Gross further reported that although this is resulting in a month's delay, he reminded the Board that the refinancing was still an excellent program for NOC to pursue.

Mr. Gross also presented the resolutions as prepared by Foley & Lardner concerning NOC's financing. The Board reviewed and approved the resolutions attached to these minutes as Exhibit A.

MSC

That the Board of Directors approve the Resolutions of the Board of Directors of Northside Operating Co. d/b/a Edgewater Medical Center as contained in Exhibit A attached to and incorporate as part of this meeting's minutes.

Northside Operating Co.
Board of Directors
March 6, 1998
Page Three

**E.  Hispanic Physicians Network (HPN)**

Mr. Rogan informed the Board that the previously approved investment
in the HPN has been completed and the Network is in the process of
going through its initial implementation. Mr. Rogan noted that a
$500,000.00 investment was made in the Network.

## III.  FACILITY REPORTS

**A.  Review and Approval of Advisory Board Meeting Minutes**

The Advisory Board Meeting minutes of December 3, 1997, were
received, reviewed and approved by the Board of Directors.
**MSC**

That the Advisory Board Meeting minutes be accepted as presented by
the Board.

**B.  Review and Approval of Medical Staff Meeting Minutes**

The Medical Staff Meeting minutes of November and December, 1997 and
January, 1998, were received, reviewed and approved by the Board of
Directors.

**MSC**

That the Medical Staff Meeting minutes be accepted as presented by
the Board.

**C.  Review and Approval of Financial Reports**

The Financial Reports of November and December, 1997 and January,
1998, were received, reviewed and approved by the Board of
Directors.

A thorough discussion occurred concerning the period ending December
31, 1997. Mr. Rogan explained some thirteenth period adjustments to
the financial statement which resulted in operating income reported
in the financial statements for December, 1997, of approximately a
$675,000.00 loss. Prior to the thirteenth period adjustments, NOC
would have had a positive bottom line. Even with these adjustments,
the Institution should have approximately a $14 to $15 Million
bottom line while at the same time increasing its cash equivalents
by approximately $9.8 Million. This $9.8 Million is net of the
approximate $914,000.00 gift and $9.1 Million loan to French
Hospital.

**MSC**

That the Financial Reports be accepted as presented.

EMC 003556

Northside Operating Co.
Board of Directors
rch 6, 1998
ge Four

IV.  BRADDOCK MANAGEMENT, L.P. REPORT

A.  Ambulatory Surgery Center

Mr. Rogan reported that the initial analysis of either building
versus acquiring an ambulatory surgery center has been put on hold.
This is subject to further analysis and any activities NOC might
enter into relevant to Columbia/Grant Hospital.

B.  Columbia/Grant Hospital

Mr. Rogan reported to the Board that Management is proceeding with
its analysis of the Columbia/Grant Hospital opportunity.  He
reported to the Board that a group of physicians at Columbia/Grant
and a healthcare concern have initially entered into a 90 day
standstill agreement with Columbia HCA relative to the acquisition
of Columbia/Grant Hospital.  This 90 day standstill agreement should
expire some time in mid May and it is NOC's intention to be prepared
should the agreement terminate thus allowing NOC into a position to
begin immediate negotiations with Columbia HCA.  Along these lines,
accountants and attorneys have been hired to assist in the
development of the appropriate structure and/or cost associated with
this acquistion.

In addition, Management is also studying and evaluating how this
opportunity might be integrated into the current corporate structure
of NOC and/or Permian and whether any new corporate structure should
be facilitated.

MSC

That the Board approve the actions of Management and further
authorize Management to take the necessary steps to development this
opportunity on a timely basis and to bring it to the Board for
action as soon as appropriate.

C.  Investment Policy

The Committee reported that the development of a new Investment
Policy is currently under way and is dealing with a number of
consultants to assist the Committee.  The Committee has delayed its
deliberation in this area in lieu of the refinancing of debt and
dealing with Credit Local de France (CLF).  In the interim, the
Committee will develop an investment policy acceptable to CLF. It is
anticipated that at the end of the second quarter the Committee will
have a report to the Board.

EMC 003557

Northside Operating Co.
Board of Directors
March 6, 1998
Page Five

D.   **Status of the Friendly Physician Model**

Mr. Gross and Mr. Rogan provided the Board with the status of the
Friendly Physician Model/Acquisition and Management:

**Hispanic Cardiology**

It was reported that the acquisition, as authorized by the Board of
Directors, of this practice has been cancelled.  The reason for this
cancellation is that the physician, at the eleventh hour, decided
that he did not wish to sell his practice.

**Other Primary Care**

• The Far Southside Clinic is currently on hold; and

• The Ilagan practice acquisition has been completed and the
  transaction has closed.

• Other Clinics:

  – Dr. Cherny

    The negotiations for the purchase of this practice are on
    hold;

  – Dr. Kerner

    The negotiations for the acquisition of this practice
    based upon due diligence has resulted in NOC amending its
    purchase price and at the present time, an acquisition
    price in the $75,000 to $100,000 range is anticipated;

  – Dr. Maitar (Devon Practice)

    The negotiations for the acquisition of this practice are
    on hold and it appears this practice will not be acquired.

**MSC**

That the Board accept the Braddock Management, L.P. report and
approve the actions of Management.

EMC 003558

Northside Operating Co.
Board of Directors
March 6, 1998
Page Six

E.    **Hispanic Program**

Mr. Rogan provided an update to the Board on the following:

**Latino Institute/Hispanic Cardiology**

It was reported that the development of the Latino Institute in
concert with the Hispanic Cardiology program is currently in the
planning stages.  The Hispanic Cardiology Program would be open to
all eligible patients and may be integrated into the Ambulatory
Physicians Network.  It is anticipated that the initial annual
expenses associated with promoting this program within the Latino
Institute would be approximately $300,000 to $350,000 per year.

**MSC**

That the Board approve the formation of the Latino Institute with
initial approximate marketing and development expenditures of
$300,000 to $350,000 annually.

**Wellness/Health Education/Screening**

Mr. Rogan also reported on the development of a Wellness/Health
Education Screening Program to be focused on the Hispanic community.
He reported that this would consist of a number of programs
including programs similar to those developed senior programs for
the Chicago Housing Authority along with other outreach and
development programs focused on the underserved population.  Based
upon preliminary analysis, it is expected that annual expenditures
for these programs will be approximately $500,000.00.

**MSC**

That the Board approve the actions of Management in the development
of a Wellness/Health Education Screening Program and outreach
programs.  That the Board approve annual expenditures of
approximately $500,000.00 for the development and implementation of
these programs.

F.    **Ambulatory Physician Network**

Mr. Rogan reported upon discussions and implementation of the
Ambulatory Physician Network in concert with NOC's teaching
responsibilities for its residency program, the relationships with
Midwestern University for the education of medical students, interns
and residents and its community outreach program. It is anticipated
that the infrastructure will be in place for the Ambulatory
Physician Network by June, 1998 and that the implementation of these
systems will begin in July, 1998.  A

Northside Operating Co.
Board of Directors
March 6, 1998
Page Seven

thorough discussion by the Board occurred concerning the focus and the need for NOC to provide these outreach programs and the medical education component associated with NOC's mission as a teaching hospital. In addition, the Board also discussed the ongoing cost associated with this and agreed that these costs complimented NOC's mission as a community based teaching institution. Furthermore, the Board understood that there would be additional expenditures for the implementation of these programs in addition to the infrastructure systems for the network reporting and the physician billing component. These additional expenditures could range up to $1 Million.

**MSC**

That the Board approve the actions taken by Management to date relative to the Ambulatory Physicians Network and that the Board authorize Management to take all necessary actions or expenditures to complete and implement the Network.

G. **Joint Commission Accreditation of Healthcare Organizations (JCAHO)**

Mr. Gross reported that NOC's JCAHO Survey should be coming up in the Fall of this year. Management is currently reviewing and updating all programs and policies and procedures to be in compliance with the new JCAHO standards. It is anticipated that a number of policies and procedures may be changed or modified to more reflect the current thinking of JCAHO. Mr. Gross reminded the Board that although this is an ongoing process at NOC, some last minute items may arise which may need addressing by the Board.

**MSC**

That the Board accept Management's report in this area and asked to be kept informed.

H. **Compliance Program Update**

Mr. Gross reported to the Board that per the previous minutes and actions of the Board authorizing the implementation of a Compliance Program, Mr. Gross reminded the Board that NOC had already instituted this in the billing area some time ago both in the 72 Hour Review and in the Lab Unbundling Review. Under both of these audit programs instituted by NOC they had excellent results. In addition, a number of years ago, NOC had already implemented an independent review of its billing procedures. This coupled with the review by Drinker, Biddle & Reath places NOC in an excellent position. Nonetheless, Mr. Gross reported that NOC is pursuing the formalization of a Compliance Program and integrating all of the independent actions NOC has already implemented.

EMC 003569

Northside Operating Co.
Board of Directors
March 6, 1998
Page Eight

I.   4th Quarter Trustee Report

Mr. Rogan reported that the 4th Quarter Trustee Report will be
prepared in the next few weeks and will be sent to the Trustee. This
is being developed to be complimentary to the refinancing.   Mr.
Rogan will provide the Board a copy of the 4th Quarter Trustee Report
at the next scheduled Board of Directors Meeting.

MSC

The Board approved Management's actions regarding the 4th Quarter
Trustee Report.

J.   Radiology Equipment Upgrades

Mr. Rogan discussed the need to upgrade three pieces of radiology
equipment.  Mr. Rogan discussed the existing prices of equipment.
The approximate total costs for the radiology equipment and
associated costs will be approximately $500,000 to $600,000.

MSC

That the Board approve the use of tax exempt financing for the
radiology equipment update projects (see attached Resolution).

MSC

That the Board approve radiology equipment upgrades for a total cost
of approximately $500,000 to $600,000.

NEW BUSINESS

A.   Review and Approval of New Physician, and Other Contracts

Mr. Rogan presented and reviewed the physician contracts which
primarily pertain to administrative and/or teaching
responsibilities for the included physicians.

| | |
|---|---|
| Nalini Ahluwalia, M.D. | Salud Martinez, M.D. |
| Mir Akif Ali, M.D. | Rogelio Maynulet, M.D. |
| Emmanuel Alzona, M.D. | Luis Mendoza, M.D. |
| Ismail Atcha, M.D. | Michael Morgenstern, M.D. |
| Ravi Barnabas, M.D. | Mario Oliveros, M.D. |
| Emo Bonaminio, D.P.M. | Robert Ramoska, D.P.M. |
| Ioan Cheregi, M.D. | Ali Riazi, M.D. |
| Yuri Cherny, M.D. | Anton J. Rittling, D.C. |
| Robert Cohen, M.D. | Bella Rozentsvagy, M.D. |
| Consultants in Neurology | Nunilo Rubia, M.D. |
| Michael J. Fox, D.P.M. | Gonzalo Ruiz, M.D.        EMC 003561 |

Northside Operating Co.
Board of Directors
March 6, 1998
Page Nine

**MSC**

That the Board approve the physician contracts as presented.

- Mr. Rogan presented and reviewed the other contracts with the Board.

Emergency Medical Associates of Illinois, Inc.
Excellcare, Inc.
The Helix Group
Hospice of Integrated Health Services, Inc.
IMSMaster
Special Care Hospital Management Corporation
Universal Geriatric Services

**MSC**

That the Board approve the other contracts as presented.

B. **Committee Report - Strategic Positioning for the Chicago Area**

The Special Committee of the Board regarding strategic positioning for NOC in the Chicago area market reported on its meeting held on February 14, 1998. The Committee provided the Board with a thorough report of its deliberations. In addition, the Committee recommended to the Board that NOC should pursue a number of development opportunities and that each of these opportunities should be entered into without any preconceived notions as to which organizational arrangement would best meet any and all circumstances.

The Board entered into thorough discussions regarding the Committee's report. After much discussion, it was concluded that the Committee's report be accepted by the Board and that the Board direct Management to pursue a variety of opportunities for strengthening NOC's position in the market place.

The Board also concluded that it would be in the best interest of both NOC and Permian as a whole that NOC have the opportunities to pursue these strengthening opportunities in a manner best suited to NOC. As such, the Board believed that an independent analysis of each opportunity would be most appropriate and that the appropriate organizational structure should be devised for each opportunity.

The Board complimented the Committee on its thorough analysis and thanked the Committee for its time and efforts. The Board further stated that it was in concurrence with the Committee in all of its deliberations.

EMC 003562

Northside Operating Co.
Board of Directors
March 6, 1998
Page Ten

### MSC

That the Board accept the Committee's report and direct Management to pursue opportunities in the Chicago market and to develop appropriate organizational structures to best meet those opportunities. Once these organizational structures are developed, Management should report back to the Board so the Board could analyze and determine the best interest of NOC and Permian Healthcare.

C.   **Appointment of Independent Auditors**

Mr. Gross reported to the Board concerning the analysis NOC had performed in selecting its new independent auditors. Mr. Gross reminded the Board of the analysis performed by NOC in requesting proposals from Arthur Andersen, Deloitte & Touche, McGladrey & Pullen, LLP, BDO Seidman and Philip Rootberg. The Board reviewed the analysis and reviewed the information provided by the appropriate accounting firms who had submitted proposals. The Board accepted the proposal from McGladrey & Pullen, LLP to serve as independent accountants for NOC.

### MSC

That the Board appoint McGladrey & Pullen, LLP, as the independent accountants for NOC. That the Board direct Management to develop a Letter of Undertstanding with McGladrey & Pullen, LLP. Furthermore, that the Board direct Management to take any and all actions to enter into an agreement with McGladrey & Pullen, LLP, to serve as independent accountants for NOC.

EMC 003563

Northside Operating Co.
Board of Directors
March 6, 1998
Page Eleven

VI.   ADJOURNMENT

MSC

There being no further business, a motion for adjournment was moved, duly
seconded and carried.

APPROVE:                                    ATTEST:


Bertram P. Rosenthal, M.D.                  William D. Fruland
President                                   Secretary

EMC 003564

IOC0306.MIN

# Exhibit

# 62

**$55,000,000**
**Illinois Health Facilities Authority**
**Edgewater Medical Center**

**Distribution List**

_**Issuer**_

Illinois Health Facilities Authority
Two Prudential Plaza
180 N. Stetson Avenue
Suite 1100
Chicago, Illinois 60601

      Mary M. McInerney, Executive Director          Phone:     312/861-4445
                                                Fax:        312/861-4458

_**Issuer's Counsel**_

Sidley & Austin
One First National Plaza
Chicago, Illinois 60603

      Richard W. Astle, Esq.                 Phone:     312/853-7270
                                            Fax:        312/853-7036

_**Financial Advisor**_

Ponder & Company
Two Prudential Plaza
180 North Stetson Avenue
Suite 1120
Chicago, Illinois 60601

      Benson T. Caswell, Senior Vice President       Phone:     312/565-3240
                                                Fax:        312/565-2883

DEFENDANT'S
EXHIBIT
62
PENGAD-Bayonne, N.J.

CHMAIN02: 217358_1.WPD
Printed: 03/04/98 06:33PM

Arent Fox 000072

*__Borrower__*

Northside Operating Co.
d/b/a Edgewater Medical Center
5700 North Ashland
Chicago, Illinois 60660

|  |  |  |
|---|---|---|
| Peter Rogan, Chief Executive Officer | Phone: | 773/878-6000 |
|  | Fax: | 773/878-6151 |
| Henry Zeisel, Vice President of Finance | Phone: | 773/878-6000 |
|  | Fax: | 773/878-1568 |

*__Edgewater Medical Center Management__*

Braddock Management, L.P.
c/o Primus Management, Inc.
One Eleven Sutter Street, Suite 2150
San Francisco, California 94104

|  |  |  |
|---|---|---|
| Daniel F. Finnane, Vice President | Phone: | 415/627-0755 |
|  | Fax: | 415/627-0766 |

Braddock Management, L.P.
c/o Primus Management, Inc.
1315 West 22nd Street, Suite 225
Oakbrook, Illinois 60523

|  |  |  |
|---|---|---|
| Michael E. Olsen, Esq. | Phone: | 630/573-1726 |
|  | Fax: | 630/472-5115 |

*__Borrower's Counsel__*

Foley, Lardner, Weissburg & Aronson
One IBM Plaza
Suite 3300
330 North Wabash Avenue
Chicago, Illinois 60611

|  |  |  |
|---|---|---|
| Robert J. Zimmerman, Esq. | Phone: | 312/755-2521 |
| Joel S. Dalinka, Esq. |  | 312/755-2571 |
|  | Fax: | 312/755-1925 |

Arent Fox 000073

***Bond Counsel***

Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601-1692

| | | |
|---|---|---|
| Lynn L. Coe, Esq. | Phone: | 312/269-4077 |
| John F. Bibby, Esq. | Phone: | 312/269-4240 |
| Peter G. Lawrence, Esq. | Phone: | 312/269-4093 |
| | Fax: | 312/782-8585 |

***Underwriter***

Cain Brothers & Company, Inc.
452 Fifth Avenue
25th Floor
New York, New York 10018

| | | |
|---|---|---|
| Thomas M. Barry, Vice President | Phone: | 212/869-5600 |
| Matthew H. Goldreich, Vice President | Phone: | 212/869-5600 |
| Mary Park, Associate | Phone: | 212/869-5600 |
| | Fax: | 212/869-6418 |

***Underwriter's Counsel***

Ballard Spahr Andrews & Ingersoll
Mellon Bank Center
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599

| | | |
|---|---|---|
| J. Brian Walsh, Esq. | Phone: | 215/864-8510 |
| Barbara Beckman | Phone: | 215/864-8410 |
| | Fax: | 215/864-8999 |

***Letter of Credit Provider***

Credit Local de France
450 Park Avenue, 3rd Floor
New York, New York 10022

| | | |
|---|---|---|
| John Flaherty, Vice President | Phone: | 212/753-2601 |
| | Fax: | 212/753-5522 |

Arent Fox 000074

**_Letter of Credit Provider's Counsel_**

Arent Fox Kintner Plotkin & Kahn
1050 Connecticut Avenue N.W.
Washington, D.C. 20036

      Arlene Fine, Esq.

| | |
|---|---|
| Phone: | 202/857-6201 |
| Fax: | 202/857-6395 |

**_Foreign Bank Counsel_**

Gide Loyrette Nouel
Swiss Bank Tower
10 East 50th Street
New York, New York 10022

      Gilles Saint Marc, Esq.

| | |
|---|---|
| Phone: | 212/644-1201 |
| Fax: | 212/644-1205 |

**Arent Fox 000075**

# Exhibit

# 63

NEW ISSUE
BOOK ENTRY ONLY

Ratings: Moody's: Aa1/VMIG-1
(See "RATINGS" herein)

*Subject to compliance by the Authority and the Corporation with certain covenants, in the opinion of Jones, Day, Reavis & Pogue, Bond Counsel, under present law, interest on the Series 1998 Bonds will not be includable in gross income of the owners thereof for federal income tax purposes and will not be treated as an item of tax preference in computing the alternative minimum tax for individuals and corporations. Interest on the Series 1998 Bonds will be taken into account, however, in computing the corporate alternative minimum tax and branch profits tax. See the heading "TAX-EXEMPTION" herein for a more detailed discussion of some of the federal tax consequences of owning the Series 1998 Bonds. Interest on the Series 1998 Bonds is not exempt from present Illinois income taxes.*



$55,000,000
# ILLINOIS HEALTH FACILITIES AUTHORITY
## VARIABLE RATE DEMAND REVENUE BONDS
### (EDGEWATER MEDICAL CENTER)

$44,475,000
Variable Rate Demand Revenue Bonds,
Series 1998A

$10,525,000
Variable Rate Demand Revenue Bonds,
Series 1998B

Dated: May 1, 1998
Due: July 1, 2031
Price: 100%, plus accrued interest

Dated: Date of Issuance
Due: July 1, 2031
Price: 100%

The Illinois Health Facilities Authority (the "Authority") is offering its $44,475,000 Variable Rate Demand Revenue Bonds, Series 1998A (Edgewater Medical Center) (the "Series 1998A Bonds") and its $10,525,000 Variable Rate Demand Revenue Bonds. Series 1998B (Edgewater Medical Center) (the "Series 1998B Bonds" and, together with the Series 1998A Bonds, the "Series 1998 Bonds"). The Series 1998 Bonds are issued under and pursuant to a Bond Trust Indenture dated as of May 1, 1998 (the "Bond Indenture") between the Authority and LaSalle National Bank, Chicago, Illinois, as bond trustee (the "Bond Trustee"). Except to the extent payable from Series 1998 Bond proceeds or moneys derived from the investment thereof and certain insurance and condemnation proceeds, the Series 1998 Bonds are payable solely from the payments to be received by the Authority pursuant to a Loan Agreement dated as of May 1, 1998 (the "Loan Agreement") between the Authority and Northside Operating Co. d/b/a Edgewater Medical Center (the "Corporation") and the Corporation's Direct Note Obligation, Series 1998A and Direct Note Obligation, Series 1998B (collectively, the "Series 1998 Obligations") each issued under and pursuant to an Amended and Restated Master Trust Indenture dated as of May 1, 1998 between the Corporation and LaSalle National Bank, as master trustee.

In addition, payment of the principal of, interest on, and purchase price of Series 1998 Bonds tendered for purchase and not remarketed will be secured by an irrevocable direct pay letter of credit (the "Initial Letter of Credit") issued by

# CREDIT LOCAL de FRANCE

acting through its New York Agency. The Initial Letter of Credit will expire on July 5, 2004, subject to extension or earlier termination as described herein and will permit the Bond Trustee to make drawings thereunder of (i) an amount not exceeding the aggregate principal amount of the Series 1998 Bonds outstanding and (ii) an amount not exceeding 205 days' interest on the Series 1998A Bonds at the rate of 4.70% per annum plus 56 days' interest on the Series 1998B Bonds at the rate of 12% per annum.

The Series 1998 Bonds are issuable as fully registered bonds without coupons, and when issued, will be registered in the name of Cede & Co., as Bondholder and nominee for The Depository Trust Company ("DTC"), New York, New York. DTC will act as Securities Depository for the Series 1998 Bonds. Purchases of the Series 1998 Bonds may be made only in book-entry form, initially in denominations of $5,000 or integral multiples thereof, with respect to the Series 1998A Bonds, and denominations of $100,000 and integral multiples of $5,000 in excess thereof, with respect to the Series 1998B Bonds. No physical delivery of the Series 1998 Bonds will be made to beneficial owners, except as described herein. The principal and tender price of and interest on the Series 1998 Bonds will be paid directly to DTC, so long as DTC or its nominee is the registered holder of the Series 1998 Bonds. The disbursements of such payments to the beneficial owners of the Series 1998 Bonds will be the responsibility of DTC Participants, all as more fully described herein under "BOOK-ENTRY-ONLY SYSTEM."

The Series 1998A Bonds will be initially issued in the Adjustable Long Mode for a Rate Period ending June 30, 2004 and during such period will bear interest at a fixed rate of 4.70% per annum. Interest on the Series 1998A Bonds during the initial Rate Period will be payable on July 1, 1998 and on each January 1 and July 1 thereafter. On July 1, 2004, the Series 1998A Bonds will be converted to the Weekly Mode as described herein.

The Series 1998B Bonds will be initially issued in the Weekly Mode and will bear interest at a Weekly Rate determined by Cain Brothers & Company, LLC, as the Remarketing Agent, as described herein. Interest on the Series 1998B Bonds while bearing interest at a Weekly Rate generally will be payable on the first Business Day of each calendar month commencing on July 1, 1998 until redemption, maturity or conversion to a different rate period as described herein.

All or any portion of either series of Series 1998 Bonds may be converted to a Daily Mode, Weekly Mode, Quarterly Mode, Semiannual Mode, Adjustable Long Mode, Commercial Paper Mode or Fixed Mode, as described herein. THIS OFFICIAL STATEMENT ONLY DESCRIBES THE TERMS AND PROVISIONS OF THE SERIES 1998 BONDS AND THE DOCUMENTS RELATING THERETO WHILE THE SERIES 1998 BONDS ARE IN THE DAILY MODE, WEEKLY MODE OR ADJUSTABLE LONG MODE. See "THE SERIES 1998 BONDS—General."

The Series 1998 Bonds are subject to optional and mandatory sinking fund redemption prior to maturity as described herein, and are also subject to mandatory and optional tender for purchase at a purchase price equal to the principal amount thereof plus accrued and unpaid interest to the date of purchase as described herein; provided that the Series 1998A Bonds are not subject to optional tender for purchase prior to July 1, 2004. See "THE SERIES 1998 BONDS—Tenders" and "—Redemption of Series 1998 Bonds."

THE SERIES 1998 BONDS ARE LIMITED OBLIGATIONS OF THE AUTHORITY AND ARE NOT A DEBT OR LIABILITY OF THE STATE OF ILLINOIS OR ANY POLITICAL SUBDIVISION OR AGENCY THEREOF OTHER THAN THE AUTHORITY. THE SOURCE OF PAYMENT OF AND SECURITY FOR THE SERIES 1998 BONDS IS MORE FULLY DESCRIBED HEREIN. THE AUTHORITY HAS NO TAXING POWER.

This cover page contains certain information for immediate reference only. It is not intended to be a complete summary of the terms of or security for the Series 1998 Bonds. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.

*The Series 1998 Bonds are offered when, as and if issued and received by the Underwriter, subject to prior sale, withdrawal or modification of the offer without any notice, and to final approval of the Series 1998 Bonds by the Authority and to the approval of legality of the Series 1998 Bonds by Jones, Day, Reavis & Pogue, Chicago, Illinois, Bond Counsel to the Authority. Certain legal matters will be passed upon for the Authority by its general counsel, Sidley & Austin, Chicago, Illinois; for the Corporation by its counsel, Foley & Lardner, Chicago, Illinois; for the Underwriter by its counsel, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania; and for Credit Local de France by its counsel, Arent Fox Kintner Plotkin & Kahn, PLLC, and Gide Loyrette Nouel. The Series 1998 Bonds are expected to be available for delivery to DTC in New York, New York on or about June 9, 1998.*

# CAIN BROTHERS

May 20, 1998

DEFENDANT'S
EXHIBIT
63
PENGAD-Bayonne, N. J.

E002948

19895

No dealer, broker, salesperson or other person has been authorized by any of the Illinois Health Facilities Authority (the "Authority"), Northside Operating Co. d/b/a Edgewater Medical Center (the "Corporation"), Credit Local de France (the "Initial Bank"), or Cain Brothers & Company, LLC (the "Underwriter") to give any information or to make any representations with respect to the Series 1998 Bonds, other than those in this Official Statement, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 1998 Bonds by any person in any state in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth herein has been obtained from the Authority (but only with respect to the Authority), the Corporation, the Initial Bank, The Depository Trust Company ("DTC") and other sources that are believed to be reliable, but the Underwriter does not guarantee the accuracy or completeness of the information and such information is not to be construed as a representation by the Underwriter or, as to information from sources other than the Authority, by the Authority. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority, the Corporation or the Initial Bank since the date hereof.

OTHER THAN WITH RESPECT TO INFORMATION CONCERNING THE AUTHORITY UNDER THE CAPTIONS "THE AUTHORITY" AND "LITIGATION — THE AUTHORITY," NONE OF THE INFORMATION IN THIS OFFICIAL STATEMENT HAS BEEN SUPPLIED OR VERIFIED BY THE AUTHORITY, AND THE AUTHORITY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.

THE SERIES 1998 BONDS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, NOR HAVE THE BOND INDENTURE OR THE MASTER INDENTURE BEEN QUALIFIED UNDER THE TRUST INDENTURE ACT OF 1939, IN RELIANCE UPON EXEMPTIONS CONTAINED IN SUCH ACTS.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITER MAY OVERALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE SERIES 1998 BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING TRANSACTIONS, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

19896

E002949

TABLE OF CONTENTS

INTRODUCTORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
THE AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
THE CORPORATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
THE SERIES 1998 BONDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
BOOK-ENTRY ONLY SYSTEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
PLAN OF FINANCING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
ESTIMATED SOURCES AND USES OF FUNDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
ANNUAL DEBT SERVICE REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
SECURITY FOR THE SERIES 1998 BONDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
CREDIT AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
THE INITIAL BANK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
BONDHOLDERS' RISKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
TAX EXEMPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
POTENTIAL CONFLICT FOR MASTER TRUSTEE . . . . . . . . . . . . . . . . . . . . . . . . . . 49
LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
VERIFICATION OF COMPUTATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
CONTINUING DISCLOSURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
RATINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
UNDERWRITING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
INDEPENDENT AUDITORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

APPENDIX A — NORTHSIDE OPERATING CO. D/B/A EDGEWATER MEDICAL CENTER
APPENDIX B — AUDITED FINANCIAL STATEMENTS
APPENDIX C — SUMMARY OF PRINCIPAL DOCUMENTS AND
                DEFINITIONS OF CERTAIN TERMS
APPENDIX D — PROPOSED FORM OF OPINION OF BOND COUNSEL

19897

E002950

[THIS PAGE INTENTIONALLY LEFT BLANK]

19898

E002951

OFFICIAL STATEMENT

Relating to the Initial Issuance of

$55,000,000
Illinois Health Facilities Authority
Variable Rate Demand Revenue Bonds
(Edgewater Medical Center)
consisting of

| $44,475,000 | $10,525,000 |
|---|---|
| Variable Rate Demand Revenue Bonds, Series 1998A | Variable Rate Demand Revenue Bonds, Series 1998B |

## INTRODUCTORY STATEMENT

The descriptions and summaries of various documents hereinafter set forth do not purport to be comprehensive or definitive, and reference is made to each document for the complete details of all terms and conditions. All statements herein regarding any such documents are qualified in their entirety by reference to such documents. This Introductory Statement is intended only to serve as a brief description of the Official Statement and is expressly qualified by reference to the Official Statement as a whole, as well as the documents summarized or described herein (all references to this Official Statement include the cover page, inside front cover page and appendices). All capitalized terms used in this Official Statement and not otherwise defined herein have the meanings set forth in "APPENDIX C—SUMMARY OF PRINCIPAL DOCUMENTS AND DEFINITIONS OF CERTAIN TERMS." For more detailed descriptions of the matters summarized below, see the information set forth in the specific sections of the Official Statement noted below.

### Purpose of this Official Statement

The purpose of this Official Statement is to set forth certain information in connection with the offering by the Illinois Health Facilities Authority (the "Authority") of $44,475,000 aggregate principal amount of its Variable Rate Demand Revenue Bonds, Series 1998A (Edgewater Medical Center) (the "Series 1998A Bonds") and $10,525,000 aggregate principal amount of its Variable Rate Demand Revenue Bonds, Series 1998B (Edgewater Medical Center) (the "Series 1998B Bonds" and, together with the Series 1998A Bonds, the "Series 1998 Bonds"). The Series 1998 Bonds will be issued in accordance with the laws of the State of Illinois (the "State"), particularly the Illinois Health Facilities Authority Act (the "Act") and a resolution (the "Resolution") duly adopted by the Authority, and pursuant to and in accordance with the provisions of the Bond Trust Indenture dated as of May 1, 1998 between the Authority and LaSalle National Bank, Chicago, Illinois, as Bond Trustee thereunder (the "Bond Indenture"). LaSalle National Bank, Chicago, Illinois, is also acting as tender agent for the Series 1998 Bonds (the "Tender Agent").

19899

E002952

**Purpose of the Series 1998 Bonds**

The proceeds of the sale of the Series 1998 Bonds will be loaned to Northside Operating Co., d/b/a Edgewater Medical Center (the "Corporation") pursuant to a Loan Agreement dated as of May 1, 1998 (the "Loan Agreement") between the Authority and the Corporation. Proceeds of the Series 1998 Bonds will be used, together with other available funds, to (i) advance refund the Authority's Revenue Bonds, Series 1994A (Edgewater Hospital and Medical Center) (the "Series 1994 Bonds"), $40,400,000 of which are currently outstanding; (ii) pay or reimburse the Corporation for the payment of certain costs of acquiring, constructing, renovating, remodeling and equipping certain health facilities of the Corporation (the "Project"); and (iii) pay certain expenses incurred in connection with the issuance of the Series 1998 Bonds and the advance refunding of the Series 1994 Bonds, as more fully set forth herein under the caption entitled "PLAN OF FINANCING."

**The Corporation**

The Corporation, an Illinois not for profit corporation, currently owns and operates an acute care hospital facility licensed for 335 beds (of which 201 are currently staffed) located on the north side of Chicago. As of the date of issuance of the Series 1998 Bonds, the Corporation will be the only Member of the Obligated Group, as such term is used in the Master Indenture (as hereinafter defined). Other entities may become Members of the Obligated Group in accordance with the procedures set forth in the Master Indenture and thereby obligated, jointly and severally, with the Corporation under the Master Indenture with respect to all Obligations secured thereby; however, the Corporation has no intention of adding additional Members to the Obligated Group in the immediately foreseeable future. See "APPENDIX C — Summary of Certain Provisions of the Master Indenture — Entrance into the Obligated Group."

**Interest Rate and Tender**

The Series 1998A Bonds will be initially issued in the Adjustable Long Mode for a Rate Period ending June 30, 2004 and during such period will bear interest at a fixed rate of 4.70% per annum. On July 1, 2004, the Series 1998A Bonds will be converted to the Weekly Mode, subject to the provisions of the Bond Indenture. The Series 1998B Bonds will be initially issued in the Weekly Mode and will bear interest at a Weekly Rate determined as described herein under the caption "THE SERIES 1998 BONDS—Determination of Interest Rates." All or any portion of either series of Series 1998 Bonds may be converted to a different Mode as described herein under the caption "THE SERIES 1998 BONDS — Conversions." The interest rate on the Series 1998 Bonds may not exceed the lesser of 15% per annum or the maximum rate permitted by law and at no time shall a Series 1998 Bond entitled to the benefit of a Credit Agreement (as defined herein) bear interest at a rate exceeding the Interest Coverage Rate.

As described herein under the caption "THE SERIES 1998 BONDS — Tenders — Optional Tenders," holders of Series 1998 Bonds in a Daily or Weekly Mode will have the right to tender their Series 1998 Bonds for purchase at any time at a price of 100% of the principal amount thereof plus any accrued and unpaid interest (the "Tender Price"). Holders of Series 1998 Bonds in an Adjustable Long Mode will have the right to tender their Series 1998 Bonds for purchase at a price of 100% of the principal amount thereof only on the first Business Day following a Rate Period. The Series 1998A Bonds are not subject to tender at the option of the holders thereof prior to July 1, 2004 and are subject to mandatory tender for purchase on July 1, 2004 in connection with the conversion of the Series 1998A

**19900**

2

E002953

Bonds to the Weekly Mode. In addition, holders of the Series 1998 Bonds may be required to tender their Series 1998 Bonds for purchase at the Tender Price in other certain circumstances as described herein under the caption "THE SERIES 1998 BONDS — Tenders — Mandatory Tenders."

Cain Brothers & Company, LLC (the "Remarketing Agent,") will (subject to certain limitations described herein) remarket Series 1998 Bonds that are tendered or deemed tendered for purchase pursuant to the provisions of the Bond Indenture, and the Remarketing Agent will perform certain interest rate-setting functions, as described herein under the caption "THE SERIES 1998 BONDS — Determination of Interest Rate." The Remarketing Agent has entered into a Remarketing Agreement dated as of May 1, 1998 with the Corporation (the "Remarketing Agreement"). The Remarketing Agreement provides, among other things, for the remarketing of Series 1998 Bonds tendered or deemed tendered for purchase and the performance by the Remarketing Agent of such interest rate-setting functions.

The procedures to be followed in connection with tenders of Series 1998 Bonds for purchase are described under the caption "THE SERIES 1998 BONDS — Tenders" and, so long as the Series 1998 Bonds are in the Book-Entry System, under the caption "BOOK-ENTRY SYSTEM."

### Letter of Credit

Under the Loan Agreement, the Corporation is required to provide a letter of credit or other credit facility (a "Credit Agreement") issued by a financial institution which provides security for the payment of the principal of and interest on the Series 1998 Bonds (other than Series 1998 Bonds bearing interest at a Fixed Rate) when due and for the payment of the purchase price of Bonds tendered for purchase as provided in the Bond Indenture. Upon the issuance of the Series 1998 Bonds, the Corporation will cause to be delivered to the Bond Trustee an irrevocable direct pay letter of credit (the "Initial Letter of Credit") issued by Credit Local de France, acting through its New York Agency (the "Initial Bank"), providing for direct payments to or upon the order of the Bond Trustee of up to (i) an amount equal to the outstanding principal amount of the Series 1998 Bonds to be used (A) to pay the principal of the Series 1998 Bonds (other than Pledged Bonds and Obligated Group Bonds) bearing interest at a rate other than the Fixed Rate, and (B) to enable the Bond Trustee to pay the portion of the purchase price equal to the principal amount of Series 1998 Bonds tendered or deemed tendered for purchase and not remarketed, plus (ii) an amount equal to 205 days' accrued interest on the Series 1998A Bonds (calculated at a rate of 4.70% per annum) plus 56 days' accrued interest on the Series 1998B Bonds (calculated at a rate of 12% per annum) to be used (A) to pay interest on the Series 1998 Bonds or (B) to pay the portion of the purchase price of Series 1998 Bonds tendered or deemed tendered for purchase equal to the accrued interest, if any, on such Series 1998 Bonds. The Initial Letter of Credit expires on July 5, 2004, unless extended or earlier terminated as provided therein. The Initial Letter of Credit will be issued pursuant to a Reimbursement and Credit Agreement dated as of May 1, 1998 between the Corporation and the Initial Bank (the "Reimbursement Agreement"). In certain circumstances described in "APPENDIX C — Summary of Certain Provisions of the Bond Indenture — Substitute Credit Agreement," the Corporation may substitute a new Credit Agreement for the Credit Agreement then in effect. Under certain circumstances, the Series 1998 Bonds will be subject to mandatory tender for purchase prior to the substitution, expiration or termination of the Credit Agreement as described under the caption "THE SERIES 1998 BONDS — Mandatory Tenders."

3

**19901**

E002954

The Initial Letter of Credit is the principal security for the Series 1998 Bonds. Prospective investors in the Series 1998 Bonds should base their credit analysis on their evaluation of the financial strength of the Initial Bank. See "THE INITIAL BANK" and "BONDHOLDERS' RISKS — Creditworthiness of the Initial Bank" herein. Upon the occurrence of an "event of default" under the Reimbursement Agreement, the Initial Bank may, at its option, direct the Bond Trustee to call the Series 1998 Bonds for mandatory tender for purchase. See "CREDIT AGREEMENT — The Reimbursement Agreement — Events of Default" and "BONDHOLDERS' RISKS — Prepayment Risks" herein.

## Security and Sources of Payment for the Series 1998 Bonds

To evidence and secure the loan made by the Authority to the Corporation pursuant to the Loan Agreement, the Corporation will execute, issue and deliver to the Authority its Direct Note Obligation, Series 1998A in a principal amount equal to the aggregate principal amount of the Series 1998A Bonds (the "Series 1998A Obligation") and its Direct Note Obligation, Series 1998B in a principal amount equal to the aggregate principal amount of the Series 1998B Bonds (the "Series 1998B Obligation" and, together with the Series 1998A Obligation, the "Series 1998 Obligations").

The Authority will pledge and assign the Series 1998 Obligations and certain of its rights under the Loan Agreement to the Bond Trustee as security for the Series 1998 Bonds. The terms of the Loan Agreement and the Series 1998 Obligations require payments by the Corporation which, together with other moneys available therefor (and interest earned thereon), will be sufficient to provide in the aggregate for the payment of the principal of, premium, if any, and interest on the Series 1998 Bonds. The Series 1998 Obligations will be issued pursuant to the Amended and Restated Master Trust Indenture dated as of May 1, 1998 (the "Master Indenture") between the Corporation and LaSalle National Bank, Chicago, Illinois, as Master Trustee (the "Master Trustee"), which amends and restates the Master Trust Indenture dated as of July 1, 1994 between the Corporation and the Master Trustee. The Series 1998 Obligations will entitle the Bond Trustee, as the holder thereof, to the protection of the covenants, restrictions and other obligations imposed upon the Corporation and any future Members of the Obligated Group by the Master Indenture. The Corporation will also execute, issue and deliver its Direct Note Obligation, Series 1998C (the "Initial Credit Obligation"), payable to the Initial Bank to evidence and secure the Corporation's payment obligations under the Reimbursement Agreement.

The Series 1998 Obligations and the Initial Credit Obligation and all other Obligations issued under the Master Indenture (collectively, the "Obligations") are and will be equally and ratably secured under the Master Indenture. Each Obligation is the unlimited general obligation of the Corporation and any future Members of the Obligated Group and is secured by a pledge of the Unrestricted Receivables of the Corporation and any future Member of the Obligated Group. The Corporation's obligations under the Master Indenture will also be secured by a Mortgage and Security Agreement dated as of July 1, 1994, as amended by a First Supplemental Mortgage and Security Agreement dated as of May 1, 1998 (collectively, the "Mortgage"), pursuant to which the Corporation has granted to the Master Trustee a mortgage lien on and security interest in the real estate, buildings, fixtures and improvements constituting the Corporation's acute care hospital facility (the "Mortgaged Property"). However, the Initial Bank may, without the consent of or notice to any of the Owners of the Series 1998 Bonds, consent to the release of the lien and security interest of the Mortgage. In addition, the Mortgage may be released without the consent of or notice to Owners of the Series 1998 Bonds upon the expiration or termination of the Initial Letter of Credit. Upon such release, the Obligations (including the Series 1998 Obligations)

**19902**

4

E002955

issued under the Master Indenture would no longer be entitled to a mortgage lien or security interest in the Mortgaged Property.

The Corporation and any future Members of the Obligated Group have also agreed under the Master Indenture to subject themselves to various operational and financial restrictions. See "APPENDIX C — Summary of Certain Provisions of the Master Indenture — The Obligations; Payment of the Series 1998 Obligations." As of the date of issuance of the Series 1998 Bonds, the Corporation will be the only Member of the Obligated Group, as such term is used in the Master Indenture. Other entities may become Members of the Obligated Group in accordance with the procedures set forth in the Master Indenture and thereby obligated, jointly and severally, with the Corporation under the Master Indenture with respect to all Obligations secured thereby; however, the Corporation has no intention of adding additional Members to the Obligated Group in the immediately foreseeable future. See "APPENDIX C — Summary of Certain Provisions of the Master Indenture — Entrance into the Obligated Group."

Under certain circumstances, the Bond Indenture permits the Bond Trustee to exchange the Series 1998 Obligations for other obligations issued by a credit group different from the Obligated Group under a replacement master indenture. See "SECURITY FOR THE SERIES 1998 BONDS."

The Series 1998 Bonds do not constitute a debt or liability of the State of Illinois (the "State") or of any political subdivision thereof, or a pledge of the faith and credit of the Authority or the State or any political subdivision thereof other than the Authority, but shall be payable solely from the funds pledged therefor in accordance with the Bond Indenture. The issuance of the Series 1998 Bonds does not, directly, indirectly or contingently, obligate the Authority or the State or any political subdivision thereof to levy any form of taxation for the payment thereof or to make any appropriation for their payment. The Series 1998 Bonds and the interest and premium, if any, payable thereon do not now and shall never constitute a debt of the State within the meaning of the Constitution or the statutes of the State and do not now and shall never constitute a charge against the credit or taxing power of the State or any political subdivisions thereof, including the Authority. The State shall not in any event be liable for the payment of the principal of, premium, if any, or interest on the Series 1998 Bonds or for the performance of any pledge, mortgage, obligation or agreement of any kind whatsoever which may be undertaken by the Authority. No breach by the Authority of any such pledge, mortgage, obligation or agreement may impose any liability, pecuniary or otherwise, upon the State or any charge upon its general credit or against its taxing power. The Authority has no taxing power.

**Additional Indebtedness**

In certain circumstances, the Corporation or any future Member of the Obligated Group may incur additional indebtedness and may issue additional Obligations under the Master Indenture to the Authority or to persons other than the Authority, that will not be pledged under the Bond Indenture but will be equally and ratably (except as described herein) secured with the Series 1998 Obligations. See "APPENDIX C — Summary of Certain Provisions of the Master Indenture — Permitted Indebtedness" herein.

**Bondholders' Risks**

Certain risk factors associated with the purchase of the Series 1998 Bonds are described under the caption "BONDHOLDERS' RISKS" herein.

**19903**

5

**E002956**