**Availability of Documents**

This Official Statement speaks only as of its date, and the information contained herein is subject to change. This Official Statement will be made available prior to the issuance and sale of the Series 1998 Bonds through Cain Brothers & Company, LLC, 452 Fifth Avenue, New York, New York 10018, (212) 869-5600.

Descriptions of the Series 1998 Bonds, the Bond Indenture, the Loan Agreement, the Master Indenture, the Mortgage, the Initial Letter of Credit, the Reimbursement Agreement and other agreements and documents contained herein constitute summaries of certain provisions thereof, and do not purport to be complete. Reference is made to the Bond Indenture, the Loan Agreement, the Master Indenture, the Initial Letter of Credit, the Reimbursement Agreement and such other agreements and documents for a more complete description of such provisions. For copies of drafts of such agreements and documents prior to the issuance and sale of the Series 1998 Bonds, requests should be directed to Cain Brothers & Company, LLC at its address set forth above. Following the issuance and sale of the Series 1998 Bonds, executed copies may be examined at the office of the Bond Trustee, 135 South LaSalle Street, Chicago, Illinois, 60603.

## THE AUTHORITY

**Powers**

The Authority is a body politic and corporate and a public instrumentality of the State. The Authority was created under the Illinois Health Facilities Authority Act (the "Act"). The Authority has, among other powers, the statutory power to (i) make mortgage loans or other secured or unsecured loans to or for the benefit of any participating health institution (as defined in the Act) located in Illinois for the cost of a project in accordance with an agreement between the Authority and the participating health institution; (ii) refund outstanding obligations, loans, indebtedness or advances issued, made or given by such participating health institution for the cost of a project; (iii) refinance indebtedness incurred by such participating health institution for projects undertaken and completed or for other facilities acquired prior to or after the enactment of the Act, when the Authority finds that such refinancing is in the public interest, and either alleviates a financial hardship of such participating health institution, or is in connection with other financing by the Authority for such participating health institution, or may be expected to result in a lessened cost of patient care and a savings to third parties, including the government, and to others who must pay for patient care, or any combination thereof; (iv) mortgage all or any portion of a project or other health facilities and the property on which any such project or other health facilities are located whether owned or thereafter acquired, and to assign and pledge mortgages, notes and other securities of participating health institutions to or for the benefit of which the Authority has made loans, and the revenues therefrom, for the benefit of the owners of bonds issued to finance such project or health facilities or issued to refund or refinance outstanding obligations, loans, indebtedness or advances of participating health institutions as permitted by the Act; and (v) do all things necessary or convenient to carry out the purposes of the Act.

**19904**

E002957

## Members of the Authority

Pursuant to the Act. the Authority is to consist of seven members, all of whom must be Illinois residents, appointed by the Governor by and with the consent of the State Senate. There are currently two vacancies. The members receive no compensation for the performance of their duties but are paid their necessary expenses incurred while engaged in the performance of such duties. The Act provides that no member, officer, agent or employee of the Authority may, directly or indirectly, have any financial interest in any bond issue or in any loan or any property to be included in, or any contract for property or materials to be furnished or used in connection with, any project of the Authority, under penalty of law, unless such member, officer, agent or employee of the Authority abstains from discussion, deliberation, action and vote by the Authority regarding such matters. Members of the Authority, however, may serve as directors or officers of participating health institutions for which the Authority is providing financing, but they may not vote on or take part in the Authority's deliberations concerning such financing. No member serves as a director or officer of the Corporation, any of its affiliates or the Underwriter.

**Jeffrey M. Holden, Chairman.** Term expires June 30, 2000. Residence: Glen Ellyn, Illinois. Background: Assistant Executive Vice President and Chief Operating Officer, Illinois State Medical Society. Chicago, Illinois; B.S.. The American University, 1974.

**Katherine S. Janega, Vice-Chairman.** Term expired June 30, 1997. Under the Act, Ms. Janega will continue to serve as a member of the Authority until she is reappointed or until a successor is appointed and qualified. Residence: Glencoe, Illinois. Background: Village Attorney, Winnetka, Illinois; admitted to Illinois Bar, 1977; B.A., College of Saint Teresa, 1969; J.D., Loyola University School of Law, 1977. Memberships: American Bar Association, Illinois State Bar Association and Chicago Bar Association.

**Cameron S. Avery.** Term expires June 30, 1999. Residence: Chicago, Illinois. Background: Partner in the law firm of Bell, Boyd & Lloyd, Chicago, Illinois; admitted to Illinois Bar, 1963; B.S.E., Princeton University, 1960; J.D., Harvard Law School, 1963. Memberships: American Bar Association, Illinois State Bar Association and Chicago Bar Association.

**James P. Hamilton.** Term expires June 30, 1998. Residence: Rockford, Illinois. Background: President and Chief Executive Officer of Milestone, Inc., a provider of residential and day training facilities to disabled adults in Rockford, Illinois; graduate studies, Northern Illinois University; B.A., Southern Illinois University, 1971. Mr. Hamilton is a member of the Illinois Planning Council for Developmentally Disabled and the Governor's Conference on Housing. He has been active in addressing issues related to community living facilities and the adult developmentally disabled.

**Dr. Roger D. Herrin.** Term expires June 30, 2002. Residence: Harrisburg, Illinois. Background: Practitioner of surgical podiatry and sports medicine in Harrisburg, Illinois; member of the active medical staff of Harrisburg Medical Center, Inc., Harrisburg, Illinois, and Hardin County General Hospital, Rosiclare, Illinois; B.S. Bethel College, 1960; Illinois College of Podiatric Medicine, 1969. Dr. Herrin also serves as President of RDK Management Services, Inc., an owner/operator of long-term care facilities, as President of Galatia Bancorp, Inc., and as Chairman of the Board of Galatia Community State Bank and First National Bank of Metropolis. He is a member of the Illinois Health Care Reform Task Force.

**19905**

E002958

**Executive Director and Associate Executive Director**

**Mary M. McInerney.** Executive Director since August 1989; Associate Executive Director from August 1988 to August 1989. Residence: Chicago, Illinois. Background: B.A., Loyola University of Chicago, 1975; J.D., Loyola University of Chicago School of Law, 1979. Prior to becoming Associate Executive Director, Ms. McInerney was Assistant General Counsel of the Illinois Housing Development Authority. Memberships: Illinois State Bar Association and Chicago Bar Association.

**Pamela A. Lenane.** Associate Executive Director since February 1996. Residence: Chicago, Illinois. Background: B.A., Dominican University, River Forest, Illinois; J.D., Northwestern University School of Law. Prior to becoming Associate Executive Director, she was Acting Director of the Illinois Housing Development Authority from June 1994 to December 1995. Prior to joining the Illinois Housing Development Authority in September 1993, Ms. Lenane was engaged in the private practice of law in Chicago, Illinois, most recently as a partner at Katten Muchin & Zavis.

**Authority Advisors**

**Sidley & Austin,** Chicago, Illinois, serves as general counsel to the Authority.

**Ponder & Co.,** Chicago, Illinois, serves as financial advisor to the Authority.

**Bonds of the Authority**

The Authority may from time to time issue bonds for any of its corporate purposes and, pursuant to the Act, such bonds are negotiable for all purposes notwithstanding their payment from a limited source. Since its organization in 1975, the Authority has issued bonds for the benefit of a large number of borrowers to assist them, among other things, in financing or refinancing the costs of health care facilities in Illinois. The bonds of each issue are payable solely out of revenues of the Authority specified in the resolution under which they are issued or in a related trust indenture or indenture of mortgage and deed of trust. The bond resolution or other instrument of the Authority providing for the issuance of bonds for a project may pledge the revenues to be received by the Authority on account of the financing described in such resolution or other instrument and may contain such provisions for protecting and enforcing the rights and remedies of the bondholders as the Authority deems reasonable and proper and which are not in violation of law.

**Interest Not Exempt from Illinois Income Taxes**

Interest on bonds issued by the Authority is not exempt from present State income taxes.

## THE CORPORATION

The Corporation is an Illinois not for profit corporation formed in 1993 to own and operate acute care general hospitals. It currently owns and operates an acute care hospital facility licensed for 335 beds (of which 201 are currently staffed) located on the north side of Chicago. The Corporation is exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code

**19906**

E002959

of 1986. by virtue of its inclusion in a group exemption extended to Permian Health Care. Inc.. a Colorado nonprofit corporation.

A more complete description of the Corporation is included in Appendix A to this Official Statement. See "APPENDIX A — NORTHSIDE OPERATING CO. D/B/A EDGEWATER MEDICAL CENTER."

## THE SERIES 1998 BONDS

**General**

The Series 1998 Bonds are issuable as fully registered bonds. without coupons. in book-entry form and will be registered in the name of Cede & Co.. as described below. The Series 1998A Bonds will be issued initially in the Adjustable Long Mode for a Rate Period ending June 30, 2004. and will be initially issued in denominations of $5,000 or any integral multiple thereof. The Series 1998A Bonds will be dated May 1, 1998 and will bear interest from such date at a fixed rate of 4.70% per annum through June 30. 2004. payable on July 1, 1998 and on each January 1 and July 1 thereafter through July 1, 2004. On July 1, 2004. subject to the provisions of the Bond Indenture, the Series 1998A Bonds will be converted to the Weekly Mode.

The Series 1998B Bonds will be issued initially in the Weekly Mode and will be initially issued in denominations of $100,000 or any $5,000 integral multiple thereof. The Series 1998B Bonds will be dated as of the date of initial issuance and will bear interest from such date at the Weekly Rate to and including the first following Tuesday, and thereafter, will bear interest at the subsequently set Weekly Rate until a Conversion Date, if any. Such interest will be payable on the first Business Day of each month commencing July 1, 1998. See "— Determination of Interest Rate" and "— Redemption of Series 1998 Bonds" below for a description of the interest rate setting process and the redemption provisions applicable to the Series 1998 Bonds.

All or any portion of each series of the Series 1998 Bonds are subject to conversion from the Adjustable Long Mode or the Weekly Mode. as applicable. to a Daily Mode, Weekly Mode, Quarterly Mode. Semiannual Mode, Adjustable Long Mode, Commercial Paper Mode. or Fixed Mode (all such modes are referred to herein as the "Modes"). All Series 1998 Bonds that are to be converted to a different Mode will be subject to mandatory tender and purchase on the date of conversion to the different Mode. **This Official Statement only describes the terms and provisions applicable to the Series 1998 Bonds while in the Daily Mode, Weekly Mode or Adjustable Long Mode.** If the Mode for any of the Series 1998 Bonds is changed to a Mode other than the Daily Mode, Weekly Mode or Adjustable Long Mode. the Corporation will supplement this Official Statement or deliver a new official statement or a remarketing circular describing the new Mode.

While a Series 1998 Bond bears interest at a Daily Rate or a Weekly Rate, interest on such Series 1998 Bond will be computed on the basis of a 365- or 366-day year, as the case may be, for the actual number of days elapsed and will be payable on the first Business Day of each month. While a Series 1998 Bond bears interest at an Adjustable Long Rate, interest on such Series 1998 Bond will be computed on the basis of a 360-day year of twelve 30-day months and will be payable on the first day of the sixth calendar month following the month in which the applicable Rate Period commences and the first day of

**19907**

E002960

each sixth month thereafter. Interest will also be paid at certain other times as described in the definition of "Interest Payment Date" set forth in "APPENDIX C — Definitions of Certain Terms". The Series 1998 Bonds mature on the respective dates set forth on the cover page hereof. Owners of Series 1998 Bonds bearing interest in the Daily Mode or Weekly Mode may tender all or any portion of their Series 1998 Bonds for purchase on any Business Day upon the appropriate notice and owners of Series 1998 Bonds bearing interest in the Adjustable Long Mode may tender all or any portion of their Series 1998 Bonds for purchase on the first Business Day following a Rate Period, all as described under "THE SERIES 1998 BONDS — Tenders — Optional Tenders." The Series 1998A Bonds shall be subject to mandatory tender on July 1, 2004.

DTC will act as the initial securities depository for the Series 1998 Bonds which will be issued initially pursuant to a book-entry only system. See the caption, "BOOK-ENTRY ONLY SYSTEM." Under the Bond Indenture, the Authority may appoint a successor securities depository to DTC for either or both series of the Series 1998 Bonds. The holders of the Series 1998 Bonds have no right to a Book-Entry Only System for the Series 1998 Bonds. The information under the caption "THE SERIES 1998 BONDS" is subject in its entirety to the provisions described below under the caption "BOOK-ENTRY ONLY SYSTEM" while the Series 1998 Bonds are in the Book-Entry Only System.

**Payments on the Series 1998 Bonds**

So long as Cede & Co. is the registered owner of a series of the Series 1998 Bonds, the Bond Trustee will pay such principal of and redemption price, if any, and interest on such series of the Series 1998 Bonds to DTC, which will remit such principal, redemption price, if any, and interest to the DTC Participants who will then remit such amounts to the Beneficial Owners of such series of the Series 1998 Bonds, as described under the caption "BOOK-ENTRY ONLY SYSTEM" herein.

The Series 1998 Bonds will be issued in fully registered form and, when issued, will be registered in the name of Cede & Co., as nominee of DTC. DTC will act as Securities Depository for the Series 1998 Bonds. Individual purchases of interests in the Series 1998 Bonds will be made in book-entry form only, in Authorized Denominations. Purchasers of such interests will not receive certificates representing their interest in the Series 1998 Bonds. For a description of the method of payment of principal, premium, if any, and interest on the Series 1998 Bonds and matters pertaining to tenders, transfers and exchanges while in the book-entry only system, see the information herein under the heading "BOOK-ENTRY ONLY SYSTEM."

In the event that the book-entry system for a series of the Series 1998 Bonds is discontinued, the following provisions would apply to such series.

Principal of and premium, if any, on such Series 1998 Bonds will be payable upon the presentation and surrender thereof at the Principal Office of the Bond Trustee. The purchase price of such Series 1998 Bonds upon optional or mandatory tender will be payable upon the presentation and surrender thereof at the Principal Office of the Bond Trustee or at such other office as may be designated by the Bond Trustee.

**19908**

E002961

Payment of interest on Series 1998 Bonds is payable by check mailed on the applicable Interest Payment Date to the registered owner thereof as of the close of business of the Bond Trustee on the Record Date for such Interest Payment Date at the address of such owner as it appears on the Bond Register or at such other address as is furnished to the Bond Trustee in writing by such owner not later than such Record Date. Payment of interest on any Series 1998 Bonds shall be made to any owner of $1,000,000 or more in aggregate principal amount of Series 1998 Bonds as of the close of business of the Bond Trustee on the Record Date for a particular Interest Payment Date by wire transfer to such owner on such Interest Payment Date upon written notice from such owner containing the wire transfer address within the continental United States of America to which such owner wishes to have such wire directed, which written notice is received not later than the Business Day next preceding such Record Date.

Notwithstanding the foregoing, payment of Defaulted Interest on Series 1998 Bonds will be made to the persons who shall be the registered owners thereof on the Special Record Date fixed by the Bond Trustee which shall be not more than fifteen nor less than ten days prior to the date of the proposed payment of such Defaulted Interest and shall not be less than ten days after receipt by the Bond Trustee of the notice of the proposed payment.

Record Date means, with respect to any Series 1998 Bond during the Daily or Weekly Mode, the Business Day immediately preceding each Interest Payment Date for such Series 1998 Bond, and with respect to any Series 1998 Bond during an Adjustable Long Mode, the 15th calendar day immediately preceding each Interest Payment Date for such Series 1998 Bond (whether or not a Business Day).

## Determination of Interest Rate

The Series 1998 Bonds will bear interest, when in the Daily Mode, at the Daily Rate, when in the Weekly Mode, at the Weekly Rate, and when in an Adjustable Long Mode, at the applicable Adjustable Long Rate. The determination of the interest rate on the Series 1998 Bonds as described herein will be conclusive and binding on the owners of the Series 1998 Bonds, the Bond Trustee, the Authority and the Corporation. At no time will the Series 1998 Bonds bear interest at a rate higher than the lesser of 15% per annum or the maximum rate permitted by law and at no time shall a Series 1998 Bond entitled to the benefit of a Credit Agreement bear interest at a rate exceeding the Interest Coverage Rate (i.e., the rate used to calculate the maximum amount available for the payment of interest accrued on the Series 1998 Bonds, initially 4.70% for the Series 1998A Bonds and 12% for the Series 1998B Bonds). All Series 1998 Bonds of a series need not operate in the same Mode at the same time and the Mode applicable to all or any portion of either series of the Series 1998 Bonds may be changed as described herein.

**Daily Rate.** No later than 3:00 p.m., Chicago, Illinois time, on each Business Day during a Daily Mode, the Remarketing Agent will determine a fixed rate per annum to be borne by each Series 1998 Bond bearing interest at the Daily Rate for the Rate Period commencing on such Business Day. Such Daily Rate will be equal to the lowest interest rate which, in the judgment of the Remarketing Agent, would enable each such Series 1998 Bond to be remarketed at the principal amount thereof, plus accrued interest thereon, if any, on such date. Except on an Adjustment Date, in the event that a Daily Rate is not determined by the Remarketing Agent, the rate of interest borne by such Series 1998 Bond bearing interest at a Daily Rate for the immediately preceding Business Day will be the Daily Rate for

**19909**

E002962

such Series 1998 Bond for the day as of which such determination is not made. The Bond Trustee will provide information regarding the Daily Rate to any Bondholder on request.

**Weekly Rate**. No later than 3:00 p.m., Chicago, Illinois time, on Tuesday of each week, or such other day of the week designated as a Rate Determination Date by the Remarketing Agent as described below, or if such day is not a Business Day, then the immediately preceding Business Day, the Remarketing Agent will determine for the period commencing on the immediately succeeding Wednesday and ending on the next succeeding Tuesday a fixed per annum interest rate to be borne by each Series 1998 Bond bearing interest at the Weekly Rate. Such Weekly Rate will be equal to the lowest interest rate which, in the judgment of the Remarketing Agent, would enable such Series 1998 Bond to be remarketed at the principal amount thereof, plus accrued interest thereon, if any, on the immediately succeeding Rate Change Date (i.e., Wednesday, or such other day of the week designated as the Rate Change Date by the Remarketing Agent as described below). Except on an Adjustment Date, in the event that the Weekly Rate is not determined by the Remarketing Agent on a Rate Determination Date, the rate of interest borne by such Series 1998 Bonds bearing interest at the Weekly Rate for the immediately preceding Rate Period will remain in effect. The Bond Trustee will provide information regarding the Weekly Rate to any Bondholder on request.

If at any time the Remarketing Agent determines that, in its judgment, the scheduled Rate Determination Dates or Rate Change Dates during a Weekly Mode have become inappropriate (taking into account general market practice with respect to periodic adjustment of rates on instruments comparable to the Series 1998 Bonds bearing interest at the Weekly Rate, whether based upon the time of compilation or reporting of any interest rate or financial index or indicator or otherwise), the Remarketing Agent may, after consultation with the Corporation, designate new scheduled Rate Determination Dates and/or Rate Change Dates, to remain in effect until another redetermination of scheduled Rate Determination Dates or Rate Change Dates. The Remarketing Agent will give written notice of any change in scheduled Rate Determination Dates and/or Rate Change Dates during a Weekly Mode to the Authority, the Bond Trustee, the Bank and the Corporation, and such change will become effective on the first scheduled Rate Determination Date or Rate Change Date, as the case may be, so designated occurring not less than 14 days following the giving of such notice. Promptly upon receipt of such notice, the Bond Trustee shall notify or cause the Remarketing Agent to notify each affected Bondholder of such change in writing.

**Adjustable Long Rate**. No later than 11:00 a.m., Chicago, Illinois time, on the Rate Determination Date for a Rate Period during an Adjustable Long Mode applicable to a particular Series 1998 Bond, the Remarketing Agent will determine a fixed per annum interest rate to be borne by such Series 1998 Bond for the Rate Period determined by the Remarketing Agent as described below. Such Adjustable Long Rate will be equal to the lowest interest rate which, in the judgment of the Remarketing Agent, would enable such Series 1998 Bond to be remarketed at the principal amount thereof, plus accrued interest thereon, if any, on the Rate Change Date for such Rate Period. Except on an Adjustment Date, if the Remarketing Agent fails to determine an Adjustable Long Rate on a Rate Determination Date for a Rate Period within an Adjustable Long Mode, the Adjustable Long Rate for the preceding Rate Period will remain in effect for such Rate Period.

The Remarketing Agent, upon the request of the Corporation, will determine the duration of Rate Periods during an Adjustable Long Mode (having a duration of 367 days or more and less than or equal to the remaining term of the Series 1998 Bonds of the series to which it relates) as will, in the judgment

E002963

19910

of the Remarketing Agent, result in the lowest aggregate cost being payable by the Authority and the Corporation with respect to the Series 1998 Bonds bearing interest at Adjustable Long Rates, taking into account interest and any other determinable fees and expenses. The Remarketing Agent may establish different Rate Periods on the same Rate Change Date for Series 1998 Bonds in an Adjustable Long Mode in order to achieve an average duration of Rate Periods that, in the judgment of the Remarketing Agent, is most likely to achieve the lowest total aggregate cost being payable by the Authority and the Corporation with respect to such Series 1998 Bonds, taking into account interest and any other determinable fees and expenses. The Remarketing Agent's determination will be based upon the market for and the relative yields of the Series 1998 Bonds and other securities that bear interest at the variable rate or at fixed rates that, in the judgment of the Remarketing Agent, are otherwise comparable to the Series 1998 Bonds or any fact or circumstance relating to the Series 1998 Bonds or affecting the market for the Series 1998 Bonds or affecting such other comparable securities in a manner that, in the judgment of the Remarketing Agent, will affect the market for the Series 1998 Bonds. The Remarketing Agent's determination will be conclusive and binding upon all parties. Except on an Adjustment Date, in the event that the Rate Period for any Series 1998 Bond in an Adjustable Long Mode is not determined by the Remarketing Agent as described above, the Rate Period for such Series 1998 Bond will be a 367-day Rate Period.

The Bond Trustee will provide information regarding the Adjustable Long Rates and Rate Periods to any Bondholder on request.

### Conversions Between Variable Rate Modes

All Series 1998 Bonds need not operate in the same Mode at the same time. The Corporation may designate a different Mode (other than a Fixed Rate Mode) with respect to any Series 1998 Bond of either series during an Adjustable Long Mode on any Rate Change Date and during a Daily Mode or a Weekly Mode on any Business Day. Within an Adjustable Long Mode, the Remarketing Agent may designate such Rate Periods from time to time, upon the request of the Corporation in the case of an Adjustable Long Mode, as will, in its judgment, result in the lowest aggregate cost being payable by the Authority and the Corporation with respect to the Series 1998 Bonds bearing interest at an Adjustable Long Rate, taking into account interest and any other determinable fees and expenses.

Except with respect to the conversion of the Series 1998A bonds to the Weekly Mode on July 1, 2004, if the Corporation designates a conversion from one Variable Rate Mode to another Variable Rate Mode, the Corporation is required to satisfy certain conditions, including delivering to the Bond Trustee and the Authority (a) a confirmation of the ratings then being maintained on the Series 1998 Bonds and (b) an Opinion of Bond Counsel to the effect that such conversion will not adversely affect (i) the validity of the Series 1998 Bonds, or (ii) any exemption from federal income taxation to which the interest on the Series 1998 Bonds would otherwise be entitled. Such Opinion of Bond Counsel must be delivered concurrently with the notice described in the following paragraph and the conclusion of such Opinion must be reaffirmed on the applicable Adjustment Date.

The Corporation shall give written notice of any such conversion to the Remarketing Agent, the Authority, the Bond Trustee, the Bond Trustee's Agent and the Bank not less than seven Business Days prior to the date on which the Bond Trustee's Agent is required to notify the affected Bondholders of the conversion. Such notice shall specify the Variable Rate Conversion Date and the Variable Rate Period (and the length of any Adjustable Long Rate Period) to which the conversion will be made. Not less than

**19911**

E002964

14 days prior to the Variable Rate Conversion Date in the case of conversions between the Daily and Weekly Mode and not less than 30 days prior to the Variable Rate Conversion Date in all other cases. the Bond Trustee's Agent shall mail a written notice of the conversion to the holders of all Series 1998 Bonds to be converted.

## Conversions to Commercial Paper Mode

At the option of the Corporation. any Series 1998 Bonds may be converted from a Variable Rate Mode to a Commercial Paper Mode on a regularly scheduled Interest Payment Date on which interest is payable for the Variable Rate Mode from which the conversion is to be made; provided, however, that in the case of a conversion from an Adjustable Long Mode. the Conversion Date shall be a regularly scheduled Interest Payment Date on which a new Adjustable Long Rate Period would otherwise have commenced. If the Corporation designates a conversion from a Variable Rate Mode to the Commercial Paper Mode, the Corporation is required to satisfy certain conditions, including delivering to the Bond Trustee and the Authority (a) a confirmation of the ratings being maintained on the Series 1998 Bonds and (b) an Opinion of Bond Counsel to the effect that such conversion will not adversely affect (i) the validity of the Series 1998 Bonds. or (ii) any exemption from federal income taxation to which the interest on the Series 1998 Bonds would otherwise be entitled. Such Opinion of Bond Counsel must be delivered concurrently with the notice described in the following sentence and the conclusion of such Opinion must be reaffirmed on the applicable Adjustment Date. The Corporation shall give written notice of any such conversion to the Authority. the Bond Trustee. the Bond Trustee's Agent, the Remarketing Agent and the Bank not less than seven Business Days prior to the date on which the Bond Trustee's Agent is required to notify the affected Bondholders of the conversion. Not less than 15 days prior to the Conversion Date. in the case of conversions from the Daily or Weekly Mode. and not less than 30 days prior to the Conversion Date in the case of conversions from the Adjustable Long Mode, the Bond Trustee's Agent shall mail a written notice of the conversion to the holders of all Series 1998 Bonds to be converted.

## Failure to Determine Interest Rate for Adjustment Date

In the event (i) the Remarketing Agent does not determine the interest rate applicable to the initial Rate Period during a new Mode with respect to any Series 1998 Bond or (ii) an opinion required with respect to a change in Mode of any Series 1998 Bond is not delivered or reaffirmed on the applicable Adjustment Date, the immediately succeeding Mode with respect to the Series 1998 Bonds in the Mode then ending will be (A) a Daily Mode if the preceding Mode was a Short Mode, with a Daily Rate established by the Remarketing Agent or if the Remarketing Agent fails to set such Rate, such Daily Rate shall be 100% of the Municipal Market Data Variable Rate Demand (Non-AMT/AMT) Daily General Market Index as most recently published in *The Bond Buyer* or (B) an Adjustable Long Mode with an Adjustment Period of 367 days if the preceding Mode was an Adjustable Long Mode, with an Adjustable Long Rate established by the Remarketing Agent. or if the Remarketing Agent fails to set such rate. such Adjustable Long Rate will be The Bond Buyer One-Year Note Index, as published in *The Bond Buyer* on the Adjustment Date.

## Fixed Rate Conversion

**19912**

At the option of the Corporation. all or any portion of the Series 1998 Bonds may be converted to bear interest at a Fixed Rate. The Fixed Rate Conversion Date shall be (i) in the case of a conversion

E002965

from the Daily or Weekly Mode, a regularly scheduled Interest Payment Date on which interest is payable for the Mode from which the conversion is to be made, and (ii) in the case of a conversion from an Adjustable Long Mode, a regularly scheduled Interest Payment Date on which a new Adjustable Long Rate Period would otherwise have commenced. Not less than seven Business Days prior to the date on which the Bond Trustee's Agent or the Bond Trustee is required to notify the affected Bondholders of the conversion as described below, the Corporation shall give written notice of the conversion to the Authority, the Bond Trustee, the Bond Trustee's Agent, the Remarketing Agent and the Initial Bank, together with an Opinion of Bond Counsel, to the effect that the conversion of the Series 1998 Bonds to the Fixed Mode will not adversely affect the validity of the Bonds or any exemption from Federal income taxation to which interest on the Bonds would otherwise be entitled. The Corporation may revoke its election to effect a conversion of the interest rate on the Series 1998 Bonds to the Fixed Mode by giving written notice of such revocation to the Authority, the Bond Trustee's Agent, the Bond Trustee and the Remarketing Agent at any time prior to the setting of the Fixed Interest Rate by the Remarketing Agent. The conversion of the interest rate borne by Series 1998 Bonds to a Fixed Rate will not become effective unless, on the applicable Conversion Date, the Bond Trustee and the Authority have each received an Opinion of Bond Counsel, dated the applicable Conversion Date, reaffirming its earlier opinion.

At least 30 days prior to the Conversion Date, the Bond Trustees Agent will give written notice of the proposed conversion to the owners of all Series 1998 Bonds to be converted which notice will state (i) the Conversion Date and (ii) that such Series 1998 Bonds will be subject to mandatory purchase on such Conversion Date.

If the conversion of the interest rate on any Series 1998 Bond to a Fixed Rate does not occur for any reason, including in the event that any condition precedent to the conversion has not occurred, such Series 1998 Bond will bear interest from and after the proposed Conversion Date in the same Mode as the Mode applicable to such Series 1998 Bond prior to the proposed Conversion Date and at the interest rate calculated in the manner set forth under the caption "THE SERIES 1998 BONDS — Determination of Interest Rate" and, in the case of an Adjustable Long Mode, for a Rate Period of 367 days.

**Tenders**

The following information, including without limitation the manner of exercising mandatory and optional tender rights, is subject in its entirety to the provisions described below under the caption "BOOK-ENTRY ONLY SYSTEM" while the Series 1998 Bonds are in the Book-Entry Only System.

**Optional Tender**. Each owner of any Series 1998 Bond (other than an Obligated Group Bond or a Pledged Bond) during a Daily Mode or a Weekly Mode may demand that its Series 1998 Bond be purchased, in whole or in part in an Authorized Denomination, on any Optional Tender Date (described below) therefor during the Daily Mode or the Weekly Mode, respectively, at a Tender Price equal to the principal amount thereof plus accrued interest, if any, to the Optional Tender Date.

To effect such purchase during a Daily Mode, an owner must deliver to the Bond Trustee irrevocable telephonic or written notice (which telephonic notice shall be confirmed in writing and which written notice may be given by telecopy), which notice must be received not later than 9:30 a.m., Chicago, Illinois time, in order to be effective on that date. Any notice received after 9:30 a.m., Chicago, Illinois time, shall be deemed given on the next succeeding Business Day. The Business Day

**19913**

E002966

on which any such notice is deemed given will be the Optional Tender Date for the applicable Series 1998 Bond.

To effect such purchase during a Weekly Mode, an owner must deliver to the Bond Trustee irrevocable written notice, which notice must be received by the Bond Trustee not later than 4:00 p.m., Chicago, Illinois time, in order to be effective on that day. Any notice received after 4:00 p.m., Chicago, Illinois time, shall be deemed given on the next succeeding Business Day. Such Optional Tender Date must be a Business Day not less than seven calendar days after the date such notice is received by the Bond Trustee.

Each owner of any Series 1998 Bond (other than an Obligated Group Bond or a Pledged Bond) during an Adjustable Long Mode may demand that its Series 1998 Bond be purchased, in whole or in part in any Authorized Denomination, on the first Business Day following a Rate Period at a purchase price equal to the principal amount thereof plus accrued interest to the Optional Tender Date. To effect such purchase, an owner must deliver to the Bond Trustee irrevocable written notice, which notice must be received not later than 4:00 p.m., Chicago, Illinois time on a Business Day not less than seven days prior to the Optional Tender Date. The Series 1998A Bonds are not subject to optional tender prior to July 1, 2004.

Any notice of tender given pursuant to the preceding three paragraphs must specify (i) the principal amount and number of such Series 1998 Bond, the name and the address of such owner and the taxpayer identification number, if any, of such owner, (ii) the Optional Tender Date on which such Series 1998 Bond is to be purchased, (iii) payment instructions with respect to the Tender Price, and (iv) that the owner irrevocably demands purchase of the Series 1998 Bonds specified in such notice.

**Mandatory Tender**. Series 1998 Bonds are subject to mandatory tender by the owners thereof to the Bond Trustee at its principal office on each date described below at a purchase price equal to 100% of the principal amount thereof plus accrued interest, if any, to the purchase date therefor plus, in the case of (i) and (iii) below, the premium amount, if any, specified in (i) and (iii):

    (i)    On each Adjustment Date, including, without limitation, a proposed Conversion Date or a Substitute Adjustment Date. The purchase price of a Series 1998 Bond in an Adjustable Long Mode purchased on a Substitute Adjustment Date shall be equal to the optional redemption price for such Series 1998 Bond set forth under the caption "THE SERIES 1998 BONDS — Redemption of Series 1998 Bonds — Optional Redemption During Adjustable Long Mode";

    (ii)    On a Business Day which is no more than 15 days after the Bond Trustee gives Immediate Notice to the owners of Series 1998 Bonds of the occurrence and continuation of a "Credit Agreement Default" (See "CREDIT AGREEMENT — The Reimbursement Agreement — Events of Default" herein); and

    (iii)    (a) On the second Business Day immediately preceding the Stated Termination Date of a Credit Agreement if, by the 20th day preceding a Stated Termination Date, a notice of extension of the current Credit Agreement or a commitment to deliver a Substitute Credit Agreement has not been delivered to the Bond Trustee, and (b) on the Business Day immediately preceding the effective date of a Substitute Credit Facility if the issuance of such Substitute Credit

Facility causes a withdrawal or reduction of the rating on the Series 1998 Bonds which was in effect prior to the Substitution Date or no evidence is received from each Rating Agency then maintaining a rating on the Series 1998 Bonds as to whether the delivery of the Substitute Credit Agreement will result in a withdrawal or reduction of the rating on the Series 1998 Bonds. In the event of a mandatory tender as described in this clause (iii), the purchase price will be 100% of the principal amount of the Tendered Bonds plus accrued interest thereon, if any, plus an amount equal to the optional redemption premium which would be payable if such Tendered Bond were redeemed on the purchase date or 3% of the principal amount thereof, if the purchase described in this clause (iii) will occur during the No-Call Period for such Tendered Bond in the Adjustable Long Mode, all as described under the caption "THE SERIES 1998 BONDS — Redemption of Series 1998 Bonds." The Bond Indenture provides that prior to July 1, 2004, the Corporation shall not provide for the delivery of any Substitute Credit Agreement which would result in (A) the withdrawal or reduction of any rating then being maintained on the Series 1998A Bonds, or (B) a mandatory tender of Series 1998A Bonds as described in this clause (iii).

In the event referred to in clause (i) above, the Series 1998 Bonds (other than Pledged Bonds and Obligated Group Bonds) which are the subject of such event are subject to mandatory tender. In the case of clauses (ii) and (iii), all Series 1998 Bonds (other than Pledged Bonds, Obligated Group Bonds or Series 1998 Bonds bearing interest at a Fixed Rate) are subject to mandatory tender.

An owner of a Series 1998 Bond subject to mandatory tender may not elect to retain its Series 1998 Bonds.

**Purchase of Tendered Bonds.** Tendered Bonds will be purchased from the following sources in the order of priority indicated:

(i)     proceeds of the remarketing of such Tendered Bonds (but not sales to the Authority, the Corporation or any Member of the Obligated Group);

(ii)     moneys received from the underwriter or the purchaser (other than the Authority, the Corporation or any Affiliate) of Tendered Bonds upon the conversion of the interest rate thereon to a Fixed Rate;

(iii)     moneys obtained by the Bond Trustee as proceeds of a draw made pursuant to the Credit Agreement to be applied to pay the purchase policy of Tendered Bonds; and

(iv)     moneys furnished by the Corporation or by any future Member of the Obligated Group to the Bond Trustee for the purchase of Tendered Bonds.

The Bond Trustee is required to pay the purchase price of each Tendered Bond to the registered owner thereof by 3:00 p.m., Chicago, Illinois time, on the purchase date, provided that such owner has delivered such Tendered Bond with any necessary endorsements to the designated office of the Bond Trustee no later than 1:15 p.m., Chicago, Illinois time, on such date.

**Undelivered Tendered Bonds.** In the event that sufficient moneys are on deposit with the Bond Trustee to pay the applicable purchase price of any Tendered Bond, such Tendered Bond will be deemed to have been purchased whether or not delivered by the owner thereof on the date such Tendered Bond

19915

E002968

is to be purchased. In the event any such purchased Tendered Bond is not so delivered, the Authority will execute and the Bond Trustee will authenticate and deliver a replacement Series 1998 Bond of like date and denomination as the Tendered Bond and bearing a number not contemporaneously outstanding.

### Redemption of Series 1998 Bonds

Any redemption of less than all of the Series 1998 Bonds outstanding will be made in such a manner that all Series 1998 Bonds outstanding after such redemption are in Authorized Denominations. If less than all of the Series 1998 Bonds are called for redemption under provisions of the Bond Indenture permitting partial redemption, the particular Series 1998 Bonds to be redeemed will be selected by the Corporation, in the principal amount designated by the Corporation, which designation is required to include the series, Mode and particular maturity to be redeemed, or as otherwise required by the Bond Indenture; provided, however, that (i) in the case of the redemption of less than all Series 1998 Bonds of a series which bear interest in the same Mode at the same rate for the same Rate Periods, such redemption will be by lot in such manner as the Bond Trustee may determine among such Series 1998 Bonds and (ii) subject to other applicable provisions of the Bond Indenture, the portion of any Series 1998 Bond to be redeemed will be in a principal amount equal to an Authorized Denomination; and provided, further, that in all cases of partial redemption, any Pledged Bonds shall be redeemed first. In selecting Series 1998 Bonds for redemption, the Bond Trustee will treat each Series 1998 Bond as representing that number of Series 1998 Bonds which is obtained by dividing the principal amount of such Series 1998 Bond by the minimum Authorized Denomination. If it is determined that one or more, but not all, of the integral multiples of the Authorized Denomination of principal amount represented by any Series 1998 Bond is to be called for redemption, then, upon notice of intention to redeem such integral multiple of an Authorized Denomination, the owner of such Series 1998 Bond will forthwith surrender such Series 1998 Bond to the Bond Trustee for payment to such owner of the redemption price of the integral multiple of the Authorized Denomination of principal amount called for redemption and the Bond Trustee will deliver to such owner a new Series 1998 Bond or Series 1998 Bonds in the aggregate principal amount of the unredeemed balance of the principal amount of such Series 1998 Bond. New Series 1998 Bonds representing the unredeemed balance of the principal amount of such Series 1998 Bond will be issued to the registered owner thereof without charge therefor.

**Mandatory Sinking Fund Redemption**. The Series 1998 Bonds will be subject to redemption prior to maturity pursuant to the mandatory sinking fund provisions of the Bond Indenture, at a redemption price equal to 100% of the principal amount redeemed plus accrued interest to the redemption date, on July 1 of the years and in the respective amounts set forth below:

**19916**

E002969

## Series 1998A Bonds

| Year (July 1) | Principal Amount | Year (July 1) | Principal Amount |
|---|---|---|---|
| 1998 | $ 30,000 | 2015 | $1,195,000 |
| 1999 | 495,000 | 2016 | 1,265,000 |
| 2000 | 525,000 | 2017 | 1,330,000 |
| 2001 | 550,000 | 2018 | 1,405,000 |
| 2002 | 580,000 | 2019 | 1,480,000 |
| 2003 | 615,000 | 2020 | 1,560,000 |
| 2004 | 460,000 | 2021 | 1,645,000 |
| 2005 | 705,000 | 2022 | 1,735,000 |
| 2006 | 745,000 | 2023 | 1,830,000 |
| 2007 | 785,000 | 2024 | 1,930,000 |
| 2008 | 825,000 | 2025 | 2,035,000 |
| 2009 | 870,000 | 2026 | 2,145,000 |
| 2010 | 920,000 | 2027 | 2,265,000 |
| 2011 | 970,000 | 2028 | 2,385,000 |
| 2012 | 1,020,000 | 2029 | 2,515,000 |
| 2013 | 1,075,000 | 2030 | 2,655,000 |
| 2014 | 1,135,000 | 2031 | 2,795,000 |

## Series 1998B Bonds

| Year (July 1) | Principal Amount | Year (July 1) | Principal Amount |
|---|---|---|---|
| 2002 | $145,000 | 2017 | $325,000 |
| 2003 | 155,000 | 2018 | 345,000 |
| 2004 | 165,000 | 2019 | 360,000 |
| 2005 | 175,000 | 2020 | 380,000 |
| 2006 | 180,000 | 2021 | 400,000 |
| 2007 | 190,000 | 2022 | 425,000 |
| 2008 | 200,000 | 2023 | 445,000 |
| 2009 | 215,000 | 2024 | 470,000 |
| 2010 | 225,000 | 2025 | 495,000 |
| 2011 | 235,000 | 2026 | 525,000 |
| 2012 | 250,000 | 2027 | 550,000 |
| 2013 | 265,000 | 2028 | 580,000 |
| 2014 | 280,000 | 2029 | 615,000 |
| 2015 | 295,000 | 2030 | 645,000 |
| 2016 | 310,000 | 2031 | 680,000 |

**Optional Redemption during Daily Mode or Weekly Mode**.  During the Daily Mode or Weekly Mode, the Series 1998 Bonds in such Mode shall be subject to redemption prior to maturity, at the option of the Authority at the direction of the Corporation, if the Corporation elects to prepay the

19

**19917**

E002970

related Series 1998 Obligation, from Eligible Moneys on deposit in the Redemption Fund, in whole or in part (and if in part in an Authorized Denomination) on any Business Day during such Daily Mode or Weekly Mode, at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the redemption date.

**Optional Redemption during Adjustable Long Mode**. The Series 1998A Bonds are not subject to optional redemption prior to July 1, 2004. Series 1998 Bonds in the Adjustable Long Mode (other than the Series 1998A Bonds during the Initial Rate Period) shall be subject to redemption prior to maturity during each Rate Period therein, at the option of the Authority at the direction of the Corporation, from Eligible Moneys on deposit in the Redemption Fund, in whole or in part on any Business Day (and if in part in an Authorized Denomination), after the No-Call Period described below, at the following redemption prices (expressed as percentages of the principal amount of Series 1998 Bonds called for redemption), plus accrued interest to the date fixed for redemption:

| Length of Rate Period | No-Call Period | Redemption Price |
|---|---|---|
| Greater than 10 years | 10 years from the Variable Rate Conversion Date | 102%, declining 1% per year to 100% |
| Less than or equal to 10 years and greater than 5 years | 5 years from the Variable Rate Conversion Date | 101%, declining ½% per year to 100% |
| Less than or equal to 5 years | Length of Rate Period | Not subject to Optional Redemption |

The Corporation may deliver an alternate redemption schedule if the Corporation delivers to the Authority and the Bond Trustee an Opinion of Bond Counsel to the effect that the alternate schedule of redemption will not adversely affect the validity and enforceability of the Series 1998 Bonds in accordance with their terms and will not have an adverse effect on any exemption from federal income taxation to which the interest on the Series 1998 Bonds would otherwise be entitled. After the first Rate Change Date succeeding the delivery of such alternate schedule and Opinion of Bond Counsel, Series 1998 Bonds operating in an Adjustable Long Mode shall be subject to redemption pursuant to the terms of such alternate schedule.

In addition, during any Adjustable Long Mode, each Series 1998 Bond in such Mode shall be subject to optional redemption prior to maturity at the option of the Authority at the direction of the Corporation, if the Corporation elects to prepay the related Series 1998 Obligation, from Eligible Moneys on deposit in the Redemption Fund, in whole or in part (and if in part in an Authorized Denomination) on any Rate Change Date therefor, at a redemption price of 100% of the principal amount thereof.

**Extraordinary Optional Redemption**. The Series 1998 Bonds are also subject to redemption prior to maturity in the event of damage to or destruction of the Facilities or any part thereof of the Corporation or any future Member of the Obligated Group or the condemnation or sale under the threat of condemnation of the Facilities or any part thereof of the Corporation or any future Member of the Obligated Group if the Net Proceeds of the insurance, condemnation or sale received in connection

E002971

19918

therewith and applied to make prepayments on the Series 1998 Obligations exceeds the greater of (a) $1,000,000 or (b) the sum of $1,000,000 plus an amount equal to $1,000,000 multiplied by a percentage equal to the aggregate percentage increase in the Construction Index from its level as of May 1, 1998. See "Summary of Certain Provisions of the Master Indenture — Damage or Destruction" or " — Condemnation" in APPENDIX C. If called for redemption in the event referred to in this paragraph, Series 1998 Bonds will be subject to redemption by the Authority at any time, in whole or in part (and if in part by maturities designated by the Corporation and by lot within maturities in such manner as the Bond Trustee determines), in an amount equal to all or that portion of such Net Proceeds which the Corporation elects to apply to such redemption at a redemption price equal to the principal amount of Series 1998 Bonds to be redeemed plus accrued interest to the redemption date and without premium. If such redemption relates to Series 1998 Bonds bearing interest at a Variable Rate, such redemption shall be made with Eligible Moneys.

**Purchase in Lieu of Redemption.** In lieu of redeeming Series 1998 Bonds, the Bond Trustee may, at the request of the Corporation, use funds otherwise available under the Bond Indenture for redemption of Series 1998 Bonds to purchase Series 1998 Bonds in the open market at a price not exceeding the redemption price then applicable. Any Series 1998 Bond so purchased in lieu of redemption shall be delivered to the Bond Trustee for cancellation as provided in the Bond Indenture.

**Notice of Redemption.** For a description of the giving of notices while the Series 1998 Bonds are in the book-entry only system, see "BOOK-ENTRY ONLY SYSTEM." Whenever Series 1998 Bonds are to be redeemed, the Bond Trustee shall give notice of the redemption of the Series 1998 Bonds, which notice shall specify the redemption date, the redemption price, the place and manner of payment and that from the redemption date interest will cease to accrue on the Series 1998 Bonds which are the subject of such notice. Notice of redemption of Series 1998 Bonds pursuant to the provisions summarized above will be given by first class mail postage prepaid (i) with respect to Series 1998 Bonds bearing interest at a Daily or Weekly Rate, by Immediate Notice not less than 10 days and not more than 30 days prior to the redemption date, and (ii) with respect to Series 1998 Bonds bearing interest at an Adjustable Long Rate, by first class mail postage prepaid not less than 30 days and not more than 60 days prior to the redemption date, to the registered owners of the Series 1998 Bonds to be redeemed at their addresses as shown on the Bond Register. Prior to the date that the redemption notice is first given as aforesaid, funds shall be placed with the Bond Trustee to pay such Series 1998 Bonds, any premium thereon, and accrued interest thereon to the redemption date. Failure to give notice in the manner described above or a defect in the notice as to any Series 1998 Bond will not affect the validity of any proceedings for redemption as to any Series 1998 Bond for which notice is properly given. Interest will not accrue after the redemption date on any Series 1998 Bond called for redemption if notice has been given and if sufficient moneys have been deposited with the Bond Trustee to pay principal of, premium, if any, and interest on such Series 1998 Bonds to the redemption date.

**No Partial Redemption After Default.** If an Event of Default under the Bond Indenture has occurred or is continuing and the Bond Trustee has actual knowledge of such Event of Default, then there shall be no redemption of less than all the Series 1998 Bonds at the time outstanding.

**Bond Registration and Transfers**

For a description of the procedure to transfer ownership of a Series 1998 Bond while in the book-entry only system, see "BOOK-ENTRY ONLY SYSTEM." Subject to the limitations described

19919

E002972

below, the Series 1998 Bonds are transferable upon surrender thereof at the Principal Office of the Bond Trustee, duly endorsed by, or accompanied by a written instrument or instruments of transfer in form satisfactory to, the Bond Trustee and duly executed by the Bondholder or such bondholder's attorney duly authorized in writing. Subject to the limitations described below, any Series 1998 Bond may be exchanged at the Principal Office of the Bond Trustee upon surrender thereof, together with an assignment duly executed by the registered owner thereof or such owner's attorney in such form and with guarantee of signature as shall be satisfactory to the Bond Trustee for an equal aggregate principal amount of Series 1998 Bonds of like date and tenor of any Authorized Denomination of the same series and maturity as the Series 1998 Bonds surrendered for exchange bearing numbers not contemporaneously outstanding. The Bond Trustee and the Authority may charge a fee sufficient to cover any tax, fee or other governmental charge in connection with any exchange, change in registration or transfer of any Series 1998 Bond, except in the case of an issuance of any Series 1998 Bond for the unredeemed portion of a Series 1998 Bond surrendered for redemption in part. The Bond Trustee shall not be required to exchange or register the transfer of any Series 1998 Bonds after the mailing of notice calling such Series 1998 Bond for redemption has been made as provided in the Bond Indenture, except that the Authority and the Bond Trustee shall be required to register the transfer of Tendered Bonds after such date of mailing of notice of redemption.

### Remarketing Agreement

Pursuant to the Remarketing Agreement, the Remarketing Agent will agree to perform the duties of the remarketing agent under the Bond Indenture. Cain Brothers & Company, LLC has been designated under the Remarketing Agreement as Remarketing Agent, and in that capacity will perform certain duties including setting the interest rates and giving certain notices relating to the remarketing of Tendered Bonds. The Remarketing Agent may at any time resign and be discharged of the duties and obligations created by the Bond Indenture by giving at least 30 days' notice to the Authority, the Corporation, the Bond Trustee and the Bank. The Remarketing Agent may be removed at any time upon three days' notice, at the direction of the Corporation by an instrument, signed by the Bank and the Authority, filed with the Remarketing Agent and the Bond Trustee. In the event of the resignation or removal of the Remarketing Agent, the Remarketing Agent must pay over, assign and deliver any moneys and Series 1998 Bonds held by it in such capacity to its successor or, if there is no successor, to the Bond Trustee.

If the Corporation fails to appoint a successor Remarketing Agent, or if the Remarketing Agent resigns or is removed, or is dissolved, or if the property or affairs of the Remarketing Agent are taken under the control of any state or federal court or administrative body because of bankruptcy or insolvency, or for any other reason, and the Corporation has not appointed its successor as Remarketing Agent, the Bond Trustee will be deemed to be the Remarketing Agent for all purposes of the Bond Indenture until the appointment by the Corporation of the successor Remarketing Agent.

## BOOK-ENTRY ONLY SYSTEM

### General

The Depository Trust Company, New York, New York ("DTC"), will act as securities depository for the Series 1998 Bonds. The Series 1998 Bonds will be issued as fully-registered Bonds

**19920**

E002973

registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered bond certificate will be issued for each series of the Series 1998 Bonds, in the aggregate principal amount of such series, and will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its participants ("Direct Participants") deposit with DTC. DTC also facilitates the settlement among Direct Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Direct Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks, and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants" and collectively with Direct Participants, "Participants"). The rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchases of the Series 1998 Bonds under the DTC system must be made by or through Direct Participants which will receive a credit for the Series 1998 Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 1998 Bond ("Beneficial Owner") is in turn to be recorded on the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase, but Beneficial Owners are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 1998 Bonds are to be accomplished by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Series 1998 Bonds, except in the event that use of the book-entry system for the Series 1998 Bonds is discontinued.

So long as Cede & Co., as nominee of DTC (or any other nominee of DTC), is the registered owner of a series of the Series 1998 Bonds, all references herein to the Series 1998 Bondholders or registered owners of the Series 1998 Bonds of such series shall mean Cede & Co., as such nominee, and shall not mean the Beneficial Owners of the Series 1998 Bonds of such series. To facilitate subsequent transfers, all Series 1998 Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. The deposit of the Series 1998 Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 1998 Bonds. DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial

19921

E002974

Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices will be sent to Cede & Co. If less than all of a series of the Series 1998 Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. will consent or vote with respect to the Series 1998 Bonds. Under its usual procedures, DTC mails an Omnibus Proxy to the Bond Trustee as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 1998 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, Tender Price, premium and interest payments on the Series 1998 Bonds will be made to DTC. DTC's practice is to credit Direct Participants' accounts on the payable date in accordance with their respective holdings as shown on DTC's records unless DTC has reason to believe that it will not receive payment on the payable date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Bond Trustee, the Corporation or the Authority subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, Tender Price, premium and interest to DTC is the responsibility of the Bond Trustee, disbursements of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

A Beneficial Owner shall give notice to the Remarketing Agent demanding that its Series 1998 Bonds bearing interest at a Daily Rate or Weekly Rate be purchased through its Participant, and shall effect delivery of such Series 1998 Bonds by causing the Participant to transfer the Participant's interest in the Series 1998 Bonds, on DTC's records, to the Remarketing Agent. The requirement for physical delivery of Series 1998 Bonds in connection with a demand for purchase or a mandatory purchase will be deemed satisfied when the ownership rights in the Series 1998 Bonds are transferred by the Participant, on DTC's records, to the Remarketing Agent.

**Neither the Authority, the Corporation nor the Bond Trustee shall have any responsibility or obligation to any DTC Participant or any Beneficial Owner with respect to: (1) the accuracy of any records maintained by DTC or any Participant; (2) the payment by DTC or any Participant of any amount due to any Beneficial Owner in respect of the principal of, premium, if any, or interest on the Series 1998 Bonds; (3) the delivery by DTC or any Participant to any Beneficial Owner of any notice (including a notice of redemption) or other communication which is required or permitted to be given to Bondholders under the Series 1998 Bond Indenture; (4) the selection of the Beneficial Owners to receive payment in the event of a partial redemption of a series of the Series 1998 Bonds; or (5) any consent given or other action taken by DTC as Bondholder.**

DTC may discontinue providing its services as securities depository with respect to a series of the Series 1998 Bonds at any time by giving reasonable notice to the Authority or the Bond Trustee. Under such circumstances, in the event that a successor securities depository is not selected as provided

**19922**

24

**E002975**

in the Bond Indenture, certificates for such series of the Series 1998 Bonds are required to be printed and delivered.

The information in this section concerning DTC and DTC's book-entry system has been obtained from DTC and none of the Authority, the Bond Trustee, the Corporation or the Underwriter takes any responsibility for the accuracy or adequacy thereof.

## PLAN OF FINANCING

The proceeds of the Series 1998 Bonds, together with certain funds held by the bond trustee for the 1994 Bonds, will be used by the Corporation to (i) advance refund the 1994 Bonds; (ii) pay or reimburse the Corporation for the payment of certain costs of acquiring, constructing, renovating, remodeling and equipping certain health facilities of the Corporation (the "Project"); and (iii) pay certain expenses incurred in connection with the issuance of the Series 1998 Bonds and the advance refunding of the Series 1994 Bonds. See "ESTIMATED SOURCES AND USES OF FUNDS."

### Refunding of the Series 1994 Bonds

Pursuant to a First Supplemental Bond Trust Indenture dated as of May 1, 1998 (the "First Supplemental Bond Indenture") between the Authority and the bond trustee for the Series 1994 Bonds, a portion of the proceeds of the Series 1998A Bonds will be deposited on the date of delivery of the Series 1998 Bonds into a trust fund established under the First Supplemental Bond Indenture. A portion of such proceeds, together with certain other funds available under the bond indenture for the Series 1994 Bonds, will be invested in certain United States Government Securities and the balance will be retained in uninvested cash. Such uninvested cash, together with the maturing principal and interest on such United States Government Securities, will be applied to pay the principal or redemption price of and interest on the Series 1994 Bonds through July 1, 2004 and to redeem the Series 1994 Bonds remaining outstanding on such date at a redemption price of 102% of the principal amount thereof. Until applied to the payment of the Series 1994 Bonds, all such cash and Government Securities will be held solely for the benefit of the holders of the Series 1994 Bonds.

### The Project

A portion of the proceeds of the Series 1998 Bonds will be used to pay or reimburse the Corporation for the payment of certain costs of constructing, renovating, remodeling and equipping certain health facilities of the Corporation and to pay certain costs of issuance of the Series 1998 Bonds. See Appendix A hereto for more information regarding the Project.

19923

E002976

## ESTIMATED SOURCES AND USES OF FUNDS

The table below shows the estimated costs of the Plan of Finance and the estimated sources of funds therefor (exclusive of accrued interest on the Series 1998A Bonds).

Sources of funds:

| | |
|---|---|
| Principal Amount of the Series 1998 Bonds | $55,000,000 |
| Funds Held Under the Bond Indenture for the Series 1994 Bonds | 6,345,600 |
| Total Sources | $61,345,600 |

Uses of funds:

| | |
|---|---|
| Refunding of Series 1994 Bonds | $49,943,415 |
| Deposit to Project Fund | 10,319,843 |
| Costs of Issuance(1) | 1,082,342 |
| Total Uses | $61,345,600 |

---

(1) Including underwriting commission, legal and accounting fees, Initial Letter of Credit fees, Issuer's fees, financial advisor's fees, trustee's fees and financial printing and rating agency charges.

**19924**

E002977

# ANNUAL DEBT SERVICE REQUIREMENTS

The following table sets forth the principal and interest due on the Series 1998A Bonds and Series 1998B Bonds for each year ending July 1.*

| Bond Year Ending July 1 | Series 1998A Bonds Principal or Bond Sinking Fund Requirements | Interest | Series 1998B Bonds Principal or Bond Sinking Fund Requirements | Interest | Total Debt Service |
|---|---|---|---|---|---|
| 1998 | $ 30,000 | $ 348,387 | — | $ 28,944 | $ 407,331 |
| 1999 | 495,000 | 2,088,915 | — | 473,625 | 3,057,540 |
| 2000 | 525,000 | 2,065,650 | — | 473,625 | 3,064,275 |
| 2001 | 550,000 | 2,040,975 | — | 473,625 | 3,064,600 |
| 2002 | 580,000 | 2,015,125 | $ 145,000 | 473,625 | 3,213,750 |
| 2003 | 615,000 | 1,987,865 | 155,000 | 467,100 | 3,224,965 |
| 2004 | 460,000 | 1,958,960 | 165,000 | 460,125 | 3,044,085 |
| 2005 | 705,000 | 1,854,900 | 175,000 | 452,700 | 3,187,600 |
| 2006 | 745,000 | 1,823,175 | 180,000 | 444,825 | 3,193,000 |
| 2007 | 785,000 | 1,789,650 | 190,000 | 436,725 | 3,201,375 |
| 2008 | 825,000 | 1,754,325 | 200,000 | 428,175 | 3,207,500 |
| 2009 | 870,000 | 1,717,200 | 215,000 | 419,175 | 3,221,375 |
| 2010 | 920,000 | 1,678,050 | 225,000 | 409,500 | 3,232,550 |
| 2011 | 970,000 | 1,636,650 | 235,000 | 399,375 | 3,241,025 |
| 2012 | 1,020,000 | 1,593,050 | 250,000 | 388,800 | 3,251,800 |
| 2013 | 1,075,000 | 1,547,100 | 265,000 | 377,550 | 3,264,650 |
| 2014 | 1,135,000 | 1,498,725 | 280,000 | 365,625 | 3,279,350 |
| 2015 | 1,195,000 | 1,447,650 | 295,000 | 353,025 | 3,290,675 |
| 2016 | 1,265,000 | 1,393,875 | 310,000 | 339,750 | 3,308,625 |
| 2017 | 1,330,000 | 1,336,950 | 325,000 | 325,800 | 3,317,750 |
| 2018 | 1,405,000 | 1,277,100 | 345,000 | 311,175 | 3,338,275 |
| 2019 | 1,480,000 | 1,213,875 | 360,000 | 295,650 | 3,349,525 |
| 2020 | 1,560,000 | 1,147,275 | 380,000 | 279,450 | 3,366,725 |
| 2021 | 1,645,000 | 1,077,075 | 400,000 | 262,350 | 3,384,425 |
| 2022 | 1,735,000 | 1,003,050 | 425,000 | 244,350 | 3,407,400 |
| 2023 | 1,830,000 | 924,975 | 445,000 | 225,225 | 3,425,200 |
| 2024 | 1,930,000 | 842,625 | 470,000 | 205,200 | 3,447,825 |
| 2025 | 2,035,000 | 755,775 | 495,000 | 184,050 | 3,469,825 |
| 2026 | 2,145,000 | 664,200 | 525,000 | 161,775 | 3,495,975 |
| 2027 | 2,265,000 | 567,675 | 550,000 | 138,150 | 3,520,825 |
| 2028 | 2,385,000 | 465,750 | 580,000 | 113,400 | 3,544,150 |
| 2029 | 2,515,000 | 358,425 | 615,000 | 87,300 | 3,575,725 |
| 2030 | 2,655,000 | 245,250 | 645,000 | 59,625 | 3,604,875 |
| 2031 | 2,795,000 | 125,775 | 680,000 | 30,600 | 3,631,375 |

---

* This table assumes that the Series 1998A Bonds will bear interest at a rate of 4.70% per annum through July 1, 2004, and at an average interest rate of 4.50% thereafter, and that the Series 1998B Bonds will bear interest at an average rate of 4.50% per annum.

19925

E002978

## SECURITY FOR THE SERIES 1998 BONDS

### General

The Series 1998 Bonds are limited obligations of the Authority payable from (i) payments or prepayments on the Series 1998 Obligations; (ii) payments or prepayments under the Loan Agreement (other than payments constituting Unassigned Rights); (iii) certain moneys and investments held by the Bond Trustee in the Funds held under, and to the extent provided in, the Bond Indenture; (iv) under certain circumstances, proceeds from certain insurance and condemnation awards or proceeds from sales consummated under threat of condemnation; and (v) amounts drawn by the Bond Trustee under the Initial Letter of Credit or any other Credit Agreement. Certain investment earnings on moneys held by the Bond Trustee may be transferred to a Rebate Fund established pursuant to a Tax Exemption Agreement among the Authority, the Bond Trustee and the Corporation. Amounts held by the Bond Trustee to pay the purchase price of Tendered Bonds will be held in a Bond Purchase Fund established pursuant to the Bond Indenture. Amounts held in the Rebate Fund and the Bond Purchase Fund are not part of the "trust estate" pledged to secure the Series 1998 Bonds and consequently will not be available to make payments on the Series 1998 Bonds.

### Initial Letter of Credit

The Initial Letter of Credit, which will be delivered to the Bond Trustee upon the issuance of the Series 1998 Bonds, is an irrevocable obligation of the Initial Bank to pay to the Bond Trustee, upon drawings by the Bond Trustee pursuant to the terms and conditions set forth in the Initial Letter of Credit, amounts sufficient to pay the principal or redemption price of and interest on the Series 1998 Bonds when due and the Tender Price of Series 1998 Bonds tendered for optional or mandatory purchase. The Initial Letter of Credit will expire on July 5, 2004 unless extended or terminated earlier in accordance with its terms. See "CREDIT AGREEMENT - The Initial Letter of Credit" herein.

### The Loan Agreement

The Loan Agreement provides that the Authority shall loan the proceeds of the Series 1998 Bonds to the Corporation and that the Corporation shall repay such loan by making payments to the Bond Trustee, in amounts sufficient to pay the principal or redemption price of and interest on the Series 1998 Bonds when due and the Tender Price of any Tendered Bonds. In addition, the Loan Agreement imposes certain restrictions on the Corporation's actions for the benefit of the Authority and the Bondholders. The Authority will pledge and assign certain of its rights under the Loan Agreement to the Bond Trustee as security for the Series 1998 Bonds.

### The Series 1998 Obligations and the Master Indenture

In order to secure the loan made by the Authority to the Corporation pursuant to the Loan Agreement, the Corporation will issue and deliver to the Authority the Series 1998 Obligations in an aggregate principal amount equal to the aggregate principal amount of the Series 1998 Bonds. The Authority will pledge and assign the Series 1998 Obligations to the Bond Trustee. The terms of the Series 1998 Obligations will require payments by the Corporation which, together with other moneys available therefor (and interest earned thereon), will be sufficient to provide for the payment of the principal of, premium, if any, and interest on the Series 1998 Bonds, provided that the Corporation shall

28

E002979

19926

receive a credit on the Series 1998 Obligations for payments made by the Corporation under the Loan Agreement.

The Corporation will also issue and deliver to the Initial Bank the Initial Credit Obligation in an amount equal to the stated amount from time to time available under the Initial Letter of Credit to evidence and secure the Corporation's payment obligations under the Reimbursement Agreement.

The Series 1998 Obligations, the Initial Credit Obligation and any other Obligations hereafter issued and outstanding under the Master Indenture are the general obligations of the Corporation and any future Members of the Obligated Group and are secured by a security interest in the Unrestricted Receivables of the Obligated Group. Notwithstanding the pledge of Unrestricted Receivables, the Corporation and any other Members of the Obligated Group may sell such Unrestricted Receivables in accordance with the provisions of the Master Indenture. The Master Indenture provides that payments on any Obligations issued and outstanding thereunder, including the Series 1998 Obligations and the Initial Credit Obligation, are the joint and several obligations of each Member of the Obligated Group. Notwithstanding limitations on and uncertainties as to enforceability of the covenant of each Member of the Obligated Group in the Master Indenture to be jointly and severally liable for each Obligation, the accounts of the Members of the Obligated Group will be combined for financial reporting purposes and will be used in determining whether the covenants and tests contained in the Master Indenture are met. See "BONDHOLDERS' RISKS — Risks Related to Obligated Group Financings."

Upon the date of issuance of the Series 1998 Bonds, the Corporation is the only Member of the Obligated Group. Upon the satisfaction of certain conditions, however, any entity may become a Member of the Obligated Group and in the future such other Members of the Obligated Group may incur indebtedness secured by Obligations of the Obligated Group. Under certain conditions and upon meeting certain tests set forth in the Master Indenture, Members of the Obligated Group may withdraw or be removed from the Obligated Group. See "APPENDIX C — Summary of Certain Provisions of the Master Indenture — Entrance into the Obligated Group" and " — Cessation of Status as a Member of the Obligated Group."

### Additional Obligations and Additional Indebtedness

Under certain conditions specified in the Master Indenture, Members of the Obligated Group may issue Additional Indebtedness, including Additional Obligations, to the Authority or to parties other than Authority, which, in the case of Additional Obligations, will not be pledged under the Bond Indenture, but will be equally and ratably secured by the Master Indenture with the Series 1998 Obligations and the Initial Credit Obligation. In addition, the Master Indenture permits such Additional Indebtedness, including Additional Obligations, to be secured by security in addition to that provided for the Series 1998 Obligations and the Initial Credit Obligation, including Liens on the Property (including health care facilities) of the Members of the Obligated Group, or letters or lines of credit or insurance, which additional security need not be extended to secure any other Indebtedness (including the Series 1998 Obligations and the Initial Credit Obligation). See "APPENDIX C — Summary of Certain Provisions of the Master Indenture — Liens on Property." In addition, the Master Indenture permits each Member of the Obligated Group to (i) enter into Guaranties and (ii) sell, lease or otherwise dispose of Property all upon the terms and conditions specified therein. See "APPENDIX C — Summary of Certain Provisions of the Master Indenture — Permitted Additional Indebtedness" and " — Sale, Lease or other Disposition of Property."

**19927**

E002980

The Master Indenture provides that Supplemental Master Indentures pursuant to which one or more series of Obligations entitled to additional security is issued may provide for such amendments to the provisions of the Master Indenture, including the provisions thereof relating to the exercise of remedies upon the occurrence of an event of default, as are necessary to provide such security and to permit realization upon such security solely for the benefit of the Obligations entitled thereto. See "APPENDIX C — Summary of Certain Provisions of the Master Indenture" hereto for a description of the terms of the Master Indenture. Such terms include, among others, restrictions on Liens on the Property of the Corporation and any future Member of the Obligated Group, restrictions on the incurrence of Additional Indebtedness and provisions governing the transfer of the Property of the Corporation and any future Member of the Obligated Group.

**The Mortgage**

In order to secure its obligations under the Master Indenture, the Corporation has granted to the Master Trustee pursuant to the Mortgage a mortgage lien on and security interest in the Mortgaged Property. Such liens and security interests are subject to Permitted Encumbrances, as defined in "APPENDIX C — Definitions of Certain Terms." However, the Initial Bank may, without the consent of or notice to any of the Owners of the Series 1998 Bonds, consent to the release of the lien and security interest of the Mortgage. In addition, the Mortgage may be released without the consent of or notice to Owners of the Series 1998 Bonds upon the expiration or termination of the Initial Letter of Credit. Upon such release the Obligations (including the Series 1998 Obligations) issued under the Master Indenture would no longer be entitled to a mortgage lien or security interest in the Mortgaged Property.

**Release and Substitution of Series 1998 Obligations**

Upon the satisfaction of the conditions set forth in the Bond Indenture, the Bond Trustee will surrender Series 1998 Obligations to the Master Trustee in exchange for an original replacement note or similar obligation issued by or on behalf of a different credit group which intends to secure the indebtedness of the Corporation with respect to the Series 1998 Bonds under and pursuant to a different master trust indenture. This could, under certain circumstances, lead to the substitution of different security in the form of an obligation backed by an obligated group which is financially and operationally different than the Obligated Group and which has substantial debt on a parity with the obligation issued in exchange for the Series 1998 Obligations. See the caption, "Summary of Certain Provisions of the Bond Indenture — Release and Substitution of Series 1998 Obligations," in APPENDIX C hereto for a description of the conditions for any such exchange of Series 1998 Obligations.

**State of Illinois Not Liable on the Series 1998 Bonds; Agreement of the State**

The Series 1998 Bonds and the interest payable thereon do not constitute a debt or liability of the State of Illinois (the "State") or of any political subdivision thereof other than the Authority or a pledge of the faith and credit of the State or any political subdivision thereof other than the Authority, but shall be payable solely from the funds pledged therefor in accordance with the Bond Indenture. The issuance of the Series 1998 Bonds does not, directly, indirectly or contingently, obligate the State or any political subdivision thereof to levy any form of taxation for the payment thereof or to make any appropriation for their payment. The Series 1998 Bonds and the interest and any premium payable thereon do not now and shall never constitute a debt of the State within the meaning of the Constitution or the statutes of the State and do not now and shall never constitute a charge against the credit or taxing power of the State

**19928**

E002981

or any political subdivision thereof. The State shall not in any event be liable for the payment of the principal of, premium, if any, or interest on the Series 1998 Bonds or for the performance of any pledge, mortgage, obligation or agreement of any kind whatsoever which may be undertaken by the Authority. No breach by the Authority of any such pledge, mortgage, obligation or agreement may impose any pecuniary liability or other liability upon the State or any charge upon its general credit or against its taxing power. The Authority has no taxing power.

The Act provides that the State pledges to, and agrees with, holders of any obligations issued by the Authority under the Act that the State will not limit or alter the rights vested in the Authority by the Act until such obligations, together with the interest thereon, are fully met and discharged; provided, however, that nothing in the Act precludes such limitation or alteration if and when adequate provision shall be made by law for the protection of the holders of such obligations.

## CREDIT AGREEMENT

Under the Loan Agreement, unless the Series 1998 are converted to the Fixed Mode, the Corporation is required to provide a Credit Agreement issued by a financial institution which provides security for the payment of the principal of and interest on the Series 1998 Bonds when due and for the payment of the purchase price of Bonds tendered for purchase as provided in the Bond Indenture.

### The Initial Letter of Credit

The following summarizes certain provisions of the Initial Letter of Credit. Reference is made to the Initial Letter of Credit for the detailed provisions thereof.

The Initial Letter of Credit is an irrevocable obligation of the Initial Bank to pay to the Bond Trustee, upon drawings by the Bond Trustee pursuant to the terms and conditions set forth in the Initial Letter of Credit, up to (a) an amount equal to the principal amount of the Series 1998 Bonds to enable the Bond Trustee to pay (i) the principal of such Bonds when due at maturity, redemption or acceleration and (ii) the portion of the purchase price of such Bonds optionally or mandatorily tendered or deemed tendered and not remarketed corresponding to the principal amount of such Bonds, plus (b) an amount equal to interest on such principal amount (i) for a period of 56 days at a rate equal to 12% per annum (computed on the basis of a 365 day year) for Series 1998 Bonds bearing interest at a Weekly Rate, and (ii) for a period of up to 205 days at the Adjustable Long Rate (computed on the basis of a 360-day year) for Series 1998 Bonds bearing interest at the Adjustable Long Rate, to enable the Bond Trustee (x) to pay interest on the Series 1998 Bonds when due and (y) to pay the portion of the purchase price of Series 1998 Bonds optionally or mandatorily tendered or deemed tendered and not remarketed corresponding to the accrued interest on such Bonds.

The interest component of the Initial Letter of Credit may also be drawn upon to pay up to a certain specified numbers of days of interest on the Series 1998 Bonds bearing interest at a Daily Rate, Quarterly Rate, Semiannual Rate and Commercial Paper Rate as well redemption or purchase premium applicable during an Adjustable Rate Period.

Each drawing honored by the Initial Bank under the Initial Letter of Credit shall immediately reduce the principal component or the interest component (as the case may be) of the amount available

31

**19929**

E002982

under the Initial Letter of Credit by the amount of such drawing. and the aggregate amount available under the Initial Letter of Credit shall be correspondingly reduced. The principal component and the interest component and the aggregate amount available under the Initial Letter of Credit, as so reduced. shall be reinstated only as follows:

(a)     In the case of a reduction resulting from a drawing to pay interest, the interest component shall be reinstated automatically on the 7th calendar day following the date such drawing is honored by an amount equal to the amount of such drawing, unless the Trustee shall have received notice from the Initial Bank before such 7th calendar day that an event of default has occurred and is continuing under the Reimbursement Agreement and directing that the Series 1998 Bonds be called for mandatory purchase pursuant to the Bond Indenture.

(b)     In the case of a reduction resulting from a drawing to pay the purchase price of any Series 1998 Bonds, the principal component and the interest component with respect to such Series 1998 Bonds. shall be reinstated to the extent and at such time that such Series 1998 Bonds are released by the Initial Bank from the Pledge Agreement (as defined in the Reimbursement Agreement) and the Initial Bank advises the Bond Trustee in writing that such reinstatement shall occur.

The principal component and the amount available under the Initial Letter of Credit shall also be reduced. in accordance with the provisions of the Initial Letter of Credit, following the payment of principal of the Series 1998 Bonds pursuant to the Bond Indenture.

The Initial Letter of Credit will terminate upon the earliest to occur of the following:

(a)     July 5, 2004 or such later date as the Initial Bank may specify pursuant to the Initial Letter of Credit (the "Stated Expiration Date");

(b)     The date on which the Initial Bank receives a certificate from the Bond Trustee in the form prescribed by the Initial Letter of Credit to the effect that (i) there are no Series 1998 Bonds outstanding, (ii) a substitute credit facility has become effective, or (iii) the interest rate on the Series 1998 Bonds has been converted to an interest rate mode which is not a covered rate mode; and

(c)     Permanent reduction of the Stated Amount to zero.

Any Series 1998 Bonds not remarketed by the Remarketing Agent will be purchased by the Bond Trustee with funds drawn from the Initial Letter of Credit and will be registered in the name of the Initial Bank, as pledgee, and such Series 1998 Bonds will constitute Pledged Bonds under the Reimbursement Agreement. The Remarketing Agent shall continue to use its best efforts to market Pledged Bonds.

**The Reimbursement Agreement**

**General**

Under the Reimbursement Agreement. the Initial Bank agrees to issue the Initial Letter of Credit to the Bond Trustee concurrently with the original issuance and delivery of the Series 1998 Bonds, and

**19930**

E002983

the Corporation agrees to reimburse the Initial Bank, with interest, for each drawing under the Initial Letter of Credit.

The Reimbursement Agreement sets forth various representations, warranties and covenants of the Corporation, including relating to maintenance of corporate existence, insurance and properties; furnishing of financial reports and other information; limitations on additional liens, indebtedness and transfers of assets; compliance with certain financial ratios; ERISA matters; and management matters. Certain of the covenants and obligations of the Corporation under the Reimbursement Agreement are more restrictive than the covenants and obligations of the Corporation under the Bond Indenture and Loan Agreement.

**Events of Default**

Each of the following shall constitute an event of default under the Reimbursement Agreement:

(a)     Failure by the Corporation to make or cause to be made to the Initial Bank when due amounts payable under the Reimbursement Agreement and continuance of such failure for a specified grace period;

(b)     Failure by the Corporation to perform or comply with any of the terms or conditions contained in specified sections of the Reimbursement Agreement;

(c)     Failure by the Corporation to perform or comply with any of the terms or conditions contained in the Reimbursement Agreement (other than those referenced in clause (b) above) and continuance of such failure for a specified grace period;

(d)     The occurrence of an event of default as defined in any of the documents relating to the Series 1998 Bonds;

(e)     Any of the representations or warranties of the Corporation proves to have been false or misleading in any material respect;

(f)     Failure by the Corporation to make certain payments required under the Loan Agreement;

(g)     Any material provision of the Reimbursement Agreement or other documents relating to the Series 1998 Bonds ceases to be valid and binding on the Corporation or is declared to be null and void, or the Corporation denies that it has any or further liability or obligation thereunder;

(h)     The occurrence of an event of bankruptcy as described in the Reimbursement Agreement with respect to the Corporation;

(i)     The Corporation's auditors deliver an opinion with respect to the financial statements of the Corporation which describes conditions which raise substantial doubt about the ability of the Corporation to continue to operate as a going concern;

33

**19931**

E002984

(j)     Any judgment or order for the payment of money of an amount specified in the Reimbursement Agreement in excess of insurance coverage is rendered against the Corporation and is not dismissed within a specified period;

(k)     The occurrence of an event of default in respect of indebtedness of the Corporation in excess of a specified amount that results in or permits the acceleration, maturity or mandatory redemption of such indebtedness;

(l)     The occurrence of an event of default as defined in any other credit agreement under which the Corporation is now or hereafter obligated to the Initial Bank; and

(m)     The Corporation shall fail to keep in full force and effect any material permit or approval which could have, in the judgment of the Initial Bank, a material adverse effect with respect to the operations of the Corporation or its use of the Mortgaged Property.

**Remedies**

Upon the occurrence of any event of default, the Initial Bank may, at its option, take any of the following actions:

(a)     Declare the Corporation's obligations under the Reimbursement Agreement and other security documents to be immediately due and payable;

(b)     Take action to collect amounts due or enforce covenants and obligations of the Corporation;

(c)     Direct the Trustee to call the Series 1998 Bonds for mandatory tender;

(d)     For certain specified events of default, engage consultants at the Corporation's expense to review and evaluate the operations of the Corporation; and

(e)     Exercise, or cause to be exercised, any and all such remedies as it may have under the Reimbursement Agreement or other documents relating to the Series 1998 Bonds or any other document or available at law or in equity.

## THE INITIAL BANK

**Credit Local De France**

Credit Local de France ("CLF") is a specialized French financial institution, primarily dedicated to regional and municipal development financing. Its principal office is located in Paris, France. CLF conducts operations through branch offices and subsidiaries primarily in France. In issuing the Letter of Credit Facility, CLF will act through its New York Agency, which is licensed by the State of New York as an unincorporated agency of CLF, Paris, and is licensed by the Banking Department of the State of New York.

**19932**

E002985

CLF is the leading local authority lender in France, funding its lending activities in 1997 primarily through the issuance of French franc. Swiss franc. ECU and U.S. dollar denominated bonds. CLF was France's second largest bond issuer on the international markets in 1996.

CLF was privatized in 1993 when the Republic of France and Caisse des Depots et Consignations reduced their ownership interest to 8% and 12%, respectively. The balance of CLF's shares were held primarily by French and foreign institutional investors. The privatization did not affect the nature of CLF's activities nor its status as a specialized financial institution that has been entrusted by the Republic. During September, 1996 the Republic sold its remaining interest in CLF.

In March, 1996 CLF and Credit Communal de Belgique ("CCB") announced the commencement of preliminary talks to explore the feasibility of forming a closer partnership. CLF and CCB, which are almost of equivalent size with businesses based principally around the financing of public authorities, agreed in principal to form a strategic alliance which is expected to lead to the creation of the 19th largest bank in the European Union, specializing in local authority financing and financing of local infrastructure projects.

CLF's shareholders approved the alliance at an extraordinary general meeting held on October 14, 1996. The new CLF-CCB group called "Dexia", was created on October 23, 1996 when CLF and CCB signed the definitive agreements that officially established their alliance.

CLF and CCB each transferred their existing assets, rights and obligations to two subsidiary operating companies which respectively carry out the pre-existing activities of CLF and CCB. The pre-existing CLF and CCB entities have become holding companies for the operating companies. The holding companies carried out a share exchange pursuant to which each holding company holds 50% of the other operating company. The management of the group is coordinated through joint bodies made up of members of the management and the administrative bodies of the four companies.

As of December 31, 1997, CLF had total consolidated assets of $95.6 billion, loans to customers of approximately $65.7 billion and shareholders' equity of nearly $3.5 billion (Tier I plus Tier II), and for the year then ended had consolidated net income of $292.8 million (assuming an exchange rate of 5.988 French francs to one United States dollar, prevailing on December 31, 1997). These figures were determined in accordance with generally accepted accounting principles in France. CLF maintains its records and prepares its financial statements in French francs. Amounts in U.S. dollars are included solely for the convenience of readers outside France. The inclusion of U.S. dollar amounts is not intended to imply that French francs have been or could readily be converted, realized or settled in U.S. dollars at that rate or any other rate.

CLF is rated Aa1 long-term and P-1 short-term by Moody's Investors Service, Inc., AA+ long-term and A-1+ short-term by Standard & Poor's Corporation, and AAA long-term and A-1+ short-term by IBCA S.A.

CLF will provide without charge a copy of its most recent publicly available annual report. Written request should be directed to CLF, New York Agency, 450 Park Avenue, 3rd Floor, New York, New York 10022, Attention: General Manager.

**19933**

E002986

The delivery of this information shall not create any implication that the information contained or referred to herein is correct as of any time subsequent to its date.

## BONDHOLDERS' RISKS

The Series 1998 Bonds are subject to certain payment risks and certain prepayment risks. Some of the possible changes in future conditions which could affect the Series 1998 Bonds are discussed below. This discussion of risk factors is not, and is not intended to be, exhaustive.

### Creditworthiness of the Initial Bank

Payment of principal of and interest on the Series 1998 Bonds is secured by the Initial Letter of Credit. Payment of these amounts will depend on the creditworthiness of the Initial Bank. For information on the Initial Letter of Credit, see "CREDIT AGREEMENT" herein. For information on the Initial Bank, see "THE INITIAL BANK". There can be no assurance that the Initial Bank will maintain its present financial condition or that an adverse change in such condition will not adversely affect its ability to honor future drawings under the Initial Letter of Credit. In addition, the Bond Indenture provides that a Substitute Credit Agreement may be substituted for the Initial Letter of Credit, provided certain conditions set forth in the Bond Indenture are satisfied. There can be no assurance, however, as to the identity of any such future provider of a Substitute Credit Agreement or that such provider will maintain its financial condition and honor future drawings under such Substitute Credit Agreement. A change in the creditworthiness of the Initial Bank or the provider of any Substitute Credit Agreement could result in a change in the ratings on the Series 1998 Bonds.

### Prepayment Risk

The Series 1998 Bonds are subject to prepayment upon mandatory tender for purchase and drawing on the Initial Letter of Credit following the occurrence of an event of default under the Reimbursement Agreement. In general, the Initial Bank has the right under the Bond Indenture to direct that any event of default by the Corporation under the Reimbursement Agreement will result in a mandatory tender for purchase of the Series 1998 Bonds. Numerous factors could affect whether or not the Initial Bank would elect to direct such a mandatory tender for purchase in the event of a default by the Corporation under the Reimbursement Agreement. No premium will be paid in connection with any such purchase.

### Revenues of the Corporation

No representation or assurance can be made that revenues will be realized by the Corporation or future Members of the Obligated Group in amounts sufficient to provide funds for payment of the principal or redemption price of and interest on the Series 1998 Bonds when due and to make other payments necessary to meet the obligations of the Corporation. Further, there is no assurance that the Corporation's revenues can be increased sufficiently to match increased costs that may be incurred.

The receipt of future revenues by the Corporation is subject to, among other factors, federal and state regulations and policies affecting the health care industry and the policies and practices of major managed care providers, private insurers and other third party payors and private purchasers of health

**19934**

E002987

care services. The effect on the Corporation of recently enacted laws, statutes and regulations and of future changes in federal, state, and private policies cannot be determined at this time. Loss of the Corporation's established managed care contracts could also adversely affect the future revenues of the Corporation.

Future economic conditions, which may include an inability to control expenses in periods of inflation, and other conditions, including demand for health care services, the capability of the management of the Corporation, the receipt of grants and contributions, physicians' and patients' confidence in the Corporation, economic and demographic developments in the United States, the State and the Corporation's service area and competition from other health care institutions in the service area, together with changes in rates, costs, third-party payments and governmental regulations, may adversely affect revenues and expenses and, consequently, the Corporation's ability to make payments under the Loan Agreement and the Series 1998 Obligations. See "APPENDIX A — NORTHSIDE OPERATING CO. D/B/A EDGEWATER MEDICAL CENTER.

**Competition**

In providing health care services, the Corporation competes with a number of other providers in its service area, including providers of acute health care services. In addition, affiliations among health care providers in the Corporation's service areas may be either in a formative phase or under negotiation. The effect of these transactions, if completed, on the Corporation cannot be determined at this time, but the Corporation's management believes it has positioned itself to effectively provide community-based healthcare.

**Payment and Reimbursement**

A substantial portion of the patient service revenues of the Corporation providing health care services are derived from third-party payors which reimburse or pay for the services provided to patients covered by such third parties for such services. These third-party payors include the federal Medicare program, state Medicaid program and private health plans and insurers, including health maintenance organizations and preferred provider organizations. Many of those programs make payments to the Corporation at rates other than the direct charges that the Corporation would charge for such services, which rates may be determined other than on the basis of the actual costs incurred in providing services to such patients. Accordingly, there can be no assurance that payments made under these programs will be adequate to cover the Corporation's actual costs. In addition, the financial performance of the Corporation could be adversely affected by the insolvency of, or other delay in receipt of payments from, third-party payors that provide coverage for services to its patients.

**Medicare and Medicaid Programs**

Medicare and Medicaid are the commonly used names for reimbursement or payment programs governed by certain provisions of the federal Social Security Act. Medicare is an exclusively federal program and Medicaid is a combined federal and state program. Medicare provides certain health care benefits to beneficiaries who are 65 years of age or older, blind, disabled or qualify for the End Stage Renal Disease Program. Medicare Part A covers inpatient hospital services, skilled nursing care and some home health care, and Medicare Part B covers outpatient services, physician services and some supplies. Medicaid is designed to pay providers for care given to the medically indigent and others who

37

receive federal aid. Medicaid is funded by federal and state appropriations and administered by the various states. For the fiscal year ended December 31, 1997, approximately 50% and 25% of the Corporation's revenues were derived from the Medicare and Medicaid programs, respectively.

### Medicare

Medicare pays most acute care hospitals for most services provided to inpatients under a payment system known as the "Prospective Payment System" or "PPS." Separate PPS payments are made for inpatient operating costs and inpatient capital-related costs. Some costs are also paid on the basis of "reasonable cost."

Inpatient Operating Costs. The Corporation is paid a specified amount towards its operating costs based on a prospectively-determined federal payment rate, adjusted for the Diagnosis Related Group or "DRG" to which each Medicare patient is assigned upon admission, which is based on the admitting diagnosis and major procedures and other factors for each particular Medicare patient. The amount to be paid for each DRG is established prospectively by the Health Care Financing Administration, an agency of the United States Department of Health and Human Services ("HCFA"), and is not related to a hospital's actual costs. Historically, the government either does not increase payment rates annually or increases the DRG rates annually at rates which are less than the increase in the cost of delivering health care services.

Outpatient Services. Through federal fiscal year 1998, Medicare payment for outpatient services, including outpatient surgery and radiology procedures, has been and will be based upon various formulae including actual costs or a blend of facility costs, prevailing charges of physicians for similar services and, in the case of outpatient surgery, a federally-determined prospective rate for ambulatory surgical procedures. A PPS system will be implemented for outpatient services in 1999.

Outpatient capital-related costs (including depreciation and interest) are currently reimbursed on a reasonable cost basis. For outpatient capital costs for fiscal years through 1998, Medicare reimburses a hospital its reasonable costs for capital, reduced by 10 percent.

Physician Payment. Medicare pays physicians eighty percent (80%) of the lower of an amount based upon a fee schedule or the physicians' actual charge. The fee schedule amount is derived from a resource-based relative value scale which calculates the weighted values of physicians' work, practice expenses, and the cost of malpractice insurance associated with each procedure performed by physicians. The amounts paid under the fee schedule in each year are updated and limited by a complex formula which ties the amount of the payment to a sustained growth factor.

Home Health Care. Medicare reimburses home health agencies for both operating and capital expenses incurred in providing each of the covered home health disciplines on a reasonable cost basis. Reasonable operating costs are limited, however, to 105% of median costs for free standing facilities effective October 1, 1997, and the aggregate costs per beneficiary treated during the cost reporting period. Payment to home health agencies will be determined on a PPS basis beginning in federal fiscal year 2000.

**19936**

E002989

### Medicaid

Significant changes have been and may be made in the Medicaid program which could have a material adverse impact on the financial condition of the Corporation. Health care providers, including the Corporation, have been affected significantly by changes in the last several years in federal and state health care laws and regulations, particularly those pertaining to Medicaid. The purpose of much of this statutory and regulatory activity has been to contain the rate of increase in health care costs, particularly costs paid under the Medicaid program. Diverse and complex mechanisms to limit the amount of money paid to health care providers under the Medicaid program have been enacted.

Payment for Medicaid patients is subject to appropriation by the respective state legislatures of sufficient funds to pay the incurred patient obligations. Delays in appropriations and state budget deficits which may occur from time to time create a risk that payment for services to Medicaid patients will be withheld or delayed.

During certain fiscal years of the State of Illinois, the amount appropriated by the General Assembly for payment of Medicaid claims has not been sufficient to reimburse hospitals for all services provided to Medicaid patients during such fiscal years. During certain fiscal years, the State of Illinois ceased making any payments and hospitals were paid on a delayed basis through either emergency appropriations or additional appropriations made during the ensuing fiscal year. Failure of the State of Illinois to pay Medicaid claims on a timely basis may have a material adverse affect on the financial condition of the Corporation.

Medicaid Managed Care. HCFA has approved the State of Illinois' Medicaid waiver demonstration project, known as "MediPlan Plus." Under the demonstration program, the State would contract with a range of managed care entities in order to achieve the goals of increasing access and quality of health care for the State's Medicaid beneficiaries while limiting cost increases. The Department has suspended implementation of the MediPlan program as a result of the passage of the Budget Act, which authorizes states to implement Medicaid managed care programs without obtaining demonstration waivers, and is considering developing a new Medicaid managed care program.

Patient Transfers. A federal "anti-dumping" statute imposes certain requirements which must be met before transferring a patient to another facility. Failure to comply with the law can result in exclusion from the Medicare and/or Medicaid programs as well as civil and criminal penalties. Failure of the Corporation to meet its responsibilities under the law could adversely affect the financial condition of such organization.

Audits, Exclusions, Fines and Enforcement Actions. Hospitals participating in Medicare are subject to audits and retroactive audit adjustments by fiscal intermediaries under the Medicare program. From an audit, a fiscal intermediary may conclude that a patient discharge has been claimed under an incorrect DRG, that services may not have been provided under the direct supervision of a physician (to the extent so required), that a patient should not have been characterized as an inpatient, that certain services provided prior to admission as an inpatient should not have been billed as outpatient services or that certain required procedures or processes were not satisfied. As a consequence, payments may be retroactively disallowed. Under certain circumstances, payments made may be determined to have been made as a consequence of improper claims subject to the federal False Claims Act or other federal statutes, subjecting the hospital to civil or criminal sanctions.

19937

E002990

**Blue Cross**

Blue Cross offers private insurance programs that provide subscribers with hospital and medical benefits. Pursuant to contracts with Blue Cross, the Corporation is reimbursed on a percentage above cost basis with respect to inpatient services and on a discount from customary charges basis with respect to outpatient services.

**Managed Care**

The Corporation contracts with several preferred provider and health maintenance organizations. For the fiscal year ended December 31, 1997, managed care accounted for approximately 4% of the Corporation's revenues.

Generally, a preferred provider organization ("PPO") is a group of health care providers who have contractual arrangements to provide specific or full-scope services at a negotiated price to a defined group of patients. A health maintenance organization ("HMO"), on the other hand, is responsible for and directly assumes the financial risk of providing health care services to its members in return for a set prepaid monthly premium. The primary objective of the managed care systems is to reduce hospital utilization and reduce health care costs to the consumer.

Most PPOs, and many HMOs, currently pay hospitals on a discounted fee-for-service basis or on a discounted fixed rate per day of care. The discounts offered to HMOs and PPOs may result in payment at less than actual cost and the volume of patients directed to a hospital under an HMO and/or PPO contract may vary significantly from projections. Therefore, the future financial consequences of such contracts may be unknown. Further, the effect of such contracts on the Corporation's financial condition and results of operations may be different in the future than for the current periods or past periods.

Some managed care organizations are now offering or mandating a "capitation" payment method under which the hospital is paid a predetermined periodic rate for each enrollee in the managed care program who is "assigned" to or otherwise directed to be cared for by the hospital. In a capitated payment system, the hospital assumes an insurance risk for the cost and scope of care given to such enrollees. If the capitation payment is insufficient to meet the hospital's costs of care, the financial condition of the hospital may erode. Further, some managed care contracts may require that the hospital care for enrollees for a certain period of time regardless of whether the HMO or PPO has funds to pay to the hospital. In cases where a managed care organization is a major purchaser of services from a particular hospital, a contract rate reduction, contract cancellation, inability to pay, business failure or bankruptcy of the managed care program may have a substantial negative effect on the Corporation's financial condition or results of operations.

Failure to execute and maintain PPO and HMO contracts could have the effect of reducing the Corporation's patient base and/or revenues. On the other hand, participation may maintain or increase the patient base, but may result in reduced payment and lower operating income. The Corporation has contracted with a variety of these programs, but there is no assurance that it will maintain these contracts or obtain other similar contracts in the future.

**19938**

E002991