### Commercial Insurance and Other Third-Party Plans

Many commercial insurance plans, including group plans, reimburse their customers or make direct payments to the Corporation for charges at established rates. Generally, these plans pay semi-private room rates plus ancillary service charges, which are subject to various limitations and deductibles depending on the plan. Patients carrying such coverage are responsible to the Corporation for any deficiency between the commercial insurance proceeds and total billed charges.

### Regulatory Environment

The facilities of the Corporation are subject to regulatory actions and policy changes by those governmental and private agencies that administer Medicare, Medicaid and third party payment programs and actions by, among others, the National Labor Relations Board, the Joint Commission on Accreditation of Healthcare Organizations and other federal, state and local government agencies. Management of the Corporation currently anticipates no difficulty in renewing or maintaining currently held licenses, certifications or accreditations, and does not anticipate a reduction in third-party payments that would materially and adversely affect the operations or financial condition of the Corporation due to licensing, certification or accreditation difficulties. Nevertheless, actions in any of these areas could result in a reduction in utilization or revenues or both, or the loss of the ability of the Corporation to operate all or a portion of its facilities, and, consequently, could adversely affect the ability of the Corporation to make principal, interest and any premium payments on the Series 1998 Bonds.

### Health Care Reform

State and federal legislation has been introduced from time to time to reform the health care delivery system, including its payment provisions. The objective of such proposed legislation has been to substantially alter the health care delivery system. If national reform legislation is enacted, the Corporation may benefit from certain provisions thereof, and, conversely, may be adversely affected by other provisions. Management of the Corporation cannot now anticipate the aggregate effect of any legislative reform proposals upon the Corporation.

### Federal "Fraud and Abuse" Laws and Regulations

The federal Medicare/Medicaid Anti-Fraud and Abuse Amendments to the Social Security Act (the "Anti-Kickback Law") make it a criminal felony offense to knowingly and willfully offer, pay, solicit or receive remuneration in order to induce business for which reimbursement is provided under the Medicare or Medicaid programs. Violations of the Anti-Kickback Law can also lead to civil monetary penalties and exclusion from the Medicare and Medicaid and certain other state and federal health care programs. The scope of prohibited payments in the Anti-Kickback Law is broad and includes economic arrangements involving hospitals, physicians and other health care providers, including joint ventures, space and equipment rentals, purchases of physician practices and management and personal services contracts. Federal regulations describe certain arrangements that will not be deemed to constitute violations of the Anti-Kickback Law. The safe harbors described in the regulations are narrow and do not cover a wide range of economic relationships which many health care providers consider to be legitimate business arrangements not prohibited by the statute.

**19939**

E002992

Management of the Corporation believes that the contracts of the Corporation with physicians and other referral sources are in material compliance with the Anti-Kickback Law. However, because of the narrowness of the safe harbor regulations and the scarcity of case law interpreting the Anti-Kickback Law, there can be no assurances that the Corporation will not be found to have violated the Anti-Kickback Law, and if so, whether any sanction imposed would have a material adverse effect upon the operations and financial condition of the Corporation or the status of the Corporation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

### Restrictions on Referrals

Current federal law (the "Stark Law") prohibits a physician who has a financial relationship with a provider of "designated health services," including a clinical laboratory, physical therapy services, occupational therapy services, radiology or other diagnostic services, durable medical equipment, radiation therapy services, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices, home health services, outpatient prescription drugs, and inpatient and outpatient hospital services, from referring Medicare and Medicaid patients to that provider for such designated health services, with limited exceptions. Certain referrals within physician group practices and to hospitals "under arrangement" are permitted. The sanctions under the Stark Law include denial and refund of payments, civil monetary penalties and exclusion from the Medicare and Medicaid programs.

Management of the Corporation believes that the Corporation is in material compliance with the Stark Law. However, because of the lack of regulatory guidance and the scarcity of case law interpreting the Stark Law, there can be no assurances that the Corporation will not be found to have violated the Stark Law, and if so, whether any sanctions imposed would have a material adverse effect upon the operations and financial condition of the Corporation.

### Future Legislation

Legislation is periodically introduced in Congress at the State level which could result in limitations on hospital revenues, reimbursement, costs or charges or which could require an increase in the quantity of indigent care required to maintain charitable status.

As discussed above, a number of additional legislative proposals concerning health care have been introduced in Congress in the past and may be introduced in the future. If such proposals are enacted, the effects on the Corporation cannot accurately be determined at this time.

In addition to legislative proposals previously discussed herein, other legislative proposals which could have an adverse effect on the Corporation include: (a) any changes in the taxation of not for profit corporations or in the scope of their exemption from income or property taxes; (b) limitations on the amount or availability of tax-exempt financing for corporations described under Section 501 (c)(3) of the Code; and (c) regulatory limitations affecting the Corporation's ability to undertake capital projects or develop new services.

Legislative bodies have considered proposed legislation on the charity care standards that non-profit charitable hospitals must meet to maintain their federal income tax-exempt status under the Code and legislation mandating non-profit, charitable hospitals to have an open-door policy toward

**19940**

E002993

Medicare and Medicaid patients as well as offer, in a non-discriminatory manner, qualified charity care and community benefits. Excise tax penalties on non-profit, charitable hospitals that violate these charity care and community benefit requirements could be imposed or their tax-exempt status under the Code could be revoked. The scope and effect of legislation, if any, which may be adopted at the federal or state levels with respect to charity care of non-profit hospitals cannot be predicted. Any such legislation or similar legislation, if enacted, may have the effect of subjecting a portion of the Corporation's income to federal or state income taxes or to other tax penalties.

## Malpractice Lawsuits and Malpractice Insurance

Although the number of malpractice lawsuits filed against physicians and hospitals has stabilized in recent years, the dollar amounts of patient damage recoveries still remain potentially significant. The ability of, and the cost to, the Corporation to insure or otherwise protect itself against malpractice claims may affect operations of the Corporation. For further information, see "APPENDIX A—NORTHSIDE OPERATING CO. D/B/A EDGEWATER MEDICAL CENTER" and "LITIGATION."

### Antitrust

Enforcement of the antitrust laws against health care providers is becoming more common, and antitrust liability may arise in a wide variety of circumstances, including medical staff privilege disputes, third party contracting, physician relations, and joint venture, merger, affiliation and acquisition activities. In some respects, the application of the federal and state antitrust laws to health care is still evolving, and enforcement activity by federal and state agencies appears to be increasing. Violation of the antitrust laws could subject a hospital to criminal and civil enforcement by federal and state agencies, as well as by private litigants. At various times, the Corporation may be subject to an investigation by a governmental agency charged with the enforcement of the antitrust laws, or may be subject to administrative or judicial action by a federal or state agency or a private party. The most common areas of potential liability are joint activities among providers with respect to payor contracting, medical staff credentialing, and use of a hospital's local market power for entry into related health care businesses. From time to time, the Corporation may be involved in joint contracting activity with other hospitals or providers. The precise degree to which this or similar joint contracting activities may expose the Corporation to antitrust risk from governmental or private sources is dependent on a myriad of factual matters which may change from time to time. A U.S. Supreme Court decision now allows physicians who are subject to adverse peer review proceedings to file federal antitrust actions against hospitals and seek treble damages. Hospitals regularly have disputes regarding credentialing and peer review, and therefore may be subject to liability in this area. In addition, hospitals occasionally indemnify medical staff members who are involved in such credentialing or peer review activities, and may also be liable with respect to such indemnity. Recent court decisions have also established private causes of action against hospitals which use their local market power to promote ancillary health care business in which they have an interest. Such activities may result in monetary liability for the participating hospitals under certain circumstances where a competitor suffers business damage. Government or private parties are entitled to challenge joint ventures that may injure competition. Liability in any of these or other antitrust areas of liability may be substantial, depending on the facts and circumstances of each case.

19941

E002994

**Environmental Laws and Regulations**

Health care providers are subject to a wide variety of federal, state and local environmental and occupational health and safety laws and regulations which address, among other things, hospital operations, facilities and properties owned or operated by hospitals. Among the types of regulatory requirements faced by hospitals are (a) air and water quality control requirements, (b) waste management requirements, (c) specific regulatory requirements applicable to asbestos, polychlorinated biphenyls and radioactive substances, (d) requirements for providing notice to employees and members of the public about hazardous materials handled by or located at the hospital, (e) requirements for training employees in the proper handling and management of hazardous materials and wastes and (f) other requirements.

In its role as an owner and operator of properties or facilities, the Corporation may be subject to liability for investigating and remedying any hazardous substances that may be present on or have migrated off of its property or facilities. Typical hospital operations include, but are not limited to, in various combinations, the handling, use storage, transportation, disposal and discharge of hazardous, infectious, toxic, radioactive, flammable and other hazardous materials, wastes, pollutants or contaminants. As such, hospital operations are particularly susceptible to the practical, financial and legal risks associated with compliance with such laws and regulations. Such risks may result from damage to individuals, property or the environment and include an interruption of operations, an increase in operating costs, legal liability, damages, injunctions or fines and investigations, administrative proceedings, penalties or other governmental agency actions. There is no assurance that the Corporation will not encounter such risks in the future, and such risks may result in material adverse consequences to the financial condition or results of operations of the Corporation.

Management of the Corporation is not aware of any pending or threatened claim, investigation or enforcement action regarding such environmental issues which, if determined adversely to the Corporation, would have a material adverse effect on its financial condition or results of operations.

The Bond Trustee may decline to enforce the Bond Indenture if the Bond Trustee has not been indemnified to its satisfaction, in accordance with the Bond Indenture, for all liabilities it may incur as a consequence thereof. Such liabilities may include, but are not limited to, costs associated with complying with environmental laws and regulations.

**Enforcement of Remedies**

Enforcement of the remedies mentioned under the headings "APPENDIX C — Summary of Certain Provisions of the Loan Agreement — Defaults and Remedies," "— Summary of Certain Provisions of the Bond Indenture — Defaults and Remedies," and "Summary of Certain Provisions of the Master Indenture — Events of Default" may be limited or delayed in the event of application of federal bankruptcy laws or other laws affecting creditor's rights and may be substantially delayed and subject to judicial discretion in the event of litigation or the required use of statutory remedial procedures.

If the Corporation or any future Member of the Obligated Group were to file a petition for relief (or a petition were filed against the Corporation or such Member of the Obligated Group) under the current Federal Bankruptcy Code, the filing would operate as an automatic stay of the commencement or continuation of any judicial or other proceeding against the Corporation or such Member of the Obligated Group, and its property. If the bankruptcy court so ordered, the Corporation or Member's

19942

44

E002995

property, including its accounts receivable and proceeds thereof, could be used for the benefit of the Corporation or such member of the Obligated Group despite the claims of its creditors.

In a case under the current Bankruptcy Code, the Corporation or any future Member of the Obligated Group as applicable, could file a plan of reorganization. The plan is the vehicle for satisfying, and provides for the comprehensive treatment of, all claims against the Corporation or any future Member of the Obligated Group, as applicable, and could result in the modification of rights of creditors generally, or the rights of any class of creditors secured or unsecured. To confirm a plan of reorganization, of those who vote, more than one-half in number and two-thirds in amount of each impaired class of claims must vote in favor of a plan. Classes of interests must vote in favor of the plan by two-thirds in amount. If these levels of votes are attained, those voting against the plan or not voting at all are nonetheless bound by the terms thereof. Other than as provided in the confirmed plan, all claims and interests are discharged and extinguished. If less than all the impaired classes accept the plan, the plan may nevertheless be confirmed by the bankruptcy court, and the dissenting claims and interests be bound thereby. For this to occur, one of the impaired classes must vote to accept the plan and the court must determine that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the nonconsenting class. A plan is fair and equitable if no class receives more than that to which it is entitled. The Bankruptcy Code establishes different fair and equitable tests for secured claims, unsecured claims and interest holders. To be confirmed, the bankruptcy court must determine that a plan, among other conditions, is in the best interest of creditors, feasible and accepted by all classes of creditors and interest holders as specified above or, if not so accepted, be in compliance with certain other requirements summarized above.

### Risks Related to Obligated Group Financings

The obligations of the Members of the Obligated Group under the Obligations and the Master Indenture will be limited to the same extent as the obligations of debtors typically are affected by bankruptcy insolvency and the application of general principles of creditors' rights and as additionally described below. Although the Corporation is currently the only Member of the Obligated Group under the Master Indenture, the Master Indenture permits the addition of other Members if certain conditions are met. See "APPENDIX C — Summary of Certain Provisions of the Master Indenture."

The joint and several obligations described herein of the Members of the Obligated Group to make payments of debt service on the Obligations issued pursuant to and under the Master Indenture may not be enforceable to the extent (1) enforceability may be limited by applicable bankruptcy, moratorium, reorganization, fraudulent conveyance or similar laws affecting the enforcement of creditors' rights and by general equitable principles or (2) such payments (a) are requested to be made with respect to payments on any Obligation which is issued for a purpose that is not consistent with the charitable purposes of the Member of the Obligated Group from which such payment is requested or which is issued for the benefit of any entity other than a tax-exempt organization; (b) are requested to be made from any money or assets which are donor restricted or which are subject to a direct or express trust which does not permit the use of such money or assets for such payment; (c) would result in the cessation or discontinuation of any material portion of the health-care or related services previously provided by the Member of the Obligated Group from which such payment is requested; or (d) are requested to be made pursuant to any loan violating applicable usury laws. The extent to which the money or assets of any present or future Member of the Obligated Group falls within the categories referred to above cannot be determined and could be substantial.

19943

E002996

A Member of the Obligated Group may not be required to make any payment of any Obligation, or portion thereof, the proceeds of which were not lent or otherwise disbursed to such Member to the extent that such payment would render the Member insolvent or which would conflict with, would not be permitted by or would be subject to recovery for the benefit of other creditors of such Member under applicable laws. There is no clear precedent in the law as to whether payments by a Member of the Obligated Group pursuant to the Master Indenture or the Obligations may be voided by a trustee in bankruptcy in the event of a bankruptcy of such member or by third party creditors in an action brought pursuant to State fraudulent conveyances statutes. Under the United States Bankruptcy Code, a trustee in bankruptcy and, under State fraudulent conveyances statutes, a creditor of a related guarantor, may avoid any obligation incurred by a related guarantor, if, among other bases therefor, (a)(i) the guarantor has not received fair consideration or reasonably equivalent value in exchange for the guaranty and (ii) the guaranty renders the guarantor insolvent, as defined in the United States Bankruptcy Code or State fraudulent conveyances statutes, or (b) the guarantor is undercapitalized or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they become due.

Application by courts of the test of "insolvency," "reasonably equivalent value" and "fair consideration" has resulted in a conflicting body of case law. It is possible that, in any action to force a Member of the Obligated Group to make a payment pursuant to the Master Indenture or the Obligations, a court might not enforce such payment obligation in the event it is determined that the Member of the Obligated Group is analogous to a guarantor of the debt of the Member who directly benefitted from the borrowing and that sufficient consideration for the Member's payment obligation was not received and that the incurrence of such obligation has rendered or will render the member insolvent or the Member of the Obligated Group is or will thereby become undercapitalized.

**Matters Relating to the Security for the Series 1998 Bonds**

The facilities of the Corporation are not comprised of general purpose buildings and generally would not be suitable for industrial or commercial use. Consequently, it could be difficult to find a buyer or lessee for such facilities, and, upon a default, the Bond Trustee for the Series 1998 Bonds may not realize an amount equal to the outstanding principal amount of the Series 1998 Bonds from sale or lease of such facilities in the event of foreclosure under the Mortgage.

The effectiveness of the security interest in Unrestricted Receivables granted pursuant to the Master Indenture may be limited by a number of factors, including: (i) the absence of an express provision permitting assignment of receivables due to the Members of the Obligated Group under the Medicare and Medicaid programs, and present or future prohibitions against assignment contained in any applicable statutes or regulations; (ii) certain judicial decisions which cast doubt upon the right of the Master Trustee, in the event of the bankruptcy of the Members of the Obligated Group to collect and retain account receivables due to the Members of the Obligated Group from Medicare, Medicaid and other governmental programs; (iii) commingling of Unrestricted Receivables with other moneys of the Members of the Obligated Group not so pledged under the Master Indenture; (iv) statutory liens; (v) rights arising in favor of the United States of America or any agency thereof; (vi) constructive trusts, equitable or other rights impressed or conferred by a federal or state court in the exercise of its equitable jurisdiction; (vii) federal bankruptcy laws which may affect the enforceability of the security interest in the Unrestricted Receivables of the Members of the Obligated Group which are earned by the Members of the Obligated Group within 90 days preceding and after any effectual institution of bankruptcy proceedings by or against such Member; (viii) rights of third parties in Unrestricted Receivables

19944

E002997

converted to cash and not in the possession of the Master Trustee; and (ix) claims that might arise if appropriate financing or continuation statements are not filed in accordance with the Illinois Uniform Commercial Code as from time to time in effect. In addition, it may not be possible to perfect a security interest in any manner whatsoever in certain types of revenues (e.g., gifts, donations, insurance proceeds and medical reimbursement program payments) prior to actual receipt thereof by the Corporation or any future Member of the Obligated Group).

Certain amendments to the Bond Indenture and the Loan Agreement may be made with the consent of the owners of 51% of the aggregate principal amount of the Series 1998 Bonds then outstanding under the Bond Indenture, and certain amendments to the Master Indenture may be made with the consent of the owners of a majority of the aggregate principal amount of Obligations then outstanding. Such amendments may adversely affect the security of the holders of the affected Series 1998 Bonds. A majority of holders of the Obligations may be comprised wholly or partially of the owners of Obligations other than the Series 1998 Obligations.

The remedies available to either the Bond Trustee, the Master Trustee, the Authority or the owners of the Series 1998 Bonds upon an event of default under the Master Indenture, the Bond Indenture, the Loan Agreement or the Series 1998 Obligations are in many respects dependent upon judicial actions which are often subject to discretion and delay. Under existing constitutional and statutory law and judicial decisions, including, specifically, Title 11 of the United States Code (the "Bankruptcy Code"), the remedies provided in the Master Indenture, the Bond Indenture, the Loan Agreement or the Series 1998 Obligation may not be readily available or may be limited. The various legal opinions to be delivered concurrently with the delivery of the Series 1998 Bonds will be qualified as to the enforceability of the various legal instruments by limitations imposed by general principles of equity and by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors' generally and laws relating to fraudulent conveyances.

## Maintenance of the Tax-Exempt Status of the Corporation

The tax-exempt status of interest on the Series 1998 Bonds presently depends upon maintenance by the Corporation of its status as an organization described in Section 501(c)(3) of the Code. The maintenance of such status is contingent on compliance with general rules promulgated in the Code and related regulations regarding the organization and operation of tax-exempt hospitals and health systems. Concerns about the IRS's position on a wide range of common activities by healthcare organizations was increased with the release of a General Counsel Memorandum (the "GCM") in November of 1991. The GCM, in effect, revokes three previous Private Letter Rulings of the IRS regarding the sale by hospitals of net revenue streams to joint ventures involving physician investors. This change of direction by the IRS with respect to previously issued Private Letter Rulings indicate more stringent enforcement and interpretation of rules regarding tax-exempt healthcare organizations generally, and may signal an abandonment of other positions previously announced by the IRS and relied upon by tax-exempt hospitals.

In addition, the GCM suggests that tax-exempt hospitals which are in violation of Medicare and Medicaid regulations regarding inducement for referrals may also be subject to revocation of their tax-exempt status. Because a wide variety of hospital-physician transactions potentially violate these broadly stated prohibitions on inducement for referrals, the GCM has broadened the range of activities which may directly affect tax-exemption, without defining specifically how such rules will be applied. As a result, tax-exempt hospitals, particularly those which have extensive transactions with physicians,

19945

E002998

are currently subject to an increased degree of scrutiny and perhaps enforcement by the IRS. The GCM is a statement of policy and interpretation of the IRS. and is not necessarily indicative of the result of a judicial adjudication of the applicable issues.

Loss of tax-exempt status by the Corporation could result in the loss of the exclusion from gross income of the interest on the Series 1998 Bonds and would have material adverse consequences on the financial condition of the Corporation. Additionally, the loss of federal tax-exempt status could adversely affect the Corporation's access to future tax-exempt financing.

As described herein under the caption "TAX EXEMPTION," failure to comply with certain legal requirements may cause the interest on the Series 1998 Bonds to become included in gross income for federal income tax purposes. In such event, the Series 1998 Bonds may be accelerated, at the discretion of the Bond Trustee or at the written request of holders of not less than 25% of the aggregate principal amount of the outstanding Series 1998 Bonds. The Bond Indenture does not provide for the payment of any additional interest or penalty in the event the interest on the Series 1998 Bonds becomes included in gross income for federal income tax purposes.

**Bond Ratings**

There is no assurance that the ratings assigned to the Series 1998 Bonds at the time of issuance will not be lowered or withdrawn at any time, the effect of which could adversely affect the market price for and marketability of such Bonds.

**Additional Risk Factors**

In the future, other events may adversely affect the operation of the Corporation, as well as other health care facilities, in a manner and to an extent that cannot be determined at this time.

## TAX EXEMPTION

The Code contains a number of requirements and restrictions which apply to the Series 1998 Bonds including investment restrictions, periodic payments of arbitrage profits to the United States. requirements regarding the proper use of bond proceeds and the facilities financed therewith, and certain other matters. The Authority and the Corporation have covenanted to comply with all requirements of the Code that must be satisfied in order for the interest on the Series 1998 Bonds to be excludable from gross income for federal income tax purposes. Failure to comply with certain of such covenants could cause interest on the Series 1998 Bonds to become includable in gross income for federal income tax purposes retroactively to the date of issuance of the Series 1998 Bonds.

Subject to compliance by the Authority and the Corporation with the above-referenced covenants. under present law, in the opinion of Bond Counsel, interest on the Series 1998 Bonds is not includable in the gross income of the owners thereof for federal income tax purposes and will not be treated as an item of tax preference in computing the federal alternative minimum tax for individuals and corporations Interest on the Series 1998 Bonds will be taken into account, however, in computing an adjustment used in determining the alternative minimum tax for certain corporations or in computing the "branch profits tax" imposed on certain foreign corporations

**19946**

48

E002999



The Code includes provisions for an alternative minimum tax ("AMT") for corporations in addition to the corporate regular tax in certain cases. The AMT, if any, depends upon the corporation's alternative minimum taxable income ("AMTI"), which is the corporation's taxable income with certain adjustments. One of the adjustment items used in computing AMTI of a corporation (excluding S Corporations, Regulated Investment Companies, Real Estate Investment Trusts, and REMICs) is an amount equal to 75% of the excess of such corporation's "adjusted current earrings" over an amount equal to its AMTI (before such adjustment item and the alternative tax net operating loss deduction). "Adjusted current earnings" would include all tax-exempt interest, including interest on the Series 1998 Bonds.

Under the provisions of Section 884 of the Code, a branch profits tax is levied on the "effectively connected earnings and profits" of certain foreign corporations, which include tax-exempt interest such as interest on the Series 1998 Bonds.

Ownership of the Series 1998 Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitations, corporations subject to the branch profits tax, financial institutions, certain insurance companies, certain S Corporations, individual recipients of Social Security or Railroad Retirement benefits and taxpayers who may be deemed to have incurred (or continued) indebtedness to purchase or carry tax-exempt obligations. Prospective purchasers of the Series 1998 Bonds should consult their tax advisers as to the applicability of any such collateral consequences.

In rendering its opinion, Bond Counsel will rely upon (i) certifications of the Corporation with respect to certain material facts solely within the Corporation's knowledge relating to the property financed or refinanced with the proceeds of the Series 1998 Bonds and the Series 1994 Bonds and the application of the proceeds of the Series 1998 Bonds and the Series 1994 Bonds and (ii) the report of McGladrey & Pullen, LLP, certified public accountants, referred to herein under the caption "VERIFICATION OF COMPUTATIONS" with respect to certain mathematical calculations.

## POTENTIAL CONFLICT FOR MASTER TRUSTEE

LaSalle National Bank, Chicago, Illinois, is serving as Bond Trustee and Master Trustee in connection with the Series 1998 Bonds. While LaSalle National Bank has an obligation to protect both Bondholders and holders of Obligations, it is possible for a conflict of interest between LaSalle National Bank's various trustee duties to develop. The potential for a conflict of interest derives from the requirement that the Master Trustee enforce, under certain circumstances, its remedies for the benefit of all bond trustees under related indentures.

## LITIGATION

### The Authority

There is not now pending or, to the knowledge of the Authority, threatened against the Authority any litigation restraining or enjoining or seeking to restrain or enjoin the issuance or delivery of the Series 1998 Bonds or questioning or affecting the validity of the Series 1998 Bonds or the proceedings and authority under which they are to be issued. Neither the creation, organization or existence of the

19947

E003000

Authority, nor the title of any of the present members or other officials of the Authority to their respective offices is being contested or questioned. There is no litigation pending or, to its knowledge threatened, which in any manner questions the right of the Authority to enter into, or the validity or enforceability of, the Bond Indenture or the Loan Agreement or the right of the Authority to secure the Series 1998 Bonds in the manner provided in the Bond Indenture.

### The Corporation

The Corporation has advised that no litigation, proceedings or investigations are pending or, to the Corporation's knowledge, threatened against the Corporation except (i) litigation, proceedings or investigations for which the probable ultimate recoveries and the estimated costs and expenses of defense will be entirely within the Corporation's applicable insurance policy limits (subject to applicable deductibles) or are not in excess of the total reserves held under its self-insurance program or otherwise available, or (ii) litigation, proceedings or investigations in which an adverse determination would not have a materially adverse effect on the financial condition or results of operations of the Corporation. The Corporation has also advised that no litigation, proceedings or investigations are pending or, to its knowledge, threatened against the Corporation, that in any manner questions the right of the Corporation to enter into the transactions described in this Official Statement.

## LEGAL MATTERS

Legal matters incident to the authorization, issuance and sale of the Series 1998 Bonds and with regard to the tax-exempt status of the interest thereon (see "TAX EXEMPTION" herein) are subject to the approving legal opinion of Jones, Day, Reavis & Pogue, Bond Counsel, a form of which is attached hereto as APPENDIX D. A signed copy of that opinion, dated and premised on law in effect as of the date of original delivery of the Series 1998 Bonds, will be delivered at the time of such original delivery. In rendering its approving opinion, Bond Counsel will rely on certifications and representations of fact to be contained in the transcript of proceedings which Bond Counsel will not have independently verified.

Certain legal matters will be passed upon for the Authority by its counsel, Sidley & Austin, Chicago, Illinois; for the Corporation by its counsel, Foley & Lardner, Chicago, Illinois; for the Underwriter by its counsel, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania; and for the Initial Bank by its special United States counsel, Arent Fox Kintner Plotkin & Kahn, PLLC, Washington, D.C. and its special French counsel, Gide Loyrette Nouel.

## VERIFICATION OF COMPUTATIONS

McGladrey & Pullen, LLP, a firm of independent public accountants, will deliver to the Corporation its verification report indicating that it has verified, in accordance with standards established by the American Institute of Certified Public Accountants, the mathematical accuracy of the computations which indicate the adequacy of the initial cash deposit together with the maturing principal of and interest on the Government Obligations, to pay, when due, the interest on and redemption price of the Series 1994 Bonds.

**19948**

50

E003001



The procedures performed by McGladrey & Pullen, LLP, will be solely based upon data, information and documents provided to McGladrey & Pullen, LLP, by the Corporation and its representatives. The report will state that McGladrey & Pullen, LLP, has no obligation to update the report because of events occurring, or data or information coming to their attention, subsequent to the date of the report.

## CONTINUING DISCLOSURE

In the continuing disclosure agreement as of May 1, 1998 (the "Continuing Disclosure Agreement"), the Corporation agrees to provide certain continuing disclosure for the benefit of the holders of the Series 1998 Bonds. The Corporation agrees to file with each nationally recognized municipal securities information depository ("NRMSIR"), recognized by the Securities & Exchange Commission (the "SEC") pursuant to SEC Rule 15c2-12 (the "Rule") and the state information depository ("SID"), if any, of the State of Illinois, recognized by the SEC pursuant to the Rule, within 120 days of the end of each fiscal year, a copy of the audited financial statements of the Obligated Group prepared in accordance with generally accepted accounting principles, and an annual updating of the information in Appendix A of the type appearing under the headings "SERVICES AND UTILIZATION" and "FINANCIAL INFORMATION."

The Corporation agrees to file, in a timely manner, with each NRMSIR and the SID notice of the occurrence of any of the following events (if material) with respect to the Series 1998 Bonds: (a) principal and interest payment delinquencies; (b) non-payment related defaults; (c) unscheduled draws on any debt service reserve reflecting financial difficulties; (d) unscheduled draws on any credit enhancement reflecting financial difficulties; (e) substitution of any credit or liquidity provider, or their failure to perform; (f) adverse tax opinions or events affecting the tax-exempt status of the Bonds; (g) modifications to rights of holders of the Series 1998 Bonds; (h) bond calls; (i) defeasances; (j) release, substitution or sale of property securing the Series 1998 Bonds; and (k) rating changes.

The Corporation also agrees to file, in a timely manner with the Bond Trustee, each NRMSIR, and the SID, notice of a failure by the Corporation to provide the required annual information described in the first paragraph of this heading within the time limits specified in such paragraph.

The Corporation may modify from time to time the specific types of information provided to the extent necessary to reflect a change in legal requirements or a change in the nature of the Corporation or the Obligated Group; provided that any such modification will be done in manner consistent with the Rule and will not, in the opinion of the Bond Trustee (who may rely on an opinion of counsel) materially impair the interests of the holders or Beneficial Owners of the Bonds. The Corporation acknowledges that its undertaking pursuant to the Rule described under this heading is intended to be for the benefit of the holders of the Series 1998 Bonds. The Bondholder or Beneficial Owner may enforce a breach by the Corporation of its continuing disclosure obligations under the Continuing Disclosure Agreement. However, a breach of the undertaking will not constitute a default or an event of default under the Bond Indenture, the Loan Agreement, the Master Indenture or the Series 1998 Obligations, and the sole remedy of the Bondholders or Beneficial Owner will be to compel specific performance of the Corporation's continuing disclosure obligations in the Continuing Disclosure Agreement.

51

**19949**

E003002

## RATINGS

Moody's Investors Service ("Moody's") is expected to assign its municipal bond ratings of Aa1/VMIG-1 to the Series 1998 Bonds, with the understanding that the Initial Letter of Credit will be delivered by the Initial Bank upon delivery of the Series 1998 Bonds. Such ratings reflect only the views of such organization, and an explanation of the significance of such ratings may be obtained only from Moody's. There is no assurance that such ratings will remain in effect for any given period of time or that such ratings will not be revised downward or upward or withdrawn entirely by Moody's if, in the judgment of such rating agency, circumstances so warrant. Any such downward revision or withdrawal of such rating may have an adverse effect on the market price or marketability of the Series 1998 Bonds. See the information under the caption "CREDIT AGREEMENT" and "THE INITIAL BANK" herein.

## UNDERWRITING

Cain Brothers & Company, LLC (the "Underwriter") has agreed to purchase from the Authority, upon the satisfaction of certain conditions, all of the Series 1998 Bonds, if any are purchased, at a purchase price of 100% of aggregate principal amount less Underwriter's commission of $357,500. The Underwriter is also serving as the Remarketing Agent for the Series 1998 Bonds. The Underwriter may offer and sell the Series 1998 Bonds to certain dealers (including depositing the Series 1998 Bonds into investment trusts) and to others at a price lower than that offered to the public. The Corporation has agreed to indemnify the Underwriter and the Authority against certain costs, claims and liabilities, including liabilities under the Securities Act of 1933, as amended, arising out of any material misstatement or omission of information pertaining to the Corporation in this Official Statement.

## INDEPENDENT AUDITORS

Attached as Appendix A hereto are the audited financial statements of the Corporation. The financial statements of the Corporation as of and for the year ended December 31, 1997 have been audited by McGladrey & Pullen, LLP, independent auditors, as stated in their report appearing therein. The financial statements of the Corporation as of and for the fiscal years ended December 31, 1996 and 1995 were audited by Coopers & Lybrand LLC. In December 1997, Coopers & Lybrand LLC resigned as independent auditors of the Corporation. Management of the Corporation reports that the resignation of Coopers & Lybrand LLC did not reflect any disagreement respecting generally accepted accounting principles or the application thereof to the financial statements of the Corporation for any fiscal period.

## MISCELLANEOUS

The references herein to the Bond Indenture, the Loan Agreement, the Master Indenture, the Initial Letter of Credit, the Reimbursement Agreement and other documents and materials are brief outlines of certain provisions thereof. Such outlines do not purport to be complete and for full and complete statements of such provisions reference is made to such instruments, and other materials, copies of which are on file at the principal office of the Bond Trustee.

**19950**

52

**E003003**



The Corporation has furnished information in this Official Statement relating to the Corporation. The Authority has furnished only the information included in this Official Statement under the heading "THE AUTHORITY", and the first paragraph under the heading "LITIGATION." All estimates and other statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact. This Official Statement is not to be construed as a contract or agreement between the Authority or the Corporation and the purchasers or holders of any of the Series 1998 Bonds.

The agreement of the Authority with the holders of the Series 1998 Bonds is fully set forth in the Bond Indenture, and neither any advertisement of the Series 1998 Bonds nor this Official Statement is to be construed as constituting an agreement between such Authority and the purchasers of its Series 1998 Bonds. So far as any statements are made in this Official Statement involving estimates, projections or matters of opinion, whether or not expressly so stated, they are intended merely as such and not as representations of fact.

CUSIP identification numbers will be printed on the Series 1998 Bonds, but neither the failure to print such numbers nor any error in the printing of such numbers shall constitute cause for a failure or refusal by the purchaser thereof to accept delivery of and pay for the Series 1998 Bonds.

The attached APPENDICES A through D are integral parts of this Official Statement and must be read together with all of the foregoing statements.

The Authority has duly authorized the execution and delivery of this Official Statement.

ILLINOIS HEALTH FACILITIES AUTHORITY

By: /s/ Mary M. McInerney
Its:  Executive Director

This Official Statement is approved:

NORTHSIDE OPERATING CO. d/b/a
EDGEWATER MEDICAL CENTER

By. s/ Bertram P. Rosenthal, M.D.
Its   President

53

**19951**

E003004

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

19952

E0ʋ3005



**APPENDIX A**

Information Concerning

Northside Operating Co.
d/b/a Edgewater Medical Center

The information contained herein as Appendix A
to this Official Statement has been obtained
from Northside Operating Co.
d/b/a Edgewater Medical Center

**19953**

E003006

# TABLE OF CONTENTS

Page

GENERAL INFORMATION ........................................................................................ :

HOSPITAL FACILITY ........................................................................................... :
    The Project.................................................................................................. :

ORGANIZATION...................................................................................................
    Board of Directors......................................................................................
    Conflicts of Interest.................................................................................... :
    Hospital Facility Management .................................................................... :

MEDICAL STAFF.................................................................................................. 4
    Age Distribution Analysis ......................................................................... 5
    Hospital Sponsored Programs..................................................................... 5
    Physician Admissions ................................................................................ 5

SERVICES AND UTILIZATION .............................................................................. 6
    Bed Complement........................................................................................ 6
    Services......................................................................................................
    Historical Utilization .................................................................................

SERVICE AREA INFORMATION ............................................................................ 8
    General ...................................................................................................... 8
    Household Income...................................................................................... 8
    Population Statistics ...................................................................................
    Competing Providers..................................................................................

FINANCIAL INFORMATION .................................................................................. 10
    Summary of Revenues and Expenses.......................................................... 10
    Sources of Revenue................................................................................... 11

MANAGEMENT'S DISCUSSION............................................................................. 12
    Senior Program.......................................................................................... 13
    Respiratory Agreement - Nursing Homes.................................................... 13
    Home Health Agency ................................................................................. 13
    Premium Times ......................................................................................... 13
    Medical Detoxification Program ................................................................. 13

EMPLOYEES......................................................................................................... 14

LICENSES, ACCREDITATION, MEMBERSHIPS AND AFFILIATIONS ..................... 14

PROFESSIONAL LIABILITY AND OTHER INSURANCE ........................................

19954

E003007

## GENERAL INFORMATION

Northside Operating Co. d/b/a Edgewater Medical Center (the "Corporation"), an Illinois not for profit corporation, was incorporated on August 18, 1993, to own and operate acute care general hospitals. The Corporation is licensed by the Department of Public Health of the State of Illinois to operate an acute care hospital (the "Hospital Facility"), with 335 acute care beds, of which approximately 201 are currently staffed. The Hospital Facility is located in Chicago, Illinois.

The Corporation is exempt from federal income tax under Section 501(a) of the Internal Revenue Code of 1986, as amended (the "Code") as an organization described in Section 501(c)(3) of the Code, by virtue of its inclusion in a group exemption extended to Permian Health Care, Inc. ("Permian"), a Colorado nonprofit corporation, on October 25, 1989. The Corporation is not a private foundation within the meaning of section 509(a) of the Code. The Corporation acquired the Hospital Facility on August 17, 1994.

## HOSPITAL FACILITY

The Hospital Facility is located at 5700 North Ashland Avenue, in a predominantly residential area of the north side of Chicago. The Hospital Facility's main campus consists of eight connected structures, and a parking structure.

The original Hospital facility was completed in 1929. Significant renovations and facility improvements have been made to the Hospital Facility in the past several years. Since January 1, 1989, over $13 million has been invested in new plant and equipment.

Projects completed since January 1, 1989, include the following:

- The seventh floor was renovated to provide for an inpatient oncology and medical/surgical unit of 26 beds.
- A replacement linear accelerator was installed.
- Same day surgery service was relocated in a completely remodeled area.
- The Emergency Room was relocated and renovated.
- A replacement cardiac catheterization laboratory was installed.
- New telemetry equipment and patient room renovations were completed.
- The laboratory information system was upgraded.
- Central supply was relocated and remodeled.

### The Project

The Corporation will utilize a portion of the proceeds of the Series 1998 Bonds to renovate patient rooms on selected nursing units throughout the Hospital Facility, renovate the main entrance, the entire first floor (including the lobby), the exterior facade of the main building and invest in significant additions and enhancements to its information systems. The information system enhancements will allow the Hospital Facility to network physician offices and interface them to Hospital Facility management information system. Additional renovations will include the remodeling of the operating room suites, physicians' lounge, the development of new support space and a new HVAC system. Also included will be Radiology Department equipment upgrades, along with other Hospital Facility equipment replacements. The Corporation plans to complete the Project by May 1, 2001.

## ORGANIZATION

### Board of Directors

The Corporation is governed by a Board of Directors, consisting of not less than three nor more than eight persons, as determined from time to time by a majority of the Directors then in office. A majority of the

19955

E003008

members of the Board of Directors shall also comprise a majority of the members of the Board of Directors of Permian, which is the sole corporate member of the Corporation. There are currently five members of the Board of Directors of the Corporation, three of whom also serve as directors of Permian. The Board of Directors of the Corporation is responsible for managing the business and affairs of the Corporation and its affiliates. Each Director is elected to a one-year term and is eligible for reappointment.

The current Board members, and their respective offices, are as follows:

| Name/Office | Affiliation |
|---|---|
| Bertram P. Rosenthal, M.D., President* | Surgeon |
| William Fruland, Secretary/Treasurer | Vice President, KDC Financial |
| Stina Hans* | President, Vista Hospital Systems, Inc. |
| B. Macon Brewer | Retired (formerly, President Dean Witter Capital Markets) |
| George Chapas* | President, Instructional Design Associates |

* Also a member of the Permian Board of Directors

### Conflicts of Interest

Any duality of interest or possible conflict of interest on the part of any Director is required to be disclosed to the Board and made a matter of record. Any Director having a duality of interest or possible conflict of interest on any matter is not permitted to vote on the matter. There currently exist no conflicts of interest among the members of the Board of Directors and the Corporation.

### Hospital Facility Management

The management of the Hospital Facility is delegated by the Board of Directors to a management firm, Braddock Management L.P. ("Braddock"), a California limited partnership, pursuant to a Management Agreement (the "Management Agreement") between the Corporation and Braddock. The Management Agreement expires July 31, 2002, and is terminable by either party at any time after July 31, 2000.

The mission of Braddock is to manage freestanding, primarily not for profit, community hospitals, providing them with sophisticated financial and operational management expertise typically available only in multi-hospital systems. Currently, Braddock manages only the Hospital Facility. Braddock remains highly focused to maintain the quality of its service, to develop relationships with the community and to allow the senior executives to take an active, direct role in each managed hospital. Pursuant to the Management Agreement, Braddock provides to the Corporation management services including operations, financial management, marketing, physician relations, and program development. Braddock maintains affiliations with experienced consulting firms and financial institutions. These resources are used to provide timely and cost effective supplemental expertise not directly provided by Braddock.

A brief outline of the professionals follows:

F. Scott Gross. Mr. Gross is the Principal of Braddock. Mr. Gross has over 20 years experience in private not for profit hospitals and for profit multi-hospital systems, including responsibility for management, acquisition and new facility development. Mr. Gross was the former president of the Hospital Group of National Medical Enterprises (NME), at one time the nation's second largest publicly traded health services management company. His educational background includes the Harvard Business School, Advanced Management Program Senior Management Fellow, Harvard University; Management Degree in Public Administration (health care

E003009

19956

management option) from the University of Southern California: and a Bachelor's of Science Degree in Biology from California State University, Northridge.

**Daniel F. Finnane.** Mr. Finnane oversees financial analysis and consultation as well as performing site reviews and project management for hospitals under contract. Mr. Finnane is a graduate of the Dartmouth College Amos Tuck School of Business Administration. He received a B.B.A. in Finance from the University of Iowa. He has worked previously as an Information System Specialist to the health care industry, expertise he continues to use in his current position.

**Karen Hyneman.** Ms. Hyneman oversees the financial planning, internal controls and financial reporting for the hospitals under contract. Ms. Hyneman received her B.B.A. from Cal State Fullerton and is also a CPA.

**Michael E. Olsen.** Mr. Olsen oversees the legal affairs of the Corporation. Mr. Olsen received his Juris Doctorate and a Masters Degree in Health Care Administration from St. Louis University. Mr. Olsen received his undergraduate degree from Depauw University.

The key members of the Hospital Facility management staff who are supplied by Braddock include:

**Peter G. Rogan, President, Braddock Management L.P.** Mr. Rogan is assigned to the Corporation pursuant to the Management Agreement. Prior to his position with Braddock, Mr. Rogan was the principal shareholder and president of Edgewater Operating Company (EOC), the predecessor to the Corporation. Mr. Rogan was previously the President/CEO of Interhealth Associates, Inc., a Chicago healthcare consulting firm founded in 1986. From 1983 to 1986, Mr. Rogan was President/CEO of St. Anthony Medical Center, a 400 bed tertiary medical center located in Crown Point, Indiana. Prior to this, Mr. Rogan was a Principal of Ernst & Whinney in Chicago. Mr. Rogan is a graduate of Niagara University and has a M.H.A. from St. Louis University and a Ph.D. in Hospital and Health Administration from the University of Iowa.

**Joann A. Skvarek, Executive Vice President.** Ms. Skvarek has nearly 20 years of experience in managing and operating health care facilities. Formerly, she was Chief Operating Officer of a 50 physician multi-specialty group. More recently, she was Chief Operating Officer of Americare, Inc., a chain of hospital affiliated urgent care centers. Prior to joining Braddock she was a consultant with Interhealth Associates, Inc. Ms. Skvarek is a graduate of Purdue University.

**Roger H. Ehmen, Senior Vice President, Marketing, Medical Staff Development and Planning.** Mr. Ehmen has 22 years experience in the health care field, 19 of them at the Hospital Facility. Previously, he served as Director of Medical Records and the Medical Staff Office at the Hospital Facility. Mr. Ehmen is a graduate of Western Illinois University, has an M.B.A from Northern Illinois University and is an Accredited Record Technician.

**Judith Lunde, Senior Vice President of Patient Services.** Ms. Lunde has fulfilled her present duties since 1991. She is a graduate of the University of Wisconsin and has a Master of Science in Nursing Administration from the University of Illinois. She has been involved in Nursing Management since 1986.

**Henry R. Zeisel, Vice President of Finance.** Mr. Zeisel has served in his current capacity or as Controller of the Corporation since 1994. Prior to 1994, Mr. Zeisel served in various financial managerial capacities for seven years with WSKC Dialysis Services in Oak Park, Illinois. Mr. Zeisel was a senior auditor for Ernst & Whinney prior to joining WSKC. Mr. Zeisel has a B.B.A in accountancy from the University of Notre Dame and is a CPA in the state of Illinois.

**Nancy L. Bryson, Vice President of Information Services.** Ms. Bryson has been in her current position since 1994. Prior to her current position, Ms. Bryson served in various managerial capacities at the Hospital Facility since 1983. Ms. Bryson is a graduate of Illinois State University, has a Masters of Business Administration from Keller Graduate School, and is a Registered Record Administrator.

**19957**

E003010

## MEDICAL STAFF

As of December 1997, the medical staff consisted of a total of 339 physicians. This includes all categories of medical staff membership.

The following table provides the distribution of those Medical Staff members who were active at the Hospital Facility during 1997. This table identifies those physicians who admitted, attended, or provided consultative services to either inpatients or outpatients.

| CATEGORY | NUMBER OF PHYSICIANS | BOARD CERTIFIED PHYSICIANS | AVERAGE AGE |
|---|---|---|---|
| Allergy | 3 | 3 | 56 |
| Anesthesiology | 5 | 2 | 44 |
| Cardiology | 5 | 4 | 47 |
| Chiropractic Medicine | 2 | 0 | 46 |
| Cardiovascular/Thoracic Surgery | 7 | 6 | 55 |
| Dentists | 2 | 0 | 38 |
| Dermatology | 2 | 2 | 55 |
| Endocrinology | 1 | 1 | 54 |
| Family Practice | 25 | 6 | 54 |
| Gastroenterology | 4 | 3 | 43 |
| Hematology/Oncology | 5 | 4 | 46 |
| Infectious Disease | 3 | 3 | 40 |
| Internal Medicine | 60 | 28 | 46 |
| Nephrology | 3 | 3 | 47 |
| Neurosurgery | 3 | 3 | 61 |
| Neurology | 10 | 10 | 50 |
| Obstetrics/Gynecology | 9 | 9 | 51 |
| Oral/Maxillofacial | 2 | 2 | 51 |
| Ophthalmology | 5 | 5 | 44 |
| Orthopedic Surgery | 6 | 6 | 48 |
| Otolaryngology | 3 | 3 | 40 |
| Pathology | 1 | 1 | 48 |
| Pediatrics | 2 | 2 | 63 |
| Plastic Surgery | 1 | 1 | 40 |
| Podiatry | 47 | 22 | 38 |
| Psychiatry | 7 | 5 | 52 |
| Pulmonary Medicine | 3 | 3 | 49 |
| Radiology | 4 | 3 | 47 |
| Radiological Oncology | 2 | 2 | 53 |
| Rehab Medicine | 1 | 1 | 55 |
| Rheumatology | 1 | 1 | 49 |
| Surgery | 13 | 10 | 53 |
| Urology | 5 | 4 | 58 |
| Total | 252 | 158 | 47* |

*  Weighted average age
Source: Corporation Records

**19958**

E003011



## Age Distribution Analysis

The following table indicates that the age distribution of the Medical Staff members is well distributed among the age groups, with approximately 90 percent of the Hospital Facility admissions in 1997 attributable to physicians under 55 years of age. The average age of the admitting physicians is 47 years.

### PROFILE OF 1997 ADMISSIONS
### BY PHYSICIAN AGE GROUP

| Age Category | # of Admitting Physicians | % of Admissions | Cumulative % |
|---|---|---|---|
| Less than 35 | 10 | 1.6% | 1.6% |
| 35 - 44 years | 30 | 25.5 | 27.1 |
| 45 - 54 years | 47 | 63.2 | 90.3 |
| 55 - 64 years | 24 | 7.8 | 98.1 |
| Over 65 | 7 | 1.9 | 100.0 |
| Total | 125 | 100.0% | 100.0% |

Source: Corporation Records

## Hospital Sponsored Programs

Over the past several years the Corporation has developed, implemented and continues to operate a number of hospital-sponsored patient care programs ("HSP"). The objectives of these HSP are to provide health care services to identified under-served populations. The Corporation contracts with and/or employs physicians to provide needed medical care to the patients of these HSP. As noted below, these HSP currently account for approximately 44% of the Corporation's 1997 admissions.

## Physician Admissions

For the fiscal year ended December 31, 1997, the most active physicians, by patient discharges on a percentage basis, are set forth in the following chart:

### TOP TWENTY PHYSICIANS DISCHARGES FOR 1997

| | Percent Total Discharges | Physicians Average Age |
|---|---|---|
| Top 5 physicians | 52% | 47 |
| Top 10 physicians | 66% | 47 |
| Top 15 physicians | 74% | 47 |
| Top 20 physicians | 79% | 50 |

Source: Corporation Records

19959

E003012

For the fiscal year ended December 31, 1997, the most active 15 physicians, by specialty practice, admissions, percentage and age, are set forth below:

## TOP FIFTEEN ADMITTERS – 1997

| | H.S.P. | Private | Total Admissions | % of Total Admissions | Age |
|---|---|---|---|---|---|
| Internal Medicine | 1,721* | 191 | 1,912 | 24.9% | 51 |
| Internal Medicine | 690 | 120 | 810 | 10.5 | 53 |
| Internal Medicine | 506* | 65 | 571 | 7.4 | 44 |
| Internal Medicine | 168* | 317 | 485 | 6.3 | 42 |
| Internal Medicine | - | 260 | 260 | 3.4 | 44 |
| Internal Medicine | - | 251 | 251 | 3.3 | 45 |
| Family Practice | - | 226 | 226 | 2.9 | 53 |
| Internal Medicine | - | 211 | 211 | 2.7 | 35 |
| Internal Medicine | 62 | 132 | 194 | 2.5 | 53 |
| Family Practice | 119 | 35 | 154 | 2.0 | 51 |
| Family Practice | - | 154 | 154 | 2.0 | 55 |
| Internal Medicine | 97 | 52 | 149 | 1.9 | 46 |
| Internal Medicine | - | 126 | 126 | 1.6 | 48 |
| Internal Medicine | - | 114 | 114 | 1.6 | 45 |
| Internal Medicine | - | 106 | 106 | 1.4 | 41 |
| Subtotal | 3,363 | 2,360 | 5,723 | 74.4 | 47 |
| All Other | | | 1,969 | 25.6 | 47 |
| Total | | | 7,692 | 100.0% | 47 |

*Hospital Sponsored Programs: These programs have been developed and managed by the Corporation. The physicians noted provide medical services to the patients of these programs.
Source: Corporation Records

## SERVICES AND UTILIZATION

### Bed Complement

The Corporation offers the full range of inpatient and outpatient diagnostic and therapeutic services and related ancillary services. The corporation is licensed to operate 335 beds, of which 201 are currently staffed. The distribution of the staffed acute care beds as of December 31, 1997 is set forth below:

### BED COMPLEMENT

| Bed Category | Staffed Bed Complement |
|---|---|
| Medical/Surgical | 159 |
| Critical Care and Step-Down | 42 |
| Total | 201 |

Source: Corporation Records

**19960**

E003013



Services



The specialty and subspecialty services offered at the Hospital Facility include:

Angioplasty
Cardiac Non-invasive Lab
Cardiac Catheterization Lab
Dermatology Services
EEG/EMG Services
Emergency Services
Endocrinology Services
Gastrointestinal Services
Geriatric Services
Health Promotion/Education
HIV - AIDs Services
Hemodialysis
Home Health Care Services
Infectious Disease Services
Intensive Care Services
Laboratory Services:
  Blood Bank
  General Lab
  Histopathology
Mammography Screening
Medical/Surgical
Neurology Services
Oncology Services
Ophthalmology Services
Outpatient Services
Pharmacy Services
Primary Care Unit

Psychiatric Geriatric Services
Pulmonary and Hyperbaric Medicine
Radiation Therapy
  Megavolt Radiation
Radiology Diagnostics:
  Nuclear Medicine
  CT Scanner
  Ultrasound
  Vascular Lab
Rehabilitation Services:
  Cardiac Rehabilitation
Rheumatology Services
Surgical Services
  General Surgical Services
  Gynecological Surgery
  Open Heart Surgery
  Orthopedic Surgery
  Outpatient Surgery
  Podiatric Surgery
  Urological Surgery
Therapy Services:
  Occupational Therapy
  Physical Therapy
  Respiratory Therapy
  Speech Pathology
Volunteer Services

Source: Corporation Records

Historical Utilization

The following table presents selected historical utilization data for the Hospital Facility for the three fiscal years ended December 31, 1997:

|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| Staffed Beds | 173 | 199 | 201 |
| Admissions | 7,743 | 8,280 | 7,692 |
| Average Length of Stay | 7.20 | 6.60 | 6.17 |
| Patient Days | 55,635 | 53,897 | 47,493 |
| Total Surgeries |  |  |  |
|     Inpatient | 1,567 | 1,416 | 2,054 |
|     Outpatient | 1,532 | 1,311 | 1,442 |
| Emergency Room Visits | 13,577[1] | 12,904 | 12,240 |

[1] Unusually high volume due to extraordinary heat wave during summer of 1995
Source: Corporation Records

19961

E003014

## SERVICE AREA INFORMATION

### General

The Hospital Facility is located near Lake Michigan on Chicago's north side, approximately six miles from the downtown area. The primary service area includes the Chicago communities of Rogers Park, Edgewater, Ravenswood, Uptown and Northtown. The Hospital Facility also serves a secondary service area which surrounds the core service area to the west and south and consists of twelve zip codes. The establishment of a clinic on the south side of Chicago has generated admissions from an emerging tertiary service area, which is located south of the downtown area. The Hospital Facility's service area was identified based upon an analysis of discharges from the Hospital Facility during the fiscal year ended December 31, 1997, as set forth in the following table:

### PATIENT ORIGIN FOR FISCAL YEAR 1997

|  | Admissions | % of Total Admissions |
|---|---|---|
| Primary Service Area | 3,572 | 46.4% |
| Secondary Service Area | 1,483 | 19.3 |
| Tertiary Service Area | 716 | 9.3 |
| Total Service Area | 5,771 | 75.0 |
| Outside Service Area | 1,921 | 25.0 |
| **TOTAL** | 7,692 | 100.0% |

Source: Corporation Records

### Household Income

Set forth in the table below are the median household income levels for the service area for 1997

| Household Income | Primary Service Area | Secondary Service Area | Tertiary Service Area |
|---|---|---|---|
| Less than $15,000 | 24.4% | 28.2% | 35.6% |
| $15,000 - $34,999 | 33.4% | 30.4% | 32.1% |
| $35,000 - $74,999 | 32.1% | 31.7% | 25.6% |
| Greater than $75,000 | 10.1% | 9.7% | 6.7% |

Source: Claritas Inc. Household Trend Report, September 1997

**19962**

A-8                                              **E003015**

## Population Statistics

The following table consists of population data and projected population growth during the period 1990 through 2002.

| Service Area | Census 1990 | Estimated 1997 | Projected 2002 | % Change 1997-2002 |
|---|---|---|---|---|
| Primary | 335,363 | 332,078 | 328,760 | -1.0% |
| Secondary | 767,536 | 732,749 | 710,221 | -3.1% |
| Tertiary | 425,001 | 387,536 | 365,628 | -5.7% |
| Total | 1,527,900 | 1,452,363 | 1,404,609 | -3.3% |

Source: Claritas Inc. Household Trend Report, September 1997

## Competing Providers

There are five other acute care facilities located within the Corporation's primary and secondary service areas. Theses facilities are Louis A. Weiss Memorial Hospital, Methodist Hospital of Chicago, Ravenswood Hospital Medical Center, Swedish Covenant Hospital and Thorek Hospital and Medical Center. Numerous outpatient providers are operating in the Corporation's service area, including physician private practices and ambulatory care centers, as well as other competing outpatient service providers. Information regarding available beds, admissions, patient days and market share for the Corporation and such competing hospitals for the nine month period January 1, 1997 through September 30, 1997 are summarized in the table below.

No single acute care hospital dominates the area. When considering all services, both acute and non-acute, market share among the five reporting hospitals ranges from 11% for Thorek to 27% for Ravenswood. When considering only those medical/surgical/critical care services which are common among all the reporting hospitals, and are the only services provided by the Corporation, the market share range changes and narrows. The Corporation has the greatest share with 24% with Thorek having the lowest share at 15%.

19963

E003016

## TOTAL SERVICES

| | Available Beds | Admissions | Patient Days | Market Share** |
|---|---|---|---|---|
| Edgewater Medical Center | 201 | 5.899 | 34,558 | 18% |
| Weiss Memorial Hospital* | 200 | 6.297 | 36,264 | 19% |
| Ravenswood Hospital Medical Center | 333 | 8.932 | 48,722 | 27% |
| Swedish Covenant Hospital | 279 | 8.253 | 56,769 | 25% |
| Thorek Hospital and Medical Center | 142 | 3.744 | 24,138 | 11% |
| Methodist Hospital (Did Not Report) | | | | |

## MEDICAL/SURGICAL/CRITICAL CARE

| | Available Beds | Admissions | Patient Days | Market Share** |
|---|---|---|---|---|
| Edgewater Medical Center | 201 | 5.899 | 34,558 | 24% |
| Weiss Memorial Hospital* | 131 | 4.347 | 23,889 | 18% |
| Ravenswood Hospital | 157 | 4.835 | 23,655 | 20% |
| Swedish Covenant Hospital | 154 | 5.493 | 32,816 | 23% |
| Thorek Hospital | 142 | 3.744 | 24,138 | 15% |
| Methodist Hospital (Did Not Report) | | | | |

---
\*      Weiss Memorial Hospital reported utilization figures for the first quarter of 1997 only, therefore these figures were extrapolated to nine month utilization.

\*\*      Market share was computed based on admissions for all reporting hospitals.

Source: MCHC Utilization of Short term General and Specialty Hospitals

## FINANCIAL INFORMATION

### Summary of Revenues and Expenses

The following Summary of Revenue and Expenses for the fiscal years ended December 31, 1995, 1996 and 1997, includes all adjustments, consisting of normal recurring accruals, which management of the Corporation considers necessary to present such information in conformity with generally accepted accounting principles. This Summary of Revenues and Expenses should be read in conjunction with the audited financial statements and related notes appearing as Appendix B to this Official Statement.

**19964**

E003017

### Revenue and Expense Summary

|  | Audited 12/31/95 | Audited 12/31/96 | Audited 12/31/97 |
|---|---|---|---|
| Total revenues and gains | $70,730,026 | $74,261,820 | $76,178,392 |
| Total expenses | 61,748,128 | 63,671,323 | 63,402,829 |
| Operating income | 8,981,898 | 10,590,497 | 12,775,563 |
| Other income | | | |
|   Investment income | 1,297,487 | 1,625,898 | 3,586,082 |
|   Third party settlement for year prior to new ownership | 3,204,217 | -- | -- |
| Excess of revenues over expenses | 13,483,602 | 12,216,395 | 16,361,645 |
| Transfer to affiliate | -- | -- | (914,373) |
| Increase in net assets | $13,483,602 | $12,216,395 | $15,447,272 |

Source  Audited Financial Statements

## Sources of Revenue

    The Corporation derives a substantial portion of its operating revenue from federal and state programs and insurance plans which pay for all or a portion of the health care services provided to a patient.  As a consequence, the operating revenue of the Corporation depends to a great extent upon the availability and level of reimbursement or payment under such programs and plans.  See the information under the caption, "BONDHOLDERS RISKS" in the front portion of this Official Statement Offering Memorandum.  The following table sets forth the percentages of discharges of patients by revenue source, applicable to the different programs and plans for the three fiscal years ended December 31, 1997.

19965

E003018

**Discharges of Patients by Revenue Source**
**Fiscal Years Ended December 31.**

|                      | 1995    | 1996    | 1997    |
|----------------------|---------|---------|---------|
| Medicare             | 46.6%   | 45.7%   | 43.3%   |
| Medicaid             | 36.1    | 40.8    | 39.7    |
| Blue Cross           | 2.2     | 1.9     | 2.7     |
| Commercial Insurance | 7.5     | 4.7     | 6.6     |
| HMO                  | 3.6     | 3.0     | 3.5     |
| Other                | 4.0     | 3.9     | 4.2     |
|                      | 100.0%  | 100.0%  | 100.0%  |

Source: Corporation Records

## MANAGEMENT'S DISCUSSION

For the fiscal year ended December 31, 1997, the Corporation continued its trend of strong financial and operating performance. Income from operations increased approximately 21% over the 1996 year end results. This increase in income from operations resulted from a 2.5% increase in net patient service revenue between 1996 and 1997 and the success of the Corporation in lowering its expenses by approximately .5%. The Corporation's success in increasing income from operations is related to its ability to identify under-served populations, develop programs to serve those populations and contain costs. The Corporation has undertaken a number of steps to maintain and/or increase patient volumes while at the same time developing programs which increasingly serve diverse patient populations.

The Corporation's strong financial performance is clearly demonstrated by the changes in its balance sheet from 1994 to 1997. Cash and short-term investments have increased from $6 million dollars at August 1994 to approximately $40 million dollars at December 31, 1997. Additionally, net days of revenue in accounts receivable has decreased from 72 days in August of 1994 to 33 days at December 31, 1997. The Corporation has also invested in excess of $5 million dollars in property, plant and equipment since 1994 and plans to invest another $10 million dollars in capital expenditures over the next three years. In summary the Corporation's total asset base has increased over the past three and a half years from $64 million to over $100 million.

The Corporation's success in program development has attracted young physicians to the service area and the Hospital's Facility medical staff and has broadened the diversity of its patient base. In addition, as these more recent members of the medical staff become more familiar with the Hospital Facility, they have become more active members of the medical staff. As such, these younger members are responsible for a more significant portion of the Corporation's patient revenues. It is anticipated that the Corporation will continue to develop diversified programs thereby attracting new physicians to its medical staff and further developing its diverse patient base.

Another factor contributing to the Corporation's success in increasing its income from operations is related to its ability to contain costs. As compared to other Chicago area hospitals, the Corporation's expenses per adjusted patient day are on average 23% lower than other area hospitals (MCHC 1997 Second Quarter Chicago Area Hospital's Financial and Statistical Results).

As mentioned above, the focus of the Corporation is to identify medically under-served populations and provide the appropriate service to those populations. Management of the Corporation has identified the Medicare and Medicaid populations as those populations whose members have the greatest health care needs. In connection with this focus, the Corporation has established or is in the process of establishing various programs to address the needs of these populations. These new programs, along with the existing programs continue to provide an array of health care services to a broad base of under-served populations. This, in turn, will prevent the

E003019

19966

Corporation from becoming overly dependent upon any one program or service. Some of the Corporation's programs are described below:

## Senior Program

The Senior Program was established in concert with the Chicago Housing Authority in July 1992. It provides a community service for a segment of the population which has not received adequate medical care in the past. Seniors are provided screening programs at various senior housing facilities throughout Chicago. The Corporation's first satellite clinic, the Artensa Randolph Center, was established in a CHA Senior Housing Development on the south side in 1992. A free-standing clinic was opened in October 1997 to serve the CHA senior population on the west side. The Westside Medical Center is currently providing family practice services to the area residents, as well as geriatric care to CHA seniors. The Corporation is investigating other potential sites. As needed, senior residents are referred to the Hospital Facility for further care and physician consultation.

## Respiratory Agreement - Nursing Homes

In early 1997, the Corporation entered into an agreement to provide respiratory services to area nursing homes. The Corporation has contracted with an entity to provide program management, while the Corporation provides the staffing. This arrangement allows nursing homes to provide more intensive services to patients within their facilities without having to refer patients to neighboring institutions.

## Home Health Agency

Edgewater Medical Center Home Health Agency was established in early 1997 to provide continuum of care to hospitalized patients by offering health service to post acute care patients in their home. The care of each patient is coordinated by a professional nurse and may include, Physical Therapy, Occupational Therapy, Speech Therapy, Medical Social Service, Nutritional Guidance and Home Health Aide service. The Home Health Agency is licensed by the State of Illinois and Department of Public Health and is a certified Medicare provider.

## Premium Times

Premium Times is an educational and awareness program for persons over 50 years of age. This program was established in October, 1988, with 980 enrollees in its initial year. The Premium Times program enrollment has expanded to over 4,000 members in December, 1997. This program focuses on attracting the membership of persons who have not previously utilized the Hospital Facility to make them aware of the various offered services.

## Medical Detoxification Program

A Medical Detoxification Program was established in March 1995. The program offers an interdisciplinary team approach, providing individualized care within a hospital setting to those in need of medical detoxification. The program assists patients in developing and maintaining a lifestyle free of chemical dependency.

## EMPLOYEES

As of December 31, 1997, the Corporation employed 696 full-time equivalent employees. The Corporation provides compensation and a full range of employee benefit programs which management believes are competitive. None of the employees of the Corporation is represented by bargaining representatives. The Corporation's management considers its relationship with its employees to be good.

**19967**

A-13

E003020

## LICENSES, ACCREDITATION, MEMBERSHIPS AND AFFILIATIONS

The Corporation is licensed by the State of Illinois Department of Public Health. The Hospital Facility is accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") for a three year period beginning September 1995. The Corporation is a provider under the Medicare and the Medicaid Programs. Affiliations of the Corporation include the American Hospital Association and the Metropolitan Chicago Healthcare Council.

## PROFESSIONAL LIABILITY AND OTHER INSURANCE

General and Professional liability insurance coverage for the Corporation is provided by various insurers on a claims-made basis. The Corporation has secured a three year policy for continuing claims-made coverage until December 31, 2000.

It is the opinion of management of the Corporation that the reserves, as stated in the audited financial statements for self-insurance claims and other professional liability reserves, are adequate to provide for losses from professional and general liability claims.

In addition to the coverage described above concerning professional and comprehensive general liability the Corporation maintains insurance with respect to its property and operations against risks and in amounts not less than is customary for entities engaged in the same or similar activities and similarly situated.

**19968**

A-14         **E003021**



APPENDIX B

AUDITED FINANCIAL STATEMENTS

[THIS PAGE INTENTIONALLY LEFT BLANK]

19970

E003023

**NORTHSIDE OPERATING COMPANY**
**d/b/a EDGEWATER MEDICAL CENTER**

**FINANCIAL REPORT**

**DECEMBER 31, 1997**

19971

E003024

**NORTHSIDE OPERATING COMPANY**
**d/b/a EDGEWATER MEDICAL CENTER**

| CONTENTS | PAGE |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | 1 |
| FINANCIAL STATEMENTS | |
| Balance sheet | 2 |
| Statement of operations and changes in net assets | 3 |
| Statement of cash flows | 4 |
| Notes to financial statements | 5-13 |

19972

E003025



## McGLADREY & PULLEN, LLP
**Certified Public Accountants and Consultants**

### INDEPENDENT AUDITOR'S REPORT

To the Board of Directors
Northside Operating Company
d/b/a Edgewater Medical Center
Chicago, Illinois

We have audited the accompanying balance sheet of Northside Operating Company d/b/a Edgewater Medical Center as of December 31, 1997, and the related statements of operations and changes in net assets and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Northside Operating Company d/b/a Edgewater Medical Center as of December 31, 1997, and the results of its operations, change in net assets, and cash flows for the year then ended in conformity with generally accepted accounting principles.

*McGladrey & Pullen, LLP*

Rockford, Illinois
April 17, 1998

**19973**

- 1 -

E003026

**NORTHSIDE OPERATING COMPANY**
**d/b/a EDGEWATER MEDICAL CENTER**

**BALANCE SHEET**
December 31, 1997

ASSETS

| | |
|---|---:|
| **Current assets:** | |
| Cash and cash equivalents | $  25,862,301 |
| Short-term investments | 14,079,649 |
| Patient accounts receivable, less estimated uncollectible accounts of $3,381,000 | 6,782,508 |
| Other receivables | 681,208 |
| Inventories, at cost | 1,098,392 |
| Prepaid expenses | 1,047,679 |
| Assets limited as to use – held by bond trustee | 2,101,234 |
| **Total current assets** | 51,652,971 |
| | |
| **Assets limited as to use, net of amounts required to meet current obligations:** | |
| Held by bond trustee | 4,229,553 |
| Self-insurance trust | 3,017,352 |
| Deferred compensation trust | 981,941 |
| | 8,228,846 |
| Deferred costs, less amortization of $1,126,241 | 2,365,584 |
| Note and related accrued interest receivable, affiliate | 9,475,490 |
| Property and equipment | 31,336,912 |
| **Total assets** | $  103,059,803 |

**LIABILITIES AND NET ASSETS**

| | |
|---|---:|
| **Current liabilities** | |
| Current portion of long-term debt | $     494,961 |
| Accounts payable | 4,490,181 |
| Accrued payroll and taxes | 1,867,142 |
| Other accrued expenses | 3,175,109 |
| Interest payable | 1,883,878 |
| Amount due to third-party payors | 4,560,798 |
| **Total current liabilities** | 16,472,069 |
| | |
| Long-term debt, less current portion | 40,000,000 |
| Self-insurance obligation | 2,814,649 |
| Deferred compensation obligation | 981,941 |
| **Total liabilities** | 60,268,659 |
| | |
| Net assets, unrestricted | 42,791,144 |
| **Total liabilities and net assets** | $  103,059,803 |

See Notes to Financial Statements.

**19974**

E003027

NORTHSIDE OPERATING COMPANY
d/b/a EDGEWATER MEDICAL CENTER

STATEMENT OF OPERATIONS AND CHANGES IN NET ASSETS
Year Ended December 31, 1997

| | |
|---|---:|
| Revenues: | |
| Net patient service revenue | $ 75,220,956 |
| Other revenue | 957,436 |
| **Total revenues** | 76,178,392 |
| | |
| Expenses: | |
| Salaries, wages and employee benefits | 25,682,456 |
| Purchased services and professional fees | 11,612,303 |
| Supplies | 6,959,915 |
| General overhead and maintenance | 3,630,884 |
| Depreciation and amortization | 2,929,920 |
| Interest | 3,822,054 |
| Bad debt expense | 5,277,484 |
| Illinois Medicaid Provider tax | 706,410 |
| Other expense | 2,781,403 |
| **Total expenses** | 63,402,829 |
| **Operating income** | 12,775,563 |
| Other income, investment income | 3,586,082 |
| **Excess of revenues over expenses** | 16,361,645 |
| Transfer to affiliate | (914,373) |
| **Increase in net assets** | 15,447,272 |
| Unrestricted net assets at beginning of year | 27,343,872 |
| Unrestricted net assets at end of year | $ 42,791,144 |

See Notes to Financial Statements.

**19975**

E003028

**NORTHSIDE OPERATING COMPANY**
**d/b/a EDGEWATER MEDICAL CENTER**

**STATEMENT OF CASH FLOWS**
**Year Ended December 31, 1997**

| | |
|---|---:|
| **Cash Flows From Operating Activities** | |
| Increase in net assets | $ 15,447,272 |
| Adjustments to reconcile increase in net assets to | |
| net cash provided by operating activities: | |
| Provision for depreciation and amortization | 2,929,920 |
| Bad debt expense | 5,277,484 |
| Net unrealized (gains) on investments | (221,766) |
| Interest income accrued on note receivable | (389,863) |
| Transfer to affiliate | 914,373 |
| Changes in operating assets and liabilities: | |
| Patient accounts receivable | (3,546,251) |
| Other assets | (1,155,661) |
| Estimated amounts due to third-party payors | 1,736,308 |
| Accounts payable, accrued payroll and taxes, interest | |
| payable and accrued expenses | 1,486,430 |
| Self-insurance obligation | (47,066) |
| **Net cash provided by operating activities** | 22,431,180 |
| | |
| **Cash Flows From Investing Activities** | |
| Purchases of assets limited as to use | (20,543,853) |
| Proceeds from assets limited as to use | 22,482,818 |
| Purchases of property and equipment | (3,446,497) |
| Purchases of investments | (1,035,639) |
| Issuance of note receivable to affiliate | (9,085,627) |
| **Net assets (used in) investing activities** | (11,628,798) |
| | |
| **Cash Flows From Financing Activities** | |
| Payments on long-term debt | (300,000) |
| Payments on capital leases | (214,991) |
| Transfer to affiliate | (914,373) |
| **Net assets (used in) financing activities** | (1,429,364) |
| | |
| **Increase in cash and cash equivalents** | 9,373,018 |
| | |
| Cash and cash equivalents at beginning of year | 16,489,283 |
| | |
| Cash and cash equivalents at end of year | $ 25,862,301 |
| | |
| **Supplemental Disclosure of Cash Flow Information** | |
| Cash payments for interest | $ 3,837,640 |

See Notes to Financial Statements.

- 4 -

E003029



19976

NORTHSIDE OPERATING COMPANY
d/b/a EDGEWATER MEDICAL CENTER

## NOTES TO FINANCIAL STATEMENTS

### Note 1.  Organization and Summary of Significant Accounting Policies

Organization:  Northside Operating Company d/b/a Edgewater Medical Center (the Medical Center) is an Illinois not-for-profit corporation established for the purpose of providing healthcare services, including inpatient acute and various outpatient services to the Chicago Metropolitan area.

Northside Operating Company is a controlled subordinate and affiliate of Permian Healthcare, Inc. (Permian), a Colorado not-for-profit corporation organized in 1989.

The Medical Center is exempt from federal income taxes on related income pursuant to Section 501(a) of the Internal Revenue Code (the Code), as an organization described in Section 501(c)(3) of the Code by virtue of its inclusion in a group exemption extended to Permian.

The Medical Center began operations on August 17, 1994 after its purchase of the stock of the former shareholders of Edgewater Operating Company d/b/a Edgewater Medical Center (Edgewater Operating Company).

A summary of the Medical Center's significant accounting policies follows:

Use of Estimates:  The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements.  Estimates also affect the reported amounts of revenue and expenses during the reporting period.  Although estimates are considered to be fairly stated at the time that the estimates are made, actual results could differ.

Cash Equivalents:  Cash equivalents consist of marketable short-term securities, not limited as to use, having an original maturity of 90 days or less.

Investments:  Investments represent marketable securities and are carried at fair value.

Assets Limited as to Use:  Assets limited as to use include investments held by trustees under debt agreements and self-insurance trust arrangements and investments in a deferred compensation trust, all of which are carried at fair value.

Property and Equipment:  Property and equipment are stated at cost.  Depreciation is computed using the straight-line method over the estimated useful life of the respective asset.  One half year of depreciation is taken in the year of acquisition and in the year of disposal.  Amortization expense on equipment acquired under capital lease is included in depreciation expense.

Deferred Costs:  Costs incurred in connection with the issuance of bonds are deferred and amortized ratably over the term of the indebtedness.  Goodwill recorded on the purchase of various acquisitions is amortized over five years using a straight-line method.

19977

E003030

## NOTES TO FINANCIAL STATEMENTS

**Note 1. Organization and Summary of Significant Accounting Policies (Continued)**

Illinois Medicaid Provider Tax: The Illinois General assembly enacted a tax for all Illinois hospitals licensed under the Illinois Hospital Licensing Act. The purpose of the tax was to fund the Illinois Medicaid program. The tax was equal to 1.25% of the Medical Center's net patient service revenue, as defined. The tax legislation expired on June 30, 1997.

Community Commitment: Community commitment represents patient charity care and/or costs for services rendered to the community at a reduced or at no fee based upon community need or the inability of the individual to pay for services.

Self-insurance Obligation: The estimated obligation for self-insurance represents the present value of the estimated liability for asserted and unasserted professional malpractice and comprehensive general liability claims.

Net Patient Service Revenue: The Medical Center has agreements with third-party payors that provide for payments to the Medical Center at amounts different from its established rates. Payment arrangements include prospectively determined rates per discharge, reimbursed costs, discounted charges and per diem payments. Net patient service revenue is reported at the estimated net realizable amounts from patients, third-party payors and others for services rendered, including retroactive adjustments under reimbursement agreements with third-party payors which are subject to audit by administering agencies. These adjustments are accrued on an estimated basis and are adjusted in future periods as final settlements are determined.

Excess of Revenues Over Expenses: The statement of operations and changes in net assets includes excess of revenues over expenses that represents the results of operations. Changes in unrestricted net assets which are excluded from excess of revenues over expenses, consistent with industry practice, include permanent transfers of assets to and from affiliates for other than goods and services.

**Note 2. Short-Term Investments and Assets Limited as to Use**

Short-term investments and assets limited as to use, which are stated at fair value at December 31, consist of the following:

| | |
|---|---:|
| Short-term investments: | |
| Trading securities, | |
| Bond Mutual Funds, total short-term investments | **$ 14,079,649** |
| | |
| Assets limited as to use: | |
| U.S. Government obligations | $ 2,647,704 |
| Corporate notes | 1,132,199 |
| Mutual funds | 5,532,459 |
| Other | 1,017,718 |
| | |
| **Total assets limited as to use** | **$ 10,330,080** |

E003031

19978

## NOTES TO FINANCIAL STATEMENTS

**Note 2.  Short-Term Investments and Assets Limited as to Use (Continued)**

Assets limited as to use are included in the balance sheet as follows at December 31:

| | |
|---|---:|
| Current assets: | |
| Assets limited as to use – held by bond trustee | $  2,101,234 |
| | |
| Noncurrent assets: | |
| Assets whose use is limited | 8,228,846 |
| | $ 10,330,080 |

Investment income, including realized and unrealized gains and losses on the above investments are comprised of the following for the year ended December 31, 1997:

| | |
|---|---:|
| Income: | |
| Interest income and realized gains | $  3,364,316 |
| Unrealized gains | 221,766 |
| | $  3,586,082 |

**Note 3.  Property and Equipment**

A summary of property and equipment at December 31, 1997 follows:

| | |
|---|---:|
| Land | $  2,000,000 |
| Building and leasehold improvements | 29,060,594 |
| Equipment and equipment under capital lease | 7,438,076 |
| | 38,498,670 |
| Less accumulated depreciation and amortization | 8,356,589 |
| | 30,142,081 |
| Construction in process | 1,194,831 |
| | $ 31,336,912 |

19979

E003032

## NOTES TO FINANCIAL STATEMENTS

**Note 4.   Net Patient Service Revenue**

The components of patient service revenue for the year ended December 31, 1997 are as follows:

| | |
|---|---:|
| Gross patient service revenue: | |
| Routine revenue | $   40,872,598 |
| Ancillary – inpatient | 105,640,474 |
| Ancillary – outpatient | 36,942,657 |
| | 183,455,729 |
| Contractual allowances under third-party payor programs | 108,234,773 |
| **Net patient service revenue** | **$   75,220,956** |

**Note 5.   Contractual Arrangements with Third-Party Payors**

The Medical Center provides care to certain patients under payment arrangements with Medicare, Medicaid, Blue Cross and various health maintenance and preferred provider organizations. Services provided under these arrangements are paid at predetermined rates and/or reimbursable costs, as defined Reported costs and/or services provided under the arrangements are subject to audit by the administering agencies. Changes in Medicare and Medicaid programs and reduction of funding levels could have an adverse effect on the future amounts recognized as net patient service revenue.

Amounts received under the above payment arrangements account for approximately 65% of the Medical Center's net patient service revenue in 1997. Provision has been made in the financial statements for contractual adjustments, representing the difference between standard charges for services and actual or estimated payment. In the opinion of management, adequate provision has been made for adjustment, if any, that may result from subsequent review. The mix of gross receivables from patients and third-party payors at December 31, 1997 is as follows:

| | |
|---|---:|
| Medicare | 34   % |
| Medicaid | 22 |
| Self-pay and other | 44 |
| | 100   % |

**Note 6.   Deferred Compensation Trust Fund and Obligation**

Prior to January 21, 1989, a nonqualified deferred compensation program was offered to employees. The program is no longer offered to employees.

19980

E003033

## NOTES TO FINANCIAL STATEMENTS

**Note 7.  Long-Term Debt**

Long-term debt consisted of the following at December 31, 1997:

|  |  |
|---|---|
| Illinois Health Facilities Authority Revenue Bonds, Series 1994 Term Bonds, due July 1, 2024, with annual principal payments ranging from $400,000 to $3,800,000 and with interest payable semiannually at 9.25%, collateralized by substantially all of the assets of the Medical Center | $ 40,400,000 |
| Capital lease obligation | 94,961 |
|  | 40,494,961 |
| Less current portion of long-term debt | 494,961 |
|  | $ 40,000,000 |

In accordance with the bond trust indenture, certain funds were established and are held by a trustee as follows at December 31, 1997:

|  |  |
|---|---|
| Debt service reserve fund | $ 4,229,553 |
| Interest fund | 1,898,264 |
| Sinking fund | 202,467 |
| Revenue fund | 503 |

The master trust indenture and the note payable agreement requires the Medical Center to maintain certain financial ratios and places restrictions on various activities such as the transfer of certain assets and incidence of additional indebtedness.

In addition, the Series 1994 bonds maturing on or after July 1, 2005 are subject to redemption at redemption prices ranging from 100% to 102%.

Maturities of long-term debt for the next five fiscal years are:  $495,000 in 1998; $400,000 in 1999; $500,000 in 2000;  $500,000 in 2001; and $500,000 in 2002.

**Note 8.   Professional Liability Insurance and Self-Insurance Obligation**

For all medical malpractice liability claims that occurred from May 1, 1986 until October 16, 1995, the Medical Center is self-insured for the first $200,000 per claim and for any claim that occurred from October 17, 1995 until December 31, 1996, the Medical Center is self-insured for the first $100,000, provided the claim was reported prior to December 31, 1997.  For claims that occurred from January 1, 1997 until December 31, 1997, the Medical Center is self-insured for the first $50,000.  In addition, the Medical Center has a $10,000 deductible for general liability claims in which no aggregate applies. Professional and general liability claims above the self-insurance layer, up to a limit of $10,000,000 for each occurrence and $20,000,000 in the aggregate are covered with purchased insurance.

19981

E003034

## NOTES TO FINANCIAL STATEMENTS

**Note 8.   Professional Liability Insurance and Self-Insurance Obligation**

The liability for self-insured risk is based on a report of consulting actuaries that is updated annually to reflect the Medical Center's actual experience. The Medical Center is funding its self-insurance liability with a trustee.   The Medical Center funded $155,637 during 1997.   The actuarial recommended contribution for 1998 is $343,265. The self-insurance trust balance is $3,017,352 at December 31, 1997 The indicated surplus on the self-insurance fund is estimated at $189,000 on December 31, 1997.

The Medical Center's accruals for self-insurance expense represent the present value of the estimated liability for asserted and unasserted professional malpractice and patient general liability claims. The discounted amount of these claims was $2,814,649 at December 31, 1997. The interest rate used to discount these claims was 5½ percent.   An independent actuary assisted management with the establishment of the estimated claims obligation.

It is the opinion of the Medical Center's management that the liability for self-insurance claims and other professional liability accruals at December 31, 1997 is adequate to provide for possible losses resulting from malpractice claims.

**Note 9.   Management Fees**

The Medical Center has a management agreement with a hospital management company (Management Company) to provide management services. The management agreement is a five-year agreement, effective August 17, 1994 and amended on August 1, 1997. The amended agreement requires payment of the monthly salaries of Management Company employees at the Medical Center and certain management fees. Management fees consist of a monthly fixed fee and a variable fee calculated as a percentage of net patient service revenue. On an annual basis, the variable fee cannot exceed the fixed fees. Total fees, including Management Company salaries, incurred by the Medical Center to the Management Company were $3,790,152 in 1997.

**Note 10.   Pension Plan**

The Medical Center sponsors a 403(b) defined contribution plan. The plan covers substantially all full-time employees of the Medical Center who have 3 consecutive months of service. Employees may contribute 15% of their base earnings up to a $9,500 maximum per year. At the discretion of the Medical Center, the Medical Center may elect to match employee contributions. No matching contributions were made during the year ended December 31, 1997.

All expenses relating to the operation of the plan are paid by the plan. However, various administrative, legal and accounting services are performed by Medical Center personnel on behalf of the plan for which no charges are made to the plan.

**19982**



E003035



## NOTES TO FINANCIAL STATEMENTS

### Note 11. Functional Expense

The Medical Center provides comprehensive quality healthcare services to the residents of the Chicago Metropolitan area. The operating expenses included in the statement of operations and changes in net assets for the year ended December 31, 1997 are as follows:

| | |
|---|---|
| Healthcare services | $ 52,701,443 |
| General and administrative | 10,701,386 |
| | $ 63,402,829 |

### Note 12. Community Commitment

Community commitment represents patient charity care and/or costs for services rendered to the community at a reduced or at no fee based upon community need or the inability of the individual to pay for services. The amount of community commitment provided during the year ended December 31, 1997 follows:

| | |
|---|---|
| Patient charity care (foregone patient charges) | $ 2,427,511 |
| Costs not reimbursed by Medicare and Medicaid | 7,400,325 |
| | $ 9,827,836 |

### Note 13. Litigation

The Medical Center is subject to various lawsuits which have arisen in the ordinary course of business. Although the ultimate outcome of these suits cannot be determined at this time, it is the opinion of management, after consultation with legal counsel, that the disposition of such lawsuits will not have a material adverse effect on the financial position of the Medical Center.

### Note 14. Note Receivable and Transfer to an Affiliate

On July 30, 1997 the Medical Center disbursed $10 million to Vista Health Systems, Inc., (VHS) an affiliate of Permian, in conjunction with its purchase of French Hospital Medical Center (FHMC). Of this amount, $914,373 was a contribution to VHS which has been reflected as a transfer to an affiliate on the accompanying statement of operations and changes in net assets. The remaining amount, $9,085,627, became a note receivable from VHS, which was subsequently assigned by VHS to FHMC, also a member of the VHS obligated group.

The note receivable, which is subordinated to certain other debt of the VHS obligated group, bears interest at 7%, and is due on July 31, 2007, the maturity date of the other debt. Principal and interest are not payable until VHS' obligated group bonds reach investment grade rating by Standard & Poor's Ratings Group or Moody's Investors Services, and VHS' obligated group has the appropriate number of days cash on hand, as defined by the agreement. As of December 31, 1997, interest of $389,863 has been accrued on the note receivable.

### Note 15. Commitments

As of December 31, 1997, the Medical Center had outstanding commitments for construction and equipment expenditures of approximately $2 million. These capital projects are expected to be completed during 1998.

19983

E003036

## NOTES TO FINANCIAL STATEMENTS

### Note 16. Fair Value of Financial Instruments

The carrying value of cash and cash equivalents, patient accounts and other receivables, accounts payable, accrued expenses, interest payable and amount due to third-party payors approximate fair values due to the short-term nature of these instruments. The following methods and assumptions were used by the Medical Center to estimate the fair value of other financial instruments:

Short-Term Investments and Assets Limited as to Use: Fair value, which are the amounts reported on the balance sheet, are based on quoted market prices.

Note Receivable: The fair value is not determinable due to a lack of quoted market prices for comparable notes.

Long-term Debt: The fair value of long-term debt is estimated to approximate the carrying value since the long-term debt is expected to be defeased during 1998.

Self-Insurance Obligation: Although the ultimate amount to be paid remains unresolved, the estimated fair value of the self-insurance obligation was computed by discounting the estimated future cash outflows based on currently available information.

Deferred Compensation Obligation: The fair value of the obligation is based upon the fair value of the investments in the deferred compensation trust.

The carrying amounts and fair values of the Medical Center's financial instruments at December 31, 1997 are as follows:

|  | (In Thousands) | |
|---|---|---|
|  | Carrying Amount | Fair Value |
| Cash and cash equivalents | $  25,862 | $   25,862 |
| Short-term investments | 14,080 | 14,080 |
| Patient accounts and other receivables | 7,464 | 7,464 |
| Assets limited as to use | 10,330 | 10,330 |
| Note and related interest receivable | 9,475 | * |
| Accounts payable and accrued expenses | 11,416 | 11,416 |
| Amount due to third-party payors | 4,561 | 4,561 |
| Long-term debt | 40,495 | 40,495 |
| Self-insurance obligation | 2,815 | 2,815 |
| Deferred compensation obligation | 982 | 982 |

*Not determinable

19984

E003037




## NOTES TO FINANCIAL STATEMENTS

### Note 17. Operating Lease

The Medical Center conducts a portion of its operations using leased equipment and facilities under an operating lease. In 1996, the Medical Center entered into a 10-year triple net lease for real property. The terms of the lease call for minimum lease payments of $954,000 for the first year and minimum annual increases thereafter of 4% per year. Rent expense for the Medical Center was $992,160 for 1997.

Future minimum lease payments as of December 31, 1997 are as follows:

| | |
|---|---|
| 1998 | $ 1,031,846 |
| 1999 | 1,073,120 |
| 2000 | 1,116,048 |
| 2001 | 1,160,687 |
| 2002 | 1,207,114 |
| Thereafter | 5,331,007 |

### Note 18. Subsequent Event

The Medical Center is in the process of arranging with the Illinois Health Facilities Authority to issue variable rate demand revenue bonds in the amount of $55 million. The proceeds of the sale of the Series 1998 Bonds will be loaned to the Medical Center pursuant to a loan agreement dated as of May 1, 1998. The Medical Center intends to use the proceeds to advance refund their existing Series 1994 Term Bonds, pay or reimburse the Medical Center for the payment of certain costs of acquiring, constructing, renovating, remodeling and equipping certain health facilities of the Medical Center, and pay certain expenses incurred in connection with the issuance of the Series 1998 Bonds and the advance refunding of the Series 1994 Bonds.

**19985**

E003038

# Exhibit

# 64

**NORTHSIDE OPERATING CO.**

**BOARD OF DIRECTORS**

**I.  CALL TO
    ORDER:**      The meeting was called to order by Bertram P. Rosenthal, MD,
                  President on Friday, June 1, 1998, at 3:00 p.m. (PST)

**Present:**      B. Macon Brewer
                  George Chapas
                  Stina Hans
                  William D. Fruland
                  Bertram P. Rosenthal, MD

**Also Present:** Dan Finnane, Primus Management, Inc.
                  F. Scott Gross, Primus Management, Inc.
                  Michael Olsen, General Counsel, Northside Operating Co.
                  Peter G. Rogan, Braddock Management, L.P.
                  Joann A. Skvarek, Executive Vice President, Northside Operating
                  Co.

**II.  OLD BUSINESS**

**A.  Review and Approval of Prior Board Meeting Minutes**

**MSC**

Minutes of the March 6, 1998, meeting of the Northside Operating Co.
(NOC) were received, reviewed and approved as corrected upon a motion
which was duly seconded and carried.

**B.  Report on the Illinois Department of Public Health Compliance Project**

Ms. Skvarek reported that it is expected the Illinois Department of
Public Health will perform their final inspection in the very near
future concerning the Plan of Corrections. At this point in time, it
is anticipated that NOC will successfully pass the inspection as it is
believed all of the steps of the Plan of Corrections have been
completed accordingly.

**MSC**

That the Board of Directors accept the report of the Illinois
Department of Public Health Compliance Project as presented by Ms.
Skvarek.

**C.  Status of Refinancing**

Mr. Rogan reported that the refinancing should be completed by mid
June, 1998. A series of meetings will take place with regard to
pre-closing and closing in the early part of June. It is anticipated
that the entire refinancing of debt will be completed by June 16th or
17th.

DEFENDANT'S
EXHIBIT
64