Northside Operating Co.
Board of Directors
June 1, 1998
Page Two

D. **Latino Institute**

**Hispanic Physicians Network (HPN)**

It was reported that the HPN is developing and Management is actively involved in the network structure.

**Latino Cardiology**

The Latino Cardiology, as part of the Latino Institute, began in mid May, 1998. The systems are in place to ensure resources are in response to the community education, outreach and marketing efforts with respect to this physician referral program.

**Latino Wellness**

The Latino Wellness Program is scheduled to begin on July 15, 1998, however, detailed negotiations are still in process with the parties involved to determine the value to the community of this proposed program. It is equally likely we will be unable to reach agreement or satisfy ourselves that the program will meet the defined needs.

**Latino Outreach & Screening**

The Latino Outreach and Screening is scheduled to begin next week. An agreement has been reached with all of the parties and physician coverage for that program is in the final stages of completion.

E. **1997 Audit Report**

The 1997 Audit Report by McGladrey & Pullen, LLP, was presented to the Board of Directors and subsequently discussed. A thorough review of the audit report occurred and Mr. Rogan responded to the Board's questions.

**MSC**

That the Board of Directors approve the 1997 Audit Report by McGladrey & Pullen, LLP, as presented.

F. **Strategic Positioning**

Strategic Positioning of NOC was tabled for discussion later in the meeting. See V. New Business (D).

EMC 003746

G. **Investment Advisors/Policy**

As a result of the refinancing, it will become necessary to re-examine the Investment Policy of NOC and possibly select investment advisors to guide NOC in investing its funds. A good deal of discussion occurred concerning the best method to pursue these activities. As a result of these discussions, it was the concensus of the Board that a

**Northside Operating Co.**
**Board of Directors**
**June 1, 1998**
**Page Three**

Investment Policy of NOC, determine the best method to invest funds, conduct a search and select investment advisors to assist NOC in investing its funds. Dr. Rosenthal asked Mr. Chapas to chair this Committee and also appointed Messrs. Brewer and Fruland to serve on the Committee. He also suggested that other people, with particular interests and/or skills, be involved in assisting the Committee. However, the Board would allow Mr. Chapas to make the decision to select other members at his own discretion.

**MSC**

That the Board of Directors appoint a Committee consisting of Messrs. Brewer, Chapas and Fruland to analyze and revise, as necessary, the Investment Policy of NOC and to select and engage advisors to assist them in this process. BMLP is authorized to enter into and execute all necessary agreements and documents.

## III. FACILITY REPORTS

A. **Review and Approval of Advisory Board Meeting Minutes**

The Advisory Board Meeting minutes of February 11, 1998, and April 15, 1998, were received, reviewed and approved by the Board of Directors. Discussion occurred concerning the title "Advisory Board" which was found to be misnomer. The Board of Directors asked that this Board be known as the Local Governing Board henceforth since it has always functioned in this capacity and the name, the Local Governing Board, would be more descriptive of its true nature and functions.

**MSC**

That the Local Governing Board Meeting minutes be accepted as presented by the Board.

B. **Review and Approval of Medical Staff Meeting Minutes**

The Medical Staff Meeting minutes of February, March and April, 1998 were received, reviewed, discussed and approved by the Board of Directors.

**MSC**

That the Medical Staff Meeting minutes be accepted as presented by the Board.

C. **Review and Approval of Financial Reports**

EMC 003747

The Financial Reports of February, March and April, 1998, were received, reviewed, discussed and approved by the Board of Directors.

Northside Operating Co.
Board of Directors
June 1, 1998
Page Four

**MSC**

That the Financial Reports be accepted as presented.

IV. **BRADDOCK MANAGEMENT, L.P. REPORT**

A. **Status Friendly Physician**

**Far Southside**

The Far Southside Clinic has been tabled and no further action will be taken at this time.

**Dr. Cherny**

NOC will not purchase Dr. Cherny's practice as it appears he will sell it to another institution.

**Dr. Kerner**

NOC will not purchase Dr. Kerner's practice as the price cannot be negotiated.

**Dr. Maitar (Devon Practice)**

Negotiations have ceased with regard to this practice.

**Ambulatory Physician Network/Faculty Practice Plan**

NOC, as previously reported, is going ahead with the implementation of the Faculty Practice Plan and is putting in place those components necessary to fulfil this. At the current time, expectations are within budget, as previously outlined in Board minutes and the implementation date is expected to be at the end of the third quarter of 1998.

**MSC**

That the Board approve the Braddock Management, L.P., report as presented.

Northside Operating Co.
Board of Directors
June 1, 1998
Page Five

V.   **NEW BUSINESS**

A.   **Review and Approval of New Physician, Vendor and Other Contracts**

Ms. Skvarek presented and reviewed the physician contracts which primarily pertain to administrative and/or teaching responsibilities for the included physicians.

Andrew H. Cubria, M.D., S.C.
Robert Fink, M.D.
Steven Miff, M.D.

**MSC**

That the Board approve the physician contracts as presented.

Ms. Skvarek presented and reviewed the vendor contracts with the Board.

Medic Computer Systems, Inc.

**MSC**

Ms. Skvarek presented and reviewed the other contracts with the Board.

Illinois Hospital and Healthsystems Association COMPdata
Press Ganey

**MSC**

That the Board approve the other contracts as presented.

B.   **Approve Bylaws Revisions of Local Governing Board**

In concert with the previous discussion in Section III (A), the Board reviewed the recommended changes to the Bylaws of the Local Governing Board. Mr. Olsen pointed out the major changes to the Bylaws of the Local Governing Board and after thorough discussion:

**MSC**

That the Board of Directors approve the recommended changes to the Bylaws of the Local Governing Board as presented.

EMC 003749

Northside Operating Co.
ard of Directors
ne 1, 1998
ge Six


C.    **Fund Raising - Northside Foundation**

In follow-up to a Board of Directors directive of some time ago, Management has analyzed and recommended the fund raising mechanism for NOC. It is anticipated that to develop the fund raising for NOC, Chicagoland Service Support Foundation (CSSF), a non-affiliated organization is to be formed to be in conformance with NOC's bond documents. It is further anticipated that an appropriate "d/b/a" name will be selected for CSSF. The Board of Directors of this organization were reviewed by the Board of NOC and found to be acceptable. Additionally, in conformance to NOC's bond documents, it was suggested that $3 Million be transferred from NOC to CSSF and that the Board of Directors of CSSF undertake the development of appropriate policies and procedures for fund raising for the support of NOC and the investment of CSSF's funds.

**MSC**

That the Board of Directors approve the transfer of $3 Million to the Chicagoland Services Support Foundation as seed money for the development of fund raising to support the charity efforts of NOC subject to final review by the Finance Committee. The Board also requested that the Chicagoland Services Support Foundation select an appropriate "d/b/a" name to recognize the close working relationship with NOC.

D.    Columbia/HCA

As previously discussed at the Board of Directors Meetings, Columbia/HCA appears to be divesting themselves of all the hospitals in the Chicago market. One of these hospitals is Grant Hospital located in the Lincoln Park area of Chicago. After large amounts of analysis and planning, Management has concluded that the purchaser of Grant Hospital, Doctors Community Healthcare Corporation, has determined that its long term strategic interests is not to own Grant Hospital. As such, Management has been discussing with Doctors Community Healthcare Corporation the possibility of NOC acquiring Grant Hospital.

The basis for this decision grew out of the work of the Strategic Positioning Committee of the Board. Further, as discussed at previous Board meetings, it would be beneficial if NOC acquired additional institutions in the Chicago area in order to strengthen its future market position.

EMC 003750

Northside Operating Co.
Board of Directors
June 1, 1998
Page Seven

The Board then entered into a discussion concerning the potential purchase price of Grant Hospital and how this would relate to the cash needs of NOC. A thorough discussion occurred, the conclusion of which was that the Grant Hospital property itself is valued at approximately $10 to $12 Million although Grant Hospital is currently losing money.

The Board then entered into a discussion about NOC's corporate organization and positioning. The discussion lead to the conclusion that it may be in NOC's best interest if NOC were a free standing institution in order to place it in a better position to respond to these types of opportunities. Dr. Rosenthal reminded the Board of the report of the Special Committee on Strategic Planning. The Board entered into an indepth discussion concerning the relative merits of separating NOC from Permian Healthcare, Inc. The Board reviewed the reasons for Permian acquiring NOC in 1994. As Dr. Rosenthal pointed out, at that time, the goal of Permian was to return NOC to a not-for-profit status as a community based institution. The Board realized that over these past years NOC has succeeded beyond the original plan and at this point in time, it is financially strong and in a position to stand on its own without the support of Permian. Further, given the recent acquisitions of Permian on the West Coast, a significant amount of time is being focused on integrating those facilities into the West Coast operations.

The Board asked Management to pursue the acquisition of Grant Hospital and authorized Management to enter into any and all appropriate agreements to pursue this acquisition. The Board also recognized that at some point in time, it may be beneficial to NOC to separate NOC from Permian Healthcare, Inc. and the Board directed Management to pursue this action.

MSC

That the Board of Directors authorize and direct Management to enter into any and all appropriate agreements to pursue the acquisition of Grant Hospital from Doctors Community Healthcare Corporation with the exception of a final binding purchase offer. Additionally, that the Board of Directors authorize Management to hire any advisors deemed necessary to assist them in this process.

MSC

That the Board request the Finance Committee consisting of Messrs. Brewer, Chapas and Fruland to direct the efforts of Management in this regard and authorize them to act on behalf of the Board of Directors.

EMC 003751

rthside Operating Co.
ard of Directors
ne 1, 1998
Page Eight

**MSC**

That the Board also authorize the Finance Committee to pursue the
analysis determining the appropriate corporate structure for NOC.
At its earliest convenience, the Committee is to report its findings
to the Board.

E.   **Medicare Provider Sponsored Organization**

Mr. Gross and Rogan lead a discussion of the Board in the new
Medicare Provider Sponsored Organization rules and regulations.
Mr. Rogan informed the Board that he is currently working with
a large group of physicians who may be interested in joint
venturing a Provider Sponsored Organization.  Mr. Rogan
informed the Board that he is in the early stages of his
analysis.  The Board appreciated Mr. Rogan's efforts and
directed him to pursue this opportunity. Mr. Gross suggested it
may be necessary for NOC to hire advisors to assist BMLP in
this process.

**MSC**

That the Board of Directors authorize BMLP to investigate the
establishment of a Provider Sponsored Organization for NOC
and/or a joint venture and authorize a budget of up to $250,000
to be spent on these efforts.

F.   **Northside Operating Co. - Facility Redecorating**

Mr. Rogan reviewed with the Board the Project Fund as a result
of the recent financing of NOC's debt.  Mr. Rogan pointed out
that of the approximate $7 Million left in the Project Fund,
most of this will be focused on renovating, redecorating and
equipment purchases for NOC.

**MSC**

That the Board of Directors authorize BMLP to spend funds as
identified in the Project Fund for the renovating, redecorating
and equipment needs of NOC.

EMC 003752

G.   **Review and Approve Strategic Plan**

Mr. Gross presented the Strategic Plan for NOC to the Board.
The Board entered into a discussion concerning the Strategic
Plan in light of the strategic positioning previously discussed
at this board meeting.  Both Mr. Gross and Mr. Rogan responded
to the Board's questions and suggestions for fine tuning the

Northside Operating Co.
Board of Directors
June 1, 1998
Page Nine

Strategic Plan. Key components addressed included the Mission, Values and Philosophy Statement; Community Assessment; Internal and External Environmental Factors; Performance Improvement Priorities and the Medical Center's goals, objectives and strategies.

**MSC**

That the Board of Directors accept the Strategic Plan of NOC as presented.

H. **Review and Approve Policies**

Ms. Skvarek presented the following policies of NOC as approved by the Local Governing Board of Directors for review and approval:

- Patient Rights
- Brain Death
- Do Not Resuscitate
- Informed Consent
- Advance Directives
- Ethics
- Code of Ethics

**MSC**

That the Board of Directors approve the above policies of NOC as presented.

I. **Performance Improvement Education Presentation**

Ms. Skvarek presented a Performance Improvement Education session to the Board of Directors.

VI. **ADJOURNMENT**

**MSC**

There being no further business, a motion for adjournment was moved, duly seconded and carried.

APPROVED:

_____
Bertram P. Rosenthal, M.D.
President

ATTEST:

_____
William D. Fruland
Secretary

EMC 003753

# Exhibit

# 65

# NORTHSIDE OPERATING CO.

## BOARD OF DIRECTORS

**CALL TO
ORDER:** The meeting was called to order by Bertram P. Rosenthal, MD, President on Friday, September 18, 1998, at 2:30 p.m. (MST)

**Present:** B. Macon Brewer
George Chapas
Jane Hurd
William D. Fruland
Bertram P. Rosenthal, MD

**lso Present:** Dan Finnane, Primus Management, Inc.
F. Scott Gross, Primus Management, Inc.
Karen Hyneman, Primus Management, Inc.
Michael Olsen, General Counsel, Northside Operating Co.
Peter G. Rogan, Braddock Management, L.P.
Joann A. Skvarek, Executive Vice President, Northside Operating Co.
Dean Spizzirri, Associate General Counsel, Northside Operating Co.

Dr. Rosenthal informed the Board that Stina Hans, because of other commitments, had submitted her resignation to the Board.

**MSC**

That the Board accept Ms. Han's resignation.

On an interim basis, Jane Hurd had been appointed to the Board by Permian Health Care, Inc.

**MSC**

That the Board accept Jane Hurd's appointment to the Board of Directors.

I. <u>OLD BUSINESS</u>

A. <u>Review and Approval of Prior Board Meeting Minutes</u>

**MSC**

Minutes of the June 1, 1998, meeting of the Northside Operating Co. (NOC) were received, reviewed and approved upon a motion which was duly seconded and carried.

DEFENDANT'S
EXHIBIT
65
PENGAD-Bayonne, N.J.

EMC 003823

Northside Operating Co.
Board of Directors
September 18, 1998
Page Two

**B.    Report on the Illinois Department of Public Health Compliance Project**

Ms. Skvarek reported to the Board that both the Lobby and First Floor projects were completed, the Illinois Department of Public Health had finished its review and had approved all of the changes.  Notification was received that NOC is now in compliance with all appropriate rules and regulations.

**MSC**

That the Board of Directors accept the report of the Illinois Department of Public Health Compliance Project as presented by Ms. Skvarek.

**C.    Status of Refinancing**

Mr. Rogan reported that the refinancing had been completed during the month of June, 1998, and that all monies were appropriately transferred.

**D.    Latino Institute**

Ms. Skvarek reported on the Latino Institute programs on both the Outreach & Screening and the Wellness.  She reported that both of these programs were operational and functioning. She further reported that there had been some minor glitches in the start up but those were being worked out.

**E.    Chicagoland Services Support Foundation (CSSF)**

Mr. Rogan reported that as previously reported in prior minutes, the Foundation had been established and the board members appointed.   In addition, as previously directed by the Board, $3 Million had been transferred from NOC to the Foundation to act as seed money for fund raising activities.  Mr. Rogan went on to report that the CSSF Board is in the process of selecting appropriate consultants to assist it and that the services of these consultants would be shared between CSSF and NOC. It is anticipated during the start-up phase that NOC would bear the major burden of consultant expenses.

**MSC**                                                               EMC 003824

That the Board of Directors reaffirm its approval of the transfer of $3 Million from NOC to CSSF.

orthside Operating Co.
rd of Directors
cember 18, 1998
e Three

MSC

That the Board of Directors approve the hiring of consultants to assist
CSSF and NOC in their fund raising activities.

II. FACILITY REPORTS

A. Review, Discuss and Approval of Local Governing Board Meeting
Minutes

The Local Governing Board Advisory Board Meeting minutes of June 10,
1998, and August 7, 1998, were reviewed, discussed and approved by
the Board of Directors subject to approval by the Local Governing
Board. Questions were asked by the Board pertaining to the Local
Governing Board minutes and were responded to accordingly by Ms.
Skvarek.

MSC

That the Local Governing Board Meeting minutes be accepted as
presented by the Board.

B. Review and Approval of Medical Staff Meeting Minutes

The Medical Staff Meeting minutes of May, June, July, and August,
1998 were reviewed, discussed and approved by the Board of
Directors. An inquiry was made concerning Medical Staff activities
and any disciplinary actions in place. Ms. Skvarek provided the
necessary information to the Board.

MSC

That the Medical Staff Meeting minutes be accepted as presented by
the Board.

C. Review and Approval of Financial Reports

The Financial Reports of May, June and July, 1998, were reviewed,
discussed and approved by the Board of Directors. Questions from the
Board members were responded to accordingly.

One time financial results such as the extraordinary loss on
refinancing were also discussed and the year-to-date comparisons
between 1997 and 1998 were also reviewed.

EMC 003825

Northside Operating Co.
Board of Directors
September 18, 1998
Page Four

It was also pointed out that Management would be meeting with Credit Local de France, the credit enhancing bank, on October 6, 1998, to discuss the corporate reorganization of a Faculty Practice Plan, the potential strategic positioning of the institution and the strategic acquisitions.

**MSC**

That the Financial Reports be accepted as presented.

V.  BRADDOCK MANAGEMENT, L.P. REPORT

A.  Ambulatory Physician Network/Faculty Practice Plan

Mr. Rogan reported on the Ambulatory Physician Network/Faculty Practice Plan. As previously discussed in prior meetings, the computer networking capabilities and the physician billing systems to support these activities and functions have been in place. In addition, as mentioned under Section III (C), Management is meeting with Credit Local de France to discuss the strategic reorganization of the physicians into a Faculty Practice Plan to be affiliated with the Edgewater Medical Center. It may require that this entity or entities become part of the Obligated Group. Faculty physicians and physicians in the Ambulatory Physician Network have been identified to compliment the medical education affiliation with Midwestern University. It is anticipated that a November 1st date will implement this program.

**MSC**

That the Board accept this report and direct Management to continue with the implementation of the Ambulatory Physician Network/Faculty Practice Plan.

B.  Joint Commission (JCAHO) Survey

Ms. Skvarek reviewed the results of the recent JCAHO Survey with the Board reporting upon the overall score and deficiencies noted by JCAHO. Ms. Skvarek responded to questions by the Board.

**MSC**

That the Board accept Ms. Skvarek's report of the recent JCAHO Survey.

EMC 003826

Northside Operating Co.
Board of Directors
September 18, 1998
_ _e Five

C. **Master Trustee Report – 2nd Quarter, 1998**

The Master Trustee Report for the second quarter of 1998 was reviewed by the Board and questions were responded to in this regard.

**MSC**

That the Board approve the Master Trustee Report for the second quarter of 1998 as presented.

D. **Y2K Update**

Ms. Skvarek provided the Board with an update on the activities that the Hospital has been undertaking concerning the Y2K situation. A number of questions were asked by the Board members. In addition, Management was directed to share the work they have completed on Y2K with the Californian institutions. Ms. Skvarek also pointed out that the Medical Center is in the process of hiring consultants to assist in this matter.

**MSC**

That the Board accept the report on the Y2K update and authorize Management to hire any necessary professionals to assist it in addressing this situation.

E. **Compliance Program Update**

Ms. Skvarek informed the Board of the timeline Management had undertaken to further implement the Compliance Program. She also discussed and reviewed with the Board several consulting proposals and reviewed the results of management's analysis with the Board. Management presented its recommendations to the Board in terms of the consultants and professionals to be utilized and the timeline to complete the implementation of this program by the end of the first quarter of 1999.

A great deal of discussion occurred concerning the Compliance Program report and the speed with which NOC is moving. The Board commended Management on the compliance work to date, its review of the consultants report and its analysis of consultants to assist in the implementation of the final steps of a full scope Compliance Program.

EMC 003827

Northside Operating Co.
Board of Directors
September 18, 1998
Page Six

The Board directed Management to continue its efforts in this area and to devote enough resources to this program implementation to complete the implementation of the Compliance Program by December 31, 1998.

**MSC**

That the Board accept Management's status report on the implementation of the Compliance Program Update and directs Management to act with dispatch to complete implementation of this program. Further, Management was authorized to hire the necessary consultants, to complete implementation of this program.

I.  **NEW BUSINESS**

A.  **Review and Approval of New Physician Contracts**

Ms. Skvarek presented and reviewed the physician contracts which primarily pertain to administrative and/or teaching responsibilities for the included physicians.

Cheryl Brown, D.P.M.
Charles Brikha, M.D.
Benjamin Emanuel, M.D.
Shaheen Fatima, M.D.
Sayeed Iqbal, M.D.
Israel Labao, M.D.
Michael Maitar, M.D.
Geetha Pillai, M.D.

**MSC**

That the Board approve the physician contracts as presented.

B.  **Strategic Positioning**

Dr. Rosenthal asked Mr. Rogan to report to the Board concerning the results of NOC's deliberations in this area. Mr. Rogan presented a thorough discussion concerning the history of committee meetings and the Board of Directors meetings concerning the strategic positioning of NOC. He further discussed the opportunities presented to NOC in the areas of joint ventures and linkages with other hospitals. He further discussed some of the difficulties NOC had encountered in an effort to explain its corporate relationship to other providers. Mr. Rogan then went through an overview of potential future affiliations

EMC 003828

Northside Operating Co.
Board of Directors
September 18, 1998
Page Seven

and also NOC's strategic positioning in terms of linking with other providers in the Chicagoland area.

An indepth discussion occurred amongst the Board members concerning the possible alternative corporate relationships that NOC could have with Permian Healthcare. Also discussed were the advantages and disadvantages of these arrangements relative to the strategic positioning of NOC in the Chicago market independent of Permian.

In addition, the Board received a report from members of the Permian Board. Because of the current activities of Vista Hospital Systems (VHS) and its demand on management resources, the Permian Board believed corporate management needs to focus its activities on the VHS. Furthermore, Permian had recently undertaken its own strategic positioning review and had decided its focus should be, in the foreseeable future, west of the Rockies.

Given the strategic position of NOC and its best interest in positioning itself in the Chicago market coupled with the desire of Permian to focus its resources on the West coast area, it was decided that NOC should pursue an independent strategy and separate itself from the Permian organization and evaluate other corporate vehicles and/or relationships to position itself in the Chicago market.

MSC

That given the opportunities NOC is currently considering in terms of its strategic positioning, the Board approves NOC's corporate independence from Permian Health Care, Inc. Management is directed to develop the necessary steps to implement this action in the immediate future.

MSC

That Management is directed to develop options to either 1) merge with an existing organization in the Chicago market or 2) position EMC as an independent organization so as to further compliment and/or enhance NOC's health care activities. Further, Management is directed to implement all steps necessary to accomplish these goals.

EMC 003829

Northside Operating Co.
Board of Directors
September 18, 1998
Page Eight

MSC

That Management is authorized to discuss NOC's corporate
reorganization and independence from Permian Health Care, Inc. with
Credit Local de France (CLF) and obtain CLF approval.

MSC

That Management is authorized to engage the necessary professionals
and incur the necessary costs to support the above activities.

C.  Columbia - Grant

Mr. Rogan directed the Board of Directors to the Finance Committee
Meeting minutes of August 7, 1998, where this subject was covered.
In addition to reporting and elaborating upon those minutes, Mr.
Rogan also provided a status update on the negotiations with Doctors
Community Healthcare (DCH) concerning the acquisition of Grant
Hospital.

Mr. Rogan detailed the strategy and thought process behind
determining the acquisition price based upon preliminary land,
equipment and supplies value at the Grant facility.  Mr. Rogan then
informed the Board that at the current time, DCH was still in the
process of closing its purchase with Columbia and it is anticipated
NOC would enter into serious negotiations with DCH some time after
October 1, 1998.

MSC

That the Board of Directors approve the Finance Committee actions of
August 7, 1998.

MSC

That, at this time, the Board of Directors approve Management
entering into negotiations for the acquisition of Grant Hospital
from DCH at an anticipated net purchase price of up to $10,000,000
for land and building and equipment. The Board recognized that the
actual purchase price may ultimately be higher than approved at this
time.

MSC

That the Board authorize Management to enter into negotiations with
third party lenders to secure appropriate financing for working
capital needs for the acquisition of Grant Hospital.

EMC 003830

Northside Operating Co.
Board of Directors
September 18, 1998
Page Eleven

VI.    ADJOURNMENT

MSC

There being no further business, a motion for adjournment was moved, duly
seconded and carried.


APPROVE:                              ATTEST:


Bertram P. Rosenthal, M.D.            William D. Fruland
President                             Secretary


EMC 003833

NOC0918.MIN

Northside Operating Co.
Board of Directors
September 18, 1998
Page Nine

MSC

That the Board also authorize Management to hire necessary professionals and authorize the cost of those professionals regarding the acquisition of Grant Hospital.

D. **Finance Committee Meeting Minutes**

The Finance Committee Meeting minutes of July 1 & 13 and August 7, 1998, were reviewed. The Board inquired of the Committee members concerning certain actions regarding the Investment Policy and protocols for the funds of NOC.

MSC

That the Board approve the report of the Finance Committee contained in the minutes of the meetings.

MSC

That the Board also approve the Investment Policy for NOC.

MSC

That the Board also direct the Finance Committee to continue its work and complete the selection of the investment advisors and implement the Investment Policy.

E. **Braddock Management, L.P. (BMLP) Services**

Mr. Rogan presented the additional services that BMLP is to provide NOC concerning services to be provided for the acquisition of Grant Hospital. Specifically, he discussed the interim management services and the acquisition analysis services that are to be provided by BMLP. A number of questions were asked by Board members and a discussion ensued.

MSC

That the Board direct the Finance Committee to negotiate the final terms of the services to be provided by BMLP and authorize the Finance Committee to enter into a contract with BMLP for these services.

EMC 003831

Board of Directors
September 18, 1998
Page Ten

F.  **Midwestern University/Family Practice Residency Program**

Ms. Skvarek informed the Board that NOC had recently been approached
by Midwestern University to be a site for their Family Practice
Residency Program.  This program would include students, interns,
and residents.  Ms. Skvarek reviewed the advantages and
disadvantages of the program and pointed out how it complemented the
other medical education programs currently in place in affiliation
with Midwestern University.

MSC

That the Board authorize Management to negotiate and enter into an
agreement with Midwestern University concerning the Family Practice
Residency Program and that the Board further authorize Management to
make the necessary expenditures for these programs.

G.  **Merger and Acquisition Assistance**

Dr. Rosenthal recused himself from this item on the agenda and
discussions related thereto.

Mr. Rogan discussed with the Board that he has had a number of
discussions with Dr. Rosenthal concerning the assistance Dr.
Rosenthal may be able to provide NOC with respect to the Grant
Hospital acquisition and physician multi specialty group
affiliations. Mr. Rogan informed the other Board members that Dr.
Rosenthal's previous experience in mergers and acquisitions, coupled
with his knowledge of NOC's acquisition, would make him a valuable
asset to the merger and acquisition team.  The Board entered into a
discussion concerning the advantages and disadvantages of receiving
this assistance.

MSC

That the Board authorize the Finance Committee of Messrs. Brewer,
Chapas and Fruland to approve the final assistance that Dr.
Rosenthal is to provide Management.  Further, that the Board direct
Management to enter into negotiations with Dr. Rosenthal to
determine a commercially reasonable arms length transaction for his
services.

Northside Operating Co.
Board of Directors
~~tember 18, 1998
~e Eleven

VI.   ADJOURNMENT

MSC

There being no further business, a motion for adjournment was moved, duly
seconded and carried.

APPROVE:                                    ATTEST:

Bertram P. Rosenthal, M.D.                  William D. Fruland
President                                   Secretary

EMC 003833

NOC0918.MIN

1                  UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF ILLINOIS

3                     EASTERN DIVISION

4

5    ————————————————————————————————————

6   UNITED STATES OF AMERICA,          )
                               )
7               Plaintiff,     )
                               ) No.
8         vs.                 ) 02-C-3310
                               )
9   PETER ROGAN,                  )
                               )
10              Defendant.     )

11

12    ————————————————————————————————————

13             **DEPOSITION OF JUDITH LUNDE**

14           Wednesday, November 17, 2004
                Seattle, Washington

15

16

17

18

19

20                        ORIGINAL

21

22   **Reported by:**
      **Kellie A. Smith, CCR**
23   **CCR No. 1950**
      **Job No. 72897**

24

25

                                     1

APPEARANCES

For Plaintiff (via telephone):

    **JOHN NEAL**
    UNITED STATES DEPARTMENT OF JUSTICE
    601 D Street, Northwest
    Room 6532
    Washington D.C.  20530
    (202) 307-0405
    (202) 305-7868 Fax

For the Defendant (via telephone):

    **MONIKA M. BLACHA**
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, Illinois  60601
    (312) 558-5600
    (312) 558-5700 Fax
    mblacha@winston.com

    **NEIL E. HOLMEN**
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, Illinois  60601
    (312) 558-5600
    (312) 558-5700 Fax

For the witness (via telephone):

    **JULIAN SOLOTOROVSKY**
    KELLEY DRYE & WARREN LLP
    333 West Wacker Drive
    26th Floor
    Chicago, Illinois  60601
    (312) 857-7070
    (312) 857-7095 Fax

Also Present (via telephone):

    Peter Rogan

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    BY MS. BLACHA:

19    Q.    Good morning, Ms. Lunde.    Would you please state your name

20          and address for the record.

21    A.    Sure.    Judy Lunde.    27130 Southeast 22nd Way, Sammamish,

22          Washington.

23

24

25

5

1

2

3

4

5

6

7

8

9

10

11

12

13    Q.   Can you describe for me your educational background since

14         high school.

15    A.   I have a Bachelor's of Science in nursing.

16    Q.   Okay.  And where was that?

17    A.   University of Wisconsin, Milwaukee.

18    Q.   And what year did you receive your Bachelor's?

19    A.   1987.

20    Q.   Okay.  And do you have any degrees after your Bachelor's

21         Degree in nursing?

22    A.   Yes.

23    Q.   And what is that?

24    A.   I have a Master's of Science in nursing administration, and

25         MBA.

13

1   Q.  Where was your Master's received?

2   A.  University of Illinois at Chicago.

3   Q.  And what year?

4   A.  1990.

5   Q.  And you said you also had an MBA; is that correct?

6   A.  Correct.

7   Q.  And where was that received from?

8   A.  University of Illinois at Chicago.

9   Q.  And what year was that?

10   A.  1990.

11   Q.  Okay.  What was your professional experience prior to your

12       employment at Edgewater?

13   A.  Staff nurse and charge nurse.

14   Q.  And where were you employed?

15   A.  Prior to Edgewater?

16   Q.  Prior to Edgewater.

17   A.  I worked at the University of Illinois and the University of

18       Chicago.

19   Q.  And your position at those institutions was the staff nurse?

20   A.  Yeah.  Staff nurse and charge nurse.

21   Q.  Are you currently employed?

22   A.  No.

23   Q.  Have you been employed since your employment at Edgewater?

24   A.  Since I left Edgewater in June of 2001?

25   Q.  And you have not been employed since then?

14

1  A.  I have not been employed since then.

2  Q.  What was the first position that you held at Edgewater

3      Hospital?

4  A.  Clinical nurse manager of the telemetry unit.

5  Q.  And when did you begin working for Edgewater?

6  A.  I believe it was 1990.

7  Q.  What were some of your duties and responsibilities as a

8      clinical nurse manager?

9  A.  Well, in general, staffing the unit, taking care of the

10     management issues associated with personnel.  A variety of

11     things.  Is there -- I mean, I can't...

12  Q.  Who did you report to in that position?

13  A.  Ron Gaddisi (sic).

14  Q.  And did you supervise anybody?

15  A.  Yes.

16  Q.  How many people?

17  A.  I'm not exactly sure.  I would estimate -- would you like me

18     to estimate?

19  Q.  Yes, please.

20  A.  20.

21  Q.  Okay.  How long did you hold that position at Edgewater?

22  A.  As I recall, I held that position until I was moved into the

23     Director of Nursing position the following year.

24  Q.  So somewhere around 1991 or so?

25  A.  Yes.

15

1    Q.  Okay.  And you said you became the Director of Nursing?

2    A.  Yes.

3    Q.  Did your duties and responsibilities change when you became

4        the Director of Nursing?

5    A.  Yes.

6    Q.  And how did they change?

7    A.  I was the person that the managers reported to.

8    Q.  And which managers are you talking about when you say that?

9    A.  The nurse managers of the patient care units and the surgical

10       services and the emergency department.

11   Q.  Were those your only reports at that time, the three that you

12       just mentioned?

13   A.  Well, I don't remember exactly how many people there were,

14       but there were the managers of the inpatient units, and there

15       were managers for different areas.  I cannot tell you exactly

16       how many, but it would be the managers of the inpatient

17       units, the emergency room, the operating room.  There was a

18       staffing person, clerical-type person.

19   Q.  Okay.  And who did you report to in the position of Director

20       of Nursing?

21   A.  To Peter and Joanne.

22   Q.  And when you say "Peter and Joanne," do you mean Peter Rogan

23       and Joanne Skvarek?

24   A.  Yes.

25   Q.  Did you report to them simultaneously or did you report to

                                                                    16

1       Peter for a given period of time and then later report to

2       Joanne?

3   A.  I don't recall specifically how it worked at that time.

4   Q.  Okay.

5   A.  We worked as a team.

6   Q.  Okay.  What was the next position that you held at Edgewater?

7   A.  Senior Vice President of -- I don't recall the specific

8       title.  Patient Services, Patient Care Services.

9   Q.  Okay.  And did your duties and responsibilities change in

10      that position from the Director of Nursing position?

11  A.  As I recall, my duties and responsibilities changed over

12      time, but I couldn't tell you exactly what, when.

13  Q.  Okay.  Can you recall some of the things that changed when

14      you became the vice president or the senior vice president?

15  A.  As I said, it occurred over time.  I don't know that it was

16      at the exact moment of the title change.

17  Q.  Did you supervise any more people as a vice president?  I

18      mean, did you have more reports that reported to you, or how

19      did that work?

20  A.  I'm trying to remember.

21  Q.  Okay.  Take your time.

22  A.  It changed over time, so I did -- additional departments did

23      report to me, but you're -- I think you're asking me, did

24      that change when my title changed?

25  Q.  Right.

                                                        17

1  A.  And that is the difficulty I'm having, because I -- you know,

2      that specific moment, I don't recall that being a specific

3      change.  I think as -- over time, things were added and

4      changed, units were open, so I just can't say that I recall

5      something specific at that moment in time.

6  Q.  Did you have responsibility for the operating room at

7      Edgewater?

8

9

10         THE WITNESS:  When I took the Director of

11     Nursing position, that was one of the managers, I believe, I

12     had.

13  Q.  And did that continue when you became the senior vice

14     president of patient care?

15  A.  Yes.

16  Q.  Do you recall approximately what year you became the senior

17     vice president of patient care?  And you can give me a rough

18     ballpark if you don't remember exactly.

19  A.  I really cannot say for certain.

20  Q.  And how long were you employed at Edgewater Medical Center?

21  A.  By the medical center itself?

22  Q.  Okay.  First.  Right.

23  A.  As I recall, when our titles changed, I think that was when

24     we were -- didn't work directly for the hospital.  We worked

25     for the management company.  I'm not a hundred percent

                                                            18

1      certain, but I know there was a point in time when we moved

2      into the management company and were not paid directly by the

3      hospital.

4   Q.  And by the management companies, do you mean Braddock

5      Management?

6   A.  Yes.

7   Q.  So this may have been somewhere around 1995 or so?  Does that

8      spark any memory?

9   A.  I'm not certain of the dates.

10  Q.  Okay.

11  A.  I just don't remember.

12  Q.  And when did you stop working for Braddock Management?

13  A.  Again, I don't remember the dates.  I know Braddock changed

14     to Bainbridge, and I do not recall when that occurred.

15

16

17

18

19

20

21

22

23

24  Q.  Okay.  Do you remember the time period that Dr. Rao's group

25     began talking to the hospital about possibly becoming or

                                                      19

1       leading the anesthesia group?

2  A.  I recall interviewing him or meeting him.

10  Q.  You said that you interviewed Dr. Rao's group.  Do you

11      remember the approximate time period that that happened?

12  A.  I don't remember the time period, but I know that -- my

13      recollection is that Del was there, Del Patulo from Higman,

14      and I know that they were there for the 1998 joint

15      commission, so it would have been before then, but I -- I

16      don't know the date.

24  Q.  Do you recall anything about what criteria the hospital was

25      looking for?

20

1    A.   Well, I know the document that you gave me to review.

2    Q.   Okay.  Why don't we turn to that.  Would the court reporter

3         please hand Ms. Lunde Exhibit 13.

4                              (Court reporter hands witness

5                              Exhibit 13 for her review.)

6              Ms. Lunde, have you ever seen this document prior to

7         reviewing it before your deposition?

8    A.   I believe that this was the document that you had asked me to

9         review at an earlier time.

10   Q.   Prior to that earlier time, though, while you were employed

11        at Edgewater, did you see this document at all?

12   A.   I really don't remember.

13   Q.   Can you turn to the second page that is labeled on the bottom

14        with E001830.

15   A.   Yes.

16   Q.   Can you recognize the signature on that page?

17   A.   On the Page 2?

18   Q.   Yes.

19   A.   Roger Ehman's signature.

20   Q.   When you were employed at Edgewater, did you have occasion to

21        see Mr. Ehman's signature other than this particular letter?

22   A.   Yes.

23   Q.   Okay.  And do you recognize that signature as his?

24   A.   Well, I haven't seen it for a long time, so I -- you know,

25        it's not something I have seen for a long time, but I would

                                                              21

1    have at that time.

2   Q.  Okay.  Do you have any reason to doubt that that's his

3    signature on that page?

4   A.  I would have no reason to doubt it's not his signature.

5   Q.  Okay.  And if you turn to the last page of this exhibit,

6    which is entitled "Anesthesia Group Criteria," does that

7    refresh your recollection as to some of the criteria that the

8    hospital was looking for in hiring a new anesthesia group?

9   A.  What I recall in regards to the criteria for an anesthesia

10    group was when we were looking to replace Dr. Rao.

11   Q.  Okay.

12   A.  And I was -- had not done an RFP, and Roger had done it

13    before, so...

14   Q.  What is an RFP?

15   A.  A request for proposal.

16   Q.  Okay.  And I'll get to that in one minute, if you will, but

17    if you'll bear with me for a moment, does this particular

18    page, though, spark any memory as to any criteria that you

19    were looking for when you were hiring Dr. Rao's group, when

20    you were hiring for an anesthesia group at that time?

21   A.  Well, I -- as I said, I was asked to interview or meet with

22    him or whatever, but I was not involved in preparing criteria

23    as I recall.  What I recall is when we were replacing

24    Dr. Rao, that we had worked on something to send out to

25    people who may be interested in replacing him.

22

1  Q.  Okay.  I'm going to direct your attention to sort of the
2      middle of that same page, marked 1832, where it says "Retain
3      current anesthesiologists."  Does that refresh your
4      recollection at all as to what you were looking for in terms
5      of bringing in a new group?
6  A.  As I said, I really don't recall in the case you're asking me
7      when Dr. Rao came in.  I do not recall that.
8  Q.  Okay.  When you interviewed Dr. Rao, did you feel that he was
9      qualified to perform the anesthesia services at Edgewater?
10 A.  You're asking me if I thought he was qualified?
11 Q.  Right.
12 A.  Well, I don't believe that that was my role in meeting with
13     him.
14 Q.  Did you form an opinion as to whether he was qualified at the
15     time?
16 A.  Well, I don't recall exactly what the interview was, but I do
17     recall afterwards talking to Peter, and he had said to give
18     him a chance, and if it doesn't work out, you know, we would
19     move on.
20 Q.  Now, you said that it wasn't your role to determine if he was
21     qualified.  Can you tell me what your role was when you were
22     talking to Dr. Rao.
23 A.  Well, in order to provide the services in the operating room,
24     you need -- you're servicing the surgeon and the patient, and
25     in order to do the surgery, you have to have anesthesia

                                                        23

1    there, so you need to be able to work well with that

2    individual.  So that is what I believe was my role.  That we

3    could work together to provide that service.

4  Q.  Okay.  Do you remember if Dr. Rao's group, when you were

5    hiring them, if he had expressed that he was willing to keep

6    some of the current anesthesiologists on Edgewater's staff?

7  A.  I don't really recall the specifics.

8  Q.  Do you recall if after he was hired he did retain those

9    anesthesiologists that had been there prior to his coming on,

10    or some of them?

11  A.  I can't remember for sure, but I do believe Dr. Solway was

12    there.

13  Q.  And Dr. Solway had been there prior to Rao coming in?

14  A.  Yes.  But I just don't remember the individuals.

15  Q.  After Dr. Rao was hired, did his group perform

16    satisfactorily?

17  A.  Well, I don't remember the specifics of them, you know, of

18    the situation that was going on.

19  Q.  Okay.  And without getting into the specifics, do you

20    remember that there were problems that occurred after Dr. Rao

21    came on board?

22  A.  Well, as I said, the only thing I recall is that there had

23    been issues--and I don't recall exactly the time frame--about

24    making sure that there were enough anesthesia personnel

25    present to run, you know, the operating room.  And --

24

1   Q.  And -- I'm sorry. I didn't mean to interrupt you. Go ahead.

2   A.  That's what I recall. Working with Del and looking at the OR

3        schedule and saying, you know, "We had this many cases

4        scheduled. We should have had this many anesthesia people,

5        but we only got this many." That is my recollection.

6   Q.  I'm going to hand you Defendant's Exhibit 16, or ask the

7        court reporter to do that.

8                      (Court reporter hands witness

9                      Exhibit 16 for her review.)

10  A.  Yes. I have it.

11  Q.  Do you recognize this exhibit at all?

12  A.  I mean, it looks like my writing.

13  Q.  On the first page there?

14  A.  Yes.

15  Q.  Is that your signature on the bottom?

16  A.  Yes.

17  Q.  Okay. Do you recall the circumstances of sending this letter

18        to Dr. Rao?

19  A.  Well, I don't remember specifically anything about that,

20        other than I can see what I've written. And it relates to

21        the issue of the anesthesiologists being available for the

22        cases in general. Obviously it lists specific items in the

23        attachment.

24  Q.  And so does the attached report from Del Patulo list out some

25        of the issues and concerns that were happening at the

25

1       hospital after Rao was hired?

2  A.  Well, this report, Del Patulo's report, does list some issues

3       that appear to be associated with Dr. Shrifter.

4  Q.  Okay.  And in terms of scheduling, though, some of the

5       anesthesiologists, is that what you're talking about when you

6       say that those were the sorts of issues that were happening

7       after Dr. Rao was hired?

8  A.  That is what I was telling you previously, is that there --

9       for every case that's scheduled, we have to have an

10      anesthesiologist there.

11  Q.  And Dr. Rao's group wasn't scheduling those anesthesiologists

12      on time or on the correct date; is that correct?

13  A.  My recollection was that there were issues in that regard.

14      But I don't remember the specifics to what she's referencing

15      in this report.

16  Q.  Do you have any reason to doubt that you would have received

17      the report that's Bates-stamped E1774 through E1776?

18  A.  You're asking me if I received this?

19  Q.  Well, I know you said you don't recall the report, but do you

20      have any reason to doubt that you would have received it on

21      or around December 8th, 1997?

22  A.  Well, I would have to conclude that since I sent Dr. Rao a

23      fax that I had received it.  I mean, prior to seeing this, I

24      couldn't tell you what reports specifically I received.

25

26

Q. Ms. Lunde, was the administration aware of the scheduling
   issues that Dr. Rao's group, the problems that were happening
   with his group in scheduling anesthesiologists?

            MR. SOLOTOROVSKY:  Can you be specific as
   to a time, Monika?

Q. During the time that you were the Director of Nursing or the
   vice president.

A. Well, from what I recall, if there were issues with
   scheduling and a doctor wanted to do a case but he couldn't
   do a case because there wasn't any anesthesiologists present
   or we had to wait for an anesthesiologist, or, you know,
   there was an issue, yes, people would hear about it.

Q. And who do you mean when you say "people"?

A. Well, a variety of ways.  It could be -- you know, it could
   be discussed at our management meeting.  It could be a doctor
   going to see Roger to complain about it, or a surgeon, or
   they could see Peter or Joanne.  I don't know specifically,
   but it -- I would not be the only person aware of this.

                                                      27

9  Q.  Sure.  Is it likely that during this time period, Peter Rogan

10     or Joanne Skvarek would have heard of the scheduling issues

11     that were happening with Dr. Rao's group?

12  A.  I would believe that they would know about it.

13  Q.  Did you ever tell Mr. Rogan or Ms. Skvarek about the issue?

14  A.  I don't specifically remember, you know, meetings or

15     whatever, but certainly, if I was having issues, I would not

16     just keep them to myself.

24  Q.  Was there a time period where the hospital decided to

25     terminate Dr. Rao's services?

28

1    A.   Yes.

2    Q.   Do you remember when that was?

3    A.   I don't remember exactly.

4    Q.   Okay.  Was it around the 1999 time period?

5    A.   I don't remember the dates.

6    Q.   Okay.  I'm going to ask the court reporter to hand you what's

7        been marked as Defendant's Exhibit 17.

8                          (Court reporter hands witness

9                          Exhibit 17 for her review.)

10   A.   And there is the date.

11   Q.   Does this exhibit, first of all, refresh your recollection as

12        to when the hospital decided to terminate Dr. Rao's services?

13   A.   Yes.

14   Q.   And when was that?

15   A.   Well, this letter is dated April 2nd, 1999.

16   Q.   I take it you recognize this letter?

17   A.   Yes.

18   Q.   What is it?

19   A.   This letter was the letter sent to Dr. Rao advising him that

20        the agreement between the hospital and him was being

21        terminated.

22   Q.   Okay.  And is it your signature on the bottom of the letter

23        there?

24   A.   It is not.

25   Q.   It is not?  Do you know whose signature it is?

29

1   A.  My secretary, apparently.

2   Q.  Did you give your secretary authority to sign your name for

3      you?

4   A.  Yes.

5   Q.  I'm going to direct your attention to the first sentence,

6      which is, "As you are aware, there are strong grounds for the

7      hospital terminating the agreement immediately for cause."

8      What were the strong grounds that you were referring to in

9      that letter?

10  A.  I really do not recall any more than what I've already told

11     you about the scheduling.  I just don't remember the details

12     surrounding this letter.

13  Q.  Okay.  Directing your attention to Defense Exhibit 18, if the

14     court reporter can hand you that.

15                      (Court reporter hands witness

16                        Exhibit 18 for her review.)

17  A.  I have it.

18  Q.  Do you recognize this letter?

19  A.  Yes.

20  Q.  And what is it?

21  A.  This is a second letter to Dr. Rao immediately terminating

22     him.

23  Q.  Okay.  And is that your signature on the bottom of the page

24     there?

25  A.  It is.

30

1   Q.   And it says, the first sentence of the letter says that,

2        "Since my letter to you of April 1st, 1999, Rao has remained

3        in repeated and continuous breach of the agreement." What

4        did you mean by that?

5   A.   I really do not recall the specifics. All I can remember is

6        this general piece of the scheduling. What I recall is that

7        we had many issues that I -- you know, which is exactly what

8        I just told you, that Del would tell me we had this many

9        cases, we needed this many anesthesiologists, and we only had

10       this many. That is the part that I remember. But I don't

11       remember the specifics of the extent of that, but that's my

12       recollection.

13   Q.   You do recall, though, don't you, that at the time, the

14       administration felt that Dr. Rao's group was not performing

15       under the services contracts that he was -- that he had

16       agreed to at the hospital?

17

18

19   Q.   Isn't that right, Ms. Lunde?

20   A.   Well, I'm not sure if I understand your question, but we were

21       sending them a termination letter, so...

22   Q.   So there were grounds to terminate Rao at the time?

23   A.   That is what was written, so -- at the time. I just don't

24       remember the specifics of it today. But, you know, at that

25       time, I wouldn't send a letter if there weren't.

31

1  Q.  Okay.  And the scheduling issues that you have referred to,

2      that's a significant issue in terms of scheduling

3      anesthesiologists for a particular procedure?  Isn't that

4      right?

5  A.  Yes.  As I said, you can't do a case without any

6      anesthesiologists.

7  Q.  Did the administration in any way try to prevent you from

8      terminating Rao?

9  A.  Not that I recall.

10 Q.  Did you discuss Dr. Rao's termination with Peter Rogan?

11 A.  I don't recall specifically discussing it.

12 Q.  Do you recall anything about telling Mr. Rogan that Dr. Rao

13     was going to be terminated?

14 A.  I don't specifically recall a discussion, but I know that I

15     am not -- I had not done something like this before, so I

16     imagine that I did talk to people, but I can't tell you

17     specifically -- I mean, I imagine I talked to Peter and

18     Joanne and whoever I would have talked to, but I can't tell

19     you specifically a time, who.  But I would not have done

20     something like this without discussing it.

21 Q.  You would have gone to someone who had more authority?

22 A.  Correct.

23 Q.  And at the time, you were reporting to either Peter Rogan or

24     Joanne Skvarek?

25 A.  Correct.

32

1   Q.   Did Peter Rogan communicate to you either directly or

2       indirectly that he was opposed to terminating Dr. Rao?

3   A.   Not that I recall.

4   Q.   Did you have any impression whatsoever that Peter Rogan was

5       opposed to terminating Dr. Rao?

6   A.   Not that I recall.

7   Q.   Did you ever feel that Rao was protected by the

8       administration?

9   A.   Protected?  I mean, he did not -- I don't know what you mean

10      by protected.

11   Q.   Did you ever feel that if Dr. Rao experienced problems under

12      his contract, you couldn't fire him?

13   A.   I did not feel that.  As I said, Peter had told me that --

14      something to the effect that if it didn't work out, we'd move

15      on.  I don't remember the specific words, but...

16

17

18

19

20

21

22

23

24

25

33

1

2

3

4    Q.  Okay.  Do you remember working with any attorneys to hire a

5        new group?

6    A.  You mean to prepare the information to -- what to send out

7        or...?

8    Q.  Either the information or the contract itself.

9    A.  I definitely worked with attorneys in preparing these letters

10       that we referred to and with -- I don't remember about the

11       contract.

12    Q.  And when you say these letters that you referred to, you're

13       talking about Exhibits 17 and 18?

14    A.  Correct.

15    Q.  And who were the lawyers that you worked with?

16    A.  Well, I see on the April 2nd, 1999, letter, the McDermott,

17       Will & Emery, Bob Hoban.  So I don't remember specifically

18       who I worked with, but as his name is there, I would then

19       imagine he was the person that I worked with.

20    Q.  Why did you work with lawyers in, number 1, terminating

21       Dr. Rao?

22    A.  Why did I work with some lawyers?

23    Q.  Did someone direct you to go work with an attorney?

24    A.  I imagine that they did.

25    Q.  Would that have been either Peter Rogan or Joanne Skvarek?

34

1    A.   I would imagine that it would be.  As I said, I didn't have

2         any experience in doing this, so someone would have had to

3         put me in the right direction.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

35

1

2

3

4

5

6

7

8

9  Q.  Were you ever aware or did you ever hear that there were

10     kickbacks or incentives or even money given to doctors at

11     Edgewater in exchange for referring patients?

12 A.  While I was working there?

13 Q.  Yes.

14 A.  I did not hear that.

15 Q.  To your knowledge, was Peter Rogan ever involved in searching

16     for doctors at Edgewater?

17 A.  I can't say I know everything that he did.

18 Q.  Do you recall him ever functioning in that role?

19 A.  Well, my experience was that Roger was the person who

20     primarily did that.  I can't speak of what other duties he

21     did, but he would be the person who would come to me and say,

22     "Judy, I want you to meet Dr. Smith.  He's just joined our

23     staff."  So that is how I would conclude that.

24

25

43

1

2

3    A.   My recollection is that if someone asked me who was searching

4         for doctors, that would be Roger.

5    Q.   At any time during your employment at Edgewater, were you

6         concerned with the propriety of the administration's conduct?

7    A.   While I worked there?

8    Q.   Yes.

9    A.   I did not -- I continued working there.  I did not have cause

10       for concern.

11   Q.   Did you have any cause for concern with the propriety of the

12      doctors' conduct while you worked there?

13   A.   We had some different doctors, but I don't know that I could

14      say I would be concerned with their propriety.  I was

15      concerned with their care as it affected my staff's ability

16      to work.

17   Q.   You never felt that they were committing Medicare fraud, for

18      example?

19   A.   I would not have reason to believe that.

20   Q.   And how about anyone on the administration?

21   A.   As I said, I did not have a sense of that as I was working

22      there.

23

24

25

45

1
2
3
4     I, **JUDITH LUNDE,** do hereby declare under penalty of
5 perjury that I have read the foregoing transcript of my
6 deposition; that I have made such corrections as noted
7 herein, in ink, initialed by me, or attached hereto; that my
8 testimony as contained herein, as corrected, is true and
9 correct.
10
11     EXECUTED this _____ day of _____, 2004, at
12 _____(City), _____ (State).
13
14     _____
15     **JUDITH LUNDE**
16
17
18
19
20
21
22
23
24
25

52

| | | |
|---|---|---|
| 1 | STATE OF WASHINGTON ) | I, Kellie A. Smith |
| | ) ss CCR SMITHKA225J5 a | |
| 2 | County of Pierce ) | duly authorized Notary |
| | | Public in and for the |
| 3 | | State of Washington |
| | | residing at Tacoma, |
| 4 | | do hereby certify: |

5

6

7       That the foregoing deposition of **JUDITH LUNDE** was taken before me and completed on **November 17, 2004,** and thereafter was transcribed under my direction; that the

8    deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers,

9    objections, motions and exceptions;

10       That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing

11    but the truth, and that the witness reserved the right of signature;

12

13       That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee

14    of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

15       That I am herewith securely sealing the said

16    deposition and promptly delivering the same to Attorney **MONIKA M. BLACHA.**

17       IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 18th day of

18    November    , 2004.

19

20

21    **Kellie A. Smith, CCR**

        Notary Public in and for the State

22    of Washington, residing at Tacoma.

23

24

25

53

# Exhibit

# 13



# EDGEWATER MEDICAL CENTER

January 17, 1997



DEFENDANT'S
EXHIBIT
13
Lunde - 11/17/04

Rao, S.C.
11 Maple Tree Court
Elmhurst, IL 60126

Dear Dr. Rao:

Edgewater Medical Center's contract for anesthesia services expires
February 28, 1997. We would like to invite your Anesthesia Group
to submit a written proposal to provide anesthesia services at
Edgewater.

A summary of our minimum contract requirements is given below:

| | | | |
|---|---|---|---|
| o | Term | - | Three year contract effective March 1, 1997 with standard termination provisions. |
| o | Coverage | - | Provide a sufficient MD/CRNA mix to staff 5 ORs and to service the cardiac cath, GI and Cysto Lab anesthesia needs. Provide comprehensive anesthesia services to accommodate Edgewater's surgical needs including primary and secondary on-call coverage with 30 minutes response time. |
| o | Credentials of M.D. Anesthesiologists | - | A minimum of board eligibility with board certification preferred. |
| o | Quality Assurance Program | - | Cooperate with the Hospital in maintaining an ongoing anesthesia quality improvement program. |
| o | Accreditation | - | Meet all accrediting body anesthesia standards including the maintenance of policy and procedure manuals. |

5 050274

- o **Chief of Anesthesia** – Provide a Chief of Anesthesia Services with minimum credentials of Board eligibility (Board Certification preferred). Chief of Anesthesia shall provide administrative duties to the Hospital as mutually agreed upon (See attachment for a partial list of administrative responsibilities).

- o **Program Development/ Marketing** – Cooperate with the Hospital in the development of new programs and in the marketing of anesthesia services.

- o **Liability Insurance** – Maintain a minimum of $1,000,000 occurrence and $3,000,000 aggregate professional liability insurance. Also, maintain appropriate levels of general liability, property damage and worker's comp insurance.

- o **Contractor Status** – Maintain Independent Contractor status.

- o **Exclusivity** – An exclusivity provision will be extended to your Anesthesia Group.

If interested, please submit a written proposal no later than Monday, <u>February 3, 1997</u> addressing the aforementioned minimum criteria and any other pertinent issues you would like to include in the proposal.

We look forward to hearing from you soon.

Sincerely,

Roger H. Ehmen
Senior Vice President

cc: P. Rogan

RHE/sg

5 050275

E001830

## ADDENDUM

## CHIEF OF ANESTHESIA ADMINISTRATIVE DUTIES

1. Organize anesthesia group activities to provide efficient, quality, and patient-oriented professional anesthesia services to the Hospital's patients;

2. Establish quality and service standards which meet or exceed the requirements for quality administrative and professional anesthesia services as set forth from time to time by the Hospital;

3. Monitor and ensure compliance with such quality and service standards on a routine basis and to take any disciplinary or corrective action to ensure that such standards are adhered to and complied with by anesthesia group;

4. Prepare professional anesthesia coverage schedules in a timely and efficient manner, in conjunction with the OR Nurse Manager.

5. Assure Anesthesia Department drug inventory is counted on a daily basis, assuming accountability of controlled substances.

6. Develop and periodically revise Anesthesia Department policies and procedures.

7. Attend all appropriate Hospital and Medical Staff Committees.

8. Develop and maintain an ongoing departmental Continuing Medical Education program.

9. Assure compliance with all JCAHO and other accrediting body standards.

10. Assist in the development of anesthesia related programs such as pain management.

11. Participate in Hospital's surgical, podiatry and internal medicine training programs.

12. Make recommendations to Administration regarding departmental equipment needs.

13. Develop appropriate medical staff education programs.

5 050276

E001831

## ANESTHESIA GROUP CRITERIA

- ✓ o    *comprehensive*
  Provide anesthesia for open heart surgery *anesthesia*.
  *services including*

- ✓ o    Provide primary and secondary on-call coverage with a 30 minute response time.

- ✓ o    Provide sufficient MD/CRNA mix to staff 5 ORs and service Cardiac Cath, GI and Cysto anesthesia needs.
  o    *Financial billing policies/procedures*

- ✓ o    3 *year agreement.*

- ✓ o    Provide ongoing anesthesia Quality Improvement Reports to be reviewed by and submitted to the Hospital QI Coordinator on a monthly basis.

- ✓ o    Meet all accrediting body anesthesia standards including the maintenance and updating of policy and procedure manuals.

- o    Work jointly with Hospital Administration and Surgical Department in the provision of quality of anesthesia services.

- o    Agree to a mutually acceptable start date.

- ✓ o    *Retain* ~~Consider~~ current anesthesiologists. ~~for retention.~~

- ✓ o    Provide an Anesthesia Director who is board certified.

- ✓ o    Provide MD Anesthesiologists who are either board certified or eligible.

- ✓ o    Agree to cooperate with Edgewater Medical Center in program development and to sit on various committees.
  *(i.e pain management)*

- o    Be able to work without an Anesthesia Tech after 3:00 p.m.

- o    Count drug inventory on a daily basis, assume accountability of controlled substances.

- o    Assume responsibility for assisting in case scheduling to provide optimum anesthesia services and taking into account surgeon requests/preferences.

- o    Surgeon determines if a case is an emergency, any conflict or disagreement is to be worked out between anesthesia and the surgeon. If no agreement can be reached, the Director will be called to do case.

- o    The Director will also be called to do a case if the on-call anesthesia staff has not arrived within 30 minutes.

**5 050277**

CRITERIA.DOC

# Exhibit

# 16



**FAXED**
12/8/97

EDGEWATER MEDICAL CENTER
5700 NORTH ASHLAND AVENUE
CHICAGO, ILLINOIS 60660

(773) 878-6000

DEFENDANT'S
EXHIBIT
16
Lunde - 11/17/04

## facsimile transmittal

| | | | |
|---|---|---|---|
| **To:** | Dr. Rao | **Fax:** | 630- 833-1820 |
| **From:** | Jody Lunde | **Date:** | 12/8/97 |
| **Re:** | | **Pages:** | 4 |
| **CC:** | | | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

**Notes:** IF FOR ANY REASON YOU REQUIRE ANY OF THE PAGES TO BE RESENT,

PLEASE DO NOT HESITATE TO CONTACT OUR OFFICE AT THE ABOVE LISTED

NUMBER.

Dr Rao-
Here is a copy of Del's report regarding some issues involving Anesthesia. The referenced chart and other reports are available at the hospital should you wish to review them.
Please let me know how you will be addressing these issues.
Thanks

E001773

5 050220

**TO:**         Judy Lunde, Senior Vice President of Patient Services

**FROM:**    Del Patulo, Higman Healthcare

**SUBJECT:**   Weekly Report

**DATE:**      December 8, 1997

## ANESTHESIA REPORT

The following issues occurred on November 11 and 12 and were reported to Dr. Rao at that time:

1. An open heart was scheduled for November 12 at 0830. Dr. Shrifter asked the OR scheduler to call the CV Surgeon to postpone the case. He was going to a concert on November 11 and would be too tired to start that early. This request was not fulfilled.

2. A case was scheduled at 1200 for creation of an AV fistula in the thigh and insertion of a Quinton catheter. The surgeon requested a graft for the AV fistula in a size that is unusual and not carried in this OR. The company was notified and they felt that they could have the graft at the hospital by 1430. The surgeon and the patient were notified of the delay. Dr. Shrifter, who was assigned to do the case, was very angry and called the surgeon. He requested that the surgeon come and put in the Quinton catheter now and bring the patient back the next day for the additional procedure. The surgeon refused. The patient was brought into the OR suite at 1430 after arrival of the graft. The surgeon complained that Dr. Shrifter was too worried about being able to leave.

3. The OR was notified that the open heart patient had arrived at the hospital for admission. I immediately notified Dr. Shrifter at 1435 to see the patient preoperatively and/or look at the old chart since the patient had been discharged within the week. At 0600 on the morning of surgery, the floor nurses notified the OR desk that they had an order to have anesthesia see the patient preoperatively and write orders. This had not been completed. The patient was brought to the PACU without a visit from anesthesia at 0630 for insertion of lines. Dr. Shrifter arrived at 0700. The patient had severe post-op complications.

4. On November 12 at 1500, the Cath Lab, GI Lab and one OR still had cases to go. All anesthesia personnel left except Dr. Chis, who was on call. Therefore, the cases had to follow each other. The two OR cases were canceled. The CRNA was still in-house but stated she had stayed late all week and had an appointment she had to keep. She stated she had discussed this with Dr. Solway who had told her Dr. Shrifter would stay late.

E001774

Higman Healthcare

5 050221

On Wednesday, November 6, 1997 I was called to come out of a meeting by the OR Coordinator and the Scheduling Clerk. They reported that after they had scheduled a case for Friday November 28, Dr. Shrifter had become very angry and yelled at them in the Nurses' Station because the case was scheduled for noon and would be a long case. I looked at the schedule to determine if there were any changes that should be made. The case needed unusual supplies which were to be brought in by Fed-Ex on Friday morning and therefore would not be able to go earlier than noon. I told the Coordinator and the Scheduler that the schedule was done correctly and also spoke to Dr. Shrifter about how the schedule would be run on Friday. After my meeting was completed I returned to the OR and again the Coordinator and Scheduler reported that Dr. Shrifter had returned to the Nurses' Station angry and yelling because an add-on case for Dr. Alexandre had to be delayed until later in the afternoon. The following issues occurred surrounding this incident::

1. Dr. Alexandre was unable to be given a 0730 start time.

2. Dr. Alexandre notified the OR desk during the morning that he had a delivery and then would come and do his case at 1300.

3. Dr. Alexandre notified the OR that his patient was unable to deliver and that he would be performing a C-Section before coming to Edgewater.

4. Dr. Shrifter notified me that he had called Dr. Alexandre to cancel his case and put it on another day.

5. At 1500 Dr. Shrifter told the OR desk that he was going home and to call him when the case was ready to go.

6. Dr. Shrifter was called back to the hospital at 1530.

7. On December 5, 1997, Dr. Alexandre met with me to express his distress that Dr. Shrifter would call him to cancel a case. Dr. Alexandre stated that he felt no one wanted to be working the evening before the holiday but he feels Dr. Shrifter was not putting the welfare of the patient first. Since this is not the first time that this type of behavior has occurred Dr. Alexandre felt that this incident needed to be reported. He was told that administration would be informed.

E001775

Higman Healthcare®

5 050222

On December 3, 1997, an incident occurred (see attached sheets). A bedside EGD was to be performed in room 341. MAC (monitored anesthesia care) was ordered and Dr. Shrifter assigned to the case. S. Schumer was the RN assigned to the case. I was present in unit for part of the case. I went to unit after procedure started to wait and talk to Dr. Maitar. While I was at the Nurses' station Dr. Shrifter came out of the room and informed the staff that there were no monitors in the room. I called the OR to send monitors down. Dr. Shrifter stayed out of the room for the remainder of the case. He asked the floor nurses to get a blood pressure and a pulse for him. Although monitors arrived, the patient was not hooked up during the procedure. A review of the anesthesia record shows documentation of monitoring during this procedure. Doctors Garlovsky and Rao were notified.

On December 5, 1997 Dr. Sriram met with me to request that Dr. Shrifter not be assigned to his cases in the future. He gave no reasons for this request. I informed him that administration would be informed.

cc:    B. Keegan, Project Manager
       Dr. Rao, Director of Anesthesia

**5 050223**

E001776

Higman Healthcare®

TOTAL P.04

# Exhibit

# 17



# EDGEWATER MEDICAL CENTER

April 2, 1999

**VIA FEDERAL EXPRESS**



DEFENDANT'S
EXHIBIT
17
Lunde- 11/17/04

Rao M.D., S.C.
11 Maple Tree Ct.
Elmhurst, Illinois 60126

> Re:  **Termination of the Exclusive Services Agreement (the "Agreement")
> Between EMC (the "Hospital") and Rao M.D., S.C. ("Rao").**

Dear Dr. Rao:

As you are aware, there are strong grounds for the Hospital terminating the Agreement immediately for cause. Nevertheless, the Hospital had chosen to terminate the Agreement under Section 3.3. We are especially concerned that there be an orderly transition of patient sources. This letter shall serve as the ninety (90) days notice of termination required pursuant to Section 3.3 of the Agreement. The termination will be effective as of midnight July 5, 1999. Obviously, there is a considerable period of time remaining prior to the end of the term of the Agreement and the Hospital intends to honor its obligations under the Agreement and expects the RAO, and its employees, will also honor their duties and obligations under the Agreement. Please be reminded that certain provisions of the Agreement continue after termination, such that the Hospital will honor its obligations under Section 5.1 and RAO must honor its obligations under Section 6.2 in regard to "tail" insurance coverage and each anesthesiologist will be deemed to have resigned from the medical staff as of July 5, 1999.

Once again, thank you for your services and support. Please contact me should you have any questions regarding this letter or the Agreement.

Sincerely,

Judith M Lunde RN

Judith M. Lunde, RN
Senior Vice President, Patient Care Services

JML/dod

cc:   Robert Hoban
      McDermott, Will & Emery            E001838

      Nicholas Rantis                    5 060283
      Nicholas S. Rantis & Associates, Ltd.

5700 NORTH ASHLAND AVENUE    CHICAGO, ILLINOIS 60660-4086    (773) 878-6000    FAX: (773) 878-4431

# Exhibit

# 18



# EDGEWATER MEDICAL CENTER

May 14, 1999



DEFENDANT'S
EXHIBIT
18
Lunde- 11/17/04

Rao M.D., S.C.
3N434 Patricia Lane
Elmhurst, Illinois 60126

**Re:** **Immediate Termination For Cause Of The Exclusive Services Agreement ("the Agreement") Between EMC ("the Hospital" and Rao M.D., S.C. ("Rao")**

Dear Dr. Rao:

Since my letter to you of April 1, 1999, Rao has remained in repeated and continuous breach of the Agreement. Accordingly, please be advised that Rao is hereby terminated, for cause, effective immediately. The Hospital further intends to pursue any and all available legal remedies in connection with this matter.

I would appreciate your advising Drs. Chis, Lau and Siram Dasu and Matilda Sekulich, CRNA pursuant to Section 8.1 (a) of the Agreement that their privileges have been withdrawn.

Sincerely,

Judith M. Lunde, RN
Senior Vice President, Patient Care Services

JML/dod

E001795      5 050242

5700 NORTH ASHLAND AVENUE   CHICAGO, ILLINOIS 60660-4086   (773) 878-6000   FAX: (773) 878-4431