UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 02 C 3310 |
| Plaintiff, | ) | |
| | ) | Judge Darrah |
| | ) | |
| v. | ) | |
| | ) | |
| PETER ROGAN, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' PROPOSED CONCLUSIONS OF LAW**

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), and the common law.  Jurisdiction over this action is conferred upon this Court by 31 U.S.C. §§3729(e), 3732(a) and 28 U.S.C. §§ 1331 and 1345 and venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).

**False Claims Act**

2.      Section 3729 of the FCA imposes liability on any person or entity who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; . . . .

31 U.S.C. § 3729(a)(1)-(3).

3.      The standard of proof under the FCA is preponderance of the evidence.  31 U.S.C. § 3731(c).

4.      A claim is broadly defined under the FCA as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient."  31 U.S.C. § 3729(c).  More simply stated, a "claim" is a demand for the payment of government money.  United States v. Neifert-White Co., 390 U.S. 228 (1968); United States v. Ekelman & Assocs., 532 F.2d 545 (6th Cir. 1976); United States v. Veneziale, 268 F.2d 504 (3d Cir. 1959).

5.      In order for the United States to recover from a defendant under Section 3729 (a)(1) or (a)(2) of the FCA , it must prove the following three elements:

        a.      that the defendant caused to be presented to the United States a false or fraudulent claim for payment, or that the defendant made, used, or caused another to make or use, a false statement or document; and

        b.      that the defendant did so for the purpose of obtaining payment from the government or approval of a claim against the government; and

        c.      that the defendant knowingly presented a claim that was false or fraudulent. See 31 U.S.C. § 3729; United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943); United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999).

6.      The False Claims Act uses the disjunctive words "or" when it prohibits "false or fraudulent" claims.  If a claim is either false or fraudulent, then the falsity element has been satisfied. Fleming v. United States, 336 F.2d 475, 479 (10th Cir. 1964).

2

7.     The FCA defines "knowing" and "knowingly" to mean that a person, with respect to information:

      a.    has actual knowledge of the information;

      b.    acts in deliberate ignorance of the truth or falsity of the information; or

      c.    acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b); see also United States v. Krizek, 111 F.3d 934, 943 (D.C. Cir. 1997); United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999); U.S. ex rel. Asch v. Teller, Levit & Silvertrust, P.C., 2004 WL 1093784, *3 (N.D.Ill., May 7, 2004) ("No person having specialized knowledge of such matters such as a CPA was consulted, no attorney oversaw the work of the non-attorney employees who were involved in the actual receipt of account payments, or gave the employees any guidance on how they should handle such payments. Such conduct certainly constitutes deliberate indifference and reckless disregard as a matter of law."); United States v. Entin, 750 F. Supp. 512, 518 (S.D. Fla. 1990).

8.     Under Section 3729(a)(3) of the FCA, the conspiracy provision, the United States must prove by a preponderance of the evidence:

      a.    An agreement, combination, or conspiracy to defraud the Government by getting a false or fraudulent claim allowed or paid; and

      b.    That the defendant did so for the purpose of obtaining or aiding to obtain payment from the government or approval of a claim against the government.

See 31 U.S.C. § 3729; United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943).

9.      ""[G]eneral civil conspiracy principles apply" to FCA conspiracy claims under 31 U.S.C. § 3729(a)(3).  United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 n.3 (7th Cir. 1999).  The essence of a civil conspiracy is as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

United States v. Murphy, 937 F.2d 1032, 1039 (6th Cir. 1991).

### Claims to Medicare and Medicaid Are Actionable Under the FCA

10.      Hospitals are paid by Medicare on an interim basis (through the filing of electronic UB-92 forms, among other submissions) for services and items rendered; however, in order to retain eligibility for those payments, CMS requires hospitals to submit an annual cost report.  Cost reports are the final "claim" that a provider submits to the Medicare program for items and services rendered to Medicare beneficiaries.   After the end of each hospital's fiscal year, the hospital files its cost report with its designated Medicare fiscal intermediary, stating the amount of reimbursement the hospital believes it is due for the year.  See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; see also 42 C.F.R. § 405.1801(b)(1).   Medicare relies upon the hospital's cost report to determine whether the hospital is entitled to more reimbursement than already received through interim payments, or whether the hospital has been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 413.60 and  413.64(f)(1).

4

11.    False claims to Medicare, including Medicare cost reports and UB-92s (also known as form "HCFA-1450"), are actionable under the civil FCA.  Peterson v. Weinberger, 508 F.2d 45, 51 (5th Cir.), cert. denied, 423 U.S. 830 (1975); United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899 (5th Cir. 1997) (claim that hospital falsely certified compliance with the Stark statute in its cost report was actionable under the FCA); United States ex rel. Augustine v. Century Health Servs., Inc., 289 F.3d 409 (6th Cir. 2002) (Circuit court affirmed liability under the FCA of provider who submitted false cost reports); United States v. Medco Physicians Unlimited, 2001 WL 293110 (N.D. Ill. Mar. 26, 2001) (where provider included costs on cost report that provider knew were unallowable, claim was actionable under the FCA); In re Cardiac Devices Qui Tam Litigation, 221 F.R.D. 318, 343 (D. Ct. 2004) (submission of UB-92 clearly constituted submission of "claim" to government) .

12.    Medicaid claims submitted to a state are also "claims" to the federal government under the FCA.  United States ex rel. Tyson v. Amerigroup Ill., Inc., et al., 2005 WL 2667207 (N.D. Ill. Oct. 17, 2005);  United States ex rel. Murphy v. Baptist Medcare, Inc., No. 4:02-CV-440 (E.D. Ark. Oct. 27, 2005).

**Compliance with the Anti-Kickback and Stark Statutes Is a Condition of Payment**

13.    Falsely certifying compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and Stark Statute, 42 U.S.C. § 1395nn, in a Medicare cost report is actionable under the FCA. See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,125 F.3d 899, 902 (5th Cir. 1997); United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 245 (3d Cir. 2004); United States ex rel. Bidani v. Lewis, 264 F. Supp. 2d 612 (N.D. Ill. 2003); United States ex rel. Pogue v.

5

Diabetes Treatment Ctrs. of America, Inc., 238 F. Supp. 2d 258 (D.D.C. 2002); United States ex rel. Pogue v. American Healthcorp. Inc., 914 F. Supp. 1507 (M.D. Tenn. 1996).

14.     Even in the absence of an express certification of compliance, the knowing submission of claims by a person who has violated a statute or regulation that contains, on its face, a direct nexus to the government's payment decision is also actionable under the FCA. See, e.g., United States ex rel. Augustine v. Century Health Svcs., Inc., 289 F.3d 409, 415 (6th Cir. 2002). Presentment of the claim falsely represents an entitlement to payment that the claimant forfeited by violating the other statute or regulation. See United States ex rel. Barrett v. Columbia/HCA Health Care Corp., 251 F. Supp. 2d 28, 33 (D.D.C. 2003) ("[w]here the government pays funds to a party, and would not have paid those funds had it known of the violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent.").

15.     "[T]he Stark laws' express prohibition on payment for services rendered in violation of their own terms makes such alleged violations actionable under the FCA." United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F. Supp. 2d at 1047. On remand from the Fifth Circuit, the district court found that defendants' claims for Medicare payments, "which [defendants] knew they were statutorily prohibited from receiving [under Stark I and II] because the claims came out of an alleged scheme of illegal self-referrals among the Columbia entities and physicians linked by illicit financial relationships[,]" were actionable under the FCA. Id.; see also Pogue, 914 F. Supp. 1507; United States ex rel. Urbanek v. Laboratory Corp. of Am. Holdings, Inc. No. 00-CV-4863, (Aug. 14, 2003 E.D. Pa.).

16.     Because compliance with the Anti-Kickback and Stark statutes is a condition of payment by the Medicare program, the submission of UB-92s by a violator of those statutes constitutes a violation of the FCA.  See McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005) (government alleged valid FCA claim against defendants who violated the Anti-kickback statute and submitted claims for reimbursement); United States ex rel. Pogue v. Diabetes Treatment Centers of America, 238 F. Supp 258, 266 (D.D.C. 2002) ("The Stark laws . . . specifically state that compliance is required in order to receive Medicare reimbursement."); Thompson, 20 F. Supp 2d 1017, 1047-48 (defendants impliedly certified compliance with the Anti-kickback and Stark Statutes when submitting claims to Medicare).

17.     Similarly, compliance with the Anti-Kickback statute is a condition of payment by the Medicaid program.  42 U.S.C. § 1320a-7b(b); United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp.2d 28, 32 (D.D.C. 2003).  Therefore, the submission of Medicaid cost reports by a violator of the Anti-kickback statute is actionable under the FCA.

## The Anti-Kickback Statute's Prohibitions

18.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from offering, making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.

(b) Illegal remuneration

*   *   *

7

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

19. First enacted in 1972, Congress strengthened the Anti-Kickback Statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

20.     Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare and Medicaid programs.  Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

21.     Payment of remuneration of any kind violates the statute if <u>one or any</u> purpose for that remuneration was to induce referrals.  <u>United States v. Greber</u>, 760 F.2d 68, 72 (3d Cir. 1985)("If the payments were intended to induce the physician to use Cardio-Med's services, the statute was violated, even if the payments were also intended to compensate for professional services."); <u>United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.</u>, 874 F.2d 20, 30 (1st Cir. 1989) ("The issue of sole versus primary reason for payments is irrelevant since any amount of inducement is illegal.") (emphasis in original); <u>United States v. McClatchey</u>, 217 F.3d 823 (10th Cir. 2000) (Adopting one-purpose test set forth in <u>Greber</u>); <u>see also</u> <u>United States v. Kats</u>, 871 F.2d 105 (9th Cir. 1989).

22.     The Seventh Circuit has been very clear about the harm arising from bribes paid in exchange for access to Medicare beneficiaries:

> In the context of Congress' regulation of the expenditure of enormous sums of federal funds under the Medicare and Medicaid programs, making payments in return for Medicare referrals is corrupt. The potential for increased costs to the Medicare-Medicaid system and misapplication of federal funds is plain where payments for the exercise of such judgments are added to the legitimate costs of the transaction.

<u>United States v. Hancock</u>, 604 F.2d 999, 1001-02 (7th Cir. 1979) ("handling fees" paid to doctors by laboratory testing company were disguised bribes for referrals).

9

23.     Payments to physicians in return for the physicians' promise to send patients to a particular facility qualify as kickbacks.  Hancock, 604 F.2d at 1002 ("the defendants were able to open up or control the payment of federal funds to Chem-Tech by sending Medicare or Medicaid patients tissue specimens to Chem-Tech . . . .").

24.     Giving a person the opportunity to earn money may constitute an inducement under the Anti-kickback statute.  "The gravamen of Medicare Fraud is inducement.  Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient."  United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 29 (1st Cir. 1989).

25.     The term "refer" as used in the Anti-kickback statute is not limited to the physician who formally authorizes a particular service.  United States v. Polin, 194 F.3d 863, 866-67 (7th Cir. 1999) ("refer" and "recommend" as used in the Anti-kickback statute may apply to physicians or others who refer, recommend, turn over, select or give business to a particular recipient).

26.     HHS has promulgated regulations specifying those payment practices that will not be subject to criminal prosecution or provide a basis for administrative exclusion.  Known as the "Safe Harbor" regulations, 42 C.F.R. § 1001.952, the Safe Harbors list various circumstances under which a financial relationship between a provider and a referral source would not give rise to liability under the Anti-kickback statute.

27.     Payments to a physician under a personal service agreement must meet all of the following requirements in order to qualify for the Safe Harbor during the time period in question, 42 C.F.R. § 1001.952(d) (1991):

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

42 C.F.R. § 1001.952(d) (1991);[1] see Nursing Home Consultants, Inc. v. Quantum Health Servs. Inc., 926 F. Supp. 835, 844 (E.D. Ark. 1996) (defendant must fully comply with Safe Harbor provisions); United States v. Neufeld, 908 F. Supp. 491, 497-98 (S.D. Ohio 1995) (defendant must fully comply with a safe harbor provision to avoid prosecution).

28.     The finder of fact may infer that payments were intended to be kickbacks based on testimony that the recipient of the payments "was grossly overpaid . . . for any legitimate professional services he may have rendered."  United States v. Norton, 2000 WL 33281703 *4 (W.D. Va. Nov. 14, 2000).

### The Stark Statute's Prohibitions

29.     Enacted as amendments to the Social Security Act, the Stark Statute, 42 U.S.C. § 1395nn, inter alia, prohibits a hospital from submitting Medicare claims for payment based on patient referrals from physicians having a prohibited "financial relationship" (as defined in the statute) with the hospital.

---

[1]     The regulations were amended in November 1999, primarily to add the seventh requirement set forth below:  (1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.  42 C.F.R. § 1001.952(d) (2000).

30.     The Stark Statute establishes the clear rule that the United States will not pay for items or services ordered by physicians who have improper financial relationships with a hospital.

31.     Violation of the Stark statute may also subject the billing entity to exclusion from participation in federal health care programs and various financial penalties.  See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

32.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider.  See Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

33.     In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services, including inpatient and outpatient hospital services.  See Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

34.     As of January 1, 1995, Stark II applied to patient referrals for designated health services by physicians with a prohibited financial relationship with a hospital.  See 42 U.S.C. § 1395nn(h)(6).

35.     In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals

(1) In general

13

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –

(A) <u>the physician may not make a referral</u> to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) <u>the entity may not present or cause to be presented a claim</u> under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

36.     In addition to prohibiting the hospital from submitting claims under these circumstances, the Stark statute also prohibits payment by the Medicare program of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section."   42 U.S.C. § 1395nn(g)(1).

37.     The Stark Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services."   42 U.S.C. § 1395nn(h)(5)(A).

38.     The accompanying regulations interpreting the statute also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a

14

physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." Id.

39.     The Stark Statute also broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. In order to avoid the referral and billing prohibitions in the statute, a hospital's financial relationship with a physician must fall into one of the exceptions.

40.     In order for compensation paid to a referring physician serving as a hospital consultant to fall within an exception to the statute during the time period at issue, the contract must

(1) be in writing and signed by the parties;

(2) be for a term of at least a year;

(3) specify the services covered, cover all the services to be provided by the physician, with the aggregate of such services reasonable and necessary for the legitimate business purposes of the hospital; and

(4) set the payment for contract services in advance, consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other business generated between the parties. 42 U.S.C. § 1395nn(e)(3).

41. Compensation paid to a physician (directly or indirectly) under a medical directorship or other services contract that exceeds fair market value, for which no actual services are required, or which takes into account the volume or value of the referrals or other business generated between the parties, triggers the referral and payment prohibitions of Stark II with respect to designated health services referred by that physician.

42. If a relationship between a physician and a hospital does not meet one of the exceptions in the statute, the hospital is prohibited from billing for designated health services referred by that physician, regardless of the legality of the physician's other relationships with the hospital.

43. If a hospital submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

44. In order to submit claims for specific Medicare patients, a hospital must identify the attending physician by placing the physician's Universal Provider Identification Number (UPIN) in Box 82 of the form used to make such claims, form "UB-92" (also known as form "HCFA-1450"). If a procedure is performed, the hospital must identify the physician who performed the principal procedure in Box 83 of the UB-92.

45.     The "attending/operating" physician identified in Boxes 82 and 83 of Form UB-92 qualifies as a referring physician as that term is defined by the Stark statute.[2]  The Stark statute defines "referral" by a physician in this context to be "the request or establishment of a plan of care by a physician which includes the provision of designated health services."  42 U.S.C. §1395nn (h)(5)(A).  For inpatient claims, the Medicare Hospital Manual published by CMS instructs hospitals to put in Box 82 the UPIN of "the clinician primarily responsible for the care of the patient from the beginning of the hospital episode."  Hospital Manual, § 460, FL 82.  In addition, the hospital must put in Box 83 the UPIN of the physician who performed the principal procedure.  Hospital Manual, § 460, FL 83.  These manual provisions were adopted to implement Congress' requirement that the identification number of referring physicians be reported with claims made to Medicare.  Hospital Manual, Transmittal No. 637, May 1, 1992.

## Admission of Co-Conspirator's Statements Against the Defendant

46.     Pursuant to Federal Rule of Evidence 801(d)(2)(E) and United States v. Santiago, 582 F.2d 1128 (7th Cir. 1978), the Court may admit co-conspirators' statements at the trial of a defendant.

---

[2]     Congress enacted the first Stark statute (Stark I) in 1989.  See Pub. L. 101-239, § 6204, 103 Stat. 2241.  Stark I required providers to submit information with claims that would identify "referring" physicians.  Pub. L. 101-239, § 6304 (b) (codified at 42 U.S.C. § 1395l (q)).  CMS, then HCFA, implemented this provision by requiring hospitals to list the UPIN of the "attending" physician on Form HCFA-1450, which at the time was form UB-82.  Hospital Manual (CMS-Pub. 10) (emphasis added), Transmittal No. 637, May 1, 1992; Home Health Agency Manual (CMS-Pub.11), Transmittal No. 256, September 1, 1992.   Providers were instructed to report this information in Boxes 92 and 93 on UB-82.  See, e.g., Carrier Medicare Newsletter published by Mutual of Omaha 91-28.  Effective October 1, 1993, CMS instituted UB-92 to replace the UB-82.  The information in Boxes 92 and 93 on UB-82 was transferred to Boxes 82 and 83 on UB-92.  See Medicare Claims Processing Manual, Pub. 100-4, Chap. 25, section 60, FL 82-83.  Obviously, given the broad statutory and regulatory definition of referral, physicians not listed as either the attending or operating physician may also qualify as one of several "referring physicians."

47.     Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."   Under well-established case law, co-conspirators' statements are admissible if the government establishes three elements by a preponderance of the evidence: (1) that a conspiracy or joint venture existed; (2) that the defendant and the person making the statement were members of the conspiracy or joint venture; and (3) that the statement was made during the course and in furtherance of the conspiracy or joint venture.  See Bourjaily v. United States, 483 U.S. 171 (1987).

48.     This rule "applies not only to conspiracies but also to joint ventures, and . . . a charge of criminal conspiracy is not required to invoke the evidentiary rule." United States v. Kelley, 864 F.2d 569, 573 (7th Cir. 1989).

49.     In Santiago, the Seventh Circuit Court of Appeals set the applicable test:

> If it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made and that the statement was in furtherance of the conspiracy, the hearsay is admissible.

582 F.2d at 1134.

50.     The Court may consider the actual hearsay statements proffered for admission in determining whether the evidence sufficiently establishes the factual prerequisites demanded by Rule 801(d)(2)(E).  Bourjaily, 483 U.S. at 178-79; see also United States v. Hooks, 848 F.2d 785, 795-96 (7th Cir. 1988).

51.     A defendant's membership in the conspiracy may be proven by either direct or circumstantial evidence.  "Because of the secretive character of conspiracies, direct evidence is

18

elusive, and hence the existence and the defendant's participation can usually be established only by circumstantial evidence." United States v. Redwine, 715 F.2d 315, 319 (7th Cir. 1983), cert. denied, 467 U.S. 1216 (1984).

52.     The Court may consider the conduct, knowledge, and statements of the defendant in establishing his participation in the conspiracy. A single act or conversation can "suffice to connect the defendant to the conspiracy if that act leads to the reasonable inference of intent to participate in an unlawful enterprise." United States v. Baskes, 687 F.2d 165, 169 (7th Cir. 1981).

53.     A defendant joins a conspiracy if he agrees with a conspirator to participate in the project or enterprise that is the object of a scheme involving others and knowingly acts in furtherance of that object; it is immaterial whether the conspirator knew, met with, or agreed with every co-conspirator. United States v. Balistrieri, 779 F.2d 1191, 1225 (7th Cir. 1985), cert. denied, 106 S. Ct. 1490 (1986).

54.     It does not matter that the conspirators performed different functions so long as they carried out one or more of the objectives of the conspiracy. United States v. Percival, 756 F.2d 600, 607 (7th Cir. 1985).

55.     The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. United States v. Liefer, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); United States v. Towers, 775 F.2d 184, 189 (7th Cir. 1985). A defendant may also be found liable for conspiracy even if he joined or terminated his relationship with core conspirators at different times. United States v. Ramirez, 796 F.2d 212, 215 (7th Cir. 1986); United States v. Noble, 754 F.2d 1324, 1329 (7th Cir. 1985).

19

56.    Even if a defendant is not an "agreeing" member of the conspiracy, he may be found liable if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy.  United States v. Kasvin, 757 F.2d 887, 890-91 (7th Cir. 1985); United States v. Galiffa, 734 F.2d 306, 309-11 (7th Cir. 1984).

57.    For a statement to be "in furtherance" of the conspiracy, there must be a reasonable basis from which to conclude that it furthered the conspiracy.  United States v. Shoffner, 826 F.2d 619, 628; United States v. Mackey, 571 F.2d 376, 383 (7th Cir. 1978). A statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy.  The statement need not have been made exclusively, or even primarily, to further the conspiracy in order to be admissible.  Shoffner, 826 F.2d at 628.

58.    Statements made to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy.  United States v. Cox, 923 F.2d 519, 527 (7th Cir. 1991).

59.    The Seventh Circuit has upheld the admission of a wide variety of co-conspirators statements, including updates on a conspiracy's progress, United States v. Potts, 840 F.2d 368, 371; and conversations concerning planning or review of co-conspirators' exploits.  United States v. Molt, 772 F.2d 366, 368-69 (7th Cir. 1985).  Assurances that a co-conspirator can be trusted or relied upon to perform his role are considered to further the conspiracy. United States v. Buishas, 791 F.2d 1310, 1315 (7th Cir. 1986).

60.    In general, statements that are "part of the information flow between conspirators intended to help each perform his role" are statements "in furtherance." United States v. Van Daal

Wyk, 840 F.2d at 499; United States v. Godinez, 110 F.3d 448, 454 (7th Cir. 1997) (Statements that are "part of the information flow between conspirators intended to help each perform his role" are statements "in furtherance.").

As the Seventh Circuit held in United States v. Pallais, 921 F.2d 684, 688 (7th Cir. 1990):

> The exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal.  Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes.  Even identification of a co-conspirator by an informative nickname. . . is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization.  Such statements are 'part of the information flow between conspirators intended to help each perform his role,' and no more is required to make them admissible.

61.     Statements made to recruit potential members of the conspiracy are made "in furtherance" of the conspiracy.  Godinez, 110 F.3d at 454.

62.     Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy.  United States v. Sophie, 900 F.2d 1064, 1073 (7th Cir. 1990) (A co-conspirator's statement describing a defendant's past drug deals furthered the conspiracy by reassuring the listener that the defendant would be a reliable source).

63.     Statements designed to conceal a conspiracy also are deemed to be "in furtherance" of it where ongoing concealment is one of its purposes.  United States v. Mackey, 571 F.2d at 383; see also United States v. Kaden, 819 F.2d 813, 820 (7th Cir. 1987).  It is immaterial that statements otherwise "in furtherance" were made to a government witness/informer or agent.  United States v. Mealy, 851 F.2d 890, 901 (7th Cir. 1988).

21

## Liability Under the FCA

64.     Once the United States has demonstrated proof of each element of a violation of the Anti-Kickback and/or Stark statutes, the burden shifts to the defendant to establish that his conduct was protected by a safe harbor or exception; the United States need not prove, as an element of its case, that defendant's conduct does not fit within a safe harbor or exception.  See United States v. Shaw, 106 F. Supp. 2d 103, 122 (D. Mass. 2000); United States v. Norton, 17 Fed. Appx. 98, 102 (4th Cir. 2001) (district court properly declined to provide jury instructions regarding Safe Harbor where the written agreement at issue did not meet the seven requirements of the personal service Safe Harbor and defendant failed to present sufficient evidence of this affirmative defense).

65.     On the basis of the facts set forth above, the Court finds defendant Peter Rogan liable for violating the FCA.  The Court finds that defendant: (a) knowingly presented, or caused to be presented, false claims for payment by the Government; (b) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims approved by the Government; and (c) conspired to defraud the Government by getting false or fraudulent claims allowed or paid.  31 U.S.C. § 3729(a)(1)-(3).

66.     The Court finds that, with respect to all cost report claims submitted by Edgewater to Medicare for Cost Report years 1995 to 1999, Rogan knowingly caused the submission of these false claims.  Rogan caused Edgewater to certify falsely that the services identified in the cost reports were provided in compliance with Medicare laws and regulations, when he knew that Drs. Cubria and Barnabas had received kickbacks from and had unlawful financial relationships with Edgewater.

67. The Court finds that, with respect to all cost report claims submitted by Edgewater to Medicaid from 1995 to 2000, Rogan caused the submission of these claims, knowing that the claims were false. Rogan caused Edgewater to certify falsely that the services identified in the cost reports were provided in compliance with the Anti-kickback statute, when he knew that Drs. Cubria and Barnabas had received kickbacks from Edgewater.

68. The Court finds that, with respect to all UB-92 claims submitted by Edgewater from 1995-1998, where Dr. Barnabas was listed as the attending or operating physician, Rogan caused the submission of these claims, knowing that the claims were false or fraudulent because Dr. Barnabas had received kickbacks from and engaged in improper financial relationships with Edgewater.

69. The Court finds that, with respect to all UB-92 claims submitted by Edgewater from 1995-2000, where Dr. Cubria was listed as the attending or operating physician, Rogan knowingly caused the submission of these claims, because Dr. Cubria had received kickbacks from and engaged in improper financial relationships with Edgewater.

70. The Court finds that Rogan knowingly made, used, or caused to be made or used, false records or statements, in the form of physician contracts, loans and related documents that disguised unlawful payments for referrals, to get the false or fraudulent claims identified above approved by the Government.

71. The Court finds that Rogan conspired with Roger Ehmen, Ravi Barnabas, Andrew Cubria and Seshiqiri Rao Vavilikolanu to get the false or fraudulent claims identified above allowed or paid by the Government.

**Damages and Penalties**

72.     Under section 3729(a), a person is liable for civil penalties of "not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a).[3]

73.     The district court assesses the penalties and applies the treble damages multiplier. Cook County, Ill. v. U.S. ex rel. Chandler, 538 U.S. 119, 123 S. Ct. 1239, 1247 (2003).

74.     The measure of damages the United States is entitled to recover under the FCA is the amount of money the government paid out by reason of the false claims over and above what it would have paid out if the claims had not been false or fraudulent.  Marcus, 317 U.S. at 543-545; United States v. Neifert-White, 390 U.S. at 232.

75.     The government is entitled to recover three times the amount of its damages.  31 U.S.C. § 3729(a).  "FCA damages 'typically are liberally calculated to ensure that they afford the government complete indemnity for the injuries done it.'"  United States ex rel. Roby v. Boeing Co., 302 F.3d 637, 646 (6th Cir. 2002) (quoting United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296, 304 (6th Cir. 1998)).

76.     The computation of damages does not have to be done with mathematical precision but rather may be based upon a reasonable estimate of the loss.  Any uncertainty in the calculation of damages must be resolved against the defendant, since otherwise the wrongdoer would profit at the expense of the victim.  Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265 (1946).

---

[3] False claims submitted after September 29, 1999 incur a penalty of between $5,500 and $11,000 per claim. See 28 C.F.R. § 85.  The permissible penalty for claims submitted on or before September 29, 1999 is between $5,000 and  $10,000 per false claim.

77.     When the case involves improper remuneration paid from a defendant to a referring physician, and the patient services in question are covered by the Stark Statute, the damages consist of Medicare payments to the entity for items or services referred by the physician. See 42 U.S.C. § 1395nn(h)(6), § 1395(a)(1)(B).

78.     When the case involves improper remuneration paid from a defendant to a referring physician in violation of the Anti-kickback statute, the damages also consist of Medicare and Medicaid payments to the entity for items or services referred by the physician. See 42 U.S.C. § 1395nn(h)(6), § 1395(a)(1)(B).

79.     The government is entitled to recover a civil penalty for each false claim. Each knowing submission of a false or fraudulent claim is a separate violation of the False Claims Act. 31 U.S.C. § 3729(a)(2). Thus, the number of violations of the False Claims Act depends on the number of false or fraudulent claims or other requests for payments that defendant caused to be submitted. A penalty is assessed per false claim. See United States v. Bornstein, 423 U.S. 303, 313 (1976); United States v. Killough, 848 F.2d 1523, 1533 (11th Cir. 1988) (holding that each separate fraudulent submission by a defendant demanding payment by the government is a "claim" within the meaning of the FCA).

80.     The penalty is mandatory. See United States v. Hughes, 585 F.2d 284, 286 (7th Cir. 1978); Killough, 848 F.2d at 1533-34. As the legislative history to the 1986 Amendments to the FCA explains:

The imposition of this forfeiture is automatic and mandatory for each claim which is found to be false. The United States is entitled to recover such forfeiture solely upon proof that

25

false claims were made, without proof of any damages. . . . A forfeiture may be recovered

from one who submits a false claim even though no payments were made on the claim.

S. Rep. No. 345, 99th Cong., 2d Sess. at 8 (July 28, 1986), reprinted in 1986 U.S.C.C.A.N. 5266,

5273 (internal citation omitted).

81.     The United States does not need to prove actual damages in order to recover these

statutory penalties.  The United States may recover penalties upon a showing that claims were false,

even if no damage is proved.  Varljen v. Cleveland Gear Co., Inc., 250 F.3d 426, 429 (6th Cir. 2001)

("recovery under the FCA is not dependent upon the Government's sustaining monetary damages");

see also United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th

Cir. 1991) ("No damages need be shown in order to recover the penalty") (citing Rex Trailer Co. v.

United States, 350 U.S. 148, 153 n.5 (1956)).

82.     On the basis of the facts set forth above, the Court finds defendant Peter Rogan liable

for penalties of (a) $10,000 per claim on the following claims submitted prior to September 30,

1999: the 1995-1998 Medicare cost reports, the 1995-1998 Medicaid cost reports, and 1,496 UB-92s;

and (b) $11,000 per claim on the following claims submitted on or after September 30, 1999: the

1999 Medicare cost report, the 1999 Medicaid cost report, and 316 UB-92s violating the FCA.  The

maximum penalty per claim is appropriate here because of the seriousness of the conduct for which

Rogan is liable.  Hays v. Hoffman, 325 F.3d 982, 994 (8th Cir. 2003).

**Common Law Claims**

83.     In addition to its claims under the FCA, the Government also has asserted common

law claims for fraud, payment under mistake of fact, and unjust enrichment.  See, e.g., United States

26

v. G & H Mach., 92 F.R.D. 465 (S.D. Ill. 1981) (Government suit under the FCA, and for relief in equity for unjust enrichment, monies paid under mistake of fact, and for breach of contract).

84. Because the assertion of these common law claims involves rights of the United States under a nationwide federal program, federal common law governs these claims. United States v. Kimbell Foods, Inc., 440 U.S. 715, 726 (1979); Clearfield Trust Co. v. United States, 318 U.S. 363, 366-67 (1943).

85. The elements of common law fraud are: "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance of the truth of the statements, and (5) damage to the other party resulting from such reliance." Indemnified Capital Invs., SA. v. R.J. O'Brien & Assocs., Inc., 12 F.3d 1406, 1412 (7th Cir. 1993) (citation omitted).

86. Under common law, the United States has a right to recover funds lost through the erroneous acts of its agents, i.e. payments to Edgewater made by virtue of mistake of fact. Thus, if federal insurers, acting on behalf of the United States, paid claims submitted by Edgewater as a result of Rogan's actions "under an erroneous belief which was material to the decision to pay, [the Government] is entitled to recover the payments." United States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970) (citations omitted); United States v. Wurts, 303 U.S. 414 (1938); United States v. Borin, 209 F.2d 145, 148 (5th Cir.), cert. denied, 348 U.S. 821 (1954).

87. This alternative theory of recovery has been recognized by this court in other cases involving FCA violations. See, e.g., United States v. A and C Invs., Inc., 513 F. Supp. 589 (N.D.

27

Ill. 1981) (the United States clearly has a federal right to recover funds wrongfully or illegally paid) (citing <u>Wurts</u>, <u>supra</u>).

88.     The equitable theory of unjust enrichment allows restitution where "the person sought to be charged is in possession of money or property which in good conscience he should not retain, but should deliver to another . . . ." <u>Matarese v. Moore-McCormack Lines</u>, 158 F.2d 631, 634 (2d Cir. 1946); <u>see</u>, <u>e.g.</u>, <u>G & H Mach.</u>, 92 F.R.D. 465; <u>United States v. Balin</u>, 1993 U.S. Dist. LEXIS 2969 (N.D. Ill. Mar. 9, 1993).

89.     Disgorgement of illegal profits is an equitable remedy and distinct from claims for unjust enrichment and breach of fiduciary duty. <u>United States ex rel. Zissler v. Regents of the Univ. of Minn.</u>, 992 F. Supp. 1097, 1109 (D. Minn. 1998).

90.     Alternatively, under the common law theories of fraud, payment under mistake of fact, and unjust enrichment, defendant is liable for damages plus interest.

91.     When the fraud involves patient services either covered by the Stark Statute, or provided by physicians to whom defendant paid monies in violation of the Anti-kickback statute, the damages consist of Medicare payments to the entity for items or services referred by the physician. <u>See</u> 42 U.S.C. § 1395nn(h)(6), § 1395(a)(1)(B).

92.     When the fraud involves improper remuneration paid from a defendant to a referring physician in violation of the Anti-kickback statute, and the patient services in question are billed to the Medicaid program, the damages consist of Medicaid payments to the entity for items or services referred by the physician.

93.     When the payment under mistake of fact involves patient services either covered by the Stark Statute, or provided by physicians to whom defendant paid monies in violation of the Anti-kickback statute, the damages consist of Medicare payments to the entity for items or services referred by the physician.  See 42 U.S.C. § 1395nn(h)(6), § 1395(a)(1)(B).

94.     For its claim for unjust enrichment, the United States is entitled to recover all monies paid to Peter Rogan either directly or indirectly by Edgewater Hospital.

### **Final Judgment**

95.     Pursuant to the FCA, the Court hereby enters judgment for the United States in the amount of $69,132,032.50.

96.     Pursuant to the common law, the Court hereby enters judgment for the United States for its claim of fraud in the amount of $16,864,677.50.

97.     Pursuant to the common law, the Court hereby enters judgment for the United States for its claim of mistake of fact in the amount of $16,864,677.50.

98.     Pursuant to the common law, the Court hereby enters judgment for the United States for its claim of unjust enrichment in the amount of $10,000,000.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

PATRICK J. FITZGERALD
UNITED STATES ATTORNEY

s/Linda A. Wawzenski
by: LINDA A. WAWZENSKI
Assistant United States Attorney
(312) 353-1994

MICHAEL FRIEDMAN
JOHN K. NEAL
LAURIE A. OBEREMBT
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-3345

Dated: May___17___, 2006          Counsel for United States

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following documents:

### NOTICE OF MOTION

were served pursuant to the district court's ECF system as to ECF filers, if any, and were sent by first-class mail on May 17, 2006, to the following non-ECF filers:

Neil E. Holmen                          Joseph Spiegler
Winston & Strawn                        Winston & Strawn
35 West Wacker Dr.                      35 West Wacker Dr.
Chicago, Illinois 60601                 Chicago, Illinois 60601


/s Linda A. Wawzenski

LINDA A. WAWZENSKI
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
(312) 353-1994