**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No. |
| | ) | 02 C 3310 |
| Plaintiff, | ) | |
| | ) | Judge John W. Darrah |
| | ) | |
| V. | ) | |
| | ) | |
| PETER ROGAN, | ) | |
| | ) | |
| Defendant. | ) | |

**POST-TRIAL CLOSING BRIEF OF THE UNITED STATES**

**TABLE OF CONTENTS**

**PAGE**

I. FACTUAL SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. The Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1. Payoffs to Dr. Barnabas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2. Payoffs to Dr. Rao . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3. Payoffs to Dr. Cubria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    C. Rogan's Efforts to Obstruct Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    D. Criminal Convictions Arising Out of the Fraud at Edgewater . . . . . . . . . . . . . . 20

    E. False Claims and Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II. ROGAN'S VIOLATIONS OF THE FCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A. The Claims at Issue Here Are Actionable Under the FCA . . . . . . . . . . . . . . . 22

    B. The Claims at Issue Here Are False Under the FCA . . . . . . . . . . . . . . . . . . . 25

        1. The Claims Certified Compliance with the Anti-kickback and/or Stark Statues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2. Rogan Violated the Anti-kickback Statute . . . . . . . . . . . . . . . . . . . . . 29

        3. Rogan Violated the Stark Statute . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    C. Rogan Caused the Submission of Knowingly False Claims . . . . . . . . . . . . . . 40

        1. Rogan Caused Edgewater to Submit the Cost Reports and UB-92s . . . . 40

        2. Rogan Knew the Claims Were False . . . . . . . . . . . . . . . . . . . . . . . . . 42

    D. Rogan Conspired with Others to Cause the Submission of False Claims . . . . . . 44

III.    DAMAGES AND PENALTIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

IV.    COMMON LAW CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VI.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

# TABLE OF AUTHORITIES

## CASES

In re Cardiac Devices Qui Tam Litigation,
221 F.R.D. 318 (D. Ct. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Hays v. Hoffman,
325 F.3d 982 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Indemnified Capital Investments, SA. v. R.J. O'Brien & Assocs., Inc.,
12 F.3d 1406 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Nursing Home Consultants, Inc. v. Quantum Health Servs. Inc.,
926 F. Supp. 835 (E.D. Ark. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Peterson v. Weinberger,
508 F.2d 45 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Provident Life & Accident Ins. Co. v. Waller,
906 F.2d 985 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.,
534 F. Supp. 340 (D. Mass. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

United States ex rel. Asch v. Teller, Levitt, & Silvertrust, P.C.,
2004 WL 1093784 (N.D. Ill. May 7, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States ex rel.  Augustine v. Century Health Servs., Inc.,
289 F.3d 409 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.,
251 F.Supp.2d 28 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States ex rel. Bidani v. Lewis,
264 F. Supp. 2d 612 (N.D. Ill. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States ex rel. Chandler v. Cook County,
538 U.S. 119, 123 S. Ct. 1239 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 46

United States ex rel Lamers v. Green Bay,
168 F.3d 1013 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States ex rel. Marcus v. Hess,
    317 U.S. 537 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 45

United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.,
    423 F.3d 1256 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States ex rel. Murphy v. Baptist Medcare, Inc.,
    No. 4:02-CV-440 (E.D. Ark. Oct. 27, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States ex rel. Pogue v. American Healthcorp. Inc.,
    914 F. Supp. 1507 (M.D. Tenn. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States ex rel. Pogue v. Diabetes Treatment Centers of America,
    238 F.Supp.2d 258 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States ex rel. Riley v. St. Luke's Episcopal Hosp.,
    355 F.3d 370 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,
    125 F.3d 899 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 26

United States ex rel. Tyson v. Amerigroup Ill., Inc.,
    2005 WL 2667207 (N.D. Ill. Oct. 17, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Bainbridge Mgmt,,Inc.
    Nos. 01 CR 469-1, 01-CR 469-6,
    2002 WL 538777 (N.D Ill. Apr. 11, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Bay State Ambulance & Hosp. Rental Serv.,
    874 F.2d 20 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

United States v. Ekelman & Assocs.,
    532 F.2d 545 (6th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Emergency Medical Assocs. of Illinois, Inc.,
    436 F.3d 726 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

United States v. First Nat'l Bank of Cicero,
    957 F.2d 1362 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 33, 40, 44

United States v. Greber,
    760 F.2d 68 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Hancock,
    604 F.2d 999 (7th Cir. 1979), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Hughes,
    585 F.2d 284 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

United States v. Kats,
    871 F.2d 105 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Kimbell Foods, Inc.,
    440 U.S. 715 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

United States v. Krizek,
    111 F.3d 934 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Mackby,
    261 F.3d 821 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. McClatchey,
    217 F.3d 823 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Mead,
    426 F.2d 118 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

United States v. Medco Physicians Unlimited,
    2001 WL 293110 (N.D. Ill. March 26, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Murphy,
    937 F.2d 1032 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Neifert-White Co.,
    390 U.S. 228 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 45

United States v. Neufeld,
    908 F. Supp. 491 (S.D. Ohio 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Norton,
    2000 WL 33281703 (W.D. Va. Nov. 14, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Polin,
    194 F.3d 863 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Teeven,
    862 F.Supp 1200 (D. Del. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Veneziale,
    268 F.2d 504 (3d Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## REGULATIONS

28 C.F.R. § 85 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

42 C.F.R. § 405.1801(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42 C.F.R. §§ 405.1803, 413.60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42 C.F.R § 411.351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

42 C.F.R. § 411.353 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

42 C.F.R. 411.357(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 C.F.R. § 413.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42 C.F.R. § 1001.952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

64 Fed. Reg. 47099, 47103 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## FEDERAL STATUTES

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 1347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

31 U.S.C. § 3729 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

31 U.S.C. §§ 3729-3733 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 1320a-7b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 1320a-7b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

42 U.S.C. § 1395g(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42 U.S.C. § 1395nn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36, 38, 39, 45

42 U.S.C. § 1395nn(h)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

42 U.S.C. § 1395nn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

Debt Collection Improvement Act, Pub. L. 104-134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No. |
| | ) | 02 C 3310 |
| Plaintiff, | ) | |
| | ) | Judge Darrah |
| | ) | |
| v. | ) | |
| | ) | |
| PETER ROGAN, | ) | |
| | ) | |
| Defendant. | ) | |

## POST-TRIAL CLOSING BRIEF OF THE UNITED STATES

The trial of this case ended much as it began – with defendant Peter Rogan on the stand, brazenly lying to this Court. As the government noted in its oral closing, Mr. Rogan's testimony in this case was so far from credible as to be incredible. Yet his own, self-serving testimony was all that Rogan could muster in his own defense. In the face of overwhelming evidence of culpability, Peter Rogan was unable to call a single other witness to support his version of events, much less one to testify to his innocence.

The bulk of this trial consisted of the United States presenting damning and highly credible testimony from witness after witness, most critically from Rogan's own co-conspirators: Roger Ehmen, Ravi Barnabas and Andrew Cubria. In contrast to Rogan's evasive and dissembling answers, each of the government's witnesses testified in a straightforward fashion, and cross-examination by Rogan's counsel failed to reveal any motive to lie. Tellingly, Mr. Ehmen, Dr. Barnabas and Dr. Cubria made no attempt to minimize their own guilt in this matter,

while consistently making clear that Rogan participated in the conspiracy that resulted in their incarceration. Some of the most damaging testimony came from Rogan himself, who admitted his knowledge of the Anti-kickback and Stark statutes, while also purporting to know nothing of the ongoing violations of those statutes at his own hospital by some of his closest associates.

Rogan's co-conspirators were followed on the witness stand by a parade of former Edgewater employees who confirmed crucial details of the government's allegations – everything from Rogan's complete control over the hospital's purse-strings, his pressure on Roger Ehmen to generate admissions by calling physicians, right down to the location of the shredder outside Rogan's office.

Frequently using the defense's own exhibits, the United States confirmed, over and over again, Rogan's intimate involvement in the kickback scheme at Edgewater. Rogan approved every payoff made and every improper financial relationship at this hospital, signing contract after contract with Drs. Barnabas, Rao and Cubria, approving payment after payment to these men – sometimes with a sham contract in place and sometimes without a contract even being signed. The pattern, however, was the same: Rogan only approved contracts and payments after he received assurances that the physicians would funnel patients to Edgewater.

If there was any doubt that Rogan's scheme harmed the Medicare and Medicaid programs, the United States definitively established that fact in multiple ways. <u>First</u>, the testimony of Drs. Barnabas and Cubria confirmed that patients were referred to and treated at Edgewater as a result of the kickbacks and improper financial relationships engineered by Rogan. <u>Second</u>, the physician statistics report (Defense Exhibit ("DX") 286), a report that Rogan

-2-

admitted receiving regularly, detailed the source of patients being admitted to Edgewater as a result of payoffs.  <u>Third</u>, the United States presented actual claims data from the Medicare program's official claims repository, showing that Edgewater, while under Rogan's control, received $14.6 million for Medicare patients treated by Drs. Barnabas and Cubria between 1995-2000.  <u>Fourth</u>, the United States presented evidence from Edgewater's own records that the Medicaid program made similar payments in the amount of $4.4 million.  Rogan could not and did not mount any serious challenge to this evidence.

As detailed below and in the accompanying proposed findings of fact and conclusions of law, the United States has presented overwhelming evidence of Peter Rogan's violations of the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733.  The United States has proven, by a preponderance of the evidence, that Peter Rogan knowingly violated the FCA by causing the submission of false Medicare and Medicaid cost reports and UB-92s for patients treated at Edgewater by Drs. Barnabas and Cubria.  Therefore, the United States is entitled to treble damages and penalties under the FCA.

## I. FACTUAL SUMMARY

### A.    <u>Background</u>

Peter Rogan first became involved with Edgewater in the 1980's, when he worked in the health care consulting practice of a major accounting firm in Chicago.  He left the firm in 1983 and became the CEO of a Catholic hospital in Indiana.  After being asked by that hospital's board to leave as CEO, Rogan returned to consulting work and eventually began advising Edgewater's board of directors.  (United States' Proposed Findings of Fact ("USPFF."), ¶ 2).  He purchased

Edgewater in January 1989, and retained a majority ownership stake in Edgewater until he sold the facility for approximately $31 million in August, 1994. (USPFF. ¶¶ 3-5).

Rogan, however, had no intention of giving up control of Edgewater as part of the 1994 sale. As far back as 1992, Rogan planned that any future sale of Edgewater would provide for the hospital to be run by a management company partly owned by Rogan, and for Rogan to remain CEO. (USPFF. ¶ 9). And that is exactly what happened. The terms of the 1994 sale ensured that shortly after the sale, a Rogan-controlled entity, Braddock Management, L.P. (Braddock), would operate Edgewater, with Rogan serving as CEO of the hospital. (USPFF. ¶ 10).

Braddock then entered into a series of management contracts with Edgewater, providing that Braddock would act as the exclusive manager of the day-to-day operations of the hospital, which included the submission of claims to Medicare and Medicaid for services rendered to patients, and would supervise and manage all billings, collections, cost reporting, and other financial matters related to hospital operations. (USPFF. ¶ 11). The hospital's senior administrative staff, including Ehmen, were employees of Braddock from beginning in approximately 1995. (USPFF. ¶ 16). Braddock changed its name to Bainbridge Management, L.P. (Bainbridge) in March 2000; after that point, Bainbridge served in the role Braddock had occupied previously. (USPFF. ¶ 15).

Pursuant to these management contracts, Edgewater paid Braddock (and later Bainbridge) a monthly fee and a monthly percentage of the hospital's net patient service revenue — essentially a commission-based payment. (USPFF. ¶ 12). Furthermore, the salaries and bonuses

-4-

of Braddock's hospital-based employees were reimbursed separately by the hospital – hence, the full amount of the management fees went to Braddock's owners. (USPFF. ¶ 16). Various entities owned by Rogan and his family received 99% of Braddock's revenues between 1995 and at least March 2000. (USPFF. ¶¶ 17-19). Between 1995-2000, the management company's distributions to Rogan and his family totaled over $9.5 million. (USPFF. ¶ 20). As even Rogan admitted, contrary to his counsel's opening statement at trial, these were not "nominal" sums. (Id.). In addition, Rogan received a personal salary from Braddock while serving as CEO of Edgewater, as well as generous bonuses. In 1996 alone, Rogan received $283,336 in salary and bonus. (USPFF. ¶ 16).

Rogan never willingly relinquished control of Edgewater to anyone. Rogan personally had <u>full</u> control of Braddock at all times between 1994 and 2001, thus ensuring that he controlled the management company that in turn controlled Edgewater. (USPFF. ¶¶ 14-15). Despite nominally having turned over the CEO position at Edgewater to a long-time employee of his, Joann Skvarek, in late 1997, Rogan still held the reins at Edgewater, and both Roger Ehmen, the Vice-President of Physician Relations, and Henry Zeisel, Edgewater's CFO, continued to report directly to him concerning physician relationships and financial matters. (USPFF. ¶¶ 27, 144). Rogan remained effectively in charge of Edgewater until May 2001, when the hospital board terminated Braddock's management contract.

**B.**    <u>The Scheme</u>

Edgewater was an old hospital and its physical structure and appearance were rundown in comparison to its competitors. It was difficult to retain existing physicians, much less recruit

new physicians. (USPFF. ¶ 24). Without physicians bringing their patients, however, Edgewater could not survive. Thus, physician recruitment, one of Roger Ehmen's primary tasks, was critical to the hospital. Rogan was well aware of how important that mission was, and he closely supervised Ehmen, a long-time Edgewater employee, as well as working directly with him to recruit new physicians. Rogan's theory, as he explained early on to Ehmen, was that if he and Ehmen could tie a physician to Edgewater through some type of services contract, the physician would be more likely to spend time at Edgewater and send his patients there. (USPFF. ¶ 25). What quickly happened, however, is that Rogan began approving contracts with physicians for the purpose of inducing referrals, with little or no expectation or concern about whether the physician would actually render the services ostensibly contracted for. Ultimately, he and Ehmen entered into a conspiracy with Drs. Barnabas, Rao and Cubria, to provide kickbacks and engage in improper financial relationships in return for patient referrals.

### 1. Payoffs to Dr. Barnabas

Ravi Barnabas, M.D. was an internist who had participated in Edgewater's residency program, but had joined his brother, also a physician, in practice at Methodist hospital, a competitor of Edgewater's. (USPFF. ¶¶ 28-29). Ehmen and Rogan viewed Dr. Barnabas as an attractive candidate to recruit to Edgewater because, as a successful primary care physician, Barnabas had a significant patient base, as did his brother. (USPFF. ¶¶ 29, 34-35). Barnabas initially resisted Ehmen's recruiting efforts. However, in 1993, Barnabas came to Ehmen and suggested that Ehmen recruit a surgeon named Dr. Ramos, whose patients Dr. Barnabas had been treating at another hospital. (USPFF. ¶ 30). Dr. Ramos informed Ehmen that he wanted

Edgewater to assist with his malpractice premiums, possibly by putting Dr. Ramos on Edgewater's own insurance policy. Ehmen and Rogan were reluctant to do this, but wanted Dr. Ramos's business. (USPFF. ¶ 31).

In a pattern that would be repeated with other physicians down the road, Rogan waited to see if the referrals lived up to his expectations. During this initial period, Dr. Ramos immediately began admitting upwards of 20-30 patients a month to Edgewater – a very significant number for the hospital. (USPFF. ¶ 31). Ultimately, in order to secure Dr. Ramos's patients and to improve their chances of persuading Dr. Barnabas to send patients from his own practice to Edgewater, Rogan and Ehmen agreed to pay Dr. Ramos $75,000 per year as a "Hispanic physician liaison." (USPFF. ¶ 33). Prior to creating this position for Dr. Ramos, Ehmen and Rogan had never discussed the need for such a position at Edgewater. (Id.). The real purpose of the contract was to induce Dr. Ramos's referrals by paying Dr. Ramos a sum sufficient to cover his high malpractice premiums, while at the same time, inducing Dr. Barnabas to send more patients to Edgewater. (Id.).

Later in 1993, in another attempt to secure patient referrals from Barnabas, Rogan and Ehmen agreed to pay him $60,000 annually, ostensibly for physician recruitment services. (USPFF. ¶ 37). In fact, the contract provided to (and signed by) Barnabas in 1993 was a teaching contract, despite Barnabas's express insistence that he did not want to teach medical residents and would not do so. (USPFF. ¶ 35-36, 38). Barnabas's contract was even presented to the hospital's Board of Directors in 1994 as a teaching contract, yet Dr. Barnabas did no teaching in 1993 or 1994. (USPFF. ¶¶ 39-40). Nor did Dr. Barnabas teach in 1995; yet

throughout the majority of 1995, Edgewater paid Dr. Barnabas pursuant to a teaching contract. (USPFF. ¶ 40).

Only in 1995 did Rogan and Ehmen create a contract that referenced his ostensible physician recruiting duties. (USPFF. ¶ 43). This recruiting contract was renewed every year through 1998. (USPFF. ¶¶46, 50). Rogan and Ehmen discussed these renewals annually with an eye toward whether the contract would help retain and increase referrals from Dr. Barnabas (referrals that Rogan and Ehmen were carefully tracking), and each time, Rogan approved the renewal on that basis. (USPFF. ¶ ¶47, 50). Dr. Barnabas was not expected to perform all of the obligations spelled out in the recruiting contracts, and was never expected to (nor did he) perform any of the duties in the teaching contracts. (USPFF. ¶¶ 44, 46-48, 50, 53). Barnabas was substantially overpaid for the little recruiting work that he actually did perform. Rogan simply used these contracts as an inducement to Dr. Barnabas to refer his substantial base of patients to Edgewater for their hospital needs. (USPFF. ¶¶ 43, 47, 50, 56).

## 2. **Payoffs to Dr. Rao**

Dr. Ramos was not the only physician for whom Dr. Barnabas managed hospital in-patients. In connection with another illegal contract approved and signed by Rogan, Dr. Barnabas also came to manage patients who were directed to Edgewater by Seshiqiri Rao Vavilikolanu, M.D. (Rao), an anesthesiologist. Anesthesiologists typically do not refer patients to hospitals; instead, they provide services to patients referred to the hospital by other physicians. (USPFF. ¶ 58). In 1997, Edgewater was in the market for a new anesthesia group. Through Barnabas, whom Rao knew from their work together at Doctor's Hospital (another

competitor of Edgewater), Rao sought an introduction to Ehmen and then Rogan in order to make a pitch for receiving the anesthesia contract. (USPFF. ¶ 57).

Dr. Rao did not make a favorable overall impression on Ehmen, and was not someone whom Ehmen wanted to have administering anesthesia to Edgewater's patients. (USPFF. ¶ 59). What did catch Ehmen's attention, however, was Rao's representation that he controlled a block of patients treated by other primary care physicians. Ehmen briefed Rogan, who was intrigued enough to meet on his own with Dr. Barnabas and Dr. Rao together at a restaurant in Chicago. (USPFF. ¶ 60). During this meeting, Rao informed Rogan that he controlled a substantial number of patients that could be referred to Edgewater if Rao were awarded the anesthesia contract. (Id.). Following this meeting, Rogan informed Ehmen that Edgewater would pay Rao $15,000 per month, ostensibly for administrative duties and for providing anesthesia services. (USPFF. ¶ 61).

As with Dr. Ramos, however, Rogan wanted to see if Dr. Rao could generate the promised level of referrals before Rogan paid out money. Although Rogan signed a contract with Rao's company, Rao M.D., S.C., in February 1997, under which Rao's company would be the exclusive provider of anesthesia services at Edgewater, the contract did not become effective until April 1997, thereby allowing for a March 1997, trial period. (USPFF. ¶ 62). Because Rao lacked admitting privileges at Edgewater, part of the arrangement was that Barnabas would serve as the admitting (and attending) physician for referrals from Rao's sources. (USPFF. ¶ 63). Rao, through Barnabas, admitted so many patients during the trial period that he received payment before the actual contract even became effective. (USPFF. ¶

-9-

62).

Shortly thereafter, Ehmen and Rogan learned that a major source of Rao's patients was Kumar Kaliana, M.D. (Kumar), a primary care physician who operated a clinic on Chicago's South Side. Rogan and Ehmen also learned that Rao had agreed to pay kickbacks to Kumar in exchange for Kumar's agreement to send his patients to Edgewater for treatment. (USPFF. ¶ 68). Rogan was completely unconcerned about the fact that Rao was bribing Kumar in exchange for patients to send to Edgewater; Rogan told Ehmen explicitly that what Rao did with his money was Rao's business. (Id).

For many months, Rao referred approximately 20 to 30 patients a month to Edgewater through Barnabas. (USPFF. ¶ 69). In order to monitor Rao's referrals, Rogan asked Ehmen to set up a tracking code in the hospital's computer system that could be used to distinguish Rao's and Kumar's patients from those that came from Barnabas's own practice. (USPFF. ¶ 64). Notwithstanding Rogan's claim at trial that he did not know what "RKO" stood for, Rogan and Ehmen tracked Barnabas's admissions that came through Rao and Kumar under, among others, a code known as "Barnabas RKO," which stood for "Rao-Kumar Organization." (Id.). Barnabas in turn referred these same Rao and Kumar patients, including Medicare and Medicaid patients, to other physicians at Edgewater for additional services and procedures. Thus, some of the patients were listed under a code of "Barnabas/Cubria RKO," to distinguish patients for whom Dr. Cubria would provide cardiology services. (USPFF. ¶ 65). Concerned that the RKO code might be a red flag given that Rao and Kumar lacked admitting privileges and Rao's status as the head of anesthesia (a specialty not associated with

-10-

patient referrals), Rogan asked Ehmen to use a different code labeled, "APN," ostensibly to stand for "ambulatory physician network," a more generic sounding name. (USPFF. ¶ 66). The APN code, however, was used exclusively with respect to the patients sent by Rao and Kumar.

The deal with Rao began to go south in 1998, when Edgewater began receiving claim denials for patients referred by Rao. (USPFF. ¶ 70). Rogan was furious given that he was paying Rao $15,000 a month, and the hospital was simultaneously losing money on services already provided to patients whose claims were denied. Rogan told Ehmen to fix the problem, but despite efforts by Ehmen and Barnabas to rectify the situation, Rao's referrals never returned to the high water mark that he had achieved earlier. Based on the declining referral levels and the claim denials, Rogan stopped paying Rao the $15,000 per month, but still expected him to provide anesthesia services – further proof that the $15,000 had been in exchange for referrals. (USPFF. ¶¶ 73-74). Rogan ultimately paid Rao's companies more than $200,000 for the anesthesia contract and a later, short-lived contract to ostensibly run the hospital's detoxification program that was awarded based on Rao's promise of large detox referrals. (USPFF. ¶ 82-88). As Ehmen confirmed on the stand, the contracts with and payments to Rao would not have been awarded but for Rao's promises to generate admissions for Edgewater in return. (USPFF. ¶¶ 74, 87).

While his deal with Edgewater was unraveling, Rao began cooperating with the government and taped various conversations with Ehmen in the late Spring of 1998 and one conversation with Rogan in August 1998. (USPFF. ¶¶ 76). Concerned about maintaining the

fiction that the termination of payments to Rao had been based on inadequate services rather than referrals, Ehmen told Rao that he did not have to bring patients to Edgewater. Both Rogan and Ehmen, however, remained concerned about Rao, and when Rao insisted on meeting with Rogan in August 1998, Rogan told Ehmen that he smelled a rat. (USPFF. ¶ 78). During this taped conversation, Rogan made a great show of telling Dr. Rao, then accompanied by Dr. Barnabas, that "Edgewater doesn't pay for patients." Even more oddly, Rogan, after being told by Dr. Rao that Dr. Rao was paying kickbacks, expressed interest in any "new programs" that Dr. Rao might want to bring to Edgewater. (USPFF. ¶ 79).

Most tellingly, despite being told by Dr. Rao that Dr. Rao had been using Edgewater money to bribe another doctor to send patients to Edgewater, Rogan never told any of the hospital's attorneys, nor did he ever report this information to the government. (USPFF. ¶ 81). Given that Rogan had at his disposal the services of an experienced health care attorney, Robert Hoban, the logical inference to be drawn here is that Rogan did not want counsel to learn about irregularities involving the Rao contract. (Id.) According to Ehmen, Rogan did, however, tell Ehmen to be on guard with Rao and Barnabas in the future. (Id.) Rogan's version of this same conversation with Ehmen, in which he testified that he asked Ehmen for assurances that Ehmen had never behaved improperly, and upon receiving Ehmen's alleged assurances, never inquired on the topic again, is entirely at odds with the picture of Rogan's management style provided by Edgewater employees at trial.

3. **Payoffs to Dr. Cubria**

Andrew Cubria, M.D. was an invasive cardiologist who began practicing at Edgewater

as a young doctor. Recruited by a fellow Cuban physician who had known Dr. Cubria's family for years in Chicago, Dr. Cubria initially was employed as a staff cardiologist when Edgewater was owned and operated by the Masel family. Some years later, after Cubria had left his employee position to focus on his private practice, Cubria became concerned about Edgewater's viability and began shifting his practice over to Illinois Masonic, a competing hospital. At the time Rogan bought the hospital in 1989, Cubria resigned his cardiac directorship position at Edgewater based on the hospital's uncertain future, and treated most of his patients at Illinois Masonic. (USPFF. ¶¶ 89-92).

Rogan and Ehmen were eager for Cubria to shift his business back to Edgewater. Cubria had a substantial practice and controlled a heavy volume of cardiology patients. In the early 1990's, Edgewater paid for a build-out of office space for Cubria and other members of his medical group, with the physicians supposed to pay for the build-out through increased rent payments. After the build-out was finished, Cubria's medical group split up, with two of the physicians leaving for another hospital. In discussions with Cubria, Rogan offered to waive Cubria's portion of the remaining costs of the build-out (estimated by Cubria at $40,000), if Cubria agreed to remain at Edgewater and increase his referrals to the hospital. Cubria accepted the offer, remained at Edgewater, and began doing more procedures there. (USPFF. ¶¶ 94-98).

Cubria remained dissatisfied with Edgewater's physical state, however, particularly the catheterization lab. In 1994, Rogan had replaced the existing cath lab equipment with used equipment that frequently broke down. For this and other reasons, Cubria continually

-13-

threatened to move his patient base to other hospitals, and Rogan responded to these threats by offering various inducements to Cubria to keep his patients at Edgewater. (USPFF. ¶¶ 111-112).

In 1994, Cubria approached Rogan about increasing payments to Cubria and three other cardiologists who held EKG reading contracts at Edgewater. Cubria wanted the payments to increase from their previous rate of $1,500-$2,000 per month to $6,000 per month, without any corresponding increase in duties. Cubria made clear to Rogan that if Rogan did not agree, Cubria would move his business from Edgewater. Rogan agreed to pay the $6,000, and signed a contract that ostensibly required Cubria to work 600 hours per year. Rogan approved annual renewals of this contract with Cubria through 2000, without ever inquiring whether Cubria worked anywhere near the hours required under the contract. Cubria himself testified that he never worked more than about 91 hours per year, which translates into an hourly rate of $720 – a sum far exceeding fair market value for the services. (USPFF. ¶¶ 101-107).

Between 1995 and 2000, Rogan approved various contracts between Edgewater or Braddock and Cubria, and also provided Cubria with loans and other benefits through a variety of vehicles, all in return for Cubria's promise to continue sending patients to Edgewater. In 1996, Cubria asked Rogan to loan him money to enable Cubria to hire a Hispanic cardiologist, Juan Diaz, M.D., for Cubria's private practice. Rogan signed the loan, which provided for payments before Cubria had even hired Dr. Diaz or incurred any salary expenses. Cubria continued to receive loan payments even after he was in default on the note

because Dr. Diaz did not join Cubria's practice.

Cubria never hired a Hispanic cardiologist, but Rogan did not terminate the loan. Instead, months after Dr. Cubria had hired a cardiologist named Dr. Goldstein, Rogan signed an amended note. Edgewater never demanded repayment according to the schedule reflected in the loan, and, as discussed later, when Cubria supposedly did repay the loan, he did so with Edgewater's own money. (USPFF. ¶¶ 113-116).

In addition to the loan, Cubria asked Rogan for more financial support to pay Dr. Goldstein's salary. Rogan then approved two contracts with Cubria's professional corporation for teaching and administrative services. While Dr. Goldstein did some teaching under the contract, his teaching duties did not interfere with his ability to work several days a week in Cubria's private practice. Cubria never performed all the duties under the administrative contract, and the contract exceeded fair market value on its face. Dr. Goldstein eventually parted ways with Dr. Cubria, and in January 1998, Edgewater terminated the two contracts. (USPFF. ¶¶ 117-119).

Unhappy about losing the income from the two contracts, Cubria asked Ehmen to make him medical director for the cardiac rehabilitation program at Edgewater for $48,000 per year. Ehmen briefed Rogan on Cubria's demand and Rogan approved the contract. Cubria never performed all the duties in the contract, and hospital personnel complained to Ehmen and Rogan, but Rogan continued to pay Cubria under the contract. When asked at trial whether he was ever concerned that Rogan would terminate his contract, Cubria explained that he had no such worry – "I was far too valuable as far as admissions to the hospital." (USPFF.

¶¶ 132-134).

In 1997, in addition to the two Goldstein contracts, Cubria also asked Rogan for a $150,000 loan to alleviate financial problems Cubria had due to a divorce and income tax issues. Rogan agreed, and on April 14, the day before tax day, Cubria received a check from Edgewater for $150,000. (USPFF. ¶ 120). During this same time frame, Cubria asked Rogan to pay for advertising to benefit Cubria's private practice. When Rogan subsequently asked Cubria about possibly repaying some of the almost $250,000 that Cubria now owed Edgewater, Cubria eventually responded that he could not come up with half the sum and asked Rogan to pay him $80,000 to work on a "feasibility study" of the advertising that Cubria had requested. Cubria would then use that money to cover a portion of the checks he would write to Edgewater, ostensibly repaying half of the loans he'd been given. Without any written contract specifying the work to be performed, the hours expected, etc., Rogan proceeded to pay Cubria in two payments of $50,000 and $30,000. As the date of receipt on both of Cubria's checks to the hospital and the date of issuance of the first $50,000 check to Cubria confirm, Cubria received the $50,000 from Edgewater before Edgewater's accounting department received Cubria's checks, thus enabling Cubria to use Edgewater's money to fund his supposed loan repayment. (USPFF. ¶¶ 121-122, 124).

Cubria never performed anywhere near $80,000 worth of work on either the feasibility study itself or the implementation. As demonstrated by the various drafts of the study, drafts which Rogan admitted seeing, the vast bulk of the work was done by Edgewater employees, including Roger Ehmen and one of his subordinates, Mary Wilbur. (USPFF. ¶ 123). Not

surprisingly, Rogan decided to pay for the advertising that Cubria had requested. As shown at trial, the commercials were filmed featuring Cubria himself and listing his own office number for patients to call. During this same time frame, after counsel allegedly told Rogan that paying for advertising would be legal if Edgewater purchased Cubria's practice, Rogan agreed to pay another $60,000 to Cubria for the option of purchasing his practice. Those discussions ended in November 1997, but the commercials featuring Cubria nevertheless ran on television, all courtesy of Rogan and Edgewater. The commercials benefitted Cubria with additional patients to his private practice, to whom he then referred to Edgewater for any inpatient hospital services. (USPFF. ¶¶ 126-130).

In 1999, Rogan gave Cubria a consulting contract with Braddock. Cubria never did work commensurate with the payments made under the contract, and some of the "work" consisted of Cubria pressuring other doctors about not sending patients to other hospitals if they had contracts with Edgewater. (USPFF. ¶¶ 137-138). The loans he received were repaid primarily with Edgewater's own money, both through the feasibility study payments and when Edgewater withheld the already inflated payments on his EKG contract. The cozy nature of the relationship between Cubria and Rogan is well illustrated by Cubria's testimony that when Christmas rolled around and Cubria needed money, he simply asked Rogan to pay him the $6,000 in December and January and Rogan agreed to do so. (USPFF. ¶ 136). In 2000, Rogan provided Cubria with $5,000, supposedly in connection with the possible purcahse of Cubria's practice – money Cubria never repaid. (USPFF. ¶ 125). In February 2001, Rogan also indirectly provided money to Cubria by giving approximately $9,800 in cash to another

physician at Edgewater, who was told to and did give the cash to Cubria. (USPFF. ¶¶ 142).

In sum, Cubria never performed all or even a majority of the work required under his contracts, and the contracts, loans and advertising were understood by both sides as a method of funneling money to Cubria in exchange for his agreement to funnel patients to Edgewater.

## C. <u>Rogan's Efforts to Obstruct Justice</u>

As he learned of the extent of the government's investigation into the fraud at Edgewater, Rogan undertook an increasingly desperate series of steps to conceal evidence of his involvement in that fraud. Rogan's efforts to cover up evidence of his fraudulent conduct were blatant and egregious, and provide some of the most telling circumstantial evidence of his involvement in illegal activity at Edgewater.

Ehmen had more direct contact with Rogan than any of the other co-conspirators, and it stands to reason that Rogan knew that co-opting Ehmen was critical if Rogan was to avoid being implicated in the government's investigation. However, Rogan was aware that at least one physician at Edgewater had worn a recording device, and needed to ensure that Ehmen was not wired before speaking to him candidly. (USPFF. ¶ 161). Rogan solved this problem by arranging to meet Ehmen at the Ritz-Carlton for a working lunch. After finishing the lunch (and after another business colleague left), Rogan invited Ehmen to join him at the Ritz's club for a steam bath. The steam bath served Rogan's purposes well – Rogan could watch Ehmen disrobe to ensure that he was not wearing a wire, and Rogan and Ehmen could talk in privacy inside the steam room. (USPFF. ¶¶ 162-163).

Rogan began the steam bath by speaking in metaphor – he relayed a story to Ehmen

-18-

about a novel that he had purportedly read, in which the lead character had to take a fall for the good of the organization if the organization was to survive. Rogan's metaphor was hardly subtle, and Ehmen picked up on its meaning immediately – that Ehmen needed to take responsibility for the fraud at Edgewater if the hospital was to survive. Later in the steam bath, Rogan dispensed with all abstract discussion, and told Ehmen explicitly that if Ehmen would avoid implicating him, Rogan would see to it that Ehmen and his family were taken care of forever. (USPFF. ¶ 164).

In 2001, Rogan repeatedly reiterated to Ehmen the point he had first made in the steam bath – namely, that if Ehmen would take the fall for the fraud at Edgewater, Rogan would ensure that Ehmen and his family were taken care of financially. Rogan conversed with Ehmen about these topics in a unique manner. Rogan would conduct surface oral conversations with Ehmen in which they would discuss innocuous topics, while Rogan passed Ehmen written notes about the government's investigation. Rogan was deeply concerned about the possibility of hidden recording devices in his office, and used this method of communicating to ensure that nothing inculpatory was ever stated orally. Rogan would always take his written notes back after showing them to Ehmen**,** thus ensuring that they would be destroyed. (USPFF. ¶¶ 165-167).

Rogan used the same bizarre modus operandi with Cubria – carrying on a surface oral conversation about benign topics while passing Cubria written notes about the investigation. In the notes he passed to Cubria, Rogan urged Cubria to destroy his computer, and told Cubria not to share Rogan's note-passing with anyone, including Cubria's lawyer, as it could be

construed as obstruction of justice.  (USPFF. ¶¶ 168-173).

Rogan's cover-up did not end with his efforts to co-opt Ehmen and Cubria.  In August 2000, Rogan was aware that the hospital had received grand jury subpoenas seeking material concerning his both his own and Braddock/Bainbridge**'s** financial relationships with Edgewater.  Despite his awareness of the government's investigation into this issue, Rogan authorized the destruction of 20 boxes of documents from Bainbridge's Indiana offices in August 2000 – boxes that may well have contained material responsive to the subpoenas.  (USPFF. ¶¶ 179-180).  Given Rogan's efforts – visible in his evasive testimony in this trial — to obscure his financial connection to Edgewater's fortunes, it is reasonable to infer that Rogan's destruction of these 20 boxes of documents were yet another attempt to frustrate the government's investigation into Rogan's misconduct.

## D.  Criminal Convictions Arising Out of the Fraud at Edgewater

On May 17, 2001, a federal grand jury indicted Bainbridge (f/k/a/ Braddock), Roger Ehmen, and Drs. Barnabas, Kumar, and Rao, for, among other things, "devising and participating in a scheme to defraud health care providers and to obtain money and property by means of false and fraudulent pretenses and to deprive certain individuals of the intangible right of the defendant's honest services in violation of 18 U.S.C. §§ 1341 and 1347." United States v. Bainbridge Management, et al., No. 01 CR 469 (N.D. Ill.).  Cubria was charged in a superseding indictment in October, 2001.  All of the individuals and the corporate entity eventually pleaded guilty to various criminal charges.  Ehmen was sentenced to 78 months imprisonment, Barnabas 52 months, and Cubria 151 months of incarceration.  Braddock pled

guilty to health care fraud, 18 U.S.C. 1347, and was ordered to pay $2.9 million in restitution. (USPFF. ¶¶ 182-188).

By the end of April 2001, with the indictments imminent, the hospital's board of directors terminated Bainbridge's management contract with the hospital, severing Rogan's ties to the institution. The hospital closed its doors to the public in December 2001 and filed for bankruptcy protection in early 2002.

E.     **False Claims and Damages**

Between 1995 and 2000, Rogan caused Edgewater to submit numerous claims for payment to the federal Medicare and the state Medicaid programs. These claims took three forms: (1) CMS form 2252s, or "cost reports;" (2) interim claims for reimbursement submitted to the Medicare program on UB-92s for specific patients; and (3) "Hospital Statements of Cost" submitted to the Illinois Medicaid program (Medicaid Cost Reports). Rogan supervised Nancy Bryson and Henry Zeisel, the two individuals responsible for submitting Edgewater's claims to the Medicare and Medicaid programs. Rogan was fully aware that Zeisel and Bryson were submitting the hospital's claims to these programs for patients treated by physicians to whom Rogan paid kickbacks. Rogan did nothing to stop these individuals from filing Edgewater's Medicare and Medicaid cost reports, and Medicare UB-92 claims, despite knowing that they all falsely certified compliance with the Anti-kickback and/or Stark statutes.

At trial, the United States introduced into evidence Edgewater's Medicare cost reports and Medicaid Statements of Cost for the years 1995-1999. The United States also introduced the UB-92 claims Edgewater submitted to the Medicare program for services provided at

-21-

Edgewater to patients treated by Drs. Barnabas and Cubria. There are 1,812 UB-92 claims, and the total amount reimbursed to Edgewater on those claims is $14,630,120. Edgewater's computer system tabulated the amount the hospital was reimbursed for Medicaid patients treated at Edgewater by Drs. Barnabas or Cubria; that total is $4,469,115. (USPFF. ¶¶ 190-234).

## II. ROGAN'S VIOLATIONS OF THE FCA

Peter Rogan violated the False Claims Act by causing Edgewater to submit false claims for payment to the Medicare and Medicaid programs. The falsity of the claims derives from Rogan having caused Edgewater to certify (both explicitly and implicitly) compliance with the Anti-kickback and Stark statutes when billing Medicare and Medicaid for services rendered by the hospital. In fact, Rogan knew that the hospital was in violation of these laws, as he caused Edgewater to enter into arrangements with physicians that violated the plain terms of one or both statutes. Rogan also violated the FCA by creating false records to disguise the kickbacks and unlawful financial relationships with certain Edgewater physicians. Finally, Rogan conspired with Roger Ehmen, Ravi Barnabas and Andrew Cubria to violate the FCA by getting these false claims paid by the United States. As a result, the United States is entitled to recover treble the amount it paid Edgewater in claims submitted in connection with the payment of unlawful remuneration, plus penalties for each and every false claim.

A.     **The Claims At Issue Here Are Actionable Under the FCA**

The FCA provides for liability on the part of any person who:

(1)  knowingly presents, or causes to be presented, to an officer or employee of the

United States Government . . . a false or fraudulent claim for payment or approval;

(2)  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

31 U.S.C. § 3729.  For the United States to recover from a defendant under the FCA, it must prove by a preponderance of the evidence each of the following three elements:

1.      That the defendant made, used, or caused another to make or use, a false statement or document, or that the defendant caused to be presented to the United States a false or fraudulent claim for payment; and

2.      That the defendant did so for the purpose of obtaining payment from the government or approval of a claim against the government; and

3.      That the defendant knew that the claim was false or fraudulent.

31 U.S.C. § 3729; United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943).

A "claim" is a demand for the payment of government money or the transfer of government property.  United States v. Neifert-White Co., 390 U.S. 228 (1968); United States v. Ekelman & Assocs., 532 F.2d 545 (6th Cir. 1976); United States v. Veneziale, 268 F.2d 504 (3d Cir. 1959).  The Supreme Court has held that the FCA is intended "to reach all types of fraud" and that the statute "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money."  Neifert-White, 390 U.S. at 232.  The FCA is not limited to cases where a person makes an actual misrepresentation to the government.  Rather, if appropriate knowledge on the part of the defendant can be established, the FCA applies whenever someone wrongfully obtains money, either directly or indirectly, from the government.  Hess, 317 U.S. at 543-545.

-23-

False claims to Medicare, including Medicare cost reports and UB-92s, and false claims to Medicaid are actionable under the civil FCA. <u>Peterson v. Weinberger</u>, 508 F.2d 45, 51 (5th Cir.), <u>cert. denied</u>, 423 U.S. 830 (1975); <u>United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.</u>, 125 F.3d 899 (5th Cir. 1997) (claim that hospital falsely certified compliance with the Stark statute in its cost report was actionable under the FCA); <u>United States ex rel. Augustine v. Century Health Servs., Inc.</u>, 289 F.3d 409 (6th Cir. 2002) (Circuit court affirmed liability under the FCA of provider who submitted false cost reports); <u>United States v. Medco Physicians Unlimited</u>, 2001 WL 293110 (N.D. Ill. March 26, 2001) (where provider knowingly included unallowable costs on cost report, claim was actionable under the FCA); <u>In re Cardiac Devices Qui Tam Litig.</u>, 221 F.R.D. 318, 343 (D. Ct. 2004) (submission of UB-92 clearly constituted submission of "claim" to government); <u>United States ex rel. Tyson v. Amerigroup Ill., Inc., et al.</u>, 2005 WL 2667207 (N.D. Ill. Oct. 17, 2005) (Medicaid claims submitted to a state are also "claims" to the federal government under the FCA); <u>United States ex rel. Murphy v. Baptist Medcare, Inc.</u>, No. 4:02-CV-440 (E.D. Ark. Oct. 27, 2005) (same).

Between 1995 and 2000, Rogan caused Edgewater to submit numerous claims for payment to the federal Medicare and the state Medicaid programs. These claims took three forms: (1) CMS form 2252s, or "cost reports," (2) interim claims for reimbursement submitted to the Medicare program on UB-92s for specific patients; and (3) "Hospital Statements of Cost" submitted to the Illinois Medicaid program (Medicaid Cost Reports).

**B.**     **The Claims at Issue Here Are False Under the FCA**

The government's core allegations in this case rest on the relationship between the FCA and two statutory regimes – the Anti-kickback Statute and the Stark Statute – designed to protect federal health care programs from fraud.   As detailed below, the conduct prohibited by these statutes is the precise conduct Peter Rogan engaged in repeatedly and regularly during his ill-fated stewardship of Edgewater, at the same time he caused Edgewater to submit claims certifying compliance with one or both statutes.

Rogan caused Edgewater to expressly certify compliance with the Anti-kickback and Stark Statutes on the Medicare cost reports, and impliedly to do so on the hospital's UB-92s and Medicaid cost reports (the latter as to the Anti-kickback statute alone).   Because the hospital was not in compliance with these statutes at the time these claims were submitted, the claims were <u>false</u>, and are actionable under the FCA.

**1.**     **The Claims Certified Compliance with the Anti-kickback and/or Stark Statutes**

Express false certifications of compliance with the Anti-Kickback and Stark statutes on a Medicare cost report are actionable under the FCA.  <u>See  United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.</u>,125 F.3d 899, 902 (5th Cir. 1997), <u>on remand</u>, 20 F. Supp. 2d 1017 (S.D. Tex. 1998); <u>United States ex rel. Bidani v. Lewis</u>, 264 F. Supp. 2d 612 (N.D. Ill. 2003); <u>United States ex rel. Pogue v. American Healthcorp. Inc.</u>, 914 F. Supp. 1507 (M.D. Tenn. 1996).

It is equally well established that the knowing submission of claims by a person who

has violated a statute or regulation that contains, on its face, a direct nexus to the government's payment decision can also establish FCA liability.  In such cases, liability attaches notwithstanding the absence of an express certification.   See, e.g., United States ex rel. Augustine v. Century Health Svcs., Inc., 289 F.3d 409, 415 (6th Cir. 2002).   Presentment of the claim falsely represents an entitlement to payment that the claimant forfeited by violating the other statute or regulation. See United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F.Supp.2d 28, 33 (D.D.C. 2003) ("[w]here the government pays funds to a party, and would not have paid those funds had it known of the violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent.").

Several courts have affirmed that the Stark and Anti-kickback statutes are in fact conditions of payment, and that providers thus impliedly certify compliance with these statutes when submitting claims to federal health care programs for reimbursement.  See  United States ex rel. McNutt v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005) ("compliance with [The Anti-kickback Statute] is necessary for reimbursement under the Medicare program . . . ."); United States ex rel. Pogue v. Diabetes Treatment Centers of America, 238 F.Supp.2d 258, 266 (D.D.C. 2002) ("The Stark laws . . . specifically state that compliance is required in order to receive Medicare reimbursement."); Thompson, 20 F.Supp 2d 1017, 1047-48 (defendants impliedly certified compliance with the Anti-kickback and Stark Statutes when submitting claims to Medicare).   In sum, by submitting claims to the Medicare program, the provider implicitly certifies that it has complied with the Stark and

Anti-kickback statutes with respect to those claims.

The express false certifications at issue in this case can be found on the face of the cost reports that Edgewater submitted to Medicare annually for cost report years 1995-1999. Hospitals are paid by Medicare on an interim basis (through the filing of electronic UB-92 claims forms, among other submissions) for services and items rendered; however, in order to retain eligibility for those payments, CMS requires hospitals to submit annually a cost report. Cost reports are the final "claim" that a provider submits to the Medicare program for items and services rendered to Medicare beneficiaries. After the end of each hospital's fiscal year, the hospital files its cost report with its designated Medicare fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the hospital's cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

Medicare cost reports, including those submitted by Edgewater, contain the following language:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

Furthermore, providers certify on the face of the cost report that:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct

-27-

and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.
(USPFF. ¶¶ 147-148).

Henry Zeisel signed the majority of these certifications, and testified that if he had known about the kickbacks and improper financial relationships at Edgewater, he would never have signed these certifications, and would have informed Ken Huff, his predecessor as CFO, before Huff signed the 1995 cost report. (USPFF. ¶¶ 152-155).

In addition to the cost reports, Rogan also caused Edgewater to submit interim UB-92 claim forms for reimbursement to the Medicare program, as well as annual Medicaid cost reports to the Illinois Department of Public Aid, for services provided to patients of Doctors Barnabas and Cubria. While these claims do not contain the same express certification of compliance with applicable statutes found on the Medicare cost reports, the statutes at issue make plain on their face that compliance with their terms is a condition of payment.

In sum, Rogan caused Edgewater to submit claims to Medicare and the state Medicaid program during the period in question. In submitting such claims, Rogan caused Edgewater to explicitly and implicitly certify compliance with the Anti-kickback and Stark Statutes. As will be described below, Rogan knew that such claims were false, because Rogan knowingly caused the hospital to enter into arrangements with certain physicians that plainly violated these statutes. Hence, Rogan knowingly caused the hospital to submit false claims, rendering him liable to the government under the FCA.

### 2.    **Rogan Violated the Anti-kickback Statute**

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (as amended), prohibits any person or entity from offering, making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.  In pertinent part, the Anti-kickback Statute reads:

> (b) Illegal remuneration
>
>                        \*    \*    \*
>
> > (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --
> >
> > > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> > >
> > > (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

Payment of remuneration of any kind violates the statute if <u>one or any</u> purpose for that remuneration was to induce referrals.  <u>United States v. Greber</u>, 760 F.2d 68, 72 (3d Cir. 1985)("If the payments were intended to induce the physician to use Cardio-Med's services,

the statute was violated, even if the payments were also intended to compensate for professional services."); United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 30 (1st Cir. 1989) ("The issue of sole versus primary reason for payments is irrelevant since any amount of inducement is illegal.") (emphasis in original); United States v. McClatchey, 217 F.3d 823 (10th Cir. 2000) (adopting one-purpose test set forth in Greber); see also United States v. Kats, 871 F.2d 105 (9th Cir. 1989).

As the Seventh Circuit stated in finding "handling fees" paid to doctors by a laboratory testing company to be disguised bribes for referrals,

> In the context of Congress' regulation of the expenditure of enormous sums of federal funds under the Medicare and Medicaid programs, making payments in return for Medicare referrals is corrupt. The potential for increased costs to the Medicare-Medicaid system and misapplication of federal funds is plain where payments for the exercise of such judgments are added to the legitimate costs of the transaction.

United States v. Hancock, 604 F.2d 999,1001-02 (7th Cir. 1979), cert. denied. 444 U.S. 991 (1979). The Seventh Circuit held in Hancock that payments to physicians in return for the physicians' promise to send patients to a particular facility qualified as kickbacks. Hancock, 604 F.2d at 1002 ("the defendants were able to open up or control the payment of federal funds to Chem-Tech by sending Medicare or Medicaid patients tissue specimens to Chem-Tech . . . .").

Giving a person the opportunity to earn money may constitute an inducement under the Anti-kickback statute. "The gravamen of Medicare Fraud is inducement. Giving a person an opportunity to earn money may well be an inducement to that person to channel potential

Medicare payments towards a particular recipient." Bay State Ambulance, 874 F.2d at 29 (1st Cir. 1989).

The Seventh Circuit broadly interprets the term "refer" as used in the Anti-kickback statute, and has held that it is not limited to the physician who formally authorizes a particular service. United States v. Polin, 194 F.3d 863, 866-67 (7th Cir. 1999) ("refer" and "recommend" as used in the Anti-kickback statute may apply to physicians or others who refer, recommend, turn over, select or give business to a particular recipient).

HHS has promulgated regulations specifying those payment practices that will not be subject to criminal prosecution or provide a basis for administrative exclusion. Known as the "Safe Harbor" regulations, 42 C.F.R. § 1001.952, the Safe Harbors list various circumstances under which a financial relationship between a provider and a referral source would not give rise to liability under the Anti-kickback statute.

Payments to a physician under a personal service agreement must meet all of the following requirements in order to qualify for the Safe Harbor during the time period in question, 42 C.F.R. § 1001.952(d) (1991):

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

-31-

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

42 C.F.R. § 1001.952(d) (1991);[1] see Nursing Home Consultants, Inc. v. Quantum Health

---

[1]    The regulations were amended in November 1999, primarily to add the seventh requirement set forth below:
(1) The agency agreement is set out in writing and signed by the parties.
(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.
(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.
(4) The term of the agreement is for not less than one year.
(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program.
(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.
(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.
42 C.F.R. § 1001.952(d) (2000).

Servs. Inc., 926 F. Supp. 835, 844 (E.D. Ark. 1996) (defendant must fully comply with Safe Harbor provisions); United States v. Neufeld, 908 F. Supp. 491, 497-98 (S.D. Ohio 1995) (defendant must fully comply with a safe harbor provision to avoid prosecution).

The finder of fact may infer that payments were intended to be kickbacks based on testimony that the recipient of the payments "was grossly overpaid . . . for any legitimate professional services he may have rendered." United States v. Norton, 2000 WL 33281703 *4 (W.D. Va. Nov. 14, 2000).

As discussed below, the transactions that Rogan engaged in with Drs. Barnabas, Rao and Cubria violated the Anti-kickback statute and did not qualify for a Safe Harbor. Rogan entered into these transactions with the physicians to induce their referrals of patients to Edgewater.

First, beginning in 1993 and continuing through 1998, Rogan arranged for Edgewater to enter into a series of teaching and physician recruiting contracts with Barnabas. (USPFF. ¶¶ 34-56). Rogan's purpose in causing the hospital to enter these contracts was to induce Barnabas to refer his substantial body of patients to Edgewater. (USPFF. ¶ 56). Barnabas was paid $60,000 per year through these contracts, and was not expected to (nor did he) perform all the obligations spelled out in the contracts. (USPFF. ¶¶ 40, 44, 48, 50, 56). The contracts thus exceeded fair market value and required few (if any) services, thus failing to satisfy the Safe Harbor requirements. The purpose of all of the contracts was to induce Barnabas's referral of patients to Edgewater, and hence Rogan's conduct violated the Anti-kickback Statute as well.

-33-

Second, in 1997, Rogan caused Edgewater to make a series of payments to and ultimately enter into a contract with Dr. Rao, ostensibly to manage the hospital's anesthesia services, and later its detox program. (USPFF. ¶¶ 61-62, 85-87). Rogan's purpose in causing the hospital to make these payments and execute these contracts was to induce Rao to refer a substantial number of patients to Edgewater. (USPFF. ¶ 74, 85-87). The anesthesia arrangement also provided Dr. Barnabas an opportunity to bill the Medicare and Medicaid programs because Rao's referrals were admitted to Edgewater through Barnabas, who could then bill for services provided to these patients. (USPFF. ¶ 63). The contracts did not satisfy the Safe Harbor given that the compensation amounts were set in a manner related to the expected value of referrals. The purpose of both contracts was to induce referrals to Edgewater from Rao, and hence the arrangement violated the Anti-kickback Statute.

Third, as with Drs. Rao and Barnabas, Rogan entered into various kickback arrangements with Dr. Cubria, beginning prior to 1995 and continuing on forward into 2000. Beginning with Rogan's forgiveness of Cubria's debt for his office build-out, time and time again, Rogan acceded to Cubria's demands in order to keep Cubria's patients at Edgewater. Rogan increased Cubria's EKG reading contract payment to $6,000, a sum far exceeding fair market value, in order to induce referrals, and continued the payments through 2000. (USPFF. ¶¶ 103-107). Rogan approved payments to Cubria in 1995 ostensibly for teaching without any contract to support the payments, and Cubria testified that he did not teach at Edgewater. USPFF. ¶¶ 99-100). In light of the circumstances surrounding Rogan and Cubria's relationship, the only logical inference to be drawn is that the payments were yet another

-34-

vehicle to funnel money to Cubria in return for referrals.

The list of benefits that Rogan provided to Cubria goes on and on - further evidence of Rogan's willingness to pay for business. In 1996, Rogan loaned Cubria $84,000 and awarded him two services contracts to help Cubria hire a physician for Cubria's own private practice, thereby saving Cubria the expense of a salary and giving him the ability to bill for the second cardiologist's services. (USPFF. ¶¶ 113-115). In 1997, Rogan loaned Cubria $150,000 of Edgewater's money due to Cubria's personal financial problems. (USPFF. ¶ 120). When Cubria explained that he would have difficulty paying back even half of what he owed the hospital at that point, Rogan agreed to pay Cubria another $80,000, without so much as even a written contract for the payments. (USPFF. ¶ 121). The ostensible purpose of the $80,000 payment was for Cubria's work on a feasibility study of advertising that Cubria himself had requested that Edgewater provide for his private practice. (Id). The sham nature of the arrangement is further buttressed by the fact that Roger Ehmen and one of his subordinates did most of the work on the study, with Cubria not doing anything remotely approaching $80,000 worth of work. (USPFF. ¶¶ 123-124).

Not surprisingly, Rogan agreed to fund the requested advertising for Cubria's practice. (USPFF. ¶ 126). When advised that it would not be appropriate to pay for advertising to benefit Cubria unless Edgewater purchased Cubria's practice, Rogan paid Cubria another $60,000 for an option to purchase Cubria's practice. (USPFF. ¶ 125). When negotiations fell apart, Rogan still went ahead with the advertising for Cubria, paying for commercials starring Cubria and featuring his office number, with only a small mention of Edgewater itself in the

commercials. (USPFF. ¶ 127). The ads drew patients into Cubria's practice – patients who Cubria then referred to Edgewater for treatment. (USPFF. ¶ 129).

In 1998, Rogan approved giving Cubria a cardiac rehabilitation directorship contract for $48,000 per year. (USPFF. ¶ 132). The amount exceeded fair market value for the services described in the contract, and far exceeded fair market value for the services that Cubria actually provided. (USPFF. ¶¶ 133-134). The purpose of the contract was to keep Cubria happy at Edgewater. (Id.). In 1999, Rogan gave Cubria another contract, this time with Braddock. (USPFF. ¶ 137). Cubria received payment in advance for some of the work, which he never fully performed. (USPFF. ¶¶ 138-140). Some of the "work" he did perform involved pressuring other physicians to whom Rogan had given contracts to keep their patients at Edgewater – hardly a legitimate task. (Id.). In sum, Rogan ensured a steady flow of money to Dr. Cubria in order to ensure a correspondingly steady flow of patient referrals. The final transaction between the two men occurred in February 2001, after news of the investigation had broken. After urging Cubria to destroy his computer to avoid incriminating himself or Rogan, Rogan gave $9,800 in cash to Cubria. (USPFF. ¶ 142). Rather than giving the money directly to Cubria, Rogan arranged for another physician, Dr. Lopez, to physically hand the money to Cubria. (Id).

### 3. Rogan Violated the Stark Statute

Enacted as amendments to the Social Security Act, the Stark Statute, codified at 42 U.S.C. § 1395nn, prohibits a hospital (or other entity providing designated healthcare items or services) from submitting Medicare claims for payment based on patient referrals from

physicians having a prohibited "financial relationship" (as defined in the statute) with the hospital.

The Stark Statute establishes the bright-line rule that the United States will not pay for claims submitted by a hospital for items or services referred by a physician with whom the hospital has a prohibited financial relationship. The statute provides, in pertinent part:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then --

(A) <u>the physician may not make a referral</u> to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) <u>the entity may not present or cause to be presented a claim</u> under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

In the Stark Statute, "referral" is defined as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn(h)(5)(A). The accompanying regulations interpreting the statute broadly define "referral" as, among other things, "a request by a physician that includes the provision of any

-37-

designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." Id.

On CMS Form UB-92s, hospitals are required to designate the patient's attending physician and the physician that performed the principal procedure (the "operating" physician). See Medicare Hospital Manual, 460, FL 82-83. A UB-92 is the hospital's claim for Medicare reimbursement for a service it provided that was requested by a given patient's attending or operating physician, was included in the plan of care established by the patient's attending or operating physician, or certified as necessary by the patient's attending or operating physician. Hence, a physician designated as an attending or operating physician on a hospital's UB-92 form qualifies as a "referring" physician under the Stark Statute.

The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly by a hospital to a referring physician. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. In order to avoid the referral and billing prohibitions in the statute, a hospital's financial relationship with a physician must meet the requirements of one of these enumerated exceptions.

In order for compensation paid to a referring physician serving as a hospital consultant

-38-

or director to fall within an exception to the statute, the contract must (1) be in writing and signed by the parties; (2) be for a term of at least a year; (3) specify the services covered, cover all the services to be provided by the physician, with the aggregate of such services reasonable and necessary for the legitimate business purposes of the hospital; and (4) set the payment for contract services in advance, consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other business generated between the parties. 42 U.S.C. § 1395nn(e)(3). [2]

Compensation paid to a physician (directly or indirectly) under a medical directorship or other contractual arrangement that exceeds fair market value, for which no actual services are required, or which takes into account the volume or value of the referrals or other business generated between the parties, triggers the referral and payment prohibitions of Stark II with respect to designated health services referred by that physician.

Rogan's dealings with Drs. Barnabas and Cubria failed to satisfy any of the exceptions set forth in the Stark statute. The teaching contract with Dr. Barnabas that extended into 1995 did not accurately describe the recruiting services that Barnabas ostensibly was doing, provided for payments for teaching services that were never performed, and the compensation amount was tied to referrals. Dr. Barnabas's recruiting contracts similarly failed to meet the fair market value requirement and provided for compensation tied to referrals.

Rogan's various financial relationships with Cubria similarly failed to satisfy the

---

[2] Regulations published in 2001 (after the time period relevant to this case) created an additional potential exception for certain physician services arrangements. See 42 C.F.R. 411.357(1).

-39-

exceptions set forth in the Stark statute. All of Cubria's professional services contracts with Edgewater exceeded fair market value and the amounts were always set in order to maintain his referrals to Edgewater. The teaching payments in 1995 were not made pursuant to any contract with Cubria, and were for services not performed. The $80,000 payment to Cubria in 1997 similarly lacked the benefit of any written contract and the payment far exceeded fair market value for the services provided. Finally, the loans and advertising provided to Cubria did not fit within any exception in the Stark statute.

If a relationship between a physician and a hospital does not meet one of the exceptions in the statute, the hospital is prohibited from billing for "designated health services" (which includes inpatient and outpatient hospital services) referred by that physician. If a hospital submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn expressly require that the hospital refund all collected amounts on a timely basis. 42 C.F.R. § 411.353 (emphasis added). Thus, because Edgewater's relationships with Drs. Barnabas and Cubria failed to satisfy the exceptions in the Stark statute, Edgewater was prohibited from billing for inpatient services for patients treated by the two physicians and should have refunded the payments it received.

**C**.     **Rogan Caused the Submission of Knowingly False Claims**

      **1.**      **Rogan Caused Edgewater to Submit the Cost Reports and UB-92s**

A defendant "causes" the submission of a false claim when he instructs others to submit false claims or delegates that responsibility to others. United States v. Mackby, 261 F.3d 821, 827–29 (9th Cir. 2001) (physical therapy provider who instructed office personnel

to submit claims was liable under FCA) <u>United States v. Krizek</u>, 111 F.3d 934, 942 (D.C. Cir. 1997) (physician who delegated billing responsibility to wife and office staff was liable under the FCA). Establishing procedures that cause others to present false claims can also give rise to FCA liability. <u>United States v. Teeven</u>, 862 F.Supp 1200, 1223 (D. Del. 1992). The causation element of the FCA can be satisfied by "anyone who knowingly assists in causing the government to pay claims grounded in fraud." <u>United States ex rel. Riley v. St. Luke's Episcopal Hosp.</u>, 355 F.3d 370, 378 (5th Cir. 2004).

Rogan was responsible for the submission of Medicare and Medicaid claims by Edgewater both legally and practically. <u>First</u>, Rogan was the majority owner of and worked for Braddock (later renamed Bainbridge), which entered into a series of management contracts with Edgewater, providing that Braddock would act as the exclusive manager of the day-to-day operations of the hospital, which included the submission of claims to Medicare and Medicaid for services rendered to patients, and would supervise and manage all billings, collections and cost reporting. (USPFF. ¶¶ 11-21). <u>Second</u>, Rogan was the CEO of Edgewater through 1997 and supervised the CEO after that, and both of the individuals responsible for submitting claims, Nancy Bryson and Henry Zeisel, reported directly to Rogan. (USPFF. ¶¶ 7, 144, 146, 157). In addition, as Zeisel testified, the Medicare program corresponded directly with Rogan concerning cost report issues. (USPFF. ¶ 146). <u>Finally</u>, a defendant who engages in conduct that violates a condition of payment, knowing that claims will subsequently be submitted seeking payment from the federal government despite the disqualifying conduct, has certainly <u>caused</u> the false claim to be submitted. In sum, Rogan

-41-

was in charge of Edgewater and had direct oversight of false claims submitted in this case.

## 2. Rogan Knew the Claims Were False

For purposes of the FCA, "knowledge" that the statement or document was false or fraudulent means that the defendant:

1. had actual knowledge that the claim was false;

2. acted in deliberate ignorance of the truth or falsity of the claim; or

3. acted in reckless disregard of the truth or falsity of the claim.

No specific intent to defraud is required. 31 U.S.C. § 3729(b); United States ex rel Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999).

Rogan was fully aware that the hospital's contracts and financial relationships with Cubria, Barnabas, and Rao were devised to induce these physicians' referrals. He testified to his knowledge of the Stark and Anti-kickback statutes. (USPFF. ¶ 150). As the CEO and later head of the management company that operated Edgewater, Rogan was also fully aware of the fact that the hospital was routinely submitting claims to the Medicare and Medicaid programs for services on behalf of patients referred and/or treated by Cubria and Barnabas. (USPFF. ¶ 158). Rogan directly supervised the individuals responsible for signing the hospital's Medicare and Medicaid cost reports and overseeing the submission of UB-92 forms. He never once informed these individuals that some of the services contained in the reports were procured through the payment of illegal kickbacks or in violation of the Stark Statute. (USPFF. ¶¶ 152, 158).

Even if Rogan's denials of knowledge were credible, which they certainly were not, he

would stand as a shining example of deliberate ignorance and reckless disregard under the FCA. As CEO of the hospital, Rogan signed contract after contract requiring physicians that he knew had busy practices to work hundreds and hundreds of hours for Edgewater, sometimes under multiple contracts. He received complaints that Dr. Cubria, for example, was not performing his directorship duties, yet he did nothing to stop the payments to Dr. Cubria. (USPFF. ¶ 133). He admitted personally negotiating payments to Cubria without the benefit of any contract, an automatic violation of the Stark statute. He never bothered to have anyone at Edgewater send Cubria a loan repayment schedule, despite arranging for the hospital to loan Cubria over a quarter of a million dollars. Rogan claimed to have received some type of legal advice that the hospital should buy Cubria's practice before paying for advertising for him, yet Rogan approved payments for such advertising knowing that Edgewater had not purchased Cubria's practice. (USPFF. ¶ 126). Rogan admitted being told by Dr. Rao in August 1998 that Dr. Rao had been using Edgewater's money to pay for patient referrals to Edgewater, yet Rogan never bothered to disclose this information to the hospitals's attorneys. (USPFF. ¶ 81). See United States ex rel. Asch v. Teller, Levitt, and Silvertrust, P.C., 2004 WL 1093784 *3 (N.D. Ill. May 7, 2004) ("No person having specialized knowledge of such matters such as a CPA was consulted, no attorney oversaw the work of the non-attorney employees who were involved in the actual receipt of account payments, or gave the employees any guidance on how they should handle such payments. Such conduct certainly constitutes deliberate indifference and reckless disregard as a matter of law.").

In sum, regardless of which prong of the FCA's knowledge requirement is applied,

Rogan knowingly caused Edgewater to submit approximately $18,000,000 in false claims, and is liable under the FCA for these actions.

**D**.     **Rogan Conspired with Others to Cause the Submission of False Claims**

Section 3729(a)(3) of the FCA prohibits "conspir[ing] to defraud the government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). General civil conspiracy principles apply to FCA claims under 31 U.S.C § 3729(a)(3), meaning that to prevail on this count, the government need only show a single illegal plan, a shared general conspiratorial objective, and an overt act committed in furtherance of the conspiracy that damaged the United States. See generally United States v. Murphy, 937 F.2d 1032, 1039 (6th Cir. 1991).

The evidence at trial showed that Rogan conspired with Ehmen and Drs. Barnabas, Cubria and Rao to engage in a kickback scheme designed to benefit Edgewater, Rogan and the physicians themselves through payments to the physicians and patient referrals to Edgewater. Rogan committed numerous overt acts in furtherance of this conspiracy, including negotiating the kickbacks himself, signing contracts that obligated Edgewater funds to pay the kickbacks, and ensuring that claims for patients referred by the physicians involved were submitted to the Medicare and Medicaid programs. This Court has already found that the United States has proved, by a preponderance of the evidence, that a conspiracy existed of which Mr. Rogan was a part. While this ruling was for evidentiary purposes only, it was a necessary and critical step towards an ultimate finding of liability in this case.

### III. DAMAGES AND PENALTIES

The FCA provides for treble damages and a civil penalty of $5,000 to $10,000 for each false claim submitted.[3]  See 31 U.S.C. § 3729(a).  The court assesses the penalties and applies the treble damages multiplier.  See United States ex rel. Chandler v. Cook County, 538 U.S. 119, 123 S. Ct. 1239, 1247 (2003) ("[U]nder the FCA, if [the jury] finds liability, its instruction is to return a verdict for actual damages, for which the court alone then determines any multiplier, just as the court alone sets any separate penalty.").  The imposition of penalties is mandatory.  See United States v. Hughes, 585 F.2d 284, 286 (7th Cir. 1978).

Under the FCA, the United States is entitled to recover all damages incurred "because of" the false claims at issue in this case.  The term "because of" simply means those damages that were caused by or would not have occurred but for the false claims and false statements. United States v. First Nat'l Bank of Cicero, 957 F.2d 1362, 1374 (7th Cir. 1992).  The measure of damages the United States is entitled to recover under the FCA is the amount of money the government paid out by reason of the false claims over and above what it would have paid out if the claims had not been false or fraudulent.  Marcus, 317 U.S. at 543-545; Neifert-White, 390 U.S. at 232.

In the instant case, the United States would have paid Edgewater nothing for hospital claims related to patients referred to Edgewater by physicians with a prohibited financial relationship with the hospital.  See 42 U.S.C. § 1395nn.  Barnabas and Cubria both had

---

[3] False claims submitted after September 29, 1999 incur a penalty of between $5,500 and $11,000 per claim.  See 28 C.F.R. § 85.

prohibited financial relationships with Edgewater.   Hence, the United States' damages are the value of claims Edgewater submitted on behalf of patients referred to the hospital by Barnabas and Cubria – i.e. the claims for which either Barnabas or Cubria served as either the attending or operating physician.

In addition to the damages figure discussed above, Rogan is liable for a civil penalty for each false claim submitted to the United States.  See 31 U.S.C. § 3729(a); United States v. Emergency Med. Assocs. of Ill., Inc., 436 F.3d 726, 727 (7th Cir. 2006).  Pursuant to the Debt Collection Improvement Act, Pub. L. 104-134, penalties for false claims submitted as of September 29, 1999 are $5,500 to $11,000.  See 64 Fed. Reg. 47099, 47103 (1999).

Though the imposition of penalties is mandatory, see 31 U.S.C. § 3729 (specifying that any person who engages in one of seven enumerated categories of conduct "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, . . ." (emphasis added)), the Court determines the penalty figure.  See Chandler, 123 S. Ct. at 1247.

Rogan is liable and subject to a civil penalty for the presentation of 1,822 claims for payment.  (USPFF ¶ 215, 218, 233).  522 of those claims were UB-92s submitted to the Medicare program for patients with whom Dr. Barnabas was identified as either the attending or operating physician.  (USPFF ¶ 207).  1,290 of those claims were UB-92s submitted to the Medicare program for patients with whom Dr. Cubria was identified as either the attending or operating physician.  (USPFF ¶ 214).  Five of the claims were Medicare cost reports submitted

between 1995-2000, (USPFF ¶ 215), and the final five claims subject to penalties were cost reports submitted to the Medicaid program. (USPFF ¶ 233). Of the 1,290 claims submitted for Dr. Cubria's patients, 316 fell <u>after</u> the September 29, 1999 increase in the penalty spectrum pursuant to the Federal Debt Collection Act. (USPFF ¶ 217). One Medicare cost report and one Medicaid cost report were also submitted after September 29,1999. (USPFF. ¶¶ 217, 233).

The Court should impose the maximum penalty for each of the false claims that Rogan caused to be presented to the United States – $10,000 for those claims submitted before September 29, 1999, and $11,000 for those claims submitted after that date. The maximum penalty is appropriate in this case as a consequence of the seriousness of the conduct for which Rogan is liable. The evidence at trial showed that Rogan was the critical participant and instigator in a wide-ranging scheme over many years to defraud the Medicare and Medicaid programs. Rogan's illegal activity resulted in criminal indictments, guilty pleas, incarcerations, and a millions upon millions of dollars in losses to the Medicare and Medicaid trust funds, <u>all of which resulted in Rogan's own personal financial gain</u>. Moreover, the evidence showed that Rogan went to great lengths to cover up his involvement in the illegal activity, including destroying documents and asking his close associates to destroy their computers and their contracts. (USPFF. ¶¶ 159-181). Rogan is guilty of the exact sort of "serious misconduct," <u>Hays v. Hoffman</u>, 325 F.3d 982, 994 (8th Cir. 2003), for which the maximum penalty amount is appropriate. The evidence also showed that Rogan caused false claims to be submitted with <u>actual knowledge</u> of their falsity – this is not a case where liability

-47-

stems from a mental state of reckless disregard or deliberate ignorance.

Of the 1,822 false claims, all but 318 were presented before the September 29, 1999 increase in the penalty spectrum. (USPFF. ¶¶ 216, 233). Consequently, those 1,504 claims should subject Rogan to a penalty of $10,000 each, in the total amount of $15,040,000. The final 318 claims that were submitted on or after September 29, 1999 should be subject to a penalty of $11,000 each, for a total of $3,498,000. The final penalty figure for the false claims comes out to $18,538,000.

In the instant case, Rogan caused Edgewater to submit $14,630,120 million in false claims to the Medicare program and $4,469,115 in false claims to the Medicaid program. (USPFF. ¶¶ 218, 234). The federal share of the funds fraudulently obtained from the Medicaid program is $2,234,557.50, or 50% of the total. (USPFF. ¶ 234). The United States has been damaged in the amount of $16,864,677.50 through Rogan's misconduct; when trebled, as required by law, the government's damages total $50,594,032.50. When the penalties are added to the government's damages , the total comes to $69,132,032.50. The United States is entitled to a judgment against Rogan in this amount pursuant to the FCA.

## IV. COMMON LAW CLAIMS

The United States also asserts claims for common law fraud, unjust enrichment, and payment under mistake of fact in its complaint. Each of these alternative theories of recovery involve the rights of the federal government under a nationwide program, and hence are governed by federal common law. United States v. Kimbell Foods, Inc., 440 U.S. 715, 726

(1979).

The elements of common law fraud are: "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance of the truth of the statements, and (5) damage to the other party resulting from such reliance." Indemnified Capital Investments, SA. v. R.J. O'Brien & Assocs., Inc., 12 F.3d 1406, 1412 (7th Cir. 1993) (citation omitted). In the instant case, Rogan knowingly caused Edgewater to falsely certify compliance with applicable statutes and regulations, in order to induce the United States to pay false claims. The United States paid claims it would not have paid had it been informed of the true facts underlying Edgewater's relationships with certain physicians, and hence was damaged by Rogan's misconduct. Rogan is liable to the United States in the amount of its damages under traditional principles of common-law fraud, which total $16,864,677.50 in the instant case.

Under the equitable theory of unjust enrichment, "a person is unjustly enriched if the retention of [a] benefit would be unjust." Restatement of Restitution, § 1 (1937); see also Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co., 534 F. Supp. 340, 347 (D. Mass. 1982) (noting that, under the federal common law, "[t]he doctrine of unjust enrichment is equitable in nature and correspondingly broad"). The elements of a federal common law claim of unjust enrichment have been summarized as follows: "the plaintiff must show that: (1) he had a reasonable expectation of payment, (2) the defendant should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by nonpayment." Provident Life & Accident Ins. Co. v. Waller, 906 F.2d 985, 993-

94 (4th Cir. 1990) (citation omitted) (emphasis added). In this case, Rogan received substantial pecuniary benefits from his affiliation with Edgewater, from his salary and bonuses as CEO to the profits his entities made through their management contracts with the hospital. Given the egregious abuses that took place at Edgewater under Rogan's watch, at a minimum, the United States (a victim of the misconduct) is entitled to recover from Rogan the substantial benefits that accrued to him from his stewardship of the institution. These benefits total at least $10,000,000, given Rogan's capture of at least $9,500,000 of Braddock's management fees from 1995-2000, in addition to the salaries, bonuses, and fringe benefits he received as CEO of Edgewater.

Under the common law, the United States has a right to recover funds lost through the erroneous acts of its agents – i.e. payments made under a mistake of fact. Thus, if agents of the federal government, acting on behalf of the United States, paid claims submitted by Edgewater as a result of Rogan's actions "under an erroneous belief which was material to the decision to pay, [the Government] is entitled to recover the payments." United States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970) (citations omitted). Here, the express and implied certifications of compliance with the Anti-kickback and Stark Statutes contained in Edgewater's cost reports and UB-92 forms were material to the United States' decision to pay Edgewater, and as these certifications were false, the United States erroneously paid Edgewater and is entitled to recover the amounts improperly provided to the hospital, which total $16,864,677.50 in the instant case.

-50-

## VI. CONCLUSION

For the foregoing reasons, the United States is entitled to judgment against Rogan under the FCA and the common law for the payments it made to Edgewater on behalf of patients treated by Drs. Barnabas and Cubria.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

PATRICK J. FITZGERALD
UNITED STATES ATTORNEY

s/Linda A. Wawzenski
by: LINDA A. WAWZENSKI
    Assistant United States Attorney
    (312) 353-1994

Laurie A. Oberembt
John K. Neal
Michael J. Friedman
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Washington, D.C. 20044

Dated: May 17, 2006                Counsel for the United States

-51-

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following documents:

### NOTICE OF MOTION

were served pursuant to the district court's ECF system as to ECF filers, if any, and were sent by first-class mail on May 17, 2006, to the following non-ECF filers:

Neil E. Holmen                          Joseph Spiegler

Winston & Strawn                        Winston & Strawn

35 West Wacker Dr.                      35 West Wacker Dr.

Chicago, Illinois 60601                 Chicago, Illinois 60601


/s Linda A. Wawzenski
_____

LINDA A. WAWZENSKI

Assistant United States Attorney

219 South Dearborn Street

Chicago, Illinois

(312) 353-1994