UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 02 C 3310 |
| Plaintiff, | ) | |
| | ) | Judge Darrah |
| | ) | |
| v. | ) | |
| | ) | |
| PETER ROGAN, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' PROPOSED FINDINGS OF FACT**

**PARTIES AND BACKGROUND**

1.      Plaintiff, the United States of America, acting through the Department of Health and Human Services (HHS), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (Act), 42 U.S.C. §§ 1395 *et seq*. (Medicare), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 *et seq*. (Medicaid).  (Joint Statement of Uncontested Facts, Exh. 2(a) to the Pretrial Order ("Jt. St. Uncontested Facts"), ¶ 1 ).

2.      Defendant Peter Rogan resides at 476 Wexford Road, Valparaiso, Indiana, 46385. Rogan has a Masters in Health Administration from St. Louis University and a Ph.D in Hospital and Health Administration from the University of Iowa.  (Government Exhibit ("GX") A1).  He was President and Chief Executive Officer of St. Anthony Medical Center in Crown Point, Indiana from 1983 to 1986.  Rogan was asked to leave St. Anthony's by the Chair of St. Anthony's Board, Sister Joseph Marie Zenda.  Transcript ("TR.") 50:12-14 (Rogan)).  In 1986, Rogan founded InterHealth

Associates, Inc., a Chicago healthcare consulting firm. (Jt. St. Uncontested Facts, ¶ 2). Interhealth performed consulting work for Edgewater Hospital and Medical Center ("Edgewater" or "the hospital"), located at 5700 North Ashland Avenue, Chicago, Illinois 60660. (TR. 56:8-10 (Rogan)). Rogan had earlier performed consulting services for Edgewater while employed at Ernst & Whinney (now Ernst & Young), a major accounting and consulting firm. (TR. 41:16-23, 44:19-25 (Rogan)).

3.     In January 1989, Rogan exercised an option he had to buy Edgewater. (TR. 44:19-25 (Rogan); GX A1). Rogan formed Edgewater Operating Company ("EOC") in order to purchase Edgewater and was the only shareholder at the time of purchase. Rogan also formed Edgewater Property Company ("EPC") and EPC acquired the real property owned by Edgewater Hospital, Inc. (Jt. St. Uncontested Facts, ¶ 3).

4.     In August 1994, Rogan and the other shareholders of EOC sold Edgewater, and Rogan became the CEO of Northside d/b/a Edgewater. The sale was accomplished through a merger of EOC with Northside Operating Company ("Northside"). Northside's parent organization was Permian Corporation, which was headquartered in California. (Jt. St. Uncontested Facts, ¶ 7).

5.     Rogan and the other shareholders of EOC received $31.1 million for the sale of Edgewater. $9,268,619 of the distribution was used to pay bank debt. Rogan received $17,371,421 as a shareholder, and the remaining shareholders, trust funds for Rogan's children, received $4,099,960. The shareholders also received a subordinated note from Northside worth $4,000,000. (Jt. St. Uncontested Facts, ¶ 8).

6.     Peter Rogan served as the Chief Executive Officer of Edgewater between 1991 and approximately October of 1997. (Jt. St. Uncontested Facts, ¶ 4, 37).

2

7.     After relinquishing the title of CEO, Rogan continued to supervise the individual who assumed the title of CEO at Edgewater, and Rogan remained Edgewater's principal decision maker until May 2001.  (TR. 1022:25, 1023:1-14 (Cubria); 1186:13-25. 1187:1-14 (Zeisel)).

### ROGAN'S FINANCIAL INTEREST IN EDGEWATER

8.     In 1994, Rogan sold Edgewater hospital.  (Jt. St. Uncontested Facts, ¶¶ 7-9).

9.     As far back as 1992, Rogan had been contemplating ways of selling Edgewater yet remaining in effective control of the hospital.  (GX A15).  Rogan created a memorandum in 1992 suggesting the sale of Edgewater to a 501(c)(3) organization, the creation of a management company (owned equally by Rogan and his colleague Scott Gross) to manage and administer Edgewater.  (GX A15).  Rogan would serve as a salaried employee of the management company, assigned as the CEO of Edgewater.  (GX A15).

10.     The 1994 sale of Edgewater was structured in a manner substantially similar to that outlined by Rogan in his 1992 memorandum.   Edgewater was sold to a 501(c)(3) organization (Northside). Braddock Management, L.P. (Braddock) was the management company created to manage and administer Edgewater.  Rogan, technically an "employee" of Braddock, was assigned to be Edgewater's CEO.  (Jt. St. Uncontested Facts, ¶ 7-9).

11.     Braddock maintained management contracts with Edgewater from 1994-2001. (Joint Exhibit ("JX") 6A-C).   These management contracts provided  that Braddock would act as the exclusive manager of the day-to-day operations of the hospital, which included the submission of claims to Medicare and Medicaid for services rendered to patients, and would supervise and manage all billings, collections, cost reporting, and other financial matters related to hospital operations. (JX 6A-C).

3

12.     Braddock's management contracts with Edgewater provided for Braddock to be compensated through both a monthly fixed-fee payment and through a payment based on a percentage of the hospital's "net patient service revenue." (JX6A-C; TR. 247:10-25, 248:1-16 (Rogan); 1218:10-22 (Zeisel)).

13.     Net patient service revenue was tied to the number of admissions at Edgewater. (TR. 248:3-15 (Rogan); 1219:8-10 (Zeisel)).

14.     Braddock was controlled between 1994 and April 1998 by its general partner, an entity called Waldo Point Management. (Jt. St. Uncontested Facts, ¶ 10). Peter Rogan was the president of Waldo Point Management from approximately 1995 through October1998. (Jt. St. Uncontested Facts, ¶ 10). Rogan had a special proxy and power of attorney from Waldo Point's sole shareholder, F. Scott Gross, as of August 1994, which provided "for the effective transfer of control of Braddock to [Rogan] . . . as of August 17, 1994." (GX A17; TR. 1436:17-22 (Rogan)). Rogan also had a put option to purchase all of Waldo's shares from Gross at any time. (GX A16). Hence, Rogan had full control of Braddock (through Rogan's control of the general partner, Waldo Point Management) from August, 1994 through April, 1998.

15.     In October, 1998, Rogan became the president of Braddock Management, Inc., which became the general partner of Braddock (replacing Waldo Point Management). (Jt. St. Uncontested facts ¶ 11). Rogan's trust owned 100% of the shares of Braddock Management, Inc. (Jt. St. Uncontested Facts, ¶ 12). This partnership structure remained in effect through 2004. (Jt. St. Uncontested Facts, ¶ 11). Hence, Rogan had full control over Braddock (which changed its name to Bainbridge Management, L.P. ("Bainbridge") in March 2000) from October 1998 until at least 2004.

16. Edgewater's senior management consisted of Braddock employees from approximately 1995 - 2000. (TR. 1176:8-25, 1177:1-6 (Zeisel)). Compensation for Braddock's Edgewater-based employees – including salaries, bonuses, and fringe benefits – was reimbursed by Edgewater separately. (JX 6A-C; TR. 1216:12-25, 1217:1-4 (Zeisel)). Hence, the management fees paid to Braddock were distributed to Braddock's owners, and were not used to compensate Braddock's hospital-based employees. (TR. 1222:1-14 (Zeisel)). During his tenure as CEO, Rogan himself received a salary and bonuses from Braddock, the cost of which were passed through to the hospital (JX 6A-B, JX 29). In 1996 alone, Rogan received a salary of $183,336 and a bonus of $100,000 from Braddock. (TR. 99:4-8 (Rogan)).

17. In 1995, Rogan (through Boulevard Management, L.P., an entity owned by Rogan) purchased the limited partnership interest of Braddock. (Rogan TR., 244:16-23). The limited partnership interest owned 99% of Braddock. (GX A2). Hence, as of his purchase of the limited partnership interest in 1995, Rogan was entitled to 99% of the management fees that Braddock earned at Edgewater. (TR. 245-247, 249:11-18 (Rogan)).

18. Over the years, Rogan assigned shares of his limited partnership interest in Braddock to his children's domestic and Belizean trusts. As of July 1997, 90% of the profits from Braddock flowed to Rogan's children's domestic and Belizean trusts. (GX A11; TR. 272:9-13 (Rogan)).

19. As of July 6, 1999, Rogan, his children's domestic and Belizean trusts, and entities owned by Rogan and his family were still receiving at least 99% of Braddock's partnership distributions. (GX 18C). An entity owned by Rogan's family, Boulevard Investors of Belize, retained its 99% share in Braddock (which later changed its name to Bainbridge) through at least March 2000. (GX 32D).

5

20.     Between 1995 and 2000, Braddock received over $9,500,000 in management fees from Edgewater, at least 99% of which flowed to Rogan and his family. (GX 40E). Rogan admitted that the money he received from his financial interest in Braddock was hardly "nominal." (TR. 242:17-21 Rogan)).

21.     Rogan and entities owned by Rogan and his family thus owned 99% of Braddock between 1995 and at least March 2000. Hence, Rogan had a major financial interest in maximizing the management fees Braddock earned from Edgewater.

## PHYSICIAN RECRUITING AT EDGEWATER UNDER ROGAN

22.     Roger Ehmen joined Edgewater in 1977 as the Director of Medical Records. (TR. 290:14-25, 291:1-5 (Ehmen)). Ehmen was promoted to the position of Edgewater's Director of Medical Administration in 1982; he was later promoted to the position of Vice President of Medical Staff Development, Marketing, and Public Relations in approximately 1989. (TR. 292:2-6, 293:16-25, 294:1-25 (Ehmen)). Ehmen began reporting directly to Rogan when Rogan assumed the position of CEO at Edgewater in 1991. (TR. 298:1-4 (Ehmen)). Ehmen's duties included recruiting physicians for Edgewater's medical staff. (Jt. St. Uncontested Facts, ¶ 22).

23.     During his tenure as CEO, Rogan served as Ehmen's supervisor. Ehmen reported to Rogan. (Jt. St. Uncontested Facts, ¶ 40). In the areas of physician recruiting and program development, Rogan was an exceptionally involved manager. (TR. 299:17-19 (Ehmen)).

24.     A major impediment to recruiting physicians at Edgewater was the physical condition of the hospital. (TR. 310:7-9 (Ehmen)). Much of the hospital's equipment was outdated. (Id.). When providing tours of the facility to physicians he was recruiting to Edgewater, Ehmen took a

6

unique route through the hospital to avoid showing these physicians Edgewater's many decrepit areas.  (TR. 297:2-21 (Ehmen)).

25.     Rogan had a strategy for recruiting physicians to Edgewater, and he shared this philosophy with Ehmen.  (TR. 309:13-15 (Ehmen)).  Rogan believed that hospital contracts with primary care physicians, such as internists or family practitioners, were an especially effective tool for recruiting physicians to practice at Edgewater.  Rogan's philosophy was that if these physicians were spending substantial time at Edgewater fulfilling their contractual obligations, it would be more likely that these physicians would refer their own patients to Edgewater.   (TR. 309:13-25, 306:1 (Ehmen)).  Thus, Rogan hoped to tie primary care physicians with substantial practices to Edgewater through contracts with the hospital.  (TR. 309:24-25, 310:1 (Ehmen)).

26.     Rogan regularly discussed physician recruiting with Ehmen.   (TR. 306:15-25 Ehmen)).  Rogan was aware of the hospital's census at all times and reviewed physician statistics regularly. (TR. 305 10:15 (Ehmen)).  If the hospital's inpatient census was low, Rogan would direct Ehmen to contact the hospital's large admitters and ask them to generate patient admissions for Edgewater.  (TR. 306:1-5 (Ehmen); 684-685 (Gotbaum)).   Ehmen termed these calls "dialing for dollars" and used this phrase with Rogan.  (TR. 306:6-12 (Ehmen)).

27.     Ehmen had no authority to approve physician contracts for Edgewater or to commit Edgewater to contracted dollars. (TR. 567:24-25, 568:1-9 (Ehmen)).  Ehmen discussed all major decisions on physician recruiting and contracting with Rogan throughout his time at Edgewater. (TR. 571:1-15 (Ehmen); 864:1-10 (Barnabas); 932:6-10 (Cubria)).  Ehmen also had no authority to authorize hospital payments to physicians who were not under contract with Edgewater.  Rogan's

7

signature was required for all hospital disbursements to physicians not under contract with the hospital. (TR. 711:17-25, 712:19-24, 713:21-25, 714:1-5 (Sinner)).

## <u>ROGAN'S KICKBACK SCHEMES AT EDGEWATER</u>

A.    **Payoffs to Ravi Barnabas**

28.    Ravi Barnabas, M.D. was a licensed internist who admitted patients to Edgewater and acted as attending physician for additional patients at Edgewater. (Jt. St. Uncontested Facts, ¶ 23).

29.    Barnabas completed a residency in internal medicine at Edgewater in 1985. (TR. 763:14-18, 765:16-21 (Barnabas)). Barnabas entered private practice with his brother, Satish Barnabas, in the late 1980s. (TR. 764:9-21 (Barnabas)). By the early 1990s, Barnabas seldom referred patients to Edgewater, though he retained admitting privileges there. (TR. 765:6-21 (Barnabas)). Ehmen tried to recruit Barnabas back to Edgewater in the early 1990s, but was rebuffed. (TR. 768:1-19 (Barnabas); 313:2-12, 315:6-8 (Ehmen)).

30.    In approximately 1993, Barnabas was serving as an internal medicine consultant for Antonio Ramos, M.D., a general surgeon with a busy practice. Ramos had a falling out with the administration at Methodist Hospital, where Ramos generally referred his patients. (TR. 336:2-9 (Ehmen); 769:17-22 (Barnabas)). Ramos began referring his patients to a hospital where Barnabas did not have privileges. (TR. 770:2-10 (Barnabas)). In an effort to interest Ramos in a hospital where Barnabas had admitting privileges, Barnabas arranged for Ramos to meet with Ehmen. (TR. 770:19-25, 771:1-8 (Barnabas)).

31.    Ramos agreed to begin referring patients to Edgewater after meeting with Ehmen, but asked for assistance paying his malpractice premiums. (TR. 329:8-22, 330:10-12 (Ehmen)). Ehmen informed Rogan of Ramos's malpractice premium request, and Rogan decided not to address it at

that time. (TR. 330:20-25, 331:1-5). Ramos referred a substantial volume of patients to Edgewater after beginning to practice there – approximately 20-30 per month. (TR. 330:14-16 (Ehmen); 776:1-16 (Barnabas)). Shortly thereafter, Ramos demanded assistance from Edgewater in paying his malpractice insurance premiums, which cost approximately $70,000 annually, and threatened to send his patients elsewhere if his demand was not met. (TR. 335:11-22 (Ehmen)).

32.     Ehmen informed Rogan of Ramos's demand. (TR. 336:20-25, 337:1-5 (Ehmen)). Rogan instructed Ehmen to consider "some creative way" to pay Ramos's malpractice premiums. (TR. 337:6-11 (Ehmen)).

33.     Ehmen suggested providing Ramos with a contract, ostensibly to serve as Edgewater's liaison to the Hispanic community in exchange for a salary that would cover his malpractice premiums. (TR. 337, 17:25, 338:1-5 (Ehmen)). Rogan approved this contract. Rogan and Ehmen had never discussed creating such a position or paying someone to perform these duties before offering this contract to Ramos. (TR. 338:6-14 (Ehmen)). Rogan and Ehmen had two purposes in providing Ramos with this contract: (1) to induce Ramos to continue referring his substantial business to Edgewater; and (2) to encourage Barnabas to spend time at Edgewater, making it more likely that he would refer a substantial number of his own patients to Edgewater. (TR. 341:3-7, 342:9-25, 371:16-21 (Ehmen)).

34.     In 1993, Barnabas and his brother had a busy internal medicine practice. Barnabas generally referred those of his patients needing hospital services to Methodist Hospital and Illinois Masonic Hospital, both competitors of Edgewater. (TR. 764:19-25, 765:1-3, 24-25, 766:1-15 (Barnabas)).

35.     In late 1993, Rogan agreed to offer Barnabas a contract with Edgewater that would pay him $60,000 annually, ostensibly in exchange for joining the teaching staff at Edgewater. (TR. 787:11-25, 788:1-25 (Barnabas)). Annual compensation of $60,000 was considerably more than Edgewater typically paid its teaching faculty, who were generally paid between $2,000 and $3,000 monthly. (TR. 345:7-12 (Ehmen)).

36.     Barnabas rejected a teaching contract because he did not want to perform the duties associated with Edgewater's formal teaching program. As an alternative, Barnabas suggested a "physician recruiting" contract for the same $60,000 annual salary. Barnabas had previously had a physician recruiting contract at Illinois Masonic Hospital which paid him $25,000 annually. (TR. 789: 4-6, 790:1-12, 791:17-25, 792:1-5 (Barnabas); 343:20-24, 344:9-22 (Ehmen)).

37.     Ehmen and Rogan agreed to provide Barnabas with a physician recruiting contract in November of 1993. The contract was to pay Barnabas $60,000 annually. (TR. 792:6-14 (Barnabas)). Barnabas understood this contract to include the expectation that he would refer a substantial number of his own patients to Edgewater in exchange for the contract. (TR. 792:15-25 (Barnabas)). The contract was intended to reward Barnabas for his efforts in bringing Ramos to Edgewater and to induce Barnabas to refer a substantial number of his own patients to Edgewater. (TR. 344:9-25, 345:1-6 (Ehmen)).

38.     Ehmen instead erroneously provided Barnabas with a standard Edgewater teaching contract as opposed to the agreed-upon recruiting contract. (JX 23; TR. 794:17-25; 795:1-11 (Barnabas)). Barnabas signed the teaching contract. Several weeks later, Barnabas noted the error and asked Ehmen to correct it. (JX 23; TR. 796:1-12 (Barnabas)). Despite Barnabas's request,

Barnabas continued to be paid under a teaching contract for the entire term of the original contract, from November 1993 through October 1994. (TR. 796: 5-18, 799:2-4 (Barnabas)).

39.     On November 1, 1994, Barnabas's teaching contract with Edgewater was renewed in a one-paragraph contract addendum that incorporated Barnabas's earlier contract by reference. (JX 24). This renewed contract was presented to Edgewater's board of Directors in November 1994 as a teaching contract. (JX 1, Bates nos. EMC 001793-001801). Hence, Barnabas continued to be paid under a teaching contract from November 1, 1994 through October 31, 1995.

40.     Barnabas never taught at Edgewater and was never a part of Edgewater's teaching faculty. (TR. 796:19-25, 797:1-8, 799:15-24 (Barnabas); 346:24-25, 347:1-2 (Ehmen)).

41.     Between November 1, 1993 and October 31, 1995, Barnabas performed some duties (an estimated 4-5 hours per week) as a physician recruiter for Edgewater. (TR. 797: 13-25, 800:15-21 (Barnabas)). However, these duties were not delineated in any written contract in existence at that time.

42.     Between November 1, 1993 and October 31, 1995, Barnabas referred patients to Edgewater. These patients included Medicare and Medicaid beneficiaries. (Barnabas TR. 799:5-9; 801: 20-24;).

43.     On November 1, 1995, Barnabas entered into another contract with Edgewater that formally set forth his duties as a physician recruiter. (JX 25) The contract required him to work 600 hours annually on physician recruiting activities in exchange for annual compensation totaling $60,000. The contract ran through October 31, 1996. (Id.). Rogan approved this contract largely in an attempt to induce patient referrals from Barnabas. (TR. 352:17-25, 353:1-2 (Ehmen)).

11

44. Barnabas did not work anywhere near 600 hours on physician recruiting activities during the contract period from November 1, 1995 through October 31, 1996. (TR.. 803:1-18 (Barnabas)).

45. Barnabas referred patients to Edgewater between November 1, 1995 and October 31, 1996. These patients included Medicare and Medicaid beneficiaries. (TR. 803:19-24 (Barnabas)).

46. In November of 1996, Barnabas renewed his physician recruiting contract with Rogan's approval and signature. (JX 26) The renewed contract ran through the end of June, 1997 and paid compensation of $5,000 per month. The contract required Barnabas to work 33.33 hours per month on physician recruiting activities. (Id.).

47. Rogan's purpose in approving this renewal was to induce Barnabas to refer a substantial number of his patients to Edgewater. (TR. 354:5-11 (Ehmen)).

48. Barnabas did not work anywhere near 33.33 hours per month on physician recruiting activities between November 1, 1996 and June 30, 1997. (TR. 805:16-18 (Barnabas)).

49. Barnabas referred patients to Edgewater between November 1, 1996 and June 30, 1997. These referrals included Medicare and Medicaid beneficiaries. (TR. 806:8-9, 15-16 (Barnabas)).

50. In July 1997, Barnabas renewed his physician recruiting contract with Edgewater. The renewed contract paid $36,000 annually for recruiting services, and required 30 hours of work on a monthly basis. (JX 27) Rogan's purpose in approving the renewal of Barnabas's recruiting contract was to induce Barnabas to refer a substantial number of his private patients to Edgewater. (TR. 355:8-17 (Ehmen)).

12

51.     Barnabas received another contract in July 1997 to serve as the medical director of the "Elderly in Distress" ("EID") program. (JX 28). This contract compensated Barnabas $24,000 annually in exchange for a requirement of 13.33 hour of work on a monthly basis. (JX 28). Barnabas's recruiting contract and the EID contract, when combined, paid Barnabas the same $60,000 annually that he had been making under his earlier recruiting and teaching contracts.

52.     Rogan approved dividing Barnabas's compensation among two contracts in order to make Barnabas's compensation appear more reasonable and to create the appearance of propriety. (TR. 355:21:25, 356; 1-8 (Ehmen)).

53.     Barnabas did not work the requisite number of hours under either his EID or his recruiting contracts in the 1997-1998 contract year. (TR. 815:21-15, 806:1-15, 817:1-17 (Barnabas)).

54.     Barnabas referred patients to Edgewater between July of 1997 and August of 1998, and these referrals included Medicare and Medicaid patients. (TR. 818:24-25; 819:1-5 (Barnabas)).

55.     Barnabas stopped practicing at Edgewater in late 1998, and did not renew his contracts with Edgewater. (TR. at 822:23-25; 823:1-5 (Barnabas)). After Barnabas stopped receiving payments from Edgewater, he stopped sending patients there. (TR. 825:10-25; 826:1-5 (Barnabas)); (GX 7D).

56.     Rogan never inquired as to whether Barnabas was working the requisite number of hours under his contracts, yet Rogan regularly discussed Barnabas's referral patterns with Ehmen. (TR. 347:16-24, 348:11-25, 349:1-3 (Ehmen); 822:6-22 (Barnabas)). Rogan's intent in approving each of Barnabas's teaching, directorship, and recruiting contracts was to induce Barnabas to refer

his considerable base of patients to Edgewater. (TR. 787:11-25, 788:1-25, 792:15-25 (Barnabas); 352:17-25, 353:1-2, 354:5-11, 355:8-17 (Ehmen)).

**B**.     **Payoffs to Sheshiqiri Rao – Anesthesia**

57.     Sheshiqiri Rao Vavilikolanu, M.D. (Rao) was an anesthesiologist and former family practitioner. (TR. 220:10–17 (Rogan)).   In late 1996, Rao asked Barnabas (whom Rao knew from their work together at Doctor's Hospital of Hyde Park) to assist him in obtaining a contract to manage Edgewater's anesthesia services. (TR. 826:23-25, 827:1-12 (Barnabas)).

58.     Anesthesiologists do not typically refer patients to hospitals; instead, they provide services to patients referred to the hospital by other physicians. (TR. 366:25, 367:1-9 (Ehmen)). However, Rao told both Ehmen and Barnabas that Rao, through his relationships with primary care physicians and patient recruiters, could provide admissions to Edgewater if he were to be awarded the anesthesia contract. (TR. 370:6-25, 371:1-5; (Ehmen); 827:9-19 (Barnabas)).

59.     Ehmen was not especially impressed with Rao, but told Rogan that Rao claimed that Rao could provide a substantial number of admissions to Edgewater if Rao were awarded the anesthesia contract. (TR. 367:10-25, 371:5-13 (Ehmen)).

60.     Rogan requested a meeting with Rao and Barnabas at a Chicago restaurant. At this meeting, Rao told Rogan that he controlled a substantial base of patients that could be referred to Edgewater if Rao received the anesthesia contract. (TR. 831:11-25 (Barnabas)).

61.     After this meeting with Rao and Barnabas, Rogan informed Ehmen that he wished to go forward with a contract with Rao's group, paying him $15,000 monthly. (TR. 374:5-12 (Ehmen). Rogan then caused Edgewater to enter into a contract with Rao's corporation, signed February 28, 1997 but effective April 1, 1997, ostensibly for administering and providing

14

Edgewater's anesthesia services. (JX 18) The contract paid Rao's corporation a total of $15,000 per month, $10,000 of which purportedly compensated Rao for serving as the sole provider of Edgewater's anesthesia services, and $5,000 of which ostensibly compensated Rao for administrative responsibilities associated with the provision of anesthesia at Edgewater. (Id.). In fact, this contract was entered into in order to induce patient referrals from Rao and his sources. (TR. 373:9-25, 374:1-12 (Ehmen)).

62. At Rogan's request, Rao referred patients to Edgewater in March 1997, as part of a "trial period" to see if Rao's referrals were as substantial as he had claimed. (TR. 373:9-25 (Ehmen)). Rogan approved paying Rao $15,000, ostensibly for "strategic planning" services in March 1997; this payment was actually to compensate Rao for his substantial referrals during this period. (JX 34B, Bates nos. 44318-44319; TR. 378:22-25; 379:1-7 (Ehmen)).

63. Beginning in March 1997, and continuing through approximately June 1998, Rao referred patients to Edgewater. (TR. 837:6-8; 859:23-25 (Barnabas)). Rao controlled a base of patients through his relationships with a variety of patient recruiters and at least one primary care physician, Kumar Kaliana, M.D. ("Kumar"). Rao paid his recruiters and sources for referrals to Edgewater. (TR. 838:2-14 (Barnabas)). Rao had no admitting privileges at Edgewater; therefore, Rao's patients were admitted under Barnabas's name. (TR. 837:10-13 (Barnabas)). Barnabas expected to receive these referrals from Rao, and benefitted from this arrangement because he could bill insurers for the services he provided to Rao's patients. (TR. 837:10-18 (Barnabas)). Having Barnabas manage Rao's referrals fit into Rogan and Ehmen's strategy to encourage Barnabas to spend more time at Edgewater, thus making it more likely that he would move more of his private patients from Methodist Hospital to Edgewater. (TR. 371:14-22 (Ehmen)).

15

64.     Rogan directed Ehmen to develop a series of codes in order to track Rao's referrals and to distinguish them from those that came from Barnabas's own practice. (TR. 379:12-22, 383:1-2 (Ehmen); 838:18-24 (Barnabas)). These codes were entered into Edgewater's daily physician statistics report after Barnabas's name, in order to designate the patients coming from Rao's sources. One of these codes was "Barnabas RKO," which stood for "Rao-Kumar Organization." (TR. 383:14-17 (Ehmen)).

65.     Rao told Andrew Henry Cubria ("Cubria"), a cardiologist who practiced at Edgewater, that Rao was being paid to bring patients to Edgewater. (TR. 1002:19-21 (Cubria)). Cubria and Rogan discussed Rao's referrals while referring to a physician statistics sheet that contained the "RKO" code. (TR. 998:8-25, 999:1-3 (Cubria)). At his request, Cubria served as the cardiac consultant for many of Rao's referrals and his name often appeared on the physician statistics sheets for Rao's patients, under designations such as "Barnabas/Cubria RKO." (DX 286, Bates no. 25369; TR. 840-842 (Barnabas)).

66.     During the course of Rao's contract, Rogan directed Ehmen to change RKO to a more generic-sounding code. (TR. 383:24-25, 384:1-15 (Ehmen)). The code "Barnabas APN" was used beginning in November 1997 to track Rao's patients. (TR. 384:16-22 (Ehmen); 849:16-25, 850:1 (Barnabas); 692:7-16 (Gotbaum); Defendant's Exhibit ("DX") 286, Bates no. 25586).

67.     Rogan denies knowing what the code "RKO" meant. (TR. 228:7-23 (Rogan)). This testimony is rebutted directly by two witnesses. (TR. 383:24-25, 384:1-15 (Ehmen); 998:8-25, 999:1-3 (Cubria)). Furthermore, Rogan was notably "hands on" in the area of physician recruiting and program development, and routinely reviewed admissions numbers with Ehmen. (TR. 299:17-25, 300:1-14, 305:3-25, 306:1-12 (Ehmen); 683-685 (Gotbaum)). Rao's referral numbers under the

16

"RKO" code were exceptionally high in several months. (DX 286, Bates no. 25512, 25440). It is simply incredible for Rogan to assert that he was unaware of the meaning of a code under which the hospital generated substantial admissions for several months.

68.     After Rao began referring patients to Edgewater, Ehmen became aware that Rao was paying Kumar $12,000 monthly in exchange for Kumar's patient referrals. (TR 385:18-22 (Ehmen)). Ehmen informed Rogan of this fact. (TR. 385:24-25, 386:1-2). Rogan replied, "What Dr. Rao does with his own money is his business." (TR. 386:3-5 (Ehmen)).

69.     The volume of Rao's referrals was quite high in the early months of Rao's anesthesia contract. (TR. 850:10-25, 851:1-11 (Barnabas); DX 286, Bates no. 25440). Rogan was fully aware of the volume of Rao's referrals and discussed the volume of Rao's referrals with Ehmen and Cubria. (TR. 384:24-25; 385:1-3 (Ehmen); 998:8-25, 999:1-3 (Cubria)). If Rao's referral numbers were low in a given month, Rogan would direct Ehmen to talk to Rao and Barnabas and demand that Rao increase his referral volume. (TR. 385:4-13 (Ehmen)). Ehmen did this on several occasions. (Id.; TR. 851:12-25; 859:7-12 (Barnabas)).

70.     Several months into Rao's anesthesia contract, the hospital began receiving numerous denials of payment from insurers for services provided to patients referred by Rao. (TR. 852:14-25; 853:1-24 (Barnabas) 388:5-14 (Ehmen)). Rogan became aware of these denials. (TR. 390:23-25 (Ehmen); 232:20-25 (Rogan)). Rogan directed Ehmen to inform Barnabas and Rao that Edgewater wanted appropriate admissions for which Edgewater would be paid. (TR. 391:1-7 (Ehmen)).

71.     In an effort to limit claims denials, Barnabas and Ehmen devised a program whereby all patients referred by Rao would be placed under a 23-hour observation status. (TR. 394:1-13 (Ehmen); 855:5-11, 856:12-25, 857:1-3 (Barnabas)). If, after that time, the patients were deemed

17

to meet inpatient criteria, the patients would be admitted; if not, the patients would be treated and released as outpatients. (Id.)

72.     Placing Rao's referrals under 23-hour observation led to a significant decrease in Rao's admissions.  (DX 286, Bates nos. 25107, 25146; TR. 857:7-25; 858:1-21 (Barnabas); 395:15-25; 396:1-17 (Ehmen)).

73.     Rogan was unhappy with the level of admissions resulting from Rao's referrals and directed Edgewater to stop paying Rao under his anesthesia contract in June of 1998.  Even though Edgewater was no longer paying Rao the $15,000 per month, Rao was still expected to provide anesthesia services to the hospital, for which Rao could submit professional billings. (TR. 413:10-23 (Ehmen)).

74.     Rogan awarded the anesthesia contract to Rao with the expectation that Rao would refer a substantial number of patients to Edgewater.  Rogan terminated the payments under the contract primarily because Rao's patients were not being admitted to the hospital at an acceptable rate. (TR. 412:19-25; 413:1-5 (Ehmen)).

75.     Rao requested that Barnabas set up a meeting with Rogan after Rao's payments were terminated.  (TR. 864:14-25, 865:1 (Barnabas)).

76.     Rogan agreed to meet with Rao and Barnabas in Rogan's office in August 1998.  Rao was cooperating with the government at the time, and wore a recording device to this meeting.  (TR. 1356:7-10 (Rogan)).

77.     Prior to this meeting taking place, several individuals at both Doctor's Hospital and Edgewater had noticed that Rao had been behaving strangely, doing things like asking people to

18

repeat particular statements and trying to put words into people's mouths during conversations. (TR. 871-873 (Barnabas)).

78.     Prior to meeting with Rao and Barnabas, Rogan told Ehmen that he felt it was "odd" that Rao and Barnabas were so aggressive about trying to meet with him. (TR. 419:19-21 (Ehmen). Rogan told Ehmen that he "smelled a rat" and would be on his guard in his meeting with Rao and Barnabas. (TR. 419:21-25 (Ehmen)).

79.     At the meeting in Rogan's office, Rao explicitly discussed his kickbacks to Kumar and threatened Rogan that Kumar may go to the authorities if Rogan didn't provide two checks to Rao that Rao was using to pay Kumar. (TR. 868:2-10 (Barnabas)). Barnabas was shocked at the blatant manner in which Rao discussed the scheme and issued these threats – illegal payoffs were not typically discussed in such an obvious manner. (TR. 868:23-25, 869-871 (Barnabas)). Rogan responded to Rao's statements and threats by denying any involvement in paying for patient referrals to Edgewater, but expressed a willingness to consider any new programs that Rao might have to offer. (TR. 1356:1-6 (Rogan)). Rogan spoke to Ehmen after the meeting and urged Ehmen to be "very careful" in his dealings with Rao and Barnabas. (TR. 420:24-25, 421:1-5 (Ehmen)).

80.      Based on the foregoing facts, it is clear that Rogan suspected Rao might have been wearing a recording device and structured his statements accordingly.

81.     Rogan never informed any of Edgewater's attorneys that Rao was paying Kumar for patient referrals that were being sent to Edgewater, despite having an experienced health care attorney available to advise him on such matters. (TR. 1357:11-19 (Rogan); 1264-1267, 1293:22-25, 1294:1-7, 10-24 (Hoban)).

C.     **Payoffs to Rao – Detoxification**

82.     Rao controlled a company called Florascribe, which provided marketing services for the detoxification program at Doctor's Hospital.  (TR. 399:5-19 (Ehmen)).   Rao told Ehmen that Florascribe had been successful in bringing detox patients to Doctor's Hospital, and could do the same at Edgewater if he were given a contract to market Edgewater's detox program.   Ehmen discussed Rao's claims with Rogan.  (TR. 399:4-24; 400:1-18 (Ehmen)).

83.     Rao and Barnabas had a dinner meeting with Rogan at Les Nomades, an exclusive Chicago restaurant.  (TR. 834:17-19 Barnabas)).  At this meeting, Rao represented to Rogan that Rao had sources that could supply 30-35 patients per month to Edgewater through Edgewater's detoxification program.  (TR. 834:9-25; 835:1-19 (Barnabas)).

84.     Rogan agreed to implement a "trial run" for Florascribe, whereby Rao would refer detox patients to Edgewater and Edgewater could assess whether the volume was consistent with Rao's claims.  (TR. 400:3-23 (Ehmen)).

85.     Prior to any contract becoming effective, Rao's company Florascribe was paid $14,000 per month during the trial period, which ran from approximately May 1997, through September 1997.  (GX 34C, Bates nos. 43440, 44344-45, 44347, 44350).  These payments were ostensibly made to compensate Florascribe for "administrative marketing for the detox program." In fact, Edgewater was paying another company for detox marketing services, and the payments to Florascribe were intended to compensate Rao for the admissions he generated for Edgewater during the trial period.  (TR. 411:19-25; 412:1 (Ehmen)).

20

86.     The trial period went well, and Ehmen recommended that Edgewater enter into a contract with Rao to ensure Rao's continued referral of detox patients.  (TR. 401:16-25, 402:1-5 Ehmen)).

87.     Rogan approved a contract with Florascribe, effective October 1, 1997, ostensibly to provide detox marketing services to Edgewater.  (JX 19).  In fact, the contract's compensation exceeded fair market value for the services to be provided, and was intended to induce Rao to refer a substantial volume of referrals to Edgewater's detox program.  (TR. 404:15-21, 405:8-21 (Ehmen)).

88.     Rogan terminated Florascribe's contract with Edgewater in early 1998.  This decision was based on the fact that Rao's detox admissions were below expectations, and Rao was attempting to take credit for recruiting patients that others had brought into Edgewater's detox program.  (TR. 414:23-25; 415:1-14 (Ehmen)).

**D.      Payoffs to Andrew Cubria**

89      Cubria was a licensed cardiologist who referred patients to Edgewater. (TR. 895:19-25, 905:18-20 (Cubria)).  In 1979, Cubria was recruited to practice at Edgewater by a fellow Cuban-American physician that was close to Cubria's family.  (TR. 896:12-20 (Cubria)).  Cubria was employed by Edgewater as a staff cardiologist until the mid 1980s, when he entered private practice. (TR. 896:21-25, 897:1-24 (Cubria)).

90.     In the mid-1980's, Cubria began shifting his practice away from Edgewater and to Illinois Masonic Hospital.  (TR. 899:1-22 (Cubria)).

91.     Cubria was performing most of his inpatient work at Illinois Masonic Hospital when Rogan took over Edgewater.  (TR. 904:3-8 (Cubria)).  The inpatient work included Medicare and Medicaid patients.  (TR. 904:16-17 (Cubria)).

92.     Cubria resigned from his position as Director of Cardiology at Edgewater shortly after Rogan took over the hospital.  (TR. 903:17-23 (Cubria)).

93.     Cubria began referring his patients back to Edgewater in the mid-1990s.  (TR. 905:18-21 (Cubria)).

94.     In the early 1990s, Cubria's main office was located in the professional building of Edgewater Hospital, along with other members of the professional group, Northside Physicians and Surgeons.  The members of Northside Physicians and Surgeons had office space scattered around the professional building.  (TR. 905:1-3, 906:4-18 (Cubria)).

95.     The members of Northside Physicians and Surgeons approached Rogan about performing a build-out so that the doctors could have their offices in the same suite.  (TR. 906: 14-21, 907:2-4 (Cubria)).  A build-out was performed on the sixth floor of the Edgewater professional building, and the cost of the build-out was to be included in the rent paid by the physicians.  (TR. 907:6-10 (Cubria)).

96.     Northside Physicians and Surgeons broke up in late 1993 or early 1994, leaving only Cubria and one other physician behind.  Cubria approached Rogan about solving the financial issues relating to the build-out in light of the break-up.  (TR. 907:11-25 (Cubria)).

97.     Rogan told Cubria that Edgewater would waive Cubria's part of the build-out fee if Cubria agreed to keep his patients at Edgewater, and admitted more of his patients to Edgewater.  (TR. 907:21-25, 908:1-25, 909:1-4 (Cubria)).

22

98. Cubria accepted Rogan's offer to waive the cost of the build-out, and began to do most of his work at Edgewater. (TR. 909:5-8 (Cubria)). Cubria estimates the value of the waiver at $40,000 minus the rent already paid. (TR. 908:12-18 (Cubria)).

99. In 1995, Cubria did not do any teaching for Edgewater, nor did he do any work for the Edgewater teaching service. (TR. 911:10-14 (Cubria)). Cubria did not have a contract for teaching at Edgewater or for participation in the teaching service. (TR. 911:1-9 (Cubria)).

100. Throughout 1995, nevertheless, Cubria received payments of thousands of dollars from Edgewater for teaching or for participation in a teaching service program. The payments included monthly payments in the amount of $3,000, plus a teaching service bonus that was directly authorized by Rogan. (TR. 912:1-25, 913:1-25, 914:1-13 (Cubria)).

101. In 1995, Cubria received payment from Edgewater in the amount of $6,000 per month pursuant to an EKG reading contract. (TR. 914:14-18 (Cubria); JX 11). Cubria and other cardiologists had earlier received only between $1,500 and $2,000 per month for reading EKGs. (TR. 914:19-25 (Cubria). Cubria spoke to Rogan directly about the EKG reading contracts, and informed Rogan that the salary should be raised to $6,000 per month or else Cubria would move his patients to a different hospital: "I would do whatever I needed to do if I was not going to get what I wanted." (TR. 915:11-19 (Cubria); 424: 5-11 (Ehmen)).

102. Rogan approved the increased salary, and in January of 1994, Rogan personally signed Cubria's EKG reading contract in the amount of $6,000 per month. (JX 11; TR. 916:16-24 (Cubria); 423:13-21 (Ehmen)).

103. The EKG reading contract signed by Rogan and Cubria required 600 hours of work annually of Cubria, for an annual payment of $72,000. (JX 11; TR. 917:2-3 (Cubria)). Cubria and

23

the other cardiologists only read EKGs one out of every four weeks, or approximately 13 weeks per year.  Cubria read EKGs only approximately one hour per day during the thirteen weeks, or a total of approximately 91 hours per year.  (TR. 917: 4-25 (Cubria)).

104.    The annual payment of $72,000 for approximately 91 hours of work results in an hourly payment of over $720 per hour.  (TR. 918:1-8 (Cubria)).

105.    According to a survey used by Edgewater in 1996, the fair market hourly rate for a physician's services under a hospital contract was between $100 and $150 per hour.  (DX 222).

106.    Neither Rogan nor anyone else at Edgewater inquired of Cubria whether he was actually spending 600 hours per year reading EKGs pursuant to the contract.  (TR. 918:14-17 (Cubria); 428:17-20 (Ehmen)).

107.    Cubria's EKG reading contract was renewed every year that he was at Edgewater, and remained in place from 1994-2000.  (TR. 918:18-20 (Cubria)).

108.    Edgewater created a code called Cubria SP to track the number of Spanish-speaking patients that Cubria admitted.  The admissions under this and other programs were recorded on a Physician Statistics Report that was distributed monthly to Rogan. (DX 286; TR. 919:16-25, 920:1-25, 921:1-17 (Cubria); 228:3-12 (Rogan); 683:14-25, 684:1-25, 685:1-17 (Gotbaum)).

109.    Cubria frequently spoke with Rogan about the various codes on the Physician Statistics Report, particularly pointing out the admissions under several of the codes: Cubria SP, Cubria Andrew H, Barnabas/Cubria SP, Ojea/Cubria SP, and Tandeter/Cubria SP.  Cubria and Rogan spoke about the admissions charted under these codes for the purpose of expanding Cubria's Hispanic Program.  (TR. 922:1-25, 923:1-25, 924:1-4 (Cubria);  DX 286, Bates nos. 25304, 25334, 25361).

24

110.     Rogan and Cubria also spoke about the Barnabas/Cubria RKO code, and in those conversations, Rogan indicated that he knew the patients referred under this code were coming via Rao from Dr. Kumar's South Side Clinic.  (TR. 998:4-25, 999:1-3 (Cubria); 477-478 (Ehmen)).

111.     In 1995, Cubria was thinking about moving his patients from Edgewater to Illinois Masonic Hospital, in part because Edgewater was in poor physical condition.  Though the cath lab had been replaced, the replacement cath lab was broken-down and was rumored to be a previously-used piece of equipment that was utilized to train technicians how to fix broken machinery.  The newer cath lab malfunctioned frequently.  (TR. 924:5-25, 925:1-25, 926:1-17 (Cubria);  429-430 (Ehmen)).  Rogan agreed to replace the cath lab.  (TR. 927:3-9 (Cubria)).

112.     Cubria frequently threatened to move his patients away from Edgewater.  Rogan and Ehmen frequently discussed ways to retain Cubria's patients.  (TR. 430:7-25 (Ehmen)).

113.     In an effort to persuade Cubria to keep his practice at Edgewater, Rogan agreed that Edgewater would loan Cubria $84,000 for the purpose of Cubria hiring a Spanish-speaking cardiologist named Dr. Juan Diaz to join Cubria's practice.  (TR. 432:9-12 (Ehmen)).

114.     Cubria negotiated the terms of the loan directly with Rogan.  Ehmen was not involved in the discussions between Cubria and Rogan regarding loans.  (TR. 432: 9-12 (Ehmen)).  The terms of the loan required Cubria to hire Diaz by April 27, 1996.  (JX 12A; TR. 927: 10-25, 928:1-25, 929:1-25 (Cubria)).

115.     Despite the requirement, Cubria never hired Dr. Diaz, or any other Spanish-speaking cardiologist.  Cubria continued to receive payments under the loan despite being technically in default because he had not hired Dr. Diaz.  (GX 34A, Bates no. 12957; TR. 930:1-25, 931:1-11 (Cubria)).

25

116.     Though installments under the loan were briefly and temporarily suspended for approximately one month in June of 1996, the installments continued in their full amount. Cubria did not repay the principal and interest in a lump sum by March 31, 1997, as required by the promissory note. (JX 12A; TR. 931:12-25, 932:1-25, 933:1-19 (Cubria)).

117.     In addition to the $84,000 loan, in 1996, Rogan authorized and signed two additional contracts designed to offset the salary of Dr. Goldstein – the cardiologist who eventually joined Cubria's practice. Cubria and Rogan signed both a teaching contract and a medical directorship contract that combined for an annual payment of $72,000. (JX 13A; JX 13B; TR. 933: 23-25, 923:1-25, 935:1-12 (Cubria)). Cubria continued receiving loan payments during the terms of these two additional contracts. (GX 34A; TR. 936:10-25, 937:1-25, 938:1-12 (Cubria)).

118.     Cubria and Rogan discussed that the contracts would ensure that Cubria and Goldstein's patients would remain at Edgewater. (TR. 935:13-25 (Cubria)). Cubria and Dr. Goldstein did not perform all of the duties required under the medical directorship contract. (TR. 940:6-11 (Cubria)).

119.     The compensation in the directorship contract exceeded fair market value. (TR. 437:21-25, 438:1-25 (Ehmen)). The payment under the dual set of contracts also exceeded the comparable salaries paid to other people at Edgewater holding similar dual responsibilities. (TR. 441:10-22 (Ehmen)). The agreements were renewed in 1997 for the same amount of payment, with Rogan's approval. (JX 13C; JX 16; TR. 987-989 (Cubria); 442:18-25 (Ehmen)).

120.     In addition to the earlier $84,000 loan, Rogan arranged for and authorized another loan to Cubria in the amount of $150,000 in April 1997. This loan was designed to offset Cubria's attorney's fees relating to Cubria's divorce, as well as Cubria's tax obligations. (GX 10B; TR.

26

940:12-21 (Cubria)). Sometime thereafter, Cubria and Rogan discussed repayment of both the earlier loan and the $150,000 loan. Rogan told Cubria that Cubria should pay back approximately half of the total amount. (TR. 943:19-25, 944:1-10 (Cubria)).

121. In order to assist Cubria in paying back half of the total amount that he had been loaned, Rogan agreed to pay Cubria $80,000 in connection with a feasibility study for a Spanish Institute of Cardiology. Rogan did not inquire of Cubria the number of hours that the project would take, nor did Rogan insist on any type of written contract to govern the transfer of funds. (TR. 947:17-25, 948:1-22 (Cubria)). Rogan did not even expect Cubria to perform all the work on the project. (TR. 155:6-12 (Rogan)).

122. One of the primary purposes of the feasibility study was to determine if Edgewater should pay for additional television advertising of Cubria's practice. Before 1997, Edgewater had previously paid for television advertisements that benefitted Cubria's practice, and Cubria wanted Edgewater to pay for more of the same. (TR. 946:8-19, 949:17-20 (Cubria)). Ehmen was not involved in negotiating the terms of Cubria's payment for the feasibility study. (TR. 446:13-21 (Ehmen)).

123. The vast bulk of work associated with the feasibility study was done by an Edgewater employee named Mary Wilbur and not by Cubria. Before 1997, Cubria had never performed a feasibility study in his entire career, nor did he manage the business aspects of even his own practice. (TR. 950:4-14, 952-956, 964-968, 969:21-25 (Cubria) 447:13-25, 448:1-25, 449:1-25, 450:1-14, 453:1-6 (Ehmen); DX 51; DX 53A; DX 53B; DX 53C; DX 53D). Rogan admits to having seen a number of drafts of the feasibility study, and those drafts reflect the substantial work done by Wilbur and Ehmen. (TR. 155:2-13 (Rogan); 448-450 (Ehmen); 965-968, 969:21-23 (Cubria); DX 53A-D).

124.    Cubria was issued the first payment for the feasibility study in the amount of $50,000 on June 13, 1997, despite having done nowhere near $50,000 worth of work on the project. (GX 34A, Bates no. 13139; TR. 958:1-8 (Cubria)). Rogan authorized and approved the payment, and another payment of $30,000, despite never inquiring of Cubria how many hours of work had gone into the project. (TR. 964:14-19 (Cubria); GX 34A, Bates no. 13164).

125.    Rogan signed and authorized an exclusive option agreement to purchase Cubria's practice in July of 1997, paying $60,000 for the option. (GX 10C). The option was executed after Rogan had been informed by his attorneys that it would be legal for the hospital to pay for advertising for a physician employed by the hospital, and after Rogan told Cubria that Cubria's proposed television advertising program would be easier to justify if Edgewater purchased Cubria's practice. (TR. 163:22-25, 164:1-9 (Rogan); 975:22-25, 976:1-25; 977:1-21 (Cubria)). Edgewater ultimately did not purchase Cubria's practice. Rogan advised Cubria, on approximately November 20, 1997, not to sell his practice because the California group that was involved with the hospital would require detailed accountings of time in ways that Cubria was not accustomed to. (TR. 977:22-25; 978:1-25 (Cubria); JX 42, Bates no. RCI006297). Later, in 2000, Rogan arranged to pay Cubria $5,000, again ostensibly in connection with the possible purchase of Cubria's practice. Cubria was never asked to pay this $5,000 back. (TR. 1038:5-17 (Cubria); GX 10D).

126.    Despite not purchasing Cubria's practice, Rogan still approved and authorized a television advertising program designed to market Cubria and Cubria's practice. (TR. 444:11-25 (Ehmen)). Cubria discussed with both Rogan and Rogan's attorney, John Tatooles, that Cubria would move his patients to a different hospital if the television advertising program was not implemented. (TR. 979-982 (Cubria)).

28

127.    Many of the television commercials featured Cubria's name and face prominently, and were designed to market Cubria's practice; some of the commercials featured specialties other than cardiology.  (GX 24; TR. 462-463 (Ehmen)).  Initially, the commercials featuring Cubria directed viewers to Cubria's own office telephone number.  (TR. 983:1-9 (Cubria)).  The commercials ran on television stations.  (TR. 983:17-25 (Cubria); 463:24-25, 464: 1-2 (Ehmen)).

128.    Later, the advertised telephone number was changed to a central Edgewater telephone, at which callers would be directed to Cubria's office for cardiac consults.  At times when the Edgewater telephone operator was not in the office, the calls would be transferred directly to Cubria's office.  (TR. 980-981, 984:13-24 (Cubria)).

129.    Cubria benefitted from the television advertising – the commercials were paid for by Edgewater at no cost to Cubria, and they increased the number of patients in Cubria's practice for which he could bill.  Cubria was the only cardiologist who received referrals from the program.  (TR. 985:4-12 (Cubria)).

130.    Rogan and Edgewater also benefitted from the arrangement; Cubria informed Rogan that the commercials were a prerequisite for Cubria keeping his patients at Edgewater.  Cubria also informed Rogan that if the patients referred as a result of television advertising needed hospitalization, they would be sent to Edgewater.  (TR. 986:1-25 (Cubria)).

131.    After Dr. Goldstein left Cubria's practice, Edgewater hired a head hunter company to find a replacement cardiologist for Cubria's practice.  Cubria never paid any money for the head hunter service.  (TR. 1023:15-25, 1024:1-25, 1025:1 (Cubria)).

132.    After Cubria's teaching and medical directorship contracts were terminated in approximately January of 1998 (upon Dr. Goldstein's departure), Rogan authorized and signed a

29

cardiac rehabilitation contract for Cubria. The contract was effective February 1, 1998 and provided for compensation in the amount of $48,000 per year. (JX 13D).

133. Though the contract required 20 hours of work per month, Cubria worked only four or five hours per month on the duties outlined in the contract. (TR. 1025-1026 (Cubria)). Rogan was aware that Cubria was not performing all of the duties or fulfilling the hours requirement under the contract. (TR. 1030:2-12 (Cubria)). The contract was not terminated, in part because of Cubria's value to the hospital in terms of patient admissions. (TR. 1030:13-17 (Cubria); 476:6-17 (Ehmen)).

134. Cubria's compensation under the cardiac rehabilitation contract was greater than fair market value even presuming that all of the duties were performed. (TR. 475:17-25, 476:1-5 (Ehmen)). Before entering into the contract, Cubria threatened to leave the institution. Rogan was aware of the threat. (TR. 474:10-25, 475:1-4 (Ehmen)).

135. In 1997 and 1998, Cubria was also paid by Edgewater for work at a Chicago Housing Authority clinic, and Cubria received payments for hours that he never worked. (TR. 1031-1034 (Cubria)).

136. Despite a loan repayment plan that resulted in monthly deductions from Cubria's paychecks, Rogan on one occasion authorized suspensions of the repayment so that Cubria could travel on a family vacation. (TR. 1035-1037 (Cubria); GX 34A, Bates no. 13221, 13223).

137. Cubria and Rogan negotiated and signed a medical consulting contract effective August 1, 1999, under which Cubria received total compensation of $84,000. (GX 33; TR. 1007: 15-25; 1008:1-25 (Cubria)). Ehmen played no role in the negotiation of the consulting contract. (TR. 480:19-25, 481:1 (Ehmen)). The contract was extended to July 31, 2002.

30

138.    As part of his work under the consulting contract, Cubria was instructed by Rogan to pressure various physicians to keep their patients at Edgewater rather than other hospitals. Rogan instructed Cubria to inquire of Dr. Ojea why Dr. Ojea transferred a cardiac patient away from Edgewater. Rogan communicated to Cubria that Rogan was dissatisfied that Dr. Ojea had transferred a patient from Edgewater because Dr. Ojea had a contract with Edgewater. (TR. 1010-1012 (Cubria)).

139.    Similarly, Cubria's duties under his consulting contract included speaking with Dr. Tandeter about Dr. Tandeter's decision to send Chicago Housing Authority patients to St. Joseph's hospital rather than Edgewater. (TR. 1013:6-25, 1014:1-19, 1019:4-25, 1020:1-13 (Cubria)).

140.    Cubria did not perform $60,000 worth of work under the consulting contract, as required by the extension to the contract. Rogan received Cubria's time-sheets for work under the contract, and consequently knew that the work actually performed was not worth $60,000. Rogan never asked Cubria to repay any of the compensation. (TR. 1022:16-24 (Cubria)).

141.    Cubria always communicated about financial issues with Rogan, even after Skvarek became CEO of Edgewater. (TR. 1023:9-14 (Cubria)).

142.    After Cubria learned that he was under investigation by the FBI, Cubria requested additional money from Rogan to help cover legal fees. Rogan transferred $9,800 to Dr. Lopez, who in turn gave the money to Cubria. (TR.1046-1047 (Cubria); 190:23-25, 191:1-5 (Rogan)).

## FALSE CLAIMS

143.    Henry Zeisel served as Edgewater's controller between 1994 and 1997. (TR. 1175:22-24 (Zeisel)). Zeisel was elevated to the position of Vice President of Finance at Edgewater in 1997. (TR. 1183:3-8 (Zeisel)). Zeisel assumed the title of Senior Vice President of Finance and Chief

31

Financial Officer at Edgewater in 1998, and remained in that position until he left Edgewater in 2001. (TR. 1184:3-11 (Zeisel)).

144.    Rogan was Zeisel's direct supervisor at all times.   (TR. 1179:11-23, 1183:1-20, 1185:21-25, 1186:1-5, 13-19 (Zeisel)).  Zeisel reported directly to Rogan on all financial matters from 1994 through at least 2000.  (Id.).

145.    Rogan delegated to Zeisel the task of assembling the Hospital's Medicare cost reports and Medicaid statements of cost between 1995 and 1999.  (TR. 1194:16-24, 1199:1-9, 1200:2-9 (Zeisel)).

146.    Zeisel briefed Rogan on Medicare cost reports before they were filed.  Rogan was familiar with the issues and information that drove reimbursement on Medicare cost reports.  (TR. at 1197:16-25, 1198:1-13 (Zeisel)).  Medicare would correspond directly with Rogan notifying him of the due date for submission of the cost report.  (TR. 1198:2-5 (Zeisel)).

147.    Each of the cost reports that Edgewater Medical Center filed between 1995 and 1999 contained a certification page which included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.  Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

(DX 254-256, 258-259; Jt. St. Uncontested Facts, ¶¶ 42-43).

148.    Each of the Medicare cost reports that Edgewater Medical center filed between 1995 and 1999 required an official of the hospital to certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and

> records of the provider in accordance with applicable instructions, except as noted.
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.
> (Id.)

149.    Rogan delegated to Zeisel the task of signing the hospital's Medicare cost reports and Medicaid statements of cost for the years ending in 1996, 1997, 1998, and 1999. (TR. 1198:14-25, 1199:1-5 (Zeisel)).

150.    Rogan was familiar with the Stark and Anti-kickback Statutes during his tenure at Edgewater hospital. (TR. 1416:16-24 (Rogan)). Rogan understood these statutes to prohibit the hospital from paying physicians money for referrals. (TR. 1416:19-21 (Rogan)).

151.    From January 1, 1995 through December 31, 2000, Rogan was aware that Edgewater had financial relationships with physicians that violated the Stark statute. Rogan was also aware that, between January 1, 1995, and December 31, 2000, Edgewater was paying kickbacks to physicians in exchange for patient referrals, which violates the Anti-kickback statute.

152.    Rogan never told Zeisel at any time that Rogan had directed the hospital to pay kickbacks to physicians in exchange for patient referrals. (TR. 1202:19-22, 1204:14-22, 1207:3-6, 1209:5-8, 1210:23-25, 1211:1 (Zeisel)). Rogan never told Zeisel at any time that Rogan had caused the hospital to enter into relationships with physicians that did not meet any exceptions under the Stark Statute. (TR. 1203:1-4, 1205:2-5, 1207:11-16, 1209:13-16, 1211:5-7 (Zeisel)).

153.    Zeisel would not have signed Edgewater's Medicare cost reports or its Medicaid statements of cost for the years 1996-1999 if Rogan had apprised him of these facts. (TR. 1203:7-9, 1205:10-12, 1207:17-19, 1209:19-21, 1214:1-17 (Zeisel)).

154.    Ken Huff served as the Senior Vice President of Finance at Edgewater in 1995. Huff reported to Rogan, and Rogan delegated to Huff the responsibility for signing Edgewater's Medicare cost report and Medicaid statement of cost for the year ending in 1995. (TR. 1198:18-25 (Zeisel)).

155.    Had Zeisel been aware of the fact that Edgewater was in violation of the Stark and Anti-kickback statutes in 1995, he would have informed Huff of those facts. (TR. 1211:11-13 (Zeisel)).

156.    Between 1995 and 2000, Edgewater submitted 1,812 claims for payment to the Medicare on behalf of services associated with medical procedures in which Cubria, Barnabas, or both were either the admitting physician, the operating physician, or both. (GX 7).

157.    Nancy Bryson was the hospital employee responsible for submitting Edgewater's electronic claims to Medicare for reimbursement, including the 1,812 claims noted above. Bryson reported to Rogan. (TR. 719:1-10 (Bryson)).

158.    Rogan was aware that Edgewater was submitting claims for reimbursement to the Medicare program on behalf of services associated with medical procedures performed by Cubria and/or Barnabas. (DX 286; TR. 89:9-19, 216:10-25, 217:9-17 (Rogan)). Rogan was aware that Edgewater was paying kickbacks to these physicians at the time the 1,812 claims were submitted, and was also aware that the hospital had financial relationships with these physicians that violated the Stark statute at the time these 1,812 claims were submitted.

## ROGAN'S EFFORTS TO OBSTRUCT INVESTIGATIONS INTO HIS CONDUCT

**A**.    **Rogan's Concealment of his Fraudulent Conduct at Edgewater**

159.    In January of 1999, agents from the FBI visited Roger Ehmen's home. (TR. 491:19-24 (Ehmen)). Rogan spoke with Ehmen that evening, and told Ehmen not to talk to the FBI without

first talking to an attorney. (TR. 492:1-12 (Ehmen)). Edgewater and/or Braddock retained the Jones, Day law firm to represent Ehmen in connection with the investigation. (TR. 492:14-23 (Ehmen)).

160. Sometime thereafter, Rogan asked Ehmen to destroy Ehmen's copy of Ehmen's 1997 Employment Agreement, which contained an incentive clause conditioning Ehmen's bonus payments on the hospital's admissions volume. (TR. 491:3-15 (Ehmen)).

161. In 2000, Rogan was aware that at least one physician at Edgewater had worn a recording device as a part of the government's investigation. (TR. 273:12-14 (Rogan)).

162. In June 2000, Rogan, Ehmen, and Ben Armstrong, an employee of Grant Hospital, met at Chicago's Ritz-Carlton hotel for a business meeting over lunch. (TR. 493:12-25 (Ehmen); 494:1-6 (Rogan)). After Armstrong left, Rogan invited Ehmen to take a steam bath with him. (TR. 494:7-11 (Rogan)).

163. Rogan watched Ehmen disrobe in order to ascertain whether Ehmen was wearing a recording device. (TR. 495:1-7 (Ehmen)).

164. During the steam bath, Rogan discussed a novel that he had purportedly read in which the lead character fell into a difficult situation, and "for the best interest of the organization had to assume responsibility for some trouble that was coming on the organization." (TR. 495:19-25, 496:1-8 (Ehmen)). Rogan's intent in relaying this story was to induce Ehmen to assume full responsibility for the fraudulent conduct that Rogan directed Ehmen to undertake at Edgewater. Before the steam bath was over, Rogan explicitly said that he would take care of Ehmen and Ehmen's family forever if Ehmen would refuse to implicate Rogan in the fraud that took place at Edgewater. (TR. 497:1-6 (Ehmen)).

35

165.    In 2001, Rogan met with Ehmen on numerous occasions to discuss the investigation with Ehmen.  In these meetings, Rogan would conduct an innocuous surface oral conversation with Ehmen, discussing the weather, sports, or other matters, while writing Ehmen notes about the government investigation.  The notes conveyed the message that Ehmen and his family would be taken care of forever if Ehmen would refuse to implicate Rogan.  In one written message, Rogan said that Rogan could not take care of Ehmen's family while Ehmen was incarcerated, because of the appearance of impropriety, but could address those issues upon Ehmen's release.  (TR. 498:16-25, 499:1-23 (Ehmen)).

166.    Rogan always took back the notes that he wrote Ehmen at these meetings.  Rogan directed Ehmen not to discuss these notes with Ehmen's attorneys.  (TR. 499:25, 500:1-5 (Ehmen)).

167.    At their last meeting, which occurred shortly before Ehmen's May 2001, indictment, Rogan passed Ehmen notes in the same manner described above.  These notes directed Ehmen to describe himself to the government as a "loose cannon" or "renegade employee," and to reiterate that Rogan had no knowledge of Ehmen's illegal conduct at Edgewater.  (TR. 500:15-25, 501:9-16 (Ehmen)).

168.    In December 2000, Rogan called Cubria to Rogan's office.  (TR. 1039:2-7 (Cubria)).  At this meeting, Rogan carried on an oral conversation with Cubria about innocuous topics, while writing him unrelated notes on a notepad.  The first note Rogan wrote said that Cubria needed to hire a criminal lawyer. (TR. 1039:9-25, 1040:1-7 (Cubria)).

169.    After receiving the first note, Cubria orally asked Rogan "What are you talking about?" (TR. 1040:8-15 (Cubria)).  Rogan put his finger to his lips to urge Cubria to be quiet, and

then pointed around the office, indicating a concern that there might have been recording devices present. (TR. 1040:16-20 (Cubria)).

170.    Rogan passed several other notes to Cubria at the December 2000, meeting in the same manner.  One of the notes informed Cubria that both Cubria and the hospital were being investigated by the authorities. (TR. 1042:1-5 (Cubria)).  Another of Rogan's notes directed Cubria to destroy his computer.  (TR. 1042:13-14 (Cubria)).  A final note urged Cubria not to disclose Rogan's advice and conduct at this meeting with anyone, including Cubria's lawyer, because Rogan's conduct could be construed as obstruction of justice.  (TR. 1042:18-23 (Cubria)).

171.    After the meeting was over, Cubria and Rogan left the office together.  Rogan destroyed the notes that he had passed Cubria by placing them in the shredder located behind Rogan's secretary's work station. (TR. 1044:1-4 (Cubria); TR. 701:6-19 (Roe-McDonald)).

172.    Ehmen and Cubria never discussed Rogan's conduct with respect to the passing of these notes with each other.  (TR. 501:17-19 (Ehmen); TR. 1044:5-9 (Cubria)).

173.    Rogan denied passing notes to Cubria and Ehmen in the manner described above. His testimony is flatly contradicted by the testimony of Cubria and Ehmen, who describe Rogan's conduct in remarkably similar ways despite having never discussed that conduct with each other. Rogan's testimony with respect to these notes is not credible.

**B**.    **Rogan's Concealment of his Financial Relationships with Edgewater and Braddock**

174.    On June 11, 1996, Edgewater's auditors, Ernst and Young, sent Rogan a letter requesting information on Edgewater's relationship with Braddock.  (GX A3).  The letter asked Rogan to provide written representation of, among other things, Braddock's "ultimate ownership." (GX A3; TR. 253:9-25, 254:1-24 (Rogan)).

37

175.     In a July 9, 1996 letter responding to Ernst and Young's query, Rogan represented that "no officer, director or employee of Permian, Vista, or Northside or related entity has any ownership, control, or financial interest in Primus, Braddock, or any entity related to Primus or Braddock." (GX A4).  In a separate letter sent on July 22, 1996, Rogan represented that information concerning Braddock's ultimate ownership/beneficial interest was "not available." (GX A5).

176.     Rogan was the Chief Executive Officer of Northside (d/b/a/ Edgewater) at the time he represented that no "officer" of Northside had any ownership interest in Braddock.  (GX A4). A partnership that Rogan owned and controlled, Boulevard Management, L.P., owned 99% of Braddock at the time of the letter.  (GX A6; TR. 263:5-25, 264:1-24 (Rogan)).

177.     Hence, Rogan was not truthful when he represented to Edgewater's auditors that no "officer" of Northside had any ownership interest in Braddock – in fact, the Chief Executive Officer of Northside had a 99% ownership interest in Braddock.  Nor was Rogan truthful when he represented to Edgewater's auditors that information concerning the ownership of Braddock was "not available."

178.     Rogan intentionally misled Edgewater's auditors in order to conceal the extent to which his personal financial fortunes were intertwined with those of Edgewater.  (GX A4; GX A5).

179.     In 2000, Rogan was aware that Edgewater had received several grand jury subpoenas pursuant to an ongoing federal investigation of Edgewater.  (TR. 281:1-3 (Rogan)).  Rogan was aware that the subpoenas sought, among other things, information relating to Rogan's compensation from Edgewater.  (TR. 282:4-14 (Rogan)).

180.     On August 10, 2000, after receiving these subpoenas, Rogan had a document destruction service destroy twenty boxes of documents taken from Braddock's offices. (TR. 282:15-

20, 283:3-7 (Rogan)). Rogan cannot recall whether documents and materials relating to Braddock's finances were among the documents destroyed at this time. (TR. 285:13-25, 286:1-19 (Rogan)).

181.    Through: (1) urging Ehmen to accept full responsibility for criminal conduct at Edgewater; (2) promising to take care of Ehmen and his family if Ehmen would not implicate Rogan; (3) urging Ehmen to destroy documents and Cubria to destroy his computer; and (4) ordering the destruction of documents at his office in Indiana in August of 2000, Rogan hoped to obstruct the government's investigation into Rogan's misconduct. Rogan's actions with respect to the government's investigation are evidence of his involvement in illegal activity at Edgewater.

## CRIMINAL CONVICTIONS ARISING OUT OF ACTIVITIES AT EDGEWATER

182.    On May 17, 2001, a federal grand jury indicted Bainbridge Management, L.P. (f/k/a/ Braddock), Ehmen, Barnabas, Kumar, and Rao for, among other things, "devising and participating in a scheme to defraud health care providers and to obtain money and property by means of false and fraudulent pretenses and to deprive certain individuals of the intangible right of the defendant's honest services in violation of 18 U.S.C. §§ 1341 and 1347." *United States v. Bainbridge Management, et al.,* No. 01 CR 469, (N.D. Ill.). (Jt. St. Uncontested Facts, ¶ 28).

183.    On October 4, 2001, the United States filed a superseding indictment against Bainbridge and added Cubria as a defendant. (Jt. St. Uncontested Facts, ¶ 34).

184.    On May 24, 2001, Rao pled guilty to Count 57 of the indictment concerning racketeering pursuant to 18 U.S.C. § 1962. (Jt. St. Uncontested Facts, ¶ 30). On May 24, 2001, Kumar pled guilty to Counts One and Nine of the indictment concerning the acceptance of kickback payments for the admission of patients, and the submission of false claims to Medicare and Medicaid. (Jt. St. Uncontested Facts, ¶ 29).

39

185.    On October 1, 2001, Ehmen and Barnabas pled guilty to Count 57 of the indictment concerning racketeering pursuant to 18 U.S.C. § 1962.  (Jt. St. Uncontested Facts, ¶ 31).

186.    On November 28, 2001, Ehmen was sentenced to 78 months of incarceration.  On the same day,  Barnabas was sentenced to 52 months of incarceration.  (Jt. St. Uncontested Facts, ¶ 33).

187.    On February 8, 2002, Cubria pled guilty to Count 57 of the indictment concerning racketeering pursuant to 18 U.S.C. § 1962.  Cubria was sentenced to 151 months of incarceration. (Jt. St. Uncontested Facts, ¶ 35).

188.    On January 15, 2003, Braddock Management L.P. pled guilty to Count 1 of the Second Superseding Information concerning health care fraud, pursuant to 18 U.S.C. § 1347, and was ordered to pay $2.9 million in restitution. (Jt. St. Uncontested Facts, ¶ 36).

## SUMMARY

189.    Based on the above, it is clear that Rogan directly negotiated the payment of kickbacks to physicians in return for patient referrals to Edgewater, instructed Ehmen to do the same, and directed that Edgewater employees file claims for payment with the Medicare and Medicaid programs for services provided to patients referred to Edgewater as part of the kickback scheme. Rogan profited from this scheme because both he and entities he owned and controlled received payments based in part on Edgewater's admissions and revenue.

## DAMAGES

190.    Nancy Bryson was in charge of information systems for Edgewater Hospital and remained so until May 2002.  While in charge of information systems, she reported to Peter Rogan. (TR. 719:1-10 (Bryson)).

191.    Edgewater's information systems department maintained claim records for the hospital, and the records were inputted by a hospital employee who had a duty to do so.  The claim records were made and kept by the hospital in the ordinary course of business.  (TR. 731:7-25 (Bryson)).

192.    Edgewater assigned specific numeric codes to physicians on staff at the hospital.  Drs. Barnabas and Cubria had multiple codes assigned to them, reflecting different programs and referral sources.  (TR. 722:24-25, 723:1-5 (Bryson); 838:18-24, (Barnabas); 922:11-18 (Cubria); DX 286, Bates nos. 25300, 25334).

193.    Edgewater tracked patients by attending physician using these physician codes.  (TR. 722:21-25, 723:1-5, 723:23-35, 724:1-11 (Bryson); DX 286).

194.    Edgewater treated Medicare and Medicaid patients, and sought and obtained reimbursement from the Medicare and Illinois Medicaid programs.  (TR. 735:9-24, 736:1-9 (Bryson); GX 13; GX 7, 7D; DX 254; DX 255; DX 256; DX 258; DX 259; JX 43).

195.    Since 1991, claims information for hospital in-patient claims has been submitted to the Medicare program electronically.  (TR. 1122:1-15 (Thomas)).

196.    Edgewater electronically submitted individual patient claims to the Medicare program in the form of UB-92s.  The UB-92s identified Edgewater by its provider number, and identified the attending and operating physician by the physicians's UPIN.  (TR. 735:15-25, 736:1-9 (Bryson); GX 7) .

197.    Edgewater's provider number was 14-0087.  (GX 7A, DX 254; DX 255; DX 256; DX 258; DX 259; TR. 1201:23-25, 1202:1-3 (Zeisel)).

198.    Dr. Barnabas's UPIN was C44050.  (DX 88; GX 7A).

41

199.    Dr. Cubria's UPIN was C39460.  (DX 63A; GX 7A).

200.    The Medicare program received electronic claims from Edgewater and paid Edgewater in response to those claims.  (TR. 735:23-35, 736:1-9 (Bryson); GX 7).

201.    The Medicare program maintains those electronic claims in the National Claims History, the agency's official repository of adjudicated claims.  (TR. 1122:1-8, 1123:1-16 (Thomas)).

202.    GX 7 contains all electronic claims submitted by Edgewater for in-patients whose attending and/or operating physician was Dr. Barnabas and/or Dr. Cubria between 1995-2000.  (GX 7; TR. 1123:24-25, 1124:1-11 (Thomas); TR. 1129:7-11, 17-25, 1130:1, 1137:1-13; 1145:4-25 (Steck); TR. 1159:12-20, 1160:3-8 (evidentiary ruling by the Court)).

203.    In 1995, Edgewater submitted 104 UB-92s for patients where Dr. Barnabas was identified as either the attending or operating physician, and received $792,646 from Medicare in reimbursement for those patients.  (GX 7D; GX 7).

204.    In 1996, Edgewater submitted 131 UB-92s for patients where Dr. Barnabas was identified as either the attending or operating physician, and received $1,054,823 from Medicare in reimbursement for those patients.  (GX 7D; GX 7).

205.    In 1997, Edgewater submitted 172 UB-92s for patients where Dr. Barnabas was identified as either the attending or operating physician, and received $1,213,603 from Medicare in reimbursement for those patients.  (GX 7D; GX 7).

206.    In 1998, Edgewater submitted 115 UB-92s for patients where Dr. Barnabas was identified as either the attending or operating physician, and received $606,473 from Medicare in reimbursement for those patients.  (GX 7D; GX 7).

207.     Between 1995 and 1998, Edgewater submitted a total of 522 UB-92s for patients where Dr. Barnabas was identified as either the attending or operating physician, and received $3,667,545 from Medicare in reimbursement for those patients.  (GX 7D; GX 7)

208.     In 1995, Edgewater submitted 201 UB-92s for patients where Dr. Cubria was identified as either the attending or operating physician, and received $1,369,921 from Medicare in reimbursement for those patients.  (GX 7D; GX 7).

209.     In 1996, Edgewater submitted 175 UB-92s for patients where Dr. Cubria was identified as either the attending or operating physician, and received $1,550,090 from Medicare in reimbursement for those patients.  (GX 7D; GX 7).

210.     In 1997, Edgewater submitted 174 UB-92s for patients where Dr. Cubria was identified as either the attending or operating physician, and received $1,382.143 from Medicare in reimbursement for those patients.  (GX 7D; GX 7).

211.     In 1998, Edgewater submitted 242 UB-92s for patients where Dr. Cubria was identified as either the attending or operating physician, and received $2,121,776 from Medicare in reimbursement for those patients.  (GX 7D; GX 7).

212.     In 1999, Edgewater submitted 228 UB-92s for patients where Dr. Cubria was identified as either the attending or operating physician, and received $2,164,968 from Medicare in reimbursement for those patients.  (GX 7D; GX 7).  Those figures include payment for one claim in the amount of $7,599 that is attributed to Barnabas on GX 7D, because Cubria was the operating physician for that procedure.  (GX 7B).

213.    In 2000, Edgewater submitted 270 UB-92s for patients where Dr. Cubria was identified as either the attending or operating physician, and received $2,373,678 from Medicare in reimbursement for those patients. (GX 7D; GX 7).

214.    Between 1995-2000, Edgewater submitted a total of 1,290 UB-92s for patients where Dr. Cubria was identified as either the attending or operating physician, and received $10,962,575 from Medicare in reimbursement for those patients. (GX 7D; GX 7). Those figures include payment for one claim in 1999 in the amount of $7,599 that is attributed to Barnabas on GX 7D, because Cubria was the operating physician for that procedure. (GX 7B; GX 7).

215.    Between 1995 and 2000, Edgewater submitted five cost reports to the Medicare program. (DX 254; DX 255; DX 256; DX 258; DX 259).

216.    Between January 1, 1995 and September 29, 1999, Edgewater submitted 974 claims where Dr. Cubria was the attending or operating physician, and 523 claims where Dr. Barnabas was the attending or operating physician. (GX 7). Edgewater also submitted four cost reports to the Medicare program between January 1, 1995 and September 29, 1999. (DX 254, 255, 256, 258).

217.    Between September 30, 1999 and December 31, 2000, Edgewater submitted 316 claims where Dr. Cubria was the attending or operating physician. (GX 7). Edgewater also submitted one cost report to the Medicare program in this time frame. (DX 259).

218.    Between January 1, 1995 and December 31, 2000, Edgewater submitted a total of 1,812 UB-92 claims forms on which Dr. Cubria or Dr. Barnabas served as either the attending or operating physician. Edgewater received a total of $14,630,120 in reimbursement from the Medicare program for those claims.

44

219.    Edgewater also submitted claims to and received reimbursement from the Medicaid program for patients treated at Edgewater by Drs. Barnabas and Cubria.  (GX 9; GX 13; JX 43; TR. 722:4-23 (Bryson)).

220.    Edgewater's computer system could track the amount of Medicare and Medicaid payments made to Edgewater for patients treated by Drs. Barnabas and Cubria, using Edgewater's internal physician codes.  (TR. 722:4-23 (Bryson); GX 9: GX 13).

221.    In 1995, Edgewater received $136,110 in reimbursement from Medicaid for patients treated by Dr. Barnabas at Edgewater.  (GX 9; GX 13).[1]

222.    In 1996, Edgewater received $96,793 in reimbursement from Medicaid for patients treated by Dr. Barnabas at Edgewater.  (GX 9; GX 13).

223.    In 1997, Edgewater received $145,443 in reimbursement from Medicaid for patients treated by Dr. Barnabas at Edgewater.  (GX 9; GX 13).

224.    In 1998, Edgewater received $223,968 in reimbursement from Medicaid for patients treated by Dr. Barnabas at Edgewater.  (GX 9; GX 13).

225.    Between 1995-1998, Edgewater received a total of $602,314 from Medicaid in reimbursement for  patients treated by Dr. Barnabas.  (GX 9; GX 13).

226.    In 1995, Edgewater received $1,185,722 in reimbursement from Medicaid for patients treated by Dr. Cubria at Edgewater.  (GX 9; GX 13).

----

[1]To ensure that Medicaid damages are not double-counted, payments made by Medicaid that are attributable to an Edgewater program that features the name of both Barnabas and Cubria are attributed here to the physician whose name appears first in the program title.  Payments made after 1998 to a program that features the name of both Barnabas and Cubria are attributed to Cubria.

227.    In 1996, Edgewater received $471,513 in reimbursement from Medicaid for patients treated by Dr. Cubria at Edgewater.  (GX 9; GX 13).

228.    In 1997, Edgewater received $448,779 in reimbursement from Medicaid for patients treated by Dr. Cubria at Edgewater.  (GX 9; GX 13).

229.    In 1998, Edgewater received $676,507 in reimbursement from Medicaid for patients treated by Dr. Cubria at Edgewater.  (GX 9; GX 13).

230.    In 1999, Edgewater received $569,199 in reimbursement from Medicaid for patients treated by Dr. Cubria at Edgewater.  (GX 9; GX 13).

231.    In 2000, Edgewater received $515,081 in reimbursement from Medicaid for patients treated by Dr. Cubria at Edgewater.  (GX 9; GX 13).

232.    Between 1995 and 2000, Edgewater received a total of $3,866,801 from Medicaid in reimbursement for patients treated by Dr. Cubria.  (GX 9; GX 13).

233.    Between 1995-2000, Edgewater submitted five cost reports to the Medicaid program. (JX 43). One of those reports (for the year ending 1999) was submitted after September 30, 1999. (JX 43).

234.    Between 1995 and 2000, Edgewater received a total of $4,469,115 in reimbursement from Medicaid for patients treated by Dr. Barnabas or Dr. Cubria.  The United States reimburses the State of Illinois for 50% of Illinois' Medicaid costs. See 42 U.S.C. § 1396d(b).  Therefore, the federal share of the reimbursement Edgewater received from Medicaid for patients treated by Dr. Cubria  or Dr. Cubria is $2,234,557.50.

46

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

PATRICK J. FITZGERALD
UNITED STATES ATTORNEY

    s/Linda A. Wawzenski
by:    Linda A. Wawzenski
       Assistant United States Attorney
       (312) 353-1994

Laurie A. Oberembt
John K. Neal
Michael J. Friedman
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Washington, D.C.  20044

Dated: May 17, 2006                    Counsel for the United States

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following documents:

### NOTICE OF MOTION

were served pursuant to the district court's ECF system as to ECF filers, if any, and were sent by first-class mail on May 17, 2006, to the following non-ECF filers:

Neil E. Holmen                        Joseph Spiegler
Winston & Strawn                      Winston & Strawn
35 West Wacker Dr.                    35 West Wacker Dr.
Chicago, Illinois 60601               Chicago, Illinois 60601


/s Linda A. Wawzenski
LINDA A. WAWZENSKI
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
(312) 353-1994