**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROGAN, | ) | Case No. 02C 3310 |
| | ) | |
| Defendant. | ) | Judge John W. Darrah |
| | ) | |
| | ) | |

**DEFENDANT PETER ROGAN'S PROPOSED FINDINGS OF FACT**

I.      **BACKGROUND**

1.      Peter Rogan ("Rogan") received his college degree from Niagara University. (Rogan - 40:15-17).  He received a master's degree in hospital administration from St. Louis University, and a Ph.D. in hospital and healthcare administration from the University of Iowa. (Rogan - 40:18-23).

2.      Rogan began working for Ernst & Ernst in 1974, where he became a principal. (Rogan - 41:16-17).  Rogan did consulting work for various hospitals in the Chicago area while he was at Ernst, including Northwestern, Children's Memorial, Michael Reese and Edgewater. (Rogan - 44:19-25).

3.      Rogan left Ernst in 1983 to become the CEO of St. Anthony's Hospital in Crown Point, Indiana, which was owned by Catholic nuns.  (Rogan - 45:14-20).

4.      After Rogan left St. Anthony's, he started a company called Interhealth.  (Rogan - 55:14-18).  Interhealth did some work for Edgewater hospital, which was in financial trouble.

(Rogan - 56:8-10; 56:24 - 57:1). Rogan was asked to provide Edgewater with assistance, including regarding its finances. (Rogan - 57:2-5).

## II. EDGEWATER MEDICAL CENTER ("EDGEWATER")

5. Edgewater was a teaching hospital located at 5700 North Ashland, Chicago, Illinois. (DX 139: CB 2045; Rogan - 95:1-2).

6. In 1985, Edgewater did not "enjoy the best of reputations." The administration was in shambles, patient care was inadequate and there was a shortage of nurses. (Barnabas - 765:17-21).

7. In 1988, Rogan gave the board of Edgewater a financing proposal and one of the aspects was that Rogan had the option to buy Edgewater. (Rogan - 57:17-20). Rogan exercised that option in 1989 and bought Edgewater for a million dollars in cash and assumed the stated liabilities. (Rogan - 58:1-8).

8. Rogan created a company named Edgewater Operating Company to purchase the hospital. (Rogan - 58:13-15).

9. Rogan, through Edgewater Operating Company ("EOC") owned Edgewater between 1989 and 1994. During that period he was on the board of directors and became the CEO in 1991. (Rogan - 63:24-25; 60:25- 61:11).

10. At the time Rogan bought the hospital in 1989, Edgewater was run-down, and nothing had been done to improve Edgewater in ten years. (Cubria - 902:22 - 903:3). Other hospitals in the area were much cleaner and more attractive than Edgewater in 1989. (Cubria - 903:12-16).

11. That situation changed after Rogan purchased Edgewater. Between January 1, 1989 through July 1, 1994, "over $10 million [had] been invested in new plant and equipment" for Edgewater. (DX 139: CB 2045). This included the relocation and renovation of the

emergency room, the redecoration of the lobby, renovation of patient rooms and the nursing unit on the fourth floor, construction of a diabetic inpatient unit, improved accessibility of the same day surgery service, new radiology equipment, a new emergency generator, installation of state-of-the-art mammography equipment, a renovation of the seventh floor for oncology and medical/surgical unit, installation of a new linear accelerator, and a new cardiac catheterization lab. (DX 139: CB 2046). Attractive facilities and up-to-date equipment, where physicians find everything they need at their fingertips so they feel comfortable providing health care services at the institution is a major factor in having a profitable hospital. (Ehmen - 296: 7-15).

12.     Edgewater had 335 licensed beds. (DX 139: CB 2012). "As of June 1993, the medical staff consisted of 348 members. Excluding Courtesy Staff members, there were 324 members of the Medical Staff; 205 of whom were the most active admitters. (DX 139: CB 2056). The Limited Offering Memorandum contains statistics of the admissions of the "active admitters" and a distribution by specialty and age. (DX 139: CB 2057-59).

13.     In 1994 Rogan sold Edgewater to an entity called Northside Operating Company ("Northside") (DX 139; Rogan - 95: 12-14).

14.     After becoming the CEO of Edgewater in 1991, Rogan remained the CEO until roughly the fall of 1997. (Rogan - 60:25- 61:11). After the 1994 sale (discussed below), Rogan became an employee of Braddock and was assigned as the CEO of Northside d/b/a/ Edgewater Medical Center, through the fall of 1997. (Rogan - 95:25-96:1).

III.     **SALE OF EDGEWATER**

   A.     **Permian Healthcare, Primus Management and Gross**

15.     Scott Gross ("Gross") obtained a bachelor's degree in biology and a master's degree in public administration with a specialty in health services from the University of Southern California in 1974. (Gross dep. 8:19 - 9:2).

16.     Gross worked for National Medical Enterprises and in 1983 became the president of the hospital group, which owned and operated about 120 hospitals.  He was the senior operating person and was in charge of all the administrative and managing functions of the hospitals in the group.  (Gross dep. 10:1-10).

17.     In 1990 Gross and a partner formed Alpha Hospital Management, a hospital management company.  (Gross dep. 10:13-14).  In 1992, Alpha Hospital Management changed its name to Primus Hospital Management ("Primus")  (Gross dep. 10:16-19).  Gross was the CEO, and at various times worked with seven to eight hospitals.  (Gross dep. 11:1-6).

18.     With some of these seven to eight hospitals Alpha had "total hospital management," which meant that Alpha would be responsible, under the supervision of the boards of directors, to hire and retain the senior management and oversee all operational and financial affairs of the hospital.  (Gross dep. 11:9-20).

19.     Gross was not employed directly by the hospital, but by a separate management company, and the managers of the various departments reported operationally and functionally to Gross, who was also accountable to the boards of directors of the hospitals.  (Gross dep. 11:12-12:7).

20.     When Gross became involved in Edgewater, his company Primus was working with three hospitals, which were all in "turn-around" mode.  (Gross dep. 13:7-10; 13:24-14:1).

21.     A hospital in "turn-around mode" means that "(a) hospital is struggling in any number of ways.  The most frequent is struggling financially where they are either in financial decline or operating at a loss.  Other ways that hospitals struggle and need turn-around is where their volume is dropping off, where they have not been successful in working with the medical staff to develop that medical staff, competition.  They may be out competed by other facilities.

They may have a physical plant problem that they didn't attend to that affected the utilization of the hospital. Almost all include a financial turn-around." (Gross dep. 14:2-15).

22.     Gross and Primus became involved with Permian Healthcare ("Permian"), a 501(c)(3) organization. (Gross dep. 16:22-23). 501(c)(3) is the provision of the Internal Revenue Code that permits a tax exempt status for non-profit organizations or charities, including hospitals. (Gross dep. 17:1-4). Permian was a 501(c)(3) organization that had a group exemption, meaning that it could create tax exempt subsidiaries (called subordinates) that would also have tax exempt status. (Gross dep. 17:11-15).

23.     Permian's investment banker solicited Primus' services in order to help Permian acquire additional hospitals. (Gross dep. 17:17-25).

24.     Primus had a contract with Permian to assist in the acquisition of other hospitals. In the early 1980s and 1990s, Primus helped Permian acquire hospitals that were identified by Permian's investment banker. Primus would help Permian go through the hospitals to evaluate them, and recommended those that Primus thought would fit into Permian's profile. (Gross dep. 20:14-21).

25.     There is no difference between a non-profit and for profit hospital in terms of reimbursement. Both non-profit and for profit hospitals are businesses and must generate a profit. (Gross dep. 24:5-11; 24:22 - 25:1).

26.     In order to make a profit, hospitals must attract business by providing good services. A hospital is a workshop for doctors, where doctors "aggregate their patients or congregate their patients for efficiency." (Gross dep. 24:16, 24:17-24).

B.  **1994 Sale to Permian**

27. Gross first heard about Edgewater in either late 1992 or early 1993. (Gross dep. 33:3-6). He found out that Edgewater was for sale because he received an offering document. (Gross dep. 33:7-9).

28. Gross did not know, nor had heard of, Rogan at that time. (Gross dep. 35:2-4).

29. Because Permian indicated that Chicago was a market Permian was interested in, Gross and Primus investigated Edgewater after receiving the offering document. (Gross dep. 34:15-20).

C. **Due Diligence of Edgewater**

30. Initially, Gross went to Chicago and took a tour of the facility, the surrounding area, and called contacts to find out more information about Edgewater. At that point, Gross thought that Edgewater was a "prime candidate" for Permian if what he saw on paper could be verified upon due diligence. (Gross dep. 35:9-15; 36:2-7).

31. At that time, Gross had been involved in hospital management and administration for 20 years, his "stock and trade" being hospital turn-arounds. (Gross dep. 15:19 - 16:1; 36:21-22). He believed that an incredible job had been done at Edgewater, and that it had been "snatched from falling into a demise." (Gross dep. 36:21 - 37:1).

32. Gross learned after looking at the data, that Edgewater had been turned around because of a very aggressive cost-cutting effort, and because of demographic changes in the area. There had previously been no effort to recruit physicians from the local community and the various ethnic groups to utilize Edgewater, and now there was, and it had been successful. (Gross dep. 37:2-20).

33. In order to determine whether there were any issues with Edgewater, Gross looked at the quality of care, at length of stay, at the admission rate through the emergency room, and at the number of laboratory and invasive procedures done in order to determine whether

6

there were any practices that would raise concern.  (Gross dep. 38:11-39:2).  There was nothing from Gross' initial inspection or conversations with Rogan that gave any hint that there was any fraud and abuse going on.  (Gross dep. 39:3-6).

34.     After his initial inspection, Gross took a team of individuals to further evaluate Edgewater by looking at "the operations of the hospital at the next level of detail."  (Gross dep. 39:7-23).

35.     Gross resisted to Edgewater many times after that, and brought others with him, including Dan Finanne, Primus' operating officer, Karen Hyneman, Primus' chief financial officer, and Dick Woolslayer, who reviewed inventory control, patient flows, staffing efficiencies, physical plant maintenance, cleanliness, internal mechanical systems etc.  (Gross dep. 40:14 - 41:3).

36.     During the due diligence, all contracts were reviewed, including vendor and physician contracts.  DX 140 is a due diligence document prepared by Permian's legal team which lists vendor and physician contracts and the contracted services with Edgewater.  (Gross dep. 51:3 - 52:3).  JX 30 is a worksheet that expands on the description of those contracts. (Gross dep. 52:4 - 20).

37.     Occasionally, a member of Gross' team would find contracts that had minor problems with the IRS regulations, like wording or cancellation provisions, and those contracts would be changed to comply, or they were cancelled.  (Gross dep. 52:24 - 53:6; 53:25 - 54:3).

38.     Gross looked at the admissions of Edgewater in order to determine how many doctors were using the hospital, and what they were doing there.  It was a way of determining which programs and services the hospital emphasized and what its profile was.  (Gross dep. 64:3-20; DX 139: CB 2057-59).

39.     Nobody in the due diligence process came up with any hint that there was any fraud and abuse at Edgewater.  (Gross dep. 41:13-16).

   D.  **Process of Purchasing Edgewater**

40.     When Permian was going to acquire Edgewater, Permian was going to structure Edgewater as a non-profit because the tax exempt financing was "less expensive" than taxable financing because the interest rate would be lower, and Permian's mission was primarily to be a non-profit.  (Gross dep. 42:3-18).

41.     There were many parties involved in the due diligence that preceded the purchase of Edgewater, including  Permian's investment bank CS First Boston, the Illinois Health Facilities Authority, bond counsel, hospital counsel, Foley & Lardner, the underwriters' counsel, Coopers & Lybrand as Permian's accountants, Epic Financial as Permian's Primus' financial advisor, and the purchasers of the bonds who had their own attorneys, because of the "laborious, very technical and highly regulated process" that is involved in tax exempt financing for hospitals.  All were involved in some degree in the hospital's due diligence at the time of the sale.  (Gross dep. 43:16 - 45:16; 45:22-49:21).

42.     Another due diligence occurred in 1998 in preparation for the refinancing of the bonds.  This due diligence also included reviewing all physician contracts and financing, and it included a similarly large and involved working group as the 1994 due diligence had.  (Gross dep. 156:11 - 157:25; DX 314).

43.     The offering circular for the 1994 transaction, DX 139, contains information relating to the payor mix of Edgewater's patients (DX 139: CB 2030-31), a description of the organization (CB 2046), and the initial board of directors of Northside d/b/a Edgewater Medical Center (CB 2047).  (Gross dep. 58:5-59:25).

44.     The boards of directors and various committees at Edgewater changed after Rogan sold Edgewater. (Rogan 101:1-3). Members of the board of Northside were also the officers of Northside d/b/a Edgewater Medical Center. The officers of Northside were listed in the Limited Offering Memorandum. Bertram Rosenthal is listed as the President of Northside, and Stina Hans is listed as the Secretary/Treasurer. (DX 139: CB 2047). Three members of the Permian board were also members of Northside's board. (DX 139).

45.     Despite the title of Chief Executive Officer, Rogan was not an officer of Northside d/b/a Edgewater Medical Center, but an employee of Braddock Management LP. (Rogan - 256:20 - 257: 13; Gross dep. 80:5-17; DX 139: CB 2047; JX 29 - Rogan employment agreement).

46.     An independent appraiser did an appraisal on Edgewater, and then the investment bank did a comparability study to ensure that the purchase price was fair. (Gross dep. 55:17-25).

47.     Rogan and the other shareholders of EOC received $31.1 million for the sale of Edgewater. $9,268,619 of the distribution was used to pay bank debt. Rogan received $17,371,421 as a shareholder, and the remaining shareholders, trust funds for Rogan's children, received $4,099,960. The shareholders also received a subordinated note from Northside worth $4,000,000. (Jt. St. Uncontested Facts, ¶ 8).

E.  **Management Companies**

48.     As part of its acquisition of Edgewater, Gross had in mind that his company, Primus Management or an affiliate, would be given the management contract with Edgewater, which became known as Northside d/b/a Edgewater Medical Center. (Gross dep. 43:3-15; Rogan 96:3-6).

49.     Gross established Braddock Management LP ("Braddock"), named after his hometown, to be the manager of Northside. (Gross dep. 69:21 - 70:4). He organized Braddock

as a California limited partnership for estate planning purposes, so that the assets could be placed in trusts for his children. (Gross dep. 70:17 - 71:3; DX 137).

50. JX 6A is the 1994 Management Agreement between Braddock and Northside d/b/a/ Edgewater Medical Center. (Gross dep. 73:6-13).

51. The 1994 Management Agreement was prepared by Gross' lawyers, approved by Northside's board of directors, and ratified by Permian's board of directors. (Gross dep. 73:21 - 74:1). Gross brought the 1994 Management Agreement to the transaction, and Rogan did not give it to Gross. (Gross dep. 74:2-7). Rogan did not negotiate the terms of the 1994 Management Agreement, nor did he have anything to do with deciding the compensation under the agreement. (Gross dep. 74:21 - 75:8).

52. In the 1994 Management Agreement, the compensation was a combination of a fixed fee and a variable fee, and the variable fee could not exceed the fixed fee, so the compensation was capped. (Gross dep. 75:15 - 25; JX 6A, sec. 6).

53. For all the management company contracts, there was a cap of the total amount of money that could be paid to the management company. (Rogan - 1231:22-1232:16). Once the cap was hit, the management fees would not go up. (Rogan - 1230:9-16).

54. The capped fee was reached in 1995 and 1996, so that once the cap was reached in these years, additional admissions did not increase the revenue of the management company. (GX 40 E).

55. In 1997, when a new management contract was entered into in August, the fees were capped again, this time with the variable fee not able to exceed the annual fixed fee. If the United States' alleged damages for 1997 are removed from the fee base, which is the basis for the variable fee, the management company would still have been paid the same amount. So any

additional admissions did not increase the revenue of the management company. (GX 40 E; GX 7-A).

56. In the years 1998 through 2000, when the alleged fraud is removed from the fee base, the management fees decrease by $95,489, $75,744 and $83,079, respectively. (GX 40 E; GX 7-D). So the total amount that the management fees were increased, assuming the United States' fraud claims are accurate and allowed, would be $254,342. This accounts for 2.2% of the total management fees earned from 1995 to 2000.

57. The variable fee was based on net patient service revenues, which included revenues from all payers, not just Medicare or Medicaid. (Gross dep. 78:19-24).

58. Under the management agreements the board of directors had ultimate control over the assets and operations of Edgewater. (Gross dep. 73:15-20; JX 6A, sec. 2.02).

59. The management contracts, including the fees, were reviewed by outside counsel for reasonableness. (Rogan - 1231:1 - 1232:16; Gross dep. 88:20-24). The fees were found to "fall within the reasonable range of commercial management fees paid by U.S. hospitals." (DX 16: VAL 10664). Rogan did not have anything to do with selecting Coopers & Lybrand, the company who performed the management fee study for the 1994 contract. (Gross dep. 91:10-12).

60. The management companies were responsible for numerous areas of Edgewater's management, including financial management (JX 6A at sec. 3.03), financial services, negotiating, entering into and discharging contracts (3.05), entering into litigation (3.06), conducting the marketing and public relations of the hospital (3.07), risk management (3.08), government regulations (3.10), confidentiality of records (3.11), non-physician quality control (3.12) and general corporate services. (Gross dep. 81:4 - 85:7).

61. The management companies were not responsible for the medical aspects of the hospital. The management was not responsible for the admission of patients or the treatment of patients. (Gross dep. 32:10-18; JX 6A, sec. 4.01).

62. The management agreements were amended from time to time, but the basic structure and duties of the management company remained the same. (Gross dep. 91:23 - 92:6; JX 6B; JX 6C).

63. Primus decided who Braddock would hire to act as managers of Edgewater, subject approval of Northside's board. (Gross dep. 92:19 - 93:4).

64. The managers/Braddock employees were paid a base salary, and Gross and the board approved any bonuses to be paid. Gross decided what Rogan's bonus would be, subject to board approval. (Gross dep. 97:17-98:4; 98:25-99:4).

65. Gross wanted to keep Rogan as a manager, and Rogan entered a three year employment agreement with Braddock on August 14, 1994. (JX 29).

66. Rogan's powers were limited by his employment agreement with Braddock, and a number of actions required the authorization of the General Partner or Edgewater. (JX 29: 9-10; Gross dep. 97:5-14). Rogan reported directly to Gross. (Gross dep. 97:15-16).

67. Miriam Roe-Macdonald was the administrative assistant mainly to Rogan, but also for Ehmen and Joann Skvarek. (Roe-Macdonald - 700:14-17).

68. According to Roe-Macdonald, in 1994 Rogan's management style changed. Rogan was not as "hands-on" as he used to be, and he delegated more. He also spent less and less time at Edgewater. (Roe-Macdonald - 708:1-11).

69. Gross wanted to keep Joann Skvarek after the 1994 sale because he believed she was "a hard-nosed, tough, very effective day-to-day hospital operator." (Gross dep. 63:15-24).

12

70.     Skvarek succeeded Rogan as CEO in the fall of 1997 with Gross' support and the board's appoval.  (Rogan - 62:10-13).  Gross was pleased with the work Skvarek had been doing and believed that Skvarek was a "very, very thorough operating person" who was very cost conscious.  (Gross dep. 135:4-22).  Gross felt that Skvarek was familiar with the hospital, and had the respect of the medical staff and department managers.  (Gross dep. 142: 10-20).

71.     Rogan spent far less time at the hospital after Skvarek became the CEO.  (Zeisel - 1224:24-1225:5;  Gross dep. 142:21-23).   While he was CEO, Rogan received a "greenbar report" (DX 286). on a monthly basis. (Rogan - 80:5-7).  The greenbar report showed the number of admissions for the month, and year-to-date.  (DX 286).  After Rogan was no longer CEO, he paid little attention to the patient census.  (Roe-Macdonald - 707:1-12).

IV.   **ROGER EHMEN**

   A.  **Physician Recruiting**

72.     One of the main factors in having a profitable hospital is the ability to recruit primary care physicians to the medical staff.  A hospital needs a sufficient number of internists and family practitioners on staff in order to bring in the necessary number of admissions and outpatient work, which are the things that make an institution viable.  (Ehmen - 295:24-296:1-6).

73.     Physician recruiting is also important  (Rogan - 75:22-24). because a hospital has to ensure that there are enough doctors in the community to handle an increasing population.  Because physicians come and go, and with the aging of the medical staff, there has to be a "pipeline of physicians" to come in and take their place.  Hospitals have a responsibility to the community to make sure there are adequate physicians to provide care.  (Gross dep. 27:11-28:5).  Primary care physicians are responsible for bringing the majority of business into a hospital.  (Rogan - 76:12-15).

74.     A hospital recruits and attracts physicians by providing service to both the physicians and their patients, and having an internal efficiency of operations that work for the physicians, because a physician's time is important to him/her. (Gross dep. 28:8-13).

B.  **Edgewater Employment and Duties**

75.     Roger Ehmen received a bachelor's degree in business administration from Western Illinois University in 1968 and a masters in business administration from Northern Illinois University in 1973.  (Ehmen - 289:14-22).

76.     Ehmen began his employment at Edgewater in 1977 as Director of Medical Records.   (Ehmen - 290:17-291:5).   In 1982, he was promoted to Director of Medical Administration.  In that position, he was the liaison between the administration and the medical staff.  (Ehmen - 292:3-8).  Ehmen entered into employment contracts with Edgewater in 1990 and again in 1993.  (DX 102A; 102B).  After the sale of the hospital to Rogan, Ehmen's job changed to vice president of medical staff development, marketing, and public relations, and one of the main emphasis was physician recruitment and program development.  In that position, Ehmen reported to Richard Stensrud,  (Ehmen - 294:2-6), and continued to report to Stensrud until 1991, at which time he reported to Rogan.  (Ehmen - 298:1-4).  Gross decided to retain Roger Ehmen after the 1994 sale of Edgewater, and Ehmen became an employee of Braddock. (Gross dep. 62:18 - 63:4; Ehmen 301:4-7).

77.     Sherry Gotbaum was Ehmen's administrative secretary from 1996 to November 1998. (Gotbaum - 672:19 - 673:6).  Gotbaum also testified that Ehmen's duties were "recruiting attending physicians, marketing the hospital and pretty much keeping the attending physicians happy."  (Gotbaum - 681:23 - 682:2).

78.     It was Ehmen's responsibility for all physician contracts to make sure that the compensation amounts were fair market value, and to verify that the hours required by the

contracts were actually worked by the physician. He was also responsible for reviewing the time studies of physicians, and ensure that they signed them. (Zeisel - 1225:16-25). Ehmen was in charge of making sure that the physicians fulfilled their contractual obligations and performed all hours required, for teaching contracts, medical directorship contracts and others. (Zeisel - 1226:1-4). This was Ehmen's responsibility for as long as he was involved in physician recruiting. (Ehmen - 615:11-18, 616:21 - 617:4; Rogan - 1309:7-10).

79. Ehmen reported to Rogan and the board of directors regarding the physicians Ehmen was contacting. (Rogan - 76:16-19). Rogan wanted to know which doctors Ehmen was recruiting, what kind of doctors they were, where they practiced, their volume of business, the patient payor mix, whether the physician applied for the medical staff, where the physician stood with the credentialing committee. After doctors joined the staff, Rogan would ask Ehmen if they were using the facility, what is their volume of business, or whether they were happy with the institution. (Ehmen - 307:13-20). In recruiting physicians, Ehmen focused on primary care physicians, internists and family practitioners, because they control and make the decision where patients are hospitalized. (Ehmen - 295:7-15). Rogan wanted Roger Ehmen to recruit primary care physicians. (Rogan - 76:9-11). Rogan would discuss entering into a contract with a physician to provide services, if Ehmen suggested to Rogan that the hospital enter into a contract with that physician. (Rogan - 83:14-18).

80. Ehmen was the administrative director in charge of the residency program at Edgewater, (Ehmen - 317:23-318:2). and was responsible for gathering information for medical education at Edgewater. It was Ehmen's responsibility to ensure that Edgewater's teaching program conformed to ACGME, the accrediting body for residency programs, and to coordinate Edgewater's number of residents that entered the program. (Rogan 1315:13-23).

81.     With respect to teaching contracts, Ehmen had the responsibility to determine the amount of compensation, to make sure the compensation was fair market value, and to determine the number of hours that were required to be worked under the contract. (Rogan 1315:24-1316:9).  If Ehmen would tell Rogan that Edgewater needed a particular physician to join the teaching faculty, and Rogan would tell Ehmen "Fine, as long as that's what the program needs, make certain the hours are appropriate and the compensation is appropriate." (Rogan - 1311:7-16).

82.     Ehmen recommended the amount of compensation for a contract because Ehmen would be the one to come to Rogan with the scope of the duties under the contract. (Rogan - 1311:25-1312:5).  Ehmen had the responsibility of determining whether the compensation met fair market value standards. (Rogan 1312:8-11).

83.     If the contract were new, then Ehmen would work with the attorneys to draw up the contract.  If it was a renewal of a contract, then Ehmen would use one of the forms that the attorneys had previously developed. (Rogan - 1312:14-22).

84.     Ehmen was also responsible for developing the physician numbers and codes on DX 286. (Rogan 227:1-3).

85.     Rogan had nothing to do with ensuring that physicians were fulfilling their contractual duties, because that was one of Ehmen's job responsibilities.  (Zeisel - 1226:9-12).

86.     Mike Olsen, the attorney who worked for Permian, developed the form of contract.  (JX 13 A-D (Cubria contracts); JX 26-28 (Barnabas contracts)).  Permian, not Rogan brought Olsen to Edgewater.  (Ehmen - 554:20-22).  Physician contracts were not hidden from Olsen.  (Ehmen - 555:17-556:6).

87.     Ehmen never had an attorney tell him how much the compensation on a physician contract should be.  (Ehmen - 486:8-16).

88.     There came a time when Ehmen filled out something called the contract approval form.  Ehmen still went to Rogan for the approval of the contracts with Barnabas and Cubria. (Ehmen - 486:1-7).  In 1996 a Contract Action Protocol was established in order to ensure that contracts were reviewed and required that senior executives and/or legal counsel review the contracts to be entered into.  (JX 37).

89.     Ehmen falsified Contract Action Protocol forms when he signed them and verified they were reviewed by legal counsel with input by Hospital staff and were for appropriate service needs.   (DX 273 A-C, E-H (Cubria agreements); DX 273 D   (Barnabas agreement)).

90.     If a physician had an administrative contract with Edgewater, the doctor would be more likely to spend time at the hospital fulfilling his duties. (Rogan - 83:23-84:1).   The physician would be more likely to know the institution and being comfortable using it.  (Rogan - 84:2-5).  That would benefit Edgewater because a physician would become more familiar with Edgewater and Edgewater's capabilities. (Rogan - 1366:15-19).  Ehmen testified that that he and Rogan merely theorized that physicians who had relationships with Edgewater and spent time at the hospital might subsequently admit and treat their patients at Edgewater.   (Ehmen - 513:20 - 514:16).

91.     Rogan would not ask Ehmen to call physicians and ask them to admit patients if the census was low. (Rogan - 84:6-9).

92.     Rogan had heard the phrase "dialing for dollars." (Rogan - 84:10-12).  He heard Ehmen use the phrase "dialing for dollars." (Rogan - 84:13-15).  Rogan thought it was used

when Ehmen was going to call physicians to recruit them. (Rogan - 84:16-18). Rogan never used the phrase himself. (Rogan - 85:1-3).

C. **Ehmen's 1997 Incentive Contract**

93. Rogan and Ehmen negotiated that Ehmen's 1997 contract would have an incentive provision based upon one of the aspects of his performance, which was the business at Edgewater. (Rogan - 1359:14-21).

94. Rogan had discussions with Tatooles regarding Ehmen's employment contract. (Rogan - 1362:4-7). Rogan gave the contract to Tatooles in approximately April or May of 1997. (Rogan - 1364:14-20).

95. Rogan did not tell Ehmen to destroy Ehmen's copy of the agreement, nor did Rogan tell Ehmen that Rogan was going to destroy Rogan's copy of the agreement. (Rogan - 1365:1-8). Rogan did not destroy his copy of the agreement, and Rogan produced his copy of the contract in this litigation, which was used at trial. (Rogan - 1365: 7-8; DX 102 C).

96. Ehmen never told the government about the incentive contract he testified about, he didn't tell the government that Rogan asked him to destroy the incentive contract and didn't tell him that Rogan would destroy his copy. (Ehmen - 657:11-20).

97. Ehmen did not tell FBI Agent James Ferguson ("Ferguson") that he had an employment contract that contained an incentive based on admissions. (Ferguson - 1262:6-9).

V. **BARNABAS**

98. Barnabas graduated from medical school in 1980 in India. (Barnabas - 761:24 - 726:5). He emigrated to the United States one year later and passed the medical residency exam. (Barnabas - 762:14 - 763:13). Barnabas undertook his medical residency at Edgewater Medical Center. (Barnabas - 763:14-18).

99.     After his residency ended in 1985, Barnabas did not refer his patients to Edgewater on a regular basis because it did not enjoy the best of reputations.  (Barnabas - 765:13-21).  Its administration was in shambles, patient care was not adequate, and there was a shortage of nurses.  (Barnabas - 765:17-21).

100.     In the early 1990s, Barnabas was sending most of his patients to Methodist Hospital. (Rogan 194:3-8).  In the early 1990s, Barnabas' view of Edgewater began to change.  (Barnabas - 766:17-21).  Barnabas was told by John Kane that Edgewater had changed for the better and Barnabas should come take a look at it.  (Barnabas - 766:24-767:4).

101.     Rogan bought Edgewater and turned it around from what it was known before to a place where doctors were very happy going.  (Barnabas - 779:9-12).  After Rogan began managing Edgewater, the physical plant of the hospital was changed.  (Barnabas - 883:6-10).  The emergency room was made bigger, better and adequately staffed.  (Barnabas - 883:6-10).  It became a more user-friendly system for doctors.  (Barnabas - 883:6-10).  For example, as soon as x-rays were done, preliminary reports were given in real time.  (Barnabas - 883:11-18).  Barnabas was impressed.  (Barnabas - 883:11-18).

102.     Ehmen had ascertained that Ravi Barnabas and his brother, Satish, had a very substantial practice at Methodist and spoke to Rogan about that.  Ehmen advised Rogan, Rogan felt it was a good idea to try to encourage Ravi Barnabas and his brother, Satish, to become more active at Edgewater.  (Ehmen - 311:22-312:4).

103.     Barnabas met with Ehmen at Edgewater.  (Barnabas - 767:9-13).  Ehmen asked Barnabas about what type of patients he saw, what the payor mix was, and how many admissions he usually generated.  (Barnabas - 768:8-11).

104.     Ehmen talked to Barnabas, told him he did his residency at Edgewater, he had roots at Edgewater, his office is near Edgewater, and that Ehmen would like him to come back to Edgewater to get busy at the institution.  Ehmen urged him to give it a try and get busy as fast as he could at the institution.  (Ehmen - 313:2-12).

105.     Rogan was aware that Ehmen had met with Barnabas in 1993 in an attempt to recruit Barnabas to Edgewater. (Rogan 194:12-16).  Rogan and Ehmen discussed Edgewater entering into a contract with Barnabas. (Rogan 195: 18-21).

106.     Ehmen had the responsibility of beginning the process of preparing Barnabas' contracts.  (Rogan 1311:2-4).

107.     Rogan thought giving Barnabas a teaching contract was a good idea because it comported with Edgewater's goal of lowering the age of the medical staff, and Barnabas was already familiar with Edgewater.  (Rogan 1315:3-8).

108.     Barnabas was offered a teaching contract in 1993. (Rogan 196:8-13; JX 23). Ehmen approached Barnabas about the teaching contract.   (Ehmen 584:23-585:8; Barnabas 789:5-7).

109.     JX 23 provides for duties in regard to Barnabas providing teaching services for the internal medicine residency teaching program.  (Ehmen - 317:3-16).  Barnabas' teaching contract, was renewed and approved by Edgewater's Board of Directors.   (JX 1: EMC 1720 (November 21, 1994 board minutes).).   Barnabas had a practice while he was teaching at Edgewater. (Rogan - 208:25-209:3).

A.  **Dr. Antonio Ramos**

110.     Barnabas told Ehmen that Ramos had a very busy practice, and his patient mix was good, and the quality of his patients was good and he would be a good addition to

Edgewater. (Barnabas - 771:2-8). Ehmen responded that he was very interested. (Barnabas - 771:9-10).

111. Barnabas had previously helped Ramos manage his patients at Methodist Hospital. (Barnabas - 769:11-16). Ramos had a falling out with the administration at Methodist and moved his practice to Sacred Heart, and Barnabas did not help Ramos manage his patients at Sacred Heart. (Barnabas - 770:6-8). Barnabas recommended Ramos to Ehmen because Barnabas thought that since Edgewater had changed for the better, Ramos had experience with a hospital on the north side and would be willing to come to Edgewater, and Barnabas wanted to regain his lost income as a result of Ramos moving to Sacred Heart. (Barnabas - 770:19-771:1).

112. Ehmen met with Barnabas and Ramos at Ramos' office. Ehmen was told that Ramos had a busy surgical practice at Sacred Heart but that he was unhappy with the nursing care at Sacred Heart. Barnabas encouraged Ramos to move his practice to Edgewater. Barnabas had been managing Ramos' patients at Sacred Heart, and it would be good for Barnabas if Ramos moved his practice to Sacred Heart. Ehmen was advised that the volume of patients they were having at Sacred Heart was 20 to 30 admissions per month. (Ehmen - 326:10-14).

113. Ehmen never told Rogan that Ramos could bring in 25 to 30 patients per month. (Rogan 1307:3-5).

114. Ehmen was attempting to recruit Ramos in 1993. (Rogan 199:3-6). Ramos was a family practitioner and a surgeon. (Rogan 199:10-15). Ehmen told Rogan that Ehmen thought that Ramos would be an excellent addition to the Edgewater staff because of Edgewater's emphasis in marketing to the Hispanic community. (Rogan 200:24 - 201:1). Rogan did not have any discussions with Ramos regarding entering into any contracts with Edgewater; Rogan spoke to Ehmen regarding Ramos. (Rogan 1306:14-16).

21

115.     Ehmen was interested in Ramos because he spoke Spanish; Edgewater always had an interest in the Latino community, and Ramos got Edgewater involved in St. Augustine College - a primarily Hispanic college; and Ramos got Edgewater involved in some Hispanic nursing homes; so Ramos did provide benefits to Edgewater Hospital.  (Ehmen - 582:23-25).

116.     Ehmen asked Ramos what Sacred Heart was doing for him, and Ramos said that Sacred Heart was paying his malpractice insurance.  (Barnabas - 772:19-20).  Ramos asked Ehmen if Ramos could be added to the hospital insurance rider for malpractice coverage because he had a high premium.  Ehmen advised him this issue would be addressed later.  (Ehmen - 329:14-22).  After a period of time of Barnabas managing Ramos' patients, Ramos asked for Barnabas and Ehmen to meet and at this meeting, Ramos said, in order for him to continue at Edgewater, the malpractice matter must be addressed.  Ehmen told Ramos he would take the matter under advisement.   (Ehmen - 335:17-24).  Ehmen asked if Ramos would consider admitting patients to Edgewater if Edgewater could pay Ramos' malpractice insurance.  (Barnabas - 772:22-24).  The meeting did not end with an agreement.  (Barnabas - 773:4-5).  Ramos began admitting patients to Edgewater and Barnabas served as a consultant for Ramos' patients.  (Barnabas - 774:13-24).

117.     Ehmen did tell Rogan that Ramos wanted to be put on Edgewater's malpractice insurance policy, and Rogan told Ehmen that Edgewater could not do that. (Ehmen - 336:20-337:11; Rogan - 1307:6-10).

118.     Rogan never spoke to Barnabas about Ramos, or any of Ramos' admissions. (Rogan 1308:18-23).

119.     Ehmen and Barnabas decided that a possibility would be to have Ramos be the liaison at Latino health fairs, outside meetings and these sorts of things.  Ehmen took this idea to Rogan and the contract got approved.  (Ehmen - 338:11-14).

120.     Ramos did not perform all the duties under the contract, probably only 50%. (Ehmen - 343:1-3, 7-9).  Rogan never learned that Ramos was not performing his duties under Ramos' contract with Edgewater. (Rogan 1309:3-6).  Ehmen never told Rogan that Ramos was not performing Ramos' duties under his contract with Edgewater. (Rogan 1309:11-13).

121.     As a result of Ramos' efforts, Ramos had Rogan meet with the board of directors and leadership of St. Augustine College.  Ramos introduced Rogan to a number of Hispanic owners of nursing homes.  Ramos and Rogan attended functions at St. Augustine College. (Rogan 1309:19-25).

122.     Rogan did not count the number of hours that Ramos was putting in under his contract.  (Rogan 1310:1-5).  But because of the work Ramos was doing that Rogan observed and participated in, Rogan had not reason to believe that Ramos was not putting in the required number of hours under Ramos' contract. (Rogan 1310:18-23).

123.     Barnabas thinks Ramos wanted Edgewater to buy his practice.  When it was not bought, Ramos began talking with other hospitals, and Doctors Hospital bought his practice in 1995, and Ramos stopped practicing at Edgewater.  (Barnabas - 783:22-24, 781:13-20; Ehmen - 581: 9-11).

B. **Barnabas Teaching Contracts**

124.     Barnabas testified that he came to Ehmen and said that he had brought Ramos to Edgewater and wanted to be rewarded, and demanded $60,000 for a contract with Edgewater. (Ehmen - 344:23 - 345:2).  Ehmen disputes this testimony.  When Ehmen appeared before the Grand Jury, however, he did not say anything about Barnabas getting a contract as a reward for

what he had done with Ramos. (Ehmen - 551:9-14). Ehmen testified before the Grand Jury that it was him, Ehmen, who instigated the idea of giving Barnabas a contract. (Ehmen - 584:23 - 585:8).

125.    In 1993 Ehmen came to Rogan and told him that Barnabas would be a good addition to the teaching faculty at Edgewater because Barnabas had graduated from Edgewater's medical residency program, and Edgewater was looking for younger physicians to join the faculty. (Rogan 1314:9-13, 19-23).

126.    Rogan thought it was a good idea to give Barnabas a teaching contract, because Edgewater was attempting to lower the average age of the medical staff. (Rogan 1415:1-5).

127.    Ehmen had the responsibility of determining whether the hours required under Barnabas' teaching contracts were being performed. (Rogan 1316:10-13). Rogan never gave Ehmen "instructions on what information should be placed on physician time sheets." (Ehmen - 665:4-7).

128.    Barnabas had a meeting with Rogan and Ehmen in Rogan's office where Ehmen told Barnabas that they had decided to pay Barnabas $60,000 to be a teaching attending at the hospital. (Barnabas - 789:21-25).

129.    Barnabas believed that this contract included the expectation that he would refer his private patients to Edgewater only because Ehmen asked on more than a couple of occasions what he could do to see some activity from Barnabas, and Barnabas knew there were physicians who had contracts at Edgewater. (Barnabas - 793:15-25).

130.    During the discussion regarding Barnabas' teaching contract for which Rogan was present, there were no discussions about the contract being for admissions. (Barnabas - 880:25-

881:3). After that discussion, Barnabas had no discussions with Rogan at all about his contract. (Barnabas - 881:22-882:1).

131. JX 23 requires Barnabas to work 600 hours annually for $60,000. (Barnabas - 794:15-795:4). JX 23 is a teaching contract. (Barnabas - 795:17-18). Barnabas signed the contract without reviewing the duties. (Barnabas - 796:9-11). The contract required 600 hours per year. That figure was arrived at by checking salary surveys by medical specialties and found the going rate was $100 an hour and then divided into the salary he wanted to be paid. (Ehmen 345:15-24).

132. Barnabas told Ehmen that he signed the wrong contract, and Ehmen said it was a brief oversight in paperwork and he would change the contract. (Barnabas - 797:5-12). Barnabas does not recall Ehmen changing the contract or Barnabas signing a new contract. (Barnabas - 797:13-15). Rogan was not present when Barnabas and Ehmen discussed that his teaching contract should be structured differently. (Barnabas - 881:22-882:1).

133. JX 24 extends the terms of the 1993 teaching contract through October 31, 1995. (Barnabas - 800:10-14). Barnabas' teaching contract, was renewed and approved by Edgewater's board of directors. (JX 1: EMC 1720 (November 21, 1994 board minutes)).

134. When Barnabas told Ehmen he was not doing any teaching, Ehmen did not terminate the contract. (Ehmen - 567:13-19).

135. Nobody told Rogan that Barnabas was not performing all of the hours under Barnabas' contract. (Rogan 1316:24-1317:1). Ehmen never told Rogan that Barnabas was not doing any teaching at Edgewater. (Rogan 204:9-11; 1316:17-20).

136. Ehmen and Rogan never discussed whether Barnabas was actually doing all the work required under his contracts. (Ehmen - 347:11-19).

137.    Barnabas never told Rogan that Barnabas was not performing all of the hours under his contract. (Barnabas - 882:7-9; Rogan - 1316:21-23).

### C. **Barnabas Outreach and Physician Recruiting**

138.    In 1995 Ehmen told Rogan that Barnabas no longer wished to teach, and that Edgewater had a need for program development and physician recruiting, which Barnabas could do.   Ehmen told Rogan that by continuing to pay Barnabas the same amount he was receiving under his teaching contract would be "budget neutral."   (Rogan 204:16-21; 1318:1-8).   Ehmen told Rogan that Ehmen thought Barnabas would be an excellent person to do physician recruiting for Edgewater because he was the right age, and knew a number of physicians in the community. (Rogan - 1317:8-19).   Barnabas likewise believed that he knew many physicians in the neighborhood, and would thus make a good physician recruiter.  (Barnabas - 790:13-22).

139.    JX 25 is a physician recruitment and marketing contract Barnabas had with Edgewater from November 1, 1995 to October 31, 1996.   (Barnabas - 803:11-15; Ehmen - 350:22-351:3).

140.    Ehmen testified that Edgewater entered into the 1995 contract with Barnabas (which would have been November 1995, JX 25). in order to maintain the relationship with Ramos where Barnabas would be managing Ramos' patients; but Ramos actually sold his practice to Doctors Hospital in April or May 1995.  (Ehmen - 581:9-11).

141.    Edgewater did not track referrals from Barnabas. (Rogan 209:14-15).   The greenbar (DX 286) would give some idea of how many patients Barnabas was treating at a given time. (Rogan 209:24-210:2).

142.    JX 26 is a renewal of the 1995 recruiting contract between Barnabas and Edgewater. (Rogan 211:7-14).   Rogan approved renewing the contract between Barnabas and Edgewater in 1996. (Rogan 211:15-17).

26

143.    The form of JX 26, the 1996 recruiting contract, was created by Michael Olsen, an attorney who worked for Permian who became General Counsel of Northside; and it was Permian, not Rogan, that brought Olsen in to prepare this type of document. (Ehmen - 554:20-22). Any notices required under this form of contract went to Olsen in Oak Brook Terrace. (Ehmen - 555:17-556:6).

144.    JX 41 is time study reports for Barnabas.    (Barnabas - 807:17-808:12). Physicians had to fill out time sheets. JX41 are time studies filled out by Barnabas under his recruiting contract. The purpose is an attestation by the physician of the number of hours they worked performing the duties outlined in the contract. (Ehmen - 559:21-24).

145.    Barnabas did not keep track of the time he spent working under his contracts. (Barnabas - 808:16-18). He asked Ehmen what Ehmen thought were appropriate hours, and Ehmen told him, so Ehmen may have kept track of Barnabas' hours. (Barnabas - 808:19-25). The time sheets do not reflect the actual hours Barnabas worked. (Barnabas - 809:7-8). Ehmen gave Barnabas a broad outline, which Barnabas followed. (Barnabas - 809:12-14).

146.    Because Barnabas did not do all the work under his contracts, the hours reflected in JX 41 are not accurate. (Ehmen - 560:16-18). Ehmen also signed Barnabas' time studies, attesting that those hours were worked, and when he did sign, it was his opinion that Barnabas didn't do all of the work. Ehmen never told anyone that these documents he signed were not accurate. (Ehmen - 560:13-23; 561:17-19).

147.    Ehmen reviewed the time sheets Barnabas submitted in connection with Barnabas' recruiting activities. (Rogan 212:5-9). Ehmen never told Rogan that Barnabas was not working anywhere near the hours required by Barnabas' recruiting contract. (Rogan 212:13-16;

1319:21-23). Barnabas never discussed with Rogan that he was not doing the work reflected in his time sheets. (Barnabas - 882:7-9; 884:15-17).

148. Ehmen would inform Rogan of some of the projects that Barnabas was working on, and some of the physicians that Barnabas had visited to possibly recruit to Edgewater's staff under the contract (Rogan - 1319:3-12). and Rogan had no reason to believe that Barnabas was not fulfilling his duties or required hours.

149. Barnabas did perform recruiting services under his recruiting contracts. (Barnabas - 803: 22-24). DX 91 is documentation of meetings Ehmen had with Barnabas to document some of the duties he performed under his contracts. When questioned by the United States, Ehmen testified that these were done to "have the appearance" that Barnabas was performing under his contracts, (Ehmen - 665:12-16). immediately after he testified on cross-examination that these include descriptions of programs that were actually implemented by Edgewater. (Ehmen - 562:8-563:2). Ehmen worked "very, very closely" with Barnabas, and Ehmen prepared the memoranda in DX 91 so that he would have a record of what Barnabas was doing, other than just by hours. (Ehmen - 562:13-19).

150. In 1997, Barnabas' physician recruiting contract amount was reduced from $60,000 to $36,000 by Ehmen. (Rogan - 214:7-17; JX 27). Ehmen never told Rogan that the amount of Barnabas' contract was being reduced "because it might be a red flag" for Medicare auditors. (Rogan - 214:21-15, 1323:4-7).

151. In giving the contract to Barnabas, Ehmen was hoping to get Barnabas' patients from Methodist, but a majority of his patients actually stayed at Methodist. (Ehmen - 551:17-25). From 1995 to 1998, Barnabas did not bring the bulk of patients to Edgewater, and Rogan

28

never told him to terminate Barnabas and Ehmen and Rogan never discussed canceling the contract. (Ehmen - 552:1-10).

D.  **Barnabas Elderly in Distress Contract**

152.    In August of 1997, Barnabas received a contract with Edgewater for the Elderly in Distress program, which paid $24,000 per year. (Rogan 215:10-22).  Barnabas was to work 30 hours.  The 30-hour figure was arrived at by Ehmen.  (Ehmen - 357:10-17).

153.    JX 28 is an contract between Edgewater and Barnabas for running the Edgewater Elderly-in-Distress ("EID") program.  (Barnabas 814:17-22).  The EID program provided medical care and diagnostic tests for citizens who due to their disabilities could not leave their houses and seek medical care.  (Barnabas 814:23-815:7).  Edgewater assigned a senior resident to make house calls on these patients and give them appropriate care if indicated.  (Barnabas 814:23-815:7).

154.    Barnabas brought the EID program to the table.  (Barnabas - 815:8-12).  The resident who did the house calls reported back to Barnabas after seeing the patient in the house. (Barnabas - 815:8-12).

155.    DX 91, the memoranda that document Ehmen's meetings with Barnabas regarding Barnabas' duties under his contracts includes Barnabas' proposal for the Elderly in Distress program on December 10, 1997. (DX 91: Edgewater 50148).

156.    Ehmen came to Rogan and said that he wanted to implement the Elderly in Distress program.  (Rogan 1321:3-9).  Ehmen thought the Elderly in Distress Program was a "good program."  (Ehmen 555:1-4). and discussed with Rogan whether that was a program that Edgewater wanted to implement, along with telling Rogan the level of effort, time and compensation. (Rogan 1321:14-20).

157.    Ehmen developed the EID code to track admissions under this program, and it was important to know the number of admission coming in under a program so you could tell whether or not the program was working.  The reason you have a code is to know whether the program is working or should be discontinued.  (Ehmen - 558:4-7).

158.    Edgewater kept documentation for the attending physician for the Elderly in Distress program. (Rogan 216:18-25; DX 286).

159.    Barnabas never discussed with Rogan that he was not doing the work reflected in his time sheets, or the hours under the contract.  (Barnabas - 882:7-9; 884:15-17; Rogan - 1316:21-23).

## E.    **Barnabas' West Side Clinic Contract**

160.    Barnabas also had a contract with Edgewater to manage patients at a clinic that Edgewater ran on the west side of Chicago.  (Rogan 217:21-23).

161.    Edgewater had opened a clinic a distance from Edgewater, and hired Barnabas as a hospitalist, which was a model that osteopathic physicians developed years ago.  (Rogan 1321:21-1322:5).  Barnabas ran a similar successful program at Methodist Hospital.  (Ehmen 358:10-11).

162.    GX56 is a contract between Barnabas and Edgewater for Barnabas to serve as a hospitalist for one of their West Side clinics.  (Barnabas - 820:5-8).  Ehmen told Barnabas that Edgewater had a new West Side Clinic for the Chicago Housing Authority.  (Barnabas - 820:23-821:8).  The contract gave Barnabas an extra $3,000/month and gave him a foothold to get into the Edgewater CHA program.  (Barnabas - 821:9-15).

163.    Barnabas performed the duties listed in GX56.  (Barnabas - 821:16-18).

164.    Barnabas' West Side Clinic contract was totally legal.  (Barnabas - 884:3-4).

165.    After reviewing a portion of his Grand jury testimony, Ehmen's memory was refreshed regarding what he told the Grand Jury as to why he gave Barnabas the West Side contract — and Ehmen admitted that he did not tell the Grand Jury that it was to reward Barnabas for what Barnabas had done with Ramos.  (Ehmen - 354:3-11).

166.    The EID and West Side Clinic contracts were not given to Barnabas as a way to reward Barnabas for bringing Ramos to Edgewater.  (Rogan - 1322:25-1323:3).

167.    Nobody, including Ehmen and Barnabas told Rogan that Barnabas was not performing the required number of hours under his EID and West Side Clinic contracts. (Rogan 1322:13-20).  Barnabas testified that he performed the work under the West Side Clinic contract. (Barnabas - 821:16-18).

168.    In addition to the contracts, Barnabas treated patients that came in through the emergency room. (Barnabas - 885:12-25).

169.    Barnabas did not renew any of his contracts with Edgewater after 1998. (Barnabas - 821:23-822:2).

F.  **Barnabas' Claim Denials**

170.    In 1997 (sic. 1998) Rogan became aware that Edgewater was receiving claim denials for patients that Barnabas was treating. (Rogan - 232:2-5).  Claim denials are a problem for a hospital because the hospital is not going to get paid. (Rogan - 233:1-4).

171.    However, Barnabas' claim denials were not a big problem.  Hospitals received denials from physicians from their medical staff, including Edgewater.  Edgewater had received denials from multiple physicians.  With hindsight, the review organization comes in and says that the patient did not meet criteria, after the physician used his best judgment to admit the patient. (Rogan 233:13-19).

31

172.    A lady in charge of quality assurance, maybe Nancy Bryson, would ask Barnabas what his plans were for a patient that came in with normal tests, and she would say the insurer gave Edgewater until a particular time to get the patient discharged if Edgewater wanted to get paid on the patient.  (Barnabas - 853:11-23).

173.    Edgewater had a 23 hour observation program for patients of all physicians when there were claim denials. (Rogan 234:1-9).  The 23 hour program had been used by Edgewater for years.  (ex. JX 1: EMC 000027, 000078, 000107, 000285, 000290).

## VI.    SESHAGIRI RAO VAVILIKOLANU

174.    Seshagiri Rao Vavilikolanu ("Rao") did not testify at trial.

175.    In 1996 Edgewater was in the process of investigating the possibility of changing the provider of its anesthesia services.  (Rogan 1326:7-9).  The contract with the group that was in place at Edgewater was set to expire at the beginning of 1997, and Lunde was dissatisfied with that group's performance and had concerns about their ability to fulfill the requirements necessary for the 1998 Joint Commission review. (Rogan 1326:11-15).

176.    Ehmen and Judy Lunde were in charge of making those changes.  Ehmen was in charge of sourcing potential candidates for the position for anesthesia services. Ehmen told Rogan that Barnabas wanted to set up a meeting between Rogan and Rao. (Rogan 218:21-219:2).

177.    Barnabas met Rao at Doctors Hospital after Ramos moved his practice there. (Barnabas - 826:17-22).   Rao was in charge of anesthesia services at Doctors Hospital. (Barnabas - 826:10-13).  Rao approached Barnabas at Doctors Hospital and said that he heard that Edgewater's contract with the current group providing anesthesia services was up for renewal, and Rao would like to bid on the contract.  (Barnabas - 827:1-8).  Rao asked Barnabas to mention it to Ehmen.  (Barnabas - 827:1-8).

178.    Rao told Barnabas that if he got the Edgewater contract, Barnabas would be in charge of his patient referrals, which would increase Barnabas' monetary reimbursements. (Barnabas - 828:12-15).   Through Rao, Barnabas benefited hundreds of thousands of dollars. (Barnabas - 887:24-888:3).

179.    Ehmen met Rao at a restaurant with Barnabas.   Ehmen met with Rao because Barnabas told Ehmen that he worked with Rao at Doctors Hospital and had come to know Rao and the services he provided.   (Barnabas 4-15).

180.    At the meeting, Ehmen gave Rao the criteria Judy Lunde put together.   Ehmen explained that Edgewater needed quality improvement and that Edgewater wanted to retain some of the anesthesiologists, which were important considerations in replacing the anesthesia group. Rao said that he could do those things.   (Ehmen - 364:3-24; 572:19-21; 575:8-25).

181.    Ehmen told the government on September 20, 2001 that some of the prospective groups wanted to clean house of all current anesthesiologists and that was the reason they did not get the job.   (Ehmen - 574:3-8, 574:23-575:3).

182.    Rao also said he knew many primary care physicians that liked his services, and he believed he could recruit a number of them to join Edgewater's staff.   (Ehmen - 366:8-18; 576:1-4).   Rao told Ehmen that Rao would not be on the medical staff, and would therefore be free to handle quality improvement and administration issues.   (Ehmen 368:6-17).   With such an arrangement, Rao would have plenty of time to handle quality improvement.   (Ehmen 368:6-17). It was not unusual for the head of a department at Edgewater to not provide services personally. (Rogan 1332:25-1333:7).

183.    Ehmen told Rogan that Rao was formerly a primary care physician and that Rao would be able to help Edgewater recruit primary care physicians to Edgewater. (Rogan 220:13-

16). Ehmen did not tell Rogan before Rogan met with Rao that Ehmen believed that Rao might be able to bring patients to Edgewater. (Rogan 219:3-6).

184. Ehmen discussed the meeting with Rogan, that he gave Rao the criteria, that Rao could address the quality assurance and was willing to keep the two anesthesiologists that they treasured and that Rao mentioned the potential capability of bringing some primary care physicians aboard. Rogan told him to explore it further. (Ehmen - 369:1-15).

185. Ehmen met with Rao and Barnabas again, and Rao mentioned he knew a board-certified pediatrician, Kumar, and that Barnabas had managed his patients at another hospital. (Ehmen - 370:21-371:4).

186. Ehmen told his brother Rodney Ehmen that there were three reasons Rao got the contract: they were going to retain some anesthesiologists, Rao's group was the best, and there was an opportunity to bring some more doctors on at Edgewater. Ehmen did not tell his brother anything about admissions being a part of it. (DX 1113, Rodney Ehmen's deposition designations.).

187. Ehmen told Rogan that Barnabas wanted to set up a meeting between Rogan and Rao. (Rogan 218:21-219:2). Barnabas introduced Rogan to Rao in the fall of 1996. (Rogan 218:10-12).

188. At the 1996 meeting among Rogan, Barnabas and Rao, Barnabas told Rogan that Rao had an anesthesiology group that was servicing Doctors Hospital of Hyde Park and Methodist Hospital, and that Rao was interested in the opportunity to bid for the position at Edgewater. (Rogan 1327:14-20).

189. Rao told Rogan that Rao had experience in Joint Commission Accreditation of Healthcare Organization ("JCAHO") work, which was important to Edgewater because of the

upcoming Joint Commission review. (Rogan 1328:8-9).  As a practical matter, all hospitals that want to stay in business and participate in reimbursement programs have to be accredited by JCAHO. (Ehmen - 586:19-25; Gross dep. 23:18-22).

190.    At the fall 1996 meeting with Rao, Rao told Rogan that he was very service-oriented toward surgeons, and that he knew a number of primary care physicians and could be helpful in assisting Edgewater in recruiting primary care physicians. (Barnabas - 888:14-18; 221:2-11).  There was no discussion of compensation at the 1996 meeting. (Rogan 1329:15-17). No agreement was reached at the meeting.  (Barnabas - 836:10-11).

191.    Rogan had no discussions with Rao about Rao bringing admissions or detoxification patients to Edgewater  (Rogan 1329:5-10),  and Rogan never had discussions with Ehmen about giving the contract to Rao so that Rao could bring patients to Edgewater.  (Rogan 1341:2-14).  Nor did Rogan tell Ehmen that Rao's contract was going to be for $15,000 a month. (Rogan 224:8-12; 1338:16-24).

192.    In January of 1997, Rogan, Ehmen and Lunde had a meeting to discuss Rao and the hiring of his anesthesia group. (Rogan 1331:3-9).

193.    Ehmen did not tell Rogan that Ehmen did not have a favorable impression of Rao, but quite the opposite. (Rogan 221:14-16).  Ehmen never expressed any reservations about Rao's qualifications or demeanor. (Rogan 1333:21-1334:2).  Ehmen told Rogan and Judy Lunde at the January 1997 meeting that Ehmen was "very happy that Rao would keep the good anesthesiologists on our staff so that that would ease the transition into his group." (Rogan 1331:21-23).

194.     Ehmen did not know Rao was going to pay Kumar while he was negotiating with Rao or where the contract was signed so he could not have told Rogan about that.  (Ehmen - 608:25 - 609:4).

195.     Later, Rao told Ehmen that he was taking $12,000 of the $15,000 and giving it to Kumar for referrals of patients.  (Ehmen - 385:14-20).

196.     Ehmen did not tell Rogan that Rao was paying $12,000 of the $15,000 that Edgewater was paying Rao to Kumar. (Rogan 230:19-22).

197.     Kumar had a relationship with Rao, and he was going to refer patients to Rao and then Barnabas would admit them.  Ehmen did not have a problem with this so long as Barnabas managed the patients responsibly; there was nothing illegal about this.  (Ehmen - 605:6-9).

198.     When Rogan met Rao in the fall of 1996, Rao never mentioned to Rogan that Rao would be able to bring patients referred by a Kumar  (Rogan 223:14-17),  and Ehmen never told Rogan that Rao was obtaining patients from Kumar to send to Edgewater. (Rogan 223:22-25).

199.     Ehmen was investigating the possibility of Edgewater entering into some sort of relationship with Kumar; Tatooles and Hoban were looking at the Kumar relationship because Ehmen wanted everything to be proper and legal.  (Ehmen - 607:4-23).

200.     Eventually, no relationship was entered into with Kumar; by March 31, 1997, Ehmen learned that Kumar was not eligible to participate in Medicaid.  (Ehmen - 608:10-14).  It was a few months after this that Ehmen learned Rao was paying Kumar $12,000.  Ehmen did not know about that when the contract with Rao was signed, and he did not know Rao was thinking about doing that when they were exploring a relationship with Kumar.  (Ehmen - 608:25-609:4).

201.     The contract with Rao's company to provide anesthesia services was signed on February 28, 1997, and the compensation was $15,000 per month. (JX 18).  Rao's company was

paid for the planning and administrative work they did during the month of March. (Rogan 1340:19-24). Rogan never told Ehmen that there was going to be a "trial run" to see whether Rao would be able to send patients to Edgewater. (Rogan 225:8-11).

202. It was Ehmen's responsibility to prepare the contract with Rao, and to have it reviewed by counsel. (Rogan - 1334:14-16; 1335:7-9). Ehmen also had the responsibility of determine the fee for Rao's contract, and whether the fee was fair market value. (Rogan 1338:16-24).

203. When Rao had a patient to admit, he would call Ehmen's secretary, Miss Sherry, who would call or go to admitting with the name of the patient and what designated to put the patient under. (Barnabas- 838:25-839:10; Gotbaum 698:7-13). Rao never called Rogan's office to admit patients. (Gotbaum 698:7-13).

204. Ehmen did not report to Rogan the number of admissions that Rao was bringing to Edgewater. Rogan did not track Rao's admissions, nor did he establish any code to track Rao's admissions. (Rogan 1341:15-23).

205. Edgewater was not able to track patient referrals. (Rogan 229:6).

206. Rogan does not know what the RKO code stands for (Rogan 227:13-16), and Ehmen did not tell Rogan what the RKO code stood for. Consequently, Rogan could not have and never did tell Ehmen to change the RKO code to an APN code. (Rogan 1342:11-17). Barnabas has no knowledge of Rogan setting up any codes for Rao. (Barnabas - 889:24-890:1).

B. **Stoppage of Payments to Rao**

207. In 1998 Rogan heard from Joann Skvarek and Judy Lunde that Rao was not performing his duties under his anesthesia contract. (Rogan 1343:10-18). Rogan received complaints about Rao's anesthesia services from Ehmen and Judy Lunde. (Rogan 231:23 -

232:1). Rogan spoke with Ehmen and told Ehmen to speak to Rao and tell him to perform the administrative duties under his contract. (Rogan 1344:5-11).

208.  Judy Lunde complained that Rao, who was responsible for QI (Quality Improvement) for the Joint Commission, was not doing the QI activities as she expected, and that there were complaints from a few surgeons about the services being provided. Some of the anesthesiologists complained to Ehmen that Rao was not paying them on a timely basis. (Ehmen - 387:24-388:4).

209.  Rogan told Ehmen that Rogan was unhappy that Rao was not performing the administrative services under his contract. (Rogan - 235:21-22). Ehmen spoke to Rao on many occasions about this, but Rao was not doing a very good job so the payments to Rao for the administrative services were eventually stopped. (Ehmen - 587:1-6, 11-20).

210.  This came about because Judy Lunde told Rogan that Rao was still not performing his duties even after Ehmen spoke with him, so Rogan instructed Ehmen to send a breach letter to Rao. (Rogan - 1344:14-19; DX 85). Rogan did not agree with Ehmen to terminate the payments to Rao because Rao had a low volume of patients. (Rogan - 1347:3-7). .

211.  Rogan made the decision to stop paying Rao the $15,000 under his corporation's anesthesia contract. (Ehmen - 596:10-18; 4125-14). Rao was still able to bill and collect payments for the services his anesthesia group provided. (Ehmen - 413:10-14).

212.  Edgewater demanded that someone within Rao's corporation provide the administrative services that Rao's corporation was no longer paid for. (Rogan 226:6-12).

213.  Ehmen testified that he told Rao that the contract was terminated solely because Rao failed to provide the administrative services, because he wanted to make it look like he was terminating the contract for that reason. (Ehmen - 588:18-20).

214.    In conversations that were taped by Rao in April, May or June, 1998, Ehmen told Rao that he never had to bring admissions.  (Ehmen - 587:25-588:5).  Ehmen did not know he was being taped.  (Ehmen - 589:12-24).  DX 994 contains two taped conversations from April 23, 1998, and DX 997 is another of the conversations on May 1, 1998, which were played in open court and which recorded Ehmen telling Rao that he never had to bring admissions to Edgewater.  (Ehmen - 590:8-591:18).[1]  At the time of these conversations, Rogan and Lunde were all over Ehmen to get QI done; Ehmen was talking with Del Patulo and Soloway about the QI problem, a breach letter was being prepared (Ehmen - 592:20-22). with John Tatooles and it was sent out .  (Ehmen - 594:8-10; DX 85).  The breach letter gave a 30-day cure period so that Rao would continue to receive payment for administrative services, which would go into June, so the contract could not have been terminated in April or May.  (Ehmen - 595:12-24; DX 85).

215.    Throughout this period, Ehmen told Rao that Rogan was freaking out over Joint Commission — and that Rogan just wanted to make sure that everything was getting done; and in the conversations that Ehmen had with Rao about getting QI done, he wasn't talking about Rao's admissions; and Ehmen kept trying to get the QI done until ultimately the payments were stopped.  (Ehmen - 596:10-18).

216.    In July, 1998, Ehmen was taped telling Rao that if Rao provided good services, he would have the anesthesia contract for life.  Nothing was said about admissions.  (DX1021[2]; Ehmen - 598:18-599:1).

C.  **Florascribe Contract**

217.    In early 1997 Rogan met with Barnabas and Rao to discuss the detoxification program at Edgewater. (Rogan 1347:8-17).

---

[1] The audio clips, which include text, were filed with the Court on May 5, 2006.
[2] Ibid.

218.    At that meeting Rao stated that he was involved with the detoxification program at Doctors Hospital of Hyde Park, and that he would be interested in working with the Edgewater program. (Rogan 1347:18-24). Rao did not say that he had a source for patients, nor did he discuss any number of patients at that meeting. (Rogan 1347:25-1348:9).

219.    At that time, Edgewater had a contract with an organization called Special Care, which was scheduled to expire at the end of 1997. Special care was paid to run Edgewater's detoxification program. (Ehmen - 411:23 - 412:1). Special Care informed Lunde, who was responsible for the program, that they wanted a significant increase in their fees. Rogan told Lunde that it would be unacceptable for Special Care to have such an increase in their fees. (Rogan - 237:9-14; 1349:18-1350:3).

220.    Ehmen and Judy Lunde were looking for an alternative to Special Care. (Rogan 1350:4-10). Rao approached Ehmen regarding Florascribe  (Ehmen- 399:10-14), and Ehmen brought Florascribe to Rogan's attention. (Rogan 1350:4-10). Ehmen testified that Doctors Hospital was the leader in terms of volume of business regarding detoxification services, and Florascribe did the marketing for that program. (Ehmen - 400:4-8).

221.    Ehmen and Lunde handled the details of the agreement. (Rogan 236:25-237:3). Lunde was responsible for the administrative side of the detox program, and Ehmen worked with Lunde to ensure that Edgewater could provide the detoxification services. (Rogan 237:5-8).

222.    Ehmen wanted to determine whether Florascribe was an acceptable vendor, and Edgewater was concurrently trying to negotiate with Special Care for a renewal of their contract. (Rogan 238:8-11), so Rogan and Ehmen decided to give Florascribe a trial run. (Ehmen 400:3-19; Rogan - 1350:20-1351:3). A trial run was given to Florascribe, Ehmen recommended the contract to Rogan, Rogan made the decision and a contract was given to Florascribe. Ehmen

40

recommended Florascribe because he wanted to save face with Rogan because Rao had not worked out very well on the anesthesiology contract which Ehmen had recommended. (Ehmen - 401:19-402:5; 599:25-600:8).

223. The Florascribe contract was presented and approved by the board of directors at the December 1, 1997 meeting. (JX 1: EMC 3405).

224. In 1997, Edgewater entered into a contract with Florascribe for marketing the medical detox program. (Ehmen 397:24-398:4). Rao's wife was the owner and/or manager of Florascribe. (Ehmen - 398:9-11; Rogan - 237: 7-15; 1352:7-9). Special Care did not do the marketing after Edgewater contracted with Florascribe. (404:8-14; 405:1-4).

225. It was Ehmen's and Lunde's job to recommend the compensation for that contract, and to ensure that the compensation was fair market value. (Rogan 1352:13-18). The Florascribe contract paid $20,000 per month, it was a figure Rao gave to Ehmen and Rogan approved it. (Ehmen 403:8-18). Ehmen testified that Rao had demanded $20,000 for Florascribe, but Ehmen told the government in his interviews that the $20,000 was, in fact, for marketing expenses. (Ehmen - 600:12-601:17). Although Ehmen did not think $20,000 was fair market value for the Florascribe contract, he recommended it to Rogan because Rao demanded it. (Ehmen 404:19-21). Ehmen never told Rogan that Ehmen thought that Florascribe's compensation was not fair market value. (Rogan 1352:23-25).

226. Florascribe was not given the contract because Rao was going to bring in patients to Edgewater. (Rogan - 1352:20-22).

227. At the end of 1997, Lunde was able to negotiate with Special Care and renew their contract with Edgewater. The Special Care contract was revised and renewed, and Florascribe was terminated because their services were no longer needed. (Rogan 1353:1-14; JX

41

1: EMC 3524-44).  The Florascribe contract was not terminated because Rao failed to bring in patients to Edgewater, or took credit for patients that Special Care had brought in. (Rogan 1353:15-21).

    D. **August 24, 1998 Meeting (Recorded).**

228.    Rao and Barnabas wanted to meet with Rogan to discuss Rogan's decision to stop paying the $15,000 to Rao under Rao's anesthesia contract.  (Ehmen - 418:7-9).

229.    Barnabas got a call from Rao asking Barnabas to set up a meeting with Rogan because Rao said Edgewater owed him two checks and he wasn't getting anywhere going through Ehmen.  (Barnabas - 859:17-22).

230.    Ehmen informed Rogan that Drs. Barnabas and Rao wanted to meet.  Prior to the meeting, Rogan never told Ehmen that Rogan thought "something was fishy" or that Rogan "smelled a rat" in connection with the meeting. (Rogan 1354:17-1355:4).

231.    The conversations Ehmen had with Rogan before and after Rogan met with Rao and Barnabas to discuss the termination of payments to Rao were significant conversations, that he recalled very well when he testified, that made an impact on him, but he doesn't remember if he told the government about those conversations.  (Ehmen - 658:12-659:17).

232.    FBI Agent Sherry Coon ("Coon") interviewed Ehmen as well, and talked with Ehmen about conversations he had with Rogan.  (Coon - 1250:17-19).  Coon also talked with Ehmen about problems with Rao's anesthesia contract.  (Coon - 1250:20-24).  Ehmen never told Coon that he had a conversation with Rogan where Rogan stated he thought it was fishy that Rao was so insistent on setting up a meeting with Rogan.  (Coon - 1250:25-1251:4).  Ehmen never told Coon that Rogan warned him to be careful when talking with Rao.  (Coon - 1251:5-7).

233.    During his interviews with Ehmen, FBI Agent Jim Ferguson asked Ehmen about the problems that Edgewater was having with Rao's anesthesia contract.  (Ferguson - 1259:6-8).

Ehmen never told Ferguson that Rogan told Ehmen that Rogan thought an upcoming meeting with Rao was fishy. (Ferguson - 1261:22-1262:1). Ehmen never told Ferguson that Rogan told Ehmen that Ehmen needed to be careful as a result of any conversation Rogan had with Rao. (Ferguson - 1262:2-5).

234.    Rao and Barnabas met with Rogan on August 24, 1998 in Rogan's office. (Rogan - 1354: 9-12; Barnabas - 865:4-14). Rao told Rogan that Edgewater owed him two checks from one of his contracts, and he was using these checks to pay a physician that was sending patients to Edgewater. (Barnabas - 866:2-7). Rogan was very emphatic that Edgewater did not pay for patients. (Barnabas - 866:20-22). Rao said that if Rogan didn't pay this physician, this physician may call certain people, meaning the authorities, and say he wasn't being paid for patients and that Edgewater owed him two checks. (Barnabas - 868:2-10). Barnabas had never seen Rogan so mad or upset as by that comment. (Barnabas - 868:11-13). Rogan again said in no uncertain terms that Edgewater did not pay for patients, never had, and if Rao continued on this line of questioning, Rogan would see that justice was served and this person was brought up to disprove what Rao was trying to say. (Barnabas - 868:14-22).

235.    At the August 1998 meeting, Rogan told Drs. Barnabas and Rao that if the proper notices had been given to Rao regarding the termination of his payments, then those payments for administrative services were not going to be reinstated. (Rogan 1355:14-21).

236.    At the August 1998 meeting, Rao said that he had a source for patients, and Rogan said that he "was not interested in a source for patients or anything else like that." (Rogan 1355:1-3).

237.    After the meeting, Rogan spoke with Ehmen and asked him if Ehmen had any kind of discussions with Rao that could be considered questionable, and that now was the time to tell Rogan. (Rogan 1356:19 - 1357:5).

238.    Ehmen assured Rogan that Ehmen had no such conversations like that with Rao. Because of this assurance, Rogan did not bring this meeting to the attention of the Edgewater attorneys. (Rogan 1357:7-19).

239.    Rogan subsequently learned that Rao was recording the meeting, and Rogan did not know at the time that the meeting was being recorded, nor did he have any suspicions that it was being taped. (Rogan 1356:7-18).

240.    In 1998/1999 Judy Lunde and Joann Skvarek informed Rogan that they were displeased with Rao's services, and that they were going to go out and search for new anesthesiologists. (Rogan 235:15-18).  This is confirmed in the February, 1999 Board of Director minutes.   (JX 1: EMC 3912).   In 1999, the anesthesia contract Edgewater had with Rao's corporation was terminated in its entirety, and Rao had nothing to do with Edgewater after that. (Rogan 1357:21 - 1358:4).

VII.    **ANDREW CUBRIA**

    A.    **Background**

241.    Cubria began practicing medicine and became an employee at Edgewater in 1979. (Cubria -  896:1-4; 896:24 - 897:4).

242.    Cubria is a bilingual, Cuban cardiologist who did both invasive and general cardiology, and who performed cardiac catheterizations. (Rogan - 89:3-12).  He was on the Edgewater staff and had medical privileges, and performed other inpatient and outpatient procedures at Edgewater. (Rogan - 89:13-17).  Dr. Cubria had a busy private practice. (Rogan - 91:16-17, 113:11-13).

243.    As part of his employment at Edgewater, Cubria was involved in the residency teaching program, primarily in the field of cardiology.  (Cubria - 897:5-13).

244.    Cubria was the co-director of one of the coronary care units and helped run the telemetry unit and the teaching program at Edgewater.  (Cubria -  897:5-13).

245.    Rogan first met Cubria when Rogan became the owner and chairman of Edgewater. (Rogan - 88:25 - 89:2).

246.    Prior to 1994, Rogan did not have a particularly close relationship with Cubria. (Rogan 91:21-92:2).

B.    **Build-out for Cubria**

247.    Cubria kept his primary office at Edgewater  from 1989 through 2001.  (Rogan 94:21-25).  In the early 1990's, Edgewater built-out the space at the Edgewater professional building for the physician practice of which Cubria was a part because the physicians were scattered throughout the building and needed to be together.  (Cubria - 906:8-18).  The cost was to be included in the future rent for the practice group.  (Cubria - 907: 6-10).  In late 1993 or 1994, the practice broke up,  (Cubria - 907:11-20). and two of the other doctors decided to leave because they were admitting most of their patients to Illinois Masonic.  (Id.).  So Cubria testified that he and the other doctor in the practice were in a bind.  (Cubria - 907:21-908:3).  Cubria testified that Rogan told him if Cubria would "stay back," the cost for the build-out would be waived.  (Cubria - 908:22-25; 909:1-4).

248.    Cubria did stay in the professional building, and continued to pay rent for his office space.  (Cubria - 909:9-11).  Rogan has become aware of the amount of rent Cubria paid for his office space through the litigation.  (Rogan - 1377:9-16).  Rogan never waived any portion of Cubria's rent for the office that Cubria maintained at Edgewater.  (Rogan - 1382:16-18).

45

249.     During the time he was cooperating with the government in connection with the investigation, Cubria was asked about the rent he paid for office space but he never told the government that Rogan allegedly agreed to waive the portion of the rent for the cost of build-out. (Cubria - 1076:21 - 1077:15).

C.  **Teaching/Directorship Contracts**

250.     In August of 1996, Edgewater and Cubria entered into a contract for Cubria to serve as a Medical Director and Edgewater entered into a contract with Cubria's professional service corporation for Samuel Goldstein ("Goldstein") to perform teaching and proctoring duties.  (Cubria - 935:13-936:18; Ehmen - 436:16-437:1).

251.     These contracts were not given in exchange for Cubria treating patients at Edgewater.  (Cubria -  935:13-16).

252.     Rogan did not agree to this contract to provide monney to Cubria to repay a loan he received from Edgewater, to defray the costs of Goldstein's salary, or so that Cubria would bring patients to Edgewater.  (Rogan - 1388:14-16; 1390:11-21).

253.     The teaching agreement with Cubria's corporation, effective August 1, 1996, provides for $28,800 in compensation, (Rogan - 126:24-127:5, 131:14-16). and  provides that either Cubria or Goldstein would perform the teaching services.  (Rogan - 127:19-22; JX 13 B).

254.     Goldstein did fulfill the duties required of him for teaching in the telemetry unit, and Cubria never said otherwise to Rogan.  (Cubria - 1079:6-11).

255.     The directorship agreement with Cubria's corporation, effective August 1, 1996, provides for $43,200 in compensation. (Rogan 126:5-15; JX 13 A).

256.     Ehmen was responsible for setting the level of compensation and determining the fair market value of the contracts.  (Rogan - 1389:16-21).  Ehmen considered the amounts to be above fair market value (Ehmen - 443:8-10), but never told Rogan that the compensation in the

agreement was not fair market value or that Cubria was not performing the services or hours under the contract. Nor did Rogan have any knowledge that Cubria was not performing the services or hours required by the contract. (Rogan - 1389:22 - 1390:10). Cubria did not tell FBI Agent Coon that he told Rogan that Cubria was failing to fulfill his duties under his Edgewater contracts. (Coon - 1247:25 - 1248:5).

257. Ehmen testified that Cubria had a directorship contract and a teaching contract that paid a total of $72,000 and that the amount was higher than any other dual responsibility contracts. (Ehmen - 440:4 - 441:22, 619:6-12). According to Ehmen, the typical amount for these services would be $36,000 per year. (Ehmen - 441:10-20).

258. DX 316 is at teaching-only contract Edgewater had with Dr. Jin that paid him $72,000. (Ehmen - 620:15 - 621:3).

259. Dr. Ali had contracts with Edgewater. DX 317 is a teaching contract between Edgewater and Ali dated January 1, 1996 which paid him $48,000. DX 318 is another contract with Ali dated July 1, 1996 which paid him $24,000. DX 319 is another contract with Ali for detoxification services dated March 1, 1996, which paid him $24,000, for a total of $96,000. Ali also had a busy practice. (Ehmen - 624:4 - 625:3).

260. Goldstein left Cubria's practice. GX 57 A is the letter dated January 27, 1998 terminating the teaching and directorship contracts because Goldstein left the practice and was no longer available to provide those services. (Ehmen - 473:7-15; Rogan - 170:10-23).

261. Cubria complained to Ehmen about losing the income from those contracts, and suggested that he be appointed as Medical Director of the Cardiac Rehabilitation program. (Ehmen - 473:16 - 474:2).

262.    The Cardiac Rehabilitation contract (discussed below) was not given to Cubria to replace the income Cubria lost from the termination of the teaching and directorship contracts. (Rogan - 1392:8-11).

D.    **Medical Directorship Contracts**

263.    Cubria had a contract to be the Director of Cardiac Rehabilitation at Edgewater beginning 1981 or 1982.    (Cubria - 1072:15-17).    Later in the 1980s Cubria was paid $36,000/year or $3,000/month to be the Medical Director of Cardiac Rehabilitation and read EKGs. (Cubria - 1073:8-15).

264.    Cubria indicated that he had, for a number of years, acted as Medical Director of Cardiac Rehabilitation without compensation, and in 1998, he suggested a figure of $4,000/month.    (Ehmen - 474:4-9).    Ehmen told Rogan that Cubria was acting as the medical director without compensation.    (Rogan - 1391:10-16).

265.    Ehmen was concerned that if Edgewater did not give Cubria this contract, he might move his business elsewhere because Cubria threatened to do that. (Ehmen - 474:10-13).

266.    Ehmen did not tell Rogan that Cubria was going to leave Edgewater if Cubria was not compensated.    Ehmen told Rogan that Cubria was no longer going to act as the Medical Director without compensation.    (Rogan - 1391:17-21).    If someone did not perform the duties of the Medical Director, then Edgewater could not have had a Cardiac Rehabilitation program because there would be no Medical Director to supervise the program.    (Rogan - 1391:21-24).

267.    In 1998, Cubria and Rogan discussed a contract for Cubria to run the Cardiac Rehabilitation Department.    Cubria and Rogan did not discuss admissions or referrals in connection with this contract.    (Cubria - 1024:6 - 1025:8).    Cubria never told FBI Agent Coon that his directorship contract was in exchange for admitting or keeping his patients at Edgewater. (Coon - 1248:22-25).

48

268.    Ehmen approached Rogan and said that the services in the contract were necessary for Edgewater, and Ehmen would have suggested how much time was required and would have recommended the level of compensation.  (Rogan - 1387:18 - 1388:1; 1392:12-13).  It was Ehmen's responsibility to ensure that the compensation was fair market value.  (Rogan 1388:2-5; 1392:14-16).  It was also Ehmen's responsibility to make sure that the services and hours required by the contract were performed.  (Rogan - 1392:20-22).

269.    Edgewater entered into a contract with Cubria to be the Medical Director of Cardiac Rehabilitation in 1998.  (Cubria - 1073:18-20).  JX 13 D is the contract to direct the Cardiac Rehabilitation program, and it paid Cubria $4,000/ month.  (Ehmen - 475:10-19).

270.    Ehmen thought $4,000 a month was overpaying Cubria for those services.  (Ehmen - 475:20-23).  Fair market value would have been $1,500 to $2,000,  (Ehmen - 475:24-476:2), but Ehmen never told Rogan that the amount of compensation in the agreement was not fair market value.  (Rogan - 1388:6-9).

271.    Ehmen testified that Cubria did not do enough work under the cardiac rehabilitation contract and that he discussed that with Rogan.  However, when he spoke to the government about this issue, Ehmen said that he heard that Cubria was not doing his work and that Ehmen did not take this issue to Rogan.  (Ehmen - 646:5-19).

272.    Cubria did not tell Rogan that he was not performing the duties under the contract to be the Director of Cardiac Rehabilitation (Cubria - 1075:23-25), and Rogan did not know that Cubria was not performing the services or putting in the hours required under the contract.  (Rogan - 1392:23 - 1393:1).  Cubria discussed this issue with Ehmen.  (Cubria -  1076:1-2).

273.    Ehmen told no one other than the nurse that Cubria was not performing his work under the Cardiac Rehabilitation contract.  (Ehmen - 647:15-19).  Ehmen did not tell Rogan that

49

Cubria was not performing the services or putting in the hours required under the contract. (Rogan - 176:3-5; 1393:2-3). Nor did Rogan hear that from anybody. (Rogan 176:6-8).

274. One of Ehmen's concerns about Cubria was that he was a big producer, and Ehmen wanted to make sure that Cubria was kept happy to keep his admissions coming into the hospital, because Ehmen was the person in charge of physician recruiting, that was part of his responsibility, and if a big producer keeps bringing in patients, that makes Ehmen look good. (Ehmen - 648:11-14).

275. DX 246 is a professional time report for Cubria. Cubria signed these forms to attest to the number of hours he worked. Ehmen's signature is attestation of the fact that Cubria said he worked the hours, though Ehmen knew that Cubria did not perform all of the hours he was required to under the contract. Ehmen believes the hours on the report are an exaggeration, which Ehmen knew when he signed. (Ehmen - 650:9-22).

E. **Teaching Service**

276. There is a $3,000 check to Cubria for services described as January 1995 Teaching S. (Rogan 105:19-106:1).

277. Cubria was paid for teaching services in June, 1995. (Rogan - 108:6-10).

278. Cubria received checks for $5,000 for teaching (GX 34 A), and there is a request for the check at (GX 34 A: 13039). that is for a "teaching service bonus" and is signed by Rogan. (Rogan - 106:20-107:21). Skvarek had approval to sign Rogan's name to check requests during 1995. (Rogan - 109:12-14). Ehmen signed and submitted the check requests for Cubria's teaching service, representing that Cubria was doing work in connection with a program Ehmen was responsible for supervising. (GX 34 at 13045).

279. The checks that were paid for Cubria that were for teaching services were to cover the teaching service, and not for Cubria teaching residents. (Rogan - 110:14-20). "TS" on the

greenbar sheets next to Cubria and Ali stands for Teaching Service. (Rogan - 142:9-10; DX 286; 25338, 25105). Cubria would not have had a contract to perform on the teaching service for Edgewater (Rogan - 110:21 -111:9) because Cubria was performing the teaching service on a fill-in basis for Dr. Ali, and was paid for that time accordingly. (Rogan 111:4-5). Ehmen established what Cubria's reasonable compensation would be. (Rogan 111:13-19).

F. **EKG Contracts**

280. After Cubria ceased to be an employee of Edgewater in approximately 1987, he was paid approximately $1,500 to $2,000/month to read EKGs. (Cubria - 898:19-25).

281. In the period 1993 and 1994, Cubria and three other cardiologists at Edgewater were responsible for reading EKGs and were paid approximately $1,500 to $2,000/month. (Cubria - 914:20-915:5).

282. In the period 1993 and 1994, Cubria and the three other cardiologists who read EKGs (Rogan - 1383:14-18) approached Rogan about an increase in the cardiologists' compensation for reading EKGs because they were not satisfied with their compensation. (Cubria - 914:20 - 915:7).

283. Prior to 1993 and 1994 physicians were able to bill and collect their professional fee for reading EKG tests. At that time Medicare proposed or was implementing changes that would not allow physicians to render a separate bill for EKGs during a normal hospitalization of a patient. Instead, the EKG would be considered part of a Diagnostic Related Group ("DRG"), so the physician could not render a separate fee. (Rogan - 1383:1-8).

284. Drs. Saudye, Hussain, Heary and Cubria were the four cardiologists who were under contract to read EKGs. (Rogan 1384:3-7). Rogan discussed with these cardiologists that they wanted to be paid for reading EKGs, and because they could not render a bill, the hospital negotiated a contract with them to pay for those services. (Rogan - 1383:14-18).

285.    During his discussions with Rogan about an increase in compensation for the duties associated with reading EKGs, Cubria did not tell Rogan that he would think about moving his patients to another hospital if Rogan did not approve an increase in the compensation to be paid for the duties associated with reading EKGs.  (Cubria -  915:8-19).

286.    Cubria "never" told Rogan that he would leave Edgewater unless Rogan and Edgewater gave him certain things, including the contract to read EKGs.  (Cubria -  915:8-19). Cubria never told the government that his contract to read EKGs was in exchange for admitting or keeping his patients at Edgewater.  (Coon - 1248:11-20).

287.    Cubria was paid $48,000 in his first year as an employee for the responsibilities associated with the teaching program and reading EKGs, and his compensation increased to $60,000/year after he passed his Board exams  (Cubria - 898:4-10).

288.    In 1995, Cubria had an EKG reading contract that paid $6,000 a month.  (Ehmen - 423:7-11).

289.    There were three other cardiologists in addition to Cubria who were also paid $6,000 per month to read EKGs.  (Ehmen - 617:5-7; Rogan - 113:5-8).  Each cardiologist would read EKGs every fourth week, one week per month.  (Ehmen - 428:7-13; Rogan - 113:9-10).

290.    JX 11 is one of the EKG reading contracts that has a 600 hour requirement and paid $6,000 per month.  Ehmen determined the number of hours the physician was required to work in the agreement. (Rogan - 114:13-15).

291.    Rogan expected Ehmen to settle on a fair amount to pay the physician under agreements. (Rogan - 113:24-114:3).  It was Ehmen's responsibility to draft the contracts and determine whether the payment was fair market value.  (Rogan - 1384:11-16; 1385:6-10).

292.    Ehmen used a salary survey to arrive at the amount, which was a legitimate document.  The salary amount of the contracts were fair market value if the hours were worked, including for the EKG contract.  (Ehmen - 614:15 - 615:17).  DX 222 is the type of salary survey used to determine the hourly fee.  (Ehmen - 426:3-427:21).  DX 20 B is a salary justification for cardiology test interpretation services.  (Ehmen - 458:9-459:3).

293.    Ehmen never reported to Rogan that the amount of the EKG contract was not fair market value. (Rogan - 1385:11-13).

294.    No one at Edgewater determined whether or not Cubria was working anywhere close to 600 hours a year on this contract.  (Ehmen - 428:17-20).  It was Ehmen's responsibility to see that the amount of work required under the EKG contracts was performed, and the appropriate number of hours put in.  (Rogan - 1385:14-19).

295.    Rogan was not involved in that process at all.  (Rogan - 1385:20-21).  Ehmen never told Rogan that Cubria was not performing the services required under the EKG contract. (Rogan - 1385:22-25).

296.    Concerning the contract to read EKGs, Cubria did not discuss with Rogan the number of hours he was to work under the contract.  (Cubria - 1075:23-25; Rogan - 1386:4-6). Cubria never told Rogan that he was not working the number of hours called for under that contract.  (Cubria - 1075:23-25; Rogan - 1386:4-6).

297.    When FBI Agent Jim Ferguson interviewed Ehmen on October 3, 2001, Ehmen told Ferguson that Cubria was not doing his work under the Cardiac Rehabilitation contract, and Ehmen also told Ferguson that Ehmen did not take that issue to Rogan.  (Ferguson - 1257:24-1258:5).

G.  **Cubria's Threats to Leave Edgewater**

53

298.    Cubria was unhappy at Edgewater a number of times. (Rogan - 92:9-11).  Cubria complained to Rogan about Edgewater's service, personnel, equipment, and facilities. (Rogan - 116:15 - 117:3; 1373:20 - 1374:2).

299.    In the early 1990s, Rogan did not learn that Cubria was thinking of moving his practice to another hospital.  (Rogan 92:3-6).  In the early 1990s, Cubria had just come back to Edgewater from Illinois Masonic. (Rogan 92:9-11).

300.    Cubria was always threatening to move his practice when he didn't get what he wanted.  (Ehmen - 430:10-13, 652:8-10).  Cubria threatened at some point in time, to move his patients somewhere else.  (Rogan 116:3-5).  Rogan heard this through somebody else.  (Rogan 116:8-10).  Ehmen and Rogan talked about the fact that they felt he was bluffing.  (Ehmen - 652:11-15).

301.    Rogan did not approve any contracts with Cubria to keep him bringing patients to Edgewater.  (Rogan - 1375:11-15).  Nor were the EKG contracts given to Cubria so that he would not leave Edgewater.  (Rogan - 1386:9-12).  There were three other cardiologists in addition to Cubria who also had contracts and were paid $6,000 per month to read EKGs. (Ehmen - 617:5-7; Rogan - 113:5-8).

302.    A cardiac catheterization lab was not built because Cubria complained about it. All of the cardiologists were pleased when the new equipment was installed. (Rogan - 1374:14-21).

303.    Rogan never threatened to pull Cubria's EKG contract if he did not refer or admit a certain number of patients to Edgewater.  (Cubria - 918:21-24).

304.    Ehmen and Rogan would discuss that they wanted to retain Cubria on the medical staff. (Ehmen - 430:10-17; Rogan - 117:4-6).  They wanted to retain Cubria because he was a

Latino cardiologist and Edgewater had a number of Latino patients, he had good credentials, was board certified, trained at the University of Illinois and had a busy practice that generated revenue for Edgewater. (Ehmen - 430:18-25).

305.    The Vida Nueva program grew out of the Hispanic Physician Referral Program, and was focused on the Hispanic community associated with primary care medicine. (Rogan 176:9-16).

306.    Cubria was concerned that the hospital was sponsoring this program, and it resulted in cardiac referrals going to other doctors, and Cubria was incensed by that.  (Ehmen 484:12-15).

307.    On June 17, 1998 Rogan sent Cubria a letter in response to a complaint by Cubria that Cubria should be in charge of the Vida Nueva program. (Rogan 177:19-25; GX 39-D). Cubria complained that the Vida Nueva program was competing with the Latino heart program. (Rogan 178:4-8).

308.    The June 17, 1998 letter discusses expanding the Latino heart program with a larger budget. (Rogan 178:15-18).  At this particular time, this did not include an expansion of the advertising budget for the Latino heart program.  (Rogan 178:19-22).  Ehmen pulled all of the Hispanic programs together and put them under one "umbrella" as multi-faceted marketing to the Hispanic community. (Rogan 179:1-6).

309.    DX 320 is a memo to Ehmen from Cubria dated August 26, 1998.  It shows that Cubria is still upset about the Nueva Vida program.  (GX 39 D).  Nevertheless, the Nueva Vida program was never cancelled.  (Ehmen - 651:25-652:4).

310. During the Edgewater investigation, Cubria was asked about contracts that he had with Edgewater. Cubria never told the government that he threatened to leave Edgewater if he did not get the contracts. (Cubria - 1098:5-8, 1101:11-13).

### H. **Loans to Cubria**

311. Doctors routinely came to Rogan and asked him for loans. (Rogan 134:1-3).

312. Rogan had a standard practice in considering whether or not to grant requests for loans physicians requested. (Rogan 137:19-21). The process was to bring in Edgewater's attorneys to make sure that Edgewater met all of the requirements to give these loans, and management would look to see whether giving the loans was something that management wanted to do. (Rogan 138:3-9).

313. Rogan did not give Cubria loans in order that Cubria bring his patients to Edgewater. (Rogan - 1375:18-20). Cubria never told the government that he got his loans from Edgewater in exchange for admitting or keeping his patients at Edgewater. (Coon - 1249:9-11).

### I. **$84,000 Loan**

314. In 1995, Cubria and Rogan discussed the circumstances under which Edgewater would consider loaning money to Cubria to help him hire another doctor, Dr. Diaz, in order to expand Cubria's practice. Cubria and Rogan did not discuss admissions or referrals in connection with this loan. (Cubria - 927:3-930:14; Ehmen - 432:16-21). In 1995 or 1996 Cubria came to Rogan to ask for assistance to help hire a Hispanic cardiologist. (Rogan 117:21-23). Rogan agreed to enter into a loan agreement with Cubria. (Rogan 118:19-20). The loan was for $84,000, and the promissory note was signed in March of 1996. (Rogan 119:1-3; JX 12 A).

315. Cubria wanted Edgewater to loan him money so that he could afford to bring Diaz in as an associate. (Ehmen - 432:16-21).

316.     Diaz did not join Cubria's practice.  As a result, Cubria wanted to hire Goldstein, a board-certified cardiologist with impeccable credentials, and he wanted Goldstein to teach in the cardiology sub-specialty for the internal medicine residency program at Edgewater.  (Ehmen 435:19-24).

317.     The payments to Cubria for the loan were stopped for a period of time  (Rogan 120:8-9), and resumed under the amendment to the loan agreement, which was signed in November of 1996 (Rogan 128:14-19; JX 12 B). and allowed for the hiring of Goldstein instead of Diaz.

318.     Cubria did hire Dr. Goldstein. (Cubria - 932:16-19; Rogan 121:17-19).

319.     This loan was paid back with interest. (Rogan 1409:7-8). (DX 1135).

J.   **$150,000 Loan**

320.     In April of 1997 Cubria came to Rogan and asked Rogan to arrange a loan from Edgewater to Cubria. (Rogan 133:9-20).  The loan was made up of two $75,000 loans.  (Rogan 134:4-7).  Rogan does not remember what Cubria needed the loan for.  (Rogan 133:21-22). Rogan does not recall whether Rogan discussed this loan with Roger Ehmen. (Rogan 134:22-23). Cubria did not testify that he and Rogan discussed admissions or referrals in connection with this loan.

321.     GX 10-B is a security agreement in association with the $150,000 loan made to Cubria, dated April 9, 1997. (Rogan 136:13-17; GX 10-B).

322.     The loan was paid back, with interest, and the interest rate was above prime. (Rogan - 1409:17-22; DX 1135).

K.  **Option to Purchase Cubria's Practice and $60,000 Loan**

323.     Rogan explored the idea of buying Cubria's practice and making Cubria an employee of the hospital in 1997. (Rogan 160:18-20).  Cubria was interested in moving out of

the practice of medicine, and into the administrative or management side of hospitals. (Rogan - 1393:13-17; Cubria - 1006:20-23).

324. An agreement relating to purchasing Cubria's practice is Exhibit 10-C. (Rogan 161:5-7).

325. Edgewater hired a valuation firm to place a value on Cubria's practice because it made good business sense and also because Edgewater had certain obligations as a non-profit company under the Internal Revenue Code. (Rogan - 1393:21 - 1394:5).

326. Rogan negotiated the agreement regarding purchasing Cubria's practice. (Rogan 161:8-11). Ehmen did not participate in the negotiations regarding Edgewater purchasing Cubria's practice. (Rogan 161:12-15).

327. The agreement relating to the purchase of Cubria's practice provides for Edgewater to pay Cubria $60,000 for an option to purchase. This $60,000 would be a down payment for the purchase if it were to go through; and if the purchase did not occur by November of 1997, then that payment would convert to a loan. (1410:13-23; GX 10C).

328. Ehmen was aware that the $60,000 payment to Cubria in 1997 for the purchase of his practice converted to a loan if the transaction did not go through and does not know whether or not the loan was paid back. (Ehmen - 618:10-23).

329. Edgewater did not Cubria's practice (Rogan - 163:16-18),

330. The $60,000 became a loan, which Cubria paid back with interest. (Rogan - 1410:24-25).

L. **Payback of the Edgewater Loans.**

331. Cubria wrote a check to Edgewater for $50,000, which is dated May 30, 1997. (Rogan - 152:23-25). Cubria wrote a check to Edgewater for $75,000, which is dated June 11,

1997. (Rogan - 153:1-5). Both the $50,000 and the $75,000 checks were received on June 17, 1997 (Rogan 153:6-8). and paid back a portion of Cubria's loans.

332. Rogan learned that Cubria had been late with his payments on the loans, and a plan was worked out whereby Cubria would have $6,000 taken out of his checks from Edgewater to repay the loans. (Rogan - 1411:1-15). Rogan also investigated placing liens on Cubria's property to get repayment of the loans, but did not follow through because the loans were being paid. (Rogan - 1411:16 - 1412:6).

333. DX 1135 is a December 22, 1997 Cubria Note Analysis. (Zeisel - 1226:22-25). The document shows Cubria's loans and the interest rates on those loans. (Zeisel - 1227:6-9). It shows that if the monthly payment amount is $6,000, the loans would be paid off by December 2000. (Zeisel - 1228:13-25).

334. A program for Cubria to repay his loans from Edgewater was implemented. (Zeisel - 1228:8-10). Zeisel was involved in setting up the procedures in the accounting department to make sure that $6,000 was deducted from Cubria's payments. (Zeisel - 1228:16-20). In 1998 Cubria still had a contract to read EKGs, but Cubria was not receiving the $6,000 per month under the contract because he was paying back the loans he had with Edgewater. (Rogan 183:24-184:4).

335. Cubria paid back all of the loans he received from Edgewater. (Cubria - 1115:5-6).

## VIII.  **Hispanic Program**

336. Edgewater had a program that focused on the Hispanic community, but it was not Cubria's program. (Rogan - 140:4-5). Edgewater "always had an interest in the Latino community." (Ehmen - 582:8-10). Ramos was hired as an Hispanic liaison. (GX A 14, A 15).

And the Limited Offering Memorandum identifies Edgewater's interest in developing the market and programs with the Hispanic community. (DX 139: CB 2173).

B. **Feasibility Study**

337.    Ehmen and Rogan discussed that Cubria had made it known that for some time Cubria was interested in being involved in the administrative side of things, that for some time he had a desire to get into the administrative arena. (Rogan - 459:20-460:1; 1393:13-17).

338.    As part of the discussions relating to purchasing Cubria's practice, there were discussions regarding the Latino Heart Institute a/k/a Instituto de Cardiologia. (Rogan - 1394:9-11).

339.    Rogan suggested that Edgewater put together a proposal with marketing and demographic analysis and all the other things that go into a normal proposal — he wanted a full-blown analysis of the Instituto de Cardiologia. (Ehmen - 445:23-446:4).

340.    Cubria and Rogan discussed Cubria performing a feasibility study for the proposed Instituto de Cardiologia, which would tie into Edgewater's purchase of Cubria's practice. (Rogan - 1394:18-23). The feasibility study would discuss, among other things, the benefits of advertising. Cubria and Rogan did not discuss admissions or referrals in connection with the feasibility study. (Cubria - 948:2-949:6; Rogan - 1375:21-24).

341.    The feasibility study concerned matters other than advertising. (Cubria - 1089:24-1090:2). including the services to be provided, the facilities, equipment, personnel and demographic information. (DX 53 D).

342.    Rogan had performed approximately 25 feasibility studies, and supervised another 25, while at Ernst & Ernst. (Rogan 1396:15-22; 1397:11-16).

343.     A feasibility study for a program typically involves demographic analyses, and analyses of competition in the area. (Rogan 149:2-11).  Feasibility studies also involve making budget projections and analyzing financial statements. (Rogan 149:12-14).

344.     Rogan was familiar with the type of information that went into feasibility studies, the costs of putting feasibility studies together, and the work necessary for a feasibility studies. (Rogan - 1396:23 - 1397:6).   The range of costs of feasibility studies Rogan recollects was between $40,000 to over $100,000.  (Rogan - 1397: 20-23).

345.     Prior to the time Cubria performed work on the feasibility study, he had been working on outreach programs for the Hispanic community for many years, including a Hispano Care program he participated in at Illinois Masonic Hospital.  (Cubria -  1079:12-1080:14).

346.     Hispanic outreach was important to Cubria.  (Cubria -  1079:24-1080:1).

347.     Cubria had accumulated a lot of knowledge about the Hispanic community as a result of his outreach efforts.  (Cubria -  1080:7-11).

348.     Cubria brought this information to bear on the feasibility study he worked on for Edgewater.  (Cubria -  1080:15-18).

349.     Rogan knew about Cubria's efforts in regards to community outreach programs to the Hispanic community.  (Cubria -  1081:3-7).

350.     Rogan knew about Cubria's knowledge of the Hispanic community.  (Cubria - 1081:8-9).

351.     Rogan and Cubria had talked for years on the best way to address Edgewater's and Cubria's interest in serving the Hispanic community. (Rogan - 148:20-149:1).

352.     Rogan and Cubria discussed Cubria's unique expertise, without which Edgewater would have had a very difficult time completing the feasibility study.  (Rogan - 1398:10-14).

353.     Edgewater would benefit from the feasibility study because if it were implemented, including the purchase of Cubria's practice, Edgewater would receive the revenue derived from Cubria's practice, and also from the other clinics that would be opened in association with the program. (Rogan - 1402:3-13).

354.     Cubria told Rogan the level of effort Cubria would have to put into the feasibility study, and estimated the fees that would result.  (Rogan - 1401:17-20).  Based on that, Rogan and Cubria negotiated that Cubria would paid $50,000 for his work on the feasibility study.  (Rogan - 148:5-9; 1398:9-14).

355.     The payment to Cubria for the feasibility study was approved by the Board of Directors, and they were aware of the study and the amount requested.  Cubria's May 8, 1997 letter to Rogan regarding the study and the fees requested were in the board's packet for the June 5, 1997 board meeting.  (JX 1: EMC 3060, 3076, 3078).  Attorneys were present at this board meeting.  (JX 1: EMC 3070).

356.     The payment to Cubria was not for Cubria to bring patients to Edgewater. (Rogan - 1401:21-24).  Nor was it for Cubria to pay the loans he owed Edgewater. (Rogan - 1403:4-7). Cubria never told FBI Agent Coon that the payment he received for developing a Latino community outreach program was in exchange for admitting or keeping his patients at Edgewater.  (Coon - 1249:5-8).

357.     Cubria reviewed drafts of the feasibility study, edited drafts, added language to the drafts, incorporated comments into the drafts. (Cubria - 1080:15-1081:2; Rogan - 154:21-155:9).

358.     Rogan received various drafts of the feasibility study, and he would comment, critique or direct that additional analysis be done.  (Rogan - 1398:17-22).  The drafts would come

from Mary Wilbur or Cubria. (Rogan 155:6-9). Mary Wilbur was an Edgewater employee who was involved in doing feasibility studies for Edgewater. (Rogan 149:15-18). Mary Wilbur was also involved in assisting Edgewater with its strategic planning. (Rogan 149:21-23). Roger Ehmen and Henry Zeisel were also involved in the study. (Rogan 155:6-9).

359.    DX 53 B is one of the drafts of the feasibility study that Ehmen testified was prepared by Mary Wilbur that included input from Cubria on the projections on the volume of business, financial information and equipment. (Ehmen - 626:17-22). Bates page 368 shows financial plan, and the next page has information on patients that Cubria supplied, and the next page has information he supplied, and the next few pages are the same. (Ehmen - 626:23-627:4).

360.    Ehmen does not know how much time Cubria spent in gathering information to give to Mary Wilbur, and he doesn't know how much time Cubria actually spent with Mary Wilbur. (Ehmen - 627:20-25).

361.    DX 53 D is another draft of the feasibility study Bates page 13330 shows Cubria's handwriting. (Ehmen - 628:4-25). Bates page 13332 has Cubria's handwriting as does 13333 and the next page. Bates page 13345 also has Cubria's handwriting. Ehmen does not know how much time Cubria spent in gathering the information. Ehmen has no way of knowing how much time Cubria put in to gather the information he submitted. (Ehmen - 629:4-630:25).

362.    Rogan received various drafts, including DX 53 D, and this was the type of work that Rogan expected from the feasibility study. It also included the type of information that Rogan expected Cubria to input. (Rogan - 1399:20 - 1400:4).

363.    Rogan knew that Cubria had input into the underlying assumptions of the forecasts of the feasibility study, and the overall planning of the study and the implementation of it. (Rogan - 1404:23 - 1405:2).

364.    Rogan was satisfied with the information, feedback and work he was receiving from Cubria on the feasibility study.  (Rogan - 1401:8-11).

365.    DX 56 is a September 7, 1997 memorandum from Ehmen to Rogan discussing a number of projects that Cubria has been involved in with respect to the Hispanic Program (Rogan - 1404:15-22).   Ehmen never told Rogan that Ehmen believed that Cubria was not putting in any effort on the feasibility study, and Ehmen was the project director. (Rogan - 1405: 6-12).

366.    Rogan and Cubria agreed that if Edgewater moved into the implementation phase of the feasibility study, then Edgewater would pay Cubria $30,000. (Rogan 156:16-21; DX 55).

367.    The feasibility study was implemented.  (Cubria -  1081:18-19).

368.    DX 56 was a request to Rogan for $30,000.  It was Ehmen's job to get the funds necessary to implement program  (Ehmen - 631:5-632:4).

369.    Ehmen testified that he did not think Cubria needed to be paid $30,000 for his services.  But he did not tell that to Rogan.  (Ehmen - 631 - 633).  Ehmen's memorandum to Rogan states that "Cubria has invested a lot of time in his development of this project," including meeting realtors, evaluating sites, surveying equipment, interviewing staff and physicians, looking at billing/collection systems and securing advertising budget proposals.  (DX 56; Ehmen - 631:18-633:8).  The memo also states that Cubria was able to increase advertising spots by 10% while keeping the advertising budget at the same level. (DX 56).

370.    Ehmen did not tell anyone that he did not think Cubria should be paid for these services.  (Ehmen - 633:13-15).

371.    Until early 1998 Edgewater expected to buy Cubria's practice and close on it. (Rogan - 1403:21 - 1404:6; JX 1: EMC 3289).

372.    Cubria decided not to sell his practice "at the 11th hour" and the program morphed into a physician outreach program.  (Rogan - 1403:13-20).

## C. **Advertising**

373.    Advertising is important to a hospital because it must "maintain an awareness in the minds of the consuming public that they are available for the public's care." (Gross dep. 26:12-27:7).  That is done in order to hopefully increase admissions in order to increase revenues. (Gross dep. 27:8-10).

374.    Rogan discussed with Ehmen the fact that Rogan was concerned how it would look that Edgewater pay for advertising featuring a physician in private practice who was not employed by Edgewater. (Rogan 159:22-160:1).   Rogan was concerned that any kind of advertising must follow the rules and regulations of Medicare. (Rogan 160:3-6).

375.    Cubria wanted Edgewater to spend a significant amount of money on advertising. (Rogan 159:18-21).

376.    Cubria discussed the issues of the advertising featuring him and where the calls from the television advertising would ring with John Tatooles, an attorney.  (Cubria -  979: 18 - 980:6; 980:12-23).

377.    Rogan understood that if Cubria became an employee of Edgewater, then Edgewater could pay for advertising that featured Cubria that met the rules and regulations of Medicare and Medicaid. (Rogan 164:3-9).

378.    Ehmen and Cubria developed the advertising with a goal of purchasing Cubria's practice in mind. (Rogan 164:10-15).

379.    Edgewater paid for the commercials to be produced. (Rogan 165:23-25).  Rogan did not have anything to do with the allocation of the advertising budget for any ads produced. (Rogan - 1406:4-6).

380. Rogan never saw the commercials that featured Cubria. (Rogan 167:4-6).

381. Ehmen never told Rogan that Edgewater made commercials, and two/thirds featured Cubria, and one/third featured actors. (Rogan 167:20-23).

382. In May, 1997, Cubria wanted Edgewater to assist in payment for a marketing program through channel 44. (Ehmen - 431:23-432:3).

383. Rogan and Ehmen discussed Cubria's proposed budget of $300,000 and the concern that to just go ahead and pay for his advertising was not something they could do because it's inappropriate to take hospital money and promote any private practitioner, so they decided to implement a physician referral service, a Latino physician referral service that would include not only Cubria, but physicians that spoke Spanish in all of the primary care and sub-specialty area. (Ehmen - 444:20-445:1).

384. Cubria and Rogan discussed Edgewater instituting a Hispanic outreach program with advertising. (Rogan 145:24-25). Cubria wanted the advertising to feature him. (Rogan 146:1-2).

385. Edgewater expanded outreach and emphasis on cardiology services to the Hispanic community. (Rogan 180:4-7). The outreach involved advertising for the entire physician referral program. (Rogan 180:9-10). Once Edgewater did not buy Cubria's practice, Edgewater had to modify the entire advertising program. (Rogan 180:10-14).

386. Ehmen was responsible for the advertising related to the Hispanic programs, and was informed that the advertising needed to be modified once Edgewater did not buy Cubria's practice. (Rogan - 180:24-181:2).

387. Rogan and Ehmen received a memorandum from Tatooles, one of Edgewater's attorneys, advising that since Edgewater was not buying Cubria's practice, Edgewater needed to

66

modify the Hispanic program, so that it became a Hispanic physician referral program. (Rogan - 181:10-14; 1406:11-13).

388. Rogan does not recall any conversations with attorneys in which they told Rogan not to run the adds featuring Cubria. (Rogan - 183:1-6).

389. Rogan told Ehmen to comply with the information that was contained in the memorandum Tatooles wrote in February, 1998. (Rogan - 183:15-19; DX 300).

390. Ehmen and Rogan were advised by the attorneys that the Hispanic Physician referral network had to be run out of the hospital with hospital office staff with the hospital telephone number and represent all of the sub-specialties and primary care specialties. (Ehmen - 467:2-13).

391. Patients that called as a result of the ad would come into the Edgewater telephone number, the intake coordinator would secure demographic information, the patient would say their needs, if it was internal medicine, it went to a bank of Latino internal medicine doctors, if it was for cardiology it would go to Cubria who was the only Spanish-speaking cardiologist on the roster. (Ehmen - 468:6-8). Cubria was the only active Spanish speaking cardiologist on the staff. (Ehmen - 634:12-21).

392. DX 300 is a memo dated February 27, 1998 to Ehmen and Rogan from John Tatooles with an update on the Latino Institute. (Ehmen - 635:21-636:1). The first sentence states that since Edgewater did not acquire Cubria's practice, the proposed marketing plan for the Latino Institute was not workable. Tatooles advised that ads could be run referencing the Latino Institute with an Edgewater telephone number, that the phone should ring in an EMC office and be answered by EMC personnel and that the program could not benefit one physician's practice alone. (Ehmen - 636:8-637:4).

393.    When Ehmen got the Tatooles memo, it was Ehmen's job to change the plan in order to comply with what Tatooles had laid out.  (Ehmen - 637:5-8).

394.    DX 59, (Edgewater's "Ayuda" commercial). was an ad that was run as part of the Latino referral program.  (Ehmen - 640:19-23).

395.    No commercials were run until after April 29, 1998.  (Ehmen - 642:9-12).

396.    The Latino referral program was not designed to just benefit Cubria.  (Ehmen - 643:4-7).

397.    DX 303 shows that various doctors were going to be part of the program.  (Ehmen - 643:8-644:10).

398.    Cubria represented himself in the ad.  Edgewater's name was in the commercial.  There was a general hospital phone number to call that was manned by a hospital employee, an intake coordinator, and housed in a hospital office.  (Ehmen - 463:15-23).

399.    GX 24 is a test clip of the Cubria commercial from December 1997.  There were different ones for diabetes, heart disease and other things, had Cubria and the phone number to dial up at the hospital.  (Ehmen - 465:20-466:2).

400.    Concerning the advertising, Cubria testified that that the calls went to a general Edgewater number.  (Cubria 981:1-9).

401.    Cubria also testified before the grand jury that the cardiac related calls went to Cubria and the non-cardiac calls went to other departments as needed.  (Cubria - 1083:2-6).

402.    Cubria testified before the grand jury that the calls went to a central number, and then if cardiac they came to him.  If they were internal medicine, which he had never done, they went to somebody else.  Because of the number of noncardiac patients the hospital was getting,

Edgewater opened up a whole new program under different physicians just to deal with Hispanic patients in internal medicine. (Cubria - 1086:10-14).

403. Rogan had discussions with Ehmen about the Physician Referral service, and was satisfied that the program was working. (Rogan 1406:25 - 1407:2).

D. **Braddock Management Consulting Agreement**

404. Concerning the consulting agreement entered into between Braddock Management and Cubria, Cubria was looking to move away from the day-to-day practice of medicine and Rogan did not discourage Cubria from doing so. (Cubria - 1093:4-8).

405. GX 33 is a consulting contract between Braddock and Cubria dated August 1, 1999 and ending July 1, 2000. The handwritten note is Rogan's and says that the agreement is extended to July 31, 2000, and the compensation shall be $60,000 for the entire two-year period. Ehmen never saw this while he was at Edgewater, and Rogan never discussed it. (Ehmen - 478:23-481:21).

406. In 1999 Cubria had a consulting agreement with Braddock Management, that Rogan negotiated on behalf of Braddock Management. (Rogan 185:25-186:3; GX 33).

407. The consulting contract was renewed for two years. (Rogan - 1415:8-10).

408. Ehmen didn't know anything about what Cubria was to do under the Braddock Consulting agreement; Ehmen was not involved in negotiating it, and he does not know whether Cubria performed the services under the contract. (Ehmen - 653:1-5).

409. Cubria performed the work that he was supposed to perform under the contract until early 2001 when Cubria voluntarily gave up his privileges to perform cardiac catheterizations and his license to practice medicine was suspended. (Rogan - 1415:20 - 1416:3).

410. Cubria never told FBI Agent Coon that his consulting contract was in exchange for admitting or keeping his patients at Edgewater. (Coon - 1249:1-4).

69

411.    Braddock did not seek to recover the money paid to Cubria under the Braddock contract because Cubria was asking for money, and Rogan saw it as a useless exercise. (Rogan - 1416:4-14).

### E. **$9000 TO CUBRIA**

412.    By 2001, Cubria had lost his medical license. (Cubria - 1094:9-11). As of July 30, 2001, Cubria was broke and had no money. (Cubria - 1096:23-25).

413.    Cubria approached others for money in 2001. Cubria received $5,000 from Lopez. (Cubria - 1116:11-20).

414.    Lopez approached Rogan and asked that Rogan help Cubria. (Rogan 191:21-22). Rogan gave Oswaldo Lopez $9,000 to give to Cubria. (Rogan 190:23-191:5; 1414:2-4). Lopez told Rogan that Lopez had given Cubria money. (Rogan 191:23-25).

415.    Despite Cubria's testimony to the contrary, (Cubria - 1119:10-1120:3), Lopez told FBI Agent Sherri Coon during an interview that Cubria approached him and said he needed money to feed his children, to eat and to have a place to sleep. (Coon - 1249:15-18). Lopez told Rogan that Cubria needed money to feed his children, to eat and to have a place to sleep as well. (Rogan - 191:12-19).

416.    Cubria and Rogan never discussed the $9,000. (Rogan 192: 11-12).

### F. **Allegations of Obstruction**

417.    Rogan never had conversations with Cubria while writing notes to Cubria at the same time. (Rogan 189:10-15; 1412:16-18).

418.    Rogan learned that the FBI had visited Cubria, and in January 2001 Rogan told Cubria not to do anything that would create problems for him downstream, "such as destroying memos, files, computer files etc." (Rogan - 1413:5-17).

419.     Rogan never told Cubria to destroy any memos that Cubria had written to Rogan. (Rogan 190:7-9).

420.     Rogan never told Cubria that Cubria should destroy his computer. (Rogan 190:4-6; 1412:19-21).

421.     Rogan was not concerned that Cubria was wearing a wire. (Rogan 188:21-23).

IX.     **FINANCIAL INFORMATION**

422.     Henry Zeisel was controller at Edgewater, and later vice president of finance, senior vice president and CFO.  (Zeisel - 1175:22-24, 1183:7-8, 1184:7).

423.     Zeisel viewed Rogan as his supervisor because he was responsible for Zeisel's performance review, and had decision making authority on his performance raises and merit increases.  (Zeisel - 1179:11-19).

424.     Rogan would discuss admissions that physicians were bringing into Edgewater on an annual basis and throughout the year.  (Rogan 1307:20-1308:6).  These discussions were had because the way Edgewater put together budgets was to develop underlying assumptions, including revenue and the expected volume of business that would be derived from admissions. (Rogan 1308:7-14).

425.     As part of Rogan's responsibilities, he followed admissions on a budget basis to determine if there were trends associated with admissions because it was essential to the operation of Edgewater. (Rogan 1323:23-1324:4).

426.     On DX 286, the Greenbars, there is a number associated with physicians and organizations.

427.     Ehmen testified that the code Barnabas Cubria SS was set up to track admissions through Rao.  (Ehmen - 382:16-19).  GX 9 shows that Edgewater received revenue under the

code Barnabas Cubria SS in 1995, which was prior to Rao having any relationships with Edgewater. (Rogan 1325:7-1326:5).

X.   **ATTORNEY REVIEW**

   A.   **Robert Hoban**

     428.   Robert Hoban is an attorney with McDermott, Will & Emery.  (Hoban - 1264:6). He completed his undergraduate degree at Yale and his law degree at Northwestern.  (Hoban - 1264:8-9).  Hoban has been involved with the health care industry his entire career, both in private practice and as in-house counsel.  (Hoban - 1264:12-14).  Hoban's focus is on contractual and regulatory issues in health care law.  (Hoban - 1264:15-17).  Hoban represents hospitals almost exclusively.  (Hoban - 1264:18-20).  He has represented over 30 hospitals, almost all being non-profits.  (Hoban - 1264:21-25).  Hoban is a member of the American Health Lawyers Association.  (Hoban - 1265:3).  Hoban has kept informed of developments in health care law through reading articles and attending conferences and educational monthly meetings at his firm. (Hoban - 1265:7-14).

     429.   From 1975 to 1981, Hoban was an attorney with Hinshaw Culbertson, and from 1981 to 1985, Hogan was in house at Elmhurst Memorial Hospital.  (Hoban - 1265:18-20). Hoban joined McDermott in 1985.  (Hoban - 1265:15-16).

     430.   Hoban is familiar with both the Stark and anti-kickback statutes, which come into play daily when contractual issues with clients.  (Hoban - 1265:24-1266:5).

     431.   McDermott represented Edgewater as primary outside counsel from 1987 to 1994. (Hoban - 1267:13-22).  McDermott handled contractual issues and regulatory concerns.  (Hoban - 1266:23-1267:2).  If Edgewater was entering into a contract with a physician, McDermott would be involved.  (Hoban - 1267:4-6).  McDermott would assess whether or not a particular transaction would be within the bounds of the Anti-Kickback and Stark statutes.  (Hoban -

1267:7-11). While Rogan had a general knowledge of what the Stark Statute was, he hired law firms to ensure that the various Edgewater dealings met with Stark's complex statutory scheme. (Rogan - 1416:15 - 1417:4).

432. By the late 1980's, Hoban with the billing partner for Edgewater. (Hoban - 1267:12-13). Hoban's involvement in Edgewater began when Rogan came in to McDermott in 1986 or 1987 for advice in drafting a management agreement for the hospital. (Hoban - 1267:14-18). The management agreement had an option for Rogan to buy the hospital, which he did. (Hoban - 1268:5-12). Rogan's corporation was sold in 1994 to a non-profit organization. (Hoban - 1268:13-16). The controlling interest was in California. (Hoban - 1268:17-19).

433. McDermott did not have active involvement with the hospital from 1994 to 1997. (Hoban - 1269:8-11). During that time, with the new operators, there was an in-house counsel at Edgewater named Olson. (Hoban - 1271:21-1272:4). Olson would call Hoban from time to time regarding physician contracts, among other things. (Hoban - 1272:5-7).

434. McDermott was involved in drafting contracts between Edgewater and physicians. (Hoban - 1270:14-16). McDermott was involved in Rao's March 1997 contract with Edgewater. (Hoban - 1273:17-24).

435. Concerning physician contracts, Hoban would deal with another lawyer working for Edgewater, Tatooles, or Ehmen or sometimes Skvarek and occasionally Rogan. (Hoban - 1273:25-1274:4).

436. Up until the early 1990s, Rogan was Hoban's primary contact at the hospital.. As time went by, Hoban would have less and less contact with Rogan. (Hoban - 1274:5-10).

437. Ehmen was in charge of medial staff matters and had involvement with the contracts, primarily hospital based physicians. (Hoban - 1274:16-22).

438. McDermott changed the form of Edgewater's physician contracts over time. (Hoban - 1274:23-1275:3). After 1997, when McDermott was brought back, it took a look at all Edgewater's contracts. (Hoban - 1275:4-18).

439. Once McDermott became primary outside counsel again, when contractual needs arose relating to physicians, Tatooles, who was another outside attorney for Edgewater, Susan Nordstrom, who was one of the assistant administrators, or Judy Lunde who was vice president of nursing, and from time to time Ehmen would be involved. (Hoban - 1279:21-1280:1).

440. If the compensation in a physician contract struck the attorneys at McDermott as being higher than what was otherwise being seen at hospitals, Hoban would comment on it and draw it to the attention of someone. (Hoban - 1280:14-17). That did not occur at Edgewater. (Hoban - 1280:18-19).

B. **Compliance Program**

441. At the March 6, 1998 board meeting, Gross informed the board of directors that management was beginning the implementation of a formalized compliance program. (JX 1: EMC 3560).

442. McDermott was actively involved in preparing a compliance program for Edgewater, which began in 1998 or early 1999. (Hoban - 1281:7-11). Rogan was very serious about having a tight program in place, and Edgewater ended up hiring a compliance officer to implement the program. (Hoban - 1282:4-8). Quadramed acted as consultant. (Hoban - 1282:13-20).

443. As part of the compliance program, McDermott did an assessment of the contracts at the hospital and whether they were or were not in compliance with federal statutes. (Hoban - 1282:21-1283:3).

444.    In September of 1998, Skvarek updated the board of directors as to the status of the compliance program.  (JX 1: EMC 3827-28).  The board was updated on the compliance program during the board meetings on December 17, 1998 (JX 1: EMC 3890) and on February 26, 1998, in which the board was informed that consultants have been chosen.  (JX 1: EMC 3911).

445.    Mary Wilbur was the compliance officer, followed by a gentleman whose name Hoban could not recall. (Hoban - 1283:11-17).  The compliance officer is involved in all forms of contract review.  The compliance officer also reviews minutes and make sure the operating people are adequately following the statutes.  (Hoban - 1283:18-24).

446.    DX 295 is a November 22, 1999 letter from Hoban to Mary Wilbur.  (Hoban - 1284:9-21).  The letter concerns a question Wilbur expressed regarding the review of the contracts at the hospital.  Quadramed had questioned how the physician referral service at the hospital operated and whether or not it met the safe harbor laid out in the anti-kickback statute, and Quadramed believed it did not fall under the safe harbor.  (Hoban - 1284:9-1285:7).  McDermott's view was that the physician referral service (when a person calls the hospital looking for a physician and they get a referral to someone). did meet the elements of the safe harbor. (Hoban - 1285:8-13).

447.    Rogan and Hoban met frequently regarding Northside.  (Hoban - 1285:18-20).  They discussed contractual issues and operational issues.  (Hoban - 1285:23-1286:3).  The hospital had been a difficult institution in those years because it had been a family operation for a long time and things needed to change.  (Hoban - 1285:23-1286:3).  Things did change.  (Hoban - 1286:4-5).  Rogan brought the hospital much more into the modern age.  He enhanced services.  He spent money on the building.  He made it a quality institution.  (Hoban - 1286:6-10).

448.    In an early meeting between Hoban and Rogan in 1988 or 1989, Rogan expressed his view that he wanted to have contracts that were not going to be something he needed to worry about later, and he was looking to Hoban to make sure the contracts complied with the law.  (Hoban - 1287:18-22).  From 1987 to 1994, Hoban would meet with Rogan quite often, and spoke with Rogan by telephone quite often.   (Hoban - 1288:9-23).   After McDermott got involved again at Edgewater in 1997, Rogan's involvement with Hoban was less than in earlier years because he had a larger staff, but Hoban still had contact with Rogan.  (Hoban - 1289:1-5). Rogan's approach regarding contracts complying with the law never changed.  (Hoban - 1289:6-9).  Rogan never failed to follow the advice Hoban gave.  (Hoban - 1289:10-12).

## XI.    CODES

449.    In general, Ehmen came up with the codes, but, according to Ehmen, APN in a designation Rogan wanted to use.  (Ehmen - 360:7-11).

450.    Ehmen created a code, EID, to track admission from the elderly-in-distress program.  (358:18-22).

451.    The Ambulatory Physician Network, or APN, was a code that Edgewater spent a number of years developing. (Rogan 229:17-22).  At the February 14, 1997 board meeting, the Board of Directors of Northside heard a presentation by Rogan and Gross regarding the APN, which was part of Edgewater's managed care strategy.   (JX 1: EMC 2876-2881).   The development of the APN was continued as seen in the October 4, 1997 board minutes, which state that Rogan and Gross "described in detail the results of all the work that management, legal counsel and consultants had performed in organizing and implementing such a network and relationships." (JX 1: EMC 3247).   On December 1, 1997 the board was updated on the development of the APN. (JX 1: EMC 3401).  On March 6, 1998 the board was updated again on

APN, and authorized management to take appropriate steps to further the APN and the outreach program. (JX 1: EMC 3560).

452.    At the September 18, 1998 board meeting, it was discussed that the APN was to be discussed with the refinancing bank while discussing the reorganization of the physicians. (JX 1: EMC 3826).

453.    At the February 26, 1999 board meeting, Skvarek discussed the further implementation of the APN. (JX 1: EMC 3909). As discusses in the June 7, 1999 board minutes, an administrator was hired for the APN plan in the summer of 1999. (JX 1: EMC 4106).

454.    The "SP" behind physicians' names was not a way that Edgewater tracked referrals from those physicians. (Rogan - 140:22-141:4). It was to identify Hispanic patients, the patients that Edgewater was marketing to. (Rogan - 141:4-6).

455.    Exhibit DX 286, despite the fact that it says "admissions" actually refers to patients for whom the physicians were attending physicians. (Rogan - 142:20-25).

## XII.    DAMAGES

### A.    **Nancy Bryson**

456.    Nancy Bryson was a vice president at Edgewater who reported to Rogan. (Bryson - 719:9-13). Bryson was in charge of physician billings and registrations. (Bryson - 719:4 - 720:3).

457.    GX 9 is a document Bryson reflecting payments received by the hospital for the individual attending physicians by the year of admission. (Bryson - 722:4-7). Bryson downloaded the information from the hospital information system. (Bryson - 722:12-14).

458.    Bryson was asked to prepare the chart by the FBI through Bill Zeigelmueller, one of the hospital attorneys. (Bryson - 723:12-19).

459.    The UB92s reflect gross charges sent to the government to request payment. (Bryson - 745:13-21).   They do not match up with the amount the hospital actually receives. (Bryson - 745:22-24).

460.    GX9 contains references to pairs of names, such as Abello/Cubria.   (Bryson - 745:25-746:3).   The first name indicates attending physician.   (Bryson - 746:14-16).   Bryson does not know for certain what the second name means.   (Bryson - 746:17-19).   The chart does not indicate who may have referred the patient to the attending physician.   (Bryson - 746:23-747:1).   The chart does not indicate who the admitting physician might have been.   (Bryson - 747:2-4).   This is true for both inpatient and outpatient services.   (Bryson - 747:5-7).

### B.  **Kathleen Creighton**

461.    Kathleen Creighton is an auditor for the United States Attorney's Office in Chicago.   (Creighton - 748:18-19).   She is a certified public accountant.   (Creighton - 748:22-23).

462.    GX 13 is a chart prepared from GX 9.   (Creighton - 751:11-13).   It depicts Barnabas/Cubria Medicare part B payments from 1995 through 2000.   (Creighton - 750:11-16).

463.    Creighton did no investigation to determine the accuracy of the schedule prepared by Edgewater that Creighton based her chart of off.   (Creighton - 757:8-11).   The chart is not about referrals at all.   (Creighton - 757:20-21).

### C.  **Robyn Thomas**

464.    Robyn Thomas is the director of the division of quality coordination and data distribution at the Centers for Medicare and Medicaid Services.   (Thomas - 1121:14-17).

### D.  **Ruben Steck**

465.    The data Steck retrieved had multiple UPINs because doctors other than Cubria or Barnabas may have been the attending or operating doctor.   (1167:13-21), and Barnabas and

Cubria are listed as attending or operating physician on the data claims. (GX 7). There is data for the years 1995 to 2000. (GX 7).

XIII.  **GOVERNMENT INVESTIGATION**

466.    Sherry Coon has been an FBI agent for 15 years. (Coon - 1243:17-18). She spent six years working in the health care fraud unit and worked about 15 cases in that time. (Coon - 1244:10-13).

467.    James Ferguson has been an FBI agent since 1995, and has worked on at least six heath care investigations. (Ferguson 1253:19-1254:4).

468.    A 302 report is always completed after a witness is interviewed. (Ferguson 1254:8-10). Ferguson takes notes during an interview and then transcribes the notes into a 302. (1254:11-16). It is bureau policy that the report is transcribed within five days. (Ferguson 1254:17-19). All relevant testimonial information is included in a 302. (Ferguson 1254:20-23).

469.    A form 302 is always prepared after a witness is interviewed. (Coon - 1244:22-24). The form is supposed to be prepared within five days. (Coon - 1245:3-4). All relevant information from an interview is memorialized in a 302. (Ferguson - 1254:20-23).

470.    If, during an interview regarding the Edgewater investigation, a witness told Coon that they had received a kickback or some sort of benefit for admitting or keeping their patients at Edgewater, that would be reflected in a 302. (Coon - 1245:8-12).

B.  **Rogan**

471.    Rogan was a target for the government. (Ehmen - 531:8-10).

472.    Rogan was never indicted, never appeared before the Grand Jury, and was never interviewed by the Government.

C.  **Ehmen**

473.    Ehmen was contacted by the FBI in January, 1999. After this contact, his lawyers talked to the government and told the government that he had nothing to offer. (Ehmen - 522:14-524:12).

474.    Ehmen was contacted by the government again in March, 2000; Ehmen and his lawyers met with Jacqueline Stern. They played some of the tapes and laid out some of the evidence against Ehmen, and he told them he could not help them at that time. (Ehmen - 524:19-525:14).

475.    When Ehmen signed the proffer agreement (DX 401N) in September 2001, he agreed to give a completely truthful statement to the government; they wanted to know everything he knew about what was going on at Edgewater. (Ehmen 525:16-527:24).

476.    At some point the government tried to connect Ehmen to the deaths they were investigating with Cubria, and it worried Ehmen to be tied to Cubria's actions with the possibility of winding up in jail for a long, long time. (Ehmen - 527:25-529:19).

477.    When Ehmen started talking to the government, he had no promises or recommendations regarding leniency in sentencing, but he was hoping that would happen. (Ehmen - 529:20-530:5).

478.    Ehmen knew in his interviews with Stern, Ferguson and Coon that they were trying to get Rogan, and Ehmen figured that if he could help them with that, they might recommend some leniency. (Ehmen 531:16-20).

479.    In his interviews, Ehmen gave the government all the information he had and tried not to leave anything out. (Ehmen - 531:21-532:9).

480.    Ehmen began his interviews on September 20, 2001, pled guilty on October 1, 2001, and gave more interviews after the plea up to the last interview on October 18, 2001.

(Ehmen - 532:10-22).  The government did not enter into a cooperation agreement with Ehmen. (Ehmen 525: 19-23).

481.    The government did not think Ehmen was being truthful in his interviews, so he volunteered to give a polygraph, which was done on October 5, 2001, because the government wanted to resolve issues of his veracity.  Ehmen did not pass the polygraph, and the government told Ehmen that his responses were "indicative of deception."  (DX 112A; Ehmen - 533:15-534:13).

482.    During the polygraph, the examiner tried to prompt Ehmen to come up with a number that would help him pass the test, that he must have talked to Rogan more than once, and they were urging him to come up with a number, which he did do, and ultimately he walked out of the office because he only had the memory of one time.  (Ehmen - 536:21-537:12).

483.    After failing the first polygraph, Ehmen volunteered to take another polygraph. He did not pass the second polygraph.  The examiner concluded that his responses were "indicative of deception."  (Ehmen - 538:4-14; DX 112 B).

484.    Ehmen met with the government several times in 2005 and several times in 2006 to prepare for his testimony in court and they went over the kind of things they were going to ask him (Ehmen - 543:15-17), but he refused to talk to Rogan's lawyers.  (Ehmen - 543:21 - 544:11).

485.    Rogan was aware that the FBI visited Ehmen in January 1999. (Rogan - 1366:20-23).

486.    In 2000 Rogan had lunch with Ehmen and Ben Armstrong, who worked at Grant Hospital.  After the meeting, Rogan spoke with Ehmen about how Ehmen was doing.  Ehmen informed Rogan that Ehmen was very concerned about his family and was contemplating suicide.  (Rogan - 1368:21 - 1369:4).

487. Rogan tried to comfort Ehmen, and invited him for a steam bath. In the steam room, Rogan told Ehmen that he had a loving, supporting family, and that Ehmen needed to really think about the situation. (Rogan - 1370:7-17).

488. Rogan did not tell Ehmen that Ehmen should not implicate Rogan, and that Rogan would take care of Ehmen's family forever, nor did Rogan describe a novel to Rogan. (Rogan - 1370:18-24).

489. Rogan never communicated with Ehmen by writing notes on one subject while talking about another subject. (Rogan - 1372:1-3).

490. Rogan never told Ehmen that Rogan could not take care of Ehmen's family because it would look inappropriate. Nor did Rogan tell Ehmen not to discuss certain matters with Ehmen's attorney. (Rogan - 1372:10-19).

491. In Rogan's opinion, Roger Ehmen was a rogue employee. (Rogan 67:10-13). However, Rogan never told Ehmen to tell the government that Ehmen was a renegade employee or loose cannon. (Rogan - 1373:3-5).

## D. **Barnabas and the FBI**

492. Barnabas pled guilty. (Barnabas - 874:23-24). The prosecutor told him that, depending on his testimony and how truthful she thought Barnabas was, she would recommend a downward departure from the federal sentencing guidelines. (Barnabas - 875:5-11).

493. Barnabas received a 52-month sentence, which was reduced in order to attend an alcohol and drug treatment course. (Barnabas - 876:16-20).

494. Barnabas had a problem with excessive drinking soon after the FBI came to his house. (Barnabas - 876:21-25). The drinking increased after the indictment. (Barnabas - 877:1-7). Barnabas drank wine, beer, and shots of whisky. (Barnabas - 877:11-15). Barnabas drank exclusively in the evening. (Barnabas - 877:16-17).

E. **Cubria**

495.    Rogan is aware that Cubria is in prison in connection with his dealings with Edgewater. (Rogan 88:16-24).

496.    Cubria personally received over $4 million from the government for billings he submitted over the period 1995 to 2001.  (Cubria -  1101:20-1102;13).

497.    Cubria engaged in fraud at Edgewater for money for himself.  (Cubria -  1102:17-21).

498.    While Cubria testified that it was not true that he "couldn't care less if the hospital made money or not," he admitted that he had said that he "couldn't care less if the hospital made money or not" under oath during a deposition in another case involving Edgewater.  (Cubria - 1103:3-21).

499.    Cubria's incentive to work with Barnabas was to receive referrals from him. (Cubria -  1104:1-3).

500.    Cubria refused to meet with counsel for Rogan prior to trial, but did agree to meet with counsel for the United States prior to trial.  (Cubria -  1050:2-15).

501.    Coon was present for all the interviews of Cubria.  (Coon - 1247:1-3).  When Coon interviewed Cubria, she wanted to know everything regarding any benefits Cubria received from Edgewater.  (Coon - 1247:11-14).

502.    One of the things Coon was investigating was whether he received payments from Edgewater in exchange for admitting or keeping his patients there.  (Coon - 1247:15-18).  Coon was also investigating Cubria's financial arrangements and contracts with Edgewater.  (Coon - 1247:19-21).

503.    Cubria never told Coon that he told Rogan that he was failing to fulfill his duties under his Edgewater contracts.  (Coon - 1247:25-1248:5).  Cubria never told Coon that his

contract to read EKGs was in exchange for admitting or keeping his patients at Edgewater. (Coon - 1248:11-20). Cubria never told Coon that his directorship contract was in exchange for admitting or keeping his patients at Edgewater. (Coon - 1248:22-25). Cubria never told Coon that his consulting contract was in exchange for admitting or keeping his patients at Edgewater. (Coon - 1249:1-4). Cubria never told Coon that the payment he received for developing a Latino community outreach program was in exchange for admitting or keeping his patients at Edgewater. (Coon - 1249:5-8). Cubria never told Coon that he got his loans from Edgewater in exchange for admitting or keeping his patients at Edgewater. (Coon - 1249:9-11).

504.    Cubria knew that he had to give full and truthful cooperation to the government during the time he was interviewed in connection with the investigation. (Cubria - 1052:17-1053:1).

505.    Cubria was interviewed by Assistant U.S. Attorneys and F.B.I. agents during the time he was cooperating with the government in connection with the investigation. (Cubria - 1050:22-1051:13).

506.    Cubria met with the government multiple times as part of his cooperation and talked with the government for hours. (Cubria - 1058:23-1059:15).

507.    Cubria knew that the government was investigating allegations of criminal wrongdoing by doctors and employees and agents of hospitals. (Cubria - 1051:14-25).

508.    When he first met with the government, on July 19, 2001, Cubria told the government he could only provide assistance on Roger Ehmen, Anthony Todd and Fernando Ojea. (Cubria - 1055:1-17). Cubria did not mention Rogan when he identified the people about whom he could provide assistance to the government. (Cubria - 1055:18-19).

509.    Cubria was told during the time he was cooperating with the government that he could be prosecuted for felony murder.  (Cubria -  1057:22-25).  Cubria understood that when he pled guilty, the government agreed not to prosecute him for felony murder.  (Cubria -  1056:20-1057:25).  Cubria understood that if he did not fully cooperate, the government would be released from the promised it made to Cubria in the plea agreement, including the promise not to prosecute him for felony murder.  (Cubria -  1058:16-22).

510.    The government prepared a grand jury statement for Cubria, which he signed after he pled guilty.  (Cubria -  1060:11-23).

511.    Cubria had the opportunity to review and make changes to it.  (Cubria -  1060:24-1061:8).

512.    Cubria never said in his statement that he was given a contract by Edgewater to refer or admit patients to Edgewater.  (Cubria -  1062:1-12).

513.    Cubria never said in his statement that he was given a contract by Edgewater so that he would keep admitting patients to Edgewater.  (Cubria -  1062:1-4).

514.    Cubria was not given a contract by Edgewater to refer or admit patients to Edgewater.  (Cubria -  1062:5-6).

515.    Cubria was not given a contract in exchange for agreeing to continue to treat patients at Edgewater.  (Cubria -  1062:7-10).

516.    Cubria never said in his statement that he was given loans in exchange for admitting patients to Edgewater.  (Cubria -  1062:24-1063:4).

517.    Cubria never said in his statement that he was given loans so that he would continue to refer patients to Edgewater.  (Cubria -  1063:5-8).

518.     Cubria testified under oath in another proceeding that he was not promised anything of value in exchange for admitting patients to Edgewater.  (Cubria -  1069:10-17).

519.     Cubria did not receive any payments from Edgewater in exchange for referrals. (Cubria -  1070:3-5, 1071:5-9).

520.     Cubria did not receive any payments from Edgewater in exchange for admissions. (Cubria -  1071:5-14).


Dated:  June 7, 2006

                                        Respectfully submitted,

                                        PETER ROGAN

                        By:      s/Chris J. Stathopoulos
                                        One of his attorneys

                                        Neil E. Holmen
                                        Joseph A. Spiegler
                                        Bryna J. Dahlin
                                        Chris Stathopoulos
                                        WINSTON & STRAWN LLP
                                        35 West Wacker Drive
                                        Chicago, Illinois  60601
                                        (312). 558-5600

## CERTIFICATE OF SERVICE

I certify that on this 7th day of June, 2006, the foregoing NOTICE OF FILING was served via email and Federal Express on the following individuals:

Linda A. Wawzenski
Assistant United States Attorney
U.S. Attorney's Office
   for the Northern District of Illinois
Federal Dirksen Building
219 S. Dearborn St.
Chicago, IL 60604
(312) 886-4073 (fax)
Linda.Wawzenski@usdoj.gov

Laurie A. Oberembt
United States Department of Justice
601 D Street, Northwest
Room 6532
Washington DC 20530
(202) 305-7868 (fax)
John.Neal2@usdoj.gov
Laurie.Oberembt@usdoj.gov

_____s/ Chris J. Stathopoulos_____
Attorney for Peter Rogan