**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PETER ROGAN, | ) | Case No. 02C 3310 |
| | ) | |
| Defendant. | ) | Judge John W. Darrah |
| | ) | |
| | ) | |

**AMENDED POST-TRIAL ARGUMENT OF PETER ROGAN**

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

FACTUAL SUMMARY ....................................................................................................4

1.       The History of Edgewater Medical Center ......................................................4

      2.     Dr. Ravi Barnabas ...........................................................................7

           A.     Teaching Contract and Physician Recruitment Contract ..............8

           B.     EID Contract and West Side Clinic Contract ...............................10

      3.     Dr. Rao..............................................................................................12

           A.     Anesthesia Contract ......................................................................12

           B.     Florascribe Contract.....................................................................17

      4.     Dr. Andrew Cubria ............................................................................18

           A.     Office Build-Out ...........................................................................19

           B.     Teaching Service ...........................................................................20

           C.     EKG Contract ...............................................................................20

           D.     Loans.............................................................................................21

           E.     Teaching Contract and Medical Director Contract.......................23

           F.     Cardiac Rehabilitation Contract....................................................23

           G.     Feasibility Study ...........................................................................23

           H.     Advertising ...................................................................................25

           I.     Consulting Agreement ...................................................................26

           J.     Cubria's Conduct After Losing his License...................................27

      5.     Roger Ehmen ....................................................................................28

ANALYSIS OF APPLICABLE LAW ...................................................................29

I.    Rogan Did Not Violate the Anti-Kickback Statute ...................................30

    A.    The Collateral Hope or Expectation of Referrals Does Not
Violate the Anti-Kickback Statute ................................................31

    B.    Remuneration for Contracts for Fair Market Value Do Not
Violate the Anti-Kickback Statute ............................................... 32

    C.    Lack of A Safe Harbor in the Anti-Kickback Statute is Irrelevant...............34

    D.    In Every Instance, the Government Failed to Prove a
Violation of the Anti-Kickback Statute .......................................35

        1.    Barnabas ..........................................................................35

        2.    Rao ..................................................................................36

        3.    Cubria................................................................................37

II.    The United States Failed to Prove Rogan Violated the Stark Statute.......................40

    A.    Overview of the Stark Statute .......................................................41

    B.    In Each Instance, the United States Failed to Demonstrate
Rogan's Violation of the Stark Statute .........................................45

        1.    Relationships Not Related to Designated
Health Services ................................................................46

        2.    For the Remaining Relationships Were
Personal Service Arrangements that
Were for Fair Market Value on
Their Face .......................................................................49

III.    False Claims Act ....................................................................................49

    A.    Rogan Presented No False Claims for Purposes of
the False Claims Act ....................................................................52

    B.    Rogan Did Not Possess the Requisite Intent to Violate
the False Claims Act ....................................................................55

      C.     The United States Presented No Evidence that
It Would Not Have Paid Claims Had It Known
of the Violations ................................................................58

      D.     The United States Failed to Prove that Rogan
Acted in Reckless Disregard of the Falsity
of the Claims Submitted...................................................60

IV.   The United States Failed to Prove Conspiracy, Both for Evidentiary
and Substantive Purposes..............................................................61

      A.     There Was No Conspiracy Involving Rogan for
Evidentiary Purposes .......................................................61

      B.     There Was No Conspiracy Involving Rogan For
Purposes of Liability .......................................................64

V.    The United States Failed to Prove Damages............................................65

VI.   The United States' Witnesses Cannot Be Believed ................................72

      A.     Ehmen Cannot Be Believed ............................................73

      B.     Cubria Cannot Be Believed .............................................77

VII.  Common Law Claims ......................................................................79

      A.     The United State Failed to Prove Common Law Fraud................79

      B.     The United States Failed to Prove Unjust Enrichment .................81

      C.     The United States Failed to Prove Mistake of Fact ......................84

CONCLUSION.....................................................................................84

# TABLE OF AUTHORITIES

## FEDERAL CASES

A.B. Dick Co. v. Leasing System, Inc., No. 89 C 4649, 1990 WL 156396 (N.D. Ill. Oct. 9, 1990) ................................................................................................82

Architectural Iron Workers, Local No. 63 Welfare Fund v. Lane-General Metal Works, Inc., No. 94 C 0808, 1997 U.S. Dist. LEXIS 12420 (N.D. Ill. Aug. 14, 1997) ................................................................................................83

Austin v. United States, 509 U.S. 602 (1993) ............................................48, 50

Bourjaily v. United States, 483 U.S. 171 (1987) ................................................62

Cook County v. United States ex rel. Chandler, 538 U.S. 119 (2003) ........................47, 48

Graham v. Renbrook School, 692 F.Supp. 102 (Dist. Conn. 1988) .................................79

Hanlester Network v. Shalala, 51 F.3d 1390 (9th Cir. 1995) ...........................................30

Hindo v. University of Health Sciences, 65 F.3d 608 (7th Cir. 1995)........................51, 56

Indemnified Capital Investments, SA. v. R.J. O'Brien & Associates, Inc., 12 F.3d 1406 (7th Cir. 1993)................................................................................................79

Jahn v. 1-800-Flowers.Com, Inc., 284 F.3d 807 (7th Cir. 2002)................................42, 45

Liparota v. United States, 471 U.S. 419, 427 (1985)........................................................48

Luckey v. Baxter Healthcare Corp., 2 F.Supp.2d 1034 (N.D. Ill. 1998) ..........................58

Mitchell v. United States, No. 03 C 0022, 2005 U.S. Dist. LEXIS 25719 (N.D. Ill. Oct. 26, 2005) ................................................................................................73

Modern Medical Laboratories, Inc. v. Smith Kline Beecham Clinical Laboratories, Inc., 1994 U.S.Dist. LEXIS 7838 (N.D. Ill. June 13, 1994).................30

Richeson v. Saltzman, No. 97-3450, 1998 WL 152987 (7th Cir. Mar. 27, 1998).............80

Sara Lee Corp. v. Daymark Group, Inc., Nos. 02 C 3427, 02 C 4277, 03 C 5929, 2004 WL 2966955 (N.D. Ill. Nov. 23, 2004) ............................................................82

Scherer v. Balkema, 840 F.2d 437 (7th Cir. 1988) ............................................................62

Stromberg Metal Works v. Press Mechanical, 77 F.3d 928 (7th Cir. 1996) ....................53

iv

United States ex rel. Aakhus v. Dyncorp, Inc., 136 F.3d 676 (10th Cir. 1998)................50

United States ex rel. Asch v. Teller, Levitt, and Silverturst, P.C., 2004 WL
1093784 (N.D. Ill. May 7, 2004) ...............................................................................61

United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co., 2000 WL
1207162 (E.D. Pa. Aug. 24, 2000)..............................................................................52

United States ex rel. Augustine v. Century Health Services, Inc., 289 F.3d 409
(6th Cir. 2002).............................................................................................................55

United States ex rel. Camillo v. Ancilla Sys., Inc., 2005 WL 1669833 (S.D. Ill.
July 18, 2005)...............................................................................................................52

United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296 (6th
Cir. 1998)......................................................................................................................67

United States ex rel. Grynberg v. Ernst & Young LLP, 323 F.Supp.2d 1152 (D.
Wyo. 2004) ..................................................................................................................52

United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013 (7th Cir. 1998)..........50

United States ex rel. Lamers v. City of Green Bay, 998 F.Supp. 971 (E.D. Wis.
1998) .............................................................................................................................55

United States ex rel. Luckey v. Baxter Healthcare Corp., 183 F.3d 730 (N.D. Ill.
1998) .............................................................................................................................59

United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943)...............................................67

United States ex rel Perales v. St. Margaret's Hospital, 243 F.Supp.2d 843 (C.D.
Ill. 2003)............................................................................................................32, 44, 47

United States ex rel. Piacentile v. Wolk, 1995 WL 20833 (E.D. Pa. Jan. 17, 1995)
.................................................................................................................................52, 53

United States ex rel. Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370 (5th
Cir. 2004) .....................................................................................................................55

United States ex rel. Roby v. Boeing Co., 302 F.3d 637 (6th Cir. 2002) ..........................67

United States ex rel. Sharp v. Consolidated Medical Transport, Inc., 2001
U.S.Dist. LEXIS 13923 (N.D. Ill. Sept. 4, 2001) ..................................................29, 59

United States v. Bass, 404 U.S. 336 (1971)....................................................................48

United States v. Cargo, No. 92 CR 442, 1992 WL 206280 (N.D. Ill. Aug. 17, 1992) ...........................................................................................................................63

United States v. Coe, 718 F.2d 830 (7th Cir. 1983).........................................................62

United States v. Domestic Industrial, Inc., 32 F.Supp.2d 855 (E.D. Va. 1999) ...............56

United States v. Durrive, 902 F.2d 1221 (7th Cir. 1990)..................................................62

United States v. Frierson, 1997 U.S.Dist. LEXIS 3368 (N.D. Ill. Mar. 20, 1997)............56

United States v. Gil, 604 F.2d 546 (7th Cir. 1976)...........................................................62

United States v. Hancock, 604 F.2d 999 (7th Cir. 1979)...................................................32

United States v. Haynie, 179 F.3d 1048 (7th Cir. 1999) ...................................................62

United States v. Job Resources for the Disabled, 2000 U.S.Dist. LEXIS 6343 (N.D. Ill. May 5, 2000) .............................................................................50, 66

United States v. Kraase, 484 F.2d 549 (7th Cir. 1973).....................................................48

United States v. Krizek, 111 F.3d 934 (D.C. Cir. 1997)....................................................54

United States v. LaHue, 261 F.3d 993 (10th Cir. 2001) ..............................................31, 33

United States v. Liefer, 778 F.2d 1236 (7th Cir. 1985) .....................................................63

United States v. Mackby, 261 F.3d 821 (9th Cir. 2001).....................................................53

United States v. Martinez de Ortiz, 883 F.2d 515 (7th Cir. 1989) (Martinez I) ..........64, 65

United States v. Martinez de Ortiz, 907 F.2d 629 (7th Cir. 1990) (en banc) (Martinez II)   ..............................................................................................64

United States v. McClatchey, 217 F.3d 823 (10th Cir. 2001) ..............................31, 36, 37

United States v. Mead, 426 F.2d 118 (9th Cir. 1970).......................................................84

United States v. Murphy, 937 F.2d 1032 (6th Cir. 1991) ..................................................52

United States v. Pagan, 196 F.3d 884 (7th Cir. 1999) ......................................................62

United States v. Palumbo, 797 F.Supp. 624 (N.D. Ill. 1992) ............................................80

United States v. Peralta, No. 90-50186, 1991 U.S.App. LEXIS 25516 (9th Cir. Oct. 31, 1991) ................................................................................64

United States v. Stephenson, 53 F.3d 836 (7th Cir. 1995)................................................62

United States v. Teeven, 862 F.Supp. 1200 (D. Del. 1992)................................................54

United States v. Trim, 31 F.Supp.2d 1308 (W.D. Okla. 1998)........................................84

United States v. Vector Corp., No. C 93-48, 1994 U.S.Dist. LEXIS 21330 (N.D. Iowa Apr. 14, 1994) ................................................................................82

Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765 (2000)................................................................................48

Visiting Nurses Ass'n v. Thompson, 378 F.Supp.2d 75, 95 (E.D.N.Y. 2004)................55

Weston Instruments, Inc. v. Systron-Donner Corp., No. C-74-1099, 1978 U.S.Dist. LEXIS 15987 (N.D. Cal. Aug. 16, 1978)................................................80

## FEDERAL STATUTES

61 Fed.Reg. 2122, 2124 ................................................................................34

31 U.S.C. § 3729................................................................................56

31 U.S.C. § 3731................................................................................50

42 C.F.R. § 1001.952 ................................................................................34

62 Fed.Reg. 7350 ................................................................................34

42 U.S.C. § 1320a-7b(b) ................................................................................30, 34

42 U.S.C. 1395hh................................................................................42

42 U.S.C. § 1395nn................................................................................40

42 U.S.C. § 1395nn(a) ................................................................................43

42 U.S.C. § 1395nn(e) ................................................................................43, 45, 49

42 U.S.C. § 1395nn(g) ................................................................................42

42 U.S.C. § 1395nn(h) ........................................................................41, 43, 44, 70

56 Fed.Reg. 35952, 35956 ........................................................................34

61 Fed.Reg. 2122, 2124 (Jan. 25, 1996) ........................................................34

64 Fed.Reg. 63517, 63519 (Nov. 19, 1999)........................................................34

66 Fed.Reg. 856 ........................................................................45

69 Fed.Reg. 16054 ........................................................................42, 45

## MISCELLANEOUS

Hospital Manual (CMS Pub. 10) § 460 (since transferred to Medicare Claims
      Processing Manual (CMS Pub. 100-04), § 60.5,  .................................69, 70

Office of Inspector General, Dep't of Health and Human Services, OIG
      Supplemental Compliance Program Guidance for Hospitals, 70 Fed.Reg.
      4858, 4864........................................................................35

Office of Inspector General, Dep't of Health & Human Svs., Fact Sheet:  Federal
      Anti-Kickback Law and Regulatory Safe Harbors (1999) ...........................35

Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204 ..............................41

Physicians' Referrals to Health Care Entities With Which They Have Financial
      Relationships, 66 Fed.Reg. 855, 860 ...........................................45

S. Rep. No. 99-345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5161, 5286..............56

Social Security Act Amendments of 1994, P.L. 103-432, § 152......................................42

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PETER ROGAN, | ) | Case No. 02C 3310 |
| | ) | |
| Defendant. | ) | Judge John W. Darrah |
| | ) | |
| | ) | |

## **AMENDED POST-TRIAL ARGUMENT OF PETER ROGAN**

The United States' case against Peter Rogan ("Rogan"), who was not charged criminally in connection with the underlying investigation and was not charged in this case with violating the Anti-Kickback Statute or Stark Statute, the predicates for liability under the Civil False Claims Act and the common law claims, is a textbook example of overreaching on the issues of liability and damages. The United States' theory of liability and damages, if adopted by this Court, would cause chaos and upheaval in the massive health care industry.

## **INTRODUCTION**

The United States seeks to premise liability and impose treble damages on Rogan under the Anti-Kickback Statute for his legitimate hopes that doctors with whom Edgewater entered into relationships would refer and treat their patients at Edgewater. Even the cases the United States cites on this point reject this extraordinary proposition. The United States also seeks to base liability under the Stark Act, which by its plain language applies only to doctors and health care entities. Moreover, the United States' case is founded in part on relationships,

such as loans and consulting arrangements, which fell into exceptions to the statute during the applicable time period at issue in the complaint.

Even assuming it could carry its burden and prove liability against Rogan, the United States has completely failed to prove damages in that it has made no effort to: (1) identify the patients referred by Drs. Barnabas, Cubria and Rao, or the services they ordered or provided; (2) separate the legitimate claims relating to patients Cubria and/or Barnabas may have consulted or operated on from the alleged illegitimate ones; (3) identify services rendered by doctors other than Barnabas and Cubria; (4) offer one UB-92 into evidence; or (5) offer any evidence that it would not have paid the claims allegedly submitted by Edgewater. The government's 'all-on-nothing' damage theory ignores critical proof requirements and is another example of overreaching that must be rejected.

Fraud occurred at Edgewater. Barnabas and Cubria, with whom Edgewater entered into contracts, did not perform all the hours set forth in their contracts. The evidence is clear that Roger Ehmen was responsible for ensuring that these doctors performed the work under the contract they had with Edgewater. The evidence also is clear that Ehmen, whom Rogan relied upon to perform this function, knew that the doctors were not fulfilling their hours requirements and that neither he nor the doctors themselves told Rogan about it. In fact, Ehmen admitted on cross-examination that he alone falsified documents to make it appear as though the doctors were in compliance with their contracts, and did not tell anyone, including Henry Zeisel, the CFO who was responsible for submitting Edgewater's cost reports, nor Nancy Bryson, a Vice President who was responsible for submitting claims for reimbursements, nor Rogan.

At day's end, the United States proved that Rogan wanted admissions for Edgewater, as any responsible hospital administrator would. Naturally, Rogan hoped that

2

doctors spending time at Edgewater would want to admit and treat their patients there. Patient admissions, after all, are absolutely necessary for a hospital to survive. It is not illegal to hope, or even to expect referrals from a doctor who has contracted with a hospital, so long as that hope or expectation is collateral to the reasons for entering into the contract. In every instance, the evidence demonstrated that Rogan relied on Ehmen to carry out his job and believed the contracts were entered into for legitimate purposes. The United States' own witnesses were hard-pressed to explain why particular contracts were not for legitimate services, such as medical directorship contracts, teaching contracts or physician recruiting contracts.

The United States also proved that physicians did not do the amount of work required under their contracts. But, in all but one instance, the United States' key witnesses admitted that the issue was never brought to Rogan's attention; concerning the lone instance where Ehmen claimed he brought the issue to Rogan, he was impeached by statements he gave to the FBI years before, during the investigation, that are directly to the contrary. Therefore, Rogan lacked knowledge that the required number of hours was not performed.

Rogan was not reckless in failing to know that a few physicians on Edgewater's staff of well over 300 were not doing all the work required under their contracts. That responsibility, as well as the responsibility to recruit physicians, was Ehmen's, the administrator who was convicted and sentenced to 78 months for his fraud at Edgewater. Rogan had no reason to suspect anything was amiss because he observed the doctors doing work under their contracts. While Ehmen had knowledge that work was not being done, he never informed Rogan, and in fact falsified records stating that work was being done.

While fraud occurred at Edgewater, Rogan's words and actions during the heart of the conspiracy rebut any knowledge of or intent to join Ehmen and the doctors' fraud. Rogan

was taped telling Barnabas and Rao in the most blatant of terms that he does not pay for patients. Although it understandably attempted to sidestep this devastating evidence, the United States was unable to prove that Rogan knew or even suspected that the conversation was being recorded; the government instructed Rao to secretly record Rogan, and presumably would not have done so if it suspected its undercover investigation had been revealed. Rogan's statement on that tape echoed the philosophy he has held since he began his involvement in Edgewater, the philosophy he relayed to his attorney when Edgewater first began entering into contracts with doctors under Rogan's stewardship: he does not pay for patients.

And there was no financial motive for Rogan to engage in such a scheme. The United States claims that Rogan was motivated by the management fees that the management company received; yet these fees were capped, and the United States put on no evidence that, if not for illegal admissions, the cap would not have been reached. Moreover, the management company would have received its fees whether or not the fraud occurred at Edgewater. By contrast, the doctors personally received millions of dollars from the Medicare and Medicaid programs, and Ehmen admitted that he wanted to keep these doctors happy in order to make himself look good so as to keep his job, and thereby receive retention and other bonus money.

In light of the United States' failure to prove liability or damages, this Court should find in favor of Rogan on all counts.

## FACTUAL SUMMARY

1.    **The History of Edgewater Medical Center**

Hospitals, whether profit or non-profit, must generate revenue to stay in business. (RPFF ¶ 25).[1] A hospital is a workshop for doctors, a place where doctors congregate their patients for efficiency. (RPFF ¶ 26). In order to generate revenue, hospitals must attract

4

business by providing good services. (Id.). A hospital needs a sufficient number of internists and family practitioners on staff in order to bring in the necessary number of admissions and outpatient work, which make a hospital a viable institution. (RPFF ¶ 72). Physician recruiting is important because a hospital must ensure that there are enough doctors to handle an increasing population. Hospitals have a responsibility to the community to make sure there are adequate physicians to provide care. (RPFF ¶ 73).

In the 1980s, Edgewater was not meeting its responsibility to the community. In fact, it was barely in business. In 1980, after the previous owner of the hospital, who had kept it in tip-top shape, died, Edgewater became quite run-down. (RPFF ¶ 10). The prior owner's family ran the hospital, but nothing had been done to update it in ten years. (Id.). Its administration was in shambles, patient care was not adequate, and there was a shortage of nurses. (RPFF ¶ 6). Edgewater had a poor reputation in the medical community and in the community at large. (RPFF ¶¶ 6, 10).

In 1989, Rogan, who had previously turned around St. Anthony's Hospital, was doing consulting work for Edgewater through Interhealth, a company he started after leaving St. Anthony's. Edgewater was in dire straits at the time and requested financial assistance from Rogan. (RPFF ¶¶ 6-7). Rogan presented a financial proposal to Edgewater's Board of Directors that included an option for him to buy the hospital, which he exercised in 1989. (RPFF ¶ 7).

Rogan immediately set to work improving the hospital, investing over $10 million in improvements. The emergency room was renovated, the lobby redecorated, patient rooms renovated, a diabetic inpatient unit was installed, and the radiology department was renovated. (RPFF ¶ 11). A new emergency generator, state-of-the-art mammography machine, and linear accelerator were installed, an oncology unit was created, and a new cardiac catheterization lab

---

[1] Cites to "RPFF" are references to paragraphs in Defendant Peter Rogan's Proposed Findings of Fact.

completed.  (Id.)  There was also an effort to encourage physicians from the local community to join Edgewater, as well as an effort to encourage the various ethnic groups in the local community to utilize Edgewater.  (RPFF ¶ 32).  And Edgewater employed a more user-friendly system for doctors, such as the delivery of x-ray reports in real time.  (RPFF ¶ 101).  Rogan brought the hospital into the modern age.  He enhanced services.  (RPFF ¶ 447).  He spent money on the building.  (RPFF ¶ 447).  He made it a quality institution.  (RPFF ¶ 447).  Edgewater had changed for the better, and doctors were happy treating patients there.  (RPFF ¶ 101).

In 1994, Edgewater was sold to Permian.  The CEO of Primus, who had a contract to look for hospitals for Permian to acquire, was Scott Gross.  Initially, Gross went to Chicago and took a tour of Edgewater, the surrounding area, and called contacts to obtain more information about Edgewater.  (RPFF ¶ 30).  Gross thought that Edgewater was a "prime candidate" for Permian if what they saw on paper could be verified upon due diligence.  (RPFF ¶ 30).

At that time, Gross had been involved in hospital management and administration for 20 years, his "stock and trade" being hospital turn-arounds.  (RPFF ¶ 31).  He believed that an incredible job had been done by Rogan, and that Edgewater had been "snatched from falling into a demise."  (RPFF ¶ 31).  Gross learned after looking at the data that Edgewater had been turned around because of a very aggressive cost-cutting effort.  There had previously been no effort to encourage physicians from the local community or members of the various ethnic groups to utilize Edgewater, but under Rogan's stewardship, outreach efforts had been successful.  (RPFF ¶ 32).

In order to determine whether there were any practices at Edgewater that would raise concern, Gross looked at the quality of care, length of stay, the admission rate through the emergency room, and the number of laboratory and invasive procedures done in order to determine whether there were any practices that would raise concern. (RPFF ¶ 33). There was nothing from Gross's initial inspection or conversations with Rogan that gave any hint that there was any fraud and abuse going on. (RPFF ¶ 33). After the initial inspection, Gross took a team of individuals to further evaluate Edgewater by looking at "the operations of the hospital at the next level of detail." (RPFF ¶ 34). During the due diligence, all contracts were reviewed, including vendor and physician contracts. (RPFF ¶ 36). Nobody in the due diligence process came up with any hint that there was any fraud and abuse at Edgewater. (RPFF ¶ 39).

Rogan was the CEO of Edgewater from 1991 until 1997. His administrative assistant (who was called by the United States) testified that Rogan's involvement was very "hands-on" in the first few years, but as the hospital became more successful and was sold in 1994, he delegated more and more. (RPFF ¶ 68). In 1997, Joanne Skvarek was appointed CEO and Rogan's involvement in the day-to-day operations of the hospital lessened again. (RPFF ¶¶ 70-71).

**2.    Dr. Ravi Barnabas**

Dr. Ravi Barnabas was a resident at Edgewater in the 1980s. (RPFF ¶ 98). After his residency ended, Barnabas did not refer any of his patients to Edgewater on a regular basis due to the poor condition of the hospital. (RPFF ¶ 99). However, in the early 1990s, Barnabas was told by a fellow doctor that Edgewater had changed for the better and Barnabas should take a look at it. (RPFF ¶ 100). Barnabas was indeed impressed by the new Edgewater. The

condition of the hospital had been improved, and it had become more doctor-friendly. (RPFF ¶ 101).

### A. Teaching Contract and Physician Recruitment Contract

Throughout his tenure at Edgewater, Barnabas, like many doctors, had a number of contracts with the hospital. Barnabas was offered a teaching contract because Edgewater was looking for younger physicians to join the faculty and reinvigorate it, and Barnabas already knew the program since he had gone through it himself as a resident. (RPFF ¶¶ 107, 125, 126). Ehmen came to Rogan with the idea, and Rogan thought giving Barnabas a teaching contract was a good suggestion because it comported with Edgewater's goal of lowering the age of the medical staff, and Barnabas was already familiar with Edgewater. (RPFF ¶ 125).

Although Ehmen claimed for the first time at trial that Barnabas came to Ehmen and demanded a contract, Ehmen admitted that he testified before the Grand Jury on June 13, 2002 that he instigated the idea of giving Barnabas a contract. (RPFF ¶ 108). This is consistent with Barnabas' recollection: Ehmen approached Barnabas about the teaching contract. (RPFF ¶ 108). Barnabas then had a meeting with Ehmen and Rogan where Ehmen stated they had decided to compensate Barnabas $60,000 to be a teaching attending at Edgewater. (RPFF ¶ 128) There was no discussion about the contract being for admissions, nor did the subject of admissions or referrals come up during this meeting. (RPFF ¶ 130). After that meeting, Barnabas never again had any discussions where Rogan was present regarding any contracts. (RPFF ¶ 130). Barnabas signed the teaching contract in 1993, although he failed to read the contract he signed. He thought he was signing a physician recruitment contract. (RPFF ¶ 131).

Barnabas apparently never did any teaching at Edgewater, but Rogan was never told that Barnabas was failing to fulfill his teaching duties.[2] (RPFF ¶¶ 132, 134, 135, 137).

After learning that he signed the wrong contract, Barnabas discussed with Ehmen changing Barnabas' duties to physician recruitment rather than teaching. (RPFF ¶ 132). Rogan was not present when Barnabas and Ehmen discussed whether Barnabas' teaching contract should be structured differently. (RPFF ¶ 132). Ehmen said he would change the contract, but Barnabas did not recall signing a new one. (RPFF ¶ 132).

In 1995, Ehmen came to Rogan, who based on his meeting with Ehmen and Barnabas believed Barnabas was teaching, and said that Barnabas no longer wanted to do so. (RPFF ¶ 138). Ehmen told Rogan he thought Barnabas would be an excellent candidate for physician recruitment because he was the right age, and knew a number of physicians in the community. (RPFF ¶ 138). Barnabas likewise believed that he knew many physicians in the vicinity and in the neighborhood, and would thus make a good physician recruiter. (RPFF ¶ 138). Barnabas and Edgewater entered into the physician recruiting contract on November 1, 1995. (RPFF ¶ 139).

Barnabas believed that this contract contained an illegal expectation that he would refer his patients to Edgewater is based solely on the fact that Ehmen "on more than a couple of occasions asked me what he could do to see more activity or some activity from me" and that "I knew there were physicians who had contracts there." (RPFF ¶ 129). In fact, Ehmen testified that by giving Barnabas a contract he hoped to attract patients from Barnabas and his brother, also a physician. (RPFF ¶ 102). Ehmen's contention that this contract was given to Barnabas

---

[2] The United States concedes no one informed Rogan that Barnabas was not working the hours required under his contracts, instead claiming that "Rogan never inquired." (USPFF ¶ 56). That was Ehmen's responsibility. (RPFF ¶¶ 78, 127).

because Barnabas tended to the patients of Dr. Ramos is belied by the facts — Ramos left Edgewater in April or May of 1995.[3] (RPFF ¶ 140).

Barnabas did undertake recruiting activities under his physician recruitment contract, although he did not work as many hours as required under the contract. (RPFF ¶¶ 148, 149) Ehmen and Barnabas, however, both signed physician time studies reflecting that Barnabas did more work than he actually did. (RPFF ¶ 146). Ehmen never told anyone that Barnabas' physician time studies were not accurate, and never told Rogan that Barnabas was not working the hours required under his contract. (RPFF ¶ 147).

**B.      EID Contract and West Side Clinic Contract**

In August of 1997, Barnabas received a contract from Edgewater for the Elderly-In-Distress ("EID") program. (RPFF ¶ 152). Barnabas proposed the EID program to Ehmen. (RPFF ¶ 154). The EID program provided medical care and diagnostic tests to senior citizens who, due to their disabilities, could not leave their homes and seek medical care. (RPFF ¶ 153). Edgewater assigned a senior resident to make house calls on these patients and give them appropriate care. (RPFF ¶ 153). The resident would report back to Barnabas after seeing each patient. (RPFF ¶ 154). Ehmen acknowledged this was a program Barnabas developed at Edgewater and was a "good program." (RPFF ¶¶ 156). An EID code was developed to track admissions under the program. Codes were developed because it was important to know the number of admissions coming in under a program in order to determine whether or not the program was working. (RPFF ¶ 157).

Barnabas also had a contract with Edgewater to manage patients at a clinic that Edgewater ran on the West Side of Chicago, which was modeled on a successful program

---

[3]  Alleged Conduct prior to 1995 is irrelevant to the United States' alleged damages. The United States' details of Ramos' relationship with Edgewater not only occurred outside the scope of the United States' alleged damages, but

10

Barnabas ran at Methodist hospital. (RPFF ¶ 160). Barnabas performed the duties required of him by this contract, which was not given to him to refer patients to Edgewater. (RPFF ¶¶ 163, 166).

The United States does not seriously contend these two contracts were illegal, other than to allege that they were a front for dividing Barnabas' $60,000 physician recruitment contract into two contracts, which would "appear more reasonable and [] create the appearance of propriety." (USPFF ¶ 52). This argument makes no sense, given that there was no need to create an appearance of propriety. The EID and West Side Clinic programs were good programs successfully implemented. And plenty of physicians had contracts for $60,000 or greater (including Barnabas since 1993). A number of doctors had contracts with Edgewater that were for more than the contracts given Barnabas. (RPFF ¶¶ 258, 259).

Ehmen and Barnabas met on at least 16 occasions to discuss all the programs Barnabas was working on under his contracts. and Ehmen drafted memos recounting those meetings. (RPFF ¶ 149). In those memos, Ehmen detailed the many components of the EID program, the steps Barnabas was taking toward physician recruitment, and specific tasks Barnabas was to undertake as part of his contractual duties. (Id.). Barnabas was clearly doing work under his contracts.

The simplest fact, however, demonstrating that not one of Barnabas' contracts were given in exchange for him to admit or refer patients to Edgewater is that Barnabas *never did* shift the bulk of his patients to Edgewater. Throughout the time that Barnabas had supposedly illegal contracts with Edgewater, he admitted the majority of his patients to Methodist Hospital, not Edgewater. (RPFF ¶¶ 100, 151). And further evidence that Rogan never believed that Barnabas' contracts were given in exchange for referrals is the fact that Rogan

the United States proved nothing unlawful about the Ramos relationship.

never directed Ehmen to cancel any of Barnabas' contracts, but rather continued to approve renewals of the contracts. (RPFF ¶ 151).

**3.   Dr. Rao**

      **A.   Anesthesia Contract**

Dr. Sheshiqiri Rao Vavilikolanu ("Rao") was a key player in the supposed conspiracy of which Rogan allegedly was a part. The United States chose not to call him as a witness. In 1996, Edgewater was in the process of investigating the possibility of changing its anesthesia service group. (RPFF ¶ 175). Judy Lunde, Edgewater's Director of Nursing, was dissatisfied with the performance of the existing group, whose contract was set to expire at the beginning of 1997, and had concerns about the group's ability to fulfill the requirements necessary for the 1998 Joint Commission on Accreditation of Health Care Organizations ("JCAHO") Review. (RPFF ¶ 175). JCAHO accreditation helps establish a hospital's eligibility to participate in Medicare and compliance with Illinois hospital licensing laws.

Rao met Barnabas while the two practiced together at Doctors Hospital of Hyde Park, where Rao was in charge of anesthesia services. (RPFF ¶ 177). After hearing that Edgewater was looking to replace its anesthesia group, Rao approached Barnabas and told Barnabas that he would like to bid on the Edgewater contract and proposed an arrangement to Barnabas whereby if Rao got the anesthesia contract with Edgewater, Barnabas could manage patients referred to Edgewater by Rao. (RPFF ¶ 178).

In December 1996, Ehmen met with Barnabas and Rao at a restaurant. (RPFF ¶ 179). Ehmen agreed to meet with Rao because Barnabas told Ehmen that he worked with Rao at Doctors Hospital and had come to know Rao and the services Rao provided. (RPFF ¶ 179). At the meeting, Ehmen gave Rao the criteria Lunde had put together for the new anesthesia group.

Ehmen explained that Edgewater was looking for an anesthesiology group that would improve the quality and keep Edgewater's good anesthesiologists on staff. (RPFF ¶ 180). Rao assured Ehmen that he could do both. (Id.).

In addition, Rao told Ehmen at the meeting that he knew many primary care physicians who liked the anesthesia services he provided at other institutions, and Rao believed he could get a number of these individuals to join Edgewater's staff. (RPFF ¶¶ 180, 182). Rao also told Ehmen that he would not be on the medical staff, and would therefore be free to handle quality improvement and administrative issues, which were important to Edgewater. (RPFF ¶ 182). Although Ehmen did not want Rao actually providing services at Edgewater because he had an unfavorable opinion of him personally, Rao's representation that he would not be providing such services allayed Ehmen's concerns. (RPFF ¶ 182). And, with such an arrangement, Ehmen thought Rao would then have plenty of time to handle quality improvement. (RPFF ¶ 182). It was not unusual that the head of a department at Edgewater provided no services personally. (RPFF ¶ 182).

Ehmen then met with Rogan, and told Rogan that he gave Rao the criteria developed by Lunde, that Rao could address the quality improvement issues and was willing to retain the two anesthesiologists Edgewater sought to keep. (RPFF ¶ 184). Ehmen also mentioned, consistent with Rogan's testimony, that Rao had the potential capability of bringing some primary care physicians to Edgewater. (RPFF ¶ 184). Ehmen did not mention anything to Rogan about paying for patients. (RPFF ¶ 238).

Barnabas introduced Rogan to Rao during a meeting in the fall of 1996. (RPFF ¶ 187). At this meeting, Rao told Rogan that he had experience in Joint Commission work. (RPFF ¶ 189). This was important to Edgewater because it had a 1998 Joint Commission review

coming up. (RPFF ¶ 189). As a practical matter, all hospitals that want to stay in business and participate in reimbursement programs must be accredited by the Joint Commission. (RPFF ¶ 189). Rao also told Rogan that he was very service-oriented towards surgeons, understood and could be very responsive to their needs, and could make it an easier place for the surgeons to practice. (RPFF ¶ 190). Rao additionally told Rogan that he knew a number of primary care physicians and could be helpful in recruiting primary care physicians to Edgewater. (RPFF ¶ 190). Compensation was not discussed, and no agreement was reached at the meeting. (RPFF ¶ 190).

In January 1997, Rogan, Ehmen and Lunde met to discuss Rao and the hiring of his anesthesia group. (RPFF ¶ 192). Ehmen expressed that he was very happy that Rao would keep the good anesthesiologists on staff, which would ease the transition. (RPFF ¶ 193). This was an important factor in Rao getting the anesthesia service contract — some of the prospective anesthesia groups wanted to clean house, and that was the reason why those groups did not get the job. (RPFF ¶ 181). Ehmen likewise told his brother that the three reasons Rao's group got the contract were because: (1) it was going to retain some anesthesiologists; (2) Rao's group was the best; and (3) there was an opportunity to bring some more doctors on at Edgewater. (RPFF ¶ 186). Based on Ehmen's recommendations, Rao was given the contract.

Rao's corporation entered into the anesthesia contract with Edgewater on February 28, 1997. (RPFF ¶ 201). The contract required Rao's group to begin providing anesthesia services on April 1, 1997, and provided that the group would be compensated $15,000 per month. (RPFF ¶ 201). It was Ehmen's responsibility to prepare the contract for Rao to determine the fee. (RPFF ¶ 202). Rao's corporation was paid for the planning and administrative work done for gearing up to provide services during the month of March. (RPFF

14

¶ 201). The United States' argument that the payment to Rao for the month of March was for a "trial period" to see how many patients Rao could admit makes no sense. The contract was entered into (and the hospital was bound) on February 28, 1997. Any so-called "trial period" would have to have been prior to Rao and Edgewater entering into the contract.

Rao told Ehmen that Dr. Kumar Kaliana, who was not affiliated with Edgewater, was going to refer patients to Rao, and Barnabas was going to admit and manage them. (RPFF ¶¶ 195, 197). Ehmen saw nothing wrong with this arrangement and felt there was nothing illegal about it. (RPFF ¶¶ 195, 197). At the same time, Ehmen began exploring whether Edgewater should enter into some sort of relationship with Kumar. (RPFF ¶ 199).

By March, 31, 1997, however, Ehmen had learned that Kumar was not eligible to participate in Medicaid, and no relationship was ever established. (RPFF ¶ 200). A few months later, Ehmen learned that Rao was paying Kumar $12,000 for the patients Rao sent to Edgewater. (RPFF ¶ 200). Ehmen did not know about Rao's payments to Kumar when the contract was signed, nor when he was investigating whether to enter into a relationship with Kumar. (RPFF ¶ 200). Rao admitted Kumar's patients to Edgewater (via Barnabas), and would call Ehmen or Ehmen's secretary to do so. (RPFF ¶ 203). He never called Rogan. (RPFF ¶ 203). Rogan did not track Rao's admissions, nor did he establish any codes to do so. (RPFF ¶ 204).

Rao turned out to be a poor provider of the administrative services associated with the anesthesiology department. Lunde complained to Ehmen that Rao was not doing the quality improvement activities that she expected, and there were complaints from surgeons about the services provided. (RPFF ¶¶ 207, 208). Some of the anesthesiologists told Ehmen that they were not getting paid on a timely basis. (RPFF ¶¶ 207, 208). Ehmen discussed Rao's

deficiencies with Rao on many occasions. (RPFF ¶ 209). But even after Ehmen spoke to Rao, Rao still was not performing his administrative duties. (RPFF ¶ 209).

Rogan instructed Ehmen to send Rao a breach letter, which stated Rao had 30 days to cure the breach. (RPFF ¶ 214). Although the United States alleges that Rogan terminated Rao's payments because he was not admitting enough patients to Edgewater, the breach letter, sent after Rao's admissions were in sharp decline, offered Rao an opportunity to fix the problems regarding the carrying out of the required administrative services, and thus continue to receive payments for those services. (RPFF ¶ 214). But Rao showed no improvement in providing the expected administrative services, and the monthly payments were stopped. (RPFF ¶ 209). Rao was still able to bill for and collect payments for the anesthesia services his group provided. (RPFF ¶ 211).

At this point in time, the United States had already begun its investigation into Edgewater. Rao had been wearing a wire and taped many conversations with Ehmen and Barnabas. (RPFF ¶ 214). Ehmen's statements to Rao on these tapes reflect both Edgewater's and Rogan's view of Edgewater's relationship with Rao. Ehmen repeatedly told Rao that his contract was being terminated because he wasn't providing the administrative services required. (RPFF ¶ 214). Ehmen told Rao that his contract "was not about admissions" and that Rao just "had to provide good quality anesthesia services, that's all." (RPFF ¶ 215). Ehmen also told Rao that "no admissions has nothing to do with your contract . . . we only want good service." (RPFF ¶ 214). Ehmen did not know he was being taped when he made these statements. (Id.).

In an effort to determine if Rogan was involved in Rao's scheme to admit patients, the United States also directed Rao to tape Rogan. Rao called Barnabas (who did not know Rao was cooperating with the United States) and said he wanted to set up a meeting with

16

Rogan because Edgewater owed him two checks. (RPFF ¶ 229). In August of 1998, the meeting occurred. Rao told Rogan that he was owed two checks, which he needed to pay a physician who was sending patients to Edgewater. (RPFF ¶ 234). Rogan responded emphatically that Edgewater did not pay for patients. (RPFF ¶ 234). Rao then told Rogan that if Rogan did not pay this physician, this physician might call certain people (i.e., the authorities) and say that he was not being paid for patients as he was supposed to be, and that Edgewater owed him two checks. (RPFF ¶ 234). Barnabas had never seen Rogan as angry as he became after this comment. (RPFF ¶ 234). Rogan again said in no uncertain terms that Edgewater did not pay for patients, never had, and if Rao continued this line of questioning Rogan would see that justice would be served and this physician would be found to disprove Rao's allegations that Edgewater was paying for patients. (RPFF ¶ 234).

The United States, recognizing the devastating impact of this objective, undisputed evidence, attempts to explain Rogan's statements by claiming Rogan knew or suspected he was being taped. The basis for this explanation is Ehmen's testimony that he had two discussions with Rogan, one before the meeting and one after, where Rogan supposedly indicated that he thought something was not right about the meeting or the conversation. However, Ehmen never told the FBI agents about these conversations in their many interviews with him. (RPFF ¶¶ 232, 233). There is no evidence that Rogan even suspected he was being recorded.

## B.     Florascribe Contract

In early 1997, Rogan met with Rao and Barnabas to discuss the detoxification program at Edgewater. Rao explained that he was involved in the detoxification program at Doctors Hospital of Hyde Park. (RPFF ¶¶ 217, 218). At that time, Edgewater had a contract

with a company called Special Care, which was set to expire at the end of 1997. (RPFF ¶ 219). Special Care wanted a significant increase in their fees, which was unacceptable. Id. Ehmen and Lunde were looking for an alternative to Special Care, and in mid-1997, Ehmen brought Florascribe to Rogan's attention. (RPFF ¶ 224). Rogan and Ehmen decided to give Florascribe a trial run.

At the same time, Edgewater was attempting to negotiate an acceptable renewal with Special Care. (RPFF ¶ 222). The trial run worked out, and a contract was given to Florascribe to provide the marketing for Edgewater's detoxification program. (RPFF ¶ 224). Edgewater still had its original contract with Special Care and was attempting to renegotiate it, only now Special care was providing the management of the detoxification services and Florascribe was handling the marketing. (RPFF ¶ 222). Ehmen had recommended Florascribe to Rogan because Rao was not working out very well with anesthesiology, and he thought if Florascribe worked out, he could "save face." (RPFF ¶ 222).

Lunde was able to renegotiate the Special Care contract, which was revised and renewed. (RPFF ¶ 227). Florascribe was terminated because its services were no longer needed. (RPFF ¶ 227). Until trial, Ehmen never alleged that there was anything illegal about the Florascribe contract, but rather, told the FBI agents that the payments to Florascribe were for marketing expenses, which is exactly what they were. (RPFF ¶ 225).

## 4. Dr. Andrew Cubria

Cubria worked at Edgewater from the time he began practicing medicine in 1979, until the time his license was revoked in 2001. (RPFF ¶¶ 241, 409, 412). Cubria kept his primary office at Edgewater from 1989 through the revocation of his license. (RPFF ¶ 247). Cubria was important to Edgewater. He was Latino, which fit into Edgewater's plan to market

18

services to the community of immigrants around Edgewater, and aided in serving the many Latino patients who came through Edgewater's doors. Cubria had good credentials. He was board-certified and trained at the University of Illinois, and he had a busy practice that generated revenue for Edgewater. (RPFF ¶ 304).

The United States contends that Cubria's Edgewater contracts were illegal because he received them in order to keep his patients at Edgewater. Ehmen, however, admitted that both he and Rogan thought Cubria was just bluffing when he would threaten to leave. (RPFF ¶ 300). For his part, Cubria conceded on cross-examination that he did not receive any payments from Edgewater in exchange for admissions or referrals. (RPFF ¶ 519, 520).

Indeed, events bear Ehmen's suspicions out: Cubria did not get a number of things he wanted at Edgewater, and he never shifted his practice to another hospital. For example, Cubria was irate that he was not in charge of the Vida Nueva program, which it competed with his Latino heart program. (RPFF ¶ 306). The program was continued despite the fact that Cubria was "incensed" by it. (RPFF ¶ 306).

### A.    Office Build-Out

In the early 1990's, Edgewater built out the space at the Edgewater professional building for the physician practice of which Cubria was a part because the physicians were scattered throughout the building and needed to be together. (RPFF ¶ 247). The cost was to be included in the future rent for the practice group. (RPFF ¶ 247). In late 1993 or 1994, the practice broke up. (RPFF ¶ 247). Two of the other doctors decided to leave because they were admitting most of their patients to Illinois Masonic. (RPFF ¶ 247). So Cubria and the other doctor in the practice were in a bind. (RPFF ¶ 247). Cubria testified that Rogan told him if Cubria would "stay back," the cost for the build-out would be waived. (RPFF ¶ 247). Mr.

Rogan never waived any portion of Dr. Cubria's rent for the office that Dr. Cubria maintained at Edgewater. (RPFF ¶ 248). Even so, Cubria's testimony does not demonstrate any inducement of referrals. Without explaining why, Cubria interpreted the phrase "stay back" to mean to "start[] admitting my patients to Edgewater" as opposed to staying back at the professional building where he had been since 1989 (Id.). Cubria did stay in the professional building, and continued to pay rent for his office space. (Id.).

### B. Teaching Service

Cubria occasionally received payments for filling in for overseeing the teaching service at Edgewater. The teaching service was a program whereby indigents coming through the emergency room were put on a teaching service floor. An attending doctor had to oversee this floor, and Cubria did so on a fill-in basis when other doctors were not available. (RPFF ¶ 279). It was Ehmen's job to set up the payment amounts for the teaching service. (RPFF ¶ 279). The United States offered no testimony that Rogan was aware that Cubria was not participating in the teaching service. In fact, Cubria offers no testimony whatsoever as to why he received payments for the teaching service. (Trial Testimony "TR." at 911:15 - 914:13).

### C. EKG Contract

From 1993 to 1994, Cubria and three other doctors were reading EKGs for Edgewater. However, the cardiologists were not satisfied with their compensation of $1,500 to $2,000/month. (RPFF ¶ 282). All four doctors, including Cubria, approached Rogan about an increase in the doctors' EKG fees. (RPFF ¶ 282). Rogan then discussed an increase in compensation with each of the four doctors (including Drs. Saudye, Hussain, and Heary) (RPFF ¶ 284). Cubria never told Rogan during these conversations that he would leave Edgewater if his compensation to read EKGs was not increased. (RPFF ¶ 285, 286). The compensation for each

of the four cardiologists was changed to $6,000 per month. (RPFF ¶ 290). The contracts were for fair market value based on 600 hours of work per year. (RPFF ¶ 292). It was Ehmen's responsibility to see that the 600 hours of work was performed by the cardiologists. (RPFF ¶ 294). Although Cubria was not working 600 hours each year, Ehmen did not take this issue to Rogan. (RPFF ¶ 295). Likewise, Cubria did not bring this issue to Rogan's attention. (RPFF ¶ 296).

### D.      Loans

In 1995, Cubria and Rogan discussed a loan to Cubria in order for Cubria to hire another doctor. Cubria wanted to hire a Hispanic cardiologist, and Rogan agreed that Edgewater would loan him the $84,000 to do so. (RPFF ¶ 314). Doctors routinely asked for loans from Edgewater. (RPFF ¶ 311). In order to determine whether to grant these loans, Edgewater's attorneys would determine whether the loans met various requirements, and hospital management would determine whether it was something Edgewater should do. (RPFF ¶ 312).

The cardiologist Cubria was planning on hiring, Dr. Diaz, did not work out, so Cubria hired Dr. Goldstein, a board-certified cardiologist with impeccable credentials who was to teach in the cardiology subspecialty of the internal medicine residency program. (RPFF ¶ 316). The note was amended in 1996 to reflect that there was a technical default in the note because Diaz did not join Cubria's practice, and the note was amended to allow for the hiring of Goldstein. (RPFF ¶ 317). Cubria paid the note back with interest. (RPFF ¶ 320). Edgewater also gave Cubria a $150,000 loan, which Cubria paid back with interest. (RPFF ¶ 322). There is no evidence that Cubria and Rogan discussed admissions in connection with the loans, let alone that the loans were given in exchange for admissions.

In 1997, Edgewater investigated whether to buy Cubria's practice. Cubria wanted to move to the administrative side of hospital management. (RPFF ¶ 323). Edgewater entered into an agreement to purchase Cubria's practice, providing for a $60,000 payment to Cubria as a down payment for the purchase. (RPFF ¶ 327). If the purchase were to fall through, the payment would be converted into a loan. (RPFF ¶ 327). A valuation firm was hired to place a value on Cubria's practice, as was necessary because Edgewater was a not-for-profit company under the Internal Revenue Code. (RPFF ¶ 327). The sale of Cubria's practice never occurred, so the payment was converted into a loan, which Cubria paid back with interest. (RPFF ¶ 329).

In December of 1997, Zeisel prepared an analysis of the loans made to Cubria, which reflected the loans, the interest rates, and the monthly payments by Cubria of $6,000. Zeisel concluded that such a payment plan would result in the loans being paid off by December 2000. (RPFF ¶ 333). Zeisel set up procedures in the accounting department to ensure that $6,000 be deducted from Edgewater's payments to Cubria each month. (RPFF ¶ 333). Cubria did pay the loans back to Edgewater. (RPFF ¶ 334).

### E.      Teaching Contract and Medical Director Contract

In August of 1996, Cubria's professional service corporation entered into a contract with Edgewater to serve as a Medical Director, and Edgewater entered into a contract with Cubria's professional service corporation for Cubria's employee, Goldstein, to perform teaching and proctoring duties.  (RPFF ¶ 250).  Goldstein taught under the contract.  (RPFF ¶ 254).  There was no testimony that either of these contracts was given in exchange for Cubria treating his patients at Edgewater.  Rogan had no knowledge that the work being done under the contracts was falling short of the hours requirements in those contracts.  (RPFF ¶ 256).

### F.      Cardiac Rehabilitation Contract

In 1998, Cubria and Rogan discussed a contract to run the Cardiac Rehabilitation Department at Edgewater.  Cubria had been acting as the Director of the Cardiac Rehabilitation Department without being compensated for years, and he discussed being compensated for the position.  (RPFF ¶ 264).  No admissions or referrals were ever discussed.  (RPFF ¶ 267).  Ehmen testified that Cubria did not do enough work under this contract, and also testified that he took this issue to Rogan.  This is the first and only contract about which Ehmen states he informed Rogan that not enough work was being done.  However, when interviewed by FBI Agent James Ferguson in 2001, Ehmen stated that although he had heard Cubria was not doing his work under this contract, he did not take this issue to Rogan.  (RPFF ¶ 271).  And although Cubria discussed his lack of work under the Cardiac Rehabilitation contract with Ehmen, he never discussed it with Rogan.  (RPFF ¶ 272).  Cubria and Ehmen signed Cubria's time reports reflecting hours supposedly worked by Cubria.  (RPFF ¶ 275).  Ehmen believed the hours reported by Cubria were exaggerated, but he never told anyone, including Rogan.  (RPFF ¶ 275).

### G.      Feasibility Study

As part of discussions related to purchasing Cubria's practice, Rogan and Cubria discussed the creation of a Latino Heart Institute (the "Instituto de Cardiologia"). (RPFF ¶ 338). Also discussed was the performance of a feasibility study regarding the implementation of the Instituto de Cardiologia. (RPFF ¶ 338). Feasibility studies involve demographic analyses, analyses of competition in the area, budget projections and analysis of financial statements. (RPFF ¶ 343). While at Ernst & Ernst in the 1980s, Rogan performed approximately 25 feasibility studies, and supervised another 25. (RPFF ¶ 342). The cost range for these feasibility studies at that time was from $40,000 to over $100,000. (RPFF ¶ 344). Cubria and Rogan negotiated that Cubria would be paid $50,000 for the feasibility study, based upon the unique expertise of Cubria and Cubria's anticipated efforts. (RPFF ¶¶ 352, 354). Hispanic outreach was important to Cubria. (RPFF ¶ 346). Prior to working on the feasibility study, Cubria had been working on outreach programs in the Hispanic community for many years, and had accumulated a great deal of knowledge about the community. (RPFF ¶ 345, 347).

Edgewater stood to greatly benefit from the projects contemplated by the feasibility study because it would receive revenue from both the purchase of Cubria's practice and the newly-opened clinics that were contemplated by the Instituto de Cardiologia. (RPFF ¶ 353). Edgewater's Board of Directors approved the feasibility study during a June 5, 1997 board meeting. (RPFF ¶ 354). Both Edgewater's general counsel and assistant general counsel were present at the meeting. (Id.).

Cubria worked on the feasibility study, as reflected in the drafts of the study, and Rogan was satisfied with the information, feedback and work he was receiving from Cubria. (RPFF ¶¶ 357, 358, 364). Months later, Rogan and Cubria agreed that $30,000 would be paid to Cubria to handle the implementation of the Latino Heart program. (RPFF ¶ 365, 366). On

September 7, 1997, Ehmen sent a memo to Rogan detailing Cubria's involvement in the development of the Instituto de Cardiologia and requesting the $30,000. (RPFF ¶ 368). Although Ehmen testified that he did not think Cubria should be paid $30,000 for his implementation work, he did not tell Rogan. (RPFF ¶ 369). Ehmen's memo to Rogan reflects the opposite. Attaching an implementation outline submitted by Cubria for expansion of the existing Latino Heart Program, Ehmen informed Rogan that "Dr. Cubria has invested a lot of time in the development of this project. He has met with numerous realtors to evaluate sites; surveyed different brands of equipment with vendors, interviewed staff and doctors for the program; looked at billing/collection systems; and secured advertising budget proposals from channels 44 and 66. In fact, in discussion with channel 44, Dr. Cubria was able to increase advertising spots by 10% while maintaining the existing program advertising budget at the same level." (Id.).

### H. Advertising

As noted above, Edgewater also developed commercials as part of the Instituto de Cardiologia. The commercials featured both Dr. Cubria and other individuals. (RPFF ¶ 381). Edgewater and Cubria consulted with one of Edgewater's outside attorneys, John Tatooles, on the creation of these commercials and in particular regarding featuring a specific doctor in the commercials. (RPFF ¶ 376). The United States' only evidence of the commercials were test clips developed in December 1997, which contained Cubria's direct phone number and which were created at a time when Edgewater planned to buy Cubria's practice.[4] Ehmen and Cubria's testimony regarding how the calls came in demonstrates that the phone number was changed to a

---

[4] Although Cubria claims he decided by November 20 that he would not be selling his practice, management meeting minutes reflect a different story. On December 1, 1997, it was reported at the Board of Directors Meeting of Northside Operating Company that the acquisition would close at the end of 1997 and all preparations were being made to integrate it into the Ambulatory Physician Network (APN). (RPFF ¶ 451).

general Edgewater number. Calls that came in regarding general internal medicine were referred to Latino internal medicine doctors; calls that came in regarding heart problems went to Cubria, the only active Spanish-speaking cardiologist at Edgewater. (RPFF ¶ 391). Both Ehmen and Cubria testified that the commercials featuring Cubria (which also prominently featured Edgewater itself) contained a general Edgewater telephone number for patients to call, consistent with Tatooles' advice in February of 1998. (RPFF ¶¶ 392, 398, 400, 401, 402).

The commercials were implemented no sooner than April 29, 1998, over four months after the test clips were created. (RPFF ¶ 395). The United States never presented evidence of the commercials that actually ran, but the evidence establishes that in the four-plus-month period between the test clips and the running of the commercials, the commercials were changed to reflect a general Edgewater telephone number. (RPFF ¶ 400, 402). These commercials benefited the hospital because they brought patients into the hospital, whether they were cardiac patients or internal medicine patients. In fact, so many non-cardiac calls came in that a whole new program was opened up for Hispanic patients in internal medicine. (RPFF ¶ 402).

## I.     Consulting Agreement

As part of Cubria's continued interest and plan to leave the day-to-day practice of medicine and focus on the administrative side, Cubria was given a consulting agreement with Braddock Management on August 1, 1999. (RPFF ¶ 405). Rogan did not discourage Cubria from leaving the practice of medicine, and the United States offers no evidence that this contract was in exchange for Cubria to admit or refer patients to Edgewater. (RPFF ¶ 404). Such a motivation would make no sense because the purpose of the contract was for Cubria to move out of the practice of medicine.

### J.    Cubria's Conduct After Losing his License

By 2001, Cubria had lost his medical license.  (RPFF ¶¶ 409, 412).  By July of that year, he was broke.  (RPFF ¶ 412).  He asked various people for money, claiming he needed it to feed his children.  (RPFF ¶ 415).  These people included his friend Dr. Lopez and Rogan.  (RPFF ¶ 415).  Lopez gave Cubria $5,000, and Rogan gave him $9,000.  (RPFF ¶¶ 413, 414).  Cubria personally received over $4 million from the United States for billings he submitted from 1995-2001.  (RPFF ¶ 496).  He was indicted for various crimes in 2001, and is currently in prison.  Cubria met with FBI agents on many occasions, and Cubria knew he had to give full and truthful statements during his interviews with those agents.  (RPFF ¶ 506).  Cubria was told he could be prosecuted for felony murder.  (RPFF ¶ 509).

Although the United States agreed not to charge Cubria with felony murder in its plea agreement with him, Cubria knew that if he did not fully cooperate the United States would be released from its agreement.  (RPFF ¶ 509).  FBI agent Sherry Coon was present for all these meetings.  She attempted to learn everything she could regarding any benefits Cubria received from Edgewater, including whether Cubria received any payments to admit or keep his patients at Edgewater.  (RPFF ¶¶ 267, 286, 313, 356, 512, 513).

In response to the United States' wide-ranging questioning, Cubria never told Coon that he received the EKG contract, the directorship contract, the consulting contract, the payments for the development of the Latino outreach program, or that the loans were given in exchange for admitting or keeping his patients at Edgewater.  (RPFF ¶ 356).  He never informed Coon that he was failing to fulfill the duties under his contracts.  (RPFF ¶ 503). This is consistent with Cubria's Grand Jury testimony, where he never stated that he was given a contract or anything else by Edgewater to refer or admit patients.  (RPFF ¶¶ 512-520).  This is consistent

with Cubria's testimony under oath in another legal proceeding, where he stated unequivocally that he was not promised anything of value in exchange for referrals to Edgewater, and that he did not receive any payments from Edgewater in exchange for admissions or referrals. (RPFF ¶ 518).

### 5. Roger Ehmen

There is no dispute that Roger Ehmen was responsible for physician recruitment at Edgewater. He was also responsible for ensuring that Edgewater's doctors were happy. He focused activities on primary care physicians, internists, and family practitioners, because they control where patients are hospitalized. (RPFF ¶ 79). Ehmen's recruiting activities were reported to Edgewater's Board of Directors. (Id.).

It was also Ehmen's responsibility to ensure that the physician contracts were for fair market value. (RPFF ¶ 81). And Ehmen believed that if the hours were worked, the salary amounts were fair market value. (RPFF ¶ 292). For example, Ehmen testified that the compensation for Cubria's EKG contract met fair market value if the hours had been worked. (RFPP ¶ 292).

It was Ehmen's responsibility to ensure that physicians worked the hours required under the contracts, and to attest in the doctors' time studies that the hours worked were accurate. (RPFF ¶ 78). Likewise, Ehmen was responsible for reviewing doctor time studies. (RPFF ¶ 78). Ehmen also came up with the physician codes. (RPFF ¶ 449). Although Ehmen claims that he did not come up with the APN code, and that it was Rogan who told Ehmen to use it, the APN code was repeatedly discussed by, and eventually approved by the Board at Edgewater. (RPFF ¶ 449).

Ehmen pled guilty to various criminal charges and was sentenced to 78 months of incarceration. (United States Br. at 20). At trial, Ehmen painted a picture of Edgewater that was quite different from his many interviews with the FBI and his Grand Jury statement. But Ehmen cannot be believed. (See VI. A., *infra*). The United States itself does not trust or believe Ehmen. It performed two polygraph examinations on Ehmen in a "continuing effort to resolve issues of his veracity." (RPFF ¶ 481, 483). Not surprisingly, the United States refused to enter into a cooperation agreement with Ehmen. (RPFF ¶ 480). Ehmen was impeached on his testimony repeatedly during trial. And Ehmen's testimony, as well as the testimony of the FBI agents who interviewed Ehmen, demonstrated that Ehmen made many of his allegations for the first time during the trial, despite the agents' attempts to learn everything that had occurred regarding the fraud at Edgewater.

## ANALYSIS OF APPLICABLE LAW

The False Claims Act ("FCA") was not intended to serve as an "end-run around" criminal prosecution under the Anti-Kickback Statute. United States ex rel. Sharp v. Consol. Med. Transp., Inc.*,* 2001 U.S. Dist. LEXIS 13923, at *28 (N.D. Ill. Sept. 4, 2001). The United States did not charge Rogan criminally with violations of the Anti-Kickback Statute.[5] Nor did it charge Rogan civilly with violations of the Anti-Kickback or Stark statutes. Instead, it uses a strained interpretation of the law, combined with broad-brush allegations of illegality, to argue that Rogan should be held liable under the FCA. As the United States acknowledges, its FCA claim against Rogan is wholly dependent on the United States proving that Rogan violated the Anti-Kickback and Stark statutes. (United States Post-Trial Br. at 25). Rogan violated neither, and the United States' claims must fail on that basis. Even if such violations were established,

---

[5] The United States could not have charged Rogan with a violation of the Stark Statute, as it is not a criminal statute. See II., *infra*.

the FCA imposes additional requirements that the United States failed to prove, such as causation, knowledge and that the United States would not have paid the claims had it known they were false.

## I.     Rogan Did Not Violate the Anti-Kickback Statute.

The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), provides that:

(b)     Illegal Remuneration

***

(2)     Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)     to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.  42 U.S.C. § 1320a-7b(b).

Under the "knowing and willful" element of the Anti-Kickback Statute, the United States must demonstrate both that Rogan:  (i) knew that the conduct was prohibited by the Anti-Kickback Statute, and (ii) engaged in the conduct with the specific intent to violate the law. Hanlester Network v. Shalala, 51 F.3d 1390, 1400 (9th Cir. 1995); Modern Med. Laboratories, Inc. v. Smith Kline Beecham Clinical Laboratories, Inc., 1994 U.S. Dist. LEXIS 7838, at *20 (N.D. Ill. June 13, 1994) ("'Willfulness' . . . requires a showing of intent to violate the law.").

### A. The Collateral Hope or Expectation of Referrals Does Not Violate the Anti-Kickback Statute.

A hope, expectation, or belief that referrals may ensue from remuneration for legitimate services is not a violation of the Anti-Kickback Statute. United States v. McClatchey, 217 F.3d 823, 834-835 (10th Cir. 2001). Rogan "cannot be convicted merely because [he] hoped or expected or believed that referrals may ensue from remuneration that was designed wholly for other purposes." Id.; see also United States v. LaHue, 261 F.3d 993, 1008 (10th Cir. 2001) (the Anti-Kickback Statute "clearly allows business relationships between a hospital and physician where the motivation to enter into the relationship is for legal reasons entirely distinct from the collateral hope for or decision to make referrals").

The Anti-Kickback Statute does not prohibit all conduct "when a hospital executive or physician has referrals in mind." LaHue, 261 F.3d at 1008. Nor does oral encouragement by a person to refer patients for services paid for by federal health care programs violate the Anti-Kickback Statute. McClatchey, 217 F.3d at 834-835 (upholding jury instructions that "mere oral encouragement to refer patients" does not violate the Anti-Kickback Statute). Likewise, the creation of an attractive place to which physicians would want to refer patients is not a violation of the Anti-Kickback Statute. Id., at 834-835 (upholding jury instructions that "the mere creation of an attractive place to which patients can be referred does not violate" the Anti-Kickback Statute).[6]

Demonstrating that Rogan wanted admissions for Edgewater from Barnabas and Cubria, or any other of the over 300 doctors at Edgewater, is not enough to establish an Anti-Kickback violation. It was not illegal for Rogan to desire that a particular doctor admit his

---

[6]     In McClatchey, the defendant, who was convicted under the FCA, knew that doctors were not performing services under their contracts, and even that staff at the hospital did not want some of those services performed. 217 F.3d at 830. That is not the case here.

patients to Edgewater, or even expect a doctor to admit his patients to Edgewater. If this were the case, every hospital administrator in the country would be in violation of the Anti-Kickback Statute because admissions are the life blood of hospitals; without them, hospitals could not stay open.

The hope and expectation that a physician will spend time at, and subsequently make referrals to, a hospital is not sufficient to prove that an agreement between the hospital and the physician violates the Anti-Kickback Statute. That was all the United States proved here with respect to Rogan's conduct. (<u>See</u> § D, below). Most of the remuneration provided under contracts or other agreements with physicians were for legitimate services. The evidence is clear that Rogan had no knowledge of the two instances where no legitimate services were performed — Barnabas' teaching contract, which he believed was a physician recruiting contract and ended in 1995, and the payments to Cubria for the teaching service, which he claims he never did.

**B.  Remuneration for Contracts for Fair Market Value Do Not Violate the Anti-Kickback Statute.**

Remuneration for legitimate services implicates the Anti-Kickback Statute *only if* accompanied by payments for the inducement of referrals. Where a fair market value payment is made to a physician for the provision of a service, there is no remuneration remaining after the payment for the service, and, therefore, there is no remuneration remaining for the inducement of referrals. <u>United States v. Hancock</u>, 604 F.2d 999, 1001 (7th Cir. 1979) (noting that there may be a violation of the Anti-Kickback Statute where "payments for the exercise of [decisions to refer] <u>are added to</u> the legitimate costs of the transaction") (emphasis added); <u>United States ex rel. Perales v. St. Margaret's Hospital</u>, 243 F. Supp. 2d 843, 851 (C.D. Ill. 2003) (noting that the relator failed to demonstrate that remuneration paid to physicians was not fair market value, "much less that there were any amounts paid <u>in excess</u> of the fair market value that could be

32

attributed to an improper inducement") (emphasis added).  See also  United States v. Lahue, 261 F.3d 993, 1007-08 (10th Cir. 2001) (a defendant cannot be convicted merely because he received or paid remuneration wholly in return for services).

 The United States offered no evidence that the compensation to be paid under the physician contracts as written and approved by Rogan exceeded fair market value.  The evidence demonstrates the opposite:  Robert Hoban of McDermott, Will & Emery served as Edgewater's primary outside counsel from 1987 to 1994, and again from 1997 until Edgewater closed its doors.  When Hoban returned in 1997, McDermott reviewed all of Edgewater's contracts. (RPFF ¶ 439).  If the compensation in a physician contract struck the attorneys at McDermott as being higher than what was otherwise being seen at hospitals, Hoban would comment on it and draw it to the attention of someone.  (RPFF ¶ 440).  That did not occur at Edgewater.  (RPFF ¶ 440).  And it was Ehmen's responsibility to determine that the contracts were for fair market value.  (RPFF ¶ 78).  Regardless, it was the United States' burden to show that the amounts in the contracts at issue were greater than fair market value, and it offered no evidence on this issue.

 The United States only offered evidence that not enough work was being done under the contracts and the doctors were therefore overpaid.  This is irrelevant if the United States failed to demonstrate that Rogan had knowledge the doctors were not performing their duties.  Regarding Cubria and Barnabas, the evidence established in every instance from the mouths of the witnesses themselves (Cubria, Barnabas and Ehmen) that Rogan had no knowledge that Cubria and Barnabas were not doing enough work under their contracts.[7]  The United States instead points to Rogan's failure to ask if the doctors were doing the required work

---

[7]  In only one instance, the directorship contract with Cubria, did Ehmen claimed he told Rogan that Cubria was not working enough hours.  However,  FBI agent Ferguson's testimony established that Ehmen told the government just the opposite.  Ehmen's failure to advise Rogan about this contract is consistent with his admitted failure to advise

under their contracts, yet offers no evidence that Rogan had a duty to do so or was somehow reckless in not doing so.  (See USPFF 56).  And it was Ehmen's job to police Cubria's hours, not Rogan.  Procedures were set up to ensure this occurred.  Doctors were required to submit signed time studies that Ehmen was required to review and sign as well, in discharging his job responsibilities.

### C.     Lack of A Safe Harbor in the Anti-Kickback Statute is Irrelevant.

The United States makes much of the safe harbor provisions of the Anti-Kickback Statute, but those provisions have no bearing on this case.  (United States Post-Trial Br. at 31-33).  Interpretation of the Anti-Kickback Statute is performed by the Office of the Inspector General of the Department of Health and Human Services (the "OIG").  42 U.S.C. § 1320a-7b(b)(3)(E); 62 Fed. Reg. 7350 (February 19, 1997).  The OIG has promulgated "safe harbor" regulations specifying those arrangements that will not be subject to criminal prosecution or provide a basis for administrative exclusion.  42 C.F.R. § 1001.952; 56 Fed. Reg. 35952, 35956 (July 29, 1991) ("If an individual or entity engages in a business arrangement that is the subject of a safe harbor provision and complies with all of its provisions, that individual will be assured that he or she will not be prosecuted.").

However, compliance with a safe harbor is not required for compliance with the Anti-Kickback Statute.  64 Fed. Reg. 63517, 63519 (November 19, 1999) ("Payment practices that do not fully comply with a safe harbor may still be lawful if no purpose of the payment practice is to induce referrals of Federal health care program business."); 61 Fed. Reg. 2122, 2124 (Jan. 25, 1996) (it should not be inferred "that because a safe harbor provision does not specifically refer to a particular arrangement or activity, it is unlawful . . . the safe harbors do not

---

Rogan with respect to every other instance in which the doctors were not working the required number of hours. (DPFF ¶¶ 135, 256, 147).

create affirmative obligations on individuals or entities since compliance with these safe harbors is purely voluntary."); 56 Fed. Reg. at 35954; OFFICE OF INSPECTOR GENERAL, DEP'T OF HEALTH AND HUMAN SERVICES, OIG SUPPLEMENTAL COMPLIANCE PROGRAM GUIDANCE FOR HOSPITALS, 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005); OFFICE OF INSPECTOR GENERAL, DEP'T. OF HEALTH AND HUMAN SERVICES, FACT SHEET: FEDERAL ANTI-KICKBACK LAW AND REGULATORY SAFE HARBORS (1999) ("Compliance with safe harbors is voluntary, and arrangements that do not comply with a safe harbor must be analyzed on a case-by-case basis for compliance with the Anti-Kickback statute.").

**D.    In Every Instance, the Government Failed to Prove a Violation of the Anti-Kickback Statute.**

The United States alleges a number of instances it believes demonstrates Rogan violated the Anti-Kickback Statute. (United States Post-Trial Br. at 33-36). Not one does so.

**1.    Barnabas**

The United States' first claim is that Rogan entered into the Barnabas contracts to induce Barnabas to refer his patients to Edgewater. It cites to the fact that Barnabas did not perform all of the obligations under his contracts, and thus the contracts exceeded fair market value. (United States Post-Trial Br. at 33). However, the United States does not claim Rogan had knowledge that the work was not being performed. (Id.) And there is no evidence in the record that "the purpose of all of the contracts was to induce Barnabas' referral of patients to Edgewater, and hence Rogan's conduct violated the Anti-Kickback Statute as well." Barnabas' assumption that he was given contracts because Ehmen "on more than a couple of occasions asked me what he could do to see more activity or some activity from me" and "I knew there were physicians who had contracts there" does not impute any knowledge or intent to violate the law on the part of Edgewater, let alone Rogan. (See USPFF ¶ 56; RPFF ¶ 129). And Ehmen's

35

discussions with Rogan regarding a desire to attract Barnabas' private patients at most demonstrates Rogan's <u>collateral</u> hope for referrals as discussed in <u>McClatchey</u>. (<u>Id.</u>) In addition, in every instance, the Barnabas contracts were given for legitimate services that were beneficial to Edgewater.

### 2. Rao

The United States next points to the Rao contracts as evidence that Rogan paid to induce Rao to refer patients to Edgewater. (United States Post-Trial Br. at 34). Rogan never had any conversations with Ehmen regarding paying Rao for patients Rao brought in. Further, Rogan did not have conversations with Ehmen in which he or Ehmen stated or even intimated that the payments to Rao would or did terminate because of problems with the quality and quantity of Rao's admissions. (RPFF ¶¶ 183, 201, 215, 234). And Ehmen himself is silent as to Rogan's reasons for contracting with Rao. (<u>See</u> USPFF ¶ 61) The evidence established that there were serious problems with Rao's performance under the anesthesia contract, and the payments were terminated on that basis.

There is likewise no evidence that Rogan gave Rao the Florsacribe contract in order to induce Rao to refer patients to Edgewater. The United States' findings of fact on this do not demonstrate an illegal kickback scheme. (<u>See</u> USPFF ¶¶ 82-88). Although the United States claims that Ehmen testified another company was paid to market Edgewater's detoxification services, Ehmen testified that another company, Special Care, was paid to <u>run</u> the detoxification program. (RPFF ¶ 219). Special Care did not do the marketing after Edgewater contracted with Florascribe. (RPFF ¶ 224). While Special Care was responsible for running the detoxification program, Florascribe was responsible for marketing the program. (<u>Id.</u>). Ehmen testified that

Doctors Hospital was the leader in terms of volume of business regarding detoxification services, and Florascribe did the marketing for that program. (RPFF ¶ 220).

The United States also relies on Ehmen's belief that the Florascribe contract was not for fair market value, but offered no evidence that Ehmen relayed his belief to Rogan. (USPFF ¶ 87). Ehmen states that he and Rogan "thought [Rao] could bring substantial volume to the medical detox program." (USPFF ¶ 87; TR. at 405:16-17 (emphasis added)). But that is exactly what Florascribe's job was — to market Edgewater's detox program. Hope or beliefs about future admissions do not trigger liability under the Anti-Kickback Statute collateral to a contract for legitimate services, which Florascribe indisputably provided. See McClatchey, 217 F.3d at 834-835.

### 3.      Cubria

The United States also failed to establish the Cubria contracts were given to "keep Cubria's patients at Edgewater." (United States Post-Trial Br. at 34-36). "Acceding" to a doctors' demands does not mean that a doctor got what he wanted in order to refer his patients to the hospital. The United States claims that Cubria's EKG contract "far exceed[ed] fair market value," but the only evidence of this is that Cubria did not perform all the hours under the contract. (USPFF ¶¶ 103-107). The United States presented no evidence that Rogan had knowledge that Cubria was not performing the required number of hours under the EKG contract. If Cubria had performed as provided under the contract, Cubria would have earned $100 per hour, hardly exceeding fair market value for an experienced cardiologist.

The United States also claims Rogan signed payment approvals for teaching, but Cubria did no teaching and there was no contract. (USPFF ¶¶ 99-100). These payments were for Cubria filling in for the teaching service, a role Dr. Ali usually performed. (RPFF ¶ 279).

Cubria offered no testimony as to why he received these payments, and no testimony was offered that Rogan knew Cubria was not filling in for the teaching service. And Ehmen signed and submitted the check requests for Cubria's teaching service, representing that Cubria was doing work in connection with a program Ehmen was responsible for supervising. (RPFF ¶ 278).

The United States next cites loans made to Cubria. Although the United States claims that Ehmen testified that the loan to recruit an additional cardiologist was "in an effort to persuade Cubria to keep his practice at Edgewater," Ehmen testified to no such thing. (See USPFF ¶ 113 and transcript cited therein). There was no testimony that these loans were given to induce Cubria to refer patients to Edgewater. And the fact remains that Cubria paid all of his loans back with interest. (RPFF ¶¶ 319, 322).

The United States also attempts to paint Edgewater's advertising to the Latino community as an inducement for Cubria to refer patients to Edgewater. (United States Post-Trial Br. at 35-36). Again twisting the facts in the record, the United States claims that Rogan testified that Edgewater would buy Cubria's practice because he was advised it would not be appropriate to pay for advertising benefiting Cubria. (USPFF ¶ 125 and transcript cited therein). The United States also fails to mention that the $60,000 "payment" under the option contract converted to a loan when the purchase of Cubria's practice fell through, pursuant to the terms of the contract, and that the loan was paid back. Cubria's practice, had Edgewater been able to purchase it, was to serve as the cornerstone of Edgewater's Instituto de Cardiologia program. (RPFF ¶ 353).

The advertising was not a cover to pay for Cubria to admit his patients to Edgewater. The commercials were such a great success that an entire new Hispanic internal medicine program was developed. Edgewater benefited greatly from the commercials, as did many other doctors, and especially the Hispanic community, a traditionally underserved

population, which gained a vital service. (RPFF ¶¶ 402, 403). The commercials were not created as an inducement to get Cubria to keep his patients at Edgewater. Indeed, all the testimony relating to the creation of the Instituto de Cardiologia program — the purchase of Cubria's practice, the feasibility study, the advertisements — demonstrate that the programs were pursued in part because Cubria wanted to sell his practice and focus on the administrative side of hospital operations, not because Cubria was going to admit patients to Edgewater. As such, one anticipated outcome of these programs was to facilitate Cubria's exit from day-to-day patient care. (RPFF ¶¶ 337, 356, 371-72).

The United States next complains that Cubria's Cardiac Directorship contract exceeded fair market value. The United States points to Ehmen's testimony, but Ehmen only testified that he "thought" Cubria was overpaid at $4,000 per month and that Cubria should have received $1,500-$2,000 per month. (See USPFF ¶ 134). The United States offered no evidence establishing Ehmen's qualifications to render such an opinion, and it is directly opposed to the testimony of Edgewater's outside counsel, Robert Hoban. (RPFF ¶ 440). And Ehmen's testimony that he informed Rogan that Cubria was not doing enough work under the contract was flatly contradicted by the United States' own agent. Ehmen cannot be believed. (RPFF ¶ 256).

The United States also takes issue with Cubria's consulting contract with Braddock Management, which was given to Cubria because he was looking to leave the practice of medicine. (RPFF ¶ 404). Considering the goal, the contract could hardly have been given to induce referrals from Cubria, and no testimony was offered to that effect. In sum, all of the United States' claims that Rogan violated the Anti-Kickback Statute fail to withstand scrutiny.

**II.    The United States Failed to Prove Rogan Violated the Stark Statute.**

The federal physician self-referral law, known as the "Stark Statute," prohibits a health care entity from submitting claims for payment to Medicare for services rendered pursuant to a referral made by a physician with whom the entity has a prohibited "financial relationship." 42 U.S.C. § 1395nn. Unlike the Anti-Kickback Statute, it is not criminal in nature and is a strict liability statute — there is no intent required.

In pertinent part, the amended Stark Statute provides that:

(a)    Prohibition of certain referrals

(1)    In general - Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then—

(A)    the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)    the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

(2)    Financial relationship specified - For purposes of this section, a financial relationship of a physician (or an immediate family member of such physician) with an entity specified in this paragraph is . . .

(B)    except as provided in subsection (e) of this section, a compensation arrangement (as defined in subsection (h)(1) of this section) between the physician (or an immediate family member of such physician) and the entity.

The United States claims that "Rogan violated the Stark Statute." (United States Post-Trial Br. at 36-40). However, on its face, the Stark Statute applies to physicians and heath care entities only. The United States does not dispute this fact. (See United States Post-Trial

Brief at 40 ("because <u>Edgewater's</u> relationships with Drs. Barnabas and Cubria failed to satisfy the exceptions to the Stark Statute, <u>Edgewater</u> was prohibited from billing for inpatient services for patients treated by the two physicians and should have refunded the payments received") (emphasis added)).  Any alleged false claim against Rogan predicated on the Stark Statute cannot stand.

Even if Rogan could be held liable for knowing others were in violation of the Stark Statute (and the United States cites no case law authority for this proposition), the United States would still fail in its claim because it cannot show that many of the services at issue violated Stark and, regarding the remaining services, they met an exception to Stark, but for the fact that physicians were not doing all the work required under their contracts.  And the United States failed to prove that Rogan had knowledge such work was not being done.

### A.        Overview of the Stark Statute

The Stark Statute is a highly complex statutory scheme.  Enacted in 1989 and effective January 1, 1992, the Stark Statute ("Stark I") originally applied only to referrals of Medicare patients for clinical laboratory services made by physicians with whom the referral recipient had a prohibited "financial relationship."  <u>See</u> Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.  The Stark Statute was expanded in 1993, effective January 1, 1995, to cover ten additional service.  Each of these services, along with clinical laboratory services, is a "designated health service."  <u>See</u> Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562; Social Security Act Amendments of 1994, P.L. 103-432, § 152.   "Inpatient and outpatient hospital services" is a designated health service.  42 U.S.C. § 1395nn(h)(6)(K).  The expanded Stark Statute ("Stark II") does not apply to any services performed prior to January 1, 1995, except for clinical laboratory services as provided in the original Stark Statute.  <u>See</u> Omnibus

41

Reconciliation Act of 1993, P.L. 103-66, § 13562; Social Security Act Amendments of 1994, P.L. 103-432, § 152.

The Centers for Medicare and Medicaid Services ("CMS") is responsible for the interpretation of the Stark Statute.  42 U.S.C. § 1395nn(g)(6).  Each time CMS promulgated Stark regulations, it announced that additional regulations would be provided in subsequent phases.  The final regulations for Stark I were not published until 2001, effective January 4, 2002.  66 Fed. Reg. 856 (January 4, 2001).  The final regulations for Stark II, the statute on which the United States premises liability here, were not published until March 26, 2004, effective July 26, 2004, years after the arrangements at issue.  69 Fed. Reg. 16054 (March 26, 2004).  The regulations for phase three and any other subsequent phases have not yet been published.  Accordingly, there were no applicable final Stark regulations during the years of 1995 through 2000.

The United States cannot apply these regulations to Rogan now.  Jahn v. 1-800-Flowers.Com, Inc., 284 F.3d 807, 810 (7th Cir. 2002 ("Federal regulations do not, indeed cannot, apply retroactively unless Congress has authorized that step explicitly.");  42 U.S.C. 1395hh(e)(A)&(C) (providing generally that "substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability under this title shall not be applied (by extrapolation or otherwise) retroactively to items and services furnished before the effective date of the change . . . . and [n]o action shall be taken against a provider of services or supplier with respect to noncompliance with such a substantive change for items and services furnished before the effective date of such a change.").

In defining "referral" and "referring physician," the Stark Statute provides that "in the case of an item or service for which payment may be made under [Medicare], the request

by a physician for the item or service, including the request by a physician for a consultation with another physician (and any test or procedure ordered by, or to be performed by (or under the supervision of) that other physician), constitutes a 'referral' by a 'referring physician'." Additionally, "the request or establishment of a plan of care by a physician which includes the provision of the designated health service constitutes a 'referral' by a 'referring physician'."  42 U.S.C. § 1395nn(h)(5).

An entity in a compensation arrangement with a physician may receive a referral and request reimbursement from Medicare if the arrangement is protected by one of the statutory or regulatory exceptions.  42 U.S.C. § 1395nn(a)(1).  A financial arrangement must only qualify under one exception.  Thus, if an arrangement does not meet the requirements of a particular exception, but does meet the requirements for a different exception, the arrangement is protected.

The "personal service arrangements" statutory exception may protect various agreements between a hospital and a physician, including medical directorship agreements, teaching agreements, and professional services agreements.  42 U.S.C. § 1395nn(e)(3).  Under the personal service agreements exception, amounts paid to the physician will not be deemed compensation if:

> (i)     the arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement,
>
> (ii)    the arrangement covers all of the services to be provided by the physician (or an immediate family member of such physician) to the entity,
>
> (iii)   the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangement,
>
> (iv)    the term of the arrangement is for at least 1 year,

    (v)      the compensation to be paid over the term of the arrangement is set in advance, does not exceed fair market value, and except in the case of a physician incentive plan described in subparagraph (B), is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties,

    (vi)    the services to be performed under the arrangement do not involve the counseling or promotion or a business arrangement or other activity that violates any State or Federal law, and

    (vii)   the arrangement meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

Fair market value, according to the Stark Statute, means "the value in arms length transactions, consistent with the general market value, and, with respect to rentals or leases, the value of rental property for general commercial purposes (not taking into account its intended use) and, in the case of a lease of space, not adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor where the lessor is a potential source of patient referrals to the lessee." 42 U.S.C. § 1395nn(h)(3). Arrangements at fair market value are generally permissible under the Stark Statute. Perales, 243 F. Supp. 2d at 857 ("compensation arrangements at fair market value are generally permissible"). The United States did not prove that the contracts at issue were not fair market value, only that not enough work was done under the contracts.

Another applicable statutory exception protects "remuneration unrelated to the provision of designated health services." This exception states that "remuneration which is provided by a hospital to a physician" will not be considered a compensation arrangement "if such remuneration does not relate to the provision of designated health services." There are no specific requirements that an arrangement unrelated to any designated health services is required to meet. Thus, there is no fair market value requirement; there is no requirement for a written

44

agreement; there is no requirement regarding the range of services; there is no minimum term requirement; there is no requirement that the arrangement not relate to the volume or value of referrals; and there is no requirement that the arrangement not violate any other law. 42 U.S.C. § 1395nn(e)(4).

Until clarified in 2004, this exception protected many relationships between a hospital and a physician that were unrelated to designated health services, including physician loans, a lease offered by a hospital to a physician, consulting agreements, physician recruitment agreements, medical directorships, and remuneration paid to a physician for advertisements. 69 Fed. Reg. 16054, 16093 (March 26, 2004). The 2004 clarifications, which purport to place these relationships outside the "unrelated to designated health care services" exception, cannot apply retroactively to this case. Jahn, 284 F.3d at 810.

Because Stark is a strict liability statute, CMS has recognized that Stark prohibitions should be interpreted narrowly and the exceptions should be interpreted broadly. Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 66 Fed. Reg. 855, 860 (Final Rule with comment period Jan. 4, 2001) (to be codified at 42 CFR pt. 411 & 424). In light of that logical conclusion, Rogan must be given the benefit of the doubt regarding the exceptions in place between 1995 and 2000. The great uncertainty surrounding the regulations and exceptions in effect during the time period at issue, in addition to the two cannons of statutory application described above - no retroactive application and prohibits narrlowly applied - at a minimum weigh against a finding that Rogan knew that these arrangment ran afoul of Stark.

**B.    In Each Instance, the United States Failed to Demonstrate Rogan's Violation of the Stark Statute.**

Not surprisingly, the United States' explanation of how Rogan violated the Stark Statute is rather terse. (United States Post-Trial Brief at 39-40). Given the statutory scheme in place during the relevant time period, in order to analyze whether there were any Stark violations as to Rogan (which there cannot be in the first instance because Stark does not apply to him), the relationships at issue must each be analyzed separately. In every case, the relationships at issue are outside the boundaries of Stark because they do not relate to designated health services, or are personal service agreements.

### 1. Relationships Not Related to Designated Health Services

Any arrangement between a hospital and a physician that in 1995 through 2000 was not related to designated health services is protected by the statutory exception for remuneration unrelated to the provision of designated health services. There were four such arrangements with Cubria in this case: (1) the feasibility study; (2) the consulting agreement; (3) the advertising; and (4) the loans.

The United States alleges the $80,000 payment to Cubria lacked a contract, but fails to explain how the related feasibility study was related to the provision of a "designated healthcare service," especially under the statutory scheme in place at the time. Cubria's feasibility study did not related a designated health service. It did not involve inpatient or outpatient hospital services, but rather involved an analysis of a particular community, and what benefits could be offered to that community. It was a program antecedent to patient care, it did not involve patient care itself. The feasibility study was discussed at a meeting with Edgewater's attorneys present, and they did not inform Rogan that the study failed to meet Stark. (RPFF ¶ 355).

46

Cubria's consulting contract with the management company also did not relate to designated health services. The consulting agreement involved providing expertise on hospital acquisition matters for the management company. As such, the agreement was completely unrelated to patient care.

The advertisements, which benefited many doctors and Edgewater itself, were unrelated to the provision of designated health services, as they were again antecedent to any sort of patient care. In addition, the advertising program, which applied on a hospital-wide basis, does not implicate Stark because no remuneration was provided to Cubria. Finally, the United States also complains of the loans to Cubria as not fitting in to any exception under Stark, but the United States did not demonstrate that these loans were related to designated health services. Indeed, there is no per se prohibition on loans from a hospital to a physician under the Stark Statute. United States ex rel. Perales v. St. Margaret's Hosp., 243 F. Supp. 2d 843, 857 (C.D. Ill. 2003) ("Stark does not impose any per se prohibition on loans from a hospital to a physician.").

Accordingly, the "unrelated to health care services" exception to Stark makes clear that remuneration unrelated to designated health services, such as loans, advertising, the feasibility study and the consulting agreement, are not prohibited by Stark. But to the extent there is any ambiguity as to whether these arrangements create liability under Stark, and at a minimum uncertainty fostered by the United States' failure to promulgate clear regulations until 2004 exists, such ambiguity must be resolved in Rogan's favor. Rogan is afforded the benefit of the doubt here because the United States seeks to impose liability under the False Claims Act, a punitive statute with a state of mind requirement, on violations of Stark.

The United States Supreme Court has stated that the treble damages called for by the False Claims Act are "essentially punitive in nature." Cook County v. United States ex rel.

Chandler, 538 U.S. 119, 130 (2003) (noting that the 1986 amendment transformed the False Claims Act from a "remedial" statute to an "essentially punitive" statute); Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 785-86 (2000) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers."). And where statutes are punitive, the protections afforded criminal defendants apply. Austin v. United States, 509 U.S. 602, 608 n.4 (1993) ("[E]ven those protections associated with criminal cases may apply to a civil forfeiture proceeding if it is so punitive that the proceeding must reasonably be considered criminal.").

One of those protections is the benefit of lenity where ambiguity exists. United States v. Bass, 404 U.S. 336, 347 (1971) (holding that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"); United States v. Kraase, 484 F.2d 549, (7th Cir. 1973) ("To the extent that any ambiguity lingers after consideration of the section's language and its legislative history, we base our decision today on the salutary principle that criminal statutes should be strictly construed . . . ."). Where punitive statutes are vague, the defendant should be afforded the benefit of the doubt. See Liparota, 471 U.S. at 427; Bass, 404 U.S. at 347.

Applying these settled principles here, any ambiguity regarding whether the loans, advertising, feasibility study or consulting agreement violate Stark, or meet an exception to Stark, must be resolved in Rogan's favor. Even if these arrangements do not meet an exception to Stark, the uncertainty surrounding the applicability of an exception undercuts any finding of intent or knowledge on the part of Rogan to violate the False Claims Act, where such liability is premised on underlying violations of Stark. The United States cannot apply the 2004 regulations retroactively to Rogan.

### 2.     For the Remaining Relationships Were Personal Service Arrangements that Were for Fair Market Value on Their Face.

Each of the remaining contracts were personal services arrangements that set out the doctors' duties in great detail, as well as the hours to be worked and the compensation.  42 U.S.C. § 139nn(e)(3).  Attorneys had oversight over these contracts, and Rogan never received information that they violated Stark on their face.  (RPFF ¶¶ 439, 440).  The contracts meet the "personal services" exception on their face.  The contracts subsequently fell out of compliance with the exception when the doctors were not working the requisite number of hours.  Critically, the United States did not prove that Rogan had knowledge of this.  For example, the United States claims all of Cubria's contracts exceeded fair market value, yet the only reason this was so is because Cubria did not do enough work under the contracts.  (See United States Post-Trial Brief at 39).  The United States did not demonstrate Rogan's knowledge of this fact.  The United States cites to Barnabas' teaching contract, claiming it "did not accurately describe the recruiting services that Barnabas ostensibly was doing, provided for payments for teaching services that were never performed, and the compensation amount was tied to referrals," but it proved no knowledge on the part of Rogan that Barnabas was not teaching under the contract.  (Id.)  Because Rogan had no knowledge that the work was done one these contracts, he could not have known of any attending Stark violations.

## III.     False Claims Act

Because the United States could not establish that Rogan violated the Stark or Anti-Kickback statutes, its FCA claim against Rogan cannot survive.  (See United States Post-Trial Brief at 25).  The government still has to prove an underlying violation.  But even if the statutes were violated by others, that does not establish liability under the FCA because additional elements must be satisfied, and these elements must be strictly applied given the

punitive nature of the FCA. <u>Austin</u>, 509 U.S. at 608 n.4 ("[E]ven those protections associated with criminal cases may apply to a civil forfeiture proceeding if it is so punitive that the proceeding must reasonably be considered criminal.").

Section 3729(a) of the FCA imposes liability on any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee of the United States United States . . . a false or fraudulent claim for payment for approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States; [or]

(3)     conspires to defraud the United States by getting a false or fraudulent claim allowed or paid.

The United States is required to prove each element of the FCA by a preponderance of the evidence. 31 U.S.C. § 3731(c). In order to establish a claim under § 3729(a)(1), the United States must prove each of the following three elements:

(1)     the defendant made, or caused to be made, a claim in order to get the United States to pay money;

(2)     the claim was false or fraudulent; <u>and</u>

(3)     the defendant knew the claim was false or fraudulent.

<u>United States ex rel. Lamers v. City of Green Bay</u>, 168 F.3d 1013, 1018 (7th Cir. 1998); <u>United States v. Job Res. for the Disabled</u>, 2000 U.S. Dist. LEXIS 6343, at *8 (N.D. Ill. May 5, 2000). With regard to a violation of § 3729(a)(2), not only must the United States prove the three elements above, but also that Rogan made or used a false statement which Rogan knew to be false, and which was causally connected to the false claim. <u>United States ex rel. Aakhus v. Dyncorp, Inc.</u>, 136 F.3d 676, 682 (10th Cir. 1998).

In addition, a certification that a claim is "true, accurate, and complete" is not a false statement if the services included on the claim were in fact provided as described. See Hindo v. University of Health Sciences, 65 F.3d 608, 613 (7th Cir. 1995) ("a false statement in an invoice . . . is the representation that a resident worked five days a week at a hospital for a given quarter when he worked only three"). The United States spends pages of its brief explaining its certification theory, yet failed to prove Rogan knew of any underlying Stark or Anti-Kickback violations in the first place. (United States Post-Trial Brief at 25-28). And, there is no evidence that the services included in the claims were not, in fact, provided.

A.      **Rogan Presented No False Claims for Purposes of the False Claims Act.**

It is not enough for the United States to prove that Rogan had knowledge that false claims were presented. To prove that the defendant caused a false claim to be presented, the United States must provide evidence of the <u>specific actions</u> taken by Rogan that caused the presentation. <u>United States v. Murphy</u>, 937 F.2d 1032, 1038 (6th Cir. 1991) (FCA liability requires "some action by the defendant whereby the claim is presented or caused to be presented" and "[c]onstructive knowledge that something illegal may have been in the offing is not enough to prove the United States' case"); <u>Piacentile</u>, 1995 WL 20833, at *4 ("The False Claims Act requires both knowledge of the claim's falsity and some action by the defendant which causes the claim to be presented to the United States . . . [m]ere inaction is not enough to constitute a violation."). <u>See also</u> <u>United States ex rel. Camillo v. Ancilla Sys., Inc.</u>, 2005 WL 1669833, *3 (S.D. Ill. July 18, 2005) ("mere knowledge of a claim with nothing more" is not a violation of the FCA); <u>United States ex rel. Grynberg v. Ernst & Young LLP</u>, 323 F. Supp. 2d 1152, 1155 (D. Wyo. 2004) (favorably noting other courts that held that a defendant with knowledge of the submission of false claims who refused to stop the submission is not liable under the FCA). Similarly, creation of circumstances that lead to the presentation of a false claim is not alone sufficient to prove that a defendant caused the presentation of the claim. <u>Camillo</u>, 2005 WL 1669833, at *4; <u>United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.</u>, 2000 WL 1207162, at *14 (E.D. Penn. Aug. 24, 2000).

Rogan had no knowledge that any claims were false. But even in instances where a defendant has such knowledge, that is still insufficient to find liability under the FCA. The fact that an officer and/or owner of a corporation has knowledge of the presentation of false claims on behalf of the corporation is not sufficient to establish that this individual caused the

presentation of the false claims. See Piacentile, 1995 WL 20833, at *4. In Piacentile, the Court dismissed the FCA claim against one of the officers and owners of a medical equipment provider, and upheld it for another. The allegations were upheld against one of the officers because he directly supervised and instructed the employees who falsified the records (as well as falsified records himself). Id. at *2. The other defendant had allegedly known that false claims were being presented, but did not take any action to present the false claims. Id. at *4.

That Rogan "was in charge of Edgewater and had direct oversight of the false claims submitted in this case" is insufficient to establish that Rogan caused false claims to be submitted. (See United States Post-Trial Brief at 40-42). There is no question that fraud occurred at Edgewater. However, Rogan cannot be held liable under the FCA for that fraud by virtue of his position at Edgewater. An officer of a corporation cannot be held liable for the acts of the corporation unless the United States can prove actual participation by the individual defendant in the wrongful acts. United States ex rel. Piacentile v. Wolk, 1995 WL 20833, at *4 (E.D. Penn. Jan. 17, 1995) (for liability to attach to an officer of a corporation, "the officer must actually participate in wrongful acts" and "may be held liable for misfeasance but not for simple nonfeasance"). See also Stromberg Metal Works v. Press Mechanical, 77 F.3d 928, 933 (7th Cir. 1996) ( "corporate officers' decisions may be imputed to the corporation; things do not work the other way 'round," in a case not involving the FCA).

The United States cites four cases in an attempt to prove that Rogan "caused" the submission of knowingly false claims. (United States Post-Trial Brief at 40-41). Not one is applicable to this case. The defendant in United States v. Mackby, 261 F.3d 821 (9th Cir. 2001), was the owner and managing director of a physical therapy clinic. He was prosecuted under the FCA for the submission of bills to Medicare that stated that a certain physician had provided

physical therapy services to patients at his clinic. But the defendant directly instructed his employee to fill in false information on each claim, specifically instructing his employee to list a specific physician as providing physical therapy services to patients when the physician never provided such services. The United States has not alleged, let alone proved, such conduct on Rogan's part.

The defendant in United States v. Krizek, 111 F.3d 934, 942 (D.C. Cir. 1997) was a psychiatrist whose claims for reimbursement were submitted by his wife. He was prosecuted under the FCA for submitting claims to Medicare for services that could not have been provided (according to his claims, he provided over 24 hours of services on several days). The United States describes this case as standing for the proposition that instruction or delegation can serve as a basis for a defendant "causing the submission" of claim. (United States Post-Trial Brief at 41) The court in Krizek made no such finding. It never discussed the "cause to be presented" prong of the FCA. The court's analysis involved the defendant's knowledge, and the court concluded that because the defendant delegated to his wife the authority to submit claims for services he provided and "utterly" failed to review them, his knowledge rose to the level of reckless disregard. Id. at 942. Rogan provided no services, and certainly had no duty to review the claims submitted by doctors for services they provided.

The United States cites United States v. Teeven, 862 F. Supp. 1200, 1223 (D. Del. 1992) for the proposition that "establishing procedures that cause others to present false claims can also give rise to FCA liability." (United States Post-Trial Brief at 41). Teeven is not remotely analogous to the issues present here. Prior to the court's decision in Teeven, the United States had obtained, under the Federal Debt Collection Procedure Act (FDCPA), a pre-judgment attachment on certain assets owned by the defendants. One requirement of the FDCPA is that

54

the United States prove the "probable validity" of the underlying debt. The defendants moved to have the writ quashed, and the court denied the defendants' motion. The FCA served as a basis for the United States' argument of the "probable validity" of the underlying debt. In its opinion, the court did not rule on the presence of an FCA violation. In addition, Teveen still requires the defendant to participate in a "wrong," which was not established here.

The United States cites United States ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 378 (5th Cir. 2004) for the argument that the causation element of the FCA can be satisfied by "anyone who knowingly assists in causing the government to pay claims grounded in fraud." (United States Post-Trial Brief at 41). In Riley, the defendants were doctors and a hospital. Both the doctors personally and the hospital filed claims for reimbursement to Medicare. There was no discussion in Riley regarding hospital administrators who did not personally file any claims.

**B.** **Rogan Did Not Possess the Requisite Intent to Violate the False Claims Act.**

An untruthful statement alone is not a "false statement" under the False Claims Act. A "false statement" is an untruthful statement made with the intent to deceive. United States ex rel. Lamers v. City of Green Bay, 998 F. Supp. 971, 986-987 (E.D. Wis. 1998) ("statements or claims which are 'false' within the meaning of the FCA must be more than objectively untrue -- they must betray or suggest intentional deceit").

The United States must demonstrate that the defendant had knowledge of the underlying Anti-Kickback or Stark Statute violation. See e.g., United States ex rel. Augustine v. Century Health Services, Inc., 289 F.3d 409, 416 (6th Cir. 2002) (the FCA scienter requirement is met only upon proof that the defendant knew of, or recklessly disregarded the risk of, the falsity of the defendant's cost report certifications); Thompson, 378 F. Supp. 2d at 95 (E.D.N.Y.

55

2004) (the FCA scienter requirement is met if a defendant has knowledge of an obligation to comply with relevant regulations and chooses not to.)

Under sections 3729(a)(1) and (a)(2), "knowingly" means that the person:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b).

The 1986 Amendments to the FCA, which added the current scienter requirement, were not intended to impose a new standard on those involved in health care. Rather, the appropriate test is whether the defendant's actions were "reasonable and prudent under the circumstances." S. REP. NO. 99-345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5161, 5286. Innocent mistakes or acts of negligence are not actionable under the FCA. Hindo, 65 F.3d at 613.

It is not enough for the United States to provide indirect proof of a defendant's knowledge. Proof of the defendant's status within the entity submitting a claim and proof that the defendant was responsible for the entity's finances, is not, in and of themselves, sufficient to support a finding of knowledge under the FCA. That Rogan was CEO and that he approved check requests is not enough to prove knowledge. United States v. Frierson, 1997 U.S. Dist. LEXIS 3368, at *40 (N.D. Ill. March 20, 1997) (dismissing a motion for summary judgment where knowledge of the FCA violation was based on "indirect proof," including evidence that the defendant was president of the entity that received the federal funds and that the defendant was solely responsible for the financial accountability of and wrote all the checks for disbursement of the federal funds); United States v. Domestic Indus., Inc., 32 F. Supp. 2d 855,

863 (E.D. Va. 1999) (dismissing a motion for summary judgment of an FCA action brought against a chief executive officer who ran a "hands-on business" because there was a material question of fact with regard to his knowledge of the false claims).

      The United States failed in its attempts to provide direct proof of Rogan's knowledge of the Anti-Kickback and Stark statutes. (Although Rogan was aware of the Anti-Kickback Statute, he had no knowledge that it was being violated at Edgewater. Assuming *arguendo* that the Stark was violated by others with respect to particular arrangements, Rogan had no knowledge of that as well. Rogan testified he had a general knowledge of what the Stark Statute was, but hired law firms to ensure that the various Edgewater dealings met with the Stark's complex statutory scheme. (RPFF ¶ 431). Rogan had no knowledge that hours requirements were not being met. Ehmen falsified records to document that Cubria and Barnabas were working the necessary hours. (RPFF ¶¶ 132, 143, 275). Rogan saw evidence of work being done on the contracts, and had no reason to suspect any problems. (RPFF ¶¶ 135, 273).

      Rogan's lack of knowledge and intent is also demonstrated by his lack of motive. He received no money from doctors, or any percentage of the fees they received. The United States attempts to demonstrate motive via the monies received by Edgewater's management company and Rogan's personal salary. (United States Post-Trial Brief at 4-5). But the fees received by the management company demonstrate no such thing. In the 1994 Management Agreement, the compensation was a combination of a fixed fee and a variable fee, and the variable fee could not exceed the fixed fee, so the compensation was capped. (RPFF ¶ 52). For all the management company contracts, there was a cap of the total amount of money that could be paid to the management company. (RPFF ¶ 53). Once the cap was hit, the management fees

would not go up. (RPFF ¶ 53). The capped fee was reached in 1995 and 1996, so that once the cap was reached in these years, additional admissions did not increase the revenue of the management company. (RPFF ¶ 54).

In 1997, when a new management contract was entered into in August, the fees were capped again, this time with the variable fee not able to exceed the annual fixed fee. If the United States' alleged damages for 1997 are removed from the fee base, which is the basis for the variable fee, the management company would still have been paid the same amount. So any additional admissions did not increase the revenue of the management company. (RPFF ¶ 54).

In the years 1998 through 2000, during the same time that Rao and Barnabas exit Edgewater, when the alleged fraud is removed from the fee base and, the management fees decrease by $95,489, $75,744 and $83,079, respectively. (RPFF ¶ 56). Put another way, the total amount that the management fees were increased, assuming the United States' fraud claims are accurate and allowed, would be $254,342. This accounts for 2.2% of the total fees the management company earned between 1995 and 2000. (Id.). This hardly serves as a motive for Rogan to participate in fraud.

### C. The United States Presented No Evidence that It Would Not Have Paid Claims Had It Known of the Violations.

In order to prove a violation of the False Claims Act, the United States must also prove that it would not have paid the claim had it known about the underlying violation. Not all violations of law can serve as the basis of an FCA claim. Luckey v. Baxter Healthcare Corp., 2 F. Supp. 2d 1034, 1045 (N.D. Ill. 1998) ("the FCA is not a vehicle for regulatory compliance . . . [and] is not designed to punish every type of fraud committed on the government"). Rather, the Seventh Circuit has held that the government must demonstrate that the underlying violation is material. To prove materiality, the government must prove that it would not have paid the claim

58

for reimbursement had it known about the underlying violation of law. <u>United States ex rel. Luckey v. Baxter Healthcare Corp.</u>, 183 F.3d 730, 732-33 (7th Cir. 1999) (an FCA action requires proof that the underlying violation "was material to the United States' buying position"); <u>United States ex rel. Sharp v. Consol. Med. Transp., Inc.</u>, 2001 U.S. Dist. LEXIS 13923, at *29 (N.D. Ill. Sept. 4, 2001) ("plaintiffs must plead (and ultimately prove) that had the government known about the kickback scheme, it would have refused payment of the claims.").

The United States did not produce a scintilla of evidence that CMS would not have paid claims if it had known of the alleged violations. This failure of evidence is even more glaring given that there is no claim, that the services billed for and reimbursed were not medically necessary: the services then would have been provided at Edgewater or another institution regardless of whether the doctors at issue received prohibited remuneration.

The evidence in fact demonstrates the United States would and did pay claims relating to Cubria and Barnabas, even *after* it aware of underlying health care violations. Rao was cooperating with the United States and began tape recording conversations with his co-conspirators in 1998, and the United States was aware of the fraud at that time. Still, it continued to pay the claims. (RPFF ¶¶ 56, 462, 465). Indeed, there were denials in 1999 because patients allegedly did not meet admission criteria, but the government did not refuse payment on the grounds that Edgewater was not in compliance with the Anti-Kickback or Stark statutes.

The United States must also prove that Rogan was aware that the United States would not have paid the alleged false claims had it known of the underlying violation at the time of the allegedly fraudulent conduct. <u>Sharp</u>, 2001 U.S. Dist. LEXIS 13923, at *29. Again, the United States was silent as to this requirement.

### D. The United States Failed to Prove that Rogan Acted in Reckless Disregard of the Falsity of the Claims Submitted.

The United States cannot establish Rogan's alleged reckless disregard through Rogan's signing of multiple contracts with physicians, even though those physicians had "busy" practices" and the contracts required "hundreds and hundreds" of hours worth of work. (United States Post-Trial Brief at 43). The United States did not establish that there was anything wrong with these contracts on their face. It only established that not enough work was being done under the contracts. Not only did neither Ehmen, Cubria or Barnabas never inform Rogan that they were not doing enough work on the contracts, but Rogan observed Cubria and Barnabas doing the tasks the contracts required. (RPFF ¶¶ 135, 147, 148, 256, 272, 273).

Edgewater was a large, busy hospital with numerous administrators responsible for numerous tasks. That Rogan delegated the recruitment of physicians to another person does not establish reckless disregard. Rogan had a right to rely on Ehmen to do his job properly. If the hospital was in technical violation of the Stark Statute, it does not follow that Rogan recklessly disregarded the submission of false claims. That he didn't send a loan repayment schedule to Cubria is irrelevant; a repayment schedule was in fact implemented, and the loans were paid back. (United States Post-Trial Brief at 43). (RPFF ¶¶ 319, 322, 335).

Rogan took additional steps to ensure that the physician relationships at Edgewater met with any applicable statutes. Attorneys developed and reviewed contracts. (RPFF ¶¶ 431-435). There was also an extensive corporate compliance program developed at the same time Rogan was allegedly participating in a scheme to defraud Medicare. Rogan was "very serious" about setting up a tight compliance program. (RPFF ¶ 442). At the March 6, 1998 board meeting, Gross informed the board of directors that management was beginning the implementation of a formalized compliance program. (RPFF ¶ 451). McDermott was actively

involved in preparing a compliance program for Edgewater, which began in 1998 or early 1999. (RPFF ¶ 442). Edgewater ended up hiring a compliance officer to implement the program. (RPFF ¶ 445). The compliance officer was involved in all forms of contract review, and also reviewed minutes and made sure the operating people were adequately following applicable statutes. (RPFF ¶ 445). In addition, as part of the compliance program, McDermott did an assessment of the contracts at the hospital and whether they were in compliance with federal statutes. (RPFF ¶ 443).

This case is a far cry from the facts in <u>United States ex rel. Asch v. Teller, Levitt, and Silverturst, P.C.</u>, 2004 WL 1093784 *3 (N.D. Ill. May 7, 2004), upon which the United States relies to demonstrate reckless disregard. That case concerned a law firm "that specialized in collection matters claims to be unaware of the requirement that payments be credited as of the date received." That Rogan did not know of the fraud occurring at Edgewater, which that involved a few bad actors out of a few hundred doctors and employees there, does not amount to recklessness.

## IV. The United States Failed to Prove Conspiracy, Both for Evidentiary and Substantive Purposes.

The United States overstates the importance of this Court's finding of a conspiracy for evidentiary purposes. It was not, as the United States argues, "a critical step towards the ultimate finding of liability." However, the United States failed to prove the existence of a conspiracy even for evidentiary purposes and this Court's ruling on that issue should be reconsidered.

### A. There Was No Conspiracy Involving Rogan for Evidentiary Purposes.

To introduce testimony under the Rule 801(d)(2)(E) coconspirator hearsay exception, the United States must prove beyond a preponderance of the evidence that (1) a

61

conspiracy existed; (2) the defendant and the declarant were both members of the same conspiracy; and (3) the statements were made during and in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Haynie, 179 F.3d 1048, 1050 (7th Cir. 1999).  Because the United States failed to establish the second requirement, there was no conspiracy for evidentiary purposes.

To establish the first point, the existence of a civil conspiracy, the United States was required to show that two or more persons acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means.  Scherer v. Balkema, 840 F.2d 437, 441 (7th Cir. 1988); United States v. Gil, 604 F.2d 546, 549-50 (7th Cir. 1976).  In other words, the United States had to prove that two or more persons agreed to inflict a wrong or injury on another and that an overt act resulted in damage.  Balkema, 840 F.2d at 44; Gil, 604 F.2d at 549-50.  Agreement is key. United States v. Coe, 718 F.2d 830, 835 (7th Cir. 1983) (existence of joint venture necessary for admission of hearsay).  Rogan does not argue that no conspiracy existed.

What the United States did not and could not prove was that Rogan was a knowing party to that conspiracy.  Even where the United States shows the existence of a conspiracy, coconspirator hearsay statements are not admissible unless it also proves that the defendant and the declarant were members of the same conspiracy.  Bourjaily, 483 U.S. at 175. The defendant must have known of the conspiracy and intended to join its unlawful purpose; there must have been a "participatory link" between the defendant and the conspiracy.  United States v. Pagan, 196 F.3d 884, 889 (7th Cir. 1999); United States v. Stephenson, 53 F.3d 836, 846 (7th Cir. 1995).

"A defendant's mere knowledge of, approval of, association with, or presence at a conspiracy is insufficient to establish the participation element."  United States v. Durrive, 902

F.2d 1221, 1225 (7th Cir. 1990). Instead, the United States must prove that the defendant "knew of the conspiracy's general scope and sought the common end" of the conspiracy. United States v. Liefer, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985). And the United States must establish the defendant's knowledge and intent to join with "substantial evidence;" "slight evidence" will not suffice. Durrive, 902 F.2d at 1228; see also United States v. Cargo, No. 92 CR 442, 1992 WL 206280, at *1 (N.D. Ill. Aug. 17, 1992) ("Once the existence of a conspiracy has been established, there must be 'substantial evidence' that the defendant and the declarant were members of that conspiracy in order for the declarant's statements to be admissible under Rule 801(d)(2)(E).").

The United States failed to meet its burden here. To establish Rogan's participation in the conspiracy, the United States had to show that he knew of its scope and joined with the intent to further its goals; instead, the evidence established that Rogan had no knowledge of the arrangements Ehmen made with the doctors. The fact that Rogan associated with Ehmen and the doctors, that he had some understanding of their activities, or that he participated in discussions regarding physician recruiting, or even that he hoped or expected admissions from certain doctors, does not suffice to establish his knowing membership in a conspiracy to defraud the United States. The United States proved only that Rogan hoped or expected doctors with whom Edgewater had relationships would admit and treat their patients at Edgewater. As discussed above, this is completely lawful conduct.

Because the United States proved nothing more, the Court should reconsider its finding of a conspiracy for evidentiary purposes and should disregard all hearsay statements allowed into evidence under the co-conspirator exception to the hearsay rule. These statements include the following testimony: Ehmen's testimony concerning statements made by Barnabas

and Ramos regarding the Ramos relationship (TR. at 323-27, 329, 335-36); Ehmen's testimony concerning Barnabas' statements regarding his own contracts (TR. at 344); Ehmen's testimony concerning statements by Rao and Barnabas regarding Rao's contracts, Kumar's referrals, payments to Kumar and the Florascribe contract (TR. at 363-68, 370-71, 374, 385, 398-400); Barnabas' testimony concerning Rao's statements at meeting with Barnabas (TR. at 831-36); Cubria's testimony concerning statements made by Ehmen regarding the teaching contract (TR. at 911); Cubria's testimony concerning Rao's statements regarding Rogan's approval for payments (TR. at 999); and Cubria's testimony concerning statements made by Ehmen regarding Rogan's knowledge of Cubria's work under the rehab contract (TR. at 1030).

### B. There Was No Conspiracy Involving Rogan For Purposes of Liability.

Yet, even if the United States satisfied the requirements for admission of coconspirator hearsay statements, the Court's evidentiary finding has no bearing on its ultimate finding of liability. United States v. Peralta, No. 90-50186, 1991 U.S. App. LEXIS 25516, at *5 (9th Cir. Oct. 31, 1991) ("[T]he evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case or a civil case."). See also United States v. Martinez de Ortiz, 883 F.2d 515 (7th Cir. 1989) (Martinez de Ortiz I) (concluding that "the standard for admissibility of statements under the Federal Rules of Evidence does not necessarily equal the burden of persuasion ultimately required to win the case"), aff'd en banc, 907 F.2d 629 (7th Cir. 1990).

The United States' burden in proving a conspiracy for liability purposes is unrelated to its burden for evidentiary purposes. For example, while the Court could consider hearsay statements in assessing whether the defendant joined the conspiracy for its evidentiary finding, for liability purposes it must disregard that evidence. United States v. Martinez de Ortiz,

907 F.2d 629, 635 (7th Cir. 1990) (en banc) (Martinez de Ortiz II).  "Conspirators, like partners, are mutual agents.  Declarations by others count against the accused only if the accused has joined the conspiracy personally.  [A witness] could not draft [the defendant] into a conspiracy; [the defendant] had to enlist.  Unless her words and deeds place her among the conspirators, other persons' statements are (substantively) irrelevant."  Id. at 633.  In other words, "[a]nother member of a conspiracy may not make the defendant a member of the conspiracy simply by saying he or she was a member. . . . [A] particular defendant's membership in the conspiracy, if any, must be based on evidence limited to that defendant."  Martinez de Ortiz I, 883 F.2d at 520.  Only Rogan's own statements and actions may be considered for liability purposes; what Ehmen, Barnabas, or Cubria believed about his knowledge or intent is irrelevant.

### V.    The United States Failed to Prove Damages.

With its all-or-nothing gambit, the United States is seeking an astounding $69,132,032.50 in damages and penalties from Rogan.  As it has done with its alleged "proof" of Rogan's liability, the United States has run roughshod over its obligation to prove the amount of damages for Rogan's alleged FCA violations.  It offered no evidence that it would not have paid the claims allegedly submitted by Edgewater; it made not effort to distinguish among the referring, the attending and the operating physicians; it made no effort to separate the legitimate claims relating to patients Cubria and/or Barnabas may have consulted or operated on from the alleged illegitimate ones; and it made no effort to identify services rendered by doctors other than Barnabas and Cubria; and without offering one UB-92, the alleged basis for their damages, into evidence.  The United States has used broad strokes to gloss over these essential elements of its alleged damages, and its inadequate proof cannot meet the burden to establish its claimed damages against Rogan and stand as a blueprint for proving damages in future FCA cases.

The measure of damages the United States is entitled to recover under the False Claims Act's treble damages provision depends on the United States' proof of the actual damages sustained. <u>See</u> <u>United States v. Job Res. for the Disabled</u>, 2000 U.S. Dist. LEXIS 6343, at *7 (N.D. Ill. May 5, 2000). While the United States asserts in its brief that it "would have paid Edgewater nothing for hospital claims related to patients referred to Edgewater by physicians with a prohibited financial relationship with the hospital," it put on no evidence to that effect. As discussed in section at III. A. *supra*, <u>proof</u> that it would not have paid the claim had it known about the underlying violation is necessary for the government to prove a violation of the FCA; and it is necessary for damages. Even the United States acknowledges that the "measure of damages the United States is entitled to recover under the FCA is the amount of money the government paid out by reason of the false claims over and above what it would have paid out if the claims had not been false or fraudulent." (United States Post-Trial Brief at 40). There is no evidence that the amount the United States "would have paid out" was zero.

In its cursory treatment of damages, the United States also failed to distinguish between the alleged fraudulent claims on which Barnabas or Cubria were the sole attending physician versus when Barnabas or Cubria were one of several attending or operating physicians. (RPFF ¶ 465). The attending physician listed in a UB 92 claim is the attending physician who provided the service with the highest charge. The operating physician listed on a UB 92 claim is the physician who performed the surgical procedure most closely related to the proscribed diagnosis of the patient. Thus, the UB 92 forms and the government's evidence do not isolate the assessment of damages the government sustained. This is significant because the United States is attempting to include in its damage claim the monies paid to Edgewater for services rendered by operating physicians or attending physicians *other than* Barnabas and Cubria,

simply because Barnabas or Cubria performed some service for the patient. Allowing the United States to claim all of the monies paid to Edgewater for services performed by numerous physicians because Barnabas or Cubria performed some service for the patient would be an inappropriate windfall for the United States. Again, the United States must prove the actual damages sustained; and there is no evidence, nor can it be the case, that the work performed by other physicians who did not have "prohibited financial relationships" contributed to the government's actual damages.

Additionally, the case the United Statse cites for its general proposition that "FCA damages 'typically are liberally calculated to ensure that they afford the government complete indemnity for the injuries done it'" does not apply in this context. United States ex rel. Roby v. Boeing Co., 302 F.3d 637, 646 (6th Cir. 2002) (quoting United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296, 304 (6th Cir. 1998) (which in turn quoted United States ex rel. Marcus v. Hess, 317 U.S. 537, 549 (1943))). In United States ex rel. Roby v. Boeing Co., 302 F.3d 637, 646 (6th Cir. 2002), the court allowed the government to recover the full cost of a helicopter Boeing manufactured because Boeing knew of a defective part that led to the helicopter's loss. In this case, however, the alleged "defective part," i.e. the amount related only to Cubria or Barnabas, has not been separated out, and the United States claims the whole amount of reimbursement, "the whole helicopter" as its damage. This allows for a windfall for the government, to Rogan's detriment. The Marcus case goes on to say that "[t]he government is entitled to full damages where it proves it received no value at all." Marcus, 317 U.S. at 549. Again, this case is not "typical" and the government did not offer evidence that it received "no value at all"—it seeks damages because of the relationship between Barnabas and Cubria and Edgewater, and not because the work they performed was of no value. In addition, work

performed by other attending and/or operating physicians on a claim would have had value to the government.

Assuming that the Stark and Anti-kickback statutes are applicable, the United States' assertion that when the "patient services in question are covered by the Stark Statue the damages consist of the Medicare payments to the entity for items or services referred by the physician" also does not carry the day. (United States Proposed Conclusions of Law ¶ 77). The United States did not put on evidence that the services for which the government was billed were "referred by" Cubria or Barnabas. The same analysis applies to Medicare and Medicaid payments under the Anti-kickback statute. (See United States Proposed Conclusions of Law ¶ 78).

Despite the United States' reliance on the number of UB-92s it alleges Edgewater submitted between 1995 and 2000, the United States did not offer any UB-92s (electronically or otherwise) into evidence. The United States tried to get around this through Kathryn Thomas, who testified that claims for Medicare reimbursement have been submitted electronically since 1991; however, the information over which Thomas is the custodian is not the UB-92s, but records of amounts paid to providers. (RPFF ¶ 464). Nancy Bryson testified that the amount requested on the UB-92 and the amount received are very rarely the same. (RPFF ¶ 459). There was no testimony regarding the process the UB-92s underwent, nor any testimony from Thomas that what she received were the UB-92s themselves.

Line 82 of the UB-92 Form requires hospitals to enter the Universal Physician Identification Number ("UPIN") and name of the "attending physician" for inpatient bills or the physician that requested outpatient services. If there is more than one physician meeting the definition of "attending" physician for a particular UB-92, the hospital must "enter the UPIN of

68

the physician requesting the service with the highest charge." Hospital Manual (CMS Pub. 10), § 460 (since transferred to Medicare Claims Processing Manual (CMS Pub. 100-04), § 60.5).

The physician entered on line 82 of a UB-92 Form may not be the only attending physician that provided or requested services with regard to the request for reimbursement. Thus, the total amount claimed on a UB-92 may not be attributable solely to the listed physician. Hospital Manual (CMS Pub. 10), § 460 (since transferred to Medicare Claims Processing Manual (CMS Pub. 100-04), § 60.5). There were no UB-92s entered into evidence, so the government cannot claim that the total amount claimed (or paid) was attributed solely to Barnabas or Cubria. Even if the UB-92s were offered and received in evidence, they could not attribute the amounts reimbursed solely to the listed physician.

Similarly, if a procedure is performed on a given patient, Line 83 of the UB-92 Form requires hospitals to "enter the UPIN and name of the physician who performed the principal procedure." If there is no principal procedure, a hospital must "enter the UPIN and name of the physician who performed the surgical procedure most closely related to the principal diagnosis." Hospital Manual (CMS Pub. 10), § 460 (since transferred to Medicare Claims Processing Manual (CMS Pub. 100-04), § 60.5).

The "other" or operating physician entered on line 83 of the UB-92 Form may not be the only operating physician with regard to the services claimed for on the UB-92 Form. Thus, the total amount claimed on a UB-92 may not be attributable solely to the listed physician. Hospital Manual (CMS Pub. 10), § 460 (since transferred to Medicare Claims Processing Manual (CMS Pub. 100-04), § 60.5). Again, the entries in GX 7 in which Barnabas or Cubria are listed as operating physician does not mean that the total amount claimed (or paid) are attributable to them.

69

Even in GX 7, submitted by the United States as proof of its damages in which the attending and "other" physician lines included *both* Barnabas and Cubria, Barnabas and Cubria may not have been the only physicians providing services with regard to the services claimed for on the UB-92 Form. Hospital Manual (CMS Pub. 10), § 460 (since transferred to Medicare Claims Processing Manual (CMS Pub. 100-04), § 60.5); (RPFF ¶ 465).

Also, the definitions of "attending" and "other" (or "operating") physician required by CMS to be included on the UB-92 Form are different than the statutory Stark definition of "referring physician." CMS does not require the physicians listed on UB-92 Forms to be "referring physicians" as defined by Stark. Compare 42 U.S.C. § 1395nn(h)(5) with Hospital Manual (CMS Pub. 10) § 460 (since transferred to Medicare Claims Processing Manual (CMS Pub. 100-04) § 60.5). Therefore, the United States cannot claim, even assuming they had offered UB-92s, that Barnabas and Cubria were "referring physicians" when they appear in the attending or other (operating) fields.

The United States also tries to mix apples and oranges in its damage calculation, by using both Kathy Creighton's chart (derived from Nancy Bryson's chart) and Ruben Steck's chart, each of which have vastly different numbers relating to Barnabas and Cubria. (RPFF ¶¶ 461-463, 465). The United States wants to use Steck's numbers in GX 7 to calculate the Medicare portion of damages, while using Creighton's numbers in GX 13 (taken from Bryson's chart) to calculate the Medicaid portion of damages. This cannot be allowed, because Bryson testified that her chart was derived from Edgewater-specific numbers assigned to physicians or codes, and not by UPIN. Steck's numbers, on the other hand, are derived by extracting the entries that list Barnabas or Cubria by UPIN. Creighton's numbers for Barnabas and Cubria [GX 13] for Medicare are very different from Steck's [GX 7-D], and the reliability or accuracy of one

70

versus the other has not been established, casting doubt upon the reliability of the Medicaid and Medicare numbers. Bryson testified that her chart does not indicate who may have referred the patient to the attending physician, nor does it indicate who the admitting physician might have been. (RPFF ¶ 460).

The same logic that should not allow the United States to collect a windfall for damages applies to the civil penalties as well. The government has not established which of the claims between 1995 and 2000 that list Barnabas or Cubria are false, though it argues that they all are. As the government states, the false claims damages refer to "those damages that were caused by or would not have occurred but for the false claims and false statements." United States Brief at 39-40. Again, even assuming *arguendo* that the portion of the claim that Cubria or Barnabas was responsible for were false, it does not stand to reason that the *whole claim* should be deemed false to apply the penalties — especially the maximum penalty as the government requests.

Finally, the United States argues that Rogan is liable and subject to the statutory penalties for "the presentation" of all of the claims with Cubria or Barnabas listed. (United States Brief at 41.) As stated in section III. A., *supra*, Rogan did not "present" any of the false claims within the meaning of the FCA, and therefore cannot be subject to the damages or statutory penalties.

The United States has not met its burden of showing that the damages it alleges are the government's actual damages, that must be trebled, nor have they met the burden of showing that Rogan is subject to the statutory penalties under the FCA. Instead, the government cobbled together general statements about damages, and unrelated damage numbers in order to

gain a windfall from any payment on which Cubria's or Barnabas' name appears. This cannot be the basis for an award, which, while civil, is punitive in nature, of $69,132,032.50.

## VI.    The United States' Witnesses Cannot Be Believed On Numerous Material Subjects.

To the extent this case turns on the testimony of Ehmen and Cubria, the record is clear that these two admitted felons, who were impeached on numerous material topics, cannot be believed on key issues in this case. Cross-examination produced two admissions critical to the case given the legal framework expressed herein. First, neither Ehmen or Cubria told Rogan that Cubria was not doing work adequate under his contracts (Ehmen and Barnabas conceded that they did not advise Rogan that Barnabas was not doing adequate work under his contracts). Second, Cubria admitted that he was not promised or given anything of value in exchange for admissions, and Ehmen admitted that that he and Rogan merely theorized that physicians who had relationships with Edgewater and spent time at the hospital might subsequently admit and treat their patients at Edgewater. (RPFF ¶ 90). As explained above, this is completely lawful conduct. Any testimony to the contrary that purports to establish a quid pro quo for admissions cannot be believed.

Ehmen and Cubria both met a number of times with the United States, and both refused to meet with Rogan's counsel. They contradicted the polished testimony they gave in their direct examinations during their cross-examinations. They also contradicted testimony they previously gave under oath, either before the Grand Jury, and, in the case of Cubria, in another legal proceeding. Additionally, they contradicted information they gave to the FBI agents (Agent Sherry Coon and Agent James Ferguson) who investigated the Edgewater case (and whom Rogan called as witnesses in his defense), or they testified to things that they never told the FBI agents  the Grand Jury, or anyone else, prior to this trial. As shown during trial, the

United States does not trust or believe Ehmen, having administered two polygraphs that he failed. Finally, Ehmen and Cubria remembered and testified to things for the first time, things they allege were not asked of them during the investigation. It is incredible, in both senses of the word, that their memories actually became better as time has worn on.

As this Court is aware, in evaluating the credibility of witnesses in a bench trial, the court should consider the same factors juries are instructed to consider. In Mitchel v. United States, No. 03 C 0022, 2005 U.S. Dist. LEXIS 25719, at *5 (N.D. Ill. Oct. 26, 2005), the court noted that it made its credibility determinations based on the factors reflected in the standard Seventh Circuit pattern instructions. According to the court, "[t]hat authority calls for the fact-finder to assess all relevant circumstances that bear on a witness's motive to tell the truth or not to tell the truth, to assess the demeanor of the witness while testifying, and to apply a healthy dose of common sense in trying to determine whose testimony is credible and whose testimony is not." Id.

### A. Ehmen Cannot Be Believed On Numerous Material Subjects

Ehmen was contacted by the FBI in January, 1999, and again in March, 2000. Both times Ehmen told the United States that he had nothing to offer them. Once Ehmen learned, however, that the government wanted to hold him responsible for the deaths associated with Dr. Cubria, he became worried that he would be tied to Dr. Cubria's actions, with the possibility of winding up in jail for a long, long time. (Ehmen - 528-29). Ehmen knew in his interviews with AUSA Jacqueline Stern, FBI Agent Ferguson and FBI Agent Coon that they were trying to get Rogan, and Ehmen figured that if he could help them with that, they might recommend some leniency. (531) Although the United States did not make a deal with Ehmen

regarding leniency in sentencing, he was hoping that would happen. Ehmen has less than a year

left to serve of his sentence before he is let out of prison.

The United States did not think Ehmen was being truthful when its agents

interviewed him, and Ehmen took a polygraph test in an attempt by the government to "resolve

issues of his veracity." According to the FBI Agent administering the test, Ehmen's answers

from that polygraph test were "indicative of deception." Ehmen then took another polygraph

test, and again, he failed it. The United States' main witness, who they now ask this Court to

believe, was not believed by the United States itself. (RPFF ¶ 481).

One of the questions in the second polygraph was whether Peter Rogan offered to

take care of Ehmen for not telling the government about his activities at the hospital. The

government did not believe Ehmen's answer, but now asks the Court to believe that Rogan did

offer to take care of Ehmen for not telling the government about Rogan's activities both in the

"steam room" story Ehmen told, in which Ehmen alleges that Rogan offered to take care of his

family, and to the alleged notes that Rogan wrote that indicated that Rogan would take care of

Ehmen and his family forever. The truth is that Rogan was trying to console Ehmen, who had

spoken about suicide, by having him relax with a steam and telling him that he was going to get

through the situation. And Rogan wrote notes to Ehmen during meetings, but never notes that

said one thing while he spoke about another thing. (RPFF ¶ 489).

Ehmen contradicted his testimony about all three of the physicians at issue,

Barnabas, Rao and Cubria. While Ehmen testified at trial that giving Barnabas a contract was a

reward to Barnabas for bringing Ramos to Edgewater, he acknowledged that he never said that

was the reason for Barnabas' contract when he testified before the Grand Jury. (RPFF ¶ 124)

Ehmen's new explanation is at odds with the facts as well: Ehmen testified that Ramos did

provide a benefit to Edgewater, and while Barnabas' contract for physician recruiting began in November, 1995, Ramos had already sold his practice to Doctors Hospital of Hyde Park in April or May of 1995. (RPFF ¶ 140). Ehmen also testified at trial that Barnabas demanded a contract, but when Mr. Ehmen appeared before the Grand Jury on July 13, 2002, he testified that he, Ehmen, instigated the idea. (583/18-585/8) This is consistent with Barnabas' testimony. (RPFF ¶ 140).

Ehmen testified during cross-examination that DX 91 was documentation of meetings Ehmen had with Barnabas to demonstrate some of the duties he performed under his contracts. (RPFF ¶ 149). Ehmen testified that he worked "very, very closely" with Barnabas, and Ehmen prepared the memoranda in DX 91 so that he would have a record of Barnabas' activities. (RPFF ¶ 149). However, when questioned by the government on re-direct, Ehmen changed his story, saying that he wrote those memoranda to "have the appearance" that Barnabas was providing those services. (RPFF ¶ 149). Ehmen changed his story on the stand in order to support the United States' position, despite the fact that a number of the programs listed in DX 91 were actually implemented, and did actually reflect work Dr. Barnabas had done under his contract. (RPFF ¶ 149). For example, the Elderly in Distress program was discussed in DX 91, was implemented, and Dr. Barnabas testified that he performed all of his duties under the West Side Clinic contract. (RPFF ¶¶ 155, 163).

Finally, with respect to Barnabas, any assertions Ehmen makes that Rogan knew that Barnabas' contracts were given so that Barnabas would bring his patients to Edgewater is belied by the fact that Barnabas never brought the bulk of his patients to Edgewater, and Rogan never told Ehmen to terminate the contracts or relationships with Barnabas. (RPFF ¶ 151).

With respect to Rao, Ehmen testified that Rogan knew that Rao could bring patients to Edgewater, and that is why he received the contract. However, Ehmen told his brother, Rodney Ehmen, that there were three reasons Rao got the contract: they were going to retain some anesthesiologists, Rao's group was the best, and there was an opportunity to bring some more doctors on at Edgewater. Ehmen did not tell his brother anything about admissions. In addition, the version Ehmen told his brother is consistent with what Barnabas and Rogan testified Rao said were the reasons he should be hired for the anesthesia position. (RPFF ¶ 186). Also, Ehmen did not know Rao was going to pay Kumar while he was negotiating with Rao or where the contract was signed, so he could not have told Rogan about that. (RPFF ¶ 194).

In April and May, 1998, Ehmen stated to Rao on at least three occasions that Rao's contract was not about admissions. These statements were taped, but Ehmen did not know it. (RPFF ¶ 214). Ehmen testified on direct that these statements were made in order to make it look like Rao's payments were being cancelled solely because he failed to provide administrative services. (RPFF ¶ 213). Nevertheless, there were complaints about Dr. Rao's performance, and when Mr. Rogan learned of them, he ordered that a breach letter be sent, dated May 4, 1998 which allowed for a 30-day cure period. (RPFF ¶ 214). In July, 1998, after the payments to Rao had stopped by Rogan's order, Ehmen was also taped telling Rao he could have the anesthesia contract for life so long as he provided good service. (RPFF ¶ 216).

Ehmen testified at trial that Cubria did not do enough work under the cardiac rehabilitation contract and that he talked to Rogan about that. However, FBI Agent Ferguson testified that Ehmen did not tell him that during interviews, (RPFF ¶ 233), and in fact, Agent Ferguson's 302 report (DX 401H) dated 10/3/01 states that Ehmen did not take this issue to Rogan. Not surprisingly, Ehmen does not recall this.

76

Ehmen also testified to things that he had never told anyone from the United States prior to trial. Ehmen testified that prior to Rogan's meeting in August, 1998 with Rao and Barnabas, which Rao was taping for the government, Ehmen said, for the first time, that Rogan told him that something was "fishy" about the meeting with Rao and Barnabas. However, both FBI Agents Coon and Ferguson testified that Ehmen never told them anything about the fact that Rogan thought that meeting was "fishy" or strange. The truth is this conversation never occurred at all.

Ehmen also never told the United States about his 1997 incentive contract, nor did he ever tell the United States that Rogan had allegedly told him to destroy Ehmen's copy of the contract and that Rogan was going to destroy his own copy. Rogan's copy was clearly not destroyed, as it was produced during discovery and used as an exhibit at trial, and it is not clear why Ehmen did not originally tell the United States this information relating to destroying evidence.

Ehmen met with the United States several times in 2005 and several times in 2006 to prepare for his testimony in court, but he refused to talk to Rogan's lawyers. (RPFF ¶ 488). Ehmen - 543) Ehmen has less than one year left before he is out of prison, and does not want to jeopardize that with the government. His testimony was well-rehearsed on direct examination, but he contradicted himself numerous times on significant issues, and he testified for the first time regarding important issues that he never told the government during his numerous interviews and Grand Jury testimony. Ehmen cannot be believed.

**B.     Cubria Cannot Be Believed On Numerous Material Subjects**

Cubria also cannot be believed on key issues, most notably because he contradicted himself multiple times on the stand with testimony that he previously gave under

oath in a different case involving Edgewater, where he stated that he was not given anything of value in exchange for referring or admitting patients to Edgewater.  (RPFF ¶ 518).  He also testified to numerous facts in this trial for the first time, despite being questioned about the same topics previously by the United States.  (RPFF ¶¶ 51, 506, 508).  Cubria received over $4 million from the government for billings he submitted from the period 1995 to 2001.  (RPFF ¶ 496).  He engaged in the fraud at Edgewater for himself, and while he testified to the contrary at trial, he acknowledged that he previously testified under oath that he couldn't care less whether Edgewater made money or not.  (RPFF ¶ 498).

Like Ehmen, Cubria, despite the numerous interviews and Grand Jury statements that he gave to the government, testified for the first time at trial regarding a number of crucial issues.  Cubria never told FBI Agent Coon that he was failing to fulfill his contracts under his Edgewater contracts.  (RPFF ¶ 503).  Cubria never told Coon that his contract to read EKGs was in exchange for admitting or keeping his patients at Edgewater.  (RPFF ¶ 503).  Cubria never told Coon that his directorship contract was in exchange for admitting or keeping his patients at Edgewater.  (RPFF ¶ 503).  Cubria never told Coon that his consulting contract was in exchange for admitting or keeping his patients at Edgewater.  (RPFF ¶ 503).  Cubria never told Coon that the payment he received for developing a Latino community outreach program was in exchange for admitting or keeping his patients at Edgewater.  (RPFF ¶ 503).  Also, Cubria never told Coon that he got his loans from Edgewater in exchange for admitting or keeping his patients at Edgewater.  (RPFF ¶ 503).  Nor did he say any of this in his Grand Jury statement, which he had the opportunity to review and amend.

Cubria testified in court emphatically that he did not say that he needed money to feed his children, yet he acknowledged that he asked for money from Dr. Oswaldo Lopez, who

told Agent Coon that, in fact, Cubria did request money to feed his children. This is consistent with what Lopez told Rogan, and why Rogan gave Lopez $9,000 to give to Cubria after Cubria had lost his license.

Like Ehmen, Cubria met with the United States and they reviewed his testimony. (RPFF ¶ 506, 510). And like Ehmen, Cubria refused to meet with Rogan's lawyers. The amount of contradictory testimony, and numerous pieces of information that Cubria did not tell the government, despite repeated opportunities to do so, undermines his credibility. The most telling fact of all is that Cubria previously testified under oath he was not promised anything of value in exchange for admitting patients to Edgewater. (RPFF ¶ 518). Cubria cannot be believed.

## VII. Common Law Claims

The United States' claims for common law fraud, unjust enrichment, and payment under mistake of fact must fail because the United States did not prove key elements of each of these claims.

### A. The United State Failed to Prove Common Law Fraud.

The United States' fraud claim must fail because the United States failed to prove (1) that Rogan caused any false claims to be submitted knowing the claims were false and with the intent to deceive, and (2) that the United States relied on any alleged misrepresentations. "Under federal common law fraud consists of five elements: (1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation." Graham v. Renbrook School, 692 F. Supp. 102, 108 (Dist. Conn. 1988) (emphasis added); see also Indemnified Capital Investments, SA. v. R.J. O'Brien & Assocs., Inc., 12 F.3d 1406, 1412 (7th Cir. 1993) (cited by the United States, and applying Illinois common law fraud, which requires "(1) a false statement

of material fact, (2) knowledge or belief of the falsity of the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance of the truth of the statements, and (5) damage to the other party resulting from such reliance.").

The United States' inability to prove a violation of the FCA dooms its common law fraud claim. Cf. United States v. Palumbo, 797 F. Supp. 624, 636 (N.D. Ill. 1992) (noting that to succeed on FCA claims premised on fraud, the plaintiff must also prove common law fraud claim). The common law fraud requirement of a false representation in this case is entirely dependent on violations of the Anti-Kickback and Stark statutes. Additionally, even if there were false representations, the United States did not establish that Rogan knew of their falsity. And the United States introduced no evidence showing that Rogan caused the submission of certifications to be submitted with an intent to deceive.

Further, the United States failed to prove that it relied on any alleged misrepresentation by Rogan. In fact, the United States failed to introduce any evidence of reliance. The United States' failure to prove reliance is fatal to its fraud claim, because courts do not presume reliance in a fraud analysis. For example, in Weston Instruments, Inc. v. Systron-Donner Corp., No. C-74-1099, 1978 U.S. Dist. LEXIS 15987, at *6-7 (N.D. Cal. Aug. 16, 1978), the court explicitly refused to presume reliance: "On the issue of reliance, Systron-Donner asks the court to incorporate into a common law action for fraud the federal common law in securities cases, wherein reliance is inferred from materiality when the alleged misrepresentation involves nondisclosure. We can find no precedent for such bootstrapping and refuse to do so in the present case." (internal citations omitted).

Likewise, in Richeson v. Saltzman, No. 97-3450, 1998 WL 152987, at *4 (7th Cir. March 27, 1998), the court did not presume reliance. In Richeson, the plaintiffs alleged that

80

a home improvement company committed fraud when the owner of the company told them that he was not available to pay a subcontractor and the home owners should pay the subcontractor themselves.  Id.  Under the contract, the defendant should have paid the subcontractor, but the court stated that there was no evidence that the defendant promised to reimburse the plaintiffs. Id.  According to the court,

> Even though the Richesons proved that Saltzman misrepresented the reason why he was unable to pay the subcontractors (that he was unable to make the payments), the Richesons did not prove beyond the preponderance of the evidence that they detrimentally relied on the misrepresentation. . . .  Although the Richesons may have been induced to make payments not required under the contract, they received materials and services from [the subcontractor].

Id.  The United States' common law fraud claim cannot survive.

### B.    The United States Failed to Prove Unjust Enrichment.

The United States' unjust enrichment claim also fails because the United States neglected to introduce evidence establishing that (1) it suffered a detriment arising from its payments to Edgewater and (2) the United States' payments enriched Rogan.

First, it should be noted that there is no clear consensus on the elements of a federal common law unjust enrichment claim in a situation such as this.  The United States noted that the elements of such a claim "have been summarized as follows: 'the plaintiff must show that: (1) he had a reasonable expectation of payment, (2) the defendant should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by nonpayment.'"  (United States Post-Trial Brief at 49 (emphasis added)).  The United States' suggested elements, pulled from an ERISA case, offer no practical guidance here.  The first two suggested elements cannot be fit within the false claims context because the United States had no reasonable expectation of payment here and Rogan was never expected to pay the

81

United States.  The third element is so ambiguous that alone it cannot form the basis for any reasoned finding of liability.

Instead, the Court should consider various state law formulations of unjust enrichment, all of which require the plaintiff to prove it suffered a detriment.  In Illinois, for example, to prove an unjust enrichment claim the plaintiff must prove (1) an unjust retention of a benefit by the defendant, (2) to the plaintiff's detriment, (3) against the fundamental principles of justice, equity, and good conscience.  Sara Lee Corp. v. Daymark Group, Inc., Nos. 02 C 3427, 02 C 4277, 03 C 5929, 2004 WL 2966955, at *5 (N.D. Ill. Nov. 23, 2004); A.B. Dick Co. v. Leasing Sys., Inc., No. 89 C 4649, 1990 WL 156396, at *4 (N.D. Ill. Oct. 9, 1990).  Similarly, under Iowa law, a plaintiff must show (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the absence of a justification for the enrichment and impoverishment; and (5) an absence of a remedy provided by law.  United States v. Vector Corp., No. C 93-48, 1994 U.S. Dist. LEXIS 21330, at *13 (N.D. Iowa April 14, 1994).  From these examples, it is clear that the United States cannot recover under an unjust enrichment theory unless Rogan was enriched and the United States suffered some loss.

The United States presented no evidence regarding Rogan's "enrichment."  The damages claims submitted by the United States do not relate to monies received by Rogan.  The management fees and Rogan's salary were fixed, and the percentage profit the management company received was capped.  The United States offered no evidence to the contrary.

In addition, the United States did not and could not establish detriment because it would have paid for medical services for the Edgewater Medicare patients somewhere else if Edgewater had not treated them because there is no claim, let alone evidence, that the services

provided were not medically necessary. In other words, the patients whose claims at issue in this case needed medical care that the Medicare and Medicaid programs were obligated to reimburse.

Rogan could not identify any case holding that detriment can be presumed in false claims unjust enrichment cases, and in <u>Architectural Iron Workers, Local No. 63 Welfare Fund v. Lane-General Metal Works, Inc.</u>, No. 94 C 0808, 1997 U.S. Dist. LEXIS 12420, at *13 (N.D. Ill. Aug. 14, 1997), the court held that where the plaintiff has not sufficiently alleged detriment, it cannot succeed in an unjust enrichment claim. The plaintiff in this case, a union, contracted to refer workers to the defendant in exchange for the defendant's promise to deduct union dues from the workers' paychecks and make fringe benefit contributions to the union. <u>Id.</u> at *3. The union sued the defendant for underpaying the fringe benefit contributions and the defendant counterclaimed that the union was unjustly enriched by overpayments. <u>Id.</u> The court concluded that the defendant had failed to allege detriment in its unjust enrichment counterclaim because it merely asserted that it "mistakenly paid" additional benefit contributions without also asserting that "it got nothing in return." <u>Id.</u> at *13. The court held that by referring union workers to the defendant, the defendant received something in exchange for its payments. <u>Id.</u>

Similarly, Rogan's actions created no detriment to the United States because the United States obtained medical care for patients. While the Court may conclude that the United States "mistakenly paid" for these patients' care on the understanding that no kickbacks were paid at Edgewater, it cannot show that it got "nothing in return." The United States got what it paid for — medical care for patients. The United States suffered no detriment because if it had not paid for this care at Edgewater, it would have paid for it somewhere else.

### C.    The United States Failed to Prove Mistake of Fact.

Finally, the United States' payment under mistake of fact claim also fails because the United States again did not prove reliance.  The United States cannot recover under this theory without proving the elements of mistake of fact.  In United States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970), the court stated that to recover under payment by mistake of fact, the United States must prove that it "made these payments under an erroneous belief which was material to the decision to pay."  Likewise, in United States v. Trim, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998), the district court held:  "In a false claims payment dispute, the government is entitled to reimbursement for payments made in reliance on the contract where it is shown: (1) payments were made (2) under the belief that they were properly owned; (3) that belief being erroneously formed; and (4) the mistaken belief was material to the decision to pay." (emphasis added).  Just as the United States' common law fraud claim fails for lack of reliance evidence, so too does its claim for payment under mistake of fact.

### CONCLUSION

For the foregoing reasons, Defendant Peter Rogan respectfully requests that this Court enter judgment in his favor and against the United States on all claims.

Dated:  June 8, 2006

                                              Respectfully submitted,

                                              PETER ROGAN

By:        s/ Chris Stathopoulos
                                              One of his attorneys

                                              Neil E. Holmen
                                              Joseph A. Spiegler
                                              Bryna J. Dahlin
                                              Chris Stathopoulos
                                              WINSTON & STRAWN LLP
                                              35 West Wacker Drive
                                              Chicago, Illinois  60601
                                              (312) 558-5600

## **CERTIFICATE OF SERVICE**

I certify that on this 8th day of June, 2006, the foregoing AMENDED POST-

TRIAL ARGUMENT OF PETER ROGAN was served via email and Federal Express on the

following individuals:


Linda A. Wawzenski
Assistant United States Attorney
U.S. Attorney's Office
  for the Northern District of Illinois
Federal Dirksen Building
219 S. Dearborn St.
Chicago, IL 60604
(312) 886-4073 (fax)
Linda.Wawzenski@usdoj.gov

Laurie A. Oberembt
United States Department of Justice
601 D Street, Northwest
Room 6532
Washington DC 20530
(202) 305-7868 (fax)
John.Neal2@usdoj.gov
Laurie.Oberembt@usdoj.gov


_____ s/ Chris J. Stathopoulos _____
Attorney for Peter Rogan

86