UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No. |
| | ) | 02 C 3310 |
| Plaintiff, | ) | |
| | ) | Judge Darrah |
| | ) | |
| v. | ) | |
| | ) | |
| PETER ROGAN, | ) | |
| | ) | |
| Defendant. | ) | |

**REBUTTAL BRIEF OF THE UNITED STATES**

**TABLE OF CONTENTS**

**PAGE**

I.      THE EVIDENCE AT TRIAL CONTRADICTS ROGAN'S PROPOSED FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     Rogan's Testimony Stands Alone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     Rogan Cannot Be Believed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.     Ehmen, Cubria, and Barnabas Are Credible . . . . . . . . . . . . . . . . . . . . . . . . 9

II.     ROGAN'S PROPOSED CONCLUSIONS OF LAW ARE WRONG . . . . . . . . . . . . . . 12

      A.     Rogan Violated the Anti-Kickback Statute . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.     Rogan's Conduct Resulted in Violations of the Stark Statue . . . . . . . . . . . . . . 16

            1.     Rogan's Arrangements with Dr. Cubria Were Related to Designated Health Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            2.     Rogan's Arrangements with Dr. Cubria Did Not Satisfy the Personal Services Exception in the Stark Statue . . . . . . . . . . . . . . . . . . . . . . . . . 19

      C.     Rogan is Liable to the United States Under the False Claims Act for Knowingly Causing the Presentation of False Claims for Payment . . . . . . . . . . . . . . . . . . . 20

            1.     Rogan Caused False Claims to be Presented to the United States . . . . . . 22

            2.     Rogan Knew the Claims were False . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            3.     Compliance with the Stark and Anti-Kickback Statutes is a Statutory Condition of Payment and Material as a Matter of Law . . . . . . . . . . . . . 26

      D.     The United States is Entitled to Damages Based on Claims Paid to Edgewater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No. |
| | ) | 02 C 3310 |
| Plaintiff, | ) | |
| | ) | Judge Darrah |
| | ) | |
| v. | ) | |
| | ) | |
| PETER ROGAN, | ) | |
| | ) | |
| Defendant. | ) | |

## **REBUTTAL BRIEF OF THE UNITED STATES**

Lacking any legal or factual defense to the evidence presented at trial against him, Rogan seeks to escape liability here by arguing that a judgment for the United States would cause "chaos and upheaval in the massive health care industry." Rogan's parade of horribles is a complete fiction, as was much of his testimony at trial. The arguments put forward by Rogan only serve to emphasize that at the end of the day, despite having been the driving force at Edgewater for over a decade, the only person Rogan could find to testify in his favor was Rogan himself.

The sweeping assertions found in the first paragraph of Rogan's closing brief are not supported by the remainder of Rogan's filings, which are laden with broad claims that have little basis in law or fact. In his Proposed Findings of Fact (RPFF), Rogan relies almost entirely on his own, self-serving testimony to buttress his incredible contention that he was completely ignorant of the fraud that occurred over many years at Edgewater. At trial, Rogan's testimony was rebutted time and time again by the testimony of witnesses far more credible than he.

1

Indeed, the contrast between Rogan's credibility and that of the government's witnesses was striking. Ehmen, Cubria, and Barnabas testified in an open and forthright manner, describing Rogan's involvement in Edgewater's fraud methodically and with no indication of any animus towards Rogan. Ehmen, Cubria and Barnabas have served or are serving their criminal sentences presently and were promised absolutely nothing by the government in exchange for their testimony in this case. Rogan was unable to point this Court to any motive the government's core witnesses may have had for lying about Rogan's involvement in the fraud that occurred at Edgewater. In contrast, Rogan had ample incentive to lie on the stand, and it is clear that he did so, time and time again.

Rogan's legal claims are as broad and baseless as his factual contentions. His application of the Anti-Kickback Statute (AKS) to this case is at odds with the facts adduced at trial. His interpretation of the Stark statute turns the statute on its head, arguing that a little-used exception is actually far broader than it appears, effectively rendering portions of the Statute superfluous and leading to absurd results. On the False Claims Act (FCA) itself, Rogan tortures existing case law to suggest that he did not cause the presentment of false claims, ignores the facts of this case in asserting that he lacked the requisite knowledge for FCA liability, and fails to cite or address any of the substantial case law holding that compliance with the AKS and Stark Statutes is material to the government's payment of Medicare and Medicaid claims.

Finally, Rogan is fundamentally wrong about the basis for the United States' damages and all of his arguments flow from that mistaken premise. As the United States' witnesses testified and the Court clearly heard, the basis for the United States' damages are amounts paid to Edgewater for services provided by Edgewater to patients referred by physicians involved in the

scheme. The United States did not seek any damages for services provided <u>by any physicians</u>. Rogan, nevertheless, repeatedly asserts that the United States is seeking damages for services provided by physicians. With that erroneous premise, Rogan then argues that the government's calculation of damages is excessive, because <u>physicians</u> other that those that Rogan bribed may have been responsible for providing services to patients at Edgewater, and these other physicians may appear on UB-92s alongside Barnabas or Cubria.

This argument reflects a fundamental misunderstanding of both the factual basis for damages here and the Stark Statute's prohibition on illegal <u>referrals</u>. Pursuant to Stark, a hospital may not bill the Medicare or Medicaid programs for any services provided to any patient <u>referred</u> to the hospital by a physician with a prohibited financial relationship with the hospital. The Stark Statute defines "referrals" broadly as virtually any request by a physician for designated health services. Hence, Edgewater was prohibited from billing for <u>any</u> services rendered to patients <u>referred</u> by either Cubria or Barnabas, regardless whether another physician may also have ordered and/or provided services to the patient. Furthermore, Rogan's approach to damages at trial was essentially limited to an ill-fated effort to exclude the United States' damages evidence. Rogan proffered no alternative damages theory nor introduced any evidence with respect to a damages calculation, rendering the United States' damages evidence essentially unrebutted in the record.

I.      **THE EVIDENCE AT TRIAL CONTRADICTS ROGAN'S PROPOSED FINDINGS OF FACT**

        A.      **Rogan's Testimony Stands Alone**

As he must, Rogan concedes that fraud occurred at Edgewater. (Rogan Post-Trial

Argument at 2). Rogan's core defense is that he was ignorant of the fraud occurring at Edgewater during his stewardship of the hospital. (Rogan Post-Trial Argument at 3-4). Rogan places the blame for the fraud at Edgewater squarely on Ehmen's shoulders, asserting that (1) Ehmen was responsible for recruiting physicians to Edgewater; (2) Ehmen alone was responsible for ensuring that Edgewater's physician contracts were for fair market value; (3) Ehmen knew that various physicians were not performing the requisite work under their contracts; and (4) Ehmen intentionally concealed this information from Rogan. Rogan states that he never approved any remuneration to Cubria, Rao, or Barnabas that was intended to induce their referral of patients to Edgewater, and contends that any such remuneration that was provided to these individuals for that purpose was provided without Rogan's knowledge.

Rogan's attempt to establish the key factual predicates for his defense rests almost entirely on his own, self-serving testimony. For example, Rogan testified that he approved Barnabas's first contract with Edgewater because retaining Barnabas "would lower the age of Edgewater's medical staff," with no mention of any intent to induce Barnabas to refer more of his substantial base of patients to Edgewater. (RPFF ¶ 107). Rogan claimed to have approved the switch of Barnabas's contract from a teaching contract to a physician recruiting contract because the change was "budget neutral." (RPFF ¶ 138). This testimony makes no sense if Rogan actually believed that Barnabas was teaching, because presumably Rogan would have had to hire someone to assume Barnabas's teaching duties, thereby incurring additional budget expenses beyond Barnabas's own salary. Rogan insisted that he had no reason to believe that Barnabas was not working the requisite number of hours required under his contracts. (RPFF ¶ 148). With respect to Dr. Rao, Rogan claimed (among other things) to have never discussed

4

with Rao or Ehmen Rao's ability to bring patients to Edgewater. Rogan further claimed to have never tracked Rao's admissions or ever discussed such admissions with Ehmen. (RPFF ¶¶ 191, 204). Rogan claimed to be ignorant of the meaning of the code Edgewater used to track Rao's admissions (termed "RKO" on Edgewater's physician statistics sheets). (RPFF ¶ 206).

As to Cubria, Rogan denied ever knowing that Cubria's compensation for his teaching/directorship contracts was above fair market value, denied that the contracts were vehicles to help Cubria pay off loans the hospital had extended him, and stated flatly that the various inflated contracts given to Cubria were not intended by Rogan to keep Cubria and his patients at Edgewater. (RPFF ¶¶ 252, 268, 273, 301). Rogan further claimed that the hospital's $80,000 payment to Cubria for a "feasibility study" was within market value and not a mere method of funneling money to Cubria to help him pay off loans the hospital had provided. (RPFF ¶ 356). Rogan purported to be unaware that two-thirds of the television advertisements Edgewater funded featured Cubria, while one-third featured actors, and Rogan also claimed to have instructed Ehmen to be sure that the advertising met all applicable laws. (RPFF ¶¶ 382, 386, 389).

Every one of Rogan's proposed factual findings listed above are supported wholly and only by Rogan's own testimony -- testimony that was squarely and thoroughly contradicted by the government's witnesses. Ehmen testified that he and Rogan routinely discussed Barnabas's recruiting contracts as a means to induce Barnabas to refer more of his patients to Edgewater. (USPFF ¶¶ 37, 43, 50, 56). Rogan and Ehmen never discussed the amount of work Barnabas was doing under his inflated contracts, largely because Rogan didn't care about Barnabas's work – the primary purpose of the contract was to induce referrals, not to obtain Barnabas's services.

5

(USPFF ¶ 56).   Contrary to Rogan's testimony, Barnabas stated that in two separate dinner meetings with Rogan, Rao brought up his control of a substantial base of patients and his ability to refer that body of patients to Edgewater.  (USPFF ¶¶ 60, 83).  Ehmen also testified that he told Rogan about Rao's alleged ability to bring patients to the hospital.  (USPFF 59).  Ehmen further stated that the primary reason Rogan awarded Rao the anesthesia contract was to induce referrals from Rao, and that Rogan directed Ehmen to come up with a set of codes on Edgewater's statistics sheets to track Rao's patient referrals.  (USPFF ¶¶ 61, 64).  Both Ehmen and Cubria discussed Rao's referrals that fell under the "RKO"(standing for Rao-Kumar Organization) designation with Rogan, and it was Rogan who directed that the RKO code be changed to the more generic sounding "APN" when tracking Rao's referrals. (USPFF ¶¶ 65-66).

With respect to Cubria's transactions, Cubria testified that he threatened to pull his business from the hospital if Rogan would not approve a grossly inflated stipend for Cubria to read EKGs at Edgewater, and Rogan promptly approved the amount. (USPFF ¶¶ 101-102). Cubria testified that he told Rogan that he would move his patients to another hospital if television advertisements benefitting Cubria's practice were not paid for by Edgewater, and Rogan approved paying for the advertisements.  (USPFF ¶ 126).  Cubria states that Rogan authorized paying Cubria $80,000 in connection with a feasibility study, despite never inquiring as to the number of hours it would take or insisting on a written contract to govern the transfer of funds. (USPFF ¶ 121).  Cubria suggested the feasibility study after Rogan mentioned that he was looking to have Cubria pay back about half of the loans Edgewater (via Rogan) had provided Cubria over the years.  (USPFF ¶ 120).

In sum, on the specific facts that are essential to support his key defense, Rogan's

6

testimony stands alone, and his testimony is directly and forthrightly contradicted by the testimony of the government's witnesses – often multiple government witnesses. In order to conclude that Rogan is telling the truth about his ignorance of the rampant fraud at Edgewater, this Court would have to conclude that Ehmen, Cubria, and Barnabas lied repeatedly on the stand.

### B.     Rogan Cannot Be Believed

Given Rogan's near-complete reliance on his own testimony to demonstrate the key predicates of his defense, Rogan's credibility as a witness is critical to an ultimate determination in his favor. Unfortunately for him, Rogan lacked any hint of credibility as a trial witness. His testimony was alternatively evasive, nonresponsive, or simply unbelievable, and his lack of credibility is fatal to his defense in this case.

Rogan dissembled about all manner of issues during the course of the trial. Examples of minor matters about which he lied abound in the transcript. Rogan denied having "anything to do" with setting up Braddock Management L.P. (Braddock), the company that later was to run Edgewater, despite a document showing that as far back as 1992, Rogan and Scott Gross, a California hospital tycoon, planned to create a management company strikingly similar to Braddock to run Edgewater after Rogan sold it. (Transcript ("TR.") 1432-1435 (Rogan); GX A15). Despite having worked with Joann Skvarek from the 1980s to the present, when asked to spell her name, Rogan prefaced his spelling by saying it reflected his "best guess," and he later claimed to be unable to identify Skvarek's handwriting on a check request form. (TR. 55:17-25, 56:4-6, 109:5-11 (Rogan)). Extracting the truth from Rogan was often a painstaking and difficult process. In response to a question by the Court about whether "adjusted patient service revenue"

7

was tied to the number of patients in the hospital, Rogan prattled on nonsensically about deductions for bad debt. (TR. 248:9-11 (Rogan)). Only after the Court insisted on a straightforward response did Rogan temporarily shed his evasiveness and respond in the affirmative. (TR. 248:12-16 (Rogan)).

Rogan's dissembling on the stand was hardly limited to minor matters. In a 1996 letter to Edgewater's auditors, Rogan flatly stated that information concerning the ownership interest of Braddock was "not available," and represented that no officer of Northside Operating Company (which did business as Edgewater Medical Center) had any ownership interest in Braddock. (GX A4, GX A5). In fact, Rogan was the CEO of Northside at the time, and a partnership that Rogan owned and controlled owned 99% of Braddock at the time the letter was sent. (TR. 263-265 (Rogan)). At trial, Rogan's attempts to explain away his lies to Edgewater's auditors were embarrassingly ham-fisted. He initially claimed to have sold his interest in Braddock by 1996, for $5,000,000 to an entity whose name he couldn't recall; under questioning, it became clear that Rogan personally remained the owner of 99% of Braddock throughout virtually all of 1996. (TR. 262-265 (Rogan)). Rogan denied knowing anything about offshore trusts that his personal attorney had set up for Rogan's three children in the country of Belize. (TR. 266:17-25 (Rogan)). Six pages later in the trial transcript, Rogan acknowledged that as of a certain point, 90% of Braddock's profits were flowing to his children's domestic and Belizean trusts. (TR. 272:9-13 (Rogan)). Rogan denied having had the option to purchase the general partnership interest (1% of the total interest) in Braddock from Gross at any time, despite clear documentation showing he held that option. (GX A16; TR: 1435-1436 (Rogan)).

Rogan stands to lose millions from a negative result in this case, giving him an ample

8

incentive to lie to this Court. His testimony on the stand was completely consistent with his personal financial incentives and completely inconsistent with the truth.

### C. Ehmen, Cubria, and Barnabas Are Credible

Rogan's testimony can only be believed if each of his co-conspirators are found to have lied. They did not. Each of Rogan's co-conspirators testified in an honest and open manner, and Rogan was unable to cast doubt upon their credibility. Indicia of these witnesses' credibility can be found in the consistency of their stories, their absence of any motive to lie, and their (rather stunning) lack of personal animus towards Rogan. Rogan's attempt to impeach these witnesses through their alleged "omissions" in interviews given in connection with the preceding criminal investigation fell flat.

Ehmen's testimony is corroborated on numerous material points by that of Barnabas and Cubria, just as Cubria's testimony is corroborated by that of Ehmen and Barnabas. Examples of situations where these witnesses provide consistent accounts of Rogan's misdeeds can be found throughout the transcript. Ehmen and Cubria both stated that they discussed Rao's referrals under the RKO designation with Rogan, and that Rogan knew that the referrals listed under the RKO code came through Rao and his sources. (USPFF ¶¶ 64-67; TR 383:16-25 (Ehmen)). Ehmen and Rogan discussed Rao's boasts of patient admissions that Rao could bring to Edgewater if awarded the anesthesia contract; shortly thereafter, Barnabas was present when Rao made those same boasts to Rogan. (USPFF ¶¶ 59-60). Cubria threatened to take his patients elsewhere unless Rogan approved paying him a grossly inflated $6,000 per month to read EKGs at Edgewater. (USPFF ¶ 101). Ehmen confirmed that he and Rogan were concerned that Cubria was going to leave the hospital unless Rogan agreed to Cubria's demand, which Rogan did. (Id.).

9

Cubria and Barnabas both confirmed that Ehmen regularly insisted on running any major decision by Rogan for his approval. (TR. 864:1-10 (Barnabas); 932:6-10 (Cubria)).

Perhaps the most compelling example of the government's witnesses corroborating each other's testimony comes in the context of Rogan's calculating behavior after he became concerned about the reach of the government's criminal investigation. Ehmen testified that Rogan, concerned about the possibility of concealed recording devices in his office, wrote candid notes to Ehmen about the criminal investigation while carrying on a surface oral conversation with Ehmen about unrelated, benign topics. (USPFF ¶ 165). In the notes, Rogan offered to take care of Ehmen and his family forever if Ehmen would refuse to implicate Rogan in the fraud at Edgewater. (Id.). Cubria testified that Rogan employed the same modus operandi in a meeting with Cubria shortly before Cubria's indictment – carrying on a surface oral conversation about ephemera while writing candid notes about the criminal investigation. (USPFF ¶¶ 168-170). When Cubria answered orally, Rogan went so far as to wave his hands around the room, indicating a concern that listening devices were present. (USPFF ¶ 169). These two witnesses are separately incarcerated and each testified that he had not talked to the other about Rogan's note-passing. (USPFF ¶ 172; TR. 288:10-14 (Ehmen), 794:8-10 (Cubria)). Rogan denied both Cubria and Ehmen's accounts of his behavior. Therefore, either: (1) two independent witnesses concocted virtually the same highly unusual and damning story and were willing to repeat that fabrication under oath in a judicial proceeding; or (2) Rogan lied. The likelihood that Rogan lied is simply overwhelming given the material similarity of the other witnesses' testimony.

Another indicator of Cubria, Ehmen, and Barnabas's credibility is the absence of any demonstrated personal motive or interest these individuals had to lie to this Court. Barnabas,

Cubria, and Ehmen all received criminal sentences for their participation in the fraud at Edgewater. Cubria and Ehmen are still serving prison time as a result of their sentences. There is no evidence in the record that Cubria and Ehmen were promised any reduction in their sentences – or any other benefit – as a result of their cooperation with the government in this matter. Barnabas has completed his sentence, and Rogan similarly was unable to demonstrate any benefit Barnabas received as a result of his testimony. Each of these witnesses provided testimony that was exceptionally incriminating of Rogan, and Rogan could not demonstrate or even identify any ulterior motive these witnesses had for testifying in this fashion. The credibility of Rogan's co-conspirators cannot be impeached through references to any external interest or motive, as there is no evidence of any such interest or motive in the record.

Not only did these witnesses lack any ulterior motive to lie, but they also displayed virtually no animus towards Rogan, which also reflects positively upon their credibility. A striking example of this lack of personal animus came from Ehmen, near the end of his lengthy direct testimony. Ehmen recounted an incident at the Ritz-Carlton's steam bath, in which Rogan (speaking in bizarre abstractions) promised to take care of Ehmen and his family forever if Ehmen would agree to take full responsibility for the fraud at Edgewater. When asked how he responded, Ehmen began by noting that he felt certain at that point that he would be going to prison, and that he didn't want to alienate Rogan because he was concerned with keeping his job to ensure that he could support his family for as long as possible. Ehmen continued, "And I was really very grateful, in fact, that [Rogan] kept me on the payroll as long as he did. That was very nice." (TR: 495-497 (Ehmen)).

Ehmen's testimony in this context – which was spoken without guile or sarcasm – is

11

hardly consistent with the notion that Ehmen testified out of personal animus towards Rogan. Rogan does not, and indeed cannot, claim that the government's witnesses testified as they did because they wished to settle scores with Rogan.

Rogan's attempts to attack Ehmen and Cubria's credibility (he largely ignores Barnabas) focus primarily on alleged distinctions between the testimony that Ehmen and Cubria gave at Rogan's trial and information contained in various interview reports and Grand Jury statements that Ehmen and Cubria gave in connection with the preceding criminal investigation. Rogan makes much of the fact that Ehmen and Cubria testified at trial about transactions or interactions they had with Rogan that were not described in any detail in these prior statements.

Rogan does not assert that Ehmen and Cubria made statements to the government investigators that were inconsistent with their trial testimony; rather, he seeks to impeach these witnesses through omission. In order to impeach the government's witnesses in this fashion, however, Rogan must show that Ehmen and Cubria were silent when asked questions that fairly called for the specific information that was elicited at trial. This Rogan completely failed to do. Rogan did not show that the government investigators in the criminal case went through the transactions and events discussed at trial in anything like the detail presented in Court. Rogan was only able to show that government investigators were generally interested in the topics that Ehmen and Cubria testified about at trial. In sum, Rogan failed to impeach these witnesses with any prior statements or omissions.

## II. ROGAN'S PROPOSED CONCLUSIONS OF LAW ARE WRONG

### A. Rogan Violated the Anti-Kickback Statute

Rogan's discussion of the AKS attempts to assign significance to the unremarkable legal

propositions that a "mere hope" for referrals on the part of a physician is not violative of the Statute, and that the Anti-Kickback Statute does not "prohibit all conduct when a hospital executive or physician has referrals in mind." (Rogan Post–Trial Argument at 31 (internal quotation marks omitted)). The AKS, however, clearly does prohibit the payment of remuneration to a physician if one or any purpose of that remuneration is the inducement of patient referrals. United States v. Greber, 760 F.2d 68, 72 (3d Cir. 1985)("If the payments were intended to induce the physician to use Cardio-Med's services, the statute was violated, even if the payments were also intended to compensate for professional services."); United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 30 (1st Cir. 1989) ("The issue of sole versus primary reason for payments is irrelevant since any amount of inducement is illegal.") (emphasis in original); United States v. McClatchey, 217 F.3d 823 (10th Cir. 2000) (adopting one-purpose test set forth in Greber); see also United States v. Kats, 871 F.2d 105 (9th Cir. 1989).

In Kats, the defendant was convicted of conspiracy to commit fraud in connection with his receipt of kickbacks for the referral of Medicare patients. On appeal, the defendant challenged the district court's jury instructions, which stated:

> The government must prove beyond reasonable doubt that one of the purposes for the solicitation of a remuneration was to obtain money for the referral of services which may be paid in whole or in part out of Medicare funds. It is not a defense that there might have been other reasons for the solicitation of a remuneration by the defendants, if you find beyond reasonable doubt that one of the material purposes for the solicitation was to obtain money for the referral of services.

Kats, 871 F.3d at 108. The instructions went on to state:

13

> The term "kickback" does not mean only the secret return of a sum of money received. "Kickback" also includes a payment for granting assistance to one in a position to control a source of income, unless such payment is <u>wholly</u> and not incidentally attributable to the delivery of goods or services.

<u>Id.</u> at 108, n. 2 (emphasis added). The Ninth Circuit affirmed these instructions, and held that "the admonition that the jury could convict unless it found the payment 'wholly and not incidentally attributable to the delivery of goods or services' accurately stated the law." <u>Id.</u>

In his Proposed Conclusions of Law, Rogan cites <u>United States ex rel. Sharp v. Consol. Med. Transp. Inc.</u>, No. 96-C6502, 2001 WL 1035720 (N.D. Ill. 2001) for the proposition that the United States must prove every element of an AKS violation in this FCA case "beyond a reasonable doubt," as the AKS is a criminal statute. Rogan confuses the question of an ultimate burden of proof with the degree of intent necessary to sustain a violation of the AKS. <u>Sharp</u> merely holds that the government must demonstrate "criminal intent," i.e., a <u>knowing</u> violation of the AKS, if it is to use the AKS as a predicate statute for an FCA violation. <u>See Sharp</u>, 2001 WL 1035720 at *10. The Supreme Court has long held that the criminality of predicate offenses in an underlying civil statute, such as the RICO Act, does not mandate application of a higher burden of proof in a civil case. <u>See Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 491 (1985) ("In a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard."). Subsequent decisions have upheld the preponderance standard in civil cases based upon predicate criminal offenses. <u>See Liquid Air Corp. v. Rogers</u>, 834 F.2d 1297, 1301 (7th Cir. 1987).

The facts of this case could not be clearer – Rogan approved contracts, loans, and remuneration that Edgewater provided to Barnabas, Cubria, and Rao with the intent to induce

14

referrals from these physicians. At a minimum, the intent to induce referrals was <u>one</u> purpose of the remuneration provided to these three physicians; often, it was the primary motivating reason Rogan caused Edgewater to enter into financial relationships with these individuals. Rogan approved inflated teaching and recruiting contracts with Barnabas repeatedly, always after discussing with Ehmen the desire to attract more of Barnabas's referrals from a competing hospital, and never bothering to inquire whether Barnabas was performing the duties listed in his expensive contracts. (USPFF ¶¶ 37, 43, 50, 52, and 56). Rogan's award of the anesthesia contract to Rao came after Rao informed Rogan that Rao could bring substantial referrals to Edgewater if awarded the contract; Rogan actually requested Rao go through a "trial period" before the contract was effective to see if Rao's referrals were as substantial as he claimed. (USPFF ¶¶ 58-62). Clearly, this contract was awarded in large part to pay Rao for patient referrals.

As to Cubria, Cubria routinely threatened to move his patients to other hospitals if Rogan would not approve various sorts of remuneration for him; in response, Rogan approved inflated service contracts, a waiver of office-rent build out expenses, and an advertising campaign designed to benefit Cubria's practice. (USPFF ¶¶ 97, 101-102, 109, 117-118, 126). Rogan also approved over $200,000 in loans to Cubria (without ever checking their financial reasonableness) to help Cubria pay his taxes and handle issues related to his divorce, while providing Cubria with a variety of vehicles (such as the ludicrous $80,000 "feasibility study") to "repay" those loans. (USPFF ¶¶ 113-114, 120-124). Rogan went to great lengths to provide remuneration to Cubria, and it is clear that these payments were primarily to compensate Cubria for his referral of patients to Edgewater.

15

In sum, it is plain that under the facts adduced at trial, Rogan approved numerous types of remuneration to three physicians in order to, in whole or in part, induce referrals from those physicians. Rogan also admitted knowing that it was illegal to pay for referrals. (TR. 1416:16-24 (Rogan)). Rogan cannot seriously claim that these facts do not make out a violation of the AKS.

**B.      Rogan's Conduct Resulted in Violations of the Stark Statute**

Rogan contends that the United States failed to prove that Rogan caused the hospital to violate the Stark Statute. He advances two arguments in support of this proposition: (1) that Cubria's feasibility study, loans, consulting agreement, and advertising fall outside of Stark because they are "unrelated to designated health services"; and (2) that the remaining contracts were personal service arrangements, and Rogan was unaware that these contracts exceeded fair market value. Neither of these arguments withstand scrutiny.

**1.      Rogan's Arrangements with Dr. Cubria Were Related to Designated Health Services**

The Stark Statute contains an exception for remuneration that is "unrelated to the provision of designated health services." 42 U.S.C. § 1395nn(e)(4). Under Stark I, which applied only to clinical lab services, the exception for services "unrelated to the provision of designated health services" was necessary to insulate a hospital's relationships with physicians that were unrelated to the provision of clinical lab services. However, once Stark II passed, all inpatient and outpatient hospital services became "designated health services." The expansion of "designated health services" thus effectively narrowed the types of relationships that could satisfy this exception.

16

Rogan argues that until accompanying regulations were issued in 2004, the exception for remuneration "unrelated to the provision of designated health services" protected "physician loans, a lease offered by a hospital to a physician, physician recruitment agreements, medical directorships and remuneration provided to a physician for advertisements." (Id.). Rogan cites to the preamble to the final 2004 rule for the proposition that the various arrangements he describes (physician loans, leases, recruitment agreements, etc.) fell within the exception prior to the issuance of the 2004 rule. The preamble says nothing of the sort. The citation makes no mention of the types of arrangements he describes, and the assertion that such arrangements fell within the "unrelated services" exception prior to 2004 is unfounded.

The facts of this case establish that Rogan approved Edgewater's loans to Cubria, Cubria's consulting agreement, payments to Cubria for a feasibility study, and payments for advertisements featuring Cubria because Cubria was in a position to refer patients to Edgewater for the provision of designated health services (i.e., inpatient hospital services), and Rogan wished to induce such referrals. Therefore, these payments were not "unrelated" to the provision of DHS and are not eligible for the statutory exception. Rogan's broad reading of the exception as it existed during the relevant time frame is untenable under two traditional principles of statutory interpretation, and therefore should be rejected by this Court.

First, it is well established that statutes are to be read in such a manner as to give effect to all the statute's provisions, rendering no part of the statute superfluous. TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001). Here, there are numerous other exceptions to the Stark Statute that would be rendered meaningless by Rogan's overly broad reading of the exception. For example, the Stark Statute provides an exception, codified at 42 U.S.C. § 1395nn(e)(5), for certain

17

relocation costs provided to physicians recruited to practice at a particular hospital. The Stark Statute also provides an exception for certain remuneration associated with the leasing of office space or equipment to physicians. 42 U.S.C. § 1395nn(e)(1). Neither of these forms of remuneration are facially tied to the provision of specific designated health services by the physician, and therefore both exceptions would be completely superfluous under Rogan's reading of the exception for remuneration "unrelated to the provision of designated health services."

Second, and perhaps more importantly, if providing remuneration to generate patient referrals in the forms described here were deemed to fall within the exception, then the Stark Statute utterly failed to regulate against the very abuses the statute was passed to prevent. Hospitals could provide referring physicians with any sort of compensation they wished – golf club memberships, vacations, airplane tickets, etc. –  and argue that because the compensation arrangement did not facially "relate" to the provision of designated health services, it fell within the exception to the Stark Statute.   Another well established canon of statutory construction is that statutes should not be interpreted in such a way as to lead to "absurd results." Rowland v. Cal. Men's Colony, 506 U.S. 194, 200 (1993).  Rogan's broad reading of this exception to the Stark Statute would lead to absurd results, and the statute should not be interpreted in this fashion.

Finally, Rogan's interpretation is completely at odds with subsequent guidance issued by the agency.  In 2004, the Department of Health and Human Services (HHS), promulgated regulations that (among other things) interpreted the scope of this exception.  HHS noted that the final rule on this exception "interpret[s] this section narrowly and [is] available only if the remuneration is wholly unrelated to the provision of designated health services." 69 Fed. Reg.

16054, 16093 (March 26, 2004) (emphasis added).  HHS further noted that "remuneration will be considered related to designated health services if it is furnished, directly or indirectly, explicitly or implicitly, in a selected, targeted, preferential, or conditional manner to medical staff or other physicians in a position to make or influence referrals." (Id.).  HHS stated that the narrow reading was consistent with the statute's history and purpose.

### 2.    Rogan's Arrangements with Dr. Cubria Did Not Satisfy the Personal Services Exception in the Stark Statute

Rogan argues that the remainder of the arrangements at issue in this case were physician contracts that facially fell within Stark's exception for personal services contracts.  He notes that the hospital fell out of compliance with the exception because the physicians were not complying with the contracts' hours requirements, but claims that he had no knowledge of this fact. Rogan's assertion is absurd, given the facts adduced at trial about both Rogan's management style and the context in which these contracts were entered.  Rogan was hardly a hands-off manager of Edgewater; if Rogan didn't know what value (in terms of physician services, such as teaching or serving as a medical director) he was getting in exchange for the substantial payments that he authorized, it's because he didn't want to know and didn't care.  The real value was in the referrals and Rogan kept careful track of those.  The United States presented overwhelming evidence of the tight control that Rogan exercised over his key managers, in particular Roger Ehmen and Henry Zeisel.  (USPFF ¶¶ 26, 27; TR. 1179-1180 (Zeisel)).   In the arena of generating, collecting, and disbursing hospital revenue, Rogan was nothing short of a micro manager.  (USPFF ¶ 27; TR. 299-300 (Ehmen); 1180:3-10 (Zeisel)).  Catherine Sinner, an accounts processing clerk, testified that Rogan's signature had to appear on every request for a

check that Edgewater disbursed outside of the normal monthly distributions. (USPFF ¶ 27).

Rogan himself claims that Edgewater was turned around under his stewardship "because of a

very aggressive cost-cutting effort."  (Rogan Post-Trial Argument at 6.)

Yet Rogan never asked whether Barnabas was performing all of the duties under his

numerous lucrative contracts, never inquired as to whether Cubria was spending 600 hours

annually reading EKGs in exchange for his $60,000, never checked to see whether Cubria's

teaching contracts and medical directorship duties were being performed, and did not pull

Cubria's $48,000 medical directorship of the cardiac rehabilitation program after learning that

Cubria was not fulfilling his responsibilities under the contract.  (USPFF ¶¶ 56, 106, 133; TR.

964:7-13 (Cubria)).  Rogan's claim to have believed the physicians were working these

extraordinary hours is further undercut by his admission that he knew both Barnabas and Cubria

had full-time, active practices.  (TR. 91:16-20; 209:1-6 (Rogan)).  The obvious inference to be

drawn from these facts is that Rogan approved the hospital's contracts with Barnabas and Cubria

in exchange for referrals, not in exchange for legitimate services.

## C.     Rogan is Liable to the United States Under the False Claims Act for Knowingly Causing the Presentation of False Claims for Payment.

Contrary to the representations in Rogan's brief, the evidence at trial demonstrated by a

preponderance of the evidence that Rogan knowingly caused the presentation of false claims for

payment, in violation of the False Claims Act.

As discussed in detail in the Post-Trial Closing Brief of the United States (pp. 22-44),

between 1995 and 2000, Rogan caused Edgewater to submit numerous false claims for payment

to the federal Medicare and state Medicaid programs, in the form of (1) CMS Form 2252s, or

20

"cost reports," (2) interim claims for reimbursement submitted to the Medicare program on UB-92s for specific patients, and (3) "Hospital Statements of Cost" submitted to the Illinois Medicaid program ("Medicaid Cost Reports"). Each of these claims for payment was false because they each either expressly or impliedly certified that Edgewater was in compliance with the Stark and/or Anti-Kickback statutes when, in fact (and as discussed supra), Edgewater was not in compliance. As explained fully in the Post-Trial Closing Brief of the United States (pp. 25-28), compliance with the Stark and Anti-Kickback statutes are statutory conditions of payment under the federal healthcare programs, and consequently both the express and implied false certifications of compliance with those statutes are actionable under the False Claims Act.

Without rehashing all of the arguments contained in the Post-Trial Closing Brief of the United States, the evidence at trial belies Rogan's incorrect assertions that (1) Rogan did not cause false claims to be presented, and (2) Rogan did not have knowledge that the claims were false, or act with deliberate ignorance or reckless disregard as to their falsity.

Rogan is also wrong to accuse the United States of not introducing evidence that the claims would not have been paid if the United States had known of the falsity – the claims would not have been paid, and there is no need or reason to introduce evidence to that effect because compliance with the Stark and Anti-Kickback statutes are statutory conditions to payment. This Court recently held that violations of the Anti-Kickback Statute, for example, are material as a matter of law (and the issue need not be presented to the jury) because "[c]ompliance with the AKS is . . . central to the reimbursement plan of Medicare." United States ex rel. Bidani v. Lewis, 264 F. Supp.2d 612, 616 (N.D. Ill. 2003) ("Having found that the alleged AKS violation is material to the government's treatment of defendants' reimbursement claims, we leave to a

21

trier of fact the remaining elements of the FCA claim . . . .").

### 1.     Rogan Caused False Claims to be Presented to the United States

Rogan is flatly wrong to argue that he did not cause any false claims to be presented to the United States for a variety of reasons, not the least of which is that it was <u>Rogan's own behavior</u> that caused the claims to be false. Contrary to Rogan's representations, this is not an instance where the United States seeks to hold a personal defendant liable for the torts of a corporation by virtue of his or her position as a corporate officer or employee. To the contrary, liability attaches because the testimony at trial proved by a preponderance of the evidence that Rogan personally participated in the wrongful acts – the claims were false because of specific actions that Rogan took.  <u>See</u> <u>United States v. Mackby</u>, 261 F.3d 821, 828 (9th Cir. 2001) ("Mackby told Medicom and Ms. Barnett to "substitute" Dr. Mackby's PIN for Leary's. In so doing, he caused the claims to be submitted with false information."); <u>United States ex rel. Piacentile v. Wolk</u>, No. 93-5773, 1995 WL 20833, *4 (E.D. Pa. 1995) ("In order for liability to attach, the officer must actually participate in wrongful acts. He may be held liable for misfeasance but not for simple nonfeasance.").

As discussed <u>supra</u> and in the Post-Trial Closing Brief of the United States (Doc. 202 at 5-18), the United States proved by a preponderance of the evidence Rogan's intimate involvement in the fraud scheme, and his personal participation in negotiating illegal kickback arrangements. From sham contracts with Dr. Barnabas and Dr. Rao that were designed first and foremost to illegally obtain patient referrals, to the myriad pay-offs to Dr. Cubria – grossly inflated EKG, medical directorship and consulting contracts, hundreds of thousands of dollars worth of loans "repaid" to Edgewater through devices like the "feasibility study," television

22

advertising programs designed to publicize Cubria's practice – the evidence proved that Rogan instigated, encouraged, and/or underlined personally negotiated all of the illegal financial arrangements at issue in this case.  The evidence that Rogan presented false claims is not, as Rogan's brief would have the Court believe, limited to "his position at Edgewater."  (Rogan Post-Trial Argument, Doc. 209 at 53.)  In fact, the evidence showed that Rogan actually participated in the wrongful activity, and was in many instances a chief offender.

In addition to Rogan's specific actions that caused the presentation of false claims, Rogan was legally and practically responsible for Edgewater's presentation of Medicare and Medicaid claims.  There can be no doubt that Rogan knew the hospital was submitting claims for payment to the United States for patients referred by Cubria, Barnabas, and Rao, because Rogan was responsible for that task, and specifically delegated the responsibility to employees who reported directly to him.  (USPFF ¶¶ 145, 157).  Even after delegating the responsibility, however, Rogan remained heavily involved in the preparation of Medicare Cost Reports through 2000.  (USPFF ¶ 146).  Rogan was the CEO of Edgewater through 1997, and he actively supervised the person who subsequently assumed that title.  (USPFF ¶ 7).  Rogan was also the majority owner and an employee of Braddock, the entity that managed the day-to-day operations of the hospital and was contractually responsible for the presentation of claims to Medicare and Medicaid for services rendered to patients.  (USPFF ¶¶ 11-21).

### 2.  Rogan Knew the Claims were False

Contrary to representations in Rogan's brief, the evidence that Rogan knew the claims for payment were false is not at all limited to "[p]roof of the defendant's status within the entity" or "proof that the defendant was responsible for the entity's finances."  (Rogan Post-Trial Argument

at 56).  Quite the opposite is true – the United States proved by a preponderance of the evidence that Rogan knew the claims for payment were false precisely because it was Rogan's own behavior that made the claims false.  Rogan's knowledge of the illegal compensation arrangements, and his participation in the crafting of the arrangements, is detailed in the Post-Trial Closing Brief of the United States (pp. 5-20, 42-44).  Indeed as presented supra, Rogan's argument that he had "no knowledge [the Anti-Kickback and Stark statutes] were being violated at Edgewater" (Rogan Post-Trial Argument at 57) is inconsistent with the testimony of multiple credible witnesses at trial, and the only testimony supporting the incorrect view that Rogan lacked knowledge of the illegal activity came from the defendant himself.  Rogan's own testimony proved his knowledge of the Stark and Anti-Kickback statutes, and specifically their prohibition of payments for referrals of patients.  (USPFF ¶ 150).[1]

Rogan also argues that his supposed "lack of motive" (Rogan Post-Trial Argument, Doc. 209 at 57) somehow demonstrates that he had no knowledge of the false claims.   This argument flies in the face of the evidence presented at trial.  Rogan personally profited from the financial success of the hospital by virtue of his ownership of Braddock, and Rogan admitted at trial that the sums he received were, contrary to his counsel's representations in the defense's opening statement, significant.

> A:     I received distributions from the management company, yes.

---

[1]     In addition to denying any actual knowledge, Rogan also argues that he cannot be held liable under the reckless disregard prong of the FCA's knowledge requirement.  In doing so, he cites to Edgewater's "compliance program," which his own counsel admitted under cross-examination was not put into place until long after most of the kickbacks occurred, and was done as a result of Edgewater having been found in violation of the FCA for billing fraud.  (TR. 1281:7-15, 1291:18-25, 1292:1-22 (Hoban)).

24

Q:     Were they nominal distributions?

A:     They were distributions.

Q:     Were they nominal distributions?

A:     I would say no, that they were not necessarily nominal distributions, the entire

       distribution, no.

(TR. 242: 15-21 (Rogan)).  The distributions that Rogan received through Braddock were

essentially a commission-based payment that included a monthly percentage of the hospital's net

patient services revenue.  (USPFF ¶ 12).  In other words, Rogan's financial success was directly

linked the Edgewater's patient revenues.  (See  Post-Trial Closing Brief of the United States at 3-

5).  Rogan's brief makes much of the fact that Braddock's variable fee was capped, and that the

cap was reached in 1995 and 1996.  Rogan obviously had a motive to reach the cap and no way

of knowing in advance that the cap would be exceeded, or by how much.  His motivation was to

maximize potential revenues as much as possible.

        Finally, Rogan's knowledge of the illegal activity and the false claims for payment is also

revealed by his blatant and desperate efforts to obstruct justice and cover up evidence of his

involvement in the fraud after learning that Edgewater was under criminal investigation.  Fearing

that Ehmen and Cubria might be wearing consensual recording devices, Rogan adopted the odd

practice of carrying on superficial oral conversations while writing notes to Cubria and Ehmen

containing messages instructing the men not to implicate Rogan.  See Post-Trial Closing Brief of

the United States at 18-20.  These efforts included a discussion in the Ritz-Carlton steam bath

with Roger Ehmen, which began with Rogan watching Ehmen undress to ensure that Ehmen was

not wearing a recording device.  (TR. 495:1-16).  The paranoia, the instructions to destroy

25

documents and computers, the promises of financial reward for silence -- all of this behavior is consistent with a guilty conscience, and evidences Rogan's knowledge of the illegal activity and the false claims that were presented.

### 3. Compliance with the Stark and Anti-Kickback Statutes is a Statutory Condition of Payment and Material as a Matter of Law

The United States would not (and could not) have paid the claims at issue in this case if it had known the claims were false because compliance with the Stark and Anti-Kickback statutes is a statutory condition of payment under Medicare, as a matter of law. Numerous courts have affirmed that compliance with the Stark and Anti-Kickback statutes is, in fact, a prerequisite to the entitlement to payment when submitting claims to federal healthcare programs for reimbursement. See United States ex rel. McNutt v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1260 (11th Cir. 2005) ("compliance with the Statute is necessary for reimbursement under the Medicare program . . . ."); United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp.2d 258, 266 (D.D.C. 2002) ("The Stark laws . . . specifically state that compliance is required in order to receive Medicare reimbursement."); United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F. Supp.2d 1017, 1047 (S.D. Tex. 1998).

This Court recently held that violations of the Anti-Kickback Statute, for example, are material as a matter of law (and the issue not determined by the jury) because "[c]ompliance with the AKS is . . . central to the reimbursement plan of Medicare." Bidani, 264 F. Supp.2d at 616. The court in Bidani denied the defendant's motion for summary judgment, and found as a matter of law "that the alleged AKS violation is material to the government's treatment of defendants' reimbursement claims." Id. The Court disposed of the "materiality" issue on summary

judgment, and stated that "we leave to a trier of fact the remaining elements of the FCA claim . . . .". Id.

In other words, and contrary to Rogan's representations in his brief, the United States was not required to "prove" at trial that "it would not have paid the claim[s] had it known about the underlying violation." (Rogan Post-Trial Argument at 58). Whether the United States would pay claims submitted in violation of the Stark and Anti-Kickback statutes is not a question for the finder of fact, and consequently any testimony on this issue would be pointless and without weight because compliance with the statutes is a statutory prerequisite to payment. (See Post-Trial Closing Brief of the United States at 25-27).

**D.** **The United States Is Entitled to Damages Based on Claims Paid to Edgewater**

At trial, Rogan failed to present a shred of evidence to undercut either the testimony or data presented by the United States with respect to damages. Rogan's brief fares no better. First, Rogan fundamentally misstates the basis for the United States' damages and many of his arguments flow from that erroneous premise. As the United States' witnesses testified and the Court clearly heard, the basis for the United States' damages are amounts paid to Edgewater for services provided by Edgewater (commonly known as Part A services) to patients referred by physicians involved in the scheme. The United States did not seek any damages for services provided by any physicians (commonly known as Part B services). Rogan, nevertheless, repeatedly asserts that the United States is seeking damages for services provided by physicians.

With that false premise, Rogan then argues that the government's calculation of damages is excessive, because physicians other than those that Rogan bribed may have been responsible

27

for providing services to patients at Edgewater who were also treated by Drs. Cubria or Barnabas, and these other physicians may appear on UB-92s alongside Barnabas or Cubria. This argument reflects a fundamental misunderstanding of both the factual basis for damages as discussed above and the Stark Statute's prohibition on illegal <u>referrals</u>. Pursuant to Stark, a hospital may not bill the Medicare program for <u>any</u> services provided to any patient <u>referred</u> to the hospital by a physician with a prohibited financial relationship with the hospital. The Stark Statute defines "referrals" broadly to include virtually any request by a physician for designated health services. Hence, Edgewater was prohibited from billing for <u>any</u> hospital services rendered to patients <u>referred</u> by either Cubria or Barnabas, regardless whether another physician may also have ordered or provided services to the patient.

The Stark Statute prohibits a hospital from billing the Medicare program for any services provided to a patient <u>referred</u> to the hospital by a physician with a prohibited financial relationship. As detailed in the United States' Closing Brief, "referral" is broadly defined in the Stark Statute as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn(h)(5)(A). The "attending physician" identified by a hospital in box 82 on a UB-92 is the physician "primarily responsible for the care of the patient from the beginning of the inpatient episode," and the "other physician" identified in box 83 is the physician who performed the "principal procedure." CMS Medicare Claims Processing Manual 100-04, Chap. 25, § 60.5, FL 82, 83 (formerly Medicare Hospital Manual, 460 FL 82, 83). The physicians listed in either box of the UB-92 are the physicians responsible for providing care to the patient in an inpatient hospital setting – therefore, they are, by definition, requesting that the hospital provide services to the patient (room and board, lab

28

tests, medicines, etc.) or, at a minimum, are establishing a plan of care for the patient that includes inpatient hospital services. Therefore, the physicians identified in either box of a UB-92 clearly are "referring" physicians under the broad definition found in the Stark Statute.

Pursuant to the plain language of the Stark Statute, once the referral is made by a physician with a prohibited financial relationship with the institution, the hospital may not bill the Medicare program for any services the hospital provides to that patient. Once the referral is inappropriate, it is irrelevant whether other physicians also treated the patient at the hospital or what set of services were provided to the patient. The hospital may not bill for any of it. 42 U.S.C. § 1395nn(a)(2)(B). Therefore, Rogan's contention that the government's damages figures are inflated due to the inclusion of amounts reflecting services not performed by Cubria or Barnabas is fundamentally flawed both because the United States is not seeking damages for physician services, and because Stark prohibits billing for any services provided to a patient under these circumstances.

Second, Rogan unaccountably continues to claim that the United States failed to introduce UB-92s into evidence. (Rogan Post-Trial Argument at 65-69.) As the United States' witnesses clearly testified, Edgewater submitted electronic UB-92s which then became part of the national claims history, CMS's official repository of adjudicated claims. The repository includes inpatient claims submitted electronically since 1991 and included Edgewater's claims at issue in this case. (TR. 1129:17-20, 1133:14-24 (Steck); 1124:3-11 (Thomas)). Robyn Thomas, a CMS official, testified that CMS provided a copy of this data to Mr. Steck, who in turn provided the relevant claims on a disc to the United States and Rogan. (TR. 1123:24-25, 1124:1-8 (Thomas)). The United States then submitted this evidence to the Court as GX 7. Mr. Steck

29

testified regarding various fields in the data, including the field that showed the amount billed by Edgewater on the UB-92 for the patient. (TR. 1131:18-24, 1132:1-8 (Steck)). Rogan's assertions on this topic are simply false. Following his ill-fated effort to exclude the United States' damages evidence, Rogan proffered no alternative damages theory nor introduced any evidence with respect to a damages calculation, leaving the United States' damages evidence unrebutted in the record.

Most astonishingly, despite having filed a Motion in Limine before trial, seeking to exclude all evidence of medically unnecessary services under Fed. R. Evid. 401 and 403, Rogan now attempts to argue that all of the services for which Edgewater sought reimbursement from the Medicare or Medicaid programs were medically necessary, and that "the services then would have been provided at Edgewater or another institution regardless of whether the doctors at issue received prohibited remuneration." (Rogan Post-Trial Argument, Doc. 209 at 59).

This argument fails in three respects. First, if a financial relationship between a physician and a hospital does not meet an exception, the Stark statute flatly prohibits the submission and payment of claims without regard to medical necessity. The statute requires no inquiry into such matters, and evidence of medical necessity is therefore legally irrelevant. Second, there is no evidence in the record that all of the procedures were medically necessary. Third, if Rogan's representations to the Court in his motion (which was granted) that such evidence "would only prejudice and mislead the factfinder" (Doc. 150 at 4) are to be taken seriously, he should not now be heard to argue that the absence of such evidence is somehow relevant to his defense.

In sum, the United States proved substantial damages arising out of Rogan's participation in the fraud scheme at Edgewater and is entitled to recover in full for its losses.

30

III.     **CONCLUSION**

For the foregoing reasons, the United States is entitled to judgment against Rogan under the FCA and the common law for the payments it made to Edgewater on behalf of patients treated by Drs. Barnabas and Cubria.

<div style="margin-left:50%">

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

PATRICK J. FITZGERALD
UNITED STATES ATTORNEY

_____s/Linda A. Wawzenski_____
by:     Linda A. Wawzenski
        Assistant United States Attorney
        (312) 353-1994

Laurie A. Oberembt
John K. Neal
Michael J. Friedman
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Washington, D.C.  20044

</div>

Dated: June 21, 2006                    Counsel for the United States

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following documents:

### REBUTTAL BRIEF OF THE UNITED STATES

were served pursuant to the district court's ECF system as to ECF filers, if any, and were sent by first-class mail on June 21, 2006, to the following non-ECF filers:

Neil E. Holmen                          Joseph Spiegler
Winston & Strawn                        Winston & Strawn
35 West Wacker Dr.                      35 West Wacker Dr.
Chicago, Illinois 60601                 Chicago, Illinois 60601


/s Linda A. Wawzenski
LINDA A. WAWZENSKI
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
(312) 353-1994

32