# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No: 02 C 3310 |
| | ) | |
| PETER ROGAN, | ) | Judge John W. Darrah |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter comes before the Court for ruling after a bench trial on a civil complaint filed by the Government against Defendant, Peter Rogan, alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, and common-law claims. The Government claims that Rogan individually and in a conspiracy with others violated the FCA by presenting Medicare and Medicaid claims for patients referred to Edgewater Medical Center ("Edgewater") by co-conspirators, Drs. Ravi Barnabas and Andrew Cubria from 1995 to 2000.

The Court has considered the evidence, including the exhibits and the testimony of witnesses, and has further considered the final oral and written arguments, proposed findings of fact and conclusions of law and the authority cited therein submitted by the parties. In evaluating the accuracy and truthfulness of each of the witnesses, the Court considered, among other things: the ability and opportunity the witness had to see, hear, or know the things about which the witness testified; the witness's memory; any interest, bias, or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all the evidence in the case and whether or not and to what extent a witness's testimony was impeached.

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following Findings of Fact and Conclusions of Law based upon consideration of all admissible evidence and the Court's own assessment of the credibility of the witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact. The Decision section of this Opinion and Order, for purposes of clarity, contains some reference to law and facts. To the extent, if any, that any part of the Decision may be considered Findings of Fact or Conclusions of Law, they shall be so deemed.

## FINDINGS OF FACT

*Background*

Rogan has been involved in the field of healthcare and hospital administration for the past 32 years. He has a Master's Degree in Health Administration from St. Louis University and a Ph.D in Hospital and Health Administration from the University of Iowa. Rogan began his career in 1974, working for Ernst & Whitney, a major accounting and consulting firm, where he became a principal. While at Ernst, Rogan did consulting work for various hospitals in the Chicago area, including Northwestern, Children's Memorial, Michael Reese, and Edgewater. In 1983, Rogan became the CEO of St. Anthony's Hospital in Crown Point, Indiana. In 1986, Rogan left St. Anthony's and formed a company called Interhealth. While at Interhealth, Rogan provided consulting services to Edgewater, a teaching hospital located at 5700 North Ashland Avenue in Chicago, Illinois. Edgewater was in financial trouble at this time, and Rogan provided Edgewater consulting services regarding its financial situation.

2

In 1989, Rogan created Edgewater Operating Company ("EOC"); and EOC purchased Edgewater for a million dollars in cash and assumed the stated liabilities.

In 1992, Rogan developed a plan to sell Edgewater to a 501(c)(3) organization, a management company (which would be owned, in part, by Rogan) that would manage and administer Edgewater. Rogan would serve ostensibly as a salaried employee of the management company and would serve as the CEO of Edgewater.

In August 1994, EOC was sold to a 501(c)(3) organization, Northside Operating Company. Northside was created purposely – by its parent company, a California-based company called Permian, whose CEO was Scott Gross – for the purchase of EOC. Rogan and the other shareholders of EOC received $31.1 million from the sale of Edgewater. Of the sale proceeds, $9,268,619 retired various financial obligations. Rogan received $17,371,421 as a shareholder; the remaining shareholders were trusts in the name of Rogan's children, who received $4,099,960. The shareholders also received a subordinated note from Northside worth $4,000,000.

After the sale, Braddock Management, L.P. ("Braddock L.P."), a California-based limited partnership, was created to operate Edgewater. Rogan became an "employee" of Braddock L.P. and the CEO of Northside d/b/a Edgewater, pursuant to management contracts between Braddock L.P. and Northside from 1994-2001.[1] These contracts provided that Braddock L.P. would act as the exclusive manager of the day-to-day operations of the hospital, which included the submission of claims to Medicare and Medicaid for services rendered to patients, and would

---

[1] In March 2000, Braddock L.P. was bought by Bainbridge Management, L.P.

supervise and manage all billings, collections, cost reporting, and other financial matters related to the hospital's operation.

Braddock L.P. was compensated pursuant to the management contracts with Edgewater by a monthly fixed-fee payment and a payment based on a percentage of the hospital's "net patient-service revenue." Net patient-service revenue was tied to the number of patient admissions to Edgewater and was essentially a commission-based payment. There was a cap on the total amount of money that could be paid to the management company. Once the cap was met, the management fees would not increase. The capped fee was reached only in 1995 and 1996.

Rogan had a direct financial interest in maximizing the management fees Braddock L.P. earned from Edgewater as Rogan and his family effectively owned and controlled Braddock L.P. between 1995 and at least March 2000. Rogan's ownership interest was concealed through an elaborate scheme of inter-locking financial entities owned by Rogan, Rogan's children, and other entities owned by Rogan as follows. In 1994, Braddock L.P. was controlled by a general partnership with Waldo Point Management ("Waldo"). Beginning in 1995, Rogan was the president of Waldo Point Management. Rogan also had a special proxy and power of attorney from Waldo Point's sole shareholder, Scott Gross (who was also the CEO of Permian, Northside's parent company), which provided for the effective transfer of control of Braddock L.P to Rogan as of August 17, 1994. Rogan also had an option to purchase all of Waldo's shares from Gross at any time.[2]

---

[2] Effective March 2000, Bainbridge Management, L.P. bought Braddock L.P.'s contract with Edgewater.

4

Bainbridge L.P.'s limited partner was Boulevard Management, L.P. In 1995, Rogan, through Boulevard Management, L.P., another entity owned by Rogan, purchased a 99 percent limited-partnership interest in a company called Braddock Management, Inc. ("Braddock, Inc.") (which should be distinguished from the Braddock Management, *L.P.* that managed Edgewater). In October 1998, Rogan became the president of Braddock, Inc., f/k/a Waldo Point Management and became the general partner of Braddock L.P. Rogan and his children's trusts owned 100 percent of the shares of Braddock, Inc., f/k/a Waldo Point Management. Later, Bainbridge Management, Inc., f/k/a Braddock, Inc., f/k/a Waldo Point Management (as distinct from Bainbridge Management, *L.P.*) became the general partner of Braddock L.P. Rogan was the president, secretary, and director of Bainbridge, Inc. The sole shareholder of Bainbridge, Inc. was the Peter Rogan Revocable Trust, of which Rogan was the trustee. This partnership structure remained in effect until at least 2001.

Rogan's purchase of the limited partnership interest in Braddock, Inc. entitled Rogan and his children to 99 percent of the management fees that Braddock L.P. earned at Edgewater. Between 1995-2000, Braddock L.P.'s distribution to Rogan and his family totaled over $9.5 million. Over the years, Rogan assigned shares of his limited partnership interest in Braddock to trusts located in the United States and Belize for the benefit of his children. As of July 1997, 90 percent of the profits from Braddock L.P. flowed to Rogan's children's domestic and Belizean trusts. As of July 6, 1999, Rogan, his children's domestic and Belizean trusts, and entities owned by Rogan and his family were receiving at least 99 percent of Braddock L.P.'s partnership distributions. An entity owned by Rogan's family, Boulevard Investors of Belize, retained its 99 percent share in Braddock L.P. (later d/b/a Bainbridge L.P.) through at least March 2000.

5

Rogan further concealed his financial interest in Braddock L.P. and Edgewater when he was CEO of Edgewater. On June 11, 1996, Edgewater's auditors, Ernst and Young, sent Rogan a letter, requesting information on Edgewater's relationship with Braddock L.P. The letter asked Rogan to provide written representation of, among other things, Braddock L.P.'s "ultimate ownership." In a July 9, 1996 letter responding to Ernst and Young's query, Rogan represented that "no officer, director or employee of Permian, Vista, or Northside or related entity has any ownership, control, or financial interest in Primus, Braddock, or any entity related to Primus or Braddock."[3] Rogan was the Chief Executive Officer of Northside (d/b/a/ Edgewater) at the time he represented that no "officer" of Northside had any ownership interest in Braddock L.P. In a separate letter sent on July 22, 1996, Rogan represented that information concerning Braddock L.P.'s ultimate ownership/ beneficial interest was "not available." A partnership that Rogan owned and controlled, Boulevard Management, L.P., owned 99 percent of Braddock L.P. at the time Rogan answered the letters.

Further, at trial, Rogan initially testified falsely as to his interest in Braddock L.P., stating that he sold his interest in Braddock L.P. by 1996, for $5,000,000. Rogan also denied knowing anything about the trusts that his personal attorney had set up for Rogan's three children in Belize but later acknowledged that, as of a certain point, 90 percent of Braddock's profits were flowing to his children's domestic and Belizean trusts. Rogan also denied having had the option to

---

[3] In 1990, Scott Gross and another person formed Alpha Hospital Management, a hospital management company. In, 1992, Alpha Hospital Management changed its name to Primus Hospital Management, or Primus.

6

purchase the general-partnership interest (1 percent of the total interest) in Braddock, Inc. from Gross at any time, despite documentary evidence showing that he held that interest.

In addition to the management fees, during his tenure as CEO, Rogan received a salary and bonuses from Braddock L.P., the cost of which were passed through to the hospital. In 1996, Rogan received a salary of $183,336 and a bonus of $100,000 from Braddock L.P. All of Edgewater's senior management were Braddock L.P. employees from approximately 1995 to 2000. Compensation for these Braddock L.P.'s Edgewater-based employees – including salaries, bonuses, and fringe benefits – was reimbursed by Edgewater separately. Therefore, management fees paid to Braddock L.P. were distributed entirely to Braddock L.P.'s owners and were not used to compensate Braddock L.P.'s hospital-based employees.

Rogan served as the CEO of Edgewater from 1994 until the Fall of 1997, when he relinquished the title of CEO;[4] but he actually maintained control of Edgewater thereafter. Rogan had a very "hands-on" approach and was a "micromanager" regarding issues that influenced revenue, particularly recruiting primary care physicians and patient admissions and in finance matters (billing and collecting). Rogan regularly discussed physician-recruiting with Roger Ehmen, the Vice President of Medical Staff Development, Marketing, and Public Relations. Rogan knew that hospital contracts with primary care physicians, such as internists or family practitioners, generally coordinate the overall care of the patient and decide where their patients are to be hospitalized. Rogan believed that a contract between Edgewater and these physicians was an effective tool for recruiting physicians to practice at Edgewater and, hence, increase

---

[4] Joann Skvarek became the CEO in 1997. Skvarek worked for Rogan when he was at Interhealth. Skvarek still works for Rogan.

7

patient admissions and revenue. In contrast to these factors that drove revenue, Rogan had a very "hands-off" approach in matters involving quality assurance and improvement and was not particularly involved in marketing activity.

Ehmen joined Edgewater in 1977 as the Director of Medical Records, became Edgewater's Director of Medical Administration in 1982, and the Vice President of Medical Staff Development, Marketing, and Public Relations in 1989. Ehmen had no authority to execute physician contracts for Edgewater and consulted with Rogan for all major decisions on physician recruiting and proposed physician contracts. Ehmen also had no authority to authorize other hospital payments to physicians. Rogan's signature was required for all hospital disbursements to physicians other than those paid pursuant to a contract with the hospital.

Rogan regularly reviewed physician-patient admission statistics and discussed the statistics with Ehmen. Rogan also received and reviewed with Ehmen weekly "flash" reports that contained information related to the inpatient census, the number of patient admissions on a daily basis.

Henry Zeisel served as Edgewater's controller between 1994 and 1997, became Vice President of Finance in 1997, and Senior Vice President of Finance and Chief Financial Officer at Edgewater in 1998 until 2001. He met with Rogan two to three times per week, and Rogan would regularly have questions about the weekly reports. These reports included admissions information, how much cash Edgewater had received and paid to vendors, and payroll data. Rogan was Zeisel's direct supervisor at all times, and Zeisel reported directly to Rogan on all financial matters from 1994 through at least 2000.

8

In the early 1990s, while at Edgewater, Rogan entered into a conspiracy with Ehmen and Drs. Barnabas, Cubria, and others to provide kickbacks and engage in improper financial relationships in return for patient referrals. This conspiracy, in turn, generated patient admissions, which resulted in substantial profits to Rogan. The conspiracy was evident in the early 1990s, although the Government's claims are based on Medicare and Medicaid claims by Barnabas and Cubria submitted from 1995 to 2000.

## Dr. Ravi Barnabas

Barnabas had completed a residency in internal medicine at Edgewater in 1985 and entered private practice in the late 1980s. By the early 1990s, Barnabas seldom referred patients to Edgewater and referred patients to Methodist Hospital and Illinois Masonic Hospital, both competitors of Edgewater. Ehmen had unsuccessfully tried to recruit Barnabas to Edgewater.

In 1993, Barnabas approached Ehmen and suggested that Ehmen recruit a surgeon named Dr. Antonio Ramos, whose patients Barnabas had been treating at another hospital. Ramos agreed to refer patients to Edgewater but informed Ehmen that he (Ramos) wanted Edgewater to assist with his malpractice premiums, possibly by including Ramos on Edgewater's own insurance policy. Ehmen reported this to Rogan. Ultimately, Rogan agreed to pay Ramos $75,000 per year as a "Hispanic physician liaison" to induce Ramos to refer patients to Edgewater. Prior to creating this position for Ramos, Rogan had never identified or discussed the need for such a position at Edgewater. Ramos immediately began admitting upwards of 20 to 30 patients a month to Edgewater.

In late 1993, Rogan, through Ehmen, agreed to offer Barnabas a contract with Edgewater that would pay him $60,000 annually, purportedly for joining the teaching faculty at Edgewater.

9

The compensation was considerably more than Edgewater paid its teaching faculty, who were generally paid between $2,000 and $3,000 monthly. Barnabas did not want to perform teaching duties. As an alternative, Barnabas suggested a "physician-recruiting" contract for the same $60,000 annual salary. Barnabas had previously had a physician-recruiting contract at Illinois Masonic Hospital, which paid him $25,000 annually. Rogan, through Ehmen, agreed to provide Barnabas with a physician-recruiting contract in November of 1993, which paid Barnabas $60,000 annually. Ehmen mistakenly gave Barnabas a standard Edgewater teaching contract, which Barnabas mistakenly signed. Several weeks later, Barnabas discovered the error and asked Ehmen to correct it; this was not done, and Barnabas continued to be paid under a teaching contract for the entire term of the original contract, from November 1993 through October 1994. On November 1, 1994, Barnabas's "teaching contract" with Edgewater was renewed in a one-paragraph contract addendum that incorporated Barnabas's earlier contract by reference. This renewed contract was presented to Edgewater's Board of Directors in November 1994 as a teaching contract. Barnabas was paid under the renewed teaching contract from November 1, 1994 through October 31, 1995, although Barnabas never taught at Edgewater and was never a part of the teaching faculty. Between November 1, 1993 and October 31, 1995, Barnabas performed some services (an estimated four to five hours per week, but not performed pursuant to a written contract) as a physician recruiter but none related to teaching for Edgewater. Barnabas was paid by Edgewater throughout 1995 until November for teaching services he did not perform. On November 1, 1995, Barnabas entered into a contract with Edgewater that changed his duties to those of physician recruiter. The contract required him to work 600 hours annually on physician-recruiting activities in exchange for annual compensation totaling $60,000

through October 31, 1996. Rogan approved this contract. Barnabas did not work 600 hours, or any significant part thereof, on physician-recruiting activities during the contract period. In November of 1996, Barnabas renewed his physician-recruiting contract with Rogan's approval and signature. The renewed contract ran through the end of June, 1997 and paid compensation of $5,000 per month. The contract required Barnabas to work 33.33 hours per month on physician-recruiting activities. Barnabas did not work the 33.33 hours per month on physician-recruiting activities between November 1, 1996 and June 30, 1997. In July 1997, Barnabas renewed his physician-recruiting contract with Edgewater. The renewed contract paid $36,000 annually for recruiting services and required 30 hours of work on a monthly basis. Barnabas received another contract in July 1997 to serve as the medical director of the "Elderly in Distress" ("EID") program. This contract compensated Barnabas $24,000 annually in exchange for a requirement of 13.33 hours of work on a monthly basis. Barnabas's recruiting contract and the EID contract, when combined, paid Barnabas the same $60,000 annually that he had received under his earlier recruiting and so-called teaching contracts. Rogan intended all of these contracts and payments to Barnabas to induce Barnabas to refer, and reward him for referring patients to Edgewater from 1995 through 1998. Barnabas did not work the requisite number of hours nor materially perform under either his EID or his recruiting contracts, nor did he perform any teaching services during these years. During this period, Rogan never inquired as to whether Barnabas was working the requisite number of hours under his contracts; yet, Rogan regularly discussed Barnabas's patient referrals with Ehmen.

Barnabas stopped practicing at Edgewater in late 1998 and did not renew his contracts with Edgewater; he then stopped referring patients there.

Dr. Sheshiqiri Rao was an anesthesiologist and former family practitioner. In late 1996, Rao asked Barnabas to assist him in obtaining a contract to manage Edgewater's anesthesia services. Anesthesiologists do not usually refer patients to hospitals; however, Rao told both Ehmen and Barnabas that through his relationships with primary care physicians and patient recruiters, Rao could provide patient admissions to Edgewater if he were to be awarded a contract for anesthesia services. Ehmen told this to Rogan.

Rogan met with Rao and Barnabas at a Chicago restaurant. At this meeting, Rao told Rogan that he controlled a substantial base of patients that could be referred to Edgewater if Rao received the anesthesia contract. After this meeting with Rao and Barnabas, Rogan directed Ehmen to obtain a contract with Rao's group.

Edgewater then entered into a contract with Rao's corporation, signed February 28, 1997, but effective April 1, 1997, which stated it was for administering and providing Edgewater's anesthesia services. The contract paid Rao's corporation a total of $15,000 per month; $10,000 of this amount purported to be for Rao's services as the sole provider of Edgewater's anesthesia services, and $5,000 of which ostensibly compensated Rao for administrative responsibilities associated with the provision of anesthesia at Edgewater. Actually, the contract was intended to induce and reward Rao for referring patients to Edgewater.

Beginning in March 1997 and continuing through approximately June 1998, Rao referred patients to Edgewater. Rao had no admitting privileges at Edgewater; therefore, Rao's patients were admitted under Barnabas's name. A code was developed, at Rogan's direction, in order to track these referrals and appeared on Edgewater's daily physician statistics reports after Barnabas's name to designate the patients admitted from Rao's sources and enable Rogan to

12

track these admissions. One of these codes was "Barnabas RKO"; the "RKO" stood for "Rao-Kumar Organization."

Rao told Cubria, a cardiologist who practiced at Edgewater, that Rao was being paid to bring patients to Edgewater. Cubria and Rogan discussed Rao's referrals while referring to a physician statistics sheet that contained the "RKO" code. Cubria served as the cardiac consultant for many of Rao's referrals, and his name often appeared on the physician statistics sheets for Rao's patients, under designations such as "Barnabas/Cubria RKO." During the course of Rao's contract, Rogan directed Ehmen to change RKO to a more generic-sounding code to disguise the purpose of the code. The use of the code "Barnabas APN" began in November 1997 to track Rao's patients.

The volume of Rao's referrals was quite high in the early months of Rao's anesthesia contract and; Rogan knew of and discussed the volume of Rao's referrals with Ehmen and Cubria. If Rao's referral numbers were low in a given month, Rogan would direct Ehmen to talk to Rao and Barnabas and demand that Rao increase his referral volume. Ehmen did this on several occasions.

Rao controlled potential inpatients through his relationships with several patient recruiters and at least one primary care physician, Dr. Kumar Kaliana (Kumar was part of the RKO code discussed above). Rao paid his recruiters and sources of referrals to Edgewater. After Rao began referring patients to Edgewater, Ehmen became aware that Rao was paying Kumar monthly in exchange for Kumar's patient referrals. Ehmen informed Rogan of this fact. Rogan replied, "What Dr. Rao does with his own money is his business." Rogan never informed

anyone, including Edgewater's health law attorney, that Rao was paying Kumar for patient referrals to Edgewater.

At a dinner meeting with Rao, Barnabas, and Rogan, Rao told Rogan that Rao had sources that could supply 30 to 35 patients per month to Edgewater through Edgewater's detoxification program through a company called Florascribe. Rao told Ehmen (who later told Rogan) that Florascribe was owned by Rao's wife. Rogan agreed to a preliminary arrangement with Florascribe, whereby Rao would refer detox patients to Edgewater and Rogan could assess whether the volume of referrals was consistent with Rao's claims. Prior to entering into a contract, Florascribe was paid $14,000 per month during the preliminary trial period, which ran from approximately May 1997 through September 1997. These payments were ostensibly made to compensate Florascribe for "administrative marketing for the detox program." However, Edgewater was, at that time, also paying another company, Special Care, for the same detox marketing services.

Because the trial period was successful in bringing patients to Edgewater, Rogan approved a contract with Florascribe, effective October 1, 1997, ostensibly to provide detox marketing services to Edgewater. However, the amount paid to Rao pursuant to the contract was in excess of the fair market value; and there was no substantial performance by Rao or Florascribe of the contract terms. The payments were made to Rao to induce him to refer patients to Edgewater.

Rogan terminated Florascribe's contract with Edgewater in early 1998 because Rao's detox patient admissions were below expectations. Rogan was also unhappy with the level of admissions resulting from Rao's referrals and directed Edgewater to stop paying Rao under his

14

anesthesia contract in June of 1998. Even though Edgewater was no longer paying Rao the $15,000 per month, Rao was still expected to provide anesthesia services to the hospital, for which Rao could submit professional billings.

## *Dr. Andrew Cubria*

Cubria was a licensed cardiologist who referred patients to Edgewater. In 1979, Cubria was recruited to practice at Edgewater by a fellow Cuban-American physician. Cubria was employed by Edgewater as a staff cardiologist until the mid-1980s. Cubria resigned from his position as Director of Cardiology at Edgewater shortly after Rogan took over the hospital and entered private practice. In the mid-1980s, Cubria began shifting his practice away from Edgewater and to Illinois Masonic Hospital and was performing most of his inpatient work there when Rogan took over Edgewater.

In the early-1990s, Cubria was a member of a professional group, Northside Physicians and Surgeons. Cubria and other members of Northside Physicians and Surgeons had office space scattered around the Edgewater professional building. Northside Physicians and Surgeons approached Rogan about construction so that the member doctors could have their offices in the same suite. The sixth floor of the Edgewater professional building was so constructed to accommodate the group, and the cost of the construction was to be included in the rent paid by the physicians. However, Northside Physicians and Surgeons broke up in late 1993 or early 1994, leaving only Cubria and one other physician in the suite. Rogan told Cubria that Edgewater would waive Cubria's part of the build-out fee if Cubria agreed to keep his patients at Edgewater and refer his patients to Edgewater. Cubria accepted Rogan's offer, and Cubria

15

estimated the value of the build-out at $40,000, less the rent paid at the time of the dissolution of the physicians' group.

In 1995, Cubria did not have a contract for teaching at Edgewater, nor did he do any teaching at Edgewater. Nevertheless, in 1995, Cubria received payments from Edgewater for teaching or for participation in a teaching-service program, including monthly payments in the amount of $3,000, plus a teaching-service bonus, all authorized by Rogan.

Cubria was also awarded a contract to read EKGs. Cubria and other cardiologists were paid between $1,500 and $2,000 per month for reading EKGs. Cubria spoke to Rogan directly about the EKG-reading contracts and informed Rogan that the salary should be raised to $6,000 per month and that, if not, Cubria would move his patients to a different hospital. Rogan approved the increased salary and, in January of 1995, personally signed Cubria's EKG-reading contract in the amount of $6,000 per month, which required 600 hours of work annually of Cubria, for a total payment of $72,000. However, Cubria and the other cardiologists only read EKGs one out of every four weeks, or approximately 13 weeks per year. Cubria read EKGs only approximately one hour per day during the thirteen weeks, or approximately 91 hours per year, an hourly rate of $720 per hour. According to a survey used by Edgewater in 1996, the fair market hourly rate for a physician's services under a hospital contract was between $100 and $150 per hour. Cubria's EKG-reading contract was renewed every year that he was at Edgewater, and remained in place from 1995 to 2000. Neither Rogan nor anyone at his direction inquired of Cubria whether he was actually spending 600 hours per year reading EKGs pursuant to the contracts.

16

Edgewater created a code called Cubria SP to track the number of Spanish-speaking patients that Cubria admitted. The admissions under this and other programs were recorded on a Physician Statistics Report that was distributed monthly to Rogan. Cubria frequently spoke with Rogan about the various codes on the Physician Statistics Report, particularly pointing out his admissions under several of the codes – Cubria SP, Cubria Andrew H, Barnabas/Cubria SP, Ojea/Cubria SP, and Tandeter/Cubria SP – for purposes of expanding Cubria's Hispanic patient admissions. Rogan and Cubria also spoke about the Barnabas/Cubria RKO code; and in those conversations, Rogan knew the patients referred under this code were coming via Rao from Kumar's South Side Clinic.

In 1995, Cubria was considering moving his patients from Edgewater to Illinois Masonic Hospital because, in part, Edgewater was in poor physical condition. Though the catheterization laboratory had been replaced, the new cath lab malfunctioned frequently. To persuade Cubria to keep his practice at Edgewater, Rogan agreed that Edgewater would loan Cubria $84,000 ostensibly for Cubria to hire a Spanish-speaking cardiologist named Dr. Juan Diaz. Cubria negotiated the terms of the loan directly with Rogan, and Ehmen was not involved in these discussions. The terms of the loan required Cubria to hire Diaz by April 27, 1996. However, Cubria never hired Diaz, nor any other Spanish-speaking cardiologist, but continued to receive payments from the loan despite being in default for failing to hire Diaz. Other than the payment for June 1996, the installment payments to Cubria were made. Cubria did not repay the principal and interest in a lump sum by March 31, 1997, as required by a promissory note he executed.

In addition to the $84,000 loan, in 1996, Rogan authorized and signed two additional contracts. Dr. Goldstein, a non-Spanish-speaking cardiologist, eventually joined Cubria's

17

practice. Rogan authorized two contracts to Cubria to offset Goldstein's salary. Cubria and Rogan signed both a teaching contract and a medical-directorship contract, which combined for an annual payment of $72,000 to Cubria. Cubria also continued receiving loan payments during the terms of these two contracts. Cubria and Rogan discussed that the contracts would ensure that Cubria and Goldstein's patients would remain at Edgewater. Cubria did not substantially perform all of the duties required under the medical-directorship contract.

Rogan arranged for and authorized another loan to Cubria in the amount of $150,000 in April 1997. This loan was designed to cover Cubria's attorney's fees relating to Cubria's divorce and Cubria's tax obligations. Sometime thereafter, Cubria and Rogan discussed repayment of both the earlier $84,000 loan and the $150,000 loan. Rogan requested Cubria to pay back approximately half of the total amount. To assist Cubria to repay this amount, Rogan paid $80,000 for a feasibility study for a Spanish Institute of Cardiology. Rogan never asked Cubria the number of hours that the project would take nor required a written contract. One of the primary purposes of the feasibility study was to determine if Edgewater should pay for television advertising of Cubria's practice. Edgewater had previously paid for advertising for Cubria; Cubria wanted Edgewater to pay for more. Ehmen was not involved in the agreement between Rogan and Cubria for the feasibility study.

Cubria had little or no experience in conducting a feasibility study. Most of the work on the project was done by Ehmen and an Edgewater employee named Mary Wilbur. Drafts of the feasibility study were produced; however, those drafts were the result of work performed by them. Cubria was issued the first payment for the feasibility study in the amount of $50,000 on

18

June 13, 1997. Rogan authorized and approved the payment, and another payment of $30,000, despite never inquiring of Cubria how many hours of work he had performed on the project.

Rogan signed and authorized an exclusive option agreement for Edgewater to purchase Cubria's practice in July of 1997 and paid $60,000 for the option. The option was executed after Rogan had been informed by his attorneys that it would be illegal for the hospital to pay for advertising for a physician employed by the hospital. Edgewater ultimately did not purchase Cubria's practice; and Rogan advised Cubria, on or about November 20, 1997, not to sell his practice because that might require detailed accountings of time in ways that Cubria was not accustomed. Later, in 2000, Rogan arranged to pay Cubria $5,000, again ostensibly in connection with the possible purchase of Cubria's practice. Cubria was never requested to repay this $5,000.

Rogan authorized a television advertising program designed to market Cubria and Cubria's practice because Cubria said he would move his patients from Edgewater if television advertising was not provided. The television commercials were aired; and two-thirds featured Cubria's name and face, promoted Cubria's practice, and displayed his office phone number. Later, the advertised telephone number was changed to a Edgewater telephone; and callers would be directed to Cubria's office for cardiac matters. When the phone was not answered at Edgewater, the calls would be transferred directly to Cubria's office.

After Cubria's teaching and medical-directorship contracts ended in January 1998, Rogan then authorized a cardiac-rehabilitation contract for Cubria, effective February 1, 1998, which provided for compensation in the amount of $48,000 per year. The contract required Cubria to work 20 hours per month; Cubria performed the contract duties for only four or five hours per

19

month; and Rogan was aware that Cubria was not performing the hours required under the contract. Ehmen told Rogan that Cubria did not do the amount of work required by the contract.

Cubria and Rogan also negotiated and signed a medical-consulting contract, effective August 1, 1999, by which Braddock L.P. would pay Cubria in the amount of $24,000 per year. Ehmen played no role in the negotiation or execution of the consulting contract. The contract was extended to July 31, 2002, at which time Cubria received another $60,000. In total, Cubria received $84,000 under this consulting contract.

When Cubria learned that he was under investigation by the FBI, he requested money from Rogan for legal fees; Rogan gave $9,800 to a Dr. Lopez, who, in turn gave the money to Cubria.

Cubria received payment from Edgewater for inflated EKG contracts, medical-directorship and consulting contracts, loans "re-paid" to Edgewater through devices like the "feasibility study," and for television advertising programs to publicize Cubria's practice. Rogan intended all of these contracts and payments to Cubria to induce Cubria to refer, and reward him for referring, patients to Edgewater from 1994 through 2000.

*Rogan's Concealment of his Fraudulent Conduct at Edgewater*

In August 1998, after these payments under the anaesthesia contract were terminated, Rao asked Barnabas to set up a meeting with Rogan. Rogan agreed; and a meeting was held with Rao, Barnabas and Rogan in August 1998 in Rogan's office. Rao was cooperating with the Government at the time and wore a recording device to this meeting. Prior to this meeting, several individuals at Edgewater observed unusual behavior by Rao, including Rao's asking

20

people to repeat particular statements and trying to put words into people's mouths during conversations. Before the meeting, Rogan told Ehmen that he felt it was "odd" that Rao and Barnabas were so aggressively trying to meet with him and that he "smelled a rat" and would be on his guard in his meeting with Rao and Barnabas.

At the meeting, Rao explicitly and blatantly discussed his kickbacks to Kumar and threatened Rogan that Kumar may go to the authorities if Rogan didn't provide checks to Rao for Rao to use to pay Kumar. Barnabas was shocked at the blatant manner in which Rao discussed the scheme and made these threats, as illegal payoffs were not typically discussed in such an obvious manner. Rogan responded with self-serving statements denying any involvement in the patient-referral scheme. Rogan was aware, during this meeting, that Rao may have been attempting to obtain incriminating statements. Rogan spoke to Ehmen after the meeting and urged Ehmen to be "very careful" in his dealings with Rao and Barnabas.

In January of 1999, Ehmen learned from his wife that agents from the FBI had visited his home. Ehmen then so advised Rogan, who told Ehmen not to talk to the FBI without first talking to an attorney. Rogan, through Edgewater and/or Braddock L.P., retained the law firm of Jones, Day to represent Ehmen in connection with the FBI investigation.

By 2000, Rogan knew that at least one Edgewater physician had worn a recording device as a part of the FBI investigation. In June 2000, Rogan, Ehmen, and Ben Armstrong, an employee of Grant Hospital, met at Chicago's Ritz-Carlton hotel for a business meeting over lunch. After Armstrong left, Rogan invited Ehmen to take a steam bath with him and observed Ehmen as he undressed to determine if Ehmen was wearing a recording device. During the

21

steam bath, Rogan suggested that Ehmen should accept any blame arising out of an investigation to prevent the people at Edgewater from suffering. Rogan then told Ehmen that he (Rogan) would take care of Ehmen and Ehmen's family forever if Ehmen did not implicate Rogan in the fraud.

Rogan met with Ehmen on numerous other occasions when Rogan would speak about innocuous, ordinary, everyday subjects, while passing Ehmen handwritten notes about the FBI investigation. In the notes, Rogan restated that Ehmen and his family would be taken care of forever if Ehmen would refuse to implicate Rogan and told Ehmen not to discuss this with his attorney. At their last meeting, Rogan passed Ehmen notes in the same manner, directing Ehmen to characterize himself to the Government as a "loose cannon" or "renegade employee," accept full responsibility and say that Rogan had no knowledge of illegal conduct at Edgewater. Rogan retrieved the notes after Ehmen read them. Ehmen was indicted shortly thereafter, in May 2001, in connection with the fraud at Edgewater.

In December 2000, Rogan met with Cubria in Rogan's office and again spoke about innocuous topics, while writing Cubria notes related to the FBI investigation. The first note Rogan wrote said that Cubria needed to hire a criminal lawyer. After reading the note, Cubria asked Rogan, "What are you talking about?" Rogan put his finger to his lips to urge Cubria to be quiet and then pointed around the office, indicating a concern that there might have been recording devices present. Rogan passed several other notes to Cubria in the same manner. One of the notes informed Cubria that both Cubria and the hospital were being investigated by the authorities. Another of Rogan's notes directed Cubria to destroy his computer. A final note urged Cubria not to disclose Rogan's advice and conduct at this meeting to anyone, including

Cubria's lawyer, because Rogan's conduct could be construed as obstruction of justice. After the meeting was over, Cubria and Rogan left the office together. Rogan destroyed the notes that he had passed Cubria by placing them in the shredder located outside of Rogan's office behind his secretary's work station.

Ehmen and Cubria never discussed Rogan's practice of passing written notes regarding the Government investigation of the hospital while speaking about unrelated matters.

In 2000, Rogan was aware that Edgewater had received several federal grand jury subpoenas pursuant to the ongoing federal investigation of Edgewater. Rogan was aware that the subpoenas sought, among other things, information relating to Rogan's compensation from Edgewater. On August 10, 2000, after receiving these subpoenas, Rogan directed a document-destruction service to destroy twenty boxes of documents taken from Braddock L.P.'s offices. Rogan cannot recall whether documents and materials relating to Braddock L.P.'s finances were among the documents destroyed at this time.

*Criminal Convictions Arising Out of Activities at Edgewater*

On May 17, 2001, a federal grand jury indicted Bainbridge Management, L.P. (f/k/a/ Braddock L.P.), Ehmen, Barnabas, Kumar, and Rao for, among other things, "devising and participating in a scheme to defraud health care providers and to obtain money and property by means of false and fraudulent pretenses and to deprive certain individuals of the intangible right of the defendant[s'] honest services in violation of 18 U.S.C. §§ 1341 and 1347." *United States v. Bainbridge Management, et al.*, No. 01 CR 469, (N.D. Ill.). On October 4, 2001, the United States filed a superseding indictment against Bainbridge and added Cubria as a defendant.

On May 24, 2001, Rao pled guilty to Count Fifty-Seven of the indictment, concerning racketeering pursuant to 18 U.S.C. § 1962. On May 24, 2001, Kumar pled guilty to Counts One and Nine of the indictment, concerning the acceptance of kickback payments for the admission of patients and the submission of false claims to Medicare and Medicaid. On October 1, 2001, Ehmen and Barnabas pled guilty to Count Fifty-Seven of the indictment, concerning racketeering pursuant to 18 U.S.C. § 1962. On November 28, 2001, Ehmen was sentenced to 78 months of incarceration. On the same day, Barnabas was sentenced to 52 months of incarceration. On February 8, 2002, Cubria pled guilty to Count Fifty-Seven of the indictment, concerning racketeering pursuant to 18 U.S.C. § 1962. Cubria was sentenced to 151 months of incarceration. On January 15, 2003, Braddock Management L.P. pled guilty to Count One of the Second Superseding Information, concerning healthcare fraud, pursuant to 18 U.S.C. § 1347, and was ordered to pay $2.9 million in restitution.

Edgewater closed its doors and ceased doing business in December 2001.

*Submission of Medicare and Medicaid Claims*

Edgewater treated Medicare and Medicaid patients, and sought and obtained reimbursement from the Medicare and Illinois Medicaid programs. Hospitals, including Edgewater, during the relevant time period, were paid by Medicare on an interim basis for services rendered. To submit claims for specific Medicare patients, the hospital completed and electronically sent form "UB-92" (also known as form "HCFA-1450"). The UB-92 form required each hospital to use a unique provider number, which identified the hospital as the place where services were rendered. The UB-92 form also identified the attending physician by

24

placing the physician's Universal Provider Identification Number (UPIN) in Boxes 82 and 83 of the UB-92 form.[5] The Center for Medicare and Medicaid Services ("CMS") maintained those electronic claims in the National Claims History, the agency's official repository of adjudicated claims.

In addition, CMS required that hospitals, including Edgewater, submit an annual cost report. The cost reports were the final "claim" that a provider submitted to the Medicare program for services rendered to Medicare beneficiaries. After the end of each hospital's fiscal year, the hospital filed its cost report with its designated Medicare fiscal intermediary, stating the amount of reimbursement the provider believed it was due for the year. *See* 42 U.S.C.§ 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Medicare cost reports, including those submitted by Edgewater, contained the following language:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

---

[5] CMS, then called the Health Care Financing Administration ("HCFA"), implemented this provision by requiring hospitals to list the UPIN of the "attending" physician on Form HCFA-1450, which, at the time, was form UB-82. Hospital Manual (CMS-Pub. 10), Transmittal No. 637, May 1, 1992; Home Health Agency Manual (CMS-Pub.11), Transmittal No. 256, September 1, 1992. Providers were instructed to report this information in Boxes 92 and 93 on UB-82. *See, e.g.*, Carrier Medicare Newsletter published by Mutual of Omaha 91-28. Effective October 1, 1993, CMS instituted UB-92 to replace the UB-82. The information in Boxes 92 and 93 on UB-82 was transferred to Boxes 82 and 83 on UB-92. *See* Medicare Claims Processing Manual, Pub. 100-4, Chap. 25, section 60, FL 82-83.

Furthermore, the person filing the report was required to certify on the face of the cost report that:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Medicare relied upon the hospital's cost report to determine whether the provider was entitled to more reimbursement than already received through interim payments or whether the provider was overpaid and was required to reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

When a hospital sought reimbursement for care provided to Medicaid patients, it was required to submit "Hospital Statements of Cost" to the Illinois Medicaid program, often referred to as Medicaid cost reports.

Rogan delegated to Zeisel the task of assembling Edgewater's Medicare cost reports and Medicaid statements of cost between 1995 and 1999. Rogan also delegated to Zeisel, Controller and VP of Finance, the task of signing Edgewater's Medicare cost reports and Medicaid statements of cost for the years ending in 1996, 1997, 1998, and 1999. Rogan delegated to Ken Huff, who served as Senior Vice President of Finance at Edgewater in 1995 and who reported to Rogan, the responsibility for signing Edgewater's Medicare cost report and Medicaid statement of cost for the year ending in 1995. Zeisel briefed Rogan on Medicare cost reports before they were filed, and Rogan was familiar with the procedure and information that was

required on Medicare cost reports for reimbursement. Medicare, on occasion, corresponded directly with Rogan to notify him of certain requirements.

Nancy Bryson reported to Rogan at all relevant times and was in charge of information systems for Edgewater, which followed the following procedures. Edgewater's information systems department maintained claim records for the hospital, and the records were inputted by a hospital employee with knowledge, who had a duty to do so. The claim records were made and kept by the hospital in the ordinary course of business. Bryson electronically submitted Edgewater patient claims to the Medicare program in the form of UB-92s. Edgewater tracked patients by attending physician, using these physician codes. Edgewater assigned specific numeric codes to physicians, including Barnabas and Cubria, when on staff at Edgewater. The UB-92s identified Edgewater by its provider number and identified the attending and operating physician by the physicians's UPIN: Edgewater's provider number was 14-0087; Barnabas's UPIN was C44050; Cubria's UPIN was C39460. Government Exhibit 7 contains all electronic claims submitted by Edgewater for treatment of in-patients whose attending and/or operating physician was Barnabas and/or Cubria between 1995 and 2000. Edgewater's computer system determined the amount of Medicare and Medicaid payments made to Edgewater for patients treated by Barnabas and Cubria, using Edgewater's physician codes.

Between January 1, 1995 and December 31, 2000, Edgewater submitted 1,812 claims where Cubria and/or Barnabas were the attending or operating physician(s) and 5 cost reports to the Medicare program. Edgewater received a total of $14,630,120 in reimbursement from the

Medicare program for the claims where Cubria and/or Barnabas were the attending or operating physician(s).[6]

From 1995 to 1998, Edgewater submitted a total of 522 UB-92s for patients where Barnabas was identified as either the attending or operating physician and received $3,667,545 from Medicare in reimbursement for those patients. Payment from Medicare for each year was as follows:

- 1995: $792,646

- 1996: $1,054,823

- 1997: $1,213,603

- 1998: $606,473

Between 1995 and 2000, Edgewater submitted a total of 1,290 UB-92s for patients where Cubria was identified as either the attending or operating physician and received $10,962,575 from Medicare in reimbursement for those patients.[7] Payment from Medicare for each year was as follows:

---

[6] Between January 1, 1995 and September 29, 1999, Edgewater submitted 974 claims to the Medicare program where Cubria was the attending or operating physician and 523 claims where Barnabas was the attending or operating physician. Edgewater also submitted four cost reports to the Medicare program between January 1, 1995 and September 29, 1999. Between September 30, 1999 and December 31, 2000, Edgewater submitted 316 claims to the Medicaid program where Cubria was the attending or operating physician. Edgewater also submitted one cost report to the Medicare program in this time frame.

[7] This figure includes payment for one claim in 1999 in the amount of $7,599 that is attributed erroneously to Barnabas on Government Exhibit 7D because Cubria was the operating physician for that procedure.

- 1995: $1,369,92

- 1996: $1,550,090

- 1997: $1,382,143

- 1998: $2,121,776

- 1999: $2,164,968[8]

- 2000: $2,373,678

Between January 1, 1995 and December 31, 2000, Edgewater also submitted claims to and received reimbursement from the Medicaid program for patients treated at Edgewater by Barnabas and Cubria. Edgewater also submitted five cost reports to the Medicaid program during this time period. Between 1995 and 2000, Edgewater received a total of $4,469,115 in reimbursement from Medicaid for patients treated by Barnabas or Cubria.[9] Between 1995 and 1998, Edgewater received a total of $602,314 from Medicaid in reimbursement for patients treated by Barnabas. The reimbursement from Medicaid for each year for patients treated by Barnabas at Edgewater was as follows:

- 1995: $136,110

- 1996: $96,793

- 1997: $145,443

---

[8] As noted above, this includes payment for one claim in 1999 in the amount of $7,599 that is attributed to Barnabas on Government Exhibit 7D.

[9] The United States reimbursed the State of Illinois for 50 percent of Illinois' Medicaid costs. 42 U.S.C. § 1396d(b). Therefore, the federal share of the reimbursement Edgewater received from Medicaid for patients treated by Barnabas and/or Cubria was $2,234,557.50.

- 1998: $223,968

Between 1995 and 2000, Edgewater received a total of $3,866,801 from Medicaid in reimbursement for patients treated by Cubria. The reimbursement from Medicaid for each year for patients treated by Cubria was as follows:

- 1995: $1,185,722

- 1996: $471,513

- 1997: $448,779

- 1998: $676,507

- 1999: $569,199

- 2000: $515,081

## CONCLUSIONS OF LAW

Jurisdiction over this action is conferred upon this Court by 31 U.S.C. §§3729(e), 3732(a) and 28 U.S.C. §§ 1331 and 1345; and venue is proper under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).

### *Stark Statute*

Enacted as amendments to the Social Security Act, the Stark Statute, 42 U.S.C. § 1395nn, prohibits, *inter alia,* a hospital from submitting Medicare claims for payment based on patient referrals from physicians having a prohibited "financial relationship" (as defined in the statute) with the hospital.

The Stark Statute establishes the clear rule that the United States will not pay for items or services ordered by physicians who have improper financial relationships with a hospital. Violation of the Stark Statute may also subject the billing entity to exclusion from participation in federal healthcare programs and various financial penalties. *See* 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204. In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services, including inpatient and outpatient hospital services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. As of January 1, 1995, Stark II applied to patient referrals for designated health services by physicians with a prohibited financial relationship with a hospital. *See* 42 U.S.C. § 1395nn(h)(6). Stark II does not apply to any services performed prior to January 1, 1995, except for clinical laboratory services as provided in Stark I. Omnibus Budget Reconciliation Act of 1989, P.L. 103-66, § 13562.

CMS is responsible for the interpretation of the Stark Statute. 42 U.S.C. § 1395nn(g)(6). CMS promulgated Stark regulations in stages. Final regulations for Phase I were published in 2001, effective January 4, 2002. 66 Fed. Reg. 865 (Jan. 4, 2001). The Phase II final regulations were published on March 26, 2004, effective July 26, 2004. 69 Fed. Reg. 16054 (March 26, 2004). The regulations for Phase III have not yet been published.

31

The Stark regulations in effect after 2000 cannot be applied retroactively. *Jahn v. 1-800-Flowers.Com, Inc.,* 284 F.3d 807, 810 (7th Cir. 2002) ("Federal regulations do not, indeed cannot, apply retroactively unless Congress has authorized that step explicitly."); 42 U.S.C. 1395hh(e)(A)&(C) (providing that generally, "substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability under [Stark] shall not be applied (by extrapolation or otherwise) retroactively to items and services furnished before the effective date of the change . . . and [n]o action shall be taken against a provider of services or supplier with respect to noncompliance with such a substantive change for items and services furnished before the effective date of such a change.").

In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

In addition to prohibiting the hospital from submitting claims under these circumstances, the Stark Statute also prohibits payment by the Medicare program of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. § 1395nn(g)(1).

The Stark Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn(h)(5)(A). The accompanying regulations interpreting the statute also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

The Stark Statute also broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. In order to avoid the referral and billing prohibitions in the statute, a hospital's financial relationship with a physician must fall into one of the exceptions. However, in order for compensation paid to a

33

referring physician serving as a hospital consultant to fall within an exception to the statute during the time period at issue, the contract must:

(1) be in writing and signed by the parties;

(2) be for a term of at least a year:

(3) specify the services covered, cover all the services to be provided by the physician, with the aggregate of such services reasonable and necessary for the legitimate business purposes of the hospital; and

(4) set the payment for contract services in advance, consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other business generated between the parties.

42 U.S.C. § 1395nn(e)(3).

Another statutory exception protects some remuneration unrelated to the provision of designated health services. 42 U.S.C. § 1395nn(e)(4). The exception provides that "remuneration which is provided by a hospital to a physician" will not be considered a compensation arrangement "if such remuneration does not relate to the provision of designated health services." 42 U.S.C. § 1395nn(e)(4).[10]

---

[10] Rogan asserts that the Stark Statute exception for remuneration "unrelated to the provision of designated health services," 42 U.S.C. § 1395nn(e)(4), obviates liability for many of Edgewater's actions. Rogan argues that until accompanying regulations for Stark II were issued in 2004, the exception for remuneration "unrelated to the provision of designated health services" allowed physician loans, a lease offered by a hospital to a physician, physician recruitment agreements, medical directorships and remuneration provided to a physician for advertisements.

However, the Stark Statute, interpreted as Rogan argues, would fail to regulate the very abuses the statute was passed to prevent; hospitals could provide referring physicians with any sort of compensation they wished – golf club memberships, vacations, airplane tickets, etc. – and argue that because the compensation arrangement did not facially "relate" to the provision of designated health services, it fell within the exception to the Stark Statute. This would be contrary to the

Because there are no applicable final regulations during the period 1995 through 2000, the statutory definition of "fair market value" is the applicable definition. The Stark Statute defines "fair market value" as "the value in arms length transactions, consistent with the general market value . . . ." 42 U.S.C. § 1395nn(h)(3).

If a hospital submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn expressly requires that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

The "attending/operating" physician identified in Boxes 82 and 83 of Form UB-92 qualifies as a referring physician as that term is defined by the Stark Statute.[11] The Stark Statute defines "referral" by a physician in this context to be "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. §1395nn (h)(5)(A). For inpatient claims, the Medicare Hospital Manual, published by CMS, instructs hospitals to put in Box 82 the UPIN of "the clinician primarily responsible for the care

---

manifest purpose of the statute.

[11] Stark I required providers to submit information with claims that would identify "referring" physicians. Pub. L. 101-239, § 6304 (b) (codified at 42 U.S.C. § 1395*l* (q)). CMS, then HCFA, implemented this provision by requiring hospitals to list the UPIN of the "attending" physician on Form HCFA-1450, which at the time was form UB-82. Hospital Manual (CMS-Pub. 10), Transmittal No. 637, May 1, 1992; Home Health Agency Manual (CMS-Pub.11), Transmittal No. 256, September 1, 1992. Providers were instructed to report this information in Boxes 92 and 93 on UB-82. *See, e.g.,* Carrier Medicare Newsletter published by Mutual of Omaha 91-28. Effective October 1, 1993, CMS instituted UB-92 to replace the UB-82. The information in Boxes 92 and 93 on UB-82 was transferred to Boxes 82 and 83 on UB-92. *See* Medicare Claims Processing Manual, Pub. 100-4, Chap. 25, section 60, FL 82-83. Obviously, given the broad statutory and regulatory definition of referral, physicians not listed as either the attending or operating physician may also qualify as one of several "referring physicians."

of the patient from the beginning of the hospital episode." Hospital Manual, § 460, FL 82. In addition, the hospital must put in Box 83 the UPIN of the physician who performed the principal procedure. Hospital Manual, § 460, FL 83. These manual provisions were adopted to implement Congress's requirement that the identification number of referring physicians be reported with claims made to Medicare. Hospital Manual, Transmittal No. 637, May 1, 1992.

*Anti-Kickback Statute*

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from offering, making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the Medicare and Medicaid programs:

> (b) Illegal remuneration
>
>         \*   \*   \*
>
> > (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
> >
> > > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> > >
> > > (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
> >
> > shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare and Medicaid programs. Violation of the statute can also subject the perpetrator to exclusion from participation in federal healthcare programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

A violation of the Anti-Kickback Statute may occur where payments for the exercise of decisions to refer increase the legitimate costs of the transaction. *United States v. Hancock*, 604 F.2d 999,1001-02 (7th Cir. 1979) (reasoning that "[t]he potential for increased costs to the Medicare-Medicaid system and misapplication of federal funds is plain where payments for the exercise of such judgments are added to the legitimate costs of the transaction" and holding that there was a violation of the Anti-Kickback Statute where "handling fees" were paid to doctors by laboratory testing company were disguised bribes for referrals).

Payments to physicians in return for the physicians' promises to send patients to a particular facility qualify as kickbacks. *Hancock*, 604 F.2d at 1002 ("the defendants were able to open up or control the payment of federal funds to Chem-Tech by sending Medicare or Medicaid patients tissue specimens to Chem-Tech . . . ."). However, a hope, expectation or belief that referrals may ensue from remuneration for legitimate services is not a violation of the Anti-Kickback Statute. *United States v. McClatchey*, 217 F.3d 823, 834-35 (10th Cir. 2000).

The term "refer," as used in the Anti-Kickback Statute, is not limited to the physician who formally authorizes a particular service. *United States v. Polin*, 194 F.3d 863, 866-67 (7th

Cir. 1999) ("*Polin*")("refer" and "recommend," as used in the Anti-Kickback Statute, may apply to physicians or others who refer, recommend, turn over, select or give business to a particular recipient).

The United States Department of Health and Human Services ("HHS") has promulgated regulations specifying those payment practices that will <u>not</u> be subject to criminal prosecution or provide a basis for administrative exclusion. Known as the "Safe Harbor" regulations, 42 C.F.R. § 1001.952, the Safe Harbor lists various circumstances under which a financial relationship between a provider and a referral source would not give rise to liability under the Anti-Kickback Statute. Payments to a physician under a personal service agreement must meet <u>all</u> of the following requirements in order to qualify for the Safe Harbor during the time period in question, 42 C.F.R. § 1001.952(d) (1991):

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program.

(6) The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

42 C.F.R. § 1001.952(d) (1991).

The regulations were amended in November 1999, primarily to add the seventh requirement set forth below:

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program.

(6) The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d) (2000).

The finder of fact may infer that payments were intended to be kickbacks based on testimony that the recipient of the payments "was grossly overpaid . . . for any legitimate professional services he may have rendered." *United States v. Norton*, 2000 WL 33281703 *4 (W.D. Va. Nov. 14, 2000).

Once the United States has demonstrated proof of each element of a violation of the Anti-Kickback and/or Stark Statutes, the burden shifts to the defendant to establish that his conduct was protected by a safe harbor or exception; the United States need not prove, as an element of its case, that defendant's conduct does not fit within a safe harbor or exception. *United States v. Shaw*, 106 F. Supp. 2d 103, 122 (D. Mass. 2000).

## *False Claims Act*

This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), and the common law. Section 3729 of the FCA imposes liability on any person or entity who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or]

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; . . . .

31 U.S.C. § 3729(a)(1)-(3).

United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.[12] 31 U.S.C. § 3731(c).

A claim is broadly defined under the FCA as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient." 31 U.S.C. § 3729(c).

In order for the United States to recover from a defendant under Section 3729 (a)(1) or (a)(2) of the FCA , it must prove the following three elements: (1) that the defendant caused to be presented to the United States a false *or* fraudulent claim for payment or that the defendant made, used, or caused another to make or use a false statement or document; (2) that the defendant did so for the purpose of obtaining payment from the government or approval of a claim against the government; and (3) that the defendant knowingly presented a claim that was false or fraudulent. *See* 31 U.S.C. § 3729; *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (*"City of Green Bay"*).

The FCA defines "knowing" and "knowingly" to mean that a person, with respect to information: has actual knowledge of the information; or acts in deliberate ignorance of the truth

---

[12] Curiously, Rogan cites *United States ex rel. Sharp v. Consol. Med. Transp. Inc.,* No. 96-C6502, 2001 WL 1035720 (N.D. Ill. 2001), for the proposition that the United States must prove every element of an Anti-Kickback Statute violation in this FCA case "beyond a reasonable doubt," as the Anti-Kickback Statute is a criminal statute. Rogan confuses the question of an ultimate burden of proof with the degree of intent necessary to sustain a violation of the Anti-Kickback Statute. *Sharp* merely holds that the government must demonstrate "criminal intent," i.e., a knowing violation of the Anti-Kickback Statute, if it is to use the Anti-Kickback Statute as a predicate statute for an FCA violation. *Sharp*, 2001 WL 1035720 at *10. The criminality of predicate offenses in an underlying civil statute, such as the RICO Act, does not mandate application of a higher burden of proof in a civil case. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 491 (1985) ("In a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard.").

or falsity of the information; or acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b).

"The knowledge that something illegal may have been in the offing is not enough to prove the government's case. The constructive knowledge amendment to the False Claims Act applies only to the information submitted. *See* 31 U.S.C.A. § 3729(b). It does not eliminate the need under subsection (a)(1) for some action by the defendant whereby the claim is presented or caused to be presented." *United States v. Murphy*, 937 F.2d 1032, 1038 -1039 (6th Cir. 1991).

The 1986 Amendments to the FCA, which added the scienter requirement, were not intended to create a burdensome obligation. Rather, the appropriate test is whether the defendant's actions were "reasonable and prudent under the circumstances." S. Rep. No. 99-345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5161, 5286.

The government must demonstrate that the underlying violation is material. To prove materiality, the government must prove that it would not have paid that claim for reimbursement had it known about the underlying violation of the law. *United States ex rel. Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-33 (7th Cir. 1999) (an FCA action requires proof that the underlying action "was material to the United States' buying position."). *See also United States ex rel Bidani v. Lewis,* 264 F. Supp. 2d 612, 615 (N.D. Ill. 2003).

Falsely certifying compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and Stark Statute, 42 U.S.C. § 1395nn, in a Medicare cost report is actionable under the FCA. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,125 F.3d 899, 902 (5th Cir. 1997) ("*Columbia/HCA*"); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245

42

(3d Cir. 2004)("*Zimmer*"); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612 (N.D. Ill. 2003);

False claims to Medicare, including Medicare cost reports and UB-92s (also known as form "HCFA-1450"), are actionable under the civil FCA. *Columbia/HCA*, 125 F.3d 899 (claim that hospital falsely certified compliance with the Stark Statute in its cost report was actionable under the FCA); *United States v. Medco Physicians Unlimited*, 2001 W.L. 293110 (N.D. Ill. Mar. 26, 2001) (where provider included costs on cost report that provider knew were unallowable, claim was actionable under the FCA). The submission of UB-92s in violation of the Stark Statute constitutes a violation of the FCA. *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 238 F. Supp.2d 258, 266 (D.D.C. 2002) ("The Stark laws . . . specifically state that compliance is required in order to receive Medicare reimbursement."). Likewise, compliance with the Anti-Kickback Statute is a condition of payment by the Medicaid program. 42 U.S.C. § 1320a-7b(b); *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp.2d 28, 32 (D.D.C. 2003).

Medicaid claims submitted to a state are also "claims" to the federal government under the FCA. *United States ex rel. Tyson v. Amerigroup Ill., Inc., et al.*, 2005 WL 2667207 (N.D. Ill. Oct. 17, 2005).

Even in the absence of an express certification of compliance, the knowing submission of claims by a person who has violated a statute or regulation that contains, on its face, a direct nexus to the government's payment decision is also actionable under the FCA. *Zimmer*, 386 F.3d 235 at 244.

Under Section 3729(a)(3) of the FCA, the conspiracy provision, the United States must

prove by a preponderance of the evidence: (1) An agreement, combination, or conspiracy[13] to

[13] At trial, the Court, in ruling on Rogan's objection to the admission of certain out-of-court statements, made a finding by a preponderance of the evidence, for evidentiary purposes under Federal Rules of Evidence 801(d)(2)(E) and 104, that a conspiracy existed of which Rogan was a member and that the out-of-court statements were made during and in the furtherance of the conspiracy. Pursuant to Federal Rule of Evidence 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), the Court may admit co-conspirators' statements at the trial of a defendant. The Defendant, in his post-trial briefs, asks the Court to reconsider this finding.

A "statement" is not hearsay if it "is offered against a party" and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Under well-established case law, co-conspirators' statements are admissible if the government establishes three elements by a preponderance of the evidence: (1) that a conspiracy or joint venture existed; (2) that the defendant and the person making the statement were members of the conspiracy or joint venture; and (3) that the statement was made during the course of and in furtherance of the conspiracy or joint venture. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987) ("when the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence."). For a statement to be "in furtherance" of the conspiracy, there must be a reasonable basis from which to conclude that it furthered the conspiracy. *United States v. Shoffner*, 826 F.2d 619, 628; *United States v. Mackey*, 571 F.2d 376, 383 (7th Cir. 1978) ("*Mackey*"). A statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. The statement need not have been made exclusively, or even primarily, to further the conspiracy in order to be admissible. *Shoffner*, 826 F.2d at 628. Statements made to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy. *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991).

The Seventh Circuit has upheld the admission of a wide variety of co-conspirators statements, including: updates on a conspiracy's progress, *United States v. Potts*, 840 F.2d 368, 371; conversations concerning planning or review of co-conspirators' exploits, *United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985); assurances that a co-conspirator can be trusted or relied upon to perform his role, *United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir. 1986); statements that are "part of the information flow between conspirators intended to help each perform his role," *United States v. Van Daal Wyk*, 840 F.2d at 499; statements made to recruit potential members of the conspiracy, *Godinez*, 110 F.3d at 454; statements intended to reassure the listener regarding the progress or stability of the conspiracy, *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990); statements designed to conceal a conspiracy where ongoing concealment is one of its purposes, *Mackey*, 571 F.2d at 383. It is immaterial that statements otherwise "in furtherance" were made to a government witness/informer or agent. *United States v. Mealy*, 851 F.2d 890, 901 (7th Cir. 1988).

In *Santiago*, the Seventh Circuit Court of Appeals set the applicable test: "If it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made and that the statement was in furtherance of the conspiracy, the hearsay is

defraud the Government by getting a false or fraudulent claim allowed or paid; and (2) the defendant did so for the purpose of obtaining or aiding to obtain payment from the government or approval of a claim against the government. 31 U.S.C. § 3729; *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943).

"'[G]eneral civil conspiracy principles apply" to FCA conspiracy claims under 31 U.S.C. § 3729(a)(3). *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999). The essence of a civil conspiracy is as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991).

A defendant's membership in the conspiracy may be proven by either direct or circumstantial evidence. "Because of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendant's participation can usually be established only by circumstantial evidence." *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983).

The Court may consider the conduct, knowledge, and statements of the defendant in establishing his participation in the conspiracy. A single act or conversation can "suffice to

---

admissible." *Santiago*, 582 F.2d at 1134. The Court ruled at trial, and now persists in its ruling, the statements were admissible. After considering all of the evidence presented at trial, Rogan's motion to reconsider and bar these statements is denied.

connect the defendant to the conspiracy if that act leads to the reasonable inference of intent to participate in an unlawful enterprise." *United States v. Baskes*, 687 F.2d 165, 169 (7th Cir. 1981).

A defendant joins a conspiracy if he agrees with a conspirator to participate in the project or enterprise that is the object of a scheme involving others and knowingly acts in furtherance of that object; it is immaterial whether the conspirator knew, met with, or agreed with every co-conspirator. *United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985).

It does not matter that the conspirators performed different functions so long as they carried out one or more of the objectives of the conspiracy. *United States v. Percival*, 756 F.2d 600, 607 (7th Cir. 1985).

The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Liefer*, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); *United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985). A defendant may also be found liable for conspiracy even if he joined or terminated his relationship with core conspirators at different times. *United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986); *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985).

Even if a defendant is not an "agreeing" member of the conspiracy, he may be found liable if he knew of the conspiracy's existence at the time of his acts and his acts knowingly aided and abetted the business of the conspiracy. *United States v. Kasvin*, 757 F.2d 887, 890-91 (7th Cir. 1985); *United States v. Galiffa*, 734 F.2d 306, 309-11 (7th Cir. 1984).

46

Under Section 3729(a) of the FCA, a person is liable for civil penalties of "not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).[14] The district court assesses the penalties and applies the treble damages multiplier. *Cook County, Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 123 S. Ct. 1239, 1247 (2003).

The measure of damages the United States is entitled to recover under the FCA is the amount of money the government paid out by reason of the false claims over and above what it would have paid out if the claims had not been false or fraudulent. *Marcus*, 317 U.S. at 543-545; *United States v. Neifert-White*, 390 U.S. at 232.

The government is allowed to recover three times the amount of its damages. 31 U.S.C. § 3729(a). "FCA damages 'typically are liberally calculated to ensure that they afford the government complete indemnity for the injuries done it.'" *United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 646 (6th Cir. 2002) (quoting *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998)). The computation of damages does not have to be done with mathematical precision but, rather, may be based upon a reasonable estimate of the loss.

The government is entitled to recover a civil penalty for each false claim. Each knowing submission of a false or fraudulent claim is a separate violation of the False Claims Act. 31 U.S.C. § 3729(a)(2). Thus, the number of violations of the False Claims Act depends on the

---

[14] False claims submitted after September 29, 1999 incur a penalty of between $5,500 and $11,000 per claim. 28 C.F.R. § 85. The permissible penalty for claims submitted on or before September 29, 1999 is between $5,000 and $10,000 per false claim. (*See* footnote 6, *supra*).

47

number of false or fraudulent claims or other requests for payments that defendant caused to be submitted. A penalty is assessed per false claim. *See United States v. Bornstein*, 423 U.S. 303, 313 (1976); *United States v. Killough*, 848 F.2d 1523, 1533 (11th Cir. 1988) (holding that each separate fraudulent submission by a defendant demanding payment by the government is a "claim" within the meaning of the FCA).

The penalty is mandatory. *See United States v. Hughes*, 585 F.2d 284, 286 (7th Cir. 1978); *Killough*, 848 F.2d at 1533-34. As the legislative history to the 1986 Amendments to the FCA explains:

> The imposition of this forfeiture is automatic and mandatory for each claim which is found to be false. The United States is entitled to recover such forfeiture solely upon proof that false claims were made, without proof of any damages. . . . A forfeiture may be recovered from one who submits a false claim even though no payments were made on the claim.

S. Rep. No. 345, 99th Cong., 2d Sess. at 8 (July 28, 1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273 (internal citation omitted). The United States does not need to prove actual damages in order to recover these statutory penalties. The United States may recover penalties upon a showing that the claims were false, even if no damage is proved. *Varljen v. Cleveland Gear Co., Inc.*, 250 F.3d 426, 429 (6th Cir. 2001) ("recovery under the FCA is not dependent upon the Government's sustaining monetary damages"); *see also United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) ("No damages need be shown in order to recover the penalty") (citing *Rex Trailer Co. v. United States*, 350 U.S. 148, 153 n.5 (1956)).

## Common Law Claims

The Government also has asserted common law claims for fraud, unjust enrichment, and payment under mistake of fact. *See, e.g., United States v. G & H Mach.,* 92 F.R.D. 465 (S.D. Ill. 1981) (Government suit under the FCA, and for relief in equity for unjust enrichment, monies paid under mistake of fact, and for breach of contract). Because the assertion of these common-law claims involves rights of the United States under a nationwide federal program, federal common law governs these claims. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726 (1979); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366-67 (1943).

The elements of common law fraud are: "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance of the truth of the statements, and (5) damage to the other party resulting from such reliance." *Indemnified Capital Invs., SA. v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1412 (7th Cir. 1993) (citation omitted). Under common law, the United States has a right to recover funds lost through the erroneous acts of its agents. *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970) ("If the government made these payments under an erroneous belief which was material to the decision to pay, it is entitled to recover the payments."); *United States v. Wurts*, 303 U.S. 414 (1938); *United States v. Borin*, 209 F.2d 145, 148 (5th Cir.). Alternative common-law theories of recovery have been recognized by this court in other cases involving FCA violations. *See, e.g., United States v. A and C Invs., Inc.*, 513 F. Supp. 589 (N.D. Ill. 1981) (the United States clearly has a federal right to recover funds wrongfully or illegally paid).

The equitable theory of unjust enrichment allows restitution where "the person sought to be charged is in possession of money or property which in good conscience he should not retain, but should deliver to another . . . ." *Matarese v. Moore-McCormack Lines*, 158 F.2d 631, 634 (2d Cir. 1946); *see, e.g., G & H Mach.*, 92 F.R.D. 465; *United States v. Balin*, 1993 U.S. Dist. LEXIS 2969 (N.D. Ill. Mar. 9, 1993).

Under these alternative claims, a defendant is liable for damages plus interest.

## DECISION

### *False Claims Act*

To prove liability under Sections 3729(a)(1)-(2) of the FCA, the Government must prove three elements: (1) that Rogan caused to be presented to the United States a false or fraudulent claim for payment; (2) that Rogan caused the presentment for the purpose of obtaining payment from the Government; and, (3) that Rogan knew that the claim was false or fraudulent. 31 U.S.C. § 3729(a)(1)-(2). The evidence at trial demonstrated that Peter Rogan knowingly and for the purpose of obtaining reimbursement from the Government caused Edgewater to submit numerous false claims in the form of interim claims for reimbursement submitted to the Medicare program on UB-92s for services provided to patients of Barnabas and Cubria; CMS Form 2252s, or "cost reports"; and Medicaid cost reports to the federal Medicare program and the Illinois Medicaid program, between 1995 and 2000 in violation of 31 U.S.C. § 3729(a)(1)-(2). Each of these claims was false because they falsely certified that Edgewater was in compliance with the Anti-Kickback and/or Stark Statutes. The evidence also proved that Rogan, in violation of Section (a)(3) of the FCA, conspired with Ehmen, Barnabas, Cubria, and Rao to

50

engage in a scheme designed to benefit Edgewater, Rogan, and the physicians themselves through payments to the physicians for patient referrals to Edgewater in violation of the Anti-Kickback and/or Stark Statutes and, therefore, in violation of 31 U.S.C. § 3729(a)(3).

### (1) Rogan Caused False Claims to be Submitted to the United States

From 1995 to 2000, Rogan caused Edgewater to submit claims for reimbursement from Medicare and Medicaid for services to patients referred to Edgewater by Barnabas and Cubria. These claims were required to be in compliance with the Stark and Anti-Kickback Statutes; they were not and were, therefore, false. These were prepared and submitted by the hospital's financial officers, Zeisel and others, who were directed and controlled by Rogan. Rogan was CEO until 1997 and effectively controlled Edgewater thereafter and, at all relevant times, effectively owned Braddock L.P., which had management responsibilities for the day-to-day operation of Edgewater, including the preparation and submission of these Medicare and Medicaid claims. Zeisel, Huff, and Bryson had no knowledge that the claims were fraudulent and would have not submitted them had they known that Rogan caused them to be false.

The claims were false because the Stark Statute provides the United States will not pay for claims submitted by Edgewater for services to patients referred by a physician, such as Barnabas or Cubria, with whom the hospital has a prohibited financial relationship, i.e., the hospital has paid any "compensation" to a referring physician. 42 U.S.C. § 1395nn. Under Stark, a referring physician is broadly defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." 42 C.F.R § 411.351. This includes an "operating or attending

physician" as designated on the UB-92 and submitted to Medicare and Medicaid. 42 U.S.C. § 1395*l* (q). The Anti-Kickback Statute prohibits payment or remuneration of any kind if one or any purpose for that remuneration was to induce referrals, 42 U.S.C. § 1320a-7b(b)(2)(A), and includes any person who recommends or arranges for federally funded medical services. *Polin*, 194 F.3d at 866-67.

The dealings between Rogan, Barnabas, Cubria, and others violated both the Stark and the Anti-Kickback Statutes in myriad ways that do not satisfy the "Safe Harbor" exception to the Anti-Kickback Statute and similar protections codified at 42 C.F.R. § 1001.952(d) (1991) of the Stark Statute.[15] These prohibited relationships between Edgewater and Barnabas, Cubria, and Rao have been established by overwhelming evidence. From 1993 and continuing through 1998, Rogan arranged for Edgewater to enter into a series of teaching and physician-recruiting contracts with Barnabas, the purpose of which was to induce Barnabas to refer his patients for admission to Edgewater and reward Barnabas for doing so. This, in turn, generated substantial reimbursement from the Medicaid and Medicare programs. Barnabas was paid $60,000 per year through these contracts and was not expected to (nor did he) substantially fulfill the obligations under the contracts. For example, Barnabas's contract that extended into 1995 was for teaching; but Barnabas never taught at Edgewater. Likewise, Barnabas did not fulfill the requisite hours nor substantially perform the contract awarded to him purportedly in connection with the Elderly-

---

[15] Rogan argues that he cannot be liable under Stark because it applies to physicians and healthcare entities only. Thus, according to Rogan, any alleged false claim against Rogan cannot stand. However, Rogan entirely misses the point. What is at issue here is whether Rogan violated the FCA, not the Stark Statute. If Rogan was aware that the Medicare and Medicaid claims were submitted by Edgewater in violation of the Stark Statute (which he was), liability, as discussed below, under the FCA attaches. It is irrelevant whether Rogan, personally, violated the Stark Statute.

in-Distress (or EID) program. The subsequent contracts with Barnabas provided for payments for services that were never substantially performed and compensated Barnabas grossly above the fair market value for these services that he did perform, thus failing to satisfy the exception to either the Stark or Anti-Kickback Statutes.

From 1995 and continuing to 2000, Rogan entered into various illegal arrangements with Cubria to induce patient referrals. Rogan increased Cubria's EKG-reading contract to $6,000, which far exceeded the fair market value. Rogan partially forgave debt for Cubria's office construction. Rogan approved payments to Cubria in 1995 without a written contract, which were ostensibly for teaching, although Cubria never taught at Edgewater. In 1996, Rogan loaned Cubria $84,000 and awarded him two service contracts to help Cubria hire a Spanish-speaking physician for Cubria's own private practice, although a Spanish-speaking physician was never hired. In 1997, Rogan, through Edgewater, loaned Cubria $150,000. When Cubria explained that he would have difficulty paying back even half of what he owed Edgewater at that point, Rogan and Cubria entered into another contract for $80,000 for work on a feasibility study of advertising for Cubria's private practice. Yet, Ehmen and Wilbur, not Cubria, did most of the work on the project. When Rogan was advised that it would be improper to pay for advertising to benefit Cubria unless Edgewater purchased Cubria's practice, Rogan paid Cubria another $60,000 for the option to purchase his practice, instead. Although negotiations fell apart with respect to the purchase of the practice, Edgewater still funded the advertising, which prominently featured Cubria and, for a time, listed his private practice telephone number. The ads drew patients to Cubria's practice; patients who were, in turn, referred to Edgewater for treatment. In 1998, Rogan approved awarding Cubria a cardiac-rehabilitation directorship contract for $48,000

53

per year. This amount exceeded the fair market value for the services described in the contract and far exceeded the fair market value for services that Cubria actually provided. Finally, Rogan arranged for another physician, Lopez, to give $9,800 to Cubria for anticipated legal fees in connection with the FBI investigation. The dealings with Cubria violated both the Stark and Anti-Kickback Statutes and are not saved by the exceptions to either statute.

Edgewater's relationship with Rao through Barnabas also violated the Anti-Kickback Statute. In 1997, Rogan caused Edgewater to make a series of payments to, and ultimately enter a contract with, Rao ostensibly to manage Edgewater's anesthesia services and, later, its detox program. The purpose of these payments was to induce Rao to refer patients for admission to Edgewater and reward him accordingly through payments to an entity involving his wife. Rao's referral patients were admitted to Edgewater through Barnabas, who then billed Medicare and Medicaid for services provided to the patients that Rao referred. As mentioned above, the term "refer," as used in the Anti-Kickback Statute, is not limited to the physician who formally authorizes a particular service; and an attending/operating physician (as Barnabas was designated on UB-92 forms for Rao's patients admitted under Barnabas's name) qualifies as a referring physician under Stark.

### (2) For Purpose of Obtaining Payment from the Government

The Medicare cost reports submitted by Edgewater contain the following language: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law." Further, while the UB-92 and Medicaid cost reports do not contain the same express

54

certification of compliance with applicable statutes found on the Medicare cost reports, both statutes clearly provide that compliance with their terms is a condition of payment under the Medicaid programs. The United States would not have paid the claims if it had known the claims were false (in claiming statutory compliance) because compliance with the Stark and Anti-Kickback Statutes is a statutory condition of payment.

### (3) Rogan Acted Knowingly

Rogan maintains that he was unaware of the misconduct in the illegal relationships between Edgewater, Barnabas, Cubria, and others and insists that Ehmen acted for Edgewater independently and without Rogan's knowledge. The evidence is overwhelmingly to the contrary. Rogan knowingly caused Edgewater to enter into arrangements with physicians that violated the Stark and Anti-Kickback Statutes and knowingly caused Edgewater to submit false claims. "Knowledge" that the submissions were false or fraudulent means that Rogan: (1) had actual knowledge that the claim was false; (2) acted in deliberate ignorance of the truth or falsity of the claim; or (3) acted in reckless disregard of the truth or falsity of the claim. *City of Green Bay*, 168 F.3d at 1018.

Several credible witnesses – including Barnabas, Cubria, and Ehmen – were presented by the Government, who offered direct evidence of Rogan's knowledge that payments to Barnabas, Cubria, and Rao were specifically intended to illegally obtain patient referrals. They also testified that the sham teaching, EKG, and consulting contracts, medical directorship, and payment of thousands of dollars worth of loans "re-paid" to Edgewater through devices like the "feasibility study," television advertising programs publicizing Cubria's practice were known to

55

Rogan and were intended and used by him to conceal the true nature of these relations as referral-inducing payments between 1995 and 2000.

Ehmen, Barnabas, and Cubria all testified to inculpatory conversations with Rogan. Material points in Ehmen's testimony were corroborated by that of Barnabas and Cubria, just as Cubria's testimony was corroborated by that of Ehmen and Barnabas. Both Ehmen and Cubria stated that they discussed Rao's referrals under the "RKO" code with Rogan and that Rogan knew that the referrals listed under the RKO code came through Rao and his sources. Ehmen testified that he and Rogan discussed Rao's boasts of numerous patient admissions that Rao could bring to Edgewater if awarded the anesthesia contract; Barnabas was later present when Rao said this to Rogan. Cubria and Barnabas both confirmed that Ehmen regularly consulted with Rogan on major decisions. Both Cubria and Ehmen testified that Rogan would write notes to them about the pending FBI investigation while carrying on unrelated conversations, though they both testified that they had not spoken with each other about this behavior by Rogan. The testimony of all three witnesses were consistent on all material matters and consistent with the other evidence. Although Ehmen's testimony was impeached in part, this was generally not material, considering Ehmen's entire testimony, the corroboration of his testimony mentioned above, the consistentcy with the other evidence, and Ehmen's overall credibility while testifying. Further, there was no motivation for Ehmen, Barnabas, or Cubria to testify falsely. All three have been convicted and sentenced. Cubria and Ehmen are still serving their sentences, but neither has been promised any reduction in their sentences or any other benefit in exchange for their cooperation and testimony for the Government. Barnabas has completed his prison sentence; and the evidence, likewise, did not establish any benefit to Barnabas for his testimony

56

against Rogan. All three witnesses – Ehmen, Barnabas, and Cubria – were credible and persuasive during their testimony. Their answers to questions were direct and responsive, and their testimony was reasonable in light of all the evidence.

The circumstantial evidence also established Rogan's knowledge. Rogan had extensive training and experience in hospital administration of more than 32 years, including undergraduate and graduate degrees and then employment in the field of hospital administration, and had years of experience submitting Medicare and Medicaid claims. He understood the regulations and requirements for the submission of Medicare and Medicaid claims and, as CEO of Edgewater and thereafter, was practically and legally responsible for the submission of the claims to the Government. Rogan took a very hands-on approach to all areas within Edgewater concerning revenue, which included daily review of patient admissions data, which included the referring physician and the number of patients referred. He created codes to track physician referrals and changed the codes to disguise their purpose. Determining how many patients Barnabas, Cubria, and the other physicians were referring to Edgewater was essential to Rogan's scheme. Rogan was interested in revenue and wanted to know that Edgewater was receiving referrals from the physicians who were being paid to do so. This was done on a regular basis through the physician codes that appeared on the hospital reports he reviewed. Rao's referrals presented a problem in this regard because the patients were admitted under Barnabas's name because Rao did not have Edgewater admitting privileges. Edgewater used code "RKO," which was created to designate those patients and enabled Rogan to determine if he was getting his money's worth in patient referrals from the payments the hospital was making to Rao. Rogan realized possible harmful evidentiary value because of the somewhat obvious nature of the code and caused it to be

57

changed to "Barnabas APN." Document-supporting testimony in this regard was introduced into evidence at trial.

Further, although Rogan at all times tried to represent himself as a salaried Braddock L.P. employee with no apparent motivation to participate in the scheme to illegally increase revenue, the evidence established that Rogan personally, directly profited from the hospital revenue because of his, and his children's, ownership and control of Braddock L.P. The millions of dollars that Rogan received through Braddock L.P. were essentially commission-based payments from a monthly percentage of Edgewater's net inpatient-service revenue. Rogan went to great lengths to hide his equitable ownership interest in Braddock L.P. at all times, from the onset of the scheme in the early 1990s continuing through his operation of Edgewater and up to the time of his testimony at trial. Rogan created a maze of entities and transactions to acquire and operate Edgewater; he provided false statements to an accounting firm regarding his ownership while CEO, and testified falsely at trial in this regard.

The direct and circumstantial evidence produced by the Government more than established Rogan's knowledge that these claims were false or, at the very least, that Rogan acted with deliberate indifference or reckless disregard of the truth or falsity of the claims.

Rogan essentially offered only his own testimony to rebut the evidence the Government amassed against him. His testimony was not credible. His answers to pointed questions were often evasive or not directly responsive, sometimes not reasonable[16], and on occasion false.

---

[16] Rogan testified that he could not recognize the handwriting Skvarek – with whom Rogan has worked with since the 1980s – first at Interhealth and later when she succeeded Rogan as CEO at Edgewater. He also testified he could not remember how to spell her name. Rogan also testified that he did not remember if trusts in Belize were created on behalf of his children.

*Conspiracy*

General civil conspiracy principles apply to FCA claims under 31 U.S.C § 3729(a)(3). To prevail, the Government need only show a single illegal plan, a shared general conspiratorial objective, and an overt act committed in furtherance of the conspiracy that damaged the United States. *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991).

The evidence demonstrated that Rogan conspired with Ehmen, Barnabas, Cubria, Rao, and others to engage in an illegal scheme designed to benefit Edgewater, as discussed above. Rogan committed numerous overt acts in furtherance of this conspiracy, including negotiating and signing contracts, making loans that resulted in payments to physicians for the illegal referral of patients to Edgewater and causing false claims to be submitted to Medicare and Medicaid for the treatment of these patients.

*Damages*

The FCA provides for the mandatory recovery of treble the Government's actual damages and a civil penalty of $5,000 to $10,000 for each false claim caused to be submitted on or before September 28, 1999, and a penalty of between $5,500 and $11,000 per claim for claims caused to be submitted after September 29, 1999.

Under the FCA, the United States is entitled to recover all damages incurred "because of" the false claims submitted by Rogan through Edgewater from 1995 to 2000 for reimbursement by Medicare and Medicaid for services to patients referred to Edgewater by Barnabas and Cubria. The term "because of" simply means those damages that were caused by or would not have occurred but for the false claims and false statements. *United States v. First Nat'l Bank of*

*Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992). The measure of damages the United States is entitled to recover under the FCA is the amount of money the Government paid out by reason of these false claims over and above what it would have paid out if the claims had not been false or fraudulent.

In the instant case, the United States would have paid Edgewater nothing for hospital claims related to patients referred to Edgewater by physicians with a prohibited financial relationship with the hospital. *See* 42 U.S.C. § 1395nn. Barnabas and Cubria both had prohibited financial relationships with Edgewater. Hence, the United States' damages are the value of the claims Edgewater submitted on behalf of patients referred to the hospital by Barnabas and Cubria, i.e. the claims for which either Barnabas or Cubria served as either the attending or operating physician. These amounts were established by competent evidence introduced by the Government, including the business records of CMS that reasonably fixed those amounts paid by the Government for services for those patients referred for admission to Edgewater by Barnabas and Cubria from 1995 to 2000.[13] Rogan caused Edgewater to submit $14,630,120 in false claims to the Medicare program and $4,469,115 in false claims to the Medicaid program. The federal share of the funds fraudulently obtained from the Medicaid program is $2,234,557.50, or 50 percent of the total. The United States has been damaged in the

---

[13]     Rogan asserts that the United States failed to introduce the underlying UB-92s into evidence. Edgewater submitted electronic UB-92s, which then became part of the national claims history, CMS's official repository of adjudicated claims. The repository includes inpatient claims submitted electronically since 1991 and included the Edgewater's claims at issue. Robyn Thomas, a CMS official, testified that CMS provided a copy of this data to Mr. Steck, who in turn provided the relevant claims on a computer disc to the United States and Rogan. The United States then submitted this evidence to the Court as Government Exhibit 7.

amount of $16,864,677.50 through Rogan's illegal conduct; when trebled, as required by law, the Government's damages total $50,594,032.50.

Though the imposition of civil penalties are mandatory, 31 U.S.C. § 3729, the court determines the amount of the penalty. *Chandler v. Cook County*, 538 U.S. 119, 133 (2003). In determining the appropriate penalty, the court considers the totality of the circumstances, including: the egregiousness of the defendant's conduct, whether the United States suffered any actual damages, other damages that the United States may have incurred, the right of the United States to be made completely whole, and general fairness. *See United States ex rel. Virgin Islands Housing Authority v. Coastal Gen. Const. Serv. Corp.*, 299 F. Supp. 2d 483, 489 (Dist. Ct. V.I. 2004); *United States ex rel. Augustine v. Century Health Serv., Inc.*, 136 F. Supp. 2d 876, 895 (M.D. Tenn. 2000); *Lamb Eng. & Const. Co. v. United States*, 58 Fed. Cl. 106, 112, n.4 (Fed. Cl. 2003) (awarding $5,000 per claim because defendant's conduct was not so egregious as to warrant maximum penalty); *United States v. Lorenzo*, 768 F. Supp. 1127, 1133 (E.D. Penn. 1991). Rogan's illegal conduct, which was designed to and provided him with significant personal gain, was calculated, deliberate, furtive, and egregious.

Of the 1,822 false claims, all but 318 were presented before the September 29, 1999 increase in the penalty range. Consequently, those 1,504 claims should subject Rogan to a penalty of $7,500 each, in the total amount of $ 11,280,000. The final 318 claims that were submitted on or after September 29, 1999 should be subject to a penalty of $7,500 each, for a total of $ 2,385,000. The total penalty amount for the false claims comes out to $13,665,000.

Total damages and penalties awarded to the Government against Peter Rogan is $64,259,032.50.

### Common Law Claims

The elements of common law fraud are: "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance of the truth of the statements, and (5) damage to the other party resulting from such reliance." *Indemnified Capital Investments, SA v. R.J. O'Brien & Assocs., Inc.,* 12 F.3d 1406, 1412 (7th Cir. 1993) (citation omitted). Rogan knowingly caused Edgewater to falsely certify compliance with the Stark and Anti-Kickback Statutes in order to induce the United States to pay false claims, which it would not have paid had it been informed of the violations and, thus, was damaged by Rogan's illegal conduct.

Under the equitable theory of unjust enrichment, "a person is unjustly enriched if the retention of [a] benefit would be unjust." Restatement of Restitution, § 1 (1937). The elements of a federal common law claim of unjust enrichment are: (1) the Government had a reasonable expectation of payment, (2) Rogan should reasonably have expected to pay, or (3) "society's reasonable expectations of person and property would be defeated by nonpayment." *Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 993-94 (4th Cir. 1990). As discussed above, Rogan received substantial financial benefits from his affiliation with Edgewater and entities, made through their management contracts with Edgewater, which were owned and controlled by Rogan; as a result, Rogan was unjustly enriched.

If agents of the federal government, acting on behalf of the United States, paid claims submitted by Edgewater as a result of Rogan's actions "under an erroneous belief which was material to the decision to pay, [the Government] is entitled to recover the payments" under a mistake-of-fact theory. *Mead*, 426 F.2d at 124. Here, the express and implied certifications of compliance with the Anti-kickback and Stark Statutes contained in Edgewater's cost reports and UB-92 forms were material to the United States' decision to pay Edgewater; and, as these certifications were false, the United States erroneously paid Edgewater.

Under both the common-law-fraud and mistake-of-fact claims, the United States would be entitled to recover the amounts improperly provided to Edgewater; a total of $16,864,677.50, plus interest. Under the unjust-enrichment claim, the United States would be entitled to recover from Rogan the benefits that accrued to him at Edgewater – which total at least $10,000,000, given Rogan's receipt of at least $9,500,000 of Braddock's management fees from 1995-2000, in addition to the salaries and bonuses he received as CEO of Edgewater. However, to avoid double redress for a single wrong, these damages are set aside. *Olympia Hotels Corp. v. Johnson Wax Development Corp.,* 908 F.2d 1363, 1371 (7th Cir. 1990) (noting that plaintiff, under the state substantive election of remedies doctrine, would not be entitled to collect the overcharges twice once as damages for breach of contract and the second time as damages for fraud); *see also United States v. United Technologies Corp.,* 255 F. Supp.2d 779, 785 (S.D. Ohio 2003) (noting that under the federal common law, "the Government will not be allowed to recover twice, but may defer its election of remedy until trial on the merits.").

## CONCLUSION

IT IS THEREFORE ORDERED that judgment be entered in favor of Plaintiff, the United States of America. Judgment is entered against Peter Rogan in the amount of $64,259,032.50.

Date: _September 29, 2006_

_JOHN W. DARRAH_
United States District Court Judge